*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 58

```
 1   STATE OF ILLINOIS    )
                          )  SS.
 2   COUNTY OF COOK       )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
     THE PEOPLE OF THE STATE OF    )
 5   ILLINOIS,                     )
                                   )
 6                   Plaintiff,    )
                                   )
 7            vs.                  )  No. 92-CR-10146-01
                                   )
 8   JOSE MAYSONET,                )
                                   )
 9                   Defendant.    )

10        REPORT OF PROCEEDINGS had of the

11   above-entitled cause, before the HONORABLE RICKEY

12   JONES, one of the judges of said Court, on the

13   26th day of October, A.D., 2016.

14   APPEARANCES:

15        HON. ANITA M. ALVAREZ,
          State's Attorney of Cook County, by:
16        MS. CELESTE STEWART STACK,
          Assistant State's Attorney,
17        appeared on behalf of the People;

18
          MS. JENNIFER BONJEAN,
19        appeared on behalf of the Defendant.

20

21

22
     KATHY SZOTEK
23   Official Court Reporter
     Criminal Division
24   CSR: #084-004657
```

1

1      THE CLERK:  Maysonet.

2      MS. BONJEAN:  Morning, your Honor.

3      THE COURT:  Good morning, Counsels.  For the

4  record.

5      MS. BONJEAN:  Good morning, your Honor.

6  Jennifer Bonjean, B O N J E A N, on behalf of the

7  petitioner, Jose Maysonet.

8      MS. STACK:  Good morning, your Honor, Counsel,

9  and Mr. Maysonet.  Celeste, C E L E S T E, Stewart

10  Stack, S T A C K, on behalf of the People.

11      THE COURT:  This is a postconviction matter.

12          State, you may proceed.

13      MS. STACK:  Yes, Judge.  As you know, we agreed

14  to a hearing on a per se conflict and your Honor

15  ordered a hearing on all the issues.  But we have

16  filed an amended answer agreeing to a new trial based

17  on that issue and been talking with Counsel about how

18  to work out the practical side of this, considering

19  her client's living conditions or living -- his

20  residence down in Pontiac.  So we'd like to address

21  that.  But, yes, we're agreeing to vacate this

22  conviction and give Mr. Maysonet a new trial.

23      THE COURT:  All right.  So you're agreeing that

24  there was error on the attorney's part that

1    represented the defendant?

2         MS. STACK:  Yes, your Honor.

3         THE COURT:  With that profession, then the

4    finding of guilty is vacated, the judgment on the

5    finding of guilty is vacated, the sentence a vacated.

6    The matter will be reset for trial.

7              But first we'll address the matter of bail.

8    What was the defendant's original bail?

9         MS. STACK:  You know, your Honor, I don't know.

10        THE COURT:  All right.  Counsel, do you want to

11   prepare some argument of some sort on the bail or do

12   you want to just -- the Court to take a look at the

13   bail.  What do you like to do?

14        MS. BONJEAN:  Judge, I would like the

15   opportunity to brief the issue.  It's our position

16   that the only evidence against Mr. Maysonet was a

17   coerced confession and we believe that the State,

18   although technically they have, of course, the right

19   to retry him, we don't believe that there's any

20   likelihood that they could possibly get a conviction

21   against him and as a result, I believe that a bail --

22   either a modest bail or even a release on

23   recognizance would be appropriate.  But I think it's

24   probably something I should brief in writing.

1     THE COURT:  All right.  Well, I'll have to hold

2  him on no bail until you do that.

3     MS. BONJEAN:  That's fine, your Honor.

4     THE COURT:  All right.  Then defendant is

5  remanded to Cook County Jail.  It will be no bail.

6     MS. BONJEAN:  Judge, we have one small issue --

7  it's not a small issue to Mr. Maysonet -- is

8  Mr. Maysonet is at Pontiac.  He's in protective

9  custody there.  He has been --

10     THE COURT:  Well, he's being remanded to Cook

11  County Jail now.

12     MS. BONJEAN:  So he won't go back to Pontiac?

13     THE COURT:  No, he will not.

14     MS. BONJEAN:  Okay.

15     THE COURT:  He'll be held on no bail in the Cook

16  County Jail until you all are prepared to go forward

17  on the bond hearing.

18     MS. BONJEAN:  All right.  Is there a way to

19  delay the vacating of the judgment until he can go

20  back to Pontiac?  He has his things there.  He has --

21     THE COURT:  Well, I don't know how that's going

22  to be accomplished.  But that's the order I have to

23  enter.

24     MS. BONJEAN:  Okay.

```
 1        MS. STACK:  Could we enter and continue the
 2   order until next week or whatever.  Just -- I mean,
 3   we're not going to -- obviously, nothing is going to
 4   change, but if --
 5        THE COURT:  All right.  I won't remand him to
 6   Cook County Jail today then.
 7        MS. BONJEAN:  Thank you, your Honor.  And I --
 8   if the Court would accommodate me, I will be here --
 9        THE COURT:  Wait one minute.  I'm sorry.  If
10   everything is vacated, then he has to be remanded.  I
11   mean, that's a technical matter that he has to take
12   care of, getting his personal belongings from down
13   there.
14        MS. STACK:  I don't believe IDOC will accept
15   someone who's not under sentence.
16        MS. BONJEAN:  And part of the issue for him is
17   that he also medication there.  So I'm just wondering
18   if there's a way to just hold it in --
19        MS. STACK:  Abeyance?
20        MS. BONJEAN:  Yeah, hold it in abeyance until
21   next week and --
22        THE COURT:  I've already ruled.
23        MS. BONJEAN:  Okay.  There's no way to --
24        THE COURT:  They have a hospital here in the
```

1  County Jail.

2      MS. STACK:  Could we get an order to have him

3  seen immediately so he doesn't get -- fall behind on

4  his --

5      THE COURT:  I can order him to the hospital here

6  in the jail.  They will address his medical issues.

7      MS. BONJEAN:  All right.  Judge, if you could do

8  that, that would be --

9          The hospital, okay?

10     THE DEFENDANT:  That will be okay.

11     THE COURT:  Defendant remanded to Cook County

12  Jail.  No bail.  Mitt to reflect hospital.

13         And we'll continue it for a bond hearing.

14     MS. BONJEAN:  Judge, also, is there a way to

15  enter an order that he should be in protective

16  custody?  He's been in protective custody for a very

17  long time.  He is -- Pontiac is all protective

18  custody.

19     THE COURT:  Well, the hospital is almost like

20  protective custody.  You want him sent to the

21  hospital.

22     MS. BONJEAN:  I'm just worried that if they send

23  him out of the hospital, he will be put in general

24  population, which --

```
 1          THE COURT:  Why is it necessary to have him in
 2     protective custody?  I mean, that may have been some
 3     issue that they -- that the Illinois Department of
 4     Corrections determined that was necessary.
 5          MS. BONJEAN:  No.  He's been in protective
 6     custody for -- at Pontiac for how long?
 7          THE DEFENDANT:  21 years.
 8          MS. BONJEAN:  It was as a result of leaving a
 9     gang -- leaving the gang.  I mean, I think, he's --
10          THE COURT:  I see.  All right.
11          MS. BONJEAN:  -- would be at risk if he was put
12     in general pop.
13          MS. STACK:  Is it possible to put that in the
14     order -- the same order that sends him to the
15     hospital just so --
16          THE COURT:  Yes, of course.  Mitt to reflect
17     defendant to be held in protective custody at Cook
18     County Jail due to gang threats.
19              All right.  Then, Counsel, what's a good
20     date for the bond hearing?
21          MS. BONJEAN:  Is November 2nd okay, your Honor?
22          MS. STACK:  That's fine, Judge.
23          THE COURT:  By agreement?
24          MS. STACK:  That's fine.
```

1   MS. BONJEAN:  Yes.

2   THE COURT:  By agreement, bond hearing,

3 November 2nd.

4    Okay.  Thank you all.

5   MS. BONJEAN:  Thank you.

6   MS. STACK:  Thank you, your Honor.  Appreciate

7 it.

8    (Proceedings were had in other matters.)

9   MS. STACK:  Judge, one other matter.

10   THE COURT:  Recall Jose Maysonet.

11   THE SHERIFF:  Do you need him back out?

12   MS. STACK:  Ms. Bonjean, could you step back

13 here for just a quick second.

14   THE COURT:  Jose Maysonet, yes.

15   MS. STACK:  There were a number of subpoenas

16 issued and some people have attorneys here

17 representing them.  Are they obviously --

18   THE COURT:  Do you need those people now?

19   MS. STACK:  No, Judge.  They were for the PC

20 hearing.  With a new trial, they're not relevant at

21 this point.

22   MS. BONJEAN:  That's correct.

23   THE COURT:  Do you want to vacate all --

24   MS. STACK:  The subpoenas.

1          THE COURT:  -- subpoenas?

2              All right.  All subpoenas are vacated.

3      MS. STACK:  Thank you, Judge.

4              (End of proceedings.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    STATE OF ILLINOIS    )
                           )  SS.
 2    COUNTY OF COOK       )

 3

 4           I, KATHY SZOTEK, an Official Court Reporter

 5    within and for the Circuit Court of Cook County,

 6    Criminal Division, do hereby certify that I have

 7    reported in shorthand in the report of proceedings

 8    had in the above-entitled cause; that I thereafter

 9    caused the foregoing to be transcribed into

10    typewriting, which I hereby certify is a true and

11    accurate transcript of the proceedings had before the

12    Honorable Rickey Jones, Judge of said court.

13

14

15    _____
      Official Shorthand Reporter
16    Circuit Court of Cook County
      County Department - Criminal
17    Division
      Certification No. 084-004657
18

19

20

21    Dated this 10th day of

22    October, 2018.

23

24
```

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 59

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    STATE OF ILLINOIS    )
                           )
 2    COUNTY OF C O O K    )

 3
            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 4             COUNTY DEPARTMENT - CRIMINAL DIVISION

 5
      THE PEOPLE OF THE STATE      )
 6    OF ILLINOIS,                 )
                                   )
 7                 Plaintiff,      )
                                   )
 8             v.                  )   Nos. 92 CR 1014601
                                   )
 9    JOSE MAYSONET,               )
                                   )
10                 Defendant.      )

11
            REPORT OF PROCEEDINGS had at the hearing
12
      in the above-entitled cause, before the
13
      HONORABLE TIMOTHY JOSEPH JOYCE, one of the Judges
14
      of said Division, on October 12, 2017.
15
      PRESENT:
16
            HONORABLE KIMBERLY M. FOXX,
17          State's Attorney of Cook County, by
            MR. JAMES PAPA and
18          MR. JEFFREY WYNN ALLEN,
            Assistant State's Attorneys,
19          appeared on behalf of the People;

20          BONJEAN LAW GROUP, PLLC, by
            MS. JENNIFER BONJEAN and
21          MS. ASHLEY COHEN,
            appeared on behalf of the Defendant;
22
            LAW OFFICES OF WILLIAM N. FAHY, LTD., by
23          MR. WILLIAM N. FAHY,
            appeared on behalf of
24          retired police detective Reynaldo Guevara;
```

1

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1          HERBERT LAW FIRM, by
            MR. DANIEL Q. HERBERT,
 2          appeared on behalf of
            retired Sergeant Edward Mingey and
 3          retired police detective Ernie Halverson;

 4          GOTTREICH, GRACE & THOMPSON, by
            MR. TIMOTHY M. GRACE,
 5          appeared on behalf of
            retired police detective Roland Polminski and
 6          retired police detective Fernando Montilla;

 7          STEVEN A. GREENBERG, by
            MR. STEVEN A. GREENBERG,
 8          appeared halfway through the hearing.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
     KATHERINE M. SPELSON, CSR
23   CSR No. 084-004359
     Official Court Reporter
24   Circuit Court of Cook County
```

2

CCSAO000014

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE CLERK:  Jose Maysonet.

2      THE COURT:  Good morning, Maysonet.

3      THE DEFENDANT:  Good morning.  Hi there.

4      THE COURT:  Can the attorneys for the parties

5  represent themselves, please.

6      MS. BONJEAN:  Good morning, your Honor.

7  Jennifer Bonjean and Ashley Cohen on behalf of the

8  Defendant Jose Maysonet.

9      MR. PAPA:  Jim Papa and Jeff Allen on behalf of the

10  State.

11      THE COURT:  The matter is set for hearing today on

12  the defendant's previously filed motion to suppress

13  certain statements alleged to have been made by

14  Mr. Maysonet, correct?

15      MS. BONJEAN:  Yes, your Honor.

16      THE COURT:  And is that the amended motion?

17      MS. BONJEAN:  The same thing, Judge.  There was an

18  additional line or two added that I sent to Mr. Papa on

19  Monday.

20      THE COURT:  And that's grounded on?

21      MS. BONJEAN:  The Fifth Amendment.

22      THE COURT:  Okay.  There was also a motion the

23  defense has filed relating to certain Fourth Amendment

24  issues; is that correct?

3

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    MS. BONJEAN:  That's correct.

2    THE COURT:  I don't have a copy of that in front of

3    me.  I'm sure that you have filed it, but I don't have

4    it.

5        If I could see it?

6    MS. BONJEAN:  Yes, Judge.  We have an extra copy,

7    Judge.

8    THE COURT:  Is the Defense ready for hearing on

9    both these motions?

10    MS. BONJEAN:  Yes.

11    THE COURT:  What's the State's position with

12    respect to first, the amended motion to suppress the

13    oral statements grounded on essentially an Edwards

14    violation?

15    MS. BONJEAN:  Correct.

16    THE COURT:  What's the State's position on that

17    record with respect to whether you're ready or not?

18    THE SHERIFF:  Everybody in the gallery sit down,

19    please.

20    THE COURT:  Sorry, Mr. Papa.

21    MR. PAPA:  Judge, the witness that we would need

22    with regard to that motion is present in court today.

23    He has retained counsel.  So that changes, I believe,

24    my ability to answer ready for trial today or not ready

4

CCSAO000016

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    for trial, ready for the motion.

2         THE COURT:  Who is the witness?  You're telling me

3    that you believe that witness is the person whom you

4    would proffer in connection with the motion?

5         MR. PAPA:  Yes.

6         THE COURT:  Who is that witness?

7         MR. PAPA:  Fernando Montilla, M-o-n-t-i-l-l-a.

8         THE COURT:  And he is a?

9         MR. PAPA:  Former Chicago police detective.

10        THE COURT:  You have three other lawyers before me

11   who I expect I'll have identify themselves in a moment.

12        Do they all represent Mr. Montilla?

13        MR. PAPA:  No.

14        MS. BONJEAN:  They represent the officers that I

15   intend to call, Judge.

16        THE COURT:  Good morning, gentlemen.

17        Can you all identify yourselves?

18        MR. FAHY:  Good morning, Judge.  My name is

19   Will Fahy.  My last name is spelled F-a-h-y.  I am here

20   on behalf of Reynaldo Guevara, who is a retired Chicago

21   police detective, who was subpoenaed here by the Defense

22   to appear before your Honor and he is here.

23        Judge, with regards to Mr. Guevara, I certainly

24   don't know as much about this case nor do I pretend to

5

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    know as much about this case as either the State or

2    the Defense.  But I'm not sure why he is here.  My

3    understanding is the State --

4        THE COURT:  Let me stop you for a minute.

5        MR. FAHY:  Okay.

6        THE COURT:  I don't begrudge you being here.  But I

7    don't want to hear any arguments from you regarding some

8    claim of irrelevancy until such time as we get to that,

9    if at all.  Because presume for the moments one or the

10   other of the parties believes Mr. Guevara's presence is

11   relevant.

12       Mr. Herbert?

13       MR. HERBERT:  Good morning, your Honor.  My name is

14   Dan Herbert, H-e-r-b-e-r-t.

15       Judge, I am here on behalf of the Edward Mingey,

16   who is a retired police sergeant.  And I am also here on

17   behalf of Ernie Halverson, who is a retired police

18   detective.  They have both been subpoenaed by the

19   Defense in this case, Judge.

20       THE COURT:  Mr. Grace?

21       MR. GRACE:  Hi, Judge.

22       THE COURT:  Good morning.

23       MR. GRACE:  Good morning.  A lot of fun.

24       My name is Tim Grace, G-r-a-c-e.  I am also here

                              6

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    on behalf of retired detective Roland Polminski and

2    retired detective Fernando Montilla, who I believe have

3    been subpoenaed by the Defense and the State with

4    respect to Mr. Montilla.

5         THE COURT:  The parties -- And when I say the

6    parties, I mean Mr. Maysonet, the State and myself have

7    had informal discussions just earlier today.  I don't

8    think they were on the record.

9         Mr. Maysonet wasn't present regarding whether we

10   would move forward on the Fourth Amendment motion

11   recently filed by the Defense, correct?

12        MR. PAPA:  Yes.

13        MS. BONJEAN:  Yes, your Honor.

14        THE COURT:  And I don't believe it was in any

15   manner substantive.  It was for scheduling.  That's why

16   I went forward in that manner.  It was actually in open

17   court, not on the record, outside Mr. Maysonet's

18   presence.  I had no misgivings about that, but I just

19   mention that prefatorily because --

20        Let's just talk about the motion to suppress the

21   oral statements.

22        MS. BONJEAN:  Yes, your Honor.

23        THE COURT:  My reading of that motion is that

24   it's primarily, as we indicated moments ago, an

7

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Edwards violation, in which Mr. Maysonet allegedly

2    requested not to speak to the police unless he was with

3    his lawyer and to remain silent, correct?

4        MS. BONJEAN:  Yes, your Honor.

5        THE COURT:  And allegedly an oral statement was

6    taken, if not at that time, at some later date, correct?

7        MS. BONJEAN:  Two oral statements; one on July 15,

8    one on August 1.

9        THE COURT:  It would seem to me by virtue of my

10   reading of that motion that the defense has the burden.

11        Do you agree with that?

12       MS. BONJEAN:  Yes.

13       THE COURT:  Who do you wish to call in connection

14   with that motion?

15       MS. BONJEAN:  I wish to call Detectives

16   Paul Nitzke, Edward Mingey.  I will be calling my own

17   client and I believe that Detective Guevara, to a lesser

18   degree, Ernie Halverson are relevant, certainly after my

19   client takes the stand.  It may end up being a rebuttal

20   witness for the defense.  But certainly, we will begin

21   with Paul Nitzke and Montilla, and my client will also

22   testify.

23        No.  I'm sorry, Mingey and Paul Nitzke.  My

24   apologies.

8

CCSAO000020

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    THE COURT:  In the two statements you're seeking to

2    suppress, you are alleging in your motion that

3    Mr. Mingey and Mr. Montilla were present.

4    MS. BONJEAN:  They were.

5    THE COURT:  And you're not alleging that any other

6    persons were present?

7    MS. BONJEAN:  Paul Nitzke was the first person who

8    had contact.  And my client exercised to Paul Nitzke

9    first.

10   THE COURT:  Oh, prior to the dates the --

11   MS. BONJEAN:  No, no, the same day.

12   THE COURT:  The same day, July 15.  All right.

13   MS. BONJEAN:  Yes.

14   THE COURT:  Okay.

15   MS. BONJEAN:  The same day.

16   THE COURT:  The statements were July 15 and

17   August 1 allegedly?

18   MS. BONJEAN:  Yes.

19   If I could just -- If the Court will indulge me

20   for one second.

21   One of the reasons that the other officers are,

22   in fact, relevant as to even the motion to suppress oral

23   statements is that --

24   THE COURT:  Specifically Mr. Guevara and

9

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Mr. Halverson?

2        MS. BONJEAN:  Correct, your Honor.  They drafted

3    the only report, authored the only report that reflects

4    these statements.  Mingey didn't draft a report, no

5    GPRs.  Paul Nitzke did not draft a GPR, as to those

6    statements, and neither did Montilla.

7        The first time we see any memorialization of

8    those statements appears in an August 23rd supplemental

9    report that was authored by Guevara and Halverson.

10       THE COURT:  How is that relevant to the motion?

11       And I believe that there may -- And this relates

12   to the kind of the things that got broached before.

13   It's essentially impeachment by omission.  It didn't get

14   documented at the time it was supposedly made and it

15   might be relevant at trial.

16       How would it be relevant at the motion that these

17   alleged statements didn't get documented until three

18   weeks or a month and a half later?

19       MS. BONJEAN:  Detective Paul Nitzke previously

20   testified in this matter that he learned about these

21   oral statements at some later date.

22       Presumably, Detective Guevara and

23   Detective Halverson learned about these statements

24   at some point, too, such that they concluded it in their

CCSAO000022

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  supplemental report, which formed the basis for the

2  arrest, frankly.  There was no other probable cause as

3  far as I can see that justified the arrest if these oral

4  statements that didn't happen that weren't, in fact,

5  memorialized until after the fact.

6        So I believe that it is relevant and the Defense

7  has the right to inquire of Guevara and Halverson as to

8  how they obtained the information about the oral

9  statements, when they obtained it, who obtained it from

10 them.  It does go to credibility as to these officers.

11 So I believe that given the fact that they authored the

12 only report that memorializes it and it's not just a

13 matter of impeachment from our perspective, but I do

14 believe that that's critical.

15       I will say this, Judge.  I think it's more

16 tenuous certainly than the guys that took the statement

17 allegedly.  I would agree with that.  And I do think

18 Guevara and Halverson are certainly relevant as to the

19 Fourth Amendment motion.

20       So I think they are relevant both, more so for

21 the Fourth Amendment, but we're not there yet.

22    THE COURT:  We're taking one at a time.

23    MS. BONJEAN:  Understood.  I just wanted the Court

24 to understand that when they were subpoenaed here today,

11

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    it was in good faith based on the oral statements in the

2    Fifth Amendment Edwards motion as well as the other

3    motions.

4         THE COURT:  I don't doubt good faith at all.

5    I'm just trying to figure out how they are relevant.

6         MS. BONJEAN:  Sure.

7         THE COURT:  Because I am going to ask their

8    attorneys in a minute what they are going to do when

9    they get called to testify.

10        MS. BONJEAN:  Yes.  And I will make one other

11   point, your Honor, if I might.

12        But my client is going to testify about a

13   previous history with Mr. Mingey and Mr. Guevara that

14   was dictating his state of mind when he was being

15   questioned by Mingey.  I believe that at that point the

16   State may want to call Mr. Guevara himself to maybe

17   refute some of the statements that my client will

18   testify to.  But that may be something to deal with at

19   the time.

20        But that's the best I can let the Court know at

21   this point unless you have some questions.

22        THE COURT:  Well, yes.

23        What's this state of mind stuff?

24        MS. BONJEAN:  Well, my client I believe --

12

CCSAO000024

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  It's not a loaded question.  I'm just

2  trying to figure it out.

3      MS. BONJEAN:  Well, Judge, you're going to have to

4  make a determination of whether my client exercised his

5  right to counsel.  I presume that if they were to

6  testify, that Sergeant Mingey and Detective Montilla

7  will --

8          Judge, I do see some of the officers here.  I

9  don't know that -- I'm a little concerned that perhaps

10 it wouldn't be...

11     THE COURT:  Are you making a motion to exclude

12 witnesses?

13     MS. BONJEAN:  I am, Judge.

14     THE COURT:  It will be granted.

15     MS. BONJEAN:  Thank you.

16     THE COURT:  Anybody who is a putative witness in

17 this case has to step outside.

18         I hope putative is the right word.

19     MS. BONJEAN:  We are none the wiser.

20     THE COURT:  It appears that those persons have left

21 the room.

22         Go ahead, Ms. Bonjean.

23     MS. BONJEAN:  I lost my train of thought.

24     THE COURT:  We were talking about how

13

CCSAO000025

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Mr. Maysonet's state of mind may be relevant to whether

2    or not there was an Edwards violation because you're not

3    making an allegation in the motion that he was subject

4    to any particular coercion I don't believe.

5        MS. BONJEAN:  Well, not as to the oral statements,

6    correct.

7        THE COURT:  And there's been a representation

8    before, and you all can correct me if I'm wrong, at some

9    later statements, the State has indicated they are not

10   using for any reason?

11       MS. BONJEAN:  That's correct.

12       THE COURT:  Meaning not in their case in chief and

13   not even as potential rebuttal to what Mr. Maysonet

14   might say at trial and presumably at this hearing; is

15   that correct, Mr. Papa?

16       MR. PAPA:  I don't think I ever went so far as to

17   say regarding the motion or the hearing itself.  I don't

18   know what he is going to testify to.  That might very

19   well come --

20       THE COURT:  I was asking.  I wasn't presuming

21   anything.

22       MS. BONJEAN:  Well, Judge, that brings up a whole

23   other question because an involuntary confession cannot

24   be used for any purpose.  And if they are saying that

14

CCSAO000026

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    they still intend to use it potentially for impeachment

2    purposes, then we are back at a motion to suppress the

3    actual confession itself because an involuntarily taken

4    statement cannot be used even for impeachment purposes

5    under the law, as I understand it.

6         So again, I was working under the assumption that

7    they were not going to introduce that confession for any

8    purpose.  But if that's the case, it is certainly

9    something -- And I don't want to get sidetracked by that

10   at the moment.  But that does raise an issue that I

11   should bring to the Court's attention immediately.

12        That being said, the Court is going to have to

13   decide on the oral statements, whether Mr. Maysonet

14   invoked.  And that is largely a credibility

15   determination, whether or not you believe the testimony

16   of Mingey and Montilla that he did not invoke or whether

17   you believe my client when he says I did invoke.

18        THE COURT:  And if that's the case, and in reading

19   your motion, that seems to be what I would have to do.

20        MS. BONJEAN:  Correct.

21        THE COURT:  What would Halverson and Guevara have

22   to do with that?

23        MS. BONJEAN:  Well, my client had a state of mind

24   because of prior dealings with Mr. Guevara that had

CCSAO000027

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    fallen off.  Mr. Guevara --

2         THE COURT:  Let me stop you.

3         MS. BONJEAN:  Yes.

4         THE COURT:  I mean, Mr. Maysonet either did or did

5    not say I want to remain silent.  I don't want to talk

6    without my lawyer present.  And maybe because of his

7    prior history, maybe because of his Miranda rights.

8         MS. BONJEAN:  I think he has the right to testify

9    why he said yes.  There is an explanation for why he

10   said, I want my attorney present.

11        THE COURT:  How is that relevant?  And I ask

12   that --

13        MS. BONJEAN:  Judge --

14        THE COURT:  No, no.  It's not a loaded question.

15   But the law is that Edwards v. Arizona is always

16   described as a very bright line rule.

17        MS. BONJEAN:  Yes, but you still have to decide

18   whether he invoked.

19        He testified he knew that Guevara was arranging

20   to hook him up for this in advance when he was in there.

21   He knew that they were trying to connect a prior attempt

22   murder with this double murder based on these .9

23   millimeter -- both crimes involved .9 millimeters.  He

24   knew because he had dealings in that he paid Guevara

                          16

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    and Guevara and Joe Miedzianowski in prior dealings with

2    him during the course of two years before this.

3         THE COURT:  I'm sorry.  Mr. Maysonet paid something

4    to --

5         MS. BONJEAN:  Protection money to Guevara.

6         THE COURT:  To Mr. Guevara?

7         MS. BONJEAN:  Yes, and Joe Miedzianowski.

8         He will testify to that as have other people

9    testified to the relationship between Mr. Guevara and

10   Joseph Miedzianowski and their taking of protection

11   money, which I think the Court could take judicial

12   notice of Mr. Miedzianowski's case in which that was an

13   issue.

14        MR. PAPA:  None of that is alleged anywhere.

15   I know your Honor is reading that right now, but none of

16   that is alleged there.

17        THE COURT:  I am not reading anything.  I am

18   just staring at the paper.  I had never heard of

19   Mr. Miedzianowski's name in connection with this case at

20   all.

21        MR. PAPA:  Nor had I, just for clarification.

22        MS. BONJEAN:  Judge, Joseph Miedzianowski's case,

23   I can represent, was very connected to Detective Guevara

24   in a number of cases.  The matter that I litigated

17

CCSAO000029

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    before Judge Linn in the Robert Almodovar case, we put

2    on a number of witnesses, who testified to dealings with

3    Mr. Guevara and Mr. Miedzianowski.

4         And this wouldn't be in the motion because it

5    goes to his state of mind and he will testify.  He has

6    the right to testify to why he knew when he was being

7    questioned by Mingey, who he will also connect to

8    Guevara, that this was a hookup.  This was a frame-up.

9    He knew it.  And if he knew it, he's not going to talk

10   to these guys.  And the fact that they memorialized a

11   report two months later, I think, speaks to the veracity

12   of it that he invoked.

13        Again, I am disinclined to litigate before we

14   litigate.  But that is, I think my client has the right

15   to take the stand and explain what was going on in that

16   interrogation room.  And I have, your Honor, Illinois

17   Supreme Court law that does support the proposition that

18   state of mind in this type of motion to suppress

19   question is relevant, state of mind of the officer and

20   state of mind of the defendant.

21        MR. GRACE:  Judge, may I be heard for a second?  I

22   might be able to help you.

23        THE COURT:  No, not right now.

24        MR. GRACE:  It may help you.

CCSAO000030

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          THE COURT:  Not right now.

2          What's the State's position?

3     MR. PAPA:  Judge, I don't even know where to begin.

4    I mean, the motion that is filed -- It's

5    straightforward.  I mean, those allegations, what you

6    just said regarding what her client's testimony is and

7    his state of mind, there are no allegations.

8          I mean, I don't even know how we would have been

9    ready to prepare for something like that since nothing

10   in this motion alleges any of that stuff.  And to put --

11         I mean, things have to be fair.  We have to be on

12   notice.  And that would be a basis to object or to move

13   to strike portions of the motion itself.  I mean, we

14   just can't have people testifying to certain things that

15   have nothing do with the motion.

16    MS. BONJEAN:  Judge, Mr. Papa has been on notice.

17   I provided him with the testimony from George Luriano

18   and Sam Perez, both of whom testified about these

19   issues.

20         Furthermore, I don't have to give the State my

21   client's testimony in advance.  I have to make out and I

22   have provided facts that -- I have to provide his state

23   of mind in a motion?  I don't think there's any law

24   certainly that they have cited that would make me -- I

19

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     am required to do so.

2              This is my client's state of mind, which since

3     when do we have to plead that in advance of a motion?

4              Now, if the Court or the State wants to move to

5     some type of litigation in advance of that to flesh that

6     out, I suppose we could do that.  But I don't think that

7     there is anything that requires the Defense to identify

8     his state of mind in a motion to suppress.

9         THE COURT:  Mr. Grace, what do you want to say on

10    behalf of -- Mr. Paul Nitzke and Mr. Montilla, correct?

11        MR. GRACE:  Right, Judge.

12             That's all very interesting, all of the things

13    that are going on that yourself, the State and the

14    Defense have to deal with.

15             I have been retained within the last 24 hours.

16    I appreciate the landscape of what's going on here.

17    And I appreciate now even more so the nature of the

18    allegations.  But I have no idea, your Honor, whether

19    I would advise my two clients to testify here today

20    because I don't have any reports.  I have no prior

21    transcripts.  I have no information.

22             So I think it's only fair before you guys can

23    figure out whatever you guys have got going on in front

24    of us we get to that point whether or not our clients

20

CCSAO000032

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    would even want to invoke or what they'd want to do.

2          My predilection is that they are not going to,

3    but I don't know that until I look at the report.

4          So I am asking if the Court would consider having

5    the State and the Defense give us the information that

6    they have, let us sit down with our clients and then

7    come back and say, Okay. We have got witnesses

8    available. And then you guys can go on doing whatever

9    you guys need to do to decide whether or not this case

10   goes to hearing or not. So that would be my position

11   right now.

12         I don't have any information. I wasn't there in

13   '92. I certainly don't know anything about allegations

14   that are being made right now.

15         So we are not really prepared to allow our

16   clients to hit to the stand and testify until we know

17   for sure, most respectfully.

18   MS. BONJEAN: Judge, I don't know what the

19   authority is that the police officers are required --

20   They're witnesses. Either they invoke because they know

21   that they have some basis to incriminate themselves or

22   they don't. I don't know what the reports have to do

23   with anything.

24         And presumably, the State has provided

21

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Mr. Montilla.  They are intending to call him today.

2    My client has been waiting 27 years in order to start

3    this litigation.  And they were on notice.  I reached

4    out to all of these officers, their civil attorneys

5    because they're all being -- You know, or not all.

6    But a number of them are being sued in federal court.

7    I reached out to them.  I said, they were personally

8    served.  It's not my fault that they ended up retaining

9    counsel sort of at the 11th hour.  And it certainly is

10   not my client's fault.

11        THE COURT:  It's generally my experience from this

12   perspective that trying to parse these things out is

13   always less efficient than just going to a hearing and

14   seeing how things play out as we progress.

15        So rather than say, you know, almost in the

16   matter of in limine that well, I won't require this

17   person to do this.  I will require this person to do

18   that, whether it's as a party or whether it's a witness,

19   it's always less productive than just saying let's go.

20        So you want to start?

21        MS. BONJEAN:  I do.

22        THE COURT:  What do you want to do, Mr. Papa and

23   Mr. Allen?

24        MR. PAPA:  (No response.)

22

CCSAO000034

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       THE COURT:  And, again, none of this is loaded.

2   I just -- It's interesting stuff.  It might be singular

3   in some of our experience, but not singular in the sense

4   that it's a pretrial motion that gets handled in a

5   certain way and plays out in a certain way.

6       But if anyone has any hesitancy, the time to

7   describe it is now.

8       MR. PAPA:  Yes.  I believe without question, as we

9   are standing here right now, we are finding out more and

10  more of the bases that she intends to try to expand this

11  very limited motion to suppress, motion to quash arrest,

12  whatever you want to call it, both of them together.

13  I mean, it appears that we would be --

14      THE COURT:  Let's take them one at a time.  Right

15  now we are talking about the motion for the oral

16  statement.  That's what I'm talking about.

17      MR. PAPA:  I'd being making a motion to make more

18  specific the allegations of whatever she is talking

19  about with her client's state of mind.

20      THE COURT:  Well, I don't know that she has to make

21  that more specific.

22      He has got a point there, that he doesn't have to

23  make an allegation regarding his state of mind.  The

24  allegation he has made is that he invoked his right to

23

CCSAO000035

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1   remain silent in the face of the Miranda warnings in

 2   that pursuant to Edwards v. Arizona because of his --

 3        Was it silence or an attorney or both?

 4     MS. BONJEAN:  He said, I don't want to talk to you.

 5   I want my attorney, Marty Abrams.

 6     THE COURT:  I don't know whether his state of mind

 7   is relevant or not.  An invocation is an invocation

 8   regardless of why it's made.

 9        I get your argument.

10     MS. BONJEAN:  Sure.

11     THE COURT:  Your argument is that it's made for

12   certain reasons because of certain reasons.  And the

13   factfinder ought to know those reasons to determine

14   whether he's telling the truth.  I get your argument.

15     MS. BONJEAN:  Exactly, Judge.

16     THE COURT:  But I still don't know that that makes

17   it relevant.

18     MS. BONJEAN:  I think your Honor has a good point

19   and needs to make that ruling at the appropriate time.

20   And the State wants to address it now.

21     THE COURT:  The appropriate time, I suppose, is

22   when you call some witness to say, isn't it a fact that

23   on such and such a date, you did this with

24   Miedzianowski?
```

CCSAO000036

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          MS. BONJEAN:  Yes, Judge, or again at the time that

2     my client tried to testify about his state of mind, the

3     State, I'm assuming, will object.  The Court will have

4     to decide.  I will make an offer of proof, and then the

5     Court will decide whether to admit it or not.  That's

6     how it works.  This is not rocket science.  And I know

7     the State wants a preview of Mr. Maysonet's testimony,

8     but they are not entitled to that.

