# EXHIBIT B

# Transcript of the Testimony of **Bernard Murray**

**Date:** June 28, 2017

**Case:** Jacques Rivera v. Reynaldo Guevara, et al.

Printed On: June 17, 2018

Siebert and Associates Court Reporters, Inc.
Phone:773 851-7779
e-mail:cmsreporters@comcast.net

```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION


JACQUES RIVERA,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           ) Case No. 12 CV 4428
                                   )
REYNALDO GUEVARA, STEVE GAWRYS,    )
DANIEL NOON, JOHN GUZMAN, JOSEPH   )
FALLON, JOSEPH SPARKS, PAUL        )
ZACHARIAS, GILLION MCLAUGHLIN,     )
JOHN LEONARD, EDWARD MINGEY,       )
RUSSEL WEINGART, THE ESTATE OF     )
ROCCO RINADLI, Chicago Police      )
Detectives, and THE CITY OF        )
CHICAGO,                           )
                                   )
          Defendants.              )
```

          The deposition of BERNARD MURRAY, taken before

BETH SKLAR, Certified Shorthand Reporter and Registered

Professional Reporter, pursuant to the Federal Rules of

Civil Procedure pertaining to the taking of depositions

for the purpose of discovery at Loevy & Loevy, 311 North

Aberdeen Street, Suite 300C, Chicago, Illinois 60607,

commencing at 10:14 a.m. on the 28th day of June, 2017.

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3        ANAND SWAMINATHAN, ESQUIRE
          KATIE ROACH, ESQUIRE
 4        LOEVY & LOEVY
          311 North Aberdeen Street
 5        Suite 300
          Chicago, Illinois 60607
 6        Phone: 312-243-5900
          E-Mail: anand@loevy.com
 7        E-Mail: katie@loevy.com

 8

 9   On behalf of the Defendant Chicago Police Officers:

10        JEFFREY N. GIVEN, ESQUIRE
          THE SOTOS LAW FIRM, P.C.
11        550 East Devon Avenue
          Suite 150
12        Itasca, Illinois 60143
          Phone: 630-735-3300
13        E-Mail: jgiven@sotoslaw.com

14

15   On behalf of the Defendant The City of Chicago:

16        EILEEN E. ROSEN, ESQUIRE
          THERESA BEROUSEK CARNEY, ESQUIRE
17        ROCK, FUSCO & CONNELLY, LLC
          321 North Clark Street
18        Suite 2200
          Chicago, Illinois 60654
19        Phone: 312-494-1000
          E-Mail: erosen@rfclaw.com
20        E-Mail: tcarney@rfclaw.com

21

22   ALSO PRESENT:

23        MR. JOHN HAZINSKI, SUMMER ASSOCIATE FOR LOEVY

24
```

**Page 3**

```
 1          P R O C E E D I N G S
 2              - - -
 3        Deposition taken before Beth Sklar, CSR, RPR,
 4    in and for the State of Illinois, in the above cause.
 5              - - -
 6    Thereupon,
 7              (BERNARD MURRAY)
 8    having been first duly sworn or affirmed, was examined
 9    and testified as follows:
10           DIRECT EXAMINATION
11    BY MR. SWAMINATHAN:
12        Q.  Good morning, Mr. Murray.  Please state and
13    spell your name for the record.
14        A.  Bernard Murray, B-e-r-n-a-r-d, Murray,
15    M-u-r-r-a-y.
16        Q.  Mr. Murray, anything that would prevent you
17    from being able to provide accurate and truthful
18    testimony today?
19        A.  No.
20        Q.  Are you taking any medications that would
21    prevent you from providing accurate and truthful
22    testimony today?
23        A.  No.
24        Q.  Do you have any medical conditions that you
```

**Page 4**

```
 1    believe would prevent you from providing accurate and
 2    truthful testimony today?
 3        A.  No.
 4        Q.  Just a couple of ground rules.  I'm sure you
 5    know these.  If you need to take a break at any point,
 6    please let me know and we can take a break.  The only
 7    rule is:  I want you to answer any pending question
 8    before we take a break.  Do you understand that?
 9        A.  I do.
10        Q.  If I ask you a question and you don't
11    understand my question, please tell me and I will
12    rephrase it; is that fair?
13        A.  Yes.
14        Q.  And if you answer my question, I'm going to
15    assume you understood it; is that fair?
16        A.  I understand.  Yes.
17        Q.  Okay.  You -- how many times have you served
18    as a retained expert?
19        A.  This is my second.
20        Q.  What was the previous instance in which you
21    served as a retained expert?
22        A.  Fields versus Chicago.
23        Q.  Is that a case that involved similar issues as
24    this one?
```

**Page 5**

```
 1        A.  Yes.
 2        Q.  You gave deposition testimony in the Fields
 3    case; is that correct?
 4        A.  I did.
 5        Q.  Okay.  Did you ever have occasion to review
 6    your deposition testimony from the Field case?
 7        A.  Yes.
 8        Q.  How many times did you review your deposition
 9    testimony from the Fields case?
10        A.  Prior to testifying at the trial and I
11    examined not all of it, but I looked at it this week,
12    parts of it.
13        Q.  Okay.  Any other times than those two times?
14        A.  Not that I recall.
15        Q.  Okay.  In the instances when you reviewed your
16    deposition testimony from the Fields case, were there
17    any instances in which you found your testimony
18    contained falsehood or inaccuracies or errors?
19           MS. ROSEN:  Objection.  Form.
20           THE WITNESS:  I did not.
21    BY MR. SWAMINATHAN:
22        Q.  Okay.  Do you stand by your deposition
23    testimony in the Fields case?
24        A.  I do.
```

**Page 6**

```
 1        Q.  Any aspect of your testimony from the Fields
 2    deposition that you would alter or change today?
 3           MS. ROSEN:  Object to the form.
 4    BY THE WITNESS:
 5        A.  No.
 6        Q.  You gave trial testimony in the Fields case as
 7    well; is that correct?
 8        A.  That's true.
 9        Q.  Did you ever have occasion to review your
10    trial testimony in the case?
11        A.  I looked at a rough copy of it recently, but I
12    did not read the entirety of it.
13        Q.  Okay.  When you gave that testimony at trial,
14    did you at any point feel that you had given any
15    testimony that was erroneous or inaccurate?
16           MS. ROSEN:  Object to the form.
17           THE WITNESS:  No.
18    BY MR. SWAMINATHAN:
19        Q.  When you reviewed some -- strike that.
20           When you reviewed portions of that trial
21    transcript from the Fields case, did you find that any
22    portions were -- contained falsehoods, errors, or
23    inaccuracies?
24        A.  No.
```

## Page 7

1    MS. ROSEN:  Object to the form.
2    THE WITNESS:  No.
3  BY MR. SWAMINATHAN:
4    Q.  Do you stand by your testimony from the Fields
5  case?
6    A.  I do.
7    Q.  We'll mark this Exhibit 1.
8    (Deposition Exhibit Number 1 was marked for
9  identification.)
10  BY MR. SWAMINATHAN:
11    Q.  Handing you a copy of a document marked
12  Exhibit 1, can you tell me what this document is?
13    A.  It's a copy of my expert report.
14    Q.  Okay.  If you turn to the last page of this
15  report, it is unsigned.  Do you see that?
16    A.  Yes.
17    Q.  We received initially an unsigned copy of your
18  report some time ago, and this morning we received a new
19  copy of your report with some additions to it.  This --
20  the copy we received this morning is not signed and I'll
21  represent that's the copy that I have printed and
22  provided you with now.
23    Is it this unsigned version of your report
24  that is marked as Exhibit 1 that you intend to use as

## Page 8

1  your expert report in this case?
2    A.  Yes.
3    Q.  Okay.  And so, although there's no signature
4  on this report, you'd have no hesitation in signing this
5  report, the copy, as Exhibit 1; correct?
6    A.  That's correct.
7    Q.  Okay.  Can you explain to me what the error
8  was that took place between the prior report and the
9  production of this report?
10    A.  Yes.  In Section 2 which starts on page 2 and
11  continues on to page 3, there were indented paragraphs
12  under 2A, 2B and 2C that for some reason were not
13  visible in the signed report.
14    Q.  Okay.  Any other changes or differences
15  between the previous version of the report and this one?
16    A.  No.  And, actually, those indented materials
17  were in the original report, just it was a -- a
18  difficulty formatting this part of the report for some
19  reason, and when it was printed, I guess, the -- those
20  indented parts disappeared, so --
21    Q.  Understood.  And they --
22    A.  So they had been there.  Just for some reason
23  in the formatting part they were hidden.
24    Q.  Okay.  And that's fair.  I'm just going to

## Page 9

1  say:  There was a version of the report that was sent to
2  us and then there's this version of your report.
3    A.  I understand.
4    Q.  So the differences between those two versions,
5  your understanding is, it is just several indented
6  paragraphs on pages 2 and 3; is that correct?
7    A.  That's correct.
8    Q.  Okay.  Are there any portions of this report
9  in which the sentences have changed or are different
10  than -- between the earlier version and this version?
11    A.  No.
12    Q.  Okay.  So the only thing that's different is
13  that there are a few paragraphs that would be inserted
14  or added into these sections on pages 2 and 3; correct?
15    A.  That's correct.
16    Q.  Okay.  Does this report contain your opinions
17  in the case of Jacques Rivera versus The City of
18  Chicago, et al.?
19    A.  It does.
20    Q.  Okay.  Are you intending to offer any opinions
21  other than those contained in this report that I've
22  handed you as Exhibit 1?
23    A.  No.
24    Q.  Does this report include the basis and bases

## Page 10

1  for your opinions in this case?
2    A.  Yes.
3    Q.  Okay.  Does it include all of the bases for
4  your opinions in this case?
5    A.  The -- yes.
6    Q.  Okay.
7    A.  To the best of my recollection, yes.
8    Q.  Okay.  Are you intending to offer any opinions
9  other than those that are contained in this report,
10  Exhibit 1?
11    A.  The -- I don't know if it's a -- it's not a
12  different opinion.  I noticed when I reviewed the
13  report, there was one of the cases where I didn't fully
14  explain photographs, but I described how the information
15  was included in the report.  I might say more about the
16  photographs.
17    Q.  Tell me where you're referring to.
18    A.  Yes.  I believe it's G.  Yeah, it's Tomas
19  Nieves.
20    Q.  What page?
21    A.  Page 20, letter G.
22    Q.  All right.  So page 20, letter G.  Tell me
23  what it is about page 20, letter G.
24    A.  The comments that are there are fine.

**Page 11**

1  Mr. Brasfield claimed there were photographs of suspects
2  that were not tendered or not found in the criminal
3  defense attorney's file. I didn't spell out exactly
4  what I would have said about that, but elsewhere in the
5  report I discussed how photographs of this nature would
6  be provided to a police off -- by the prosecutor to the
7  criminal defense attorney prior to trial, and I would
8  also describe how every one of those three people,
9  including the defendant, were discussed at length in the
10 police reports.
11      Q.  Okay.  And other than those two points you
12 just told me with regard to the People versus Tomas
13 Nieves file, are there any other opinions that you
14 intend to offer other than those contained in this
15 report?
16      A.  No.
17      Q.  And in this report, you mentioned the Tomas
18 Nieves file.  The Tomas Nieves file is one of nine total
19 files that you discussed specifically in your report; is
20 that correct?
21      A.  Right.  The seven that Mr. Brasfield used as I
22 think he called them examples and then two that came to
23 my attention were -- that the supplementary reports were
24 not found in the prosecutor's file --

**Page 12**

1      Q.  And --
2      A.  -- so that was the other two that are separate
3  from this discussion of the set.
4      Q.  Okay.  And those nine files are the only nine
5  files that you discussed in this report; is that
6  correct?
7      A.  At length, yes.
8      Q.  Are there other files that you discuss
9  specifically in this report?
10      A.  Well, not specifically, no.
11      Q.  Okay.
12      A.  There are other files that are referenced,
13 but.
14      Q.  Well, when you say "other files that are
15 referenced," what are you referring to?
16      A.  Well, the -- the files from Section F, the
17 titles of the pages that Mr. Brasfield said were
18 investigative material; I didn't do a case-by-case
19 analysis on them, but I discussed how, just by the title
20 of the documents, those documents, in my opinion, were
21 not investigative material, so I didn't discuss them on
22 a case-by-case basis like I did those nine cases, but --
23 well, discuss them, Mr. Brasfield's titling of them as
24 investigative material, I would just say that the

**Page 13**

1  material that he calls investigative material in those
2  Section F cases that I wouldn't agree to that.
3      Q.  Okay.  So you have some general opinions that
4  respond to Mr. Brasfield on all of the various cases; is
5  that correct?
6      A.  That's correct.
7      Q.  But what you don't have are any case-specific
8  things other than for those nine cases; is that correct?
9      A.  That's correct.
10      Q.  I want to ask you:  What forms the basis of
11 your opinions in this case?
12      A.  My experience as a prosecutor both in the Cook
13 County State's Attorney's Office primarily, but also as
14 a prosecutor with DuPage County State's Attorney's
15 Office, the training I received over the years in those
16 offices, the training on -- on discovery matters that I
17 either helped implement or helped teach over those years
18 as -- and experience in obtaining documents from the
19 Chicago Police Department and then providing them to
20 defense counsel in court, my own personal experience
21 doing that, as well as training I might have received
22 from the National College of District Attorneys Office,
23 the Association of Government Attorneys in capital
24 litigation, and trainings that I conducted on behalf of

**Page 14**

1  the Illinois State's Attorneys Association in Illinois
2  and for the National District Attorneys Association in
3  their nationwide seminars.
4      Q.  Anything else that you're relying on that form
5  the basis of your opinions in this case?
6          MS. ROSEN:  Object to the form of the
7  question.
8  BY THE WITNESS:
9      A.  Well, the examination of Mr. Brasfield's
10 report, my examination of -- of -- of the files, of all
11 the files for the defense attorney, the prosecutor's
12 file, or the Chicago Police Department files.  I think
13 that's primarily it.
14      Q.  Yeah.  Let me provide you with materials
15 reviewed by Bernard Murray.
16          Would you mark this Exhibit 2?
17          (Deposition Exhibit Number 2 was marked for
18 identification.)
19  BY MR. SWAMINATHAN:
20      Q.  All right.  Handing you a document entitled
21 "Materials Reviewed by Bernard Murray" --
22      A.  Yes.
23      Q.  -- is this the document you were referring to
24 just a moment ago?

## Page 15

1     A. Yes. I guess, in addition, Mr. Brasfield's
2 deposition and his expert report and attachments, I
3 think I said that.
4     Q. Yeah, that's listed here.
5     A. The specific cases that he used as examples,
6 so seven of them, then the criminal defense files, the
7 SAO subpoenaed response documents, and the warehoused
8 production which included those other two files which
9 were also discussed in more detail other than the seven
10 that he did.
11     Q. Okay. The SAO subpoenaed response documents
12 listed here, just so I understand, how many files,
13 different cases do those SAO subpoenaed response
14 documents apply to?
15     A. Well, obviously on the seven files that
16 Mr. Brasfield used and then the two where there is
17 material not found in the prosecutor's file that was
18 allegedly not found in the criminal defense attorney
19 file so those two. There was a total of -- I think
20 mentioned in Mr. Brasfield narrowed his cases to 38
21 cases. There were 26 prosecutor files related to those
22 38. I didn't review all the prosecutor's files, just
23 that they were available for me to look at them, but I
24 primarily looked at them when it was referring to the

## Page 16

1 seven cases that he looked at, and the two where we
2 couldn't find police reports.
3     Q. So the State's Attorney's Office file that you
4 looked at were the -- that you re -- strike that.
5     The State's Attorney's Office files that you
6 reviewed were for the nine cases that are specifically
7 referenced in your report; is that correct?
8     A. And also as need be to look at them for the
9 cases listed in Section F, like the -- for example,
10 there might be a case in Mr. Brasfield's Section F where
11 he says in any -- he would say a body chart was missing,
12 then I would look at the prosecutor's file to see if the
13 body chart was in there and I'd also look at the police
14 department report to see what the body chart was,
15 whether it was an ME body chart or a police body chart,
16 but I primarily used them for those nine cases as well
17 as -- as need be. I didn't -- you know, since I didn't
18 do a comprehensive examination of all of the other cases
19 that -- like Mr. Brasfield, I didn't look at all of
20 them.
21     Q. So let me make sure I understand. This -- the
22 Bates range identified on Exhibit 2 is SAO Subpoena 1
23 through 36244. I'll say that again: 1 through 36,244.
24     A. Yes.

## Page 17

1     Q. Is that a set of files for all -- is that all
2 26 State's Attorney's office files?
3     MS. ROSEN: Twenty-eight.
4 BY MR. SWAMINATHAN:
5     Q. Twenty-eight to some high point --
6     MS. ROSEN: Oh, no. You were right. I'm
7 sorry. Twenty-six.
8 BY THE WITNESS:
9     A. My recollection was that it was 26.
10     Q. Okay.
11     A. And that -- that -- in that number you've just
12 cited here refers to those files.
13     Q. Okay. So those 36,000-plus pages cover the 26
14 State's Attorney's Office files and you were -- all of
15 those files were made available to you; is that correct?
16     A. That's correct.
17     Q. And you did not review all of those files;
18 correct?
19     A. Excuse me. That is correct.
20     Q. Okay. You -- how many files -- strike that.
21     How many files did you review in their
22 entirety?
23     A. I would say the -- the seven cases that -- the
24 nine cases in their entirety and -- yeah, in their

## Page 18

1 entirety those are the nine cases.
2     Q. Okay. Other than those nine cases, for the
3 remaining 17 cases you looked at pages here and there;
4 is that fair?
5     A. Yes.
6     Q. Okay. All right. Now, looking at this entire
7 list here, I want to go back to my question about the
8 basis for your opinions, so let me ask you this. Is it
9 fair to say that the basis of your opinions in this case
10 is the list of materials reviewed on Exhibit 2 plus your
11 experience in all the forms that it takes?
12     A. Experience, training, yes.
13     Q. Anything else?
14     A. Well, everything I said before.
15     Q. Everything you said before is the reference to
16 all the -- is your experience and all the forms it
17 takes?
18     A. Yes.
19     Q. And so, ultimately, I'm just saying you have
20 experience from your time as a prosecutor and you have a
21 set of materials you've reviewed and identified in the
22 Exhibit 2. Are those the things you're relying on as
23 the basis of your opinions in this case?
24     MS. ROSEN: Object to the form.

**Page 19**

1          THE WITNESS:  But the experience includes
2  training and my experiences in all those other
3  organizations, yes.
4  BY MR. SWAMINATHAN:
5      Q.  Anything else?
6      A.  Not that I can think of.
7      Q.  Now, talking about your experience, you're
8  talking about --
9      A.  Well --
10     Q.  Go ahead.
11     A.  Actually, I'm sorry.  I think it is included
12  in my report, but obviously referencing the Illinois
13  Supreme Court 412, a working familiarity with Brady and
14  Giglio, so those legal requirements as well would be
15  something that helped formed the basis of my opinions.
16     Q.  And those are legal requirements you developed
17  a familiarity with during your time in the prosecutor's
18  office; is that correct?
19     A.  Yes.
20     Q.  Okay.  Anything else?
21     A.  No.
22     Q.  Okay.
23     A.  That I can think of, no.
24     Q.  Okay.  So let's talk about the experience

**Page 20**

1  part.  In terms of your experience, we're talking
2  specifically about your experience as essentially a
3  prosecutor over multiple decades; correct?
4      A.  Yes.
5      Q.  Just tell me the timeframe where you were
6  working at the Cook County State's Attorney's Office.
7      A.  Started at the Cook County State's Attorney's
8  Office in December of 1983.  I worked in that office
9  till December of 2008.
10     Q.  Now, during that time period, what percentage
11  of the cases that you worked on involved underlying
12  investigations by the Chicago Police Department?
13     A.  A very, very high percentage.  I -- during my
14  tenure with the Cook County State's Attorney's Office, I
15  was primarily assigned to city courtrooms, whether it be
16  juvenile or adult court.  I did not have suburban
17  assignments during that time period, though on occasion
18  I would try a suburban case which might involve a
19  suburban police district.  There were some other
20  experiences that were either downstate or with the U.S.
21  Attorney's Office; obviously they were not exclusively
22  Chicago Police Department cases.  But the vast majority
23  of my career with the Cook County State's Attorney's
24  Office involved working with the Chicago Police

**Page 21**

1  Department.
2      Q.  Okay.  If you had to put a ballpark on it,
3  what percentage of the cases you worked on while you
4  were at the Cook County State's Attorney's Office
5  involved underlying investigations of the Chicago Police
6  Department?
7          MS. ROSEN:  Object to the form.
8          Asked and answered.
9          THE WITNESS:  High nineties.
10  BY MR. SWAMINATHAN:
11     Q.  Now, this case, as you know, involves an
12  underlying homicide; correct?
13     A.  Yes.
14     Q.  And is it your understanding that the
15  practices at issue involving, you know, the Chicago
16  Police Department file keeping and so on are -- relate
17  to the keeping of homicide files?  Is that your
18  understanding?
19     A.  Homicide, violent crimes, and I'm not sure if
20  it -- well, it applies to a violent crime detective, so
21  it could be rape, too, as well.  It could be other
22  violent crimes that are felonies.
23     Q.  Okay.  During your time at the prosecutor's
24  office, were you always working on those types of cases,

**Page 22**

1  violent crimes involving the Chicago Police Department?
2      A.  No.  I went through the juvenile court which
3  was, you know, anything from retail theft, misdemeanor,
4  all the way to one murder case over there, but primarily
5  non-murder cases in juvenile court.  When I got to adult
6  court in the mid-eighties, then it was almost
7  exclusively violent crimes, felonies that I worked on.
8      Q.  So what was the period in which you were
9  working on violent crimes cases involving the Chicago
10  Police Department?
11     A.  Like I said, there may have been some violent
12  crimes in the Chicago Police Department that came
13  through juvenile court, I mean there were, armed
14  robberies and things like that and shootings, but it
15  would be more to the point when I got to the felony
16  courtroom in 19 -- in a felony courtroom, 1986 or '87, I
17  always forget what year that was, but then all the way
18  to the end of my career.
19     Q.  And is it that experience in a felony
20  courtroom towards the end of your career that really
21  forms the primary basis of your experience as a
22  prosecutor that you think is relevant to this case?
23     A.  Well, actually, when I was in juvenile court,
24  we had training on discovery procedures there, too.  And

**Page 23**

1    so my first exposure to how -- you know, how to obtain
2    police documents or tendering during discovery started
3    even in juvenile court, and that would be 1984.
4        Q.   That training, was it -- who conducted those
5    trainings?  Was it prosecutors, police officers?
6        A.   Yes.  Senior -- senior prosecutors would --
7    either they were already assigned to juvenile court or
8    were still assigned at -- in the felony courtrooms would
9    come in and provide training.  It was primarily obtained
10   in the Chicago Police Department for juvenile court,
11   juvenile -- let me rephrase that.  Primarily acquiring
12   Chicago Police Department reports even in juvenile court
13   delinquency side, but there were a number of other
14   agencies that provided investigative material and other
15   material, private agencies, social service agencies, so
16   there were other documents we had to acquire as well in
17   juvenile court, so the training would include both.
18       Q.   And was the training specific to obtaining
19   documents from the Chicago Police Department or was it
20   more general in the obtaining documents from law
21   enforcement agencies?
22       A.   It was obtaining all forms of documents from
23   any sort of different groups, but it was primarily
24   focused on obtaining Chicago Police Department

**Page 24**

1    documents.
2        Q.   Did you receive any training by Chicago police
3    officers or police officials?
4        A.   Not that I recall.
5        Q.   And let me rephrase it so it's clear.  Did you
6    receive any trainings that were conducted by Chicago
7    police officers or police officials?
8        A.   Not that I recall.
9        Q.   Did you ever give any trainings to Chicago
10   police officers or Chicago police officials?
11       A.   Training in general?
12       Q.   Yes.
13       A.   I remember at one time providing the training
14   to police officers when the mandatory videotape
15   interrogation law went into effect; I was part of that
16   training.  That was a large group of detectives.  In
17   different National District Attorney's Association
18   training where police officers would be invited at some
19   national level.  Winnebago County does an annual seminar
20   which includes discovery materials and it's open to all
21   police agencies.  I don't think any Chicago police
22   officers came to that though.
23       Q.   Okay.
24       A.   But those were -- would be trainings where

**Page 25**

1    police officers were open to those trainings.
2        Q.   Any other trainings that you've done of
3    Chicago police officers, other than what you've just
4    told me?
5        A.   Not that I recall.
6        Q.   So would it be fair to say that you've never
7    given any training to Chicago police officers on the
8    subject of file keeping practices and disclosure
9    obligations?
10       A.   I have not.
11       Q.   And no Chicago police officer or official has
12   ever conducted any trainings that you've attended about
13   file keeping practices and disclosure obligations; is
14   that correct?
15       A.   To me or the other prosecutors, no.  Not that
16   I experienced.
17       Q.   Did you ever work for the Chicago Police
18   Department?
19       A.   No.
20       Q.   Do you claim to have knowledge about the
21   internal workings within the Chicago Police Department
22   each time a new case is opened?
23       A.   Well --
24       MS. ROSEN:   Object to the form.

**Page 26**

1        THE WITNESS:  I --
2        MS. ROSEN:  Can you read it back?
3        I'm sorry.  I don't that I understood the
4    question.
5        Can you read it back?
6        (A portion of the record was read by the
7    reporter.)
8    BY THE WITNESS:
9        A.   Well, I have -- during the course of my career
10   of working with the -- to obtain police reports for
11   discovery purposes, I've become familiar with some of
12   their processes.  I don't claim to have -- to understand
13   exactly how they compile the material, but I know where
14   to look for the material, for lack of a better word.
15       Q.   Okay.  You don't claim to have an
16   understanding of internally what happens within the
17   Chicago Police Department in terms of where they keep
18   their files and when they open their files at first and
19   how they move around; is that correct?
20       A.   Well, it's kind of hard for me to answer that
21   because when I -- when I'm -- either a murder case
22   charge, for example, I know where investigative material
23   should be found and where to look for it, so I do know
24   that.

Page 27

1        Now, when or what -- when they open the file
2    or why they open a file, I don't claim to know that.
3    But cases I'm working on, I know where to look for
4    material.
5        Q.  You know -- you know a place to look for
6    material.  Do you know every place to look for material?
7        MR. GIVEN:  Object to form.
8    BY THE WITNESS:
9        A.  I think so, yes.
10       Q.  Okay.  And what's the basis for saying you
11   know every place to look for material?
12       A.  Well, from the training I received and from my
13   own personal experiences, you come to have an
14   understanding of -- of the different parts of Chicago
15   Police Department, where the material can be found.
16       Q.  Have you ever seen any Chicago Police
17   Department special orders about maintaining homicide
18   investigation files prior to being retained in this
19   case?
20       A.  No.
21       Q.  And let me strike that.  Well, your answer
22   stands, but let me ask you again, just to be -- I think
23   you might have misspoken there.
24       You were initially retained in the Fields

Page 28

1    case; is that correct?
2        A.  Mm-hmm.  Yes.
3        Q.  At that time did you see Chicago Police
4    Department special orders with regard to the keeping of
5    homicide files?
6        A.  Right.  And that would also be prior to being
7    retained in this case.
8        Q.  Okay.  And that was the first time that you
9    saw such special orders; is that correct?
10       A.  Yeah.  I might have understood they existed,
11   but reviewing them, that's the first time I actually
12   reviewed those.
13       Q.  Okay.  So prior to that you had never --
14   during the time working as a prosecutor, you had never
15   seen Chicago Police Department special orders explaining
16   what the file keeping process was; correct?
17       A.  My understanding was that they existed, but I
18   didn't -- I was more concerned, as I explained to you,
19   from the training and it was, Where do I go to get the
20   material.
21       Q.  Okay.
22       A.  So --
23       Q.  And the training was -- go ahead.
24       A.  And so my -- my experience is I didn't review

Page 29

1    those orders back in the eighties or the nineties to
2    understand their policies.  I was trying to get the
3    documents I needed to proceed with the prosecution.
4        Q.  And the training you're referring to is the
5    training you received from prosecutors; correct?
6        A.  Correct.
7        Q.  Okay.  Are you claiming to be an expert in
8    Chicago Police Department file keeping practices?
9        A.  Not on their file keeping.  But, again, as I
10   alluded to a few minutes ago, a few answers ago, that
11   because of my experience with obtaining documents to be
12   tendered during discovery, I do know from that
13   experience where to look for the documents and where
14   they're generally kept.
15       Q.  So would it be fair to say you have some
16   expertise and substantial experience in how prosecutors
17   go about obtaining documents and seeking documents from
18   the Chicago Police Department?  Is that -- is that true?
19       A.  That's fair.
20       Q.  Okay.
21       MS. ROSEN:  Object to form.
22   BY MR. SWAMINATHAN:
23       Q.  In terms of how the Chicago Police Department
24   internally goes about collecting documents, do you claim

Page 30

1    to have expertise on that issue?
2        MS. ROSEN:  Object to the form.
3        THE WITNESS:  Could you explain how -- what
4    you mean by how they collect the documents?  I
5    don't think I understand that part of your
6    question.
7        MR. SWAMINATHAN:  Sure.
8    BY MR. SWAMINATHAN:
9        Q.  So let's do it this way.  When you -- a
10   prosecutor makes requests to the Chicago Police
11   Department for materials; correct?
12       A.  Yes.
13       Q.  And tell me some of the ways that prosecutors
14   make requests for materials.
15       A.  In my experience, it was a -- it was -- it
16   could be anything from a -- a phone call to the
17   detectives assigned to the case saying -- requesting any
18   investigative materials from them directly.  It could
19   also -- we also had an inter- and intra-office mail
20   between the prosecutor's office and the Chicago Police
21   Department; we'd obtained some of their request forms,
22   blank request forms, and request documents and
23   photographs in that fashion.
24       And primarily or -- not exclusively, but

## Page 31

1  primarily we would send subpoenas to the Chicago Police
2  Department.  Initially that started by sending them
3  right to the area and right to the specific parts of the
4  Chicago Police Department to obtain documents.
5  Eventually that became sending a subpoena to what's
6  generically referred to as headquarters.
7         And even after all that if there was a time
8  when we were getting ready for a motion or getting ready
9  for a trial, we would ask the detectives assigned to the
10  case to bring in their investigative material to make
11  sure that we had received everything.
12     Q.  And were you -- why would you do that last
13  step?
14     A.  When you finally -- there may have been a
15  supplemental report that was not signed off on and
16  approved by the police officer's supervisor until later
17  in the process, so the police department, in responding
18  to a subpoena for a date certain in court, would provide
19  everything they had on that date certain, but a closing
20  supplemental report might not be signed off on,
21  approved, and available until after that date.
22     Q.  Any -- any other reasons?
23     A.  Just in general to make sure we had
24  everything.

## Page 32

1     Q.  Would it ever the case -- was it ever the case
2  that they would bring in their -- you'd have the
3  detective or officer bring in their file and there would
4  be materials you hadn't previously had?
5     A.  There -- there may have been occasions which I
6  alluded to, the signed off report.  There might have
7  also been a General Progress Report that was
8  associated with that closing supp that maybe I didn't
9  see before as well.
10     Q.  And in --
11     A.  But it --
12     Q.  Go ahead.
13     A.  But -- and if there was a situation where
14  early on, for whatever reason, that we didn't get all
15  the police reports and you could tell from reading what
16  we had that we were missing some police reports, that
17  was also another stop gap method to make sure we
18  received everything.
19     Q.  That last example you just gave, that's a
20  scenario where you've already received documents from
21  the police department and you're now reviewing them and
22  find that there may be some -- some gaps; is that -- is
23  that correct?
24     A.  That's fair to say.

## Page 33

1     Q.  Okay.  Is that something that happens
2  sometimes?
3     A.  Yes, it happens sometimes.
4     Q.  Okay.  And what was the explanation given for
5  why you hadn't received everything initially?
6     A.  The -- maybe the primary example is what I've
7  already stated to you that the handwritten reports,
8  handwritten notes that were associated with a close of
9  Supplemental Report were still with the sergeant who
10  hadn't signed off on it.  There was a time period in the
11  early nineties where there was even more murders and
12  shootings than there are now and detectives were -- and
13  sergeants were very backed up on approving those
14  documents.
15     Q.  And --
16     A.  So there was a gap in time there where -- and
17  in the course of the investigation they might have done
18  a lot of work and then at the very end of the
19  investigation they interviewed one more person or ten
20  more people or whatever it might be and they may not be
21  close to concluding until that final closing supp and
22  maybe even an additional supplemental report.
23     Q.  Okay.  So --
24     A.  Supplementary report.

## Page 34

1     Q.  Yeah.  And then let me -- let me do it this
2  way because I want to make sure I'm clear.
3         There's an issue and then there's a diagnosis.
4  So the issue is, in some instances, you would have a set
5  of documents from the city of Chicago in response to a
6  subpoena and you would find sometimes that there were
7  gaps or what appeared to be missing documents and you'd
8  follow-up with it and get those documents; is that a
9  fair characterization?
10     A.  Yeah.  Yes.
11     Q.  Okay.  And then, in those instances it sounds
12  like you have some understanding or knowledge about why
13  that had happened; is that correct?
14     A.  Yes.
15     Q.  Now, would you do an investigation in each of
16  those instances to find out, "Hey, why are there
17  documents that I didn't get previously," or was that not
18  part of your role?
19     A.  I'm not sure what you mean by an
20  investigation.
21     Q.  Yeah.  I mean investigation, I don't
22  necessarily mean in the formal sense.  I mean each time
23  that happened that there was a gap in documents and then
24  you got some documents, would you go about saying, "All

**Page 35**

1  right, let me find out why it is that I'm getting this
2  stuff now that I didn't get before"?
3      A.  I -- I wouldn't use the word "investigation,"
4  but I would ask -- if I noticed that maybe a closing
5  supp was not present, I would say, "Hey, I don't have
6  the closing supp, why not?"  And then the explanation
7  the vast majority of the time was, "Well, I already told
8  you."
9      Q.  Okay.  Now, is it the case that every time
10  that there were gaps in documents that you received
11  later that you reached out to somebody to find out why
12  you hadn't received it before?
13      A.  Well, if I had not received a document, I
14  would call the detective and, "Hey, I've not received
15  the closing supp," so that was part of the nature of the
16  phone call for me to get the closing supp.
17      Q.  There are examples in which there were
18  sometimes gaps and you ultimately got documents later,
19  there were -- other than the closing supp example;
20  correct?
21      A.  Well, the -- if there were other materials
22  missing, like maybe a General Progress Report was
23  missing, it was generally because it was associated with
24  a closing supp or a -- maybe not even a closing supp,

**Page 36**

1  just an intermediate supp that one detective worked on
2  one piece of the case and he didn't have his re -- maybe
3  a lineup supp that he didn't have that appeared yet, so
4  there was a GPR associated with that.
5          My understanding is that when the detectives
6  are submitting their material to be approved by their
7  sergeants they include the GPR that's associated with
8  that.
9      Q.  So sometimes it would be the case that you'd
10  have a Supplementary Report and you would expect that
11  there to have been an associated GPR that you hadn't
12  received; is that correct?
13      A.  That's correct.
14      Q.  Okay.  And in those instances you might say,
15  "Hey, is there a GPR associated with this?  I want a
16  copy of it"; is that correct?
17      A.  Commonly there's a missing supp as well as a
18  GPR, but yes.
19      Q.  Can you read that last answer back?
20          (A portion of the record was read by the
21  reporter.)
22  BY MR. SWAMINATHAN:
23      Q.  Okay.  Now, in those cases is it your
24  assumption that the reason is because it hadn't been

**Page 37**

1  signed off on or is that in each case you did an
2  investigation to establish that, aha, the reason was
3  because it hadn't been signed off on?
4      A.  I would say I never conducted an investigation
5  the way you're using that word.  I would call and say,
6  "Where is the GPR?  Where is the supp?"  And they would
7  say whatever the explanation was, "It hasn't been signed
8  off on yet," and then they would provide it.
9      Q.  Would you ever get any other explanation other
10  than it wasn't signed off on yet?
11      A.  Well, the -- the -- once the subpoenas were
12  centralized and going to 11th and State or 35th and
13  Michigan, the people who received the subpoenas would
14  send them out based upon the request in the part of the
15  subpoena, they would send the subpoena out to the
16  different units.  So if I asked for a -- a Bureau of
17  Identification photograph, they would send it to the
18  Bureau of Identification; they would Xerox it and do
19  that.
20          And there were occasions where maybe seven of
21  the ten different parts of the police department had
22  responded before the court date and the other three had
23  not responded, so that would cause me to say, "I still
24  didn't get whatever," and the police sometimes reissued

**Page 38**

1  the subpoena, sometimes the documents would come to
2  court with the old dated subpoena as the cover sheet to
3  it.  So it was a -- it -- I'm not exactly sure how to
4  phrase this, but it was timing, I guess, that wherever
5  the different parts of the police department were that
6  were compiling that material, they didn't compile it as
7  quickly as other parts of the police department.
8      Q.  What was the point at which the subpoena
9  process was centralized?
10      A.  The 1990s.  And I was in the Gang Prosecution
11  Unit, so sometime in the 1990s.  Because there were
12  occasions where we were still faxing subpoenas directly
13  to the area to get investigative material.  And, as I
14  said before, we sent an interoffice mail request to
15  other parts of the Chicago Police Department.  We would
16  make phone calls to get rap sheets, for example, or
17  arrest sheets, stuff like that.  So we also started
18  using subpoenas during that early 1990s as well.  Well,
19  heck, 1980s I was using subpoenas.
20          But at some point, they -- the police
21  department informed us they preferred that we send our
22  all-inclusive subpoena to 11th and State or 35th and
23  Michigan, and that they would make sure that all the
24  different parts of the police department complied with

## Page 39

1   it.
2       Q.  Okay.  So prior to the 1990s and the
3   centralized process, you'd still use subpoenas, but you
4   may not send them to one centralized location; is that
5   correct?
6       A.  We'd send -- right.  We would send them either
7   to the -- to the area for sure.  We'd send them to 11th
8   and State as well.  We would send them to all those
9   different places.  But sometime in the 1990s they said,
10  "You don't need to send" -- "You don't need to fax it
11  over to Area One.  Just send it to us and we'll take
12  care of that part."
13      Q.  And.  So --
14      A.  And, by the way, we still continued to use
15  those interoffice forms to obtain things like
16  photographs and rap sheets and all of that.  That was
17  still being done even with a subpoena requested them as
18  well, kind of a belt and suspenders I guess.
19      Q.  Okay.  Now, in terms of the subpoenas, putting
20  aside the phone calls and the interoffice memos and
21  focus on the subpoenas for a moment -- understood?
22      A.  Yes.
23      Q.  Okay.  So looking -- talking about subpoenas,
24  once subpoenas would get to the police department,

## Page 40

1   whether it was to a centralized department or whether it
2   was in the individual departments, do you have an
3   understanding about what or whether there were specific
4   documents or checklists that were used within CPD to
5   comply with those subpoenas?
6       MS. ROSEN:  Object to the form.
7   BY THE WITNESS:
8       A.  I don't know precisely what was done when the
9   subpoena arrived at 11th and State or 35th and Michigan,
10  but it became pretty obvious to us, just by looking what
11  was returned to court, what was being done.  You could
12  see, like, if -- if there was an envelope that -- that
13  the judge received in court on a certain day that came
14  from the Bureau of Identification and included some
15  photographs, you'd see a copy of the original subpoena
16  on the outside of the envelope and you'd see the -- a
17  circle or a checkmark next to the photographs, and then
18  there may be another envelope that came to the judge's
19  attention on the same date and you'd see "GPR" circled
20  and a little checkmark next to that, and within that
21  envelope would be the General Progress Reports.
22      So I don't know what they were doing at 11th
23  and State or 35th and Michigan, but I can -- the
24  circumstantial evidence would indicate to me that they

## Page 41

1   were looking at what we were requesting and they were
2   sending it to the different parts of the police
3   department which would have the material requested in
4   the subpoena.
5       Q.  Was it sometimes the case that you would get
6   GPRs, you know, as things were checked off and produced
7   as just GPRs and then separately at another time you
8   would get supplementary reports and other such report --
9   type reports?
10      A.  It seemed to me that the -- these -- that the
11  subpoena that would reply -- the subpoena materials that
12  would come to a judge's courtroom that replied to a
13  request for GPRs, they would often have all the
14  investigative material from the area.
15      Q.  What do you mean by that?
16      A.  In other words, the investigative file that's
17  maintained at the area may have some supplemental
18  reports in it; it may have rap sheets, arrest sheets,
19  whatever, all that.  So you wouldn't -- you wouldn't --
20  rarely would you get just the GPRs.  I'm not saying that
21  didn't happen, that on occasion it did.  But my -- my
22  sense was that when that subpoena was sent to the area
23  for the GPRs that the police department, the people at
24  the area, would Xerox everything in the investigative

## Page 42

1   file.
2       Q.  What's the basis of that understanding?
3       A.  Because, as I said, rarely did I ever get just
4   ten GPRs.  That -- that -- that folder that had the
5   GP -- the -- I'm sorry.  The envelope from the police
6   department with the subpoena on it didn't have just GPRs
7   in it; they had all the material that's found in the
8   investigative file.
9       Q.  Have you ever seen any Chicago Police
10  Department document that says the policy is to copy the
11  entire investigative file in response to the subpoena?
12      A.  My -- I don't know if those exact words, but,
13  you know, my recollection is the general orders created
14  the investigative file and said put all these documents
15  in it so they'd be available for the prosecutors and the
16  criminal defense attorneys and used in court.
17      Q.  Are you referring to the Special Orders 83-1-1
18  and 5 --
19      A.  Whatever -- yeah.
20      Q.  And so you're saying those Special Orders
21  state that the entire investigative file should be
22  copied and produced in response to a subpoena?
23      A.  I don't know if the words "copied" were in
24  there, but the whole point of creating an investigative

**Page 43**

1    file was so the documents would be maintained by the
2    police department and therefore available for use by
3    prosecutors and defense attorneys.
4         Q.   When you say that's the whole point, what are
5    you saying?  What's the basis for your understanding of
6    what the intention was?
7         A.   My understanding is before the general orders
8    were created there was not a formalized investigative
9    file.  And I don't remember the man's name, but one --
10   somebody from the Chicago Police Department created the
11   investigative file and said this should be maintained
12   and put all the investigative material into it.
13        Q.   Does the Special Order 83-1 and its progeny
14   state anywhere in the order that the entire file,
15   investigative file, shall be produced in response to a
16   subpoena?
17        A.   I don't know --
18             MS. ROSEN:  Object to the form.
19             Asked and answered.
20   BY THE WITNESS:
21        A.   I don't know if it used that word, but I -- my
22   recollection is it said that it should be created and
23   maintained and that was the reason why.
24        Q.   I'm asking you -- I'm asking you a different

**Page 44**

1    question than created and maintained.  But you agree
2    that creating and maintaining is different than
3    producing and disclosing; correct?
4             MS. ROSEN:  Object to the form.
5    BY THE WITNESS:
6         A.   Yes.
7         Q.   Okay.  Does the Special Order 83-1 and its
8    progeny state that materials should be produced and
9    disclosed or anything to that effect?
10             MS. ROSEN:  Object to the form.
11   BY THE WITNESS:
12        A.   I'd have to look at it.  I don't think it uses
13   those exact words, but what's the point of creating and
14   maintaining them if you're not going to have them be
15   produced for trial?
16        Q.   Does it say anything beyond creating and
17   maintaining?
18             MS. ROSEN:  Object to the form.
19   BY THE WITNESS:
20        A.   I'd have to review them.  I don't know if it
21   does.
22        Q.   Okay.  Would you expect that it would?
23             MS. ROSEN:  Object to the form.
24

**Page 45**

1    BY THE WITNESS:
2         A.   I don't know if it would.  It's -- the idea is
3    to maintain the reports so they can be obtained by the
4    prosecutor and the criminal defense attorney.  So if
5    you're maintaining them, I think it's implicit that
6    you're producing them.
7         Q.   Is there an -- have you seen any document,
8    special order or otherwise, that says all the material
9    in the investigative file should be produced and
10   disclosed?
11             MS. ROSEN:  Object to the form.
12   BY THE WITNESS:
13        A.   Not that I recall, no.
14        Q.   Have you seen any document that says all the
15   material in the investigative file should be copied and
16   produced?
17             MS. ROSEN:  Object to the form.
18   BY THE WITNESS:
19        A.   Again, not those -- not that I recall those
20   exact words, but the whole point of creating an
21   investigative file was to maintain them so they could be
22   produced.
23        Q.   Okay.  So was it your expectation -- strike
24   that.

**Page 46**

1         So you haven't seen a document, but you
2    believe it was implicit that that entire investigative
3    file was going to be copied and produced to the
4    prosecutors in response to a subpoena; is that correct?
5         A.   That's correct.
6         Q.   Okay.  And it was your --
7         A.   Or to a criminal defense attorney's subpoena,
8    for that matter.
9         Q.   That was my next question.  And it would also
10   be your expectation that if a subpoena were received
11   from a criminal defendant that the entire investigative
12   file would be copied and produced to the criminal
13   defendant; is that correct?
14        A.   That's correct.
15        Q.   That's how your ex -- you believe the way the
16   process should work is that the entire investigative
17   file would be copied and produced in response to
18   subpoenas, whether they came from prosecutors or
19   criminal defendants; is that correct?
20        A.   That's correct.
21        Q.   Okay.  But you are not aware of any place
22   that's written down within the Chicago Police
23   Department; is that correct?
24             MS. ROSEN:  Object to the form.

## Page 47

1  BY THE WITNESS:
2      A.  Not that I recall.
3      Q.  Well, when you say "Not that I recall," do you
4  believe you might have seen that written down somewhere
5  at some point or you just don't know, or something else?
6      A.  No, I --
7      MS. ROSEN:  Object to the form.
8  BY THE WITNESS:
9      A.  I would just be repeating what I said earlier
10  that I think it's implicit in the creation of the
11  document.  So did I see those exact words?  No, I did
12  not.
13      Q.  Okay.  So that's what I want to clarify.  You
14  haven't seen -- it's not that "I don't recall," or
15  unless it is, and you just correct -- make sure I
16  understand it correctly.
17      You have not seen it written down anywhere at
18  any point during your time as a retained expert or
19  previously as a prosecutor that the contents of the
20  entire investigative file would be produced in response
21  to a subpoena; is that correct?
22      MS. ROSEN:  Object to the form.
23  BY THE WITNESS:
24      A.  Not that I recall seeing, but I'm not -- not

## Page 48

1  ruling out that there might be another special order out
2  there that I'm aware of that might have those words in
3  there or -- or some other words to the effect of on
4  production, but not that I saw.
5      Q.  Okay.  And --
6      A.  Not that I recall seeing.
7      Q.  Okay.  And, ultimately, that -- that's part of
8  my point and I want to make sure I'm -- I want to see if
9  I've got this right.
10      Ultimately, there are other people who would
11  have much more knowledge about whether those types of
12  policies or practices or checklists or trainings exist
13  within the Chicago Police Department other than you;
14  correct?
15      MS. ROSEN:  Object to the form.
16  BY THE WITNESS:
17      A.  Training for who?
18      Q.  Okay.  Let me -- let me ask.  Let me ask it a
19  different way.
20      There are people who are more qualified to
21  talk about what happens within the Chicago Police
22  Department in terms of responding to a subpoena than
23  you; would you agree with that?
24      MS. ROSEN:  Object to the form.

## Page 49

1  BY THE WITNESS:
2      A.  I am fully conversant in what is done when I
3  send a subpoena, what's sent to me.
4      Now, how that's accomplished internally in
5  their office, I don't know how that's necessarily
6  accomplished other than what I alluded to before about
7  circumstantial methods in which it might be done.
8      So I would say that I also understand that
9  if -- if a -- if the police agency doesn't send over the
10  materials requested in a subpoena that can be enforced
11  in court by a judge on the request of the defense or
12  even the prosecutor, and I understand that part of the
13  compliance with the subpoena and --
14      Q.  Does that happen sometimes?
15      A.  There were times where police reports were not
16  provided and the defense attorneys would raise that
17  issue with the judge, and the judge would usually turn
18  to the prosecutor and tell us to get on it before he
19  sought to hold the police in contempt.
20      Q.  And then you would go out and get those
21  documents?
22      A.  Yes.
23      Q.  And would you succeed in getting those
24  documents in those instances?

## Page 50

1      A.  Yes.
2      Q.  Okay.  Approximately how many times do you
3  think that happened during the course of your career?
4      A.  Pretty rarely, but I would again reference
5  that era in the early nineties where there was a lot of
6  violent crimes happening and it was a matter of the
7  police officers logistically getting their reports
8  approved, so a case may be pending for a few months
9  before that final supp was finally signed off on.
10      Q.  So what were all of the reasons that were
11  given in those instances when a defense attorney would
12  come into court to enforce a subpoena to get documents
13  from the Chicago Police Department?
14      A.  What the criminal defense attorney would say?
15      Q.  I apologize.  Let me ask it better.
16      In those instances when a criminal defense
17  would seek to enforce a subpoena to get the Chicago
18  Police Department to produce materials, what were the
19  reasons given by the Chicago Police Department for not
20  complying?
21      A.  What I just said to you.
22      Q.  Anything else?
23      A.  Not that I can think of, no.
24      Q.  Okay.  You have knowledge of your requests for

**Page 51**

1    a subpoena and where you submit it within the Chicago
2    Police Department; correct?
3         A.   Yes.
4         Q.   And you have knowledge of what comes back to
5    you; correct?
6         A.   Yes.
7         Q.   And it's fair to say that you have
8    knowledge -- you have some inferences about what's
9    happening internally within the police department based
10   on what you get handed back to you; correct?
11        A.   Yes, and also understanding where in the
12   police department certain documents or photographs or
13   forensic materials are preserved.
14        Q.   But in terms of once you hand a subpoena to
15   the police department, what the people in the police
16   department do in terms of where they go, who they talk
17   to, what checklists and worksheets they use, whatever it
18   is, those are not things you're claiming to have
19   expertise on.  Is that correct or not correct?
20        A.   Well, I've already alluded to you how I think
21   they may be doing it circumstantially from the evidence
22   of the little circles and marks on the front of the
23   subpoenaed material that showed up in court, but what
24   they did once the subpoena hit their desk I don't claim

**Page 52**

1    to know.
2         Q.   Okay.  And so you're not claiming to have
3    expertise on how they go about fulfilling your subpoena;
4    is that fair?
5         A.   That's fair to say.
6         Q.   Okay.  And you would agree that there are
7    people who are more qualified to talk about their
8    process for going about responding to your subpoena than
9    you; correct?
10             MS. ROSEN:  Object to the form.
11   BY THE WITNESS:
12        A.   I would presume that people who work for the
13   Chicago Police Department understand how that role is
14   carried out.  I only know the result of that role being
15   carried out.
16        Q.   Okay.  And they understand it better than you
17   do?
18             MS. ROSEN:  Object to the form.
19   BY THE WITNESS:
20        A.   I think I've already answered that, but, yeah,
21   they understand it better than I do.
22        Q.   Are you intending to offer any opinions about
23   the specifics of the Chicago Police Department file
24   keeping practices and whether they're consistent with

**Page 53**

1    national standards?
2         A.   I don't claim to understand national
3    standards, so I would not be talking about national
4    standards.
5         Q.   And when you say "I don't claim to be
6    knowledgeable about national standards," we're talking
7    specifically with regard to file keeping and disclosure
8    of homicide investigation files; correct?
9         A.   From the police, and I'm not claiming to have
10   an area of expertise in that.
11        Q.   Okay.  And you're not intending to offer any
12   opinions on that subject either; correct?
13        A.   On their file -- say -- say the question
14   again.  I'm sorry.
15        Q.   Yeah.  You're not intending to offer any
16   opinions about whether the Chicago Police Department's
17   file keeping practices and disclosure practices are
18   consistent with national standards; correct?
19        A.   Consistent with national standards?  I would
20   not --
21        Q.   Okay.
22        A.   -- make an -- not offer an opinion on that.
23        Q.   Okay.  Do you believe you're qualified to
24   offer such an opinion?

**Page 54**

1              MS. ROSEN:  Object to the form.
2    BY THE WITNESS:
3         A.   No.  I don't think I -- I think I'm able to
4    talk about what I received from them.
5         Q.   And that's it?
6              MS. ROSEN:  Object to the form.
7    BY THE WITNESS:
8         A.   And that's it.
9         Q.   That's all that you're saying you're qualified
10   to talk about.
11             MS. ROSEN:  Object to the form.
12   BY THE WITNESS:
13        A.   Well, I'm not qualified to speak about police
14   national standards.
15        Q.   And whether the Chicago Police Department
16   complied with them; correct?
17        A.   I'm not an expert in that area, no.
18        Q.   Okay.  We started out talking about your
19   experience is one of the things that forms the basis of
20   your opinions in this case.
21        A.   Yes.
22        Q.   So in what way is your experience relevant to
23   your opinions in this case?
24             MS. ROSEN:  Object to the form.

## Page 55

1  BY THE WITNESS:
2      A.  I'm not sure I understand the question.
3      Q.  Yeah.  I'm just saying you have -- you've
4  talked about the opinion that you have substantial
5  experience as a prosecutor; that includes, I'm sure, the
6  actual work you've done prosecuting cases and then all
7  the trainings and other things that have been part of
8  your work within the prosecutor's office.
9          In what way is all that experience relevant to
10  the opinions you're offering in this case?
11      MS. ROSEN:  Object to the form.
12  BY THE WITNESS:
13      A.  Well, it's -- what -- what it helps explain is
14  the processes that are used at the pretrial and at the
15  time of trial to obtain trial documents, investigative
16  material, that can ensure the due process rights of the
17  defendants are protected at trial.  So discussing what
18  documents are available and how we obtain them and how
19  we provide them to the defense counsel I think is
20  significant to understand that maybe the documents that
21  were created and tendered in discovery back at the time
22  of trial or pretrial are not the same 25 years later.
23      Q.  And one of the things -- and is part of that
24  experience your experience interacting with Chicago

## Page 56

1  police officers?
2      A.  Yes.
3      Q.  So help me understand that.  I mean, in your
4  role as a prosecutor, how often are you really in a
5  position where you're interacting with the Chicago
6  Police Department and Chicago police officers.
7      A.  Daily.  On the trial all the time.
8      Q.  So explain to me on a trial why it is you're
9  interacting with Chicago police officers all the time.
10      A.  Well, the -- if I'm prosecuting a homicide
11  case, I'm reading the police report and I'm calling the
12  police officers and saying, "Where are these witnesses?
13  We need to get ready for trial.  We need to prepare for
14  trial."
15          I want to make sure I've got all the police
16  reports that related to the interviews of witnesses, for
17  example, or the statement given by a defendant or the
18  forensic reports that were created by the Chicago Police
19  Department, so I need to be able to acquire all those
20  materials to prepare for trial, in addition to
21  discovery.
22      Q.  So are you -- are you interacting with Chicago
23  police officers, like, on a daily basis in your job as
24  the trial prosecutor?

## Page 57

1      A.  Well, maybe not on a daily basis, but on a
2  given file, both in the discovery phase and then maybe
3  motion phase and -- and when we're finally at the trial
4  date and we're getting ready for trial, there's far more
5  interaction at that point.  Half of it is just logistics
6  to make sure that they're available on certain dates for
7  court, for trial, for motions, whatever it might be.
8          But as far as this case, as far as this matter
9  here is, it's acquiring material, making sure we have
10  all of the reports so we can call the witnesses and
11  prepare them to testify.
12      Q.  So are you reaching out to Chicago police
13  officers -- so let me see if I understand.
14          You're interacting with Chicago police
15  officers in order to obtain documents and materials; is
16  that correct?
17      A.  Yes.
18      Q.  And in what percentage of your -- of cases
19  does a Chicago police officer end up testifying at
20  trial?
21      A.  Let's put it this way.  It would be very rare
22  that a police officer wouldn't testify at trial.
23      Q.  Okay.
24      A.  I mean, there are some cases that could be

## Page 58

1  exclusively civilian witness cases, but it would still
2  be pretty rare.
3      Q.  So in the context of having to testify and
4  then I assume that there's some interaction with them
5  preparing for the trial testimony; is that correct?
6      A.  Yes.
7      Q.  Okay.  Other than, you know, trial testimony
8  and preparing for trial and asking them to collect
9  documents for you, are there any other contexts in which
10  you're interacting with Chicago police officers in the
11  context of one of your cases?
12      A.  Pretrial motions.
13      Q.  What -- what's that context there?
14      A.  Well, there could be a motion to quash the
15  arrest.  There could be a motion to suppress a
16  statement.  There could be -- maybe there's a witness
17  who gave a statement now who's refusing to testify so
18  we're trying to admit his prior statements as
19  substantive evidence, so, again, it's preparing the
20  police officer to testify in that situation.  Where did
21  he write down what the witness said, things of that
22  nature.  So there's a lot of interaction related to the
23  police reports that were created to prepare for
24  testimony for the motions.

**Page 59**

1    Q.   Anything else?  Any other context in which
2  you're interacting with the police officers in the
3  context of a case?
4    A.   Though the prosecutor's office has their own
5  investigators, we often ask the Chicago Police
6  Department to help us locate witnesses that we might
7  have a difficult time locating, witnesses that they
8  previously interviewed and have police reports and notes
9  on, that type of nature, so they often -- they often
10  help us try to locate those witnesses.
11    Q.   Any other context?
12    A.   Yes.  Evidence that -- that may be stored in
13  the Evidence and Recovered Property Section or in the
14  bulk warehouse.  You know, the gun or photographs from a
15  lineup or whatever it might be, we always ask the
16  detective assigned to the case to -- when we get to the
17  verge of trial to sign those items out and then we take
18  possession of them, but we need a detective to do that.
19      At that same time period for preparing for
20  trial or a motion, we'll go over those items so we can
21  fully understand exactly how they were obtained, when,
22  where, how, and their relevance, even though we already
23  know what the relevance is in general, but we get a
24  better understanding of how that evidence was collected

**Page 60**

1  and maintained.
2    Q.   Anything else you can think of?
3    A.   I can't think of anything else at this time.
4    Q.   Okay.  So you were interacting with the
5  Chicago Police Department's officers extensively during
6  your time in the State's Attorney's Office; is that
7  correct?
8    A.   That's correct.
9    Q.   Did you form any opinions about Chicago police
10  officers, their professionalism, how they conducted
11  their jobs, during your time as a state's attorney?
12      MR. GIVEN:  Objection to form.
13  BY THE WITNESS:
14    A.   I thought my opinion was that they were
15  competent.
16    Q.   Did you have -- having spent as much time as
17  you have working with Chicago police officers, do you
18  come to this case with any sort of bias in favor of
19  against police officers?
20    A.   As far as a homicide case that I was handling?
21    Q.   In general, where you're -- you're being asked
22  to provide opinions on behalf of the Chicago Police
23  Department, correct, in this case?
24    A.   Oh, you mean in this case?

**Page 61**

1    Q.   Yes.
2    A.   Oh.
3      MS. ROSEN:  I'm going to object to the form.
4  BY THE WITNESS:
5    A.   I would say just -- I don't know if I would
6  call it a bias, but just in general I thought they did a
7  good job on the cases that I worked on with them.
8    Q.   You had positive experiences working with the
9  Chicago Police Department over the course of your
10  career?
11    A.   Yes.
12    Q.   Okay.  Did you ever have negative experiences
13  working with any individual officers in the Chicago
14  Police Department?
15    A.   Well, maybe if they couldn't find the
16  witnesses we were looking for or maybe at the time of
17  the investigation they didn't talk to all of the
18  witnesses maybe that, in retrospect, I thought they
19  should have talked to.  I wouldn't call that negative.
20  Just it's kind of, you know, hindsight being 20/20, you
21  wish other things had been done, but it's not
22  necessarily negative as opposed to, gee, I wish this
23  extra thing was done.
24    Q.   And I'm sure there were officers who were more

**Page 62**

1  friendly or some who were more corrupt, but I'm not
2  talking about the personality kind of issues.
3      But instances in which you thought Chicago
4  police officers had behaved unprofessionally?
5      MR. GIVEN:  Objection.  Form.
6      MR. SWAMINATHAN:  Yeah, strike that.  Let me
7  ask it in a better way.
8  BY MR. SWAMINATHAN:
9    Q.   Were there ever any instances during your time
10  in the Cook County State's Attorney's Office where you
11  felt that individual officers who you had interaction
12  with in the context of your cases had behaved
13  unprofessionally in any way?
14      MR. GIVEN:  Objection.  Form.
15  BY THE WITNESS:
16    A.   No.
17    Q.   And to be more specific:  Any instances in
18  which you felt that an officer who you were interacting
19  with on a case had behaved unprofessionally in any way
20  with regard to their conduct in the underlying
21  investigation?
22      MR. GIVEN:  Objection.  Form.
23  BY THE WITNESS:
24    A.   You -- I'm -- the first part of the question

## Page 63

1  was behaved how?
2      Q.  Unprofessionally.
3      A.  And I don't really -- what do you mean by
4  unprofessionally?  That's what I don't understand.
5      Q.  Yeah.  Let's -- let's define it in a way
6  that's comfortable for you.  So what's a fair way to
7  talk about the term "unprofessionally"?
8          MS. ROSEN:  Object to the form.
9          It's your word.
10     BY THE WITNESS:
11         A.  Yeah.  I mean, I don't know what --
12     unprofessionally?  He didn't wear a tie?  I don't know.
13     What do you mean by unprofessional?
14         Q.  Sure.  Any time that you feel -- strike that.
15             Any instances during your time working with
16     the state's attorney's office where you felt that an
17     individual officer had committed any misconduct in the
18     underlying investigation?
19         A.  No.
20             MR. GIVEN:  Objection.  Form.
21     BY MR. SWAMINATHAN:
22         Q.  Any instance in which you interacted with any
23     Chicago police officers who you felt were somebody who
24     was a -- potentially a bad apple or somebody who you

## Page 64

1  don't trust, somebody who you don't think should be put
2  on the stand because they're not trustworthy or honest?
3          MR. GIVEN:  Object to the form.
4          MS. ROSEN:  Object to the form.
5      BY THE WITNESS:
6      A.  I didn't have that experience.
7      Q.  Okay.  Have you ever had, during your time
8  working with the state's attorney's office, an officer
9  who you interacted with who you said, "That's somebody
10     who I'm not going to put on the stand"?
11         A.  No.
12         Q.  Was there ever a police officer who you had
13     reservations about putting on the stand?
14         A.  No.
15         Q.  Was there ever an officer who you had
16     reservations about whether they had conducted the
17     investigation fairly and honestly?
18         A.  I did have that experience.
19         Q.  You said one of the ways in which you
20     interacted with Chicago police officers was in the
21     context of pretrial motions including motions to
22     suppress statements; is that correct?
23         A.  Yes.
24         Q.  That's something that comes up regularly?

## Page 65

1      A.  Yes.
2      Q.  Were there ever any -- was there ever an
3  instance during your time in the Cook County State's
4  Attorney's Office where you agreed with a motion to
5  suppress a statement?
6          MR. GIVEN:  Objection.  Form.
7      BY THE WITNESS:
8      A.  There -- there was a case where the -- it was
9  a Miranda issue, whether the Miranda rights were given
10     at the proper time, and we litigated a case -- actually,
11     somebody else litigated the case, but the Appellate
12     Court said no, that's a Miranda court vi -- Miranda
13     violation.  So on retrial, you know, reading their --
14     the Appellate Court opinion, obviously we couldn't use
15     the statement.
16         Q.  But had there previously been a motion to
17     suppress prior to the appeals court decision?
18         A.  Yes.
19         Q.  And you had --
20         A.  I did not handle that.  Other prosecutors had
21     handled that and contested it and said there was
22     either an exception to Miranda or Miranda wasn't
23     required at that time period and the Appellate Court
24     disagreed.

## Page 66

1      Q.  Was there ever an instance in one of your
2  cases or a case you supervised where you agreed with the
3  motion to suppress or didn't object to it or didn't
4  contest a motion to suppress?
5          MR. GIVEN:  Objection to form.
6          MS. ROSEN:  Objection.  Form.
7          Relevance.
8      BY THE WITNESS:
9      A.  Not that I can recall.
10         Q.  Based on your experience working with the
11     Chicago Police Department, did you have any opinions --
12     strike that.
13             Before being retained as an expert in this
14     case, based on your experience working with the Chicago
15     Police Department, did you have any opinions about
16     Chicago Police Department's file keeping and disclosure
17     practices?
18         A.  Well, I mean, to the degree I even thought
19     about them, I thought that the documents were provided
20     were maintained and provided to me when I needed them,
21     when I requested them.
22         Q.  So it would be fair to say going into this
23     case -- strike that.
24             Before you were retained in either the Fields

## Page 67

1    case or this case it was your general opinion that the
2    Chicago Police Department's file keeping and disclosure
3    practices were good?
4       A.  Yes.
5       Q.  And your opinion in this case is ultimately
6    that, indeed, my earlier impressions and opinions were
7    right, I believe their practices are good; is that
8    correct?
9       A.  That's correct.
10       Q.  Okay.  To what extent did you rely on the
11   documents you reviewed in this case to form your
12   opinions?
13       MR. GIVEN:  Objection to form.
14       Asked and answered.
15   BY THE WITNESS:
16       A.  The documents --
17       Q.  Yeah.  Let me --
18       Can you be more specific?
19       Q.  Let me ask it a better way.
20       Did you need to review documents in this case
21   to be able to offer the opinions you've offered in this
22   case?
23       A.  Well, I did review the documents on those nine
24   cases to be able to discuss those, yes.

## Page 68

1       Q.  Putting aside your -- those nine cases, so
2   let's just assume for the moment we excise those nine
3   cases, your discussion of those nine cases from your
4   report, for the rest of the opinions in your report
5   could you have offered those opinions without your
6   review of any of the documents based -- just based on
7   your experience with the police department?
8       A.  Well, to the extent that Mr. Brasfield, in
9   Section F of his report where he would list documents
10   that were not found with the allegation that they were
11   investigative material, just by the titles of them I
12   could tell that they were not investigative material and
13   I was informed upon that from my experience in the
14   Fields case.
15       For example, he would list subpoenas and
16   subpoenas are not investigative material, or he would
17   list court attendance -- police court attendance reports
18   and other documents.
19       Q.  So is that a yes?  In other words, you --
20   putting aside those nine cases, the opinions you offered
21   in this case you could have offered without the need to
22   review additional materials.  Is that correct or am I
23   wrong?
24       A.  Well --

## Page 69

1       MS. ROSEN:  Object to the form.
2   BY THE WITNESS:
3       A.  You're wrong to this extent.  I mean, I could
4   make those opinions based upon the titles of some of
5   those documents, but if he -- another document said GPR
6   is missing or Supplementary Report missing, I would
7   obviously have to examine both the prosecutor's file to
8   see if in fact it was in the prosecutor's file or maybe
9   on occasion that it actually was in the defense file and
10   he did -- he missed it himself.  So I would still have
11   to -- if they were missing, I'd need to examine them.
12       Q.  Okay.  And so, let me just ask you this.  You
13   have reviewed documents.  You have some underlying
14   experience working with Chicago police officers on these
15   prosecutions over many years.  Strike that.
16       You formed -- you have some general opinion,
17   before you were retained in this case, that the Chicago
18   Police Department's practice for file keeping and
19   disclosure were good; correct?
20       A.  I think I already answered that.  The answer
21   is yes.
22       Q.  Okay.  And that's based on your experience
23   working with the Chicago Police Department over those
24   years; correct?

## Page 70

1       A.  That's correct.
2       Q.  And that experience -- strike that.
3       Is part of that experience and part of that
4   opinion that you had of the Chicago Police Department
5   prior to being retained based on any knowledge about
6   whether or not there were instances in which the Chicago
7   Police Department was failing to disclose materials?
8       MS. ROSEN:  Objection.  Form.
9       MR. GIVEN:  Object to the form.
10   BY THE WITNESS:
11       A.  You know, I don't think I understand that
12   question.  Could you --
13       Q.  Yeah.  The reason I'm asking is:  What was
14   that -- you had this opinion that generally their file
15   keeping and disclosure practices were good.
16       A.  Right.
17       Q.  Why did you have the opinion that they were
18   good?
19       A.  Well, I had that opinion that they were good
20   because when I was issuing subpoenas or making phone
21   calls or interoffice requests to obtain documents and
22   evidence, although sometimes it might be a little bit
23   slower than normal, they would comply.
24       Q.  So there were not -- were there any instances

**Page 71**

1  in which the Chicago Police Department, in your view,
2  failed to turn over investigative materials?
3      A.  In my experience, they did not fail.  They
4  always turned over the material, the investigative
5  material.
6      Q.  And you believe that's relevant to your
7  opinions in this case?
8      A.  Well, it's -- relative to my opinions, yes, I
9  do.
10     Q.  It forms part of your experience --
11     A.  Yes.
12     Q.  -- that you then rely on in this case; is that
13  correct?
14     A.  That's correct.
15     Q.  Okay.  And is the corollary also true:  If,
16  during your time working in the state's attorney's
17  office, it had been the case where there were a number
18  of instances that came to your attention in which the
19  Chicago Police Department was not turning over material
20  to you that that would be relevant to you?
21         MR. GIVEN:  Objection.  Form.
22  BY THE WITNESS:
23     A.  The -- the -- I'm not sure if I follow the
24  word "corollary."  But it's -- I didn't have that

**Page 72**

1  experience so it didn't form the basis of my opinion.
2      Q.  So let me put it -- you -- the fact that you
3  didn't have that experience is relevant to your opinions
4  in this case; right?
5      A.  Yes.
6      Q.  Okay.  And if it had been the case that there
7  were those instances where they were failing to turn
8  over investigative material, that would have relevant to
9  you; correct?
10     A.  It would cause me to ask more questions, but
11  it would be relevant.
12     Q.  Okay.  And could potentially affect your
13  overall opinions in this case; correct?
14     A.  Well, I'd want to know why I didn't -- in this
15  hypothetical situation, I would ask ten questions on why
16  I didn't receive the document, so it may not alter my
17  opinions at all.
18     Q.  And ultimately if the reason was just simply
19  they didn't turn this stuff over in response to
20  subpoenas, that could have some impact on your opinions
21  in this case; correct?
22         MS. ROSEN:  Object to the form and asked and
23      answered.
24

**Page 73**

1  BY THE WITNESS:
2      A.  I guess it could.  But, like I said, before I
3  would ask a bunch of questions before I got to that
4  point.
5      Q.  Okay.  What work did you do, if any, to find
6  out if there were any instances during your time in the
7  prosecutor's office when the Chicago Police Department
8  failed to disclose investigative material?
9         MS. ROSEN:  Object to the form.
10  BY THE WITNESS:
11     A.  I think I answered this earlier where I said
12  there may be occasions where we didn't receive all the
13  subpoenaed material in a timely fashion, so in those --
14  either I didn't receive it or even the criminal defense
15  attorney didn't receive it in response to their subpoena
16  and it would be brought to the judge's attention and I
17  would reach out to the detective assigned to the case,
18  or if it was from another area in the police department,
19  the crime lab or Evidence and Recovered Property
20  Section, wherever it might be, I'd reach out to them and
21  say, "Hey, we didn't receive this report.  Can you
22  please get this report to us?"
23     Q.  Once you were retained in this case, did you
24  take any steps to determine if there had been instances

**Page 74**

1  in which investigative material had been withheld from
2  criminal defendants during the time you were in the
3  prosecutor's office?
4      A.  No.
5      Q.  Are you aware, as you sit here today, of any
6  instances in which investigative material had been
7  denied to a criminal defendant?
8         MS. ROSEN:  Object to the form.
9         THE WITNESS:  Yeah.  And --
10        MS. ROSEN:  And vague as to the use of the
11     word denied.
12        THE WITNESS:  I would ask you to --
13        MR. SWAMINATHAN:  Yeah, I'll rephrase it.
14  BY MR. SWAMINATHAN:
15     Q.  As you sit here today, are you aware of any
16  instances in which investigative material was withheld
17  from a criminal defendant?
18        MS. ROSEN:  Object to the form.
19        The same objection with respect to the use of
20     the word "withheld."
21  BY THE WITNESS:
22     A.  Though --
23     Q.  And I'll be -- I'll clarify.  When I use the
24  word "withheld," I mean deliberately or unintentionally.

**Page 75**

1    It doesn't intend -- it doesn't mean to intend it or
2    communicate a deliberate intent, all right?  So let
3    me -- let me ask it again.  Do you --
4        A.  Sure.
5        Q.  -- understand that clarification?
6        A.  I think I do, yes.
7        Q.  Okay.
8        MS. ROSEN:  Object to the form.
9    BY MR. SWAMINATHAN:
10       Q.  As you sit here today, are you aware of any
11   instances in which investigative material was withheld
12   intentionally or unintentionally by the Chicago Police
13   Department to a criminal defendant?
14       A.  Though I did not examine the underlying
15   investigative file in the Fields case, it was my
16   understanding that the lawyers representing the police
17   officers indicated that a group of investigative
18   materials had not been provided in pretrial or during
19   the trial of Fields.  I'm not sure which trial, but his
20   trial.  His criminal trial, I'm sorry.  So I became
21   aware that the attorneys in that case said there were
22   investigative materials that had not been provided.
23       Q.  So that's an instance that you're aware of; is
24   that correct?

**Page 76**

1        A.  Right.
2        Q.  And that's an instance you weren't -- you only
3    became aware of after your time in the prosecutor's
4    office; is that correct?
5        A.  That's correct.
6        Q.  Okay.  Are you aware of any other instances
7    other than the Fields case?
8        A.  I mean, nothing comes to mind, no.
9        Q.  Did you -- strike that.
10       Do you have any knowledge or understanding
11   about why it is that the Fields file had been withheld
12   from that criminal defendant?
13       MS. ROSEN:  Object to the form.
14   BY MR. SWAMINATHAN:
15       Q.  Or is that not something you developed or
16   understood in the context of your involvement in that
17   case?
18       A.  No, I -- I was not asked to look at why the --
19   that material was not provided to the defense attorneys
20   and I don't really know how that happened.
21       Q.  Okay.  So you know in the Fields case
22   information was withheld, but you don't know why that
23   happened; is that fair?
24       MS. ROSEN:  Object to the form.

**Page 77**

1    BY THE WITNESS:
2        A.  I know that some investigative material was
3    not provided to the original criminal defense attorneys,
4    but I don't know how that happened.
5        Q.  Okay.  Did you do any investigation in the
6    course of your work in this case to understand why that
7    happened in the Fields case?
8        A.  No.
9        Q.  And I apologize.  You might have already
10   answered this.  Other than the Fields case, are you
11   aware of any other instance from your time in the
12   prosecutor's office in which information had not been
13   disclosed to a criminal defendant?
14       MS. ROSEN:  Object to the form.
15   BY THE WITNESS:
16       A.  Not that I can think of, no.
17       Q.  Can we take a quick break?
18       (A short recess was taken.)
19   BY MR. SWAMINATHAN:
20       Q.  There's one thing I wanted to clarify.  We
21   talked about your understanding of the Special Orders
22   83-1 and its progeny.  We talked about the fact that
23   they're a reference to creating and maintaining
24   investigative files in those specific orders and we

**Page 78**

1    talked about the issue of whether or not there was, you
2    know, references to disclosing and the process for
3    disclosing.  I'm not asking you question yet.  I just
4    want to go back to that testimony.  Do you recall what
5    I'm talking about?
6        A.  Yes.
7        Q.  Okay.  Because I had asked you whether you had
8    ever seen any Chicago Police Department document saying
9    anything expressly about the process or disclosing
10   investigative files or that you should be disclosing
11   investigative files; correct?
12       A.  You asked questions in that area.
13       Q.  And you stated that you're not aware of any
14   Chicago Police Department written document that says you
15   are to disclose this investigative file; is that
16   correct?
17       A.  No, I think the word was -- you said --
18   copying and producing was the words you were asking.
19       Q.  Okay.  You have not seen any document from the
20   Chicago Police Department that says the investigative
21   file is to be copied and produced; correct?
22       A.  The words "copied," no.
23       Q.  But --
24       A.  And you -- no.  But my understanding was and

**Page 79**

1    my recollection was in the -- the 83-1 or one of those
2    that case -- one of those had said to create this
3    investigative file so they would be available for
4    defense attorneys.
5        Q.   Right.  So just with regard to the creating,
6    copying, and producing, let's just leave it there, with
7    regard to copying and producing or words to that effect,
8    you have not seen those words expressly written in any
9    Chicago Police Department documents with regard to the
10   time that you worked in the prosecutor's office;
11   correct?
12       MR. GIVEN:  Objection.  Form.
13   BY THE WITNESS:
14       A.   I did not review any of those general orders
15   during my time as a prosecutor.
16       Q.   Okay.  And let me ask you this way.  From the
17   time you worked as a prosecutor in the Cook County
18   State's Attorney's Office to today, have you ever seen
19   any Chicago Police Department document that specifically
20   says you're to copy and produce the investigative file
21   or words to that effect?
22       A.   Well, words to that effect.  It's the
23   documents are to be created so -- I mean, the
24   investigative file should be created so the documents

**Page 80**

1    could be available to criminal defense attorneys and
2    prosecutors, so --
3        Q.   Anything beyond that?
4        A.   Not that I recall, no.
5        Q.   Have you seen anything from that -- from the
6    time you started at the prosecutor's office to today
7    that says the content of the investigative file is to be
8    copied and produced?
9        A.   The words "copied and produced," I don't
10   recall seeing those words.
11       Q.   Have you seen the word "disclosed" in any
12   Chicago Police Department document from the time you
13   started as a prosecutor in the 1980s through today?
14       A.   Well, I mean, I have to look at that 83 order.
15   But, again, my recollection of that order is it says
16   these documents should be maintained in the
17   investigative file so they are available to criminal
18   defense attorneys and prosecutors.  So the exact word
19   "disclose," I don't know if that word is in there, I'd
20   have to look, but definitely the idea that the
21   investigative file was being created so they were
22   available to the criminal defense attorney and the
23   prosecutors.
24       Q.   Is the word "available" in there?

**Page 81**

1        A.   I'd have to check.  But, you know, maybe --
2    I'm not sure of the exact word that's in there, but I
3    know it's in there where they're discussing the reason
4    behind this.
5        Q.   Okay.  I want to turn back to Exhibit
6    Number 1, which is your expert report.
7            In creating your expert report, were you asked
8    to make any factual assumptions in forming your
9    opinions?
10       A.   I'm not sure what you mean by "factual
11   assumptions."
12       Q.   In other words, were you told, "Okay, assume
13   the following fact for purposes of your report"?
14       A.   No.
15       Q.   Were you asked to make any legal assumptions
16   for the purpose of your report?
17       A.   What do you mean by "legal assumptions"?
18       Q.   Assume for the purposes of your report that
19   the following is the legal standard, something like
20   that.  Did you receive any kind of legal assumptions you
21   were told to make?
22       A.   I was not told to make legal assumptions.  I
23   mean, I know the rules of discovery from the Illinois
24   Supreme Court and from Brady and Giglio and of that

**Page 82**

1    nature, so I knew that independently of working with the
2    city's lawyers.
3        Q.   Did the city's lawyers provide you with the
4    documents that are listed in your Exhibit 2?
5        A.   Yes.
6        Q.   Okay.  Did they provide you with any other
7    information for purposes of your work in this case?
8        MR. GIVEN:  Objection to the form.
9        MS. ROSEN:  Object to the form.
10   BY THE WITNESS:
11       A.   What do you mean by "information"?
12       Q.   Well, did they provide you with anything else
13   other than these documents that's relevant or that you
14   relied on in forming your opinions?
15       A.   Not that I recall.
16       Q.   Did they provide you with any -- strike that.
17           Did counsel provide you with any documents or
18   analysis that they wanted you to use for purposes of
19   your expert report?
20       MR. GIVEN:  Objection.  Form.
21   BY THE WITNESS:
22       A.   These are the documents that I was given
23   access to.
24

## Page 83

1    Q. Nothing else?
2    A. Nothing else.
3    Q. Did they provide you with any spreadsheets?
4    A. No.
5    Q. Did you create any spreadsheets?
6    A. I did not.
7    Q. Did you create any documents during the course
8  of your work on this case other than the expert report
9  itself?
10    A. Documents relating to my expert conclusions,
11  no.
12    Q. Help me understand the clarification that
13  you're making.
14    A. Well, I provided a -- I submitted for -- to be
15  compensated for my work so far and I provided a cover
16  letter saying what my rates would be.
17    Q. Anything else?
18    A. My resume.
19    Q. Anything else?
20    A. I think that's everything.
21    Q. Okay. You said you've testified one other
22  time as an expert; correct?
23    A. In a deposition once and at trial once.
24    Q. Okay.

## Page 84

1    A. In the same case.
2    Q. And so you have been retained as an expert two
3  times total; correct?
4    A. That's correct.
5    Q. That's the Fields case and this case; correct?
6    A. That's correct.
7    Q. Both times you've -- correct me if I'm wrong.
8  Both times you have been retained as an expert was by
9  the Chicago Police Department; is that correct?
10    MS. ROSEN: Object to the form.
11  BY THE WITNESS:
12    A. Yeah, the city's attorneys for the Chicago
13  Police Department, the City of Chicago, one of the two.
14    Q. Have you ever been retained as an expert to
15  provide opinions for anyone other than the Chicago
16  Police Department or its counsel?
17    MS. ROSEN: Object to the form.
18  BY THE WITNESS:
19    A. No.
20    Q. Turning to your list of materials reviewed,
21  you talked about this before, this is Exhibit 2, you do
22  not list here the Special Orders 83-1 and its progeny.
23  Did you not review those materials in preparing your
24  report in this case?

## Page 85

1    A. I think in my report I referenced that my
2  report is informed by my work in the Fields case. In
3  the Fields case, I had reviewed those special orders,
4  so --
5    Q. So you --
6    A. -- that's how I became aware of them.
7    Q. So you had not reviewed those special orders
8  again before writing your report in this case; is that
9  correct?
10    A. I might have -- I might have looked at them,
11  but not like -- they were not new to me, so I might have
12  looked at them just to see in general what they were.
13    Q. Okay. So you had -- if I understand
14  correct --
15    A. But I --
16    Q. Go ahead.
17    A. Let me clarify. I looked at them, but it was
18  not like it was in the Fields case where I was reading
19  them to try to understand what they were requiring and
20  all that. It was just more of an, "Oh, yeah, 83-1 is
21  the main one," and then there was an 86 and stuff like
22  that. It was to refamiliarize myself with those
23  documents.
24    Q. Anything beyond that?

## Page 86

1    A. No.
2    Q. Okay. Any other documents that you're relying
3  on other than -- we talked about the special orders
4  which are referenced within Exhibit 1. Is there
5  anything else that's not listed in your materials
6  reviewed that you reviewed for purposes of your
7  opinions?
8    A. Well, I reviewed my expert report from Fields.
9    Q. Okay. Why did you attach your expert report
10  from Fields?
11    A. Pardon me?
12    Q. Why did you attach your expert report from
13  Fields?
14    A. Well, it's a very similar analysis regarding
15  discussing Mr. Brasfield's analysis on what he held and
16  determined was for whatever reasons withheld or not
17  provided to the criminal defense attorneys, and then,
18  also, the examination of documents that he said was
19  investigative in nature, and in the Fields case I didn't
20  agree with that. So the work I did on that case informs
21  me of -- helps inform me of creating my opinions on
22  Mr. Brasfield's report and the things that he thinks are
23  investigative and/or disclosed.
24    Q. Now -- so are you saying there's similarities

Page 87

1 between the Fields case and the opinions in that case
2 and this case?
3 A. Similarities into what Mr. Brasfield claimed
4 were investigative materials which I disagreed with.
5 Q. Okay. Similarities in the underlying file
6 keeping practices that would be relevant or no?
7 MS. ROSEN: Object to the form.
8 BY THE WITNESS:
9 A. I think it's the same file keeping
10 requirements, the special orders, whatever else was in
11 place during the entirety of that case as well as this
12 case.
13 Q. So from your perspective, the documents you
14 reviewed in the Fields case and your understanding that
15 you developed in the Fields case is applicable in this
16 case; is that correct?
17 MS. ROSEN: Object to the form.
18 BY THE WITNESS:
19 A. It certainly helps me in forming my opinions
20 in this case.
21 Q. Okay. Any differences that you think should
22 be noted between the Fields case and this case with
23 regard to this other matter and your opinions?
24 MS. ROSEN: Object to the form.

Page 88

1 THE WITNESS: Yeah, I'm not sure I understand
2 what you're asking.
3 BY MR. SWAMINATHAN:
4 Q. Yeah. Is there anything that you said, "Well,
5 I'm attaching the Fields case, but I say it with this
6 caveat. You know, there are some differences between
7 Fields and Jacques Rivera," anything like that?
8 MS. ROSEN: Object to the form.
9 MR. GIVEN: Object to the form.
10 BY THE WITNESS:
11 A. Not that I can think of it, no.
12 Q. Okay. So as you sit here today, there are not
13 any differences between the Fields case and this case
14 with regards to the subject matter of your opinion that
15 you've pointed out today; is that correct?
16 MS. ROSEN: Object to the form.
17 BY THE WITNESS:
18 A. Well, there's nothing from this case that's --
19 from Mr. Brasfield's analysis, it's the same analysis he
20 used in the Fields case. So I would say as far as me
21 examining his opinion regarding the seven cases and what
22 he calls investigative material, I don't think anything
23 is different.
24 Q. Sure. And in terms of some of the opinions

Page 89

1 you're offering, you're not offering opinions
2 exclusively about Mr. Brasfield's work, you're offering
3 opinions about your understanding of CPD practices and
4 your understanding of what prosecutors received from the
5 police department and those kinds of things; correct?
6 A. And that was -- those opinions were also
7 offered in the Fields report.
8 Q. Okay. Any differences that we should
9 understand or any caveats that you would make with
10 regard to those subjects of your opinions in this case
11 versus Fields?
12 A. I just want to take a -- leaf through it
13 quickly, but I think the answer is going to be no, that
14 there's no -- I don't think there's any caveats.
15 I mean, obviously the seven cases and the two
16 other cases are different underlying criminal cases than
17 from Fields, but the analysis I think is the same. I
18 don't think there's a caveat I can think of off the top
19 of my head.
20 Q. Okay.
21 A. Caveat meaning being something different about
22 the analysis; I don't think that's true.
23 Q. Did you interview anyone -- and let me strike
24 that and say this. I'm not asking you about

Page 90

1 conversations with counsel right now. Okay?
2 Putting aside conversations with counsel, did
3 you interview anyone or speak with anyone for purposes
4 of forming your opinions in this case?
5 A. No.
6 Q. For purposes of your opinions in this case,
7 did you review any investigative files other than the
8 ones set forth on Exhibit 2?
9 A. No.
10 Q. Did you review any criminal defense files for
11 purposes of offering your opinions in this case?
12 A. The criminal defense files that are listed in
13 the exhibit.
14 Q. Those are Bates-stamped JR-L202873 through
15 231556; correct?
16 A. That's correct.
17 Q. Any other criminal defense files?
18 A. No.
19 Q. Did you review those files in their entirety?
20 A. No.
21 Q. What portion of those files did you review?
22 A. The criminal defense files that I did a more
23 in depth examination of are the seven that Mr. Brasfield
24 used as examples and then the two where there were some

## Page 91

1  police reports that were not found in the prosecutor's
2  file.  Those were -- those seven specifically and those
3  two were looked at, you know, with a more thorough
4  nature.
5       Q.  Did you look at any of the other ones, other
6  than those nine?
7       A.  There -- the cases in the Section F area I --
8  there were -- I would do spot-checks to ensure that the
9  investigative material had been found in the
10  prosecutor's file, but I did not look at them in a
11  comprehensive nature.
12       Q.  Beyond spot-checking them, did you do any
13  further review of those files other than the nine?
14       A.  No.
15       Q.  Did you look at any permanent retention files
16  for the purposes of your opinions in this case?
17       A.  The -- the warehouse production is the
18  investigative file; is that correct?  I'm trying to
19  recall right now.
20       Q.  I think that's a question for you.  What is
21  your understanding of what the warehouse production is?
22       A.  It's the investigative file.
23       Q.  Did you review any permanent retention files?
24  Strike that.

## Page 92

1       You know what a permanent retention file is;
2  correct?
3       A.  You know, there's different understandings of
4  that, so maybe -- I might have a different definition --
5       Q.  Yeah.
6       A.  -- of what that is --
7       Q.  That's fair.
8       A.  -- than you do.
9       Q.  That's fair.  So let's do it this way.
10       Have you heard the term "permanent retention
11  file" with regard to your time working in the
12  prosecutor's office?
13       A.  Yes.
14       Q.  Okay.  And what was your understanding of what
15  the permanent retention file as that term was used?
16       A.  Well, a little subtle, not a big distinction,
17  but the case reports and the typed supplemental reports,
18  we would often refer to them as the RDs as opposed to
19  the GPRs or the investigative file.  Those would be
20  primarily maintained, again generically, at
21  headquarters, wherever they were retained exactly I
22  don't know, but that's how we would obtain them.
23       When a case was -- you know, the case -- a
24  murder case happens today, it's solved tomorrow and the

## Page 93

1  case is pending the day after, we would call those the
2  RD files.
3       If the case was years old or closed out and, I
4  don't know, maybe came back for a retrial or whatever
5  reason might be, that's when CPD would put that stamp on
6  it, "Permanent Retention."  It's the same document.
7  It's just that after a number of years they stamp that
8  on it.
9       So that's why I'm saying, during my career
10  when the cases were new and not cold cases and not
11  retrials, they were just called the RD file.
12       Q.  Okay.
13       A.  But the permanent retention file, that's -- my
14  understanding is it's the same documents, just that it
15  might have been sent to the CPD warehouse and they put
16  the big stamp on it.
17       Q.  Okay.  And so would it be fair to say that
18  sometimes permanent retention files were known more
19  commonly as Records Division or RD files?
20       A.  To -- the more common phrase would be the RD
21  file.
22       Q.  And that's a reference essentially to a file
23  that contains just the official reports; is that
24  correct?

## Page 94

1       MS. ROSEN:  Object to the form of the
2  question.
3  BY THE WITNESS:
4       A.  Well, we would call it the -- the typed
5  supplemental -- supplementary reports, they had the case
6  report.  There may be other reports, but those are the
7  main ones that were what we would call the RD file.
8       Q.  It wouldn't contain handwritten notes or GPRs
9  or those kinds of things; is that correct?
10       A.  Handwritten notes and GPRs were found in the
11  investigative file.
12       Q.  And where would you request these RD files
13  from?
14       A.  Again loosely, headquarters.  That would be
15  part of the subpoena process.  Also, you know,
16  interoffice mail documents or the phone calls, you know.
17       Q.  You saw in Mr. Brasfield's report that he
18  makes repeated reference to permanent retention files;
19  correct?
20       A.  Yes.
21       Q.  Okay.  When he used that term "permanent
22  retention files," is it your understanding he was
23  referring to RD files and what you commonly called RD
24  files?

Page 95

1    A.  My understanding was he was referring to what
2 I would call RD files.
3    Q.  Okay.  Did you review any permanent retention
4 files or RD files for purposes of forming your opinions
5 in this case?
6    A.  Not maintained separately, but the RD files of
7 course were included in the prosecutor's files, they
8 were -- some RDs were included in the -- many were
9 included in the criminal defense files, and even on
10 occasion in the investigative files there might have
11 been supplemental re -- supplementary reports included
12 in there.  So did I look at a separate RD file?  No.
13 But the RD reports were included in all three.
14    Q.  So for the nine cases that you looked at more
15 thoroughly, was there a full RD file in each one of
16 those nine cases?
17    A.  They -- again, the documents would be either
18 in the prosecutor's file or elsewhere, so I would say it
19 was not a separate RD file.
20    Q.  When you say they'd be in the prosecutor's
21 file, you mean that's your expectation.  They normally
22 would be in the -- the prosecutor normally would get the
23 full RD file; correct?
24    A.  And I would -- and the materials that were

Page 96

1 available to me they were in there.
2    Q.  So you're saying each of the nine cases you
3 are able to say that the RD file in its completeness was
4 in the prosecutor's file?
5    A.  Well, I'm not --
6    MR. GIVEN:  Objection.  Form.
7 BY THE WITNESS:
8    A.  I'm not going to say in its completeness
9 because I'm reacting to Brasfield's allegations of, you
10 know, this page is missing or that page is missing, so
11 I'm looking at the prosecutor's file to see if those
12 pages that he claims are missing are missing from the
13 prosecutor's file, so I'm not looking to see is every
14 single RD page in there or is every single investigative
15 page in there.  I'm reacting to what he claims is
16 missing.
17    Q.  But ultimately in this case, a number of
18 documents were produced that came specifically from
19 the -- strike that.
20    A number of documents produced in this case
21 that were just standalone permanent retention files.
22 You understand that; correct?
23    MS. ROSEN:  Object to the form.
24

Page 97

1 BY THE WITNESS:
2    A.  I don't know if I understand that.  I assume
3 that's true.
4    Q.  Okay.  And did you review that set of
5 standalone RD files or permanent retention files?
6    A.  I only -- no.  I only referred -- reviewed
7 these files to see again if the pages that Mr. Brasfield
8 said were missing were in fact missing.
9    Q.  Okay.  And when you say -- when you refer to
10 "these files," you're not referring to the permanent
11 retention files or the RD files that were produced?
12    A.  I'm referring to the criminal defense files --
13    Q.  Got it.
14    A.  -- the SAO subpoena response documents and the
15 warehouse production.
16    And, obviously, I'm sorry, to the extent that
17 the RDs are included in each one of the criminal defense
18 attorney case files specifically, yes.
19    Q.  For purposes of your opinions in this case,
20 did you review any testimony from James Hickey?
21    A.  I did not.
22    Q.  For purposes of your opinions in the Fields
23 case, did you review any testimony from James Hickey?
24    A.  Not in its entirety, but I did review -- many

Page 98

1 times Mr. Brasfield referred to Mr. Hickey's testimony
2 on topics so I saw it that way.
3    I know there was a transcript available to me,
4 but I don't remember to any great extent read -- I did
5 not read the whole transcript.  I may have referred to
6 it once in a while.
7    Q.  You -- you said you may have referred to it
8 once in a while?
9    A.  Yeah.
10    Q.  When did you refer to the Hickey testimony?
11    A.  During the -- well, during the Fields case --
12 well, and actually I guess in this case too,
13 Mr. Brasfield would refer to Hickey testified to this,
14 Hickey testified to that.
15    Q.  Other than that, you have no other knowledge
16 about Hickey testimony; is that correct?
17    A.  That's correct.
18    Q.  You did not receive a copy of any transcript
19 of any deposition --
20    A.  That's correct.
21    Q.  -- or trial testimony from Mr. Hickey; is that
22 correct?
23    A.  No, I did not.
24    Q.  Okay.  To the extent you have any knowledge of

## Page 99

1    any testimony Mr. Hickey has ever given, it's what
2    Mr. Brasfield has said in his expert report; is that
3    correct?
4            MS. ROSEN:  Object to the form.
5            Mischaracterizes his testimony.
6    BY THE WITNESS:
7        A.  In this case that's correct.
8        Q.  In what ways is it different than in the
9    Fields case?
10       A.  Well, in the Fields case, the -- my
11   recollection of that is that it was maybe different
12   parts of his -- of different transcripts so different
13   depositions were discussed in the Fields case, so it
14   would be different than what Mr. Brasfield discussed in
15   this -- in this case's -- his expert report in this
16   case.
17       Q.  In the Fields case, you're saying mis --
18   you're -- strike that.
19           In the Fields case, once again to the extent
20   you have any knowledge of Mr. Hickey's testimony, it's
21   what Mr. Brasfield said in his expert report in that
22   case; correct?
23       A.  That's correct.
24       Q.  You're not claiming that in the Fields case

## Page 100

1    you read deposition or trial testimony of Mr. Hickey;
2    correct?
3        A.  No.
4        Q.  When you say "no," you mean correct; am I
5    correct?
6        A.  Can you reask the question?
7        Q.  Yeah.
8            Can you read back my question?
9            (A portion of the record was read by the
10   reporter.)
11   BY THE WITNESS:
12       A.  That's correct.
13       Q.  For purposes of your opinions in this case,
14   did you review any policies, procedures, guidelines,
15   checklists, or any other documents from the Subpoena
16   Service Unit?
17       A.  No.
18       Q.  Do you know if any such documents exist within
19   the Subpoena Service Unit?
20       A.  I don't know.
21       Q.  Did you review any -- strike that.
22           For purposes of forming your opinions in this
23   case, did you review any of the underlying investigative
24   materials from the Jacques Rivera case?

## Page 101

1        A.  I did not.
2        Q.  That includes any police files, criminal
3    defense files and prosecutor files; correct?  You didn't
4    review any of those materials?
5        A.  I reviewed nothing.
6        Q.  Did you review any depositions of any of the
7    officers in this case discussing their file keeping and
8    disclosure --
9        A.  I'm sorry.  Of who?
10       Q.  I'll start over.
11           Did you review any depositions of any of the
12   officers from this case discussing their file keeping
13   and disclosure practices?
14       A.  I did not.
15       Q.  Are you aware that police officers who are
16   defendants in this case discussed their file keeping and
17   disclosure practices in their depositions?
18       A.  I'm not --
19           MS. ROSEN:  Object to the form.
20   BY THE WITNESS:
21       A.  I'm not aware of anything from the
22   depositions.
23       Q.  Okay.  If that testimony existed, is it
24   testimony that would be relevant, that's actually

## Page 102

1    relevant to you?
2            MS. ROSEN:  Object to the form.
3            MR. GIVEN:  Objection to form.
4            Foundation.
5            Calls for speculation.
6            THE WITNESS:  Can you ask it again?
7    BY MR. SWAMINATHAN:
8        Q.  If there is testimony from the defendants in
9    this case about their time keeping and disclosure
10   practices, is that information that might be potentially
11   relevant to you?
12           MS. ROSEN:  Object to the form.
13   BY THE WITNESS:
14       A.  Without reviewing it, I don't know if I can
15   answer that because, you know, again, my perspective is
16   the manner in which I obtained documents from the police
17   department through a different process as we discussed
18   already today.  So if a police officer created a
19   document in a different fashion, I don't necessarily
20   really care how he created it.
21       Q.  Is it possible that his -- that an officer's
22   testimony in this case could be relevant to your
23   opinions in this case?
24           MS. ROSEN:  Object to the form.

## Page 103

1        Foundation.
2        And calls for speculation.
3   BY THE WITNESS:
4        A.  It's impossible for me to answer about that.
5        Q.  Are you staying -- strike that.
6        As I understand your testimony so far, you're
7   saying -- so far you've told me it is possible that an
8   officer's testimony in this case might not be relevant.
9   You told me that so far; correct?
10       MS. ROSEN:  Object to the form.
11  BY THE WITNESS:
12       A.  It might not be relevant because I'm more
13  concerned with obtain -- how to obtain documents from
14  the police department.
15       Q.  And it also might be relevant; correct?
16       MR. GIVEN:  Objection.
17       MS. ROSEN:  Object to the form.
18       Asked and answered.
19       MR. GIVEN:  Foundation.
20       Speculation.
21  BY THE WITNESS:
22       A.  Well, as I said before, how an officer creates
23  a document, I don't think I really care about that; it's
24  just my ability to obtain it.

## Page 104

1        Q.  So let me -- let me be more clear.  Let's --
2   and please understand what I'm -- listen to my question.
3        If there is officer testimony from this case
4   about the officer's own file keeping and disclosure
5   practices, could that be potentially relevant to your
6   opinions in this case?
7        MR. GIVEN:  The same objections.
8        MS. ROSEN:  Object to the form.
9        Foundation.
10       Calls for speculation.
11  BY THE WITNESS:
12       A.  It's very speculative.  I would -- it could
13  help inform my opinion.  If anything, it might just
14  further buttress my opinion.
15       Q.  In other words, you could imagine scenarios
16  where it could have no impact whatsoever on your
17  opinions; correct?
18       A.  Yes.
19       Q.  You could imagine scenarios where it supports
20  your opinions; correct?
21       A.  Yes.
22       Q.  You could imagine scenarios where it
23  undermines or changes your opinions; correct?
24       A.  Well -- mm-mm.  Since we're speculating, I

## Page 105

1   would speculate that that would be incredibly rare
2   because what I'm testifying to is the procedures that I
3   used as a prosecutor to obtain documents from the
4   Chicago Police Department, so --
5        Q.  That's all -- go ahead.
6        A.  So I'm going to all the different areas where
7   my experience has taught me where the documents are
8   available.
9        Q.  So if I understand your testimony correctly,
10  you're saying what an officer in this case says was
11  their own file keeping and disclosure practices is very
12  unlikely to relate to you because you're not
13  offering opinions about the process within the Chicago
14  Police Department for disclosing those documents?
15       MS. ROSEN:  Object to the form.
16       MR. GIVEN:  Objection.  Mischaracterizes --
17       MS. ROSEN:  Mischaracterizes his testimony.
18  BY THE WITNESS:
19       A.  No.  I'm offering opinion on how where a
20  prosecutor and I guess even a criminal defense attorney
21  with a subpoena, where we send the subpoenas to to
22  obtain the documents, and that's where the -- the --
23  we -- our experience has taught us where the records are
24  kept.  So I find it very difficult to understand how a

## Page 106

1   police officer would have a different location in the
2   police department where he keeps a file.
3        Q.  If an officer testifies about where he keeps
4   files, that could be relevant; correct?
5        MS. ROSEN:  Object to the form.
6        Calls for speculation.
7   BY THE WITNESS:
8        A.  Well, I guess it could -- I'm purely
9   speculating it could be relevant, but I think that's
10  highly unlikely based upon my experience.
11       Q.  Okay.  One of things that you're saying, if I
12  understand you correctly, in your opinion is, "I make a
13  request from the Chicago Police Department, I have some
14  sense of where I'm requesting those materials to come
15  from, and I get materials back from the Chicago Police
16  Department in response to my subpoena"; correct?
17       A.  That's --
18       MS. ROSEN:  Object to the form.
19  BY THE WITNESS:
20       A.  -- part of what I'm saying, yes.
21       Q.  And you're saying, "I think the stuff I get
22  back is pretty complete"; correct?
23       MS. ROSEN:  Object to the form.
24

Page 107

1    BY THE WITNESS:
2        A.  I need to review them to determine if they're
3    complete.  But in general, you know, either if I get the
4    materials in a timely fashion or maybe a little slower
5    fashion, but by going to the different parts of the
6    Chicago Police Department where they are tasked with
7    keeping those documents, those documents are provided to
8    me.
9        Q.  And you're knowledgeable about what those
10   places are.  Are you saying you're knowledgeable about
11   what those places are that the Chicago Police Department
12   keeps these investigative files?
13       A.  Based upon my experience as a prosecutor, yes.
14       Q.  Okay.  And what are those places where files
15   are kept by the Chicago Police Department?
16       A.  The investigative files are maintained at the
17   individual area which is tasked with investigating the
18   violent crime, for example.
19           The Bureau of Identification keeps photographs
20   and rap sheets, and that's at a different location than
21   an area.
22           The RD files are kept at, you know, again,
23   loosely referred to as headquarters; that's how we
24   obtain them.

Page 108

1            The case reports are created by a patrol
2    division, but they're commonly kept with the RD files.
3    That's a different location.
4            The forensic investigators who collect
5    evidence usually preserve it with the Evidence and
6    Recovered Properties Section.
7            The -- they -- to the degree that the Chicago
8    Police Department still has a crime lab, either on their
9    own or by request of other detectives or requesting
10   prosecutors, they would send someone that recovered
11   property, the evidence they collected, to the lab for
12   forensic work-up, maybe fingerprints, maybe ballistics,
13   whatever it might be.  In the day when they had blood
14   and all that stuff, they don't do that anymore, but
15   that.
16           The -- also, the forensic investigators also
17   are tasked with photographing the crime scene in
18   addition to collecting any relevant evidence.  Those
19   photographs are -- I don't think they're kept at
20   Evidence and Recovered Property.  I think they're kept
21   maybe at the forensic lab itself.
22           So those are a myriad of locations where
23   documents are stored by the Chicago Police Department,
24   in addition to -- well, other parts of the Chicago

Page 109

1    Police Department if they -- like patrol, if they create
2    an RD, it's kept in the -- it's usually provided from
3    the -- from headquarters from the RD file.
4            So different parts of the Chicago Police
5    Department, say, bomb and arson or gangs or whatever
6    else, if they create a report, that's also preserved at
7    the RD part, the RD file.
8        Q.  Have you now listed for me each of the places
9    that you go as a prosecutor to get files?
10       A.  Pardon me?
11       Q.  Are those -- have you now listed for me each
12   of the places that you go as a prosecutor to get files?
13       A.  I think that's the different locations that
14   come to mind right off the top of my head, yes.
15       Q.  Okay.  You've said so far -- so if I
16   understand correctly, one of your opinions is:  As a
17   prosecutor, we go to the Chicago Police Department and
18   get files from various locations from the Chicago Police
19   Department.
20       A.  That's correct.
21       Q.  And the places that you go that you've
22   identified are:  The investigative file; the Bureau of
23   Identification Services; RD files; ERPS, E-R-P-S,
24   Evidence Recovery and Property Section; the crime lab.

Page 110

1    Those are the basic places you go; correct?
2        A.  From --
3            MS. ROSEN:  I'm going to object to the form.
4            Can you read back the question?
5            (A portion of the record was read by the
6    reporter.)
7    BY MR. SWAMINATHAN:
8        Q.  So the places that you go that you've
9    identified so far are -- where do you go to get the
10   investigative file?
11       A.  Initially we sent subpoenas or made requests
12   of the detectives right at the area, but eventually even
13   faxing over subpoenas, but eventually the Chicago Police
14   Department asked us to send that subpoena to
15   headquarters.
16       Q.  Okay.
17       A.  As they did in -- with all of the other
18   locations as well.
19       Q.  And your understanding is there's an
20   investigative file maintained at the area; is that
21   correct?
22       A.  Yes.
23       Q.  Okay.  So far you've told me that files that
24   you'd request are investigative files from the area,

Page 111

1    documents kept at the Bureau of Identification Services,
2    documents kept at the RD file, documents kept at
3    Evidence Recovery and Property Section, documents kept
4    at the crime lab; is that correct?
5        A.  And the forensic investigators might have an
6    office that's separate from the crime lab, though they
7    work hand-in-hand, and they're not just documents.  At
8    the Bureau of Identification would also be mugshots,
9    photos.  And, also, as part of the Evidence and
10   Recovered Property, they may use the bulk storage
11   warehouse to keep a gun or a tire iron or whatever the
12   heck was used in a crime so, it's a different location,
13   but the documents are what we're requesting at that time
14   in the investigation.
15       Q.  Okay.  So whether it's documents or evidence
16   or other form -- let -- call it -- whether it's
17   documents or other forms of evidence, let's be clear.
18       The places where you are expecting documents
19   to be produced to you from, from the Chicago Police
20   Department, are the area, Bureau of Identification
21   Services, the RD file at headquarters, and Evidence and
22   Recovered Property Section, and the crime lab; is that
23   correct?
24       A.  And -- like, again, the forensic investigators

Page 112

1    to the degree that -- I'm not sure if they actually
2    share offices with the crime lab anymore, but to the
3    degree that they don't, that would be another location
4    where their documents would be.
5        Q.  Any other places where you understand there to
6    be documents that prosecutor's request?
7        A.  That are created by the Chicago Police
8    Department?
9        Q.  That are created by the Chicago Police
10   Department.
11       A.  I think that's -- well, the rap sheets, I
12   think, are the Bureau of Identification, too, and the
13   arrest reports are -- are generated through the RD file,
14   so I think that's everything.
15       Q.  Okay.  So that you've now listed for me all of
16   the places where a prosecutor will make individual
17   requests for documents; correct?  At the time that that
18   was being done separately; correct?
19       A.  Correct.
20       Q.  And you've also identified for me all of the
21   places where you expect the Chicago Police Department to
22   be going to get stuff for you; correct?
23       A.  Yes.
24       Q.  Are there any other places where you expect

Page 113

1    the Chicago Police Department to be going to get stuff
2    for you?
3        A.  On records they create, I think that's every
4    place.
5        Q.  Okay.  And your opinion, basically, is:  Those
6    are the places I request documents from and those are
7    the places that I get documents from; is that fair?
8        A.  Yeah.  I mean through -- through -- you know,
9    centralized now through headquarters, but how -- yes.
10       Q.  And your opinion basically is, in your
11   experience, I make requests to those places and they do
12   a pretty good job of giving me documents from those
13   places; correct?
14       MS. ROSEN:  Object to the form.
15   BY THE WITNESS:
16       A.  My -- that's been my experience.
17       Q.  Is that basically a pretty fair summary of
18   your opinions, putting aside the discussion of those
19   nine specific cases?
20       MS. ROSEN:  Object to the form.
21   BY THE WITNESS:
22       A.  That's too superficial.  So no.
23       Q.  What's it missing?
24       A.  Well, a big part of my opinion is that the

Page 114

1    files that Mr. Brasfield was relying upon are 25 years
2    old, the criminal defense files, and he presumes that
3    they are complete today when they're clearly not.
4        Q.  Okay.  So sticking with the issue of the
5    files, we've talked about your understanding about where
6    the places are where documents are produced from.
7        If -- strike that.
8        So for purposes of your opinions, your
9    assumption is the places that you've identified for me
10   so far today in your deposition are the places in which
11   all the Chicago Police Department investigative files
12   are kept; correct?
13       MS. ROSEN:  Object to the form.
14   BY THE WITNESS:
15       A.  The investigative files, RD files, and other
16   related documents and photographs.
17       Q.  Yeah, let me ask it a better way.  That --
18   that's a fair point.
19       Your opinion basically assumes that, to the
20   extent they're investigative materials created by the
21   Chicago Police Department, they are in one of the
22   locations you've identified for me so far today;
23   correct?
24       A.  My experience has been that they are tasked

**Page 115**

1    with the creating or preserving those documents.
2        Q.  Okay.  And your opinion assumes that that
3    is -- those are the places and the only places where
4    that material is because those are the places you
5    request it and those are the places you get it from;
6    correct?
7        A.  That's correct.
8        Q.  Okay.  Now, if it is the case that there are
9    any investigative materials kept somewhere other than
10   those places, that would be relevant to you, wouldn't
11   it?
12       A.  If it was investigative materials that were
13   kept somewhere else and not also kept in those places,
14   that would be relevant.
15       Q.  Okay.  And as you sit here today, you're
16   simply saying you're not aware of that being the case;
17   correct?
18       A.  Yeah, my -- that's correct.
19       Q.  Okay.  What did you do to establish that in
20   fact that's not the case for purposes of offering your
21   opinions in this case?
22       A.  It's been my experience over 32 years as a
23   prosecutor when I requested all the reports and the
24   investigative material from an investigation that they

**Page 116**

1    were found in those locations.
2        Q.  Okay.  Now, have you looked at any testimony
3    at any case from a Chicago police officer about where
4    and how they've kept files and whether they've kept them
5    in one of the locations you're talking about or if they
6    kept them in any other locations?
7        A.  I've not reviewed depositions or information
8    like that.
9        Q.  Have you spoken to any of the Chicago police
10   officers who are defendants in this case about where
11   they kept documents and investigative material?
12       A.  I have not.
13       Q.  Do you think that could be relevant?
14       MR. GIVEN:  Were you done with the question?
15       MR. SWAMINATHAN:  Yeah.
16       MR. GIVEN:  Objection to form.
17       MS. ROSEN:  Object.  Form.
18       MR. GIVEN:  Foundation and calls for
19   speculation.
20   BY THE WITNESS:
21       A.  The -- I didn't look at this case, so I don't
22   know what those officers would say that's different
23   about the cases that I've reviewed.
24       Q.  And would you agree with me that if it turns

**Page 117**

1    out, and this is a hypothetical, that materials are kept
2    by Chicago police officers -- strike that.
3        If it was the case that investigative
4    materials were kept by Chicago police officers in places
5    other than these locations, that would affect your
6    opinions in this case?
7        MR. GIVEN:  Objection.
8        MS. ROSEN:  Objection.  Form.
9        Calls for speculation.
10       MR. GIVEN:  Incomplete hypothetical.
11       MS. ROSEN:  Foundation.
12   BY THE WITNESS:
13       A.  Well, the -- if the -- if those -- if there
14   was investigative materials that were not also in those
15   other locations, I'd want to know why.
16       Q.  Okay.  And that would be --
17       A.  So --
18       Q.  Go ahead.
19       A.  -- it would lead me to ask more questions
20   before I determined whether it would affect my opinion
21   or not.
22       Q.  Okay.  And it could be potentially problematic
23   for your opinions if in fact there were investigative
24   materials that existed only in places other than the

**Page 118**

1    once you've identified; correct?
2        MS. ROSEN:  Objection.  Form.
3        Calls for speculation.
4    BY THE WITNESS:
5        A.  I wouldn't say it was problematic because
6    the -- the locations we've discussed and the type of
7    documents and the investigative material we've discussed
8    is -- those parts of the police department are tasked
9    with either creating and maintaining or maintaining
10   those investigative materials.
11       Q.  Help me understand that answer.
12       MS. ROSEN:  Objection.  Form.
13       That's not a question:  "Help me understand
14   that answer."
15       What don't you understand?
16   BY MR. SWAMINATHAN:
17       Q.  Can you -- are you able to answer my question?
18       A.  No.
19       Q.  Okay.  So let's do it this way.
20       If one of the officer defendants in this case
21   testified that they kept notes that were not in any one
22   of the locations that we've talked about so far where
23   you go to get documents, would that be potentially
24   problematic?

## Page 119

1    MS. ROSEN: Objection. Form.
2        MR. GIVEN: Form.
3        Foundation.
4        Incomplete hypothetical.
5    BY THE WITNESS:
6        A. Well, I disagree with the word "problematic"
7    because those locations are, by their general orders or
8    by the nature of my experience with the police
9    department, are where documents are supposed to be
10   created and/or preserved. So if an officer had
11   investigative material related to a case that was not
12   also maintained in those places, I'd want to know why he
13   did that. But it doesn't change where documents are
14   required by the police department to be created and
15   preserved.
16       Q. Because it's your understanding that materials
17   that are produced to you are produced to you from the
18   specific locations we've talked about so far; correct?
19       A. Yes.
20       Q. And so if materials exist in another location,
21   but not in one of the locations we've talked about, that
22   information may not get to you; correct?
23       MS. ROSEN: Objection. Form.
24       Calls for speculation.

## Page 120

1    BY THE WITNESS:
2        A. Well, if it's another part of the Chicago
3    Police Department, the -- and the subpoena is sent, I
4    expect the police department to comply with the subpoena
5    and provide the information to me.
6        Like, for example, if I'm wrong on where the
7    CB report is kept, the arrest report, if it's kept
8    somewhere other than I just said to you, and it's -- I
9    think it's kept in the RD area, but it's kept somewhere
10   else, I would expect the subpoena to be complied with.
11       If you're -- if you're speculating that a
12   police officer had investigative material that he didn't
13   give to the police department, that's different.
14       Q. Yeah.
15       A. And I'd want to know why he did that.
16       Q. If a police officer kept investigative
17   material that wasn't put into the investigative file and
18   it wasn't put into a supplementary report, are you aware
19   of any mechanism by which that would be produced to you?
20       MS. ROSEN: Objection. Form.
21   BY THE WITNESS:
22       A. It -- using your hypothetical, if it was kept
23   somewhere in the police department, I think I'd be able
24   to obtain it. But if it was not submitted to some part

## Page 121

1    of the Chicago Police Department, it would be -- how
2    would -- how can you issue a subpoena for something
3    that's not preserved by one of the departments, parts of
4    the department? That would be impossible.
5        Q. So what you're saying is if that person took
6    those notes and provided them to -- put them into one of
7    these locations you've talked about, then you'd expect
8    you'd receive it; correct?
9        A. Yes.
10       Q. And if they didn't put it into one of those
11   locations, then you'd expect that it's very possible
12   you're not going to receive it; correct?
13       MR. GIVEN: Objection. Mischaracterizes his
14       testimony.
15   BY THE WITNESS:
16       A. Well, my -- I think -- in addition to me
17   asking why that happened, it would be very difficult for
18   me to understand how I would receive that subpoena
19   unless -- that material unless the subpoena was
20   forwarded directly to that officer.
21       But, I mean, my understanding is that any
22   investigative material that the officer creates is
23   supposed to be placed into one of those locations.
24       Q. Okay. And if it isn't, then the process

## Page 122

1    you've described so far about how prosecutors go about
2    obtaining materials would not ensure the production of
3    that material; correct?
4        A. Not ensure it.
5        Q. And it could very well be missed; correct?
6        A. It could be. It depends upon if -- you know,
7    if -- say there's notes of an interview with
8    someone that was not put into the investigative file,
9    but that person is named or maybe even a summary of what
10   he said is in a typed RD file, I would start asking,
11   "Where's the GPR on Witness A," and that would cause me
12   to talk to the investigators who were involved in the
13   investigation to say, "Where is the GPR on Person A?"
14       Q. Has that ever happened in your experience, the
15   example you just gave?
16       A. The -- there were times when reading the RD
17   file if you see, like, a detailed interview in the RD
18   file that was of a somewhat significant witness and I
19   didn't find a GPR, that would cause me to say, "Where is
20   the GPR on this?"
21       And it could just be simply a matter of the RD
22   file hadn't been complied with, the subpoena for the RD
23   file, the investigative file had not been complied with
24   yet or hadn't been attached to a supplement -- another

**Page 123**

1    supplement that hadn't been approved yet, wherever it
2    might be, so it could happen in that situation.
3         I mean, I can recall looking for GPRs that I
4    didn't have initially, but eventually I obtained them.
5         Q.  Was it your general experience that for
6    most -- and I'm not going to say all, but for most
7    supplementary reports that were prepared there would
8    usually be an associated GPR?
9         A.  Usually, yes.
10        Q.  And I'm talking now about your typical
11   practice when you were a prosecutor.
12        A.  And let --
13        Q.  Go ahead.
14        A.  Let me -- let me rephrase that answer.
15        You might have maybe a canvassed witness where
16   in the GPRs I would find the canvass witnesses' names
17   and identifying information and then there would be no
18   note associated with that person, and then looking at
19   the typed supplementary report it would have that same
20   person listed and it might be something as "Saw nothing,
21   heard nothing," or it might say, you know, "Talked to
22   the next day, saw nothing, heard nothing," it might go
23   something like that, and I would ask, "Was there a GPR
24   of this person?"  And the detectives would say, "They

**Page 124**

1    saw nothing, heard nothing, so I did record their
2    identifying information to show that I talked to them,
3    but they saw nothing, heard nothing."
4         Q.  And it sounds like -- and, again, correct me
5    if I'm wrong -- your general practice is, when the time
6    you were a prosecutor, was that, as you were going
7    through the report, if you saw supp reports and you did
8    see an associated GPR, you would sometimes check in and
9    say, "Hey, is there a GPR to go with this?"
10        A.  Yes.
11        Q.  Was that a practice that was typically
12   followed by other prosecutors as well or was that just a
13   personal practice?
14        A.  Not to the prosecutors I talked to.  We would
15   make sure that we had -- that was a way of ensuring that
16   we had received all of the General Progress Reports and
17   all of the investigative material.
18        Q.  Was that something that you trained the other
19   prosecutors on that you supervised?
20        A.  I don't know if they -- we trained them on all
21   the different subpoenas and all the different ways of
22   obtaining reports.  I think -- I don't know that
23   technique was ever discussed, but the point was there
24   should be GPRs in a homicide investigation, so make sure

**Page 125**

1    you've got all the GPRs.
2         Q.  And I'm not -- and let me use the word
3    "training" and I don't mean in the formal sense.  You
4    know, I mean --
5         A.  Well, I mean, there was -- there was formal
6    training.
7         Q.  Understood.  And now I'm asking you a question
8    of -- I'm going to use the word "training" again and now
9    I'm asking you in the both formal and informal training.
10        When people came in to work with you who you
11   were supervising, would you talk to them and say, "Hey,
12   you know, as you're going through these files, keep an
13   eye out for whether you've got GPRs for these supp
14   reports that match up"?
15        MR. GIVEN:  Objection to the form of the
16   question.
17   BY THE WITNESS:
18        A.  I'm not sure if I'd word it that way.  I think
19   the way I would have worded it was:  "Make sure we've
20   got all the GPRs."
21        Q.  Anything more you'd say other than "Just make
22   sure you get all the GPRs"?
23        A.  Not that I recall.
24        Q.  In your practice of keeping an eye out for

**Page 126**

1    whether or not you had GPRs associated with the various
2    supplemental reports you had, that's not something you
3    communicated to other prosecutors?
4         A.  I think everyone was aware of if you had the
5    typed RD reports, and, again, there was a witness who
6    provided some substantial information that there was, in
7    all likelihood, a GPR associated with that witness.  So
8    it's one of those once you've been trained on:  "Get the
9    GPRs because there are always GPRs in a homicide
10   investigation," once you've been trained on that, I
11   don't know if -- if I said to one of my people I was
12   supervising, you know, "Make sure there's a matching
13   RD," I don't know if I'd word it that way, but the --
14   the -- common sense between people assigned to the
15   same courtroom or even in a formal training thing was:
16   "Make sure you've got all the RDs."
17        Q.  Okay.  In your experience that you've
18   described where sometimes you'd call over to a detective
19   or to the division and say, "Hey, is there a GPR
20   associated with the supp report," that's an experience
21   that was common among the prosecutors you worked with
22   and supervised?
23        A.  To the extent that I talked to them, yes, it
24   was known.  It -- I remember when it came to -- when

**Page 127**

1  you're conducting bond hearings, I remember one
2  supervisor trained us, quote/unquote, looking for the
3  gap, you know, and you'd have Chicago rap sheet and the
4  person had been arrested ten times and all of a sudden
5  you had a three-year gap and then he was arrested ten
6  more times. So the bond hearing prosecutors are trained
7  if there's a gap there, that probably means the person
8  was sent to a penitentiary somewhere or has a conviction
9  out of Indiana or Wisconsin or another state, so that
10  would cause us to order interstate reports to see if he
11  had been convicted, interstate rap sheets to see if he
12  had been convicted somewhere else.
13      So the similar idea was, when you're working
14  up a file for discovery, the connotation of make sure
15  you've got all the GPRs is, though maybe not equated to
16  the bond process, the same idea: Is there a gap? Is
17  there, like, extensive interviews with someone, a
18  defendant, or a witness and all of a sudden there's no
19  GPR, so there must be a GPR.
20      Q.  Was it your understanding and expectation as a
21  prosecutor that any Chicago police officer who was
22  involved in working on a homicide investigation creating
23  notes or reports that those materials were being turned
24  in and produced to you?

**Page 128**

1      MS. ROSEN:  Object to the form.
2  BY THE WITNESS:
3      A.  Yeah, I'm not sure if I understand. Anybody
4  working on -- you know, there's a forensic investigator
5  collecting evidence at a scene --
6      Q.  Yeah.
7      A.  -- doesn't necessarily have notes. He fills
8  out his standard one-page or two-sided form at some
9  point during his investigation, so I wouldn't call that
10  notes. But it's the detectives' notes that's been
11  created and they know they want to have a copy of it
12  during their investigation. So though it's something
13  that's maintained by the forensic investigators, the
14  violent crime detective who's assigned to the case wants
15  to make sure he's got a copy of that because it might
16  inform him and the rest of his investigation.
17      Q.  So it's your understanding that the crime
18  scene person who might create whether it's notes or
19  reports, I don't care, whatever documents they create,
20  that those are getting turned over to the detective and
21  then ultimately turned over to you?
22      MS. ROSEN:  Object to the form.
23  BY THE WITNESS:
24      A.  The forensic investigators in this example

**Page 129**

1  would maintain their own records. But during the course
2  of the investigation and if it wasn't solved
3  immediately, you know, the detective would want to know,
4  "Well, what did we find at the crime scene?" "Oh,
5  there's nothing but nine-millimeter shell casings."
6  Because when he's interviewing the possible suspects or
7  witnesses, if they say a different type of gun, then
8  they know that they've got to ask more questions during
9  an investigation, so they want to know what that
10  evidence was that was collected by the forensic
11  investigators.
12      But then the reports would come to us in the
13  subpoena process from the forensic investigators, the
14  crime lab part of the police department.
15      Q.  Directly?
16      A.  Yes.
17      Q.  So --
18      A.  Now, if the police department, that invest --
19  if that violent crimes detective also had a copy of it
20  during the course of the investigation and if perchance
21  he made it part of the investigative file, then I would
22  get that document twice.
23      Q.  Two times?
24      A.  I would get it from the subpoena that was sent

**Page 130**

1  over to the crime lab and I would get it because if he
2  included it in his file as well.
3      Q.  So let's -- let's do it that way.
4      When you sent out a subpoena to the Chicago
5  Police Department, was it pretty typical to send out a
6  subpoena for everything? It's a centralized process --
7      A.  Yes.
8      Q.  -- send me everything. When it was the
9  pre-centralized process, it was sending a subpoena to
10  all of the different locations; correct?
11      A.  Even in the pre-centralized era when we'd send
12  that subpoena for the RD file, we'd often include the
13  laundry list of items similar to our colleagues on the
14  defense bar who would also -- I wouldn't be a bit
15  surprised if we copied their language from their
16  subpoenas and put it in our subpoenas or vice versa.
17      Q.  Suffice it to say during the time that you
18  were in the prosecutor's office the typical practice was
19  that you were issuing a subpoena for all of the
20  investigative materials from the Chicago Police
21  Department; correct?
22      A.  That's correct.
23      Q.  Okay. When you made those requests, was it
24  your understanding and expectation that all

Page 131

1 investigative materials created by anyone involved in
2 the homicide investigation was being produced to you?
3 A. Yes.
4 Q. Okay. In other words, it doesn't matter if it
5 was the forensic investigator or the detective. Whoever
6 is creating investigative materials, be they notes or
7 reports or other documents or material, that stuff is
8 being produced to you. That's your understanding and
9 expectation; correct?
10 A. Yes.
11 Q. Would that include any notes or reports
12 created by patrol officers?
13 A. I don't know if patrol officers ever created
14 any notes, but the subpoena was for every document
15 created under the RD number. Not -- I wouldn't even
16 just say RD, any investigative document created.
17 Q. So if patrol officers were creating notes or
18 reports, your expectation is they would be produced to
19 you; correct?
20 A. Yeah. The patrol officers are generally
21 tasked with creating the initial case report.
22 Q. And so just to my question: If patrol
23 officers were creating notes or reports, any such notes
24 or reports that they've created your understanding is --

Page 132

1 and expectation is that those would be produced to you
2 in response to your subpoenas; correct?
3 A. On -- with this exception: I've never seen a
4 patrol officer create a note.
5 Q. So that's yes, but with that exception?
6 A. Yes.
7 Q. Okay. If gang crimes officers were creating
8 notes and reports, would it be your expectation and
9 understanding that they were producing all of such notes
10 and reports to you?
11 A. Yes. And, again, gang crimes officers,
12 commonly, I didn't see notes from gang crimes officers.
13 I saw very brief reports, maybe -- maybe two pages at
14 most of their format of the supplementary report; I
15 would expect to see that, yes.
16 Q. So your experience -- strike that.
17 Are you saying in your experience you have
18 never seen gang crimes officers' notes?
19 A. Not like -- so compared to a violent crimes
20 detective who have -- where you would expect to see a
21 set of GPRs, I rarely, if ever, saw notes from gang
22 crimes officers.
23 Q. And as you sit here today, can you remember
24 any time you ever saw notes from a gang crimes officer?

Page 133

1 A. I'm sure there were. I've worked on so many
2 gang cases, I'm sure there were notes, but, boy,
3 exceedingly rare.
4 Q. Okay. And in those instances where such notes
5 were create by a gang crimes officer, your understanding
6 and expectation is that those would be produced in your
7 response to a subpoena; correct?
8 A. Yes.
9 Q. Okay. And to the extent gang crimes officers
10 were creating reports of any kind, your understanding
11 and expectation is those would be produced to you in
12 response to your subpoenas; correct?
13 A. Yes.
14 Q. What's your understanding of where such
15 documents were being produced?
16 How would gang crimes officers' notes or
17 reports get to you in response to subpoena?
18 What's your understanding?
19 A. Well, they -- they -- any reports that they
20 type up pursuant to their -- their responsibilities,
21 it's -- usually that work is done in conjunction with
22 the violent crimes detectives. It's not their -- it's
23 not their primary responsibility to solve a violent
24 crime, it's the area detectives, so their reports would

Page 134

1 be under the same RD number as the -- let's say it's a
2 murder case and they were talking to a gang and violent
3 witness for information, whatever it might be, it would
4 be typed under the same RD number as the homicide
5 investigation. So wherever they would turn it into, it
6 would be obtained generally through the RD subpoena, the
7 subpoena to headquarters.
8 The gang crimes officers, to the extent that
9 they worked in conjunction with violent crimes
10 detectives, again the violent crimes detective may have
11 a copy of that RD report that they filled out and they
12 may include that in their investigative file as well,
13 so, again, I would get their reports.
14 Q. So if the gang crimes officer reports, you
15 would expect to either be getting them from the
16 investigative file or from the RD file; correct?
17 A. Yes.
18 Q. Okay. Gang crime notes, you would expect to
19 be getting them either from the investigative file or
20 the RD file; correct?
21 A. Well, I don't know if they've -- I don't know
22 how they would preserve notes. Possibly they would give
23 it to the violent crimes detective. I'm not sure -- to
24 the extent that I received the notes, I don't know if I

## Page 135

1    ever received that from -- attached to the RD that they
2    typed up or if it was provided to the violent crimes
3    detective. I don't know exactly where that -- notes, to
4    the extent that they ever wrote notes, were preserved,
5    but.
6         Q. But in terms of the process that you had as a
7    prosecutor where you were going with the Chicago Police
8    Department to request materials, if gang crimes officers
9    had notes, they would have to have been in the
10   investigative file for you to get them; correct?
11        MS. ROSEN: Object to the form.
12        Mischaracterizes her answer.
13   BY THE WITNESS:
14        A. I don't know if they would be attached to the
15   RD that they typed up and kept that way or if they --
16   you know, to the extent that they ever wrote notes if
17   they were preserved with the investigative file, so I
18   don't really know.
19        Q. So -- okay. So to be clear: If -- when --
20   based on the process that you followed and the
21   prosecutors followed that you've testified to in terms
22   of requesting materials from the CPD, any notes that
23   gang crimes officers might have kept would get to you
24   either by the investigative file or the RD file;

## Page 136

1    correct?
2         MS. ROSEN: Object to the form.
3    BY THE WITNESS:
4         A. That would be my understanding, yes.
5         Q. Okay. There's not any other mechanisms you're
6    identifying other than those notes two; correct?
7         A. That's the -- yes.
8         Q. Okay. Now, it's 12:45. Take a break now?
9         MS. ROSEN: Yes.
10        (A lunch recess was taken from 12:46 p.m. to
11   1:50 p.m.)
12        (Deposition Exhibit Number 3 was marked for
13   identification.)
14   BY MR. SWAMINATHAN:
15        Q. All right, Mr. Murray. Have you ever heard of
16   a Serafini Report?
17        A. No.
18        Q. Have you ever received copies of Serafinis
19   Reports as a prosecutor --
20        A. No.
21        Q. -- at the Cook County State's Attorney's
22   Office?
23        A. No.
24        Q. Have you ever heard of a document called a

## Page 137

1    Humper Report?
2         A. No.
3         Q. When you were at the Cook County State's
4    Attorney's Office, did you ever receive documents called
5    Humper Reports?
6         A. I did not.
7         Q. Handing you a document marked Exhibit 3, can
8    you tell me what this document is, sir?
9         A. It's my resume.
10        Q. Is this a resume you prepared particularly --
11   specifically for this case?
12        A. Yes.
13        Q. Do you have other versions of your resume,
14   other than this one?
15        A. No.
16        Q. Okay. So you don't have an -- other versions
17   of your resume that contain more or different
18   information?
19        A. No.
20        Q. Okay. You don't have a version of your resume
21   that contains more information? This is sort of a --
22   you know, of a summarized or shorter version.
23        A. I do not.
24        Q. I want to talk about your professional

## Page 138

1    experience. I see you worked at the Cook County State's
2    Attorney's Office from 1983 to 2008; correct?
3         A. Yes.
4         Q. Okay. And then after that, it appears you
5    spent some time working in the DuPage County State's
6    Attorney's Office; correct?
7         A. Yes.
8         Q. What was the reason for the move from Cook
9    County to DuPage County?
10        A. The -- there was a change in administrations
11   in Cook County and Ms. Alvarez was elected, and the
12   position I held was a bureau chief and she wanted to
13   restaff the bureau chiefs with people of her own
14   choosing.
15        Q. And you -- it says you were at the DuPage
16   County State's Attorney's Office until 2015. What
17   happened in 2015?
18        A. 2000 -- December of 2014, I formally retired.
19   Then in -- I was brought back to handle a murder
20   prosecution that I had been working on, so I was brought
21   back on a contract basis. That case was tried in March
22   of '15 and then there was post-trial motions, so that
23   didn't wrap up until June or something like that.
24        Q. Basically since June of 2015 you've been

## Page 139

1  retired?
2      A. Yes. From the DuPage County State's
3  Attorney's and from Cook County, yes.
4      Q. Yes. Are you retired from all professional
5  endeavors or is there anything else you're doing?
6      A. I have an update for you. Obviously you can
7  see I'm teaching part-time as an adjunct professor at
8  William J. Harper. About two-and-a-half-weeks ago, I've
9  been appointed a special Kane County assistant state's
10 attorney. It's not a full-time position. It's to look
11 at a couple of confidential matters, so it's a limited
12 employment, but that happened about two weeks,
13 two-and-a-half-weeks ago.
14     Q. Did you say it was Kane County?
15     A. Kane County.
16     Q. Okay. Any other updates or changes or any
17 other updates to your resume?
18     A. I don't think so.
19     Q. Okay.
20     A. Let me take a look though.
21         No, that's -- that is it.
22     Q. Have you started the position with Kane
23 County?
24     A. Pardon me?

## Page 140

1      Q. Have you started the position with Kane
2  County?
3      A. I went out and did a couple of interviews with
4  the state's attorney and the first assistant. The
5  matters I'm looking at, I have not delved into that --
6  well, there was a couple of interviews. I take that
7  back. A couple of phone interviews on the matters I'm
8  asked to look at.
9      Q. Are you being compensated by Kane County?
10     A. I am.
11     Q. Have you already been compensated --
12     A. No.
13     Q. -- for work so far?
14     A. I'm not. Have --
15     Q. So you'll start being compensated once --
16 strike that.
17         You haven't --
18     A. I have not been compensated yet.
19     Q. Okay. Since the time you left the DuPage
20 County State's Attorney's Office have you had any
21 sources of income?
22     A. Teaching at -- at William Harper College. The
23 other -- the only other income was testifying as an
24 expert witness in the Fields matter.

## Page 141

1      Q. Okay. And then subsequently testifying in
2  this case; correct?
3      A. That's correct.
4      Q. Okay. Would it be fair to say that you've
5  earned approximately $100,000 testifying in the Fields
6  matter and in -- strike that -- that you've earned
7  approximately $100,000 working as a retained expert for
8  the city in Fields and the Jacques Rivera combined?
9      A. Close. I don't think it's over that yet, but
10 in that vicinity.
11     Q. Okay. And then, for your teaching position do
12 you get paid a full-time salary?
13     A. No.
14     Q. How much do you get paid in the teaching
15 position?
16     A. I want to say it's -- for a 12-month period,
17 it's about $4,000, $5,000. It's a -- it's a nominal
18 fee.
19     Q. Okay. So the vast majority of your income
20 since retirement, retiring from DuPage County, has come
21 from your work as a retained expert; is that correct?
22     A. From my pension.
23     Q. Okay. Understood.
24         I want to talk about your time in the Cook

## Page 142

1  County State's Attorney's Office.
2          You said approx -- starting approximately in
3  1986 or '87 you started working in a felony courtroom;
4  correct?
5      A. That's -- yeah, that's my estimate. I don't
6  know the exact date at this present time.
7      Q. Okay. Since that time that you started
8  working in a felony courtroom, were there periods of
9  time where you worked cases that came out of specific
10 districts or areas of the Chicago Police Department or
11 did you work cases from all over the Chicago Police
12 Department?
13     A. All over. When assigned to the Felony Trial
14 Division, it was cases from all over the city of
15 Chicago.
16     Q. And just help me understand. There's a
17 portion where it talks about the Gang Prosecution Unit
18 and there's a portion where it talks about the Felony
19 Trial Division and Special Prosecutions Bureau. Help me
20 understand the relationship between those various units
21 and bureaus.
22     MR. GIVEN: Object to the form.
23 BY THE WITNESS:
24     A. Which relationship do you want to hear about

Page 143

1    first?
2        Q.   Well, the -- so once you went into the Felony
3    Trial Division in or around '86 or '87, have you always
4    been in the Felony Trial Division?
5        A.   No.
6        Q.   Okay.  When did you leave the Felony Trial
7    Division?
8        A.   I went to the Special Prosecution Bureau and
9    the Gang Crimes Prosecution Unit in 1990.
10       Q.   Okay.  So the Gang Crimes Prosecution Unit is
11   within the Special Prosecutions Bureau; is that right?
12       A.   Yes.
13       Q.   Okay.  And you went there in 1990.  And then
14   how long were you in the Gang Prosecutions Unit?
15       A.   You can see that I eventually became a deputy
16   supervisor in the Gang Prosecution Unit in '93, so I
17   remained in that unit until 1998.
18       Q.   So from 1990 to 1998 you were in the Gang
19   Prosecutions Unit; correct?
20       A.   Yes, in one capacity or another.
21       Q.   Okay.  And then in 1998 what happened?
22       A.   I was put in a supervisory position appointed
23   to that -- promoted to that in January -- not January,
24   but sometime in 1998.

Page 144

1        Q.   Okay.
2        A.   And then went back in the Criminal
3    Prosecutions Bureau where the Felony Trial Division is
4    located.
5        Q.   And then the Special -- I'm sorry.  Did you
6    say the Felony Trial Division is within the Special
7    Prosecutions Bureau?
8        A.   No, I did not.  I said the Felony Trial
9    Division is in the Criminal Prosecutions Bureau.
10       Q.   Okay.  And then in 2000, you moved back to the
11   Special Prosecutions Bureau; is that correct?
12       A.   I did.
13       Q.   Okay.  What kind of cases are you handling in
14   the Special Prosecutions -- were you handling in the
15   Special Prosecutions Bureau in 2000 and 2001?
16       A.   As a deputy chief -- there's a chief and a
17   deputy chief of every one of the bureaus at the time, so
18   I was a deputy chief to the Special Prosecutions Bureau
19   and it was primarily a supervisory role over the
20   different units that are in the Special Prosecutions
21   Bureau, and that would include the Auto Theft Unit; the
22   Gang Crime -- the Gang Prosecution Unit; the -- it
23   wasn't called the Cold Case Unit, it was called
24   something else at the time, but it morphed into the Cold

Page 145

1    Case Unit; the Financial and Government Crimes Unit, and
2    the Arson Unit.  Did I say auto theft?  The Auto Theft
3    Unit too.
4        Q.   Okay.  Those were units that were under your
5    umbrella while you were the deputy chief of the Special
6    Prosecutions Bureau?
7        A.   They were u -- yes, units included in the
8    Special Prosecutions Bureau.
9        Q.   Okay.  I understand they're units within the
10   Special Prosecutions Bureau.  Are they units that you
11   had supervisory authority over?
12       A.   I'm the deputy chief of that bureau, so I
13   supervised -- I had supervisory authority over all of
14   those units, just as the chief was above me and had the
15   same responsibilities.
16       Q.   Okay.  When you were working the Felony Trial
17   Division before joining the Gang Prosecutions Unit in
18   1990, what kinds of cases were you working?
19       A.   Every felony possible.
20       Q.   Including homicides?
21       A.   Yes.
22       Q.   Did your cases come -- did more of your cases,
23   in that specific time period, come from one area versus
24   another area --

Page 146

1        A.   No.
2        Q.   -- of the city?
3             Once you joined the Gang Prosecutions Unit in
4    that period from 1990 to 1998, did your cases -- well,
5    what kinds of cases did you have?
6        A.   Gang -- primarily gang homicide cases, though
7    there were I want to say a few attempted murders, but
8    primarily gang homicides cases.
9        Q.   Did those cases come out of particular areas
10   more often than others?
11       A.   They -- the -- the prosecutors in the unit
12   were not limited geographically or anything like that
13   nature.  By the luck of the draw, though, I tended to
14   handle more of the -- luck of the bad draw I guess, I
15   tended to handle more of the Gangster Disciple cases.
16   That gang was primarily located on the South Side of the
17   city.
18       Q.   And so which area were those cases coming out
19   of?
20       A.   Area One and Area Two.  Though there were some
21   Gangster Disciple cases out of Area Six on North Side,
22   not as many -- not many though.
23       Q.   In your time working in the Gang Prosecutions
24   Unit in 1990 to 1998, did you -- what types of officers

Page 147

1    within the Chicago Police Department were you working
2    with most commonly?
3        A.  Most commonly --
4            MR. GIVEN:  Objection.  Form.
5        I'm sorry.  Could you read that back?
6        Did you say what kinds of officers?
7            MR. SWAMINATHAN:  What kinds or what types.  I
8        don't remember what I said.
9            (A portion of the record was read by the
10   reporter.)
11           MR. GIVEN:  Objection.  Form.
12   BY THE WITNESS:
13       A.  You mean their assignment?  Is that what you
14   mean?
15       Q.  Yeah.  Like detectives or patrol officers or
16   other -- other types of officers.  What type of --
17       A.  Well, homicide cases it's primarily you're
18   working with violent crimes detectives; however, there
19   may be a tactical officer who had some involvement in
20   the investigation of the case.  There could be a gang
21   crimes officer.  There even could be an arson -- a bomb
22   and arson officer if the gang used arson as their -- as
23   their method of committing a crime, and obviously beat
24   officers, but the primary -- the primary one was the --

Page 148

1    the detectives.
2        Q.  Okay.  You said tactical officers.  What
3    are -- what are tactical officers?
4        A.  Tactical officers are officers in the Chicago
5    Police Department who -- who wear -- they don't have to
6    wear uniforms when they're conducting their assignments.
7    They -- different superintendents use them differently.
8            They may be targeted to a certain area where
9    there's a lot of violent crime going on.  They may be --
10   they may be just recently patrol officers who have now
11   been promoted to tact officers.
12           They're not narcotics officers.  They're not
13   gang prosecution officers.  They're there to augment
14   investigations on patrols that are in, like, hot spot
15   neighborhoods.
16       Q.  So they're not patrol officers?
17       A.  They might have just been a patrol officer.
18   It's kind of the -- one of the steps up and out of
19   patrol.
20       Q.  And are they considered gang crime officers?
21       A.  No.
22       Q.  Okay.
23       A.  Not in my era.
24       Q.  Did they later become gang -- the independent

Page 149

1    gang --
2        A.  Not that I'm aware --
3        Q.  -- type tactical officers at so point?
4        A.  Not that I'm aware of.  I'm not sure what the
5    status of the tactical officer is today.
6        Q.  Okay.  So in all of your cases in the period
7    from 1990 to 1998, I'm assuming you'd have some
8    involvement of detectives; is that correct?
9        A.  Yeah.
10       Q.  Okay.  And then in -- and how often would you
11   have the involvement of gang crimes officers?
12       A.  Not every gang case.  You might think there
13   would be a gang crimes officer associated with every
14   gang crime case, but that wasn't necessarily true.
15       Q.  Approximately what percentage of the cases
16   while you were in the Gang Prosecution Unit had gang
17   crime officer involvement?
18       A.  Well, at least half, maybe two-thirds, maybe
19   even three-quarters.
20       Q.  Um --
21       A.  But just -- and by -- that -- that -- my point
22   of that is there's so much gang crime in Chicago that a
23   gang crimes officer might not have been involved in the
24   investigation of a crime at all.  It might have been the

Page 150

1    detectives handling it separately and they were able to
2    put together the investigation and solve the case even
3    though a gang crimes officer never had anything to do
4    with the case.
5        Q.  Did you -- when you were working in the Gang
6    Crimes Unit, I'm assuming you had detectives who
7    testified regularly at trials; is that correct?
8        A.  Gang -- detectives commonly testified at
9    pretrial motions or trials, yes.
10       Q.  Did gang crimes officers testify at pretrial
11   motions and trials in those cases from 1990 to 1998 when
12   you were in the Gang Prosecutions Unit?
13       A.  Potentially, but certainly not as frequently
14   as a detective.
15       Q.  It sounds like in every case there'd be at
16   least one detective testifying; correct?
17           MS. ROSEN:  Object to the form.
18   BY THE WITNESS:
19       A.  I'm not sure they would test -- they would
20   testify in every case, but there was a potential of it,
21   of a detective testifying in the case.
22       Q.  And then in -- in the gang crime cases -- and,
23   again, I think you said it was greater than 50 percent
24   of your cases in that unit had gang crime officer

## Page 151

1  involvement; correct?
2      A.  Yes.
3      Q.  Between -- was it -- was it as high as
4  75 percent?
5      A.  It could be, but, boy, I just -- I couldn't
6  put a number on it today.
7      Q.  Could it be as high as 90 percent?
8      A.  No.
9      Q.  Could it be as high as 80 percent?
10     A.  No.  I'm not going to pare it down that fine.
11 It's over 50 percent and it could be 75 percent.
12     Q.  All right.  Got it.
13         In those instances when gang crime officers
14 were involved -- this is, again, speaking of the period
15 from 1990 to '98 -- how often would those gang crimes
16 officers then also be individuals who would either
17 testify or being prepared to testify at trial?
18     A.  It depends upon their role in the case.  If
19 they made an arrest, maybe a motion to quash arrest on a
20 lack of probable cause would be filed, then it would be
21 necessary for them to testify.  They commonly --
22 detectives were commonly called on most other motions
23 or -- or aspects of -- of the trial, so not -- again,
24 not -- not as often as the violent crimes detectives.

## Page 152

1      Q.  Okay.  In terms of -- of, again, putting
2  percentages on it, what percentage of the time that a
3  gang crime officer was involved were they ultimately
4  testifying or preparing to testify at pretrial motions
5  or at trial?
6      A.  It's impossible for me to estimate that.
7      Q.  Do you think it's in the -- could it be --
8  could it be more than 50 percent?
9      A.  It's impossible for me to estimate that.
10     Q.  Could it be as few as ten percent of the time?
11     A.  It's still impossible for me to estimate that.
12     Q.  Could it be as high as 90 percent of the time?
13     A.  It's still impossible for me to estimate that.
14     Q.  Okay.  Would you say you had regular
15 interaction with gang crime officers during that period
16 that you were -- from 1990 to 1998 while you were in the
17 Gang Prosecutions Unit?
18     A.  Yeah.
19         MR. GIVEN:  Objection.  Form.
20 BY THE WITNESS:
21     A.  By -- by regular, again, not as often as maybe
22 the violent crimes detectives, but if they were involved
23 in a case, I would have contact with them.
24

## Page 153

1      Q.  What about bomb and arson?  Did you have
2  regular contact with bomb and arson investigators?
3      A.  I did not because, though I was aware of gangs
4  using arson as a method to kill people or intimidate
5  people, I -- so I knew other people in the Gang
6  Prosecution Unit that handled cases like that.  There
7  was -- I remember one case specifically where an arson
8  prosecutor and a gang prosecutor tried a case, it was an
9  arson murder, but I didn't have that experience
10 personally.
11     Q.  In terms of gang crimes officers in that
12 period from 1990 to 1998, what kind of roles were they
13 playing in the homicide investigations that you were
14 involved with?
15     A.  The -- their involvement really came through
16 the violent crimes detectives who were working on a
17 case.  You know, just generically, if there was an area
18 where there was a lot of driveby shootings, the
19 detectives might reach out to the gang crimes officers
20 and said, "Do you have any intelligence what's going on
21 here," and they would try to identify suspects that way.
22     Q.  But in terms of the roles within an
23 investigation, a homicide investigation -- strike that.
24         Is it your understanding gang crimes officers

## Page 154

1  were sometimes assigned to homicide investigations?
2  Correct?
3      A.  I don't know if the word "assigned" is the
4  word to use.  They -- they had their own role to
5  investigate gang crime activity.  They often worked more
6  often with the Narcotics Unit.  At one time in the
7  nineties, they combined gangs and narcotics.  I'm not
8  sure if they kept that, but they -- at one time they
9  combined the two of them together because it was --
10 gangs were selling drugs to get by and the shootings
11 were related to their narcotics sales, but -- so I don't
12 know if we would you're assigned to the violent crimes
13 detective, but the violent crimes detectives would use
14 whatever resources at their -- they would turn to tact
15 officers and say, "What do you know about this area?  We
16 just had a shooting here."  So I'm not sure if the word
17 "assigned" is correct, but they would work with the
18 detectives on an occasion on cases.
19     Q.  Okay.  And on police reports sometimes in
20 homicide investigations, would you see gang crimes
21 officers listed as among the assigned officers on a
22 case?
23     A.  Yeah.  In other words that, during the course
24 of the investigation, they brought some information to

Page 155

1    bear, just like you might have, in the formatting of the
2    initial case re -- of the initial crime scene
3    supplemental report, you're going to see that first beat
4    car on the scene and they're filed out -- filled out by
5    the first case report and you're going to see his name
6    there.  You're going to see the forensic investigators
7    who collected whatever evidence they collect and
8    whatever photographs they took.
9         So if a gang crime specialist either was
10   called to respond to the scene or respond to the scene
11   on their own, they could be listed in the formatting of
12   the crime scene supplemental report, supplementary
13   report.
14        Q.  So within the contents of a homicide
15   investigation that a gang crimes officer might
16   participate in in some way, what are the types of things
17   gang crimes officers were doing in those cases, based on
18   your experience?
19        A.  What were they doing?
20        Q.  Yeah.
21        A.  Well, as I said before, if -- if they -- say
22   it's a driveby shooting and everyone either thought it
23   was a gang-related case or they were at a loss as to who
24   did it, they might turn to the gang crimes officers to

Page 156

1    say, "There's a shooting here and I see a six-pointed
2    star painted on the wall here.  What do you know is
3    going on here?"  And they -- their own prior
4    investigations into whatever activity they were
5    investigating they might say, "Oh, it's a retaliation
6    shooting," bah bah bah bah, and that would create a list
7    of suspects for everybody to go interview.  Whether the
8    gang crimes officers did the interview or whether the
9    violent crimes detectives did the interview, I couldn't
10   tell you, but they were -- lack for a better word, they
11   were used for intelligence purposes on many cases.
12        Q.  So that -- and this is not a criticism.  That
13   tells me something about how detectives used the gang
14   crimes specialists, obviously to get intelligence on the
15   games.  But in terms of the gang specialists themselves,
16   in addition to providing information to the detectives
17   about potential leads and so on, what are other kinds of
18   roles gang crimes officers play in homicide
19   investigations that you observed in your experience?
20        A.  What other role did they play?  Well, they
21   might go make an arrest if -- either they, in
22   conjunction with the violent crimes detective or in
23   conjunction with witnesses' accounts or whatever, you
24   know, "The shooter was Tom Jones, let's go arrest Tom

Page 157

1    Jones," they might go make the arrest.
2         Q.  Other things you've see them -- roles you've
3    seen them play in homicide investigations?
4         A.  Maybe not limited to a homicide investigation,
5    but they might execute a search warrant if there was
6    a -- if they were working in conjunction on a narcotics
7    investigation, or even on a violent crime they could be
8    executing a search warrant, they could be assisting on
9    that.
10        Q.  Finding witnesses?
11        A.  I'm not sure how to word that.  I mean, if --
12   if it's a cold situation and no one knows who did it,
13   the -- they may reach out to gang members they've
14   reached out to in the past and say, "What do you know,"
15   and maybe develop witnesses that way.
16        Q.  And what about the other way?  If someone
17   says, "Hey, I'm trying to find this person; can you go
18   find him?"
19        A.  Well, if the police officer -- another violent
20   crimes de -- yeah.  Sure.
21        Q.  That's a role that you've seen them sometimes
22   play in cases too?
23        A.  Yeah.  I mean, sometimes they would go with
24   the detective and to do or sometimes they would be asked

Page 158

1    to do that by themselves.
2         Q.  Would they interview witnesses?
3         A.  Yeah.  I mean, that's -- yeah, they would.
4    Yes.
5         Q.  Would they ever do canvassing?
6         A.  I don't know.  In my experience, canvassing
7    was often done on the detectives who responded to the
8    scene, but that's not to say that the -- that tact
9    officers, case officers, or gang officers or bomb and
10   arson officers didn't also canvass.  But it seemed to
11   me -- my recollection would be that was primarily the
12   case -- the violent crimes detectives who were
13   responding to the scene would do that primarily.  But,
14   again, I can imagine them turning to somebody else and
15   say, "Help me out here."
16        Q.  Gang crime specialist, in your experience,
17   would they ever do -- show witnesses gang books?
18        A.  If they're trying to identify someone, yeah.
19   They maintain books of photographs of known gang
20   members.
21        Q.  And would they use those photo books to talk
22   to witnesses about those potential witnesses or
23   potential suspects?
24        A.  To try and identify if someone is known only

Page 159

1    by a nickname or if a witness thought they could
2    identify them from a photo, they'd show them from a
3    book.
4         Q.   So that's a function you've seen gang crime
5    officers perform in the homicide --
6         A.   I didn't see it.
7         Q.   -- investigations in your experience?
8         So let me ask it better.  That's something
9    you're aware of hom -- of gang crimes specialists doing
10   in homicide investigations based on your experience?
11        A.   Yeah, not just homicide investigations, in
12   other investigations.
13        Q.   Okay.
14        A.   But they've used a gang book to try to help
15   identify a suspect, yes.
16        Q.   In your experience --
17        A.   Or effectively to identify a witness too.  If
18   someone knows -- "I know this guy who is a gang member
19   was out on the corner, he saw what happened too," so
20   that might be a way to identify a witness as well.
21        Q.   Gang crimes specialists, in your experience,
22   would they ever to photo arrays?
23        A.   Would they ever do what?
24        MR. GIVEN:  I'm sorry.  Would do what?

Page 160

1         MS. ROSEN:  Photo arrays.
2         MR. GIVEN:  Oh, photo arrays.
3         Thank you.
4    BY THE WITNESS:
5         A.   I -- yeah, I -- they certainly weren't
6    precluded from doing it.  Yeah, they would do it.
7         Q.   Were they --
8         A.   See, now you're getting into the role that's
9    more traditionally the violent crimes detective's role
10   than getting into that -- not that a gang crimes officer
11   couldn't do photo array or use his gang book, obviously.
12   But if you're getting to a stage where someone's already
13   been identified or you think you've narrowed it down to
14   a suspect, it's usually a violent crime detective who
15   carries the ball at that point, usually.
16        Q.   So it's more common that the gangs detective
17   would take that board, but it's also sometimes done by
18   gang crimes specialist --
19        A.   Sure.
20        Q.   -- in your experience?
21        A.   Yes.
22        Q.   And what about live lineups?
23        A.   When you get to live lineups, that's primarily
24   the responsibility of the violent crimes detective.

Page 161

1         Q.   Was it ever the case that in your experience
2    that gang crime specialists would conduct live lineups?
3         A.   Not without a detective being there, in my
4    experience.  I'm not saying there was a prohibition
5    against it, just that I -- I don't think I ever saw a
6    live lineup done.  Let me think about that.  I don't
7    think a live lineup was done without a detective being
8    present.
9         Q.   Any other functions you can think of or roles
10   you can think of that gang crimes specialists would play
11   in homicide investigations from your experience that we
12   haven't covered?
13        A.   Well, I mean, just for it to be a general
14   investigative role, so if there's specific unique things
15   to a particular case, they weren't precluded from doing
16   those things necessarily.
17        Q.   All right.  In your experience in the cases
18   where gang crimes specialists were involved in the
19   homicide investigation, did they -- did they
20   participate, you know, fully in those investigations or
21   were they limited in the roles they could play in an
22   investigation?
23        MS. ROSEN:  Object to the form.
24        MR. GIVEN:  Objection.

Page 162

1    BY THE WITNESS:
2         A.   I don't know if there were limitations, you
3    know, by some sort of police order or something like
4    that.  But as I've said before, the violent crimes
5    detectives had the responsibility for, you know,
6    obtaining charges against a person for a violent crime.
7    So you wouldn't see a closing supp signed by a gang
8    officer; it would be the violent crime detective who
9    either interviewed the defendant or the final lineup
10   perhaps or whatever it might be before charges were
11   referred to the prosecutor's office.  So I don't know if
12   that was a limitation put on them by the hierarchy in
13   the Chicago Police Department.  Just:  You didn't see
14   it.
15        Q.   And -- well, in other words -- strike that.
16        The ultimate responsibility in every homicide
17   investigation, there's some detective who has ultimate
18   responsibility; correct?
19        A.   Violent crimes detectives, the Detective
20   Division has the responsibility for investigating,
21   clearing and closing and obtaining charges on violent
22   crimes.
23        Q.   Okay.  Now, that being said, in your
24   experience, were gang crimes officers often involved in

## Page 163

1     actively helping solve homicides?
2         MS. ROSEN: Objection. Form.
3     BY THE WITNESS:
4         A. They were certainly part of violent crime
5     homicide investigations. So to that degree if they were
6     active, they were active in assisting the violent crimes
7     detective in the investigation and the resolution of
8     those cases, or those investigations.
9         Q. Now, were there instances in your experience
10    when gang crimes officers solved homicide cases?
11        MS. ROSEN: Objection. Form.
12    BY THE WITNESS:
13       A. I -- see, I don't know how you would define
14    "solved." I mean, they may have developed a witness who
15    said, yes, he was the shooter, so you could say, yes,
16    that gang detective solved it, but then the violent
17    crime detective is still going to interview those
18    witnesses, other witnesses, and interview the defendant,
19    see if he's going to give a statement, so I would just
20    say the word "solved" is kind of inexact.
21       Q. Okay. And so, maybe another way to put it is,
22    based on your experiences, you're aware of instances in
23    which gang crimes officers, the investigative steps they
24    took were crucial to solving the crime?

## Page 164

1       A. They could be.
2       Q. And that's not atypical in your experience or
3    was it very uncommon in your experience?
4       A. Well, it was -- their participation in helping
5    the detectives out was not unheard of. But them being
6    the person who, quote/unquote, solved it, it was often
7    them working in tandem with the detective. It wasn't
8    necessarily -- they may have developed the leads that
9    helped solve the case, but they weren't solving the case
10    by themselves.
11       Q. Okay. And when you say "working in tandem,"
12    do you mean that they were together at all times or do
13    you mean that they were working in tandem on the
14    investigation, but maybe doing different tasks?
15       A. I mean both.
16       Q. Okay. In terms of your time in the Gang
17    Prosecution Unit, it sounds like you obviously worked
18    with the Detectives Division and you had some
19    interaction with the Gang Crimes Units. Were there
20    other units that you worked with or -- well, strike
21    that. Let me -- let me just ask a different question.
22       Did you ever work with SOS at the time you
23    were in the Gang Prosecutions Unit?
24       A. I did not.

## Page 165

1       Q. Was there any point in your time in the Cook
2    County State's Attorney's Office when you worked with
3    SOS?
4       A. I never worked with SOS.
5       Q. At the beginning of your last deposition in
6    Field, I believe there was some reference to a
7    deposition you gave related to a memo or some other
8    document involving SOS; is that correct?
9       A. Yes.
10       Q. Can you tell me what that's about?
11       A. SOS officers were indicted, and I -- frankly,
12    I don't remember if the Cook County State's Attorney's
13    Office indicted them first and then the feds indicted
14    them or vice versa, but both offices indicted a group of
15    them.
16       So the memo that I was responsible for
17    disseminating was: If you've got any of these officers
18    on a case, you have to determine whether we can go
19    forward because in all likelihood they would just take
20    the Fifth Amendment if called to testify, so there was a
21    matter of checking with your supervisors and seeing what
22    further action would be taken on these cases.
23       Q. Do you remember the names of the officers that
24    were the subject of that memo?

## Page 166

1       A. I don't.
2       Q. Well, was Miedzanowski one of them?
3       A. No. He was not. Miedzanowski was a gang
4    crimes officer who was indicted by the federal
5    government.
6       Q. And --
7       A. I don't think he was SOS.
8       Q. Okay. Did you have --
9       MS. ROSEN: He wasn't.
10    BY MR. SWAMINATHAN:
11       Q. Did you have any incidences in which you
12    worked with Miedzanowski --
13       A. Never worked with --
14       Q. -- in the course of your time with the --
15       A. I've never worked with Miedzanowski.
16       Q. Okay. And when I say "worked with," I
17    basically mean any instances in which he was the -- you
18    know, an officer involved in a case --
19       A. You know --
20       Q. -- that you were taking to trial?
21       A. His name -- I never saw his name on any of my
22    police reports during my entire tenure in the Gang
23    Crimes Unit, the Gang Prosecution Unit. In fact, when
24    he was indicted by the federal government and they said

## Page 167

1  he was a gang crimes officer, I was like, "Really?  Who
2  is this guy," because I had never heard of him.
3      Q.  And you had never interacted with him?
4      A.  Never.
5      Q.  What about Rey Guevara?  Did you ever have any
6  interactions with him during your time with the Cook
7  County State's Attorney's Offices?
8      A.  Yes.
9      Q.  What were the circumstances in which you had
10 interactions with Rey Guevara?
11     A.  I was aware that he was a violent crimes
12 detective out of Area Five.  There's one case and maybe
13 two cases that -- that when he was a violent crimes
14 detective I worked with.
15     Q.  Okay.  When -- so for each of those cases tell
16 me when those were.
17     A.  Boy.  Maybe, I think, the 1990s.
18         One was a retrial of a case that someone else
19 had tried initially.  Boy, when was that?  The retrial
20 might have been mid-nineties.
21         The other case, if I'm -- if he was on this
22 other case, I'm not positive he was on it, but it was an
23 Area Five case, would have been 1990, 1991, somewhere
24 around in there.

## Page 168

1      Q.  So one case was 1990 and 1991 and the other
2  case was mid-nineties?
3      A.  And mid- to late nineties because it was a
4  retrial that had come back for basically a sentencing
5  hearing, so I -- the persons -- the prosecutors who had
6  tried the case initially were gone, so I had to put on
7  the resentencing and he was one of the detectives on the
8  case.
9      Q.  And so in those two cases, did --
10     A.  I'm sorry.  Not resentencing.  It was a
11 reconsideration of a motion.
12     Q.  Okay.
13     A.  And then a trial after that.
14     Q.  Okay.  So let's do the 1990 to -- I'm sorry.
15 Let's do the mid- to late nineties case we were just
16 talking about.
17     A.  Yes.
18     Q.  That case ultimately went to trial; correct?
19     A.  Yes.
20     Q.  Okay.  In that case, was Mr. Guevara a
21 witness?
22     A.  Yes.
23     Q.  What role did he play in the underlying
24 investigation, as you recall?

## Page 169

1      A.  He found the house where the -- the -- one of
2  the two defendants lived at a certain house and he found
3  the house where she had been staying or living,
4  apparently, and that's where her parents, she was living
5  with other people, and I believe he was in on the
6  arrest.  Boy, let's see.  Either in the arrest or he --
7  it was one of the two things.  He either was in the
8  arrest of her or someone else did the arrest and he had
9  to contact the woman -- it was a girl -- contact her
10 mother because the defendant was 16, so that was his
11 role.  He didn't take a statement from the witness; that
12 was done by other detectives at Area Five.
13         I'm not sure if he made the arrest now that I
14 think about it.  He might have just contacted the
15 mother, because that was part of the motion that we had
16 to litigate.
17     Q.  Did he testify at the trial you said?
18         MR. GIVEN:  Let me just -- before we go on,
19 I'm just going to have a standing objection to this
20 whole line of questioning.  It has nothing to do
21 with his report.  He's here as an expert witness.
22 There's no opinions that he's expressed.  This is
23 entirely fishing for something else.
24         I'm just going to have a standing objection to

## Page 170

1  this whole line of questioning.  I'll move it
2  strike it later.
3  BY MR. SWAMINATHAN:
4      Q.  Did you testify at that -- or did he testify
5  at that trial?
6      A.  At the motion part of it, yes.
7      Q.  And did you prepare him at all for that
8  testimony?
9      A.  Yes.
10     Q.  Did you put him on the trial?
11     A.  I did.
12     Q.  How much time --
13     A.  At the motion.
14     Q.  And he didn't testify at trial; is that right?
15     A.  Not --
16     Q.  Is that my understanding from your --
17     A.  Not that I -- not that I recall.
18     Q.  Approximately how much time did you spend
19 working with Mr. Guevara on that case?
20     A.  Maybe preparing him for the motion, maybe --
21 and another day putting him on.  Maybe parts of two
22 days.
23     Q.  Okay.  And what was the -- what were the names
24 of the defendants in that case?

**Page 171**

1    A. Montanez and Mulero.
2    Q. The Montanez, do you remember the full name of
3 the --
4    A. Jackie Montanez.
5    Q. And then the other case --
6    A. The other case where I'm not sure that he was
7 involved in, but he may have been, was a man by the name
8 of Joseph Curtis. It was an Area Five murder and was --
9 the reason I think he may have been involved: It was --
10 Mr. Curtis had committed two separate murders on
11 separate days and was arrested for both of them
12 eventually. He was -- if he was involved in this case,
13 it was -- it was non -- it was the defendant Curtis gave
14 a statement, but he was not on that. See, that's why
15 I'm not sure if he was on that one exactly, but if he --
16 he could have been on that one. And that one I do not
17 recall preparing him to testify.
18    I remember other Area Five detectives who
19 definitely testified in that case, and I just don't
20 remember if he was one of them.
21    Q. Any other cases on which you had any
22 interaction with Mr. Guevara?
23    A. Not that I recall.
24    Q. Outside of the cases, any circumstances in

**Page 172**

1 which you had interaction with Mr. Guevara?
2    A. When he was in the courthouse going to testify
3 for other people I would see him. I -- because of my
4 involvement with him on one case, I knew who he was, but
5 I didn't interact with him on any other cases.
6    Q. Was he one of the detectives or gang
7 specialists on any cases that you supervised?
8    A. Well, when I was a deputy supervisor in the
9 Gang Prosecution Unit, there were, you know, anywhere
10 from 10 to 17 prosecutors in a unit; they may have had
11 cases with him, but I don't know that -- I don't know
12 if -- I don't know what cases he was on, but they were
13 Area Five gang-related murders that were in the Gang
14 Crimes Unit, so I assume there's a chance he could have
15 been a detective on one of those cases.
16    Q. During that period you were in the Gang
17 Prosecution Unit as a deputy supervisor, any cases that
18 he would have been involved with as an Area Five gang
19 specialist or detective, would they have been under your
20 supervision, those cases?
21    A. Well, as a deputy supervisor, I'm supervising
22 all of the prosecutors in the unit, so if they've got a
23 case that's from Area Five and Detective Guevara was on
24 one of those cases, then I'm -- yes, I'm indirectly

**Page 173**

1 supervising the prosecutors that handled the case that
2 he might have been assigned to.
3    Q. Okay.
4    A. But I could not name one for you right now or
5 identify a case that -- "Oh, yeah, I remember the Jones
6 case that was on," I couldn't tell you that.
7    Q. Understood. So any -- but the -- so the part
8 that I'm trying to understand is: Any Area Five
9 gang-related cases that he was involved in investigating
10 and might have been working with prosecutors on would
11 have been cases that would have been under your
12 umbrella; is that correct?
13    A. Not all gang cases because, again, there are
14 so many gang-related homicides that a gang prosecution
15 unit didn't take all of the gang prosecution cases.
16    Q. So he wouldn't have been working on every
17 gang-related investigation. But of the gang
18 investigations that he would have, with those would
19 have been under your umbrella in the time you were in
20 the Gang Prosecutions Unit; is that correct?
21    A. No.
22    MS. ROSEN: No.
23 BY MR. SWAMINATHAN:
24    Q. Okay. Help me understand. I think I'm -- so

**Page 174**

1 I'm definitely confused.
2    A. If there's one million gang murders in Area
3 Five, they don't all come to the Gang Prosecution Unit.
4    Now, by bad luck of the draw, he might have
5 been on -- or good luck of the draw -- he might have
6 been on the gang-related -- he might have been a
7 detective on gang-related homicides that all went to the
8 Trial Division and none of his cases came to us.
9    But if perchance one of the prosecutors in the
10 Gang Prosecution Unit picked up one of those million
11 cases that he was on, then, yeah, we were indirectly
12 involved with Detective Guevara.
13    Q. Did any of the prosecutors who worked under
14 you in your Gang Prosecution Unit in that period from
15 1990 to 1998 ever raise any concerns about Mr. Guevara
16 to you?
17    A. No.
18    Q. And did you ever form any concerns of your own
19 about Mr. Guevara?
20    A. No.
21    Q. Okay. In the time you worked in the State's
22 Attorney's Office, did prosecutors ever come to you
23 with concerns about Mr. Guevara?
24    A. I think I just said no to that question.

## Page 175

1    Q.  The earlier one was about '90 to '98, but now
2    I'm asking for your time period.
3        All right.  What about Jerome Finnigan?  Did
4    you ever have any interaction with him in your time in
5    the Cook County State's Attorney's Office?
6        MS. ROSEN:  Okay.  Now I'm going to object to
7    the relevance of a 1988 murder prosecution.
8    BY MR. SWAMINATHAN:
9    Q.  Go ahead.
10   A.  No.
11   Q.  All right.  The last thing I want to ask you
12   about is the -- is John Burge.  Did you ever have any
13   cases in which John Burge was a detective or
14   investigator on any other case?
15       MS. ROSEN:  Objection.  Relevance.
16       MR. GIVEN:  The same objection.
17       The same standing objection that I raised
18   earlier.
19   BY THE WITNESS:
20   A.  I've never worked with John Burge.
21   Q.  Have you ever worked as a criminal defense
22   attorney?
23   A.  I have not.
24   Q.  Have you ever worked on a case where you later

## Page 176

1    found out the person was innocent?
2        MS. ROSEN:  Object to the form.
3    BY THE WITNESS:
4    A.  The word "innocent" is not in the criminal
5    justice system.
6    Q.  Have you ever worked on a case where the
7    conviction was overturned or vacated on the grounds of
8    innocence?
9    A.  No.
10   Q.  Have you ever worked on a case where an
11   individual was ultimately exonerated?
12       MS. ROSEN:  Object to the form.
13       MR. GIVEN:  Objection.  Form.
14   BY THE WITNESS:
15   A.  That I worked on a case?  No.
16   Q.  Okay.  Did you have cases that were with --
17   worked on by both -- either by you or people you
18   supervised that resulted in the case being vacated or
19   dismissed based on innocence?
20       MS. ROSEN:  Oh, wow.  Object to the form.
21   BY THE WITNESS:
22   A.  I don't know.
23   Q.  All right.  Let's talk about your -- a little
24   bit of the timing related to your expert report.

## Page 177

1        When were you first retained in this case?
2    A.  April 4th or April 5th, one of those two days.
3    Q.  Of 2017?
4    A.  In this case?  Yes.
5    Q.  Yes.  Okay.
6        And did you have discussions with attorneys or
7    other folks at the Chicago Police Department prior to
8    being retained in the case?
9    A.  No.  About being retained?  No.
10   Q.  Do you know why the City of Chicago selected
11   you to be an expert in the Fields case and this case?
12   A.  You have to ask them.
13   Q.  Did you have -- do you have any idea how they
14   found you?
15   A.  Probably because I worked on the Fields case.
16       MS. ROSEN:  How I found him?
17       MR. SWAMINATHAN:  No.
18       MS. ROSEN:  Okay.
19   BY MR. SWAMINATHAN:
20   Q.  So let me -- yeah.
21       So do you have any idea how the attorneys in
22   the Fields case found you?
23   A.  No.
24

## Page 178

1    Q.  You just got a call one day?
2    A.  Yes.
3    Q.  Okay.  Had you been expecting the call?
4    A.  No.
5    Q.  Had anybody told you you're going to be
6    getting a call from the attorneys for the City of
7    Chicago?
8    A.  No.
9    Q.  Had you communicated to anyone that you were
10   interested in potentially doing expert work as a
11   retained expert?
12   A.  No.
13   Q.  What's your hourly rate for this case?
14   A.  Two hundred dollars and $300 an hour -- $200
15   an hour.  $300 an hour for depositions and trial
16   testimony.
17   Q.  Did you receive any documents before you were
18   retained in this case?
19   A.  Could you be more specific?
20   Q.  Yeah.  Did you receive any documents related
21   to the Jacques Rivera case or the -- ultimately the
22   material -- strike that.
23       Any of the materials you reviewed in
24   Exhibit 2, were you provided with those prior to being

## Page 179

1    retained in the case?
2        A.  No.
3        Q.  Let's take a look at your invoice.
4            (Deposition Exhibit Number 4 was marked for
5    identification.)
6    BY MR. SWAMINATHAN:
7        Q.  Handing you a document marked Exhibit 4.  Can
8    you tell me what this document is?
9        A.  It's an invoice for professional services
10   rendered on this case.
11       Q.  Okay.  Is this something you prepared?
12       A.  I did.
13       Q.  Okay.  Do you have any additional hours that
14   you billed or intend to bill since the time of this
15   invoice?
16       A.  Today, and Monday I met with the attorneys in
17   this case and discussed my testimony.
18       Q.  How long did you meet with the attorneys on
19   Monday?
20       A.  Approximately four, four-and-a-half hours.
21   Lunch was in there somewhere.
22       Q.  Other than that four to four-and-a-half hour
23   meeting, did you have any other meeting with counsel to
24   prepare for this deposition?

## Page 180

1        A.  I met at their office this morning, but we had
2    some small talk regarding the case.  I guess you could
3    term that a meeting about the case.
4        Q.  Approximately how long was that?
5        A.  A half-hour, 45 minutes maybe.
6        Q.  Any other --
7        A.  Oh, no.  No.  It was about an hour.
8        Q.  Any other meetings with counsel to prepare for
9    this deposition?
10       A.  No.
11       Q.  Have you reviewed documents in either of those
12   meetings?
13       A.  I reviewed my report.
14       Q.  Any other documents, other than your report,
15   that you reviewed in those meetings?
16       A.  Looked at the -- the Fields deposition
17   regarding the area of my expertise as it was defined in
18   the deposition.
19       Q.  So it was a portion of your deposition
20   testimony; is that right?
21       A.  Yes.
22       Q.  Any other portions of your deposition
23   testimony other than the portion discussing your
24   expertise?

## Page 181

1        A.  No.
2        Q.  Did you view any other documents in
3    preparation for today's deposition?
4        A.  I looked at the -- that deposition by myself a
5    little bit last night; looked at a part of my trial
6    testimony from Fields, about 50 or 75 pages; looked at
7    Mr. Brasfield's report in conjunction with the seven
8    cases that I looked at, looked at that again last night
9    as well.
10       Q.  Anything else?
11       A.  I examined this, my invoice for services.  And
12   what else did I look at?
13           Oh, last night when I was reviewing the seven
14   cases, I did pull up Nieves and looked at Nieves again,
15   and I've already discussed that with you where it was --
16   where I didn't thoroughly discuss the photographs of
17   other potential suspects, but I saw that it was raised
18   in Mr. Brasfield's report, and then I rereviewed the
19   file.
20       Q.  Anything else?
21       A.  That's all I can think of.
22       Q.  Okay.  Did you receive any new materials since
23   the time of your report being disclosed?
24       A.  No.

## Page 182

1        Q.  Looking at your invoice marked Exhibit 4,
2    you've identified eight hours to review plaintiff's
3    expert report and --
4        A.  Let me stop you there for a second.
5            Looking at my deposition from Fields and
6    looking at my Fields testimony, those are, I guess, new
7    documents because they're not listed on the materials
8    reviewed.
9        Q.  Okay.  Anything else that's not listed in your
10   Fields review that you consider new documents that
11   you've reviewed?
12       A.  I mean, those were not new documents, but just
13   not listed here.
14           No.
15       Q.  Okay.  You have eight hours for the review of
16   plaintiff's expert report and deposition; correct?
17       A.  Correct.
18       Q.  So that's time you spent before issuing your
19   report in which you reviewed the deposition of
20   Mr. Brasfield in this case and his report in this case;
21   is that correct?
22       A.  That's correct.
23       Q.  Okay.  Did it involve anything other than
24   reviewing the deposition and report of Mr. Brasfield,

## Page 183

1    that eight hours?
2        A.   I'm not sure I understand the question.
3        Q.   In other words, that eight hours consisted
4    entirely of time spent with Mr. Brasfield's expert
5    report and deposition; is that correct?
6        A.   Well, a little tricky because it's probably
7    less than that, you know, initially reading through
8    both.  But then as I'm doing other work in the case, I
9    would come back and re-review his report, so that's how
10   we get to eight hours.
11       Q.   Okay.
12       A.   But the initial readthrough of his report and
13   deposition was solely reading through his report and his
14   deposition.
15       Q.   So cumulatively -- it's not necessarily all at
16   once, but cumulatively the total amount of time you
17   spent focused exclusively on his report and his
18   deposition was eight hours; is that correct?
19       A.   That's my best estimate, yes.
20       Q.   Okay.  Now, in terms of document review and
21   preparing your report, would it be fair to say that the
22   total amount of time spent on that effort is 49.5 hours?
23       A.   What are you adding together?
24       Q.   Thirty-four and --

## Page 184

1        A.   And 15?
2        Q.   -- and 15?  Forty-five?
3        A.   Mm-hmm.  Yeah.
4        Q.   Yeah.
5        A.   So that would be a fair estimate.
6        Q.   Okay.  So that 49.5 hours, can you tell me
7    what activities you performed that make up that 49.5
8    hours?
9        A.   Reviewing the files, reviewing the documents,
10   compiling the report.  Compiling the report would be,
11   you know, as I go along typing my report, you know, it
12   may be in an informal manner, but typing it into what
13   eventually became cleaned up the final report.  And then
14   when I was finally org -- the final report compilation
15   was in the last ten days or so where I would gather up
16   all my observations and try to put it in a coherent,
17   organized fashion, so that would be more hours put in at
18   that point of my work, and that would also still cause
19   me to go back and review files yet again to make sure I
20   was being accurate when I was typing up the final
21   report.
22       Q.   Of that 49.5 hours, what portion of it would
23   you say was spent on drafting and compiling your report?
24       A.   Well, it would be -- the final report

## Page 185

1    compilation is in the 15.5 category, so a good part of
2    the final report, because I mentioned to you already I
3    was typing observations that became part of the final
4    report along the way, so some of those typing of that
5    would be included in the 34 hours, but the final report
6    compilation organization is included in the 15.5.
7        Q.   Is the majority of the 15.5 -- strike that.
8             Essentially is most of the time in that 15.5
9    hours, is that from the process of compiling and
10   drafting your final report?
11       A.   Yeah.  It might be -- hmm.  Yeah, like
12   reorganizing -- organizing the way I wanted to -- the
13   report to be structured and adding in new comments,
14   observations, and analysis.  But at the same time to do
15   that, I would have to go back and look at certain files
16   to make sure that that was, to my satisfaction,
17   accurate.
18       Q.   So of that 15.5 hours, what portion of it do
19   you think was spent looking at -- looking back at
20   documents and what portion of it do you think was spent
21   on the drafting and compiling of the report?
22       A.   I'd say maybe two-thirds of the report
23   compilation at least and then -- because a file review
24   wouldn't -- going back and looking at files which I've

## Page 186

1    already looked at would just be for accuracy's sake, not
2    for, gee, you know, this is the first time I'm looking
3    at it, or something like that.
4        Q.   So you think it's -- it might have been as
5    much as five hours that you spend going back to the
6    files or do you think it's less than that?
7        A.   Probably a little bit less than that.
8        Q.   Okay.  And then in the earlier portion, file
9    and document review and report compilation of 34 hours,
10   what's the breakdown there between time spent drafting
11   and compiling your report versus time spent reviewing
12   documents?
13       A.   Examining the files and the different
14   documents would be the majority of that time.  When I
15   felt the need to record something for my -- for use in
16   the final final report, I would take time out from that.
17            In other words, I'd have my laptop with
18   that -- with my report open as I'm reviewing files and
19   looking at the -- the allegations made by Mr. Brasfield,
20   then I would be, you know, spending the bulk of the time
21   looking at all the three different sources of reports
22   and trying to understand all the documents and what his
23   analysis was, so the majority of the 34 hours would be
24   looking at files and documents, including Brasfield's

Page 187

1  report.
2      Q.  Well, what amount of that 34 hours would you
3  estimate was spent on drafting and compiling the report?
4      A.  Oh, boy.  It's hard to say.
5          Less than -- less than ten hours.
6      Q.  So is --
7      A.  Something like that.
8      Q.  Go ahead.
9      A.  That's a really rough estimate.
10     Q.  Okay.  So overall the time spent drafting and
11 compiling the report as opposed to reviewing documents
12 could be in the ballpark of that ten hours plus
13 approximately ten hours of that later period, so
14 approximately call it 20 hours?
15     A.  No.
16     Q.  Is that a fair estimate?  You think it's too
17 high, too low?
18     A.  Well, it's probably too high.  I don't think
19 that I -- in the 34 hours spent, I don't think that I
20 spent as much time writing as I did in the final 15
21 hours.  So that's why I'm saying -- saying ten of the 34
22 is probably too high.
23     Q.  Okay.
24     A.  It's really hard for me to estimate that

Page 188

1  because the report was always open on my computer for me
2  to type something into it, so it wouldn't necessarily
3  take long to add information to the report that would be
4  reorganized and recomposed later on.
5      Q.  Understanding it's a rough estimate, is 15
6  hours, approximately, a fair estimate of the time spent
7  on the compiling and drafting process?
8      A.  It's the best estimate I can give you, but
9  I'm -- you know, I'm not superconfident in the amount of
10 hours put in.
11     Q.  I hope you don't take offense to this
12 question, but do you have any relationships with -- do
13 you have any friends or family members who work for the
14 Chicago Police Department?
15     A.  No family members.  I know police officers
16 from my day as a prosecutor and I would call them at
17 most colleagues.  I don't necessarily pal around with
18 them or anything like that.
19     Q.  Okay.  And when you say no family members in
20 the Chicago Police Department, is that none of them are
21 current or former Chicago police officers?
22     A.  That's correct.
23     Q.  Are you familiar with the term "street files"?
24         MR. GIVEN:  Actually, I'll object to the form.

Page 189

1  BY THE WITNESS:
2      A.  I know the word "street files."  I know the
3  two words "street files."
4      Q.  The term "street file" has come up in the
5  context of this case between your report and
6  Mr. Brasfield's report; correct?
7      A.  Yes.
8      Q.  How do you use the term "street file"?  What
9  does it mean to you?
10     A.  Well, the -- I'm not sure what street files
11 was originally, but the -- the feeling that I had as a
12 prosecutor was it was the investigative material
13 compiled by the detectives and, you know, under my
14 experience, maintained at the area.
15         As time went by, the prosecutors might
16 still -- prosecutors and defense attorneys might still
17 call it street files, but it was just as often called
18 GPRs or just as often called notes of interview.
19     Q.  And that term "street file," was it intended
20 to communicate -- strike that.
21         Was it intended to essentially refer to the
22 investigative file as that term is used in the special
23 orders or is it something else, either broader or
24 narrower than that?

Page 190

1      A.  Well, I don't know that -- until I, you know,
2  was hired as an expert in Fields, I didn't know exactly
3  the genesis of the word "street files," but I think it
4  was perceived to be notes that were not included in the
5  investigative file.  But by the time -- you know, I
6  always worked under the general orders even though I
7  didn't know it.
8          The general orders, prosecutors and criminal
9  defense attorneys would create whole laundry lists to
10 make -- of words and phrases to make sure they got all
11 the investigative materials.  So they'd often say,
12 "Please provide, you know, this, that and the other,"
13 and then they would say, "Street files," also known as
14 notes, also known as working files, also known as
15 running files, also known as -- they'd use every
16 adjective in the world to make sure that essentially
17 notes of interviews were not being -- that were being
18 tendered to me.
19     Q.  What is your understanding about the files --
20 strike that.
21         What is your understanding about what files
22 were reviewed in this case?
23         MR. GIVEN:  Objection.
24         MS. ROSEN:  What -- object to form.

Page 191

1          MR. SWAMINATHAN:  Yeah.  So let me ask --
2    yeah, let ask another question.
3    BY MR. SWAMINATHAN:
4        Q.  You reviewed a number of files in this case;
5    Mr. Brasfield has reviewed a number of files in this
6    case talking about investigative files and investigative
7    material.  What's your understanding with regard to the
8    police investigative files?  So putting aside the
9    state's attorney's files and the criminal defense
10   attorney's files, just focusing on the police
11   investigative files from this case, what's your
12   understanding about where those files came from that
13   were reviewed in this case either by Mr. Brasfield or
14   yourself?
15       A.  I don't necessarily have a clear understanding
16   of how the -- Mr. Brasfield came to examine the files
17   that he did other than that they were deemed to be
18   relevant to an investigation into -- I mean into the
19   plaintiff's allegations.  I don't know how the list of
20   files was created.
21       Q.  That set of files that he looked at and some
22   or all of what you looked at, do you know where those
23   files were stored when they were taken and produced in
24   this case?

Page 192

1        A.  I have no idea where they were stored.
2        Q.  Do you have any knowledge about exactly what
3    kind of files those were?
4        A.  They were investigative files.
5          MR. GIVEN:  Object to form.
6    BY MR. SWAMINATHAN:
7        Q.  What's your basis for believing they were
8    investigative files if you don't know where they had
9    been found?
10       A.  I think they were called the warehouse
11   production, so my understanding was it was all the
12   investigative files that were produced, that were
13   produced under a title of Warehouse Production.
14       Q.  But what is it about warehouse production that
15   makes you certain that they are in fact investigative
16   files?
17       A.  Well, the files contain General Progress
18   Reports; those are commonly found in investigative
19   files.
20       Q.  Anything else?
21       A.  Just the overall style of the documents in
22   there is primarily what leads me to believe that they
23   were investigative files.
24       Q.  In forming your opinions in this case, I

Page 193

1    assume you reviewed Mr. Brasfield's report; correct?
2        A.  Yes.
3        Q.  Do you recall -- did you review the
4    attachments to his report?
5        A.  I specifically focused -- my responsibilities
6    were specifically focusing on the seven cases; that's
7    where I spent the bulk of my time, the seven cases that
8    he examined that he called examples, and, also, the
9    attachment Section F which was his summary of --
10   included his summary of what he called investigative
11   materials that were -- he claimed were not found in the
12   criminal defense attorney files.
13          So though I read through the whole report at
14   one point, but my tasks were limited -- or maybe not
15   limited, but focused on the seven cases and the
16   materials that he claimed were investigative.
17       Q.  So the focus would then be on the seven cases
18   which -- those were identified in the body of his report
19   itself; correct?
20       A.  Yes.
21       Q.  Okay.  And then the Attachment F is the other
22   location of material, the information you were focused
23   on for your assignment; is that correct?
24       A.  Well, he looked -- in Section F is where he

Page 194

1    gives a description of -- in each one of the files he
2    gives a description of what he claims to be
3    investigative material that was he claims to be withheld
4    or just -- I guess missing is a better word, missing at
5    this point from the criminal defense attorney's files.
6        Q.  Did you review Attachments A through E?
7        A.  I looked at them when I read through his
8    report initially.
9        Q.  Did you have any assignment with regard to
10   Attachments A through E?
11       A.  No.
12       Q.  Okay.  Do you form any --
13       A.  I'd have to look at them again, but not that I
14   recall, no.
15       Q.  And did you -- are you intending to offer any
16   opinions specific to what is said in Attachments A
17   through E?
18       A.  If my report references different parts of the
19   report that may be referencing A through E, then yes.
20       Q.  Well, do you recall anything that is in
21   Attachments A through E that you were responding to?
22       A.  Well, I know, like, in the bulk of -- in the
23   body of his report he would make different comments
24   regarding the files that he investigated and what he

## Page 195

1  found and what he didn't find, so I definitely commented
2  on that, like his -- I know at one point I discussed
3  what he called parallel files and the difficulty I had
4  understanding what he meant by parallel files, so I know
5  I'm referencing not necessarily the section with the
6  seven cases when I'm talking about that.
7        Q.  But that's something you're talking about that
8  was in his report itself, the body of his report, when
9  he's talking about parallel files; correct?
10       A.  That's correct.
11       Q.  And you're responding to that; correct?
12       A.  Right.
13       Q.  But in terms of Attachments A through E, is
14  there anything specific in those attachments that you
15  were asked to look at and respond to?
16       A.  Off the top of my head, not that I recall.
17  I'd like to -- well, I mean, one of the -- one of those
18  sections was how much he's being paid.  Another one was
19  his resume.  So I'm not commenting on his resume.  I'm
20  not commenting on how much he's being paid.  So off the
21  top of my head, I would say I'm not necessarily
22  responding to those sections.
23       Q.  Attachment G was his big spreadsheet.  Were
24  you asked, as part of your assignment, to offer any

## Page 196

1  opinions specifically to Attachment G and the
2  information contained in it?
3        A.  I reviewed Section G, but far easier, more
4  user friendly for me was Section F.
5        Q.  But --
6        A.  Attachment F.
7        Q.  When you say far friendlier for me, did you
8  have an assignment with regard to looking at Attachment
9  G and responding in some way?
10       A.  No.
11       Q.  Okay.
12       A.  And just to clarify on that:  Obviously when
13  he talks about the seven cases or the whole pool of
14  cases that he looks at which are -- which he lists
15  missing documents in Section F, obviously those same
16  documents are in G as well, and he also referenced a
17  method he would put of striking lines through them in G
18  if he was not going to rely on them.  He knocked out ten
19  cases he's not going to look at.  So on occasion I would
20  look at Section G to see that, but it was far easier for
21  me to look at F and look at the analysis that he
22  provided elsewhere than to utilize G.  So I didn't
23  exclude G from my consideration, but it wasn't my focus.
24       Q.  In terms of Attachment G, do you have any --

## Page 197

1  based or your time spent reviewing materials in this
2  case, are there any errors or inaccuracies in Attachment
3  G that you identified?
4        A.  I didn't specifically go through G in that
5  manner, but, as I've said, I take issue with what he
6  calls investigative materials.  So in G, he's got
7  columns where he says this is missing or withheld
8  investigative material, so, yeah, I would take issue
9  with that, but it's not based upon my analysis of
10  Section G; it's based on my analysis of the rest of the
11  report and Section F where he titles subpoenas as
12  investigative material that was withheld.
13       Q.  So in terms of -- so to the extent you have
14  any criticism of Attachment G that you're able to
15  identify, it's with some of the terminology that might
16  be used; is that correct?
17       A.  The way he classifies documents as
18  investigative material and the -- and when you -- if and
19  when he repeats that in G, I would say I had easier
20  parts of his report to use to analyze it, specifically F
21  and in the body of his report.
22       Q.  Will you mark this Exhibit 5, please?
23           (Deposition Exhibit Number 5 was marked for
24  identification.)

## Page 198

1  BY MR. SWAMINATHAN:
2        Q.  Handing you a document marked Exhibit 5 and
3  this document is the cover page for Attachment G, and
4  I'll represent to you I've just printed the first page
5  of the Attachment G spreadsheet.  I have not printed the
6  entire spreadsheet.  And it's in black and white, not in
7  color.
8            This first page, this is the spreadsheet that
9  we've been referring to.  Do you understand that to be
10  the case?
11       A.  It resembles pages I've looked at.  I'll take
12  your word for it.
13       Q.  Yes.  And I understand that the writing is
14  quite small on the page, so it's not going to be easy to
15  read through this exhibit.
16           Now, in terms of this document, without
17  getting into specifics, essentially each row contains
18  information about each specific file that he reviewed.
19  You understand that, right, from your review of
20  Attachment G?
21       A.  Yes.
22       Q.  Now, in terms of the specific information that
23  he put down "yes," "no," or Bates numbers in each of
24  these columns, do you have any instances where you say,

## Page 199

1  hey, what he put in that row or column is wrong?
2      MS. ROSEN:  Object to the form.
3  BY THE WITNESS:
4      A.  Well, wrong from the point of view that if he
5  called something notes that were missing, it's
6  misleading in that is it a General Progress Report note
7  or is it a note that was not investigative material, so
8  that's my problem with it in general.
9      Q.  Okay.  And that's why --
10     A.  He may have put titles on documents that --
11  which either directly says they're investigative
12  material or makes you believe they're investigative
13  material and they were found or not found, and I'm
14  taking issue with the way he's titled documents, calling
15  them investigative material when I don't think they are.
16     Q.  Okay.  And other than the criticism about how
17  he's titled documents, any other -- anything else in
18  this spreadsheet that you can say, "I have reviewed the
19  documents, I would say he's got -- he's -- this has got
20  to be crossed out, this is wrong, this is a typo," any
21  of those kinds of things?
22     A.  I did not examine it to that degree of
23  specificity to comment on that.
24         There was one -- at one point where he was

## Page 200

1  referring to Row L and he meant Column L and L wasn't
2  even labeled, so to me that's why this was so user
3  unfriendly to me, in addition to the small print and the
4  colorization that often hid text.  You know, this was
5  not a user friendly document for me.  And from my point
6  of view, Section F was far more easier to analyze.
7      Q.  Okay.  So it --
8      A.  So I cannot -- I'm sorry for --
9      Q.  Yeah.
10     A.  -- being so long on that.  But I cannot say
11  whether he made mistakes in here or did not make
12  mistakes in here because I did not examine it to that
13  specificity for all of the reasons I just stated.
14     MS. ROSEN:  Can we take a short break?
15     MR. SWAMINATHAN:  Yeah.
16     (A short recess was taken.)
17  BY MR. SWAMINATHAN:
18     Q.  When you received the materials on Attachment
19  2, were they provided to you in hard copy or
20  electronically?
21     A.  Initially hard copies, but I also got
22  electronic copies of them, too.
23     Q.  How did you interact with them, mostly in hard
24  copy form or in electronic form?

## Page 201

1      A.  I'd say the majority in hard copy.  It was
2  just easier to work with.
3      Q.  Okay.
4      A.  But then the -- so I was working at home, I
5  guess I could use the electronic versions.
6      Q.  Did you take notes on any of the paper
7  documents?
8      A.  Any observations I made I would, like, type
9  them right into my -- what became my report.
10     Q.  Did you receive any assistance from counsel in
11  preparing any of the specific information in your
12  report?
13     MS. ROSEN:  Object to the form.
14  BY THE WITNESS:
15     A.  The -- I compiled -- I compiled and wrote the
16  report entirely.
17     Q.  Any identification of instances in which
18  material was identified as missing from a criminal
19  defense file, but you find it in the state's attorney
20  file or any kind of comparisons you did, were all those
21  done by yourself or was any information or material
22  provided to you by counsel?
23     A.  Could you say that again?
24     Q.  Yeah.  So let me -- let's do it this way.

## Page 202

1  Let's break it down.
2         Did you do some comparison of files in this
3  case?
4      A.  The seven and the two.
5      Q.  Okay.  So for the seven and the two, what kind
6  of file comparison did you do for those cases?
7      A.  I -- well, so the allegation on the seven
8  files that Mr. Brasfield called examples, at one point
9  in his report he says the material missing from the
10  criminal defense file is also missing from the
11  prosecutor's file and that he also characterized why he
12  thought the material was investigative material.  So to
13  fully understand that, I first had to go to the
14  criminal -- well, maybe not first, but I went to the
15  criminal defense attorney file, examined what he said
16  was missing, and then I went to the investigative file
17  so I'd get a feel for what, you know, would put that in
18  context what that document might have been, was it
19  referenced anywhere else in the investigative material?
20  And then I would also look at the prosecutor's file to
21  see if that material was missing.  So it was a pretty
22  much going through all three sources of files on those
23  seven cases.  It was time consuming.
24     Q.  And did you do that all yourself?

## Page 203

1    A.  Yes.
2    Q.  Where you found that an item that was missing
3  from the criminal defense file was found in the state's
4  attorney file, how did you make notation of that?
5    A.  It would be described in -- for the seven
6  files, it would be described right in there.
7    Q.  Did you write -- did you keep any track of any
8  of that on paper?
9    A.  I typed it into what became the report.  But
10  remember one of the cases where he discussed a Mr. Reed,
11  that information was in the prosecutor's file and
12  mentioned elsewhere in the file, so I just typed right
13  into the report that Mr. Reed is -- Reed and his wife
14  Carol, it's mentioned right in the report.
15    Q.  That process of comparing the files, was that
16  done entirely by you with no assistance from counsel?
17    A.  On those seven files, it was done entirely by
18  me.
19    Q.  Okay.  On those seven files, were there
20  instances where you said, "Oh, some of this information
21  was contained in another places in the investigative
22  file"?  Was that something you identified on your own or
23  was that pointed out to you by counsel or anyone else?
24    A.  Something I found on my own.

## Page 204

1    Q.  Okay.  And so this -- what you've just
2  described for me, is that your process with regard to
3  the seven files identified in the body of
4  Mr. Brasfield's report was conducted entirely by you;
5  correct?
6    A.  Yes.
7    Q.  Okay.  Now, you said you also did some
8  analysis of two additional files; correct?
9    A.  No.  And before I -- yes.
10    Q.  Now, let's stop there for a second.  With
11  regard to the seven, did you decide that you wanted to
12  look at those seven files or did counsel ask you to look
13  at those seven files?
14    A.  That's -- they asked me to look at those seven
15  files.
16    Q.  Okay.  So one of your assignments was to
17  specifically do a comparison with regard to those seven
18  files; correct?
19    A.  Right.
20    Q.  Okay.
21    A.  And that was this false -- because -- well,
22  yes, that's exactly what happened.
23    Q.  Now, with regard to the two files, two
24  additional files that you identified -- and just so

## Page 205

1  we're clear in the record:  We're talking about Israel
2  Pacheco and Samuel Robinson identified on pages 12 and
3  13 of your report; correct?
4    A.  Yes.
5    Q.  Okay.  So for those two additional files, how
6  were those two files selected for your review?
7    A.  Well, at the time I was examining the
8  materials Mr. Brasfield's Attachment F where he went
9  through the files and he said "Here's investigative
10  material that was missing," and, just as I said before,
11  just by the title of them I took issue with whether they
12  were investigate material or not; for example, subpoenas
13  or court attendance reports or investigative file
14  inventories, things of that nature.  So I would include
15  that information in my report.
16    He had also listed in that there where the
17  police reports were missing.  While I was compiling that
18  information, it was brought to my attention by the
19  city's attorneys that there were two files where they
20  could not find allegedly missing police reports.  They
21  could also not find them in the prosecutor's files.  And
22  that's how I came to address Pacheco and Robinson.
23    Q.  Is it your understanding that the counsel for
24  the city or the city itself was going through all of the

## Page 206

1  files identified by Mr. Brasfield other than the seven
2  that you were asked to look at specifically?
3    A.  That's my understanding.
4    Q.  And were they providing -- was the
5  understanding that they were then going to provide you
6  information that you would use for your report for all
7  of those files other than the seven?
8    A.  What -- while I was examining the titles of
9  documents and pointing out how they were not
10  investigative material, they were looking to see if
11  alleged missing GPRs or Supplemental Reports, if they
12  were found in the prosecutor's file, and they would
13  alert me to that, and that was Pacheco and Robinson.
14    And they could not find also alleged missing
15  Supplementary Reports or GPRs, could not find them in
16  the prosecutor's file.
17    Q.  Okay.  So is it your -- so what it is your
18  understanding about how many of the -- how many total
19  files did Mr. Brasfield review?  Are you aware?
20    A.  Mr. Brasfield reportedly limited his review to
21  38 files.
22    Q.  Are you talking about in terms of a comparison
23  of investigative files to criminal defense files?
24    A.  Yes.  Well, I mean, he eliminated certain

**Page 207**

1    files for certain reasons so he got to 38.
2       Q.  But his spreadsheet in Attachment G, for
3    example, contained information about 190 files; correct?
4       A.  Yes.
5       Q.  Okay.  You didn't look at all of those 190
6    files; correct?
7       A.  No.
8       Q.  To the extent any analysis was done that
9    you're aware, it was done with regard to the 38 files;
10   is that correct?
11          MS. ROSEN:  Object to the form.
12   BY THE WITNESS:
13      A.  No.  The -- I'm looking at the 38 files based
14   upon what I know by the titles of documents that are, in
15   my opinion, not investigative material, but there were
16   only 26 corresponding prosecutor files.
17          So the examine -- if he said a police report
18   was withheld, it would be looking at the prosecutor's
19   file to see if that police report, that General Progress
20   Report, or that Supplementary Report was in that.
21      Q.  Okay.  So we've got 26 total files for which
22   some analysis is being done either by you or by counsel
23   for the city; is that correct?
24      A.  Yeah.  I mean --

**Page 208**

1          MS. ROSEN:  Object to the form.
2    BY THE WITNESS:
3       A.  And they -- yeah, at least 26.
4       Q.  What would be the other files of which some
5    analysis was done either by you or by counsel for the
6    city?
7          MS. ROSEN:  Object to the form.
8    BY THE WITNESS:
9       A.  Well, I'm focusing on the seven and then the
10   seven of the 38, but I'm also looking at the whole 38 to
11   see what documents he said -- well, the seven were
12   separate from the remaining 38, so I'm looking at the
13   rest of the documents to see what documents he -- in the
14   documents he claims were investigative material and
15   missing.  So the counsel for the city are trying to
16   determine whether those police reports are missing.
17          I know on at least 26 of them they had the
18   ab -- or the remaining 20, I guess, they had ability to
19   look at the prosecutor's files.  They may also have
20   looked at other sources to see if the police reports
21   were found in the criminal defense attorney's files
22   themselves.  Mr. Brasfield wasn't always accurate on
23   that.
24

**Page 209**

1       Q.  Did you get any information provided to you or
2    did you find yourself any instances where Mr. Brasfield
3    identified material as being missing from the criminal
4    defense file where he had just gotten it wrong and in
5    fact it was in the criminal defense file?
6       A.  Well, from -- maybe the symmetrical situation
7    of that.  There was one of the seven files which there
8    were no police reports at all in the criminal defense
9    file, yet he claimed there were missing pages from the
10   criminal defense file as well as the prosecutor's files,
11   so how could you say that if you don't know if
12   they're -- there's -- there's no police reports in the
13   file, but you're saying only a handful of police reports
14   were not tendered.  It was impossible to determine that.
15          I mean, I'm --
16      Q.  You're just saying in that instance, in that
17   file he shouldn't have relied on it because there were
18   no police reports in the criminal defense file; correct?
19      A.  That's right.
20      Q.  Okay.  Now --
21      A.  And there was -- real quick:  Of the seven
22   files, he said every one of the seven files had a
23   missing -- the prosecutor's files were also missing the
24   same reports.  Well, one of the seven files there was no

**Page 210**

1    prosecutor's file, so I'm not sure how he claimed that
2    to be true when there was no prosecutor's files on File
3    Number 7.
4       Q.  That was the Samuel Slack file; correct?
5       A.  I'd have to look, but I think that rings a
6    bell.
7       Q.  Take a look.
8       A.  Yes.
9       Q.  Any other errors you've disclosed in your
10   report or that you point out, as you sit here today, by
11   Mr. Brasfield?
12      A.  Well, the -- I think I mentioned earlier the
13   Mr. Reed comment.  He said -- and this Reed information
14   is found nowhere else in the report.  It was found
15   elsewhere in defense attorney reports.
16          There was also -- one of the cases, I think
17   it's Borroto, he was talking about one of the documents
18   missing.  He claims it shows that the defendant Borotto
19   didn't own the Nissan with the license plate that was
20   alleged by the police; it was really a different license
21   plate.  Well, those -- right on the form that wasn't in
22   the defense attorney's file and which did contain one of
23   the license plate numbers, it contained the other
24   license plate number, so it was right on that document

Page 211

1    that was in the defense attorney's file.
2        Q.   Any other areas you've identified in
3    Mr. Brasfield's analysis other than the ones you've just
4    told me about?
5        A.   Well, I mean, the documents that he -- this is
6    a different type of what I would call an error:  The
7    documents that he calls investigative materials that are
8    on call [sic].
9        Q.   Right.  So that's a -- that's a dispute about
10   how to characterize these materials and whether they're
11   important or not.  Okay.
12       I'm asking you about errors where he says
13   something is missing, but in fact it wasn't missing, or
14   he says something wasn't referenced, but in fact it was
15   referenced.
16       Any other errors other than the ones you've
17   told me about so far?
18       A.   Well, on the -- that file which I've already
19   alluded to, I think it's -- yeah, I think it's Demetrius
20   Johnson, in the preface to where he gets from 48 files
21   to 38 files, he said in there that he would not use
22   files where it was obvious the file was transferred to
23   another attorney, and Demetrius Johnson, which he used
24   as one of the seven cases, was in fact transferred to a

Page 212

1    private attorney.  And in his Attachment G, he even has
2    it marked out with the little strike-through marks to
3    indicate that he was not going to use it, yet he used
4    it.
5        Q.   Any others?
6        A.   Yeah, it may be a semantic difference, but in
7    the Kirkland case he said only a note -- handwritten
8    notes naming other possible suspects that were only
9    developed by the defense attorney two years after the
10   crime happened when in fact there's a GPR that lists
11   those people's names, and the criminal defense attorney
12   filed a motion for a continuance to examine these four
13   people, and from out of that investigation they found a
14   witness that he says only the defense knew about, but it
15   was clear that it came out of that part of the
16   investigation.  So it's putting that -- those documents
17   in a misleading light.
18       I'm not sure if you can call that an out and
19   out error, but it's certainly misleading as to how the
20   documents came to the criminal defense attorney's
21   attention.  In fact, it came through discovery from the
22   police and prosecutors.
23       Q.   And so out of the full universe of files that
24   were reviewed, any other errors you would identify?

Page 213

1        A.   Well, the full universe of files that I
2    examined extensively were the seven and then the two, so
3    those were the errors from those.
4        Q.   But you were provided with additional
5    information.  You came up with some additional analysis
6    of some 30 plus additional files; correct?
7        A.   From looking at the titles of the documents in
8    Section F, yes.  The titles of documents that he said
9    were investigative material.
10       Q.   And counsel for the City of Chicago also
11   performed some analysis of those 30 plus files; correct?
12       A.   Right.
13       Q.   And between you and counsel's work, are there
14   any additional errors that you're able to identify as we
15   sit here today?
16       MS. ROSEN:  Object to the form.
17   BY THE WITNESS:
18       A.   By -- I meant -- well, how -- what -- how are
19   you using errors in this context?
20       Q.   Yes.  Any errors as in he said something was
21   missing or not missing or he said something was
22   referenced or not referenced or typos or anything else
23   that he just got wrong?
24       A.   Not that I can recall at this point.

Page 214

1        Q.   Okay.  Now, in terms of the seven, I think
2    we've talked about that you independently did a full
3    analysis of the files and all of the sister files, the
4    public defender files, the state's attorney files and so
5    on.  Then there's the remaining group of 30 plus files
6    on which you did a partial analysis; correct?
7        A.   Well, yeah, I would say I -- what I've already
8    described a couple of times now.
9        Q.   And your focus on that partial analysis was
10   essentially the -- is it whether or not the documents
11   you characterized as being investigative or not; is that
12   correct?
13       A.   That's what I said earlier, yes.
14       Q.   Okay.  And what -- and counsel's project was
15   to provide you information about whether Mr. Brasfield
16   had made any errors.  Strike that.
17       Counsel was looking at that same set of 30
18   plus files to determine what percentage or which of
19   those pages missing from criminal defense files were in
20   the state's attorney's files; correct?
21       A.   Correct.
22       Q.   Okay.
23       A.   And there was 26 prosecutor's files associated
24   with those 38 files.

## Page 215

1      Q.   Okay.  And so for those 26 prosecutor -- so
2  there was 26 --
3      A.   I'm not sure what else they did to look for if
4  police reports were also actually found in the criminal
5  defense attorney's file or whatever steps they took, but
6  I know for -- certainly they looked at the prosecutor's
7  file to see if police reports were in the prosecutor's
8  file.
9      Q.   Did they provide you with any information to
10  tell you, based on their portion of the analysis, that
11  there were any errors in Brasfield's report about
12  documents he characterized as missing from criminal
13  defense files?
14      A.   The only information I was directed to on that
15  was Pacheco and Robinson in that they could not find
16  police reports, so allegedly missing from the defense
17  attorney file in the prosecutor's file.  But there was a
18  discussion at one point that we had regarding ME body
19  charts, whether they were generated by CPD or generated
20  by the medical examiner's report, so Mr. Brasfield would
21  call them -- alternatively called them body charts or ME
22  reports.
23          It didn't make much of a difference to me
24  because the body charts were always included in the ME's

## Page 216

1  report which was not a report that CPD was responsible
2  for maintaining, but, nevertheless, characterizing that
3  as a CPD report I guess generically would be -- it's not
4  even -- we're not even arguing now about whether it's
5  investigative or not.  We're arguing about whether it
6  was CPD's responsibility to maintain those reports.
7      Q.   If the document was kept in a CPD
8  investigative file, you would expect it to be produced
9  to you and to the criminal defendant in response to a
10  subpoena; correct?
11      A.   If it was.
12      Q.   Regardless of whether it had been created by
13  the CPD or somebody else; correct?
14      A.   Yes.  But the difference being that it
15  actually shows that the criminal defense attorney files
16  today are incomplete and unreliable today because
17  there's never been a homicide investigation where a
18  criminal defense attorney didn't have the ME's protocol.
19      Q.   Now, is it your experience and expectation
20  that any material contained -- strike that.
21          Is it your understanding of the Chicago Police
22  Department, when they get subpoenas and respond to those
23  subpoenas that come from your office, that they might
24  pick and choose and take out materials from an

## Page 217

1  investigative file that were not created by CPD?
2      A.   No.
3      Q.   Okay.  Was it your understanding and
4  expectation that they copied the file in its entirety
5  and produce it to you?
6      A.   Yes.
7      Q.   Okay.  When you have those -- when you
8  received those files from CPD, did you produce those
9  files in their entirety to criminal defendants or did
10  you do some picking and choosing in those files?
11      A.   No.  I would -- my practice was to tender it
12  all.
13      Q.   Okay.  So your practice was --
14      A.   The only difference being is that -- and most
15  prosecutors did this.  When they were providing those
16  documents during the discovery process, many prosecutors
17  would write on their blueback, which is in their file,
18  it's essentially a diary of their file, exactly:
19  "Tendered 26 GPRs."
20          That -- so even though the investigative file
21  might have GPRs and an ME report, they would list the ME
22  report separately, but they would tender all the
23  documents.  They would just take time to list on their
24  GPR -- on their blueback what they tendered.  That

## Page 218

1  morphed into eventually of signed receipts, which I
2  think is still used today with defense attorneys.
3          So, again, though you got a response,
4  including all of the investigative material, the
5  investigative material also included an ME report.  When
6  you had that signed receipt from the defense attorney,
7  you would list the ME's report separately.
8      Q.   So I understand you've got a -- some process
9  that you followed with regard to the blueback.  But
10  specifically when you got a subpoena response from CPD,
11  whatever materials you received, regardless of who
12  created them, you produced them in their entirety to the
13  criminal defendant as a matter of your practice;
14  correct?
15      A.   Yes.
16      Q.   And was that -- was that the practice of other
17  prosecutors who you supervised?
18      A.   Yes.
19      Q.   Was that the practice of the Cook County
20  State's Attorney's Office, as far as you know?
21      A.   I don't know if there was a written policy per
22  se, but we definitely erred on the side of tendering
23  everything.
24      Q.   And so your experience was that the Cook

## Page 219

1  County State's Attorney's Office prosecutors, as a
2  general matter, turned over everything they got from
3  CPD; correct?
4      A.  As a general matter, yes.
5      Q.  Are you aware of or can you identify any
6  specific prosecutors who would pick and choose which
7  materials to turn over that came from CPD?
8      A.  No.  Not picking and choosing.  The only --
9  maybe just as a way of explanation:  If there's a
10  situation where I already tendered ten pages, but I'm
11  looking for that eleventh page and they respond to a
12  subpoena and they give me all 11 pages again, but I know
13  it's just that one page I'm looking for, I'm not going
14  to re-tender those other ten pages which I've already
15  tendered, so I just tender that one page that I was
16  looking for.  But that's -- from my point of view,
17  that's not a picking and choosing because I'm tendering
18  everything as I get it.  I'm just getting to a point
19  where I might be looking for that one more document.
20  And it doesn't matter to me that CPD is giving me the
21  same documents they've given me before.  I'm just giving
22  that last page because it was the one that I was looking
23  for, that we were all looking for.
24      Q.  And so, to be clear:  Because you're producing

## Page 220

1  the files in their entirety without any picking and
2  choosing, you're not pulling out material that you
3  considered administrative even if you didn't think it
4  was investigative material?
5      A.  The -- I would not pull out, for example, the
6  investigative file inventory if I received it, I would
7  not pull that out.  But I was also aware during that
8  time period that CPD would use documents and fold them
9  over and staple them and mail them to somebody.
10          If there was a -- either a real envelope that
11  was blank, I would not Xerox that and tender that.  If
12  there was the back of a document which was used as an
13  envelope, I probably wouldn't tender that.
14      Q.  Any other examples of material that you would
15  say is not investigative material that you would hold
16  back in your production to a criminal defendant other
17  than the two things you just mentioned?
18      A.  A blank piece of paper that was, for some
19  reason, included in there, I wouldn't tender that.
20      Q.  Anything else?
21      A.  No.
22      Q.  And what you just described the practice
23  that you would say is common or typical among all
24  prosecutors during your timeframe?

## Page 221

1      A.  I can't speak for what they would do.  I'm
2  speaking for what I did.
3      Q.  Yeah.  But you're also offering opinions on
4  behalf of -- about what the prosecutors' practices were.
5  So are you able to say that the practice you just
6  described is consistent with the practices of other
7  prosecutors, based on your experience?
8      A.  They might have Xeroxed the envelope and they
9  might have Xeroxed the blank piece of paper.
10      Q.  Are you aware of any prosecutors in that time
11  period that you were at the Cook County State's
12  Attorney's Office that pulled out administrative
13  materials before tendering the documents?
14      A.  No, I'm not aware of that.
15      Q.  Returning to my questions about the process by
16  which the files were analyzed for your report, what
17  information did you receive back from counsel with
18  regard to their portion of the analysis of the 30 plus
19  files?
20      A.  Pacheco and Robinson; there were police
21  reports that they couldn't find.
22      Q.  Anything else?
23      A.  No.
24      Q.  Did they provide you anything in writing, any

## Page 222

1  kind of documentation whatsoever?
2      A.  No.
3      Q.  Did they provide the information you just
4  described through an e-mail?
5      A.  No.
6      Q.  The information that they provided to you
7  about Robinson and Pacheco, was that communicated over
8  the phone?
9      A.  Personally.
10      Q.  Did they provide you with any other
11  information about the analysis that they had done of the
12  files other than this communication about the Robinson
13  and Pacheco files?
14      A.  No.
15      Q.  Now, after they identified those two files did
16  they give you any particular assignment with regard to
17  those two files?
18      A.  No.  It was -- it caused me to examine those
19  two files and those missing documents from the point of
20  view of were those materials in those documents
21  referenced anywhere else for materiality purposes.  If
22  there was a significance to those documents or, from my
23  point of view, an additional point of my -- point of my
24  view would be were these documents likely tendered

## Page 223

1   during discovery and if we're now just looking at an
2   incomplete prosecutor's file as well as an incomplete
3   criminal defense attorney's file, and I think I comment
4   on that definitely in Pacheco, if not in both of them.
5      Q.  Let's turn to the next section of your report.
6      All right.  In looking first at the paragraph
7   that precedes the Israel Pacheco information you've
8   provided, it says "In two of these files, investigative
9   material alleged to be missing from the criminal defense
10   attorney's files were also missing from the prosecutor's
11   files as they exist today."  Do you see that?
12      A.  Yes.
13      Q.  Now, the term "investigative material" there
14   in that sentence, what is that specifically referring
15   to?
16      A.  A General Progress Report or a police report.
17      Q.  Anything else?
18      A.  Not that I'm aware of.
19      Q.  Okay.  So the exercise, as you understood it,
20   was to focus on whether or not General Progress Reports
21   or police report -- or other police reports were missing
22   from the state's attorney's files; is that correct?
23      A.  They may have examined the prosecutor's files
24   for all reports, whether we would term them

## Page 224

1   investigative or not.  But, as I said before, a subpoena
2   is not, in my mind, investigative material.  So when
3   they see a supplementary report as in Pacheco that's
4   alleged to be missing, that's on its face investigative
5   material.  When they look to the prosecutor's files and
6   it's missing there, that's something for me to consider.
7      Q.  Who decided to focus on General Progress
8   Reports and typed police reports, you or counsel?
9      A.  With the work that counsel did, I'm not saying
10   that they focused limited.  I'm saying that when I
11   looked at Section F, I'm the one who -- and when I was
12   composing my reports said he's -- there's a number of
13   documents here that are -- that on their face are
14   non-investigative file.
15      I'm not saying they also didn't look at the
16   prosecutor's file to see if subpoenas were in there, I
17   don't know if they did or didn't.  But on the face of
18   it, that's not investigative material.
19      Q.  Okay.  So when you did your -- let's focus on
20   your analysis for a moment.  When you went through
21   Attachment F and looked at documents, your analysis was
22   to figure out:  Are these GPRs and typed reports that I
23   would consider investigative material or are they not
24   those two things; is that correct?

## Page 225

1      A.  Mr. Brasfield listed them in that fashion.
2      Q.  Right.
3      A.  He saved me a lot of time.
4      Q.  Okay.  So you focused, when you did your
5   analysis of Attachment F, on GPRs and typed reports; is
6   that correct?
7      A.  And when I was looking at Section F, I went
8   through to say, "Look at all the documents that he
9   claims are missing from the criminal defense files that
10   are not investigative material on the face of them," so
11   that's the -- frankly, the easy part of examining those
12   files.  At the same time, the city attorneys were
13   examining to see if any police reports as well maybe
14   other documents, too, but specifically any police
15   reports or investigative material was missing.
16      Q.  Now, when you --
17      A.  On its face.
18      Q.  When you did your analysis of Attachment F,
19   you were only looking at his descriptions in Attachment
20   F on their face; correct?
21      A.  Yes.
22      Q.  Okay.  When you -- and so you weren't going to
23   the document to do some assessment of whether it was
24   investigative or not.  You were relying on how he

## Page 226

1   characterized it in his Attachment F; correct?
2      A.  And the way he characterized it was, to my
3   analysis, obviously that it was not investigative
4   material.
5      Q.  Okay.  So the answer to my question is yes,
6   you were looking just at what he said in Attachment F
7   and how he characterized the document and not the
8   underlying documents themselves; correct?
9      A.  Initially, yes.
10      Q.  Okay.  And when you did that analysis, you
11   were basically looking to see is he -- does he
12   characterize it as a GPR or a typed report.
13      A.  Other way around.  Did he characterize it as a
14   subpoena?  Did he characterize it as a court
15   notification?  Did he -- or court appearance document?
16   Did he characterize it as a file inventory report?
17      I mean, there was a whole host of documents.
18   Sometimes those were the only documents he said that
19   were missing.
20      Q.  If he characterized a document as anything
21   other than a typed report or a GPR, did you define that
22   as then being non-investigative material?
23      MS. ROSEN:  Objection to the form.
24      Asked and answered.

## Page 227

1    Mischaracterizes his testimony.
2  BY THE WITNESS:
3    A.  No.  You had to look at what -- what I'm
4  stressing to you right now is that were some -- many
5  documents that were obviously on their face in my
6  analysis not investigative material.  But if he called
7  something a note, then that would be something that
8  should be looked at because I don't what note it is.  Is
9  it, you know, "Call home, your wife called," or is it a
10  note of an interview?
11    Or one of the file's envelope, you know?  Now,
12  I would suspect envelope is just an envelope and that
13  has no investigative material, but, you know, you never
14  know.  Maybe there was something written on the envelope
15  which could be of an investigative nature, so I didn't
16  rule that out.
17    Q.  So you did an initial pass to determine if
18  there were materials that on their face you could
19  identify as being non-investigative; is that correct?
20    A.  Initial and primary.
21    Q.  Okay.  And then did you do -- and then for
22  some number of the things he characterized in Attachment
23  F, did you do some additional analysis?
24    A.  I can remember specifically looking at body

## Page 228

1  charts because -- I think I mentioned this earlier
2  today -- a body chart could be one that is obtained from
3  the medical examiner, but really is part of a police
4  document where they type their information onto it, or
5  it could be a body chart that comes from the medical
6  examiner's protocol report, so those are some documents
7  I looked at to see which ones they were, and some were
8  purely M.E. or some of them were M.E. reports that were
9  co-opted by the police officers.
10    Q.  Anything else?
11    A.  Well, if the name was not obvious on its face,
12  the -- if -- it's the other way around.  If it was
13  obviously a, you know, police supplementary report or
14  General Progress Report, something like that, that would
15  be some information that it was later brought to my
16  attention that there was Pacheco and Robinson were not
17  found in the prosecutor's file.
18    Q.  Okay.  So when you did your analysis -- and
19  let's see if I've got it right -- you look at the
20  Attachment F in Brasfield's report --
21    A.  Yes.
22    Q.  -- and you identified based on what he
23  characterized as the documents in Attachment F and you
24  see that it's either clearly non-investigative or

## Page 229

1  clearly investigative or gray area; is that fair?
2    A.  Yes.  That's fair.
3    Q.  Okay.  If it's clearly non-investigative, you
4  don't do anything more other than incorporate what
5  you're finding into your report; correct?
6    A.  Clearly non-investigative I would -- as a
7  matter of fact, I listed them somewhere, the titles of
8  them.
9    Q.  The titles or the types of documents you were
10  finding that he characterized -- that he listed, but you
11  characterize as non-investigative?
12    A.  Yes.
13    Q.  Okay.  Anything further that you do with the
14  ones that you believe are clearly not investigative?
15    A.  No.
16    Q.  Okay.  Any further analysis you do with the
17  ones that you describe as being clearly investigative?
18    A.  Well, the city's attorneys were examining the
19  prosecutor's files during this time period to see if
20  those documents could be found in the prosecutor's file.
21  That's -- I did not do a case-by-case examination
22  like -- on that like I did on the seven cases.
23    Q.  So for those where you identified as being
24  clearly investigative you didn't do any further

## Page 230

1  analysis, the city was doing some; is that correct?
2    A.  Yes.
3    Q.  Okay.  For the ones you've characterized as
4  being gray area, did you do some further analysis?
5    A.  Yeah.  I pulled up the body charts and saw
6  that on occasion they were real ME charts and sometimes
7  they were police body charts.
8    Q.  Anything else or any other instance, examples
9  other than the body chart example?
10    A.  I did a spot check then on -- on -- not
11  through every single one of the files, but I hopscotched
12  around on police reports just to see that they were in
13  the prosecutor's file.  I might have done 15 of those
14  just to confirm that they were in the prosecutor's file,
15  so I just skipped around from file to file to file, and
16  they were in the prosecutor's file.
17    Q.  Were the 15 investigative,
18  non-investigative --
19    A.  That's an estimate.
20    Q.  -- or gray?
21    A.  Those were investigative.
22    Q.  Okay.  And in how many of the 15 cases were
23  they in the state's attorney's office file?
24    A.  A hundred percent.

Page 231

1    Q.  And how long did you spend doing your
2  spot-checking?
3    A.  Maybe one -- part of one afternoon.
4    Q.  Are we talking more than an hour, less than an
5  hour?
6    A.  Maybe two hours.  Only because of the
7  electronic program was kind of slow.
8    Q.  In terms of the gray area category, you
9  identified the ME chart, body chart issue.  How do you
10 resolve that one?  Did you ultimately characterize it as
11 investigative or not investigative?
12   A.  The -- the -- they were almost always ME body
13 charts, not CPD body charts.
14   Q.  Okay.  And how did that then synch up with
15 whether you were going to characterize it as
16 investigative or not investigative?
17   A.  Well --
18   MS. ROSEN:  Object to the form.
19 BY THE WITNESS:
20   A.  To my -- there's a Cause of Death Report,
21 two-page report, with that body chart attached, the CPD
22 co-opting of the ME's body chart.  In all of those
23 situations, it was really peculiar; the Cause of Death
24 Report was in the prosecutor's file, but sometimes the

Page 232

1  body chart was not.  So to me that was just another
2  example of an incomplete prosecutor's file.
3    Q.  And --
4    A.  But I recall that.  That's part of the
5  investigative material involved.
6    Q.  Okay.  So you consider that to be
7  investigative material?
8    A.  Yes.
9    Q.  Any other examples that were in this gray area
10 category other than the body chart example you've given
11 me so far?
12   A.  No.
13   Q.  Let's start with Israel Pacheco.  And let's
14 just make sure we're clear for the record.  In both the
15 Israel Pacheco case and Samuel Robinson case, you
16 identified documents that were either GPRs or police
17 reports, investigative material that was missing from
18 both the state's attorney's office file and the criminal
19 defense attorney file; correct?
20   A.  That's correct.
21   Q.  Okay.  If a document is missing from both the
22 criminal defense attorney file and the state's attorney
23 file, just as a general principle, does that make it
24 more likely that it wasn't tendered by the police

Page 233

1  department rather than it being lost or having an
2  incomplete file?
3    A.  It's more likely that it's an incomplete
4  criminal defense attorney file and an incomplete
5  prosecutor file.
6    Q.  So from your perspective if a document is
7  missing from both the state's attorney and the criminal
8  defense attorney, it's more likely that both of those
9  files are incomplete and missing the exact same document
10 than that the document itself wasn't turned over from
11 CPD to the state's attorney or criminal defendant.  Is
12 that your opinion?
13   A.  That's my opinion.
14   Q.  Okay.  What's the basis for that opinion?
15   A.  Just look at the Pacheco case.  The -- the one
16 two-page report from Detective Dorsch deals with a
17 witness who was brought to the state's attorney's Gang
18 Prosecution Unit to be interviewed.  Some sort of a
19 written or formal statement was taken from him of which
20 the police report indicates was retained by the
21 prosecutor's office.  So Detective Dorsch's -- I think
22 it was a two-page supplementary report is a police
23 report that's commonly found in the RD file and would be
24 tendered in discovery.  But also, it was a witness who

Page 234

1  implicated a co-defendant and whatever statement he
2  gave, the prosecutors would tender that statement in
3  discovery because they would want to use Collazo against
4  co-defendant Madrid.  So to me those are reports that
5  were obviously tendered during discovery that would be
6  for all the reasons that it helps the prosecutors in
7  their ability to prosecute the co-defendant Madrid.
8      The other two live reports, it's obvious on
9  the face of them that the criminal defense attorneys
10 knew about them because they are -- criminal defense
11 attorneys were listed on both lineup reports as being
12 present for the lineup.  Now, those were negative
13 lineups in that there was no positive identifications
14 were made, but the criminal defense attorneys, Mr. Green
15 was one of them and I don't remember who the second
16 defense attorney was, they were present for both of
17 those lineups.  So, again, those lineup reports were --
18 would be maintained in the RD file of the police
19 department.  Especially the fact that there was no
20 identification, the criminal defense attorney would want
21 to possibly be able to use that, exploit that at trial.
22 But also the prosecutor and the -- the -- the prosecutor
23 was -- the type of report they would also typically
24 obtain and tender during discovery because they were

Page 235

1    present for the lineup as well.
2        Q.  Now, so to be clear with regard to the Israel
3    Pacheco file, there are police reports, RFC7160 to 61
4    and 7162 to 63, and Cause of Death Supplementary Report
5    RFC7184 and 7185, that you would expect to be turned
6    over to prosecutors and criminal defendants; correct?
7        A.  That's correct.
8        Q.  Those are materials that you believe should be
9    turned over to criminal defendants; correct?
10       A.  Yes.  Should be and not just -- should be and
11   are tendered during discovery.  But in the special
12   situation, it's clear that the information was known to
13   the criminal defense attorneys in one situation, but
14   known specifically to the prosecutors in the other
15   situation.
16       Q.  Now, putting aside what the person may have
17   known or not known and how they knew it, the reports
18   themselves that you've identified in your report for
19   Israel Pacheco, those three reports -- two lineup
20   reports and a supplementary report -- those are
21   materials that are not just -- not just should be turned
22   over, but are required to be turned over; is that
23   correct?
24       A.  That's correct.

Page 236

1        Q.  Okay.  That is potential Brady material;
2    correct?
3        A.  Yes, it is.
4        Q.  Okay.  Now, with regard to the Samuel Robinson
5    case --
6        A.  It's also 412 material regarding Mr. Collazo.
7    It's a witness giving a statement.
8        Q.  Okay.  All reasons that it is required to be
9    turned over; correct?
10       A.  Yes.
11       Q.  Now, with regard to the Samuel Robinson case,
12   in that instance there's a typed note, RFC13648, that
13   was not in the prosecutor's file and it was not in the
14   criminal defense file; correct?
15       A.  Yes.
16       Q.  Okay.  And is it your opinion that it is more
17   likely that both the prosecutor and the criminal defense
18   attorney lost the exact same document than that that
19   document was not turned over by the police department?
20       A.  What I'm saying is that these files are
21   approximately 25 years old.  The report was retained by
22   the Chicago Police Department in the investigative
23   material, so it's my opinion that it was highly likely
24   that it was received during discovery and was provided

Page 237

1    to the defense attorney during discovery.
2        Q.  So --
3        A.  Now we're 25 years later and we're dealing
4    with a host -- especially the criminal defense
5    attorney's files are -- are -- are in many instances
6    wholly inadequate.  The prosecutor's files are better,
7    but in no way, shape or form are they pristine either.
8    So just because it's missing from both files, it -- to
9    me it's more evidence of the toll of time that's taken
10   on these files as opposed to it was never tendered at
11   the very beginning.  It's the opposite.  It's maintained
12   in the Chicago Police Department's investigative file
13   which means that it's highly likely it was uncovered
14   during discovery.
15       Q.  Now, you have listed here RFC13648, this typed
16   note.  That is a document that should have been
17   disclosed to prosecutors and to criminal defendants;
18   correct?
19       A.  I'm sorry.  Where are you at now?
20       Q.  The same document.  This document we've been
21   talking about.  The typed note --
22       A.  Robinson?
23       Q.  -- about an anonymous tip in Samuel
24   Robinson --

Page 238

1        A.  Yeah.
2        Q.  -- RFC13648.  That is a document that should
3    be tendered by the police department to prosecutors and
4    to criminal defendants; correct?
5        A.  I don't think I worded it that way.
6            I'm saying the document would have been
7    tendered during discovery.
8        Q.  Right.  When you say the document would have
9    been tendered during discovery, you mean it is a
10   document that would have typically, under the normal
11   process and procedure, been tendered during discovery;
12   correct?
13       A.  Yes.
14       Q.  You're not saying you know that it was
15   tendered --
16       A.  No.
17       Q.  -- during discovery.  You agree with me?
18       A.  I agree with you.
19       Q.  Okay.  Now, this is a document that should
20   have been turned over in discovery because it would be
21   required to be turned over in discovery; correct?
22       A.  Should.  It's not necessarily exculpatory.  It
23   doesn't necessarily cause impeachment of any one person.
24           All the information in the file indicates that

**Page 239**

1   Mr. Robinson was not just a co-defendant in this case,
2   but he was the actual shooter. I mean, that was the
3   evidence present in the file. So that's why I worded
4   this that it's not necessarily Brady or Giglio material.
5   And going back to Rule 412, it's not the statement of --
6   of the defendant's statement of a witness, a lab report
7   or something like that. It's not -- I'm not using --
8   I'm saying it would have been tendered typically in
9   discovery. Should it have been? I think that's more of
10  an analysis that would happen in a materiality context.
11      Q.  Well, is it a document that -- putting aside
12  requirements, is this a document that should have been
13  turned over in discovery, based on your understanding
14  and expectations as a prosecutor in the Cook County
15  State's Attorney's Office?
16      A.  See, I'm -- just --
17      MS. ROSEN: Objection. Asked and answered.
18  BY THE WITNESS:
19      A.  I'm differing here on should and would. I
20  think if -- so if I had subpoenaed that material and it
21  was in the investigative material and it was brought to
22  my attention, I would have turned it over.
23      Now, is it a should be turned over? It
24  doesn't necessarily fall into we'd have an argument in

**Page 240**

1   front of a judge over this, whether it's Brady or Giglio
2   and I don't think it is, and it's certainly not
3   exculpatory of Mr. Robinson, and it doesn't necessarily
4   fall under the 412 responsibility.
5       So I'm not saying should. I'm saying I would
6   have if I received it in discovery, and I think I would
7   have received it in discovery, I would have tendered it.
8       Q.  Okay. So let's do it this way. If you had
9   received this document, RFC13648, you would have
10  tendered it in discovery; correct?
11      A.  Yes.
12      Q.  And can you think of any prosecutor in your
13  office if they received this document that would not
14  have tendered this in discovery?
15      A.  I think they would have tendered it.
16      Q.  Okay. And you used the phrase here "not
17  necessarily Brady or Giglio material."
18      A.  Right.
19      Q.  Is it fair to understand that clause to mean
20  it may be, it may not be?
21      A.  See, now you're looking -- you're looking at
22  a -- what the Supreme Court says about Brady and Giglio
23  material. It's not just -- well, you start off with
24  does it exonerate, does it in some way exonerate a

**Page 241**

1   defendant, or is it some way to be used for impeachment.
2   And then, part two of that is, is it material. And
3   that's why I'm saying it's not necessarily either Brady
4   or Giglio because I don't think it's necessarily either
5   one of them.
6       But if there was an allegation that this
7   document had not been turned over and we had to have a
8   hearing on it, I would make those arguments at that time
9   saying it was not necessarily Brady or Giglio.
10      However, if I received it during discovery,
11  and I think I would have because it's part of the
12  investigative file, I would have turned it over.
13      Q.  All right. The Cook County State's Attorney's
14  files that you received, can you tell me what those
15  files are, like complete files? Are they partial files?
16  What are they?
17      MS. ROSEN: Object to the form.
18  BY THE WITNESS:
19      A.  Are you referring to the Cook County State's
20  Attorney's Office trial files?
21      Q.  Well, I'm asking about the files received.
22  What are the files received, to the extent you know?
23      A.  They're trial files.
24      Q.  Okay. And tell me what that means that

**Page 242**

1   they're trial files.
2       A.  When a murder case comes off of arraignment
3   and is assigned to a prosecutor and a courtroom, the
4   prosecutor has the responsibility of gathering all the
5   investigative material and providing it during discovery
6   pursuant to the rules in Brady and all that, but also so
7   the prosecutors can figure out what witnesses they need,
8   what evidence they need to go ahead and proceed to
9   motions or trial. So they're compiling all of those
10  documents, materials, even phone numbers of police
11  officers, pagers back in the day, or cell phone numbers,
12  getting photographs enlarged, whatever it might be to
13  get ready, doing jury instructions, getting ready for
14  trial, finding a convenient trial date, so that is the
15  trial file.
16      There may be motions in there as well, that --
17  the actual motion and maybe a transcript related to a
18  motion. There's -- the trial file if there's a
19  conviction may also have some material that was
20  accumulated for the sentencing hearing, and that
21  material generally would stay in the trial file
22  generally, you know, after the case was closed out.
23      Obviously if it was a not guilty, the file
24  would be closed out, you know, without that type of

## Page 243

1    material in it or without going to a sentencing hearing
2    necessarily. So that file then gets sent to the
3    prosecutor's warehouse, these files or trial files.
4        Q.   Now, to the extent that they are trial files,
5    are there other types of files that would be ultimately
6    maintained for a single given case?
7        A.   I don't think I understand the question.
8        Q.   Yeah. So you take a given case, one crime
9    that's being prosecuted, there will be a trial file;
10   correct?
11       A.   Yes.
12       Q.   What other types of files may or may not be
13   created for that given case?
14       A.   For the prosecutor handling it from indictment
15   to conviction and sentencing, there's no other file.
16       Q.   Okay. Are there any other files maintained by
17   the Cook County State's Attorney's Office for a single
18   given case other than the trial file?
19       A.   Well, if you're the prosecutor in appeals
20   who's handling the appeal, you're going to get the
21   common law record from the Clerk of the Appellate Court,
22   you're going to get the brief from the criminal defense
23   attorney who's appealing the case, you're filing your
24   brief, you're getting a reply brief. The common law

## Page 244

1    record, depending on the length of the trial, can be
2    gigantic or smaller if it's a quicker trial.
3        When the prosecutor in appeals files his
4    appeals and does oral arguments, they return the common
5    law record to the Appellate Court and they -- God knows
6    what they do with it. I don't think it goes back to the
7    Clerk of the Circuit Court or is kept with the Appellate
8    Court for a period of time. So you -- you -- that
9    prosecutor might still have all your briefs and reply
10   briefs and things of that nature, so that would be an
11   appellate file.
12       Now, I think at some point, when I was in
13   appeals anyway, we just kept the -- at some point we
14   just kept the briefs and threw all the other stuff out.
15       Q.   What do mean threw all the other stuff out?
16       A.   Like whatever handwritten notes I had when I
17   was compiling my brief.
18       Q.   Would the --
19       A.   And the common law record would go back to the
20   Appellate Court.
21       Q.   Other than the trial file and the appellate
22   file, are there any other files that would be kept for a
23   given case in the Cook County State's Attorney's Office?
24       A.   If the post-conviction petition was filed, the

## Page 245

1    prosecutors assigned to the Post-Conviction Unit would
2    handle that. The post-conviction file looked very
3    similar to an appellate file in that a state
4    post-conviction petition would be filed making the
5    constitutional allegations, the allegations that were
6    not raised in the motion for new trial or at trial,
7    asking for a new trial to be granted.
8        If the case was docketed, the prosecutor would
9    file a reply. The -- there may even be a hearing to
10   determine whether it would go to a full hearing or not
11   and there would be a legal argument. So, again, there
12   would be a lot of documents in there that look similar
13   to appellate briefs, frankly. That is not the trial
14   file. It's a separate file from the trial file.
15       If there was some reason for something
16   happening at trial with maybe a jury instruction or
17   something of that nature, maybe the prosecutors in the
18   Post-Conviction Unit or maybe defense counsel in the
19   Post-Conviction, handling post-conviction, would order
20   transcripts from the trial; they may be in the
21   post-conviction file if there was allegations of that
22   nature. But, again, that would be, like, attached to
23   the motion: Here's the transcript showing how the judge
24   screwed up the jury instruction or something like that,

## Page 246

1    or here's the prosecutor's closing argument which was
2    improper somehow.
3        Q.   If an attorney handling -- if an attorney in
4    the Cook County State's Attorney's Office handling an
5    appeal or a post-conviction petition wanted to see
6    police reports or photos from a case, would they have
7    access to that material?
8        A.   The appellate practice back in the eighties
9    was you're limited to the common law record. If you --
10   if you, you the prosecutor, or the criminal defense
11   attorney felt the record was missing something, you'd
12   need to file a motion to augment the record, so it would
13   be very, very rare for anyone to be -- for a prosecutor
14   to be looking at the trial file on an appellate level.
15       In the Post-Conviction Unit, like I testified
16   before, there may be reasons if there was an allegation
17   maybe that -- and I don't know why this wouldn't have
18   been handled at the motion for new trial or on direct
19   appeal, but maybe there was a motion that photographs
20   were used at trial that shouldn't have been allowed back
21   to the jury or something like that, then there may be a
22   need for the lawyers on both sides to get ahold of the
23   photographs that were tendered during trial, but those
24   photographs would be impounded with the circuit court so

## Page 247

1    they have to un-impound them to get the photographs.
2         So a prosecutor in the Post-Conviction Unit
3    certainly could have access to the trial file, but it
4    would be -- the nature of that would be the trial file
5    would be ordered up and it would sit on their table or
6    their file room of their office separate from their
7    post-conviction file.
8         Q.  Did you ever work on post-conviction cases?
9         A.  I've worked on a couple of my own
10   post-convictions in conjunction with the prosecutor from
11   the Post-Conviction Unit because they were far more
12   adept at it than I was.
13        So I know that if there was a need to order up
14   a trial file, we could order up on it.  On mine, it was
15   not an issue where, like I described to you, where
16   photographs for closing argument.  It was something -- I
17   remembered one about a jury instruction; that's why I
18   brought that up.  So we -- though we had access to the
19   file if we needed to, we never looked at it.
20        Q.  In the cases that you were involved with, you
21   never ordered up the trial file; is that correct?
22        A.  No.
23        Q.  Let me ask a better question.  In the limited
24   number of post-conviction cases you were involved with,

## Page 248

1    you never ordered up a trial file; correct?
2         A.  Right.
3         Q.  But post-conviction attorneys in general in
4    the Cook County State's Attorney's Office could order up
5    a trial file; correct?
6         A.  Could and -- I mean, it was -- I'm not saying
7    it was not done.  It was done, but it was -- it was, as
8    I said before, the post-conviction file that the
9    post-conviction prosecutor was working from, it looks
10   very much more so like an appellate file than a trial
11   file.
12        Q.  Now, when a post-conviction attorney gets
13   access to the file, are there any specific Cook County
14   State's Attorney's Office policies and practices that
15   are written out that say how they can go about accessing
16   a trial file, what can they pull up, what they can't
17   pull up, anything like that?
18        A.  Not that I'm aware of.  At least not up to
19   2008.
20        Q.  In terms of the appeals, the attorneys
21   handling appeals in the Cook County State's Attorney's
22   Office, are you saying they could never access a trial
23   file unless they got a court's permission to do it by
24   motion?

## Page 249

1         A.  No, they could -- there had to be a reason why
2    you wanted to access a trial file.  When I was -- I
3    started in the Appellate Unit.  I never had a need to
4    augment the record on appeal, but supervise -- there
5    were supervisors either had been trial attorneys before
6    or just were very good appellate attorneys and they'd
7    say, you know, "The common law record is missing the
8    jury instructions, so you need to find -- you've got to
9    go back to the Circuit Court, find the jury
10   instructions," which were probably still in the court
11   file, "and file a motion here in the Appellate Court
12   because they've raised an issue about the jury
13   instructions.  We want to get the real jury instructions
14   before the Appellate Court because the common law record
15   was insufficient."
16        So it's not that they didn't have access to
17   the Cook County prosecutor's trial -- the appellate
18   prosecutors didn't have access to the trial files, but
19   there was rarely a need to access them.  The defense
20   attorney filing the appeal would say, "Here's my reason,
21   my constitutional violation reasons that were not raised
22   in my motion for a new trial and not raised on my direct
23   appeal, and here's what I want you to consider."
24        It would only come to light where, you know,

## Page 250

1    someone would say, "Well, they're relying upon half of
2    the common law record.  We're still missing something."
3    So that --
4         Q.  So --
5         A.  That's not necessarily we need to order up the
6    trial file.  As a matter of fact, it would be
7    exceedingly rare.
8         Q.  So the point is:  I understand that you're --
9    as a general rule when you're doing the Appellate Court,
10   you're relying on the common law record.  But there is
11   no rule or anything that prevents an appellate attorney
12   from accessing the trial file; correct?
13        A.  No.  But --
14        Q.  Is that correct or not correct?
15        A.  There's no rule that prevents them from
16   accessing the trial prosecutor's file, but I never saw
17   them in appeals during my limited time there.  And as
18   supervisor of appeals, I -- I mean, not supervisor of
19   appeals, supervisor of the Criminal Prosecution Bureau,
20   I knew that it was rarely done.
21        Q.  Okay.  Now -- and you're not aware -- are you
22   aware of any policies and practices at the Cook County
23   State's Attorney's Office that prohibit or that provide
24   any rules or instructions about how to go about

## Page 251

1    accessing trial files and what you can pull out and not
2    pull out that applies to appeals?
3        A.  No.
4        Q.  And in terms of your time in appeals, you
5    spent a very limited amount of time in appeals; correct?
6        A.  Nine months.
7        Q.  Okay.  The process that you described to me in
8    terms of the analysis you did of the seven files and
9    then the additional 30 or so files, is there anything
10   else in that process you haven't explained to me?
11       MS. ROSEN:  Objection to form.
12       MR. GIVEN:  Objection to form.
13   BY MR. SWAMINATHAN:
14       Q.  In other words, is there anything else that
15   was done as part of that process that you haven't
16   described so far today?
17       MR. GIVEN:  Objection.  Form.
18       MS. ROSEN:  The same objection.
19       Adding other words doesn't fix the form.
20   BY THE WITNESS:
21       A.  I believe I've explained the process to you.
22       Q.  The process that you followed in this case is
23   very different than the process you followed in Fields;
24   is that correct?

## Page 252

1        A.  It's different.  Yes, it is.
2        Q.  Okay.  Why is it different?  Why did you
3    follow a different process in this case?
4        A.  I was asked to examine in great detail the
5    seven cases where Mr. Brasfield used them as example
6    cases and he also claimed that they were cases where the
7    prosecutor's files were missing the documents, as did
8    the criminal defense attorney files were missing, so the
9    analysis of those files were -- and I still don't know
10   why he picked those seven and didn't look at the other
11   20, but whatever that might be, I was focusing on those.
12       Q.  So the assignment in this case was different;
13   is that correct?
14       A.  Yes.
15       Q.  Did you have any say?  Did you decide, hey, I
16   want to do the process but only in this case or did you
17   do this process based on what the assignment was
18   provided to you by counsel?
19       A.  I focused on the seven cases.
20       Q.  Based on the request from counsel; is that
21   correct?
22       A.  Yes.
23       Q.  Now, in the Fields case when you disclosed
24   your report, you went through file-by-file and

## Page 253

1    identified the number of pages that Mr. Brasfield said
2    was missing from the criminal defense files, and then
3    you identified out of those pages how many of those
4    pages were missing from the State's Attorney's files.
5    Do you recall that?
6        A.  It's the other way around.  I -- the files
7    that were found in the prosecutor's files.
8        Q.  Right.  You ident -- but you took the universe
9    of documents that Mr. Brasfield said was missing from
10   the criminal defense file and out of that said -- you
11   went through and found how many of those were found in
12   the state's attorney file; correct?
13       A.  Yes.
14       Q.  And you did that file-by-file; correct?
15       A.  Yes.
16       Q.  For all the files that had state's attorney
17   files; correct?
18       A.  Yes.
19       Q.  And you identified in your report exactly how
20   many of those pages that Mr. Brasfield identified as
21   missing from criminal defense files were found in
22   state's attorney's files; correct?
23       A.  Yes.
24       Q.  And you didn't do that analysis in this case,

## Page 254

1    did you?
2        A.  I did not.
3        Q.  And what was the result of that analysis in --
4    strike that.
5        In the Fields case, you would acknowledge that
6    when you did that analysis, in all but one of the cases
7    some material was found that was missing from both the
8    criminal defense file and the state's attorney file; is
9    that correct?
10       Q.  Can you say that again?
11       Q.  In all but one of the instances that you did a
12   comparison of the criminal defense file and the
13   materials that were missing from the state's attorney
14   file, you found materials were missing from both files;
15   correct?
16       A.  In all but one case some material was missing
17   from both?
18       Q.  Yes.
19       A.  That sounds right.
20       Q.  Okay.  And did you conduct any type of
21   analysis like that in this case?
22       A.  No.
23       Q.  You could have done that type of analysis in
24   this case; correct?

## Page 255

1       A.  I was not asked to do that.
2       Q.  Do you know who staffed the Subpoena Service
3   Unit?
4       A.  Pardon me?
5       Q.  The Subpoena Service Unit in the Chicago
6   Police Department, do you know who staffed that unit?
7       A.  I know they're associated with
8   Superintendent's Office, but beyond that I don't know
9   who they are.
10      Q.  Do you know anything about the qualifications
11  of the individuals who work in that department?
12      A.  I do not.
13      Q.  Do you know anything of the training those
14  individuals receive?
15      A.  I do not.
16      Q.  All right.  Let's turn to your report again.
17  Before we do, do you want to take a quick break or keep
18  going?  Anybody need a break?
19      A.  I'll take a quick break.
20          (A short recess was taken.)
21  BY MR. SWAMINATHAN:
22      Q.  In terms of the file keeping practices of the
23  State's Attorney's Office which we've been discussing
24  before the break, was it the Cook County State's

## Page 256

1   Attorney's Office policy to retain complete trial files?
2          MS. ROSEN:  Object to the form.
3   BY THE WITNESS:
4       A.  There's -- there was no written policy that
5   I'm aware of.
6       Q.  Was there any policy at all about what could
7   be thrown out and what shouldn't be thrown out?
8       A.  The -- not a policy.
9       Q.  Was there any -- what was the practice in
10  terms of what was thrown out and what was kept?
11      A.  The -- the prosecutors were told when a --
12  case has been closed out for whatever reason to try to
13  throw out duplicate police reports, just to keep the
14  basic version of the file, that you should keep all your
15  prosecutor-generated documents.
16          There's -- legally there's not an obligation
17  to keep the Chicago police reports, but everybody tried
18  to keep an entire set of reports and all the material
19  they generated during the course of the trial together
20  for many reasons, not overlooking the fact that you
21  might have to retry the case.
22      Q.  So one of the practices, as I understand it,
23  is to keep all of the material, you know, nonduplicative
24  material, that was collected during the course of the

## Page 257

1   investigation and prosecution; correct?
2       A.  Right.
3       Q.  And there was at least one very strong reason
4   to do that which was the possibility of needing to retry
5   people; correct?
6       A.  True.
7       Q.  Okay.  Now -- so in that -- so would it be
8   fair to say that the practice in general was that if
9   there were investigative materials received from the
10  Chicago Police Department, those would be kept and
11  preserved rather than discarded?  Is that correct?
12      A.  You'd -- yes.  You try to keep everything you
13  received during the course of your file work-up and
14  discovery and trial.
15      Q.  Okay.  Now, is it your understanding that
16  practice was pretty consistently followed within the
17  State's Attorney's Office?
18      A.  I'm not sure I can say that.
19      Q.  Tell me why.
20      A.  There were many files where you'd see
21  duplicates, triplicates of police reports that they had
22  not been cleaned up.  When a prosecutor got to trial, he
23  might have kept all of the reports related to his case
24  and he may have saved all of that, but there may have

## Page 258

1   been another folder somewhere in his office that had all
2   the material that he collected and that didn't
3   necessarily make it to the warehouse; it should have,
4   but didn't necessarily.
5       Q.  Now --
6       A.  It's just sloppiness.  There's not, you know,
7   any other reason for it.
8       Q.  Okay.  So the practice was for that to -- for
9   all that stuff to be kept, but in some instances that
10  might not happen.  Is that right, how you describe it?
11      A.  Yes.
12      Q.  Now, in terms of materials that go into the
13  trial file and ultimately get stuck in the warehouse, is
14  it your sense that that file stays pretty pristine or
15  that once trial file is in the warehouse, things can
16  still happen?
17      A.  The Cook County State's Attorney's Office
18  warehouse has different locations they have and they've
19  moved from one warehouse to another warehouse.  It is --
20  poorly organized is the best way to describe it.
21      Q.  So for one way of poorly organized is, you
22  know, files might not be exactly where you expect them
23  to be, you know, based on some indexing system or
24  something else?

Page 259

1     A.  That's presupposing that there's a supposed to
2  be location.
3     Q.  Okay.  Fair enough.
4        But another type of problem is if stuff is
5  coming out of the files.  Do you have any reason to
6  believe stuff was coming out of the files?
7     A.  A file may -- maybe there was a post -- maybe
8  it was a post-conviction and the file was brought over
9  to 26th Street and then sent back, so now it's no longer
10  on the shelf it should have been, so that's one issue
11  that could happen.
12        Or maybe a trial -- a case was retried and
13  then the file was sent back and maybe now the file is in
14  two locations.
15        During the course of the Fields investigation,
16  I was trying to assist looking for files in the
17  warehouse.  I saw a rather infamous case because it made
18  case law in Illinois.  I saw it in two warehouses and on
19  three shelves, and that was a very -- it was a death
20  penalty case.  It was a very big case and seeing --
21  which was not our file at all, not related to Fields at
22  all, but that's an example of how unorganized the
23  warehouse is.
24     Q.  Okay.  Now, is it -- when a case goes over, if

Page 260

1  the appeal was over, what would happen with the
2  appellate file?  Would it ever go to the warehouse?
3     A.  No.
4     Q.  Why was it appellate files?
5     A.  The appellate files were primarily the briefs
6  and they would be kept in the Appellate Unit.
7     Q.  And once the case was closed, they would still
8  be kept in the unit?
9     A.  The briefs obviously were filed with the
10  court, so those are essentially just copies of the
11  briefs.  I remember on occasion someone would say, "Hey,
12  the Jones case decided a year ago, go find the brief on
13  that because we had the same exact issue and there you
14  can get relatively new case law and the arguments being
15  made on your brief," and so that was one of the main
16  reasons for keeping the briefs in appeals.
17        I don't know how long they kept the briefs,
18  and now it's different because everything's electronic,
19  you can save things a lot longer.  But at some point,
20  the -- I'm sure they warehouse those files too.
21     Q.  The post-conviction cases, where did they go
22  when they were done?
23     A.  The warehouse.
24     Q.  The same warehouse where all of the files are

Page 261

1  that we're talking about --
2     A.  One of the --
3     Q.  -- the trial files?
4     A.  Yeah.  I mean, the Cook County State's
5  Attorney's Office initially kept files in the basement
6  at 26th Street, then they kept them on Washtenaw, then
7  there was two different warehouses that were utilized on
8  the Near West Side, and they moved from one warehouse to
9  another warehouse.  And for a while in the early 2000 --
10  2010s they were scanning and the contract ran out so
11  they weren't scanning, so it's a complete hodgepodge.
12     Q.  So there's no real uniform process?
13     A.  No.
14     Q.  Things would happen in all kinds of different
15  ways; is that right?
16     A.  Well, in this case, sure, we only found 26
17  prosecutor's files and there's 38, so the example.
18  Those other remaining files could be in that warehouse.
19     Q.  Now, in terms of going back to my question
20  about the post-conviction files, if I understand
21  correctly, the post-conviction file, the case is closed,
22  it could -- it would also go to the same warehouse; is
23  that correct?
24     A.  Right.

Page 262

1     Q.  Okay.  But when a post-conviction file goes
2  over to the warehouse, would it ever go and be put with
3  the trial file?
4     A.  You would think that would happen, but I don't
5  think that happened.
6     Q.  In other words, it was supposed to happen, but
7  it didn't always happen?
8     A.  I'm not even sure if it was supposed to
9  happen.  But, like I said, the Frank Red file I saw in
10  three locations.
11     Q.  So, in your experience, once post-conviction
12  files went over that warehouse, it could get put with
13  the trial file, it could get put in some other
14  completely different place, both are possible?
15     A.  Yes.
16     Q.  In terms of retrials -- well, strike that.
17        And when a post-conviction file goes over to
18  the warehouse, if it goes and is put with the trial
19  file, is there any rule or anyone that would prevent you
20  from putting those two files together?
21     A.  See, I don't know if there was a rule to put
22  them together, so I don't know if there would be -- I
23  don't know if people sought out to do that.  They might
24  just say, "Here's Post-Conviction File 99CR100.  Just

Page 263

1    file it where we're filing this file today."
2        Q.  Okay.  Now, that file --
3        A.  It might be treated as a new file, in other
4    words.
5        Q.  It would be treated as a new file.  It could
6    also go and sit with the old file, the old trial file?
7        A.  I think it's less likely that happened.
8        Q.  Okay.  And are you speaking on speculation or
9    are you saying this is something that you know from your
10   experience, or are we outside the -- sort of the range
11   of what you know as someone who was in the prosecutor's
12   office?
13       A.  Let's put it this way.  There was no written
14   policies on that.  So when we send a file to the
15   warehouse, the warehouse would document the file you
16   just closed today, I put it on Shelf 1, Row 2, whatever
17   they might do, you know, or File Number 2 on that shelf.
18       Then if I took it out for some reason, maybe
19   there was a late post-trial motion filed, I took the
20   file back, I handled that and sent it back, allegedly
21   there would be space on that shelf to put it there, but
22   if someone else had put a new file in there instead, now
23   they might put it in a separate location, and they
24   literally written saying, "Oh, you want the Jones case?

Page 264

1    That's on Shelf 2," and they'd look.  Whoops, I had
2    taken it out, it's no longer there, so now they've got
3    to see they log it in somewhere else, so now they'd
4    look at it the new login location.  So in the
5    post-conviction situation, that file could very well
6    just arrive as a new file and be filed away in a new
7    location.
8        Q.  Right.  And is it -- and so it sounds like
9    there's some process by which -- it may not be a
10   foolproof process, but there's some process by which
11   they're keeping track of where they expect files to be;
12   correct?
13       A.  Yes.
14       Q.  So if the warehouse person gets a
15   post-conviction file and it comes into the warehouse,
16   theoretically they should be able to look at this log or
17   some documentation to tell them where the underlying
18   trial file is; correct?
19       A.  I don't think there -- post-conviction files,
20   I don't think there's much of a distinction made.  It's
21   just:  Here's the file, here's the 99CR file.  So
22   they -- they -- post-conviction people are not -- you
23   know, the filing people might not make a distinction
24   between post-conviction and that.

Page 265

1        The Special Prosecutions Bureau tended to keep
2    their files segregated in the warehouse away from
3    everybody else's files, primarily because of the
4    confidential nature of some of the investigations that
5    never led to an indictment, so they were definitely in
6    the warehouse kept in a separate location.  But they
7    still suffered from some of the same problems that if a
8    person in the Special Prosecutions Bureau took a file
9    out, sent it back, it might not be put on the original
10   shelf where it was maintained.
11       Q.  So but I'm ask -- I understand that and I
12   understand it may be haphazard.  And even though the log
13   says it's in Location A, things sometimes end up in
14   Location B for all kinds of reasons.
15       If a post-conviction file comes into the
16   warehouse and the warehouse person wants to put it with
17   the trial file for the associated case, they would be
18   able to at least identify where the trial file is
19   supposed to be; correct?
20       A.  I don't think that's true.
21       Q.  Why not?
22       A.  For two reasons.  One, when the
23   post-conviction attorney finishes his work on the file
24   and sends his file to the warehouse, he doesn't

Page 266

1    necessarily say, "This is" -- "there's a Trial File 2,
2    put this with the trial file."  He would just send the
3    file to the warehouse --
4        Q.  Sure.
5        A.  -- and let the -- and it doesn't stay on it
6    PC, it just says 99CR100.  So the file room person, "Oh,
7    it's not a special pros case?  It's not a civil case?
8    I'm just going to file it as a brand new file that just
9    got closed out yesterday," even though it's ten years
10   old or fifteen years old.
11       Q.  But you've told me previously sometimes files
12   might get put next to each other, sometimes they might;
13   right?
14       So if he wanted to put it next to another
15   file, which you're saying is one of the possible
16   scenarios that happens down there in this haphazard
17   world, he would have an ability to know where to go to
18   put it; right?
19       A.  What I'm saying to you is, I don't think
20   post-conviction attorneys would say to the file room
21   personnel, "There's a corresponding trial file and make
22   sure you put this with the trial file."  I think it's
23   the opposite.  I think they would just send the -- they
24   would close the file out and send it to the warehouse.

**Page 267**

1     Q. Now, in terms of what the warehouse guy
2 chooses to do, whether he gets an instruction or not, do
3 you know what the warehouse guys do in each instance?
4     A. I don't know what they do in each instance.
5     Q. Okay. So if the warehouse guy wanted to put
6 the post-conviction for the Joe Blow case next to the
7 trial file for the Joe Blow case, he'd have ability to
8 do that; correct?
9     A. I'm not sure if he had the ability to do it.
10 I can't speak to that.
11    Q. Okay. You can't speak to it either way?
12    A. I -- because to my understanding is the PC
13 people don't say, "Hey, put this with the original trial
14 file." They just close their file out.
15    Q. Now, I think you said -- so, so far we know
16 trial files, when they're all closed out, they go to the
17 warehouse. Post-conviction files, those go to the
18 warehouse, too, when they're closed out; correct?
19    A. Mm-hmm.
20    Q. Appeals -- appellate files, to the extent a
21 file gets sent -- gets capped of any kind, that would
22 also go to the warehouse; correct?
23    A. Well, the appellate people kept their files,
24 kept the -- primarily all they kept was the briefs, what

**Page 268**

1 they -- what was filed, what they filed.
2     Q. So usually a file just didn't go to the
3 warehouse for appellate files?
4     A. In my experience, files on appeals, they were
5 all kept there in the Daley Center.
6     Now, I know electronically now they store a
7 lot of briefs that they've filed -- maybe not the brief
8 they filed, but the final version of it electronically,
9 I know they kept those to a certain extent.
10    But in that paper era, if they finally,
11 eventually after a number of years briefed up their --
12 boxed up their briefs and sent them to the warehouse, I
13 don't know if that happened.
14    Q. Now, what about --
15    A. I'm not familiar with that at all.
16    Q. You said there are cases that involve
17 retrials. In the case of retrials, a file could go to
18 the warehouse and they could be pulled out of the
19 warehouse; correct?
20    A. Yes.
21    Q. And they could end up going back to the
22 warehouse again later; correct?
23    A. Yes.
24    Q. In those cases, if some additional

**Page 269**

1 investigation is done in the case between the time of
2 the original trial and the retrial, will new materials
3 go into that trial file or will they create a separate
4 file for their retrial?
5     A. They'd go into the original trial file.
6     Q. Um --
7     A. There might be like a Folder Number 2 or
8 Folder Number 3, but the -- it would be the -- in
9 general, the trial file.
10    Q. Do you -- did you ever work at the public
11 defender's office?
12    A. Did I work with them?
13    Q. Did you ever work at the public defender's
14 office?
15    A. No.
16    Q. Do you have any knowledge or experience with
17 the public defender's office's policies and practices
18 related to file retention?
19    A. I'm not aware of their policies and practices.
20    Q. Have you -- do you have any -- strike that.
21    Are you aware of their practices or any --
22 strike that.
23    Do you have any understanding about whether
24 the public defender's office attorneys, as a matter of

**Page 270**

1 practice, try to retain all the materials from their
2 trials?
3     A. I don't. I don't have an understanding of
4 what they try to retain or not.
5     Q. You just don't know either way?
6     A. I don't know.
7     Q. So you essentially can't speak to the public
8 defender's office retention practices; is that correct?
9     A. I cannot.
10    Q. Now, when Mr. Brasfield did his analysis of
11 comparing the investigative files to criminal defense
12 files, would you agree that the assumption he used for
13 purposes of his analysis is that any material contained
14 in a criminal defense file today was contained in that
15 criminal defense file at the time of the original file?
16    MS. ROSEN: I'm sorry. Could you --
17    THE WITNESS: Yeah. I have to ask you to
18 repeat that. I'm sorry.
19    MS. ROSEN: Okay.
20 BY MR. SWAMINATHAN:
21    Q. So Mr. Brasfield compared the investigative
22 files in this case to criminal defense files; correct?
23    A. Yes.
24

Page 271

1    Q.  And those are criminal defense files he
2  received in the -- that were produced in the last few
3  years; correct?
4    A.  Yes.
5    Q.  Involving homicides and trials that took place
6  often decades earlier; correct?
7    A.  Yes.
8    Q.  Okay.  Now, when he did his comparison, he's
9  looking at a whole bunch of documents in a criminal
10  defense file, and do you agree under his analysis he's
11  assuming that the documents he's seeing in the file were
12  all in that file at the time of the original trial?
13    MS. ROSEN:  Objection.  Foundation.
14    Calls for speculation.
15  BY THE WITNESS:
16    A.  The -- I'm not sure if he clearly stated that.
17  But the problem I have is, his assumption is that the
18  file has he's looking at today is all the attorney had
19  at the time of trial.  That's the problem I have with
20  his analysis.
21    Q.  I understand that, and you've said that in
22  your report.  But there's something you didn't say in
23  your report and that's what I want you to ask about now.
24    Just like that's something that you have a

Page 272

1  concern about, it's also the case that whatever is in
2  that criminal defense file today it is assumed, in his
3  analysis, that that was all in the file at the time of
4  the original trial; correct?
5    MS. ROSEN:  Objection.  Foundation.
6    Calls for speculation.
7  BY THE WITNESS:
8    A.  I'm not sure if he ever spelled that out, and
9  if he did, if he believed that, then I would say he's
10  wrong yet again because there was files from either
11  Fields or from here which was like appellate material
12  which was not trial material, so if he thought that was
13  in the trial file at the time of trial, he would be
14  wrong.
15    Q.  So let's --
16    A.  And the other file, the File Number 7 I think,
17  which has got VA reports from some guy who's completely
18  unrelated to the case, if he thought that was in the
19  trial file at the time of trial, then he's -- his
20  analysis is even worse than I fear.
21    Q.  Let's start with the first part of your answer
22  which is, you're saying you aren't -- you don't know
23  exactly what his process was?
24    A.  He never -- I don't recall him saying in his

Page 273

1  report that "the material I'm looking at today was
2  definitely in the trial file at the time of the --"
3    Q.  Right, because he doesn't say that in his
4  report, so let's -- let's see.
5    Do you -- what is your understanding of his
6  process with regard to how he was going to treat
7  documents found in the file today?
8    MS. ROSEN:  Objection.  Foundation.
9    Calls for speculation.
10  BY THE WITNESS:
11    A.  I don't know what he thought of tho -- if
12  those documents were in the trial file.  I think I just
13  said to you that if he assumes Appellate Court materials
14  were in the trial file at the time of trial, he's
15  mistaken yet again.
16    My point is that he assumes what he's looking
17  at today is all the criminal defense attorney had at the
18  time of trial and I think that's the flaw in his
19  analysis.
20    Q.  Understood.  I'm asking you a different
21  question.
22    A.  And I think I've already answered.
23    Q.  So you've made your opinion really clear.  All
24  right?  So let's -- let's do it this way.

Page 274

1    If he -- if there is a police report that's in
2  a criminal defense file, under Brasfield's analysis, as
3  you understand it, he assumes that that police report
4  had been in the criminal defense attorney's file back at
5  the time of the trial; correct?
6    MS. ROSEN:  Objection.
7  BY THE WITNESS:
8    A.  I don't know --
9    MS. ROSEN:  Foundation.
10    MR. GIVEN:  Objection.
11    MS. ROSEN:  Calls for speculation.
12  BY THE WITNESS:
13    A.  I don't know if he assumed that.
14    Q.  Okay.  So you just don't know either way.
15  When he sees investigative material in a criminal
16  defense file, you just don't know how his analysis
17  works, whether he assumes that it had been in the trial
18  file originally or if it wasn't?
19    A.  Right.  Because what he -- what he does is he
20  looks at the investigative material and he looks for
21  investigative material that's not in the file today, so
22  his analysis is that way.  It's not that, at least my
23  understanding of it, he doesn't say, "Well, the police
24  report I have in here was in here on day one."  He

**Page 275**

1    doesn't say that, so I don't know if that's what he
2    assumes or not.
3        Q.   Does he state anywhere in his report that his
4    assumption for purposes of the analysis is that any
5    material contained in the criminal defense file today he
6    is going to treat as having been disclosed and produced
7    to the criminal defense attorney before the original
8    trial?
9        A.   I don't recall him saying --
10        Q.   You didn't see that in his report?
11        A.   I don't recall him saying that.
12        Q.   Okay.  And if he did say that and if he did
13    treat it as though any investigative material in the
14    criminal defense file today, he's going to treat it as
15    though that was always considered to have been tendered
16    to that person before the criminal trial, that would be
17    a benefit of the doubt he'd be giving to the city of
18    Chicago in his analysis, wouldn't it?
19        MS. ROSEN:  I'm sorry.  Can you read back the
20    question?
21        (A portion of the record was read by the
22    reporter.)
23        MS. ROSEN:  Objection.  Form.
24

**Page 276**

1    BY THE WITNESS:
2        A.   I don't recall if he said that or if you'd
3    consider it giving the benefit of the doubt, but I'll go
4    back to what I said earlier.  Then he's considering
5    reports for some guy from a VA hospital as being
6    tendered by the police at the time of trial when they're
7    completely unrelated to the file.
8        I mean, I have a problem if -- if -- the
9    analysis that everything he found in there is
10    investigative material related to this file that was in
11    the criminal defense attorney's file at the time of
12    trial, there's a bunch of irrelevant documents that were
13    misfiled, clearly misfiled in the criminal defense
14    files, or sometimes they were appellate materials or
15    stuff of that nature, so then he's assuming stuff that's
16    not even investigative material is investigative
17    material.
18        Q.   So now, let's take a possible -- let's take a
19    single police report that he might have, that he
20    might -- that might be found in a criminal defense file.
21        A.   Okay.
22        Q.   That police report that he has in a criminal
23    defense file, standing alone we don't know whether that
24    police report was given to that criminal defense

**Page 277**

1    attorney before trial or if it got added to that
2    criminal defense attorney's file sometime later during
3    an appellate process or something else.  Can we agree
4    with -- can we agree to that so far?
5        MS. ROSEN:  Object to the form.
6        Foundation.
7    BY THE WITNESS:
8        A.   As I said before, I wouldn't agree that a
9    police report would be added in the appellate process,
10    so --
11        Q.   We're asking for the public -- we're asking
12    about a regular criminal defense attorney's file.
13        A.   Yes.
14        Q.   A criminal defense attorney has a police
15    report in his file.
16        A.   Right.
17        Q.   Just standing alone, you don't know whether
18    that police report in the criminal defense attorney's
19    file had been given to that criminal defense attorney
20    before the trial; correct?
21        MS. ROSEN:  Objection.  Form.
22    BY THE WITNESS:
23        A.   Not based upon that report being in his file.
24    I would need to look at what was in the prosecutor's

**Page 278**

1    file, what the prosecutor's tendered during discovery.
2    You may even look at the -- an Appellate Court opinion
3    which discusses that police report, and then I would
4    circumstantially say yes, he had that police report
5    prior to trial.
6        Q.   So, in other words, that police report that
7    will be found in the criminal defense attorney's file,
8    it's not necessarily the case that just because it's in
9    the criminal defense attorney's file it had been there
10    at the time of the original trial; would you agree with
11    that?
12        MS. ROSEN:  Objection.  Form.
13    BY THE WITNESS:
14        A.   Highly unlikely, but not necessarily.
15        Q.   Okay.  Now, for purposes of his analysis, he
16    said, "Well, I will assume, for purposes of my analysis,
17    that this wasn't turned over to the criminal defense
18    attorney far too late during an appellate process or
19    years later, I will assume it was turned over at the
20    beginning when it should have been before the trial."
21    Do you understand that?  Is that what he did?
22        MS. ROSEN:  Objection.  Form.
23        Foundation.
24        MR. GIVEN:  Are you telling him that's what

---

**Page 279**

1    did --
2           MS. ROSEN:  Speculation.
3           MR. GIVEN:  -- or are asking him?
4           MS. ROSEN:  Asked and answered.
5    BY THE WITNESS:
6           A.  I don't know how he treated the report other
7    than he didn't count it against the city.
8           Q.  All right.  Let's look at page 2 of your
9    report, in the top paragraph.  You'll see about the
10   middle way of that paragraph it says "For the remaining
11   files he failed to even attempt."  Do you see that?
12          A.  Yes.
13          Q.  All right.  So the next sentence after that
14   reads:  "An examination of the prosecutor's files
15   reveals many of the alleged withheld documents are
16   contained in the CCSAO's trial files and therefore not
17   regularly withheld."  Do you see that?
18          A.  Yes.
19          Q.  What do you mean by the word "many"?
20          A.  Well, I mean documents -- the -- the -- there
21   were the Pacheco and Robinson case which where police
22   reports were not tendered, but -- I'm sorry -- were not
23   found in the prosecutor's file, but the bulk -- the
24   remaining investigatory material, investigative material

---

**Page 280**

1    was found in the prosecutor's file.
2           Q.  Do you provide a percentage in your report
3    anywhere?
4           A.  No.
5           Q.  Did you calculate a percentage and not
6    disclose it?
7           A.  I did not.
8           Q.  Have you ever calculated a percentage?
9           A.  No.
10          Q.  Okay.  So the most precise you can say, you
11   say in your report, is the use of the term "many"; is
12   that correct?
13          A.  Yes.  And the -- my hesitancy is because
14   there's documents that are not investigative material
15   but he says were withheld, and they're not investigative
16   material, so I'm -- my quibbling or my argument with him
17   is that it's not investigative material to begin with.
18          Q.  With regard to -- whether it's investigative
19   material or non-investigative material, you have not
20   provided any calculation in your report or done any
21   calculation about what percentage of those materials
22   were ultimately found in the state's attorney file;
23   correct?
24          A.  I have not.

---

**Page 281**

1           Q.  Turn your attention to page 3 of your report.
2    In the Section titled "Regulation of Discovery" -- do
3    you see that?  And it might be that -- I think I'm
4    looking at the old version of your report because I
5    wrote up on your report because you sent me the new
6    version.  So I'm looking at the section that begins
7    "Regulation of Discovery," Roman numeral III.  Do you
8    see that?
9           A.  On page 4.  Okay.
10          Q.  On page 4 of your report?
11          A.  Yes.
12          Q.  Paragraph A.
13          A.  Yes.
14          Q.  I want to focus on that paragraph.  You have a
15   section there where you say, "Along with the
16   checklists" -- so let me get the sentence back.
17   "Prosecutors maintain checklists of documents that may
18   exist and should be obtained."  Do you see that?
19          A.  Yes.
20          Q.  Why do prosecutors in the Cook County State's
21   Attorney's Office maintain checklists?
22          A.  Why do they do it?
23          Q.  Yes.
24          A.  As a way of reminding you of the universe of

---

**Page 282**

1    police reports that may be out there.
2           Q.  Well, is it something that's helpful to making
3    sure they're collecting all the documents they need to
4    collect?
5           A.  Yeah.  For example, a checklist may include
6    bomb and arson reports, but you're working up a retail
7    theft, so you look at your checklist:  "Well, this is a
8    retail theft, there's no need for me to send a subpoena
9    to bomb and arson."
10          But the checklist is pretty inclusive of all
11   the different possible units or different types of
12   documents that a prosecutor should think about
13   collecting.
14          Q.  Was this something that was maintained
15   throughout the time that you were in the State's
16   Attorney's Office or is this something that got created
17   while you were there?
18          A.  I'm not sure when I first --
19          MR. GIVEN:  Objection to the form of that
20   question.
21   BY THE WITNESS:
22          A.  It was a document that was informally handed
23   from one prosecutor to another prosecutor.  So when I
24   became a felony court prosecutor, the various forms of

---

Page 283

1    checklists were hanging around and the prosecutors would
2    use them.
3          To a certain degree, those checklists,
4    checklists kind of morphed into the discovery receipts
5    that defense attorneys were asked to sign later in the
6    nineties, so it would be that same format, then people
7    would write next to it "26 pages of GPRs" or
8    "Supplemental Report dated" whatever date, "five pages,"
9    and then they'd add a signature line at the bottom for
10   the criminal defense attorney to sign off on.
11         So the checklist, in its rudimentary format,
12   was just a reminder list.
13         Q.  Did the checklist -- was the checklist
14   something that you used in your practice?
15         A.  Sure.
16         Q.  Did prosecutors in general in the office use
17   the checklists?
18         A.  Yes.
19         Q.  Did you find it to be helpful to have those
20   checklists?
21         A.  Sure.
22         Q.  Did other prosecutors in your office find it
23   to be helpful to have checklists?
24         A.  I didn't personally sit around and talk to

Page 284

1    them about it, but everybody used a checklist.  It was a
2    way of reminding you of stuff to subpoena.
3          Q.  Okay.  Do you consider it good practice either
4    for yourself, for the attorneys you supervised for them
5    to use a checklist to ensure they were getting all of
6    the materials they needed?
7          A.  That they were sending out requests and/or
8    subpoenas and phone calls to get the materials.
9          Q.  So that's a yes, it was something that you
10   considered to be good practice?
11         A.  I considered it very good practice.
12         Q.  Did CPD have any checklist, as far as you
13   know, with regard to file keeping and disclosure?
14         MS. ROSEN:  Object to the form.
15   BY THE WITNESS:
16         A.  I'm unaware of a checklist that they might
17   have maintained, may or may not have maintained.
18         Q.  Do you think it would have been a good idea
19   for them to maintain a checklist as good practice?
20         MS. ROSEN:  Object to the form.
21   BY THE WITNESS:
22         A.  I don't have an opinion on whether they should
23   have maintained a checklist or not.  I know it was very
24   good for prosecutors as a tool to remind us of what

Page 285

1    requests to send out.
2          Q.  And I think we -- I was turning to page --
3    let's see now.
4          A.  It's in the section --
5          Q.  This is Section Number C, page 5 of your
6    report.
7          A.  Okay.
8          Q.  I think it's the second to last sentence.  It
9    says "From there the CPD Subpoena Unit would cause the
10   subpoenaed material to be collected from the relevant
11   unit and sent to the trial court."  Do you see that?
12         A.  Yes, I do.
13         Q.  So I think we've covered this earlier, but I
14   want to make sure.  With regard to that statement in
15   your report, you're not claiming to know exactly how the
16   CPD Subpoena Unit went about collecting their material;
17   correct?
18         A.  Well, I know that when they finally
19   centralized that through the superintendents' units, it
20   was made clear to us that they will get our subpoenas
21   out to all the different units to get us the material.
22         And as I described earlier, if -- envelopes
23   with Xeroxed copies of subpoenas would come on different
24   dates to the trial court and we'd see little circles

Page 286

1    where they -- obviously they had circled whatever they
2    wanted that unit to provide.
3          So both from what they -- we were told while
4    they were centralizing and then what I saw in practice,
5    that's what makes me believe that they were the ones who
6    caused the subpoenaed material to be collected from the
7    relevant material and caused it to be sent to the trial
8    court.
9          Q.  Understood.  But you have a reason to believe
10   that it was the centralized unit that was causing the
11   material, the subpoenaed material, to be sent back, but
12   I'm asking you a different question.
13         In terms of the process by which they went
14   about going that, do you know exactly what that process
15   was?
16         MS. ROSEN:  Objection.  Asked and answered ad
17   nauseam this morning.
18   BY THE WITNESS:
19         A.  Circumstantially as I described to you what I
20   think the process was.  I don't have a -- I didn't talk
21   to someone in the unit and say, "How do you guys do
22   this?"  But circumstantially and what was told that you
23   are going to be the central people for doing this.
24         So how they carried it out specifically, I

Page 287

1    don't know.
2        Q.  Okay.  Paragraph D.
3        A.  Yes.
4        Q.  Or Section D.  It says "To ensure a prompt
5    flow of information, prosecutors would also reach out to
6    detectives and have them bring their investigative files
7    to court for copying."  Do you see that?
8        A.  Yes.
9        Q.  What do you mean by investigative files there?
10       A.  I mean the investigative file that was
11   maintained at the area.
12       Q.  And is it your understanding that when
13   detectives were coming to meet with you as a prosecutor
14   and would bring files with them police materials,
15   they were bringing the singular investigative file in
16   the area?
17       A.  I saw it happen both ways where -- and usually
18   this was not done on a timely basis; it was done when
19   the discovery had been moving kind of slow and we wanted
20   to get it done, or I knew they were in the courthouse
21   for some other reason and I said, "Hey, bring by my
22   Jones file too."
23          They would do it one of two ways.  They would
24   either sign out the whole investigative file and bring

Page 288

1    it and then we would Xerox it right there in my office,
2    or I would say to them, "I still need the GPRs in the
3    Jones file," and then they would go Xerox the GPRs in
4    the Jones files and they would bring that in to my
5    office.
6        Q.  Would they ever bring their own file rather
7    than the investigative file and check it out?  Would
8    they ever just bring their own working file?
9        A.  In my --
10       MS. ROSEN:  Objection.  Form.
11   BY THE WITNESS:
12       A.  In my opinion, the investigative file is their
13   own file.
14       Q.  Were police officers, the Chicago police
15   officers, as far as you understand, during the time you
16   were working in the prosecutor's office, allowed to keep
17   their own working files separate from the investigative
18   file?
19       MS. ROSEN:  Objection.  Form.
20   BY THE WITNESS:
21       A.  I -- my understanding is the investigative
22   file at the area is what the detectives used in the
23   course of an investigation.
24          Now, they -- CPD my understanding is wanted to

Page 289

1    keep the investigative file in the area sergeant's or
2    the commander's office.  So I don't know if the
3    detectives signed out that file every time they went and
4    carried out an investigation or if they went and Xeroxed
5    a couple of pages that were already in the investigative
6    file for use on that given day whether they were going
7    to talk to someone.  I don't know if they did that.  But
8    the repository for all of the investigative materials
9    was the investigative file maintained at the area.
10       Q.  So from your perspective looking into the
11   Chicago Police Department from the prosecutor's office,
12   it was your understanding that there was really only one
13   file being maintained by the officers in the
14   investigation and that was the single investigative file
15   at the area?
16       A.  The investigative file.  And, as I said, if a
17   detective might have Xeroxed a couple of pages as he's
18   going to go out and interview a witness, he might have
19   those pages in his hand, but that's a document that's
20   already in the investigative file, so he doesn't have to
21   take the whole investigative file out on the street with
22   him.
23       Q.  And so, based on your experience in the
24   eighties and nineties in the Chicago Police Department

Page 290

1    in the time you were there, which is post-1983,
2    officers -- you never had occasion to believe officers
3    were walking around with their own working files of any
4    kind?
5        MS. ROSEN:  Object to the form.
6    BY THE WITNESS:
7        A.  Well, the police officer, an investigative --
8    a detective investigating a case, an ongoing
9    investigation where it's not solved immediately or in
10   short order, they may Xerox documents from the
11   investigative file as they went about their day
12   continuing their investigation, but that was done as a
13   matter of convenience so they could leave the
14   investigative file with all the documents in there.
15          If they went out on the street and created a
16   new GPR by interviewing somebody, then they would come
17   back to the office and add that GPR to the main
18   investigative file.  So whatever they carried with them
19   was a Xerox of something that was already in the
20   investigative file.
21       Q.  How do you know that?
22       A.  Because the investigative file's where all the
23   original documents were maintained in the investigation.
24       Q.  Now, do you have any experience in which

Page 291

1    officers ever came and you said, "Hey, come bring the
2    file," where they ever brought their own working file
3    rather than an investigative file?
4        A.   No.
5        Q.   When you had officers bring the investigative
6    files to your office to meet with you, were the files --
7    were the actual police reports and documents contained
8    within that file, were they originals or copies?
9        A.   It was the actual -- if they brought the
10   investigative file, if they didn't just Xerox specific
11   pages I asked for, if they brought it, it was the manila
12   folder with the Echo fasteners and everything was there,
13   so it was the original.
14       Q.   Was that always the case when they brought a
15   file in?
16       A.   When they brought a file in for me to Xerox in
17   preparation for discovery, it was always the original
18   file, unless, of course, I said to them I just need the
19   blah blah blah GPR and then they themselves Xeroxed that
20   GPR for me from the area and then they brought that GPR
21   in for me.
22       Q.   In paragraph Section F, do you see that?
23       A.   Is it on page 5?
24

Page 292

1        MS. ROSEN:  Yeah.
2    BY MR. SWAMINATHAN:
3        Q.   Yes.
4        A.   Yes.  I can see it.
5        Q.   Yeah.  It says "Prosecutors provide these
6    documents to defense counsel in court and generally
7    indicate when they believe they have tendered the
8    complete file."  Do you see that?
9        A.   I do.
10       Q.   Now, with regard to the complete file portion,
11   I think we talked about this earlier, your understanding
12   and expectation and practice was to turn over everything
13   you got from the Chicago Police Department; correct?
14       A.   Yes.
15       Q.   Now, with regard to the portion about they
16   believed they had tendered the complete file, why do you
17   use that phrase, "they believed they had tendered"?
18       A.   On -- I think this was more in the Fields
19   case, I saw a couple of transcripts where cases got
20   continued a couple of times for some GPRs were tendered
21   and I saw a prosecutor using that type of language:
22   "Judge, I think I've got it all now, because we were
23   continuing it numerous times for this last set of GPRs.
24   I'm tendering what I think is the final and complete

Page 293

1    file."
2        Q.   And when you make that kind of -- have you
3    made that kind of a representation to a court before and
4    say, "Hey, I think I've tendered the entire file"?
5        A.   Yeah.
6        Q.   Okay.
7        A.   Yes.
8        Q.   Now, when you've made that kind of a
9    representation, is that based on a representation from
10   someone in the Chicago Police Department that, "Hey,
11   we've now given you everything"?
12       A.   It's based upon when I -- for example, if
13   I received -- the example I've used to you before where
14   the closing supp had not been available earlier and I
15   finally got it and there might have been some GPRs with
16   the closing supp, I would use the word "believe" because
17   it looks like I've got everything.
18       Q.   Now -- and that ultimately -- and so,
19   ultimately, it's -- you have to rely on the police
20   department to tell you that they've given you
21   everything; correct?
22            You can't know for sure whether you have
23   everything; correct?
24       A.   My experience from reading the reports that

Page 294

1    have been tendered it's -- for example, if a witness
2    gives a handwritten statement to a prosecutor in the
3    course of an investigation and I don't have a GPR
4    associated with that, I'm like, "Where's that GPR?"  So
5    I don't need the police to tell me that there's probably
6    a GPR; I can tell from reading it.
7            Or reading some supplemental reports where
8    there's a lengthy interview with a witness and I don't
9    have a GPR related to that, so I don't need the police
10   officers to tell me that I don't have all the documents.
11   I can tell from the context of the file.
12       Q.   So you --
13       A.   Also -- real quick.  Also lineup reports:
14   There's occasion where the supplemental report would
15   mention a lineup report and there's no lineup -- a
16   separate lineup supplemental report, it's nowhere to be
17   found, and you find out it's the situation again where
18   the detective arraigned the lineup report has been on
19   furlough, been on vacation, whatever it's been, and he
20   has not completed his lineup report.  So when that
21   lineup report would come in months later, I would say to
22   the judge, "I think we finally got all the stuff."
23       Q.   So you have a number of ways of identifying
24   when you think you have an incomplete file; correct?

Page 295

1    A.  Yes.
2    Q.  And we've talked about some of those earlier
3  today; correct?
4    A.  Yes.
5    Q.  And that happens sometimes; correct?
6    A.  Yes.
7    Q.  But what you don't have is a way of knowing
8  with certainty that you have a complete file; correct?
9    A.  What do you mean by a complete file?
10    Q.  In other words, once the materials are
11  produced to you from the Chicago Police Department,
12  unless you can tell on its face there's something I'm --
13  that's missing here, there's something that's in the
14  supplementary report, but I don't have the underlying
15  GPR, some scenario like that, you can't know with
16  certainty that there isn't anything else out there;
17  wouldn't you agree with that?
18    A.  I wouldn't agree with that.
19    Q.  Okay.  Tell me why I've got that wrong.  How
20  can you know with certainty that there isn't any single
21  one document sitting in the Chicago Police Department
22  that you don't know about?
23    A.  You start off with the types of documents.
24  You know, where is the arrest report?  If I don't have

Page 296

1  the arrest report, I know the arrest report is missing,
2  you know.  If the police report says "We also arrested
3  this other guy and released him," and I don't have the
4  arrest report for that guy; I want the arrest report.
5        (At 5:02 p.m., Ms. Carney exited the
6  proceedings.)
7  BY THE WITNESS:
8    A.  There's also the crime scene supplemental
9  report.  If I don't have that, if -- also an
10  investigation starting in midstream, I'm like, "Where is
11  the crime scene supplemental report?"
12        And the final supplemental report that says
13  "Cleared and closed by arrest," I know that's what the
14  police consider to be the final report in the sequence.
15        If I'm reading all of the reports and all of
16  the witnesses are identified in the reports and I have
17  GPRs associated with them, there's absolutely no reason
18  for me to believe that there's a report missing.
19    Q.  I understand that.  There's no reason for you
20  to believe that there's a report missing, as in there's
21  no way for you to know that there's some document
22  missing; correct?
23        MS. ROSEN:  Object to the form.
24

Page 297

1  BY THE WITNESS:
2    A.  From my experience of handling hundreds, if
3  not thousands, of homicide reports, if everything is in
4  place I've described to you, I believe that is a
5  complete report.
6    Q.  You make an assumption that if you have a file
7  where you've got all the documents, the types of
8  documents that you typically see in the file, and you've
9  got GPRs that are associated with specific supplementary
10  reports that you've got a complete file; correct?
11    A.  Yes.
12    Q.  Okay.  That's all you mean when you say "I've
13  got a complete file"; correct?
14    A.  That's --
15        MS. ROSEN:  Objection.  Form.
16        MR. GIVEN:  Object to the form.
17        MS. ROSEN:  Mischaracterizes his testimony.
18  BY THE WITNESS:
19    A.  Well, in addition to if there's, as I said
20  earlier, if there's a reference to Tom Jones who was
21  arrested and released, if I don't have that report too,
22  then that's something else that I may be looking for.
23    Q.  But those are instances when you have the
24  ability to tell on the face of documents if something

Page 298

1  hasn't come to you; correct?
2    A.  Something that I requested through subpoenas
3  from different parts of the Chicago Police Department --
4    Q.  Can you fathom a scenario where a Chicago
5  police officer goes and talks to a witness, writes a
6  report and it doesn't get into the file that gets
7  produced to you and you wouldn't about it?
8    A.  So a police officer interviews somebody and
9  writes a report and then he does not submit it to the
10  investigative file, he does not submit it to the
11  record -- RD retention?
12    Q.  Right.  Would you have any -- can you envision
13  a scenario where that happens, you get a file that
14  contains all of the police reports and everything else,
15  but not anything about -- not that one police report
16  that he prepared and you would know that that interview
17  happened and you're not -- and you don't have it?
18    A.  Say it again.  I would know?
19    Q.  You would not -- you would not -- you would
20  know that "I know there's some other police report out
21  there where he interviewed some other witness."  Is
22  there any way you'd know that?
23        MS. ROSEN:  Object to the form.
24

## Page 299

BY THE WITNESS:
    A.  If a police -- if I understand you correctly,
if a police officer interviewed someone and wrote a
report on it, a GPR or typed up an RD, but he did not
submit it to the police department, the only way I would
know about that is if it was referenced in other
reports.
    Q.  Exactly.  And so you can imagine a scenario,
right, based on all of your experience as a prosecutor,
where a report exists in the Chicago Police Department,
it doesn't get produced to you and you don't know it,
you wouldn't have a way of knowing it.
        MR. GIVEN:  Objection to the --
        MS. ROSEN:  Objection.  Form.
        MR. GIVEN:  -- form of that question.
BY THE WITNESS:
    A.  It's not a police report -- it's not a police
report retained by the police department as you just
described.
    Q.  I'm not --
    A.  You --
    Q.  I don't think I'm understanding the
distinction.
    A.  You described it as a report created by a

## Page 300

police officer, but he never submitted it to any --
where he should have.
    Q.  It doesn't matter which scenario it is.
Either he creates the report and submits it to his
sergeant or he creates the report and then decides not
to submit it to his sergeant.  In either instance, if
that report doesn't get to you, it's possible that
you'll never know it, that that document exists;
correct?
    A.  Well, if he --
        MS. ROSEN:  Object to the form.
BY THE WITNESS:
    A.  I would disagree with you on half of what you
just said.  If he creates a report and submits it to his
sergeant, to me that means it's being included in the
investigative file or it's being included in the RD
file, so I would be able to obtain it from the Chicago
Police Department.
    Q.  You mean it should be in those files; right?
        MR. GIVEN:  Objection.
        MS. ROSEN:  Object to the form.
BY THE WITNESS:
    A.  So your hypothetical now presumes that a
detective create -- interviewed somebody, created a

## Page 301

report of some fashion and now gave it to a sergeant who
also decides not to submit it to the investigative file
or to the RD file, and it's not mentioned in any other
police report?
    Q.  No.
    A.  Yeah, I guess I would never get that report.
    Q.  Yes.  Now, let's try something even -- let's
try something really simple.
        Do you agree with me that as a Cook County
State's Attorney at the end of the day you are dependent
on the Chicago Police Department to ensure that it has
given you everything, that you cannot be 100 percent
certain that they have given you everything in a file?
        MS. ROSEN:  Object to the form.
BY THE WITNESS:
    A.  I'm dependent upon them to provide me the
reports that they've maintained in their -- either in
the investigative file or the RD file or whatever parts
of the police department.
    Q.  And would you agree with me that if you go
into court and you make a representation that "I have a
complete file, I've turned over the complete file,"
you're making that representation based on the
assumption that the Chicago Police Department has given

## Page 302

you everything they have; correct?
    A.  They've given me everything --
        MS. ROSEN:  Object to the form.
BY THE WITNESS:
    A.  -- that they've maintained in the
investigative file, the RD file, and other parts of the
police department.
    Q.  And in some times you might be able to catch
an instance where a document created by a Chicago police
officer didn't get to you; correct?
        MS. ROSEN:  Object to the form.
BY THE WITNESS:
    A.  The documents that might not have got to me
usually, as I described earlier in the deposition, were
a timing matter where a report had not been signed off
on, but --
    Q.  And --
    A.  -- they got to me.
    Q.  Just as there can sometimes be instances where
a document doesn't get to you and you could catch it, it
is also the case that there can sometimes be instances
where a document doesn't get to you and you don't catch
it; do you agree with that?
    A.  I don't agree with that.

## Page 303

1    MS. ROSEN: Object to the form.
2  BY MR. SWAMINATHAN:
3    Q. You think it's impossible for a document to be
4  created by Chicago Police Department that doesn't get to
5  you and you wouldn't be able to catch it?
6    MS. ROSEN: Can you read back the question?
7    (A portion of the record was read by the
8  reporter.)
9  BY MR. SWAMINATHAN:
10    Q. I'll ask it again so we have a clear record.
11    Is it your opinion that it is impossible for
12  the Chicago Police Department to create a document that
13  doesn't get to you and you wouldn't catch it?
14    MS. ROSEN: Object to the form.
15  BY THE WITNESS:
16    A. If a Chicago Police Department officer and a
17  sergeant or whatever level you want to go to, they
18  create a document and they include it in the
19  investigative file and they include it -- or in the RD
20  file or elsewhere, the subpoena process is going to turn
21  up that report.
22    If you presume what you said earlier that a
23  detective and a sergeant collude on creating a report
24  and not including it in the investigative file or not

## Page 304

1  including it into all of the other locations of the
2  police department they should include it, I won't
3  receive that document.
4    Q. Please answer my question.
5    MR. GIVEN: Okay.
6  BY MR. SWAMINATHAN:
7    Q. I wasn't asking you --
8    MR. GIVEN: Just hold on a minute.
9    MS. ROSEN: I'm going to object --
10  BY MR. SWAMINATHAN:
11    Q. -- you about the investigative --
12    MS. ROSEN: I'm going to object to --
13  BY MR. SWAMINATHAN:
14    Q. -- files and assumptions.
15    MS. ROSEN: -- you raising your voice.
16  I'm going to object to you characterizing --
17    MR. SWAMINATHAN: This is totally evasive, so
18  I want a clear answer. This is a --
19    MS. ROSEN: No. Now you're --
20    MR. SWAMINATHAN: -- very simple hypothetical.
21    MS. ROSEN: -- just cutting me off, so I get
22  to make my objection. It is not a very simple
23  hypothetical. It's got form problems all over it
24  and that we've been objecting to.

## Page 305

1    MR. SWAMINATHAN: And he can tell me he
2  doesn't understand the question. He hasn't said
3  that.
4    MS. ROSEN: I -- can you --
5    MR. GIVEN: Do you want to stop interrupting?
6    MS. ROSEN: Can you let me finish?
7    MR. SWAMINATHAN: Go ahead.
8    MS. ROSEN: Oh, thank you.
9    He has answered the question repeatedly, and
10  he has disagreed with you the premise which is what
11  is annoying to you. So this has been asked and
12  answered numerous times and he's answered it
13  numerous times.
14    MR. SWAMINATHAN: No. Look --
15    MS. ROSEN: And for you to raise your voice
16  because you're not liking the answer is
17  inappropriate. So I'm going to ask you not to
18  raise your voice and not to be argumentative.
19    MR. SWAMINATHAN: Okay. Now, are you done?
20    MS. ROSEN: I am.
21  BY MR. SWAMINATHAN:
22    Q. I'm going to make my record. That was an
23  extremely evasive answer and you've given me a series of
24  evasive answers. And I'll be fair to you. You haven't

## Page 306

1  done that earlier in the deposition, but you're doing
2  that now on this subject for reasons I cannot
3  understand. But I'm going to ask you again and I'm
4  going to keep asking until I get a nonevasive answer to
5  this very simple question. Okay?
6    MS. ROSEN: And I'm going to object --
7  BY MR. SWAMINATHAN:
8    Q. I'm not asking you --
9    MS. ROSEN: -- to the threatening nature.
10  BY MR. SWAMINATHAN:
11    Q. And I'm going to -- I'm going to lay a
12  threshold. Okay? I'm not asking you --
13    MS. ROSEN: I'm objecting to the threatening
14  tone in your voice.
15  BY MR. SWAMINATHAN:
16    Q. -- about process.
17    MR. GIVEN: I'd also object. Just for the
18  record, since we all want to express our opinions
19  here, I don't believe he's being evasive. That's
20  your interpretation and your anger about it all.
21    MR. SWAMINATHAN: Oh, I'm not angry.
22    MR. GIVEN: Oh, yes. Your tone of voice --
23    MR. SWAMINATHAN: No, I think --
24    MR. GIVEN: -- indicates that you are very

## Page 307

1    angry.
2        MR. SWAMINATHAN: I think it's disrespectful,
3    but I'm not angry.
4    BY MR. SWAMINATHAN:
5    Q. Now, let's be very clear.
6        MS. ROSEN: Oh, so you're being disrespectful.
7    That is a lovely admission to make on the record.
8        MR. SWAMINATHAN: I said I think he's being
9    disrespectful.
10       MS. ROSEN: You're being disrespectful.
11       MR. SWAMINATHAN: No. Let's be -- let's --
12   let's try this again.
13   BY MR. SWAMINATHAN:
14   Q. I'm not asking you to take this scenario and
15   put it into buckets where an officer turns it into an
16   investigative file and gives it to the sergeant and
17   colludes with the sergeant, et cetera, et cetera.
18       I'm asking you a very simple scenario. Okay?
19       The entire investigation is done. All the
20   typical type of documents you see in an investigation
21   are in that file. There are, let's say, ten
22   supplementary reports in that file. Are you with me so
23   far?
24   A. Yes.

## Page 308

1    Q. Let's say an officer either fills in a
2    handwritten note or fills in a supp report and that
3    eleventh handwritten note or supp report has to do with
4    the interview of a witness who is not referenced in any
5    other of the ten supplementary reports or other
6    documents. Still with me?
7    A. So I think I am. And he submits that?
8    Q. No. If --
9    A. Does he submit it or no?
10   Q. That document is not submitted to anyone. The
11   officer keeps it. If the rest of the file gets turned
12   over to you and doesn't include that include one note or
13   report, would you agree with me that it's very possible
14   you're not going to know about the existence of that
15   report?
16   A. A report that -- so I understand your
17   question: So some sort of report that was in existence
18   that he somehow annotates it with new information, but
19   he does not submit that to the police department, his
20   annotation.
21   Q. I'm not sure what you mean by annotation. An
22   officer simply has created a note or a report --
23   A. Okay.
24   Q. -- of an interview with a witness.

## Page 309

1    A. And he does not submit it?
2    Q. Exactly.
3    A. Then I'm not going to know about it.
4    Q. Okay. And, ultimately, it is possible that in
5    every given case some officer is creating reports;
6    right? I'm not saying this is happening in every case.
7    I'm not making it up. I'm saying it is always possible
8    that an officer can create notes -- let's just do notes
9    because that might be simpler; right?
10       It's always possible that on a case an officer
11   can be creating notes of investigative steps they take
12   and unless that information gets put into the
13   investigative file and gets produced to you, you may not
14   know about it; correct?
15   A. If it's --
16       MS. ROSEN: Object to the form.
17   BY THE WITNESS:
18   A. Just so I understand you --
19   Q. Yes.
20   A. -- if it's not put into the investigative
21   file, then it would be impossible for it to be produced
22   to me.
23   Q. And it wouldn't be impossible -- it wouldn't
24   be possible for you to know that you haven't received

## Page 310

1    that thing; correct?
2    A. Well, I gave you examples earlier where I
3    might know about it if that interview note that he
4    created was related to a witness, I might say, "Do we
5    have anything more on that witness," so there's a
6    possibility I could go looking for that information.
7        But to go back to what you said, if he did not
8    include it into the investigative file, how -- the CPD
9    could not respond -- could not produce it during the
10   subpoena process.
11   Q. Okay. And you wouldn't know -- you wouldn't
12   even know to ask for that document; correct?
13   A. If he --
14       MS. ROSEN: Object to the form.
15   BY THE WITNESS:
16   A. Under the way you described it that it's
17   something that he did not submit, I would not know about
18   it.
19   Q. Okay. Now, let's try one other scenario, a
20   slight tweak. We'll go ahead and put this handwritten
21   note into the investigative file now. Okay? The
22   officer goes out on the street, interviews a witness,
23   writes up a handwritten note about it, puts that note in
24   the investigative file. There are no references in the

## Page 311

1    investigative file or in any other police report that
2    discussed the interview with this witness.  The only
3    document that contains a reference to an interview with
4    this witness is the officer's handwritten note if she
5    has included it in the investigative file.  Are you with
6    me so far?
7        A.  Mm-hmm.
8        Q.  Now, a subpoena comes in for the investigative
9    file and the investigative file is produced to you, but
10   for whatever reason, deliberate or not deliberate, that
11   one handwritten note does not get produced to you.  Are
12   you still with me?
13       A.  That last part I'm not with you on.  It's not
14   produced to me?
15       Q.  Yes, that one page.
16       A.  So the people in the CPD who's responsible for
17   Xeroxing investigative material didn't Xerox that page?
18       Q.  Yeah.  Either that page didn't Xeroxed, the
19   page got pulled out because somebody was looking at it
20   at the time, somebody did something deliberate and
21   nefarious, whatever it is, for whatever good or bad
22   reason that page doesn't get copied and produced to you.
23   Are you still with me?
24       A.  Yes.

## Page 312

1        Q.  Would you agree with me that it's very likely
2    you're not going to have any idea that that document is
3    sitting out there?
4        A.  Two ways I'll disagree with you.  First, your
5    scenario is just highly speculative.  It's -- so I don't
6    think scenario would happen.  But let's assume that
7    scenario happened that -- you tend to think that we just
8    collect the materials from the subpoena at one time.
9    You know, I might not send out a subpoena for months for
10   GPRs, or maybe some other GPR or report was not timely
11   filed, or maybe the police -- the criminal defense
12   attorney subpoenaed the file later on, so it's also
13   likely that, yeah, I may collect that report because
14   we're subpoenaing the investigative file and the RD file
15   at separate times.  So even on that scenario, there's
16   still a chance that I'm going to get that material even
17   if it wasn't there on the day that someone was supposed
18   to Xerox it.
19       Q.  I didn't ask you if there was a chance you
20   could get it at some later point.  I asked you when you
21   get that file, would you have any way of knowing that
22   that document is sitting out there?
23       MS. ROSEN:  At that moment in time?
24       MR. GIVEN:  He answered your question.

## Page 313

1        MR. SWAMINATHAN:  Yes.
2        MS. ROSEN:  At that particular moment in time?
3        MR. SWAMINATHAN:  Sure.
4    BY MR. SWAMINATHAN:
5        Q.  At that moment in time, yes or no?
6        MS. ROSEN:  Okay.
7    BY MR. SWAMINATHAN:
8        Q.  Does that help you?
9        A.  As I said before, it's ridiculously
10   speculative, but at that moment in time, I would not
11   know that document exists.
12       Q.  Okay.  Now, have you had cases where you get
13   an investigative file and it contains no GPRs?
14       A.  I think probably every -- let me think this
15   through.  I think almost every murder case would have
16   GPRs.
17       Q.  Okay.  And if --
18       A.  Sometimes not as extensive as others, but I
19   think there's always a GPR.
20       Q.  And if you get an investigative file produced
21   to you or you get a file produced to you from the
22   Chicago Police Department and it contains no GPRs, you'd
23   raise questions; is that correct?
24       A.  Yes.

## Page 314

1        Q.  Because you would expect there to be GPRs in
2    that file; correct?
3        A.  Yes.
4        MS. ROSEN:  You're talking about violent crime
5    files?
6        MR. SWAMINATHAN:  Yes.
7    BY MR. SWAMINATHAN:
8        Q.  And have you ever had that scenario where you
9    get files produced to you from the Chicago Police
10   Department that you are supposed to include all of
11   the -- the full investigative file and you find no GPRs
12   and you follow-up:  "Hey, are there any GPRs here?"
13       A.  There may have been instances where I did not
14   receive the GPR, the investigative file that included
15   GPRs in a timely fashion and I'd follow-up on it and I
16   would get it.
17       Q.  So that's an instance where you didn't get
18   any -- are we talking about an instance where you --
19   there was one or two possible GPRs and you didn't get
20   them --
21       A.  No.
22       Q.  -- or are we talking about a scenario where
23   sometimes you just didn't get any GPRs?
24       A.  No.  It could be, like, 26 pages of GPRs

Page 315

1    missing.
2        Q.  Yes.  And so that scenario happens sometimes
3    where you say, "I didn't get any GPRs," and someone
4    says, "All right, here's the 26 GPRs," something like
5    that?  Has that happened on occasions?
6        A.  On occasions.  It's what I've referred to
7    earlier in this deposition.  It's a timing issue.  For
8    whatever reason the subpoena didn't get to them for them
9    to comply with it or all of the GPRs -- whoever was
10   Xeroxing GPRs that day didn't get around to our file in
11   a timely fashion, so there have been occasions where I
12   received -- didn't receive an investigative file,
13   doesn't receive the GPRs immediately.
14       Q.  Have there been occasions in those instances
15   where you get documents produced that you're getting
16   just a full set of just GPRs?  Is that correct?
17       MS. ROSEN:  Object to the form.
18   BY THE WITNESS:
19       A.  I would usually ask for everything again in
20   the investigative file just to make sure.
21       Q.  Are there ever instances when you've gotten
22   produced to you just a set of GPRs and nothing else?
23       A.  No.  Unless I said, "Hey, I'm missing the GPRs
24   related to Tom Jones," and then they would give me those

Page 316

1    extra GPRs, but commonly I would get the entire
2    investigative file again.
3        Q.  Turning to page, let's see, page 8.  This
4    is -- I'm looking at 3B.  Yeah, this is page 9 of your
5    report.
6        A.  I've got it.
7        Q.  Section 3, Section B.
8        A.  Yes.
9        Q.  This discussed patrol and gangs and their
10   related files.  Do you see that?
11       A.  I do.
12       Q.  In Section B, you say, "If a patrol or a gang
13   officer participates in the investigation of a homicide,
14   any reports generated by those officers are shared with
15   the violent crimes detectives and filed by CPD under the
16   RD number associated with the crime."  Do you see that?
17       A.  Yes.
18       Q.  Is that based on any policy or procedure that
19   you're aware of in the Chicago Police Department?
20       A.  The violent crimes?  I'm not sure if it's --
21   how the policy is worded, but the violent crimes
22   detectives are responsible for the investigation and
23   the -- the -- and seeking charges on homicides, for
24   example.  So if a patrol officer or a tact officer, bomb

Page 317

1    and arson, gang officer, anybody, if they also
2    participate in that, any reports they generate should be
3    under the same RD number and they -- they're usually
4    working hand in hand with the violent crimes detectives,
5    so those reports are shared with them.
6        Q.  So that's what I wanted to ask you.  That's --
7    you just used the word "should."  Section 3B, is that a
8    description of how the process is supposed to work?
9        A.  That's how the process works to my
10   observation.
11       Q.  Now, when you say that's how the process works
12   to your observation, let's start first with that's how
13   the process should work.  Is that how the process should
14   work, the way you've described it in 3B?
15       MS. ROSEN:  Object to the form.
16   BY THE WITNESS:
17       A.  I'm not sure what you mean by should.
18   BY MR. SWAMINATHAN:
19       Q.  Well, is that how the process is supposed to
20   work, as you understand it, in Section 3B?
21       A.  Yeah, my understanding is the violent crimes
22   detectives are given the primary responsibility for
23   investigating violent crimes including homicide.  So to
24   the degree that any other officer who is not assigned to

Page 318

1    violent crimes participates or gains information in the
2    course of the investigation, they are to share it with
3    the detective who is assigned the case.
4        Q.  Okay.  So they are supposed to do that;
5    correct?
6        A.  That's my understanding and that's my
7    observation.
8        Q.  Now, when you say it's your understanding,
9    have you seen any Chicago Police Department Special
10   Order or other policy --
11       A.  No, I have not.
12       Q.  -- that states that?
13       A.  I have not.
14       Q.  Okay.  Have you seen any document of any kind
15   from the Chicago Police Department that states that?
16       A.  Other than the violent crimes detectives have
17   primary responsibility for violent crimes, no.
18       Q.  Have you seen any document that says patrol
19   officers and gang officers involved in a homicide
20   investigation will file their documents with the violent
21   crimes detectives and use the same RD number?
22       MS. ROSEN:  Object to the form.
23   BY THE WITNESS:
24       A.  I've not seen a Special Order or some sort of

Page 319

1    form saying that's what should happen, but that's --
2    that is what happens.  And I'm using patrol or gang
3    officer just as an example.  It could be bomb and arson.
4    It could be forensic investigators.  It could be the
5    crime lab, whatever else.  Whoever -- whatever piece of
6    investigation they work on they're to use the RD number
7    that's associated with the crime itself and they're to
8    share the information with the detective.  They do share
9    the information with the detectives because the
10   detectives are the ones who have the primary
11   responsibility for solving the case and getting charges
12   approved.
13         Q.  I mean, in that paragraph you used the word
14   "any."  "If a patrol or gang officer participates in the
15   investigation of a homicide, any reports generated by
16   those officers are shared with the violent crimes
17   detectives."
18         A.  Yes.
19         Q.  Do you agree with me that the word "all" also
20   is appropriate there?  All reports generated by those
21   officers are supposed to be shared with the violent
22   crimes detectives.  Would you agree with that?
23         A.  I'm not perceiving the distinction you're
24   making between any and all.

Page 320

1         Q.  I'm not making a distinction.  I just want to
2    be clear that if any reports generated by a patrol or
3    gang officer, you would agree all of them should be
4    generated by -- strike that.
5             All reports generated by patrol and gang
6    officers who participate in a homicide investigation
7    should be shared with the violent crimes detectives.  Do
8    you agree?
9             MR. GIVEN:  Objection.  Form.
10   BY THE WITNESS:
11        A.  Well, if I'm understanding what you're saying,
12   like maybe a gang crimes officer develops information
13   from two sources on two different days and he types up
14   two reports, yes, all those reports should go to the
15   police officer.
16            If a patrol officer participates in a violent
17   crime, it's generally he's the first car on the scene
18   and he's responsible for that initial case report, so
19   it's probably not anything more than that initial
20   report.  But if for some reason somebody came in with
21   information later on and he files a report on that, he
22   should share that with the police officer as well.
23        Q.  Okay.  And you're --
24        A.  The detective as well.

Page 321

1         Q.  And you're saying it's your experience that
2    those officers share that information with the violent
3    crimes detectives?
4         A.  Yes.
5         Q.  That's based on your experience as a
6    prosecutor?
7         A.  Yes.
8         Q.  Is it based on any review of depositions of
9    the detectives in this case?
10        A.  No.
11        Q.  Is it based on any interviews with anyone at
12   the Chicago Police Department about whether that's done
13   by gang crimes officers and patrol officers?
14        A.  Just what from I have observed and in my
15   experience as a prosecutor.
16        Q.  All right.  I need to just grab a few files,
17   so why don't we just take a quick two-minute break, I'll
18   grab those files, and that's my last set of questions I
19   think.
20            (A short recess was taken.)
21   BY MR. SWAMINATHAN:
22        Q.  I want to turn back to your report, page -- I
23   think it's going to be 22.  It's the Demetrius Johnson
24   case.

Page 322

1         A.  Yes, I have it.
2         Q.  All right.  Now, this is one of the cases that
3    you analyzed entirely on your own; correct?
4         A.  Yes.
5         Q.  And in this case, there's a reference to some
6    number of documents that were missing from both the
7    criminal defense attorney file and the prosecutor file;
8    correct?
9         A.  That's correct.
10        Q.  And one of those documents was related to a
11   lineup report in which there was a suspect named Bryan
12   Johns; correct?
13        A.  That's correct.
14        Q.  Now, is it fair to say that Mr. Brasfield's
15   opinion is basically that there is a lineup report that
16   exists in the investigative file that is not contained
17   in the state's attorney's file or the criminal defense
18   files?
19        A.  That -- that is his contention, and I don't
20   know how he made that because the criminal defense
21   attorney file doesn't have any police reports.
22        Q.  Okay.  Now, let's --
23        A.  And in fact -- I'm sorry.
24        Q.  Go ahead.

## Page 323

1    A.  This is a file that he said he was not -- the
2  type of file he said he was not going to use because it
3  was handed off from the public defender's office to a
4  private attorney.  And, in fact, in his Section G
5  report, he has the little strikeout lines through it, so
6  he's violating his own parameters.
7    Q.  Now, on this file, would you agree with me
8  there were two lineup reports related to the Bryan Johns
9  lineup?  Do you agree with me?
10   A.  I'm reviewing my report.
11   Q.  Yeah, take a look at your notes on this one
12 because we're going to discuss it at length, so take the
13 time you need to go through your -- what you've written.
14   A.  Yes, I've reviewed my notes on this.
15   Q.  Okay.  Now, in this case, would you agree with
16 me there are two lineup reports, both of which were
17 conducted by Detectives Erickson and Guevara in which a
18 number of people viewed a lineup with Bryan Johns in it?
19   A.  Definitely one lineup with Bryan Johns for
20 sure.
21   Q.  Okay.  Let's do it this way.
22       Let's mark this.  I'm not sure what number
23 we're on.
24

## Page 324

1        (Deposition Exhibit Number 6 was marked for
2  identification.)
3  BY MR. SWAMINATHAN:
4    Q.  All right.  What I've handed you is a document
5  marked Exhibit 6.  It appears to be RFC15470.
6    A.  Yes.  I'm looking at it.
7    Q.  Now, this is the lineup report in the
8  investigative file that is the subject of
9  Mr. Brasfield's statements; correct?
10   A.  I actually did not include the RFC number in
11 my report, but I believe this is the report.
12   Q.  Right.  So this is a lineup report in the
13 investigative file?
14   A.  Yes.
15   Q.  This is a lineup conducted by Detectives
16 Erickson and Guevara; correct?
17   A.  Yes.
18   Q.  And it is a lineup that is viewed by a number
19 of witnesses including Aby Gonzalez.  Do you see that?
20   A.  Yes.
21   Q.  Okay.  And it says the lineup is conducted at
22 2230 hours on June 12, '91.  Do you see that?  By
23 detective five or detective Area Five headquarters?
24   A.  Yes, I see that now.

## Page 325

1    Q.  All right.  And now, the document says that
2  the person identified in the lineup is Bryan Johns, and
3  I'll turn your attention specifically to the Aby
4  Gonzalez portion of the lineup.
5    A.  Yes.
6    Q.  And it says "After viewing this lineup, he
7  identified the number two participant, Bryan Johns, as
8  the offender in said homicide."  Do you see that?
9    A.  I see that.
10   Q.  Okay.
11       (Deposition Exhibit Number 7 was marked for
12 identification.)
13 BY MR. SWAMINATHAN:
14   Q.  Handing you a document marked Exhibit 7 from
15 the permanent retention file.
16   A.  Yes.
17   Q.  This is a supplementary report.  It's -- the
18 date of the report is June 12, 1991.
19   MS. ROSEN:  Where's the Bates number?
20   MR. SWAMINATHAN:  2300 hours.
21   MR. GIVEN:  Yeah, I was just going to say I
22 don't see a Bates number.
23   MR. SWAMINATHAN:  Yeah, the Bates number looks
24 like it's cut off at the bottom.

## Page 326

1    MS. ROSEN:  On both sides?
2    MR. SWAMINATHAN:  It's on the bottom right and
3  it seems like the page is kind of fading off, so I
4  don't -- the Bates number is not -- didn't get
5  printed on this somehow.
6    MR. GIVEN:  You know what?  I'm seeing a very
7  faint --
8    MR. SWAMINATHAN:  Yeah, like it's fading a
9  little on the bottom.
10   MR. GIVEN:  -- a very faint number there.
11   MR. SWAMINATHAN:  Kate, are you able to figure
12 out what the Bates page of this is?
13   MS. ROACH:  I think it's 163448, but I will
14 confirm.
15   MR. SWAMINATHAN:  Okay.  Or if you have it in
16 Brasfield's report, you can probably confirm it
17 that way.
18   MS. ROACH:  Oh, yeah.
19 BY MR. SWAMINATHAN:
20   Q.  All right.  This is a supplementary report
21 that's dated -- the date of this report at the bottom as
22 submitted, it says June 12, 1991, 2300 hours, and the
23 reporting officers are listed as Guevara and Erickson.
24 Do you see that?

Page 327

1    A.  Yes.
2    Q.  And you see the permanent retention file stamp
3  on this?
4    A.  Yes.
5    Q.  Okay.  So this is -- will you agree with me
6  this is a lineup report that is found in the permanent
7  retention file or RD file?
8    A.  Yes.
9    Q.  The persons conducting the lineup are Guevara
10  and Erickson.  Do you see that?
11    A.  Yes.
12    Q.  And the lineup takes place on June 12, 1991,
13  2300 hours, at Area Five Violent Crimes.  Do you see
14  that?
15    A.  I do see that.
16    Q.  Now, the first person listed as viewing the
17  lineup is Aby Gonzalez.  Do you see that?
18    A.  Yes.
19    Q.  And if you look at the second page of the
20  report, it says "After four witnesses viewing this
21  lineup, the result of it was negative."
22        What does it mean for a lineup to be negative?
23        MS. ROSEN:  Object to the form.
24

Page 328

1  BY THE WITNESS:
2    A.  My understanding is negative that it was the
3  person was not identified.
4    Q.  In other words, the people who viewed the
5  lineup could not make an identification of anyone;
6  correct?
7    A.  Yes.
8    Q.  Now, are there ever occasions where someone
9  picks a filler in a lineup?
10    A.  I'm sure that's happened.
11    Q.  When someone picks a filler in a lineup, do
12  you expect that information to be documented?
13        MS. ROSEN:  Object to the form.
14  BY THE WITNESS:
15    A.  It would be -- I think it would be documented
16  from the point of view that a suspect was number one and
17  the other people were not suspects, so enough -- I don't
18  think they'd -- they'd say it was these people were
19  fillers.
20    Q.  Yeah.  So, I mean, like the report will say
21  somewhere that the witness is, you know, number one, and
22  if the witness -- I'm sorry.  I did not phrase that
23  clearly.
24        You know, the lineup report might say the

Page 329

1  suspect is number one, but let's say the witness picks
2  number three who's obviously not a suspect.
3    A.  Right.
4    Q.  The lineup report would document the fact that
5  they had picked a filler; is that your understanding?
6        MS. ROSEN:  Object to the form.
7  BY THE WITNESS:
8    A.  My understanding is that if there's one
9  suspect put in the lineup and the other people are not
10  suspects at all, and there was --
11    Q.  Yeah.
12    A.  I guess there was a time they might put more
13  than one suspect in the lineup, but the remaining people
14  were not suspects and the person was not picked, they
15  would say it was a negative result.
16    Q.  Okay.  Now, when you say -- so let me ask you
17  this.  If you have a scenario where the witness either
18  is not able to make any identification, doesn't pick
19  anybody out of the lineup versus a scenario where the
20  witness picks somebody out of the lineup who's not a
21  suspect, is it your understanding or expectation that
22  those things are documented differently or they're
23  documented the same?
24        MS. ROSEN:  Object to the form.

Page 330

1        And can we just say -- well, you can answer
2    the question.
3  BY THE WITNESS:
4    A.  I'm not sure if it would be -- specifically
5  say a filler was picked or -- it may.
6    Q.  And does it make any difference to you as a
7  prosecutor if the witness has picked the wrong person or
8  if the witness says they're unable to make an
9  identification?  Those are two different things; would
10  you agree?
11        MS. ROSEN:  Object to the form.
12  BY THE WITNESS:
13    A.  The result is the same though.
14    Q.  So it would make no difference to you at all
15  as a prosecutor if the witness had made a wrong
16  identification versus a witness making no
17  identification?
18    A.  There's a difference, obviously, but at the
19  end of the day they could not pick the suspect out of
20  the lineup.
21    Q.  The --
22    A.  In other words, the filler was not going to be
23  charged.
24    Q.  Understood.

## Page 331

1    Is it your understanding that when a filler is
2  selected as opposed to the person being unable to make
3  an identification that those two things, as a general
4  matter in the Chicago Police Department practice, would
5  be documented the same or be documented differently?
6          MS. ROSEN:  Object to the form.
7  BY THE WITNESS:
8      A.  Back in this era, I'm not exactly sure how it
9  would be documented because there's been dramatic
10  changes to lineup procedures by statute and the way
11  they're created now, so -- and the way they're recorded
12  now, so I don't know what it was back in that era.
13          MS. ROSEN:  So just for purposes of the record
14  so it's clear:  You switched off.  You've --
15          MR. SWAMINATHAN:  Yeah.
16          MS. ROSEN:  -- marked the wrong one.
17          MR. SWAMINATHAN:  Yeah.
18          MS. ROSEN:  And so the one that we're using
19  is -- the exhibit actually has the handwriting,
20  your handwriting, Exhibit 7, on the document.
21          MR. SWAMINATHAN:  Yes.  I gave him the one
22  with my notes on it --
23          MS. ROSEN:  Yeah.  Yeah.
24          MR. SWAMINATHAN:  -- so I just moved the stamp

## Page 332

1  over to --
2          MS. ROSEN:  Okay.
3          MR. SWAMINATHAN:  -- to the other version.
4          MS. ROSEN:  So that we know it's the exhibit.
5          MS. ROACH:  And I --
6          MS. ROSEN:  And did you figure out --
7          MS. ROACH:  Yeah.  The Bates stamps of -- for
8  those two are RFC163448 to 49.
9          MS. ROSEN:  Okay.  163448 and 163449?
10          MS. ROACH:  Correct.
11          MS. ROSEN:  Thank you.
12          MR. SWAMINATHAN:  So we're looking at -- so
13  Exhibit 7, for the record, is RFC163448 through
14  449.
15          MS. ROSEN:  Okay.  Thank you.
16  BY MR. SWAMINATHAN:
17      Q.  All right.  Turning to this document -- strike
18  that.
19          One other question about the filler lineups.
20  Have you ever seen an instance, during your time as a
21  prosecutor in the Cook County State's Attorney's Office
22  where a -- where a witness identification of filler --
23  the witness identified a filler and that was documented
24  in the lineup report you received?

## Page 333

1          MS. ROSEN:  Object to the form.
2  BY THE WITNESS:
3      A.  I don't recall seeing that.
4      Q.  Okay.  Sticking with this Exhibit 7 now, this
5  document states that Aby Gonzalez, along with three
6  other witnesses, was not able to make an identification
7  of Bryan Johns.  Do you agree with me?
8      A.  Yes, I see that.
9      Q.  And do you agree with me that Exhibit 6 says
10  the very opposite with regard to Aby Gonzalez?  It said
11  that Aby Gonzalez made a positive identification of
12  Bryan Johns; do you agree?
13      A.  Yes.
14      Q.  Okay.  Now, would you agree with me we have
15  two reports that appear to relate to the same lineup?
16  Correct?
17      A.  Yes.
18          MS. ROSEN:  Object to the form.
19  BY MR. SWAMINATHAN:
20      Q.  And those two --
21      A.  Well, there is a time difference, though, the
22  date, time and location of the lineup.  One is at 2300
23  and the other one is at 2230.  So I don't know if -- no,
24  actually, on the unsigned one, they assumed it had times

## Page 334

1  in parentheses next to the witnesses.  I'm assuming
2  that's the time they viewed the lineup separately, or
3  maybe I shouldn't assume that.
4          Well, let me just stop at the -- in the lineup
5  reports, there's a 30-minute difference between the
6  date, time and location of the lineup.
7      Q.  Okay.  Do you agree with me it's very unlikely
8  they conducted a lineup with these four individuals and
9  then conducted another lineup 30 minutes later with
10  these exact same four individuals and these exact same
11  suspects?
12          MS. ROSEN:  Object to the form.
13          Calls for speculation.
14  BY THE WITNESS:
15      A.  Well, isn't it six people viewing the -- the
16  lineup in Exhibit Number 6?
17      Q.  In Exhibit Number 6, it's six people.  In
18  Exhibit Number 7, it's four people.
19      A.  Right.
20      Q.  Four of the six people in Exhibit 6 are in
21  Exhibit 7.  Do you see that?
22      A.  I do see that.
23      Q.  Okay.  Now, would you agree me, as a general
24  matter, that this is very unusual, to have two lineups

**Page 335**

1    right on top of each other with almost all of the same
2    witnesses involving a lineup of the same suspect?
3          MS. ROSEN: Object to the form.
4          Foundation.
5    BY THE WITNESS:
6       A. Yeah, let me -- it's not unusual for a series
7    of lineups to be conducted in a sequential fashion. But
8    if what you're asking me is, Is it unusual to show the
9    same lineup to the same people twice, that would be
10   unusual.
11      Q. Okay. Because that's what's happening here;
12   correct?
13      A. I actually don't know what's happening here.
14      Q. All right. Now, in terms of the results here,
15   would you agree with me there's something inconsistent
16   between these two reports? One says Aby Gonzalez picked
17   Bryan Johns out of the lineup and one says Aby Gonzalez
18   could not make an identification. Do you agree with me?
19      A. Yeah, I --
20         MS. ROSEN: Object to the form.
21         Foundation.
22   BY THE WITNESS:
23      A. The one -- Exhibit -- yes, one exhibit says
24   Aby made an identification. The other one says Aby

**Page 336**

1    Gonzalez did not make an identification. And the other
2    difference, as I pointed to before, it's six people as
3    opposed to four.
4      Q. Yes. Now, the Aby Gonzalez -- well, Exhibit 6
5    is the document that is missing from the Cook County
6    State's Attorney's Office file; agreed?
7      A. It's -- as the file is constituted today, it's
8    missing from there.
9      Q. Okay. Now, this is, by the way, a lineup that
10   is conducted by Rey Guevara. Do you agree with me with
11   that, about that?
12      A. Detective William Erickson and Detective
13   Raymond Guevara [sic].
14      Q. Okay. And will you agree with me that the
15   version of -- well, strike that.
16      Do you agree with me that Exhibit 7, the
17   version of the lineup in which Aby Gonzalez makes no
18   identification of Bryan Johns, that is not found in the
19   state's attorney's file or the criminal defense file?
20   Would you agree with that too?
21      A. I -- well, there were no -- there was no
22   Chicago Police Department reports of any type in the
23   public defender's file.
24      Q. What about the state's attorney file? Does

**Page 337**

1    the state's attorney's file have a copy of Exhibit 7,
2    the version of the lineup report where Aby Gonzalez
3    makes no identification?
4         MS. ROSEN: I'm sorry. Could you read back
5       the question?
6    BY THE WITNESS:
7      A. I --
8         MS. ROSEN: Wait.
9       (A portion of the record was read by the
10   reporter.)
11   BY THE WITNESS:
12      A. I'll have to say that my report is lacking
13   here because I didn't write down the number of the
14   lineup report that the expert claimed was missing, so I
15   don't know if he claimed this one was missing or that
16   one missing or both, I -- I don't know. So --
17      Q. Okay. Go ahead.
18      A. So I don't know if that was one that he
19   claimed was missing because --
20      Q. In any event --
21      A. Because in my report, I do address the
22   unsigned lineup report being indicated in the material
23   that was written on the prosecutor's subpoena, the
24   prosecutor's material to follow. So there's an in --

**Page 338**

1    what I'm saying in my report is that the -- at one point
2    the prosecutors may have had the unsigned lineup report
3    and provided it during discovery.
4      Q. Now, you say in your report that the Bryan
5    Johns -- Exhibit 6, the version in which Aby Gonzalez
6    selects Bryan Johns, that that was possibly produced;
7    correct?
8      A. Yes.
9      Q. Now, first of all, you don't know whether it
10   was produced or not. You think that there's some
11   possibility that it was produced; agreed?
12      A. I'm circumstantially saying it was -- is that
13   there was a chance or there was a probability, whatever
14   you want to say, that it was provided.
15      Q. Okay. Now, walk me through your logic. What
16   is it that causes you to believe it was possibly
17   produced?
18      A. Well, there was a subpoena in the Chicago
19   Police Department's investigative material; the ASA
20   subpoena is present; the subpoena and the investigative
21   material that follow it, including the Bryan Johns
22   unsigned lab report, totals 26 pages. So I'm making the
23   assumption that the prosecutors tendered that during
24   discovery based upon the subpoena that they sent for

**Page 339**

1  those materials. I'm agreeing with you that their file
2  as it exists today does not contain that report.
3      Q. Okay. Now, will you mark this one Exhibit 8?
4      (Deposition Exhibit Number 8 was marked for
5  identification.)
6  BY MR. SWAMINATHAN:
7      Q. All right. Now, handing you a document marked
8  Exhibit 8. This is Bates-stamped SAO Subpoena 15056.
9  Do you see that?
10     A. I do.
11     Q. Now, is this the document that you're
12  identifying as being the document that causes you to
13  believe the Exhibit 6 might have been produced?
14     A. Yes.
15     Q. Okay. What is it on this document that causes
16  you to believe that?
17     A. There's two entries, but it's probably the
18  second entry is the one that I believe that indicates at
19  11/27/91 the state files answer to discovery, tenders 26
20  pages RD, GPR subpoena, so the material they received
21  was pursuant to the GPR subpoena, and then it also
22  indicates crime lab reports, firearms, and other items.
23     Also on the prior court date, the prosecutor
24  indicated on the blueback that he tendered 37 pages of

**Page 340**

1  GPRs in there that included also the RD, the CB, and
2  other documents that are above and beyond the notes
3  themselves.
4      So there's two examples here. The second one
5  I thought was more circumstantial evidence that the
6  Bryan Johns unsigned lineup report was tendered because,
7  as I indicated in my report, in the CPD investigative
8  material the prosecutor's subpoena is present, the
9  subpoena and the investigative material that follows it,
10  including Bryan Johns unsigned lineup report, totals 26
11  pages, so that's where I'm circumstantially indicating
12  in my report and in my opinion that on 11/27/91 the
13  prosecutor did circumstantially tender 26 pages, and
14  including in parentheses the GPR subpoena.
15     And then in the police department
16  investigative material, there's 26 pages that follow the
17  prosecutor's subpoena. So that's what makes me think
18  that the 26 pages in the investigative file are the same
19  26 pages that were tendered on 11/27/91, which includes
20  the Bryan Johns unsigned lineup report.
21     Q. Okay. So you're saying -- and let me see if
22  I've got this right. You're saying the state's
23  attorney's office -- is this a blueback or a discovery?
24  What do you call this?

**Page 341**

1      A. This is one page of what's referred to as a
2  blueback.
3      Q. Okay. So on the state's attorney's office
4  blueback, it says 26 pages were tendered on 11/27/91;
5  correct?
6      A. Right.
7      Q. And what you're saying is that causes you to
8  believe that the material in Exhibit 6 was produced from
9  the investigative file because if you go to the
10  investigative file, there's a subpoena, plus the ensuing
11  pages adds up to 26 pages?
12     A. And it includes the Bryan Johns unsigned
13  report.
14     Q. And so that likely means that the Bryan Johns
15  report was --
16     A. That's what I'm trying to indicate that
17  circumstantially that gives me the belief that that was
18  tendered.
19     Q. Okay.
20     A. Like I think you said earlier, I do not know
21  if it was tendered on that date, but from this blueback
22  entry, it appears to give me reason to believe it was.
23     Q. Now, do you identify the page of the subpoena
24  here?

**Page 342**

1      A. You know, I did not.
2      Q. Okay. Now, let's look at the investigative
3  file.
4      (Deposition Exhibit Number 9 was marked for
5  identification.)
6  BY MR. SWAMINATHAN:
7      Q. All right. I've handed you a document marked
8  as Exhibit 9, RFC15446 through 15481. Do you see that?
9      A. I do.
10     Q. Okay. Now, before we talk about that
11  document, let me just make sure this is clear about
12  Exhibit 6. Exhibit 6 is a document, the lineup report
13  in which Aby Gonzalez makes a positive ID of Bryan
14  Johns. That's a document that you would expect to be
15  tendered to the prosecutor and the criminal defendants
16  in response to any subpoena request; correct?
17     A. Yes.
18     Q. And the defendant in this case is Demetrius
19  Johnson. So if a witness has picked Bryan Johns as the
20  suspect, that's obviously important exculpatory
21  information. Would you agree with that?
22     A. Potentially, yes.
23     Q. Okay. So this is potential Brady material.
24  Do you agree with me?

## Page 343

1      A.  Yes.
2      Q.  Okay.  Now, looking at Exhibit 9.  And that's
3  all right.  Let me just be as clear as I can about this.
4          Exhibit 6 is also, not to put it in legal
5  terms, it is potentially highly exculpatory information.
6  Would you agree with me?
7      MS. ROSEN:  Object to the form of the
8  question.
9  BY THE WITNESS:
10     A.  I think I need to know more about Aby Gonzalez
11  and the other investigation to categorize it highly
12  or --
13     Q.  Okay.
14     A.  -- lesser.
15     Q.  Let's put it this way.  Exhibit 6 is
16  potentially strong evidence of innocence for Demetrius
17  Johnson; correct?
18     MS. ROSEN:  Objection.
19  BY THE WITNESS:
20     A.  I wouldn't agree with that.  It's Brady
21  material.  It's definitely -- a defense attorney could
22  use that to their benefit, but I wouldn't agree with
23  anything more than that.
24

## Page 344

1      Q.  Okay.  Now, let's look at Exhibit 9.  This is
2  the investigative file, the file that contains the Bryan
3  Johns report.  Okay?  And so if we turn to page
4  RFC15456, that's the subpoena; right?
5      A.  I'm sorry.  What page again?
6      Q.  RFC15465.  That's the subpoena.  And then if
7  you count 26 pages, one -- starting with the subpoena,
8  one --
9      A.  Yeah.
10     Q.  If you count all the pages starting with the
11  subpoena, you get 26 pages; am I right?
12     A.  I think that's right.
13     Q.  I'll let you do it and make sure I've got it
14  right.
15     A.  Counting the subpoena, 26.
16     Q.  Okay.  And so that's how you describe it in
17  your report, I think.  Including the Bryan Johns, the
18  subpoena and the investigative materials that follow it,
19  including the lineup report, totals 26 pages, so that's
20  what you're referring to as the circumstantial evidence
21  that you might have received in the file; is that
22  correct?
23     A.  Yes.
24     Q.  In other words, the reference on the blueback

## Page 345

1  to 26 pages being tendered you think is a reference to
2  these 26 pages starting with RFC15456 --
3      A.  Yes.
4      Q.  -- and ending in 15481; correct?
5      A.  That's where I got that belief, yes.
6      Q.  And that is the basis for your belief that
7  this Bryan Johns lineup report that's Exhibit 6 might
8  have been turned over; correct?
9      A.  That is what I'm basing my opinion on.
10     Q.  Anything else?
11     A.  Well, also the criminal defense attorney knew
12  about Bryan Johns.  Though he doesn't reference the
13  lineup, there's a note in the criminal defense
14  attorney's file.  The note indicates that Bryan Johns,
15  quote/unquote, knows the real defendant, so that does
16  not reference the lineup, but it referenced the fact
17  that the criminal defense attorney, at least one of the
18  criminal defense attorneys assigned to the case, thought
19  that Bryan Johns could be a significant witness.
20     Q.  And so -- and there's no dispute that the
21  defense attorney might have known the name Bryan Johns
22  because Bryan Johns, at minimum, was on Exhibit 7, the
23  other lineup report; correct?
24     A.  Sure.

## Page 346

1      Q.  That was in the permanent retention file?
2      A.  Yeah.  And the, quote/unquote, knows the real
3  defendant seems to be more than just a casual
4  acquaintance, a casual knowledge of who Bryan Johns is.
5  Either he gleaned something from the police report or
6  possibly had already talked to Bryan Johns one way or
7  another for him to make that comment in a note to file
8  or whatever it was.
9      Q.  So the fact that the criminal defense attorney
10  may have had some information from Bryan Johns, you
11  agree with me that criminal defense attorney did not
12  know about Exhibit 6, a lineup report in which Aby
13  Gonzalez selected Bryan Johns; correct?
14     A.  In that comment he does not reference anything
15  else other than that Bryan Johns knows the real
16  defendant, so he's not saying -- the criminal defense
17  attorney in that one note doesn't indicate whether
18  anything about Johns being picked or not being picked
19  out of the lineup.  He doesn't reference that.
20     Q.  Right.  And so to be clear:  You don't have
21  any indication from your review of the files that the
22  criminal defense attorney knew that Aby Gonzalez had
23  selected Bryan Johns; correct?
24     A.  I do -- yeah, I do not know that.  I only just

**Page 347**

1    know that he knows the significance of Bryan Johns.
2        Q.   Okay.  And would you agree with me that any
3    information you've reviewed that suggested the criminal
4    defense attorney knew something about Bryan Johns does
5    not make Exhibit 6 any less Brady material?  Do you
6    agree with me?
7        A.   Yeah, I'm not saying it doesn't.
8        Q.   Okay.  That fact that he knew of the name
9    Bryan Johns does not change the fact that this is Brady
10   material; agreed?
11           MS. ROSEN:  Objection.  Asked and answered.
12   BY THE WITNESS:
13       A.   Yeah, I already answered that.
14       Q.   Okay.  Is that a yes?
15       A.   That's a yes.
16       Q.   Okay.  I just want to be clear on the record.
17           Now, looking at the blueback, you -- which is
18   Exhibit 8.
19       A.   Yes.
20       Q.   The blueback reference to the tendering of 26
21   pages, the date for that subpoena is 11/27/91.  Do you
22   see that?
23       A.   The date of the court appearance?  Yes.
24       Q.   Yes.  So the court appearance on which the 26

**Page 348**

1    pages are tendered that you believe indicate the Bryan
2    Johns report might have been tendered, that was
3    11/27/91; we're in agreement?
4        A.   Yes.
5        Q.   Now, if you look at the subpoena, RFC15456.
6        A.   Yes.
7        Q.   This is a subpoena from September of 1992.  Do
8    you see that?
9        A.   I do see that.
10       Q.   Does that indicate to you that in fact this
11   is -- this subpoena is not the document referenced in
12   the blueback?
13       A.   It's -- obviously it's a much later date, but
14   I'm -- still would say that it -- I don't think it's a
15   coincidence that there's 26 pages of material behind the
16   subpoena.  So if material was received and tendered in
17   1991 and then subpoenaed again in '92, I don't think
18   that's -- it's a different subpoena, I would agree with
19   you on that.  But my point is that it's still evidence
20   that these 26 pages were in the police -- in the -- I'm
21   sorry -- in the investigative file and that they were
22   circumstantially provided to -- in court.
23       Q.   So let's be clear.  The blueback says that in
24   19 -- in November of 1991, 26 pages were produced.

**Page 349**

1        A.   Right.
2        Q.   Here we have, in 1992, a subpoena plus 25
3    pages.
4        A.   Yes.
5        Q.   You're not claiming that the reference to 26
6    pages on the blueback is the reference to this subpoena
7    and the ensuing 25 pages, are you?
8        A.   No, because the date of the subpoena is so
9    much later, so it's not that the exact subpoena.  But I
10   guess what I'm trying to say to you is that here in the
11   investigative file, yeah, we have a different subpoena,
12   a different and a much later date, but it's the same
13   amount of documents that are included in there after the
14   subpoena.
15           So what I guess I'm trying to say to you is
16   that, though this is a much later subpoena, it's
17   still -- we don't have a 27th page or a 28th page or a
18   29th page.  We have the same 25 pages after the
19   subpoena.
20           So what I'm trying to say to you is that,
21   though the date is much later on the subpoena, so this
22   is not the subpoena that was tendered in '91 --
23       Q.   So you're -- go ahead.
24       A.   Well, but --

**Page 350**

1        Q.   So you're basically saying the fact that this
2    is a document subpoena --
3            MS. ROSEN:  Are you going to allow him to
4    finish?
5            MR. SWAMINATHAN:  I'm sorry.
6    BY MR. SWAMINATHAN:
7        Q.   Did you have more you wanted to say?
8        A.   Well, yeah, I do.
9            So what I'm trying to say is, in other words,
10   in '92, when this was subpoenaed, there was still the
11   same amount of pages counting the subpoena that were
12   obtained and provided.  So my point is that this might
13   have been a different subpoena and documents, but it's
14   the same amount of substantive documents after the
15   subpoena.
16           In other words, there's not a 27th page or a
17   28th page or a 29th page that we could say makes us not
18   understand whether the unsigned report was tendered.
19       Q.   Now, this is -- and you're saying basically
20   the circumstances in which you have a document subpoena
21   followed by 25 pages makes you think that this might
22   synch up even if it's from a different timeframe.  Is
23   that what you're saying?
24       A.   That's what I'm trying to say.

Page 351

1    Q.  Now, this subpoena is a subpoena not for
2    documents, as I understand it, or as I normally see
3    them.  This is a subpoena to Detective Halverson.  Would
4    you see agree with that?
5    A.  I see that, yes.
6    Q.  So this is not a subpoena that's asking for
7    documents.
8    A.  Right.
9    Q.  It's a subpoena asking Halverson to appear in
10   court.  Would you agree with me?
11   A.  I agree.
12   Q.  All right.  So this is not a document
13   subpoena?
14   A.  No.
15   Q.  And it's not a subpoena from 1991 in and
16   around the time of the blueback note; correct?
17   A.  I agree.
18   Q.  Would you agree with me this reference on --
19   from 1919 on the blueback does not provide a basis to
20   say that these twenty-some pages in the investigative
21   file were produced?
22   A.  I still think it does from this point of view
23   that these are the substantive materials that were found
24   in the investigative file even at a later date of 1992,

Page 352

1    and in 1991 it's the same amount of substantive
2    documents that were in the investigative file.
3        So though this is a subpoena to Halverson to
4    appear, that might have also been:  "Halverson bring the
5    file with you yet again," it might have been, I don't
6    know, but set that aside for a minute.
7        All of the substantive material total out to
8    the same amount of pages as from earlier, so I still
9    think it's circumstantial evidence that these reports
10   were tendered in discovery.
11   Q.  Okay.  Now -- but you would agree with me
12   there is an error, in any event, in your report by
13   referencing this subpoena from 1992 would be something
14   produced in 1991?
15   A.  I agree.
16   Q.  Okay.  And you agree with me that it is not a
17   subpoena in 1991 -- strike that.  Strike that.
18       All right.  Let's try -- so earlier on this
19   same blueback there's a reference to documents being
20   tendered to the defense and it says "RD 26 pages."  Do
21   you see that?
22   A.  No, not yet.
23   Q.  Yes.
24   A.  Yes.

Page 353

1    Q.  What do you understand that RD 26 pages to be?
2    Is that usually -- I think when we talked about earlier.
3    RD, as we talked about earlier, is a reference sometimes
4    to permanent retention files.  Is that how that would be
5    used here in your view?
6    A.  Commonly.  I mean, I don't know how this
7    prosecutor used it.  I would say that these all are --
8    these all are RD reports.
9    Q.  Would you take the word RD in that -- in the
10   middle of Exhibit 8 to be a reference to permanent
11   retention file, RD documents?
12       MS. ROSEN:  Object to the form.
13   BY THE WITNESS:
14   A.  As you can see here, the prosecutor uses the
15   term both GPRs and RD, so what I -- I think the
16   distinction he's making is that when he says RD, it's
17   documents that are Record Division documents.  So -- and
18   it turns out that these are Record Division documents,
19   but they of course are 25 pages, not 26.
20   Q.  So the RD -- RD, as you understand it in this
21   document, is a reference to the Records Division or
22   permanent retention file documents; correct?
23   A.  Yeah, I think I said before permanent
24   retention is a stamp that's put on it usually years

Page 354

1    later, so we still refer -- we would refer to it as the
2    RD file.
3    Q.  Understood.  And that's why I'm saying when we
4    talked about the permanent retention files in the course
5    of this case --
6    A.  Yeah.
7    Q.  -- on this document you're not going to call
8    that a PRF, you're going to call that an RD because
9    that's your terminology that you guys regularly used;
10   correct?
11   A.  Right.
12   Q.  Okay.
13   A.  And the number of pages, it's one page off of
14   26, but, again, it's very similar to the amount of pages
15   that are here.
16   Q.  And you agree with me that the permanent
17   retention file in this case was produced to the criminal
18   defense attorney and the prosecutor, they would receive
19   Exhibit 7, a document that says Aby Gonzalez made no
20   identification?
21   A.  They might.  The --
22       MS. ROSEN:  Object to the form.
23   BY THE WITNESS:
24   A.  The Records Division documents are usually

## Page 355

1    the -- well, I mean, that's a Record Division format, so
2    I don't know if they would receive both of them or just
3    one of them. Commonly it was the final signed off on
4    reports that are included in the RD file, whereas the
5    investigative file could have an unsigned report in it.
6        Q. So Exhibit 7 you'd agree with me is a signed
7    report; correct?
8        A. Yes, it is.
9        Q. That's the version of the lineup in which Aby
10   Gonzalez says there's no identification of Bryan Johns;
11   correct?
12       A. Yes.
13       Q. And that's the version that would be produced
14   in an RD file; correct?
15       A. Right.
16       Q. Okay.
17       A. But --
18       Q. So this -- go ahead.
19       A. But these documents here are also RD
20   documents, so I don't think it's that fine of a line
21   here to say that these documents here from the
22   investigative file could not also be maybe casually or
23   sloppily referred to as RD files.
24       Q. Yeah. And this Exhibit 9 as we talked about,

## Page 356

1    this is the investigative file that was produced to us
2    in this case. You understand that; correct?
3       A. I understand that.
4       Q. Yeah. Are there any GPRs in this file?
5       A. Not that I'm seeing, no.
6       Not in this, no.
7       Q. You would expect there to be GPRs if this was
8    the investigative file; correct?
9       A. Yes.
10       Q. What's your understanding of where the GPRs
11   are?
12       A. I don't have an understanding of where --
13       MS. ROSEN: Object to the form.
14   BY THE WITNESS:
15       A. I don't know where the GPRs are.
16       Q. Do you agree with me that this file,
17   Exhibit 9, should have GPRs and those GPRs are missing?
18       MS. ROSEN: Object to the form.
19       MR. GIVEN: Object to the form.
20       MS. ROSEN: Foundation.
21       Calls for speculation.
22   BY THE WITNESS:
23       A. I would ex -- whenever there's extensive
24   interviews of witnesses, I would expect to see a General

## Page 357

1    Progress Report notes of those interviews. Why they're
2    not here, I don't know.
3       Q. Now, is it possible that when you don't have
4    GPRs here with this file that in fact Exhibit 9 is not a
5    complete investigative file?
6       MS. ROSEN: Object to the form.
7   BY THE WITNESS:
8       A. I still don't know why there's -- I don't know
9    why there's a -- an invest -- there would -- not be GPR
10   forms. There may have been a reason why there were no
11   GPRs.
12       Q. So -- and -- and putting it this way,
13   Exhibit 9, putting aside why it happened, Exhibit 9,
14   when you look at this document based on your experience
15   as a prosecutor, is not a complete investigative file.
16   Would you agree with me?
17       MS. ROSEN: Object to the form.
18   BY THE WITNESS:
19       A. I -- I don't -- I believe there should be GPRs
20   associated with it, but I would -- you know, if I were
21   assigned to this case today, I would be calling up the
22   detectives and asking them why there are no GPRs, so I
23   don't know if it's an incomplete file or if there's
24   another reason why there's no GPRs.

## Page 358

1       Q. And you don't know. But as you sit here
2    today, you -- based on your experience, you would
3    suspect that Exhibit 9 is an incomplete investigative
4    file; correct?
5       A. No, I --
6       MS. ROSEN: Object to the form.
7   BY THE WITNESS:
8       A. I would repeat again that I don't know why
9    there are no GPRs in there, so I don't know if this is
10   an incomplete file. I would expect there to be GPRs.
11       Q. Let's look quickly at the Quinones file.
12       A. I'm sorry. Which one?
13       Q. Quinones, which I believe is the first in
14   the -- it's the first in the list, so it's Section 6B.
15       A. Yes.
16       Q. Do you see it?
17       All right. Looking at that file --
18       (Deposition Exhibit Number 10 was marked for
19   identification.)
20   BY MR. SWAMINATHAN:
21       Q. All right. Exhibit 10.
22       A. Yes.
23       Q. Bates-stamped RFC6443. This is a document
24   from the investigative file that was missing from the

## Page 359

1  criminal defense file and the state's attorney's file;
2  agreed?
3      A.  Yes.
4      Q.  Okay.  Now, help me understand.  What is this
5  document?  It says "Request for Identification Photos."
6      A.  This is a document used by a detective or
7  another police officer who is requesting commonly called
8  mugshots or identification photographs or -- for
9  whatever reason.  And during the course of an
10 investigation, the detective's name is on it, it's sent
11 to the Bureau of Identification, and those photographs
12 would be sent back to the detective by police
13 interoffice mail.
14     Q.  Now --
15     A.  These are the same documents that prosecutors
16 would also use to request mugshots.
17     Q.  Are these mugshots -- are mugshot photos often
18 collected by police investigators of potential suspects?
19     MS. ROSEN:  Object to the form.
20 BY THE WITNESS:
21     A.  They -- they are -- they are collected for a
22 host of reasons, the suspects being one of them;
23 witnesses being another reason; a deceased person,
24 someone who's been murdered, to try to fully find out

## Page 360

1  who the person is and whatever other information they
2  can gain off of that.
3      Q.  So mugshot photos are often requested by
4  police investigators of suspects and witnesses.  Do we
5  agree on those?
6      MS. ROSEN:  Object to form.
7  BY THE WITNESS:
8      A.  Suspects, witnesses and victims.
9      Q.  Okay.
10     A.  Among others.
11     Q.  Among others.  Okay.
12         Now, here on this Request for Identification,
13 there's a Request for Identification for Mickey Harris.
14 Do you see that?
15     A.  I see that.
16     Q.  Mickey Harris you agree is not mentioned
17 anywhere else in any of the files?
18     A.  I agree.
19     Q.  Okay.  Now, what is your explanation with
20 regard to this -- this document here and whether this
21 is -- strike that.  Let me ask you this.
22         Is this information potentially exculpatory?
23 Is it information that -- strike that.
24         Is this information that you would expect to

## Page 361

1  be produced to you by the Chicago Police Department,
2  this document?
3      A.  No.
4      Q.  Why not?
5      A.  It's an interoffice request for photographs.
6  It's not per se part of the investigation.
7      Q.  You consider it administrative?
8      A.  I do.
9      Q.  Now, if Mickey Harris was a suspect and
10 Gillion McLaughlin requested his mugshot, then that's
11 potentially important information to a defendant;
12 correct?
13     A.  That would be a report indicating that he was
14 a suspect, not a request for his photograph.
15     Q.  You would expect there to be a report;
16 correct?
17     A.  If Detective McLaughlin was investigating
18 Mickey Harris as a suspect, I'm sure that would be
19 included in some report.
20     Q.  Not -- you're sure, as you know for certain,
21 that it would be in a report, or you're saying you would
22 expect it or it should be in a report?
23     A.  Both.
24     Q.  So you're prepared to sit here and say you

## Page 362

1  know for a certainty that if Mickey Harris was a suspect
2  that Detective McLaughlin would have written a report
3  and did write a report?
4      A.  Well, with regard to the other two people who
5  were being investigated, she referenced those people in
6  her reports as well.
7      Q.  So you agree that Santiago Chacon was a
8  suspect in that case; correct?
9      A.  I believe so.
10     Q.  Bruce Andras was a defendant in that case;
11 correct?
12     A.  Yes.
13     Q.  And it's your testimony and opinion that
14 Mickey Harris was neither a suspect nor a defendant; is
15 that correct?
16     A.  It is my opinion that he was in all likelihood
17 neither.
18     Q.  It's your opinion that Mickey Harris has
19 nothing to do with this case; correct?
20     A.  Yes.
21     Q.  And that's -- and what's that based on?
22     A.  Well, his name is found nowhere in any of the
23 police reports.  That's number one.
24         Number two, just by looking at the IR number

Page 363

1    you can see it's -- he's a very much older person
2    compared to the other two people listed here, just by
3    the -- the IR numbers are assigned sequentially.
4          I think it's just as likely, though I don't
5    know, it's just as likely that Mickey Harris was part of
6    another case that McLaughlin was investigating and she
7    threw all three names on one request form rather than
8    filling out separate request forms.
9          Q.  And so would you agree with me if Mickey
10   Harris's name was put on this request form in relation
11   to another case, then Mickey Harris's name would not be
12   on a Request for Identification for photos in that other
13   case?  Agree with me?
14          MS. ROSEN:  What did you just say?
15   BY THE WITNESS:
16          A.  I don't understand your question.
17          Q.  Then let me ask it again.  If Mickey Harris
18   was a -- you're theory is that Mickey Harris was a
19   suspect in a different case, not --
20          A.  Or --
21          Q.  -- this case; correct?
22          A.  Or deceased.
23          Q.  Okay.
24          A.  Or a witness.

Page 364

1          Q.  Okay.  So one possibility is that Mickey
2    Harris is a suspect in another case; correct?
3          A.  In addition to being maybe a witness or
4    deceased.
5          Q.  Okay.  Now, if Mickey -- if we choose one of
6    the possibilities that you acknowledge, which is that
7    Mickey Harris is a suspect in another case, and your
8    theory in that scenario is that Mickey Harris is just
9    included on this request because it's easier for
10   Detective McLaughlin; correct?
11          A.  Yes.
12          Q.  In that scenario, there would not be a request
13   for identification for photos for a suspect named Mickey
14   Harris in the other case in which he was actually
15   potentially involved; correct?
16          MR. GIVEN:  Objection.
17          MS. ROSEN:  Object to the form and --
18          MR. GIVEN:  Form and foundation.
19          MS. ROSEN:  -- calls for speculation.
20   BY THE WITNESS:
21          A.  If she's ordering up his photograph through
22   this process, I don't expect her to order the photo up
23   again unless --
24          Q.  In --

Page 365

1          A.  -- she forgot that she ordered it up once and
2    ordered it again.
3          Q.  In other words, if you looked at the file for
4    that other case on which she was really requesting
5    Mickey Harris's photo, you wouldn't see her request for
6    identification of photos for the suspect Mickey Harris.
7    Would you agree with me?
8          A.  Well, she might have requested it twice.  But
9    I would -- I would say likely it wouldn't be in that
10   file.
11          Q.  Okay.
12          A.  But he could also be a person that she wants
13   to interview related to that other file, or she -- he
14   could be -- or there's a possibility that he could be
15   used as a filler in a photo array.
16          Q.  Let me give you this.  Mark this Exhibit 11.
17          (Deposition Exhibit Number 11 was marked for
18   identification.)
19   BY MR. SWAMINATHAN:
20          Q.  Handing you a document marked Exhibit 11.
21   It's RFC6442.  This is the page before 6443; agreed?
22          A.  I'm sorry.  This is what?
23          Q.  This is the page immediately preceding --
24          A.  Yes.

Page 366

1          Q.  -- the request for identification of photos
2    we've been discussing; correct?
3          A.  It is.
4          Q.  Are these types of requests often sent
5    interoffice mail?
6          A.  Yes, and they can be sent either in an
7    envelope or they could also be sent just as a piece of
8    paper.
9          Q.  So does it appear likely, given their
10   location, that this request for identification was in
11   this interoffice form on the page earlier?
12          A.  It --
13          MS. ROSEN:  Object to the form.
14   BY THE WITNESS:
15          A.  It's --
16          MS. ROSEN:  Foundation.
17   BY THE WITNESS:
18          A.  It's certainly possible.  I don't know if it's
19   likely.
20          Q.  Okay.  Now, that interoffice form identifies
21   one RD number; correct?
22          A.  Yes.
23          Q.  And it's the RD number of the Demetrius
24   Johnson case; correct?

Page 367

1    A. Yes, it is.
2    Q. Does it identify any other RD numbers for any
3 other cases?
4    A. It does not.
5    Q. Does that in any way affect your view about
6 whether Mickey Harris may or may not have been a suspect
7 in this case?
8    A. No, the -- his name still could have been
9 added to this as a matter of convenience.
10    Q. Does it make any more or any less likely in
11 your view as a practitioner?
12    A. No.
13    Q. Let's turn to the Samuel Slack case. That's
14 on page 60 of your report.
15    A. I'm sorry. What page?
16    Q. 60. It's Section D.
17    A. Yes.
18    Q. Actually, I'm going to spare you this one.
19    A. Okay.
20    Q. I'm almost done. I've got a few more
21 questions.
22       I have nothing else.
23       MS. ROSEN: You're done?
24       MR. GIVEN: I have a couple of quick

Page 368

1 questions. Only a very few follow-up questions
2 spurred by some of Mr. Swaminathan's questions.
3       RECROSS (BERNARD MURRAY)
4 BY MR. GIVEN:
5    Q. During your years at the Cook County State's
6 Attorney's Office, was there a practice of prosecutors
7 maintaining a dialogue with defense attorneys about
8 discovery and production of documents?
9    A. Yes. That commonly would happen when we were
10 in court when a case was up to make sure we had
11 everything. I mean, I'm sorry, that they had everything
12 or if they were missing anything for us to look for.
13    Q. So during the course of a case, for instance,
14 a criminal defense attorney can say to you or another
15 prosecutor, "Hey, these documents you gave me, I notice
16 I have a bunch of supp reports, but I don't have any
17 GPRs. Could you look into that for me? Or, what's
18 going on," is that --
19    A. That's --
20    Q. -- an example of how the dialogue could go?
21    A. That's one example, yes.
22    Q. And in your experience at the Cook County
23 State's Attorney's Office, could defense attorneys
24 communicate directly with the police department about

Page 369

1 discovery issues and production of documents in the way
2 you described earlier via subpoenas or phone calls or
3 whatever?
4    A. I would say primarily through subpoenas, but a
5 lot of the criminal defense attorneys and long-serving
6 senior public defenders, they were -- I wouldn't say
7 they were necessarily on friendly terms with police
8 officers, but they were on talkative terms with them,
9 too, so not as regular as using subpoenas to obtain
10 documents, but there were occasions where they would
11 reach out to a detective and say, "I don't have
12 everything."
13       MR. SWAMINATHAN: Can we take a break? I have
14 a little child care emergency. Can we just stop
15 real quick?
16       MS. ROSEN: Of course.
17       THE WITNESS: Yes.
18       (A short recess was taken.)
19       MR. SWAMINATHAN: I have to leave right now.
20 I have an emergency, so I've got to leave. Can I
21 just have one of my colleagues finish attending the
22 dep?
23       MS. ROSEN: Sure.
24       THE WITNESS: Sure. Take care.

Page 370

1       MS. ROSEN: Are you okay?
2       MR. SWAMINATHAN: Yeah. Everything's fine. I
3 just have to leave.
4       Go ahead. I'll just leave this out here.
5 Sorry, guys.
6       (At 6:25 p.m., Mr. Swaminathan exited the
7 proceedings.)
8 BY MR. GIVEN:
9    Q. So in your experience with the Cook County
10 State's Attorney's Office if a defense attorney was
11 aware that gang crime officers had been involved in a
12 murder investigation, was there anything preventing that
13 defense attorney from asking either the state's attorney
14 or CPD for any documents related to or generated by gang
15 crime officers?
16    A. No. If it was evident from the case, they
17 would send a subpoena directly, either the public
18 defender or a private defense attorney could send a
19 subpoena directly to the gang crimes officers, or they
20 were stationed -- at different times they were stationed
21 out of the area, so they might just send a subpoena to
22 the area, or they could send it to the superintendent's
23 office and write on it "Gang Crime Officer So and So's
24 reports," or whatever.

## Page 371

1      And, also, again, if they were on a talking
2  basis with the gang crimes officers, the same thing:
3  They could say to them, "Hey, I'm looking for your
4  reports."
5      Q.  In your experience at the Cook County State's
6  Attorney's Office, was there a widespread and pervasive
7  practice of the Chicago Police Department failing to
8  provide evidence pursuant to its Brady obligations?
9      MS. ROACH:  I'm going to object to form.
10  BY THE WITNESS:
11      A.  No.
12      Q.  In your experience at the Cook County State's
13  Attorney's Office, did criminal defense attorneys ever
14  raise with you or the State's Attorney's Office or any
15  judges that you're aware of an issue of a policy or
16  practice by the Chicago Police Department of failing to
17  produce documents in compliance with Brady?
18      MS. ROACH:  Object to form.
19  BY THE WITNESS:
20      A.  We did not have that type of complaint in my
21  experience.  I think I alluded to this earlier in the
22  deposition where in the early nineties, you know, sadly
23  the crime rate was very high at that time and there were
24  a lot of problems on getting the final closing supps, so

## Page 372

1  that was probably the closest thing to a recurring issue
2  on getting the final closing supps.  It was just a
3  matter of when we got them, not that there was some sort
4  of attempt to hide reports or not tender reports.
5      Q.  Okay.  That's all I have.
6      MS. ROSEN:  I have nothing.
7      MS. ROACH:  I have nothing.
8      MS. ROSEN:  We reserve.
9      THE REPORTER:  Are you ordering at this time?
10      MS. ROACH:  No.

## Page 373

1  STATE OF ILLINOIS )
                 ) SS.
2  COUNTY OF COOK   )
3
4      I, BETH SKLAR, Certified Shorthand Reporter
and Registered Professional Reporter, do hereby certify
5  that on the 28th day of June, 2017, the deposition of
the witness, BERNARD MURRAY, called by the Plaintiff,
6  was taken before me, reported stenographically and was
thereafter reduced to typewriting under my direction.
7      The said deposition was taken at the offices
of Loevy & Loevy, 311 North Aberdeen Street, Suite 300C,
8  Chicago, Illinois 60607, and there were present Counsel
as previously set forth.
9      The said witness, BERNARD MURRAY, was first
duly sworn to tell the truth, the whole truth, and
10  nothing but the truth, and was then examined upon oral
interrogatories.
11      I further certify that the foregoing is a
true, accurate and complete record of the questions
12  asked of and answers made by the said witness, BERNARD
MURRAY, at the time and place hereinabove referred to.
13      The signature of the witness, BERNARD MURRAY,
was not waived and the deposition was submitted pursuant
14  to Rules 207 and 211(d) of the Rules of the Supreme
Court of Illinois to the deponent per copy of the
15  attached letter.
       The undersigned is not interested in the
16  within, case, nor of kin or counsel to any of the
parties.
17
18
19
20      Beth Sklar, CSR, RPR
21      License No. 084-002148
22
23
24

## Page 374

1      REPORTER:  BETH SKLAR
       DEPOSITION OF: BERNARD MURRAY
2      TAKEN: 06/28/2017
       DEPOSITION ERRATA SHEET
3
4  Page No._____ Line No._____ Change to:_____
5
6  Reason for change:_____
7  Page No._____ Line No._____ Change to:_____
8
9  Reason for change:_____
10  Page No._____ Line No._____ Change to:_____
11
12  Reason for change:_____
13  Page No._____ Line No._____ Change to:_____
14
15  Reason for change:_____
16  Page No._____ Line No._____ Change to:_____
17
18  Reason for change:_____
19  Page No._____ Line No._____ Change to:_____
20
21  Reason for change:_____
22
23      SIGNATURE:_____ DATE:_____
24          BERNARD MURRAY

**Page 375**

```
 1                       REPORTER:  BETH SKLAR
                         DEPOSITION OF: BERNARD MURRAY
 2                       TAKEN: 06/28/2017

 3

 4                    WITNESS CERTIFICATION

 5   Case Caption:  RIVERA vs. GUEVARA, ET AL.

 6

 7            I hereby certify that I have read the entire

 8   transcript of my deposition consisting of pages 1

 9   through 375, inclusive.  Subject to the changes set

10   forth on the preceding pages, the foregoing is a true

11   and correct transcript of my deposition on June 28,

12   2017.

13            Signed on the _____ day of _____,

14   _____.

15

16                         _____

17                         BERNARD MURRAY

18

19   SUBSCRIBED AND SWORN TO
     before me this_____day
20   of_____, _____.

21

22   _____

23      NOTARY PUBLIC

24
```

Page 376

1    January 27, 2018

2    Eileen E. Rosen
     ROCK, FUSCO & CONNELLY, LLC
3    321 NORTH CLARK STREET, SUITE 2200
     CHICAGO, ILLINOIS 60654

4

5    In Re: Rivera v. Guevara, et al.

6    Deposition of: BERNARD MURRAY

7

8    Dear Ms. Rosen:

9        The deposition testimony given on June 26, 2017, in
     the above-captioned case has been transcribed, and
10   inasmuch as signature was not waived, this is to advise
     that the deposition will be available in our office for
11   30 days for reading and signing.
         If you choose to read and sign the deposition at
12   our office, please call the undersigned for an
     appointment.  Our office hours are from 9:00 a.m. to
13   4:00 p.m., Monday through Friday.
         If you choose to make other arrangements for
14   reading and signing of the deposition, please advise us
     of the arrangements you have made in writing within 30
15   days from the date of this letter.

16                      Sincerely, yours,

17

18                      _____
                        Beth Sklar, CSR, RPR
19

20   CC: Anand Swaminathan, Esquire
         Jeffrey N. Given, Esquire
21

22

23

24

Page 377

```
 1                     I N D E X

 2  WITNESS            DIRECT   CROSS   REDIRECT   RECROSS

 3  BERNARD MURRAY

 4  BY MR. SWAMINATHAN   3
    BY MR. GIVEN                                     368
 5
                          -   -   -
 6
                      E X H I B I T S
 7
    NUMBER                 DESCRIPTION              PAGE
 8
    DEPOSITION EX. 1     EXPERT REPORT OF BERNARD     7
 9                       J. MURRAY
    DEPOSITION EX. 2     MATERIALS REVIEWED BY       14
10                       BERNARD MURRAY
    DEPOSITION EX. 3     CURRICULUM VITAE OF        136
11                       BERNARD J. MURRAY
    DEPOSITION EX. 4     INVOICE FOR PROFESSIONAL   179
12                       SERVICES
    DEPOSITION EX. 5     ATTACHMENT G               198
13  DEPOSITION EX. 6     SUPPLEMENTARY REPORT       324
    DEPOSITION EX. 7     SUPPLEMENTARY REPORT       325
14  DEPOSITION EX. 8     COPY OF A BLUE BACK        339
    DEPOSITION EX. 9     INVESTIGATIVE FILE         342
15  DEPOSITION EX. 10    REQUEST FOR IDENTIFICATION 358
                         PHOTOS
16  DEPOSITION EX. 11    CHICAGO POLICE             365
                         INTRA-DEPARTMENTAL MAIL
17                       COVER SHEET

18

19

20

21

22

23

24
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

**A**

**a.m** 1:20 376:12
**ab** 208:18
**Aberdeen** 1:19
2:4 373:7
**ability** 103:24
208:18 234:7
266:17 267:7
267:9 297:24
**able** 3:17 54:3
56:19 67:21
67:24 96:3
118:17 120:23
150:1 197:14
213:14 221:5
234:21 264:16
265:18 300:17
302:8 303:5
326:11 329:18
333:6
**above-captio...**
376:9
**absolutely**
296:17
**Aby** 324:19
325:3 327:17
333:5,10,11
335:16,17,24
335:24 336:4
336:17 337:2
338:5 342:13
343:10 346:12
346:22 354:19
355:9
**access** 82:23
246:7 247:3
247:18 248:13
248:22 249:2
249:16,18,19
**accessing**
248:15 250:12
250:16 251:1
**accomplished**
49:4,6
**accounts** 156:23
**accumulated**
242:20

**accuracy's**
186:1
**accurate** 3:17
3:21 4:1
184:20 185:17
208:22 373:11
**acknowledge**
254:5 364:6
**acquaintance**
346:4
**acquire** 23:16
56:19
**acquiring** 23:11
57:9
**action** 165:22
**active** 163:6,6
**actively** 163:1
**activities** 184:7
**activity** 154:5
156:4
**actual** 55:6
239:2 242:17
291:7,9
**ad** 286:16
**add** 188:3 283:9
290:17
**added** 9:14
277:1,9 367:9
**adding** 183:23
185:13 251:19
**addition** 15:1
56:20 108:18
108:24 121:16
156:16 200:3
297:19 364:3
**additional**
33:22 68:22
179:13 204:8
204:24 205:5
213:4,5,6,14
222:23 227:23
251:9 268:24
**additions** 7:19
**address** 205:22
337:21
**adds** 341:11
**adept** 247:12

**adjective**
190:16
**adjunct** 139:7
**administratio...**
138:10
**administrative**
220:3 221:12
361:7
**admission**
307:7
**admit** 58:18
**adult** 20:16
22:5
**advise** 376:10
376:14
**affect** 72:12
117:5,20
367:5
**affirmed** 3:8
**afternoon** 231:3
**agencies** 23:14
23:15,15,21
24:21
**agency** 49:9
**ago** 7:18 14:24
29:10,10
139:8,13
260:12
**agree** 13:2 44:1
48:23 52:6
86:20 116:24
238:17,18
270:12 271:10
277:3,4,8
278:10 295:17
295:18 301:9
301:20 302:23
302:24 308:13
312:1 319:19
319:22 320:3
320:8 323:7,9
323:15 327:5
330:10 333:7
333:9,12,14
334:7,23
335:15,18
336:10,14,16

336:20 342:21
342:24 343:6
343:20,22
346:11 347:2
347:6 348:18
351:4,10,11
351:17,18
352:11,15,16
354:16 355:6
356:16 357:16
360:5,16,18
362:7 363:9
363:13 365:7
**agreed** 65:4
66:2 336:6
338:11 347:10
359:2 365:21
**agreeing** 339:1
**agreement**
348:3
**aha** 37:2
**ahead** 19:10
28:23 32:12
85:16 105:5
117:18 123:13
175:9 187:8
242:8 305:7
310:20 322:24
337:17 349:23
355:18 370:4
**ahold** 246:22
**al** 9:18 375:5
376:5
**alert** 206:13
**all-inclusive**
38:22
**allegation** 68:10
202:7 241:6
246:16
**allegations** 96:9
186:19 191:19
245:5,5,21
**alleged** 206:11
206:14 210:20
223:9 224:4
279:15
**allegedly** 15:18

205:20 215:16
263:20
**allow** 350:3
**allowed** 246:20
288:16
**alluded** 29:10
32:6 49:6
51:20 211:19
371:21
**alter** 6:2 72:16
**alternatively**
215:21
**Alvarez** 138:11
**Amendment**
165:20
**amount** 183:16
183:22 187:2
188:9 251:5
349:13 350:11
350:14 352:1
352:8 354:14
**analysis** 12:19
82:18 86:14
86:18 88:19
88:19 89:17
89:22 185:14
186:23 196:21
197:9,10
204:8 207:8
207:22 208:5
211:3 213:5
213:11 214:3
214:6,9
215:10 221:18
222:11 224:20
224:21 225:5
225:18 226:3
226:10 227:6
227:23 228:18
229:16 230:1
230:4 239:10
251:8 252:9
253:24 254:3
254:6,21,23
270:10,13
271:10,20
272:3,20

273:19 274:2
274:16,22
275:4,18
276:9 278:15
278:16
**analyze** 197:20
200:6
**analyzed**
221:16 322:3
**Anand** 2:3
376:20
**anand@loevy...**
2:6
**and/or** 86:23
119:10 284:7
**Andras** 362:10
**anger** 306:20
**angry** 306:21
307:1,3
**annotates**
308:18
**annotation**
308:20,21
**annoying**
305:11
**annual** 24:19
**anonymous**
237:23
**answer** 4:7,14
26:20 27:21
36:19 69:20
89:13 102:15
103:4 118:11
118:14,17
123:14 135:12
226:5 272:21
304:4,18
305:16,23
306:4 330:1
339:19
**answered** 21:8
43:19 52:20
67:14 69:20
72:23 73:11
77:10 103:18
226:24 239:17
273:22 279:4

286:16 305:9
305:12,12
312:24 347:11
347:13
**answers** 29:10
305:24 373:12
**anybody** 128:3
178:5 255:18
317:1 329:19
**anymore**
108:14 112:2
**anyway** 244:13
**apologize** 50:15
77:9
**apparently**
169:4
**appeal** 243:20
246:5,19
249:4,20,23
260:1
**appealing**
243:23
**appeals** 65:17
243:19 244:3
244:4,13
248:20,21
250:17,18,19
251:2,4,5
260:16 267:20
268:4
**appear** 333:15
351:9 352:4
366:9
**appearance**
226:15 347:23
347:24
**APPEARAN...**
2:1
**appeared** 34:7
36:3
**appears** 138:4
324:5 341:22
**appellate** 65:11
65:14,23
243:21 244:5
244:7,11,20
244:21 245:3

245:13 246:8
246:14 248:10
249:3,6,11,14
249:17 250:9
250:11 260:2
260:4,5,6
267:20,23
268:3 272:11
273:13 276:14
277:3,9 278:2
278:18
**apple** 63:24
**applicable**
87:15
**applies** 21:20
251:2
**apply** 15:14
**appointed**
139:9 143:22
**appointment**
376:12
**appropriate**
319:20
**approved** 31:16
31:21 36:6
50:8 123:1
319:12
**approving**
33:13
**approx** 142:2
**approximately**
50:2 141:5,7
142:2 149:15
170:18 179:20
180:4 187:13
187:14 188:6
236:21
**April** 177:2,2
**area** 31:3 38:13
39:7,11 41:14
41:17,22,24
53:10 54:17
73:18 78:12
91:7 107:17
107:21 110:12
110:20,24
111:20 120:9

133:24 145:23
145:24 146:18
146:20,20,21
148:8 153:17
154:15 167:12
167:23 169:12
171:8,18
172:13,18,23
173:8 174:2
180:17 189:14
229:1 230:4
231:8 232:9
287:11,16
288:22 289:1
289:9,15
291:20 324:23
327:13 370:21
370:22
**areas** 105:6
142:10 146:9
211:2
**arguing** 216:4,5
**argument**
239:24 245:11
246:1 247:16
280:16
**argumentative**
305:18
**arguments**
241:8 244:4
260:14
**armed** 22:13
**arraigned**
294:18
**arraignment**
242:2
**arrangements**
376:13,14
**array** 160:11
365:15
**arrays** 159:22
160:1,2
**arrest** 38:17
41:18 58:15
112:13 120:7
151:19,19
156:21,24

157:1 169:6,6
169:8,8,13
295:24 296:1
296:1,4,4,13
**arrested** 127:4
127:5 171:11
296:2 297:21
**arrive** 264:6
**arrived** 40:9
**arson** 109:5
145:2 147:21
147:22,22
153:1,2,4,7,9
158:10 282:6
282:9 317:1
319:3
**ASA** 338:19
**aside** 39:20 68:1
68:20 90:2
113:18 191:8
235:16 239:11
352:6 357:13
**asked** 21:8
37:16 43:19
60:21 67:14
72:22 76:18
78:7,12 81:7
81:15 103:18
110:14 140:8
157:24 195:15
195:24 204:14
206:2 226:24
239:17 252:4
255:1 279:4
283:5 286:16
291:11 305:11
312:20 347:11
373:12
**asking** 43:24,24
58:8 70:13
78:3,18 88:2
89:24 121:17
122:10 125:7
125:9 175:2
211:12 241:21
245:7 273:20
277:11,11

279:3 286:12
304:7 306:4,8
306:12 307:14
307:18 335:8
351:6,9
357:22 370:13
**aspect** 6:1
**aspects** 151:23
**assessment**
225:23
**assigned** 20:15
23:7,8 30:17
31:9 59:16
73:17 126:14
128:14 142:13
154:1,3,12,17
154:21 173:2
242:3 245:1
317:24 318:3
345:18 357:21
363:3
**assignment**
147:13 193:23
194:9 195:24
196:8 222:16
252:12,17
**assignments**
20:17 148:6
204:16
**assist** 259:16
**assistance**
201:10 203:16
**assistant** 139:9
140:4
**assisting** 157:8
163:6
**ASSOCIATE**
2:23
**associated** 32:8
33:8 35:23
36:4,7,11,15
123:8,18
124:8 126:1,7
126:20 149:13
214:23 255:7
265:17 294:4
296:17 297:9

316:16 319:7
357:20
**Association**
13:23 14:1,2
24:17
**assume** 4:15
58:4 68:2
81:12,18 97:2
172:14 193:1
278:16,19
312:6 334:3
**assumed** 272:2
274:13 333:24
**assumes** 114:19
115:2 273:13
273:16 274:3
274:17 275:2
**assuming** 149:7
150:6 271:11
276:15 334:1
**assumption**
36:24 114:9
270:12 271:17
275:4 297:6
301:24 338:23
**assumptions**
81:8,11,15,17
81:20,22
304:14
**attach** 86:9,12
**attached** 122:24
135:1,14
231:21 245:22
373:15
**attaching** 88:5
**attachment**
193:9,21
195:23 196:1
196:6,8,24
197:2,14
198:3,5,20
200:18 205:8
207:2 212:1
224:21 225:5
225:18,19
226:1,6
227:22 228:20

228:23 377:12
**attachments**
15:2 193:4
194:6,10,16
194:21 195:13
195:14
**attempt** 279:11
372:4
**attempted**
146:7
**attendance**
68:17,17
205:13
**attended** 25:12
**attending**
369:21
**attention** 11:23
40:19 71:18
73:16 205:18
212:21 228:16
239:22 281:1
325:3
**attorney** 11:7
14:11 15:18
45:4 50:11,14
60:11 73:15
80:22 97:18
105:20 139:10
140:4 175:22
193:12 201:19
202:15 203:4
210:15 211:23
212:1,9,11
214:4 215:17
216:15,18
218:6 232:19
232:22,22
233:4,7,8,11
234:16,20
236:18 237:1
243:23 246:3
246:3,11
248:12 249:20
250:11 252:8
253:12,16
254:8,13
265:23 271:18

273:17 275:7
277:1,14,19
278:18 280:22
283:10 301:10
312:12 322:7
322:21 323:4
336:24 343:21
345:11,17,21
346:9,11,17
346:22 347:4
354:18 368:14
370:10,13,13
370:18
**attorney's** 11:3
13:13,14 16:3
16:5 17:2,14
20:6,7,14,21
20:23 21:4
24:17 46:7
60:6 62:10
63:16 64:8
65:4 71:16
79:18 136:21
137:4 138:2,6
138:16 139:3
140:20 142:1
165:2,12
167:7 174:22
175:5 191:9
191:10 194:5
208:21 210:22
211:1 212:20
214:20 215:5
218:20 219:1
221:12 223:3
223:10,22
230:23 232:18
233:17 237:5
239:15 241:13
241:20 243:17
244:23 246:4
248:4,14,21
250:23 253:4
253:22 255:23
256:1 257:17
258:17 261:5
274:4 276:11

277:2,12,18
278:7,9
281:21 282:16
322:17 332:21
336:6,19
337:1 340:23
341:3 345:14
359:1 368:6
368:23 370:10
371:6,13,14
**attorneys** 13:22
13:23 14:1,2
42:16 43:3
49:16 75:21
76:19 77:3
79:4 80:1,18
84:12 86:17
177:6,21
178:6 179:16
179:18 189:16
190:9 205:19
218:2 225:12
229:18 234:9
234:11,14
235:13 248:3
248:20 249:5
249:6 266:20
269:24 283:5
284:4 345:18
368:7,23
369:5 371:13
**atypical** 164:2
**augment** 148:13
246:12 249:4
**authority**
145:11,13
**auto** 144:21
145:2,2
**available** 15:23
17:15 31:21
42:15 43:2
55:18 57:6
79:3 80:1,17
80:22,24 96:1
98:3 105:8
293:14 376:10
**Avenue** 2:11

**aware** 46:21
48:2 74:5,15
75:10,21,23
76:3,6 77:11
78:13 85:6
101:15,21
115:16 120:18
126:4 149:2,4
153:3 159:9
163:22 167:11
206:19 207:9
219:5 220:7
221:10,14
223:18 248:18
250:21,22
256:5 269:19
269:21 316:19
370:11 371:15

**B**

**B** 265:14 316:7
316:12 377:6
**B-e-r-n-a-r-d**
3:14
**back** 18:7 26:2
26:5 29:1
36:19 51:4,10
55:21 78:4
81:5 93:4
100:8 106:15
106:22 110:4
138:19,21
140:7 144:2
144:10 147:5
168:4 183:9
184:19 185:15
185:19,24
186:5 220:12
220:16 221:17
239:5 242:11
244:6,19
246:8,20
249:9 259:9
259:13 261:19
263:20,20
265:9 268:21
274:4 275:19

276:4 281:16
286:11 290:17
303:6 310:7
321:22 331:8
331:12 337:4
359:12 377:14
**backed** 33:13
**bad** 63:24
146:14 174:4
311:21
**bah** 156:6,6,6,6
**ball** 160:15
**ballistics** 108:12
**ballpark** 21:2
187:12
**bar** 130:14
**based** 37:14
51:9 66:10,14
68:6,6 69:4,22
70:5 106:10
107:13 135:20
155:17 159:10
163:22 176:19
197:1,9,10
207:13 215:10
221:7 228:22
239:13 252:17
252:20 258:23
277:23 289:23
293:9,12
299:9 301:23
316:18 321:5
321:8,11
338:24 357:14
358:2 362:21
**basement** 261:5
**bases** 9:24 10:3
**basic** 110:1
256:14
**basically** 113:5
113:10,17
114:19 138:24
166:17 168:4
226:11 322:15
350:1,19
**basing** 345:9
**basis** 9:24 12:22

13:10 14:5
18:8,9,23
19:15 22:21
27:10 42:2
43:5 54:19
56:23 57:1
72:1 138:21
192:7 233:14
287:18 345:6
351:19 371:2
**Bates** 16:22
198:23 325:19
325:22,23
326:4,12
332:7
**Bates-stamped**
90:14 339:8
358:23
**bear** 155:1
**beat** 147:23
155:3
**beginning** 165:5
237:11 278:20
**begins** 281:6
**behalf** 2:2,9,15
13:24 60:22
221:4
**behaved** 62:4
62:12,19 63:1
**belief** 341:17
345:5,6
**believe** 4:1
10:18 46:2,15
47:4 53:23
67:7 71:6
165:6 169:5
192:22 199:12
229:14 235:8
251:21 259:6
286:5,9 290:2
292:7 293:16
296:18,20
297:4 306:19
324:11 338:16
339:13,16,18
341:8,22
348:1 357:19

358:13 362:9
**believed** 272:9
292:16,17
**believing** 192:7
**bell** 210:6
**belt** 39:18
**benefit** 275:17
276:3 343:22
**Bernard** 1:14
3:7,14 14:15
14:21 368:3
373:5,9,12,13
374:1,24
375:1,17
376:6 377:3,8
377:10,11
**BEROUSEK**
2:16
**best** 10:7
183:19 188:8
258:20
**Beth** 1:15 3:3
373:4,20
374:1 375:1
376:18
**better** 26:14
50:15 52:16
52:21 59:24
62:7 67:19
114:17 156:10
159:8 194:4
237:6 247:23
**beyond** 44:16
80:3 85:24
91:12 255:8
340:2
**bias** 60:18 61:6
**big** 92:16 93:16
113:24 195:23
259:20
**bill** 179:14
**billed** 179:14
**bit** 70:22 130:14
176:24 181:5
186:7
**black** 198:6
**blah** 291:19,19

291:19
**blank** 30:22
220:11,18
221:9
**blood** 108:13
**Blow** 267:6,7
**BLUE** 377:14
**blueback**
217:17,24
218:9 339:24
340:23 341:2
341:4,21
344:24 347:17
347:20 348:12
348:23 349:6
351:16,19
352:9
**board** 160:17
**body** 16:11,13
16:14,15,15
193:18 194:23
195:8 197:21
204:3 215:18
215:21,24
227:24 228:2
228:5 230:5,7
230:9 231:9
231:12,13,21
231:22 232:1
232:10
**bomb** 109:5
147:21 153:1
153:2 158:9
282:6,9
316:24 319:3
**bond** 127:1,6,16
**book** 159:3,14
160:11
**books** 158:17
158:19,21
**Borrotto** 210:17
210:18
**bottom** 283:9
325:24 326:2
326:9,21
**boxed** 268:12
**boy** 133:2 151:5

167:17,19
169:6 187:4
**Brady** 19:13
81:24 236:1
239:4 240:1
240:17,22
241:3,9 242:6
342:23 343:20
347:5,9 371:8
371:17
**brand** 266:8
**Brasfield** 11:1
11:21 12:17
13:4 15:16,20
16:19 68:8
87:3 90:23
97:7 98:1,13
99:2,14,21
114:1 182:20
182:24 186:19
191:5,13,16
202:8 206:1
206:19,20
208:22 209:2
210:11 214:15
215:20 225:1
252:5 253:1,9
253:20 270:10
270:21
**Brasfield's**
12:23 14:9
15:1 16:10
86:15,22
88:19 89:2
94:17 96:9
181:7,18
183:4 186:24
189:6 193:1
204:4 205:8
211:3 215:11
228:20 274:2
322:14 324:9
326:16
**break** 4:5,6,8
77:17 136:8
200:14 202:1
255:17,18,19

255:24 321:17
369:13
**breakdown**
186:10
**brief** 132:13
243:22,24,24
244:17 260:12
260:15 268:7
**briefed** 268:11
**briefs** 244:9,10
244:14 245:13
260:5,9,11,16
260:17 267:24
268:7,12
**bring** 31:10
32:2,3 287:6
287:14,21,24
288:4,6,8
291:1,5 352:4
**bringing** 287:15
**broader** 189:23
**brought** 73:16
138:19,20
154:24 205:18
228:15 233:17
239:21 247:18
259:8 291:2,9
291:11,14,16
291:20
**Bruce** 362:10
**Bryan** 322:11
323:8,18,19
325:2,7 333:7
333:12 335:17
336:18 338:4
338:6,21
340:6,10,20
341:12,14
342:13,19
344:2,17
345:7,12,14
345:19,21,22
346:4,6,10,13
346:15,23
347:1,4,9
348:1 355:10
**buckets** 307:15

**bulk** 59:14
111:10 186:20
193:7 194:22
279:23
**bunch** 73:3
271:9 276:12
368:16
**bureau** 37:16
37:18 40:14
107:19 109:22
111:1,8,20
112:12 138:12
138:13 142:19
143:8,11
144:3,7,9,11
144:15,18,21
145:6,8,10,12
250:19 265:1
265:8 359:11
**bureaus** 142:21
144:17
**Burge** 175:12
175:13,20
**buttress** 104:14

---
## C

**C** 3:1 285:5
**calculate** 280:5
**calculated**
280:8
**calculation**
280:20,21
**call** 30:16 35:14
35:16 37:5
57:10 61:6,19
93:1 94:4,7
95:2 111:16
126:18 128:9
178:1,3,6
187:14 188:16
189:17 211:6
211:8 212:18
215:21 227:9
340:24 354:7
354:8 376:12
**called** 11:22
93:11 94:23

136:24 137:4
144:23,23
151:22 155:10
165:20 189:17
189:18 192:10
193:8,10
195:3 199:5
202:8 215:21
227:6,9 359:7
373:5
**calling** 56:11
199:14 357:21
**calls** 13:1 38:16
39:20 70:21
88:22 94:16
102:5 103:2
104:10 106:6
116:18 117:9
118:3 119:24
197:6 211:7
271:14 272:6
273:9 274:11
284:8 334:13
356:21 364:19
369:2
**canvass** 123:16
158:10
**canvassed**
123:15
**canvassing**
158:5,6
**capacity** 143:20
**capital** 13:23
**capped** 267:21
**Caption** 375:5
**car** 155:4
320:17
**care** 39:12
102:20 103:23
128:19 369:14
369:24
**career** 20:23
22:18,20 26:9
50:3 61:10
93:9
**Carney** 2:16
296:5

**Carol** 203:14
**carried** 52:14
52:15 286:24
289:4 290:18
**carries** 160:15
**case** 1:6 4:23
5:3,6,9,16,23
6:6,10,21 7:5
8:1 9:17 10:1
10:4 13:11
14:5 16:10
18:9,23 20:18
21:11 22:4,22
25:22 26:21
27:19 28:1,7
30:17 31:10
32:1,1 35:9
36:2,9 37:1
41:5 50:8
54:20,23
55:10 56:11
57:8 59:3,16
60:18,20,23
60:24 62:19
65:8,10,11
66:2,14,23
67:1,1,5,11,20
67:22 68:14
68:21 69:17
71:7,12,17
72:4,6,13,21
73:17,23
75:15,21 76:7
76:17,21 77:6
77:7,10 79:2
82:7 83:8 84:1
84:5,5,24 85:2
85:3,8,18
86:19,20 87:1
87:1,2,11,12
87:14,15,16
87:20,22,22
88:5,13,13,18
88:20 89:10
90:4,6,11
91:16 92:17
92:23,23,24

| | | | | |
|---|---|---|---|---|
| 93:1,3 94:5 | 179:1,10,17 | 367:7,13 | 173:11,13,15 | **cell** 242:11 |
| 95:5 96:17,20 | 180:2,3 | 368:10,13 | 174:8,11 | **Center** 268:5 |
| 97:18,19,23 | 182:20,20 | 370:16 373:16 | 175:13 176:16 | **central** 286:23 |
| 98:11,12 99:7 | 183:8 189:5 | 375:5 376:9 | 181:8,14 | **centralized** |
| 99:9,10,13,16 | 190:22 191:4 | **case's** 99:15 | 193:6,7,15,17 | 37:12 38:9 |
| 99:17,19,22 | 191:6,11,13 | **case-by-case** | 195:6 196:13 | 39:3,4 40:1 |
| 99:24 100:13 | 191:24 192:24 | 12:18,22 | 196:14,19 | 113:9 130:6 |
| 100:23,24 | 197:2 198:10 | 229:21 | 202:6,23 | 285:19 286:10 |
| 101:7,12,16 | 202:3 212:7 | **case-specific** | 203:10 210:16 | **centralizing** |
| 102:9,22,23 | 232:15,15 | 13:7 | 211:24 229:22 | 286:4 |
| 103:8 104:3,6 | 233:15 236:5 | **cases** 10:13 | 230:22 247:8 | **certain** 31:18 |
| 105:10 108:1 | 236:11 239:1 | 12:22 13:2,4,8 | 247:20,24 | 31:19 40:13 |
| 115:8,16,20 | 242:2,22 | 15:5,13,20,21 | 252:5,6,6,19 | 51:12 57:6 |
| 115:21 116:3 | 243:6,8,13,18 | 16:1,6,9,16,18 | 254:6 260:21 | 148:8 169:2 |
| 116:10,21 | 243:23 244:23 | 17:23,24 18:1 | 268:16,24 | 185:15 192:15 |
| 117:3,6 | 245:8 246:6 | 18:2,3 20:11 | 292:19 313:12 | 206:24 207:1 |
| 118:20 119:11 | 251:22 252:3 | 20:22 21:3,24 | 322:2 367:3 | 268:9 283:3 |
| 128:14 131:21 | 252:12,16,23 | 22:5,9 27:3 | **casings** 129:5 | 301:13 361:20 |
| 134:2 137:11 | 253:24 254:5 | 36:23 55:6 | **casual** 346:3,4 | **certainly** 87:19 |
| 138:21 141:2 | 254:16,21,24 | 57:18,24 58:1 | **casually** 355:22 | 150:13 160:5 |
| 144:23 145:1 | 256:12,21 | 58:11 61:7 | **catch** 302:8,20 | 163:4 212:19 |
| 147:20 149:12 | 257:23 259:12 | 62:12 66:2 | 302:22 303:5 | 215:6 240:2 |
| 149:14 150:2 | 259:17,18,20 | 67:24 68:1,3,3 | 303:13 | 247:3 366:18 |
| 150:4,15,20 | 259:20,24 | 68:20 88:21 | **categorize** | **certainty** 295:8 |
| 150:21 151:18 | 260:7,12,14 | 89:15,16,16 | 343:11 | 295:16,20 |
| 152:23 153:7 | 261:16,21 | 91:7 93:10,10 | **category** 185:1 | 362:1 |
| 153:8,17 | 263:24 265:17 | 95:14,16 96:2 | 231:8 232:10 | **CERTIFICA...** |
| 154:22 155:2 | 266:7,7 267:6 | 113:19 116:23 | **cause** 3:4 37:23 | 375:4 |
| 155:5,23 | 267:7 268:17 | 133:2 142:9 | 72:10 122:11 | **Certified** 1:15 |
| 158:9,12 | 269:1 270:22 | 142:11,14 | 122:19 127:10 | 373:4 |
| 161:1,15 | 272:1,18 | 144:13 145:18 | 151:20 184:18 | **certify** 373:4,11 |
| 164:9,9 | 278:8 279:21 | 145:22,22 | 231:20,23 | 375:7 |
| 165:18 166:18 | 290:8 291:14 | 146:4,5,6,8,9 | 235:4 238:23 | **cetera** 307:17 |
| 167:12,18,21 | 292:19 302:21 | 146:15,18,21 | 285:9 | 307:17 |
| 167:22,23 | 309:5,6,10 | 147:17 149:6 | **caused** 222:18 | **Chacon** 362:7 |
| 168:1,2,6,8,15 | 313:15 318:3 | 149:15 150:11 | 286:6,7 | **chance** 172:14 |
| 168:18,20 | 319:11 320:18 | 150:22,24 | **causes** 338:16 | 312:16,19 |
| 170:19,24 | 321:9,24 | 153:6 154:18 | 339:12,15 | 338:13 |
| 171:5,6,12,19 | 322:5 323:15 | 155:17 156:11 | 341:7 | **change** 6:2 |
| 172:4,23 | 342:18 345:18 | 157:22 161:17 | **causing** 286:10 | 119:13 138:10 |
| 173:1,5,6 | 354:5,17 | 163:8,10 | **caveat** 88:6 | 347:9 374:4,6 |
| 175:14,24 | 356:2 357:21 | 165:22 167:13 | 89:18,21 | 374:7,9,10,12 |
| 176:6,10,15 | 362:8,10,19 | 167:15 168:9 | **caveats** 89:9,14 | 374:13,15,16 |
| 176:18 177:1 | 363:6,11,13 | 171:21,24 | **CB** 120:7 340:1 | 374:18,19,21 |
| 177:4,8,11,11 | 363:19,21 | 172:5,7,11,12 | **CC** 376:20 | **changed** 9:9 |
| 177:15,22 | 364:2,7,14 | 172:15,17,20 | **CCSAO's** | **changes** 8:14 |
| 178:13,18,21 | 365:4 366:24 | 172:24 173:9 | 279:16 | 104:23 139:16 |

331:10 375:9
**characterizati...**
 34:9
**characterize**
 211:10 226:12
 226:13,14,16
 229:11 231:10
 231:15
**characterized**
 202:11 214:11
 215:12 226:1
 226:2,7,20
 227:22 228:23
 229:10 230:3
**characterizing**
 216:2 304:16
**charge** 26:22
**charged** 330:23
**charges** 162:6
 162:10,21
 316:23 319:11
**chart** 16:11,13
 16:14,15,15
 228:2,5 230:9
 231:9,9,21,22
 232:1,10
**charts** 215:19
 215:21,24
 228:1 230:5,6
 230:7 231:13
 231:13
**check** 81:1
 124:8 230:10
 288:7
**checked** 41:6
**checking**
 165:21
**checklist** 282:5
 282:7,10
 283:11,13,13
 284:1,5,12,16
 284:19,23
**checklists** 40:4
 48:12 51:17
 100:15 281:16
 281:17,21
 283:1,3,4,17

283:20,23
**checkmark**
 40:17,20
**Chicago** 1:10
 1:11,19 2:5,9
 2:15,18 4:22
 9:18 13:19
 14:12 20:12
 20:22,24 21:5
 21:15 22:1,9
 22:12 23:10
 23:12,19,24
 24:2,6,9,10,21
 25:3,7,11,17
 25:21 26:17
 27:14,16 28:3
 28:15 29:8,18
 29:23 30:10
 30:20 31:1,4
 34:5 38:15
 42:9 43:10
 46:22 48:13
 48:21 50:13
 50:17,19 51:1
 52:13,23
 53:16 54:15
 55:24 56:5,6,9
 56:18,22
 57:12,14,19
 58:10 59:5
 60:5,9,17,22
 61:9,13 62:3
 63:23 64:20
 66:11,14,16
 67:2 69:14,17
 69:23 70:4,6
 71:1,19 73:7
 75:12 78:8,14
 78:20 79:9,19
 80:12 84:9,12
 84:13,15
 105:4,13
 106:13,15
 107:6,11,15
 108:7,23,24
 109:4,17,18
 110:13 111:19

112:7,9,21
 113:1 114:11
 114:21 116:3
 116:9 117:2,4
 120:2 121:1
 127:3,21
 130:4,20
 135:7 142:10
 142:11,15
 147:1 148:4
 149:22 162:13
 177:7,10
 178:7 188:14
 188:20,21
 213:10 216:21
 236:22 237:12
 255:5 256:17
 257:10 275:18
 288:14 289:11
 289:24 292:13
 293:10 295:11
 295:21 298:3
 298:4 299:10
 300:17 301:11
 301:24 302:9
 303:4,12,16
 313:22 314:9
 316:19 318:9
 318:15 321:12
 331:4 336:22
 338:18 361:1
 371:7,16
 373:8 376:3
 377:16
**chief** 138:12
 144:16,16,17
 144:18 145:5
 145:12,14
**chiefs** 138:13
**child** 369:14
**choose** 216:24
 219:6 364:5
 376:11,13
**chooses** 267:2
**choosing** 138:14
 217:10 219:8
 219:17 220:2

**circle** 40:17
**circled** 40:19
 286:1
**circles** 51:22
 285:24
**circuit** 244:7
 246:24 249:9
**circumstances**
 167:9 171:24
 350:20
**circumstantial**
 40:24 49:7
 340:5 344:20
 352:9
**circumstantia...**
 51:21 278:4
 286:19,22
 338:12 340:11
 340:13 341:17
 348:22
**cited** 17:12
**city** 1:10 2:15
 9:17 20:15
 34:5 84:13
 141:8 142:14
 146:2,17
 177:10 178:6
 205:24,24
 207:23 208:6
 208:15 213:10
 225:12 230:1
 275:17 279:7
**city's** 82:2,3
 84:12 205:19
 229:18
**civil** 1:17 266:7
**civilian** 58:1
**claim** 25:20
 26:12,15 27:2
 29:24 51:24
 53:2,5
**claimed** 11:1
 87:3 193:11
 193:16 209:9
 210:1 252:6
 337:14,15,19
**claiming** 29:7

51:18 52:2
 53:9 99:24
 285:15 349:5
**claims** 96:12,15
 194:2,3
 208:14 210:18
 225:9
**clarification**
 75:5 83:12
**clarify** 47:13
 74:23 77:20
 85:17 196:12
**Clark** 2:17
 376:3
**classifies** 197:17
**clause** 240:19
**cleaned** 184:13
 257:22
**clear** 24:5 34:2
 104:1 111:17
 135:19 191:15
 205:1 212:15
 219:24 232:14
 235:2,12
 273:23 285:20
 303:10 304:18
 307:5 320:2
 331:14 342:11
 343:3 346:20
 347:16 348:23
**Cleared** 296:13
**clearing** 162:21
**clearly** 114:3
 228:24 229:1
 229:3,6,14,17
 229:24 271:16
 276:13 328:23
**Clerk** 243:21
 244:7
**close** 33:8,21
 141:9 266:24
 267:14
**closed** 93:3
 242:22,24
 256:12 260:7
 261:21 263:16
 266:9 267:16

267:18 296:13
closest 372:1
closing 31:19
  32:8 33:21
  35:4,6,15,16
  35:19,24,24
  162:7,21
  246:1 247:16
  293:14,16
  371:24 372:2
co-defendant
  234:1,4,7
  239:1
co-opted 228:9
co-opting
  231:22
coherent 184:16
coincidence
  348:15
cold 93:10
  144:23,24
  157:12
Collazo 234:3
  236:6
colleagues
  130:13 188:17
  369:21
collect 30:4
  58:8 108:4
  155:7 282:4
  312:8,13
collected 59:24
  108:11 129:10
  155:7 256:24
  258:2 285:10
  286:6 359:18
  359:21
collecting 29:24
  108:18 128:5
  282:3,13
  285:16
College 13:22
  140:22
collude 303:23
colludes 307:17
color 198:7
colorization

200:4
column 199:1
  200:1
columns 197:7
  198:24
combined 141:8
  154:7,9
come 23:9
  27:13 38:1
  41:12 50:12
  60:18 106:14
  109:14 129:12
  141:20 145:22
  145:23 146:9
  168:4 174:3
  174:22 183:9
  189:4 216:23
  249:24 285:23
  290:16 291:1
  294:21 298:1
comes 51:4
  64:24 76:8
  228:5 242:2
  264:15 265:15
  311:8
comfortable
  63:6
coming 146:18
  259:5,6
  287:13
commander's
  289:2
commencing
  1:20
comment
  199:23 210:13
  223:3 346:7
  346:14
commented
  195:1
commenting
  195:19,20
comments
  10:24 185:13
  194:23
committed
  63:17 171:10

committing
  147:23
common 93:20
  126:14,21
  160:16 220:23
  243:21,24
  244:4,19
  246:9 249:7
  249:14 250:2
  250:10
commonly
  36:17 93:19
  94:23 108:2
  132:12 147:2
  147:3 150:8
  151:21,22
  192:18 233:23
  316:1 353:6
  355:3 359:7
  368:9
communicate
  75:2 189:20
  368:24
communicated
  126:3 178:9
  222:7
communication
  222:12
compared
  132:19 270:21
  363:2
comparing
  203:15 270:11
comparison
  202:2,6
  204:17 206:22
  254:12 271:8
comparisons
  201:20
compensated
  83:15 140:9
  140:11,15,18
competent
  60:15
compilation
  184:14 185:1
  185:6,23

186:9
compile 26:13
  38:6
compiled
  189:13 201:15
  201:15
compiling 38:6
  184:10,10,23
  185:9,21
  186:11 187:3
  187:11 188:7
  205:17 242:9
  244:17
complaint
  371:20
complete
  106:22 107:3
  114:3 241:15
  256:1 261:11
  292:8,10,16
  292:24 295:8
  295:9 297:5
  297:10,13
  301:22,22
  357:5,15
  373:11
completed
  294:20
completely
  262:14 272:17
  276:7
completeness
  96:3,8
compliance
  49:13 371:17
complied 38:24
  54:16 120:10
  122:22,23
comply 40:5
  70:23 120:4
  315:9
complying
  50:20
composing
  224:12
comprehensive
  16:18 91:11

computer 188:1
concern 272:1
concerned
  28:18 103:13
concerns
  174:15,18,23
concluding
  33:21
conclusions
  83:10
conditions 3:24
conduct 62:20
  161:2 254:20
conducted
  13:24 23:4
  24:6 25:12
  37:4 60:10
  64:16 204:4
  323:17 324:15
  324:21 334:8
  334:9 335:7
  336:10
conducting
  127:1 148:6
  327:9
confidential
  139:11 265:4
confirm 230:14
  326:14,16
confused 174:1
conjunction
  133:21 134:9
  156:22,23
  157:6 181:7
  247:10
CONNELLY
  2:17 376:2
connotation
  127:14
consider 182:10
  224:6,23
  232:6 249:23
  276:3 284:3
  296:14 361:7
consideration
  196:23
considered

148:20 220:3
275:15 284:10
284:11
**considering**
276:4
**consisted** 183:3
**consistent** 52:24
53:18,19
221:6
**consistently**
257:16
**consisting** 375:8
**constituted**
336:7
**constitutional**
245:5 249:21
**consuming**
202:23
**contact** 152:23
153:2 169:9,9
**contacted**
169:14
**contain** 9:16
94:8 137:17
192:17 210:22
339:2
**contained** 5:18
6:22 9:21 10:9
11:14 196:2
203:21 207:3
210:23 216:20
270:13,14
275:5 279:16
291:7 322:16
**contains** 93:23
137:21 198:17
298:14 311:3
313:13,22
344:2
**contempt** 49:19
**content** 80:7
**contention**
322:19
**contents** 47:19
155:14
**contest** 66:4
**contested** 65:21

**context** 58:3,11
58:13 59:1,3
59:11 62:12
64:21 76:16
189:5 202:18
213:19 239:10
294:11
**contexts** 58:9
**continuance**
212:12
**continued** 39:14
292:20
**continues** 8:11
**continuing**
290:12 292:23
**contract** 138:21
261:10
**convenience**
290:13 367:9
**convenient**
242:14
**conversant** 49:2
**conversations**
90:1,2
**convicted**
127:11,12
**conviction**
127:8 176:7
242:19 243:15
**Cook** 13:12
20:6,7,14,23
21:4 62:10
65:3 79:17
136:21 137:3
138:1,8,11
139:3 141:24
165:1,12
167:6 175:5
218:19,24
221:11 239:14
241:13,19
243:17 244:23
246:4 248:4
248:13,21
249:17 250:22
255:24 258:17
261:4 281:20

301:9 332:21
336:5 368:5
368:22 370:9
371:5,12
373:2
**copied** 42:22,23
45:15 46:3,12
46:17 78:21
78:22 80:8,9
130:15 217:4
311:22
**copies** 136:18
200:21,22
260:10 285:23
291:8
**copy** 6:11 7:11
7:13,17,19,20
7:21 8:5 36:16
40:15 42:10
79:20 98:18
128:11,15
129:19 134:11
200:19,24
201:1 337:1
373:14 377:14
**copying** 78:18
79:6,7 287:7
**corner** 159:19
**corollary** 71:15
71:24
**correct** 5:3 6:7
8:5,6 9:6,7,14
9:15 11:20
12:6 13:5,6,8
13:9 16:7
17:15,16,18
17:19 19:18
20:3 21:12
25:14 26:19
28:1,9,16 29:5
29:6 30:11
32:23 34:13
35:20 36:12
36:13,16 39:5
44:3 46:4,5,13
46:14,19,20
46:23 47:15

47:21 48:14
51:2,5,10,19
51:19 52:9
53:8,12,18
54:16 57:16
58:5 60:7,8,23
64:22 67:8,9
68:22 69:19
69:24 70:1
71:13,14 72:9
72:13,21
75:24 76:4,5
78:11,16,21
79:11 83:22
84:3,4,5,6,7,9
85:9,14 87:16
88:15 89:5
90:15,16
91:18 92:2
93:24 94:9,19
95:23 96:22
98:16,17,20
98:22 99:3,7
99:22,23
100:2,4,5,12
101:3 103:9
103:15 104:17
104:20,23
106:4,16,22
109:20 110:1
110:21 111:4
111:23 112:17
112:18,19,22
113:13 114:12
114:23 115:6
115:7,17,18
118:1 119:18
119:22 121:8
121:12 122:3
122:5 124:4
130:10,21,22
131:9,19
132:2 133:7
133:12 134:16
134:20 135:10
136:1,6 138:2
138:6 141:2,3

141:21 142:4
143:19 144:11
149:8 150:7
150:16 151:1
154:2,17
162:18 165:8
168:18 173:12
173:20 182:16
182:17,21,22
183:5,18
188:22 189:6
193:1,19,23
195:9,10,11
197:16 204:5
204:8,18
205:3 207:3,6
207:10,23
209:18 210:4
213:6,11
214:6,12,20
214:21 216:10
216:13 218:14
219:3 223:22
224:24 225:6
225:20 226:1
226:8 227:19
229:5 230:1
232:19,20
235:6,7,9,23
235:24 236:2
236:9,14
237:18 238:4
238:12,21
240:10 243:10
247:21 248:1
248:5 250:12
250:14,14
251:5,24
252:13,21
253:12,14,17
253:22 254:9
254:15,24
257:1,5,11
261:23 264:12
264:18 265:19
267:8,18,22
268:19,22

271:3,6 272:4
274:5 277:20
280:12,23
285:17 292:13
293:21,23
294:24 295:3
295:5,8
296:22 297:10
297:13 298:1
300:9 302:1
302:10 309:14
310:1,12
313:23 314:2
315:16 318:5
322:3,8,9,12
322:13 324:9
324:16 328:6
332:10 333:16
335:12 338:7
341:5 342:16
343:17 344:22
345:4,8,23
346:13,23
351:16 353:22
354:10 355:7
355:11,14
356:2,8 358:4
361:12,16
362:8,11,15
362:19 363:21
364:2,10,15
366:2,21,24
375:11
**correctly** 47:16
105:9 106:12
109:16 261:21
299:2
**corresponding**
207:16 266:21
**corrupt** 62:1
**counsel** 13:20
55:19 82:17
84:16 90:1,2
179:23 180:8
201:10,22
203:16,23
204:12 205:23

207:22 208:5
208:15 213:10
214:17 221:17
224:8,9
245:18 252:18
252:20 292:6
373:8,16
**counsel's**
213:13 214:14
**count** 279:7
344:7,10
**counting** 344:15
350:11
**County** 13:13
13:14 20:6,7
20:14,23 21:4
24:19 62:10
65:3 79:17
136:21 137:3
138:1,5,9,9,11
138:16 139:2
139:3,9,14,15
139:23 140:2
140:9,20
141:20 142:1
165:2,12
167:7 175:5
218:19 219:1
221:11 239:14
241:13,19
243:17 244:23
246:4 248:4
248:13,21
249:17 250:22
255:24 258:17
261:4 281:20
301:9 332:21
336:5 368:5
368:22 370:9
371:5,12
373:2
**couple** 4:4
139:11 140:3
140:6,7 214:8
247:9 289:5
289:17 292:19
292:20 367:24

**course** 26:9
33:17 50:3
61:9 77:6 83:7
95:7 129:1,20
154:23 166:14
256:19,24
257:13 259:15
288:23 291:18
294:3 318:2
353:19 354:4
359:9 368:13
369:16
**court** 1:1 13:20
19:13 20:16
22:2,5,6,13,23
23:3,7,10,12
23:17 31:18
37:22 38:2
40:11,13
42:16 49:11
50:12 51:23
57:7 65:12,12
65:14,17,23
68:17,17
81:24 205:13
226:14,15
240:22 243:21
244:5,7,8,20
246:24 249:9
249:10,11,14
250:9 260:10
273:13 278:2
282:24 285:11
285:24 286:8
287:7 292:6
293:3 301:21
339:23 347:23
347:24 348:22
351:10 368:10
373:14
**court's** 248:23
**courthouse**
172:2 287:20
**courtroom**
22:16,16,20
41:12 126:15
142:3,8 242:3

**courtrooms**
20:15 23:8
**cover** 17:13
38:2 83:15
198:3 377:17
**covered** 161:12
285:13
**CPD** 40:4 89:3
93:5,15
135:22 215:19
216:1,3,7,13
217:1,8
218:10 219:3
219:7,20
220:8 231:13
231:21 233:11
284:12 285:9
285:16 288:24
310:8 311:16
316:15 340:7
370:14
**CPD's** 216:6
**create** 79:2 83:5
83:7 109:1,6
113:3 128:18
128:19 132:4
133:5 156:6
190:9 269:3
300:24 303:12
303:18 309:8
**created** 42:13
43:8,10,22
44:1 55:21
56:18 58:23
79:23,24
80:21 102:18
102:20 108:1
112:7,9
114:20 119:10
119:14 128:11
131:1,12,13
131:15,16,24
191:20 216:12
217:1 218:12
243:13 282:16
290:15 299:24
300:24 302:9

303:4 308:22
310:4 331:11
**creates** 103:22
121:22 300:4
300:5,14
**creating** 42:24
44:2,13,16
45:20 77:23
79:5 81:7
86:21 115:1
118:9 127:22
131:6,17,21
131:23 132:7
133:10 303:23
309:5,11
**creation** 47:10
**crime** 21:20
73:19 107:18
108:8,17
109:24 111:4
111:6,12,22
112:2 128:14
128:17 129:4
129:14 130:1
133:24 134:18
144:22 147:23
148:9,20
149:14,17,22
149:24 150:22
150:24 151:13
152:3,15
154:5 155:2,9
155:12 157:7
158:16 159:4
160:14 161:2
162:6,8 163:4
163:17,24
212:10 243:8
296:8,11
314:4 316:16
319:5,7
320:17 339:22
370:11,15,23
371:23
**crimes** 21:19,22
22:1,7,9,12
50:6 129:19

132:7,11,12
132:18,19,22
132:24 133:5
133:9,16,22
134:8,9,10,14
134:23 135:2
135:8,23
143:9,10
145:1 147:18
147:21 149:11
149:13,23
150:3,6,10
151:15,24
152:22 153:11
153:16,19,24
154:12,13,20
155:15,17,24
156:8,9,14,18
156:22 157:20
158:12 159:9
159:21 160:9
160:10,18,24
161:10,18
162:4,19,22
162:24 163:6
163:10,23
164:19 166:4
166:23 167:1
167:11,13
172:14 316:15
316:20,21
317:4,21,23
318:1,16,17
318:21 319:16
319:22 320:7
320:12 321:3
321:13 327:13
370:19 371:2
**criminal** 11:2,7
15:6,18 42:16
45:4 46:7,11
46:12,19
50:14,16
73:14 74:2,7
74:17 75:13
75:20 76:12
77:3,13 80:1

80:17,22
86:17 89:16
90:10,12,17
90:22 95:9
97:12,17
101:2 105:20
114:2 144:2,9
175:21 176:4
190:8 191:9
193:12 194:5
201:18 202:10
202:14,15
203:3 206:23
208:21 209:3
209:5,8,10,18
212:11,20
214:19 215:4
215:12 216:9
216:15,18
217:9 218:13
220:16 223:3
223:9 225:9
232:18,22
233:4,7,11
234:9,10,14
234:20 235:6
235:9,13
236:14,17
237:4,17
238:4 243:22
246:10 250:19
252:8 253:2
253:10,21
254:8,12
270:11,14,15
270:22 271:1
271:9 272:2
273:17 274:2
274:4,15
275:5,7,14,16
276:11,13,20
276:22,24
277:2,12,14
277:18,19
278:7,9,17
283:10 312:11
322:7,17,20

336:19 342:15
345:11,13,17
345:18 346:9
346:11,16,22
347:3 354:17
359:1 368:14
369:5 371:13
**criticism** 156:12
197:14 199:16
**CROSS** 377:2
**crossed** 199:20
**crucial** 163:24
**CSR** 3:3 373:20
376:18
**cumulatively**
183:15,16
**current** 188:21
**CURRICUL...**
377:10
**Curtis** 171:8,10
171:13
**cut** 325:24
**cutting** 304:21
**CV** 1:6
_____

**D**

**D** 3:1 287:2,4
367:16 377:1
**daily** 56:7,23
57:1
**Daley** 268:5
**DANIEL** 1:7
**date** 31:18,19
31:21 37:22
40:19 57:4
142:6 242:14
283:8 325:18
326:21 333:22
334:6 339:23
341:21 347:21
347:23 348:13
349:8,12,21
351:24 374:23
376:15
**dated** 38:2
283:8 326:21
**dates** 57:6

285:24
**day** 1:20 40:13
93:1 108:13
123:22 170:21
178:1 188:16
242:11 274:24
289:6 290:11
301:10 312:17
315:10 330:19
373:5 375:13
375:19
**days** 170:22
171:11 177:2
184:15 320:13
376:11,15
**de** 157:20
**dealing** 237:3
**deals** 233:16
**Dear** 376:8
**death** 231:20,23
235:4 259:19
**decades** 20:3
271:6
**deceased**
359:23 363:22
364:4
**December** 20:8
20:9 138:18
**decide** 204:11
252:15
**decided** 224:7
260:12
**decides** 300:5
301:2
**decision** 65:17
**deemed** 191:17
**defendant** 2:9
2:15 11:9
46:11,13
56:17 74:7,17
75:13 76:12
77:13 127:18
162:9 163:18
169:10 171:13
210:18 216:9
218:13 220:16
233:11 241:1

342:18 345:15
346:3,16
361:11 362:10
362:14
**defendant's**
239:6
**defendants** 1:12
46:19 55:17
74:2 101:16
102:8 116:10
118:20 169:2
170:24 217:9
235:6,9
237:17 238:4
342:15
**defender** 214:4
370:18
**defender's**
269:11,13,17
269:24 270:8
323:3 336:23
**defenders** 369:6
**defense** 11:3,7
13:20 14:11
15:6,18 42:16
43:3 45:4 46:7
49:11,16
50:11,14,16
55:19 69:9
73:14 76:19
77:3 79:4 80:1
80:18,22
86:17 90:10
90:12,17,22
95:9 97:12,17
101:3 105:20
114:2 130:14
175:21 189:16
190:9 191:9
193:12 194:5
201:19 202:10
202:15 203:3
206:23 208:21
209:4,5,8,10
209:18 210:15
210:22 211:1
212:9,11,14

212:20 214:19
215:5,13,16
216:15,18
218:2,6 223:3
223:9 225:9
232:19,22
233:4,8 234:9
234:10,14,16
234:20 235:13
236:14,17
237:1,4
243:22 245:18
246:10 249:19
252:8 253:2
253:10,21
254:8,12
270:11,14,15
270:22 271:1
271:10 272:2
273:17 274:2
274:4,16
275:5,7,14
276:11,13,20
276:23,24
277:2,12,14
277:18,19
278:7,9,17
283:5,10
292:6 312:11
322:7,17,20
336:19 343:21
345:11,13,17
345:18,21
346:9,11,16
346:22 347:4
352:20 354:18
359:1 368:7
368:14,23
369:5 370:10
370:13,18
371:13
define 63:5
163:13 226:21
defined 180:17
definitely 80:20
171:19 174:1
195:1 218:22

223:4 265:5
273:2 323:19
343:21
definition 92:4
degree 66:18
108:7 112:1,3
163:5 199:22
283:3 317:24
deliberate 75:2
311:10,10,20
deliberately
74:24
delinquency
23:13
delved 140:5
Demetrius
211:19,23
321:23 342:18
343:16 366:23
denied 74:7,11
dep 369:22
department
13:19 14:12
16:14 20:12
20:22 21:1,6
21:16 22:1,10
22:12 23:10
23:12,19,24
25:18,21
26:17 27:15
27:17 28:4,15
29:8,18,23
30:11,21 31:2
31:4,17 32:21
37:21 38:5,7
38:15,21,24
39:24 40:1
41:3,23 42:6
42:10 43:2,10
46:23 48:13
48:22 50:13
50:18,19 51:2
51:9,12,15,16
52:13,23
54:15 56:6,19
59:6 60:23
61:9,14 66:11

66:15 68:7
69:23 70:4,7
71:1,19 73:7
73:18 75:13
78:8,14,20
79:9,19 80:12
84:9,13,16
89:5 102:17
103:14 105:4
105:14 106:2
106:13,16
107:6,11,15
108:8,23
109:1,5,17,19
110:14 111:20
112:8,10,21
113:1 114:11
114:21 118:8
119:9,14
120:3,4,13,23
121:1,4
129:14,18
130:5,21
135:8 142:10
142:12 147:1
148:5 162:13
177:7 188:14
188:20 216:22
233:1 234:19
236:19,22
238:3 255:6
255:11 257:10
289:11,24
292:13 293:10
293:20 295:11
295:21 298:3
299:5,10,18
300:18 301:11
301:19,24
302:7 303:4
303:12,16
304:2 308:19
313:22 314:10
316:19 318:9
318:15 321:12
331:4 336:22
340:15 361:1

368:24 371:7
371:16
Department's
53:16 60:5
66:16 67:2
69:18 237:12
338:19
departments
40:2 121:3
dependent
301:10,16
depending
244:1
depends 122:6
151:18
deponent
373:14
deposition 1:14
3:3 5:2,6,8,16
5:22 6:2 7:8
14:17 15:2
83:23 98:19
100:1 114:10
136:12 165:5
165:7 179:4
179:24 180:9
180:16,18,19
180:22 181:3
181:4 182:5
182:16,19,24
183:5,13,14
183:18 197:23
302:14 306:1
315:7 324:1
325:11 339:4
342:4 358:18
365:17 371:22
373:5,7,13
374:1,3 375:1
375:8,11
376:6,9,10,11
376:14 377:8
377:9,10,11
377:12,13,13
377:14,14,15
377:16
depositions

1:17 99:13
101:6,11,17
101:22 116:7
178:15 321:8
depth 90:23
deputy 143:15
144:16,17,18
145:5,12
172:8,17,21
describe 11:8
229:17 258:10
258:20 344:16
described 10:14
122:1 126:18
203:5,6 204:2
214:8 220:22
221:6 222:4
247:15 251:7
251:16 285:22
286:19 297:4
299:19,24
302:14 310:16
317:14 369:2
description
194:1,2 317:8
377:7
descriptions
225:19
desk 51:24
detail 15:9
252:4
detailed 122:17
detective 21:20
32:3 35:14
36:1 59:16,18
73:17 126:18
128:14,20
129:3,19
131:5 132:20
134:10,23
135:3 150:14
150:16,21
154:13 156:22
157:24 160:14
160:16,24
161:3,7 162:8
162:17,19

163:7,16,17
164:7 167:12
167:14 172:15
172:19,23
174:7,12
175:13 233:16
233:21 289:17
290:8 294:18
300:24 303:23
318:3 319:8
320:24 324:23
324:23 336:12
336:12 351:3
359:6,12
361:17 362:2
364:10 369:11
**detective's**
160:9 359:10
**detectives** 1:10
24:16 30:17
31:9 33:12
36:5 108:9
110:12 123:24
133:22,24
134:10 147:15
147:18 148:1
149:8 150:1,6
150:8 151:22
151:24 152:22
153:16,19
154:13,18
156:9,13,16
158:7,12
162:5,19
164:5,18
168:7 169:12
171:18 172:6
189:13 287:6
287:13 288:22
289:3 316:15
316:22 317:4
317:22 318:16
318:21 319:9
319:10,17,22
320:7 321:3,9
323:17 324:15
357:22

**detectives'**
128:10
**determine**
73:24 107:2
165:18 208:16
209:14 214:18
227:17 245:10
**determined**
86:16 117:20
**develop** 157:15
**developed**
19:16 76:15
87:15 163:14
164:8 212:9
**develops** 320:12
**Devon** 2:11
**diagnosis** 34:3
**dialogue** 368:7
368:20
**diary** 217:18
**difference**
212:6 215:23
216:14 217:14
330:6,14,18
333:21 334:5
336:2
**differences** 8:14
9:4 87:21 88:6
88:13 89:8
**different** 9:9,12
10:12 15:13
23:23 24:17
27:14 37:16
37:21 38:5,24
39:9 41:2
43:24 44:2
48:19 88:23
89:16,21 92:3
92:4 99:8,11
99:12,12,14
102:17,19
105:6 106:1
107:5,20
108:3 109:4
109:13 111:12
116:22 120:13
124:21,21

129:7 130:10
137:17 144:20
148:7 164:14
164:21 186:13
186:21 194:18
194:23 210:20
211:6 251:23
252:1,2,3,12
258:18 260:18
261:7,14
262:14 273:20
282:11,11
285:21,23
286:12 298:3
320:13 330:9
348:18 349:11
349:12 350:13
350:22 363:19
370:20
**differently**
148:7 329:22
331:5
**differing** 239:19
**difficult** 59:7
105:24 121:17
**difficulty** 8:18
195:3
**direct** 3:10
246:18 249:22
377:2
**directed** 215:14
**direction** 373:6
**directly** 30:18
38:12 121:20
129:15 199:11
368:24 370:17
370:19
**disagree** 119:6
300:13 312:4
**disagreed** 65:24
87:4 305:10
**disappeared**
8:20
**discarded**
257:11
**Disciple** 146:15
146:21

**disclose** 70:7
73:8 78:15
80:19 280:6
**disclosed** 44:9
45:10 77:13
80:11 86:23
181:23 210:9
237:17 252:23
275:6
**disclosing** 44:3
78:2,3,9,10
105:14
**disclosure** 25:8
25:13 53:7,17
66:16 67:2
69:19 70:15
101:8,13,17
102:9 104:4
105:11 284:13
**discovery** 1:18
13:16 22:24
23:2 24:20
26:11 29:12
55:21 56:21
57:2 81:23
127:14 212:21
217:16 223:1
233:24 234:3
234:5,24
235:11 236:24
237:1,14
238:7,9,11,17
238:20,21
239:9,13
240:6,7,10,14
241:10 242:5
257:14 278:1
281:2,7 283:4
287:19 291:17
338:3,24
339:19 340:23
352:10 368:8
369:1
**discuss** 12:8,21
12:23 67:24
181:16 323:12
**discussed** 11:5

11:9,19 12:5
12:19 15:9
99:13,14
101:16 102:17
118:6,7
124:23 179:17
181:15 195:2
203:10 311:2
316:9
**discusses** 278:3
**discussing**
55:17 81:3
86:15 101:7
101:12 180:23
255:23 366:2
**discussion** 12:3
68:3 113:18
215:18
**discussions**
177:6
**dismissed**
176:19
**dispute** 211:9
345:20
**disrespectful**
307:2,6,9,10
**disseminating**
165:17
**distinction**
92:16 264:20
264:23 299:23
319:23 320:1
353:16
**district** 1:1,1
13:22 14:2
20:19 24:17
**districts** 142:10
**division** 1:2
93:19 108:2
126:19 142:14
142:19 143:3
143:4,7 144:3
144:6,9
145:17 162:20
164:18 174:8
353:17,18,21
354:24 355:1

**docketed** 245:8
**document** 7:11
7:12 14:20,23
35:13 42:10
45:7,14 46:1
47:11 69:5
72:16 78:8,14
78:19 79:19
80:12 93:6
102:19 103:23
129:22 131:14
131:16 136:24
137:7,8 165:8
179:7,8
183:20 186:9
198:2,3,16
200:5 202:18
210:24 216:7
219:19 220:12
225:23 226:7
226:15,20
228:4 232:21
233:6,9,10
236:18,19
237:16,20,20
238:2,6,8,10
238:19 239:11
239:12 240:9
240:13 241:7
263:15 282:22
289:19 295:21
296:21 300:8
302:9,20,22
303:3,12,18
304:3 308:10
310:12 311:3
312:2,22
313:11 318:14
318:18 324:4
325:1,14
329:4 331:20
332:17 333:5
336:5 339:7
339:11,12,15
342:7,11,12
342:14 348:11
350:2,20

351:12 353:21
354:7,19
357:14 358:23
359:5,6
360:20 361:2
365:20
**documentation**
222:1 264:17
**documented**
328:12,15
329:22,23
331:5,5,9
332:23
**documents**
12:20,20
13:18 15:7,11
15:14 23:2,16
23:19,20,22
24:1 29:3,11
29:13,17,17
29:24 30:4,22
31:4 32:20
33:14 34:5,7,8
34:17,23,24
35:10,18 38:1
40:4 42:14
43:1 49:21,24
50:12 51:12
55:15,18,20
57:15 58:9
66:19 67:11
67:16,20,23
68:6,9,18 69:5
69:13 70:21
79:9,23,24
80:16 82:4,13
82:17,22 83:7
83:10 85:23
86:2,18 87:13
93:14 94:16
95:17 96:18
96:20 97:14
100:15,18
102:16 103:13
105:3,7,14,22
107:7,7
108:23 111:1

111:2,2,3,7,13
111:15,17,18
112:4,6,17
113:6,7,12
114:6,16
115:1 116:11
118:7,23
119:9,13
128:19 131:7
133:15 137:4
178:17,20
180:11,14
181:2 182:7
182:10,12
184:9 185:20
186:12,14,22
186:24 187:11
192:21 196:15
196:16 197:17
199:10,14,17
199:19 201:7
206:9 207:14
208:11,13,13
208:14 210:17
211:5,7
212:16,20
213:7,8
214:10 215:12
217:16,23
219:21 220:8
221:13 222:19
222:20,22,24
224:13,21
225:8,14
226:8,17,18
227:5 228:6
228:23 229:9
229:20 232:16
242:10 245:12
252:7 253:9
256:15 271:9
271:11 273:7
273:12 276:12
279:15,20
280:14 281:17
282:3,12
290:10,14,23

291:7 292:6
294:10 295:23
297:7,8,24
302:13 307:20
308:6 315:15
318:20 322:6
322:10 340:2
349:13 350:13
350:14 351:2
351:7 352:2
352:19 353:11
353:17,17,18
353:22 354:24
355:19,20,21
359:15 368:8
368:15 369:1
369:10 370:14
371:17
**doing** 13:21
40:22 51:21
139:5 155:17
155:19 159:9
160:6 161:15
164:14 178:10
183:8 230:1
231:1 242:13
250:9 286:23
306:1
**dollars** 178:14
**Dorsch** 233:16
**Dorsch's** 233:21
**doubt** 275:17
276:3
**downstate**
20:20
**drafting** 184:23
185:10,21
186:10 187:3
187:10 188:7
**dramatic** 331:9
**draw** 146:13,14
174:4,5
**driveby** 153:18
155:22
**drugs** 154:10
**due** 55:16
**duly** 3:8 373:9

**DuPage** 13:14
138:5,9,15
139:2 140:19
141:20
**duplicate**
256:13
**duplicates**
257:21

---
### E
**E** 2:16 3:1,1
194:6,10,17
194:19,21
195:13 376:2
377:1,6
**e-mail** 2:6,7,13
2:19,20 222:4
**E-R-P-S** 109:23
**earlier** 9:10
47:9 67:6
73:11 175:1
175:18 186:8
210:12 214:13
228:1 271:6
276:4 285:13
285:22 292:11
293:14 295:2
297:20 302:14
303:22 306:1
310:2 315:7
341:20 352:8
352:18 353:2
353:3 366:11
369:2 371:21
**early** 32:14
33:11 38:18
50:5 261:9
371:22
**earned** 141:5,6
**easier** 196:3,20
197:19 200:6
201:2 364:9
**East** 2:11
**EASTERN** 1:2
**easy** 198:14
225:11
**Echo** 291:12

EDWARD 1:9
effect 24:15
　44:9 48:3 79:7
　79:21,22
effectively
　159:17
effort 183:22
eight 182:2,15
　183:1,3,10,18
eighties 29:1
　246:8 289:24
Eileen 2:16
　376:2
either 13:17
　20:20 23:7
　26:21 39:6
　53:12 65:22
　66:24 73:14
　95:17 107:3
　108:8 118:9
　134:15,19
　135:24 151:16
　155:9,22
　156:21 162:9
　169:6,7
　176:17 180:11
　189:23 191:13
　199:11 207:22
　208:5 220:10
　228:24 232:16
　237:7 241:3,4
　249:5 267:11
　270:5 272:10
　274:14 284:3
　287:24 300:4
　300:6 301:17
　308:1 311:18
　329:17 346:5
　366:6 370:13
　370:17
elected 138:11
electronic
　200:22,24
　201:5 231:7
　260:18
electronically
　200:20 268:6

268:8
eleventh 219:11
　308:3
eliminated
　206:24
else's 265:3
emergency
　369:14,20
employment
　139:12
endeavors
　139:5
enforce 50:12
　50:17
enforced 49:10
enforcement
　23:21
enlarged 242:12
ensuing 341:10
　349:7
ensure 55:16
　91:8 122:2,4
　284:5 287:4
　301:11
ensuring 124:15
entire 18:6
　42:11,21
　43:14 46:2,11
　46:16 47:20
　166:22 198:6
　256:18 293:4
　307:19 316:1
　375:7
entirely 169:23
　183:4 201:16
　203:16,17
　204:4 322:3
entirety 6:12
　17:22,24 18:1
　87:11 90:19
　97:24 217:4,9
　218:12 220:1
entitled 14:20
entries 339:17
entry 339:18
　341:22
envelope 40:12

40:16,18,21
　42:5 220:10
　220:13 221:8
　227:11,12,12
　227:14 366:7
envelopes
　285:22
envision 298:12
equated 127:15
era 50:5 130:11
　148:23 268:10
　331:8,12
Erickson
　323:17 324:16
　326:23 327:10
　336:12
erosen@rfcla...
　2:19
ERPS 109:23
ERRATA 374:3
erred 218:22
erroneous 6:15
error 8:7 211:6
　212:19 352:12
errors 5:18 6:22
　197:2 210:9
　211:12,16
　212:24 213:3
　213:14,19,20
　214:16 215:11
especially
　234:19 237:4
Esquire 2:3,3
　2:10,16,16
　376:20,20
essentially 20:2
　93:22 185:8
　189:21 190:16
　198:17 214:10
　217:18 260:10
　270:7
establish 37:2
　115:19
ESTATE 1:9
estimate 142:5
　152:6,9,11,13
　183:19 184:5

187:3,9,16,24
　188:5,6,8
　230:19
et 9:18 307:17
　307:17 375:5
　376:5
evasive 304:17
　305:23,24
　306:19
event 337:20
　352:12
eventually 31:5
　110:12,13
　123:4 143:15
　171:12 184:13
　218:1 268:11
everybody
　156:7 256:17
　265:3 284:1
everything's
　260:18 370:2
evidence 40:24
　51:21 58:19
　59:12,13,24
　70:22 73:19
　108:5,5,11,18
　108:20 109:24
　111:3,9,15,17
　111:21 128:5
　129:10 155:7
　237:9 239:3
　242:8 340:5
　343:16 344:20
　348:19 352:9
　371:8
evident 370:16
ex 46:15 356:23
　377:8,9,10,11
　377:12,13,13
　377:14,14,15
　377:16
exact 42:12
　44:13 45:20
　47:11 80:18
　81:2 142:6
　233:9 236:18
　260:13 334:10

334:10 349:9
exactly 11:3
　26:13 38:3
　59:21 92:21
　135:3 171:15
　190:2 192:2
　204:22 217:18
　253:19 258:22
　272:23 285:15
　286:14 299:8
　309:2 331:8
examination
　3:10 14:9,10
　16:18 86:18
　90:23 229:21
　279:14
examine 69:7
　69:11 75:14
　191:16 199:22
　200:12 207:17
　212:12 222:18
　252:4
examined 3:8
　5:11 181:11
　193:8 202:15
　213:2 223:23
　373:10
examiner 228:3
examiner's
　215:20 228:6
examining
　88:21 186:13
　205:7 206:8
　225:11,13
　229:18
example 16:9
　26:22 32:19
　33:6 35:19
　38:16 56:17
　68:15 107:18
　120:6 122:15
　128:24 205:12
　207:3 220:5
　230:9 232:2
　232:10 252:5
　259:22 261:17
　282:5 293:12

293:13 294:1
316:24 319:3
368:20,21
**examples** 11:22
15:5 35:17
90:24 193:8
202:8 220:14
230:8 232:9
310:2 340:4
**exceedingly**
133:3 250:7
**exception** 65:22
132:3,5
**excise** 68:2
**exclude** 196:23
**exclusively**
20:21 22:7
30:24 58:1
89:2 183:17
**exculpatory**
238:22 240:3
342:20 343:5
360:22
**Excuse** 17:19
**execute** 157:5
**executing** 157:8
**exercise** 223:19
**exhibit** 7:7,8,12
7:24 8:5 9:22
10:10 14:16
14:17 16:22
18:10,22 81:5
82:4 84:21
86:4 90:8,13
136:12 137:7
178:24 179:4
179:7 182:1
197:22,23
198:2,15
324:1,5
325:11,14
331:19,20
332:4,13
333:4,9
334:16,17,18
334:20,21
335:23,23

336:4,16
337:1 338:5
339:3,4,8,13
341:8 342:4,8
342:12,12
343:2,4,15
344:1 345:7
345:22 346:12
347:5,18
353:10 354:19
355:6,24
356:17 357:4
357:13,13
358:3,18,21
365:16,17,20
**exist** 48:12
100:18 119:20
223:11 281:18
**existed** 28:10,17
101:23 117:24
**existence**
308:14,17
**exists** 299:10
300:8 313:11
322:16 339:2
**exited** 296:5
370:6
**exonerate**
240:24,24
**exonerated**
176:11
**expect** 36:10
44:22 112:21
112:24 120:4
120:10 121:7
121:11 132:15
132:20 134:15
134:18 216:8
235:5 258:22
264:11 314:1
328:12 342:14
356:7,24
358:10 360:24
361:15,22
364:22
**expectation**
45:23 46:10

95:21 127:20
130:24 131:9
131:18 132:1
132:8 133:6
133:11 216:19
217:4 292:12
329:21
**expectations**
239:14
**expecting**
111:18 178:3
**experience**
13:12,18,20
18:11,12,16
18:20 19:1,7
19:24 20:1,2
22:19,21
28:24 29:11
29:13,16
30:15 54:19
54:22 55:5,9
55:24,24 64:6
64:18 66:10
66:14 68:7,13
69:14,22 70:2
70:3 71:3,10
72:1,3 105:7
105:23 106:10
107:13 113:11
113:16 114:24
115:22 119:8
122:14 123:5
126:17,20
132:16,17
138:1 153:9
155:18 156:19
158:6,16
159:7,10,16
159:21 160:20
161:1,4,11,17
162:24 163:9
164:2,3
189:14 216:19
218:24 221:7
262:11 263:10
268:4 269:16
289:23 290:24

293:24 297:2
299:9 321:1,5
321:15 357:14
358:2 368:22
370:9 371:5
371:12,21
**experienced**
25:16
**experiences**
19:2 20:20
27:13 61:8,12
163:22
**expert** 4:18,21
7:13 8:1 15:2
29:7 47:18
54:17 66:13
81:6,7 82:19
83:8,10,22
84:2,8,14 86:8
86:9,12 99:2
99:15,21
140:24 141:7
141:21 169:21
176:24 177:11
178:10,11
182:3,16
183:4 190:2
337:14 377:8
**expertise** 29:16
30:1 51:19
52:3 53:10
180:17,24
**explain** 8:7
10:14 30:3
55:13 56:8
**explained** 28:18
251:10,21
**explaining**
28:15
**explanation**
33:4 35:6 37:7
37:9 219:9
360:19
**exploit** 234:21
**exposure** 23:1
**express** 306:18
**expressed**

169:22
**expressly** 78:9
79:8
**extensive**
127:17 313:18
356:23
**extensively** 60:5
213:2
**extent** 67:10
68:8 69:3
97:16 98:4,24
99:19 114:20
126:23 133:9
134:8,24
135:4,16
197:13 207:8
241:22 243:4
267:20 268:9
**extra** 61:23
316:1
**extremely**
305:23
**eye** 125:13,24

---

**F**

**F** 12:16 13:2
16:9,10 68:9
91:7 193:9,21
193:24 196:4
196:6,15,21
197:11,20
200:6 205:8
213:8 224:11
224:21 225:5
225:7,18,20
226:1,6
227:23 228:20
228:23 291:22
**face** 224:4,13,17
225:10,17,20
227:5,18
228:11 234:9
295:12 297:24
**fact** 69:8 72:2
77:22 81:13
97:8 115:20
117:23 166:23

192:15 209:5
211:13,14,24
212:10,21
229:7 234:19
250:6 256:20
322:23 323:4
329:4 345:16
346:9 347:8,9
348:10 350:1
357:4
**factual** 81:8,10
**fading** 326:3,8
**fail** 71:3
**failed** 71:2 73:8
279:11
**failing** 70:7
72:7 371:7,16
**faint** 326:7,10
**fair** 4:12,15
8:24 18:4,9
25:6 29:15,19
32:24 34:9
51:7 52:4,5
63:6 66:22
76:23 92:7,9
93:17 113:7
113:17 114:18
141:4 183:21
184:5 187:16
188:6 229:1,2
240:19 257:8
259:3 305:24
322:14
**fairly** 64:17
**fall** 239:24
240:4
**FALLON** 1:8
**false** 204:21
**falsehood** 5:18
**falsehoods** 6:22
**familiar** 26:11
188:23 268:15
**familiarity**
19:13,17
**family** 188:13
188:15,19
**far** 57:4,8,8

60:20 83:15
88:20 103:6,7
103:9 109:15
110:9,23
114:10,22
118:22 119:18
122:1 140:13
196:3,7,20
200:6 211:17
218:20 232:11
247:11 251:16
267:15 277:4
278:18 284:12
288:15 307:23
311:6
**fashion** 30:23
73:13 102:19
107:4,5
184:17 225:1
301:1 314:15
315:11 335:7
**fasteners**
291:12
**fathom** 298:4
**favor** 60:18
**fax** 39:10
**faxing** 38:12
110:13
**fear** 272:20
**federal** 1:16
166:4,24
**feds** 165:13
**fee** 141:18
**feel** 6:14 63:14
202:17
**feeling** 189:11
**felonies** 21:22
22:7
**felony** 22:15,16
22:19 23:8
142:3,8,13,18
143:2,4,6
144:3,6,8
145:16,19
282:24
**felt** 62:11,18
63:16,23

186:15 246:11
**Field** 5:6 165:6
**Fields** 4:22 5:2
5:9,16,23 6:1
6:6,21 7:4
27:24 66:24
68:14 75:15
75:19 76:7,11
76:21 77:7,10
84:5 85:2,3,18
86:8,10,13,19
87:1,14,15,22
88:5,7,13,20
89:7,11,17
97:22 98:11
99:9,10,13,17
99:19,24
140:24 141:5
141:8 177:11
177:15,22
180:16 181:6
182:5,6,10
190:2 251:23
252:23 254:5
259:15,21
272:11 292:18
**fifteen** 266:10
**Fifth** 165:20
**figure** 224:22
242:7 326:11
332:6
**file** 11:3,13,18
11:18,24
14:12 15:17
15:19 16:3,12
21:16 25:8,13
27:1,2 28:16
29:8,9 32:3
41:16 42:1,8
42:11,14,21
43:1,9,11,14
43:15 45:9,15
45:21 46:3,12
46:17 47:20
52:23 53:7,13
53:17 57:2
66:16 67:2

69:7,8,9,18
70:14 75:15
76:11 78:15
78:21 79:3,20
79:24 80:7,17
80:21 87:5,9
91:2,10,22
92:1,11,15,19
93:11,13,21
93:22 94:7,11
95:12,15,18
95:19,21,23
96:3,4,11,13
101:7,12,16
104:4 105:11
106:2 109:3,7
109:22 110:10
110:20 111:2
111:21 112:13
120:17 122:8
122:10,17,18
122:22,23,23
127:14 129:21
130:2,12
134:12,16,16
134:19,20
135:10,17,24
135:24 181:19
185:23 186:8
189:4,8,19,22
190:5 198:18
201:19,20
202:6,10,11
202:15,16,20
203:3,4,11,12
203:22 205:13
206:12,16
207:19 209:4
209:5,9,10,13
209:17,18
210:1,2,4,22
211:1,18,22
215:5,7,8,17
215:17 216:8
217:1,4,17,18
217:20 220:6
223:2,3

224:14,16
226:16 228:17
229:20 230:13
230:14,15,15
230:15,16,23
231:24 232:2
232:18,19,22
232:23 233:2
233:4,5,23
234:18 235:3
236:13,14
237:12 238:24
239:3 241:12
242:15,18,21
242:23 243:2
243:9,15,18
244:11,21,22
245:2,3,9,14
245:14,14,21
246:12,14
247:3,4,6,7,14
247:19,21
248:1,5,8,10
248:11,13,16
248:23 249:2
249:11,11
250:6,12,16
253:10,12
254:8,8,12,14
255:22 256:14
257:13 258:13
258:14,15
259:7,8,13,13
259:21 260:2
261:21 262:1
262:3,9,13,17
262:19,24
263:1,1,2,3,5
263:6,6,14,15
263:17,20,22
264:5,6,15,18
264:21,21
265:8,15,17
265:18,23,24
266:1,2,3,6,8
266:8,15,20
266:21,22,24

267:7,14,14
267:21 268:2
268:17 269:3
269:4,5,9,18
270:14,15,15
271:10,11,12
271:18 272:2
272:3,13,16
272:16,19
273:2,7,12,14
274:2,4,16,18
274:21 275:5
275:14 276:7
276:10,11,20
276:23 277:2
277:12,15,19
277:23 278:1
278:7,9
279:23 280:1
280:22 284:13
287:10,15,22
287:24 288:3
288:6,7,8,12
288:13,18,22
289:1,3,6,9,13
289:14,16,20
289:21 290:11
290:14,18,20
291:2,2,3,8,10
291:15,16,18
292:8,10,16
293:1,4
294:11,24
295:8,9 297:6
297:8,10,13
298:6,10,13
300:16,17
301:2,3,13,18
301:18,22,22
302:6,6
303:19,20,24
307:16,21,22
308:11 309:13
309:21 310:8
310:21,24
311:1,5,9,9
312:12,14,14

312:21 313:13
313:20,21
314:2,11,14
315:10,12,20
316:2 318:20
322:7,7,16,17
322:21 323:1
323:2,7 324:8
324:13 325:15
327:2,7,7
336:6,7,19,19
336:23,24
337:1 339:1
340:18 341:9
341:10 342:3
344:2,2,21
345:14 346:1
346:7 348:21
349:11 351:21
351:24 352:2
352:5 353:11
353:22 354:2
354:17 355:4
355:5,14,22
356:1,4,8,16
357:4,5,15,23
358:4,10,11
358:17,24
359:1,1 365:3
365:10,13
377:14
**file's** 227:11
290:22
**file-by-file**
252:24 253:14
**filed** 151:20
155:4 212:12
244:24 245:4
260:9 263:19
264:6 268:1,1
268:7,8
312:11 316:15
**files** 11:19 12:4
12:5,8,12,14
12:16 14:10
14:11,12 15:6
15:8,12,15,21

15:22 16:5
17:1,2,12,14
17:15,17,20
17:21 21:17
26:18,18
27:18 28:5
53:8 77:24
78:10,11 90:7
90:10,12,17
90:19,21,22
91:13,15,18
91:23 93:2,18
93:19 94:12
94:18,22,23
94:24 95:2,4,4
95:6,7,9,10
96:21 97:5,5,7
97:10,11,11
97:12,18
101:2,3,3
106:4 107:12
107:14,16,22
108:2 109:9
109:12,18,23
110:23,24
114:1,2,5,11
114:15,15
116:4 125:12
184:9,19
185:15,24
186:6,13,18
186:24 188:23
189:2,3,10,17
190:3,13,14
190:15,19,21
191:4,5,6,8,9
191:10,11,12
191:16,20,21
191:23 192:3
192:4,8,12,16
192:17,19,23
193:12 194:1
194:5,24
195:3,4,9
202:2,8,22
203:6,15,17
203:19 204:3

204:8,12,13
204:15,18,23
204:24 205:5
205:6,9,19,21
206:1,7,19,21
206:23,23
207:1,3,6,9,13
207:16,21
208:4,19,21
209:7,10,22
209:22,23,24
210:2 211:20
211:21,22
212:23 213:1
213:6,11
214:3,3,4,4,5
214:18,19,20
214:23,24
215:13 216:15
217:8,9,10
220:1 221:16
221:19 222:12
222:13,15,17
222:19 223:8
223:10,11,22
223:23 224:5
225:9,12
229:19 230:11
233:9 236:20
237:5,6,8,10
241:14,15,15
241:15,20,21
241:22,23
242:1 243:3,3
243:4,5,12,16
244:3,22
249:18 251:1
251:8,9 252:7
252:8,9 253:2
253:4,6,7,16
253:17,21,22
254:14 256:1
257:20 258:22
259:5,6,16
260:4,5,20,24
261:3,5,17,18
261:20 262:12

262:20 264:11
264:19 265:2
265:3 266:11
267:16,17,20
267:23 268:3
268:4 270:11
270:12,22,22
271:1 272:10
276:14 279:11
279:14,16
287:6,9,14
288:4,17
290:3 291:6,6
300:19 304:14
314:5,9
316:10 320:21
321:16,18
322:18 339:19
346:21 353:4
354:4 355:23
360:17
**filing** 243:23
249:20 263:1
264:23
**filled** 134:11
155:4
**filler** 328:9,11
329:5 330:5
330:22 331:1
332:19,22,23
365:15
**fillers** 328:19
**filling** 363:8
**fills** 128:7 308:1
308:2
**final** 33:21 50:9
162:9 184:13
184:14,20,24
185:2,3,5,10
186:16,16
187:20 268:8
292:24 296:12
296:14 355:3
371:24 372:2
**finally** 31:14
50:9 57:3
184:14 268:10

285:18 293:15
294:22
**Financial** 145:1
**find** 6:21 16:2
  32:22 34:6,16
  35:1,11 61:15
  73:5 105:24
  122:19 123:16
  129:4 157:17
  157:18 195:1
  201:19 205:20
  205:21 206:14
  206:15 209:2
  215:15 221:21
  249:8,9
  260:12 283:19
  283:22 294:17
  314:11 359:24
**finding** 157:10
  229:5,10
  242:14
**fine** 10:24
  151:10 355:20
  370:2
**fingerprints**
  108:12
**finish** 305:6
  350:4 369:21
**finishes** 265:23
**Finnigan** 175:3
**firearms** 339:22
**FIRM** 2:10
**first** 3:8 23:1
  26:18 28:8,11
  62:24 140:4
  143:1 155:3,5
  165:13 177:1
  186:2 198:4,8
  202:13,14
  223:6 272:21
  282:18 312:4
  317:12 320:17
  327:16 338:9
  358:13,14
  373:9
**fishing** 169:23
**five** 167:12,23

169:12 171:8
171:18 172:13
172:18,23
173:8 174:3
186:5 283:8
324:23,23
327:13
**fix** 251:19
**flaw** 273:18
**flow** 287:5
**focus** 39:21
  193:17 196:23
  214:9 223:20
  224:7,19
  281:14
**focused** 23:24
  183:17 193:5
  193:15,22
  224:10 225:4
  252:19
**focusing** 191:10
  193:6 208:9
  252:11
**fold** 220:8
**folder** 42:4
  258:1 269:7,8
  291:12
**folks** 177:7
**follow** 71:23
  252:3 337:24
  338:21 340:16
  344:18
**follow-up** 34:8
  314:12,15
  368:1
**followed** 124:12
  135:20,21
  218:9 251:22
  251:23 257:16
  350:21
**following** 81:13
  81:19
**follows** 3:9
  340:9
**foolproof**
  264:10
**foregoing**

373:11 375:10
**forensic** 51:13
  56:18 108:4
  108:12,16,21
  111:5,24
  128:4,13,24
  129:10,13
  131:5 155:6
  319:4
**forget** 22:17
**forgot** 365:1
**form** 5:19 6:3
  6:16 7:1 14:4
  14:6 18:24
  21:7 25:24
  27:7 29:21
  30:2 40:6
  43:18 44:4,10
  44:18,23
  45:11,17
  46:24 47:7,22
  48:15,24
  52:10,18 54:1
  54:6,11,24
  55:11 60:9,12
  61:3 62:5,14
  62:22 63:8,20
  64:3,4 65:6
  66:5,6 67:11
  67:13 69:1
  70:8,9 71:21
  72:1,22 73:9
  74:8,18 75:8
  76:13,24
  77:14 79:12
  82:8,9,20
  84:10,17 87:7
  87:17,24 88:8
  88:9,16 94:1
  96:6,23 99:4
  101:19 102:2
  102:3,12,24
  103:10,17
  104:8 105:15
  106:5,18,23
  110:3 111:16
  113:14,20

114:13 116:16
116:17 117:8
118:2,12
119:1,2,23
120:20 125:15
128:1,8,22
135:11 136:2
142:22 147:4
147:11 150:17
152:19 161:23
163:2,11
174:18 176:2
176:12,13,20
188:24 190:24
192:5 194:12
199:2 200:24
200:24 201:13
207:11 208:1
208:7 210:21
213:16 226:23
231:18 237:7
241:17 251:11
251:12,17,19
256:2 275:23
277:5,21
278:12,22
282:19 284:14
284:20 288:10
288:19 290:5
296:23 297:15
297:16 298:23
299:14,15
300:11,21
301:14 302:3
302:11 303:1
303:14 304:23
309:16 310:14
315:17 317:15
318:22 319:1
320:9 327:23
328:13 329:6
329:24 330:11
331:6 333:1
333:18 334:12
335:3,20
343:7 353:12
354:22 356:13

356:18,19
357:6,17
358:6 359:19
360:6 363:7
363:10 364:17
364:18 366:11
366:13,20
371:9,18
**formal** 34:22
  125:3,5,9
  126:15 233:19
**formalized** 43:8
**formally** 138:18
**format** 132:14
  283:6,11
  355:1
**formatting** 8:18
  8:23 155:1,11
**formed** 19:15
  69:16
**former** 188:21
**forming** 81:8
  82:14 87:19
  90:4 95:4
  100:22 192:24
**forms** 13:10
  18:11,16
  22:21 23:22
  30:21,22
  39:15 54:19
  71:10 111:17
  282:24 357:10
  363:8
**forth** 90:8 373:8
  375:10
**Forty-five**
  184:2
**forward** 165:19
**forwarded**
  121:20
**found** 5:17 11:2
  11:24 15:17
  15:18 26:23
  27:15 42:7
  68:10 91:1,9
  94:10 116:1
  169:1,2 176:1

177:14,16,22
192:9,18
193:11 195:1
199:13,13
203:2,3,24
206:12 208:21
210:14,14
212:13 215:4
228:17 229:20
233:23 253:7
253:11,11,21
254:7,14
261:16 273:7
276:9,20
278:7 279:23
280:1,22
294:17 327:6
336:18 351:23
362:22
**foundation**
102:4 103:1
103:19 104:9
116:18 117:11
119:3 271:13
272:5 273:8
274:9 277:6
278:23 335:4
335:21 356:20
364:18 366:16
**four** 179:20,22
212:12 327:20
334:8,10,18
334:20 336:3
**four-and-a-half**
179:20
**four-and-a-h...**
179:22
**Frank** 262:9
**frankly** 165:11
225:11 245:13
**frequently**
150:13
**Friday** 376:13
**friendlier** 196:7
**friendly** 62:1
196:4 200:5
369:7

**friends** 188:13
**front** 51:22
240:1
**fulfilling** 52:3
**full** 95:15,23
171:2 212:23
213:1 214:2
245:10 314:11
315:16
**full-time** 139:10
141:12
**fully** 10:13 49:2
59:21 161:20
202:13 359:24
**function** 159:4
**functions** 161:9
**furlough** 294:19
**further** 91:13
104:14 165:22
229:13,16,24
230:4 373:11
**FUSCO** 2:17
376:2

_____

## G

**G** 3:1 10:18,21
10:22,23
195:23 196:1
196:3,9,16,17
196:20,22,23
196:24 197:3
197:4,6,10,14
197:19 198:3
198:5,20
207:2 212:1
323:4 377:12
**gain** 360:2
**gains** 318:1
**games** 156:15
**gang** 38:10
132:7,11,12
132:18,21,24
133:2,5,9,16
134:2,8,14,18
135:8,23
142:17 143:9
143:10,14,16

143:18 144:22
144:22 145:17
146:3,6,6,8,16
146:23 147:20
147:22 148:13
148:20,24
149:1,11,12
149:13,14,16
149:16,22,23
150:3,5,8,10
150:12,22,24
151:13,15
152:3,15,17
153:5,8,11,19
153:24 154:5
154:20 155:9
155:15,17,24
156:8,13,15
156:18 157:13
158:9,16,17
158:19 159:4
159:9,14,18
159:21 160:10
160:11,18
161:2,10,18
162:7,24
163:10,16,23
164:16,19,23
166:3,22,23
167:1 172:6,9
172:13,16,18
173:13,14,15
173:17,20
174:2,3,10,14
233:17 316:12
317:1 318:19
319:2,14
320:3,5,12
321:13 370:11
370:14,19,23
371:2
**gang-related**
155:23 172:13
173:9,14,17
174:6,7
**gangs** 109:5
153:3 154:7

154:10 160:16
316:9
**Gangster**
146:15,21
**gap** 32:17 33:16
34:23 127:3,5
127:7,16
**gaps** 32:22 34:7
35:10,18
**gather** 184:15
**gathering** 242:4
**GAWRYS** 1:7
**gee** 61:22 186:2
**general** 13:3
23:20 24:11
31:23 32:7
35:22 40:21
42:13 43:7
59:23 60:21
61:6 67:1
69:16 79:14
85:12 107:3
119:7 123:5
124:5,16
161:13 190:6
190:8 192:17
199:6,8
207:19 219:2
219:4 223:16
223:20 224:7
228:14 232:23
248:3 250:9
257:8 269:9
283:16 331:3
334:23 356:24
**generally** 29:14
35:23 70:14
131:20 134:6
242:21,22
292:6 320:17
**generate** 317:2
**generated**
112:13 215:19
215:19 256:19
316:14 319:15
319:20 320:2
320:4,5

370:14
**generically** 31:6
92:20 153:17
216:3
**genesis** 190:3
**geographically**
146:12
**getting** 31:8,8
35:1 49:23
50:7 57:4
128:20 134:15
134:19 160:8
160:10,12
178:6 198:17
219:18 242:12
242:13 243:24
284:5 315:15
319:11 371:24
372:2
**gigantic** 244:2
**Giglio** 19:14
81:24 239:4
240:1,17,22
241:4,9
**Gillion** 1:8
361:10
**girl** 169:9
**give** 24:9
120:13 134:22
163:19 188:8
219:12 222:16
315:24 341:22
365:16
**given** 2:10 6:14
25:7 27:7 33:4
50:11,19
56:17 57:2
60:12 62:5,14
62:22 63:20
64:3 65:6,9
66:5 67:13
70:9 71:21
79:12 82:8,20
82:22 88:9
96:6 99:1
102:3 103:16
103:19 104:7

105:16 116:14
116:16,18
117:7,10
119:2 121:13
125:15 142:22
147:4,11
152:19 159:24
160:2 161:24
169:18 175:16
176:13 188:24
190:23 192:5
219:21 232:10
243:6,8,13,18
244:23 251:12
251:17 274:10
276:24 277:19
278:24 279:3
282:19 289:6
293:11,20
297:16 299:13
299:15 300:20
301:12,13,24
302:2 304:5,8
305:5,23
306:17,22,24
309:5 312:24
317:22 320:9
325:21 326:6
326:10 356:19
364:16,18
366:9 367:24
368:4 370:8
376:9,20
377:4
**gives** 194:1,2
294:2 307:16
341:17
**giving** 113:12
219:20,21
236:7 275:17
276:3
**gleaned** 346:5
**go** 18:7 19:10
28:19,23
29:17 32:12
34:24 49:20
51:16 52:3

59:20 78:4
85:16 105:5
109:9,12,17
109:21 110:1
110:8,9
117:18 118:23
122:1 123:13
123:22 124:9
156:7,21,24
157:1,17,23
165:18 169:18
175:9 184:11
184:19 185:15
187:8 197:4
202:13 242:8
244:19 245:10
248:15 249:9
250:24 258:12
260:2,12,21
261:22 262:2
263:6 266:17
267:16,17,22
268:2,17
269:3,5 276:3
288:3 289:18
301:20 303:17
305:7 310:6,7
310:20 320:14
322:24 323:13
337:17 341:9
349:23 355:18
368:20 370:4
**God** 244:5
**goes** 29:24
244:6 259:24
262:1,17,18
298:5 310:22
**going** 4:14 8:24
37:12 44:14
46:3 52:8 61:3
64:10 66:22
89:13 96:8
105:6 107:5
110:3 112:22
113:1 121:12
123:6 124:6
125:8,12

135:7 148:9
151:10 153:20
155:3,5,6
156:3 163:17
163:19 169:19
169:24 172:2
175:6 178:5
185:24 186:5
196:18,19
198:14 202:22
205:24 206:5
212:3 219:13
225:22 231:15
239:5 243:1
243:20,22
255:18 261:19
266:8 268:21
273:6 275:6
275:14 286:14
286:23 289:6
289:18 303:20
304:9,12,16
305:17,22
306:3,4,6,11
306:11 308:14
309:3 312:2
312:16 321:23
323:2,12
325:21 330:22
350:3 354:7,8
367:18 368:18
371:9
**Gonzalez**
324:19 325:4
327:17 333:5
333:10,11
335:16,17
336:1,4,17
337:2 338:5
342:13 343:10
346:13,22
354:19 355:10
**good** 3:12 61:7
67:3,7 69:19
70:15,18,19
113:12 174:5
185:1 249:6

284:3,10,11
284:18,19,24
311:21
**gotten** 209:4
315:21
**government**
13:23 145:1
166:5,24
**GP** 42:5
**GPR** 36:4,7,11
36:15,18 37:6
40:19 69:5
122:11,13,19
122:20 123:8
123:23 124:8
124:9 126:7
126:19 127:19
127:19 212:10
217:24 226:12
226:21 290:16
290:17 291:19
291:20,20
294:3,4,6,9
295:15 299:4
312:10 313:19
314:14 339:20
339:21 340:14
357:9
**GPRs** 41:6,7,13
41:20,23 42:4
42:6 92:19
94:8,10 123:3
123:16 124:24
125:1,13,20
125:22 126:1
126:9,9
127:15 132:21
189:18 206:11
206:15 217:19
217:21 224:22
225:5 232:16
283:7 288:2,3
292:20,23
293:15 296:17
297:9 312:10
313:13,16,22
314:1,11,12

314:15,19,23
314:24 315:3
315:4,9,10,13
315:16,22,23
316:1 340:1
353:15 356:4
356:7,10,15
356:17,17
357:4,11,19
357:22,24
358:9,10
368:17
**grab** 321:16,18
**granted** 245:7
**gray** 229:1
230:4,20
231:8 232:9
**great** 98:4
252:4
**greater** 150:23
**Green** 234:14
**ground** 4:4
**grounds** 176:7
**group** 24:16
75:17 165:14
214:5
**groups** 23:23
**guess** 8:19 15:1
38:4 39:18
73:2 98:12
105:20 106:8
146:14 180:2
182:6 194:4
201:5 208:18
216:3 301:6
329:12 349:10
349:15
**Guevara** 1:7
167:5,10
168:20 170:19
171:22 172:1
172:23 174:12
174:15,19,23
323:17 324:16
326:23 327:9
336:10,13
375:5 376:5

guidelines
    100:14
guilty 242:23
gun 59:14
    111:11 129:7
guy 159:18
    167:2 267:1,5
    272:17 276:5
    296:3,4
guys 267:3
    286:21 354:9
    370:5
GUZMAN 1:7

### H

H 377:6
half 57:5 149:18
    250:1 300:13
half-hour 180:5
Halverson
    351:3,9 352:3
    352:4
hand 51:14
    289:19 317:4
    317:4
hand-in-hand
    111:7
handed 9:22
    51:10 282:22
    323:3 324:4
    342:7
handful 209:13
handing 7:11
    14:20 137:7
    179:7 198:2
    325:14 339:7
    365:20
handle 65:20
    138:19 146:14
    146:15 245:2
handled 65:21
    153:6 173:1
    246:18 263:20
handling 60:20
    144:13,14
    150:1 243:14
    243:20 245:19

246:3,4
248:21 297:2
handwriting
    331:19,20
handwritten
    33:7,8 94:8,10
    212:7 244:16
    294:2 308:2,3
    310:20,23
    311:4,11
hanging 283:1
haphazard
    265:12 266:16
happen 41:21
    49:14 123:2
    239:10 258:10
    258:16 259:11
    260:1 261:14
    262:4,6,7,9
    287:17 312:6
    319:1 368:9
happened 34:13
    34:23 50:3
    76:20,23 77:4
    77:7 121:17
    122:14 138:17
    139:12 143:21
    159:19 204:22
    212:10 262:5
    263:7 268:13
    298:17 312:7
    315:5 328:10
    357:13
happening 50:6
    51:9 245:16
    309:6 335:11
    335:13
happens 26:16
    33:1,3 48:21
    92:24 266:16
    295:5 298:13
    315:2 319:2
hard 26:20
    187:4,24
    200:19,21,23
    201:1
Harper 139:8

140:22
Harris 360:13
    360:16 361:9
    361:18 362:1
    362:14,18
    363:5,17,18
    364:2,7,8,14
    365:6 367:6
Harris's 363:10
    363:11 365:5
HAZINSKI
    2:23
head 89:19
    109:14 195:16
    195:21
headquarters
    31:6 92:21
    94:14 107:23
    109:3 110:15
    111:21 113:9
    134:7 324:23
hear 142:24
heard 92:10
    123:21,22
    124:1,3
    136:15,24
    167:2
hearing 127:6
    168:5 241:8
    242:20 243:1
    245:9,10
hearings 127:1
heck 38:19
    111:12
held 86:15
    138:12
help 56:3 59:6
    59:10 83:12
    104:13 118:11
    118:13 142:16
    142:19 158:15
    159:14 173:24
    313:8 359:4
helped 13:17,17
    19:15 164:9
helpful 282:2
    283:19,23

helping 163:1
    164:4
helps 55:13
    86:21 87:19
    234:6
hereinabove
    373:12
hesitancy
    280:13
hesitation 8:4
hey 34:16 35:5
    35:14 36:15
    73:21 124:9
    125:11 126:19
    157:17 199:1
    252:15 260:11
    267:13 287:21
    291:1 293:4
    293:10 314:12
    315:23 368:15
    371:3
Hickey 97:20
    97:23 98:10
    98:13,14,16
    98:21 99:1
    100:1
Hickey's 98:1
    99:20
hid 200:4
hidden 8:23
hide 372:4
hierarchy
    162:12
high 17:5 20:13
    21:9 151:3,7,9
    152:12 187:17
    187:18,22
    371:23
highly 106:10
    236:23 237:13
    278:14 312:5
    343:5,11
hindsight 61:20
hired 190:2
hit 51:24
hmm 185:11
hodgepodge

261:11
hold 49:19
    220:15 304:8
hom 159:9
home 201:4
    227:9
homicide 21:12
    21:17,19
    27:17 28:5
    53:8 56:10
    60:20 124:24
    126:9 127:22
    131:2 134:4
    146:6 147:17
    153:13,23
    154:1,20
    155:14 156:18
    157:3,4 159:5
    159:10,11
    161:11,19
    162:16 163:5
    163:10 216:17
    297:3 316:13
    317:23 318:19
    319:15 320:6
    325:8
homicides
    145:20 146:8
    163:1 173:14
    174:7 271:5
    316:23
honest 64:2
honestly 64:17
hope 188:11
hopscotched
    230:11
hospital 276:5
host 226:17
    237:4 359:22
hot 148:14
hour 178:14,15
    178:15 180:7
    231:4,5
hourly 178:13
hours 179:13,20
    182:2,15
    183:1,3,10,18

183:22 184:6
184:8,17,22
185:5,9,18
186:5,9,23
187:2,5,12,13
187:14,19,21
188:6,10
231:6 324:22
325:20 326:22
327:13 376:12
**house** 169:1,2,3
**Humper** 137:1
137:5
**hundred** 178:14
230:24
**hundreds** 297:2
**hypothetical**
72:15 117:1
117:10 119:4
120:22 300:23
304:20,23

**I**

**ID** 342:13
**idea** 45:2 80:20
127:13,16
177:13,21
192:1 284:18
312:2
**ident** 253:8
**identification**
7:9 14:18
37:17,18
40:14 107:19
109:23 111:1
111:8,20
112:12 136:13
179:5 197:24
201:17 234:20
324:2 325:12
328:5 329:18
330:9,16,17
331:3 332:22
333:6,11
335:18,24
336:1,18
337:3 339:5

342:5 354:20
355:10 358:19
359:5,8,11
360:12,13
363:12 364:13
365:6,18
366:1,10
377:15
**identifications**
234:13
**identified** 16:22
18:21 109:22
110:9 112:20
114:9,22
118:1 160:13
182:2 193:18
197:3 201:18
203:22 204:3
204:24 205:2
206:1 209:3
211:2 222:15
228:22 229:23
231:9 232:16
235:18 253:1
253:3,19,20
296:16 325:2
325:7 328:3
332:23
**identifies**
366:20
**identify** 153:21
158:18,24
159:2,15,17
159:20 173:5
197:15 212:24
213:14 219:5
227:19 265:18
341:23 367:2
**identifying**
123:17 124:2
136:6 294:23
339:12
**III** 281:7
**Illinois** 1:1,19
2:5,12,18 3:4
14:1,1 19:12
81:23 259:18

373:1,8,14
376:3
**imagine** 104:15
104:19,22
158:14 299:8
**immediately**
129:3 290:9
315:13 365:23
**impact** 72:20
104:16
**impeachment**
238:23 241:1
**implement**
13:17
**implicated**
234:1
**implicit** 45:5
46:2 47:10
**important**
211:11 342:20
361:11
**impossible**
103:4 121:4
152:6,9,11,13
209:14 303:3
303:11 309:21
309:23
**impounded**
246:24
**impressions**
67:6
**improper** 246:2
**inaccuracies**
5:18 6:23
197:2
**inaccurate** 6:15
**inadequate**
237:6
**inappropriate**
305:17
**inasmuch**
376:10
**incidences**
166:11
**include** 9:24
10:3 23:17
36:7 130:12

131:11 134:12
144:21 205:14
282:5 303:18
303:19 304:2
308:12,12
310:8 314:10
324:10
**included** 10:15
15:8 19:11
40:14 95:7,8,9
95:11,13
97:17 130:2
145:7 185:5,6
190:4 193:10
215:24 218:5
220:19 300:15
300:16 311:5
314:14 340:1
349:13 355:4
361:19 364:9
**includes** 19:1
24:20 55:5
101:2 340:19
341:12
**including** 11:9
64:21 145:20
186:24 218:4
303:24 304:1
317:23 324:19
338:21 340:10
340:14 344:17
344:19
**inclusive** 282:10
375:9
**income** 140:21
140:23 141:19
**incomplete**
117:10 119:4
216:16 223:2
223:2 232:2
233:2,3,4,9
294:24 357:23
358:3,10
**inconsistent**
335:15
**incorporate**
229:4

**incredibly**
105:1
**indented** 8:11
8:16,20 9:5
**independent**
148:24
**independently**
82:1 214:2
**indexing** 258:23
**Indiana** 127:9
**indicate** 40:24
212:3 292:7
341:16 346:17
348:1,10
**indicated** 75:17
337:22 339:24
340:7
**indicates**
233:20 238:24
306:24 339:18
339:22 345:14
**indicating**
340:11 361:13
**indication**
346:21
**indicted** 165:11
165:13,13,14
166:4,24
**indictment**
243:14 265:5
**indirectly**
172:24 174:11
**individual** 40:2
61:13 62:11
63:17 107:17
112:16 176:11
**individuals**
151:16 255:11
255:14 334:8
334:10
**inexact** 163:20
**infamous**
259:17
**inferences** 51:8
**inform** 86:21
104:13 128:16
**informal** 125:9

184:12
**informally**
282:22
**information**
10:14 76:22
77:12 82:7,11
102:10 116:7
119:22 120:5
123:17 124:2
126:6 134:3
137:18,21
154:24 156:16
188:3 193:22
196:2 198:18
198:22 201:11
201:21 203:11
203:20 205:15
205:18 206:6
207:3 209:1
210:13 213:5
214:15 215:9
215:14 221:17
222:3,6,11
223:7 228:4
228:15 235:12
238:24 287:5
308:18 309:12
310:6 318:1
319:8,9
320:12,21
321:2 328:12
342:21 343:5
346:10 347:3
360:1,22,23
360:24 361:11
**informed** 38:21
68:13 85:2
**informs** 86:20
**initial** 131:21
155:2,2
183:12 227:17
227:20 320:18
320:19
**initially** 7:17
27:24 31:2
33:5 110:11
123:4 167:19

168:6 183:7
194:8 200:21
226:9 261:5
**innocence** 176:8
176:19 343:16
**innocent** 176:1
176:4
**inserted** 9:13
**instance** 4:20
63:22 65:3
66:1 75:23
76:2 77:11
209:16 230:8
236:12 267:3
267:4 300:6
302:9 314:17
314:18 332:20
368:13
**instances** 5:15
5:17 34:4,11
34:16 36:14
49:24 50:11
50:16 62:3,9
62:17 63:15
70:6,24 71:18
72:7 73:6,24
74:6,16 75:11
76:6 133:4
151:13 163:9
163:22 166:17
198:24 201:17
203:20 209:2
237:5 254:11
258:9 297:23
302:19,21
314:13 315:14
315:21
**instruction**
245:16,24
247:17 267:2
**instructions**
242:13 249:8
249:10,13,13
250:24
**insufficient**
249:15
**intelligence**

153:20 156:11
156:14
**intend** 7:24
11:14 75:1,1
179:14
**intended** 189:19
189:21
**intending** 9:20
10:8 52:22
53:11,15
194:15
**intent** 75:2
**intention** 43:6
**intentionally**
75:12
**inter-** 30:19
**interact** 172:5
200:23
**interacted**
63:22 64:9,20
167:3
**interacting**
55:24 56:5,9
56:22 57:14
58:10 59:2
60:4 62:18
**interaction** 57:5
58:4,22 62:11
152:15 164:19
171:22 172:1
175:4
**interactions**
167:6,10
**interested**
178:10 373:15
**intermediate**
36:1
**internal** 25:21
**internally** 26:16
29:24 49:4
51:9
**interoffice**
38:14 39:15
39:20 70:21
94:16 359:13
361:5 366:5
366:11,20

**interpretation**
306:20
**interrogation**
24:15
**interrogatories**
373:10
**interrupting**
305:5
**interstate**
127:10,11
**interview** 89:23
90:3 122:7,17
156:7,8,9
158:2 163:17
163:18 189:18
227:10 289:18
294:8 298:16
308:4,24
310:3 311:2,3
365:13
**interviewed**
33:19 59:8
162:9 233:18
298:21 299:3
300:24
**interviewing**
129:6 290:16
**interviews**
56:16 127:17
140:3,6,7
190:17 298:8
310:22 321:11
356:24 357:1
**intimidate**
153:4
**INTRA-DEP...**
377:16
**intra-office**
30:19
**inventories**
205:14
**inventory** 220:6
226:16
**invest** 129:18
357:9
**investigate**
154:5 205:12

**investigated**
194:24 362:5
**investigating**
107:17 156:5
162:20 173:9
290:8 317:23
361:17 363:6
**investigation**
27:18 33:17
33:19 34:15
34:20,21 35:3
37:2,4 53:8
61:17 62:21
63:18 64:17
77:5 111:14
115:24 122:13
124:24 126:10
127:22 128:9
128:12,16
129:2,9,20
131:2 134:5
147:20 149:24
150:2 153:23
153:23 154:24
155:15 157:4
157:7 161:19
161:22 162:17
163:7 164:14
168:24 173:17
191:18 212:13
212:16 216:17
257:1 259:15
269:1 288:23
289:4,14
290:9,12,23
294:3 296:10
307:19,20
316:13,22
318:2,20
319:6,15
320:6 343:11
359:10 361:6
370:12
**investigations**
20:12 21:5
148:14 153:13
154:1,20

156:4,19
157:3 159:7
159:10,11,12
161:11,20
163:5,8
173:18 265:4
**investigative**
12:18,21,24
13:1 23:14
26:22 30:18
31:10 38:13
41:14,16,24
42:8,11,14,21
42:24 43:8,11
43:12,15 45:9
45:15,21 46:2
46:11,16
47:20 55:15
68:11,12,16
71:2,4 72:8
73:8 74:1,6,16
75:11,15,17
75:22 77:2,24
78:10,11,15
78:20 79:3,20
79:24 80:7,17
80:21 86:19
86:23 87:4
88:22 90:7
91:9,18,22
92:19 94:11
95:10 96:14
100:23 107:12
107:16 109:22
110:10,20,24
114:11,15,20
115:9,12,24
116:11 117:3
117:14,23
118:7,10
119:11 120:12
120:16,17
121:22 122:8
122:23 124:17
129:21 130:20
131:1,6,16
134:12,16,19

135:10,17,24
161:14 163:23
189:12,22
190:5,11
191:6,6,8,11
192:4,8,12,15
192:18,23
193:10,16
194:3 197:6,8
197:12,18
199:7,11,12
199:15 202:12
202:16,19
203:21 205:9
205:13 206:10
206:23 207:15
208:14 211:7
213:9 214:11
216:5,8 217:1
217:20 218:4
218:5 220:4,6
220:15 223:8
223:13 224:1
224:2,4,18,23
225:10,15,24
226:3 227:6
227:13,15
229:1,14,17
229:24 230:17
230:21 231:11
231:11,16,16
232:5,7,17
236:22 237:12
239:21 241:12
242:5 257:9
270:11,21
274:15,20,21
275:13 276:10
276:16,16
279:24 280:14
280:15,17,18
287:6,9,10,15
287:24 288:7
288:12,17,21
289:1,5,8,9,14
289:16,20,21
290:7,11,14

290:18,20,22
291:3,5,10
298:10 300:16
301:2,18
302:6 303:19
303:24 304:11
307:16 309:11
309:13,20
310:8,21,24
311:1,5,8,9,17
312:14 313:13
313:20 314:11
314:14 315:12
315:20 316:2
322:16 324:8
324:13 338:19
338:20 340:7
340:9,16,18
341:9,10
342:2 344:2
344:18 348:21
349:11 351:20
351:24 352:2
355:5,22
356:1,8 357:5
357:15 358:3
358:24 377:14
**investigator**
128:4 131:5
175:14
**investigators**
59:5 108:4,16
111:5,24
122:12 128:13
128:24 129:11
129:13 153:2
155:6 319:4
359:18 360:4
**investigatory**
279:24
**invited** 24:18
**invoice** 179:3,9
179:15 181:11
182:1 377:11
**involve** 20:18
182:23 268:16
**involved** 4:23

20:11,24 21:5
122:12 127:22
131:1 149:23
151:14 152:3
152:22 153:14
161:18 162:24
166:18 171:7
171:9,12
172:18 173:9
173:18 174:12
232:5 247:20
247:24 318:19
364:15 370:11
**involvement**
76:16 147:19
149:8,11,17
151:1 153:15
172:4
**involves** 21:11
**involving** 21:15
22:1,9 165:8
271:5 335:2
**IR** 362:24 363:3
**iron** 111:11
**irrelevant**
276:12
**Israel** 205:1
223:7 232:13
232:15 235:2
235:19
**issue** 21:15 30:1
34:3,4 49:17
65:9 78:1
114:4 121:2
197:5,8
199:14 205:11
231:9 247:15
249:12 259:10
260:13 315:7
371:15 372:1
**issues** 4:23 62:2
369:1
**issuing** 70:20
130:19 182:18
**Itasca** 2:12
**item** 203:2
**items** 59:17,20

130:13 339:22

---

**J**

**J** 139:8 377:9
377:11
**Jackie** 171:4
**Jacques** 1:4
9:17 88:7
100:24 141:8
178:21
**James** 97:20,23
**January** 143:23
143:23 376:1
**Jeffrey** 2:10
376:20
**Jerome** 175:3
**jgiven@sotosl...**
2:13
**job** 56:23 61:7
113:12
**jobs** 60:11
**Joe** 267:6,7
**John** 1:7,9 2:23
175:12,13,20
**Johns** 322:12
323:8,18,19
325:2,7 333:7
333:12 335:17
336:18 338:5
338:6,21
340:6,10,20
341:12,14
342:14,19
344:3,17
345:7,12,14
345:19,21,22
346:4,6,10,13
346:15,18,23
347:1,4,9
348:2 355:10
**Johnson** 211:20
211:23 321:23
342:19 343:17
366:24
**joined** 146:3
**joining** 145:17
**Jones** 156:24

157:1 173:5
260:12 263:24
287:22 288:3
288:4 297:20
315:24
**Joseph** 1:7,8
171:8
**JR-L202873**
90:14
**judge** 40:13
49:11,17,17
240:1 245:23
292:22 294:22
**judge's** 40:18
41:12 73:16
**judges** 371:15
**June** 1:20
138:23,24
324:22 325:18
326:22 327:12
373:5 375:11
376:9
**jury** 242:13
245:16,24
246:21 247:17
249:8,9,12,13
**justice** 176:5
**juvenile** 20:16
22:2,5,13,23
23:3,7,10,11
23:12,17

---

**K**

**Kane** 139:9,14
139:15,22
140:1,9
**Kate** 326:11
**KATIE** 2:3
**katie@loevy....**
2:7
**keep** 26:17
111:11 125:12
203:7 255:17
256:13,14,17
256:18,23
257:12 265:1
288:16 289:1

306:4
**keeping** 21:16
21:17 25:8,13
28:4,16 29:8,9
52:24 53:7,17
66:16 67:2
69:18 70:15
87:6,9 101:7
101:12,16
102:9 104:4
105:11 107:7
125:24 255:22
260:16 264:11
284:13
**keeps** 106:2,3
107:12,19
308:11
**kept** 29:14
105:24 107:15
107:22 108:2
108:19,20
109:2 111:1,2
111:2,3
114:12 115:9
115:13,13
116:4,4,6,11
117:1,4
118:21 120:7
120:7,9,9,16
120:22 135:15
135:23 154:8
216:7 244:7
244:13,14,22
256:10 257:10
257:23 258:9
260:6,8,17
261:5,6 265:6
267:23,24,24
268:5,9
**kill** 153:4
**kin** 373:16
**kind** 26:20
39:18 61:20
62:2 81:20
133:10 144:13
148:18 153:12
163:20 192:3

201:20 202:5
222:1 231:7
267:21 283:4
287:19 290:4
293:2,3,8
318:14 326:3
**kinds** 89:5 94:9
145:18 146:5
147:6,7
156:17 199:21
261:14 265:14
**Kirkland** 212:7
**knew** 82:1
153:5 172:4
212:14 234:10
235:17 250:20
287:20 345:11
346:22 347:4
347:8
**knocked** 196:18
**know** 4:5,6
10:11 16:17
21:11,15 22:3
23:1 26:13,22
26:23 27:2,3,5
27:5,6,11
29:12 40:8,22
41:6 42:12,13
42:23 43:17
43:21 44:20
45:2 47:5 49:5
52:1,14 58:7
59:14,23 61:5
61:20 63:11
63:12 65:13
70:11 72:14
76:20,21,22
77:2,4 78:2
80:19 81:1,3
81:23 88:6
91:3 92:1,3,22
92:23 93:4
94:15,16
96:10 97:2
98:3 100:18
100:20 102:14
102:15 107:3

107:22 113:8
116:22 117:15
119:12 120:15
122:6 123:21
124:20,22
125:4,12
126:11,12,13
127:3 128:4
128:11 129:3
129:3,8,9
131:13 134:21
134:21,24
135:3,14,16
135:18 137:22
142:6 153:17
154:3,12,15
156:2,24
157:14 158:6
159:18 161:20
162:2,3,5,11
163:13 166:18
166:19 172:9
172:11,11,12
176:22 177:10
183:7 184:11
184:11 186:2
186:20 188:9
188:15 189:2
189:2,13
190:1,1,2,5,7
190:12 191:19
191:22 192:8
194:22 195:2
195:4 200:4
202:17 207:14
208:17 209:11
215:6 218:20
218:21 219:12
224:17 227:9
227:11,13,14
228:13 238:14
241:22 242:22
242:24 246:17
247:13 249:7
249:24 252:9
255:2,6,7,8,10
255:13 256:23

258:6,22,23
260:17 262:21
262:22,23
263:9,11,17
264:23 266:17
267:3,4,15
268:6,9,13
270:5,6
272:22 273:11
274:8,13,14
274:16 275:1
276:23 277:17
279:6 284:13
284:23 285:15
285:18 286:14
287:1 289:2,7
290:21 293:22
295:15,20,22
295:24 296:1
296:2,13,21
298:16,18,20
298:20,22
299:6,11
300:8 308:14
309:3,14,24
310:3,11,12
310:17 312:9
313:11 322:20
326:6 328:21
328:24 331:12
332:4 333:23
335:13 337:15
337:16,18
338:9 341:20
342:1 343:10
346:12,24
347:1 352:6
353:6 355:2
356:15 357:2
357:8,8,20,23
358:1,8,9
361:20 362:1
363:5 366:18
371:22
**knowing** 295:7
299:12 312:21
**knowledge**

25:20 34:12
48:11 50:24
51:4,8 70:5
76:10 98:15
98:24 99:20
192:2 269:16
346:4
**knowledgeable**
53:6 107:9,10
**known** 93:18
126:24 158:19
158:24 190:13
190:14,14,15
235:12,14,17
235:17 345:21
**knows** 157:12
159:18 244:5
345:15 346:2
346:15 347:1

## L

**L** 200:1,1,1
**lab** 73:19 108:8
108:11,21
109:24 111:4
111:6,22
112:2 129:14
130:1 239:6
319:5 338:22
339:22
**labeled** 200:2
**lack** 26:14
151:20 156:10
**lacking** 337:12
**language**
130:15 292:21
**laptop** 186:17
**large** 24:16
**late** 168:3,15
263:19 278:18
**laundry** 130:13
190:9
**law** 2:10 23:20
24:15 243:21
243:24 244:5
244:19 246:9
249:7,14

250:2,10
259:18 260:14
**lawyers** 75:16
82:2,3 246:22
**lay** 306:11
**lead** 117:19
**leads** 156:17
164:8 192:22
**leaf** 89:12
**leave** 79:6 143:6
290:13 369:19
369:20 370:3
370:4
**led** 265:5
**left** 140:19
**legal** 19:14,16
81:15,17,19
81:20,22
245:11 343:4
**legally** 256:16
**length** 11:9 12:7
244:1 323:12
**lengthy** 294:8
**LEONARD** 1:9
**lesser** 343:14
**let's** 19:24 30:9
57:21 63:5,5
68:2 79:6 92:9
104:1 111:17
118:19 122:7
130:3,3 134:1
156:24 168:14
168:15 169:6
176:23 179:3
201:24 202:1
204:10 223:5
224:19 228:19
232:13,13
240:8 255:16
263:13 272:15
272:21 273:4
273:4,24,24
276:18,18
279:8 285:3
301:7,7 307:5
307:11,11,12
307:21 308:1

309:8 310:19
312:6 316:3
317:12 322:22
323:21,22
329:1 342:2
343:15 344:1
348:23 352:18
358:11 367:13
**letter** 10:21,22
10:23 83:16
373:15 376:15
**level** 24:19
246:14 303:17
**license** 210:19
210:20,23,24
373:21
**light** 212:17
249:24
**likelihood** 126:7
165:19 362:16
**liking** 305:16
**limitation**
162:12
**limitations**
162:2
**limited** 139:11
146:12 157:4
161:21 193:14
193:15 206:20
224:10 246:9
247:23 250:17
251:5
**line** 169:20
170:1 283:9
355:20 374:4
374:7,10,13
374:16,19
**lines** 196:17
323:5
**lineup** 36:3
59:15 161:6,7
162:9 234:11
234:12,17
235:1,19
294:13,15,15
294:16,18,20
294:21 322:11

322:15 323:8
323:9,16,18
323:19 324:7
324:12,15,18
324:21 325:2
325:4,6 327:6
327:9,12,17
327:21,22
328:5,9,11,24
329:4,9,13,19
329:20 330:20
331:10 332:24
333:15,22
334:2,4,6,8,9
334:16 335:2
335:9,17
336:9,17
337:2,14,22
338:2 340:6
340:10,20
342:12 344:19
345:7,13,16
345:23 346:12
346:19 355:9
**lineups** 160:22
160:23 161:2
234:13,17
332:19 334:24
335:7
**list** 18:7,10 68:9
68:15,17
84:20,22
130:13 156:6
191:19 217:21
217:23 218:7
283:12 358:14
**listed** 15:4,12
16:9 82:4 86:5
90:12 109:8
109:11 112:15
123:20 154:21
155:11 182:7
182:9,13
205:16 225:1
229:7,10
234:11 237:15
326:23 327:16

363:2
**listen** 104:2
**lists** 190:9
196:14 212:10
**literally** 263:24
**litigate** 169:16
**litigated** 65:10
65:11
**litigation** 13:24
**little** 40:20
51:22 70:22
92:16 107:4
176:23 181:5
183:6 186:7
212:2 285:24
323:5 326:9
369:14
**live** 160:22,23
161:2,6,7
234:8
**lived** 169:2
**living** 169:3,4
**LLC** 2:17 376:2
**locate** 59:6,10
**located** 144:4
146:16
**locating** 59:7
**location** 39:4
106:1 107:20
108:3 111:12
112:3 119:20
193:22 259:2
263:23 264:4
264:7 265:6
265:13,14
333:22 334:6
366:10
**locations**
108:22 109:13
109:18 110:18
114:22 116:1
116:5,6 117:5
117:15 118:6
118:22 119:7
119:18,21
121:7,11,23
130:10 258:18

304:1
Loevy 1:18,18
  2:4,4,23 373:7
  373:7
log 264:3,16
  265:12
logic 338:15
login 264:4
logistically 50:7
logistics 57:5
long 143:14
  179:18 180:4
  188:3 200:10
  231:1 260:17
long-serving
  369:5
longer 259:9
  260:19 264:2
look 15:23 16:8
  16:12,13,19
  26:14,23 27:3
  27:5,6,11
  29:13 44:12
  76:18 80:14
  80:20 91:5,10
  91:15 95:12
  116:21 139:10
  139:20 140:8
  179:3 181:12
  185:15 194:13
  195:15 196:19
  196:20,21,21
  202:20 204:12
  204:12,14
  206:2 207:5
  208:19 210:5
  210:7 215:3
  224:5,15
  225:8 227:3
  228:19 233:15
  245:12 252:10
  264:1,4,16
  277:24 278:2
  279:8 282:7
  305:14 323:11
  327:19 342:2
  344:1 348:5

357:14 358:11
368:12,17
looked 5:11
  6:11 15:24
  16:1,4 18:3
  85:10,12,17
  91:3 95:14
  116:2 180:16
  181:4,5,6,8,8
  181:14 186:1
  191:21,22
  193:24 194:7
  198:11 208:20
  215:6 224:11
  224:21 227:8
  228:7 245:2
  247:19 365:3
looking 18:6
  39:23 40:10
  41:1 61:16
  96:11,13
  123:3,18
  127:2 140:5
  182:1,5,6
  185:19,19,24
  186:2,19,21
  186:24 196:8
  206:10 207:13
  207:18 208:10
  208:12 213:7
  214:17 219:11
  219:13,16,19
  219:22,23
  223:1,6 225:7
  225:19 226:6
  226:11 227:24
  240:21,21
  246:14 259:16
  271:9,18
  273:1,16
  281:4,6
  289:10 297:22
  310:6 311:19
  316:4 324:6
  332:12 343:2
  347:17 358:17
  362:24 371:3

looks 196:14
  248:9 274:20
  274:20 293:17
  325:23
loosely 94:14
  107:23
loss 155:23
lost 233:1
  236:18
lot 33:18 50:5
  58:22 148:9
  153:18 225:3
  245:12 260:19
  268:7 369:5
  371:24
lovely 307:7
low 187:17
luck 146:13,14
  174:4,5
lunch 136:10
  179:21

———————
M
M-u-r-r-a-y
  3:15
M.E 228:8,8
Madrid 234:4,7
mail 30:19
  38:14 94:16
  220:9 359:13
  366:5 377:16
main 85:21 94:7
  260:15 290:17
maintain 45:3
  45:21 129:1
  158:19 216:6
  281:17,21
  284:19
maintained
  41:17 43:1,11
  43:23 44:1
  60:1 66:20
  80:16 92:20
  95:6 107:16
  110:20 119:12
  128:13 189:14
  234:18 237:11

243:6,16
265:10 282:14
284:17,17,23
287:11 289:9
289:13 290:23
301:17 302:5
maintaining
  27:17 44:2,14
  44:17 45:5
  77:23 118:9,9
  216:2 368:7
majority 20:22
  35:7 141:19
  185:7 186:14
  186:23 201:1
making 57:9
  70:20 83:13
  245:4 282:2
  301:23 309:7
  319:24 320:1
  330:16 338:22
  353:16
man 171:7
man's 43:9
mandatory
  24:14
manila 291:11
manner 102:16
  184:12 197:5
March 138:21
mark 7:7 14:16
  197:22 323:22
  339:3 365:16
marked 7:8,11
  7:24 14:17
  136:12 137:7
  179:4,7 182:1
  197:23 198:2
  212:2 324:1,5
  325:11,14
  331:16 339:4
  339:7 342:4,7
  358:18 365:17
  365:20
marks 51:22
  212:2
match 125:14

matching
  126:12
material 12:18
  12:21,24 13:1
  13:1 15:17
  23:14,15
  26:13,14,22
  27:4,6,6,11,15
  28:20 31:10
  36:6 38:6,13
  41:3,14 42:7
  43:12 45:8,15
  51:23 55:16
  57:9 68:11,12
  68:16 71:4,5
  71:19 72:8
  73:8,13 74:1,6
  74:16 75:11
  76:19 77:2
  88:22 91:9
  115:4,24
  116:11 118:7
  119:11 120:12
  120:17 121:19
  121:22 122:3
  124:17 131:7
  178:22 189:12
  191:7 193:22
  194:3 197:8
  197:12,18
  199:7,12,13
  199:15 201:18
  201:21 202:9
  202:12,12,19
  202:21 205:10
  205:12 206:10
  207:15 208:14
  209:3 213:9
  216:20 218:4
  218:5 220:2,4
  220:14,15
  223:9,13
  224:2,5,18,23
  225:10,15
  226:4,22
  227:6,13
  232:5,7,17

236:1,6,23
239:4,20,21
240:17,23
241:2 242:5
242:19,21
243:1 246:7
254:7,16
256:18,23,24
258:2 270:13
272:11,12
273:1 274:15
274:20,21
275:5,13
276:10,16,17
279:24,24
280:14,16,17
280:19,19
285:10,16,21
286:6,7,11,11
311:17 312:16
337:22,24
338:19,21
339:20 340:8
340:9,16
341:8 342:23
343:21 347:5
347:10 348:15
348:16 352:7
**materiality**
222:21 239:10
**materials** 8:16
14:14,21
18:10,21
24:20 30:11
30:14,18 32:4
35:21 41:11
44:8 49:10
50:18 51:13
56:20 57:15
68:22 70:7
71:2 75:18,22
84:20,23 86:5
87:4 95:24
100:24 101:4
106:14,15
107:4 114:20
115:9,12

117:1,4,14,24
118:10 119:16
119:20 122:2
127:23 130:20
131:1,6 135:8
135:22 178:23
181:22 182:7
190:11 193:11
193:16 197:1
197:6 200:18
205:8 211:7
211:10 216:24
218:11 219:7
221:13 222:20
227:18 235:8
235:21 242:10
254:13,14
257:9 258:12
269:2 270:1
273:13 276:14
280:21 284:6
284:8 287:14
289:8 295:10
312:8 339:1
344:18 351:23
377:9
**matter** 46:8
50:6 57:8
87:23 88:14
122:21 131:4
140:24 141:6
165:21 218:13
219:2,4,20
229:7 250:6
269:24 290:13
300:3 302:15
331:4 334:24
367:9 372:3
**matters** 13:16
139:11 140:5
140:7
**McLaughlin**
1:8 361:10,17
362:2 363:6
364:10
**ME's** 215:24
216:18 218:7

231:22
**mean** 22:13
30:4 34:19,21
34:22,22
41:15 56:3
57:24 60:24
63:3,11,13
66:18 69:3
74:24 75:1
76:8 79:23
80:14 81:10
81:17,23
82:11 89:15
95:21 100:4
113:8 121:21
123:3 125:3,4
125:5 147:13
147:14 157:11
157:23 158:3
161:13 163:14
164:12,13,15
166:17 182:12
189:9 191:18
195:17 206:24
207:24 209:15
211:5 226:17
238:9 239:2
240:19 244:15
248:6 250:18
261:4 276:8
279:19,20
287:9,10
295:9 297:12
300:19 308:21
317:17 319:13
327:22 328:20
353:6 355:1
368:11
**meaning** 89:21
**means** 127:7
237:13 241:24
300:15 341:14
**meant** 195:4
200:1 213:18
**mechanism**
120:19
**mechanisms**

136:5
**medical** 3:24
215:20 228:3
228:5
**medications**
3:20
**meet** 179:18
287:13 291:6
**meeting** 179:23
179:23 180:3
**meetings** 180:8
180:12,15
**member** 159:18
**members**
157:13 158:20
188:13,15,19
**memo** 165:7,16
165:24
**memos** 39:20
**mention** 294:15
**mentioned**
11:17 15:20
185:2 203:12
203:14 210:12
220:17 228:1
301:3 360:16
**met** 179:16
180:1
**method** 32:17
147:23 153:4
196:17
**methods** 49:7
**Michigan** 37:13
38:23 40:9,23
**Mickey** 360:13
360:16 361:9
361:18 362:1
362:14,18
363:5,9,11,17
363:18 364:1
364:5,7,8,13
365:5,6 367:6
**mid-** 168:3,15
**mid-eighties**
22:6
**mid-nineties**
167:20 168:2

**middle** 279:10
353:10
**midstream**
296:10
**Miedzanowski**
166:2,3,12,15
**million** 174:2
174:10
**mind** 76:8
109:14 224:2
**mine** 247:14
**MINGEY** 1:9
**minimum**
345:22
**minute** 304:8
352:6
**minutes** 29:10
180:5 334:9
**Miranda** 65:9,9
65:12,12,22
65:22
**mis** 99:17
**Mischaracter...**
99:5 105:16
105:17 121:13
135:12 227:1
297:17
**misconduct**
63:17
**misdemeanor**
22:3
**misfiled** 276:13
276:13
**misleading**
199:6 212:17
212:19
**missed** 69:10
122:5
**missing** 16:11
32:16 34:7
35:22,23
36:17 69:6,6
69:11 96:10
96:10,12,12
96:16 97:8,8
113:23 194:4
194:4 196:15

197:7 199:5
201:18 202:9
202:10,16,21
203:2 205:10
205:17,20
206:11,14
208:15,16
209:3,9,23,23
210:18 211:13
211:13 213:21
213:21 214:19
215:12,16
222:19 223:9
223:10,21
224:4,6 225:9
225:15 226:19
232:17,21
233:7,9 237:8
246:11 249:7
250:2 252:7,8
253:2,4,9,21
254:7,13,14
254:16 295:13
296:1,18,20
296:22 315:1
315:23 322:6
336:5,8
337:14,15,16
337:19 356:17
358:24 368:12
**misspoken**
27:23
**mistaken**
273:15
**mistakes** 200:11
200:12
**Mm-hmm** 28:2
184:3 267:19
311:7
mm-mm 104:24
**moment** 14:24
39:21 68:2
224:20 312:23
313:2,5,10
**Monday** 179:16
179:19 376:13
**Montanez**

171:1,2,4
**months** 50:8
251:6 294:21
312:9
**morning** 3:12
7:18,20 180:1
286:17
**morphed**
144:24 218:1
283:4
**mother** 169:10
169:15
**motion** 31:8
57:3 58:14,15
59:20 65:4,16
66:3,4 151:19
168:11 169:15
170:6,13,20
212:12 242:17
242:18 245:6
245:23 246:12
246:18,19
248:24 249:11
249:22 263:19
**motions** 57:7
58:12,24
64:21,21
138:22 150:9
150:11 151:22
152:4 242:9
242:16
**move** 26:19
138:8 170:1
**moved** 144:10
258:19 261:8
331:24
**moving** 287:19
**mugshot** 359:17
360:3 361:10
**mugshots** 111:8
359:8,16,17
**Mulero** 171:1
**multiple** 20:3
**murder** 22:4
26:21 92:24
134:2 138:19
153:9 171:8

175:7 242:2
313:15 370:12
**murdered**
359:24
**murders** 33:11
146:7 171:10
172:13 174:2
**Murray** 1:14
3:7,12,14,14
3:16 14:15,21
136:15 368:3
373:5,9,12,13
374:1,24
375:1,17
376:6 377:3,9
377:10,11
**myriad** 108:22

### N

N 2:10 3:1
376:20 377:1
**name** 3:13 43:9
155:5 166:21
166:21 171:2
171:7 173:4
228:11 345:21
347:8 359:10
362:22 363:10
363:11 367:8
**named** 122:9
322:11 364:13
**names** 123:16
165:23 170:23
212:11 363:7
**naming** 212:8
**narcotics**
148:12 154:6
154:7,11
157:6
**narrowed** 15:20
160:13
**narrower**
189:24
**national** 13:22
14:2 24:17,19
53:1,2,3,6,18
53:19 54:14

**nationwide** 14:3
**nature** 11:5
35:15 58:22
59:9 82:1
86:19 91:4,11
119:8 146:13
205:14 227:15
244:10 245:17
245:22 247:4
265:4 276:15
306:9
**nauseam**
286:17
**Near** 261:8
**necessarily**
34:22 49:5
61:22 102:19
128:7 149:14
161:16 164:8
183:15 188:2
188:17 191:15
195:5,21
238:22,23
239:4,24
240:3,17
241:3,4,9
243:2 250:5
258:3,4 266:1
278:8,14
369:7
**necessary**
151:21
**need** 4:5 16:8
16:17 39:10
39:10 56:13
56:13,19
59:18 67:20
68:21 69:11
107:2 186:15
242:7,8
246:12,22
247:13 249:3
249:8,19
250:5 255:18
277:24 282:3
282:8 288:2
291:18 294:5

294:9 321:16
323:13 343:10
**needed** 29:3
66:20 247:19
284:6
**needing** 257:4
**nefarious**
311:21
**negative** 61:12
61:19,22
234:12 327:21
327:22 328:2
329:15
**neighborhoods**
148:15
**neither** 362:14
362:17
**never** 25:6
28:13,14 37:4
132:3,18
150:3 165:4
166:13,15,21
167:2,3,4
175:20 216:17
227:13 237:10
247:19,21
248:1,22
249:3 250:16
265:5 272:24
290:2 300:1,8
301:6
**nevertheless**
216:2
**new** 7:18 25:22
85:11 93:10
181:22 182:6
182:10,12
185:13 245:6
245:7 246:18
249:22 260:14
263:3,5,22
264:4,6,6
266:8 269:2
281:5 290:16
308:18
**nickname** 159:1
**Nieves** 10:19

11:13,18,18
181:14,14
**night** 181:5,8,13
**nine** 11:18 12:4
12:4,22 13:8
16:6,16 17:24
18:1,2 67:23
68:1,2,3,20
91:6,13 95:14
95:16 96:2
113:19 251:6
**nine-millimeter**
129:5
**nineties** 21:9
29:1 33:11
50:5 154:7
168:3,15
283:6 289:24
371:22
**Nissan** 210:19
**nominal** 141:17
**non** 171:13
**non-investiga...**
224:14 226:22
227:19 228:24
229:3,6,11
230:18 280:19
**non-murder**
22:5
**nonduplicative**
256:23
**nonevasive**
306:4
**NOON** 1:7
**normal** 70:23
238:10
**normally** 95:21
95:22 351:2
**North** 1:18 2:4
2:17 146:21
373:7 376:3
**NORTHERN**
1:1
**NOTARY**
375:23
**notation** 203:4
**note** 123:18

132:4 199:6,7
212:7 227:7,8
227:10 236:12
237:16,21
308:2,3,12,22
310:3,21,23
310:23 311:4
311:11 345:13
345:14 346:7
346:17 351:16
**noted** 87:22
**notes** 33:8 59:8
94:8,10
118:21 121:6
122:7 127:23
128:7,10,10
128:18 131:6
131:11,14,17
131:23,23
132:8,9,12,18
132:21,24
133:2,4,16
134:18,22,24
135:3,4,9,16
135:22 136:6
189:18 190:4
190:14,17
199:5 201:6
212:8 244:16
309:8,8,11
323:11,14
331:22 340:2
357:1
**notice** 368:15
**noticed** 10:12
35:4
**notification**
226:15
**November**
348:24
**number** 7:8
14:17 17:11
23:13 71:17
81:6 93:7
96:17,20
131:15 134:1
134:4 136:12

151:6 179:4
191:4,5
197:23 210:3
210:24 224:12
227:22 247:24
253:1 263:17
268:11 269:7
269:8 272:16
285:5 294:23
316:16 317:3
318:21 319:6
322:6 323:18
323:22 324:1
324:10,18
325:7,11,19
325:22,23
326:4,10
328:16,21
329:1,2
334:16,17,18
337:13 339:4
342:4 354:13
358:18 362:23
362:24,24
365:17 366:21
366:23 377:7
**numbers**
198:23 210:23
242:10,11
363:3 367:2
**numeral** 281:7
**numerous**
292:23 305:12
305:13

——————

**O**

**O** 3:1
**object** 6:3,16
7:1 14:6 18:24
21:7 25:24
27:7 29:21
30:2 40:6
43:18 44:4,10
44:18,23
45:11,17
46:24 47:7,22
48:15,24

52:10,18 54:1
54:6,11,24
55:11 61:3
63:8 64:3,4
66:3 69:1 70:9
72:22 73:9
74:8,18 75:8
76:13,24
77:14 82:9
84:10,17 87:7
87:17,24 88:8
88:9,16 94:1
96:23 99:4
101:19 102:2
102:12,24
103:10,17
104:8 105:15
106:5,18,23
110:3 113:14
113:20 114:13
116:17 128:1
128:22 135:11
136:2 142:22
150:17 161:23
175:6 176:2
176:12,20
188:24 190:24
192:5 199:2
201:13 207:11
208:1,7
213:16 231:18
241:17 256:2
277:5 284:14
284:20 290:5
296:23 297:16
298:23 300:11
300:21 301:14
302:3,11
303:1,14
304:9,12,16
306:6,17
309:16 310:14
315:17 317:15
318:22 327:23
328:13 329:6
329:24 330:11
331:6 333:1

333:18 334:12
335:3,20
343:7 353:12
354:22 356:13
356:18,19
357:6,17
358:6 359:19
360:6 364:17
366:13 371:9
371:18
**objecting**
304:24 306:13
**objection** 5:19
60:12 62:5,14
62:22 63:20
65:6 66:5,6
67:13 70:8
71:21 74:19
79:12 82:8,20
96:6 102:3
103:16 105:16
116:16 117:7
117:8 118:2
118:12 119:1
119:23 120:20
121:13 125:15
147:4,11
152:19 161:24
163:2,11
169:19,24
175:15,16,17
176:13 190:23
226:23 239:17
251:11,12,17
251:18 271:13
272:5 273:8
274:6,10
275:23 277:21
278:12,22
282:19 286:16
288:10,19
297:15 299:13
299:14 300:20
304:22 320:9
343:18 347:11
364:16
**objections**

104:7
**obligation**
 256:16
**obligations** 25:9
 25:13 371:8
**observation**
 317:10,12
 318:7
**observations**
 184:16 185:3
 185:14 201:8
**observed**
 156:19 321:14
**obtain** 23:1
 26:10 31:4
 39:15 55:15
 55:18 57:15
 70:21 92:22
 103:13,13,24
 105:3,22
 107:24 120:24
 234:24 300:17
 369:9
**obtained** 23:9
 30:21 45:3
 59:21 102:16
 123:4 134:6
 228:2 281:18
 350:12
**obtaining** 13:18
 23:18,20,22
 23:24 29:11
 29:17 122:2
 124:22 162:6
 162:21
**obvious** 40:10
 211:22 228:11
 234:8
**obviously** 15:15
 19:12 20:21
 65:14 69:7
 89:15 97:16
 139:6 147:23
 156:14 160:11
 164:17 196:12
 196:15 226:3
 227:5 228:13

234:5 242:23
260:9 286:1
329:2 330:18
342:20 348:13
**occasion** 5:5 6:9
 20:17 41:21
 69:9 95:10
 154:18 196:19
 230:6 260:11
 290:2 294:14
**occasions** 32:5
 37:20 38:12
 73:12 315:5,6
 315:11,14
 328:8 369:10
**offender** 325:8
**offense** 188:11
**offer** 9:20 10:8
 11:14 52:22
 53:11,15,22
 53:24 67:21
 194:15 195:24
**offered** 67:21
 68:5,20,21
 89:7
**offering** 55:10
 89:1,1,2 90:11
 105:13,19
 115:20 221:3
**office** 13:13,15
 13:22 16:3,5
 17:2,14 19:18
 20:6,8,8,14,21
 20:24 21:4,24
 30:20 49:5
 55:8 59:4 60:6
 62:10 63:16
 64:8 65:4
 71:17 73:7
 74:3 76:4
 77:12 79:10
 79:18 80:6
 92:12 111:6
 130:18 136:22
 137:4 138:2,6
 138:16 140:20
 142:1 162:11

165:2,13
174:22 175:5
180:1 216:23
218:20 219:1
221:12 230:23
232:18 233:21
239:15 240:13
241:20 243:17
244:23 246:4
247:6 248:4
248:14,22
250:23 255:8
255:23 256:1
257:17 258:1
258:17 261:5
263:12 269:11
269:14,24
270:8 281:21
282:16 283:16
283:22 288:1
288:5,16
289:2,11
290:17 291:6
323:3 332:21
336:6 340:23
341:3 368:6
368:23 370:10
370:23 371:6
371:13,14
376:10,12,12
**office's** 269:17
**officer** 25:11
 32:3 57:19,22
 58:20 62:18
 63:17 64:8,12
 64:15 102:18
 103:22 104:3
 105:10 106:1
 106:3 116:3
 118:20 119:10
 120:12,16
 121:20,22
 127:21 132:4
 132:24 133:5
 134:14 147:19
 147:21,22
 148:17 149:5

149:13,17,23
150:3,24
152:3 155:15
157:19 160:10
162:8 166:4
166:18 167:1
290:7 298:5,8
299:3 300:1
302:10 303:16
307:15 308:1
308:11,22
309:5,8,10
310:22 316:13
316:24,24
317:1,24
319:3,14
320:3,12,15
320:16,22
359:7 370:23
**officer's** 31:16
 102:21 103:8
 104:4 311:4
**officers** 2:9 23:5
 24:3,7,10,14
 24:18,22 25:1
 25:3,7 50:7
 56:1,6,9,12,23
 57:13,15
 58:10 59:2
 60:5,10,17,19
 61:13,24 62:4
 62:11 63:23
 64:20 69:14
 75:17 101:7
 101:12,15
 116:10,22
 117:2,4
 131:12,13,17
 131:20,23
 132:7,11,12
 132:22 133:9
 134:8 135:8
 135:23 146:24
 147:6,15,16
 147:24 148:2
 148:3,4,4,10
 148:11,12,13

148:16,20
149:3,11
150:10 151:13
151:16 152:15
153:11,19,24
154:15,21,21
155:17,24
156:8,18
158:9,9,9,10
159:5 162:24
163:10,23
165:11,17,23
188:15,21
228:9 242:11
288:14,15
289:13 290:2
290:2 291:1,5
294:10 316:14
318:19,19
319:16,21
320:6 321:2
321:13,13
326:23 369:8
370:11,15,19
371:2
**officers'** 132:18
 133:16
**offices** 13:16
 112:2 165:14
 167:7 373:7
**official** 25:11
 93:23
**officials** 24:3,7
 24:10
**Oh** 17:6 60:24
 61:2 85:20
 129:4 156:5
 160:2 173:5
 176:20 180:7
 181:13 187:4
 203:20 263:24
 266:6 305:8
 306:21,22
 307:6 326:18
**okay** 4:17 5:5
 5:13,15,22
 6:13 7:14 8:3

9:12,16,20
10:3,6,8 11:11
12:4,11 13:3
15:11 17:10
17:13,20 18:2
18:6 19:20,22
19:24 21:2,23
24:23 26:15
27:10 28:8,13
28:21 29:7,20
33:1,4,23
34:11 35:9
36:14,23 39:2
39:19,23 44:7
44:22 45:23
46:6,21 47:13
48:5,7,18 50:2
50:24 52:2,6
52:16 53:11
53:21,23
54:18 57:23
58:7 60:4
61:12 64:7
67:10 69:12
69:22 71:15
72:6,12 73:5
75:7 76:6,21
77:5 78:7,19
79:16 81:5,12
82:6 83:21,24
85:13 86:2,9
87:5,21 88:12
89:8,20 90:1
92:14 93:12
93:17 94:21
95:3 97:4,9
98:24 101:23
106:11 107:14
109:15 110:16
110:23 111:15
112:15 113:5
114:4 115:2,8
115:15,19
116:2 117:16
117:22 118:19
121:24 126:17
130:23 131:4

132:7 133:4,9
134:18 135:19
136:5,8
137:16,20
138:4 139:16
139:19 140:19
141:1,4,11,19
141:23 142:7
143:6,10,13
143:21 144:1
144:10,13
145:4,9,16
148:2,22
149:6,10
152:1,14
154:19 159:13
162:23 163:21
164:11,16
166:8,16
167:15 168:12
168:14,20
170:23 173:3
173:24 174:21
175:6 176:16
177:5,18
178:3 179:11
179:13 181:22
182:9,15,23
183:11,20
184:6 186:8
187:10,23
188:19 193:21
194:12 196:11
199:9,16
200:7 201:3
202:5 203:19
204:1,7,16,20
205:5 206:17
207:5,21
209:20 211:11
214:1,14,22
215:1 217:3,7
217:13 223:19
224:19 225:4
225:22 226:5
226:10 227:21
228:18 229:3

229:13,16
230:3,22
231:14 232:6
232:21 233:14
236:1,4,8,16
238:19 240:8
240:16 241:24
243:16 250:21
251:7 252:2
254:20 257:7
257:15 258:8
259:3,24
262:1 263:2,8
267:5,11
270:19 271:8
274:14 275:12
276:21 278:15
280:10 281:9
284:3 285:7
287:2 293:6
295:19 297:12
304:5 305:19
306:5,12
307:18 308:23
309:4 310:11
310:19,21
313:6,12,17
318:4,14
320:23 322:22
323:15,21
324:21 325:10
326:15 327:5
329:16 332:2
332:9,15
333:4,14
334:7,23
335:11 336:9
336:14 337:17
338:15 339:3
339:15 340:21
341:3,19
342:2,10,23
343:2,13
344:1,3,16
347:2,8,14,16
352:11,16
354:12 355:16

359:4 360:9
360:11,19
363:23 364:1
364:5 365:11
366:20 367:19
370:1 372:5
**old** 38:2 93:3
114:2 236:21
263:6,6
266:10,10
281:4
**older** 363:1
**once** 37:11
39:24 51:14
51:24 73:23
83:23,23 98:6
98:8 99:19
118:1 126:8
126:10 140:15
143:2 146:3
183:16 258:15
260:7 262:11
295:10 365:1
**one-page** 128:8
**ones** 90:8 91:5
94:7 211:3,16
228:7 229:14
229:17 230:3
286:5 319:10
**ongoing** 290:8
**open** 24:20 25:1
26:18 27:1,2
186:18 188:1
**opened** 25:22
**opinion** 10:12
12:20 53:22
53:24 55:4
60:14 65:14
67:1,5 69:16
70:4,14,17,19
72:1 88:14,21
104:13,14
105:19 106:12
113:5,10,24
114:19 115:2
117:20 207:15
233:12,13,14

236:16,23
273:23 278:2
284:22 288:12
303:11 322:15
340:12 345:9
362:13,16,18
**opinions** 9:16
9:20 10:1,4,8
11:13 13:3,11
14:5 18:8,9,23
19:15 52:22
53:12,16
54:20,23
55:10 60:9,22
66:11,15 67:6
67:12,21 68:4
68:5,20 69:4
71:7,8 72:3,13
72:17,20 81:9
82:14 84:15
86:7,21 87:1
87:19,23
88:24 89:1,3,6
89:10 90:4,6
90:11 91:16
95:4 97:19,22
100:13,22
102:23 104:6
104:17,20,23
105:13 109:16
113:18 114:8
115:21 117:6
117:23 169:22
192:24 194:16
196:1 221:3
306:18
**opposed** 61:22
92:18 187:11
237:10 331:2
336:3
**opposite** 237:11
266:23 333:10
**oral** 244:4
373:10
**order** 43:13,14
44:7 45:8 48:1
57:15 80:14

80:15 127:10
162:3 245:19
247:13,14
248:4 250:5
290:10 318:10
318:24 364:22
**ordered** 247:5
247:21 248:1
365:1,2
**ordering** 364:21
372:9
**orders** 27:17
28:4,9,15 29:1
42:13,17,20
43:7 77:21,24
79:14 84:22
85:3,7 86:3
87:10 119:7
189:23 190:6
190:8
**org** 184:14
**organization**
185:6
**organizations**
19:3
**organized**
184:17 258:20
258:21
**organizing**
185:12
**original** 8:17
40:15 77:3
265:9 267:13
269:2,5
270:15 271:12
272:4 275:7
278:10 290:23
291:13,17
**originally**
189:11 274:18
**originals** 291:8
**outside** 40:16
171:24 263:10
**overall** 72:13
187:10 192:21
**overlooking**
256:20

**overturned**
176:7

___

**P**

**P** 3:1
**P.C** 2:10
**p.m** 136:10,11
296:5 370:6
376:13
**Pacheco** 205:2
205:22 206:13
215:15 221:20
222:7,13
223:4,7 224:3
228:16 232:13
232:15 233:15
235:3,19
279:21
**page** 7:14 8:10
8:11 10:20,21
10:22,23
96:10,10,14
96:15 198:3,4
198:8,14
219:11,13,15
219:22 279:8
281:1,9,10
285:2,5
291:23 311:15
311:17,18,19
311:22 316:3
316:3,4
321:22 326:3
326:12 327:19
341:1,23
344:3,5
349:17,17,18
350:16,17,17
354:13 365:21
365:23 366:11
367:14,15
374:4,7,10,13
374:16,19
377:7
**pagers** 242:11
**pages** 9:6,14
12:17 17:13

18:3 96:12
97:7 132:13
181:6 198:11
205:2 209:9
214:19 219:10
219:12,14
253:1,3,4,20
283:7,8 289:5
289:17,19
291:11 314:24
338:22 339:20
339:24 340:11
340:13,16,18
340:19 341:4
341:11,11
344:7,10,11
344:19 345:1
345:2 347:21
348:1,15,20
348:24 349:3
349:6,7,18
350:11,21
351:20 352:8
352:20 353:1
353:19 354:13
354:14 375:8
375:10
**paid** 141:12,14
195:18,20
**painted** 156:2
**pal** 188:17
**paper** 201:6
203:8 220:18
221:9 268:10
366:8
**paragraph**
223:6 279:9
279:10 281:12
281:14 287:2
291:22 319:13
**paragraphs**
8:11 9:6,13
**parallel** 195:3,4
195:9
**parameters**
323:6
**Pardon** 86:11

109:10 139:24
255:4
**pare** 151:10
**parentheses**
334:1 340:14
**parents** 169:4
**part** 8:18,23
20:1 24:15
30:5 34:18
35:15 37:14
39:12 48:7
49:12 55:7,23
62:24 70:3,3
71:10 94:15
106:20 109:7
111:9 113:24
120:2,24
129:14,21
163:4 169:15
170:6 173:7
181:5 185:1,3
195:24 212:15
225:11 228:3
231:3 232:4
241:2,11
251:15 272:21
311:13 361:6
363:5
**part-time** 139:7
**partial** 214:6,9
241:15
**participant**
325:7
**participate**
155:16 161:20
317:2 320:6
**participates**
316:13 318:1
319:14 320:16
**participation**
164:4
**particular**
146:9 161:15
222:16 313:2
**particularly**
137:10
**parties** 373:16

**parts** 5:12 8:20
27:14 31:3
37:21 38:5,7
38:15,24 41:2
99:12 107:5
108:24 109:4
118:8 121:3
170:21 194:18
197:20 298:3
301:18 302:6
**pass** 227:17
**patrol** 108:1
109:1 131:12
131:13,17,20
131:22 132:4
147:15 148:10
148:16,17,19
316:9,12,24
318:18 319:2
319:14 320:2
320:5,16
321:13
**patrols** 148:14
**PAUL** 1:8
**PC** 266:6
267:12
**peculiar** 231:23
**penalty** 259:20
**pending** 4:7
50:8 93:1
**penitentiary**
127:8
**pension** 141:22
**people** 11:8,12
33:20 37:13
41:23 48:10
48:20 51:15
52:7,12
125:10 126:11
126:14 138:13
153:4,5,5
169:5 172:3
176:17 212:13
257:5 262:23
264:22,23
267:13,23
283:6 286:23

311:16 323:18
328:4,17,18
329:9,13
334:15,17,18
334:20 335:9
336:2 362:4,5
363:2
**people's** 212:11
**perceived** 190:4
**perceiving**
319:23
**percent** 150:23
151:4,7,9,11
151:11 152:8
152:10,12
230:24 301:12
**percentage**
20:10,13 21:3
57:18 149:15
152:2 214:18
280:2,5,8,21
**percentages**
152:2
**perchance**
129:20 174:9
**perform** 159:5
**performed**
184:7 213:11
**period** 20:10,17
22:8 33:10
59:19 65:23
141:16 145:23
146:4 149:6
151:14 152:15
153:12 172:16
174:14 175:2
187:13 220:8
221:11 229:19
244:8
**periods** 142:8
**permanent**
91:15,23 92:1
92:10,15 93:6
93:13,18
94:18,21 95:3
96:21 97:5,10
325:15 327:2

327:6 346:1
353:4,10,22
353:23 354:4
354:16
**permission**
248:23
**person** 33:19
121:5 122:9
122:13 123:18
123:20,24
127:4,7
128:18 157:17
162:6 164:6
176:1 235:16
238:23 264:14
265:8,16
266:6 275:16
325:2 327:16
328:3 329:14
330:7 331:2
359:23 360:1
363:1 365:12
**personal** 13:20
27:13 124:13
**personality**
62:2
**personally**
153:10 222:9
283:24
**personnel**
266:21
**persons** 168:5
327:9
**perspective**
87:13 102:15
233:6 289:10
**pertaining** 1:17
**pervasive** 371:6
**petition** 244:24
245:4 246:5
**phase** 57:2,3
**phone** 2:6,12,19
30:16 35:16
38:16 39:20
70:20 94:16
140:7 222:8
242:10,11

284:8 369:2
**photo** 158:21
159:2,22
160:1,2,11
364:22 365:5
365:15
**photograph**
37:17 361:14
364:21
**photographing**
108:17
**photographs**
10:14,16 11:1
11:5 30:23
39:16 40:15
40:17 51:12
59:14 107:19
108:19 114:16
155:8 158:19
181:16 242:12
246:19,23,24
247:1,16
359:8,11
361:5
**photos** 111:9
246:6 359:5
359:17 360:3
363:12 364:13
365:6 366:1
377:15
**phrase** 38:4
93:20 240:16
292:17 328:22
**phrases** 190:10
**pick** 216:24
219:6 329:18
330:19
**picked** 174:10
252:10 329:5
329:14 330:5
330:7 335:16
342:19 346:18
346:18
**picking** 217:10
219:8,17
220:1
**picks** 328:9,11

329:1,20
**piece** 36:2
220:18 221:9
319:5 366:7
**place** 8:8 27:5,6
27:11 46:21
87:11 113:4
262:14 271:5
297:4 327:12
373:12
**placed** 121:23
**places** 39:9
107:10,11,14
109:8,12,21
110:1,8
111:18 112:5
112:16,21,24
113:6,7,11,13
114:6,9,10
115:3,3,4,5,10
115:13 117:4
117:24 119:12
203:21
**Plaintiff** 1:5 2:2
373:5
**plaintiff's** 182:2
182:16 191:19
**plate** 210:19,21
210:23,24
**play** 156:18,20
157:3,22
161:10,21
168:23
**playing** 153:13
**please** 3:12 4:6
4:11 73:22
104:2 190:12
197:22 304:4
376:12,14
**plus** 18:10
187:12 213:6
213:11 214:5
214:18 221:18
341:10 349:2
**point** 4:5 6:14
17:5 22:15
38:8,20 42:24

43:4 44:13
45:20 47:5,18
48:8 57:5 73:4
114:18 124:23
128:9 149:3
149:21 160:15
165:1 184:18
193:14 194:5
195:2 199:4
199:24 200:5
202:8 210:10
213:24 215:18
219:16,18
222:19,23,23
222:23 244:12
244:13 250:8
260:19 273:16
312:20 328:16
338:1 348:19
350:12 351:22
**pointed** 88:15
203:23 336:2
**pointing** 206:9
**points** 11:11
**police** 1:10 2:9
11:6,10 13:19
14:12 16:2,13
16:15 20:12
20:19,22,24
21:5,16 22:1
22:10,12 23:2
23:5,10,12,19
23:24 24:2,3,7
24:7,10,10,14
24:18,21,21
25:1,3,7,11,17
25:21 26:10
26:17 27:15
27:16 28:3,15
29:8,18,23
30:10,20 31:1
31:4,16,17
32:15,16,21
37:21,24 38:5
38:7,15,20,24
39:24 41:2,23
42:5,9 43:2,10

46:22 48:13
48:21 49:9,15
49:19 50:7,13
50:18,19 51:2
51:9,12,15,15
52:13,23 53:9
53:16 54:13
54:15 55:15
56:1,6,6,9,11
56:12,15,18
56:23 57:12
57:14,19,22
58:10,20,23
59:2,5,8 60:5
60:9,17,19,22
61:9,14 62:4
63:23 64:12
64:20 66:11
66:15,16 67:2
68:7,17 69:14
69:18,23 70:4
70:7 71:1,19
73:7,18 75:12
75:16 78:8,14
78:20 79:9,19
80:12 84:9,13
84:16 89:5
91:1 101:2,15
102:16,18
103:14 105:4
105:14 106:1
106:2,13,15
107:6,11,15
108:8,23
109:1,4,17,18
110:13 111:19
112:7,9,21
113:1 114:11
114:21 116:3
116:9 117:2,4
118:8 119:8
119:14 120:3
120:4,12,13
120:16,23
121:1 127:21
129:14,18
130:5,20

135:7 142:10
142:11 147:1
148:5 154:19
157:19 162:3
162:13 166:22
177:7 188:14
188:15,20,21
191:8,10
205:17,20
207:17,19
208:16,20
209:8,12,13
209:18 210:20
212:22 215:4
215:7,16
216:21 221:20
223:16,21,21
224:8 225:13
225:14 228:3
228:9,13
230:7,12
232:16,24
233:20,22
234:18 235:3
236:19,22
237:12 238:3
242:10 246:6
255:6 256:13
256:17 257:10
257:21 274:1
274:3,23
276:6,19,22
276:24 277:9
277:14,18
278:3,4,6
279:21 282:1
287:14 288:14
288:14 289:11
289:24 290:7
291:7 292:13
293:10,19
294:5,9
295:11,21
296:2,14
298:3,5,8,14
298:15,20
299:2,3,5,10

299:17,17,18
300:1,18
301:4,11,19
301:24 302:7
302:9 303:4
303:12,16
304:2 308:19
311:1 312:11
313:22 314:9
316:19 318:9
318:15 320:15
320:22 321:12
322:21 331:4
336:22 338:19
340:15 346:5
348:20 359:7
359:12,18
360:4 361:1
362:23 368:24
369:7 371:7
371:16 377:16
**policies** 29:2
   48:12 100:14
   248:14 250:22
   263:14 269:17
   269:19
**policy** 42:10
   218:21 256:1
   256:4,6,8
   316:18,21
   318:10 371:15
**pool** 196:13
**poorly** 258:20
   258:21
**portion** 26:6
   36:20 90:21
   100:9 110:5
   142:17,18
   147:9 180:19
   180:23 184:22
   185:18,20
   186:8 215:10
   221:18 275:21
   292:10,15
   303:7 325:4
   337:9
**portions** 6:20

6:22 9:8
   180:22
**position** 56:5
   138:12 139:10
   139:22 140:1
   141:11,15
   143:22
**positive** 61:8
   167:22 234:13
   333:11 342:13
**possession**
   59:18
**possibilities**
   364:6
**possibility**
   257:4 310:6
   338:11 364:1
   365:14
**possible** 102:21
   103:7 121:11
   129:6 145:19
   212:8 262:14
   266:15 276:18
   282:11 300:7
   308:13 309:4
   309:7,10,24
   314:19 357:3
   366:18
**possibly** 134:22
   234:21 338:6
   338:16 346:6
**post** 259:7
**post-1983** 290:1
**post-conviction**
   244:24 245:1
   245:2,4,18,19
   245:19,21
   246:5,15
   247:2,7,8,11
   247:24 248:3
   248:8,9,12
   259:8 260:21
   261:20,21
   262:1,11,17
   262:24 264:5
   264:15,19,22
   264:24 265:15

265:23 266:20
   267:6,17
**post-convicti...**
   247:10
**post-trial**
   138:22 263:19
**potential**
   150:20 156:17
   158:22,23
   181:17 236:1
   342:23 359:18
**potentially**
   63:24 72:12
   102:10 104:5
   117:22 118:23
   150:13 178:10
   342:22 343:5
   343:16 360:22
   361:11 364:15
**practice** 69:18
   123:11 124:5
   124:11,13
   125:24 130:18
   217:11,13
   218:13,16,19
   220:22 221:5
   246:8 256:9
   257:8,16
   258:8 270:1
   283:14 284:3
   284:10,11,19
   286:4 292:12
   331:4 368:6
   371:7,16
**practices** 21:15
   25:8,13 29:8
   48:12 52:24
   53:17,17
   66:17 67:3,7
   70:15 87:6
   89:3 101:13
   101:17 102:10
   104:5 105:11
   221:4,6
   248:14 250:22
   255:22 256:22
   269:17,19,21

270:8
**practitioner**
367:11
**pre-centralized**
130:9,11
**precedes** 223:7
**preceding**
365:23 375:10
**precise** 280:10
**precisely** 40:8
**precluded**
160:6 161:15
**preface** 211:20
**preferred** 38:21
**premise** 305:10
**preparation**
181:3 291:17
**prepare** 56:13
56:20 57:11
58:23 170:7
179:24 180:8
**prepared** 123:7
137:10 151:17
179:11 298:16
361:24
**preparing** 58:5
58:8,19 59:19
84:23 152:4
170:20 171:17
183:21 201:11
**present** 2:22
35:5 142:6
161:8 234:12
234:16 235:1
239:3 338:20
340:8 373:8
**preserve** 108:5
134:22
**preserved** 51:13
109:6 119:10
119:15 121:3
135:4,17
257:11
**preserving**
115:1
**presume** 52:12
303:22

**presumes** 114:2
300:23
**presupposing**
259:1
**pretrial** 55:14
55:22 58:12
64:21 75:18
150:9,10
152:4
**pretty** 40:10
50:4 58:2
106:22 113:12
113:17 130:5
202:21 257:16
258:14 282:10
**prevent** 3:16,21
4:1 262:19
**preventing**
370:12
**prevents** 250:11
250:15
**previous** 4:20
8:15
**previously** 32:4
34:17 47:19
59:8 65:16
266:11 373:8
**PRF** 354:8
**primarily** 13:13
14:13 15:24
16:16 20:15
22:4 23:9,11
23:23 30:24
31:1 92:20
144:19 146:6
146:8,16
147:17 158:11
158:13 160:23
192:22 260:5
265:3 267:24
369:4
**primary** 22:21
33:6 133:23
147:24,24
227:20 317:22
318:17 319:10
**principle**

232:23
**print** 200:3
**printed** 7:21
8:19 198:4,5
326:5
**prior** 5:10 8:8
11:7 27:18
28:6,13 39:2
58:18 65:17
70:5 156:3
177:7 178:24
278:5 339:23
**pristine** 237:7
258:14
**private** 23:15
212:1 323:4
370:18
**probability**
338:13
**probable**
151:20
**probably** 127:7
177:15 183:6
186:7 187:18
187:22 220:13
249:10 294:5
313:14 320:19
326:16 339:17
372:1
**problem** 199:8
259:4 271:17
271:19 276:8
**problematic**
117:22 118:5
118:24 119:6
**problems** 265:7
304:23 371:24
**procedure** 1:17
238:11 316:18
**procedures**
22:24 100:14
105:2 331:10
**proceed** 29:3
242:8
**proceedings**
296:6 370:7
**process** 28:16

31:17 38:9
39:3 46:16
52:8 55:16
78:2,9 94:15
102:17 105:13
121:24 127:16
129:13 130:6
130:9 135:6
135:20 185:9
188:7 203:15
204:2 217:16
218:8 221:15
238:11 251:7
251:10,15,21
251:22,23
252:3,16,17
261:12 264:9
264:10,10
272:23 273:6
277:3,9
278:18 286:13
286:14,20
303:20 306:16
310:10 317:8
317:9,11,13
317:13,19
364:22
**processes** 26:12
55:14
**produce** 50:18
79:20 217:5,8
310:9 371:17
**produced** 41:6
42:22 43:15
44:8,15 45:9
45:16,22 46:3
46:12,17
47:20 78:21
80:8,9 96:18
96:20 97:11
111:19 114:6
119:17,17
120:19 127:24
131:2,8,18
132:1 133:6
133:11,15
191:23 192:12

192:13 216:8
218:12 271:2
275:6 295:11
298:7 299:11
309:13,21
311:9,11,14
311:22 313:20
313:21 314:9
315:15,22
338:6,10,11
338:17 339:13
341:8 348:24
351:21 352:14
354:17 355:13
356:1 361:1
**producing** 44:3
45:6 78:18
79:6,7 132:9
219:24
**production** 8:9
15:8 48:4
91:17,21
97:15 122:2
192:11,13,14
220:16 368:8
369:1
**professional**
1:16 137:24
139:4 179:9
373:4 377:11
**professionalism**
60:10
**professor** 139:7
**progeny** 43:13
44:8 77:22
84:22
**program** 231:7
**Progress** 32:7
35:22 40:21
124:16 192:17
199:6 207:19
223:16,20
224:7 228:14
357:1
**prohibit** 250:23
**prohibition**
161:4

**project** 214:14
**promoted**
    143:23 148:11
**prompt** 287:4
**proper** 65:10
**Properties**
    108:6
**property** 59:13
    73:19 108:11
    108:20 109:24
    111:3,10,22
**pros** 266:7
**prosecute** 234:7
**prosecuted**
    243:9
**prosecuting**
    55:6 56:10
**prosecution**
    29:3 38:10
    138:20 142:17
    143:8,9,10,16
    144:22 148:13
    149:16 153:6
    164:17 166:23
    172:9,17
    173:14,15
    174:3,10,14
    175:7 233:18
    250:19 257:1
**prosecutions**
    69:15 142:19
    143:11,14,19
    144:3,7,9,11
    144:14,15,18
    144:20 145:6
    145:8,10,17
    146:3,23
    150:12 152:17
    164:23 173:20
    265:1,8
**prosecutor** 11:6
    13:12,14
    15:21 18:20
    20:3 22:22
    28:14 30:10
    45:4 47:19
    49:12,18 55:5

56:4,24 79:15
79:17 80:13
95:22 101:3
105:3,20
107:13 109:9
109:12,17
112:16 115:23
123:11 124:6
127:21 135:7
136:19 153:8
153:8 188:16
189:12 207:16
215:1 233:5
234:22,22
236:17 239:14
240:12 242:3
242:4 243:14
243:19 244:3
244:9 245:8
246:10,13
247:2,10
248:9 257:22
282:12,23,23
282:24 287:13
292:21 294:2
299:9 321:6
321:15 322:7
330:7,15
332:21 339:23
340:13 342:15
353:7,14
354:18 357:15
368:15
**prosecutor's**
    11:24 14:11
    15:17,22
    16:12 19:17
    21:23 30:20
    55:8 59:4 69:7
    69:8 73:7 74:3
    76:3 77:12
    79:10 80:6
    91:1,10 92:12
    95:7,18,20
    96:4,11,13
    112:6 130:18
    162:11 202:11

202:20 203:11
205:21 206:12
206:16 207:18
208:19 209:10
209:23 210:1
210:2 214:23
215:6,7,17
223:2,10,23
224:5,16
228:17 229:19
229:20 230:13
230:14,16
231:24 232:2
233:21 236:13
237:6 243:3
246:1 249:17
250:16 252:7
253:7 261:17
263:11 277:24
278:1 279:14
279:23 280:1
288:16 289:11
337:23,24
340:8,17
**prosecutor-ge...**
    256:15
**prosecutors**
    23:5,6 25:15
    29:5,16 30:13
    42:15 43:3
    46:4,18 65:20
    80:2,18,23
    89:4 108:10
    122:1 124:12
    124:14,19
    126:3,21
    127:6 135:21
    146:11 168:5
    172:10,22
    173:1,10
    174:9,13,22
    189:15,16
    190:8 212:22
    217:15,16
    218:17 219:1
    219:6 220:24
    221:7,10

234:2,6 235:6
235:14 237:17
238:3 242:7
245:1,17
249:18 256:11
281:17,20
283:1,16,22
284:24 287:5
292:5 338:2
338:23 359:15
368:6
**prosecutors'**
    221:4
**protected** 55:17
**protocol** 216:18
    228:6
**provide** 3:17
    14:14 23:9
    31:18 37:8
    55:19 60:22
    82:3,6,12,16
    82:17 83:3
    84:15 120:5
    190:12 206:5
    214:15 215:9
    221:24 222:3
    222:10 250:23
    280:2 286:2
    292:5 301:16
    351:19 371:8
**provided** 7:22
    11:6 23:14
    49:16 66:19
    66:20 75:18
    75:22 76:19
    77:3 83:14,15
    86:17 107:7
    109:2 121:6
    126:6 135:2
    178:24 196:22
    200:19 201:22
    209:1 213:4
    222:6 223:8
    236:24 252:18
    280:20 338:3
    338:14 348:22
    350:12

**providing** 3:21
    4:1 13:19
    24:13 156:16
    206:4 217:15
    242:5
**public** 214:4
    269:10,13,17
    269:24 270:7
    277:11 323:3
    336:23 369:6
    370:17 375:23
**pull** 181:14
    220:5,7
    248:16,17
    251:1,2
**pulled** 221:12
    230:5 268:18
    311:19
**pulling** 220:2
**purely** 106:8
    228:8
**purpose** 1:18
    81:16
**purposes** 26:11
    81:13,18 82:7
    82:18 86:6
    90:3,6,11
    91:16 95:4
    97:19,22
    100:13,22
    114:8 115:20
    156:11 222:21
    270:13 275:4
    278:15,16
    331:13
**pursuant** 1:16
    133:20 242:6
    339:21 371:8
    373:13
**put** 21:2 42:14
    43:12 57:21
    64:1,10 72:2
    93:5,15
    120:17,18
    121:6,10
    122:8 130:16
    143:22 150:2

151:6 162:12 163:21 168:6 170:10 184:16 184:17 188:10 196:17 198:23 199:1,10 202:17 262:2 262:12,13,18 262:21 263:13 263:16,21,22 263:23 265:9 265:16 266:2 266:12,14,18 266:22 267:5 267:13 307:15 309:12,20 310:20 329:9 329:12 343:4 343:15 353:24 363:10
**puts** 310:23
**putting** 39:19 64:13 68:1,20 90:2 113:18 152:1 170:21 191:8 212:16 235:16 239:11 262:20 357:12 357:13

**Q**

**qualifications** 255:10
**qualified** 48:20 52:7 53:23 54:9,13
**quash** 58:14 151:19
**question** 4:7,10 4:11,14 14:7 18:7 26:4 30:6 44:1 46:9 53:13 55:2 62:24 70:12 78:3 91:20 94:2 100:6,8 104:2 110:4 116:14 118:13 118:17 125:7 125:16 131:22 164:21 174:24 183:2 188:12 191:2 226:5 243:7 247:23 261:19 273:21 275:20 282:20 286:12 299:15 303:6 304:4 305:2,9 306:5 308:17 312:24 330:2 332:19 337:5 343:8 363:16
**questioning** 169:20 170:1
**questions** 72:10 72:15 73:3 78:12 117:19 129:8 221:15 313:23 321:18 367:21 368:1 368:1,2 373:11
**quibbling** 280:16
**quick** 77:17 209:21 255:17 255:19 294:13 321:17 367:24 369:15
**quicker** 244:2
**quickly** 38:7 89:13 358:11
**Quinones** 358:11,13
**quite** 198:14
**quote/unquote** 127:2 164:6 345:15 346:2

**R**

**R** 3:1
**raise** 49:16 174:15 305:15 305:18 313:23 371:14
**raised** 175:17 181:17 245:6 249:12,21,22
**raising** 304:15
**ran** 261:10
**range** 16:22 263:10
**rap** 38:16 39:16 41:18 107:20 112:11 127:3 127:11
**rape** 21:21
**rare** 57:21 58:2 105:1 133:3 246:13 250:7
**rarely** 41:20 42:3 50:4 132:21 249:19 250:20
**rate** 178:13 371:23
**rates** 83:16
**Raymond** 336:13
**RD** 93:2,11,19 93:20 94:7,12 94:23,23 95:2 95:4,6,12,13 95:15,19,23 96:3,14 97:5 97:11 107:22 108:2 109:2,3 109:7,7,23 111:2,21 112:13 114:15 120:9 122:10 122:16,17,21 122:22 126:5 126:13 130:12 131:15,16 134:1,4,6,11 134:16,20 135:1,15,24 233:23 234:18 298:11 299:4 300:16 301:3 301:18 302:6 303:19 312:14 316:16 317:3 318:21 319:6 327:7 339:20 340:1 352:20 353:1,3,8,9,11 353:15,16,20 353:20 354:2 354:8 355:4 355:14,19,23 366:21,23 367:2
**RDs** 92:18 95:8 97:17 126:16
**re-review** 183:9
**re-tender** 219:14
**reach** 73:17,20 153:19 157:13 287:5 369:11
**reached** 35:11 157:14
**reaching** 57:12
**reacting** 96:9 96:15
**read** 6:12 26:2,5 26:6 36:19,20 98:4,5 100:1,8 100:9 110:4,5 147:5,9 193:13 194:7 198:15 275:19 275:21 303:6 303:7 337:4,9 375:7 376:11
**reading** 32:15 56:11 65:13 85:18 122:16 183:7,13 293:24 294:6 294:7 296:15 376:11,14
**reads** 279:14
**readthrough** 183:12
**ready** 31:8,8 56:13 57:4 242:13,13
**real** 209:21 220:10 230:6 249:13 261:12 294:13 345:15 346:2,15 369:15
**really** 22:20 56:4 63:3 76:20 102:20 103:23 135:18 153:15 167:1 187:9,24 210:20 228:3 231:23 273:23 289:12 301:8 365:4
**reask** 100:6
**reason** 8:12,19 8:22 32:14 36:24 37:2 43:23 70:13 72:18 81:3 93:5 138:8 171:9 220:19 245:15 249:1 249:20 256:12 257:3 258:7 259:5 263:18 286:9 287:21 296:17,19 311:10,22 315:8 320:20 341:22 357:10 357:24 359:9 359:23 374:6 374:9,12,15 374:18,21
**reasons** 31:22 50:10,19 86:16 200:13 207:1 234:6 236:8 246:16 249:21 256:20 260:16 265:14

265:22 306:2
359:22
**recall** 5:14 24:4
24:8 25:5
45:13,19 47:2
47:3,14,24
48:6 66:9 78:4
80:4,10 82:15
91:19 123:3
125:23 168:24
170:17 171:17
171:23 193:3
194:14,20
195:16 213:24
232:4 253:5
272:24 275:9
275:11 276:2
333:3
**receipt** 218:6
**receipts** 218:1
283:4
**receive** 24:2,6
72:16 73:12
73:14,15,21
81:20 98:18
121:8,12,18
137:4 178:17
178:20 181:22
201:10 221:17
255:14 304:3
314:14 315:12
315:13 354:18
355:2
**received** 7:17
7:18,20 13:15
13:21 27:12
29:5 31:11
32:18,20 33:5
35:10,12,13
35:14 36:12
37:13 40:13
46:10 54:4
89:4 124:16
134:24 135:1
136:18 200:18
217:8 218:11
220:6 236:24

240:6,7,9,13
241:10,14,21
241:22 257:9
257:13 271:2
293:13 309:24
315:12 332:24
339:20 344:21
348:16
**recess** 77:18
136:10 200:16
255:20 321:20
369:18
**recollection**
10:7 17:9
42:13 43:22
79:1 80:15
99:11 158:11
**recomposed**
188:4
**reconsideration**
168:11
**record** 3:13
26:6 36:20
100:9 110:5
124:1 147:9
186:15 205:1
232:14 243:21
244:1,5,19
246:9,11,12
249:4,7,14
250:2,10
275:21 298:11
303:7,10
305:22 306:18
307:7 331:13
332:13 337:9
347:16 353:17
353:18 355:1
373:11
**recorded**
331:11
**records** 93:19
105:23 113:3
129:1 353:21
354:24
**recovered** 59:13
73:19 108:6

108:10,20
111:10,22
**Recovery**
109:24 111:3
**RECROSS**
368:3 377:2
**recurring** 372:1
**Red** 262:9
**REDIRECT**
377:2
**reduced** 373:6
**Reed** 203:10,13
203:13 210:13
210:13
**refamiliarize**
85:22
**refer** 92:18 97:9
98:10,13
189:21 354:1
354:1
**reference** 18:15
50:4 77:23
93:22 94:18
165:6 297:20
311:3 322:5
344:24 345:1
345:12,16
346:14,19
347:20 349:5
349:6 351:18
352:19 353:3
353:10,21
**referenced**
12:12,15 16:7
85:1 86:4
196:16 202:19
211:14,15
213:22,22
222:21 299:6
308:4 345:16
348:11 362:5
**references** 78:2
194:18 310:24
**referencing**
19:12 194:19
195:5 352:13
**referred** 31:6

97:6 98:1,5,7
107:23 162:11
315:6 341:1
355:23 373:12
**referring** 10:17
12:15 14:23
15:24 29:4
42:17 94:23
95:1 97:10,12
198:9 200:1
223:14 241:19
344:20
**refers** 17:12
**refusing** 58:17
**regard** 11:12
28:4 53:7
62:20 79:5,7,9
87:23 89:10
92:11 191:7
194:9 196:8
204:2,11,17
204:23 207:9
218:9 221:18
222:16 235:2
236:4,11
273:6 280:18
284:13 285:14
292:10,15
333:10 360:20
362:4
**regarding** 86:14
88:21 180:2
180:17 194:24
215:18 236:6
**regardless**
216:12 218:11
**regards** 88:14
**Registered** 1:15
373:4
**regular** 152:14
152:21 153:2
277:12 369:9
**regularly** 64:24
150:7 279:17
354:9
**Regulation**
281:2,7

**reissued** 37:24
**relate** 21:16
333:15
**related** 15:21
56:16 58:22
114:16 119:11
154:11 165:7
176:24 178:20
242:17 257:23
259:21 269:18
276:10 294:9
310:4 315:24
316:10 322:10
323:8 365:13
370:14
**relating** 83:10
**relation** 363:10
**relationship**
142:20,24
**relationships**
188:12
**relative** 71:8
**relatively**
260:14
**released** 296:3
297:21
**relevance** 59:22
59:23 66:7
175:7,15
**relevant** 22:22
54:22 55:9
71:6,20 72:3,8
72:11 82:13
87:6 101:24
102:1,11,22
103:8,12,15
104:5 105:12
106:4,9
108:18 115:10
115:14 116:13
191:18 285:10
286:7
**relied** 82:14
209:17
**rely** 67:10 71:12
196:18 293:19
**relying** 14:4

18:22 86:2
114:1 225:24
250:1,10
**remained**
143:17
**remaining** 18:3
208:12,18
214:5 261:18
279:10,24
329:13
**remember**
24:13 43:9
98:4 126:24
127:1 132:23
147:8 153:7
165:12,23
171:2,18,20
173:5 203:10
227:24 234:15
260:11
**remembered**
247:17
**remind** 284:24
**reminder**
283:12
**reminding**
281:24 284:2
**rendered**
179:10
**reorganized**
188:4
**reorganizing**
185:12
**repeat** 270:18
358:8
**repeated** 94:18
**repeatedly**
305:9
**repeating** 47:9
**repeats** 197:19
**rephrase** 4:12
23:11 24:5
74:13 123:14
**replied** 41:12
**reply** 41:11
243:24 244:9
245:9

**report** 7:13,15
7:18,19,23 8:1
8:4,5,8,9,13
8:15,17,18 9:1
9:2,8,16,21,24
10:9,13,15
11:5,15,17,19
12:5,9 14:10
15:2 16:7,14
19:12 31:15
31:20 32:6,7
33:9,22,24
35:22 36:10
41:8 56:11
68:4,4,9 69:6
73:21,22 81:6
81:7,13,16,18
82:19 83:8
84:24 85:1,2,8
86:8,9,12,22
89:7 94:6,17
99:2,15,21
109:6 120:7,7
120:18 123:19
124:7 126:20
131:21 132:14
134:11,13
136:16 137:1
155:3,5,12,13
169:21 176:24
180:13,14
181:7,18,23
182:3,16,19
182:20,24
183:5,9,12,13
183:17,21
184:10,10,11
184:13,14,21
184:23,24
185:2,4,5,10
185:13,21,22
186:9,11,16
186:18 187:1
187:3,11
188:1,3 189:5
189:6 193:1,4
193:13,18

194:8,18,19
194:23 195:8
195:8 197:11
197:20,21
199:6 201:9
201:12,16
202:9 203:9
203:13,14
204:4 205:3
205:15 206:6
207:17,19,20
207:20 210:10
210:14 215:11
215:20 216:1
216:1,3
217:21,22
218:5,7
221:16 223:5
223:16,16,21
224:3 226:12
226:16,21
228:6,13,14
228:20 229:5
231:20,21,24
233:16,20,22
233:23 234:23
235:4,18,20
236:21 239:6
252:24 253:19
255:16 271:22
271:23 273:1
273:4 274:1,3
274:24 275:3
275:10 276:19
276:22,24
277:9,15,18
277:23 278:3
278:4,6 279:6
279:9 280:2
280:11,20
281:1,4,5,10
283:8 285:6
285:15 294:14
294:15,16,18
294:20,21
295:14,24
296:1,1,2,4,4

296:9,11,12
296:14,18,20
297:5,21
298:6,9,15,20
299:4,10,17
299:18,24
300:4,5,7,14
301:1,4,6
302:15 303:21
303:23 308:2
308:3,13,15
308:16,17,22
311:1 312:10
312:13 316:5
320:18,20,21
321:22 322:11
322:15 323:5
323:10 324:7
324:11,11,12
325:17,18
326:16,20,21
327:6,20
328:20,24
329:4 332:24
337:2,12,14
337:21,22
338:1,2,4,22
339:2 340:6,7
340:10,12,20
341:13,15
342:12 344:3
344:17,19
345:7,23
346:5,12
348:2 350:18
352:12 355:5
355:7 357:1
361:13,15,19
361:21,22
362:2,3
367:14 377:8
377:13,13
**reported** 373:6
**reportedly**
206:20
**reporter** 1:15
1:16 26:7

36:21 100:10
110:6 147:10
275:22 303:8
337:10 372:9
373:4,4 374:1
375:1
**reporting**
326:23
**reports** 11:10
11:23 16:2
23:12 26:10
32:15,16 33:7
40:21 41:8,9
41:18 45:3
49:15 50:7
56:16,18
57:10 58:23
59:8 68:17
91:1 92:17,17
93:23 94:5,6
95:11,13
108:1 112:13
115:23 123:7
124:7,16,22
125:14 126:2
126:5 127:10
127:23 128:19
129:12 131:7
131:11,18,23
131:24 132:8
132:10,13
133:10,17,19
133:24 134:14
136:19 137:5
154:19 166:22
186:21 192:18
205:13,17,20
206:11,15
208:16,20
209:8,12,13
209:18,24
210:15 215:4
215:7,16,22
216:6 221:21
223:20,21,24
224:8,8,12,22
225:5,13,15

228:8 230:12
232:17 234:4
234:8,11,17
235:3,17,19
235:20 246:6
256:13,17,18
257:21,23
272:17 276:5
279:22 282:1
282:6 291:7
293:24 294:7
294:13 296:15
296:16 297:3
297:10 298:14
299:7 301:17
307:22 308:5
309:5 316:14
317:2,5
319:15,20
320:2,5,14,14
322:21 323:8
323:16 333:15
334:5 335:16
336:22 339:22
352:9 353:8
355:4 362:6
362:23 368:16
370:24 371:4
372:4,4
**repository**
289:8
**represent** 7:21
198:4
**representation**
293:3,9,9
301:21,23
**representing**
75:16
**request** 30:21
30:22,22
37:14 38:14
41:13 49:11
94:12 106:13
108:9 110:24
112:6 113:6
115:5 135:8
252:20 342:16

359:5,16
360:12,13
361:5,14
363:7,8,10,12
364:9,12
365:5 366:1
366:10 377:15
**requested** 39:17
41:3 49:10
66:21 115:23
298:2 360:3
361:10 365:8
**requesting**
30:17 41:1
106:14 108:9
111:13 135:22
359:7 365:4
**requests** 30:10
30:14 50:24
70:21 110:11
112:17 113:11
130:23 284:7
285:1 366:4
**required** 65:23
119:14 235:22
236:8 238:21
**requirements**
19:14,16
87:10 239:12
**requiring** 85:19
**rereviewed**
181:18
**resembles**
198:11
**resentencing**
168:7,10
**reservations**
64:13,16
**reserve** 372:8
**resolution**
163:7
**resolve** 231:10
**resources**
154:14
**respect** 74:19
**respond** 13:4
155:10,10

195:15 216:22
219:11 310:9
**responded**
37:22,23
158:7
**responding**
31:17 48:22
52:8 158:13
194:21 195:11
195:22 196:9
**response** 15:7
15:11,13 34:5
42:11,22
43:15 46:4,17
47:20 72:19
73:15 97:14
106:16 132:2
133:7,12,17
216:9 218:3
218:10 342:16
**responsibilities**
133:20 145:15
193:5
**responsibility**
133:23 160:24
162:5,16,18
162:20 216:6
240:4 242:4
317:22 318:17
319:11
**responsible**
165:16 216:1
311:16 316:22
320:18
**rest** 68:4 128:16
197:10 208:13
308:11
**restaff** 138:13
**result** 52:14
254:3 327:21
329:15 330:13
**resulted** 176:18
**results** 335:14
**resume** 83:18
137:9,10,13
137:17,20
139:17 195:19

195:19
**retail** 22:3
282:6,8
**retain** 256:1
270:1,4
**retained** 4:18
4:21 27:18,24
28:7 47:18
66:13,24
69:17 70:5
73:23 84:2,8
84:14 92:21
141:7,21
177:1,8,9
178:11,18
179:1 233:20
236:21 299:18
**retaliation**
156:5
**retention** 91:15
91:23 92:1,10
92:15 93:6,13
93:18 94:18
94:22 95:3
96:21 97:5,11
269:18 270:8
298:11 325:15
327:2,7 346:1
353:4,11,22
353:24 354:4
354:17
**retired** 138:18
139:1,4
**retirement**
141:20
**retiring** 141:20
**retrial** 65:13
93:4 167:18
167:19 168:4
269:2,4
**retrials** 93:11
262:16 268:17
268:17
**retried** 259:12
**retrospect**
61:18
**retry** 256:21

257:4
**return** 244:4
**returned** 40:11
**Returning**
221:15
**reveals** 279:15
**review** 5:5,8 6:9
15:22 17:17
17:21 28:24
44:20 67:20
67:23 68:6,22
79:14 84:23
90:7,10,19,21
91:13,23 95:3
97:4,20,23,24
100:14,21,23
101:4,6,11
107:2 182:2
182:10,15
183:20 184:19
185:23 186:9
193:3 194:6
198:19 205:6
206:19,20
321:8 346:21
**reviewed** 5:15
6:19,20 10:12
14:15,21 16:6
18:10,21
28:12 67:11
69:13 84:20
85:3,7 86:6,6
86:8 87:14
97:6 101:5
116:7,23
178:23 180:11
180:13,15
182:8,11,19
190:22 191:4
191:5,13
193:1 196:3
198:18 199:18
212:24 323:14
347:3 377:9
**reviewing** 28:11
32:21 102:14
181:13 182:24

184:9,9
186:11,18
187:11 197:1
323:10
**Rey** 167:5,10
336:10
**REYNALDO**
1:7
**RFC** 324:10
**RFC13648**
236:12 237:15
238:2 240:9
**RFC15446**
342:8
**RFC15456**
344:4 345:2
348:5
**RFC15465**
344:6
**RFC15470**
324:5
**RFC163448**
332:8,13
**RFC6442**
365:21
**RFC6443**
358:23
**RFC7160** 235:3
**RFC7184** 235:5
**ridiculously**
313:9
**right** 10:22
11:21 14:20
17:6 18:6 28:6
31:3,3 35:1
39:6 48:9 67:7
70:16 72:4
75:2 76:1 79:5
90:1 91:19
109:14 110:12
136:15 143:11
151:12 161:17
170:14 173:4
175:3,11
176:23 180:20
195:12 198:19
201:9 203:6

203:12,14
204:19 209:19
210:21,24
211:9 213:12
223:6 225:2
227:4 228:19
238:8 240:18
241:13 248:2
253:8 254:19
255:16 257:2
258:10 261:15
261:24 264:8
266:13,18
273:3,24
274:19 277:16
279:8,13
288:1 298:12
299:9 300:19
309:6,9 315:4
321:16 322:2
324:4,12
325:1 326:2
326:20 329:3
332:17 334:19
335:1,14
339:7 340:22
341:6 342:7
343:3 344:4
344:11,12,14
346:20 349:1
351:8,12
352:18 354:11
355:15 358:17
358:21 369:19
**rights** 55:16
65:9
**RINADLI** 1:10
**rings** 210:5
**Rivera** 1:4 9:17
88:7 100:24
141:8 178:21
375:5 376:5
**ROACH** 2:3
326:13,18
332:5,7,10
371:9,18
372:7,10

**robberies** 22:14
**Robinson** 205:2
205:22 206:13
215:15 221:20
222:7,12
228:16 232:15
236:4,11
237:22,24
239:1 240:3
279:21
**ROCCO** 1:10
**ROCK** 2:17
376:2
**role** 34:18 52:13
52:14 56:4
144:19 151:18
154:4 156:20
157:21 160:8
160:9 161:14
168:23 169:11
**roles** 153:12,22
156:18 157:2
161:9,21
**Roman** 281:7
**room** 247:6
266:6,20
**Rosen** 2:16 5:19
6:3,16 7:1
14:6 17:3,6
18:24 21:7
25:24 26:2
29:21 30:2
40:6 43:18
44:4,10,18,23
45:11,17
46:24 47:7,22
48:15,24
52:10,18 54:1
54:6,11,24
55:11 61:3
63:8 64:4 66:6
69:1 70:8
72:22 73:9
74:8,10,18
75:8 76:13,24
77:14 82:9
84:10,17 87:7

87:17,24 88:8
88:16 94:1
96:23 99:4
101:19 102:2
102:12,24
103:10,17
104:8 105:15
105:17 106:5
106:18,23
110:3 113:14
113:20 114:13
116:17 117:8
117:11 118:2
118:12 119:1
119:23 120:20
128:1,22
135:11 136:2
136:9 150:17
160:1 161:23
163:2,11
166:9 173:22
175:6,15
176:2,12,20
177:16,18
190:24 199:2
200:14 201:13
207:11 208:1
208:7 213:16
226:23 231:18
239:17 241:17
251:11,18
256:2 270:16
270:19 271:13
272:5 273:8
274:6,9,11
275:19,23
277:5,21
278:12,22
279:2,4
284:14,20
286:16 288:10
288:19 290:5
292:1 296:23
297:15,17
298:23 299:14
300:11,21
301:14 302:3

302:11 303:1
303:6,14
304:9,12,15
304:19,21
305:4,6,8,15
305:20 306:6
306:9,13
307:6,10
309:16 310:14
312:23 313:2
313:6 314:4
315:17 317:15
318:22 325:19
326:1 327:23
328:13 329:6
329:24 330:11
331:6,13,16
331:18,23
332:2,4,6,9,11
332:15 333:1
333:18 334:12
335:3,20
337:4,8 343:7
343:18 347:11
350:3 353:12
354:22 356:13
356:18,20
357:6,17
358:6 359:19
360:6 363:14
364:17,19
366:13,16
367:23 369:16
369:23 370:1
372:6,8 376:2
376:8
**rough** 6:11
187:9 188:5
**row** 198:17
199:1 200:1
263:16
**RPR** 3:3 373:20
376:18
**rudimentary**
283:11
**rule** 4:7 227:16
239:5 250:9

250:11,15
262:19,21
**rules** 1:16 4:4
81:23 242:6
250:24 373:14
373:14
**ruling** 48:1
**running** 190:15
**RUSSEL** 1:9

---

**S**

**S** 3:1 377:6
**sadly** 371:22
**sake** 186:1
**salary** 141:12
**sales** 154:11
**Samuel** 205:2
210:4 232:15
236:4,11
237:23 367:13
**Santiago** 362:7
**SAO** 15:7,11,13
16:22 97:14
339:8
**satisfaction**
185:16
**save** 260:19
**saved** 225:3
257:24
**saw** 28:9 48:4
94:17 98:2
123:20,22
124:1,3,7
132:13,21,24
159:19 161:5
166:21 181:17
230:5 250:16
259:17,18
262:9 286:4
287:17 292:19
292:21
**saying** 18:19
27:10 30:17
34:24 41:20
42:20 43:5
54:9 55:3
56:12 78:8

83:16 86:24
93:9 96:2
99:17 103:7
105:10 106:11
106:20,21
107:10 115:16
121:5 132:17
161:4 187:21
187:21 209:13
209:16 224:9
224:10,15
236:20 238:6
238:14 239:8
240:5,5 241:3
241:9 248:6
248:22 263:9
263:24 266:15
266:19 272:22
272:24 275:9
275:11 309:6
309:7 319:1
320:11 321:1
338:1,12
340:21,22
341:7 346:16
347:7 350:1
350:19,23
354:3 361:21
**says** 16:11
42:10 45:8,14
78:14,20
79:20 80:7,15
105:10 138:15
157:17 197:7
199:11 202:9
211:12,14
212:14 223:8
240:22 265:13
266:6 279:10
280:15 285:9
287:4 292:5
296:2,12
315:4 318:18
324:21 325:1
325:6 326:22
327:20 330:8
333:9 335:16

335:17,23,24
341:4 348:23
352:20 353:16
354:19 355:10
359:5
**scanning**
261:10,11
**scenario** 32:20
295:15 298:4
298:13 299:8
300:3 307:14
307:18 310:19
312:5,6,7,15
314:8,22
315:2 329:17
329:19 364:8
364:12
**scenarios**
104:15,19,22
266:16
**scene** 108:17
128:5,18
129:4 155:2,4
155:10,10,12
158:8,13
296:8,11
320:17
**screwed** 245:24
**se** 218:22 361:6
**search** 157:5,8
**second** 4:19
182:4 204:10
234:15 285:8
327:19 339:18
340:4
**section** 8:10
12:16 13:2
16:9,10 59:13
68:9 73:20
91:7 108:6
109:24 111:3
111:22 193:9
193:24 195:5
196:3,4,15,20
197:10,11
200:6 213:8
223:5 224:11

225:7 281:2,6
281:15 285:4
285:5 287:4
291:22 316:7
316:7,12
317:7,20
323:4 358:14
367:16
**sections** 9:14
195:18,22
**see** 7:15 16:12
16:14 28:3
32:9 40:12,15
40:16,19
47:11 48:8
57:13 69:8
85:12 96:11
96:13 97:7
122:17 124:8
127:10,11
132:12,15,20
138:1 139:7
143:15 154:20
155:3,5,6
156:1 157:2
159:6 160:8
162:7,13
163:13,19
169:6 171:14
172:3 196:20
202:21 206:10
207:19 208:11
208:13,20
215:7 223:11
224:3,16
225:13 226:11
228:7,19,24
229:19 230:12
239:16 240:21
246:5 257:20
262:21 264:3
273:4 275:10
279:9,11,17
281:3,8,18
285:3,11,24
287:7 291:22
292:4,8 297:8

307:20 316:3
316:10,16
324:19,22,24
325:8,9,22
326:24 327:2
327:10,13,15
327:17 333:8
334:21,22
339:9 340:21
342:8 347:22
348:8,9 351:2
351:4,5
352:21 353:14
356:24 358:16
360:14,15
363:1 365:5
**seeing** 47:24
48:6 80:10
165:21 259:20
271:11 326:6
333:3 356:5
**seek** 50:17
**seeking** 29:17
316:23
**seen** 27:16
28:15 42:9
45:7,14 46:1
47:4,14,17
78:8,19 79:8
79:18 80:5,11
132:3,18
157:3,21
159:4 318:9
318:14,18,24
332:20
**sees** 274:15
**segregated**
265:2
**selected** 177:10
205:6 331:2
346:13,23
**selects** 338:6
**selling** 154:10
**semantic** 212:6
**seminar** 24:19
**seminars** 14:3
**send** 31:1 37:14

37:15,17
38:21 39:4,6,6
39:7,8,10,11
49:3,9 105:21
108:10 110:14
130:5,8,11
263:14 266:2
266:23,24
282:8 285:1
312:9 370:17
370:18,21,22
**sending** 31:2,5
41:2 130:9
284:7
**sends** 265:24
**senior** 23:6,6
369:6
**sense** 34:22
41:22 106:14
125:3 126:14
258:14
**sent** 9:1 38:14
41:22 49:3
93:15 110:11
120:3 127:8
129:24 130:4
243:2 259:9
259:13 263:20
265:9 267:21
268:12 281:5
285:11 286:7
286:11 338:24
359:10,12
366:4,6,7
**sentence** 223:14
279:13 281:16
285:8
**sentences** 9:9
**sentencing**
168:4 242:20
243:1,15
**separate** 12:2
95:12,19
111:6 171:10
171:11 208:12
245:14 247:6
263:23 265:6

269:3 288:17
294:16 312:15
363:8
**separately** 41:7
95:6 112:18
150:1 217:22
218:7 334:2
**September**
348:7
**sequence**
296:14
**sequential**
335:7
**sequentially**
363:3
**Serafini** 136:16
**Serafinis**
136:18
**sergeant** 33:9
300:5,6,15
301:1 303:17
303:23 307:16
307:17
**sergeant's**
289:1
**sergeants** 33:13
36:7
**series** 305:23
335:6
**served** 4:17,21
**service** 23:15
100:16,19
255:2,5
**services** 109:23
111:1,21
179:9 181:11
377:12
**set** 12:3 17:1
18:21 34:4
90:8 97:4
132:21 191:21
214:17 256:18
292:23 315:16
315:22 321:18
352:6 373:8
375:9
**seven** 11:21

15:6,9,15 16:1
17:23 37:20
88:21 89:15
90:23 91:2
181:7,13
193:6,7,15,17
195:6 196:13
202:4,5,7,23
203:5,17,19
204:3,11,12
204:13,14,17
206:1,7 208:9
208:10,11
209:7,21,22
209:24 211:24
213:2 214:1
229:22 251:8
252:5,10,19
**shape** 237:7
**share** 112:2
318:2 319:8,8
320:22 321:2
**shared** 316:14
317:5 319:16
319:21 320:7
**sheet** 38:2 127:3
374:3 377:17
**sheets** 38:16,17
39:16 41:18
41:18 107:20
112:11 127:11
**shelf** 259:10
263:16,17,21
264:1 265:10
**shell** 129:5
**shelves** 259:19
**shooter** 156:24
163:15 239:2
**shooting** 154:16
155:22 156:1
156:6
**shootings** 22:14
33:12 153:18
154:10
**short** 77:18
200:14,16
255:20 290:10

321:20 369:18
**shorter** 137:22
**Shorthand** 1:15
373:4
**show** 124:2
158:17 159:2
335:8
**showed** 51:23
**showing** 245:23
**shows** 210:18
216:15
**sic** 211:8 336:13
**side** 23:13
146:16,21
218:22 261:8
**sides** 246:22
326:1
**sign** 59:17
283:5,10
287:24 376:11
**signature** 8:3
283:9 373:13
374:23 376:10
**signed** 7:20
8:13 31:15,20
32:6 33:10
37:1,3,7,10
50:9 162:7
218:1,6 289:3
302:15 355:3
355:6 375:13
**significance**
222:22 347:1
**significant**
55:20 122:18
345:19
**signing** 8:4
376:11,14
**similar** 4:23
86:14 127:13
130:13 245:3
245:12 354:14
**similarities**
86:24 87:3,5
**simple** 301:8
304:20,22
306:5 307:18

**simpler** 309:9
**simply** 72:18
115:16 122:21
308:22
**Sincerely**
376:16
**single** 96:14,14
230:11 243:6
243:17 276:19
289:14 295:20
**singular** 287:15
**sir** 137:8
**sister** 214:3
**sit** 74:5,15
75:10 88:12
115:15 132:23
210:10 213:15
247:5 263:6
283:24 358:1
361:24
**sitting** 295:21
312:3,22
**situation** 32:13
58:20 72:15
123:2 157:12
209:6 219:10
235:12,13,15
264:5 294:17
**situations**
231:23
**six** 146:21
334:15,17,20
336:2
**six-pointed**
156:1
**skipped** 230:15
**Sklar** 1:15 3:3
373:4,20
374:1 375:1
376:18
**Slack** 210:4
367:13
**slight** 310:20
**sloppily** 355:23
**sloppiness**
258:6
**slow** 231:7

287:19
slower 70:23
  107:4
small 180:2
  198:14 200:3
smaller 244:2
So's 370:23
social 23:15
solely 183:13
solve 133:23
  150:2 163:1
  164:9
solved 92:24
  129:2 163:10
  163:14,16,20
  164:6 290:9
solving 163:24
  164:9 319:11
somebody
  35:11 43:10
  63:23,24 64:1
  64:9 65:11
  158:14 216:13
  220:9 290:16
  298:8 300:24
  311:19,20
  320:20 329:20
someone's
  160:12
somewhat
  122:18
sorry 17:7
  19:11 26:3
  42:5 53:14
  75:20 97:16
  101:9 144:5
  147:5 159:24
  168:10,14
  200:8 237:19
  270:16,18
  275:19 279:22
  322:23 328:22
  337:4 344:5
  348:21 350:5
  358:12 365:22
  367:15 368:11
  370:5

sort 23:23 60:18
  137:21 162:3
  233:18 263:10
  308:17 318:24
  372:3
SOS 164:22
  165:3,4,8,11
  166:7
SOTOS 2:10
sought 49:19
  262:23
sounds 34:11
  124:4 150:15
  164:17 254:19
  264:8
sources 140:21
  186:21 202:22
  208:20 320:13
South 146:16
space 263:21
spare 367:18
SPARKS 1:8
speak 54:13
  90:3 221:1
  267:10,11
  270:7
speaking
  151:14 221:2
  263:8
special 27:17
  28:4,9,15
  42:17,20
  43:13 44:7
  45:8 48:1
  77:21 84:22
  85:3,7 86:3
  87:10 139:9
  142:19 143:8
  143:11 144:5
  144:6,11,14
  144:15,18,20
  145:5,8,10
  189:22 235:11
  265:1,8 266:7
  318:9,24
specialist 155:9
  158:16 160:18

172:19
specialists
  156:14,15
  159:9,21
  161:2,10,18
  172:7
specific 15:5
  23:18 31:3
  40:3 62:17
  67:18 77:24
  113:19 119:18
  142:9 145:23
  161:14 178:19
  194:16 195:14
  198:18,22
  201:11 219:6
  248:13 291:10
  297:9
specifically
  11:19 12:9,10
  16:6 20:2 53:7
  79:19 91:2
  96:18 97:18
  137:11 153:7
  193:5,6 196:1
  197:4,20
  204:17 206:2
  218:10 223:14
  225:14 227:24
  235:14 286:24
  325:3 330:4
specificity
  199:23 200:13
specifics 52:23
  198:17
speculate 105:1
speculating
  104:24 106:9
  120:11
speculation
  102:5 103:2
  103:20 104:10
  106:6 116:19
  117:9 118:3
  119:24 263:8
  271:14 272:6
  273:9 274:11

279:2 334:13
  356:21 364:19
speculative
  104:12 312:5
  313:10
spell 3:13 11:3
spelled 272:8
spend 170:18
  186:5 231:1
spending
  186:20
spent 60:16
  138:5 182:18
  183:4,17,22
  184:23 185:19
  185:20 186:10
  186:11 187:3
  187:10,19,20
  188:6 193:7
  197:1 251:5
spoken 116:9
spot 148:14
  230:10
spot-checking
  91:12 231:2
spot-checks
  91:8
spreadsheet
  195:23 198:5
  198:6,8
  199:18 207:2
spreadsheets
  83:3,5
spurred 368:2
SS 373:1
staffed 255:2,6
stage 160:12
stamp 93:5,7,16
  327:2 331:24
  353:24
stamps 332:7
stand 5:22 7:4
  64:2,10,13
standalone
  96:21 97:5
standard 81:19
  128:8

standards 53:1
  53:3,4,6,18,19
  54:14
standing 169:19
  169:24 175:17
  276:23 277:17
stands 27:22
staple 220:9
star 156:2
start 101:10
  122:10 140:15
  232:13 240:23
  272:21 295:23
  317:12
started 20:7
  23:2 31:2
  38:17 54:18
  80:6,13
  139:22 140:1
  142:3,7 249:3
starting 142:2
  296:10 344:7
  344:10 345:2
starts 8:10
state 3:4,12
  37:12 38:22
  39:8 40:9,23
  42:21 43:14
  44:8 127:9
  245:3 275:3
  339:19 373:1
state's 13:13,14
  14:1 16:3,5
  17:2,14 20:6,7
  20:14,23 21:4
  60:6,11 62:10
  63:16 64:8
  65:3 71:16
  79:18 136:21
  137:3 138:1,5
  138:16 139:2
  139:9 140:4
  140:20 142:1
  165:2,12
  167:7 174:21
  175:5 191:9
  201:19 203:3

214:4,20
218:20 219:1
221:11 223:22
230:23 232:18
232:22 233:7
233:11,17
239:15 241:13
241:19 243:17
244:23 246:4
248:4,14,21
250:23 253:4
253:12,16,22
254:8,13
255:23,24
257:17 258:17
261:4 280:22
281:20 282:15
301:10 322:17
332:21 336:6
336:19,24
337:1 340:22
341:3 359:1
368:5,23
370:10,13
371:5,12,14
**stated** 33:7
78:13 200:13
271:16
**statement** 56:17
58:16,17 65:5
65:15 163:19
169:11 171:14
233:19 234:1
234:2 236:7
239:5,6
285:14 294:2
**statements**
58:18 64:22
324:9
**states** 1:1
318:12,15
333:5
**stationed**
370:20,20
**status** 149:5
**statute** 331:10
**stay** 242:21

266:5
**staying** 103:5
169:3
**stays** 258:14
**stenographic...**
373:6
**step** 31:13
**steps** 73:24
148:18 163:23
215:5 309:11
**STEVE** 1:7
**sticking** 114:4
333:4
**stop** 32:17
182:4 204:10
305:5 334:4
369:14
**storage** 111:10
**store** 268:6
**stored** 59:12
108:23 191:23
192:1
**street** 1:19 2:4
2:17 188:23
189:2,3,4,8,10
189:17,19
190:3,13
259:9 261:6
289:21 290:15
310:22 373:7
376:3
**stressing** 227:4
**strike** 6:19 16:4
17:20 27:21
45:23 62:6
63:14 66:12
66:23 69:15
70:2 76:9
82:16 89:23
91:24 96:19
99:18 100:21
103:5 114:7
117:2 132:16
140:16 141:6
153:23 162:15
164:20 170:2
178:22 185:7

189:20 190:20
214:16 216:20
254:4 262:16
269:20,22
320:4 332:17
336:15 352:17
352:17 360:21
360:23
**strike-through**
212:2
**strikeout** 323:5
**striking** 196:17
**strong** 257:3
343:16
**structured**
185:13
**stuck** 258:13
**stuff** 35:2 38:17
72:19 85:21
106:21 108:14
112:22 113:1
131:7 244:14
244:15 258:9
259:4,6
276:15,15
284:2 294:22
**style** 192:21
**subject** 25:8
53:12 88:14
165:24 306:2
324:8 375:9
**subjects** 89:10
**submit** 51:1
298:9,10
299:5 300:6
301:2 308:9
308:19 309:1
310:17
**submits** 300:4
300:14 308:7
**submitted**
83:14 120:24
300:1 308:10
326:22 373:13
**submitting** 36:6
**subpoena** 16:22
31:5,18 34:6

37:15,15 38:1
38:2,8,22
39:17 40:9,15
41:4,11,11,22
42:6,11,22
43:16 46:4,7
46:10 47:21
48:22 49:3,10
49:13 50:12
50:17 51:1,14
51:24 52:3,8
73:15 94:15
97:14 100:15
100:19 105:21
106:16 110:14
120:3,4,10
121:2,18,19
122:22 129:13
129:24 130:4
130:6,9,12,19
131:14 133:7
133:17 134:6
134:7 216:10
218:10 219:12
224:1 226:14
255:2,5 282:8
284:2 285:9
285:16 303:20
310:10 311:8
312:8,9 315:8
337:23 338:18
338:20,20,24
339:8,20,21
340:8,9,14,17
341:10,23
342:16 344:4
344:6,7,11,15
344:18 347:21
348:5,7,11,16
348:18 349:2
349:6,8,9,11
349:14,16,19
349:21,22
350:2,11,13
350:15,20
351:1,1,3,6,9
351:13,15

352:3,13,17
370:17,19,21
**subpoenaed**
15:7,11,13
51:23 73:13
239:20 285:10
286:6,11
312:12 348:17
350:10
**subpoenaing**
312:14
**subpoenas** 31:1
37:11,13
38:12,18,19
39:3,19,21,23
39:24 40:5
46:18 68:15
68:16 70:20
72:20 105:21
110:11,13
124:21 130:16
130:16 132:2
133:12 197:11
205:12 216:22
216:23 224:16
284:8 285:20
285:23 298:2
369:2,4,9
**SUBSCRIBED**
375:19
**subsequently**
141:1
**substantial**
29:16 55:4
126:6
**substantive**
58:19 350:14
351:23 352:1
352:7
**subtle** 92:16
**suburban** 20:16
20:18,19
**succeed** 49:23
**sudden** 127:4
127:18
**suffered** 265:7
**Suffice** 130:17

suggested 347:3
**Suite** 1:19 2:5
 2:11,18 373:7
 376:3
**summarized**
 137:22
**summary**
 113:17 122:9
 193:9,10
**SUMMER** 2:23
**superconfident**
 188:9
**superficial**
 113:22
**superintende...**
 255:8 370:22
**superintende...**
 148:7
**superintende...**
 285:19
**supervise** 249:4
**supervised** 66:2
 124:19 126:22
 145:13 172:7
 176:18 218:17
 284:4
**supervising**
 125:11 126:12
 172:21 173:1
**supervision**
 172:20
**supervisor**
 31:16 127:2
 143:16 172:8
 172:17,21
 250:18,18,19
**supervisors**
 165:21 249:5
**supervisory**
 143:22 144:19
 145:11,13
**supp** 32:8 33:21
 35:5,6,15,16
 35:19,24,24
 36:1,3,17 37:6
 50:9 124:7
 125:13 126:20

162:7 293:14
293:16 308:2
308:3 368:16
**supplement**
 122:24 123:1
**supplemental**
 31:15,20 33:9
 33:22 41:17
 92:17 94:5
 95:11 126:2
 155:3,12
 206:11 283:8
 294:7,14,16
 296:8,11,12
**supplementary**
 11:23 33:24
 36:10 41:8
 69:6 94:5
 95:11 120:18
 123:7,19
 132:14 155:12
 206:15 207:20
 224:3 228:13
 233:22 235:4
 235:20 295:14
 297:9 307:22
 308:5 325:17
 326:20 377:13
 377:13
**supports** 104:19
**supposed** 119:9
 121:23 259:1
 262:6,8
 265:19 312:17
 314:10 317:8
 317:19 318:4
 319:21
**suppress** 58:15
 64:22 65:5,17
 66:3,4
**supps** 371:24
 372:2
**Supreme** 19:13
 81:24 240:22
 373:14
**sure** 4:4 16:21
 21:19 30:7

31:11,23
32:17 34:2,19
38:3,23 39:7
47:15 48:8
55:2,5 56:15
57:6,9 61:24
63:14 71:23
75:4,19 81:2
81:10 88:1,24
112:1 124:15
124:24 125:18
125:19,22
126:12,16
127:14 128:3
128:15 133:1
133:2 134:23
149:4 150:19
154:8,16
157:11,20
160:19 169:13
171:6,15
183:2 184:19
185:16 189:10
190:10,16
210:1 212:18
215:3 232:14
257:18 260:20
261:16 262:8
266:4,22
267:9 271:16
272:8 282:3
282:18 283:15
283:21 285:14
293:22 308:21
313:3 315:20
316:20 317:17
323:20,22
328:10 330:4
331:8 342:11
344:13 345:24
361:18,20
368:10 369:23
369:24
**surprised**
 130:15
**suspect** 159:15
 160:14 227:12

322:11 328:16
329:1,2,9,13
329:21 330:19
335:2 342:20
358:3 361:9
361:14,18
362:1,8,14
363:19 364:2
364:7,13
365:6 367:6
**suspects** 11:1
 129:6 153:21
 156:7 158:23
 181:17 212:8
 328:17 329:10
 329:14 334:11
 359:18,22
 360:4,8
**suspenders**
 39:18
**Swaminathan**
 2:3 3:11 5:21
 6:18 7:3,10
 14:19 17:4
 19:4 21:10
 29:22 30:7,8
 36:22 62:6,8
 63:21 74:13
 74:14 75:9
 76:14 77:19
 88:3 102:7
 110:7 116:15
 118:16 136:14
 147:7 166:10
 170:3 173:23
 175:8 177:17
 177:19 179:6
 191:1,3 192:6
 198:1 200:15
 200:17 251:13
 255:21 270:20
 292:2 303:2,9
 304:6,10,13
 304:17,20
 305:1,7,14,19
 305:21 306:7
 306:10,15,21

306:23 307:2
307:4,8,11,13
313:1,3,4,7
314:6,7
317:18 321:21
324:3 325:13
325:20,23
326:2,8,11,15
326:19 331:15
331:17,21,24
332:3,12,16
333:19 339:6
342:6 350:5,6
358:20 365:19
369:13,19
370:2,6
376:20 377:4
**Swaminathan's**
 368:2
**switched** 331:14
**sworn** 3:8 373:9
 375:19
**symmetrical**
 209:6
**synch** 231:14
 350:22
**system** 176:5
 258:23

---

| **T** |

**T** 377:6
**table** 247:5
**tact** 148:11
 154:14 158:8
 316:24
**tactical** 147:19
 148:2,3,4
 149:3,5
**take** 4:5,6,8
 39:11 59:17
 73:24 77:17
 89:12 136:8
 139:20 140:6
 160:17 165:19
 169:11 173:15
 179:3 186:16
 188:3,11

197:5,8
198:11 200:14
201:6 210:7
216:24 217:23
243:8 255:17
255:19 276:18
276:18 289:21
307:14 309:11
321:17 323:11
323:12 353:9
369:13,24
**taken** 1:14 3:3
77:18 136:10
165:22 191:23
200:16 233:19
237:9 255:20
264:2 321:20
369:18 373:6
373:7 374:2
375:2
**takes** 18:11,17
327:12
**talk** 19:24 48:21
51:16 52:7
54:4,10 61:17
63:7 122:12
125:11 137:24
141:24 158:21
176:23 180:2
283:24 286:20
289:7 342:10
**talkative** 369:8
**talked** 55:4
61:19 77:21
77:22 78:1
84:21 86:3
114:5 118:22
119:18,21
121:7 123:21
124:2,14
126:23 214:2
292:11 295:2
346:6 353:2,3
354:4 355:24
**talking** 19:7,8
20:1 39:23
53:3,6 54:18

62:2 78:5
116:5 123:10
134:2 168:16
191:6 195:6,7
195:9 205:1
206:22 210:17
231:4 237:21
261:1 314:4
314:18,22
371:1
**talks** 142:17,18
196:13 298:5
**tandem** 164:7
164:11,13
**targeted** 148:8
**tasked** 107:6,17
108:17 114:24
118:8 131:21
**tasks** 164:14
193:14
**taught** 105:7,23
**tcarney@rfcl...**
2:20
**teach** 13:17
**teaching** 139:7
140:22 141:11
141:14
**technique**
124:23
**tell** 4:11 7:12
10:17,22 20:5
30:13 32:15
49:18 68:12
137:8 156:10
165:10 167:15
173:6 179:8
184:6 215:10
241:14,24
257:19 264:17
293:20 294:5
294:6,10,11
295:12,19
297:24 305:1
373:9
**telling** 278:24
**tells** 156:13
**ten** 33:19 37:21

42:4 72:15
127:4,5
152:10 184:15
187:5,12,13
187:21 196:18
219:10,14
266:9 307:21
308:5
**tend** 312:7
**tended** 146:13
146:15 265:1
**tender** 217:11
217:22 219:15
220:11,13,19
234:2,24
340:13 372:4
**tendered** 11:2
29:12 55:21
190:18 209:14
217:19,24
219:10,15
222:24 232:24
233:24 234:5
235:11 237:10
238:3,7,9,11
238:15 239:8
240:7,10,14
240:15 246:23
275:15 276:6
278:1 279:22
292:7,16,17
292:20 293:4
294:1 338:23
339:24 340:6
340:19 341:4
341:18,21
342:15 345:1
348:1,2,16
349:22 350:18
352:10,20
**tendering** 23:2
218:22 219:17
221:13 292:24
347:20
**tenders** 339:19
**tenure** 20:14
166:22

**term** 63:7 92:10
92:15 94:21
180:3 188:23
189:4,8,19,22
223:13,24
280:11 353:15
**terminology**
197:15 354:9
**terms** 20:1
26:17 29:23
39:19 48:22
51:14,16
88:24 135:6
135:21 152:1
153:11,22
156:15 164:16
183:20 195:13
196:24 197:13
198:16,22
206:22 214:1
231:8 248:20
251:4,8
255:22 256:10
258:12 261:19
262:16 267:1
286:13 335:14
343:5 369:7,8
**test** 150:19
**testified** 3:9
83:21 98:13
98:14 118:21
135:21 150:7
150:8 171:19
246:15
**testifies** 106:3
**testify** 57:11,22
58:3,17,20
150:10,20
151:17,17,21
152:4 165:20
169:17 170:4
170:4,14
171:17 172:2
**testifying** 5:10
57:19 105:2
140:23 141:1
141:5 150:16

150:21 152:4
**testimony** 3:18
3:22 4:2 5:2,6
5:9,16,17,23
6:1,6,10,13,15
7:4 58:5,7,24
78:4 97:20,23
98:1,10,16,21
99:1,5,20
100:1 101:23
101:24 102:8
102:22 103:6
103:8 104:3
105:9,17
116:2 121:14
170:8 178:16
179:17 180:20
180:23 181:6
182:6 227:1
297:17 362:13
376:9
**text** 200:4
**thank** 160:3
305:8 332:11
332:15
**theft** 22:3
144:21 145:2
145:2 282:7,8
**theoretically**
264:16
**theory** 363:18
364:8
**THERESA**
2:16
**they'd** 42:15
95:20 159:2
190:11,15
249:6 264:1,3
269:5 283:9
328:18,18
**thing** 9:12
61:23 77:20
126:15 175:11
310:1 371:2
372:1
**things** 13:8
18:22 22:14

39:15 41:6
51:18 54:19
55:7,23 58:21
61:21 86:22
89:5 94:9
106:11 155:16
157:2 161:14
161:16 169:7
199:21 205:14
220:17 224:24
227:22 244:10
258:15 260:19
261:14 265:13
329:22 330:9
331:3
**think** 11:22
14:12 15:3,19
19:6,11,23
22:22 24:21
27:9,22 30:5
44:12 45:5
47:10 50:3,23
51:20 52:20
54:3,3 55:19
60:2,3 64:1
69:20 70:11
73:11 75:6
77:16 78:17
83:20 85:1
87:9,21 88:11
88:22 89:13
89:14,17,18
89:18,22
91:20 103:23
106:9,21
108:19,20
109:13 112:11
112:12,14
113:3 116:13
120:9,23
121:16 124:22
125:18 126:4
139:18 141:9
149:12 150:23
152:7 160:13
161:5,6,7,9,10
166:7 167:17

169:14 171:9
173:24 174:24
181:21 185:19
185:20 186:4
186:6 187:16
187:18,19
190:3 192:10
199:15 210:5
210:12,16
211:19,19
214:1 218:2
220:3 223:3
228:1 233:21
238:5 239:9
239:20 240:2
240:6,12,15
241:4,11
243:7 244:6
244:12 262:4
262:5 263:7
264:19,20
265:20 266:19
266:22,23
267:15 272:16
273:12,18,22
281:3 282:12
284:18 285:2
285:8,13
286:20 292:11
292:18,22,24
293:4 294:22
294:24 299:22
303:3 306:23
307:2,8 308:7
312:6,7
313:14,14,15
313:19 321:19
321:23 326:13
328:15,18
338:10 340:17
341:20 343:10
344:12,17
345:1 348:14
348:17 350:21
351:22 352:9
353:2,15,23
355:20 363:4

371:21
**thinks** 86:22
**Thirty-four**
183:24
**tho** 273:11
**thorough** 91:3
**thoroughly**
95:15 181:16
**thought** 60:14
61:6,18 62:3
66:18,19
155:22 159:1
202:12 272:12
272:18 273:11
340:5 345:18
**thousands**
297:3
**threatening**
306:9,13
**three** 11:8
37:22 95:13
186:21 202:22
235:19 259:19
262:10 329:2
333:5 363:7
**three-quarters**
149:19
**three-year**
127:5
**threshold**
306:12
**threw** 244:14
244:15 363:7
**throw** 256:13
**thrown** 256:7,7
256:10
**tie** 63:12
**till** 20:9
**time** 7:18 18:20
19:17 20:10
20:17 21:23
24:13 25:22
28:3,8,11,14
31:7 33:10,16
34:22 35:7,9
41:7 47:18
55:15,21 56:7

56:9 59:7,19
60:3,6,11,16
61:16 62:9
63:14,15 64:7
65:3,10,23
71:16 73:6
74:2 76:3
77:11 79:10
79:15,17 80:6
80:12 83:22
92:11 102:9
111:13 112:17
124:5 130:17
132:24 138:5
140:19 141:24
142:6,7,9
144:17,24
145:23 146:23
152:2,10,12
154:6,8
164:16,22
165:1 166:14
167:6 170:12
170:18 173:19
174:21 175:2
175:4 179:14
181:23 182:18
183:4,16,22
185:8,14
186:2,10,11
186:14,16,20
187:10,20
188:6 189:15
190:5 193:7
197:1 202:23
205:7 217:23
220:8 221:10
225:3,12
229:19 237:9
241:8 244:8
250:17 251:4
251:5 269:1
270:15 271:12
271:19 272:3
272:13,19
273:2,14,18
274:5 276:6

276:11 278:10
282:15 288:15
289:3 290:1
311:20 312:8
312:23 313:2
313:5,10
323:13 329:12
332:20 333:21
333:22 334:2
334:6 351:16
371:23 372:9
373:12
**timeframe** 20:5
220:24 350:22
**timely** 73:13
107:4 287:18
312:10 314:15
315:11
**times** 4:17 5:8
5:13,13 49:15
50:2 84:3,7,8
98:1 122:16
127:4,6
129:23 164:12
214:8 292:20
292:23 302:8
305:12,13
312:15 333:24
370:20
**timing** 38:4
176:24 302:15
315:7
**tip** 237:23
**tire** 111:11
**title** 12:19
192:13 205:11
**titled** 199:14,17
281:2
**titles** 12:17
68:11 69:4
197:11 199:10
206:8 207:14
213:7,8 229:7
229:9
**titling** 12:23
**today** 3:18,22
4:2 6:2 74:5

74:15 75:10
79:18 80:6,13
88:12,15
92:24 102:18
114:3,10,22
115:15 132:23
149:5 151:6
179:16 210:10
213:15 216:16
216:16 218:2
223:11 228:2
251:16 263:1
263:16 270:14
271:18 272:2
273:1,7,17
274:21 275:5
275:14 295:3
336:7 339:2
357:21 358:2
**today's** 181:3
**told** 11:12 25:4
35:7 81:12,21
81:22 103:7,9
110:23 178:5
211:4,17
256:11 266:11
286:3,22
**toll** 237:9
**Tom** 156:24,24
297:20 315:24
**Tomas** 10:18
11:12,17,18
**tomorrow**
92:24
**tone** 306:14,22
**tool** 284:24
**top** 89:18
109:14 195:16
195:21 279:9
335:1
**topics** 98:2
**total** 11:18
15:19 84:3
183:16,22
206:18 207:21
352:7
**totally** 304:17

**totals** 338:22
340:10 344:19
**track** 203:7
264:11
**traditionally**
160:9
**trained** 124:18
124:20 126:8
126:10 127:2
127:6
**training** 13:15
13:16,21
18:12 19:2
22:24 23:4,9
23:17,18 24:2
24:11,13,16
24:18 25:7
27:12 28:19
28:23 29:4,5
48:17 125:3,6
125:8,9
126:15 255:13
**trainings** 13:24
23:5 24:6,9,24
25:1,2,12
48:12 55:7
**transcribed**
376:9
**transcript** 6:21
98:3,5,18
242:17 245:23
375:8,11
**transcripts**
99:12 245:20
292:19
**transferred**
211:22,24
**treat** 273:6
275:6,13,14
**treated** 263:3,5
279:6
**trial** 5:10 6:6,10
6:13,20 11:7
31:9 44:15
55:15,17,22
56:7,8,13,14
56:20,24 57:3

57:4,7,20,22
58:5,7,8 59:17
59:20 75:19
75:19,20,20
83:23 98:21
100:1 142:13
142:19 143:3
143:4,6 144:3
144:6,8
145:16 151:17
151:23 152:5
166:20 168:13
168:18 169:17
170:5,10,14
174:8 178:15
181:5 234:21
241:20,23
242:1,9,14,14
242:15,18,21
243:3,4,9,18
244:1,2,21
245:6,6,7,13
245:14,16,20
246:14,18,20
246:23 247:3
247:4,14,21
248:1,5,10,16
248:22 249:2
249:5,17,18
249:22 250:6
250:12,16
251:1 256:1
256:19 257:14
257:22 258:13
258:15 259:12
261:3 262:3
262:13,18
263:6 264:18
265:17,18
266:1,2,21,22
267:7,13,16
269:2,3,5,9
271:12,19
272:4,12,13
272:13,19,19
273:2,12,14
273:14,18

274:5,17
275:8,16
276:6,12
277:1,20
278:5,10,20
279:16 285:11
285:24 286:7
**trials** 150:7,9,11
270:2 271:5
**tricky** 183:6
**tried** 138:21
153:8 167:19
168:6 256:17
**triplicates**
257:21
**true** 6:8 29:18
71:15 89:22
97:3 149:14
210:2 257:6
265:20 373:11
375:10
**trust** 64:1
**trustworthy**
64:2
**truth** 373:9,9,10
**truthful** 3:17,21
4:2
**try** 20:18 59:10
85:19 153:21
158:24 159:14
184:16 256:12
257:12 270:1
270:4 301:7,8
307:12 310:19
352:18 359:24
**trying** 29:2
58:18 91:18
157:17 158:18
173:8 186:22
208:15 259:16
341:16 349:10
349:15,20
350:9,24
**turn** 7:14 49:17
71:2 72:7,19
81:5 134:5
154:14 155:24

219:7 223:5
255:16 281:1
292:12 303:20
321:22 325:3
344:3 367:13
**turned** 71:4
127:23 128:20
128:21 219:2
233:10 235:5
235:9,21,22
236:9,19
238:20,21
239:13,22,23
241:7,12
278:17,19
301:22 308:11
345:8
**turning** 71:19
84:20 158:14
285:2 316:3
332:17
**turns** 116:24
307:15 353:18
**tweak** 310:20
**Twenty-eight**
17:3,5
**Twenty-six** 17:7
**twenty-some**
351:20
**twice** 129:22
134:13 335:9
365:8
**two** 5:13 9:4
11:11,22 12:2
15:8,16,19
16:1 84:2,13
89:15 90:24
91:3 129:23
132:13 136:6
139:12 146:20
154:9 167:13
168:9 169:2,7
170:21 171:10
177:2 178:14
189:3 202:4,5
204:8,23,23
205:5,6,19

212:9 213:2
220:17 222:15
222:17,19
223:8 224:24
231:6 234:8
235:19 241:2
259:14,18
261:7 262:20
265:22 287:23
312:4 314:19
320:13,13,14
323:8,16
325:7 330:9
331:3 332:8
333:15,20
334:24 335:16
339:17 340:4
362:4,24
363:2
**two-and-a-ha...**
139:8,13
**two-minute**
321:17
**two-page**
231:21 233:16
233:22
**two-sided** 128:8
**two-thirds**
149:18 185:22
**type** 41:9 59:9
118:6 129:7
133:20 147:16
149:3 188:2
201:8 211:6
228:4 234:23
242:24 254:20
254:23 259:4
292:21 307:20
323:2 336:22
371:20
**typed** 92:17
94:4 122:10
123:19 126:5
134:4 135:2
135:15 203:9
203:12 224:8
224:22 225:5

226:12,21
236:12 237:15
237:21 299:4
**types** 21:24
48:11 146:24
147:7,16
155:16 229:9
243:5,12
282:11 295:23
297:7 320:13
366:4
**typewriting**
373:6
**typical** 123:10
130:5,18
220:23 307:20
**typically** 124:11
234:23 238:10
239:8 297:8
**typing** 184:11
184:12,20
185:3,4
**typo** 199:20
**typos** 213:22

———————
**U**
**u** 145:7
**U.S** 30:20
**ultimate** 162:16
162:17
**ultimately**
18:19 35:18
48:7,10 67:5
72:18 96:17
128:21 152:3
168:18 176:11
178:21 231:10
243:5 258:13
280:22 293:18
293:19 309:4
**Um** 149:20
269:6
**umbrella** 145:5
173:12,19
**un-impound**
247:1
**unable** 330:8

331:2
**unaware** 284:16
**uncommon**
164:3
**uncovered**
237:13
**underlying**
20:11 21:5,12
62:20 63:18
69:13 75:14
87:5 89:16
100:23 168:23
226:8 264:17
295:14
**undermines**
104:23
**undersigned**
373:15 376:12
**understand** 4:8
4:11,16 9:3
15:12 16:21
26:12 29:2
30:5 47:16
49:8,12 52:13
52:16,21 53:2
55:2,20 56:3
57:13 59:21
63:4 70:11
75:5 77:6
83:12 85:13
85:19 88:1
89:9 96:22
97:2 103:6
104:2 105:9
105:24 106:12
109:16 112:5
118:11,13,15
121:18 128:3
142:16,20
145:9 173:8
173:24 183:2
186:22 198:9
198:13,19
202:13 218:8
240:19 243:7
250:8 256:22
261:20 265:11

265:12 271:21
274:3 278:21
288:15 296:19
299:2 305:2
306:3 308:16
309:18 317:20
350:18 351:2
353:1,20
356:2,3 359:4
363:16
**understanding**
9:5 21:14,18
26:16 27:14
28:17 34:12
36:5 40:3 42:2
43:5,7 51:11
59:24 75:16
76:10 77:21
78:24 87:14
89:3,4 91:21
92:14 93:14
94:22 95:1
110:19 114:5
119:16 121:21
127:20 128:17
130:24 131:8
131:24 132:9
133:5,10,14
133:18 136:4
153:24 170:16
188:5 190:19
190:21 191:7
191:12,15
192:11 195:4
205:23 206:3
206:5,18
216:21 217:3
239:13 257:15
267:12 269:23
270:3 273:5
274:23 287:12
288:21,24
289:12 292:11
299:22 317:21
318:6,8
320:11 328:2
329:5,8,21

331:1 356:10
356:12
**understandings**
92:3
**understood**
4:15 8:21 26:3
28:10 39:21
76:16 125:7
141:23 173:7
223:19 273:20
286:9 330:24
354:3
**unfriendly**
200:3
**unheard** 164:5
**uniform** 261:12
**uniforms** 148:6
**unintentionally**
74:24 75:12
**unique** 161:14
**unit** 38:11
100:16,19
142:17 143:9
143:10,14,16
143:17,19
144:21,22,23
145:1,1,2,3,17
146:3,11,24
149:16 150:6
150:12,24
152:17 153:6
154:6 164:17
164:23 166:23
166:23 172:9
172:10,14,17
172:22 173:15
173:20 174:3
174:10,14
233:18 245:1
245:18 246:15
247:2,11
249:3 255:3,5
255:6 260:6,8
285:9,11,16
286:2,10,21
**UNITED** 1:1
**units** 37:16

142:20 144:20
145:4,7,9,10
145:14 164:19
164:20 282:11
285:19,21
**universe** 212:23
213:1 253:8
281:24
**unorganized**
259:22
**unprofessional**
63:13
**unprofession...**
62:4,13,19
63:2,4,7,12
**unrelated**
272:18 276:7
**unreliable**
216:16
**unsigned** 7:15
7:17,23
333:24 337:22
338:2,22
340:6,10,20
341:12 350:18
355:5
**unusual** 334:24
335:6,8,10
**update** 139:6
**updates** 139:16
139:17
**use** 7:24 35:3
39:3,14 43:2
51:17 65:14
74:10,19,23
82:18 111:10
125:2,8 148:7
154:4,13
158:21 160:11
186:15 189:8
190:15 197:20
201:5 206:6
211:21 212:3
220:8 234:3
234:21 280:11
283:2,16
284:5 289:6

292:17 293:16
318:21 319:6
323:2 343:22
359:16
**user** 196:4
200:2,5
**uses** 44:12
353:14
**usually** 49:17
108:5 109:2
123:8,9
133:21 160:14
160:15 268:2
287:17 302:14
315:19 317:3
353:2,24
354:24
**utilize** 196:22
**utilized** 261:7

_____

**V**

**v** 376:5
**VA** 272:17
276:5
**vacated** 176:7
176:18
**vacation** 294:19
**vague** 74:10
**various** 13:4
109:18 126:1
142:20 282:24
**vast** 20:22 35:7
141:19
**verge** 59:17
**versa** 130:16
165:14
**version** 7:23
8:15 9:1,2,10
9:10 137:20
137:22 256:14
268:8 281:4,6
332:3 336:15
336:17 337:2
338:5 355:9
355:13
**versions** 9:4
137:13,16

201:5
**versus** 4:22
9:17 11:12
89:11 145:23
186:11 329:19
330:16
**vi** 65:12
**vice** 130:16
165:14
**vicinity** 141:10
**victims** 360:8
**videotape** 24:14
**view** 71:1 181:2
199:4 200:6
219:16 222:20
222:23,24
328:16 351:22
353:5 367:5
367:11
**viewed** 323:18
324:18 328:4
334:2
**viewing** 325:6
327:16,20
334:15
**violating** 323:6
**violation** 65:13
249:21
**violent** 21:19,20
21:22 22:1,7,9
22:11 50:6
107:18 128:14
129:19 132:19
133:22,23
134:2,9,10,23
135:2 147:18
148:9 151:24
152:22 153:16
154:12,13
156:9,22
157:7,19
158:12 160:9
160:14,24
162:4,6,8,19
162:21 163:4
163:6,16
167:11,13

314:4 316:15
316:20,21
317:4,21,23
318:1,16,17
318:20 319:16
319:21 320:7
320:16 321:2
327:13
**visible** 8:13
**VITAE** 377:10
**voice** 304:15
305:15,18
306:14,22
**vs** 1:6 375:5

_____

**W**

**Wait** 337:8
**waived** 373:13
376:10
**walk** 338:15
**walking** 290:3
**wall** 156:2
**want** 4:7 13:10
18:7 34:2
36:15 47:13
48:8,8 56:15
72:14 78:4
81:5 89:12
117:15 119:12
120:15 128:11
129:3,9
137:24 141:16
141:24 142:24
146:7 175:11
234:3,20
249:13,23
252:16 255:17
263:24 271:23
281:14 285:14
296:4 303:17
304:18 305:5
306:18 320:1
321:22 338:14
347:16
**wanted** 77:20
82:18 138:12
185:12 204:11

246:5 249:2
266:14 267:5
286:2 287:19
288:24 317:6
350:7
**wants** 128:14
265:16 365:12
**warehouse**
59:14 91:11
91:21 93:15
97:15 111:11
192:10,13,14
243:3 258:3
258:13,15,18
258:19,19
259:17,23
260:2,20,23
260:24 261:8
261:9,18,22
262:2,12,18
263:15,15
264:14,15
265:2,6,16,16
265:24 266:3
266:24 267:1
267:3,5,17,18
267:22 268:3
268:12,18,19
268:22
**warehoused**
15:7
**warehouses**
259:18 261:7
**warrant** 157:5
157:8
**Washtenaw**
261:6
**wasn't** 37:10
65:22 120:17
120:18 129:2
144:23 149:14
164:7 166:9
196:23 200:1
208:22 210:21
211:13,14
232:24 233:10
274:18 278:17

304:7 312:17
**way** 22:4,17
  30:9 34:2 37:5
  39:14 46:15
  48:19 54:22
  55:9 57:21
  62:7,13,19
  63:5,6 67:19
  79:16 92:9
  98:2 114:17
  118:19 124:15
  125:18,19
  126:13 130:3
  135:15 153:21
  155:16 157:15
  157:16 159:20
  163:21 185:4
  185:12 196:9
  197:17 199:14
  201:24 219:9
  226:2,13
  228:12 237:7
  238:5 240:8
  240:24 241:1
  253:6 258:20
  258:21 263:13
  267:11 270:5
  273:24 274:14
  274:22 279:10
  281:24 284:2
  295:7 296:21
  298:22 299:5
  299:12 310:16
  312:21 317:14
  323:21 326:17
  331:10,11
  336:9 343:15
  346:6 357:12
  367:5 369:1
**ways** 30:13
  64:19 99:8
  124:21 261:15
  287:17,23
  294:23 312:4
**we'll** 7:7 39:11
  59:20 310:20
**we're** 20:1 53:6

57:3,4 58:18
  104:24 111:13
  205:1,1 216:4
  216:5 223:1
  232:14 237:3
  237:3 250:2
  261:1 263:1
  277:11,11
  312:14 323:12
  323:23 331:18
  332:12 348:3
**we've** 114:5
  118:6,7,22
  119:18,21
  125:19 198:9
  207:21 214:2
  237:20 255:23
  285:13 293:11
  295:2 304:24
  366:2
**wear** 63:12
  148:5,6
**week** 5:11
**weeks** 139:12
**WEINGART**
  1:9
**went** 22:2 24:15
  140:3 143:2,8
  143:13 144:2
  168:18 174:7
  189:15 202:14
  202:16 205:8
  224:20 225:7
  252:24 253:11
  262:12 285:16
  286:13 289:3
  289:4 290:11
  290:15
**weren't** 76:2
  160:5 161:15
  164:9 225:22
  261:11
**West** 261:8
**whatsoever**
  104:16 222:1
**white** 198:6
**wholly** 237:6

**Whoops** 264:1
**widespread**
  371:6
**wife** 203:13
  227:9
**William** 139:8
  140:22 336:12
**Winnebago**
  24:19
**Wisconsin**
  127:9
**wish** 61:21,22
**withheld** 74:1
  74:16,20,24
  75:11 76:11
  76:22 86:16
  194:3 197:7
  197:12 207:18
  279:15,17
  280:15
**witness** 5:20 6:4
  6:17 7:2 14:8
  17:8 19:1 21:9
  26:1,8 27:8
  30:3 40:7
  43:20 44:5,11
  44:19 45:1,12
  45:18 47:1,8
  47:23 48:16
  49:1 52:11,19
  54:2,7,12 55:1
  55:12 58:1,16
  58:21 60:13
  61:4 62:15,23
  63:10 64:5
  65:7 66:8
  67:15 69:2
  70:10 71:22
  73:1,10 74:9
  74:12,21 77:1
  77:15 79:13
  82:10,21
  84:11,18 87:8
  87:18 88:1,10
  88:17 94:3
  96:7 97:1 99:6
  100:11 101:20

102:6,13
  103:3,11,21
  104:11 105:18
  106:7,19
  107:1 113:15
  113:21 114:14
  116:20 117:12
  118:4 119:5
  120:1,21
  121:15 122:11
  122:18 123:15
  125:17 126:5
  126:7 127:18
  128:2,23
  134:3 135:13
  136:3 140:24
  142:23 147:12
  150:18 152:20
  159:1,17,20
  160:4 162:1
  163:3,12,14
  168:21 169:11
  169:21 175:19
  176:3,14,21
  189:1 199:3
  201:14 207:12
  208:2,8
  212:14 213:17
  227:2 231:19
  233:17,24
  236:7 239:6
  239:18 241:18
  251:20 256:3
  270:17 271:15
  272:7 273:10
  274:7,12
  276:1 277:7
  277:22 278:13
  279:5 282:21
  284:15,21
  286:18 288:11
  288:20 289:18
  290:6 294:1,8
  296:7 297:1
  297:18 298:5
  298:21 299:1
  299:16 300:12

300:22 301:15
  302:4,12
  303:15 308:4
  308:24 309:17
  310:4,5,15,22
  311:2,4
  315:18 317:16
  318:23 320:10
  328:1,14,21
  328:22 329:1
  329:7,17,20
  330:3,7,8,12
  330:15,16
  331:7 332:22
  332:23 333:2
  334:14 335:5
  335:22 337:6
  337:11 342:19
  343:9,19
  345:19 347:12
  353:13 354:23
  356:14,22
  357:7,18
  358:7 359:20
  360:7 363:15
  363:24 364:3
  364:20 366:14
  366:17 369:17
  369:24 371:10
  371:19 373:5
  373:9,12,13
  373:4 377:2
**witnesses** 56:12
  56:16 57:10
  59:6,7,10
  61:16,18
  129:7 157:10
  157:15 158:2
  158:17,22,22
  163:18,18
  242:7 296:16
  324:19 327:20
  333:6 334:1
  335:2 356:24
  359:23 360:4
  360:8
**witnesses'**

123:16 156:23
**woman** 169:9
**word** 26:14
  35:3 37:5
  43:21 63:9
  71:24 74:11
  74:20,24
  78:17 80:11
  80:18,19,24
  81:2 119:6
  125:2,8,18
  126:13 154:3
  154:4,16
  156:10 157:11
  163:20 176:4
  189:2 190:3
  194:4 198:12
  279:19 293:16
  317:7 319:13
  319:19 353:9
**worded** 125:19
  238:5 239:3
  316:21
**words** 41:16
  42:12,23
  44:13 45:20
  47:11 48:2,3
  68:19 78:18
  78:22 79:7,8
  79:21,22 80:9
  80:10 81:12
  104:15 131:4
  154:23 162:15
  183:3 186:17
  189:3 190:10
  251:14,19
  262:6 263:4
  278:6 295:10
  328:4 330:22
  344:24 350:9
  350:16 365:3
**work** 25:17
  33:18 46:16
  52:12 55:6,8
  73:5 77:6 82:7
  83:8,15 85:2
  86:20 89:2

111:7 125:10
133:21 140:13
141:21 142:11
154:17 164:22
178:10 183:8
184:18 188:13
201:2 213:13
224:9 247:8
255:11 265:23
269:10,12,13
317:8,13,14
**work-up** 108:12
  257:13
**worked** 20:8,11
  21:3 22:7 36:1
  61:7 79:10,17
  126:21 133:1
  134:9 138:1
  142:9 154:5
  164:17,20
  165:2,4
  166:12,13,15
  166:16 167:14
  174:13,21
  175:20,21,24
  176:6,10,15
  176:17 177:15
  190:6 247:9
**working** 19:13
  20:6,24 21:24
  22:9 26:10
  27:3 28:14
  60:17 61:8,13
  63:15 64:8
  66:10,14
  69:14,23
  71:16 82:1
  92:11 127:13
  127:22 128:4
  138:5,20
  141:7 142:3,8
  145:16,18
  146:23 147:1
  147:18 150:5
  153:16 157:6
  164:7,11,13

170:19 173:10
173:16 190:14
201:4 248:9
282:6 288:8
288:16,17
290:3 291:2
317:4
**workings** 25:21
**works** 274:17
  317:9,11
**worksheets**
  51:17
**world** 190:16
  266:17
**worse** 272:20
**wouldn't** 13:2
  35:3 41:19,19
  57:22 61:19
  94:8 115:10
  118:5 128:9
  130:14 131:15
  162:7 173:16
  185:24 188:2
  220:13,19
  246:17 275:18
  277:8 295:17
  295:18 298:7
  299:12 303:5
  303:13 309:23
  309:23 310:11
  310:11 343:20
  343:22 365:5
  365:9 369:6
**wow** 176:20
**wrap** 138:23
**write** 58:21
  203:7 217:17
  283:7 337:13
  362:3 370:23
**writes** 298:5,9
  310:23
**writing** 85:8
  187:20 198:13
  221:24 376:14
**written** 46:22
  47:4,17 78:14
  79:8 218:21

227:14 233:19
248:15 256:4
263:13,24
323:13 337:23
362:2
**wrong** 68:23
  69:3 84:7
  120:6 124:5
  199:1,4,20
  209:4 213:23
  272:10,14
  295:19 330:7
  330:15 331:16
**wrote** 135:4,16
  201:15 281:5
  299:3

—————
**X**
—————
**X** 377:1,6
**Xerox** 37:18
  41:24 220:11
  288:1,3
  290:10,19
  291:10,16
  311:17 312:18
**Xeroxed** 221:8
  221:9 285:23
  289:4,17
  291:19 311:18
**Xeroxing**
  311:17 315:10

—————
**Y**
—————
**yeah** 10:18
  14:14 15:4
  17:24 28:10
  34:1,10,21
  42:19 52:20
  53:15 55:3
  62:6 63:5,11
  67:17 70:13
  74:9,13 84:12
  85:20 88:1,4
  92:5 98:9
  100:7 113:8
  114:17 115:18
  116:15 120:14

128:3,6
131:20 142:5
147:15 149:9
152:18 154:23
155:20 157:20
157:23 158:3
158:3,18
159:11 160:5
160:6 173:5
174:11 177:20
178:20 184:3
184:4 185:11
185:11 191:1
191:2 197:8
200:9,15
201:24 207:24
208:3 211:19
212:6 214:7
221:3 230:5
238:1 243:8
261:4 270:17
282:5 292:1,5
293:5 301:6
311:18 312:13
316:4 317:21
323:11 325:21
325:23 326:8
326:18 328:20
329:11 331:15
331:17,23,23
332:7 335:6
335:19 344:9
346:2,24
347:7,13
349:11 350:8
353:23 354:6
355:24 356:4
370:2
**year** 22:17
  260:12
**years** 13:15,17
  55:22 69:15
  69:24 93:3,7
  114:1 115:22
  212:9 236:21
  237:3 266:9
  266:10 268:11

271:3 278:19
353:24 368:5
**yesterday** 266:9

___

**Z**

**ZACHARIAS**
1:8

___

**0**

**06/28/2017**
374:2 375:2
**084-002148**
373:21

___

**1**

**1** 7:7,8,12,24
8:5 9:22 10:10
16:22,23 81:6
86:4 263:16
375:8 377:8
**1:50** 136:11
**10** 172:10
358:18,21
377:15
**10:14** 1:20
**100** 301:12
**100,000** 141:5,7
**11** 219:12
365:16,17,20
377:16
**11/27/91** 339:19
340:12,19
341:4 347:21
348:3
**11th** 37:12
38:22 39:7
40:9,22
**12** 1:6 205:2
324:22 325:18
326:22 327:12
**12-month**
141:16
**12:45** 136:8
**12:46** 136:10
**13** 205:3
**136** 377:10
**14** 377:9

**15** 138:22 184:1
184:2 187:20
188:5 230:13
230:17,22
**15.5** 185:1,6,7,8
185:18
**150** 2:11
**15056** 339:8
**15481** 342:8
345:4
**16** 169:10
**163448** 326:13
332:9
**163449** 332:9
**17** 18:3 172:10
**179** 377:11
**19** 22:16 348:24
**190** 207:3,5
**1919** 351:19
**198** 377:12
**1980s** 38:19
80:13
**1983** 20:8 138:2
**1984** 23:3
**1986** 22:16
142:3
**1988** 175:7
**1990** 143:9,13
143:18 145:18
146:4,24
149:7 150:11
151:15 152:16
153:12 167:23
168:1,14
174:15
**1990s** 38:10,11
38:18 39:2,9
167:17
**1991** 167:23
168:1 325:18
326:22 327:12
348:17,24
351:15 352:1
352:14,17
**1992** 348:7
349:2 351:24
352:13

**1998** 143:17,18
143:21,24
146:4,24
149:7 150:11
152:16 153:12
174:15

___

**2**

**2** 8:10,10 9:6,14
14:16,17
16:22 18:10
18:22 82:4
84:21 90:8
178:24 200:19
263:16,17
264:1 266:1
269:7 279:8
377:9
**20** 10:21,22,23
187:14 208:18
252:11
**20/20** 61:20
**200** 178:14
**2000** 138:18
144:10,15
261:9
**2001** 144:15
**2008** 20:9 138:2
248:19
**2010s** 261:10
**2014** 138:18
**2015** 138:16,17
138:24
**2017** 1:20 177:3
373:5 375:12
376:9
**2018** 376:1
**207** 373:14
**211(d)** 373:14
**22** 321:23
**2200** 2:18 376:3
**2230** 324:22
333:23
**2300** 325:20
326:22 327:13
333:22
**231556** 90:15

**25** 55:22 114:1
236:21 237:3
349:2,7,18
350:21 353:19
**26** 15:21 17:2,9
17:13 207:16
207:21 208:3
208:17 214:23
215:1,2
217:19 261:16
283:7 314:24
315:4 338:22
339:19 340:10
340:13,16,18
340:19 341:4
341:11 344:7
344:11,15,19
345:1,2
347:20,24
348:15,20,24
349:5 352:20
353:1,19
354:14 376:9
**26th** 259:9
261:6
**27** 376:1
**27th** 349:17
350:16
**28** 375:11
**28th** 1:20
349:17 350:17
373:5
**29th** 349:18
350:17
**2A** 8:12
**2B** 8:12
**2C** 8:12

___

**3**

**3** 8:11 9:6,14
136:12 137:7
269:8 281:1
316:7 377:4
377:10
**30** 213:6,11
214:5,17
221:18 251:9

**334**:9 376:11
376:14
**30-minute**
334:5
**300** 2:5 178:14
178:15
**300C** 1:19
373:7
**311** 1:18 2:4
373:7
**312-243-5900**
2:6
**312-494-1000**
2:19
**32** 115:22
**321** 2:17 376:3
**324** 377:13
**325** 377:13
**339** 377:14
**34** 185:5 186:9
186:23 187:2
187:19,21
**342** 377:14
**358** 377:15
**35th** 37:12
38:22 40:9,23
**36,000-plus**
17:13
**36,244** 16:23
**36244** 16:23
**365** 377:16
**368** 377:4
**37** 339:24
**375** 375:9
**38** 15:20,22
206:21 207:1
207:9,13
208:10,10,12
211:21 214:24
261:17
**3B** 316:4 317:7
317:14,20

___

**4**

**4** 179:4,7 182:1
281:9,10
377:11

| | | |
|---|---|---|
| **4,000** 141:17 | **6B** 358:14 | 262:24 266:6 |
| **4:00** 376:13 | | |
| **412** 19:13 236:6 | **7** | |
| 239:5 240:4 | **7** 210:3 272:16 | |
| **4428** 1:6 | 325:11,14 | |
| **449** 332:14 | 331:20 332:13 | |
| **45** 180:5 | 333:4 334:18 | |
| **48** 211:20 | 334:21 336:16 | |
| **49** 332:8 | 337:1 345:22 | |
| **49.5** 183:22 | 354:19 355:6 | |
| 184:6,7,22 | 377:8,13 | |
| **4th** 177:2 | **7162** 235:4 | |
| | **7185** 235:5 | |
| **5** | **75** 151:4,11 | |
| **5** 42:18 197:22 | 181:6 | |
| 197:23 198:2 | | |
| 285:5 291:23 | **8** | |
| 377:12 | **8** 316:3 339:3,4 | |
| **5,000** 141:17 | 339:8 347:18 | |
| **5:02** 296:5 | 353:10 377:14 | |
| **50** 150:23 | **80** 151:9 | |
| 151:11 152:8 | **83** 80:14 | |
| 181:6 | **83-1** 43:13 44:7 | |
| **550** 2:11 | 77:22 79:1 | |
| **5th** 177:2 | 84:22 85:20 | |
| | **83-1-1** 42:17 | |
| **6** | **86** 85:21 143:3 | |
| **6** 324:1,5 333:9 | **87** 22:16 142:3 | |
| 334:16,17,20 | 143:3 | |
| 336:4 338:5 | | |
| 339:13 341:8 | **9** | |
| 342:12,12 | **9** 316:4 342:4,8 | |
| 343:4,15 | 343:2 344:1 | |
| 345:7 346:12 | 355:24 356:17 | |
| 347:5 377:13 | 357:4,13,13 | |
| **6:25** 370:6 | 358:3 377:14 | |
| **60** 367:14,16 | **9:00** 376:12 | |
| **60143** 2:12 | **90** 151:7 152:12 | |
| **60607** 1:19 2:5 | 175:1 | |
| 373:8 | **91** 324:22 | |
| **60654** 2:18 | 349:22 | |
| 376:3 | **92** 348:17 | |
| **61** 235:3 | 350:10 | |
| **63** 235:4 | **93** 143:16 | |
| **630-735-3300** | **98** 151:15 175:1 | |
| 2:12 | **99CR** 264:21 | |
| **6443** 365:21 | **99CR100** | |