9          THE COURT:  That's kind of what I mean by maybe the

10    best, most efficacious way to do this is to just do it.

11    And when certain objections get made and when certain

12    arguments get made in response, the Court makes a ruling

13    and we go from there.  Whether the ruling is correct or

14    not, it's just what we do.

15         MR. GREENBERG:  It's been my experience.

16         MR. PAPA:  Judge, my only other concern will be

17    then --

18         THE COURT:  And I can appreciate that this is new

19    to everybody.  I don't know that we have got to do this

20    right now for a variety of reasons.  But I'd willing to

21    do it right now if everybody is willing to do it right

22    now,  But I am beginning to believe that this is how I

23    ought to have the parties proceed.

24         MR. PAPA:  I would say, Judge, based on the

CCSAO000037

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  representations that I have heard being made in this

2  courtroom from the witnesses' attorneys, that they

3  should be given an opportunity to speak with their

4  clients and be informed when they consult and give their

5  opinions as opposed to potentially just some haphazard

6  advice.

7       THE COURT:  So what you're telling me is, you don't

8  want to start today?

9       MR. PAPA:  Correct.

10      THE COURT:  What do you want to do?

11      MS. BONJEAN:  I'd like to start today.

12         And I believe that if Detective Paul Nitzke and

13  Sergeant Mingey and/or Montilla want to invoke their

14  Fifth Amendment rights for some reason, certainly they

15  are at liberty to do so.  They have more information

16  about this investigation than any of us in the room.

17  They already know more than we do.  They don't -- I,

18  frankly, don't know why we would need any extended date,

19  but --

20      THE COURT:  Well, I don't know that I'm going to

21  give an extended date.  It's just that the State is

22  asking for a date.

23      MS. BONJEAN:  Sure.

24      THE COURT:  The reasons underlying your request to

26

CCSAO000038

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    have these persons testify is just being expressed

2    today.  I'm not suggesting that it had to have been

3    expressed previously.  But it's just being expressed

4    today.

5         MS. BONJEAN:  True.

6         THE COURT:  So I don't think it's unreasonable to

7    give the State those witnesses and those witness'

8    lawyers an opportunity to mull over what's being

9    expressed today for the first time in order to plan how

10   they individually wish to proceed from here.

11        And I get your point that Mr. Maysonet has been

12   waiting for a long time.  But the fact that he's been

13   waiting for a long time doesn't mean I'm going to give

14   them the bum's rush.

15        MS. BONJEAN:  No.  I understand, Judge.  I did

16   reach out to the Sotos firm, who represents a number of

17   these individuals.  And I've been trying to communicate

18   and let them know what my intent was.  No one was trying

19   to sandbag them.

20        THE COURT:  No, no.  My comments are not indicative

21   or suggesting that at all.

22        MS. BONJEAN:  Okay.

23        THE COURT:  If you were trying to sandbag them, you

24   wouldn't have fronted this in the first place.  And I

27

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    appreciate and I think everybody appreciates that we are

2    being upfront regarding what the issues in this

3    particular case -- it is getting more and more

4    interesting by the minute -- are going to be.

5         But because they're particularly interesting, I

6    don't think it's unreasonable to give everybody a date.

7    And I, frankly from my part, I'd like to --

8         Would the 15th, 16th or 17th of November work

9    possibly for everybody?

10    MS. BONJEAN:  I'd prefer the week before, Judge.

11    THE COURT:  Well, you know, the 10th is a court

12    holiday.  The 10th is a court holiday.  I could try the

13    7th, but you might get backed up behind a couple of

14    juries that are set for the 6th.  But I'll give it my

15    shot if that works for everybody.  I've also got eight

16    attorneys in front of me who have got dynamic schedules.

17         Well, I'm saying that date because I want to do

18    it sooner instead of later.

19    MS. BONJEAN:  I do, Judge.  And more importantly,

20    my client does.  And my job is, obviously, to advance

21    his interest to the best of my ability.

22    MR. GRACE:  The 15th is fine for me, Judge.

23    THE COURT:  Does the 7th work for everybody or no?

24    MR. GRACE:  It doesn't work with me.

28

CCSAO000040

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
1        THE COURT:  You said 1:00 o'clock?

2        MR. HERBERT:  1:00 o'clock would work for me.

3        THE COURT:  On the 7th?

4        MR. GRACE:  I have got a murder trial I'm trying in

5    front of Judge Flaherty in Markham that week.

6        MR. FAHY:  Judge, do you have staff on that day?

7    I think it's election day.

8        MR. GREENBERG.  There's no election this year.

9        THE COURT:  We will go off the record for

10   scheduling purposes.

11                        (Discussion had off the record.)

12       THE COURT:  The parties, including the attorneys

13   who were here in connection with certain witnesses to

14   discuss their schedules, we are going to hold this over

15   by agreement of the parties to November 15, 2017 at

16   1:00 p.m. in the afternoon.

17           A couple of things, in the nature of disclosures,

18   I used to work with Mr. Fahy.  Mr. Fahy and I shared an

19   office space as fellow defense attorneys.  So we are

20   going back into the late 1990s, early 2000s.  We were

21   not partners in law.  I suppose you could call us

22   colloquially partners in fact.  We sometimes referred

23   matters to one another, shared expenses.  We did not

24   share fees.  We did not share revenue.
```

29

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1              I became a judge in 2007 pursuant to

 2    Illinois Supreme Court Rule 62 and 63.  There is no

 3    reason for me to recuse myself in the absolute matter

 4    nor do I believe there is any reason for me to recuse

 5    myself just by virtue of my judgment.  But I do want

 6    everybody to know that I had this relationship with

 7    Mr. Fahy previously.

 8              If you wish to take steps in the interest of your

 9    client, you may certainly do so hereafter.  But that's

10    where we are at.

11         MS. BONJEAN:  Thank you, Judge.

12         THE COURT:  Nobody has to do anything now.  I am

13    not suggesting you do.  Otherwise, I'll see everyone on

14    November 15.

15              Thank you everyone.

16         MS. BONJEAN:  Thank you.

17         MR. PAPA:  Thank you, Judge.

18                        (The above-entitled cause was

19                         continued to 1:00 o'clock p.m.,

20                         November 15, 2017.)

21

22

23

24
```

CCSAO000042

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    STATE OF ILLINOIS      )
                             )    SS.
 2    COUNTY OF C O O K       )

 3

 4         I, KATHERINE M. SPELSON, C.S.R., Official

 5    Shorthand Reporter of the Circuit Court of Cook County,

 6    County Department - Criminal Division, do hereby certify

 7    that I reported in shorthand the evidence had in the

 8    above-entitled cause and that the foregoing is a true

 9    and correct transcript of all the evidence heard.

10

11

12                    [signature]

13               KATHERINE M. SPELSON, C.S.R.
                 Official Shorthand Reporter
                 Circuit Court of Cook County
14               County Department-Criminal Division
                 CSR No. 084-004359
15

16

17

18

19

20

21

22

23
      Dated this 20th day
24    of November, 2017.
```

31

CCSAO000043

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 60

```
 1   STATE OF ILLINOIS )
                       )   SS.
 2   COUNTY OF C O O K )

 3
        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 4          COUNTY DEPARTMENT - CRIMINAL DIVISION

 5   PEOPLE OF THE            )
     STATE OF ILLINOIS,       )
 6              Plaintiff,    )
           vs.               )No. 92 CR 10146-01
 7                           )
     JOSE MAYSONET,           )
 8              Defendant.    )

 9

10                   REPORT OF PROCEEDINGS had at the

11   Hearing of the above-entitled cause, before the

12   HONORABLE TIMOTHY J. JOYCE, Judge of said court, on the

13   15th day of November, 2017.

14              APPEARANCES:
                HON. KIMBERLY M. FOXX,
15                 State's Attorney of Cook County, by:
                MESSRS. ERIC SUSSMAN, JEFFREY ALLEN and
16              JAMES PAPA,
                   Assistant State's Attorneys,
17                 appeared on behalf of the People;

18              MS. JENNIFER BONJEAN, MS. ASHLEY COHEN
                and MR. STEVEN GREENBERG,
19                 Attorneys at Law,
                   appeared on behalf of the Defendant.

20

21

22
     Annette Cesario
23   Official Court Reporter
     Criminal Division
24   CSR #84-2529
```

JGS_MAYSONET 5028

1     THE CLERK:  Jose Maysonet.

2          (Enter defendant.)

3     THE COURT:  Good afternoon everyone.

4     THE DEFENDANT:  Good afternoon.

5     MS. BONJEAN:  Good afternoon, Your Honor, Jennifer

6  Bonjean on behalf of the defendant Jose Maysonet.

7     MS. COHEN:  Ashley Cohen on behalf of the

8  defendant Jose Maysonet.

9     MR. GREENBERG:  Steve Greenberg on behalf of the

10 Mr. Maysonet.

11    MR. SUSSMAN:  Eric Sussman, Jeff Allen and Jim

12 Papa on behalf of the State of Illinois.

13    THE COURT:  Good afternoon, everybody.

14        The matter is set for hearing on some pretrial

15 motions?

16    MS. BONJEAN:  Yes, Your Honor.

17    MR. SUSSMAN:  Your Honor, if I may, I appreciate

18 it.  As Your Honor knows, the State's Attorney's Office

19 has consistently maintained and continues to maintain

20 that Mr. Maysonet is guilty of the murder of the Wiley

21 brothers consistent with the jury's verdict in August

22 of 1995.  The State also maintains as you've see

23 through the pleadings that Mr. Maysonet's numerous

24 statements were not the result of any abuse or improper

— 2 —

JGS_MAYSONET 5029

1  police conduct.

2      Nevertheless, we have been advised over the

3  last several days, including just now, by counsel for

4  the former police detectives that each detective will

5  invoke their 5th Amendment right not to incriminate

6  themselves and will refuse to testify.

7      Without the cooperation and the testimony of

8  the Chicago police detectives, the State is unable to

9  meet our burden at this hearing or at the underlying

10 case.

11     So it is with deep regret and sadness for the

12 families of the victims in this case that we request

13 that the Court nolle the case against the defendant,

14 Mr. Maysonet.

15     THE COURT:  Thank you, Mr. Sussman.  I will note,

16 I don't know that I have any discretion in this regard

17 in any event; but I will grant the State's motion for

18 nolle pros.

19     MS. BONJEAN:  Thank you, Your Honor, defendant

20 demands trial.

21     THE COURT:  For some reason I have two cases, a

22 1990 case and a 1992 case, I thought it was only the

23 '92 case.

24     MS. BONJEAN:  It's the same case, Judge, it was

—3—

JGS_MAYSONET 5030

1 reindicted.

2     THE COURT: I will note both motion State nolle

3 pros, for the record.

4     MS. BONJEAN: Thank you, Your Honor.

5     THE COURT: Release this case only. Thank you

6 very much. Quiet please, court is in session.

7     THE DEFENDANT: Thank you.

8     THE COURT: Good luck, Mr. Maysonet.

9         (Which were all the proceedings had on

10         the above-entitled cause, this date.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

—4—

JGS_MAYSONET 5031

1  STATE OF ILLINOIS )

2  COUNTY OF C O O K )

3

4              I, ANNETTE C. CESARIO, Official Shorthand

5  Reporter of the Circuit Court of Cook County, County

6  Department-Criminal Division, do hereby certify that I

7  reported in shorthand the proceedings had in the

8  above-entitled cause; that I thereafter caused the

9  foregoing to be transcribed on a computer, which I

10 hereby certify to be a true and accurate transcript of

11 all the evidence heard.

12

13

14

15 _____

16 Certified Shorthand Reporter
   Circuit Court of Cook County

17 County Department-Criminal Division

18 Date:  _____10-10-18_____

19

20

21

22

23

24

—5—

JGS_MAYSONET 5032

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 61

```
 1   STATE OF ILLINOIS  )
                        )  SS.
 2   COUNTY OF COOK     )

 3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
       THE PEOPLE OF THE STATE OF    )
 5     ILLINOIS,                     )
                                     )
 6                    Plaintiff,     )
                                     )
 7              vs.                  ) No. 92 CR 10146-01
                                     )
 8     JOSE MAYSONET,                )
                                     )
 9                    Defendant.     )

10         REPORT OF PROCEEDINGS had of the

11   above-entitled cause, before the HONORABLE ERICA L.

12   REDDICK, one of the judges of said court, on the

13   15th day of August, 2022.

14   APPEARANCES:

15       HON. KIMBERLY M. FOXX,
         State's Attorney of Cook County, by:
16       MS. MAUREEN RENNO,
         Assistant State's Attorney,
17       appeared on behalf of the People;

18
         MR. STEVE GREENBERG,
19       appeared on behalf of the defendant.

20

21

22
     ANGELA K. PATLA
23   Official Court Reporter
     Criminal Division
24   CSR: #084-004877
```

—1—

JGS_MAYSONET 4558

1      THE COURT:  Maysonet.  Court is back in session.

2   We are proceeding with our final matter on the call

3   today.  This is Jose Maysonet, which is a petition for

4   Certificate of Innocence.  I will note that

5   Mr. Maysonet appears by Zoom, and Counsel, will you

6   identify for the record?

7      MR. GREENBERG:  Steve Greenberg on behalf of Mr.

8   Maysonet.  I will be the only one appearing today on

9   his behalf, Judge.

10      THE COURT:  Understood.  Attorney Greenberg is

11   present in open court.  And State, would you identify?

12   If you're speaking, we cannot hear you.

13      MS. RENNO:  I apologize, your Honor.  Maureen

14   Renno, and that's M A U R E E N, R E N N O, on behalf

15   of the People.

16      THE COURT:  Okay.  The matter appears on the court

17   call today for ruling after several continuance dates

18   after hearing.  There were quite a few matters to sort

19   through for the ruling with respect to this case.  Now,

20   the petition -- let's begin with Petitioner has asked

21   the Court to grant relief in his petition for

22   Certificate of Innocence, then to specifically find

23   that the petitioner has established by a preponderance

24   of the evidence that he is entitled to the Certificate

JGS_MAYSONET 4559

1    of Innocence because he has established that he was

2    convicted of one or more felony in the State of

3    Illinois, in Cook County in particular; that he was, in

4    this case, the convictions of course previously were

5    for murder that he was subsequently sentenced to a term

6    of imprisonment.  There were two murders in this case.

7    That term of imprisonment was for natural life, which I

8    believe has been established by the record, and that

9    the Petitioner served all or any part of that sentence,

10   and clearly, that testimony was provided as part of the

11   Petitioner's direct examination, as well as a matter of

12   record with respect to the sentencing, but the

13   Petitioner did provide the testimony about the time he

14   served being imprisoned up to the date he was released,

15   that thereafter, the Petitioner has established that

16   the judgment of conviction was vacated, that occurring

17   on or about November 15th, 2017, which again, coincides

18   with the date and the time that Petitioner had served

19   from the date of his arrest, I believe that would be in

20   August of 1990, although the facts do establish the

21   Petitioner had been arrested on some unrelated charges

22   before that time.  But any way, that Petitioner -- the

23   convictions were ultimately vacated, and then the State

24   initially sought to proceed to trial, but then

JGS_MAYSONET 4560

1  thereafter, after key detectives who would be necessary

2  to establish the charges, there was an announcement in

3  court that they were pleading the 5th, and that the

4  State, as a consequence, would not be able to proceed,

5  so the State did dismiss the charges motion State nolle

6  prosequi, and the State elected not to proceed further.

7  The Petitioner's petition for Certificate of Innocence,

8  although it does not appear in the record, is alluded

9  to the by the State, as well as the Petitioner as

10  having been filed in -- back in 2020.  So I

11  unfortunately am not able to make a determination with

12  respect to the timeliness of the filing simply because

13  I do not have that information from the clerk's record

14  and a copy of the filed petition does not appear on the

15  record.  I will note that the People acknowledge that

16  the Certificate of Innocence was filed

17  February 13th of 2020.

18          Now, the other matters that the Petitioner is

19  required to establish is that the Petitioner is

20  innocent of the offenses charged in the indictment or

21  information for which Petitioner was convicted and

22  sentenced, that the Petitioner did not, by his own

23  conduct, voluntarily cause or bring about his

24  conviction.  The Court is additionally mindful of the

—4—

JGS_MAYSONET 4561

1  fact that within the beginning language of the involved

2  statute, that being 735 ILCS 5/2-702, that it is the

3  intent of the general assembly in this law that the

4  Court, in exercising its discretion as permitted by law

5  regarding the weight and admissibility of evidence

6  submitted pursuant to the section shall, in the

7  interest of justice, give due consideration to

8  difficulties of proof caused by the passage of time,

9  the death or unavailability of witnesses, the

10  destruction of evidence, or other factors not caused by

11  such persons or those acting on their behalf, so that

12  is really under Subsection A of this particular

13  statute.  The Court is well guided by that in its

14  decision ruling and has been throughout.  So

15  essentially, the Petitioner is asking the Court to

16  grant its petition, and I believe both the State and

17  the Petitioner agree, the Petitioner and the Respondent

18  agree that the issues really surround whether the

19  petitioner has established that he's innocent of the

20  charges, and that he did not, by his own conduct, cause

21  or bring about this conviction.  And to that end, and

22  I'll try to be as distinct as possible, the Petitioner

23  sets forth the events that resulted in this conviction,

24  namely he was -- this all began when he was arrested by

—5—

JGS_MAYSONET 4562

1  Detective Paulmitsky, P A U L M I T S K Y, on July 3rd

2  of 1990 in connection with a shooting that was not

3  related to this matter, that the Petitioner was

4  questioned about the murders, and that he was, you

5  know, ultimately -- in August -- although he was

6  questioned at that time, he was not arrested.  He was

7  questioned specifically about 9 millimeter handgun, he

8  did not make statements incriminating himself, and he

9  stated that he did not have anything to do with any

10  murders.  The Petitioner was questioned again in the

11  Cook County Jail in August of 1990.  He was, at that

12  time by his testimony, represented by his attorney

13  William Swano, S W A N O, and that Sergeant Mingey,

14  M I N G E Y, and Detective Montilla, M A N T I L L A,

15  or M O N T I L L A, tried to question the Petitioner,

16  Mr. Maysonet, again but that Petitioner indicated that

17  at that time, he did not wish to speak to the

18  detectives and police personnel.  He did not make any

19  incriminating statements and stated that he was not

20  involved, but Petitioner ultimately was on bail

21  August 16th -- this is all in 1990, by the way -- and

22  that he had court on August 22nd of 1990.  He attended

23  court to receive an assignment for this instant case,

24  and -- or for a case rather when he was arrested right

JGS_MAYSONET 4563

1  outside of this very courtroom, Courtroom 101.  He

2  testified he was taken to the other side of the

3  building here at the 2600 South California Courthouse,

4  taken to the 10th floor, and then to the basement,

5  placed him in a detective car, and took him to Grand

6  and Central.  Once at Grand and Central, then he was

7  placed in a second floor interview room.  It was a

8  small room, and then five to ten minutes later,

9  Detective Montilla, either M O or M A N T I L L A,

10  arrived, that thereafter, this Detective Paulmitsky who

11  had arrested him, while he was there in the room, there

12  was testimony that that detective did slap him, throw

13  him to the floor, grab him by the throat.  The

14  Petitioner testified that he was taken to the lockup in

15  the basement at Grand and Central, where he encountered

16  Detective Reynaldo, R E Y N A L O, Guevara,

17  G U E V A R A, who said to the Petitioner that he

18  needed to talk to the Petitioner.  Petitioner testified

19  that he knew Detective Guevara, that he had had a

20  falling out with him, and the subject of that falling

21  out was presented as part of the hearing.  It had to do

22  with the Petitioner's good friend at the time who had

23  committed suicide, and -- under the testimony of the

24  Petitioner -- as a result of being falsely charged with

JGS_MAYSONET 4564

1   a case by Detective Guevara, and the Petitioner was

2   upset with Detective Guevara as a result of that, and

3   the significance of the timing of Petitioner's friend's

4   death coincides with the date and time that the

5   murders, which are the subject of this particular case

6   of the Wiley brothers, it coincides with that timeframe

7   during which it was alleged to have occurred, but we'll

8   get to that in a moment.

9         This specific friend about which Petitioner

10  spoke was a man named Santiago, S A N T I A G O,

11  Sanchez, S A N C H E Z.  This is the friend of the

12  Petitioner who died on May 21st of 1990, so there were

13  services surrounding his death, which again coincides

14  with the time of the death of the individuals who were

15  murdered in this particular case in which the

16  Petitioner has brought the Certificate of Innocence.

17  Nevertheless, Petitioner testified that during this

18  encounter with Detective Guevara in the basement of

19  Grand and Central, that the Petitioner offered Guevara

20  money to let the Petitioner out, but that Guevara came

21  back with a phone book, leather gloves, and a

22  flashlight, placed them on the table, and in essence,

23  said that the Petitioner was going talk one way or

24  another.  Petitioner's testimony was that he was

JGS_MAYSONET 4565

1   handcuffed to a wall at points, that he was questioned

2   over several hours, that the questioning became more

3   aggressive, that Detective Guevara put on the gloves,

4   punched the Petitioner, hit him in the head with the

5   phonebook, flashlight, hit the Petitioner with a

6   broom -- broom, kept beating him, and Petitioner

7   testified that he ultimately urinated on himself.

8        He testified to Detective Montilla, being in

9   the role of someone who would assist him, the

10   Petitioner, in speaking as Petitioner testified that he

11   did not speak English very well.  He did speak some of

12   the English at the time, but did not speak it very

13   well, and so Detective Montilla was there to assist

14   him.  He's -- Petitioner speaks specifically of a

15   yellow tablet that Detective Montilla would write on,

16   and that in essence, Detective Guevara would provide

17   the information that Petitioner needed to include as

18   part of the his ultimate statement incriminating

19   himself.

20        Petitioner speaks of encountering a female

21   State's Attorney who seemed not to be interested in the

22   concerns that Petitioner tried to raise, and he

23   encountered Assistant State's Attorney DiFranco.  And

24   there was much evidence introduced with respect to this

JGS_MAYSONET 4566

1  being a -- a first time for Assistant State's Attorney

2  DiFranco with a statement of this caliber, but that

3  ultimately, after the encounter between Petitioner and

4  Detective Guevara and the previous encounters with

5  Detective Paulmitsky, who was also part of this entire

6  process that Petitioner did, in fact, ultimately give a

7  court reported statement implicating himself and three

8  others in the murders which were the subject of the

9  charges in this particular case.

10      Petitioner also describes during this time

11  that he did see the mother of his son, Rosa Bella,

12  R O S A, B E L L A, I believe, and that she was at the

13  police station and that she said to him that they, the

14  police, would take the Petitioner's child away from

15  her -- or from them if the Petitioner did not

16  cooperate, and that ultimately factored into his

17  decision to give the statement and that he did, in

18  fact, agree and eventually, because of the beatings and

19  the concern about his son, provided this incriminating

20  statement.  The Petitioner insisted through his

21  testimony that he was at his friend, Santiago Sanchez's

22  funeral on May 24th to May 25th of 1990, and that he

23  did not go out and did not participate in the murders

24  of the two Wiley brothers who were, in fact, murdered

—10—

JGS_MAYSONET 4567

1  during that time.

2       Now, the Court well considers Mr. Maysonet's

3  testimony, the Court considered his account of the

4  events, as well as the evidence the State asked the

5  Court to consider in -- to challenge that the

6  Petitioner establishes his innocence by his testimony

7  and supporting documentation.  The Court did view each

8  of the exhibits, wherein the Petitioner identified

9  himself 4A through 4B, I believe, where he places an X

10  indicating himself next to the vehicle, which carried

11  the coffin of Mr. Santiago Sanchez, Petitioner's

12  Exhibit 3, which was a card that speaks of in loving

13  memory of the individual.  The Court viewed all of that

14  in support of Petitioner's claim that he was upset

15  about his friend's death.  His friend was someone who

16  was popular in the neighborhood, and particularly him,

17  and that he was not out shooting people he did not

18  know.  He testified he did not know the Wiley involved.

19       Now, Petitioner was forthright in admitting

20  that he certainly was a member of a gang at the time,

21  and that he engaged in certain activities as a result

22  of that gang activity, but he strongly denies having,

23  you know -- having participated in the murders of the

24  two deceased in this case.  Now, some of the State's

—11—

JGS_MAYSONET 4568

1  evidence that the State asked the Court to take

2  judicial notice of had to do with the participants

3  surrounding the taking of the statement.  So for

4  instance, Assistant State's Attorney DiFranco, who

5  provided deposition testimony since these events have

6  occurred, the State's Attorney Court Reporter Joseph

7  Szybist, S, like Sam, Z, like zebra, Y B, like baby, I

8  S T, and they certainly were presented for the Court to

9  have a view of the claims of witnesses who were also

10  present at the taking of the statement to contradict

11  the claims of the Petitioner.  And that specifically,

12  Court Reporter Szybist who took the Polaroid of the

13  Petitioner at the time, which was included as part of

14  the evidence, and actually took the court reported

15  statement, could not corroborate that the Petitioner

16  appeared to have urinated on himself or to be injured

17  or show physical evidence of a beating.  The Assistant

18  State's Attorney Mr. DiFranco and Mr. Szybist both were

19  presented to provide evidence with respect to the

20  Petitioner's language ability at the time, and their

21  testimony does support that -- really corroborates that

22  the Petitioner himself said that he could speak some

23  English, so there was not huge matters contradicted

24  there.  I think the extent of Mr. Maysonet's language

—12—

1   abilities was at issue.  The Court considered all of

2   the evidence on that from Rosa Bello to Christopher

3   Gossens who submitted information from his deposition,

4   and the Court considered it all including

5   Mr. Maysonet's own statements, and I do find that

6   clearly he had some ability with the English language

7   sufficient to communicate.

8          Now, when I look, though, at the specific

9   issues surrounding whether Mr. Maysonet has established

10  by a preponderance of the evidence that he is innocent

11  of the offenses for which he was charged and convicted

12  and sentenced, I -- I -- clearly there is -- the

13  physical evidence is -- there is none.  There is

14  testimony that there was a 9 millimeter that was

15  evidence, there was a 9 millimeter.  There is no

16  physical evidence tying this claim to the Petitioner,

17  Jose Maysonet.  The evidence was primarily his

18  statement and circumstantial evidence.  Now, the Court

19  considered clearly the evidence from the other

20  individuals charged and the conflicts with the claims

21  that the three -- what each of the three did, where

22  they were, and there were -- there was quite a bit of

23  conflicting information about that.  In this case,

24  however, concerning for the Court as the Court views

—13—

JGS_MAYSONET 4570

1   the innocence aspect of this charge is the evidence

2   presented by the Petitioner's mother of the

3   petitioner's son, and that being Rosa, R O S A, Bello,

4   B E L L O.  She provided testimony at a co-defendant's

5   trial, Alfredo Gonzalez's trial, and she did so at the

6   time that -- based on her testimony, she had been

7   experiencing what were she termed threats to herself

8   and her children, but she did testify and provide

9   evidence to the police at the time of the incidents

10  back in 1990, and this was maintaining that her

11  testimony in Alfredo Gonzalez's trial, as well as

12  reaffirmed in 2021 when she was located somewhere in

13  Massachusetts to provide her deposition testimony, and

14  in sum -- and she did -- there was a prosecution

15  handwritten statement prepared May 25th of 1990, but in

16  essence, the evidence from her is that the Petitioner

17  did, in fact, leave the home that night after returning

18  from his friend's funeral, and that people will

19  first -- at some time before the shooting incident May

20  24, May 25th of 1990 that resulted in the charges of

21  this case, that a member of the gang appear at

22  Petitioner's home and asked him to hold a weapon, and

23  although the Petitioner has testified that he did not

24  regularly keep a weapon at his house, there is

—14—

1 further -- and I did consider his affidavit, as well as

2 his testimony, that there was this weapon.  Maybe it's

3 contested that it was a 9 millimeter, but it is

4 acknowledged that there was a weapon.

5     MR. GREENBERG:  Your Honor --

6     THE COURT:  Yes?

7     MR. GREENBERG:  May I interrupt for one moment?

8     THE COURT:  Yes.

9     MR. GREENBERG:  As you mentioned it.  We

10 supplemented the record last week without objection

11 from the State with the document that Mr. Gonzalez's

12 conviction was one of the convictions vacated last

13 week.  I just want to make sure that --

14     THE COURT:  And I'm fully aware, I did receive

15 that.

16     MR. GREENBERG:  Okay.  I wanted to -- I should have

17 mentioned that at the beginning.

18     THE COURT:  All right.  But I did receive that, so

19 thank you for doing that.

20     MR. GREENBERG:  Thank you.

21     THE COURT:  Now, in this instance, I'm going back

22 to the weapons, Rosa Bello testified that the night

23 after the funeral services that three individuals

24 showed up at the home.  She enumerated who those

-15-

JGS_MAYSONET 4572

1    individuals are and were, that they -- that ultimately,

2    a weapon was retrieved that was in a glass with a towel

3    around it from the bedroom of Mr. Maysonet's home that

4    he shared with Rosa Bello, and that that weapon was

5    retrieved and that all of those individuals left the

6    home that night with the Petitioner returning some time

7    after either midnight or 1:00 a.m.  And again, Rosa

8    Bello is the mother of the Petitioner's son.  She

9    testified to experiencing some jeopardy, claiming that

10   someone attempted to run her over at some point while

11   these matters were proceeding, that she believed it to

12   be someone affiliated with the gang of the -- her son's

13   father, the Petitioner, but interestingly, Ms. Bello

14   has not swayed from her accounting that she testified

15   truthfully when she testified at Mr. Gonzalez's trial,

16   and that when she reaffirmed it in her October 2021

17   deposition testimony.  Now, I considered that she had

18   an axe to grind here.  Is her claim or testimony worthy

19   of belief given what to me appeared to be hostility in

20   some of her testimony, but again, perhaps was the

21   reason if she felt her life was jeopardized.  I

22   considered that she specifically spoke with the State

23   about solely testifying as it pertains to

24   Mr. Gonzalez -- as Counsel just brought up -- Alfredo

—16—

JGS_MAYSONET 4573

1  Gonzalez's case has since -- he has been -- those

2  convictions have been vacated against him as well, but

3  it is evidence that the Court cannot ignore but must

4  consider as it pertains to the Petitioner's claim that

5  he was home and remained home the entire time and did

6  not engage in this.

7          Now, as I consider the -- my ultimate

8  conclusion is there is -- I do give some credence to

9  Rosa Bello's testimony understanding that her testimony

10  is after these events occurred in 1990.  She did not

11  have any further dealings with Jose Maysonet from that

12  point, and ultimately even breaking ties with her own

13  family to get away from the concerns that she had from

14  1990 until the time when she was located in 2021.  So

15  that has -- the Court gives due conversation to that

16  testimony.  When it comes to really looking at the

17  significance of Petitioner's Maysonet's statements, I

18  think when I consider all the evidence as to that, that

19  you know, the Petitioner testified to this coercion,

20  that he felt disadvantaged, of course, in the language

21  department, but he felt a real and present threat from

22  the police personnel, in his arrest, his relationship

23  with Guevara, the physical abuse he testified -- he

24  sustained, there is not physical proof to verify that,

—17—

JGS_MAYSONET 4574

1  but the Petitioner's, after this pattern and practice

2  evidence, which the Court considers with respect to the

3  events solely as it pertains to the claims in this

4  case, I -- the sum of my considering all of the

5  evidence surrounding the taking of the statement, the

6  other witnesses, the Petitioner's own claims, I --

7  ultimately, I believe that the statement was not a

8  fully voluntary statement.  I cannot say the depth or

9  the extent to which the, you know, the -- the events

10  applied, but that's not the end of the inquiry for the

11  Court, however.  I consider in that that Detective

12  Guevara asserted the 5th, that Paulmitsky, clearly

13  there is no contest as to -- or no one to rebut the

14  specific claims at this point, but that does not

15  indicated to the Court as to whether or not the

16  Petitioner has established by a preponderance of the

17  evidence that the Petitioner is innocent of the charges

18  in this case.  The Court does consider that even

19  factually, and this was in the arguments of

20  petitioners, maybe not so much evidence laden, but the

21  arguments as to the impossibilities of the claims

22  within the contents of the statement itself.  On the

23  whole, this statement -- and I'm speaking of the court

24  reported statement, is not the sole consideration for

—18—

JGS_MAYSONET 4575

1   the Court in determining whether or not the Petitioner

2   for Certificate of Innocence should be granted.  It's

3   the considerations of all the evidence, some of my

4   discussions, some I could certainly look to the

5   petitioner's own credibility as I weigh these issues as

6   well, and while I would need the Petitioner has been

7   forthright about his live, he is older now, he has gone

8   through imprisonment for these offenses, he has -- is

9   someone who has engaged in a life filled with the

10  activities of someone engaged in gang activity.  He

11  talked about the things that he did, and while I

12  believe he has been mostly forthright, there are still

13  some concerns with credibility there as well, and the

14  offering to the detective to give -- you know, to ask

15  him to be released and the contradictions to his claims

16  from the mother of his own child, and I consider the

17  evidence of the others charged in the events whose

18  accounts of the events show clearly that the

19  evidence -- that it was the right decision that these

20  convictions be vacated against the Petitioner

21  considering all of it, but as I consider this on a

22  whole, the evidence in this case, clearly it was the

23  right result that the convictions be overturned, but I

24  cannot say it has been proven by a preponderance of the

JGS_MAYSONET 4576

1   evidence that the Petitioner is innocent of guilt under

2   the standard.

3          When it comes to whether the Petitioner's own

4   conduct voluntarily caused or brought about his

5   conviction, again, the statement as I weigh it all

6   together, I don't find that he would have made that

7   statement without the pressures applied to him, but I

8   cannot say still that that alone suffices to establish

9   his actual innocence in this case, and so in an

10  exercise of my discretion after having viewed it all, I

11  cannot find that Petitioner had met its burden, so

12  Petition Certificate of Innocence is denied.

13      MR. GREENBERG:  Thank you, Judge.

14              (Which were all the proceedings had in the

15              above-entitled cause.)

16

17

18

19

20

21

22

23

24

—20—

```
 1   STATE OF ILLINOIS       )
                             )  SS.
 2   COUNTY OF COOK          )

 3

 4           I, ANGELA K. PATLA, an Official Court Reporter

 5   within and for the Circuit Court of Cook County,

 6   Criminal Division, do hereby certify that I have

 7   reported in shorthand in the report of proceedings had

 8   in the above-entitled cause; that I thereafter caused

 9   the foregoing to be transcribed into typewriting, which

10   I hereby certify is a true and accurate transcript of

11   the proceedings had before the Honorable ERICA L.

12   REDDICK, Judge of said court.

13

14

15                           _____
16                           ANGELA K. PATLA
                             Official Shorthand Reporter
17                           Circuit Court of Cook County
                             County Department - Criminal
18                           Division
                             Certification No. 084-004877
19

20

21

22   Dated this 20th day of

23   August, 2022.

24
```

—21—

JGS_MAYSONET 4578

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 62

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FERNANDO MONTILLA'S ANSWER TO PLAINTIFF'S FIRST SET OF**
**INTERROGATORIES**

Defendant FERNANDO MONTILLA ("Montilla") by his attorneys, The Sotos Law

Firm, P.C., answers Plaintiff's First Set of Interrogatories as follows:

**PLAINTIFF'S DEFINITIONS AND INSTRUCTIONS**

Defendant Montilla incorporates his objections to the definitions and instructions in

Plaintiff's First Set of Requests for Production propounded on Defendant Montilla as though

fully set forth herein.

**INTERROGATORIES**

1.      Please identify all persons who, to the best of your understanding, have

knowledge of facts that relate to any of the claims or defenses in this action. This request

includes but is not limited to those persons listed in the Defendants' Rule 26 Initial Disclosures.

1

For each person with knowledge responsive to this interrogatory, please describe with particularity any categories of facts known by each such person, including all categories of facts about which the person may be competent to testify at trial. If this interrogatory is answered by incorporating documents, please state whether there are any categories of facts known to any witness relating to the claims or defenses in this action that are not reflected in the documents upon which you rely; in the event you fail to do so, Plaintiff will assume the substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**ANSWER:** Defendant Montilla objects to this request as vague and ambiguous as to the terms "categories of facts" and "competent to testify at trial," over broad in scope, calls for a legal conclusion, and compound. Defendant Montilla also objects to this interrogatory to the extent that if it is answered by incorporating documents it requires Defendant Montilla to possess knowledge of facts known to the witness beyond the information contained in the documents. Defendant Montilla further objects to this interrogatory to the extent that it requests the home addresses of the individual defendant officers, other police personnel, or other city employees on the grounds that such information is irrelevant, not proportional to the needs of this case, and could pose a risk to them and/or their families. Finally, Defendant Montilla objects to Plaintiff assuming "the substance of the witnesses' testimony is strictly limited to what is contained in such documents." Subject to and without waiving these objections, all such individuals were previously disclosed in the parties' initial disclosures pursuant to the Mandatory Initial Discovery Pilot Program ("MIDPP") or can be readily identified in the documents previously produced in this case. Investigation continues.

2.      If any document requested in Plaintiff's discovery requests has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for losing, discarding, or destroying the document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it. In answering this

interrogatory, please list all steps taken to discover documents that have been lost, discarded or destroyed, and the names of the individuals who took those steps.

**ANSWER:** Defendant Montilla objects to this interrogatory as to the terms "any Document requested," over broad as to time frame and scope, unduly burdensome, premature, and not proportional to the needs of the case. Defendant Montilla also objects to this interrogatory to the extent it requests information that is within the knowledge of other parties to this action or third parties. Subject to and without waiving these objections, Defendant Montilla states that he is currently unaware of any document relevant to the claims and defenses in this case that has been lost, discarded, or destroyed. Investigation continues.

3. Please identify all complaints that have ever been made against you relating to your role as a law enforcement official, including but not limited to any and all internal affairs, COPA, IPRA, OPS, intra-or inter-departmental, citizen complaints, or court complaints and lawsuits alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive, or torturous methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, or any form of misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If You do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**ANSWER:** Defendant Montilla objects that this interrogatory is vague and ambiguous as to the terms "all complaints that have ever been made", "complaint," "dishonest behavior," "improperly suggestive," and "improper behavior during interrogations or interviews," over broad in scope, time and subject matter, unduly burdensome, and not proportional to the needs of this case, and violates Fed. R. Civ. P. 33(a) regarding the use of discrete subparts. Defendant Montilla additionally objects to complaints alleging misconduct as irrelevant, not proportional to the needs of the

case as it could include motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff.  Subject to and without waiving these objections, Defendant Montilla does not recall all complaints against him and states that any such legal complaints are in the public domain so are equally available to Plaintiff. Additionally, Defendant Montilla states that complaint register histories, SPAR histories, and complaint register files will be produced under an appropriate protective order.  In further answer to this interrogatory, Defendant Montilla states that, subject to the Confidentiality Order entered in this case, the Clear reports for log files of CRs will be produced.  Answering further, Defendant Montilla reserves the right to withhold responsive documents on the basis of the attorney-client or deliberative process privileges and will produce a privilege log in the event any documents are withheld on these bases. To the best of his recollection, Defendant Montilla recalls the following lawsuits naming him as a defendant in his capacity as an employee of the Chicago Police Department: *Martinez v. Montilla*, 92 cv 1540 and *Jimenez v. Montilla*, 09 cv 8081.

4.     Please identify every Communication that You have had with any Person, including but not limited to Plaintiff, Suspects, Persons of Interest and any of the Individual Defendants or anyone else, about any of the allegations, events, or circumstances described in Plaintiff's Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when, with whom, and in what medium (in person, phone, email, text, etc.) the Communications occurred; and (c) provide the date of the Communication. If You answer this Interrogatory by referring to Documents, please identify the document and affirm that the sum total of Your Communications responsive to this Interrogatory are contained in the Documents that You reference.

**ANSWER:**     Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "every communication," "the allegations, events or circumstances described in Plaintiff's Complaint" and "sum total," over broad and unduly burdensome in scope of subject matter and time, requests a narrative response better suited to a deposition, to the extent it seeks information protected by the attorney-client and work-product privileges, and not proportional to the needs of the case. Subject to and without waiving said objections, Defendant Montilla cannot recall all communications he had and refers Plaintiff to documents previously produced in

this case which identify or indicate communications that Defendant Montilla would have had with other police officers, staff and Plaintiff. Additionally, Defendant Montilla has discussed Plaintiff's claims of misconduct against him with his attorneys. In the normal course of an investigation, Defendant Montilla may have communicated with police officers and staff with regard to the investigation. Investigation continues.

5.      Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the individual who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under Federal Rule of Evidence 609. Please be advised that Your duty to supplement Your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiff intends to move in *in limine* to bar any references to convictions not identified in the manner requests.

**ANSWER:**   Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "relating to" and "claims or defenses". Defendant Montilla further objects to this interrogatory as not proportional to the needs of the case to the extent it requests "all criminal convictions," requesting information protected by the attorney work product privilege, premature, requesting information equally available to Plaintiff, and requesting information beyond that required by Federal Rule of Evidence 609. Subject to and without waiving said objections, Defendant Montilla refers Plaintiff to documents previously produced in this case. Defendant Montilla will disclose any criminal convictions, not identified in the documents previously produced, that he intends to use as evidence and those convictions will be identified, in accordance with the FRCP, with the filing of the final pretrial order. Investigation continues.

6.      Do you contend that Jose Maysonet committed any of the illegal acts with which he was prosecuted in *People v. Maysonet*, Case No. 92 CR 10146, Case No. 90 CR 21787 and/or Case No. 90 CR 18419 or any illegal act relating to the incidents in Plaintiff's Complaint? If so, please describe each alleged illegal act that You contend was committed by Jose Maysonet, provide the complete factual basis for Your contention, and identify all evidence and witnesses

upon which You may rely to support Your contention. For all affirmative defenses that You have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiff requests that You provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if You intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

**ANSWER:**    Defendant Montilla objects that this interrogatory is vague and ambiguous as to the terms "any illegal act," over broad in scope, to the extent it seeks information protected by the attorney-client and work-product privileges, violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts, confusing, and unintelligible as written. Subject to and without waiving said objections, Defendant Montilla states that he was not present during the commission of either of the crimes forming the basis for the listed criminal prosecutions, and thus he does not have personal knowledge of the identities of the people who committed those crimes. Defendant Montilla is aware that Plaintiff pleaded guilty to No. 90 CR 18419. Defendant Montilla believes that Plaintiff Maysonet was involved in the commission of the illegal acts for which he was prosecuted in addition to lesser included offenses based on all the evidence and witnesses identified in the investigation of the Wiley brothers murders and evidence and witnesses presented at Plaintiff's criminal trial in addition to Plaintiff's confession to ASA DiFranco. Defendant Montilla was a public employee as a law enforcement officer during his involvement in the Wiley murder investigation. The times of events are set forth in Plaintiff's complaint and in the documents produced in this case. Defendant Montilla is also aware that Plaintiff admits to running a drug sales ring in his complaint. Investigation continues.

7.     For punitive damages purposes, please estimate Your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior to the filing of this complaint, including Your annual salary and any income from any other source for those years.

**ANSWER:**     Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "net financial worth," over broad in scope, and premature as he has not asserted a defense of inability to pay the punitive damages sought by Plaintiff. Subject to and without waiving said objections, if Defendant Montilla determines that he will assert such a defense and present evidence, Defendant Montilla will supplement his response to this Interrogatory.

8.     Given the sum total of Your personal knowledge of the policies, customs, and practices of the City of Chicago as You understand them (formal or informal, written or unwritten), please state whether You or any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the entire encounter or interaction with Plaintiff described in Plaintiff's Complaint, during the Jose Maysonet Double Murder Investigation, Wiley Brothers murder investigation, Jose Maysonet Attempt Murder Investigation or at any time up to the reversal of Jose Maysonet's conviction. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to Your knowledge was violated; (b) describe the circumstances and manner in which said policy, custom, or practice was violated, including which Defendant violated the policy; and (c) state whether any discipline resulted from that violation.

**ANSWER:**     Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "policies, customs, and practices of the City of Chicago," "sum total," and "acted inconsistently with any of those policies, customs, or practices," over broad in scope, not proportional to the needs to the case and violates Fed. R. Civ. P. 33(a) regarding the use of discrete subparts. Subject to and without waiving

said objections, Defendant Montilla states that he believes he followed all applicable Chicago Police Department policies and is unaware of any other Individual Defendants' actions inconsistent with policies or practices of the Chicago Police.

9.      Please state with specificity each activity and investigative task that You participated in during the Jose Maysonet Double Murder Investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Jose Maysonet investigation is described in the Documents that You reference.

**ANSWER:**      Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "each activity…that you participated in" and "sum total of your participation," over broad in scope, unduly burdensome, and requests a narrative response better suited to a deposition. Defendant Montilla further objects to this interrogatory's request to be specifically answered under oath because unsworn declarations or verifications under penalty of perjury are permitted with like force and effect pursuant to 28 U.S.C. §1746. Subject to and without waiving said objections, Defendant Montilla states that a summary of his activity or investigative tasks would be documented in the police records in the case. In addition, during the investigation, Defendant Montilla would have communicated with other police officers and staff with regard to the investigation. Defendant Montilla was assigned to perform some of the tasks by his supervisors and other tasks were undertaken by him.

10.      Please state with specificity each activity and investigative task that You participated in during the Wiley Brothers murder investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25,

1990 up to and including the present day. It includes any line-ups, photo-arrays, If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Wiley Brothers murder investigation is described in the Documents that You reference.

**ANSWER:**     Defendant Montilla incorporates his objections and answer to interrogatory #9 as if fully set forth herein.

11.     Please state all cell phone numbers and cell phone providers that You, and each of Your immediate supervisors, used at any time between May 1988 and the present day. This request includes both work-issued and personal cell phone numbers and providers.

**ANSWER:**     Defendant Montilla objects to this interrogatory as overly broad and unduly burdensome based on the over 25 year time period requested. Additionally, Defendant Montilla objects because the disclosure of any of his telephone numbers, telephone company providers, or account numbers of any telephone accounts are not relevant or proportional to the needs of this litigation because there are no allegations in the complaint that the Defendant Officers used cellular telephones during the Wiley brothers murder investigation. Defendant Montilla also objects to producing any police or personal cellular telephone numbers as doing so would implicate safety concerns for the Defendant Officers and their families. Subject to and without waiving said objections, Defendant Montilla never used a cellphone to communicate about the Wiley brothers homicide investigation or Plaintiff.

12.     Did You violate Plaintiff or any Suspect's (see definition in Plaintiff's Request for Production) Constitutional right to a fair trial? Did you have any knowledge that you [sic] officers were violating Plaintiff or any suspects constitutional right to a fair trial? If Your position is that you did not violate either Plaintiff or any Suspects Constitutional rights, please detail every item of evidence and identify every witness that would support Your position.

**ANSWER:**     Defendant Montilla objects to this interrogatory as vague and ambiguous as to the term "constitutional right to a fair trial" because an individual's right to a fair trial can be violated under a number of circumstances that do not necessarily involve a police investigation, and also as a premature contention interrogatory. Additionally, Defendant Montilla objects to this interrogatory as it is overbroad in scope and calls for a legal conclusion. Subject to and without waiving said

9

objections, Defendant Montilla denies he violated Plaintiff's or any "Suspect's" Constitutional rights as evidenced by the testimony of parties, witnesses and documents produced in discovery and directs Plaintiff to his answer to Plaintiff's complaint. Investigation continues.

13.    Identify each and every incident and/or instance by date, time, and location in which you interacted with Plaintiff prior to August 23, 1990, including but not limited to, July 15, 1990, August 1, 1990 and August 22, 1990. Identify the purpose of the interaction, who was present during this interaction, what was said by either party during this interaction and whether you made any physical contact or threatening remarks to Plaintiff whatsoever.

**ANSWER:**    Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "instance" and "interacted." Subject to and without waiving said objections, Defendant Montilla states that he would have been present with Plaintiff on those dates and times as set forth in the records. Investigation continues.

14.    Identify any training or instruction you have received regarding policing, arrest procedures, unlawful searches and seizures, use of force, probable cause determinations, report writing, interrogations, preservation of evidence, and duty to disclose exculpatory evidence.

**ANSWER:**    Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "instruction" and "policing". Subject to and without waiving said objections, Defendant Montilla states that he received formal training at the police academy and during the course of his employment with the Chicago Police Department that would have covered the listed topics, but does not have a specific recollection of the courses, materials or instruction. Such information may be available from the Chicago Police Department. In addition, Defendant Montilla would have received on the job training about the listed topics from his supervisors and fellow officers in addition to comments, which could be construed as instruction, he would have received from participants in the criminal court system. Investigation continues.

15.    State whether you have ever been referred for or received any mental health/psychological assessments or treatment or any substance abuse assessments and/or treatment. If the answer is in the affirmative, identify when the referral was made, by whom, the reason for the referral, whether the assessment or treatment was completed, the length of the

treatment, where it was administered, and the outcome of the assessment and/or treatment.

**ANSWER:**    Defendant Montilla objects to this interrogatory because it requests information protected by HIPAA; the Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110, et seq.); the Medical Patient Rights Act (410 ILCS 50 et seq.); the Illinois Constitution right to privacy (Illinois Constitution at Article I § 6); the psychotherapist-patient privilege set forth in *Jaffee v. Redmond* (518 U.S. 1 (1996)); the physician-patient privilege (735 ILCS 5/8-802); and drug and alcohol treatment/rehabilitation confidentiality statutes (20 ILCS 301/30-5; 42 USC 290dd-2; and 42 CFR Part 2). Defendant Montilla further objects because his medical and mental health is not at issue in this case.

16.    State whether you have ever accepted money [sic] a member of a street gang. State further whether you ever observed or learned in any way that Defendant Guevara was accepting money from Mr. Maysonet to protect Mr. Maysonet from arrest. If the answer is in the affirmative, identify every transaction that took place by date, time, location, who was present, and the amount exchanged during the transaction.

**ANSWER:**    Defendant Montilla objects to this interrogatory as unintelligible as written, and vague and ambiguous as to the terms "learned in any way." Subject to and without waiving said objections, No.

17.    Identify each and every investigative activity or task that took place as a result of the May 25, 1990 shooting of the Wiley brothers including but not limited to, arrests, line-ups, photoarrays, show-ups and interrogations. For each activity or task, include the name of the individuals involved (officer and suspect), date, time, location, and any relevant document and communication (see definition in Plaintiff request for Production) generated as a result of the aforementioned activity or task.

**ANSWER:**    Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "task" and "as a result of" and over broad in scope. Subject to and without waiving said objections, Defendant Montilla states that he is aware of the investigative activities that are set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers. Investigation continues.

18. State whether you or any Defendant ever physically assaulted Plaintiff. Further state whether you ever observed or learned that Guevara physically assaulted Plaintiff. State whether you ever learned that Guevara physically assaulted Plaintiff because Plaintiff stopped paying Guevara protection money.

**ANSWER:** Defendant Montilla objects to this interrogatory as vague and ambiguous as to the term "learned". Subject to and without waiving said objection, Defendant Montilla states he never physically assaulted Plaintiff and has no knowledge about whether any other officer physically assaulted Plaintiff.

19. State whether you or any Defendant held Plaintiff *incommunicado* for an extended period of time, denying him access to his attorney even after repeated requests to speak to his attorney. Further state whether you or any Defendant falsely told Plaintiff's sister and Plaintiff's attorney that he was not at Area Five when he was in fact in your custody and control.

**ANSWER:** Defendant Montilla objects to this interrogatory as vague and ambiguous as to the terms "held incommunicado" and "extended period of time." Subject to and without waiving said objections, Defendant Montilla states that he did not prevent Plaintiff from speaking to his attorney and has no knowledge whether any other officer prevented Plaintiff from speaking to his attorney. Further answering the second question in this interrogatory, Defendant Montilla states that to his knowledge, he has never communicated with Plaintiff's sister or attorney and has no knowledge about whether any other officer communicated with Plaintiff's sister or attorney.

20. State whether you or any defendant threatened Plaintiff in any way, including but not limited to, telling Plaintiff he would get the death penalty if he did not admit his involvement in the Wiley brother murders and implicate other individuals in the shooting, threatening to lock up Plaintiffs girlfriend and sister, and/or threatening to take Plaintiff's children and his girlfriend's children away from her by placing them with DCFS. If the answer is in the affirmative, identify every instance in which you threatened Plaintiff by date, time, location, who was present, and the words that were spoken to Mr. Maysonet.

**ANSWER:** Defendant Montilla objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Montilla states he never threatened Plaintiff and has no knowledge about whether any other officer threatened Plaintiff.

21. State the name of every individual who alleges that you framed or assisted

another officer in a frame-up during your time as a Chicago Police Officer.

**ANSWER:** Defendant Montilla objects to this interrogatory as overbroad in scope and timeframe. Defendant Montilla additionally objects to the extent this interrogatory seeks the identity of individuals who filed motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff. Subject to and without waiving said objections, Defendant Montilla states that he is aware of allegations that he framed or assisted another officer in a "frame-up" in the lawsuits he referenced in interrogatory # 3 above.

22. State with specificity each and every time you contend that Mr. Maysonet made

any inculpatory statement(s) and/or confession(s) to you or any Defendant. For each statement,

please provide the date, time, location, individuals present, the words Mr. Maysonet

communicated to you and what you communicated to Mr. Maysonet.

**ANSWER:** Defendant Montilla objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Montilla states that Plaintiff made inculpatory statements as set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers and is aware that Plaintiff pleaded guilty in Case No. 90 CR 18419 an attempted murder case.

Date: March 6, 2019                           Respectfully Submitted,

James G. Sotos                                 /s/ David A. Brueggen
Josh M. Engquist                               DAVID A. BRUEGGEN, Attorney No. 6289138
Caroline P. Golden                             *One of the Attorneys for Defendants Halvorsen,*
David A. Brueggen                              *Mingey, Epplen, Montilla and Paulnitsky*
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
Tel: 630-735-3300
Fax: 630-773-0980
dbrueggen@jsotoslaw.com

## PROOF OF SERVICE

I, David A. Brueggen, an attorney, certify that a copy of the attached **Defendant Fernando Montilla's Answers to Plaintiff's First Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on March 6, 2019.

**_Attorneys for Plaintiff:_**
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

**_Attorneys for City_**
Eileen E. Rosen
Catherine M. Barber
Patrick R. Moran
Stacy A. Benjamin
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly
321 N. Clark Street, Suite 2200
Chicago, IL 60654
312-494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
pmoran@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

**Attorneys for Frank DiFranco and Cook County**
Allyson L. West
James Chandler
Christina C. Chojancki
Scheagbe Grigsby
Sara D. Spivy
Cook County State's Attorney's Office
Richard J. Daley Center
50 West Washington Street, Room 500
Chicago, IL 60602
(312)603-6299
allyson.west@cookcountyil.gov
james.chandler@cookcountyil.gov
christina.chojnacki@cookcountyil.gov
scheagbe.grigsby@cookcountyil.gov
sara.spivy2@cookcountyil.gov

**Attorney for Reynaldo Guevara**
Thomas M. Leinenweber
Justin L. Leinenweber
James V. Daffada
Michael J. Schalka
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com
jim@ilesq.com
justin@ilesq.com
mjs@ilesq.com

/s/ David A. Brueggen
DAVID A. BRUEGGEN, Attorney No. 628913
*One of the Attorneys for Defendants Halvorsen,*
*Mingey, Epplen, Montilla and Paulnitsky*

14

## CERTIFICATION

I hereby certify that I am a defendant in the above captioned case. I have reviewed the Above interrogatories propounded by Plaintiff Jose Maysonet and hereby certify that the foregoing answers to the interrogatories are true and accurate to the best of my information, knowledge and belief.

DATED: _5/18 2018_

_Fernando E. Montilla_

Fernando Montilla

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 63

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT EDWARD MINGEY'S ANSWER TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant EDWARD MINGEY ("Mingey") by his attorneys, The Sotos Law Firm, P.C., answers Plaintiff's First Set of Interrogatories as follows:

### PLAINTIFF'S DEFINITIONS AND INSTRUCTIONS

Defendant Mingey incorporates his objections to the definitions and instructions in Plaintiff's First Set of Requests for Production propounded on Defendant Mingey as though fully set forth herein.

### INTERROGATORIES

1.      Please identify all persons who, to the best of your understanding, have knowledge of facts that relate to any of the claims or defenses in this action. This request includes but is not limited to those persons listed in the Defendants' Rule 26 Initial Disclosures.

1

For each person with knowledge responsive to this interrogatory, please describe with particularity any categories of facts known by each such person, including all categories of facts about which the person may be competent to testify at trial. If this interrogatory is answered by incorporating documents, please state whether there are any categories of facts known to any witness relating to the claims or defenses in this action that are not reflected in the documents upon which you rely; in the event you fail to do so, Plaintiff will assume the substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**ANSWER:**     Defendant Mingey objects to this request as vague and ambiguous as to the terms "categories of facts" and "competent to testify at trial," over broad in scope, calls for a legal conclusion, and compound. Defendant Mingey also objects to this interrogatory to the extent that if it is answered by incorporating documents it requires Defendant Mingey to possess knowledge of facts known to the witness beyond the information contained in the documents. Defendant Mingey further objects to this interrogatory to the extent that it requests the home addresses of the individual defendant officers, other police personnel, or other city employees on the grounds that such information is irrelevant, not proportional to the needs of this case, and could pose a risk to them and/or their families. Finally, Defendant Mingey objects to Plaintiff assuming "the substance of the witnesses' testimony is strictly limited to what is contained in such documents." Subject to and without waiving these objections, all such individuals were previously disclosed in the parties' initial disclosures pursuant to the Mandatory Initial Discovery Pilot Program ("MIDPP") or can be readily identified in the documents previously produced in this case. Investigation continues.

2.      If any document requested in Plaintiff's discovery requests has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for losing, discarding, or destroying the document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it. In answering this interrogatory, please list all steps taken to discover documents that have been lost, discarded or

destroyed, and the names of the individuals who took those steps.

**ANSWER:** Defendant Mingey objects to this interrogatory as to the terms "any Document requested," over broad as to time frame and scope, unduly burdensome, premature, and not proportional to the needs of the case. Defendant Mingey also objects to this interrogatory to the extent it requests information that is within the knowledge of other parties to this action or third parties. Subject to and without waiving these objections, Defendant Mingey states that he is currently unaware of any document relevant to the claims and defenses in this case that has been lost, discarded, or destroyed. Investigation continues.

3. Please identify all complaints that have ever been made against you relating to your role as a law enforcement official, including but not limited to any and all internal affairs, COPA, IPRA, OPS, intra-or inter-departmental, citizen complaints, or court complaints and lawsuits alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive, or torturous methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, or any form of misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If You do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**ANSWER:** Defendant Mingey objects that this interrogatory is vague and ambiguous as to the terms "all complaints that have ever been made", "complaint," "dishonest behavior," "improperly suggestive," and "improper behavior during interrogations or interviews," over broad in scope, time and subject matter, unduly burdensome, and not proportional to the needs of this case, and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts. Defendant Mingey additionally objects to complaints alleging misconduct as irrelevant, not proportional to the needs of the case as it could include motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to

3

Plaintiff.  Subject to and without waiving these objections, Defendant Mingey does not recall all complaints against him and states that any such legal complaints are in the public domain so are equally available to Plaintiff. Additionally, Defendant Mingey states that complaint register histories, SPAR histories, and complaint register files will be produced under an appropriate protective order.  In further answer to this interrogatory, Defendant Mingey states that, subject to the Confidentiality Order entered in this case, the Clear reports for log files of CRs will be produced.  Answering further, Defendant Mingey reserves the right to withhold responsive documents on the basis of the attorney-client or deliberative process privileges and will produce a privilege log in the event any documents are withheld on these bases. To the best of his recollection, Defendant Mingey recalls the following lawsuits naming him as a defendant in his capacity as an employee of the Chicago Police Department: *Llaguna v. Mingey*, 88 cv 1372; *Flores v. Mingey*, 85 C 9575; *Pong v. Mingey*, 97 cv 6268; *Rivera v. Mingey*, 12 cv 4428. In addition, Defendant Mingey is aware that he has been named as a defendant in cases filed by Serrano, Sierra, Almodovar, Maysonet, Gomez, Negron, Solache, Reyes, and Rodriguez. Investigation continues.

4.     Please identify every Communication that You have had with any Person, including but not limited to Plaintiff, Suspects, Persons of Interest and any of the Individual Defendants or anyone else, about any of the allegations, events, or circumstances described in Plaintiff's Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when, with whom, and in what medium (in person, phone, email, text, etc.) the Communications occurred; and (c) provide the date of the Communication. If You answer this Interrogatory by referring to Documents, please identify the document and affirm that the sum total of Your Communications responsive to this Interrogatory are contained in the Documents that You reference.

**ANSWER:**     Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "every communication," "the allegations, events or circumstances described in Plaintiff's Complaint" and "sum total," over broad and unduly burdensome in scope of subject matter and time, requests a narrative response better suited to a deposition, to the extent it seeks information protected by the attorney-client and work-product privileges, and not proportional to the needs of the case. Subject to and without waiving said objections, Defendant Mingey cannot recall all communications he had and refers Plaintiff to documents previously produced in

this case which identify or indicate communications that Defendant Mingey would have had with other police officers, staff and Plaintiff. Additionally, Defendant Mingey has discussed Plaintiff's claims of misconduct against him with his attorney. In the normal course of an investigation, Defendant Mingey may have communicated with police officers and staff with regard to the investigation. Investigation continues.

5.    Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the individual who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under Federal Rule of Evidence 609. Please be advised that Your duty to supplement Your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiff intends to move in *in limine* to bar any references to convictions not identified in the manner requests.

**ANSWER:**    Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "relating to" and "claims or defenses". Defendant Mingey further objects to this interrogatory as not proportional to the needs of the case to the extent it requests "all criminal convictions," requesting information protected by the attorney work product privilege, premature, requesting information equally available to Plaintiff, and requesting information beyond that required by Federal Rule of Evidence 609. Subject to and without waiving such objections, Defendant Mingey refers Plaintiff to documents previously produced in this case. Defendant Mingey will disclose any criminal convictions, not identified in the documents previously produced, that he intends to use as evidence and those convictions will be identified, in accordance with the FRCP, with the filing of the final pretrial order. Investigation continues.

6.    Do you contend that Jose Maysonet committed any of the illegal acts with which he was prosecuted in *People v. Maysonet*, Case No. 92 CR 10146, Case No. 90 CR 21787 and/or Case No. 90 CR 18419 or any illegal act relating to the incidents in Plaintiff's Complaint? If so, please describe each alleged illegal act that You contend was committed by Jose Maysonet, provide the complete factual basis for Your contention, and identify all evidence and witnesses

upon which You may rely to support Your contention. For all affirmative defenses that You have

asserted or will assert in this matter, please describe the entire factual basis supporting each such

defense and specifically identify any witnesses or physical, documentary, or testimonial evidence

that supports each such defense. The information sought by this interrogatory is not a mere

recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiff

requests that You provide a detailed description of every fact and legal basis on which the

affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of

additional discovery requests. For example, if You intend at any point in this litigation to assert

an immunity defense, please state all facts, evidence, and legal bases for such a defense,

identifying any witnesses or physical, documentary, or testimonial evidence relating to the

immunity defense.

**ANSWER:** Defendant Mingey objects that this interrogatory is vague and ambiguous as to the terms "any illegal act," over broad in scope, to the extent it seeks information protected by the attorney-client and work-product privileges, violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts, confusing, and unintelligible as written. Subject to and without waiving said objections, Defendant Mingey states that he was not present during the commission of either of the crimes forming the basis for the listed criminal prosecutions, and thus he does not have personal knowledge of the identities of the people who committed those crimes. Defendant Mingey is aware that Plaintiff pleaded guilty to No. 90 CR 18419. Defendant Mingey believes that Plaintiff Maysonet was involved in the commission of the illegal acts for which he was prosecuted in addition to lesser included offenses based on all the evidence and witnesses identified in the investigation of the Wiley brothers murders and evidence and witnesses presented at Plaintiff's criminal trial. Defendant Mingey was a public employee as a law enforcement officer during his involvement in the Wiley murder investigation. The times of events are set forth in Plaintiff's complaint and in the documents produced in this case. Defendant Mingey is also aware that Plaintiff admits to running a drug sales ring in his complaint. Investigation continues.

7. For punitive damages purposes, please estimate Your net financial worth. Please

describe how that net worth has been calculated by providing a balance sheet of all assets greater

than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior to the filing of this complaint, including Your annual salary and any income from any other source for those years.

**ANSWER:** Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "net financial worth," over broad in scope, and premature as he has not asserted a defense of inability to pay the punitive damages sought by Plaintiff. Subject to and without waiving said objections, if Defendant Mingey determines that he will assert such a defense and present evidence, Defendant Mingey will supplement his response to this Interrogatory.

8. Given the sum total of Your personal knowledge of the policies, customs, and practices of the City of Chicago as You understand them (formal or informal, written or unwritten), please state whether You or any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the entire encounter or interaction with Plaintiff described in Plaintiff's Complaint, during the Jose Maysonet Double Murder Investigation, Wiley Brothers murder investigation, Jose Maysonet Attempt Murder Investigation or at any time up to the reversal of Jose Maysonet's conviction. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to Your knowledge was violated;v(b) describe the circumstances and manner in which said policy, custom, or practice was violated, including which Defendant violated the policy; and (c) state whether any discipline resulted from that violation.

**ANSWER:** Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "policies, customs, and practices of the City of Chicago," "sum total," and "acted inconsistently with any of those policies, customs, or practices," over broad in scope, not proportional to the needs to the case and violates Fed. R. Civ. P. 33(a) regarding the use of discrete subparts. Subject to and without waiving said objections, Defendant Mingey states that he believes he followed all applicable Chicago Police Department policies and is unaware of any other

Individual Defendants' actions inconsistent with policies or practices of the Chicago Police.

9.    Please state with specificity each activity and investigative task that You participated in during the Jose Maysonet Double Murder Investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Jose Maysonet investigation is described in the Documents that You reference.

**ANSWER:**    Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "each activity…that you participated in" and "sum total of your participation," over broad in scope, unduly burdensome, and requests a narrative response better suited to a deposition. Defendant Mingey further objects to this interrogatory's request to be specifically answered under oath because unsworn declarations or verifications under penalty of perjury are permitted with like force and effect pursuant to 28 U.S.C. §1746. Subject to and without waiving said objections, Defendant Mingey states that a summary of his activity or investigative tasks would be documented in the police records in the case. In addition, during the investigation, Defendant Mingey would have communicated with other police officers and staff with regard to the investigation. Defendant Mingey was not assigned to perform any of the tasks by his supervisors.

10.    Please state with specificity each activity and investigative task that You participated in during the Wiley Brothers murder investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. It includes any line-ups, photo-arrays, If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your

participation in the Wiley Brothers murder investigation is described in the Documents that You reference.

**ANSWER:**     Defendant Mingey incorporates his objections and answer to interrogatory #9 as if fully set forth herein.

11.     Please state all cell phone numbers and cell phone providers that You, and each of Your immediate supervisors, used at any time between May 1988 and the present day. This request includes both work-issued and personal cell phone numbers and providers.

**ANSWER:**     Defendant Mingey objects to this interrogatory as overly broad and unduly burdensome based on the over 25 year time period requested. Additionally, Defendant Mingey objects because the disclosure of any of his telephone numbers, telephone company providers, or account numbers of any telephone accounts are not relevant or proportional to the needs of this litigation because there are no allegations in the complaint that the Defendant Officers used cellular telephones during the Wiley brothers murder investigation. Defendant Mingey also objects to producing any police or personal cellular telephone numbers as doing so would implicate safety concerns for the Defendant Officers and their families. Subject to and without waiving said objections, Defendant Mingey did not have a cellular telephone provided by the City of Chicago Police Department. Defendant Mingey does not recall having a personal cellular telephone until the late 1990's after Plaintiff was convicted of the murders of the Wiley brothers.

12.     Did You violate Plaintiff or any Suspect's (see definition in Plaintiff's Request for Production) Constitutional right to a fair trial? Did you have any knowledge that you [sic] officers were violating Plaintiff or any suspects constitutional right to a fair trial? If Your position is that you did not violate either Plaintiff or any Suspects Constitutional rights, please detail every item of evidence and identify every witness that would support Your position.

**ANSWER:**     Defendant Mingey objects to this interrogatory as vague and ambiguous as to the term "constitutional right to a fair trial" because an individual's right to a fair trial can be violated under a number of circumstances that do not necessarily involve a police investigation, and also as a premature contention interrogatory. Additionally, Defendant Mingey objects to this interrogatory as it is overbroad in scope and calls for a legal conclusion. Subject to and without waiving said objections, Defendant Mingey denies he violated Plaintiff's or any "Suspect's" Constitutional rights as evidenced by the testimony of parties, witnesses and

9

documents produced in discovery and directs Plaintiff to his answer to Plaintiff's complaint. While Defendant Mingey continues to deny he violated Jacques Rivera's constitutional rights, he was found liable for violating Jacques Rivera's constitutional rights but has a pending post trial motion. Investigation continues.

13.    Identify each and every incident and/or instance by date, time, and location in which you interacted with Plaintiff prior to August 23, 1990, including but not limited to, July 15, 1990, August 1, 1990 and August 22, 1990. Identify the purpose of the interaction, who was present during this interaction, what was said by either party during this interaction and whether you made any physical contact or threatening remarks to Plaintiff whatsoever.

**ANSWER:**    Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "instance" and "interacted." Subject to and without waiving said objections, Defendant Mingey states that he would have been present with Plaintiff on those dates and times as set forth in the records. Investigation continues.

14.    Identify any training or instruction you have received regarding policing, arrest procedures, unlawful searches and seizures, use of force, probable cause determinations, report writing, interrogations, preservation of evidence, and duty to disclose exculpatory evidence.

**ANSWER:**    Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "instruction" and "policing". Subject to and without waiving said objections, Defendant Mingey states that he received formal training at the police academy and during the course of his employment with the Chicago Police Department that would have covered the listed topics, but does not have a specific recollection of the courses, materials or instruction. Such information may be available from the Chicago Police Department. In addition, Defendant Mingey would have received on the job training about the listed topics from his supervisors and fellow officers in addition to comments, which could be construed as instruction, he would have received from participants in the criminal court system. Investigation continues.

15.    State whether you have ever been referred for or received any mental health/psychological assessments or treatment or any substance abuse assessments and/or treatment. If the answer is in the affirmative, identify when the referral was made, by whom, the reason for the referral, whether the assessment or treatment was completed, the length of the

treatment, where it was administered, and the outcome of the assessment and/or treatment.

**ANSWER:**     Defendant Mingey objects to this interrogatory because it requests information protected by HIPAA; the Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110, et seq.); the Medical Patient Rights Act (410 ILCS 50 et seq.); the Illinois Constitution right to privacy (Illinois Constitution at Article I § 6); the psychotherapist-patient privilege set forth in *Jaffee v. Redmond* (518 U.S. 1 (1996)); the physician-patient privilege (735 ILCS 5/8-802); and drug and alcohol treatment/rehabilitation confidentiality statutes (20 ILCS 301/30-5; 42 USC 290dd-2; and 42 CFR Part 2). Defendant Mingey further objects because his medical and mental health is not at issue in this case.

16.     State whether you have ever accepted money [sic] a member of a street gang. State further whether you ever observed or learned in any way that Defendant Guevara was accepting money from Mr. Maysonet to protect Mr. Maysonet from arrest. If the answer is in the affirmative, identify every transaction that took place by date, time, location, who was present, and the amount exchanged during the transaction.

**ANSWER:**     Defendant Mingey objects to this interrogatory as unintelligible as written, and vague and ambiguous as to the terms "learned in any way." Subject to and without waiving said objections, Defendant Mingey states he has never accepted money from a member of a street gang and has no knowledge about whether Guevara accepted money from Mr. Maysonet.

17.     Identify each and every investigative activity or task that took place as a result of the May 25, 1990 shooting of the Wiley brothers including but not limited to, arrests, line-ups, photoarrays, show-ups and interrogations. For each activity or task, include the name of the individuals involved (officer and suspect), date, time, location, and any relevant document and communication (see definition in Plaintiff request for Production) generated as a result of the aforementioned activity or task.

**ANSWER:**     Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "task" and "as a result of" and over broad in scope. Subject to and without waiving said objections, Defendant Mingey states that he is aware of the investigative activities that are set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers. Investigation continues.

11

18.     State whether you or any Defendant ever physically assaulted Plaintiff. Further

state whether you ever observed or learned that Guevara physically assaulted Plaintiff. State

whether you ever learned that Guevara physically assaulted Plaintiff because Plaintiff stopped

paying Guevara protection money.

**ANSWER:**     Defendant Mingey objects to this interrogatory as vague and ambiguous as to the term "learned". Subject to and without waiving said objection, Defendant Mingey states he never physically assaulted Plaintiff and has no knowledge about whether any other officer physically assaulted Plaintiff.

19.     State whether you or any Defendant held Plaintiff *incommunicado* for an

extended period of time, denying him access to his attorney even after repeated requests to speak

to his attorney. Further state whether you or any Defendant falsely told Plaintiff's sister and

Plaintiff's attorney that he was not at Area Five when he was in fact in your custody and control.

**ANSWER:**     Defendant Mingey objects to this interrogatory as vague and ambiguous as to the terms "held incommunicado" and "extended period of time." Subject to and without waiving said objections, Defendant Mingey states that he did not prevent Plaintiff from speaking to his attorney and has no knowledge whether any other officer prevented Plaintiff from speaking to his attorney. Further answering the second question in this interrogatory, Defendant Mingey states that to his knowledge, he has never communicated with Plaintiff's sister or attorney and has no knowledge about whether any other officer communicated with Plaintiff's sister or attorney.

20.     State whether you or any defendant threatened Plaintiff in any way, including but

not limited to, telling Plaintiff he would get the death penalty if he did not admit his involvement

in the Wiley brother murders and implicate other individuals in the shooting, threatening to lock

up Plaintiffs girlfriend and sister, and/or threatening to take Plaintiff's children and his

girlfriend's children away from her by placing them with DCFS. If the answer is in the

affirmative, identify every instance in which you threatened Plaintiff by date, time, location, who

was present, and the words that were spoken to Mr. Maysonet.

12

**ANSWER:**   Defendant Mingey objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Mingey states he never threatened Plaintiff and has no knowledge about whether any other officer threatened Plaintiff.

21.   State the name of every individual who alleges that you framed or assisted

another officer in a frame-up during your time as a Chicago Police Officer.

**ANSWER:**   Defendant Mingey objects to this interrogatory as overbroad in scope and timeframe. Defendant Mingey additionally objects to the extent this interrogatory seeks the identity of individuals who filed motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff.   Subject to and without waiving said objections, Defendant Mingey states that he is aware of allegations that he framed or assisted another officer in a "frame-up" in the lawsuits he referenced in interrogatory # 3 above.

22.    State with specificity each and every time you contend that Mr. Maysonet made

any inculpatory statement(s) and/or confession(s) to you or any Defendant. For each statement,

please provide the date, time, location, individuals present, the words Mr. Maysonet

communicated to you and what you communicated to Mr. Maysonet.

**ANSWER:**   Defendant Mingey objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Mingey states  that Plaintiff made inculpatory statements as set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers and is aware that Plaintiff pleaded guilty in Case No. 90 CR 18419 an attempted murder case.

Date: March 6, 2019                                Respectfully Submitted,

                                                   /s/ David A. Brueggen
James G. Sotos                                     DAVID A. BRUEGGEN, Attorney No.  6289138
Josh M. Engquist                                   *One of the Attorneys for Defendants Halvorsen,*
Caroline P. Golden                                 *Mingey, Epplen, Montilla and Paulnitsky*
David A. Brueggen
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
Tel: 630-735-3300
Fax: 630-773-0980
dbrueggen@jsotoslaw.com

**CERTIFICATION**

I hereby certify that I am a defendant in the above captioned case. I have reviewed the
Above interrogatories propounded by Plaintiff Jose Maysonet and hereby certify that the
foregoing answers to the interrogatories are true and accurate to the best of my information,
knowledge and belief..

DATED: _1-24-2019_

_____
Edward Mingey

## PROOF OF SERVICE

I, David A. Brueggen, an attorney, certify that a copy of the attached **Defendant Edward Mingey's Answers to Plaintiff's First Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on March 6, 2019.

**_Attorneys for Plaintiff:_**
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

**_Attorneys for City_**
Eileen E. Rosen
Catherine M. Barber
Patrick R. Moran
Stacy A. Benjamin
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly
321 N. Clark Street, Suite 2200
Chicago, IL 60654
312-494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
pmoran@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

**Attorneys for Frank DiFranco and Cook County**
Allyson L. West
James Chandler
Christina C. Chojancki
Scheagbe Grigsby
Sara D. Spivy
Cook County State's Attorney's Office
Richard J. Daley Center
50 West Washington Street, Room 500
Chicago, IL 60602
(312)603-6299
allyson.west@cookcountyil.gov
james.chandler@cookcountyil.gov
christina.chojnacki@cookcountyil.gov
scheagbe.grigsby@cookcountyil.gov
sara.spivy2@cookcountyil.gov

**Attorney for Reynaldo Guevara**
Thomas M. Leinenweber
Justin L. Leinenweber
James V. Daffada
Michael J. Schalka
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com
jim@ilesq.com
justin@ilesq.com
mjs@ilesq.com

/s/ David A. Brueggen
DAVID A. BRUEGGEN, Attorney No. 6289138
*One of the Attorneys for Defendants Halvorsen, Mingey,*
*Epplen, Montilla and Paulnitsky*

14

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 64

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT ROLAND PAULNITSKY'S ANSWER TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant ROLAND PAULNITSKY ("Paulnitsky") by his attorneys, The Sotos Law

Firm, P.C., answers Plaintiff's First Set of Interrogatories as follows:

### PLAINTIFF'S DEFINITIONS AND INSTRUCTIONS

Defendant Paulnitsky incorporates his objections to the definitions and instructions in

Plaintiff's First Set of Requests for Production propounded on Defendant Paulnitsky as though

fully set forth herein.

### INTERROGATORIES

1.      Please identify all persons who, to the best of your understanding, have

knowledge of facts that relate to any of the claims or defenses in this action. This request

includes but is not limited to those persons listed in the Defendants' Rule 26 Initial Disclosures.

1

For each person with knowledge responsive to this interrogatory, please describe with particularity any categories of facts known by each such person, including all categories of facts about which the person may be competent to testify at trial. If this interrogatory is answered by incorporating documents, please state whether there are any categories of facts known to any witness relating to the claims or defenses in this action that are not reflected in the documents upon which you rely; in the event you fail to do so, Plaintiff will assume the substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**ANSWER:** Defendant Paulnitsky objects to this request as vague and ambiguous as to the terms "categories of facts" and "competent to testify at trial," over broad in scope, calls for a legal conclusion, and compound. Defendant Paulnitsky also objects to this interrogatory to the extent that if it is answered by incorporating documents it requires Defendant Paulnitsky to possess knowledge of facts known to the witness beyond the information contained in the documents. Defendant Paulnitsky further objects to this interrogatory to the extent that it requests the home addresses of the individual defendant officers, other police personnel, or other city employees on the grounds that such information is irrelevant, not proportional to the needs of this case, and could pose a risk to them and/or their families. Finally, Defendant Paulnitsky objects to Plaintiff assuming "the substance of the witnesses' testimony is strictly limited to what is contained in such documents." Subject to and without waiving these objections, all such individuals were previously disclosed in the parties' initial disclosures pursuant to the Mandatory Initial Discovery Pilot Program ("MIDPP") or can be readily identified in the documents previously produced in this case. Investigation continues.

2.      If any document requested in Plaintiff's discovery requests has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for losing, discarding, or destroying the document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it. In answering this interrogatory, please list all steps taken to discover documents that have been lost, discarded or

2

destroyed, and the names of the individuals who took those steps.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as to the terms "any Document requested," over broad as to time frame and scope, unduly burdensome, premature, and not proportional to the needs of the case. Defendant Paulnitsky also objects to this interrogatory to the extent it requests information that is within the knowledge of other parties to this action or third parties. Subject to and without waiving these objections, Defendant Paulnitsky states that he is currently unaware of any document relevant to the claims and defenses in this case that has been lost, discarded, or destroyed. Investigation continues.

3. Please identify all complaints that have ever been made against you relating to your role as a law enforcement official, including but not limited to any and all internal affairs, COPA, IPRA, OPS, intra-or inter-departmental, citizen complaints, or court complaints and lawsuits alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive, or torturous methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, or any form of misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If You do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**ANSWER:** Defendant Paulnitsky objects that this interrogatory is vague and ambiguous as to the terms "all complaints that have ever been made", "complaint," "dishonest behavior," "improperly suggestive," and "improper behavior during interrogations or interviews," over broad in scope, time and subject matter, unduly burdensome, and not proportional to the  needs of this case, and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts. Defendant Paulnitsky additionally objects to complaints alleging misconduct as irrelevant, not proportional to the needs of the case as it could include motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to

3

Plaintiff. Subject to and without waiving these objections, Defendant Paulnitsky does not recall all complaints against him and states that any such legal complaints are in the public domain so are equally available to Plaintiff. Additionally, Defendant Paulnitsky states that complaint register histories, SPAR histories, and complaint register files will be produced under an appropriate protective order. In further answer to this interrogatory, Defendant Paulnitsky states that, subject to the Confidentiality Order entered in this case, the Clear reports for log files of CRs will be produced. Answering further, Defendant Paulnitsky reserves the right to withhold responsive documents on the basis of the attorney-client or deliberative process privileges and will produce a privilege log in the event any documents are withheld on these bases. To the best of his recollection, Defendant Paulnitsky recalls the following lawsuits naming him as a defendant in his capacity as an employee of the Chicago Police Department: *Castillo v. Paulnitsky*, 01 cv 6161; *Currie v. Paulnitsky*, 97 cv 4541; *Delgadillo v. Paulnitsky*, 05 cv 3448; *Godinez v. Paulnitsky*, 04 cv 2510; *Martin v. Paulnitsky*, 06 cv 2850; *Vargas v. Paulnitsky*, 96 cv 1104; *Walton v. Paulnitsky*, 04 cv 7718; *and Washington v. Paulnitsky*, 92 cv 7691.

4.    Please identify every Communication that You have had with any Person, including but not limited to Plaintiff, Suspects, Persons of Interest and any of the Individual Defendants or anyone else, about any of the allegations, events, or circumstances described in Plaintiff's Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when, with whom, and in what medium (in person, phone, email, text, etc.) the Communications occurred; and (c) provide the date of the Communication. If You answer this Interrogatory by referring to Documents, please identify the document and affirm that the sum total of Your Communications responsive to this Interrogatory are contained in the Documents that You reference.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "every communication," "the allegations, events or circumstances described in Plaintiff's Complaint" and "sum total," over broad and unduly burdensome in scope of subject matter and time, requests a narrative response better suited to a deposition, to the extent it seeks information protected by the attorney-client and work-product privileges, and not proportional to the needs of the case. Subject to and without waiving said objections, Defendant Paulnitsky cannot recall all communications he had and refers Plaintiff to documents

4

previously produced in this case which identify or indicate communications that Defendant Paulnitsky would have had with other police officers, staff and Plaintiff. Additionally, Defendant Paulnitsky has discussed Plaintiff's claims of misconduct against him with his attorney. In the normal course of an investigation, Defendant Paulnitsky may have communicated with police officers and staff with regard to the investigation. Investigation continues.

5.     Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the individual who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under Federal Rule of Evidence 609. Please be advised that Your duty to supplement Your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiff intends to move in *in limine* to bar any references to convictions not identified in the manner requests.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "relating to" and "claims or defenses". Defendant Paulnitsky further objects to this interrogatory as not proportional to the needs of the case to the extent it requests "all criminal convictions," requesting information protected by the attorney work product privilege, premature, requesting information equally available to Plaintiff, and requesting information beyond that required by Federal Rule of Evidence 609. Subject to and without waiving said objections, Defendant Paulnitsky refers Plaintiff to documents previously produced in this case. Defendant Paulnitsky will disclose any criminal convictions, not identified in the documents previously produced, that he intends to use as evidence and those convictions will be identified, in accordance with the FRCP, with the filing of the final pretrial order. Investigation continues.

6.     Do you contend that Jose Maysonet committed any of the illegal acts with which he was prosecuted in *People v. Maysonet*, Case No. 92 CR 10146, Case No. 90 CR 21787 and/or Case No. 90 CR 18419 or any illegal act relating to the incidents in Plaintiff's Complaint? If so, please describe each alleged illegal act that You contend was committed by Jose Maysonet, provide the complete factual basis for Your contention, and identify all evidence and witnesses

upon which You may rely to support Your contention. For all affirmative defenses that You have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiff requests that You provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if You intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

**ANSWER:** Defendant Paulnitsky objects that this interrogatory is vague and ambiguous as to the terms "any illegal act," over broad in scope, to the extent it seeks information protected by the attorney-client and work-product privileges, violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts, confusing, and unintelligible as written. Subject to and without waiving said objections, Defendant Paulnitsky states that he was not present during the commission of either of the crimes forming the basis for the listed criminal prosecutions, and thus he does not have personal knowledge of the identities of the people who committed those crimes. Defendant Paulnitsky is aware that Plaintiff pleaded guilty to No. 90 CR 18419. Defendant Paulnitsky believes that Plaintiff Maysonet was involved in the commission of the illegal acts for which he was prosecuted in addition to lesser included offenses based on all the evidence and witnesses identified in the investigation of the Wiley brothers murders and evidence and witnesses presented at Plaintiff's criminal trial. Defendant Paulnitsky was a public employee as a law enforcement officer during his involvement in the Wiley murder investigation. The times of events are set forth in Plaintiff's complaint and in the documents produced in this case. Defendant Paulnitsky is also aware that Plaintiff admits to running a drug sales ring in his complaint. Investigation continues.

7.    For punitive damages purposes, please estimate Your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater

than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate,

etc.) and including all liabilities. Please also provide an income statement for the five years prior

to the filing of this complaint, including Your annual salary and any income from any other

source for those years.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to
the terms "net financial worth," over broad in scope, and premature as he has not
asserted a defense of inability to pay the punitive damages sought by Plaintiff.
Subject to and without waiving said objections, if Defendant Paulnitsky
determines that he will assert such a defense and present evidence, Defendant
Paulnitsky will supplement his response to this Interrogatory.

8.     Given the sum total of Your personal knowledge of the policies, customs, and

practices of the City of Chicago as You understand them (formal or informal, written or

unwritten), please state whether You or any of the other Defendants acted inconsistently with

any of those policies, customs, or practices at any time during the entire encounter or interaction

with Plaintiff described in Plaintiff's Complaint, during the Jose Maysonet Double Murder

Investigation, Wiley Brothers murder investigation, Jose Maysonet Attempt Murder

Investigation or at any time up to the reversal of Jose Maysonet's conviction. If the answer is in

the affirmative, please: (a) identify any particular policy, custom, or practice which, to Your

knowledge was violated; (b) describe the circumstances and manner in which said policy,

custom, or practice was violated, including which Defendant violated the policy; and (c) state

whether any discipline resulted from that violation.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to
the terms "policies, customs, and practices of the City of Chicago," "sum total,"
and "acted inconsistently with any of those policies, customs, or practices," over
broad in scope, not proportional to the needs to the case and violates Fed. R. Civ.
P. 33(a) regarding the use of discrete subparts. Subject to and without waiving
said objections, Defendant Paulnitsky states that he believes he followed all
applicable Chicago Police Department policies and is unaware of any other

7

Individual Defendants' actions inconsistent with policies or practices of the Chicago Police.

9.    Please state with specificity each activity and investigative task that You participated in during the Jose Maysonet Double Murder Investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Jose Maysonet investigation is described in the Documents that You reference.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "each activity…that you participated in" and "sum total of your participation," over broad in scope, unduly burdensome, and requests a narrative response better suited to a deposition. Defendant Paulnitsky further objects to this interrogatory's request to be specifically answered under oath because unsworn declarations or verifications under penalty of perjury are permitted with like force and effect pursuant to 28 U.S.C. §1746. Subject to and without waiving said objections, Defendant Paulnitsky states that a summary of his activity or investigative tasks would be documented in the police records in the case. In addition, during the investigation, Defendant Paulnitsky would have communicated with other police officers and staff with regard to the investigation. Defendant Paulnitsky was not assigned to perform any of the tasks by his supervisors.

10.    Please state with specificity each activity and investigative task that You participated in during the Wiley Brothers murder investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. It includes any line-ups, photo-arrays, If You answer

8

this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your

participation in the Wiley Brothers murder investigation is described in the Documents that You

reference.

**ANSWER:** Defendant Paulnitsky incorporates his objections and answer to interrogatory #9 as if fully set forth herein.

11. Please state all cell phone numbers and cell phone providers that You, and each of

Your immediate supervisors, used at any time between May 1988 and the present day. This

request includes both work-issued and personal cell phone numbers and providers.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as overly broad and unduly burdensome based on the over 25 year time period requested. Additionally, Defendant Paulnitsky objects because the disclosure of any of his telephone numbers, telephone company providers, or account numbers of any telephone accounts are not relevant or proportional to the needs of this litigation because there are no allegations in the complaint that the Defendant Officers used cellular telephones during the Wiley brothers murder investigation. Defendant Paulnitsky also objects to producing any police or personal cellular telephone numbers as doing so would implicate safety concerns for the Defendant Officers and their families. Subject to and without waiving said objections, Defendant Paulnitsky did not have a cellular telephone provided by the City of Chicago Police Department. Defendant Paulnitsky does not recall using a cellular telephone to communicate about the Wiley brothers homicide investigation or Plaintiff..

12. Did You violate Plaintiff or any Suspect's (see definition in Plaintiff's Request for

Production) Constitutional right to a fair trial? Did you have any knowledge that you [sic]

officers were violating Plaintiff or any suspects constitutional right to a fair trial? If Your

position is that you did not violate either Plaintiff or any Suspects Constitutional rights, please

detail every item of evidence and identify every witness that would support Your position.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the term "constitutional right to a fair trial" because an individual's right to a fair trial can be violated under a number of circumstances that do not necessarily involve a police investigation, and also as a premature contention interrogatory. Additionally, Defendant Paulnitsky objects to this interrogatory as it is overbroad in scope and calls for a legal conclusion. Subject to and without waiving said objections, Defendant Paulnitsky denies he violated Plaintiff's or any "Suspect's"

9

Constitutional rights as evidenced by the testimony of parties, witnesses and documents produced in discovery and directs Plaintiff to his answer to Plaintiff's complaint. Investigation continues.

13. Identify each and every incident and/or instance by date, time, and location in which you interacted with Plaintiff prior to August 23, 1990, including but not limited to, July 15, 1990, August 1, 1990 and August 22, 1990. Identify the purpose of the interaction, who was present during this interaction, what was said by either party during this interaction and whether you made any physical contact or threatening remarks to Plaintiff whatsoever.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "instance" and "interacted." Subject to and without waiving said objections, Defendant Paulnitsky states that he would have been present with Plaintiff on those dates and times as set forth in the records. Investigation continues.

14. Identify any training or instruction you have received regarding policing, arrest procedures, unlawful searches and seizures, use of force, probable cause determinations, report writing, interrogations, preservation of evidence, and duty to disclose exculpatory evidence.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "instruction" and "policing". Subject to and without waiving said objections, Defendant Paulnitsky states that he received formal training at the police academy and during the course of his employment with the Chicago Police Department that would have covered the listed topics, but does not have a specific recollection of the courses, materials or instruction. Such information may be available from the Chicago Police Department. In addition, Defendant Paulnitsky would have received on the job training about the listed topics from his supervisors and fellow officers in addition to comments, which could be construed as instruction, he would have received from participants in the criminal court system. Investigation continues.

15. State whether you have ever been referred for or received any mental health/psychological assessments or treatment or any substance abuse assessments and/or treatment. If the answer is in the affirmative, identify when the referral was made, by whom, the

reason for the referral, whether the assessment or treatment was completed, the length of the treatment, where it was administered, and the outcome of the assessment and/or treatment.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory because it requests information protected by HIPAA; the Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110, et seq.); the Medical Patient Rights Act (410 ILCS 50 et seq.); the Illinois Constitution right to privacy (Illinois Constitution at Article I § 6); the psychotherapist-patient privilege set forth in *Jaffee v. Redmond* (518 U.S. 1 (1996)); the physician-patient privilege (735 ILCS 5/8-802); and drug and alcohol treatment/rehabilitation confidentiality statutes (20 ILCS 301/30-5; 42 USC 290dd-2; and 42 CFR Part 2). Defendant Paulnitsky further objects because his medical and mental health is not at issue in this case.

16. State whether you have ever accepted money [sic] a member of a street gang. State further whether you ever observed or learned in any way that Defendant Guevara was accepting money from Mr. Maysonet to protect Mr. Maysonet from arrest. If the answer is in the affirmative, identify every transaction that took place by date, time, location, who was present, and the amount exchanged during the transaction.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as unintelligible as written, and vague and ambiguous as to the terms "learned in any way." Subject to and without waiving said objections, No.

17. Identify each and every investigative activity or task that took place as a result of the May 25, 1990 shooting of the Wiley brothers including but not limited to, arrests, line-ups, photoarrays, show-ups and interrogations. For each activity or task, include the name of the individuals involved (officer and suspect), date, time, location, and any relevant document and communication (see definition in Plaintiff request for Production) generated as a result of the aforementioned activity or task.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "task" and "as a result of" and over broad in scope. Subject to and without waiving said objections, Defendant Paulnitsky states that he is aware of the investigative activities that are set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers. Investigation continues.

11

18. State whether you or any Defendant ever physically assaulted Plaintiff. Further state whether you ever observed or learned that Guevara physically assaulted Plaintiff. State whether you ever learned that Guevara physically assaulted Plaintiff because Plaintiff stopped paying Guevara protection money.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the term "learned". Subject to and without waiving said objection, Defendant Paulnitsky states he never physically assaulted Plaintiff and has no knowledge about whether any other officer physically assaulted Plaintiff.

19. State whether you or any Defendant held Plaintiff *incommunicado* for an extended period of time, denying him access to his attorney even after repeated requests to speak to his attorney. Further state whether you or any Defendant falsely told Plaintiff's sister and Plaintiff's attorney that he was not at Area Five when he was in fact in your custody and control.

**ANSWER:** Defendant Paulnitsky objects to this interrogatory as vague and ambiguous as to the terms "held incommunicado" and "extended period of time." Subject to and without waiving said objections, Defendant Paulnitsky states that he did not prevent Plaintiff from speaking to his attorney and has no knowledge whether any other officer prevented Plaintiff from speaking to his attorney. Further answering the second question in this interrogatory, Defendant Paulnitsky states that he has no recollection of communicating with Plaintiff's sister or attorney and has no knowledge about whether any other officer communicated with Plaintiff's sister or attorney.

20. State whether you or any defendant threatened Plaintiff in any way, including but not limited to, telling Plaintiff he would get the death penalty if he did not admit his involvement in the Wiley brother murders and implicate other individuals in the shooting, threatening to lock up Plaintiffs girlfriend and sister, and/or threatening to take Plaintiff's children and his girlfriend's children away from her by placing them with DCFS. If the answer is in the affirmative, identify every instance in which you threatened Plaintiff by date, time, location, who was present, and the words that were spoken to Mr. Maysonet.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Paulnitsky states he never threatened Plaintiff and has no knowledge about whether any other officer threatened Plaintiff.

21.    State the name of every individual who alleges that you framed or assisted

another officer in a frame-up during your time as a Chicago Police Officer.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as overbroad in scope and timeframe. Defendant Paulnitsky additionally objects to the extent this interrogatory seeks the identity of individuals who filed motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff.   Subject to and without waiving said objections, Defendant Paulnitsky states that he is aware of allegations that he framed or assisted another officer in a "frame-up" in the lawsuits he referenced in interrogatory # 3 above.

22.    State with specificity each and every time you contend that Mr. Maysonet made

any inculpatory statement(s) and/or confession(s) to you or any Defendant. For each statement,

please provide the date, time, location, individuals present, the words Mr. Maysonet

communicated to you and what you communicated to Mr. Maysonet.

**ANSWER:**    Defendant Paulnitsky objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Paulnitsky states  that Plaintiff made inculpatory statements as set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers and is aware that Plaintiff pleaded guilty in Case No. 90 CR 18419 an attempted murder case.

Date: March 6, 2019                                Respectfully Submitted,

James G. Sotos                                  /s/ David A. Brueggen
Josh M. Engquist                               DAVID A. BRUEGGEN, Attorney No.  6289138
Caroline P. Golden                             *One of the Attorneys for Defendants Halvorsen,*
David A. Brueggen                              *Mingey, Epplen, Montilla and Paulnitsky*
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
Tel: 630-735-3300
Fax: 630-773-0980
dbrueggen@jsotoslaw.com

**CERTIFICATION**

I hereby certify that I am a defendant in the above captioned case. I have reviewed the Above interrogatories propounded by Plaintiff Jose Maysonet and hereby certify that the foregoing answers to the interrogatories are true and accurate to the best of my information, knowledge and belief.

DATED: _15 Feb. 2019_

_____
Roland Paulnitsky

## PROOF OF SERVICE

    I, David A. Brueggen, an attorney, certify that a copy of the attached **Defendant Roland Paulnitsky's Answers to Plaintiff's First Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on March 6, 2019.

**_Attorneys for Plaintiff:_**
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

**_Attorneys for City_**
Eileen E. Rosen
Catherine M. Barber
Patrick R. Moran
Stacy A. Benjamin
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly
321 N. Clark Street, Suite 2200
Chicago, IL 60654
312-494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
pmoran@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

**Attorneys for Frank DiFranco and Cook County**
Allyson L. West
James Chanlder
Christina C. Chojancki
Scheagbe Grigsby
Sara D. Spivy
Cook County State's Attorney's Office
Richard J. Daley Center
50 West Washington Street, Room 500
Chicago, IL 60602
(312)603-6299
allyson.west@cookcountyil.gov
james.chandler@cookcountyil.gov
christina.chojnacki@cookcountyil.gov
scheagbe.grigsby@cookcountyil.gov
sara.spivy2@cookcountyil.gov

**Attorney for Reynaldo Guevara**
Thomas M. Leinenweber
Justin L. Leinenweber
James V. Daffada
Michael J. Schalka
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com
jim@ilesq.com
justin@ilesq.com
mjs@ilesq.com

/s/ David A. Brueggen
DAVID A. BRUEGGEN, Attorney No. 628913
_One of the Attorneys for Defendants Halvorsen,_
_Mingey, Epplen, Montilla and Paulnitsky_

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 65

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ERNEST HALVORSEN'S ANSWER TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES**

Defendant ERNEST HALVORSEN ("Halvorsen") by his attorneys, The Sotos Law Firm,

P.C., answers Plaintiff's First Set of Interrogatories as follows:

**PLAINTIFF'S DEFINITIONS AND INSTRUCTIONS**

Defendant Halvorsen incorporates his objections to the definitions and instructions in

Plaintiff's First Set of Requests for Production propounded on Defendant Halvorsen as though

fully set forth herein.

**INTERROGATORIES**

1.      Please identify all persons who, to the best of your understanding, have

knowledge of facts that relate to any of the claims or defenses in this action. This request

includes but is not

limited to those persons listed in the Defendants' Rule 26 Initial Disclosures. For each person
with knowledge responsive to this interrogatory, please describe with particularity any categories
of facts known by each such person, including all categories of facts about which the person may
be competent to testify at trial. If this interrogatory is answered by incorporating documents,
please state whether there are any categories of facts known to any witness relating to the claims
or defenses in this action that are not reflected in the documents upon which you rely; in the
event you fail to do so, Plaintiff will assume the substance of the witnesses' testimony is strictly
limited to what is contained in such documents.

**ANSWER:**   Defendant Halvorsen objects to this request as vague and ambiguous as to the
terms "categories of facts" and "competent to testify at trial," over broad in scope,
calls for a legal conclusion, and compound. Defendant Halvorsen also objects to
this interrogatory to the extent that if it is answered by incorporating documents it
requires Defendant Halvorsen to possess knowledge of facts known to the witness
beyond the information contained in the documents. Defendant Halvorsen further
objects to this interrogatory to the extent that it requests the home addresses of the
individual defendant officers, other police personnel, or other city employees on
the grounds that such information is irrelevant, not proportional to the needs of
this case, and could pose a risk to them and/or their families. Finally, Defendant
Halvorsen objects to Plaintiff assuming "the substance of the witnesses' testimony
is strictly limited to what is contained in such documents." Subject to and without
waiving these objections, all such individuals were previously disclosed in the
parties' initial disclosures pursuant to the Mandatory Initial Discovery Pilot
Program ("MIDPP") or can be readily identified in the documents previously
produced in this case. Investigation continues.

2.      If any document requested in Plaintiff's discovery requests has been lost,

discarded or destroyed, please identify each such document as completely as possible and state

the approximate date it was lost, discarded or destroyed; the circumstances and manner in which

it was lost, discarded or destroyed, including the identities of all persons involved; the reasons

for

losing, discarding, or destroying the document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it. In answering this interrogatory, please list all steps taken to discover documents that have been lost, discarded or destroyed, and the names of the individuals who took those steps.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as to the terms "any Document requested," over broad as to time frame and scope, unduly burdensome, premature, and not proportional to the needs of the case. Defendant Halvorsen also objects to this interrogatory to the extent it requests information that is within the knowledge of other parties to this action or third parties. Subject to and without waiving these objections, Defendant Halvorsen states that he is currently unaware of any document relevant to the claims and defenses in this case that has been lost, discarded, or destroyed. Investigation continues.

3.      Please identify all complaints that have ever been made against you relating to your role as a law enforcement official, including but not limited to any and all internal affairs, COPA, IPRA, OPS, intra-or inter-departmental, citizen complaints, or court complaints and lawsuits alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive, or torturous methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, or any form of misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If You do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**ANSWER:** Defendant Halvorsen objects that this interrogatory is vague and ambiguous as to the terms "all complaints that have ever been made", "complaint," "dishonest behavior," "improperly suggestive," and "improper behavior during interrogations

or interviews," over broad in scope, time and subject matter, unduly burdensome, and not proportional to the  needs of this case, and violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts.  Defendant Halvorsen additionally objects to complaints alleging misconduct as irrelevant, not proportional to the needs of the case as it could include motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff.   Subject to and without waiving these objections, Defendant Halvorsen does not recall all complaints against him and states that any such legal complaints are in the public domain so are equally available to Plaintiff. Additionally, Defendant Halvorsen states that complaint register histories, SPAR histories, and complaint register files will be produced under an appropriate protective order.  In further answer to this interrogatory, Defendant Halvorsen states that, subject to the Confidentiality Order entered in this case, the Clear reports for log files of CRs will be produced.  Answering further, Defendant Halvorsen reserves the right to withhold responsive documents on the basis of the attorney-client or deliberative process privileges and will produce a privilege log in the event any documents are withheld on these bases. To the best of his recollection, Defendant Halvorsen recalls a CR from about 1999 by a Maniac Latin Disciple alleging mistreatment in custody that was not sustained and recalls two lawsuits by Angel Rodriguez (03 cv 3880; 10 cv 4207) naming him as a defendant in his capacity as an employee of the Chicago Police Department . In addition, Defendant Halvorsen is aware that he has been named as a defendant in cases brought by Serrano, Montanez, Sierra, Almodovar, Negron, Solache, Reyes and Rodriguez. Investigation continues.

4.      Please identify every Communication that You have had with any Person, including but not limited to Plaintiff, Suspects, Persons of Interest and any of the Individual Defendants or anyone else, about any of the allegations, events, or circumstances described in Plaintiff's Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when, with whom, and in what medium (in person, phone, email, text, etc.) the Communications occurred; and (c) provide the date of the Communication. If You answer this Interrogatory by referring to Documents, please identify the document and affirm that the sum total of Your Communications responsive to this Interrogatory are contained in the Documents that You reference.

**ANSWER:**    Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "every communication," "the allegations, events or circumstances described in Plaintiff's Complaint" and "sum total," over broad and unduly burdensome in scope of subject matter and time, requests a narrative response better suited to a deposition, to the extent it seeks information protected by the attorney-client and work-product privileges, and not proportional to the needs of the case. Subject to and without waiving said objections, Defendant Halvorsen cannot recall all communications he had and refers Plaintiff to documents previously produced in this case which identify or indicate communications that Defendant Halvorsen would have had with other police officers and staff. Additionally, Defendant Halvorsen has discussed Plaintiff's claims of misconduct against him with his attorney.  In the normal course of an investigation, Defendant Halvorsen may have communicated with police officers and staff with regard to the investigation.  Investigation continues.

5.    Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the individual who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under Federal Rule of Evidence 609. Please be advised that Your duty to supplement Your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiff intends to move in *in limine* to bar any references to convictions not identified in the manner requests.

**ANSWER:**    Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "relating to" and "claims or defenses". Defendant Halvorsen further objects to this interrogatory as not proportional to the needs of the case to the extent it requests "all criminal convictions," requesting information protected by the attorney work product privilege, premature, requesting information equally available to Plaintiff, and requesting information beyond that required by Federal Rule of Evidence 609. Subject to and without waiving said objections, Defendant Halvorsen refers Plaintiff to documents previously produced in this case. Defendant Halvorsen will disclose any criminal convictions, not identified in the documents previously produced, that he intends to use as evidence and those convictions will be identified, in accordance with the FRCP, with the filing of the final pretrial order. Investigation continues.

6. Do you contend that Jose Maysonet committed any of the illegal acts with which he was prosecuted in *People v. Maysonet*, Case No. 92 CR 10146, Case No. 90 CR 21787 and/or Case No. 90 CR 18419 or any illegal act relating to the incidents in Plaintiff's Complaint? If so, please describe each alleged illegal act that You contend was committed by Jose Maysonet, provide the complete factual basis for Your contention, and identify all evidence and witnesses upon which You may rely to support Your contention. For all affirmative defenses that You have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiff requests that You provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if You intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

**ANSWER:** Defendant Halvorsen objects that this interrogatory is vague and ambiguous as to the terms "any illegal act," over broad in scope, to the extent it seeks information protected by the attorney-client and work-product privileges, violates FED. R. CIV. P. 33(a) regarding the use of discrete subparts, confusing, and unintelligible as written. Subject to and without waiving said objections, Defendant Halvorsen states that he was not present during the commission of either of the crimes forming the basis for the listed criminal prosecutions, and thus he does not have personal knowledge of the identities of the people who committed those crimes. Defendant Halvorsen is aware that Plaintiff pleaded guilty to No. 90 CR 18419. Defendant Halvorsen believes that Plaintiff Maysonet was involved in the commission of the illegal acts for which he was prosecuted in addition to lesser

6

included offenses based on all the evidence and witnesses identified in the investigation of the Wiley brothers murders and evidence and witnesses presented at Plaintiff's criminal trial. Defendant Halvorsen was a public employee as a law enforcement officer during his involvement in the Wiley murder investigation. The times of events are set forth in Plaintiff's complaint and in the documents produced in this case. Defendant Halvorsen is also aware that Plaintiff admits to running a drug sales ring in his complaint. Investigation continues.

7.    For punitive damages purposes, please estimate Your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior to the filing of this complaint, including Your annual salary and any income from any other source for those years.

**ANSWER:**    Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "net financial worth," over broad in scope, and premature as he has not asserted a defense of inability to pay the punitive damages sought by Plaintiff. Subject to and without waiving said objections, if Defendant Halvorsen determines that he will assert such a defense and present evidence, Defendant Halvorsen will supplement his response to this Interrogatory.

8.    Given the sum total of Your personal knowledge of the policies, customs, and practices of the City of Chicago as You understand them (formal or informal, written or unwritten), please state whether You or any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the entire encounter or interaction with Plaintiff described in Plaintiff's Complaint, during the Jose Maysonet Double Murder Investigation, Wiley Brothers murder investigation, Jose Maysonet Attempt Murder Investigation or at any time up to the reversal of Jose Maysonet's conviction. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to Your knowledge was violated; (b) describe the circumstances and manner in which said policy,

custom, or practice was violated, including which Defendant violated the policy; and (c) state whether any discipline resulted from that violation.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "policies, customs, and practices of the City of Chicago," "sum total," and "acted inconsistently with any of those policies, customs, or practices," over broad in scope, not proportional to the needs to the case and violates Fed. R. Civ. P. 33(a) regarding the use of discrete subparts. Subject to and without waiving said objections, Defendant Halvorsen states that he believes he followed all applicable Chicago Police Department policies and is unaware of any other Individual Defendants' actions inconsistent with policies or practices of the Chicago Police.

9.      Please state with specificity each activity and investigative task that You participated in during the Jose Maysonet Double Murder Investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Jose Maysonet investigation is described in the Documents that You reference.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "each activity…that you participated in" and "sum total of your participation," over broad in scope, unduly burdensome, and requests a narrative response better suited to a deposition. Defendant Halvorsen further objects to this interrogatory's request to be specifically answered under oath because unsworn declarations or verifications under penalty of perjury are permitted with like force and effect pursuant to 28 U.S.C. §1746. Subject to and without waiving said objections, Defendant Halvorsen states that a summary of his activity or investigative tasks would be documented in the police records and his testimony in the case. In addition, during the investigation, Defendant Halvorsen would have communicated with other police officers and staff with regard to the investigation.

8

Defendant Halvorsen was assigned to perform some of the tasks by his supervisors and other tasks were undertaken by him.

10.     Please state with specificity each activity and investigative task that You participated in during the Wiley Brothers murder investigation. For each activity and task, please describe the Person who assigned You the task or what task you assigned to the person and the Person to whom You reported for the task or the person whom reported to you. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from May 25, 1990 up to and including the present day. It includes any line-ups, photo-arrays, If You answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of Your participation in the Wiley Brothers murder investigation is described in the Documents that You reference.

**ANSWER:**     Defendant Halvorsen incorporates his objections and answer to interrogatory #9 as if fully set forth herein.

11.     Please state all cell phone numbers and cell phone providers that You, and each of Your immediate supervisors, used at any time between May 1988 and the present day. This request includes both work-issued and personal cell phone numbers and providers.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as overly broad and unduly burdensome based on the over 25 year time period requested. Additionally, Defendant Halvorsen objects because the disclosure of any of his telephone numbers, telephone company providers, or account numbers of any telephone accounts are not relevant or proportional to the needs of this litigation because there are no allegations in the complaint that the Defendant Officers used cellular telephones during the Wiley brothers murder investigation. Defendant Halvorsen also objects to producing any police or personal cellular telephone numbers as doing so would implicate safety concerns for the Defendant Officers and their families. Subject to and without waiving said objections, Defendant Halvorsen did not have a cellular telephone provided by the City of Chicago Police Department. Defendant Halvorsen does not recall having a personal cellular telephone until the late 1990's after Plaintiff was convicted of the murders of the Wiley brothers.

12.     Did You violate Plaintiff or any Suspect's (see definition in Plaintiff's Request for

9

Production) Constitutional right to a fair trial? Did you have any knowledge that you [sic] officers were violating Plaintiff or any suspects constitutional right to a fair trial? If Your position is that you did not violate either Plaintiff or any Suspects Constitutional rights, please detail every item of evidence and identify every witness that would support Your position.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the term "constitutional right to a fair trial" because an individual's right to a fair trial can be violated under a number of circumstances that do not necessarily involve a police investigation, and also as a premature contention interrogatory. Additionally, Defendant Halvorsen objects to this interrogatory as it is overbroad in scope and calls for a legal conclusion. Subject to and without waiving said objections, Defendant Halvorsen denies he violated Plaintiff's or any "Suspect's" Constitutional rights as evidenced by the testimony of parties, witnesses and documents produced in discovery and directs Plaintiff to his answer to Plaintiff's complaint. Investigation continues.

13.    Identify each and every incident and/or instance by date, time, and location in which you interacted with Plaintiff prior to August 23, 1990, including but not limited to, July 15, 1990, August 1, 1990 and August 22, 1990. Identify the purpose of the interaction, who was present during this interaction, what was said by either party during this interaction and whether you made any physical contact or threatening remarks to Plaintiff whatsoever.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "instance" and "interacted." Subject to and without waiving said objections, Defendant Halvorsen states that he would have been present with Plaintiff on those dates and times as set forth in the records. Investigation continues.

14.    Identify any training or instruction you have received regarding policing, arrest procedures, unlawful searches and seizures, use of force, probable cause determinations, report writing, interrogations, preservation of evidence, and duty to disclose exculpatory evidence.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "instruction" and "policing". Subject to and without waiving said objections, Defendant Halvorsen states that he received formal training at the

police academy and during the course of his employment with the Chicago Police Department that would have covered the listed topics, but does not have a specific recollection of the courses, materials or instruction. Such information may be available from the Chicago Police Department. In addition, Defendant Halvorsen would have received on the job training about the listed topics from his supervisors and fellow officers in addition to comments, which could be construed as instruction, he would have received from participants in the criminal court system. Investigation continues.

15.     State whether you have ever been referred for or received any mental health/psychological assessments or treatment or any substance abuse assessments and/or treatment. If the answer is in the affirmative, identify when the referral was made, by whom, the reason for the referral, whether the assessment or treatment was completed, the length of the treatment, where it was administered, and the outcome of the assessment and/or treatment.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory because it requests information protected by HIPAA; the Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110, et seq.); the Medical Patient Rights Act (410 ILCS 50 et seq.); the Illinois Constitution right to privacy (Illinois Constitution at Article I § 6); the psychotherapist-patient privilege set forth in *Jaffee v. Redmond* (518 U.S. 1 (1996)); the physician-patient privilege (735 ILCS 5/8-802); and drug and alcohol treatment/rehabilitation confidentiality statutes (20 ILCS 301/30-5; 42 USC 290dd-2; and 42 CFR Part 2). Defendant Halvorsen further objects because his medical and mental health is not at issue in this case.

16.     State whether you have ever accepted money [sic] a member of a street gang. State further whether you ever observed or learned in any way that Defendant Guevara was accepting money from Mr. Maysonet to protect Mr. Maysonet from arrest. If the answer is in the affirmative, identify every transaction that took place by date, time, location, who was present, and the amount exchanged during the transaction.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as unintelligible as written, and vague and ambiguous as to the terms "learned in any way." Subject to and without waiving said objections, Defendant Halvorsen states he has never accepted money from a member of a street gang and has no knowledge about whether Guevara accepted money from Mr. Maysonet.

17.     Identify each and every investigative activity or task that took place as a result of the May 25, 1990 shooting of the Wiley brothers including but not limited to, arrests, line-ups, photoarrays, show-ups and interrogations. For each activity or task, include the name of the individuals involved (officer and suspect), date, time, location, and any relevant document and communication (see definition in Plaintiff request for Production) generated as a result of the aforementioned activity or task.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "task" and "as a result of" and over broad in scope. Subject to and without waiving said objections, Defendant Halvorsen states that he is aware of the investigative activities that are set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers. Investigation continues.

18.     State whether you or any Defendant ever physically assaulted Plaintiff. Further state whether you ever observed or learned that Guevara physically assaulted Plaintiff. State whether you ever learned that Guevara physically assaulted Plaintiff because Plaintiff stopped paying Guevara protection money.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the term "learned". Subject to and without waiving said objection, Defendant Halvorsen states he never physically assaulted Plaintiff and has no knowledge about whether any other officer physically assaulted Plaintiff.

19.     State whether you or any Defendant held Plaintiff *incommunicado* for an extended period of time, denying him access to his attorney even after repeated requests to speak to his attorney. Further state whether you or any Defendant falsely told Plaintiff's sister and Plaintiff's attorney that he was not at Area Five when he was in fact in your custody and control.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as vague and ambiguous as to the terms "held incommunicado" and "extended period of time." Subject to and without waiving said objections, Defendant Halvorsen states that he did not prevent Plaintiff from speaking to his attorney and has no knowledge whether any other officer prevented Plaintiff from speaking to his attorney. Further answering

the second question in this interrogatory, Defendant Halvorsen states that to his knowledge, he has never communicated with Plaintiff's sister or attorney and has no knowledge about whether any other officer communicated with Plaintiff's sister or attorney.

20.     State whether you or any defendant threatened Plaintiff in any way, including but not limited to, telling Plaintiff he would get the death penalty if he did not admit his involvement in the Wiley brother murders and implicate other individuals in the shooting, threatening to lock up Plaintiffs girlfriend and sister, and/or threatening to take Plaintiff's children and his girlfriend's children away from her by placing them with DCFS. If the answer is in the affirmative, identify every instance in which you threatened Plaintiff by date, time, location, who was present, and the words that were spoken to Mr. Maysonet.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Halvorsen states he never threatened Plaintiff and has no knowledge about whether any other officer threatened Plaintiff.

21.     State the name of every individual who alleges that you framed or assisted another officer in a frame-up during your time as a Chicago Police Officer.

**ANSWER:**     Defendant Halvorsen objects to this interrogatory as overbroad in scope and timeframe. Defendant Halvorsen additionally objects to the extent this interrogatory seeks the identity of individuals who filed motions to suppress and motions to quash which are routine in criminal court, and requesting information that is equally available to Plaintiff.  Subject to and without waiving said objections, Defendant Halvrosen states that he is aware of allegations that he framed or assisted another officer in a "frame-up" in the lawsuits he referenced in interrogatory # 3 above.

22.     State with specificity each and every time you contend that Mr. Maysonet made any inculpatory statement(s) and/or confession(s) to you or any Defendant. For each statement, please provide the date, time, location, individuals present, the words Mr. Maysonet communicated to you and what you communicated to Mr. Maysonet.

**ANSWER:** Defendant Halvorsen objects to this interrogatory as overbroad in scope. Subject to and without waiving said objections, Defendant Halvorsen states he never communicated substantively with Plaintiff and only has knowledge of those statements made by Plaintiff that are set forth in the Chicago Police Department records for the investigation of the May 25, 1990 shooting of the Wiley brothers and is aware that Plaintiff pleaded guilty in Case No. 90 CR 18419 an attempted murder case.

Date: March 6, 2019                    Respectfully Submitted,

                                       /s/ David A. Brueggen
                                       DAVID A. BRUEGGEN, Attorney No.  6289138
                                       *One of the Attorneys for Defendants Halvorsen,*
                                       *Mingey, Epplen, Montilla and Paulnitsky*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
David A. Brueggen
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
Tel: 630-735-3300
Fax: 630-773-0980
dbrueggen@jsotoslaw.com

14

## CERTIFICATION

I hereby certify that I am a defendant in the above captioned case. I have reviewed the above interrogatories propounded by Plaintiff Jose Maysonet and hereby certify that the foregoing answers to the interrogatories are true and accurate to the best of my information, knowledge and belief.

DATED: Jan. 24, 2019

_____
Ernest Halvorsen

## **PROOF OF SERVICE**

I, David A. Brueggen, an attorney, certify that a copy of the attached **Defendant Ernest Halvorsen's Answers to Plaintiff's First Set of Interrogatories** was served upon counsel of record via electronic mail at the electronic addresses listed below on March 6, 2019.

***Attorneys for Plaintiff:***
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

***Attorneys for City***
Eileen E. Rosen
Catherine M. Barber
Patrick R. Moran
Stacy A. Benjamin
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly
321 N. Clark Street, Suite 2200
Chicago, IL 60654
312-494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
pmoran@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

**Attorneys for Frank DiFranco and Cook County**
Allyson L. West
James Chandler
Christina C. Chojancki
Scheagbe Grigsby
Sara D. Spivy
Cook County State's Attorney's Office
Richard J. Daley Center
50 West Washington Street, Room 500
Chicago, IL 60602
(312)603-6299
allyson.west@cookcountyil.gov
james.chandler@cookcountyil.gov
christina.chojnacki@cookcountyil.gov
scheagbe.grigsby@cookcountyil.gov
sara.spivy2@cookcountyil.gov

**Attorney for Reynaldo Guevara**
Thomas M. Leinenweber
Justin L. Leinenweber
James V. Daffada
Michael J. Schalka
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
(847)251-4091
thomas@ilesq.com
jim@ilesq.com
justin@ilesq.com
mjs@ilesq.com

/s/ David A. Brueggen
DAVID A. BRUEGGEN, Attorney No. 6289138
*One of the Attorneys for Defendants Halvorsen, Mingey, Epplen, Montilla and Paulnitsky*

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 66

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Andrea R. Wood |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS ERNEST HALVORSEN, EDWARD MINGEY, LEE EPPLEN, FERNANDO MONTILLA, AND ROLAND PAULNITSKY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendants Ernest Halvorsen, Edward Mingey, Lee Epplen, Fernando Montilla and Roland Paulnitsky ("Answering Defendants"), by their attorneys The Sotos Law Firm, P.C., and for their answer to Plaintiff's Complaint state:

### INTRODUCTION

1.     Plaintiff, Jose Juan Maysonet, Jr., spent 27 years incarcerated in the Illinois Department of Corrections for the murders of Torrence and Kevin Wiley ("the Wiley brothers") – a crime he did not commit.

**ANSWER:     The Answering Defendants admit that Plaintiff was incarcerated in the Illinois Department of Corrections in part for the murder of Torrence and Kevin Wiley, but deny, on information and belief, the remaining allegations in this paragraph.**

2.      In and around August 22, 1990, the Police Officer Defendants conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murders of the Wiley brothers while indifferent to the fact that he was innocent.

**ANSWER:      The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

3.      Former Assistant Cook County State's Attorney defendant Frank DIFRANCO, while acting in an investigatory function and prior to the existence of any probable cause to believe Plaintiff committed the crime, conspired with the defendant officers to procure a fabricated confession from Plaintiff.

**ANSWER:      The Answering Defendants admit that Frank DiFranco was a Cook County Assistant State's Attorney; deny the remaining allegations in this paragraph as they pertain to them; but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

4.      All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by attributing fabricated oral admissions to the Plaintiff, by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murders, and by physically coercing a fabricated court-reported statement from Plaintiff that was transcribed in English even though Plaintiff spoke little to any English at the time of his arrest.

**ANSWER:      The Answering Defendants admit that Plaintiff provided admissions in a court-reported statement that was transcribed in English and that other witnesses made statements implicating Plaintiff in the murders, but deny that Plaintiff spoke "little to any English" at the time of his arrest and deny that there was any physical coercion. Further answering, the Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

5.      There were no eyewitnesses to the murders, no plausible motive, and no physical evidence connecting Plaintiff to the crime.  Without the Defendants' concealment of evidence,

falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's

false inculpatory statements, Plaintiff would never have been convicted.

**ANSWER:** **The Answering Defendants deny that there were no witnesses to the murder, no plausible motive, that Plaintiff's statements were false, and that there was any physical coercion of Plaintiff, but admit that Plaintiff made inculpatory statements. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

6.      For nearly three decades, Plaintiff fought to prove his innocence while the

defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until

retiring with their full police pension.

**ANSWER:** **The Answering Defendants admit that they receive police pensions. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

7.      On October 19, 2016, Cook County Circuit Court Judge Ricky Jones vacated

Plaintiff's convictions without objection from the State after it was discovered that his trial

attorney, Richard Beuke, labored under a *per se* conflict of interest while defending Plaintiff

against the double murder charges.  Unbeknownst to Plaintiff, at the time of his trial, Mr. Beuke

was simultaneously representing defendant GUEVARA in unrelated child-support proceedings.

**ANSWER:** **The Answering Defendants admit, on information and belief, that Plaintiff's conviction was vacated, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

8.      On November 15, 2017, the State moved for an order to *nolle prosequi* the

charges against Plaintiff after *all* of the defendant officers represented through counsel that they

would exercise their Fifth Amendment rights to remain silent in response to questions about their

investigation of the Wiley brothers' murders.  That same day, Plaintiff was released from

custody after having spent 27 years of his life in the Illinois Department of Corrections.

**ANSWER:** **The Answering Defendants admit, on information and belief, that Plaintiff**
**was released from prison on November 15, 2017 and that Plaintiff had been**
**incarcerated for about 27 years on two separate charges. Further answering,**
**the Answering Defendants deny that** *all* **the defendant officers represented**
**through counsel that they would assert their Fifth Amendment rights, but**
**lack knowledge or information sufficient to admit or deny the remaining**
**allegations in this paragraph.**

9.     Sadly, Plaintiff is among a growing group of Latino men from Humboldt Park

who have proven that they were framed for crimes they did not commit at the hands of the

defendant officers.  Just by way of example, defendant GUEVARA, HALVORSEN, and

MINGEY framed Armando Serrano and Jose Montanez for the 1993 murder of Rodrigo Vargas.

Serrano and Montanez were exonerated on July 20, 2016, following the Illinois Appellate

Court's issuance of a pair of scathing decisions acknowledging GUEVARA's pattern and

practice of misconduct.  *People v. Serrano,* 2016 IL App (1st) 133493 (June 7, 2016) & *People*

*v. Montanez*, 2016 IL App (1st) 133726 (June 7, 2016).  Serrano and Montanez received

Certificated of Innocence in November 2016 and both filed federal civil rights actions that are

currently pending in this Court.  *See Serrano v. Guevara, et al*., 17-cv-2869 ad *Montanez v.*

*Guevara, et al*. 17-cv-4560.

**ANSWER:** **The Answering Defendants admit, on information and belief,  that Serrano**
**and Montanez were convicted of the 1993 murder of Rodrigo Vargas; that**
**Serrano and Montanez were released from incarceration on July 20, 2016**
**after the Illinois Appellate Court issued opinions in** *People v. Serrano,* **2016**
**IL App (1st) 133493 &** *People v. Montanez*, **2016 IL App (1st) 133726; that**
**Serrano and Montanez received Certificates of Innocence in November 2016;**
**and that Serrano and Montanez filed federal civil rights actions that are**
**currently pending in this Court.  The Answering Defendants deny the**
**remaining allegations in this paragraph as they pertain to them, but**
**otherwise lack knowledge or information sufficient to admit or deny the**
**remaining allegations in this paragraph.**

10.     Defendants GUEVARA, HALVORSEN, and MINGEY framed Roberto

Almodovar, Jr. and William Negron for the murders of Jorge Rodriguez and Amy Merkes in

September 1994. Both men were exonerated in April 2017 and received Certificates of

Innocence on November 20, 2017.

**ANSWER:** **The Answering Defendants admit, on information and belief, that Almodovar, Jr. and Negron were convicted of the September 1994 murders of Jorge Rodriguez and Amy Merkes; that Almodovar, Jr. and Negron were released from incarceration on that matter; and that Almodovar, Jr. and Negron received Certificates of Innocence in November 2017. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

11.     Defendants GUEVARA and MINGEY also framed Jacques Rivera who was

wrongfully convicted of the 1988 murder of Felix Valentin. The Cook County State's

Attorney's office vacated Rivera's conviction on October 4, 2011, and he received a Certificate

of Innocence on September 5, 2012. Rivera's civil suit against GUEVARA and MINGEY is

currently pending in this Court. *Rivera v. Guevara, et al.,* 12-cv-4428.

**ANSWER:** **The Answering Defendants admit, on information and belief, that Rivera was convicted of the 1988 murder of Felix Valentin; that Rivera was released from incarceration in 2011; that Rivera received a Certificate of Innocence in 2012; and that Rivera filed a federal civil rights suit against Guevara and Mingey that is currently pending in this Court. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

12.     Since Plaintiff's exoneration less than a year ago, the State has vacated murder

convictions of at least five other individuals who have demonstrated that they were framed by

GUEVARA, HALVORSEN and MINGEY, including Arturo Reyes, Garbriel Solache, Thomas

Sierra, Ariel Gomez, and Ricardo Rodriguez.

**ANSWER:** **The Answering Defendants admit, on information and belief, that since Plaintiff was released from incarceration, Reyes, Solache, Sierra, Gomez and Rodriguez have been released from incarceration. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

13. Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

**ANSWER:** **The Answering Defendants admit Plaintiff is seeking a monetary award based on his allegations of misconduct. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

## JURISDICTION AND VENUE

14. This actions is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

**ANSWER:** **The Answering Defendants admit Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Illinois state law to redress alleged deprivations under color of state law of Plaintiff's rights as secured by the United States Constitution and Illinois law. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

15. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391 (b), because the parties reside in this judicial district, and the events given rise to the claims asserted herein occurred in this judicial district.

**ANSWER:** **The Answering Defendants admit this Court has jurisdiction under 28 U.S.C. §§1331 and 1367 and venue is proper under 28 U.S.C. §1391(b). The Answering Defendants admit that they reside within this judicial district. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

## PARTIES

16. Plaintiff Jose Juan Maysonet, Jr., a 49-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

17.     At all relevant times hereto, Defendants Reynaldo GUEVARA (Star No. 16345), Ernest HALVORSEN (Star No. 6036), and Roland PAULNTISKY (Star No. 6503) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Fernando MONTILLA (Star No. 16410) was a member of the Chicago Police Department assigned to Area Five Property Crime Unit.  Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the murder of the Wiley brothers.

**ANSWER:** The Answering Defendants admit that at certain relevant times Guevara, Halvorsen and Paulnitsky were members of the Chicago Police Department assigned to the Area Five Violent Crimes Unit and  Montilla was a member of the Chicago Police Department assigned to the Area Five Property Crimes Unit. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

18.     Defendants Sergeant Edward MINGEY (Star No. 1731) and Sergeant EPPLEN (Star No. 890) were members of the Chicago Police Department and assigned to the Area Five's Violent Crimes Unit.  MINGEY and EPPLEN were, at all relevant times, supervisors of the Police Officer Defendants.  They facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.  In addition, Defendant MINGEY directly fabricated oral statements of the Plaintiff that were later used to convict him.

**ANSWER:** The Answering Defendants admit that at certain relevant times Mingey and Epplen were members of the Chicago Police Department assigned to the Area Five Detective Division and that at certain times supervised one or more of the Police Officer Defendants.  The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but

otherwise lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.

19.     Defendant Frank DIFRANCO, at all relevant times, was an Assistant Cook
County State's Attorney. Defendant DIFRANCO, while acting in an investigatory fashion,
helped procure fabricated statements from Plaintiff and his girlfriend that were later introduced
at trial and used to wrongfully convict Plaintiff. Defendant DIFRANCO is sued for conspiring
with the Defendant Officers to frame Plaintiff while acting in an investigatory capacity and
without probable cause to believe Plaintiff committed a crime.

**ANSWER:     The Answering Defendants admit at certain relevant times , DiFranco was an
Assistant Cook County State's Attorney. The Answering Defendants deny
the remaining allegations in this paragraph as they pertain to them, but
otherwise lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.**

20.     Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which
employs or employed the Police Officer Defendants at the time of the events giving rise to this
suit.

**ANSWER:     The Answering Defendants admit the Defendant City of Chicago is an Illinois
municipal corporation which employed the Police Officer Defendants. The
Answering Defendants deny the remaining allegations in this paragraph as
they relate to them, but otherwise lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.**

21.     Defendant COOK COUNTY is a governmental entity within the State of Illinois
which provides funding for the COOK County State's Attorney's office which is responsible for
paying and judgment entered against the defendant Frank DIFRANCO.

**ANSWER:     The Answering Defendants admit Defendant Cook County is a governmental
entity within the State of Illinois but lack knowledge or information sufficient
to admit or deny the remaining allegations in this paragraph.**

22.     Each of the individual Chicago Police officer defendants and defendant DIFRANCO are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

**ANSWER:     The Answering Defendants admit the individual Chicago Police officer defendants are sued in their individual capacities and DiFranco is sued in his individual capacity.  The Answering Defendants further admit that they acted under color of state law and in the scope of their employment at all times relevant to this lawsuit. The Answering Defendants deny the remaining allegations in this paragraph as they relate to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

## FACTUAL ALLEGATIONS

23.     In the mid-1980's, Plaintiff lived with his mother, step-father, and siblings in the Humboldt Park area of Chicago.  Plaintiff  had spent much of his childhood in Puerto Rico but settled in Chicago to attend high school.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

24.     Plaintiff struggled academically since he did not fluently speak English.  He dropped out of high school around his junior year.  Like many of the young men in his community, Plaintiff became a member of the Latin Kings street gang.

**ANSWER:     The Answering Defendants admit that Plaintiff was a member of the Latin Kings street gang, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

25.     Shortly after dropping out of high school, Plaintiff moved into the basement of his family building with his girlfriend Rosa Bello and her two daughters.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

### A "Deal with the Devil"

26.     As a member of the Latin Kings street gang, Plaintiff was involved in selling narcotics in the area of Pierce and Kedzie.  In the summer of 1988, defendant GUEVARA and Joseph Miedzianowski,[1] both officers from the 25th district gang crimes unit, raided Plaintiff's home searching for drugs and guns.  Although the officers came up empty handed, defendant GUEVARA told Plaintiff (in Spanish) that he wasn't "dumb" and knew what Plaintiff was up to (i.e., selling drugs) and that if Plaintiff didn't want trouble from them [the police] there was a "price to pay."  At the time, Plaintiff did not give much thought to GUEVARA's statements.

**ANSWER:     The Answering Defendants admit that Plaintiff was a member of the Latin Kings street gang and sold narcotics. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

27.     After the raid, Plaintiff and Rosa Bello (and her children) moved out of Plaintiff's mother's building into an apartment on North Homan Avenue.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

28.     Several months later, Plaintiff was formally introduced to defendant GUEVARA and Miedzianowski in the kitchen of a Cuban restaurant on North Avenue.  Plaintiff was friendly with the owner of the restaurant who was involved in the drug trade and used the restaurant mostly as a front for narcotics activity.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

29.     Plaintiff vividly recalls the day he met GUEVARA and Miedzianowski in the kitchen of the Cuban restaurant.  Plaintiff had finished eating a meal and walked to the kitchen to drop off his dirty plate when he noticed the owner speaking to defendant GUEVARA and

---

[1] Joseph Miedzianowski is currently serving a life sentence in the federal Bureau of Prisons after being convicted of racketeering and drug conspiracy in April 2001.

Miedzianowski.  Plaintiff recognized the officers from the raid of his home several months

earlier.  The owner introduced Plaintiff to GUEVARA and Miedzianowski and told him that if

he ever had any problems with other officers in the neighborhood, GUEVARA and

Miedzianowski could be of assistance.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

     30.     Defendant Guevara spoke in Spanish to Plaintiff and told him that he remembered

him from the raid of his home.  Defendant GUEVARA confirmed that he could help protect

Plaintiff from arrest for his drug activities but that there was a cost involved.  Plaintiff asked

GUEVARA what type of "cost" was involved and Defendant GUEVARA told him that he would

talk to him later about the details.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

     31.     After another conversation a week later, Plaintiff began paying defendant

GUEVARA protection money in the amount of $1000 per week so that Plaintiff and a small

crew with whom he worked could sell drugs without police interference.  Plaintiff did not feel at

liberty to decline defendant GUEVARA's offer.  GUEVARA made it clear that if Plaintiff did

not pay him the fee he was charging, he and his crew would be targeted for arrest.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

     32.     For roughly a year, Plaintiff paid GUEVARA his weekly fee and GUEVARA

delivered on his promise to protect Plaintiff from police interference in his drug sales.  However,

in late 1989, Plaintiff and GUEVARA had a "falling-out" when Area Five detectives arrested

and falsely charged one of Plaintiff's best friends, Santiago Sanchez ("Macho") with attempt

murder.  Upset that his friend had been charged, Plaintiff confronted GUEVARA about the

situation. GUEVARA was unsympathetic to Plaintiff's complaint and told Plaintiff, in sum and substance, that Sanchez was getting "hooked up" and there was nothing Plaintiff could do about it.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

33.     Plaintiff reluctantly continued to pay GUEVARA his weekly "protection" fee, fearful that the notorious "hook-up" artist might turn his sights on him. But that all changed on May 21, 1990.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

34.     On May 21, 1990, Sanchez, who was out on bond, missed a court appearance for his attempt murder case. Later that day Sanchez committed suicide by shooting himself in a car near Crystal and Kedzie avenues.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

35.     Although violence was common-place in the Humboldt Park community, suicide was highly unusual which made this period of time striking and memorable. Plaintiff was devastated by the loss of his friend and blamed GUEVARA and the crooked Area Five detectives for the tragedy. Plaintiff stopped making "protection payments" to defendant GUEVARA from that day forward.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

36.     On the morning of May 25, 1990, Plaintiff attended Sanchez's funeral along with numerous other friends and fellow Latin Kings from the neighborhood.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

### The Wiley Brothers' Murders

37.     Earlier on the morning of May 25, 1990 at roughly 1:00 a.m., Torrence and Kevin Wiley, two African-American men in their late 20s, were shot and killed in front of a vacant lot at 3428 W. North Avenue.  The brothers were not associated with any street gangs or drug activity and did not live in Humboldt Park.

**ANSWER:     The Answering Defendants admit,  on information and belief, the allegations in this paragraph.**

38.     There were no eye-witnesses to the crime, but two women who lived on the block told the police that they heard an argument between two black males just before the shooting. The argument lasted for about an hour and the voices they heard were of African-American men, not men speaking Spanish or speak English with Puerto Rican accents.  The women heard bits and pieces of the argument, including the statements, "I'm trying to help you," and "I'm going to kill you first" and "you said we would get the last bus."  Of particular note, the men kept saying the name "Lulu Dog."

**ANSWER:     The Answering Defendants admit, on information and belief, that two women who lived on the block heard bits and pieces of two English speaking men arguing for about one hour just before hearing gunshots, and that the men stated "I'm trying to help you," "I'm going to kill you first" and "you said we would get the last bus" and also referenced "Lulu dog" a number of times.  The Answering Defendants deny that there were no witnesses to the crime and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

39.     After an initial canvas of the neighborhood that yielded little information, defendant MINGEY, who was the supervising sergeant on the case, decided that he would close the case by finding a gang-banger to pin the murders on rather than conduct a meaningful investigation designed to identify the real offenders.  Police reports show that detectives made no further attempts to locate potential witnesses who lived or worked on the busy street were the shooting occurred.  Incredibly, detectives did nothing to identify or track down "Lulu Dog" even though the victims' sister confirmed that he was a person known to the victims and provided a phone number and address for him.

**ANSWER:     The Answering Defendants admit there was a canvas of the neighborhood that yielded little information but deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

40.     Area Five detectives supervised by defendant MINGEY had no interest in solving this senseless murder of two young black men but instead saw it as an opportunity to frame "gang bangers."

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

41.     A couple of weeks after the Wiley brothers' murders, defendants GUEVARA and HALVORSEN arrested two Latin Kings from the area, Efrain Cruz ("King") and Francisco Veras ("Cisco") for the petty offense of "mob action." Cruz was being targeted by GUEVARA, HALVORSEN and MINGEY because he had recently beat an armed robbery case.  It was a known practice of Area Five detectives that if a gang-banger "beat" a case, he would be prioritized for a "frame-up."

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny whether a couple of weeks after the Wiley brothers' murders,**

14

> **Guevara and Halvorsen arrested Latin Kings Efrain Cruz ("King") and Francisco Veras ("Cisco") for the petty offense of "mob action" and whether Cruz had recently beaten an armed robbery case. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

42.     Cruz and Veras were taken to Grand and Central where they were interrogated and accused of killing the Wiley brothers.  The men were put in line-ups and falsely told they were identified as the shooters, presumably in hopes that they would make an inculpatory statement that could be used against them or, more like, would make an exculpatory statement pointing the finger at someone else, thereby providing probable cause to arrest that person who could then be interrogated and tricked, manipulated or coerced into pointing the finger back at Cruz and Veras.  This tactic was standard operating procedure for Area Five detectives under the supervision of defendant MINGEY.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Cruz and Veras were taken to Grand and Central, interrogated, accused of killing the Wiley brothers, put in line-ups, and falsely told they were identified as the shooters. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

43.     Defendants GUEVARA and HALVORSEN told both Cruz and Veras that they knew another Latin King was the get-away driver and that whomever implicated the other first would get leniency.  Neither Cruz nor Veras took the bait.  The men were eventually released from Grand and Central after they figured out that they had been in police custody at the time of the Wiley brothers' murders.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to admit or deny allegations in this paragraph.**

44.     As fate would have it, Santiago Sanchez's visitation on the evening of May 24, 1990 had raised tensions in the neighborhood and that same evening, officers conducted a sweep on North Avenue that resulted in the Arrests of more than a dozen Latin Kings, including Cruz and Veras.  Thus, Cruz and Veras were sitting in a police lock-up at the exact time the Wiley brothers were shot and killed.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

45.     With airtight alibis for the night of the Wiley brothers' murders, detectives GUEVARA, HALVORSEN, and MINGEY realized that they could not pin the murders on Cruz and Veras or any of the other Latin Kings who were in custody that night.  Unfortunately for Plaintiff, on the night of May 24, 1990 after attending Sanchez's visitation, he spent a quiet night at home with his girlfriend, mourning the loss of his close friend.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny whether Cruz and Veras had alibis and whether Plaintiff attended Snachez's visitation on the night of May 24, 1990. The Answering Defendants deny Plaintiff spent a quiet night at home mourning the loss of his close friend on May 24-25, 1990. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

### Plaintiff's July 15, 1990 Arrest

46.     On July 15, 1990, defendant PAULNITSKY arrested Plaintiff in connection with an unrelated shooting that occurred on July 3, 1990.

**ANSWER:     The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

47.     Plaintiff was brought to Area Five, Grand and Central, where he was placed in a line-up and purportedly identified as being involved in the unrelated July 3, 1990 shooting.  With the assistance of a Spanish-speaking police officer, Defendant PAULNITSKY interviewed

Plaintiff about the July 3, 1990 shooting. Plaintiff denied his involvement in the shooting and exercised his right to counsel. Defendant PAULNITSKY stated, in sum and substance that "he didn't need a statement from Plaintiff, because he was identified and was getting charged." However, defendant PAULNITSKY told Plaintiff that his supervisor, defendant MINGEY, wanted to talk to him about another matter.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff exercised his right to counsel for the July 3, 1990 shooting and whether Paulnitsky stated "he didn't need a statement from Plaintiff, because he was identified and was getting charged." Further answering, the Answering Defendants admit, on information and belief, the remaining allegations in this paragraph.**

48.  Plaintiff was brought into a different interview room where he was interviewed by defendants MINGEY and MONTILLA. MINGEY did the questioning while MONTILLA acted as an interpreter. Defendant MINGEY asked Plaintiff where he was in the early morning hours of May 25, 1990. Plaintiff responded that he was at home because he was mourning the loss of his good friend, Santiago Sanchez, and that they buried him the morning of May 25, 1990. Plaintiff asked MINGEY why he was asking for his whereabouts during that time period.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff mentioned he was mourning his friend who was buried on May 25, 1990 and admit, on information and belief, the remaining allegations in this paragraph.**

17

49.     Defendant MINGEY told Plaintiff that two "brothers" had been shot on North Avenue and that the ballistics evidence found at the scene of the murders suggested that the weapon used in the murder of the Wiley brothers was the same caliber weapon used in the shooting that Plaintiff had just been arrested for.  Recognizing defendants MINGEY and MONTILLA's design to implicate Plaintiff in the double murders, Plaintiff told the detectives that they were on some "bullshit" and that he wanted his lawyer.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny whether at some point Plaintiff told them they were on some "bullshit" and what if anything Plaintiff allegedly recognized, but deny that Plaintiff requested a lawyer. Further answering, the Answering Defendants, admit on information and belief, the remaining allegations in this paragraph.**

50.     Defendant MINGEY stated in sum and substance [through defendant MONTILLA], "you'll be hearing from us again.  We know where to find you." Plaintiff was then taken to the Cook County Jail on charges for attempted murder related to the July 3, 1990 shooting.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

**Defendants MINGEY and MONTILLA Make a Surprise Visit to Cook County Jail**

51.     Two weeks later on August 1, 1990, a correctional officer retrieved Plaintiff from Division 2 of the Cook County Jail where he was being housed.  Plaintiff followed the correctional officer to Division 5 where he was met by an older supervising Cook County sheriff dressed in jeans and a white shirt.  The sheriff directed Plaintiff to sign a piece of paper and Plaintiff complied without question.  Plaintiff did not read the paper as it was written in English and assumed it was just protocol.  No one translated the paper to Plaintiff or explained its contents.

**ANSWER:**      **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

52.      After signing the paper, the sheriff brought Plaintiff into an interview room where Plaintiff was surprised to see defendants MINGEY and MONTILLA seated at a table. MINGEY and MONTILLA told Plaintiff to sit down. Again, MONTILLA was acting as an interpreter, translating from English to Spanish and vice versa. Plaintiff complied but told the detectives that he had nothing to say to them and that they should contact his lawyer, William Swano. Plaintiff had Swano's business card in his pocket and pulled it out and handed it to the detectives.

**ANSWER:**      **The Answering Defendants deny that Plaintiff stated he had nothing to say, advised Mingy and Montilla to contact his attorney and provided them Swano's business card and affirmatively state that Plaintiff was advised of his right to counsel in Spanish and signed an attorney waiver form. Further answering, the Answering Defendants admit that Mingey and Montilla were at the Cook County Jail seated at a table in an interview room with Plaintiff and Montilla translated, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

53.      Defendants MINGEY and MONTILLA told Plaintiff that they weren't calling his lawyer and only wanted to talk to him about the murders of those "niggers" on North Avenue. Plaintiff went to grab a telephone that was in the interview room and defendant MINGY grabbed it out of his hand. MINGEY told Plaintiff "we have a CTA bus full of people who identified you." Plaintiff responded by stating, "then why are you here talking to me?" Plaintiff stood up with an intent to leave the room and the detectives also stood up aggressively and began yelling at Plaintiff to sit down. The conversation got so heated that the Cook County sheriff came into the room and stated something sternly to the detectives. The sheriff looked at Plaintiff and asked him, "you ok?" and then escorted Plaintiff out of the interview room.

**ANSWER:**      **The Answering Defendants admit Mingey and Montilla advised Plaintiff that they wanted to discuss the Wiley brothers' murder, but deny the remaining allegations in this paragraph.**

54.     On August 16, 1990, Plaintiff made bond on the attempted murder case and was

released from Cook County Jail.

**ANSWER:     The Answering Defendants admit, on information and belief, the allegations
in this paragraph.**

**Plaintiff's August 22, 1990 Arrest for the Wiley Brothers' Murders**

55.     Shortly before 9:00 a.m. on August 22, 1990, Plaintiff appeared before the Chief

Judge of the criminal division of the Circuit Court of Cook County (Room 101) at 26th California

for assignment of his attempted murder case.  Plaintiff was accompanied by a friend and his

sister Rose Maysonet.

**ANSWER:     The Answering Defendants admit that Plaintiff was at the criminal
courthouse at 26th and California on August 22, 1990, but lack knowledge or
information sufficient to admit or deny the remaining allegations in this
paragraph.**

56.     Plaintiff noticed that defendant PAULNITSKY entered the courtroom and seemed

surprised to see Plaintiff out of custody.  Defendant PAULNITSKY quickly left room 101.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph.**

57.     Plaintiff's case was called shortly after 9:00 a.m. and acting Chief Judge Bastone

told Plaintiff that his case was assigned to Judge Loretta Lee Morgan and ordered him to appear

in her courtroom, located in the same building, *instanter*.  Plaintiff's attorney William Swano

had previously told Plaintiff that he would meet Plaintiff in the assigned court room.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

58.     Plaintiff walked out of courtroom 101 and toward the elevator bank that led to

Judge Morgan's courtroom when he was grabbed and physically pushed up against the wall by

defendant PAULNITSKY in the hallway outside courtroom 101.  Defendant's bi-lingual sister

immediately questioned the detective in English, "what are you doing?" and PAULNITSKY told

Plaintiff's sister that Plaintiff was wanted for two murders and that he had to go with him. Plaintiff, with the assistance of his sister, told defendant PAULNTISKY that he wanted his attorney who was waiting for him in Judge Morgan's courtroom. Defendant PAULNITSKY ignored Plaintiff's request, handcuffed him, and took him to the other side of the building that housed the administrative offices.

**ANSWER:** **The Answering Defendants admit that Paulnitsky advised Plaintiff that Detectives wanted to question Plaintiff and then took Plaintiff to an administrative area of the courthouse, but deny the remaining allegations in this paragraph.**

59.     Defendant PAULNTISKY took Plaintiff up to the offices of the Cook County State's Attorney where he made a phone call. Defendant PAULNITSKY then brought Plaintiff to the basement of the building where he was brought outside, placed in a marked police car, and driven to the police station at Grand and Central. Plaintiff never made it to Judge Morgan's courtroom.

**ANSWER:** **The Answering Defendants admit that Paulnitsky took Plaintiff to an office area used by police and then took Plaintiff outside the courthouse to a marked police car that drove Plaintiff to Area Five, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

60.     Meanwhile, Plaintiff's sister contacted Plaintiff's attorney to tell him that Plaintiff had just been arrested in the courthouse.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

61.     Once at a Grand and Central, Plaintiff was placed in an interview room. Defendants MONTILLA and MINGEY entered the room and Plaintiff immediately told the detectives that he wanted to speak to his attorney, William Swano.

**ANSWER:** The Answering Defendants admit that Plaintiff was placed in an interview room at Area Five with Montilla and Mingey, but deny the remaining allegations in this paragraph.

62.     Speaking in Spanish, defendant MONTILLA asked Plaintiff who arrested him, and Plaintiff pointed at defendant PAULNTISKY who was standing outside the interview room. Upon seeing Plaintiff pointing at him, defendant PAULNTISKY ran into the interview room, grabbed Plaintiff by the throat and threw Plaintiff to the floor while hitting him in the face. Defendant PAULNTISKY threatened to "bust" his face if Plaintiff ever spoke about him in Spanish again.

**ANSWER:** The Answering Defendants admit that Montilla spoke to Plaintiff in Spanish, lack knowledge or information sufficient to admit or deny whether Montilla asked Plaintiff who arrested him and whether Plaintiff pointed to Paulnitsky, but deny the remaining allegations in this paragraph.

63.     After the assault, Plaintiff was taken to the lock-up for the better part of the afternoon. During that time, William Swano called Area Five numerous times but was repeatedly told that Plaintiff was not there. Plaintiff's sister went to Grand and Central to locate her brother and was falsely told that he was not there.

**ANSWER:** The Answering Defendants deny there was an assault and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

64.     Plaintiff was held  *in communicado* until defendants GUEVARA and HALVORSEN arrived to grand and Central to start their shift. GUEVARA was eager to frame Plaintiff for the murders since Plaintiff had stopped paying "protection money" to GUEVARA and knew that Plaintiff had information about GUEVARA that could expose GUEVARA as a corrupt officer.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff was held "*in communicado*" and admit that Guevara and Halvorsen arrived at Area Five to start their shift and then

22

**interviewed Plaintiff. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

65. At roughly 5:00 p.m. defendant GUEVARA retrieved Plaintiff from the lock up and brought him to an interview room. GUEVARA told Plaintiff that he wanted Plaintiff to tell him "about them two niggers that was shot on North Avenue." Plaintiff responded that he knew nothing about the murders and wanted to speak to his attorney William Swano.

**ANSWER: The Answering Defendants admit that Guevara interviewed Plaintiff about the Wiley brothers' murder when he started his shift. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

66. Defendant GUEVARA left the interrogation room and returned with a telephone book and large black flashlight. Detective Guevara asked Defendant whether he was "ready to talk." Plaintiff again exercised his right to counsel by saying, "I want my lawyer." Defendant GUEVARA put on black leather gloves and began beating Defendant in the head and body with the phonebook.

**ANSWER: The Answering Defendants lack knowledge or information sufficient to admit or deny whether Guevara left the interrogation room and whether Plaintiff asked for his lawyer, but deny the remaining allegations in this paragraph.**

67. Guevara left the interview room a number of times only to return and continue the beating by placing the telephone book on various parts of Defendant's body, including his head and genitals, striking the book with the flashlight with all of his force. During the beating, Guevara repeatedly asked Defendant "do you still want to talk to your lawyer?" Guevara also falsely told Defendant that he already knew that he was involved in the shooting and that they had witnesses who said it was him. Defendant eventually began to cry, and Guevara said, "you

wasn't crying like a little bitch when you shot those two niggers?" Guevara eventually left, and detective MONTILLA returned to the interview room.

**ANSWER:** **The Answering Defendants deny that Guevara physically abused Plaintiff with a telephone book and flashlight, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

68. Defendant MONTILLA told Plaintiff to calm down and that he would allow Plaintiff to see his sister who was at the police station and had some anxiety medicine for him. MONTILLA uncuffed Plaintiff and brought him to another interview room. Shortly after being brought to another room, MONTILLA returned to the room with Plaintiff's sister, Rose Maysonet. Plaintiff and Rose had a short conversation and Rose gave him an anxiety pill that she obtained from her mother.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

69. Defendant MONTILLA also brought Plaintiff's pregnant and live-in girlfriend, Rosa Bello, to the interview room to speak with Plaintiff. Rose was terrified because detective told her that she could have her kids taken away if Plaintiff didn't cooperate with their investigation. Rosa tried to persuade Plaintiff to "talk" to the officers, but Plaintiff told her that he had no knowledge about the shootings. Rosa expressed her fear that the police were going to arrest her and take the kids from her and begged him to "cooperate."

**ANSWER:** **The Answering Defendants admit, on information and, admit that Plaintiff was allowed to speak with his girlfriend. Further answering, the Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

70. Defendant MONTILLA told Rosa she had to leave and after escorting her out, MONTILLA returned and asked Plaintiff in sum and substance, "do you want your kids to grow up without their family? Just tell us what happened," Plaintiff again asked for his attorney.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Montilla told Rosa to leave and escorted her out, but deny the remaining allegations in this paragraph.**

71.     After some time, GUEVARA returned to the interview room and again began beating Plaintiff with the phone book and flashlight, yelling at him in Spanish to tell him about the murders. Plaintiff lost track of time but after several hours, a female State's attorney came into the interview room to speak with him. The female State's Attorney, ASA Jennifer Borowitz, read Plaintiff his rights with defendant MONTILLA translating and asked Plaintiff what he knew about the murders on North Avenue. Plaintiff told the ASA that he knew nothing and wanted his lawyer. ASA Borowitz then got up and left the room.

**ANSWER:** **The Answering Defendants admit that Guevara returned to the interview room; that ASA Borowitz was in the interview room and had Montilla provide Plaintiff his Miranda rights in Spanish; that Plaintiff made a statement to ASA Borowitz and agreed to give a court reported statement; and that subsequently ASA Borowitz left the interview room. The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff lost track of time or how much time passed, but deny the remaining allegations in this paragraph.**

72.     Sometime after ASA Borowitz left, defendant GUEVARA returned to the room and began threatening Plaintiff again. Apart from the physical punishment, GUEVARA told Plaintiff that he would get the death penalty if he did not admit his involvement in the murders and that he just needed to admit that the was present at the shooting not that he was the shooter. GUEVARA repeatedly asked Plaintiff for the names of other people who may have done the shooting and urged Plaintiff to point the finger at someone else. GUEVARA also continually threated to "lock up" Plaintiff's girlfriend and sister.

**ANSWER:** **The Answering Defendants deny that Plaintiff was physically abused and deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

73.     After nearly 20 hours in custody, much of it involving physical and psychological abuse by defendants GUEVARA and MONTILLA, Plaintiff's will was overborne, and he agreed to tell GUEVARA whatever he wanted him to say.  Plaintiff was overcome with fear that the beatings would continue and that the detectives would arrest his sister and girl-friend and place Rosa's children with DCFS.

**ANSWER:     The Answering Defendants admit that Plaintiff had been at the police station for nearly 20 hours at the time ASA Borrowitz left and that Plaintiff confessed to his involvement in the murders. The Answering Defendants deny that Plaintiff was physically abused and deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

74.     Assistant State's Attorney defendant DIFRANCO arrived at Area Five shortly after Plaintiff succumbed to defendant GUEVARA's physical abuse and agreed to "cooperate." At roughly 7:00 am., defendants GUEVARA, MONTILLA, and DIFRANCO met in a room with Plaintiff to construct a false narrative that Plaintiff would regurgitate in front of a court-reporter. DIFRANCO knew that Plaintiff had been physically beaten and had exercised his right to counsel to ASA Borowitz, but nonetheless approved of, conspired with, and aided GUEVARA and MONTILLA in creating a false narrative that Plaintiff would repeat under oath before a court reporter.

**ANSWER:     The Answering Defendants admit that DiFranco arrived at Area Five at approximately 6:30 a.m., met in a room with Plaintiff, Guevara and Montilla, and that Plaintiff cooperated and agreed to provide a court reported statement. The Answering Defendants deny remaining allegations in this paragraph.**

75.     However, defendant DIFRANCO realized that Plaintiff would not be able to give a statement in English and DIFRANCO did not speak Spanish.  Defendant DIFRANCO wrote out the questions and answers in English on a yellow pad of paper, and defendant MONTIlLA

translated the questions and answers in Spanish. Plaintiff was then instructed to study the pad of paper.

**ANSWER:** **The Answering Defendants admit that Montilla translated. The Answering Defendants deny that Plaintiff was instructed to study questions and answers on a pad of paper, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

76. Approximately two hours later, a court-reporter arrived at the station to transcribe a statement from Plaintiff. Defendant DIFRANCO began questioning Plaintiff in English according to the script the group had previously prepared. Defendant MONTILLA translated the question into Spanish for Plaintiff, and Plaintiff responded in Spanish as he had practiced. MONTILLA provided the English translation of Plaintiff's response, and the court-reporter transcribed the English provided by MONTILLA. At no point did any party put on the record that Plaintiff was speaking only in Spanish.

**ANSWER:** **The Answering Defendants admit that a court reporter arrived about two hours later, DiFranco questioned Plaintiff, and no party put on the record that Plaintiff was speaking Spanish because he was not, but deny the remaining allegations in this paragraph.**

77. Plaintiff's court-reported statement was taken on August 23, 1990 at 9:28 a.m.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations of this paragraph.**

78. Consistent with the false narrative concocted by defendants, Plaintiff falsely confessed that on May 20, 1990 at around 12:45 a.m. Alfredo Gonzalez ("Lluvia") came to his house at 1320 North Homan to ask him to hide a .9 mm pistol. Lluvia returned to his home between 11:30 p.m. and 12:00 p.m. on May 24, 1990 with two other Latin Kings, Christopher Hernandez who went by the nickname "Fro," and "Tino" Curz. According to the physically coerced false statement, Plaintiff stated that Lluvia, Fro, and Tino told him that "they got two guys on Drake and North avenue waiting for dope." Plaintiff then falsely stated that he drove to

Drake and North with Lluvia, Fro and Tino. Plaintiff drove the car; Lluvia was in the front

passenger seat with the gun, and Fro and Tino were in the back. According to the false

statement, when they got to the area, Plaintiff waited in the car while Lluvia, Fro and Tino

approached the two black men. Plaintiff could see them talking and then heard five or six shots

and saw the two men on the found and Lluvia pointing the .9 mm at them. The three returned to

Plaintiff car and he drove away. According to the false statement, Lluvia, Fro, Tino, Cisco

(Francisco Veras) and King (Efrain Cruz) came to his house on August 16, 1990, and King put a

gun to his head and threatened to kill him if he talked.

**ANSWER:**     **The Answering Defendants admit Plaintiff confessed and admit the statements attributed to Plaintiff set forth in his court reported statement, but deny Plaintiff's characterization of those statements. Answering Defendants deny that Plaintiff's statement was a false narrative concocted by Defendants, was physically coerced and any other remaining allegations in this pargraph.**

    79.     Plaintiff was unable to read English but signed the statement per DIFRANCO's

direction. The statement was false in its entirety and procured from Plaintiff through physical

abuse and threats and other coercive tactics.

**ANSWER:**     **The Answering Defendants deny Plaintiff's statement was false and procured from Plaintiff through physical abuse and threats and other coercive tactics, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

    80.     Subsequent to Plaintiff's false and physically coerced statement, Area Five

detectives arrested Alfredo Gonzalez ("Lluvia"), Justino Cruz ("Tino"), and Christopher

Goosens ("Fro"). Like Plaintiff, Gonzalez and Cruz were also physically coerced by defendant

GUEVARA to confess to the crimes and both men were charged and then later wrongfully

convicted of the Wiley brothers' murders. Goosens was charged but acquitted after a bench trial.

**ANSWER:**     **The Answering Defendants deny Plaintiff's statement was false and physically coerced and deny that Plaintiff, Gonzalez and Cruz were**

physically coerced and/or wrongfully convicted, but admit, on information
and belief, the remaining allegations of this paragraph.

### Coerced and Manipulated Statement of Rosa Bello

81.     After coercing Plaintiff's court-reported statement, defendants MONTILLA and

DIFRANCO threatened and coerced a statement from Plaintiff's pregnant girlfriend Rosa Bello.

**ANSWER:**     **The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

82.     On August 23, 1990 at 2:10 p.m., Bello provided a hand-written statement in

which she falsely stated that Lluvia, Fro, and Tino came to the house she shared with Plaintiff

and retrieved a .9mm weapon at roughly 11:30 p.m. on May 24, 1990.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to
admit or deny the time at which Bello provided a hand-written statement,
deny that her statement was false, but admit, on information and belief, the
contents of her statement as alleged.**

83.     Defendants MONTILLA and DIFRANCO told Bello that Plaintiff had already

confessed to the murders and that her kids would be taken away from her if she did not admit

that she saw the men retrieve a gun from the house on that particular date.

**ANSWER:**     **The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

84.     After spending over 24 hours at the police station, Bello eventually agreed to sign

whatever statement the assistant state's attorney and the detective prepared for her.

**ANSWER:**     **The Answering Defendants admit that Bello agreed to and signed a
statement, lack knowledge or information about who prepared Bello's signed
statement, and deny the remaining allegations in this paragraph.**

85.     Defendants DIFRANCO and MONTILLA knew that they had fed a false statement to Bello and that she signed the statement out of fear that she would lose custody of her kids if she did not cooperate with the defendants.

**ANSWER:      The Answering Defendants deny the allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

### Defendant HALVORSEN Authors a False and Fabricated Supplemental Police Report with the Help of All the Defendants

86.     After Plaintiff and his co-defendants were charged with the double murder of the Wiley brothers, defendant DIFRANCO realized that Plaintiff's court-reported statement was subject to suppression since no probable cause existed to justify his arrest in the first place. Indeed, no evidence existed whatsoever that suggested Plaintiff was involved in the Wiley brother's murder.

**ANSWER:      The Answering Defendants deny that no evidence existed that suggested Plaintiff was involved in the Wiley brothers' murder and there was no probable cause to arrest Plaintiff. Further answering, the Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

87.     With the collaboration of all of the defendants, defendant HALVORSEN put his report-writing skills to work and began drafting a supplemental police report replete with false and fabricated statements that served to justify Plaintiff's unlawful arrest and bolster the bogus investigation. The report was written on the evening of August 24, 1990 and approved by defendant sergeant EPPLEN at 11:45 p.m. – long after Plaintiff was charged.

**ANSWER:      The Answering Defendants admit that Halvorsen drafted a supplemental report that was approved by Epplen on or about 23:45 on August 24, 1990, but deny the remaining allegations of this paragraph.**

88.     Defendants MINGEY and MONTILLA directed Defendant HALVORSEN to falsely report that on July 15, 1990, Plaintiff told them he *did* have knowledge of the murders of the two black youths on North Avenue, and that on the night of the murders, three Latin Kings came to his house to get a 9mm pistol.  Plaintiff never made this statement; its contents are false in their entirety and completely fabricated by the defendants.  No police report or General Progress Report ("GPR") reflects that Plaintiff made this statement on July 15, 1990.  Defendant EPPLEN approved this false and fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

**ANSWER:**     **The Answering Defendants lack sufficient knowledge to admit or deny whether there are reports or GPR's memorializing the statements Plaintiff made on July 15, 1990 and admit those statements attributed to Plaintiff set forth in the investigation documents but deny Plaintiff's characterization of those statements, characterization of the report and characterization of Epplen's approval of the report. The Answering Defendants deny the remaining allegations in this paragraph.**

89.     Defendant HALVORSEN further reported (at defendant MINGEY's direction) that Plaintiff told defendants MONTILLA and MINGEY at Cook County Jail on August 1, 1990 that he was involved in the murders of the black men but that he was not the shooter and was only present for the shooting.  According to the fabricated statement, Plaintiff told MINGEY and MONTILLA that he knew who the shooter was but only reveal the information in exchange for leniency on his attempt murder case.  Plaintiff never made this statement; its contents are false in their entirety, completely contrived by the defendants.  No police report or GPR reflects that Plaintiff made these admissions on August 1, 1990.  Defendant EPPLEN approved this false and fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

**ANSWER:**     **The Answering Defendants lack sufficient knowledge to admit or deny whether there are reports or GPR's memorializing the statements Plaintiff**

> **made on August 1, 1990 and admit those statements attributed to Plaintiff set forth in the investigation documents but deny Plaintiff's characterization of those statements, characterization of the report and characterization of Epplen's approval of the report. The Answering Defendants deny the remaining allegations in this paragraph.**

90.     According to the supplemental police report signed by the defendant officers but authored by defendant HALVORSEN, Plaintiff admitted his involvement in the shooting to defendant GUEVARA on August 22, 1990 at approximately 8:00 p.m. Plaintiff never admitted his involvement in the murders of the Wiley brothers to defendant GUEVARA.  Only after being physically abused and threatened for nearly 24 hours by GUEVARA and his accomplices did Plaintiff eventually agree to repeat a false and fabricated statement that was fed to him by GUEVARA, MONTILLA and DIFRANCO and later recorded by a court reporter.

**ANSWER:     The Answering Defendants admit those statements attributed to Plaintiff set forth in the investigation documents but deny Plaintiff's characterization of those statements. The Answering Defendants deny the remaining allegations in this paragraph.**

91.     Defendant HALVORSEN also falsely reported that after providing a court-reported statement, Plaintiff drove to the area of 3428 W. North Ave., the scene of the murders, with defendants MONTILLA, PAULNITSKY, and DIFRANCO to "corroborate" his court-reported statement.  Plaintiff never drove to the crime scene with the defendants nor did he demonstrate or point out any of the facts set forth in his physically coerced and fabricated statement.

**ANSWER:     The Answering Defendants admit, on information and belief, to those actions of driving Plaintiff to have him identify the scene of the murder as described in the investigation documents but deny Plaintiff's characterization of those actions. The Answering Defendants deny the remaining allegations in this paragraph.**

**Plaintiff's Wrongful Conviction**

92. Defendants HALVORSEN and PAULNITSKY falsely testified before the grand jury that Plaintiff had supplied the murder weapon that was used to shoot the Wiley brothers and that Plaintiff had driven the car to and from the murder scene.

**ANSWER:**   **The Answering Defendants admit only the testimony of Halvorsen and Paulnitsky as set forth in the grand jury transcript, and deny Plaintiff's characterization of that testimony.**

93. Prior to Plaintiff's trial, Plaintiff was forced to hire a new attorney after his attorney William Swano was indicted in connection with allegations that he had "payed[sic] off" a judge in exchange for a favorable outcome case. Unfortunately for Plaintiff, Plaintiff's new attorney, Richard Beuke, was no more ethical than his prior one.

**ANSWER:**   **The Answering Defendants admit that Plaintiff hired attorney Richard Beuke, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

94. While Beuke was defending Plaintiff against these double murder charges, he was concurrently representing defendant GUEVARA (the State's key witness against Plaintiff) in unrelated family and child-support proceedings. Indeed, Beuke and GUEVARA had a decade-long personal and professional friendship that Beuke failed to disclose to Plaintiff. Unsurprisingly, Beuke's efforts at challenging the State's evidence and cross-examining his buddy defendant GUEVARA were feeble and ineffectual.

**ANSWER:**   **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

95. At Plaintiff's trial, defendant MONTILA falsely testified that Plaintiff made inculpatory statements to him and defendant MINGEY on July 15, 1990 and August 1, 1990 as set out in detail above. Defendant MONTILLA also falsely testified at Plaintiff's trial that Plaintiff made a voluntary confession to the murders as described in detail above.

**ANSWER:**     **The Answering Defendants admit only the testimony of Montilla as set forth in the trial transcript, and deny Plaintiff's characterization of that testimony.**

96.     Defendant PAULNTISKY falsely testified at Plaintiff's trial that he had knowledge of Plaintiff's inculpatory oral statements made on July 15 and August 1, 1990 when he arrested Plaintiff on August 22, 1990. Defendant PAULNITSKY had no knowledge about those statements as Plaintiff never made the statements and the defendants did not fabricate the statements until after Plaintiff's arrest on August 22, 1990.

**ANSWER:**     **The Answering Defendants admit only the testimony of Paulnitsky as set forth in the trial transcript, and deny Plaintiff's characterization of that testimony.**

97.     Defendant GUEVARA falsely testified that Plaintiff first orally confessed his involvement to him for the murders of the Wiley brothers as reflected above. GUEVARA denied that he used any sort of physical coercion or threats to coerce those statements. GUEVARA further denied that he supplied the false narrative that Plaintiff regurgitated before a court reporter on August 23, 1990.

**ANSWER:**     **The Answering Defendants admit only the testimony of Guevara as set forth in the trial transcript, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

98.     Defendant DIFRANCO falsely testified at Plaintiff's trial that he conversed with Plaintiff in English and that Plaintiff had no difficulties communicating with him in English. DIFRANCO falsely testified that Plaintiff gave his court-reported statement in English and that it was a voluntarily given statement free from physical coercion or suggestion. DIFRANCO further falsely testified that he accompanied Plaintiff and defendants MONTILLA and PAULNITSY to the crime scene so that Plaintiff could "act out" the shooting. This field-trip to the crime scene never happened.

**ANSWER:** The Answering Defendants admit only the testimony of DiFranco as set forth in the trial transcript, and deny Plaintiff's characterization of said testimony and further deny that the visit to the crime scene never happened. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

99. Although Plaintiff wanted to testify, his attorney (whose conflict was so disabling that Plaintiff was essentially left without counsel at all) told him that no one would believe him and that he shouldn't testify.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

100. Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first degree murder and Plaintiff was sentenced to a prison term of natural life imprisonment.

**ANSWER:** The Answering Defendants admit that Plaintiff was convicted of two counts of murder; lack knowledge sufficient to admit or deny the term of his sentence; and deny the remaining allegations in this paragraph.

Plaintiff's Exoneration

101. Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the 1990 murders of the Wiley brothers.

**ANSWER:** The Answering Defendants deny that Plaintiff's incarceration and conviction were wrongful, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

102. Plaintiff, through his counsel, filed a successor post-conviction petition, alleging Plaintiff's actual innocence. Plaintiff further claimed that Plaintiff's sixth Amendment right to conflict free counsel was violated when his trial attorney, Richard Beuke, simultaneously represented defendant GUEVARA on unrelated family/child support proceedings.

**ANSWER:** The Answering Defendants admit, on information and belief, the allegations in this paragraph.

103.     The State agreed that Beuke labored under a *per se* conflict of interest and on
October 19, 2016, the State consented to the court vacating Plaintiff's convictions and sentence.
The matter was set for a new trial scheduled to commence on November 15, 2017.  However, the
State moved to *nolle prosequi* all charges against Plaintiff after *all* of the defendant officers
indicated that they would plead the Fifth Amendment in response to any questions regarding
their investigation of the Wiley brothers' murders.

**ANSWER:**     **The Answering Defendants admit, on information and belief, that the State
agreed that Beuke had a conflict of interest and moved to *nolle prosequi* all
charges against Plaintiff.  Further answering, the Answering Defendants
deny that *all* the defendant officers indicated that they would assert their
Fifth Amendment rights, but lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.**

104.     After spending 27 years in Illinois Department of Corrections, Plaintiff was
released from custody on November 2017.

**ANSWER:**     **The Answering Defendants admit, on information and belief, the allegations
in this paragraph.**

### Defendants GUEVARA, HALVORSEN and MINGEY's
### History of Framing Innocent Persons

105.     Tragically, Plaintiff's wrongful conviction at the hands of defendant GUEVARA
and his accomplices, including defendants HALVORSEN and MINGEY, is not an isolated
miscarriage of justice.  Over the course of two decades, the trio framed literally dozens of other
innocent men who have all lodged independent accusations of similar misconduct against him.[2]

**ANSWER:**     **The Answering Defendants admit, on information and belief, that other
individuals have made allegations of misconduct against Mingey, Halvorsen
and Guevara. The Answering Defendants deny the remaining allegations in
this paragraph as they pertain to them, but otherwise lack knowledge or
information sufficient to admit or deny the remaining allegations in this
paragraph.**

---

[2] https://www.buzzfeed.com/melissasegura/detective-GUEVARAs-witnesses?utm
term=.tymQzXk3Yn#.ilhx2y8nb1B

106.     In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home.  When Llyod asked who they were, she was told to shut up.  The officers terrified Llyod, her brother, and two children, and left the home in shambles.  Lloyd filed a complaint with the Office of Professional Standards the next day.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

107.     Defendant GUEVARA has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, physical coercion of inculpatory statements, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons.  There are dozens of identified cases in which GUEVARA has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as he did in this case.  In many of these cases, detective HALVORSEN worked hand-in-hand with GUEVARA and MINGEY supervised the rogue detectives, approved their investigations, and sometimes played an even more active role in framing suspects.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

108.     Given this extensive history, it is apparent that GUEVARA, HALVORSEN, and MINGEY engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then [sic] for doing so.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

109.     Regarding their role in framing Plaintiff, the Defendant Officers have all indicated that they will assert their Fifth Amendment rights to silence when questioned about: whether they physically coerced a court-reported statement from Plaintiff, whether they manipulated, threatened and coerced a statement from Plaintiff's girlfriend, and whether they attributed false oral statements to Plaintiff, and whether they prepared false reports.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph.**

110.     On at least seven occasions in the last few years, defendant GUEVARA has invoked his Fifth Amendment right and refused to answer any questions about allegations that he physically coerced suspects and/or manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.  And recently, defendants HALVORSEN and MINGEY have begun asserting their Fifth Amendment rights to refuse to answer questions about their involvement in Area Five investigations, most recently in response to interrogatories propounded to them in the federal civil rights litigation brought by Armando Serrano and Jose Montanez.

**ANSWER:    The Answering Defendants admit that Guevara, Mingey and Halvorsen have, at times, invoked their Fifth Amendment rights in response to questions about their employment with the Chicago Police Department and that Halvorsen and Mingey so invoked initially in response to interrogatories in the *Montanez* case. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

111.     Bill Dorsch is a former Area Five Chicago police detective.  While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months

after the murder occurred, Defendant GUEVARA brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place [sic] of the shooter.

**ANSWER:** **The Answering Defendants admit Bill Dorsch is a former Area Five Chicago police detective, but lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

112. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant GUEVARA pointed to the suspect's photo and told the juvenile "that is him." The juvenile then agreed with GUEVARA, saying that was the person who committed the shooting.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

113. Dorsch then directed Defendant GUEVARA to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

114. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant GUEVARA being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

115. Defendant GUEVARA's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associated, including defendant

GUEVARA.  The report details that defendant GUEVARA, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble."[sic]  According to the report, GUEVARA also took bribes to alter both positive and negative lineups of murder suspects.  Finally, the report states that GUEVARA, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

116.  In 1989, Defendant GUEVARA coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez.  Defendant GUEVARA put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder.  Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

117.  In 1989, Defendant GUEVARA also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

118.  Juan Johnson was later exonerated and brought suit against Defendant GUEVARA.  A federal jury found that GUEVARA framed Johnson for murder and awarded Johnson $21 million in damages.

**ANSWER:** **The Answering Defendants, upon information and belief, admit that Juan Johnson sued Defendant Guevara and that a jury returned a verdict in Juan Johnson's favor, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

119.     In 1989, Defendant GUEVARA coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

120.     In 1989, Defendant GUEVARA coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

122.     In 1991, Defendant GUEVARA coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. GUEVARA fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime.  Rosario recanted his identification of Arcos at trial.  Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

123.     In 1991, Defendant GUEVARA physically coerced sixteen-year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk.  All of the false details of Velazquez's statement were provided by GUEVARA.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

124. In 1993, Defendant GUEVARA coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, was familiar with GUEVARA's tactics, believed that GUEVARA would honor this threat.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

125. In 1995, Defendant GUEVARA arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told GUEVARA that he did not do it, GUEVARA forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

126. In 1991, Defendant GUEVARA told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant GUEVARA's misconduct to light.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

127. In 1995, Defendant GUEVARA coerced Evelyn Diaz into make a false identification and providing false testimony to the Grand Jury by threatening Diaz that is she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

42

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

128. In 1995, Defendant GUEVARA told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

129. In 1995, Defendant GUEVARA coerced Gloria Ortiz Bordoy into making a false statement and testifying against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, GUEVAR yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

130. In 1995, Defendant GUEVARA coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by GUEVARA and identified Ricardo Rodriguez and the offender because GUEVARA told him that Rodriguez was the shooter.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

131. In 1995, Defendant GUEVARA engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the

shooter.  Melendez identified Sierra but recanted his identification at trial.  Thomas Sierra was

exonerated last year but only after serving his enter[sic] sentence .

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

132.    In 1996, Defendant GUEVARA coerced Maria Rivera into making a false

identification of a man in a lineup by unzipping his pants and propositioning her.  Rivera later

told the prosecutor that she had falsely identified an individual in a lineup at GUEVARA's

direction.  The prosecution later abandoned murder charges against the individual whom Rivera

falsely identified in the lineup.

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

133.    In 1997, Defendant GUEVARA coerced Robert Ruiz into making a false

identification.  GUEVARA detained Ruiz repeatedly over the course of a ten-day period, locking

him in an interrogation room without food, water, or a bathroom.  Though Ruiz kept telling

GUEVARA that he had not seen the shooter or the driver involved in the crime, GUEVARA told

Ruiz who to identify and what to say in his statement.  Ruiz finally implicated Freddy and

Concepcion Santiago in the murder because RUIZ believed that GUEVARA would continue to

harass him until he changed his story.  Ruiz recanted his identification at trial, and the judge

found Freddy Concepcion Santiago not guilty.  The trial judge found it disturbing that

GUEVARA was the lead detective in the case because the victim was his GUEVARA's nephew.

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

134.    In 1997, Defendant GUEVARA withheld physical evidence and failed to disclose

the exculpatory statements of witness Ruth Antonetty to Ariel Gomez.  Gomez was accused of

firing multiple shots from a car into a crow.  Ruth Antonetty told GUEVARA that she heard

multiple shots coming from within the crowd, not from Gomez's vehicle.  GUEVARA continued

to pressure her to change her account, and when she would not, he told her he " had other

witnesses" and "didn't need her."  As a result, Ariel Gomez did not have access to key *Brady*

material at his trial.  Gomez was also exonerated last year.

> **ANSWER:**　　**The Answering Defendants lack knowledge or information sufficient to**
> **admit or deny the allegations in this paragraph.**

135.　In 1998, Defendant GUEVARA used suggestive tactics to force twelve-year-old

Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a

result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he

had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial.

Ultimately, the State's Attorney dropped all charges against Rivera.  Rivera was awarded a

Certificate of Innocence and his federal civil rights action is currently pending in this Court.

> **ANSWER:**　　**The Answering Defendants admit, on information and belief,  that Rivera**
> **was convicted of the 1988 murder of Felix Valentin, that Rivera was released**
> **from incarceration and received a Certificate of Innocence. The Answering**
> **Defendants deny that Lopez testified he had never been able to identify**
> **Rivera as the murderer. Further answering, the Answering Defendants deny**
> **the remaining allegations in this paragraph as they pertain to them, but**
> **otherwise lack knowledge or information sufficient to admit or deny the**
> **remaining allegations in this paragraph.**

136.　In 1982, Defendant GUEVARA and another officer arrested and physically

assaulted Annie Turner for smoking on a bus.  GUEVARA called her a "bitch" and pushed her

out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so

tightly that her skin broke.  He also hit her across the face with a metal bracelet he was wearing

and called her a "nigger bitch."  Turner sough medical treatment and filed a complaint with the

Office of Professional Standards.

> **ANSWER:**　　**The Answering Defendants lack knowledge or information sufficient to**
> **admit or deny the allegations in this paragraph.**

137. In 1982, Defendant GUEVARA and three other officers broke through Almarie Llyod's locked front door and conducted a warrantless search of her home. When Llyod asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

138. In 1983, Defendant GUEVARA and other officers forcibly removed LeShurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was eaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

139. In 1984, Defendant GUEVARA and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. GUEVARA repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was dislocated/broken and she spent, one week in the hospital.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

140.     In 1985, Defendant GUEVARA attempted to coerce a false statement from Reynaldo Munoz. GUEVARA handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people GUEVARA was asking about, GUEVARA repeatedly hit him in the mouth with his fist. GUEVARA then took Munoz to rival gang territory where he allowed rival gang members to sit on Munoz and beat Munoz about the head. Munoz was later framed by defendant HALVORSEN for the murder of HALVORSEN induced a false identification from an alleged witness to the shooting.

**ANSWER:**     **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

141.     In 1986, Defendant GUEVARA threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although GUEVARA denied the charge, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that GUEVARA had lied about the incident and recommended that GUEVARA be suspended for two days.

**ANSWER:**     **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

142.     In 1986, Defendant GUEVARA and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and

abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had

been beaten while in police custody.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

143.    In 1986, Defendant GUEVARA pulled over Melvin Warren because Warren cut

him off while driving westbound on Augusta Boulevard. GUEVARA called Warren a "nigger

dog" and "threatened to tear [Warren's] head off." GUEVARA hit Warren in the face with a

closed fist and then forced him down into the front seat of his car and began to choke him. Two

eyewitnesses confirmed that GUEVARA initiated the beating. In response to this incident,

Warren sought medical treatment and filed a complaint with the Office of Professional Standards

(OPS). OPS sustained Warren's allegations that GUEVARA had physically and verbally

assaulted him and recommended that GUEVARA be reprimanded.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

144.    In 1989, Defendant GUEVARA coerced a false confession from Victor Vera by

transporting him to rival gang territory and threatening to release him unless he confessed to the

murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he

knew nothing about.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

145.    In 1991, Defendant GUEVARA coerced David Rivera into signing a confession

for murder by intimidation, threats, and inducements. GUEVARA told Rivera that if he

confessed he would serve seven years in prison whereas if he did not confess, he would be sent

away for fifty years. GUEVARA then promised Rivera that if he signed a statement, he could go

home.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

146.     In 1991, Defendant GUEVARA coerced a false confession from Daniel Rodriguez through the use of threats and intimidation.  While en-route to the police station, GUEVARA threatened to harm Rodriguez's family if he did not cooperate.  Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by GUEVARA's partner, Defendant HALVORSEN in the chest and torso.  GUEVARA provided details of the crime to Rodriguez to include in Rodriguez's false confession.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

147.     In 1992, Defendant GUEVARA engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present.  The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

148.     In 1993, Defendant GUEVARA arrested fifteen-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder.  GUEVARA also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement.  At the time, Cruzado had a limited ability to read and write.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

149.     In 1993, Defendant GUEVARA used physical force and threats to coerce a false confession rom Adolfo Frias-Munoz.  Over the course of a two-day interrogation, Frias-Munoz

was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant GUEVARA, and beaten by two other officers. Though isolated in a locked interrogation room, Friaz-Munoz could hear his wife screaming and his son crying in another room. GUEVARA threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Friaz-Munoz spoke in Spanish and GUEVARA translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

**ANSWER:**    **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

150.    In 1994, Defendant GUEVARA, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by GUEVARA.

**ANSWER:**    **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

151.    In 1994, defendants GUEVARA and HALVORSEN manipulated, coerced and induced false identifications of Robert Almodovar and William Negron from Kennelly Saez and Jacqueline Grande for the murders of Jorge Rodriguez and Amy Merkes. Saez admitted that GUEVARA showed him and Grande photos of Almodovar and Negron prior to having them view a line-up. Almodovar and Negron were wrongfully convicted of the murders based on

these fabricated eye-witnesses identifications and sentenced to natural life imprisonment.  Both

men were exonerated and received Certificates of Innocence in November 2017.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

152.    In 1995, Defendants GUEVARA and HALVORSEN coerced a confession from

17 year-old Santos Flores after handcuffing him to the wall of a locked interview room and

refusing his request for an attorney.  During the course of the 11-hour interrogation, GUEVARA

yelled at him, slapped him numerous times on the side of his head, and told him that if he did not

confess he would never see the light of the day.  Flores eventually gave a statement to the police

indicating his involvement in the crime.  Flores's statement was ruled inadmissible on appeal on

the grounds that it was elicited in violation of *Miranda*.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

153.    In 1997, Defendant GUEVARA coerced a false confession from Voytek Dembski

by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish

National who did not speak English, was interrogated by GUEVARA without *Miranda* warning,

without notification to the Polish consulate, and without a Polish language interpreter.  Dembski

could not read the statement he eventually signed as it was written in English.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

154.    In 1998, Defendant GUEVARA repeatedly hit Rosauro Mejia in an attempt to

coerce a confession from him.  Rosauro never confessed and was finally released after being held

in custody for three days.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

155.    In 1998, Defendant GUEVARA repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

156.    In 1998, Defendant GUEVARA repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement.  After two days of isolation and interrogation, Reyes provided a false statement.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

157.    In 1998, Defendant GUEVARA repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room.  After 40 hours of interrogation, Solache gave a false statement so the beating would stop.  Solache sought medical treatment and sustained permanent hearing lost to his left ear.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

158.    Reyes and Solache were also exonerated last year and released from prison.  Reyes recently filed a civil rights action in this Court, *Deleon-Reyes v. Guevara, et al*. 18-cv-1028.

**ANSWER:** The Answering Defendants admit,  on information and belief,  the allegations in this paragraph.

### Plaintiff's Damages

159.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct.  Plaintiff faced the risk of being executed for a crime he did not commit and spent 27 years of his life

imprisoned for crimes that he did not commit.  He woke up each day with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

**ANSWER:** **The Answering Defendants deny that Plaintiff was incarcerated for 27 years solely for the murders of the Wiley brothers and the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

160.    Over the course of his 27 years of imprisonment, Plaintiff was separated from his son who was not even born when he was incarcerated.  Plaintiff lost the chance to raise, care for, and mentor his child who was a grown man by the time Plaintiff was released from prison.

**ANSWER:** **The Answering Defendants admit, on information and belief,  Plaintiff was incarcerated for 27 years, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

161.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**COUNT I**
**42 U.S.C. § 1983 – Due Process: False Confession**

162.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

163.    In the manner described more fully above, the Police Officer Defendants and Defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff

of committing any crime, individually, jointly, and in conspiracy with one another, and others

unknown, as well as under color of law and within the scope of their employment, forced

Plaintiff to make false statements involuntarily and against his will, which incriminated him and

which were used against him in criminal proceedings, in violation of his rights secured by the

Fifth And Fourteenth Amendments.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

164.    In addition, the Police Officer Defendants and defendant DIFRANCO, acting as

an investigator and without probable cause to suspect cause to suspect Plaintiff of any crime,

individually and jointly, and in conspiracy with one another, as well as under color of law and

within the scope of their employment, used physical violence and psychological coercion in

order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not

committed, in violation of his right to due process secured by the Fourteenth Amendment.  This

misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it

was not supported by any conceivable governmental interest.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

165.    Similarly, Defendant DIFRANCO, acting individually, jointly, and in conspiracy

with the Police Officer Defendants, deprived Plaintiff of his constitutional right to a fair trial, in

violation of the Fifth and Fourteenth Amendments when he knowingly solicited a physically

coerced statement from the Plaintiff that he knew to be false.  Indeed, DIFRANCO directly

participated in crafting the false statements with the defendant officers that was then fed to the

Plaintiff who will had been overborne by the physical and psychological abuse he incurred at the hands of the Defendant officers.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

166.    In addition, the Police Officer Defendants and defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

167.    Specifically, Police Officer Defendants and defendant DIFRANCO conducted, participated in, encouraged, advised, and ordered an unconstitutional 24-hour interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the murder of Kevin and Torrence Wiley.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

168.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff who was forced to regurgitate the statements before a court reporter.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

169.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case.  They were the reason the Plaintiff was prosecuted and convicted of the Wiley brothers' murders.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

170.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

171.     As a result of Defendants' misconduct described in this County,[sic] Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

172.     The misconduct described in this County[sic] by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT II
### 42 U.S.C. § 1983 – Due Process: Fabrication of Evidence

173.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers
to the foregoing paragraphs of this complaint as though fully set forth herein.**

174.     As more fully described above, the individual Police Officer Defendants acting

individually, jointly, and in conspiracy, as well under color of law and within the scope of their

employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth

and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at

Plaintiff's trial about those statements.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers
to the foregoing paragraphs of this complaint as though fully set forth herein.
The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

175.     In the manner described more fully above, Defendants fabricated, coerced,

manipulated and/or solicited false testimony from Rosa Bello implicating Plaintiff in the crimes

that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using

false evidence; and failed to correct fabricated evidence that they knew to be false when it was

used against Plaintiff at his criminal trial.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers
to the foregoing paragraphs of this complaint as though fully set forth herein.
The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

176.     The Police Officer Defendants concealed and fabricated additional evidence that

is not yet known to Plaintiff.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

177. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of the Wiley brothers. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

178. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

179. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

180. The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT III
### 42 U.S.C. § 1983 – *Brady* Violations

181.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

182.     As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

183.     Defendant DIFRANCO, while acting in an investigatory function, also withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

184.     The Police Officer Defendants and defendant DIFRANCO continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 27 years in prison for a crime he did not commit.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

185.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

186.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

187.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT IV
## 42 U.S.C. § 1983 – Malicious Prosecution

188.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

189.    In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

190.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

191.    Similarly, defendant DIFRANCO, acting in an investigatory function, exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probably cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

192.    In so doing, the Defendant officers and Defendant DIFRANCO caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting

in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

193. The Defendant officers and defendant DIFRANCO subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

194. The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

193[sic].As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

195.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in County VII.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT V
## 42 U.S.C. § 1983 – Conspiracy

196.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

197.     All of the individual Police Officer Defendants, defendant DIFRANCO, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of confessions, admissions, witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

198.     All of the individual Police Officer Defendants, defendant DIFRANCO, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he

was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, and described above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

199.    In this manner, the Police Officer Defendants and defendant DIFRANCO acting in concert with other known and unknown co-conspirators conspired to accomplish an unlawful purpose by an unlawful means.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

200.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

201.    This misconduct described in the Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

202.    As a direct and proximate result of this of this[sic] illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

203.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT VI
### 42 U.S.C. § 1983 – Failure to Intervene

204.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

205.    In the manner described above, one or more of the individual Police Officer Defendant, defendant DIFRANCO, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

206.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

207. As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

208. The misconduct described above in this County by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

**COUNT VII**
**42 U.S.C. § 1983 –** *Monell* **Policy Claim**

**Count VII of Plaintiff's Complaint is not directed at the Answering Defendants, and therefore they answer Count VII only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.**

209. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.

210.    The Chicago Police Department is responsible for scores of miscarriages of justice.  Since 1986, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit.  There are undoubtedly many more such cases that have not yet been discovered.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

211.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants GUEVARA, HALVORSEN, MINGEY, PAULNITSKY, and MONTILLA employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; and (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

212.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves.  As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

213.    Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to regurgitate a false and fabricated confession that was later used as the primary piece of evidence against at his trial for the murders of the Wiley brothers.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

214.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system.  As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as art of the official file.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

215.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's court-reported

statement was involuntary and procured through physical coercion, that Plaintiff's girlfriend's statement was procured through manipulation, threats and coercion, that certain oral statements attributed to the Plaintiff were fabricated and all police reports reflecting that two other suspects (Efrain Cruz and Francisco Veras) were interrogated and allegedly identified as the perpetrators of the Wiley brother's murders.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

216. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purposes of influencing their testimony to confirm to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

217. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of Rosa Bello to falsely implicate Plaintiff in the shooting of the Wiley brothers' by threatening to take her children away from her.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

218. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person

with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

219. Prior to and during 1990, the year in which Plaintiff was falsely charged with the Wiley brothers' murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

220. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

221. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence

within the Chicago Police Department, officers (including the Defendants here) have come to

believe that they may violate the civil rights of members of the public and cause innocent

persons to be charged with serious crimes without fear of adverse consequences. As a result of

these policies and practices of the City of Chicago, members of the Chicago Police Department

act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

222. The defendant officers have a long history of engaging in the kind of investigative

misconduct that occurred in this case, including the physical coercion of fabricated confessions,

manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of

maliciously prosecuting innocent persons. There are approximately 40 known cases in which

GUEVARA and HALVORSEN have engaged in serious investigative misconduct, including

many cases in which they have manipulated and coerced witnesses and fabricated and concealed

evidence, as he did in this case. Defendants engaged in such misconduct because he had no

reason to fear that the City of Chicago and its Police Department would ever discipline him for

doing so.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

223. The City of Chicago and its Police Department failed in 1994 and in the years

prior to provide adequate training to Chicago Police Detectives and other officers in any of the

following areas, among others:

      a.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

      b.      The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

      c.      The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

      d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

      e.      The risks of engaging in tunnel vision during investigation.

      f.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**    **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

    224.    The need for police officers to be trained in these areas was and remains obvious. City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph Proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**    **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

    225.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants GUEVARA, HALVORSEN, and MINGEY effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged

above.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

226. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

227. The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of the constitutional rights described herein.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

228. The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

    a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

b.     manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

c.     filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches:" and otherwise covering up the true nature of those interviews and/or interrogations.

d.     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees.  Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants GUEVARA and HALVORSEN.

e.     perpetuating, encouraging  and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report.  This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges.  The code of silence also caused police offices to perjure themselves in criminal cases where they and their fellow officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

**ANSWER:**    **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

229.    The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

230.    As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

231.    The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**COUNT VIII**
**State Law Claim – Malicious Prosecution**

232.    Plaintiff repeats and re-alleges all of the paragraphs n this Complaint as if fully set forth herein.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

233.    All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff.  All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that the underlying criminal proceeding was terminated in a manner indicative of Plaintiff's innocence, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

234.     The Defendants accused Plaintiff of murdering the Wiley brothers, knowing that he was innocent of the crime.  All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence.  The individual Defendant officers and defendant DIFRANCO knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

235.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

236.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limier to, emotional distress, as is more fully alleged above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT IX
## State Law Claim – Civil Conspiracy

237.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

238.     As described more fully in the preceding paragraphs, the individual Defendant officers and defendant DIFRANCO acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

239.     In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

240.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

241.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

242.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

243.     The acts and conduct of the individual Defendants as set forth above were extreme and outrageous.  The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever[sic], emotional distress to Plaintiff.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

244.     The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

245.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

246.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT XI
## State Law Claim- *Respondeat Superior*

Count XI of Plaintiff's Complaint is not directed at the Answering Defendants, and therefore they answer Count XI only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

247.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

248      When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:     The Answering Defendants admit that the individual Defendant Officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, during the relevant times set forth in Plaintiff's Complaint and further admit that they were acting in the scope of their employment and under color of law. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

249.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:     The Answering Defendants deny they committed any torts and deny that this is a correct or complete statement of the law.**

**COUNT XI (sic)**
**State Law Claim – Indemnification**

Count XII of Plaintiff's Complaint is not directed at the Answering Defendants, and therefore they answer Count XII only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

250.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

251.    Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

**ANSWER:    The Answering Defendants, upon information and belief, admit that Illinois law requires public entities to pay any tort judgment for compensatory damages awarded against its employees acting within the scope of their employment activities. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

252.    The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:    The Answering Defendants admit that the individual Defendant Officers were employees of the Chicago Police Department, an agency of the City of Chicago, and that they acted in the scope of their employment at all relevant times in the Complaint. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

253.    Defendant Cook County is responsible for any judgment entered against defendant DIFRANCO.

**ANSWER:** The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

### AFFIRMATIVE DEFENSES

#### First Affirmative Defense

At all times material hereto, Answering Defendants were law enforcement officers who performed discretionary functions. A reasonable law enforcement officer objectively viewing the facts and circumstances that confronted Answering Defendants could have believed his actions to be lawful, in light of clearly established law. Answering Defendants are therefore entitled to qualified immunity on Plaintiff's federal claims.

#### Second Affirmative Defense

Plaintiff fails to state a claim for "federal malicious prosecution" in Count IV.

#### Third Affirmative Defense

Plaintiff's claim under Illinois law for intentional infliction of emotional distress is barred by the one-year statute of limitations under the Illinois Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101, because it was not filed within one year after it accrued.

#### Fourth Affirmative Defense

Answering Defendants are absolutely immune from civil liability for any claim alleged based on their testimony given in judicial proceedings in plaintiff's underlying criminal case. *Rehberg v. Paulk*, 566 U.S. 356 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Jurgensen v. Haslinger*, 295 Ill.App.3d 139; 692 N.E.2d 347 (3rd Dist. 1998).

#### Fifth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because at all times relevant to this complaint they were public employees, namely police

detectives and sergeants, who were engaged in the execution and enforcement of the law, and none of their acts or omissions in the execution or enforcement of any law constituted willful and wanton conduct. 745 ILCS 10/2-202.

### Sixth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person. 745 ILCS 10/2-204.

### Seventh Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because their alleged decisions regarding the investigation and the arrest of Plaintiff were decisions that involved the determination of policy and the exercise of discretion for which they are immune from liability. 745 ILCS 10/2-201.

### Eighth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

### Ninth Affirmative Defense

As to the state law claim of Intentional Infliction of Emotional Distress, Punitive damages cannot be awarded for this claim based on Illinois law. *Knierim v. Izzo*, 22 Ill. 2d 73 (1961).

### Tenth Affirmative Defense

As to the state law claims, Punitive damages cannot be awarded for these claims because

the Illinois Governmental Tort Immunity Act does not allow punitive damages. 745 ILCS 10/2-102.

### Eleventh Affirmative Defense

Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff are required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

### Twelfth Affirmative Defense

Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

### JURY DEMAND

The Answering Defendants request a trial by jury.

Dated: September 18, 2018    Respectfully submitted,

James G. Sotos       /s/Josh M. Engquist
Jeffrey N. Given       JOSH M. ENGQUIST, Attorney No. 6242849
Caroline P. Golden      *One of the Attorneys for Defendant Officers*
David A. Brueggen
Josh M. Engquist
The Sotos Law Firm, P.C.
550 E. Devon Avenue, Suite 150
Itasca, Illinois 60143
(630) 735-3300
jengquist@jsotoslaw.com

## CERTIFICATE OF SERVICE

I certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746, that on September 18 2018, I electronically filed foregoing **Defendants Ernest Halvorsen, Edward Mingey, Lee Epplen, Fernando Montilla, and Roland Paulnitsky's Answer to Plaintiff's Complaint** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the below service list.

*Attorney for Plaintiff*
Jennifer A. Bonjean
Ashley Cohen
Bonjean Law Group
100 Dean Street #422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenbergcd.com

*Attorney for City of Chicago*
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Patrick R. Moran
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
pmoran@rfclaw.com

*Attorney for Frank DiFranco and Cook County*
Allyson L. West
James Chandler
Chirstina C. Chojancki
Scheagbe Grigsby
Sara D. Spivy
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
 (312)603-6229
Allyson.west@cookcountyil.gov
James.chandler@cookcountyil.gov
christina.chojnacki@cookcountyil.gov
scheagbe.grisby@cookcountyil.gov
sara.spivy2@cookcountyil.gov

*Attorney for Matthew Coghlan*
Paula Sue Quist
Morgan Hirst
Leigh A. Krahenbuhl
Jones Day
77 W. Wacker Drive, Suite 3500
Chicago, IL 60601
(312)782-3939
pquist@jonesday.com
mhirst@jonesday.com
lkrahenbuhl@jonesday.com

*Attorneys for Reynaldo Guevara*
Thomas Leinenweber
James Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
thomas@ilesq.com
jim@ilesq.com
kevin@ilesq.com

/s/Josh M. Engquist
JOSH M. ENGQUIST, Attorney No. 6242849
*One of the Attorneys for Defendant Officers*

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 67

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon.Mary M. Rowland |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | JURY DEMAND |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF MAYSONET'S AMENDED ANSWERS TO**
**DEFENDANT EDWARD MINGEY'S FIRST SET OF**
**INTERROGATORIES**

Plaintiff Jose Juan Maysonet, Jr., by and through his attorneys, Jennifer Bonjean and

Ashley Cohen of the Bonjean Law Group, PLLC and Steven Greenberg, responds as follows to

Defendant Mingey's First Set of Interrogatories.

**GENERAL OBJECTIONS**

Plaintiff's investigation is ongoing as to all matters referenced in the objections and responses

below. Plaintiff's objections and responses are based upon, and necessarily limited by, information

now reasonably available to Plaintiff. Plaintiff specifically reserves all rights to revise, correct,

supplement, modify, or clarify the content of his objections and responses below, in accordance

with the applicable Federal Rules of Civil Procedure and Federal Rules of Evidence. Each objection

below applies to each specific request included in the interrogatories; and unless otherwise stated,

shall have the same force and effect as if set forth in full in response to each specific request.

Plaintiff construes Defendant's interrogatories to request information within his possession, custody, or control, consistent with the requirements of the Federal Rules of Civil Procedure, and to not seek information that is already in the possession, custody or control of Defendant, or that is obtainable from public sources or court records, from a source more convenient or less burdensome than from Plaintiff, or from a source equally accessible to Plaintiff and Defendant. Plaintiff objects to the interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work-product doctrine, the joint-defense or common-interest privilege, the psychotherapist-patient privilege, the marital communications privilege, or any other applicable law, regulation, privilege, immunity, or discovery protection, or that are otherwise protected by disclosure under the Federal Rules of Civil Procedure and/or Federal Rules of Evidence. In responding to these interrogatories, Plaintiff preserves all objections and intends to make no waiver with regard to any claim of privilege. Plaintiff reasonably interprets the interrogatories to not seek information that is privileged, and therefore outside of the scope of discovery as defined by Federal Rule of Civil Procedure 26(b)(1), or protected as work product, which falls presumptively outside the scope of discovery as set forth in Federal Rule of Civil Procedure 26(b)(3)(A). Plaintiff objects to the interrogatories to the extent that they purport to impose burdens or obligations on Plaintiff that are broader than, inconsistent with, not authorized under, or not reasonable pursuant to the applicable Federal Rules of Civil Procedure and Federal Rules of Evidence. Plaintiff further reserves the right to assert additional objections which may become apparent in the course of this action, including those based on undue burden. Plaintiff objects to the interrogatories as a whole and to each interrogatory contained therein, to the extent that they are compound and a violation of the applicable Rules, which limit Defendant's interrogatories, including all discrete subparts. Plaintiff objects to the interrogatories that exceed the permitted number of requests and/or include multiple questions on the basis that they should not be considered a single interrogatory under the

applicable Rules. Plaintiff will construe each interrogatory that contains multiple questions as individual interrogatories, including discrete subparts. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

## INTERROGATORIES

1.      Identify, with specificity, what conduct you attribute to Defendant Mingey which you claim led to your arrest, prosecution, and conviction for the murders of Torrence and Kevin Wiley.

    **ANSWER:** Plaintiff objects to this interrogatory as unduly burdensome and premature having been propounded at the start of discovery. Plaintiff further objects because information relevant to this inquiry is principally in the possession, custody and control of the Defendants.

    Subject to and without waiving said objections, Plaintiff states generally that Defendant Mingey was a supervising sergeant on the Wiley brothers' murder case. Prior to Plaintiff's arrest on August 22, 1990, defendant Mingey was directly involved in the investigation of the Wiley brothers' murders and supervised the investigation. As pled in paragraphs 39-40 of Plaintiff's complaint, Defendant Mingey failed to properly investigate the case and interview occurrence witnesses and possible suspects to the murders. Defendant Mingey abandoned a meaningful investigation in favor of framing someone he perceived as a "gang banger" with the assistance of the other defendants in this case. Defendant Mingey, along with the other defendants in the case, indiscriminately arrested members of the Latin Kings street gang, interrogated them, and placed them in line-ups as part of their "investigation" of the Wiley brothers' murders. Defendant Mingey either failed to memorialize the investigate actions he took, concealed the reports that memorialized those actions, or destroyed the reports that memorialized those actions.

    On July 15, 1990, defendant Mingey directed defendant Paulnitsky to arrest Plaintiff in connection with a drive-by shooting, in part, so that defendant Mingey could interrogate Plaintiff about the Wiley brothers' murders. Even though defendant Mingey knew that Plaintiff had asserted

his Fifth Amendment right to counsel to defendant Paulnitsky, defendant Mingey interrogated Plaintiff at Grand and Central about the Wiley brothers' murders. Defendant Mingey interrogated Plaintiff with an eye toward framing him for the Wiley brothers' murders. Plaintiff told defendant Mingey that he had no knowledge about the shootings and was at home on the early morning hours of May 25, 1990 mourning the death of his friend Santiago Sanchez who was buried that same day. When defendant Mingey falsely suggested that there was a connection between the murder weapon and the weapon purportedly used in the attempt murder case that Plaintiff had been arrested for, Plaintiff communicated to defendant Mingey (through defendant Montilla) that he knew what they were trying to do, that is, "hook him up." Plaintiff then told defendant Mingey (and Montilla) that he would no longer speak to them and wanted his lawyer. Defendant Mingey told Plaintiff that they knew where to find him and would be back. Defendant Mingey did not memorialize this interview with Plaintiff and did not disclose to the defense that Plaintiff had denied involvement and knowledge about the murder and had provided defendant Mingey with an alibi for the time the crime was committed. Defendant Mingey took no actions to corroborate Plaintiff's alibi.

On August 1, 1990, defendant Mingey went to the Cook County Jail with defendant Montilla to interrogate Plaintiff again despite the fact that Plaintiff had asserted his Fifth Amendment right to counsel in connection with the offenses that defendant Mingey sought to question him about. Defendant Mingey interrogated Plaintiff at Cook County Jail as described in paragraphs 52-53 of Plaintiff's Complaint. Defendnat Mingey did not memorialize this interview with Plaintiff.

On August 22, 1990, defendant Mingey and Montilla questioned Plaintiff again at Grand and Central briefly. Defendant Mingey was present when defendant Paulnitskly physically assaulted Plaintiff as described in the Complaint and took no action to intervene or protect Plaintiff from the assault. Defendant Mingey directed the other detectives to hold Plaintiff in the lock-up until

defendant Guevara and Halvorsen started their shift. Defendant Mingey knew that defendant

Guevara would use physical violence, psychological coercion, and false promises, to procure a false

statement from Plaintiff. Defendant Mingey approved a number of police reports that he knew

contained false statements. Defendant helped author and approve a supplemental police report that

falsely claimed that Plaintiff had made inculpatory statements to defendant Mingey on July 15,

1990 and again on August 1, 1990. Defendant Mingey did not disclose that Plaintiff had made no

such incriminating statements and that statements attributed to him in the supplement report were,

in fact, never made but instead fabricated. Plaintiff reserves the right to amend and/or supplement

this answer as his investigation continues.

2.      Identify all persons, if any, you may call to testify against Defendant Mingey pursuant to

        Fed. R. Evid. 404(b), and for each person, identify:

        a.   the person's name, last known address, and phone number;

        b.   the nature of the claim or incident involving the person and Defendant

             Mingey;

        c.   the date of the alleged incident; and

        d.   any witnesses, documents, or other evidence you possess, or are aware of, that

             corroborate Defendant Mingey's involvement in the incident alleged by the

             person.

**ANSWER:** Plaintiff objects to this interrogatory as overly broad, unduly burdensome and

premature and imposing obligations on the Plaintiff that are inconsistent with the Federal Rules of

Civil Procures. Plaintiff further objects because information relevant to this inquiry is principally in

the possession, custody, and control of the Defendants. Plaintiff objects that this interrogatory is

compound and includes multiple questions and sub-questions that are more appropriately brought in

separate interrogatories. Plaintiff objects that this interrogatory seeks the thoughts and mental

impression of counsel and violates the work-produce doctrine.

Subject to and without waiving said objections, please see factual allegations contained in Plaintiff's complaint. Answering further, please see the persons identified in Plaintiff's Rule 26(a)(1) disclosures. Plaintiff will continue to supplement his disclosures and he reserves the right to supplement or modify this answer as new information comes to light.

3.   Please identify the name, address, and telephone number of each Rule 26(a)(2) expert you expect to call as a witness at trial and for each such expert, provide:

   a.   the subject matter on which each expert is expected to testify;

   b.   The conclusions and/or opinions of each expert witness and the bases therefore, including any reports of the witness;

   c.   the qualifications of each expert witness, including a curriculum vitae; and;

   d.   a comprehensive list of all cases in which the expert has provided expert testimony, including case number and jurisdiction, and the name, address, and telephone number of the attorney or party responsible for hiring the expert.

**ANSWER:**  Plaintiff objects to this interrogatory as it is compound and includes multiple questions and sub-questions that are more appropriately brought in separate interrogatories. Plaintiff further objects to the extent that this interrogatory calls for information protected from disclosure by the attorney-client privilege and work product doctrine. Plaintiff objects to this interrogatory to the extent that it prematurely seeks expert discovery. Plaintiff will disclose non-privileged expert information as required by Rule 26 and on the schedule established by the court.

4.   Are you currently receiving or have you ever received (or has anyone ever received on your behalf) any reimbursement, medical insurance coverage, or disability benefits for any physical, mental or emotional illness, or injury from any source, including but not limited to, a private

employer, a private insurer (including medical insurance providers), the Social Security

Administration, or the Illinois Department of Public Aid, etc.,? If so, list as to each benefit:

    a.   the name and address of the source of benefit;

    b.   the nature of the injury or disability involved;

    c.   the period of time (month and year) during which the disability benefit was

        provided; and,

    d.   the nature and amount of the benefit.

**ANSWER:** Plaintiff objects that this interrogatory is compound and includes multiple

questions and sub-questions that are more appropriately brought in separate interrogatories. Plaintiff

objects to the extent that this interrogatory calls for information that is irrelevant and not

proportionate to the needs of the case. Subject to and without waiving the foregoing objections,

Plaintiff states that sometime after his release from prison he obtained a medical card from the

Illinois Department of Public Aid. Plaintiff further states that sometime in spring 2018 he began

receiving food stamp benefits in the amount of $190 a month.


5.  Please specify in complete detail where you were, who you were with and what you were

doing between 5:00 p.m. on May 24, 1990 and 5:00 p.m. on May 25, 1990.

**ANSWER**:  Plaintiff objects to this interrogatory as unreasonable, overly burdensome and vague to

the extent it asks for "complete detail."  Subject to and without waiving the foregoing objection,

Plaintiff states that he cannot remember complete details for where he was and who he was with for

a 24-hour period of time nearly 29 years ago. Plaintiff does recall that during this period of time he

was mourning the death of his good friend Santiago Sanchez who committed suicide. To the best of

his recollection, he attended Sanchez's visitation on May 24, 1990 with dozens of people from the

neighborhood. After the visitation he went home and mourned the loss of his friend. The following

day he attended the funeral and burial of Sanchez with the same people.

6.   Please identify with specificity (including but not limited to manufacturer, caliber, type, revolver, semi-automatic, etc.) each and every firearm you owned, possessed, operated, discharged, borrowed, or utilized for the five (5) year time period before your arrest for the murders of the Wiley brothers.

**ANSWER**: Plaintiff objects to this interrogatory as irrelevant, unreasonable, unduly burdensome, harassing and of an inappropriate temporal scope and disproportionate to the needs of the case. Subject to and without waiving the foregoing objections, Plaintiff cannot recall discharging a weapon in the five-year time period before his arrest. Plaintiff does recall having a firearm in his house. To the best of Plaintiff's recollection, he had a 45 caliber handgun. Plaintiff does not recall the exact dates on which he possessed the weapon.

7.   Were you released on bond at any time from the date of your arrest on or about August 22, 1990 through October 19, 2016 the date you allege in paragraph 7 of your Complaint that a Cook County Judge vacated your murder conviction without objection from the Cook County State's Attorney? If your answer is in the affirmative, please state all dates and periods of time you were released on bond and the reason for any revocation of bond.

**ANSWER**: Plaintiff states that he was not released on bond at any time after his arrest on August 22, 1990.

8.   Provide the names of all attorneys, paralegals, assistants and investigators who worked on your criminal defense of the Wiley brothers' murders from the date of your charge through your release from incarceration.

 **ANSWER:** Plaintiff objects to this interrogatory as it is overly broad, unduly burdensome, irrelevant and not proportionate to the needs of the case. Subject to and without waiving the foregoing objections, Plaintiff states that he was represented by Richard Beuke and Randy C.

Rueckert during the trial proceedings. Plaintiff was represented by the office of the State Appellate

Defendant on appeal. Plaintiff was represented by Jennifer Bonjean and her associate Ashley

Cohen in connection with successive post-conviction proceedings.

Dated: December 2, 2019                Respectfully submitted,

                              /s/ASHLEY COHEN
                              *One of Plaintiff's Attorneys*

## ***CERTIFICATE OF SERVICE***

I certify under penalty of perjury, pursuant to 28 U.S.C.A. § 1746, that on December 2, 2019, the foregoing amended responses to Defendant Mingey's First Set of Interrogatories to Plaintiff were served upon counsel of record via electronic mail.

/s/ASHLEY COHEN

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 68

**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-2342 |
| | ) | |
| v. | ) | Honorable Mary M. Rowland |
| | ) | |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOSE JUAN MAYSONET, JR.'S RESPONSES TO DEFENDANT**
**FERNANDO MONTILLA'S SECOND SET OF INTERROGATORIES TO PLAINTIFF**

Plaintiff Jose Juan Maysonet, Jr., by and through his attorneys, Bonjean Law Group and

Greenberg Trial Lawyers, respond as follows to Defendant Fernando Montilla's Second Set of

Interrogatories to Plaintiffs:

**GENERAL OBJECTIONS**

Plaintiff incorporates his objections Defendant Fernando Montilla's first set of

interrogatories. Plaintiff objects to the extent these interrogatories request information which

necessarily would require Plaintiffs' attorneys to reveal their work product, including strategy,

thoughts, and mental impressions, including how they intend to prove their case at trial. Plaintiff

further objects on the grounds that these interrogatories are overbroad, unreasonable, oppressive,

and unduly burdensome as they request Plaintiff to identify each and every piece of evidence that he

has developed over the course of this six-year litigation. Plaintiff further objects on the grounds that

he intends to rely on the entire body of evidence produced in this case to prove his theories of

liability and any failure to identify any piece of evidence shall not be construed as a waiver of any

kind to his ability to present specific facts and/or evidence to a jury in the event his claims are

ultimately presented to a jury. Plaintiff incorporates his general and specific objections and responses

to Defendant Montilla's First Set of Interrogatories herein. Subject to and without waiving the foregoing objections:

## RESPONSES

10.     Please describe with specificity all evidence that supports Plaintiff's allegations in Count VI and VIII that Defendant Montilla exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without probable cause.

**ANSWER:** Plaintiff objects to this interrogatory on the grounds that it seeks the thoughts, strategy, and mental impressions of counsel, and therefore invades the attorney work product privilege. Plaintiff further objects that this interrogatory is overbroad, unduly burdensome, and oppressive as it asks Plaintiff to identify all evidence that supports Plaintiff's allegations in Count VI and VIII. Plaintiff objects on the grounds that this question is compound and includes multiple questions that are more appropriately brought in separate interrogatories.

Subject to and without waiving the any objections, Detective Montilla, along with ASA DiFranco, took a full statement from Rosa Bello and threatened to take her kids from her, thereby obtaining false information that was used to build a case against Maysonet. (Rosa Bello dep., pg. 70; Montilla dep., pg. 246); Montilla refused to allow Maysonet or Rosa Bello to call an attorney (Maysonet dep., pg. 299); Told Rosa Bello that if Maysonet cooperated, he could go home (Maysonet dep., pg. 301); Montilla falsely claimed to have participated in taking Maysonet for a ride along with Paulnitsky and DiFranco (Paulnitsky dep., pg. 266; Montilla dep., pgs. 231-236; DiFranco dep., pg. 244); Claimed that there were conversations where Maysonet made incriminating statements to Paulnitsky, Mingey and Montilla on July 15, 1990 (dep., pgs. 279-283; Mingey dep., pgs. 181-189); When Maysonet was at Area Five, Montilla agreed to translate an interview for Paulnitsky that he was conducting with Maysonet, from Spanish to English and English to Spanish, on July 15, 1990 (dep., pg. 191); He accompanied Sgt. Mingey to the Cook County jail to interview

2

Maysonet on August 1, 1990 (dep., pgs. 203-204; Maysonet dep., pgs. 245-257 Mingey dep., pg. 207);

SAO 1558); Montilla falsely claimed that he participated in an interview with Maysonet, Paulnitsky,

and Sgt. Mingey, on July 15, 1990, where Maysonet claimed to have given a gun to fellow Latin

Kings that was used to shoot "some guys" (dep., pg. 282; RFC 47); Montilla served as an interpreter

at Area Five when Maysonet was interviewed regarding the murder of the Wiley brothers, on or

about August 23, 1990 (dep., pg. 221; Maysonet dep.,  pg. 270); Montilla allowed officers to verbally

and physically abuse Maysonet at Area Five (Maysonet dep., pgs. 271-277); Montilla placed

Maysonet in the lockup without probable cause (Maysonet dep., pg. 296); Montilla told Maysonet to

cooperate in order to avoid having Guevara continue beating him (Maysonet dep., pg. 298); Montilla

falsely claimed to have participated in the questioning of Maysonet at Area Five, along with

Guevara, Paulnitsky, and DiFranco (dep., pg. 233); Montilla also acted as an interpreter when

Maysonet was questioned by the assistant state's attorneys, assisting in obtaining fabricated and false

statements from Maysonet (dep., pgs. 228-passim); Montilla accompanied Paulnitsky, DiFranco, and

Maysonet to the crime scene (dep., pg. 231); Montilla participated in the creation of a false and

coerced court reported statements from Maysonet and Rosa Bello (Maysonet dep. pgs. 313-327;

Rosa Bello dep., pgs. 58-85); RFC – Maysonet pgs. 47-54); Montilla participated in writing or

allowed his name to be included on one or more reports which falsely claimed that Maysonet and

others made incriminating statements concerning the murder of the Wiley brothers (dep., pg. 270);

Montilla assisted in the arrest of Maysonet and others, and the preparation of false police reports

and investigatory reports, which make false allegations about Maysonet and the others (RFC

Maysonet pgs. 47-63, dep., pg. 343); Detective Montilla failed to prepare any reports memorializing

or summarize any of his conversations that he had with Maysonet or that others had with Maysonet

that he was present for; Detective Montilla participated in the taking of a false, coerced, and

fabricated statement from Maysonet at Area Five, along with Detective Guevara and ASA Jennifer

Borowitz (dep., pg. 334; RFC Maysonet pgs. 47-54; Maysonet dep. pgs. 313-327); Montilla further testified falsely at Plaintiff's pretrial motion hearings and trial about the alleged fabricated statements made by Jose during the July 15, 1990 and August 1, 1990 interviews. Plaintiff further incorporates his answers to Defendant Mingey, Paulnitsky, Halvorsen, and Epplen's contention interrogatories, as if fully repeated herein. Plaintiff reserves the right to supplement this response.

11. Please describe with specificity all evidence that supports Plaintiff's allegation in Count V and IX that Defendant Montilla agreed and conspired with others to deprive Plaintiff of his constitutional rights, including but not limited to the date on which that agreement was made, between whom it was made, all other persons who participated in the conspiracy, and each overt act committed.

**ANSWER**: Plaintiff objects to this interrogatory on the grounds that it seeks the thoughts, strategy, and mental impressions of counsel, and therefore invades the attorney work product privilege. Plaintiff further objects that this interrogatory is overbroad, unduly burdensome, and oppressive as it asks Plaintiff to identify all evidence that supports Plaintiff's allegations in Count V and IX. Plaintiff objects to this interrogatory as containing multiple questions within a single interrogatory and requiring information that is not necessary to prove a conspiracy, such as the exact date on which a conspiratorial agreement was reached, the names of all coconspirators, the names of all participants and each overt act. Plaintiff objects to this interrogatory as containing multiple questions within a single interrogatory and requiring information that is not necessary to prove a conspiracy, such as the exact date on which a conspiratorial agreement was reached, the names of all coconspirators, the names of all participants and each overt act.

Without waving said objections, Plaintiff responds that defendant Montilla conspired with the other officers to frame the defendant for a double murder that he had absolutely nothing to do with by fabricating multiple statements and other evidence implicating him as set forth and detailed

4

in the response to interrogatory #10. In addition to what is set also forth above, which is by no means an exclusive or exhaustive list, the defendant officers arrested Francisco Veras and Efrain Cruz and attempted to pin this double murder on them by placing them in line-ups, falsely telling them that they had been identified in lineups, falsely telling them that witnesses had identified them as being involved in this double murder, and using improper and illegal tactics to get them to confess to this double murder, only to discover that both had been in custody at the time of the murder. To cover up their illegal activity the defendant officers and others failed to create any police reports documenting their arrest of various individuals, utilized other detectives who were unaffiliated with the investigation and would not have been responsible for writing a report then failed to write the report themselves so that there would be no record of what actually occurred and they would be able to create a report and fill in the blanks after the fact, failed to write reports documenting the line ups, arrests, or the interrogations. They conspired to arrest plaintiff at the Cook County courthouse when he was there for another case, claiming that he volunteered to go with them to rather than appear on the case that he was at the courthouse for that day, volunteering to remain for 24 plus hours in an interrogation room where he was subjected to physical and mental abuse, and subjecting himself to an arrest warrant for failing to appear on his case at 26th St. The defendant officers also arrested Christopher Goosens, Alfredo Gonzalez, and Justino Cruz for this double murder. Cruz and Gonzalez, although innocent, were interrogated, falsely accused by the defendant officers, beaten, and although both were innocent eventually both gave false statements where each named a different person as the shooter. Plaintiff further incorporates his answers to Defendant Mingey, Paulnitsky, Halvorsen, and Epplen's contention interrogatories, as if fully repeated herein. Plaintiff reserves the right to supplement this response.

12.     Please describe with specificity all evidence that supports Plaintiff's allegation in Count VI that Defendant Montilla intentionally failed to prevent the violation of Plaintiff's constitutional

rights.

**ANSWER**: Plaintiff incorporates his objections and responses to his answers to interrogatory numbers 10 and 11 herein.

13. Please describe with specificity all evidence that supports Plaintiff's allegation as in paragraph 164 of his amended complaint that Defendant Montilla used "physical violence and psychological coercion in order to force Plaintiff to incriminate himself falsely."

**ANSWER**: Plaintiff incorporates his objections and responses to his answers to interrogatory numbers 10 and 11 herein.

14. Please describe with specificity all evidence that supports Plaintiff's allegation in Count III of his amended complaint that Defendant Montilla withheld evidence from the State's Attorney prosecuting Plaintiff for the Wiley brother murders.

**ANSWER**: Plaintiff incorporates his objections and responses to his answers to interrogatory number 10 and 11 herein. In addition, there is not a single report in any CPD file or the Cook County State's Attorney's file that memorializes any investigative conduct between May 25, 1990 and August 22, 1990. (Mingey dep. Pgs. 285-313) Plaintiff notes that defendant Montilla and others claim that plaintiff made incriminating statements at Area 5 on July 15, 1990, and at the Cook County jail on August 1, 1990, that were not memorialized in any report or included in any file or shared with the Cook County State's Attorney's Office, and that there were discussions of a cooperation deal with plaintiff and between plaintiff and the Cook County State's Attorney's Office that were not memorialized. Furthermore, when questioned about the "missing" reports, Mingey testified, "They're missing, but I'm sure they're somewhere." Plaintiff further incorporates his answers to Defendant Mingey, Paulnitsky, Halvorsen, and Epplen's contention interrogatories, as if fully repeated herein. Plaintiff reserves the right to supplement this response. (Mingey dep. Pgs. 369-374)

6

15.     Please explain how the evidence set forth in your answer to the foregoing interrogatory #14 was exculpatory or impeaching.

**ANSWER**: Plaintiff objects to this interrogatory on the grounds that it seeks the thoughts, strategy, and mental impressions of counsel, and therefore invades the attorney work product privilege.

Subject to and without waiving the foregoing objection, the withheld evidence was exculpatory because it proves that the inculpatory statements were never made. The reason that the conversations were never memorialized was because plaintiff never made any incriminating statements. The reason why there are no reports memorializing any conversations with the Cook County State's Attorney's Office conveying plaintiffs request for a cooperation deal is because the detectives never contacted the Cook County State's Attorney's Office seeking a cooperation deal because the plaintiff never shared any information with them about this murder, because he did not have any information about the murder. The detectives withheld from the Cook County State's Attorney's Office information that they spoke with plaintiff, and he truthfully told them that he did not know anything about what happened to the Wiley brothers. Plaintiff further incorporates his answers to Defendant Mingey, Paulnitsky, Halvorsen, and Epplen's contention interrogatories, as if fully repeated herein. Plaintiff reserves the right to supplement this response.

16.     Please identify Plaintiff's "best friend" to whom he introduced Ms. Cazares, as she testified to in her deposition (Cazares Dep., at 18-19, 55-56), including providing his name, date of birth, address, telephone number and email address.

**ANSWER**: Plaintiff objects to this interrogatory on the grounds that it is vague, irrelevant and ambiguous as Plaintiff does not know who Ms. Cazares believes to be Plaintiff's "best friend." Subject to and without waiving the foregoing objection, Plaintiff does now know who Ms. Cazares is talking about. To the best of his recollection, the only individual Plaintiff recalls introducing Ms.

Cazares to is a former classmate, Raphael Rodriguez. Plaintiff does not have any additional identifying information for Mr. Rodriguez.

17.    Please identify the "guys" by name and with contact information with whom Plaintiff was drinking when he originally advised Ms. Cazares that he was home and later admitted to being out with "guys" drinking, as Ms. Cazares testified about in her deposition (Cazares Dep. At 53, 59).

    **ANSWER**: Plaintiff objects to this request on the grounds that it is vague, irrelevant, and ambiguous. Subject to and without waiving the foregoing objections, Plaintiff does not know what Ms. Cazares is talking about and does not recall the incident she is referring to in her deposition.

18.    Please describe with specificity all evidence that supports Plaintiff's allegation in paragraph 175 of his amended complaint that Rosa Bello's statement/testimony was false.

    **ANSWER**: Plaintiff objects to this interrogatory on the grounds that it vague, overbroad and misstates what Plaintiff states paragraph 175 of his amended complaint. Plaintiff does not make this allegation in the way the interrogatory posed seems to suggest. To the extent defendants in this interrogatory seek to determine plaintiff's allegations about Rosa Bella, the complaint refers to their misconduct in paragraphs 82-86, where it alleges that defendant officers coerced a false statement from her by threatening her, and threatening to take her children from her, including her unborn child, if she did not provide a statement, as she testified to at her deposition. In further support, plaintiff refers to his answer to interrogatory #10. Plaintiff further incorporates his answers to Defendant Mingey, Paulnitsky, Halvorsen, and Epplen's contention interrogatories, as if fully repeated herein. Plaintiff reserves the right to supplement this response.

19.    Are you or your attorneys aware of any street files, personal notes and/or personal files relating to any criminal investigations kept by the following named defendants a) Ernest Halvorsen; b) Edward Mingey; c) Fernando Montilla; d) Roland Paulnitsky; e) Lee Epplen and f) Reynaldo Guevara. If the answer to this question is anything other than an unqualified "no," please describe

the contents of these notes and/or files and evidentiary basis of your belief.

      **ANSWER**: Plaintiff objects to this request on the grounds that this interrogatory is overbroad, unintelligible, and unclear. Plaintiff does not know what Defendants mean by are his attorneys "aware" of any files "kept" by the following officers. Furthermore, this question seeks the thoughts, strategy, and mental impressions of counsel and therefore invades the attorney work product privilege.,

      Subject to and without waiving the foregoing objections, Plaintiff and his attorneys are aware that Area Five detectives had a practice of maintaining secret street files, personal notes and/or personal files. In at least one case *Rivera v. Guevara, et. al.*12-cv-04428 a jury found both Defendants Guevara and Mingey liable for violating their *Brady* obligations after hundreds of homicide files were found at Area North and in Rivera's own case a street file was discovered, containing highly exculpatory evidence not disclosed to Mr. Rivera until his civil case decades after his wrongful conviction. Plaintiff would have no way of knowing whether the Defendants have personal files in their possession that they maintain as tokens of their misconduct. Plaintiff's counsel welcomes the opportunity to search the Defendants' homes to determine such information with the Defendants consent of course. Plaintiff reserves the right to supplement this response.

Dated: April 16, 2024          Respectfully submitted,

                    /s/ *Steve Greenberg*

                    Jennifer Bonjean
                    Ashley Cohen
                    Bonjean Law Group, PLLC
                    750 Lexington Avenue, 9th Floor
                    New York, New York 10022
                    718-875-1850

                    Steve Greenberg
                    GREENBERG TRIAL LAWYERS
                    Attorneys and Counselors
                    53 W. Jackson Blvd., Suite 315

Chicago, IL 60604
(312) 399-2711

## <u>CERTIFICATE OF SERVICE</u>

I, Ashley Cohen, an attorney of Bonjean Law Group, hereby certify that a copy of Plaintiff's Responses to Fernando Montilla's Second Set of Interrogatories has been served upon call counsel of record via ELECTRONIC MAIL on April 16, 2024.

<u>/s/ ASHLEY COHEN </u>