# EXHIBIT E

# In The Matter Of:

*Maysonet v.*

*Guevara*

---

*Kevin D. Bruno*

*September 10, 2024*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DIVISION OF ILLINOIS
 2                       EASTERN DIVISION

 3                       CASE NO. 18-cv-02342

 4   JOSE JUAN MAYSONET,          )
                                  )
 5        Plaintiff(s),           )
                                  ) DEPOSITION UPON ORAL
 6        -v-                     )  EXAMINATION OF:
                                  )
 7   REYNALDO GUEVARA, et al.,    )   KEVIN D. BRUNO
                                  )
 8        Defendant(s).           ) (VIA VIDEOCONFERENCE)
                                  )
 9

10

11

12        T R A N S C R I P T  of the stenographic

13   notes of JOYCE TKACH, Certified Court Reporter of

14   the State of New Jersey, Certificate No. XIO1989,

15   taken VIA VIDEOCONFERENCE on Tuesday, September 10,

16   2024, commencing at 1:08 p.m.

17

18

19

20

21

22

23

24

25
```

## Page 2

```
 1   A P P E A R A N C E S :

 2   BONJEAN LAW GROUP, PLLC
     303 Van Brunt Street, 1st Floor
 3   Brooklyn, New York 11231
     (718) 875-1850
 4   jennifer@bonjeanlaw.com
     By:  JENNIFER BONJEAN, ESQ.
 5   Appearing on behalf of the Plaintiff(s),
     Jose Juan Maysonet
 6
     BORKAN & SCAHILL, LTD.
 7   Two First National Plaza
     20 South Clark Street, Suite 1700
 8   Chicago, Illinois 60603
     (312) 580-1030
 9   tscahill@borkanscahill.com
     By:  TIMOTHY P. SCAHILL, ESQ.
10   Appearing on behalf of the Defendant(s),
     Reynaldo Guevara
11
     THE SOTOS LAW FIRM, PC
12   141 West Jackson Boulevard, Suite 1240A
     Chicago, Illinois 60604
13   (630) 735-3300
     jenqquist@jsotoslaw.com
14   By:  JOSH ENGQUIST, ESQ.
     Appearing on behalf of the Defendant(s),
15   JoAnn Halvorsen, Edward Mingey, Lee Epplen, Fernando
     Montilla and Ronald Paulnitsky
16
     ROCK, FUSCO & CONNELLY, LLC
17   333 West Wacker Drive, 19th Floor
     Chicago, Illinois 60606
18   (312) 494-1000
     erosen@rfclaw.com
19   By:  EILEEN E. ROSEN, ESQ.
     Appearing on behalf of the Defendant(s),
20   City of Chicago

21

22   A L S O   P R E S E N T :

22   ASHLEY B. COHEN, ESQ., Bonjean Law Group, PLLC
23   HALEY COOLBAUGH, Paralegal, Bonjean Law Group, PLLC
     STEVEN A. GREENBERG, ESQ., Steven A. Greenberg &
24   Associates, Ltd.
     THERESA BEROUSEK CARNEY, ESQ., Rock, Fusco &
25   Connelly, LLC
```

## Page 3

```
 1                 I N D E X

 2   WITNESS NAME                                PAGE

 3   KEVIN D. BRUNO

 4     By: MS. BONJEAN                          5,242

 5     By: MS. ROSEN                              240

 6

 7                 E X H I B I T S

 8   NO.    DESCRIPTION                          PAGE

 9   Bruno-1  A three-page copy of a Notice of Rule   11
10            30(b)(6), Deposition of City of
             Chicago, dated August 22, 2024

11   Bruno-2  A 987-page copy of a collection of     18
12            documents, Bates stamp RFC-Maysonet
             000001 through 000066

13   Bruno-3  A 226-page copy of a collection of     27
14            documents, Bates stamp RFC-Maysonet
             050636 through 050861

15   Bruno-4  A 36-page copy of a collection of      62
16            documents, Bates stamp RFC-Maysonet
             000067 through 000102

17   Bruno-5  A 265-page copy of a collection of     87
18            documents, Bates stamp RFC-Maysonet
             050862 through 051226

19   Bruno-6  A 346-page copy of a collection of    121
20            documents, Bates stamp RFC-Maysonet
             051127 through 051472

21   Bruno-7  A one-page copy of a document titled  133
22            "Excerpt from BOD Spreadsheet," Bates
             stamp RFC-Maysonet 051862

23   Bruno-8  A seven-page copy of a collection of  142
24            documents, Bates stamp RFC-Maysonet
             051494 through 051500

25
```

## Page 4

```
 1            E X H I B I T S  (Continued)

 2   NO.    DESCRIPTION                          PAGE

 3   Bruno-9  A two-page copy of a memo titled     143
 4            "Bureau of Detectives, 19 April
             2013," Bates stamp RFC-Maysonet
             051859 and 051860

 5   Bruno-10 A 17-page copy of a document titled  158
 6            "1990 Homicides," Bates stamp
             RFC-Maysonet 051473 through 051489

 7            (Exhibit(s) attached to transcript.)

 8

 9                 R E Q U E S T S

10            PAGE          LINE

11            139            11

12            179             7

13            188             3

14

15

16

17

18

19

20

21

22

23

24

25
```

Maysonet v.
Guevara

---

Page 5

1 K E V I N  D.  B R U N O, with offices at
2 3510 South Michigan Avenue, Chicago, Illinois 60653,
3 having been duly sworn, testified as follows:
4
5    EXAMINATION BY MS. BONJEAN:
6 Q.  Good afternoon, Mr. Bruno.  My name is
7 Jennifer Bonjean.  That's B-o-n-j-e-a-n.  My law
8 firm is the Bonjean Law Group, and I represent the
9 plaintiff, Jose Juan Maysonet, in the matter of
10 Maysonet v. Guevara, et al.
11    Before we get started today, I'm going
12 to also place appearances on the record for Ashley
13 Cohen, who is with my firm, who also represents the
14 plaintiff, and Haley Coolbaugh, C-o-o-l-b-a-u-g-h,
15 my paralegal, who will assist with documents.
16    MS. BONJEAN: And I guess we'll start
17 with appearances by the defendants, starting with
18 the city and, I guess, on behalf of the deponent.
19    MS. ROSEN: Eileen Rosen, on behalf of
20 the Defendant City of Chicago and Deputy Chief
21 Bruno.
22    MR. ENGQUIST: Josh Engquist, on
23 behalf of the Defendants Halvorsen, Mingey, Epplen,
24 Montilla and Paulnitsky.
25    MR. SCAHILL: Timothy Scahill, on

---

Page 6

1 behalf of Defendant Guevara.
2    MS. BONJEAN: Okay.
3 Q.  Deputy Chief Bruno, is that what people
4 call you in your office?
5 A.  Yes.  Kevin is also just fine.
6 Q.  I won't call you Kevin.  Deputy chief
7 seems a little lengthy.  I may call you Mr. Bruno
8 along the way.  Please don't take it as any type of
9 slight.
10 A.  Not at all.
11 Q.  Okay.  Mr. Bruno, I know your rank is
12 deputy chief.  Can you tell me what your position is
13 with the Chicago Police Department?
14 A.  Sure.  So I currently serve as the deputy
15 chief of the bureau of detectives.
16 Q.  How long have you held that position?
17 A.  A year and a half now.
18 Q.  What are your job responsibilities as
19 deputy chief of the detective bureau?
20 A.  I assist the chief in overseeing the entire
21 bureau of detectives.
22 Q.  And the bureau of detectives would be
23 every detective who works in the Chicago Police
24 Department?
25 A.  Yes.

---

Page 7

1 Q.  I'm going to ask that, at a high level,
2 we go through your background a little bit.
3 A.  Sure.
4 Q.  We won't belabor it, but maybe start by
5 telling me when you joined the Chicago Police
6 Department.
7 A.  November 15, 1999.
8 Q.  Did you hold employment prior to
9 joining the Chicago Police Department?
10 A.  I did odd jobs here and there, yeah.
11 Q.  Okay.  How old were you, approximately,
12 in November of 1999?
13 A.  Twenty-three.
14 Q.  So I guess you're coming up on your
15 twenty-fifth-year anniversary, right?
16 A.  Correct.
17 Q.  If you would and if you're able to,
18 quickly kind of go through for me, between November
19 of 1999 to 2024, what your assignments were.  Again,
20 you don't have to get into significant detail.  I
21 might go back and ask some questions, but if you're
22 able to do that, that would help us move this along.
23 A.  Sure.  So I joined -- I started the police
24 academy in November of 1999.  I came out in February
25 of 2020 [sic].

---

Page 8

1    I was assigned to the 18th District.  I
2 worked as a patrol officer in the 18th District
3 until December of 2005, when I was promoted to
4 detective.
5    In February, I believe it was, of 2006,
6 I was assigned to the Area Five Detective Division,
7 where I worked violent crimes in Area Five until the
8 summer of 2009.
9    At that time, I was promoted to
10 sergeant, initially assigned to the 7th District.  I
11 worked as a patrol division sergeant for nine or ten
12 months, until 2010, when I was moved back to the
13 Area Three Detective Division as a sergeant.
14    I worked in Area Three as a midnight
15 sergeant for a couple years and then moved to the
16 afternoon shift in, I believe it was, March of 2012,
17 where I supervised homicide teams on afternoons in
18 what then became Area North Detective Headquarters.
19 I worked there as a homicide sergeant until 2016.
20    At that time, I moved to a cold case
21 team in Area North.  I continued in that role until
22 October of 2018, when I was promoted to lieutenant.
23    As a lieutenant, I was initially
24 assigned to the 11th District.  I worked on the
25 midnight shift in the 11th District, as a

---

Page 9

1 lieutenant, until May of 2019, when I then went back
2 to the detective division as a lieutenant of the
3 investigative response team that handled all of the
4 officer-involved shooting incidents.
5     In, I believe it was, February of 2020,
6 I was promoted to commander of that unit, the same
7 unit, the investigative response team, and did that
8 until November of 2022.
9     At that time, I moved to the Area Three
10 Detective Division as the commander of the Area
11 Three Detective Division. I was there from November
12 of 2022 until February of 2023.
13    In February 2023, I was promoted to
14 deputy chief of the bureau of detectives.
15 Q. Okay. Thank you. I might ask a couple
16 follow-ups.
17 A. Sure.
18 Q. You went from the 18th District to Area
19 Five in December of 2005, is that right?
20 A. I left 18 in December of 2005. There's a, I
21 believe, six-week or so detective training program,
22 and then to Area Five as a detective in February of
23 2006.
24 Q. Got it, and the violent crimes unit
25 there, right?

Page 10

1 A. Yes.
2 Q. You were there until summer of 2009.
3 So over about three and a half years as --
4 A. Yes.
5 Q. -- a detective in Area Five?
6 A. Yes.
7 Q. I know you may anticipate where my
8 questions go. If you can remember just to let me
9 finish, so we have a clear record, and I'll do the
10 same. Okay?
11 A. Sure.
12 Q. Then you got promoted to sergeant and
13 went to Area Three in, what, 2010? Is that right?
14 A. Yes, 7th District first and then Area Three.
15 Q. When you were assigned to the Area Five
16 Detective Division, violent crimes, in, I guess,
17 February of 2006, where was that physically located?
18 A. That was 5555 West Grand Avenue.
19 Q. So it was still Grand and Central at
20 that point?
21 A. Yes.
22 Q. It's still Grand and Central, right?
23 A. It still is.
24 Q. Area Five has not changed locations for
25 at least the last 35 years, right?

Page 11

1     MS. ROSEN: Objection; form.
2     But you can answer.
3 A. Yeah, in 2012, the city closed Areas Four and
4 Five.
5 Q. I see. Okay.
6 A. So it became Area North, and then they
7 reopened them in April of 2020.
8 Q. So it's Area Five again?
9 A. Yes.
10 Q. There's a period of time where it was
11 just called Area North and, what, did they combine
12 Four and Five? Is that what happened?
13 A. Correct. They split up the districts that
14 covered Four and Five, and we had Area North, South
15 and Central and then, in 2020, opened up Areas Four
16 and Five again, but not the exact same districts.
17 Q. Okay. Have you had an opportunity to
18 review the 30(b)(6) notice that was issued by the
19 plaintiff in this case?
20 A. Yes.
21     MS. BONJEAN: I'm going to mark that,
22 if we can, as Bruno-1.
23     (Exhibit Bruno-1, a three-page copy of
24 a Notice of Rule 30(b)(6), Deposition of City of
25 Chicago, dated August 22, 2024, is marked for

Page 12

1 identification.)
2     MS. ROSEN: Jennifer, he has in front
3 of him a printed version of it but the one with our
4 objections, just so you know.
5     MS. BONJEAN: Okay. I don't know if
6 the other parties have it handy. So if you guys
7 want me to keep it up, I can; otherwise, I'll take
8 it down, because I have a physical copy in front of
9 myself.
10     MR. ENGQUIST: I don't need it up.
11     MS. BONJEAN: Okay.
12 Q. Do you understand, Mr. Bruno, that you
13 have been designated here today, by the City of
14 Chicago, as someone who can speak to matters that
15 are identified on the 30(b)(6) notice?
16 A. Yes.
17 Q. What did you do today to prepare for
18 your deposition?
19     MS. ROSEN: I object to the form.
20     You can answer.
21 A. I reviewed the memo from you and looked at
22 some of the orders related to investigative files.
23 Q. When you say memo from me, are you
24 talking about the 30(b)(6) notice?
25 A. Yes.

Maysonet v.
Guevara

Page 13

1 Q. Okay. And you looked at some written
2 policies or orders?
3 A. Correct.
4 Q. Do you have those in front of you?
5 A. Some of them.
6 Q. Can you tell me which ones you reviewed
7 in preparation for your deposition here today?
8 A. Sure. The 1986 Detective Division Special
9 Order on Investigative Files. That's order number
10 86-3.
11 Q. Okay.
12 A. A March 2015 Bureau of Detectives Special
13 Order. That's order 15-26.
14 A Detective Division Special Order on
15 Investigative Files.
16 Q. Is that 15-26?
17 A. That's SOP Chapter -- I'm sorry. That
18 rescinds SOP Chapter 18. That's Special Order
19 11-01.
20 Q. 11-01?
21 A. Yes.
22 The Bureau of Detectives Special Order
23 on Investigative Files, that's 15-26. Yeah, I have
24 two copies of that one in front of me.
25 Q. Did you say "Special Order"?

Page 14

1 A. Bureau of Detectives Special Order on
2 Investigative Files, yes.
3 Q. Okay. Any others?
4 A. Detective Division Special Order 11-01,
5 titled "Homicide and Sworn Weapon Discharge
6 Incidents."
7 Q. I thought you mentioned that one, but
8 maybe it was Special -- maybe it was a -- I know you
9 mentioned 11-01 earlier, but maybe I have that
10 wrong.
11 A. Yeah, some of these have been updated, and
12 there are multiple versions.
13 Detective Division Special Order 11-01
14 from 2011.
15 Q. Okay.
16 A. And I think that's about it.
17 Q. If you could refer back to Exhibit 1 or
18 Bruno-1 that we've looked at, which is the 30(b)(6)
19 notice, I just want to be sure that we're on the
20 same page about what you're here to talk about today
21 or if you have a different understanding. Okay?
22 A. Okay.
23 Q. On the second page of the notice,
24 there's a number 1, and as you can see, it indicates
25 that we are seeking testimony and information

Page 15

1 relating to homicide investigative files relating to
2 the investigation of the Wylie brothers' homicide at
3 issue in this case, and then there are some
4 specifics there.
5 Is it your understanding that you are
6 here to talk as a designee or to give testimony as a
7 designee of the City of Chicago about files related
8 to the investigation of the Wiley Brothers'
9 homicide?
10 (Technical difficulties.)
11 Q. Did you answer?
12 A. I did. "Yes."
13 Q. I'm sorry. I didn't hear it. Okay.
14 Then as to 2, the 30(b)(6) notice is
15 seeking testimony from a city designee as it relates
16 to homicide investigative files, specifically Area
17 Five investigations, between 1985 and 2000.
18 Again, there is some detailed
19 information that we have identified, but, generally,
20 is it your understanding that you're here to testify
21 on behalf of the city related to homicide
22 investigations between 1985 and 2000?
23 A. Yes.
24 Q. Okay. Then the third request also
25 relates to locations where information may be

Page 16

1 stored, related to the Area Five homicide
2 investigations for that same time period. Do you
3 see that?
4 A. Yes.
5 Q. And are you prepared to give testimony,
6 to the best of your ability as a designee of the
7 City of Chicago, on that subject matter?
8 A. Yes, I am.
9 Q. If I'm not mistaken, as to 4 and 5,
10 these are areas that you either are objecting to or
11 are unable to give testimony related to these
12 subject matters. Do I have that right?
13 A. Correct.
14 Q. All right. Thank you.
15 I'm going to try to keep this as
16 streamlined and organized as possible. I do want to
17 start specifically with inquiries related to the
18 homicide investigation of the Wiley brothers and the
19 files and reports that were prepared in connection
20 with that specific homicide investigation. Okay?
21 A. Okay.
22 Q. I may go off on some tangents, if it's
23 organic, but I will try to, again, to keep this as
24 organized as possible.
25 Have you had a chance to look at or

Maysonet v.
Guevara

Page 17

1  review, even at a cursory level, the materials that
2  have been produced to the plaintiff that purport to
3  be investigative reports related to the homicide
4  investigation?
5  A.  Yes.
6  Q.  And have you had a chance to look at
7  the homicide files that have been produced to the
8  plaintiff in connection with the Wiley brothers'
9  homicide investigation?
10     MS. ROSEN: Objection; form.
11     If you understand what she's referring
12  to, you can answer.
13  A.  Yes.
14  Q.  Okay.  So I was just making a
15  distinction between -- and, like, I know there's a
16  bunch of reports you may have looked at -- but if
17  you also had an opportunity to sort of see the files
18  themselves and how they've been presented as files.
19  I guess that may not be a great question, but have
20  you had an opportunity to see how it's been produced
21  to us, --
22  A.  Yes.
23  Q.  -- to the plaintiff?
24  A.  Yes.
25  Q.  All right.  So I want to, if we can,

Page 18

1  start with a collection of documents.
2     MS. BONJEAN: We'll mark that as
3  Bruno-2, and that is marked RFC-Maysonet 1 through
4  66.
5     (Exhibit Bruno-2, a 987-page copy of a
6  collection of documents, Bates stamp RFC-Maysonet
7  000001 through 000066, is marked for
8  identification.)
9     MS. BONJEAN: Do you have that,
10  Eileen, or should we put it up?
11     MS. ROSEN: I think I do.  Hold on.
12  Okay, yes, I have 1 through 66.
13  Q.  I've marked this as Bruno-2.
14  Mr. Bruno, have you had a chance to actually look at
15  this collection of materials?
16  A.  Yes.
17  Q.  Just so we're clear, RFC-Maysonet 1
18  appears to be a copy, a Xerox copy or a photocopy,
19  of the front of some type of manila folder that has
20  some typewritten words as well as some handwritten
21  words in, likely, Magic Marker.
22     Do you see that?
23  A.  Yes, just one letter.  Just numbers with one
24  letter, in marker.
25  Q.  Right.  Correct.  Sorry.

Page 19

1     There's a big "190" over there on the
2  left-hand side.  Do you know what that number
3  represents?
4  A.  I don't.
5  Q.  Do you know who wrote that number?
6  A.  No.
7  Q.  Is it possible that --
8     MS. BONJEAN: We lost him.
9     (Technical difficulties.)
10     (Off the record.)
11  Q.  All right.  I think I asked you if you
12  knew what the 190 was, and you said you didn't.
13     Do you know whether that has any
14  connection to what number homicide for that year had
15  taken place?
16  A.  It's possible.
17  Q.  Okay.  Then underneath that, in Magic
18  Marker, is the letter "N" and then 234297.  What
19  does that, to the best of your understanding,
20  reflect?
21  A.  That is the records division number.
22  Q.  Then up in the right-hand corner,
23  there's 90-50 and 90-51.  Do you know what those
24  numbers reflect?
25  A.  Those, I believe, are the number of murders

Page 20

1  for that area, murder 50 and 51 for Area Five for
2  that year.
3  Q.  Got it.  And that would be the year
4  1990, right?
5  A.  Yes.
6  Q.  Then in the sort of middle, there are
7  some typewritten words that say "Assigned:  Boyle
8  P." and then "Assisted:  Tapkowski, Dickinson."  Do
9  you see that?
10  A.  Yes.
11  Q.  Do you know what that reflects, those
12  names reflect, other than people who worked at Area
13  Five?
14  A.  Right, that's the originally assigned and
15  assisting detective.
16  Q.  Would that be for the original response
17  to a homicide?
18  A.  I don't know.
19  Q.  Okay.  So you said you had an
20  opportunity to look through this set of documents.
21  Would you agree that it appears to be a set of
22  documents that contains police reports, court
23  attendance reports?  It looks like it has a medical
24  examiner report.  But, in general, a number of
25  reports related to the Wiley Brothers' homicide

Maysonet v.
Guevara

Page 21

1  investigation?
2  A.  Yes.
3  Q.  And it appears to be contained within
4  some type of folder or file?
5  A.  I mean, this is just a stack of documents.
6  Q.  Did you look at the original?
7  A.  No.
8  Q.  Are you suggesting this isn't a file?
9      MS. ROSEN: I'm going to object to the
10  extent that he's not been designated to discuss the
11  files, per se, only the locations of the files.
12      MS. BONJEAN: No, no.  The contents of
13  the files is right there.
14      MS. ROSEN: Sure, the information --
15  the contents of the files, but you're asking him if
16  he knows what the originals looked like and you
17  didn't ask for that.
18      So I'm just objecting --
19      MS. BONJEAN: I asked him if he looked
20  at the original in preparation for his deposition,
21  which one would think he would do if he's here to
22  speak on behalf of the city about the contents of
23  the files.
24      MS. ROSEN: I'm going to object to
25  what "one would think."

Page 22

1      I requested multiple times to have
2  conversations with you about your 30(b)(6) notice,
3  to facilitate the dep.
4      All I am saying is that your innuendo
5  about "one would think," I'm objecting to.  You can
6  go ahead and ask your questions.
7  Q.  Did you look at this file, in its
8  original form, in preparation for your deposition
9  here today?
10  A.  This particular one?  No.
11  Q.  Okay.  What would you call this file?
12  A.  A collection of documents related to the
13  Wiley brothers' homicide investigation.
14  Q.  What would you call this file?
15      MS. ROSEN: Object to the form.
16  A.  I would call this a collection of
17  documentation related to the Wiley Brothers'
18  homicide investigation.
19  Q.  Where was it located?
20      MS. ROSEN: Objection; form.
21  Q.  Let me strike that.
22      Where is this file currently located
23  today?
24  A.  This one in particular?  I don't know.
25  Q.  Where has this filed, that we've just

Page 23

1  identified as RFC-Maysonet 1 through 66, been
2  maintained since 1990?
3  A.  I don't know.
4  Q.  So you're really not prepared to speak
5  to where this particular file has been maintained,
6  is that right?
7      MS. ROSEN: Objection; form.  I don't
8  think there's anybody that can speak to the breadth
9  of your question, which is where has it been for the
10  last 35 years.
11      MS. BONJEAN: I wouldn't know that,
12  Eileen.  It seems like somebody should be able to,
13  frankly.
14      MS. ROSEN: Well, frankly, what you
15  think and what is true are two different things.
16      So, once again, I am saying that your
17  question is overbroad.
18      MS. BONJEAN: Okay.  I don't really
19  care about your objections.
20      MS. ROSEN: I know.
21      MS. BONJEAN: I mean, he can answer
22  and you can object.
23  Q.  Just to be clear, if someone in your
24  chain of command, like, I don't know, the
25  superintendent, your chief, said, "I want this file,

Page 24

1  this collection of documents that's 1 through 66,"
2  and they said that to you today, where would you go
3  find this?
4  A.  They would never say, "I want this collection
5  of documents."
6      They would say, "Can you find the file
7  under this RD number?"
8  Q.  So is this an RD file?
9      MS. ROSEN: Objection; form.
10  A.  Can you repeat that, please?
11  Q.  So is this an RD file?
12  A.  This is a collection of documents related to
13  the Wiley brothers' investigation.
14  Q.  Where is this collection of documents
15  related to the Wiley brothers' homicide
16  investigation located today?
17  A.  The file related to this investigation is at
18  the records warehouse.
19  Q.  And this specific collection of
20  documents related to the Wiley brothers' homicide
21  investigation --
22      MS. ROSEN: So, Jennifer, stop.
23      MS. BONJEAN: Well, I mean --
24      MS. ROSEN: The snarky faces
25  is unprofessional.

Page 25

1      MS. BONJEAN: I mean, it's going to be
2   a long day.
3      I don't care. You know what's
4   unprofessional? Producing an investigative file six
5   years after a lawsuit. That is unprofessional. I
6   may be annoying, but that is unprofessional.
7      MS. ROSEN: Are you done?
8      MS. BONJEAN: Yes, I'm done, but I
9   want an answer to my question.
10      MS. ROSEN: Great. Well, maybe finish
11   the question without the sarcasm.
12   Q.  Mr. Bruno, you're referring to this
13   document that has -- you've admitted it looks like a
14   folder, right? This folder. (Indicating.)
15   A.  Yes, this looks like a copy of a folder.
16   Q.  Okay, a copy of a folder.
17      And this folder contains the reports
18   related to the Wiley brothers' homicide
19   investigation? You've testified to that, right?
20   A.  Yes.
21   Q.  Where is this folder, the original
22   folder, as we sit here today?
23   A.  At the records division warehouse.
24   Q.  Where is the records division
25   warehouse?

Page 26

1   A.  The 3900 block of South Michigan Avenue. I
2   think it's 3922 South Michigan Avenue.
3   Q.  And is this the investigative file in
4   connection with the Wiley brothers' homicide
5   investigation?
6      MS. ROSEN: Objection; form.
7   A.  As we know now, this is part of the
8   investigative file.
9   Q.  What is an investigative file, then?
10   A.  It's a collection of documents relating to
11   the investigation.
12   Q.  Why is this collection of documents,
13   that's Bates-stamped RFC-Maysonet 1 through 66, in a
14   separate file, like in its own little subfile?
15      MS. ROSEN: Objection; form.
16   A.  That, I don't know.
17   Q.  Do you know where this file was when
18   this lawsuit was initiated in 2018?
19   A.  In 2018, this was at the records division
20   warehouse.
21   Q.  Do you have any reason to believe it
22   has ever left the records division warehouse, other
23   than for copying purposes?
24   A.  No.
25   Q.  Okay. So it's your testimony that this

Page 27

1   particular file, that's RFC-Maysonet 1 through 66,
2   has been consistently maintained at the records
3   division warehouse since it was received at the
4   records division warehouse, in whatever year that
5   was, until 2018? Is that right?
6   A.  Probably not. The files have been moved
7   around over the years.
8   Q.  There must be, of course, a log that
9   indicates when files get moved, right?
10   A.  There are records indicating the moves.
11   Q.  Before we get there, and we will, I'm
12   going to have you --
13      MS. BONJEAN: Haley?
14      MS. COOLBAUGH: Yes.
15      MS. BONJEAN: Okay. Please pull up
16   RFC-Maysonet 50636, part 1. I don't know what it
17   goes to. We'll call this Bruno-3.
18      (Exhibit Bruno-3, a 226-page copy of a
19   collection of documents, Bates stamp RFC-Maysonet
20   050636 through 050861, is marked for
21   identification.)
22      MS. ROSEN: Can you tell me the -- oh,
23   never mind. It's at the top of the screen. I don't
24   have this one in here.
25      MS. BONJEAN: Well, it's 226 pages

Page 28

1   long.
2      MS. ROSEN: Do you want him to have it
3   in here?
4      MS. BONJEAN: No. We'll scroll
5   through it together. That's fine. I mean, let's
6   find out what he knows about it.
7   Q.  Have you had a chance to look at
8   this --
9      MS. BONJEAN: Haley, can you enlarge
10   this? I'm sorry. It's fine.
11   Q.  Okay. I am going to have you look at
12   it. At least we're looking at the first page at
13   this point, of a document that is Bates-stamped
14   RFC-Maysonet 50636. It's been produced in a PDF, a
15   226-page long PDF, that goes from 50636 to 50861 and
16   also bears a number at the top. It says N234297.
17      Do you see that?
18   A.  Yes.
19   Q.  Mr. Bruno, have you had a chance to
20   look at this collection of reports?
21      MS. BONJEAN: I'm going to ask you to
22   scroll through it a little bit more because I don't
23   know that we can tell, from the cover only, which
24   file this is.
25      MS. BONJEAN: You produced it. It's

Page 29

1  part 1. I mean, I don't --
2      MS. ROSEN: Okay. Well, if you don't
3  want to scroll through it, then I'm going to print
4  it.
5      MS. BONJEAN: I'll scroll through it.
6  I'll scroll through it.
7      MS. ROSEN: Okay.
8      MS. BONJEAN: I'll scroll through it,
9  but, I mean, I'm not doing his preparation here
10 today.
11     MS. ROSEN: His preparation does not
12 require him to memorize sheets of paper. So there
13 has to be --
14     MS. BONJEAN: His preparation would
15 require him to look at the files that he's going to
16 testify about.
17     MS. ROSEN: Of course.
18     MS. BONJEAN: Okay.
19     MS. ROSEN: So I have told you, I can
20 get the hard copy if you want him to look through
21 it.
22     MS. BONJEAN: No.
23     MS. ROSEN: Otherwise, you can scroll
24 through it.
25     MS. BONJEAN: I mean, just keep

Page 30

1  scrolling. Maybe something will go off in his
2  brain.
3  Q.  Does this refresh your recollection
4  about what this is?
5  A.  Yes.
6      MS. BONJEAN: Go back to the first
7  page, Haley.
8  Q.  We scrolled through a couple pages.
9  Certainly, if you need to scroll through all 226,
10 you can certainly do that.
11     Looking at the pages that you have
12 looked at, are you able to tell me -- well, strike
13 that.
14     Can you see that there is, on this
15 RFC-Maysonet 50636, another file that bears an RD
16 number of N234297?
17 A.  Yes.
18 Q.  And it also has some --
19     MS. BONJEAN: Scroll down.
20 Q.  -- handwriting down at the bottom of
21 this?
22 A.  (No response.)
23 Q.  Do you see that?
24 A.  Yes, I do.
25 Q.  Okay. It looks like some dates there?

Page 31

1  A.  Yes.
2  Q.  Do you know what those dates reflect or
3  why they're there?
4  A.  I don't know.
5  Q.  This collection of documents or this
6  file, if you will, what would you call this file?
7  A.  I would call this the investigative file.
8  Q.  And why do you call this the
9  investigative file or how do you know it's the
10 investigative file?
11 A.  Just the way that it's organized and what it
12 contains.
13 Q.  What about its organization leads to
14 you believe that it's the investigative file?
15 A.  Well, as you scroll down, if you will, --
16 Q.  Okay.
17     MS. BONJEAN: Keep going, Haley.
18 A.  -- to what looks like a table of contents
19 page?
20 Q.  The inventory control sheet?
21 A.  Yes. The investigative file inventory, yes.
22 Q.  Right. All right.
23     So the investigative file inventory
24 sheet leads you to believe what about this
25 particular file?

Page 32

1  A.  That this is the investigative file from this
2  case.
3  Q.  And why is that?
4  A.  Because that is how investigative files are
5  kept and organized.
6  Q.  What do you mean by that?
7  A.  The investigative files for homicides include
8  the investigative file inventory and a list of all
9  the documents that are held within that file.
10 Q.  Does that include the general defense
11 case report?
12 A.  It's going to include a copy of the general
13 defense case report from this time.
14 Q.  Why would it be a copy?
15 A.  Because at that time, the original would be
16 in the records division copy of the file.
17 Q.  So original documents would go to the
18 records division file and copies would remain in the
19 investigative file?
20     MS. ROSEN: Objection; form, misstates
21 his testimony.
22 Q.  You can answer.
23 A.  Can you repeat that, please?
24 Q.  Original reports, such as the general
25 offense case report, would go into the permanent

Page 33

1  retention file or the RD file? Is that what you're
2  saying?
3  A. Yes.
4  Q. Do you use the words "RD file" and
5  "permanent retention interchangeably"?
6  A. Yes. It's technically called the records
7  division file, but it's stamped "Permanent
8  Retention" and it's also known as the permanent
9  retention file.
10 Q. Was there a records division file --
11 well, strike that.
12    When you say it's the records division
13 file which is stamped the "Permanent Retention
14 File," did records division files exist in 1990?
15 A. Yes.
16 Q. And do they exist today?
17 A. No.
18 Q. When did that change?
19 A. 2002.
20 Q. How did it change?
21 A. It was changed after the implementation of
22 the CHRIS system, which automated the detective
23 division reports. That system came in in the late
24 '90s, I believe '98, and they gave it some time to
25 ensure that that system was working.

Page 34

1    And then in 2002, the decision was made
2  to stop with the records division files.
3  Q. Does the CHRIS system exist today?
4  A. It is -- no. It is still out there, but we
5  no longer use CHRIS.
6  Q. What do you use now?
7  A. R-Case.
8  Q. R-Case?
9  A. Yes, the letter "R" then "Case."
10 Q. Do you know when that change was made?
11 A. Within the last few years.
12    For a while, you could use either. Now
13 it's strictly R-Case.
14 Q. Somewhere between 2020 and 2024, it
15 went exclusively to R-Case?
16 A. Yes. I would say '22-ish would be an
17 estimate.
18 Q. Okay, So let me understand this. Prior
19 to 2002, the Chicago Police Department maintained a
20 records division file which contained reports
21 related to investigations, and then in 2002, the
22 city moved to the use of the CHRIS system, right?
23 A. CHRIS started in the late '90s.
24 Q. So it started in the '90s but was sort
25 of fully implemented in 2002, and the RD file system

Page 35

1  was at that point discontinued entirely. Is that
2  correct?
3  A. Yes.
4  Q. All right. Where were records division
5  files maintained in 1990?
6  A. At the warehouse.
7  Q. Also at the records division warehouse?
8  A. Yes.
9  Q. Were they organized with the
10 investigative files or separate from the
11 investigative files?
12 A. Separate.
13 Q. Were they always maintained in the
14 records -- strike that.
15    Were the records division files always
16 maintained at the records division warehouse, again,
17 starting in 1990 until 2002, when the use was
18 discontinued?
19 A. Yes.
20    MS. ROSEN: Objection; form.
21    But you can answer.
22 Q. How were records division files
23 organized? By what system, if that makes sense?
24 A. They would be by RD number.
25    I'm not sure if they were done by area

Page 36

1  or sequential -- you know, sequentially across the
2  city. I'm not sure.
3  Q. So you don't know whether records
4  division files were organized by area or by RD
5  number, is that what you're saying?
6  A. Correct.
7  Q. How are they organized today, do you
8  know that?
9  A. How our investigative files are organized?
10 Q. No, RD files. I mean, I know it's the
11 R-Case number, but if you wanted to look for an RD
12 file, would it be by RD number, or you don't know?
13 A. Well, we don't have RD numbers today.
14 Q. Oh. When did RD numbers --
15 A. RD files, we don't have.
16 Q. I know.
17    But I'm saying if you want to look up
18 an RD case number, you still have RD numbers, right?
19 A. Right.
20 Q. Okay. So today, if you wanted to go
21 look up an RD case number, you would go to R-Case.
22 This is an electronic system, I assume, right?
23 A. Yes.
24 Q. Are there different search parameters
25 that you could put in to pull up the information for

Page 37

1 an RD --
2 A. Yes.
3 Q. -- or a court case file?
4 A. Yes.
5 Q. But back in 1990 to 2002, there were
6 paper files, right, except during this transition
7 period when the CHRIS system was coming into being,
8 right?
9 A. Yes.
10 Q. All right. You're saying it's possible
11 that it was sort of a citywide filing process where
12 it was just by RD number but it could also have been
13 by area, is that right?
14 A. Correct. Investigative files were kept by
15 area.
16    The RD files, I'm not sure if they were
17 by file or across the city.
18 Q. Were they organized in any way, as it
19 related to the type of crime? Are we talking
20 specifically homicide files or any violent crimes?
21 A. Homicide files.
22 Q. Was there a written policy, back in
23 1990 or the early '90s, let's say, that dictated
24 what documents were required to be placed into and
25 maintained in the RD files?

Page 38

1    (Witness reviews.)
2 A. I don't know. I don't have that in front of
3 me.
4 Q. Well, if you wanted to find that out,
5 where would you go and look?
6 A. I'd have to check orders from that time,
7 related to records division files.
8 Q. So in preparation for your deposition
9 here today, you didn't look at policies that would
10 tell you specifics about what documents should be or
11 would have been contained in the RD files in the
12 early '90s?
13 A. Right. I have it for all the investigative
14 files.
15 Q. Is there a reason you did not look into
16 specifically RD files?
17 A. My focus was on the investigative files.
18 Q. Why?
19 A. Because all of the documents are in the
20 investigative file.
21 Q. Okay. But did you see the part of the
22 30(b)(6) notice that referenced "Information related
23 to homicide investigative files, including area
24 files, permanent retention files, gang crimes files,
25 crime lab files, street files, or any other

Page 39

1 repository of investigative information"?
2    MS. ROSEN: So, Jennifer, I'm going to
3 remind you that we have objected to the use of your
4 phrases, and so to the extent that it's overbroad,
5 we made an objection.
6    We've asked to speak to you about it in
7 advance of this dep. You couldn't -- we didn't
8 meet. So the --
9    MS. BONJEAN: You reached out to me
10 literally the day before.
11    MS. ROSEN: You're talking over me,
12 and so the court reporter can't take it down.
13    MS. BONJEAN: Okay.
14    MS. ROSEN: So to the extent that he
15 did not pull directives,-- and, quite frankly, I
16 don't believe there are any directives that speak to
17 that issue -- we have not produced them in this
18 case? I don't think I've ever seen them.
19    But the accusation that he didn't go
20 look for it is not well-founded. He obviously did
21 what he was instructed to do, based on the
22 parameters of the 30(b)(6) notice.
23    MS. BONJEAN: No, not by the
24 parameters of the 30(b)(6) notice. By you. By your
25 decision of -- the 30(b)(6) notice absolutely would

Page 40

1 cover this, and you just decided that he shouldn't
2 have to look at that.
3    MS. ROSEN: Okay. I have decided that
4 your request was overbroad, and I asked to speak
5 with you about it.
6    We can take this to --
7    MS. BONJEAN: Do you want to taek a
8 break and talk about it, Eileen?
9    MS. ROSEN: No, I don't want to take a
10 break and talk about it, because it's not like he
11 can prepare any more.
12    If there's information -- I did the
13 best that -- we did the best that we could. I did
14 the best that I could, based on what I thought you
15 wanted.
16    These deps always have to be discussed.
17 That didn't happen. I appreciate we're under a very
18 tight deadline. Great. We've moved as quickly as
19 we can to get you the information we can.
20    There is no issue in this case about
21 the RD file. You've had it.
22    MS. BONJEAN: Don't --
23    MS. ROSEN: There's nothing new about
24 it. So the focus has been on the investigative
25 file, because that's where the new information came

Maysonet v.
Guevara

Page 41

1  from.
2      MS. BONJEAN: Okay.
3      MS. ROSEN: If you want specific
4  information about the RD file, you and I can discuss
5  it, and if we need to provide another witness for it
6  or if Chief Bruno needs to go do more research on
7  it, I'm happy to do it.
8      But it wasn't his choice not to go and
9  comply with your order -- your notice.
10     MS. BONJEAN: Okay. Well, that's
11 fine.
12     I mean, we'll see if your objections
13 hold up, okay, or whether they were frivolous
14 when --
15     MS. ROSEN: We'll see.
16     MS. BONJEAN: We'll see. That's
17 right, we'll see.
18     Hold on one second.
19     (Off the record.)
20 Q.  Are you saying that you don't know what
21 documents go into an RD file?
22     MS. ROSEN: Objection; form.
23 A.  No, I did not say that.
24 Q.  So if I am a detective, like yourself,
25 working back in the, you know, whatever, let's say

Page 42

1  the '90s, -- I know that's before your time, but
2  let's say the early '90s. How did documents make
3  their way into an RD file?
4  A.  Those would be handled by the file
5  coordinators in the areas.
6  Q.  So there was a position called a file
7  coordinator at Area Five back in 1990?
8  A.  I don't know if it's called a file
9  coordinator, but there would be a person or persons
10 who maintain files.
11 Q.  Are they called a file coordinator or
12 something else? You used the word, not me.
13 A.  I don't know what the title would be.
14 Q.  But back in 1990 or the early '90s,
15 let's just say, there was an individual whose job it
16 was to make sure reports got into their appropriate
17 files. Is that correct?
18 A.  Correct.
19 Q.  And each area had one of those
20 individuals?
21 A.  Yes.
22 Q.  As you sit here today, do you know who
23 the file coordinator was or the individual assigned
24 to making sure documents got into their appropriate
25 files in Area Five in 1990?

Page 43

1  A.  I don't know.
2  Q.  Back in 1990, whoever that person was
3  that was assigned to Area Five, what dictated his or
4  her -- I assume it's a him -- assessment of what
5  reports should go into the RD file?
6  A.  The RD file would have original reports,
7  original handwritten case reports, supp. reports,
8  things of that nature.
9  Q.  Did it have GPRs?
10 A.  The RD file would not have GPRs.
11 Q.  So it would have original reports, case
12 reports, supp. reports.
13     Any other types of reports?
14 A.  In the RD file, it would just be those
15 original reports and supp. reports.
16 Q.  And I think you answered this, but your
17 understanding is that -- or maybe this is what
18 Eileen said. But you don't believe there was a
19 written policy that dictated or mandated
20 specifically what reports went into the RD file back
21 in 1990?
22     MS. ROSEN: It's what I said.
23     MS. BONJEAN: Okay.
24 Q.  I don't know. I think it's what you
25 said, but --

Page 44

1      MS. ROSEN: You can ask him if he
2  knows that or not.
3      MS. BONJEAN: I was just about to. I
4  was just about to. I mean, I think you should be
5  the designee, Eileen.
6  Q.  Mr. Bruno, do you know whether there
7  was an order of any type, special order, general
8  order, any type of written directive, that guided
9  the individual responsible for putting records into
10 the appropriate places about what reports were
11 required to be placed into the RD files?
12     (Technical difficulties.)
13 Q.  I'm sorry. I didn't hear you.
14 A.  I said, "I don't know."
15 Q.  Going back to Bruno-3, which we have in
16 front of us, I think this is what you previously
17 identified as what you believe to be the
18 investigative file in the Wiley brothers' homicide
19 investigation. Is that correct?
20 A.  Yes.
21 Q.  And you reached that conclusion because
22 there's an investigative file inventory document in
23 this folder, right?
24 A.  Correct. Plus, what's listed on the
25 investigative file inventory.

Maysonet v.
Guevara

1  Q.  Okay.  Are these investigative file
2  inventory sheets prepared after a case is closed,
3  while the case is going?  How does it work?  As a
4  file gets added?  What's the process?
5  A.  Yes, as the case is going and as the
6  documents are created and added to the file.
7  Q.  So when a case is being investigated in
8  the area, before it's closed, how many files are
9  there off which the detectives are working or within
10  which the detectives are working?
11      MS. ROSEN: Objection; form.
12  A.  It would be the one investigative file.
13  Q.  So there isn't an RD file prepared
14  until after a case is closed.  Is that correct?
15      MS. ROSEN: Objection; form.
16      Prepared by who?
17  Q.  Well, who prepared the RD file?  Again,
18  I'm talking about 1990.
19  A.  It would be the person assigned to maintain
20  the files.
21  Q.  So this is the person we were talking
22  about earlier, who may be called a file coordinator
23  or maybe some other name that you don't know,
24  correct?
25  A.  Correct.

1  Q.  Okay.  So at what point during the
2  investigative process does the RD file get created?
3  Yeah, created.  Is it an ongoing process?  Is it
4  after the case is closed?  How does that work?
5  A.  That would be as those reports come in.
6  Q.  Is that the same for the investigative
7  file?
8  A.  Yes.
9  Q.  So there, we have at least two
10  different files that are kind of being created at
11  the same time, is that right?
12  A.  Yes, with the originals in the records
13  division file and copies in the investigative file.
14  Q.  Okay.  Then as the case is being
15  investigated, different individuals in Area Five,
16  whether it's a sergeant or even detectives, they
17  have their own working files as well, right?
18      MS. ROSEN: Objection; form.
19  A.  Can you repeat that, please?
20  Q.  As a case is being investigated,
21  different detectives or supervising sergeants or
22  lieutenants have a collection of investigative
23  documents that they are maintaining during the
24  course of the investigation, correct?
25      MS. ROSEN: Objection; form.

1  A.  Yeah, they would be working off of the
2  investigative file.
3  Q.  But there are additional files that
4  they're making copies of and working off of as well,
5  correct?
6      MS. ROSEN: Objection; form.
7  A.  Yeah, they should be working off of the
8  investigative file.
9  Q.  My question is different.  I understand
10  there's an investigative file, but there's also
11  other -- strike this.
12      There's also a collection of reports
13  that are being copied and maintained in different
14  locations, other than the investigative file, during
15  the course of the investigation, isn't that right?
16  A.  All the files should be copied and maintained
17  in the investigative file.
18  Q.  Okay.  So if a detective in this case
19  testified under oath that as reports were prepared
20  and put into the bin for approvals, that those
21  reports would go into an investigative file but
22  copies would be made and maintained on a clipboard
23  in the sergeant's office or might be maintained
24  separately with the detectives working the case,
25  does that sound right to you or are you disagreeing

1  that that happened?
2  A.  Well, I can't speak to --
3      MS. ROSEN: Object to form.
4      You can answer.
5  A.  Yeah, I can't speak to what the detectives
6  did on this case in 1990.
7  Q.  Why not?
8  A.  Because I wasn't there.
9  Q.  You're a designee for the city, sir.
10  That's sort of the whole purpose of this deposition.
11      You weren't even in the force until ten
12  years after -- I mean, you were like a 12-year-old
13  when this murder happened.  We know you weren't
14  there.
15      MS. ROSEN: I'm going to object to the
16  sarcasm, once again.
17  Q.  I mean, we don't -- its stating the
18  obvious.
19      I'm asking you a question, sir.  Were
20  copies of reports maintained on clipboards in the
21  lieutenant's office or sergeant's office in Area
22  Five in 1990?
23  A.  Not to my knowledge.
24  Q.  So if a detective testified to that,
25  that would not be consistent with your understanding

Page 49

1  of what the practices and policies were of the
2  police department in 1990, is that right?
3  A.  Please repeat that for me?
4  Q.  If a detective in this case testified
5  that that was what occurred in 1990 at Area Five,
6  that copies of police reports were placed on
7  clipboards or maintained on clipboards in the
8  lieutenant's office or sergeant's office, -- I don't
9  remember what rank -- meaning separate and apart
10 from what was in the investigative file, that would
11 not be consistent with your understanding of what
12 the police department required pursuant to its
13 policies, directives and orders, is that right?
14     MS. ROSEN: I'm going to object as
15 beyond the scope of the 30(b)(6) notice.
16     But you can answer.
17 A.  Yeah, I would not say that it's inconsistent,
18 but the investigative file is the file for the
19 investigation.
20     If a detective wants to make a copy of
21 a report to assist him with his investigation, that
22 wouldn't be inconsistent.
23 Q.  Okay.  So detectives were permitted to
24 make copies of whatever reports they wanted to and
25 maintain them separate and apart from the

Page 50

1  investigative file, correct?
2  A.  They certainly could have.
3  Q.  And do you know whether that occurred
4  in the Wiley brothers' homicide investigation?
5  A.  I don't know.
6  Q.  Now, in this investigative file
7  inventory sheet, there is a description of the
8  document.  It actually has an "Exhibit" number.  Why
9  does it have an exhibit number?
10     MS. ROSEN: What are you talking
11 about?
12     MS. BONJEAN: The first column of this
13 report.
14     MS. ROSEN: Oh.  Are you saying why
15 does the form say "Exhibit"?
16     MS. BONJEAN: Yeah.
17 Q.  Do you know why?
18 A.  I don't know.
19 Q.  Okay.  Then it says "Description of
20 Document" and then it has "Entering Member," which
21 means the detective who put the document into the
22 investigative file, is that right?
23     (Witness reviews.)
24 A.  I believe it's going to be the member that
25 created that document.

Page 51

1  Q.  Okay.  So it might not be the person
2  who's actually putting the file into -- strike that.
3     The "Entering Member" doesn't reflect
4  the individual who is actually putting the reports
5  into the file but, rather, the officer who authored
6  the report, is that right?
7  A.  I believe so.
8  Q.  What about the "Date of Entry," what
9  does that mean?
10     (Witness reviews.)
11     MS. ROSEN: They can scroll it.
12 A.  Yeah, can you scroll down for me?
13 Q.  Sure.
14     MS. BONJEAN: Go ahead.
15 Q.  Do you want to go to the next page or
16 just the bottom of the page?
17 A.  Please.
18     (Witness reviews.)
19 A.  Yeah, I believe that's going to be when that
20 document was created.
21 Q.  So you're talking about when the
22 document was created or authored by the detective
23 who filled it out and put in whatever narrative was
24 required?
25 A.  (No response.)

Page 52

1  Q.  I really don't want you to guess.  If
2  you don't know, that's a problem to me, but I'd
3  rather you say that you don't know than to guess.
4     (Witness reviews.)
5  A.  Yeah, I'm --
6     MS. ROSEN: He can answer the
7  question, but I'm going to actually go print this
8  document because it's hard for us to --
9     MS. BONJEAN: Okay.  Let's take a
10 break and print it, and part 2, while you're at it.
11     MS. ROSEN: Okay, that's fine.  Give
12 us a few minutes.  Thanks.
13     MS. BONJEAN: Okay.
14     (Recess:  2:18 p.m. to 2:23 p.m.)
15     MS. BONJEAN: Joyce, can you repeat
16 the last question I asked?
17     (Designated question is read back as
18 follows:
19     "QUESTION: So you're talking about
20 when the document was created or authored by the
21 detective who filled it out and put in whatever
22 narrative was required?")
23     MS. BONJEAN: So I will strike that
24 and start it over.
25 Q.  We were looking at the investigative

Page 53

1   file inventory log that I think you have a paper
2   copy of now?
3   A.   Yes.
4   Q.   We were talking about the different
5   columns, the "Exhibit" number that you didn't know
6   what that reflected.
7       Then the "Description of Document,"
8   which I assume you know what that reflects, right?
9   A.   Yes.
10  Q.   Then "Entering Member," you testified
11  that that was the officer who prepared the report or
12  authored the report, right?
13  A.   Yes, but looking at this now, that's going to
14  be the person who puts it into the file and the date
15  that they put it into the file.
16  Q.   Oh, I see.
17      Did Ms. Rosen talk to you about that in
18  the break?
19      MS. ROSEN: I'm going to object and
20  instruct him not to answer.  That's privileged
21  communication.
22      MS. BONJEAN: Okay, but it's also
23  coaching a witness, which is also improper.
24      MS. ROSEN: I'm not going to engage
25  with you on this level.

Page 54

1   Q.   Then the "Date of Entry," you
2   previously testified that was the date that the
3   report was authored but, let me guess, the answer to
4   your question how now changed?
5       MS. ROSEN: I'm going to object to the
6   form of your question and ask you to rephrase it,
7   please.
8   Q.   Has the answer to my question changed?
9   What does the "Date of Entry" mean?
10  A.   The "Date of Entry" is going to be the date
11  that it was put into the investigative file.
12  Q.   So you would agree that's different
13  than what you testified to before the break, right?
14      MS. ROSEN: I'm going to object to the
15  form.
16  Q.   You can answer.
17      MS. ROSEN: You can answer.
18  A.   Yes, I'm clarifying that it is the date that
19  it was put into the file.
20  Q.   And that's different than what you
21  testified to before the break, right?
22  A.   Yes.
23  Q.   Since I'm not sure what to rely on at
24  this point, I'll ask this question again:  Are these
25  documents identified on the investigative file

Page 55

1   inventory log at the time they're placed into the
2   investigative file or at some other time?
3       MS. ROSEN: I'm sorry.  Could you
4   repeat your question?
5       MS. BONJEAN: Yes.
6   Q.   Are the dates -- well, strike that.
7       Are the entries of the documents that
8   went into this investigative file or any
9   investigative file, for that matter, identified on
10  the log at the time that they are placed into the
11  investigative file or is it at some other time?
12      MS. ROSEN: I'm confused by what
13  you're asking.
14  A.   Yeah, I mean, a GPR is described as a GPR.
15  It's a description that a GPR is put into the file,
16  the investigative file inventory.
17  Q.   I'm aware.
18      So if we're looking at 1 through 7 on
19  this file inventory log -- I mean investigative file
20  inventory log, do you see that?
21  A.   On the first page of it or the second?
22  Q.   Well, let's look at the -- hold on.
23  (Mr. Greenberg enters the Zoom meeting.)
24  Q.   Well, the second page.
25      (Witness reviews.)

Page 56

1   A.   Okay.  So you're asking about 1 through 7 on
2   the second page?
3   Q.   Yes.  Do you see it?
4   A.   Yes.
5   Q.   Okay.  So 1 through 7 is a collection
6   of documents; the GPR, general offense case report,
7   the IR numbers that are run, some type of inventory
8   number, an evidence report and a supplementary
9   report.  Is that right?
10  A.   Yes.
11  Q.   It all appears to be entered by an
12  Officer or Detective Boyle, right?
13  A.   Yes.
14  Q.   And it all appears to have gone in
15  there on May 25th of 1990, is that right?
16  A.   Yes.
17  Q.   What I'm asking is, are we confident
18  that these documents were placed into the file on
19  May 25th of 1990 as opposed to some other date and
20  then the "Date of Entry" is either backdated or a
21  different date is used?
22      MS. ROSEN: Object to form.
23      You can answer.
24  A.   Can you repeat that?
25  Q.   Are you confident, from looking at

Page 57

1  this, that all of those reports were placed into the
2  investigative file on May 25th of 1990? That's what
3  I'm asking.
4  A.  From looking at this, yes.
5  Q.  Okay.  These go sequentially in order,
6  right?
7  A.  Yes.
8  Q.  And all the GPRs that are indicated in
9  "Exhibit 1" should be in the investigative file or
10  will be in the investigative file, right?
11  A.  Yes.
12  Q.  Then it looks like there are two
13  documents here at Exhibit Numbers 10 and 11 that
14  were also placed into the file, according to this
15  document, on May 25th of 1990, right?
16  A.  No.  Nine and 10 look like 25 May.  Eleven
17  looks, to me, as 27 August.
18  Q.  I don't think I said 11, but if I did,
19  I strike that.  I meant -- well, it's 8, 9 and 10, I
20  thought I said that.
21    MS. ROSEN: You're asking 8, 9 and 10?
22    MS. BONJEAN: Yes.
23  Q.  I don't know what that says, "prop
24  inventory" something, then "programs..." -- I don't
25  know.  I don't know what that says.

Page 58

1    Well, you tell me.  Can you read that
2  writing?  I can't.
3  A.  Progress supp.
4  Q.  Okay.  But do you know what 8 says,
5  "Progress Inventory Sheet" or something, is that
6  what that says?
7  A.  Property inventory sheet.
8  Q.  Property.  Okay, makes sense.  So 8 is
9  "Property Inventory Sheet."  Nine is "Progress
10  Supp."  Ten is "Progress Supp."
11    Those three documents are also placed
12  into the investigative file on May 25, 1990, right?
13  A.  I'm looking at this.  It looks like 25 May.
14  Q.  What did I just say?  Did I say
15  something other than May?
16  A.  No.  All of those look like 25 May, to me,
17  yes.
18  Q.  I thought I said that.  I'm going crazy
19  right now.
20    Let's just get this clear.  So 8, 9 and
21  10, those documents were all placed in this file on
22  May 25, 1990, according to this, right?
23  A.  Yes.
24  Q.  And then there are no documents placed
25  into this file again until August 27th of 1990,

Page 59

1  right?
2  A.  Correct.
3  Q.  Then it looks like Detective Halvorsen
4  places a bunch of documents into this investigative
5  file on August 27th of 1990, right?
6  A.  Yes.
7  Q.  Okay, and that doesn't necessarily
8  correlate to when those documents were created or
9  authored.  We just know that that "Date of Entry"
10  means the date on which they're placed into the
11  investigative file, right?
12  A.  Correct.
13  Q.  Then there is a -- I don't know.  It
14  looks like a stamp of some type, like it's filled in
15  there at the bottom of page 2, that says, "Copy Sent
16  to Case Report Unit (164) Records Processing."
17    Do you see that?
18  A.  I do.
19  Q.  That is dated August 27th of 1990 and
20  is signed off by E. Halvorsen as well?
21  A.  Yes.
22  Q.  What does that reflect?
23    (Witness reviews.)
24  A.  "Sent to Case," that a copy of this was sent
25  to the records division processing unit.

Page 60

1  Q.  A copy of what?
2  A.  Of the investigative file inventory.
3  Q.  Just the inventory file sheet?
4  A.  Yes.
5  Q.  Hold on.  So you're saying that a copy
6  of this investigative file inventory, which would be
7  this one sheet, was sent to the --
8    MS. ROSEN: It's two sheets.
9    MS. BONJEAN: Well, yeah, but -- okay.
10  Q.  Well, let's talk about that, then.
11  Let's look at the second sheet.  When is the entry
12  of Exhibit 1 made on the second sheet?
13  A.  Looks like 24 -- I can't make that out.
14  Q.  Looks like "November," right?
15  A.  What is it?
16  Q.  Looks like "November"?
17  A.  "November," yes.  It does look like
18  "November."
19  Q.  At entry line 5, what is that?  Even if
20  you don't -- to me, it looks like "1 April," but we
21  know it says "1992," right?
22  A.  Correct.
23  Q.  So all of these -- from 5 to 8, all of
24  these entries are from 1992, right?
25  A.  Yes.

Page 61

1  Q.  Then this sheet is sent off to the
2  records processing in May of '92?
3  A.  Correct.
4  Q.  Okay.  So let's go back to the first
5  sheet.  It says that this was sent off on August
6  27th of 1990, right?
7  A.  Yes.
8  Q.  So if we believe how the calendar
9  works, the second sheet wouldn't have existed yet,
10  right?
11  A.  Correct.
12  Q.  So is it your testimony that this one
13  sheet, that's at RFC-Maysonet 50642, was sent to the
14  records division on August 27th of 1990?
15  A.  Yes.
16  Q.  Where did it go at the records
17  division?
18  A.  That would then go with the records division
19  file.
20  Q.  The RD file?
21  A.  Yep.
22  Q.  Have you seen the RD file in this case?
23  A.  I have not.
24  Q.  Why don't we take a look at it.  We'll
25  mark it as Bruno-4.

Page 62

1      MS. BONJEAN: Haley, it's
2  RFC-Maysonet -- or as far as I know, it's
3  RFC-Maysonet 67 to 102.
4      (Exhibit Bruno-4, a 36-page copy of a
5  collection of documents, Bates stamp RFC-Maysonet
6  000067 through 000102, is marked for
7  identification.)
8      MS. BONJEAN: Scroll through it for
9  Mr. Bruno.  It's not very long.  It shouldn't take
10  us about a minute.
11  Q.  As we're going, Mr. Bruno, does this
12  appear to be an RD file that we're looking at,
13  marked as Bruno-4?
14  A.  Yes.
15  Q.  And how can you tell?
16  A.  It's marked "Permanent Retention."
17  Q.  Does it also, since it's in color,
18  appear to be originals?
19  A.  It does.
20      MS. BONJEAN: Keep going, Haley.
21  I'm going to object to any sort of
22  talking through this, to the extent it's relating to
23  testimony.
24  Q.  Did you happen to see an investigative
25  file inventory sheet in this permanent retention or

Page 63

1  RD file?
2  A.  I did not.
3  Q.  Do you have an explanation for that?
4  A.  No.
5  Q.  But according to you, if I'm not
6  mistaken, when Halvorsen signed off on this on
7  August 27, 1990, he sent a copy of this
8  investigative file inventory sheet over to the
9  records division, which was then supposed to be
10  placed in the RD file and/or what the city calls the
11  permanent retention file?
12  A.  Correct.
13  Q.  Can you think of any explanation for
14  why this investigative file inventory sheet is not
15  reflected in the RD file that was provided to the
16  plaintiffs by the city?
17  A.  No.
18  Q.  All right.  Now, going back to that
19  second sheet we discussed, which is Bates-stamped
20  RFC-Maysonet 50640, which is part of Bruno-3, it
21  looks like there was additional investigative work
22  or reports that were placed into the investigative
23  file.
24      Would that be your best assessment of
25  what happened here?

Page 64

1  A.  Yes.
2  Q.  And then a copy of this additional
3  investigative file inventory sheet was sent in May
4  of 1992, to be placed in the permanent retention
5  file or RD file?
6  A.  Correct.
7  Q.  Did you see that second --
8  A.  No.
9  Q.  -- inventory sheet?  Wait for my
10  question, please.
11      Did you see the second investigative
12  file inventory sheet in the permanent retention or
13  the RD file?
14  A.  No.
15  Q.  Do you have any explanation for why the
16  second investigative file inventory sheet cannot be
17  found in the permanent retention file or the RD file
18  that we just previously looked at and which is
19  marked Bruno-4?
20  A.  No.
21  Q.  Why does it say "Case Report Unit,"
22  "Copy Sent to Case Report Unit"?  What's the case
23  report unit?
24      (Witness reviews.)
25  A.  That's part of the records division that

Maysonet v.
Guevara

Page 65

1    receives all of the case reports.
2    Q.   So there's a unit, that works as part
3    of the records division, that receives reports that
4    come into the records division by, I don't know, the
5    different areas of the detective division?  Is that
6    fair?
7    A.   Yes.
8    Q.   Where do these people work or where did
9    they work in 1990?  Did they work at the warehouse
10   or some other location?
11   A.   I believe they would have been at
12   headquarters.
13   Q.   You previously testified that, for
14   instance, the RD file would go to the records
15   division bureau, right?
16   A.   Yes.  Well, yes, if I can actually go back to
17   that?  It is the records division that creates the
18   records division file.  It is not the area.
19   Q.   Okay.  Well, that wasn't clear earlier.
20       So in a homicide investigation from May
21   of 1990, putting aside Maysonet's, but any homicide
22   investigation from 1990 out of Area Five, there is
23   typically a general offense case report that would
24   be the initiating document or one of the first
25   documents that's prepared in connection with the

Page 66

1    investigation, right?
2    A.   Yes.
3    Q.   There's an original of that report
4    that's first prepared, right?
5    A.   Correct.
6    Q.   And there are copies made of that
7    report, right?
8    A.   Yes.
9    Q.   Now, tell me all the places that those
10   copies would go, that you can think of, or might go.
11   A.   Copies would go to the area, and copies would
12   also go to the patrol district that created that
13   report, as well as to records division.
14   Q.   So the general offense case report, an
15   original is made and then it is submitted to a
16   supervisor?  Is that how it would typically work?
17   A.   Yes.
18   Q.   And would that be of the district or
19   the detective division?
20   A.   Of the district.
21   Q.   Okay.  Then once that occurred, there
22   were copies made, you said, and where would the
23   original go?
24   A.   The original would go to records.
25   Q.   Would it go to records immediately?

Page 67

1    A.   After approved in the district.
2    Q.   So as soon as it's approved, it would
3    go off to the -- the original would go off to the
4    records division, is that right?
5    A.   Yes, and it's probably a daily run.
6    Q.   So by "immediately," I mean, let's say,
7    promptly, within a day or so?
8    A.   Yes.
9    Q.   All right.  So there wasn't a file
10   being maintained that would go to the records
11   division all sort of at one time?  It was document
12   by document, is that right?
13   A.   Correct.
14   Q.   Then when it got to the records
15   division, the records division would do what, with
16   that general offense case report?
17   A.   They would create a permanent -- a records
18   division file with the originals, and then as far as
19   them making copies and distributing them, I'm not
20   sure exactly how that process worked.
21   Q.   Well, how did the area get a copy of
22   the general offense case report?
23   A.   They could have received copies from the
24   district as well, or from records.
25   Q.   Well, that wouldn't make much sense,

Page 68

1    would it, for the general offense case report in a
2    double homicide to be prepared, sent over to records
3    and then the detective division that's investigating
4    it has to get it back from the records division?
5    A.   (No response.)
6    Q.   Is that how it worked?
7    A.   I'm not sure.
8    Q.   Okay.  Let's talk about a supplemental
9    report prepared by a detective, you know, like the
10   first scene report.
11       Like if you look at entry number 7 on
12   this investigative file inventory log,
13   chronologically the first one, it says,
14   "Supplementary Report" at number 7.  It's entered
15   into the investigative file on May 25, 1990, right?
16   A.   Yes.
17   Q.   So on May 25th of 1990, it's entered
18   into the investigative file.  So we could assume
19   that it was prepared prior to May 25th of 1990,
20   right?
21   A.   Yes.
22   Q.   There would be nothing to enter if it
23   wasn't, right, presumably, correct?
24   A.   Correct.
25   Q.   All right.  There's an original of that

Maysonet v.
Guevara

1  supplementary report that is entered on May 25th of
2  1990, right?
3      MS. ROSEN: Can you repeat the
4  question?
5  Q.  There would be an original of that
6  supplementary report that was entered into the
7  investigative file on May 25th of 1990, right?
8      MS. ROSEN: Objection to form.
9  A.  Yes.
10 Q.  So that report would also be, upon
11 completion, submitted to a supervisor for approval,
12 correct?
13 A.  Correct.
14 Q.  Then it would be approved or not
15 approved, but assuming it's approved, where would
16 the original supplementary report go?
17     (Technical difficulties.)
18 Q.  Okay. I can't hear you. I don't know
19 why, but --
20     MS. ROSEN: He said, "To records."
21     MS. BONJEAN: Okay.
22 Q.  So it would go to records, and there
23 would be copies of that report made, right?
24 A.  Yes.
25 Q.  Where would the copies go?

1  A.  In the investigative file.
2  Q.  Anyplace else?
3  A.  I mean, they could -- a detective could
4  certainly make a copy for himself.
5  Q.  Right. And as the detective in this
6  case testified, that copies might be put on
7  clipboards in the lieutenant's office? That's
8  possible too, right?
9  A.  Yes.
10 Q.  There's nothing inconsistent or wrong
11 about having done that, right, from the police
12 department's perspective back in 1990?
13 A.  Correct.
14 Q.  So the investigative file, including --
15 well, strike that.
16     The investigative file inventory would
17 be actually logging copies of reports, not
18 originals, right?
19 A.  Correct.
20 Q.  Who was responsible, to the best of
21 your understanding, for making copies of original
22 reports that were approved in the course of a
23 homicide investigation?
24     (Technical difficulties.)
25 Q.  You keep cutting out.

1      MS. BONJEAN: Joyce, is he cutting out
2  for you, too?
3      THE COURT REPORTER: Yes. His lips
4  are moving, that's all I can tell.
5      (Off the record.)
6  Q.  Now, the GPRs that are identified on
7  the investigative file inventory log at Exhibit 1
8  were placed into the investigative file on May 25th
9  of 1990, right?
10 A.  Yes.
11 Q.  You have no reason to doubt that,
12 correct?
13 A.  Correct.
14 Q.  They would have to be GPRs that were
15 prepared prior to May 25th of 1990, right?
16 A.  Correct.
17 Q.  And those GPRs are submitted for
18 approval by supervisors?
19 A.  Yes, for review by supervisors.
20 Q.  Okay. But if I remember your testimony
21 from earlier, they would not go to the records
22 division, to be placed in the permanent retention
23 file, right?
24 A.  Correct.
25 Q.  Or the RD file, as we've called it,

1  right?
2  A.  Yes.
3  Q.  Can we agree that the permanent
4  retention file and the RD file are synonymous?
5  A.  Yes.
6  Q.  So where would the GPRs go? What file
7  would they be placed in, if the originals don't need
8  to go to the permanent retention file? Where would
9  the originals be placed?
10 A.  The originals would go in the investigative
11 file.
12 Q.  So an investigative file should contain
13 original GPRs, right?
14 A.  Yes.
15 Q.  Whereas, supplementary reports would be
16 copies, is that right?
17 A.  Yes.
18 Q.  All right. The investigative file that
19 was developed during the course of a homicide
20 investigation back in May of 1990, that was a file
21 that was an ongoing, active file, meaning there were
22 documents -- until a case is closed, there were
23 documents going into the file, right, on a regular
24 basis?
25 A.  Yes.

Page 73

1 Q. While a case was still open, where was
2 the investigative file maintained at Area Five?
3 A. It would be maintained in their homicide file
4 room.
5 Q. Let's talk about that, if we can. Back
6 in May of 1990, there was a homicide file room?
7 A. All the homicide files would be kept in one
8 location.
9 Q. Where was that location back in 1990,
10 May of 1990, at Area Five?
11 A. I don't know.
12 Q. Would you be able to find something
13 like that out?
14 A. I don't know. You're talking about what room
15 exactly, within Area Five?
16 Q. Yeah, what room? Where was it?
17 A. Yeah, I don't know if I could find that out.
18 Q. Would speaking to an Area Five
19 detective or the file coordinator at that time help
20 you, per chance?
21 A. It would. Do you know who that was?
22 Q. No. I don't work for the City of
23 Chicago, and I'm also not a designee for the City of
24 Chicago but you are.
25 So I would ask the question to you, do

Page 74

1 you know who that was?
2 A. I don't.
3 Q. If you wanted to find out who it was,
4 what would be the process for trying to find out who
5 was the file coordinator or whoever the file person
6 was at Area Five?
7 MS. ROSEN: Are you asking him how he
8 would go about finding that out?
9 MS. BONJEAN: Yes.
10 MS. ROSEN: I'm going to object as
11 beyond the 30(b)(6) notice.
12 MS. BONJEAN: Okay. Are instructing
13 him not to answer?
14 MS. ROSEN: No. He can answer, if he
15 knows.
16 If you want -- this is exactly why I
17 wanted to have a conversation with you, but,
18 regardless, you can ask him if he can think of a way
19 to find the answer to your question.
20 MS. BONJEAN: Okay. Our conversation
21 would not have resolved these issues, because you
22 already know it's definitely within the scope of
23 what's been notified.
24 Q. But go on, you can answer, if you know.
25 A. I would try and get in touch with somebody

Page 75

1 who worked in Area Five at that time.
2 Q. So it's fair to say that someone who
3 worked in Area Five in 1990 would be better equipped
4 to answer that question than you?
5 MS. ROSEN: Object to the form of the
6 question.
7 A. In terms of what room the files were stored
8 in, yes.
9 Q. Yes. So you don't know if it was on
10 the second floor, the first floor, the basement? If
11 it was set aside, whether it was secure, how it was
12 set up? If there were file cabinets, if it was
13 thrown in a pile? You don't know any of that
14 information because you don't have any idea where
15 the file room was, right?
16 A. Correct.
17 MS. ROSEN: Object to form.
18 Q. So it's possible it was in the
19 basement, in some file cabinets, right?
20 MS. ROSEN: Objection to form.
21 A. It would have been within the detective
22 division on the second floor.
23 Q. I thought you didn't know. So you're
24 just assuming it?
25 A. Well, the detective division maintains the

Page 76

1 second floor of Grand and Central. All the
2 detective operations are on the second floor.
3 Q. Okay. So your file room now is on the
4 second floor of the detective division, is that your
5 testimony?
6 A. I believe that's where it would be.
7 Q. Are you assuming that or are you --
8 MS. ROSEN: I'm going to object to the
9 form of the prior question. Go ahead.
10 Q. Are you assuming the file room was in
11 the detective division on the second floor, back in
12 May of 1990?
13 A. Yes, all operations were on the second floor
14 in the detective division, and the files would be
15 within that area.
16 Q. But you don't know that to be the case?
17 You're just assuming that the file room would be
18 where the operations are?
19 A. Correct.
20 Q. Am I getting that right?
21 A. Correct.
22 Q. How was it set up? Was it secure,
23 meaning did somebody have to access it with a key?
24 A. I don't know.
25 Q. Could anybody go in there and grab the

Page 77

1  file?
2      MS. ROSEN: Object to the form.
3  A.  At that time, I don't know.
4  Q.  Was there someone who maintained the
5  room, in the sense of someone who worked in the file
6  room and ensured the security of those files?
7  A.  I don't know.  I don't know.
8      MS. ROSEN: Object to the form.
9  Q.  Who had access to the file room that
10  contained the investigative files for homicide
11  investigations at Area Five in 1990?
12  A.  I don't know.
13  Q.  How were those files organized, to the
14  best of your understanding?  Was it by RD number or
15  some other number?
16  A.  By RD number, they would be.
17  Q.  Okay.  Were they in file cabinets?
18  A.  I would assume, yes, but I don't know that.
19  Q.  What was the process for reports being
20  placed into the investigative file?  Who was
21  responsible for doing that, as an example?
22  A.  I don't know.
23  Q.  Did the investigative files have
24  control cards in them?
25  A.  They do now.  In 1990, I don't know.

Page 78

1  Q.  What is a control card?
2  A.  It's a card that when you take a file out to
3  look at it, you sign the control card, indicating
4  that you are taking that file out.
5  Q.  Have you seen any control cards in
6  connection with Mr. Maysonet's investigative file?
7  A.  No.
8  Q.  And as you sit here today, do you know
9  whether control cards existed in 1990, in homicide
10  investigative files?
11  A.  I don't know.
12      MS. BONJEAN: Eileen, are you passing
13  him notes?
14      MS. ROSEN: No.  I'm looking at a
15  directive.  Passing him notes?
16      MS. BONJEAN: Are you pointing out
17  directives to this --
18      MS. ROSEN: I am reading a directive.
19  A.  She is not.
20      MS. BONJEAN: Okay.  It sure looked
21  like it, to me, but I'll take you at your word.
22  Q.  Was there a policy at the time, whether
23  written order or directive of any type, that
24  indicated how much time was permitted to elapse
25  before a supplementary report was placed into the

Page 79

1  investigative file?
2  A.  Can I take a look at that directive?
3  Q.  Which directive?  If you're going to
4  look at documents, at least do me the courtesy of
5  telling me what documents you're looking at.
6  A.  Sure.  I'm looking at the directive on
7  investigative files, Detective Division Special
8  Order 86-3.
9  Q.  Okay, take a look at it.
10      (Witness reviews.)
11  Q.  Have you had a chance to look at it?
12  A.  I'm still looking at it.
13      (Witness reviews.)
14  Q.  Did you come up with anything?
15  A.  I don't see a time frame.
16  Q.  What's the effective date of the policy
17  you're looking at?
18  A.  29 May '86.
19  Q.  Okay.  I just want to make sure we're
20  looking at the same thing.
21      So you didn't find the answer to my
22  question in the special order, Investigative File
23  Special Order 86-3, right?
24  A.  Correct.
25  Q.  Can you think of any other written

Page 80

1  policy or directive, order, etcetera, that provided
2  a guideline to officers about the amount of time
3  that may elapse before a supplementary report is
4  placed into the investigative file?
5  A.  Can you repeat that?
6  Q.  Can you think of any other policy,
7  practice, order -- well, strike that.  Let me start
8  over.
9      Can you think of any other written
10  directive or order that reflects when or how much
11  time may elapse before a detective is required to
12  place a supplementary report into the investigative
13  file?
14  A.  No.
15  Q.  So at least as far as written policies
16  go, a detective could prepare a supplementary report
17  and hold onto it for a week, for instance, before he
18  submits it for approval and then ultimately into the
19  investigative file, is that right?
20  A.  Yes.
21  Q.  Can you think of any policy, off the
22  top of your head or based on your review of the
23  materials, that governs how long or how much time
24  may elapse between when an officer prepares a
25  supplementary report and must submit it to his

Page 81

1  supervising sergeant?
2  A.  Can you please repeat that?
3  Q.  Yes.  Is there a written directive or
4  policy or order, that you're aware of, that dictates
5  how much time may elapse between the authoring or
6  writing of a supplementary report and its submission
7  to a supervising sergeant for approval?
8  A.  No.
9  Q.  All right.  On page 2 of the
10  investigative file inventory that we were looking
11  at, that's been prepared in connection with the
12  homicide, the Wiley brothers' homicide file, if you
13  could look at that real quick?
14      (Witness reviews.)
15  Q.  Other than the GPRs that were placed
16  into the investigative file on May 25, 1990, do you
17  see any other investigative files that were placed
18  into this investigative file prior to August 27th of
19  1990?
20      MS. ROSEN: You said "investigative
21  files."  Did you mean GPRs?
22      MS. BONJEAN: Yes.  Let me start over
23  if I screwed that up.
24  Q.  Apart from the GPRs that were placed
25  into the investigative file on May 25th of 1990 --

Page 82

1  do you see that?
2  A.  Exhibit 1, GPRs, 25 May '90.  Yes.
3  Q.  So putting aside those GPRs, according
4  to this investigative file inventory, can you see
5  whether or not there were any other GPRs placed in
6  this investigative file prior to August 27th of
7  1990?
8      (Witness reviews.)
9  A.  No.
10  Q.  Now, this investigative file that we're
11  looking at, in part at least, would you say this is
12  the investigative file for the Wiley brothers'
13  homicide investigation?
14  A.  Yes.
15  Q.  And can you tell me how many documents
16  are contained therein?
17      MS. ROSEN: Do you want him to count?
18  Q.  Well, I guess I want to figure out --
19  the city has produced a file in two parts.  There's
20  a PDF of 236 pages, which is what we're looking at
21  right now, which they've labeled part 1, and then
22  there was a second part.  I'm trying to understand
23  if that's the complete investigative file, if the
24  whole thing was the investigative file.
25      What's your understanding of the

Page 83

1  starting page of the investigative file and the
2  ending page of the investigative file?
3      MS. ROSEN: At what point in time?
4      MS. BONJEAN: Presently.
5      MS. ROSEN: Okay.
6  A.  Yeah, including the --
7  Q.  Let me ask the question this way:  What
8  constitutes the investigative file, as of today, for
9  the Wiley brothers' murder investigation?
10  A.  According to the investigative file
11  inventory, the last entry was 1 May of '92.
12  Q.  Okay.  That's not my question.  That's
13  not my question.
14      Let me ask it this way:  Are you saying
15  that the investigative file only consists of the
16  documents on the investigative file inventory log?
17  A.  I'm saying that I believe this is the
18  investigative file, that I am holding.
19      MS. ROSEN: Give her the Bates range.
20  So it starts here.
21      THE WITNESS: Oh, these are, too?
22      MS. ROSEN: Uh-hum.
23      THE WITNESS: Okay.  And this is the
24  complete copy?
25  Q.  Yeah, I don't think you can really ask

Page 84

1  the lawyer.
2      You're supposed to be the designee of
3  the city.  You're the one that binds the city, on
4  your testimony.  So, I mean, if Eileen wants to be
5  the designee, I would be happy to take her
6  deposition?
7      MS. ROSEN: I am simply showing him
8  the document that you have marked and giving you a
9  way, short of him counting pages, to --
10      MS. BONJEAN: Listen, he doesn't need
11  to count the pages.  They're marked.  So he can --
12      MS. ROSEN: So I'm just pointing him
13  to the Bates numbers.
14  A.  She was showing me where they were marked.
15  Q.  I just asked you, is this the complete
16  file?
17      MS. BONJEAN: I just asked the
18  question, because he does not seem to know.  So I'm
19  asking him again.
20      MS. ROSEN: He did answer the
21  question.  He said, "These documents in my hand."
22  You are not in the room.
23      I am giving him the ability to identify
24  the documents that are in his hand.
25      MS. BONJEAN: Okay.

Maysonet v.
Guevara

---

1  Q.  So what constitutes the Wiley brothers'
2  homicide investigative file, as we sit here today?
3  A.  I'm looking at 050636 to 050860.
4  Q.  050636 to 05 what?
5  A.  050860.
6  Q.  860.  All right, that's helpful.
7      Just so the record is clear, you have
8  identified the Bates stamp range of 050636 to 050860
9  as the investigative file of the homicide
10  investigation pertaining to the Wiley brothers,
11  right?
12  A.  Right.
13  Q.  Where is this investigative file
14  presently located?
15  A.  At the records division warehouse.
16  Q.  And how is it kept, meaning how is it
17  organized there?
18  A.  They are organized by RD numbers, by year.
19  Q.  Not by area?
20  A.  No.
21  Q.  Okay.  So all homicide investigative
22  files are organized, in the records division
23  warehouse, by RD number within a particular year.
24  Is that correct?
25  A.  Correct.

---

1  Q.  If I wanted to go find a particular
2  homicide investigative file and I had an RD number,
3  I would have to first figure out what year the
4  homicide was investigated or the RD number was
5  generated, right?
6  A.  Correct.
7  Q.  Is there like a chart somewhere that
8  tells you that like something that begins with the
9  letter "N" will be 1990 or something?
10  A.  Yes.
11  Q.  What's that document called?
12  A.  I don't know the name of it.
13  Q.  But in any event, there's a way to
14  figure out, from an RD number itself, what year the
15  RD number was first generated, and then you would go
16  to that year and it would be in numerical order?
17  A.  Yes.
18  Q.  Okay.  Starting at RFC-Maysonet 050862,
19  which would be the document that comes after what
20  you have designated as the investigative file, --
21      MS. ROSEN: Hold on one second.  So
22  that's the second part of it, right?
23      MS. BONJEAN: I guess so, yeah.
24      MS. ROSEN: Or the second PDF, is what
25  I'm saying.

---

1      MS. BONJEAN: Correct.  I don't know
2  how you guys labeled things, but, yes, it was the
3  second PDF.
4      MS. ROSEN: Can you give me the first
5  page of that Bates range again?
6      MS. BONJEAN: Yes.  It's 050862, and I
7  think it goes to 051126.
8      MS. ROSEN: Sorry.  Give me one
9  second.  I'm sorry.  One more time on the Bates
10  number?
11      THE WITNESS: 050862.
12      MS. BONJEAN: It's 050862.
13      MS. ROSEN: Okay.  I just needed the
14  first one.
15      MS. BONJEAN: Let me know when you're
16  there.
17      MS. ROSEN: So 050862 to 51126, right?
18  That's what you want him to have?
19      MS. BONJEAN: Yes.
20  Q.  Are you looking at --
21      MS. BONJEAN: We're going to mark this
22  separately as Bruno-5.
23      (Exhibit Bruno-5, a 265-page copy of a
24  collection of documents, Bates stamp RFC-Maysonet
25  050862 through 051226, is marked for

---

1  identification.)
2  Q.  Mr. Bruno, do you see the first page of
3  what we've marked as Bruno-5, which is Bates-stamped
4  as RFC-Maysonet 050862?  Do you see what appears to
5  be another type of file folder or file?
6  A.  Yes.
7  Q.  It appears to be like the outer cover
8  of a file?
9  A.  Yes.
10  Q.  And it is written, in red pen, "Wiley
11  Brothers," and then it also has the RD number
12  written there?
13  A.  Yes.
14  Q.  Then it appears to contain -- well, let
15  me ask you this:  The last page appears to be sort
16  of the other side of the file, and the Bates stamp
17  is 51126?
18  A.  Yes.
19  Q.  I'm not great at math, but it appears
20  to be about 444 pages of documents that are within
21  this file, right?
22  A.  Yes.
23  Q.  All right.  What would you call this
24  file?
25  A.  This is -- I think it's a lot of duplicates,

---

Page 89

1  but I would need to take a good look through it.
2  Q.  What do you mean, "duplicates"?
3    Duplicates of what?
4      (Witness reviews.)
5  A.  Can I take a break and look through this?
6  Q.  No.  I want to know what it is before
7    you take a break.
8  A.  Okay, then bear with me.
9  Q.  Take your time.  We're staying on the
10   record, though.
11     (Witness reviews.)
12     THE WITNESS: Do you have number 2?  I
13   think it's up here.  I don't know.
14     MS. ROSEN: I've handed him the prior
15   exhibit as well.
16     (Witness reviews.)
17 A.  Okay.  So this looks like a copy of this
18   file.
19 Q.  So it's your belief that this is just
20   another copy of the investigative file?
21 A.  It looks like it has additional court
22   documents as well.
23 Q.  Okay.  So what would you call this
24   file?
25 A.  A copy of the file.

Page 90

1  Q.  So it's your testimony that
2    RFC-Maysonet 050862 through 051126 is a copy of the
3    investigative file that's been identified as
4    RFC-Maysonet 050638 through 050860?  Is that
5    correct?
6  A.  It appears that way, yes.
7  Q.  Is it your testimony that it is an
8    identical copy?
9      (Technical difficulties.)
10 Q.  I'm sorry?
11 A.  I would need to look through each of them to
12   determine if it's identical.
13 Q.  Why would be there two investigative
14   files?
15     MS. ROSEN: Object to form.
16 A.  There should be one investigative file.
17 Q.  Okay.  Why is there a duplicate
18   investigative file, sir?
19 A.  I don't know.
20 Q.  Does every homicide investigative file
21   have a duplicate investigative file?
22 A.  No.
23 Q.  Do you know if there's a duplicate
24   investigative file in this case?
25 A.  I don't know.

Page 91

1  Q.  Do you know whether there's actually a
2    duplicative file or are you just kind of assuming
3    that because it looks like some of the documents in
4    Bruno-3 are the same as what's in Bruno-4?
5  A.  Yeah, it looks like a lot of the same
6    documents.
7  Q.  Okay.  So based on your cursory review
8    of --
9      MS. BONJEAN: Is it Bruno-4 that we
10   marked this?  I just want to make sure we have that
11   right.
12     MS. ROSEN: I think it's Bruno-5.
13     MS. COOLBAUGH: Yes, it's Bruno-5.
14     MS. BONJEAN: Okay.
15 Q.  So based on your review of Bruno-4,
16   which is RFC-Maysonet 050638 through 050860, which
17   you previously identified as the investigative file,
18   your comparison between that and then what we've
19   marked as Bruno-5, your belief is that because there
20   are some of the same reports in 4 as appear in 5,
21   that it's just some type of duplicative
22   investigative file?  Do I have that right?
23     MS. ROSEN: Object to form.  He didn't
24   say that he compared them.
25     MS. BONJEAN: Okay.  Well, please quit

Page 92

1    coaching.
2  Q.  But you said, sir, it's a duplicate
3    file, did you not?
4  A.  Yeah, it looks like a copy of the
5    investigative files.
6  Q.  Why do you reach that conclusion that
7    you believe it's a duplicate investigative file?
8  A.  Because at first glance, it's a lot of the --
9    it's the same reports.
10 Q.  Well, let's just look at the first page
11   of it, 050864.  All right?  You see those
12   handwritten notes there?
13 A.  Yes.
14 Q.  Can you find that document in the
15   actual investigative file?
16     (Witness reviews.)
17 A.  No.
18 Q.  So at least one document is in this
19   other file that's not in the investigative file,
20   right?
21 A.  Correct.
22     MS. ROSEN: Jennifer, can we take a
23   break?
24     MS. BONJEAN: Yes, in a minute.  I've
25   got a couple questions along this line.

Maysonet v.
Guevara

Page 93

1    MS. ROSEN: Okay.
2 Q.  Now, in the document that we've marked
3 as Bruno-4, which you have identified as the
4 investigative file, I want to draw your attention --
5 I mean, just the mere fact that Bruno-4 is like 236
6 pages while Bruno-5 is 444 pages, can we agree that
7 it's probably not an exact duplicate?
8 A.  Yes.
9 Q.  And where was this other file, that
10 we've marked as Bruno-5, or where is it located
11 presently?
12 A.  I'm not sure.
13 Q.  Do you know when it came into
14 existence?
15 A.  No.
16 Q.  Do you know where it was maintained
17 prior to being produced to us in 2024?
18 A.  No.
19 Q.  Do you know where it was maintained --
20 well, strike that.
21    MS. BONJEAN: One other question, and
22 then we can take a break.
23 Q.  We previously looked at what was marked
24 as Bruno-1.  Do you remember that?
25    MS. ROSEN: The 30(b)(6) notice?

Page 94

1    MS. BONJEAN: Oh, no.  I guess it was
2 Bruno-2.  It was RFC-Maysonet 1 through 66.
3    MS. ROSEN: Yep.
4 Q.  As I recall, Mr. Bruno, you said this
5 was a collection of reports that were part of the
6 investigative file, right?
7 A.  Right.
8 Q.  Okay.  We've now looked at Bruno-4 and
9 5.  Where is Bruno-2 in there?
10    MS. ROSEN: I'm sorry.  Objection;
11 form.  What do you mean, where is it in there?
12    MS. BONJEAN: Okay.
13 Q.  So Bruno-2, we looked at it.  We've
14 described it, right?
15    MS. ROSEN: Yeah.
16    MS. BONJEAN: It contains this 190.
17 It has --
18    MS. ROSEN: Right, I understand what
19 you're referring to.
20    MS. BONJEAN: He said it was a
21 collection of documents that were part of the
22 investigative file and that we've now looked at the
23 investigative file.
24    MS. ROSEN: Oh.
25 Q.  Where in the investigative file can we

Page 95

1 find this collection of documents that we've
2 previously marked as Bruno-2?
3    MS. ROSEN: Objection; form.
4 A.  Where within the investigative file?
5 Q.  Yeah.  You said it was a collection of
6 documents within the investigative file.  So I'm
7 asking you to please tell me where in Bruno-4, which
8 you've identified as the investigative file, we can
9 find sort of this subfile or other file?
10 A.  I mean, it's the same reports in Bruno-2 that
11 are in Bruno-4.
12 Q.  I understand you're saying they're the
13 same reports, and that may be true that some are the
14 same reports.
15    But there's an actual file.  We looked
16 at it, the front page, right?
17 A.  Uh-hum.
18 Q.  This front page of this file, right?
19 A.  Right.
20 Q.  Okay.  That's not in Bruno-4, is it?
21 A.  No.
22 Q.  So it wasn't contained within the
23 investigative file?  It's a different file, right?
24 A.  Right.
25    MS. BONJEAN: Did you want to take a

Page 96

1 break?
2    MS. ROSEN: Yes, please.
3    MS. BONJEAN: All right.
4    (Recess:  3:44 p.m. to 3:55 p.m.)
5    MS. BONJEAN: Let's go back on the
6 record.
7 Q.  Mr. Bruno, when we left off, I was
8 asking a number of questions about this file that we
9 had marked at Bruno-5.
10    MS. ROSEN: Oh, I'm sorry.  I don't
11 mean to -- I meant to tell you, I have one of our
12 new attorneys is in here, observing.  She doesn't
13 have a screen.  She's just watching.
14    (Off the record.)
15 Q.  Going back to what we've marked as
16 Bruno-5, Mr. Bruno, which I think you previously
17 said was some type of duplicate file, but I think
18 you also conceded that there are materials in 5 that
19 are not in 4?  Would you agree that there are
20 materials in 4, Bruno-4, that are not in Bruno-5?
21 A.  Materials in 4 that are not in 5?  I don't
22 know that I'm ready to agree to that.
23 Q.  Okay.  Well, how about we go through
24 it.
25    So looking at the actual investigative

Page 97

1  file, which we've marked as -- well, according to
2  you, the actual investigative file, which was marked
3  as Bruno-4. Okay?
4  A. Yes.
5  Q. That's the one with the investigative
6  file inventory sheet or sheets.
7      Are those investigative file inventory
8  sheets in this collection of documents that has been
9  marked as Bruno-5?
10 A. No.
11 Q. Speaking of, in the investigative file
12 that we've marked as Bruno-4, if you could please
13 take a look at RFC-Maysonet 050648, that page?
14     (Witness reviews.)
15 A. Okay. I'm looking at a subpoena.
16 Q. Do you know why there's a subpoena that
17 says "In the Interest of Brian Henderson, a Minor,"
18 in the investigative file for the Wiley brothers'
19 homicide investigation?
20 A. No.
21 Q. Also, written on the back of the page
22 at RFC-Maysonet 050 -- well, I'm sorry. Let me
23 start that over.
24     At Bates stamp RFC-Maysonet 050647,
25 there's a number KLZ 823, and then it says "81" and

Page 98

1  "Mario Ramirez"?
2  A. Yes.
3  Q. Can you tell me what that means?
4  A. I don't know.
5  Q. Do you know why there would be the
6  year, a name and what appears to be maybe a license
7  plate, or some other number, related to something on
8  a random piece of paper or on the back of a subpoena
9  in this investigative file?
10 A. No. It's a subpoena issued from 1995, with
11 the handwriting on the back. I don't know why.
12 Q. Well, do we know it's on the back of
13 the subpoena, or is it just a different piece of
14 paper?
15 A. In my copy, it's on the back of this piece of
16 paper. I don't know.
17 Q. Right. Is your copy double-sided or is
18 it single-sided?
19 A. Double-sided. Double-sided.
20 Q. So you don't know if it's -- so because
21 it's double-sided, you wouldn't necessarily know if
22 it's on the back of the subpoena or its own piece of
23 paper, right?
24 A. Correct.
25 Q. In any event, do you have any idea why

Page 99

1  that's written?
2  A. No.
3  Q. Would you agree that consistent with
4  the policies of the Chicago Police Department, if
5  this was an individual who had some relevance to the
6  Wiley brothers' homicide investigation, that this
7  should probably be written on a GPR or something?
8  A. I would agree.
9  Q. At 050649 and 050650, we have
10 additional subpoenas that are all for Detective
11 Guevara but are not correlated to this case, right?
12 So there's "In the Interest of Brian Henderson,"
13 "The People of the State v. Michael Paige." At
14 050652, there's "People of the State of Illinois v.
15 Henry Rodriguez, Jesus Cuevas and Rosario Cuevas."
16     Any idea why those are contained in the
17 investigative file for the Wiley brothers' homicide
18 investigation?
19 A. No.
20 Q. Can you tell me what is 050654, what
21 that envelope is?
22     (Witness reviews.)
23 A. This looks like the miscellaneous document
24 envelope that would be in an investigative file.
25 Q. It appears to have things inside of it,

Page 100

1  doesn't it? You see, in the little holes, it looks
2  like there's something underneath that?
3  A. Yes, I see that.
4  Q. Do you know why that is, what that
5  means?
6  A. I don't know.
7  Q. Okay. And you don't know if anyone
8  opened up this envelope and copied its contents,
9  correct?
10     MS. ROSEN: Jennifer, I can represent
11 to you that we did open up the envelope and
12 photocopied the contents before we produced it to
13 you, right? So my office went and physically viewed
14 the original file.
15     MS. BONJEAN: All right.
16     MS. ROSEN: So we opened it up and
17 photocopied the contents.
18     MS. BONJEAN: Did it have the photos
19 in it, that follow?
20     MS. ROSEN: Yes.
21     MS. BONJEAN: All right.
22 Q. So, Mr. Bruno, at RFC-Maysonet 050656
23 through -- we'll just go all the way to 050663. Do
24 you see there are pages of some Polaroid photos as
25 well as what appear to be personal photos? Do you

Page 101

1  see that?
2  A.  Yes.
3  Q.  Would you call those Candido photos?
4     MS. ROSEN: What is the word?
5  A.  I don't know that word.
6  Q.  Maybe that's just a Joe Miedzianowski
7     word, like Candido or Candida photos?
8  A.  I'm not familiar with that.
9  Q.  All right.
10    MS. ROSEN: Can you spell that?
11    MS. BONJEAN: Yeah, it's like
12    "candid," but it's photos that are not
13    police-generated but like are candid photos obtained
14    from suspects' homes or -- I think they're called
15    Candida or Candido.
16 Q.  But that's not a term that you're
17    familiar with, right, Mr. Bruno?
18 A.  Correct.
19 Q.  Okay.  Then on page 050662, we have
20    some State of Illinois -- looks like Illinois
21    Department of Public Aid identification cards?
22 A.  Correct.
23 Q.  Are those photographs contained in this
24    other file, that we've marked as Bruno-5?
25 A.  No.

Page 102

1  Q.  So that's an example of materials that
2  are in the investigative file that are not in this
3  other file that we've marked as Bruno-5, right?
4  A.  Yes.
5  Q.  I provided some examples.  I'm sure I
6  could provide more examples.
7     But I guess more to the point, do you
8  have an explanation for why there are these two
9  files that are not actual duplicates, one with the
10 investigative file having some documents that the
11 other file doesn't and vice versa?
12 A.  Yeah, I don't know why.
13 Q.  Then what we looked at earlier as
14 Bruno-2, which was this other file, that had the big
15 190 on it, is it fair to say that you didn't see any
16 photographs in that file either?  Right?
17 A.  Correct.
18 Q.  And are you able to explain why that
19 file doesn't have photographs and materials that are
20 in the investigative file?
21 A.  I don't know.
22 Q.  I don't know if I asked you this.  I
23 think I did, and I'm sort of blanking.  What we've
24 marked as Bruno-5, which is that file that has the
25 red handwriting and that starts with Bates stamp

Page 103

1  RFC-Maysonet 050862, where can we find that file
2  today, do you know?
3  A.  I believe these are all in our records
4  division today.
5  Q.  Are they all in the same place in
6  records division?
7  A.  Yes.
8  Q.  But you can't tell us if they've always
9  been in the records division, right?
10 A.  I cannot.
11 Q.  You don't know the provenance of any of
12 these files that we've looked at, right?
13 A.  No.
14 Q.  And it's fair to say you can't, then,
15 tell us sort of the chain of custody of any one of
16 these files, right?
17 A.  Correct.
18 Q.  Do you know who has had access to any
19 one of these files?  I'm assuming no, since you
20 don't know where they've been.
21 A.  No.
22 Q.  Do you know whether, generally
23 speaking, Area Five homicide investigative files
24 have always been maintained, at least since 1990, in
25 the records division?

Page 104

1     MS. ROSEN: The records division
2  warehouse, you mean?
3     MS. BONJEAN: Yes.
4  Q.  I'm sorry, in the records division
5  warehouse.
6  A.  Except for a time frame in 2012, '13 -- or
7  2013, '14.  At one point, they were moved to
8  headquarters at 35th and Michigan, closed homicide
9  files.
10 Q.  For the entire department or just Area
11 Five?
12 A.  The entire department.
13 Q.  Okay.  So the best of your
14 understanding is, between 1990, I guess, -- well,
15 strike that.
16    Let's just start with investigative
17 files.  Between 1990 and 2012, investigative files
18 were purportedly maintained in the records division
19 warehouse, right?
20 A.  Yes.  They were in the area until the final
21 court disposition and then to be shipped to the
22 warehouse for storage.
23 Q.  Right.  So when you say "the area," you
24 mean the investigative file was maintained at
25 whatever violent crimes area the case arose from,

Maysonet v.
Guevara

Page 105

1  until the case was disposed of in the court system,
2  and then it was moved to the records division
3  warehouse?  At least that was the process until
4  2012, is that right?
5  A.  Yes.
6  Q.  All right.  As I recall, just as a
7  point of comparison, the RD file or the permanent
8  retention file was also maintained at the records
9  division until, I think you said, you went to the
10  CHRIS system in the late '90s, but that was created
11  in the records division and then maintained there as
12  well, right?
13  A.  Yes.
14  Q.  Before a case was disposed of through
15  the criminal justice process, where was it
16  maintained in the area, to the best of your
17  knowledge, -- and we're talking about Area Five --
18  after it was closed?
19  A.  It would be stored with all of the homicide
20  files, all kept in one location.
21  Q.  Remember earlier, we talked about --
22  and you really didn't have any knowledge, but you
23  said there were investigative files that you thought
24  were maintained in the operations area of Area Five,
25  which you thought would be on the second floor, but

Page 106

1  you didn't really have any clear understanding of
2  what that looked like, right?
3  A.  Correct.
4  Q.  Is it your testimony that you believe
5  that those files were maintained in that same
6  location until resolution in the criminal justice
7  process?
8  A.  Yes.
9  Q.  They didn't go to the basement at any
10  point, as far as you know?
11  A.  As far as I know, no.
12  (Ms. Carney enters the Zoom meeting.)
13  Q.  So open files and closed files would be
14  in the same location at Area Five before they went
15  off to the records division warehouse, is that
16  right?
17  A.  Yes.
18  Q.  Were they organized differently or were
19  they just organized by RD number?
20  A.  By RD number.
21  Q.  So you could have an open investigation
22  with an RD number in this records file area, at the
23  area, in the same file filed amongst closed files
24  that have not been disposed of in the criminal
25  justice process, right?

Page 107

1  A.  Yes.
2  Q.  I'd like you to look at what you've
3  identified as the investigative file, that we've
4  marked as Bruno-4.  Now, some of these documents
5  appear to have two-hole punches at the top of them.
6  Do you see that?
7  A.  Yes.
8  Q.  Okay, although not all of them.
9  Now, I assume the photographs came out
10  of an envelope, so we wouldn't expect to see those
11  with a two-hole punch, right?
12  A.  Correct.
13  Q.  Another looks to be copies of evidence,
14  right?
15  A.  Can you repeat that?
16  Q.  Yeah.  Also, again, I'm making
17  assumptions here, but, for instance, there's these
18  ID cards as well as what appears to be a check of
19  some type and like a receipt.
20  These don't have two-hole punches, and
21  perhaps they were in that envelope that contained
22  photos and other types of, I guess, evidence, right?
23  A.  Yes.
24  Q.  But starting at 050672 through 050674,
25  it's pretty faint, but it looks like there are

Page 108

1  double holes.  There are residual marks from a
2  double-hole punch at the top.  Do you see that?
3  A.  I mean, I see the two-hole punch at the top.
4  Q.  Yeah, that's what I'm talking about.
5  A.  Yeah.
6  Q.  Were investigative files prepared in
7  that manner, where they had like a double-hole punch
8  and you could review them sort of by -- they could
9  be reviewed by -- they were assembled at the top and
10  you could flip through them, essentially?
11  A.  Correct.
12  Q.  Then if we look at Bruno-5, it's a
13  little different.  If you could -- first of all,
14  just throughout Bruno-5, there are these additional
15  folders.
16  Like, for instance, if you're looking
17  at RFC-Maysonet 050868, it's a file that says "Case
18  & Supp's."  Do you see that?
19  A.  Yes.
20  Q.  Have you ever seen this type of file
21  before?
22  A.  Yes.
23  Q.  What is it?  What's it used for?  What
24  is it?
25  A.  It's files used to organize the initial file.

Page 109

1  Q.  Okay.  But you would agree that those
2  files are not present in the actual investigative
3  file that is marked as Bruno-4, right?
4  A.  Correct.
5  Q.  Do you know why they appear in this
6  other file, that we don't have a name for but we've
7  marked as Bruno-5?
8  A.  I don't know.
9  Q.  Now, there are also two-hole punches
10  kind of at the top there, do you see that?  On some
11  of the documents, anyway.
12  A.  Yes.
13  Q.  Then going back to Bruno-2, which is
14  what's been Bates-stamped RFC-1 through 66 and has
15  the big 190 on the top, that does not have any
16  two-hole punches at the top of them, or at least it
17  doesn't appear to, does it?
18  A.  It does not appear to.
19  Q.  Okay.  So do you have any idea where
20  the file that is marked RFC-Maysonet 1 through 66 --
21  well, first of all, when it was created?
22  A.  No, I don't know.
23  Q.  And I think you already said this, but
24  you don't know the provenance of this particular set
25  of materials either, right?

Page 110

1  A.  No.
2  Q.  You said you don't believe it is,
3  today, at the records division warehouse, right, or
4  you don't know?
5  A.  Exhibit 2?  I don't believe so.
6  Q.  Where is it presently?
7  A.  I don't know.
8  Q.  So you don't know where the original is
9  of Exhibit 2, or Bruno-2, right?
10  A.  I don't know.
11  Q.  Now, I'd like you to look at Bruno-5
12  again, if you could.
13  A.  Okay.
14  Q.  I'm going to have you look -- hold on.
15  Let me make sure.
16  Well, we looked at this first document
17  in here, that's marked 050864, that has some
18  handwritten notes on it.  Do you see that?
19  A.  Yes.
20  Q.  Okay.  Would you agree that if these
21  notes had some relevance to the investigation of the
22  Wiley brothers at any point, it's something that
23  should be written on a GPR?
24  MS. ROSEN: Object to the form.
25  A.  It doesn't have to be written on a GPR.

Page 111

1  Q.  You mean pursuant to Chicago Police
2  Department policy?
3  A.  You can still take notes on other paper and
4  include them in the file.
5  Q.  And, again, is that pursuant to the
6  Chicago Police Department policy?
7  A.  That all notes must be taken on GPR?
8  Q.  If a police officer chooses to take
9  handwritten notes, they must be on a GPR Chicago
10  Police Department-issued form?  Is that the policy
11  of the Chicago Police Department, as far as you
12  know?
13  A.  Yeah, I mean, you're still allowed to take
14  notes that are not on a GPR, if you don't have one
15  at the time.
16  Q.  So it's your testimony that -- and,
17  again, you're speaking for the Chicago Police
18  Department, not as Chief Bruno but as a designee of
19  the Chicago Police Department.
20  It's your testimony that even today, it
21  is consistent with Chicago Police Department
22  directives and orders to take handwritten notes on
23  any old piece of paper?  You don't have to do it on
24  a GPR?
25  A.  No.  Preferably, on a GPR, but if you don't

Page 112

1  have a GPR and you take a note and include it in the
2  file, that's still acceptable.
3  Q.  What if you don't include it in the
4  file?
5  A.  It should be included in the file.
6  Q.  Are you obligated to put it into the
7  file?
8  A.  If it's pertinent to that investigation, yes.
9  Q.  Okay.  So is it your assumption, then,
10  that whoever wrote the handwritten notes at
11  RFC-Maysonet 050864 didn't have a GPR?
12  MS. ROSEN: Object to the form.
13  A.  Yes.
14  Q.  I mean, isn't it important when notes
15  are documented, to know who documented them?
16  A.  Yes.
17  Q.  Isn't it important to know when notes
18  are documented or investigative notes are
19  documented?
20  A.  Yes.
21  Q.  Okay.  Looking at this document at
22  050864, can you tell who wrote these notes?
23  A.  No.
24  Q.  Can you tell when they were written?
25  A.  No.

Maysonet v.
Guevara

Page 113

1  Q.  And that's because it doesn't contain
2  all the information that a GPR expects you to fill
3  out, right?
4  A.  Correct.
5  Q.  A GPR has the officer identify who they
6  are, what shift they're on, right, when they wrote
7  the note, even the time, right, and when it's
8  submitted, correct?
9  A.  Correct.
10  Q.  I'm going to ask you to look at 051005,
11  that page.  You see there's like a -- let me know
12  when you're there.
13  A.  051005?
14  Q.  Yeah.
15  A.  Okay.
16  Q.  There's like a Post-it there?
17  A.  Okay.  Yes, I see that.
18  Q.  That's got some information on it?
19     (Witness reviews.)
20  A.  Yes.
21  Q.  Do you know who wrote it?
22  A.  No.
23  Q.  Do you know when it was written?
24  A.  No.
25  Q.  Do you know why it was written?

Page 114

1  A.  No.
2  Q.  Do you know what relevance it has to
3  this investigation?
4  A.  No.
5  Q.  Do you know why it is not included in
6  the investigative file, or whatever the file is,
7  that we're calling Bruno-2?
8  A.  No.
9  Q.  I'm going to RFC-Maysonet 051009.
10  There's some what appear to be handwritten notes
11  there.  Do you see that?
12  A.  I do.
13  Q.  It looks like a phone number and -- I
14  don't know.  It says a name.  It looks like "Mango"
15  to me.  Does it look like "Mango" to you?
16  A.  Yes.
17  Q.  Would you agree this is not written on
18  a GPR?
19  A.  Yes.
20  Q.  Do you know when it was written?
21  A.  No.
22  Q.  Do you know who wrote it?
23  A.  No.
24  Q.  Do you know why it was written?
25  A.  No.

Page 115

1  Q.  Do you know what relevance it has to
2  this investigation, that is, the Wiley brothers'
3  homicide investigation?
4  A.  I do not.
5  Q.  Do you know why those notes are not
6  found in the investigative file that's marked as
7  Bruno-4 or the other file that's marked as Bruno-2?
8  A.  I don't know.
9  Q.  By the way, and I guess this is a very
10  easy and obvious question, do you have any idea
11  whether or not these documents that I've had you
12  look at, those handwritten notes, were ever provided
13  to the Cook County State's Attorney's Office or the
14  criminal defense attorneys in this case at any
15  point?
16  A.  I don't know.
17  Q.  I'd like you to look at RFC-Maysonet
18  051057.  Let me know when you're there.
19  A.  Okay, I have it.
20  Q.  It looks to be like an "Internet Inmate
21  Status" that says "As of:  Tuesday, July 13, 2004."
22  Do you see that?
23  A.  Yes.
24  Q.  Can you shed any light about why this
25  was printed out and put in this file, that we've

Page 116

1  marked as Bruno-5, as of 2004?
2  A.  I don't know.
3  Q.  Do you know that -- were you aware that
4  at least Mr. Maysonet was convicted in 1995 and sent
5  off to prison in 1995?
6  A.  Yes.
7  Q.  Okay.  But you would agree that at
8  least the markings on this suggest it was printed
9  out in and around July of 2004, nearly, what, ten
10  years later or something, right?
11  A.  Yes.
12  Q.  And you don't know why?
13  A.  No.
14  Q.  Have you inquired or been able to find
15  out?  Did you try to figure it out?
16  A.  I don't know.
17  Q.  There's also a "Felony Case Master
18  Screen" printout that starts on 051061, for both
19  Mr. Gonzalez and Mr. Maysonet, that also appears to
20  be printed out in July of '04.
21     Do you see that?
22  A.  Yes.
23  Q.  Do you know why these were printed out?
24  A.  No.
25  Q.  Do you know who printed them out?

Page 117

1  A.  No.
2  Q.  Do you know why they were placed into
3  this file that is not the investigative file?
4  A.  No.
5  Q.  Okay.  I'm going to ask, can you look
6  at RFC-Maysonet 051075?
7  A.  Okay.
8  Q.  Were you working at Area Five in 2004?
9  I can't remember.
10  A.  I was not.
11  Q.  Do you know a Sergeant Carlos Velez?
12  A.  I do know who he is, yes.  I do know him.
13  Q.  How do you know him?
14  A.  Our paths have crossed over the years, just
15  through work.  He was a sergeant when I first got
16  there, and then he was a street deputy when I worked
17  with the police-shooting team and interacted with
18  him on scenes of police shootings.
19  Q.  Did you work together at Area Five?
20  A.  No.
21  Q.  Okay.  This document I'm having you
22  look at, it says "Request for Identification
23  Record," and it seems to have been prepared or
24  printed out in July of '04, filled out.
25      Do you see that?

Page 118

1  A.  Yes.
2  Q.  First of all, what is a request for an
3  identification record?
4  A.  It's a request for a rap sheet.
5  Q.  And is that a city rap sheet?
6  A.  Yeah, yes.
7  Q.  Meaning it's not the state printout?
8  A.  Correct.
9  Q.  It's the city printout, right?
10  A.  Yes.
11  Q.  Does this tell you that Sergeant Velez
12  requested a rap sheet for Mr. Maysonet in '04?
13  A.  Yes.
14  Q.  Do you know why Sergeant Velez
15  requested a rap sheet for Jose Maysonet in '04?
16  A.  I do not.
17  Q.  Do you know why this document is
18  contained in this file that has been marked Bruno-5?
19  A.  No.
20  Q.  Do you know why it wasn't included in
21  the investigative file?
22  A.  No.
23  Q.  Do you know why it wasn't included in
24  Bruno-2?
25  A.  No.

Page 119

1  Q.  Then at 051077, there's also a request
2  for the rap sheet of the co-defendant, Alfredo
3  Gonzalez, in '04, right?
4  A.  Yes.
5  Q.  Then if you look at the next page, I
6  don't know if they're arrest reports, but they all
7  seem to be faxed from the records division in July
8  of '04, and I'm looking specifically at RFC-Maysonet
9  051079 and 051081.
10  A.  Okay, I have those.
11  Q.  What do you make of that, in the sense
12  of -- what's your best guess here?  Did somebody
13  request these arrest reports from the records
14  division?
15      (Witness reviews.)
16  A.  Yeah, if you look at the requests, it also
17  includes a request for the arrest report.
18  Q.  Oh, okay.  Yeah, I must have missed
19  that.
20      So Sergeant Velez was asking for the
21  rap sheet plus the arrest report, right underneath
22  that.  Got it.
23  A.  Right.
24  Q.  So the records division responded and
25  sent it back.  All right.  That's what the fax sheet

Page 120

1  would suggest.
2      Looking at 051038, what is this memo
3  here?  Like I'm not asking you to explain its
4  contents, but what is it?
5  A.  It is a memo from one watch to the next
6  watch, just telling what's going on in the area at
7  that time.
8  Q.  Do you have any idea why it's in this
9  file here?
10  A.  No.
11  Q.  Do you know if it has any connection to
12  the Wiley brothers' homicide investigation?
13  A.  It does not look like it.
14  Q.  Is this some Brady material from
15  another case that got stuck in here, do you reckon?
16      MS. ROSEN: Object to the form.
17  A.  It looks like a piece that was erroneously
18  stacked in.
19  Q.  See, I'd use the word "concealed," but
20  I guess we'll never know, right?
21      MS. ROSEN: Is that a question?
22      MS. BONJEAN: No.  I'll withdraw it.
23  Q.  All right, let's see.  I would like to
24  look at some other documents.
25      (Off the record.)

Page 121

1     MS. BONJEAN: I would like -- Haley,
2  are you there?
3     MS. COOLBAUGH: I am here.
4     MS. BONJEAN: Okay.  I'm going to
5  mark -- we're on Bruno-6.  I would like to mark
6  another set of documents which was produced by the
7  city, I think just on Sunday or something.
8     (Exhibit Bruno-6, a 346-page copy of a
9  collection of documents, Bates stamp RFC-Maysonet
10  051127 through 051472, is marked for
11  identification.)
12  Q.  I am going to reference the Bates stamp
13  numbers as RFC-Maysonet 051127 to 051472.  It was
14  produced with a file name that says "Copy" and then,
15  in parentheses, "Second Scanned Copy," the PDF.
16     MS. BONJEAN: Haley, if you could pull
17  that up, it's a 346-page PDF.  There we go, yes.
18  Okay.
19  Q.  Mr. Bruno, it also curiously says -- I
20  don't know why, but it also has this "Copy" mark on
21  it.  Okay?  Do you see that?
22  A.  Yes.
23  Q.  All right.  Have you seen this set of
24  materials before?
25  A.  Yes, I have.

Page 122

1  Q.  Specifically, this 346 pages that we're
2  now going to call Bruno-6, --
3  A.  Yes.
4  Q.  -- can you tell me what this set of
5  documents is?
6  A.  This is a copy from the records division --
7  I'm sorry, from the warehouse.
8  Q.  Well, according to you, there's a
9  couple different files at the warehouse, including
10  the RD file.
11     Are you saying this is a copy of the RD
12  file?
13  A.  This is a combination of the RD file and the
14  investigative file.
15  Q.  And how is it maintained presently,
16  this 346 --
17  A.  Now they are currently kept together at the
18  warehouse.
19  Q.  In what?  In like a folder?  In what?
20  Like how is it kept together?
21  A.  In a folder.
22  Q.  When was this amalgamation of RD
23  materials and investigative file materials put
24  together in this particular set of materials?
25  A.  This would have been earlier this summer.  I

Page 123

1  believe in July, but I'm not sure.
2  Q.  And why was it put together?
3  A.  I received -- I was asked to answer some
4  interrogatories regarding the lack of GPRs for this
5  file, and that did not make a lot of sense to me.
6     So I had one of my assistants ask for
7  the file from the warehouse, and this is what they
8  sent over.
9  Q.  So what we've marked as Bruno-6,
10  though, we can agree it is not a duplicate of
11  Bruno-2, Bruno-5 or Bruno-4, right?
12  A.  Correct.
13  Q.  And you're saying that this was
14  prepared by someone who works in the records
15  division warehouse and sent to you this selection of
16  documents, right?
17  A.  Yes.
18  Q.  Let's start with, who put these
19  materials together for you, which I think you said
20  was put together for the purpose of responding to an
21  interrogatory, is that right?
22  A.  Correct.
23  Q.  And this was an interrogatory
24  propounded by the co-plaintiff in this case,
25  Mr. Gonzalez?

Page 124

1  A.  Yes.
2  Q.  All right.  So you get an interrogatory
3  from the law firm of Loevy & Loevy on behalf of
4  their client, Alfredo Gonzalez, that asks you,
5  essentially, why are there no GPRs in the file
6  that's been produced to us as the investigative
7  file, right?
8  A.  Correct.
9  Q.  And you looked at RFC-1 through 66, I
10  assume, and said, "Huh, that's curious.  There are
11  no GPRs in here," right?
12  A.  Right.  Actually, I don't know if I looked at
13  the actual file, but the fact that they were asking
14  why there were no GPRs led me to check for myself.
15  Q.  And you would agree it's unusual?
16  There should always be GPRs in an investigative
17  file, or usually, I should say, there would be GPRs
18  in an investigative file, a homicide file, right?
19  A.  Yes.
20  Q.  Okay.  So what did you do, then, after
21  you were -- well, strike that.
22     Were you tasked with this jobm or how
23  did you get the job of answering this interrogatory?
24  Again, I'm not looking for privileged information or
25  conversations.  If you can answer it without

Maysonet v.
Guevara

Page 125

1  revealing privileged communications, I'd ask that
2  you do so.
3  A.  Okay.  Can I check with Eileen quickly?
4  Q.  Yeah.
5     (Off the record.)
6  A.  Okay.  So, yeah, our legal affairs asked me
7  to answer the interrogatories.
8  Q.  So then I take it you reached out to
9  someone in the records division warehouse?
10 A.  Yes, through someone that works with me.
11 Q.  So you delegated that to someone in
12 your office, of some type, to talk to the records
13 division warehouse and try to find out if there are
14 GPRs, where they are, why they're not --
15 A.  Correct.
16 Q.  What's the name of that person?
17 A.  Stephen Smith.
18 Q.  And is that a civilian or is that a
19 sworn officer?
20 A.  He's a detective.
21 Q.  What area does he work at presently?
22 A.  He works with me, at headquarters.
23 Q.  All right.  Then Stephen Smith did
24 whatever Stephen Smith did, which sounds like he
25 reached out to the records division, right?

Page 126

1  A.  Yes.
2  Q.  What's the next information you
3  received about your request for clarification on the
4  GPRs?
5  A.  I received his file.
6  Q.  Okay.  Did Stephen Smith give you this
7  file?
8  A.  I don't know if it was sent to him and he
9  sent it to me or if it was sent right to me.
10 Q.  And was it sent via e-mail or in some
11 other fashion?
12 A.  E-mail.
13 Q.  Okay.  So you get this set of documents
14 of 346 pages.  When you received this, what did you
15 understand this 346 pages of materials to be?
16 A.  The investigative file related to this case.
17 Q.  Then you opened it up and you saw that
18 there are permanent retention files in here.  So did
19 that make you pause and say, "This does not appear
20 to be the investigative file"?
21 A.  Yeah, then I realized it's a combination.
22 Q.  Did you ask Mr. Smith to obtain a
23 combination of the permanent retention file and the
24 investigative file, or had you requested the
25 investigative file?

Page 127

1  A.  The investigative file.
2  Q.  Do you know why you were provided with
3  a combination of the permanent retention file and
4  the investigative file?
5  A.  Because I believe they're now stored
6  together.
7  Q.  You believe they're now stored together
8  as a matter of policy or that this particular
9  investigative file is stored together with the
10 permanent retention file?
11 A.  Yeah, I believe all of them are now.
12 Q.  Do you know when that happened or when
13 they started storing permanent retention files with
14 investigative files?
15 A.  This would have been 2020, when they moved
16 them all back to the warehouse.
17 Q.  Yeah, I want to get back to that in a
18 second, but I've got to remind myself.  Okay.
19    So are you able to differentiate --
20 hold on a second.  Give me one second.
21    (Off the record.)
22    MS. BONJEAN: Sorry about that.
23 Q.  So am I to understand that the
24 documents that we now have in Bruno-6, anything that
25 is stamped "Permanent Retention File" is the RD

Page 128

1  file, as it presently is constituted, or at least as
2  of July of 2024?
3  A.  Yes.
4  Q.  So that would be -- hold on.  Let me
5  get the Bates stamp.  051127 through 051161 is the
6  currently constituted RD file?
7  A.  Correct.
8  Q.  Then starting at 051162, this would
9  mark the beginning of the currently constituted
10 investigative file for the homicide of the Wiley
11 brothers?
12 A.  Yes.
13 Q.  Have you compared it to what we've
14 previously marked as the investigative file, that I
15 think we've marked as Bruno-4, and is it identical?
16 A.  It appeared identical.
17 Q.  And do you know when those "Copy"
18 stamps went on it?
19 A.  I don't know.
20 Q.  Now, when you asked for this material
21 and you received this 346 pages of documents, you
22 did not receive the collection of documents that
23 we've previously marked as Bruno-2, right?
24 A.  Correct.
25 Q.  And you did not receive the set of

Page 129

```
 1   documents that's 444 pages, roughly, that we've
 2   marked as Bruno-5, right?
 3       MS. ROSEN: What's the end Bates that
 4   you have for Bruno-6?
 5       MS. BONJEAN: Bruno-6?
 6       MS. ROSEN: Yeah.
 7       MS. BONJEAN: That's the one we're
 8   looking at right now.
 9       MS. ROSEN: Yeah.
10       MS. BONJEAN: I have 051472.
11       MS. ROSEN: Okay, great. Thank you.
12   Q.  Do you need that question back?
13   A.  Please.
14       MS. ROSEN: Sorry about that.
15   Q.  Well, I guess let me it more
16   open-ended. Let me strike it and start over.
17       It's a 346-page PDF, right?
18   A.  Yes.
19   Q.  And, I don't know, the first -- let's
20   see. Just a second. The first, roughly, 36 pages
21   is the RD file, and then the next 310 pages are
22   supposedly a copy of the investigative file, right?
23   A.  Right, but also the -- it also does have some
24   of those documents in 6.
25   Q.  Yeah, that's my question.
```

Page 130

```
 1   A.  Yeah, it looks like it's a combination of all
 2   of them.
 3   Q.  How did this come to be that you have,
 4   really, a combination of -- you were sent 346 pages
 5   of materials that appear to be a combination of at
 6   least three different files.
 7   A.  Correct.
 8   Q.  Do you know how that came to be?
 9   A.  I don't know. All the copies ended up filed
10   together at the warehouse.
11   Q.  This file, that is now stamped a copy,
12   does it still exist in this format that we see it?
13   Is it just electronic? Is it physical? How does it
14   exist, as of today?
15   A.  Both.
16   Q.  So you have and I have and the records
17   division warehouse has, and I guess a number of
18   people have, this PDF of 346 pages. There's also a
19   physical copy of this version of the record or
20   version of the file that's 346 pages, --
21   A.  Yes.
22   Q.  -- and we've marked it as Bruno-6.
23       Who put this together? Stephen Smith
24   didn't go and put it together, right? Do you know
25   who did?
```

Page 131

```
 1   A.  This would have been personnel at the
 2   warehouse.
 3   Q.  Does this personnel have a name?
 4   A.  This was previously scanned into the system.
 5   So all they did was send the scanned version, which,
 6   you know, exactly who scanned it, I don't know.
 7   Q.  What system was it scanned into?
 8   A.  This file was scanned and saved on a network
 9   drive at the warehouse.
10   Q.  Does this network drive have a name?
11   A.  Just their network drive.
12   Q.  So the records division warehouse has
13   its own network drive?
14   A.  Right. They receive so many requests, this
15   saves them time. So if it was previously requested
16   and scanned, they can send it without re-scanning
17   it.
18   Q.  Requested by whom?
19   A.  You mean who previously requested it?
20   Q.  Well, I guess I'm confused.
21       You are the chief of the Chicago Police
22   Department, or a deputy chief. You're looking for
23   the investigative file, which is allegedly the most
24   comprehensive file for a homicide investigation,
25   right? Your request of that is different than, say,
```

Page 132

```
 1   I don't know, like NBC requesting a file? Like
 2   they're not necessarily going to get the same thing,
 3   right?
 4       MS. ROSEN: Object to the form.
 5       But you can answer.
 6   A.  The original scan of the file will be the
 7   same.
 8       If the FOIA people determined not to
 9   give certain things to NBC, then that goes through
10   that department.
11   Q.  Okay. Well, then I guess we'll get to
12   that.
13       But in any event, what you're saying is
14   that this 346-page PDF or electronic file, which
15   also happens to apparently be a paper file,
16   pre-existed your request for it, is that right?
17   A.  Yes.
18   Q.  When did it come into existence, this
19   PDF file or the paper file or both?
20   A.  It was -- I don't know.
21   Q.  I'm sorry. You broke up again.
22   A.  I'm not sure.
23   Q.  First of all, is there some log, either
24   electronic or paper or some type of way, as far as
25   you know, that can determine when this particular
```

Page 133

1  document -- 346-page file, I'm going to call it --
2  was created in its first instance?
3  A.  There is a log.
4  Q.  Where is that log?
5  A.  Can you give me a second?
6  Q.  Sure.
7      (Witness reviews.)
8      MS. BONJEAN: Do I have that, Eileen?
9      MS. ROSEN: This one?
10     THE WITNESS: No.
11     MS. ROSEN: This one?
12     THE WITNESS: Yes.
13     MS. ROSEN: It's the document we
14  produced this morning, 51862.
15     MS. BONJEAN: Is this the "Excerpt
16  from BOD Spreadsheet"?
17     MS. ROSEN: Yes.
18     MS. BONJEAN: All right.  So this
19  document, we're going to mark it as Bruno-7.
20     (Exhibit Bruno-7, a one-page copy of a
21  document titled "Excerpt from BOD Spreadsheet,"
22  Bates stamp RFC-Maysonet 051862, is marked for
23  identification.)
24  Q.  What does "BOD" stand for?
25  A.  Bureau of detectives.

Page 134

1  Q.  And what is the BOD spreadsheet?
2  A.  It just tracks all of the requests that come
3  through the bureau of detectives.
4  Q.  Well, requests aren't made -- well,
5  what do you mean?  Are requests made to the bureau
6  of detectives?
7  A.  They're funneled through the appropriate
8  bureaus.
9  Q.  Where is this spreadsheet maintained?
10  A.  Within our office at the bureau of
11  detectives, at the fourth floor of headquarters.
12  Q.  Is it maintained just in electronic
13  form or is it maintained in some other form?
14  A.  In the electronic form.
15  Q.  When did you start tracking this via a
16  spreadsheet?
17  A.  I don't know.
18  Q.  All right.  So let's go through this,
19  if we can.
20     First of all, who maintains this
21  spreadsheet?
22  A.  Our FOIA personnel within BOD.
23  Q.  So the bureau of detectives of the
24  Chicago Police Department has its own FOIA person
25  assigned to the BOD, is that right?

Page 135

1  A.  Correct.
2  Q.  They don't work at the warehouse,
3  right?
4  A.  Correct.
5  Q.  Does the warehouse personnel have
6  access to this spreadsheet?
7  A.  I don't know.  I don't think they would.
8  Q.  Okay.  So I guess -- I mean, I'm a
9  little confused.
10     I thought you previously testified that
11  this document that we marked as Bruno-6 was
12  assembled and put together and forwarded to you from
13  the personnel in the records division warehouse.  Is
14  that right?
15  A.  Right.
16  Q.  They would have had it on their own
17  network drive, correct?
18  A.  Correct.
19  Q.  And it's your testimony that it existed
20  previous to your request in July, is that right?
21  A.  Yes.
22  Q.  When was it created?  Are you able to
23  determine when it was created, by looking at this
24  spreadsheet?
25  A.  No.

Page 136

1  Q.  Okay.  Do you know, if I wanted to know
2  when it was created, how would I find that out?
3  A.  I could check with the people at the
4  warehouse.
5  Q.  So it would be information they would
6  be able to get off their network drive, presumably,
7  when they actually created this document and for
8  what purpose -- or strike that.  Let me start over.
9  I want to make sure I'm precise about my language.
10     The records division warehouse
11  personnel created a PDF consisting of 346 pages,
12  which appears to be the permanent retention file and
13  either the investigative file plus some materials
14  from this other file, that we've marked as Bruno-5,
15  at some point prior to July, right?
16  A.  Right.
17  Q.  You're not able to tell me when it was
18  prepared, but you believe it's possible that they
19  would have that information, probably on their
20  network drive, right?
21  A.  Right.
22  Q.  At least there would be some metadata
23  somewhere about when this document was created,
24  correct, this PDF document?
25  A.  That's correct.

Maysonet v.
Guevara

Page 137

1  Q.  But you don't know, as you sit here
2  today, that information?
3  A.  Correct.
4  Q.  Do you know why it was originally
5  created?  And I'm talking specifically about this
6  346-page PDF.
7  A.  I don't know.
8  Q.  Do you know for whom it was originally
9  created, if anyone?
10 A.  I don't know.
11 Q.  Would you presume that it was created
12 sometime after 2020, since it contained a collection
13 of RD files and files from the investigative file?
14 A.  Yes.
15 Q.  But as you sit here today, you don't
16 know why the personnel for the records division
17 warehouse put this PDF together, of 346 pages, after
18 2020?
19 A.  Correct.
20 Q.  You don't know what it was in response
21 to, right?
22 A.  Right.
23 Q.  Before we get too far, at some point,
24 you said the files left the warehouse and went
25 somewhere else?  And I'm talking about homicide

Page 138

1  files for the City of Chicago.
2  A.  Yes.
3  Q.  And that was in 2012, is that what you
4  said?
5  A.  '13, I believe.
6  Q.  So between 1990 and 2013, both the RD
7  files and the investigative files were maintained at
8  the records division warehouse, right?
9  A.  Yes.
10 Q.  And at that time, they were separated,
11 right?  They weren't together in the same place?
12 They were maintained differently or in different
13 places?
14 A.  Yes, and I need to double-check if they are
15 still separate or if they are all combined.
16 Q.  Well, now, that's an important thing
17 because, you know, you just previously testified
18 that this 346-page document, you believe, was
19 produced in this fashion because they're held
20 together.  Am I right?
21 A.  Yes, but I would just like to double-check on
22 that fact, if they are still stored separately or if
23 they've all been combined.
24 Q.  Because that would be different, right?
25 Like if they were stored separately, that means

Page 139

1  personnel from the warehouse went and retrieved
2  documents from two different places and then put
3  them in a single document, as opposed to they're
4  already kind of together, right?
5  A.  Correct.
6  Q.  Those are two different things?
7  A.  Correct.
8  Q.  Okay, then that's fine.  I would like
9  you to check on that and tell me what the matter is
10 on that subject.
11     (A request is made.)
12 Q.  Now, first of all, in 2013 when these
13 homicide files, investigative files, -- was it just
14 homicide investigative files or was it also the RD
15 files that were moved out of the warehouse?
16 A.  No, just investigative files.
17 Q.  And why were the homicide
18 investigations files, that were being maintained by
19 the Chicago Police Department, moved out of the
20 records division warehouse in 2013?
21 A.  They were auditing the files and trying to
22 organize them better, and they felt that moving them
23 to headquarters would make it easier for answering
24 the drastic increase in file requests around that
25 time.

Page 140

1  Q.  Who's the "they" in the sentence of,
2  "They were auditing the files"?
3  A.  Well, this was Chief Tom Byrne at the time.
4  Q.  Is this an internal audit, you're
5  saying?
6  A.  Yes.
7  Q.  It wasn't the FBI or anything like
8  that, right?
9  A.  No, no.
10 Q.  Okay.  So the Chicago Police Department
11 is doing an internal audit of its own homicide files
12 in 2013, is that what you're saying?
13 A.  Yes.
14 Q.  And was that at the direction of Chief
15 Tom Byrne?
16 A.  Yes.
17 Q.  Why did Chief Tom Byrne order an audit
18 of the Chicago Police Department's homicide files in
19 2013?
20 A.  Because there were issues with homicide
21 files; issues finding them, issues with storages.
22 There were significantly more requests for these
23 files at that time.
24 Q.  When you say "there were issues," in
25 what respect were there issues?

Page 141

1 A. Just difficulty locating files, files in
2 different locations at the warehouse.
3 Q. Were there issues that prompted
4 litigation or was it just like issues within the
5 department, like challenges that you were dealing
6 with as a department, or were there actual like
7 issues related to litigation?
8 A. Well, I think it's both.
9 Q. Okay. Was there something specific
10 that resulted in the audit of the homicide files in
11 2013?
12 A. Not to my knowledge.
13 Q. Was there an order that came down from
14 Chief Byrne, related to this audit?
15 A. There was a memo, yes.
16 Q. Doesn't everything have a memo? Like
17 in order to do an audit of the homicide files, it
18 has to be memorialized in some way, right?
19 A. Correct.
20 Q. Those memos are maintained somewhere,
21 right?
22 A. Yes.
23 Q. Have you looked at that 2013 memo?
24 A. Yes.
25 Q. When did you last look at it?

Page 142

1 A. This week.
2 Q. Oh, fantastic.
3 MS. ROSEN: We have it.
4 MS. BONJEAN: Oh, do you?
5 MS. ROSEN: Yeah. We produced it.
6 MS. BONJEAN: All right, let me see.
7 I mean, you produced these things that are not
8 completely intuitive, though.
9 MS. ROSEN: Yep, hold on.
10 MS. BONJEAN: We need a Bates stamp.
11 MS. ROSEN: Do you want the Bates?
12 MS. BONJEAN: Yeah.
13 MS. ROSEN: It start at 51859 to 60.
14 THE WITNESS: There's one more
15 connected to this.
16 MS. ROSEN: There's another one that's
17 connected to it, which is --
18 THE WITNESS: 051494.
19 MS. BONJEAN: All right, got it. So
20 let's see. Let's mark 51494 as Bruno-8, and then
21 we'll mark the one that starts with 51859 as
22 Bruno-9. All right?
23 (Exhibit Bruno-8, a seven-page copy of
24 a collection of documents, Bates stamp RFC-Maysonet
25 051494 through 051500, is marked for

Page 143

1 identification.)
2 (Exhibit Bruno-9, a two-page copy of a
3 memo titled "Bureau of Detectives, 19 April 2013,"
4 Bates stamp RFC-Maysonet 051859 and 051860, is
5 marked for identification.)
6 Q. So Bruno-8, it's the "Executive Summary
7 Regarding Stored Homicide Files," is that right?
8 A. Yes.
9 Q. This seems to correspond to when the
10 CHRIS system case into -- well, no.
11 CHRIS was already in existence, right?
12 A. Right. CHRIS was late '90s.
13 Q. All right. So by this point, there
14 were no new paper investigative homicide files,
15 right?
16 A. When this was going on? Correct.
17 Q. Yeah. Like this "Executive Summary
18 Regarding Stored Homicide Files" related to old
19 homicide files, correct?
20 MS. ROSEN: Wait. Can I get clarity?
21 Are you talking about RD files or investigative
22 files?
23 MS. BONJEAN: Investigative files.
24 A. I mean, not strictly old ones. This is also
25 moving forward.

Page 144

1 MS. ROSEN: CHRIS did not eradicate
2 investigative files.
3 MS. BONJEAN: I'm aware of that.
4 MS. ROSEN: Okay.
5 MS. BONJEAN: But did CHRIS eradicate
6 paper investigative files, that what I'm asking.
7 MS. ROSEN: Well, there's still GPRs.
8 Yeah, GPRs are still paper.
9 MS. BONJEAN: That's true. Let me
10 back up a second.
11 MS. ROSEN: Yeah.
12 Q. First of all, let me ask a more basic
13 question I think I overlooked.
14 All homicide investigative files from,
15 let's just say, like the early '90s, before there
16 was any kind of computerized or electronic system,
17 have those all been digitized or no?
18 A. No.
19 Q. Is there any effort to digitize all
20 those files?
21 A. That is something that we would like to do.
22 Q. Obviously, as discovery requests come
23 in, and I'm guessing primarily it's civil rights
24 cases, you have to digitize old files.
25 Once that happens, do they get

Page 145

1 maintained somewhere, the digital versions?
2 A. Can you repeat that one?
3 Q. Sure. I'm sure you're aware that in
4 the litigation of civil rights cases against the
5 City of Chicago, you've had to produce investigative
6 files from, let's just say, an era when there were
7 only paper files, right?
8 A. Right.
9 Q. And in so doing, you're not obviously
10 handing over original papers? You're handing over
11 scanned versions of these old files, correct?
12 A. Correct.
13 Q. Once that happens, are they being saved
14 by the Chicago Police Department, so essentially you
15 don't have to like re-create the wheel if you have
16 to hand over those documents again?
17 A. Yes.
18 Q. Okay. So who maintains those digitized
19 versions of these old paper homicide files?
20 A. Warehouse personnel.
21 Q. And is that on their network again, the
22 one we talked about earlier?
23 A. Yes.
24 Q. Do you know how it's organized on the
25 network? Is it by RD number?

Page 146

1 A. By year, by RD number.
2 Q. And that's kind of how you got that
3 346-page document, that we've marked as Bruno-6, is
4 because it had been put together for some reason and
5 they gave it to you because it was already there in
6 their network, right?
7 A. Correct.
8 Q. Okay. I think I understand.
9 Now, going back to this executive
10 summary, it looks like there is -- which is marked
11 as Bruno-8, it looks like there were some problems
12 identified that -- or this executive summary
13 identifies some problems with the existing storage
14 model, I guess, as of 2013, right?
15 A. Yes.
16 Q. Okay. So going to this next page of
17 this, 051495, -- by the way, I don't -- I put
18 Bruno-8. Let me tell you what I have in Bruno-8.
19 It's 051494 through 051499 -- or, I'm sorry, 051500.
20 I don't know if they all go together, but I just
21 want to run through it.
22 There's an executive summary first, at
23 494, right?
24 A. Yes.
25 Q. Then the next page, 051495 is the Bates

Page 147

1 stamp, and this is some type of, I don't know,
2 PowerDMS, I don't know, directive? It's a directive
3 that's kept on PowerDMS, is that right?
4 A. Yeah, that is notes about updating
5 directives.
6 Q. Well, what is this 42.1.3(LE1)? What
7 is this?
8 A. I don't know.
9 Q. What do you mean, you don't know? I
10 feel like this is something you should know.
11 Have you seen this before?
12 A. I have not, but I guess internal was research
13 and development.
14 Q. All right. Do you know if it's
15 correlated to this executive summary in any way or
16 is it just some other document that was produced
17 with it?
18 A. It is not.
19 Q. You don't know when it was written or
20 who it was written by or what it is, right?
21 A. Right.
22 Q. Okay. Let's just stick to the first
23 page for now. This executive summary, you think,
24 was issued in and around 2013, right?
25 A. Yes.

Page 148

1 Q. And then the goal was to move homicide
2 files to the headquarters, to store all the closed
3 homicide files that pre-existed 2013, like through
4 2012, right?
5 A. Yes.
6 Q. And I asked this, but now maybe I'm
7 going to ask again and I can understand it a little
8 better: What was it about moving these documents to
9 headquarters that made them easier to, I don't know,
10 maintain or organize, or what was it about the move
11 that was beneficial to implementing better storage
12 procedures?
13 A. From when the warehouse was a mess and they
14 had a decent-sized room within the bureau of
15 detectives, and then also the people that were
16 copying all of these files for litigation requests
17 and FOIA requests worked out of that floor at
18 headquarters.
19 Q. So was there more staff at
20 headquarters?
21 A. Yes. At the time, BOD did not have staff at
22 the warehouse.
23 Q. When you moved the homicide files -- or
24 when they moved the homicide files out of the
25 warehouse, was the warehouse being used for some

Page 149

1  other purpose?
2  A.  For all sorts of storage.
3  Q.  Were the RD files also moved out of the
4  warehouse in 2013, or just the investigative files?
5  A.  No, just the investigative files.
6  Q.  I think you answered that.  I forgot.
7  Okay.
8     Then we marked Bruno-9, which appears
9  to be a to/from memo dated April 19, 2013, from
10  Chief Thomas Byrne to Eugene E. Williams.
11     Do you have that in front of you or do
12  you need me to share it?
13  A.  I have that.
14  Q.  This indicates that there's an audit
15  being conducted of the homicide files.
16     What is your understanding of what this
17  audit entailed, apart from moving the files from the
18  warehouse to headquarters?
19  A.  Locating and cataloguing all of the homicide
20  files.
21  Q.  And can you tell me what was involved
22  in that, like at what level of detail were they
23  doing this?
24  A.  I know they created spreadsheets by year,
25  going back, I think, a hundred years, of all

Page 150

1  homicides.
2  Q.  It says here, "Phase I - Identify and
3  locate all open homicide files within Detective
4  Areas for the years 2000 to present," right?
5  A.  Yes.
6  Q.  This isn't closed homicide files?
7  These are open homicide files that were being
8  maintained in the detective areas?
9  A.  For Phase I, yes.
10  Q.  By the way, were all open homicide
11  files maintained in the detective areas, even if
12  they went cold and hadn't been touched in some time?
13  A.  Yes.
14  Q.  So until a case was closed, it did not
15  go to the records division warehouse in the '90s,
16  right?
17  A.  Right.
18  Q.  So it could essentially -- I mean, I
19  know this sounds like it changed in 2013, but there
20  could be an open case from the '70s that stayed in
21  the area, right?
22  A.  Yes.
23  Q.  And that would just be maintained with
24  all the other investigative files in the area, fair?
25  A.  Correct.

Page 151

1  Q.  In 2013, part of the process was to
2  locate these open homicide files from these
3  different detective areas and bring them to
4  headquarters, and that covered the years from 2000
5  to present?
6  A.  Well, unless I misheard you, I think you said
7  open --
8  Q.  Yes.  Phase I says, "Identify and
9  locate all open homicide files within the Detective
10  Areas for the years 2000 to present," which would
11  have been 2013, right?
12  A.  Right, but those were not moved to
13  headquarters.  Those were maintained in the areas.
14  Q.  Got it.
15     But the idea is just to identity and
16  locate them?
17  A.  Yes.
18  Q.  Were there spreadsheets made, like
19  cataloguing what they were, where they were, the RD
20  numbers, that type of thing?
21  A.  Right.
22  Q.  Okay.  Then Phase II was, "Identify and
23  locate all closed homicide files located within
24  Detective Areas for the years 2000 to 2013."  Is
25  that correct?

Page 152

1  A.  Correct.
2  Q.  Why would there be closed homicide
3  files in the areas, that you had to go locate?
4  A.  Some of them may not have been shipped to the
5  warehouse yet.  There may not have been a final
6  court disposition.
7  Q.  Yeah, but you're talking about a
8  13-year period.
9     Was there a problem with files not
10  making their way to the warehouse?
11  A.  Not to my knowledge.
12  Q.  Was there any paperwork generated as a
13  result of this Phase II, identifying and locating
14  homicide files within the detective areas for the
15  years 2000 to 2013?
16  A.  Not that I'm aware of.
17  Q.  I mean, you said earlier that closed
18  homicide files remained in the area through the
19  court disposition, right?
20     (Technical difficulties.)
21  Q.  Is that correct?
22  A.  Yes, yes.
23  Q.  I couldn't hear you.  For some reason,
24  you cut out.
25     Closed homicide files that have been

Maysonet v.
Guevara

Page 153

1  resolved in the court should not have remained
2  indefinitely in the investigation -- or, I'm sorry,
3  in the violent crimes area, right?
4  A. Correct.
5  Q. All right. Then Phase III was, "Move
6  all of the aforementioned homicide files to the
7  recently designated storage room, located within the
8  CPD Headquarters, Bureau of Detectives
9  Administration Section, Room 404 SEE [sic]",
10 correct?
11 A. Yes, 4044 SE.
12 Q. So that only covers the closed homicide
13 files from 2000 to 2013, right?
14 A. For Phase III, yes.
15 Q. "This room will remain locked and
16 secured at all times and will have restricted
17 access," and that's not something that was going on
18 at the areas? The closed homicide files were not in
19 secured areas that had restricted access?
20 A. Right.
21 Q. Then this Phase III also included
22 closed homicide files that were located at the
23 records storage warehouse from, again, 2000 to 2013,
24 correct?
25 A. Yes.

Page 154

1  Q. And those got moved. Okay.
2  Then Phase IV said that moving forward,
3  murder investigations that are closed are kept in
4  the investigative area for five years and then would
5  be moved to the headquarters "storage facility and
6  maintained by the homicide desk," right?
7  A. Yes.
8  Q. All right. Now we're in the homicide
9  files from 1990 to 2000, which were "Open and
10 Cleared/Open homicide files will be stored at the
11 Areas, space permitting."
12 Okay. So these were kind of -- these
13 are going to be cold cases, right?
14 A. Right.
15 Q. So they stayed at the areas?
16 A. Yes.
17 Q. And then closed homicide files from
18 1990 to 2000 would be sent to the headquarters
19 homicide room?
20 A. Yes.
21 Q. So the Wiley brothers' investigative
22 file would fall into this category, presumably,
23 right, the closed homicide files from 1990 to 2000?
24 A. It falls in that range, but it could have
25 already been shipped to the warehouse.

Page 155

1  Q. Well, if Mr. Maysonet was not
2  convicted -- and I think he was the last one
3  convicted, if I'm not mistaken -- until 1995, it
4  would have remained -- presumably, according to your
5  testimony, it would have remained at the
6  investigative -- I'm sorry. Strike that.
7  Since it didn't resolve itself in the
8  court system until 1995, it would have stayed in the
9  area until '95 and then it would have moved to the
10 warehouse in '95?
11 A. Right.
12 Q. So it should have been closed and at
13 the warehouse and then it would have, in 2013, moved
14 to headquarters in the homicide room, if this all
15 went according to plan?
16 A. Yes.
17 Q. And, what, they were put in bankers
18 boxes?
19 A. Correct.
20 Q. And how were they organized at the
21 homicide room?
22 A. I believe it was by year and then RD number.
23 Q. Got it.
24 So how did that system work? Did it
25 improve the maintenance of these files?

Page 156

1  A. It improved, for sure. It just became a
2  space issue at headquarters.
3  Q. What was different about how the files
4  were being organized and maintained at headquarters
5  versus the records division warehouse? And when I
6  say "files," I mean the investigative files.
7  A. Yeah, I mean, they were poorly organized at
8  the warehouse.
9  Q. Like poorly organized in what sense?
10 A. They were by area in different boxes, in
11 different locations, mixed up. Many files were in
12 the wrong locations. Homicide files mixed in with,
13 you know, non-homicide cases.
14 There were a number of issues.
15 Q. When the closed files were moved from
16 the warehouse to headquarters, were the contents of
17 those files reorganized in any way or was it just
18 the file itself?
19 A. The files themselves.
20 Q. You said they were organized by year
21 and then, what, RD number within a year?
22 A. Yes.
23 Q. And then this was in bankers boxes at
24 headquarters?
25 (Technical difficulties.)

Page 157

1  Q.  Yes?
2  A.  Yes.
3  Q.  Then there was something called the
4  homicide file room at headquarters, which is where
5  they were organized, correct?
6  A.  Yes.
7  Q.  Okay.  Tell me again, if you would, --
8  I don't know if you actually told me.  When this
9  occurred, there was an audit of these files.  What
10  information was organized and how was it organized
11  and, you know, in what manner, if that makes sense?
12  A.  I know spreadsheets were created, which broke
13  down the homicides by year and by RD number.
14      Exactly what they did in this 2013
15  audit, I'm not positive.
16  Q.  Are some of these documents you've
17  provided these spreadsheets or is that something
18  else?  That's more for Eileen.
19      MS. BONJEAN: Eileen, do you know what
20  I'm talking about?  I did see spreadsheets produced.
21      MS. ROSEN: Yes, we did produce some
22  spreadsheets.  I don't know if that's right now what
23  he's testifying about.  Maybe.  He's looking at it.
24  A.  Yes.  So, yes, these spreadsheets were
25  created, again, broken down by year and then by RD

Page 158

1  number.
2      MS. ROSEN: Do you need the Bates
3  number on that one?  You're muted.
4      MS. BONJEAN: Sorry.  Is it 051473?
5      THE WITNESS: Yes.
6      MS. ROSEN: Yes.
7      MS. BONJEAN: Okay.  Hold on one
8  second.  Let me get these.
9  Q.  So I'm looking at an eight-page
10  document that is RFC-Maysonet 051473 to 051487,
11  which I guess we'll mark as Bruno --
12      MS. BONJEAN: I think we're on
13  Bruno-10, right?
14      THE COURT REPORTER: Yes.
15      (Exhibit Bruno-10, a 17-page copy of a
16  document titled "1990 Homicides," Bates stamp
17  RFC-Maysonet 051473 through 051489, is marked for
18  identification.)
19  Q.  Mr. Bruno, this appears to be a
20  spreadsheet, and it says "1990 Homicides."  Okay?
21  A.  Okay.
22  Q.  Is this the spreadsheet that resulted
23  from the audits or the audit that was done pursuant
24  to the to/from memo we just looked at, which I think
25  we marked as Bruno-9?

Page 159

1  A.  I don't know if this was started at that time
2  or when they moved them back to the warehouse, this
3  particular document.
4  Q.  Where is this spreadsheet maintained
5  presently?
6  A.  At the warehouse.
7  Q.  On their network?
8  A.  I believe so.
9  Q.  But you don't know if this was
10  specifically created in connection with the 2013
11  audit, is that right?
12  A.  That's right.
13  Q.  But I see these boxes here.  What are
14  these boxes?  Okay, there's an RD number.  I know
15  what that is.
16      Then there's a column that says
17  "Stored," and they say "Bulk."  What does that mean?
18  A.  That's the bulk warehouse.
19  Q.  So that reflects where it is to this
20  day, like right now?
21  A.  Yes.
22  Q.  Okay.  So it wouldn't say "Bulk" if it
23  was, for instance, in the homicide room at
24  headquarters, right?
25  A.  Well, right.  Now they're all at the

Page 160

1  warehouse.
2  Q.  This spreadsheet purports to be a
3  current reflection of --
4  A.  Yes.
5  Q.  -- where the files are, right?
6  A.  Yes.
7  Q.  Then it appears to reflect what boxes
8  they're in?
9  A.  Yes.
10  Q.  And then what's "Media"?  Is that like
11  there's video or some type of media in the box?
12  A.  I believe so.
13  Q.  I see an "HOM#."  Is that a homicide
14  number?
15  A.  Yes.
16  Q.  What's a homicide number?  Is that an
17  internal number?
18  A.  Yeah, that's an internal number, you know,
19  tracking the total number of homicides for that
20  year.
21  Q.  Then the "Date," I take it that's the
22  date of the homicide, right?
23  A.  Yes, date of incident.
24  Q.  And then the "District" it occurred in,
25  the "Address of Occurrence" and then the "Victim,"

Page 161

1 right?
2 A. Yes.
3 Q. The Wiley brothers' homicide, did you
4 notice whether it's reflected here?
5 A. It is.
6 Q. Is it on 51478?
7 A. Yes.
8 Q. Where it says "Wiley, Wiley"?
9 A. Correct.
10 Q. So if there's a request that comes in
11 to the City of Chicago for an old homicide file, the
12 personnel there should be able to tell pretty
13 quickly, if they have an RD number, what box that
14 investigative file is in, right?
15 A. Yes.
16 Q. All right.
17 MS. ROSEN: Jennifer, are you leaving
18 from that topic?
19 MS. BONJEAN: For a moment, yeah.
20 MS. ROSEN: Okay. Well, I would just
21 suggest to you that you ask him what it means when
22 the numbers are blue.
23 MS. BONJEAN: Blue? Oh, I didn't even
24 notice that. My eyes are so terrible. Yeah, I saw
25 the yellow highlights. Honestly, I should have

Page 162

1 asked that.
2 Q. There are blue highlights on some of
3 these numbers. What are they?
4 A. It means that they've previously been
5 scanned.
6 Q. Got it. Okay.
7 MS. BONJEAN: Thank you, Eileen.
8 MS. ROSEN: You're welcome.
9 Q. And the yellow highlighting, what does
10 that mean?
11 A. I don't know.
12 Q. Those blue highlights, are they
13 hyperlinks, meaning you can click on them and
14 they'll take you to the scanned documents, or you
15 don't know that?
16 A. I don't know.
17 Q. It looks like the Wiley brothers' entry
18 shows that they had been previously scanned, at
19 least as of the printing of this document, right?
20 A. Yes.
21 Q. All right. Going back to this 346-page
22 document, which I think we've marked as Bruno-6,
23 right, and it has the "Copy" marks on it?
24 MS. ROSEN: Yep.
25 A. Yes.

Page 163

1 Q. This is what was sort of -- this was
2 e-mailed to you, I take it, correct?
3 A. Correct.
4 Q. When you received this PDF, did you --
5 I mean, I know you initially asked for it in
6 connection with an interrogatory.
7 What about this PDF made you go "Ah-ha"
8 or, you know, helped you answer the interrogatory or
9 what stuck out to you? Like why was it of any
10 significance to you, if it was? I don't know?
11 A. No. Initially, I was just looking for GPRs,
12 to see if there were GPRs within the file.
13 Q. And did you find them?
14 A. Yes.
15 Q. And then you were like, "Wait a second.
16 This file has GPRs. Why are they asking me this
17 question?", right?
18 A. Yes.
19 Q. And then Eileen eventually got the news
20 that there was actually at least some other file
21 there? Is that kind of how it all went down?
22 A. Correct.
23 Q. All right. So did somebody then go
24 look, physically, at what was in the warehouse after
25 this, as far as you know? Like was that you or was

Page 164

1 it somebody else?
2 A. We had them bring the actual file to us, at
3 headquarters.
4 Q. Does this reflect what was previously
5 scanned, this 346-page document, PDF?
6 A. I believe so.
7 Q. Okay. So on that spreadsheet, we saw
8 that the Wiley brothers' homicide documents or files
9 in box 10 had been previously scanned, as reflected
10 in the blue?
11 A. Right.
12 Q. Again, we don't know if that's a
13 hyperlink, but it's an indication that it was
14 previously scanned, and to the best of your
15 understanding, what was previously scanned is this
16 document that's 346 pages and appears to be some
17 amalgamation of, really, a couple different files,
18 right?
19 A. Yes.
20 Q. All right. Then you said, "Give me all
21 the physical files?" Is that what happened next?
22 A. I passed on the information that there were
23 GPRs, and then through legal, they asked for the
24 physical file, which we requested through records
25 and they brought it to headquarters.

Maysonet v.
Guevara

Page 165

1  Q.  What specifically -- and maybe I'll ask
2  it in a more pinpointed way, but what was actually
3  brought to headquarters?
4      MS. ROSEN: The three folders, right?
5  So it was brought for us.
6      MS. BONJEAN: Okay.
7  Q.  We looked at Bruno-4, which you've
8  identified as the investigative file.  Was that
9  brought to headquarters?
10 A.  Yes.
11 Q.  Then we had this other file, which
12 we've marked as Bruno-5, that was produced as a part
13 2.  Was that also brought to headquarters?
14 A.  Yes.
15 Q.  Bruno-2 was not brought to
16 headquarters, though, correct?
17     MS. ROSEN: No.  Bruno-2 was also
18 brought to headquarters.
19 Q.  You're answering for him.
20     MS. ROSEN: Well, I don't know that he
21 knows what was brought to headquarters, but I'm
22 telling you, I was -- Austin was there.
23 Q.  So Bruno-2 was brought to headquarters,
24 but it wasn't within the investigative file?  It was
25 a separate file?

Page 166

1      MS. ROSEN: Yeah.  There's three
2  folders, and that's how we produced -- that's why we
3  produced them that way.  Folder one is 1 through 66,
4  folder two is --
5      MS. BONJEAN: Part 1 and then --
6      MS. ROSEN: And then folder three was
7  part 2.  That's how it was brought to headquarters.
8      MS. BONJEAN: Okay.
9  Q.  Mr. Bruno, do you have any idea why it
10 is that in 2018, when Mr. Maysonet made the request
11 for any and all files, -- investigative files,
12 street files, RD files, files by any other name --
13 what we've now marked as Bruno-4 and Bruno-5 were
14 not produced?
15 A.  Now, the beginning of that question was, do I
16 have any idea why?
17 Q.  Yes.
18 A.  They were -- I believe they were misfiled
19 within the warehouse.
20 Q.  And what forms your basis for that
21 belief?
22 A.  Just that was a very common issue.
23 Q.  Yeah, which that issue would have
24 existed in 2018?
25 A.  Yes.  That issue was really cleaned up when

Page 167

1  we moved the files back to the warehouse in 2020.
2  Q.  So in 2018, are you saying that the
3  files were still at headquarters?
4  A.  The files as -- the investigative files were
5  at headquarters, yes, but there were boxes all over
6  the warehouse that contained miscellaneous files.
7  Q.  That doesn't explain why there are
8  duplicate files or partially duplicate files.  Do
9  you know why there are?
10 A.  I think they were inadvertently filed in
11 different places and then, once realized, combined
12 and organized together.
13 Q.  Why were duplicate files created in the
14 first place?  That's what I'm asking.
15 A.  I don't know.
16 Q.  And when I say "duplicate," I mean
17 partially duplicate.  I think we agree they're not
18 identical.
19     But why were partially duplicate files
20 created in the first place, do you know?
21 A.  I don't know.
22     MS. ROSEN: Jennifer, can we take a
23 bathroom break?
24     MS. BONJEAN: Sure, why not.  How much
25 time do you need?

Page 168

1      MS. ROSEN: Is ten minutes okay?
2      MS. BONJEAN: Yes.
3      (Recess:  5:53 p.m. to 6:06 p.m.)
4  Q.  Mr. Bruno, you acknowledge that it was
5  more of a guess than anything, but your belief or
6  your hunch was that these files that turned up in
7  July of 2024, that were not produced in 2018 when we
8  requested all files, was because you believe they
9  were misfiled when they returned back to the
10 warehouse?  Is that one of the working theories?
11 A.  Can you repeat that?  I want to clarify.
12 Q.  Let me ask it more open-ended.
13     Can you please explain to me what your
14 best guess as to why in 2018, when the city produced
15 documents to us and we requested all of the files,
16 including the complete investigative file, why we
17 did not receive what has now been produced in July
18 of 2024?
19 A.  Yes.  So I believe that files were misfiled
20 within the warehouse.
21 Q.  When?
22 A.  Going back years; decades, even.
23     And when they made the move to
24 headquarters, they cleaned some of that up, and then
25 when they moved back to the warehouse, they really

Maysonet v.
Guevara

1  dug deeper and found boxes all over the warehouse,
2  containing a number of different files.
3  Q.  Can you pinpoint the date of when there
4  was the move of the homicide investigative files
5  from the headquarters homicide room back to the
6  warehouse?
7  A.  That was in 2020, that started.
8  Q.  You would admit, though, what has been
9  marked as -- I think it was Bruno-6, which is that
10  346-page document that was e-mailed to you, that
11  believe that was already digitized, right?
12  A.  When it was sent to me, yes.
13  Q.  Well, I thought I understood you to say
14  that it was already in an electronic version before
15  it was sent to you, when you asked for the
16  investigative file in response to the interrogatory?
17  A.  Correct.
18  Q.  Okay.
19  A.  But I don't know when it was scanned.
20  Q.  I'm sorry?
21  A.  I don't know when it was scanned.
22  Q.  You don't know when it was scanned.
23     And you really don't know how it came
24  to be, because it doesn't really match any of the
25  files in exactness, correct?

1  A.  Correct.
2  Q.  But we could find out and I think, you
3  know, I will write a letter to follow up, but I
4  would like to see the metadata of when that 346-page
5  PDF was created, because it would have had to have
6  been after 2018, though, right?
7     (A request is made.)
8  A.  Right.
9  Q.  So at some point -- well, strike that.
10  Let me ask a different question first.
11     That document, that 346-page PDF that
12  you received, that was already scanned although we
13  don't know when, did contain a fair amount of
14  material that was not in Bruno-2?
15  A.  Yes.
16  Q.  Okay.  So that means that whoever put
17  that document together, after 2018, had access to
18  the investigative file, correct?
19  A.  Correct.
20  Q.  Your belief is that in 2018, the
21  investigative file was filed somewhere else.  So at
22  some point, it got returned to where it was supposed
23  to go, right, --
24  A.  Correct.
25  Q.  -- or supposed to be?

1  A.  Correct.
2  Q.  And have you been able to find out how
3  or why or when it got returned?  Do you have a
4  theory about that?
5  A.  No.  I believe I have the -- my theory would
6  be that it's as they are moving the files back to
7  the warehouse and trying to clean up the warehouse,
8  they come across additional boxes and file those
9  appropriately.
10  Q.  Have you had a chance to look at the
11  Cook County State's Attorney's file on this case?
12  I'm guessing no, but I'm going to ask the question
13  anyway.
14  A.  No.
15  Q.  Are you aware that in 2017, the Cook
16  County State's Attorney requested the investigative
17  file for the --
18  A.  No.
19  Q.  -- Wiley brothers' homicide
20  investigation?
21  A.  No.
22  Q.  If I wanted to determine what, if
23  anything, was produced to them in 2017, would that
24  be information that would be available on the
25  network of the warehouse?

1  A.  I don't know.
2  Q.  So it would be possible or conceivable
3  that in 2017, when the Cook County State's Attorney
4  requested -- it could have been 2018, even.
5     MS. ROSEN: Are you sure about the
6  date?  You're not, right?
7     MS. BONJEAN: No.  I see there is a
8  request there, yeah.
9     MS. ROSEN: I haven't looked.  I'm
10  just looking at the chart, Exhibit 7.
11     MS. BONJEAN: Yeah, Bruno-7.
12     MS. ROSEN: Yeah.
13     MS. BONJEAN: Yeah, I see -- I mean,
14  we can go look at Bruno-7 in a second, but maybe
15  it's 2018.  Let me --
16     MS. ROSEN: I'm not suggesting that
17  it's there.  I'm just asking if you're definitive
18  about the date or estimating.
19     MS. BONJEAN: They were still wanting
20  to retry him then.  So that would make some sense,
21  right?
22     MS. ROSEN: Okay.  I'll look myself.
23  Thank you.
24  Q.  Let's look at Bruno-7 again, if we can.
25  Maybe this will help.  I'm still not clear on what

Page 173

1  this document is exactly and how it interfaces with
2  your warehouse, but maybe it doesn't at all.
3      This is maintained by the bureau of
4  detectives, right?
5  A.  Yes.
6  Q.  Do you know when you started logging
7  information like this?  The bureau of detectives,
8  that is.
9  A.  I don't know.
10  Q.  Okay.  Let me first ask this question:
11  You would agree that requests for documents come in
12  a number of different forms, right?  They can come
13  through a FOIA request.  That's one way, right?
14  A.  Right.
15  Q.  They can come through a subpoena,
16  through the criminal justice process, correct?
17  A.  Correct.
18  Q.  They can come through your office of
19  legal affairs, which would be via civil litigation,
20  right?
21  A.  Correct.
22  Q.  So if you're a party to a lawsuit, it
23  could come that way.
24      I guess if you're a third party, you
25  could get a subpoena that would go through your

Page 174

1  legal affairs department, fair?
2  A.  Yes.
3  Q.  That's off the top of my head.  Maybe
4  there's other ways you get requests.
5      Does the bureau of detectives get
6  notice every single time there's a request made for
7  a homicide file, no matter in what manner it's being
8  requested?
9  A.  I know we do for FOIA requests and requests
10  that come through legal affairs.
11      The subpoena request process, I'm not
12  sure if BOD headquarters would get notified.
13  Q.  Okay.  Where is BOD headquarters?
14  A.  35th and Michigan.
15  Q.  That's where you work?
16  A.  Yes.
17  Q.  Looking at this first entry here --
18  well, first of all, this excerpt, did you put this
19  together?  Who put this document together, do you
20  know?
21  A.  A sergeant that works for me.
22  Q.  Sergeant Smith or somebody else?
23  A.  Sergeant Muzupappa.
24  Q.  Okay, and it's just excerpt.
25      What did you ask him to put together?

Page 175

1  Like how did you come up with this particular
2  excerpt?  Just based on the RD number?
3  A.  I asked her to check for the requests related
4  to this RD number.
5  Q.  Okay.  Thank you.  It's a her.  I
6  forgot.  Now we're in 2024.
7      So you can search by way of RD number,
8  and then it will generate sort of a spreadsheet of
9  this information based on RD number?
10  A.  Yes.  My understanding, it's an Excel
11  spreadsheet that you can search by RD number.
12  Q.  I mean, this looks like it was sort of
13  put into a spreadsheet.  What is the software, do
14  you know?  Like what actually -- what is the actual
15  software that maintains the data, do you know?
16  A.  I believe it's Excel.  It's an Excel
17  spreadsheet.
18  Q.  Oh.  Well, who puts the data in?
19  A.  The officers that handle the requests.
20  Q.  The FOIA requests?
21  A.  Yes.
22  Q.  Is it the same people who handle FOIA
23  requests as your office of legal affairs?
24  A.  It's the same people within BOD who handle
25  those requests.

Page 176

1  Q.  "BOD," you said?
2  A.  Bureau of detectives.
3  Q.  Do those people have a particular unit
4  they're assigned to?
5  A.  They're assigned to our unit, Unit 180,
6  Bureau of Detectives.
7  Q.  Do they have a particular --
8      MS. ROSEN:  Jennifer, they're not -- I
9  think you might be confused, just based on asking
10  the question.
11      There are also FOIA officers not in
12  BOD, right?
13      MS. BONJEAN:  Okay.
14      MS. ROSEN:  So this is just BOD.
15      MS. BONJEAN:  Okay.  Yeah, I mean,
16  that doesn't surprise me.
17  Q.  But I guess my question is, within the
18  bureau of detectives, there is a unit of officers
19  who handle requests for documents, whether they by
20  way of FOIA request or in your legal affairs
21  department?  Is that a correct statement?
22  A.  Yes.  It's a team of two officers.
23  Q.  So it's two officers.
24      What is the assignment?
25  A.  To handle FOIA requests and document requests

Page 177

1 from legal affairs.
2 Q. Do they do anything else?
3 A. That's -- that's almost all -- well, I mean,
4 different odd jobs, as needed, but that's their
5 primary function.
6 Q. So it's like an administrative
7 position?
8 A. Yes.
9 Q. And one of them is Sergeant Muzupappa
10 and then --
11 A. (Gesturing.)
12 Q. No?
13 A. No.
14 Q. All right.
15 A. Sergeant Muzupappa is my administrative
16 sergeant.
17 Q. All right. Well, I don't want to go
18 too far down that rabbit hole, but maybe it'll come
19 up again.
20 The spreadsheet that was produced here,
21 which was produced -- it's an Excel spreadsheet that
22 I'm looking at?
23 A. I'm pretty certain it is.
24 Q. In the first column, there's a "Date."
25 What date does that reflect? Like what date goes in

Page 178

1 there? When a request is made?
2 A. That would be the date they received a
3 request.
4 Q. And that could be a request either by
5 FOIA or the office of legal affairs?
6 A. Yes.
7 Q. And then the "BOD#," what is that?
8 A. That's just a tracking number to keep track
9 of these requests, created within BOD.
10 Q. So it's a BOD -- it's an internal
11 number from the bureau of detectives?
12 A. Yes.
13 Q. Is that correct?
14 A. Yes.
15 Q. Well, can you explain it to me? Like I
16 see a year here. What does the "F" mean?
17 A. So the "F" is going to be FOIA, 2017, the
18 80th request of the year.
19 Q. Got it.
20 A. The next one is going to be office of legal
21 affairs, 2018, 355th request of the year.
22 Q. Got it.
23 Then there's a "FOIA#," and that's just
24 -- I mean, how does that number get generated, if
25 you know?

Page 179

1 A. That's from the FOIA office. That's their
2 FOIA tracking number.
3 Q. Then the "Location" says "warehouse."
4 What does that mean?
5 A. Where the file is located.
6 Q. And that's where it's located as of the
7 date of the request?
8 A. Yes. Well, yes.
9 Q. Then the "Records," is that what's
10 being sought or requested?
11 A. Yes.
12 Q. Then there's the "Requester," and then
13 there's the "Officer" who's handling it, right?
14 A. Correct.
15 Q. Okay. So this would suggest that in
16 February of 2017, there was a FOIA request by NBC
17 Universal for, essentially, the investigative file
18 related to the Wiley brothers, right?
19 A. Yes.
20 Q. Are you able to -- I think we did get a
21 production of materials that were produced, that
22 were responsive to that request. Do you know how
23 those materials came to be?
24 A. I don't know.
25 Q. Have you had a chance to look at those

Page 180

1 materials?
2 A. No.
3 Q. Well, I have, and there are materials
4 within there that do not appear in the file that was
5 produced to us in 2018. There's like photographs in
6 there. Do you know why that might be?
7 A. No.
8 Q. So as of February of 2017, there was a
9 file in the warehouse that contained documents as
10 well as photos that were produced to NBC but that do
11 not appear in Bruno-2, right?
12 MS. ROSEN: Well, hold on, because the
13 FOIA request was broader than just for the
14 investigative stuff, right?
15 MS. BONJEAN: I mean, that's fine. I
16 mean, that already occurred to me, but I'm going to
17 get to that. It might have been broader.
18 Q. Are photos maintained somewhere else,
19 other than in the --
20 MS. ROSEN: Crime scene photos?
21 MS. BONJEAN: Any photos.
22 A. Yeah. Yeah, photos would be kept somewhere
23 else.
24 Q. Where?
25 A. Within forensics.

Page 181

1 Q. For the Chicago Police Department? You
2 mean forensics for the Chicago Police Department?
3 A. Correct.
4 Q. Where are those photos maintained?
5 A. They're out of Homan Square.
6 Q. Okay.
7 A. If you have that FOIA request, it could help.
8 Q. We can look at that in a minute.
9    So tell me everything that's maintained
10 at Homan Square as of -- well, I mean, I know we're
11 covering a lot of eras.
12    Well, let's talk about, first of all
13 right now, what is maintained at Homan Square?
14 A. Can you be a little more specific?
15 Q. Yeah. What materials relevant to a
16 homicide investigation are maintained or stored in
17 Homan Square presently?
18 A. It would be all within the forensics
19 umbrella. So you're talking, you know, pictures,
20 ballistic evidence. They have a firearms unit
21 there, evidence.
22    All of those things are at Homan
23 Square.
24 Q. And how long has that been the case?
25 Was that true in 2018?

Page 182

1 A. Yes.
2 Q. Was that true in 2000?
3 A. Yes.
4 Q. Was that true in 1990?
5 A. I believe so, but I'm not positive.
6 Q. Are there any reports, internal police
7 department-generated reports, maintained there? I
8 mean other than those that are, I guess, forensic
9 reports.
10 A. Files? No.
11    But you would have inventory reports
12 with the evidence. You would have crime scene
13 reports within forensics.
14 Q. And how are those organized?
15 A. They're all digital now.
16 Q. Since when?
17 A. The 2000s. Mid-2000s or 2005, '6 maybe.
18 Q. Well, how did that happen or when did
19 that happen? I guess you said mid-2000s to 2006.
20 So they started digitizing forensic files there at
21 Homan Square? Well, how do you digitize forensics?
22 A. It becomes a digital crime scene processing
23 report, which is created through our computer
24 systems.
25 Q. What about photos? Like did all the

Page 183

1 photos get digitized, crime scene photos?
2 A. They are now digitized.
3 Q. Okay. Where are the originals?
4 A. They were -- not until -- I don't know.
5    Again, I would estimate '06, '7, '8, somewhere in
6 there.
7 Q. And the original photos are where now?
8 A. They're digitally stored.
9 Q. But the original photos from 1990 of
10 the crime scene?
11 A. Oh, from 1990?
12 Q. Yeah.
13 A. Yeah, those are within the forensics group.
14 Q. They weren't destroyed, the originals?
15 They're still maintained there at Homan Square?
16 A. Yes, they should be.
17 Q. And organized by RD number?
18 A. Yes.
19 Q. Okay. We'll come back to that FOIA
20 request in a minute, but I want to get through
21 Bruno-7, if we can.
22    MS. BONJEAN: I mean, Eileen, I think
23 you're suggesting that Bruno-2 is what was produced
24 in February of 2017, plus they pulled photos from
25 Homan Square.

Page 184

1    MS. ROSEN: No, I'm not. All I know
2 is that those photos look like crime scene photos,
3 and those are not -- there might be sometimes copies
4 of them in investigative files, but the originals
5 are not maintained in the bureau of detectives.
6    And I thought, when I read the FOIA
7 request, there was a request for a file and there
8 was a request for photos, but that's going off my
9 memory of the FOIA request.
10 Q. So when there is a request for files
11 and photos through a FOIA request, is it sort of up
12 to the FOIA officer to go to the different places to
13 get what they need that is responsive to the FOIA
14 request?
15 A. Yes.
16 Q. So if they have to go to the warehouse
17 and then also Homan Square, like that's kind of what
18 they need to do?
19 A. Correct.
20 Q. Okay. Looking back at Bruno-7, then,
21 it looks like it's September 20th of 2018, there is
22 a legal affairs request which seems to correspond --
23 I guess it corresponds with, yeah, the lawsuit that
24 was filed in this case.
25    I see these case numbers, "warehouse,"

Maysonet v.
Guevara

Page 185

1  and then there's, "Original file requested for
2  attorney's review." That's probably, I'm guessing,
3  Ms. Rosen's request.
4      Then on September -- by the way, do I
5  have that correct, that September 20th of 2018,
6  there was a request by your legal affairs
7  department?
8  A.  Yes.
9  Q.  Okay. And you know, of course, that
10  this lawsuit was filed in April of 2018, something
11  like that? Like a lifetime ago, something like
12  that. You're aware that it was filed in 2018,
13  right, earlier 2018?
14  A.  Yes.
15  Q.  Then on September 26th of 2018, there's
16  another legal affairs request. There's a case
17  number. What does this TN628443 mean?
18  A.  I'm not sure.
19  Q.  That's not a case number, is it?
20  A.  No.
21  Q.  "Copy of files and scan to outside
22  counsel," do you know what that means?
23  A.  That it was scanned and sent to an outside --
24  an attorney outside of the city.
25  Q.  But it came directly from the office of

Page 186

1  legal affairs?
2  A.  The request would come from legal affairs.
3  Q.  Right, the request came from legal
4  affairs.
5      Then it says, "Copy of files and scan
6  to outside counsel." Is that outside counsel -- I
7  guess I'm confused. Outside counsel as in like
8  Rock-Fusco or outside counsel as in like someone who
9  doesn't represent the city?
10  A.  I don't know.
11  Q.  Is there any way to figure out who this
12  request came from?
13  A.  (No response.)
14  Q.  I'm guessing the fact that Eileen is
15  being silent, it wasn't her, but I don't know.
16      MS. ROSEN: Well, I don't know the
17  dates. I know there may be a way to track it
18  through OLA. So I just don't have the OLA dates in
19  front of me.
20  Q.  Then it says, "The bureau of detectives
21  copied the files that came from warehouse." That
22  would be your department, right?
23  A.  Right.
24  Q.  And then they were scanned as well?
25  A.  Yes.

Page 187

1  Q.  Okay. So do you know what materials
2  were scanned in and around September of 2018?
3  A.  I don't know.
4      MS. ROSEN: I'm being told that that
5  September request is from our office. So we are the
6  "outside counsel."
7      MS. BONJEAN: I mean, is there a paper
8  trail of this somewhere, other than this
9  spreadsheet?
10      MS. ROSEN: My office makes requests
11  via e-mail, so we have that. I haven't produced any
12  of that because the requests go to the office of
13  legal affairs and typically maintain privilege over
14  that, because it's communications.
15      We can talk about a mechanism, maybe,
16  for you to get that information without waiving the
17  privilege.
18      MS. BONJEAN: I'm just trying to
19  understand the difference between the prior requests
20  and this request.
21      MS. ROSEN: I could tell you that we
22  were making a lot of requests during that time
23  frame, about the file, because of what we were
24  getting back. So we can probably piece together a
25  paper trail for you, in some form that doesn't

Page 188

1  violate privilege.
2      MS. BONJEAN: Okay.
3      (A request is made.)
4  Q.  Now, it looks like there was a request
5  made again, in March of 2019, and the file was
6  obtained from the warehouse and hand-carried to the
7  office of legal affairs.
8      Is it your belief that the file that
9  was obtained from the warehouse that was brought to
10  legal affairs is Bruno-2?
11  A.  Yes.
12  Q.  Is that a "Yes"?
13  A.  "Yes."
14  Q.  So what we have now identified as
15  Bruno-4 and Bruno-5, according to the City of
16  Chicago, was not in the same location as Bruno-2, as
17  of March 26th of 2019, am I correct?
18  A.  Yes.
19  Q.  And it's your belief that at some point
20  in time, it's still misfiled somewhere, correct?
21  A.  Correct.
22  Q.  Do you know how it got unearthed, --
23  A.  I don't know.
24  Q.  -- like how it miraculously appeared
25  where it was supposed to be as of, you know, July of

Page 189

1 2024?
2 A. I don't know.
3 Q. What seems to be an important question,
4 to me at least, is that when you got this scanned
5 document in July of 2024 that was already scanned,
6 we don't know when it was scanned, is that right?
7 A. That's correct.
8 Q. But it sounds like something we should
9 be able to get to the bottom of, fair?
10 A. Yes.
11 Q. Even as of May 19th of 2023, though,
12 Bruno-4 and Bruno-5 wasn't where it was supposed to
13 be, right?
14 A. I don't know that.
15 Q. Because I'll represent that the
16 investigative file that was produced in the Gonzalez
17 case, which is Bruno-2, or, you know, the alleged
18 investigative file, it was the same file as of --
19 and I don't know exactly when it was produced but
20 I'm going to assume May of 2023 sounds about right.
21 MS. ROSEN: It was actually produced
22 before May of 2023, and the OLA 30(b)(6) doesn't
23 mean we'll be able to speak to that request in May
24 of 2023 and what happened to it.
25 I can preview that they did request it.

Page 190

1 The OLA requested it and apparently got files that
2 were never given to us.
3 MS. BONJEAN: That's the person
4 tomorrow?
5 MS. ROSEN: Yeah.
6 MS. BONJEAN: Okay.
7 Q. Have the homicide investigative files,
8 let's say from Area Five, have they ever -- strike
9 that. Let me start over.
10 The homicide investigative files from,
11 let's just say, the 1990s, -- okay, to make it
12 easy -- have they been maintained in Area Central?
13 A. From Area Five to Central?
14 Q. I'm sorry. I didn't hear you.
15 A. Did you say from Area Five to Central?
16 Q. What I'm saying is, the Area Five
17 investigative files that have been closed, you know,
18 between 1990 and 2000, let's just say, okay, have
19 they ever been maintained or kept at Area Central?
20 A. No.
21 And just for clarification, Area
22 Central does not exist at this point.
23 Q. Right. That's Belmont and Western?
24 MS. ROSEN: No.
25 A. No.

Page 191

1 Q. Where's Area Central?
2 A. 51st and Wentworth.
3 MS. ROSEN: Do you mean Area North?
4 MS. BONJEAN: I am going to ask about
5 Area North in a second.
6 MS. ROSEN: Okay.
7 Q. 51st and Wentworth, that was Area One
8 at some time, is that right?
9 A. It was and it is again.
10 Q. Oh, Lord. You keep switching things
11 around.
12 A. Yeah, I know.
13 Q. I mean, it seems like you're not really
14 addressing the real problems, but that's my little
15 soapbox.
16 But, anyway, okay. Area Central, I'm
17 talking about, which I guess is 51st and Wentworth.
18 At any point between 1990 and today, have homicide
19 investigative files been stored there?
20 A. No.
21 MS. ROSEN: From Area Five?
22 Q. Well, I suppose Area One files have
23 been stored there, right?
24 A. Right.
25 Q. And that would be Area One files that

Page 192

1 are either open or haven't made their way through
2 the criminal justice process, correct?
3 A. Yes.
4 Q. Closed Area One files should not be at
5 Area Central? They should go to the warehouse,
6 right?
7 A. Yes.
8 Q. Okay. Now, specific to Area Five, have
9 Area Five homicide files ever been stored at area
10 Central?
11 A. No.
12 Q. We already talked about Area Five, and
13 if I understand you correctly, Area Five homicide
14 investigative files stayed there throughout the
15 course of the criminal justice process and, with
16 final disposition of the criminal justice process,
17 they were moved to the warehouse, but if they
18 remained open files, they stayed at Area Five,
19 correct?
20 A. Yes.
21 Q. Okay, and I think we talked about this.
22 You believe this is in the file room, but you don't
23 really know where that's at or how it's really
24 maintained over there, correct?
25 A. Correct.

Page 193

1 Q. What about Area North? Is Area North
2 also known as Gang Crimes North, or was it?
3 A. No.
4 Q. What's Area North?
5 A. Area North was created when they closed Area
6 Four and Area Five in March of 2012.
7 Q. Okay. Have there ever been any
8 homicide investigative files maintained at Area
9 North, I guess, -- or strike that.
10 So Area North became when they closed
11 Area Four, you said?
12 A. Area Four and Area Five.
13 Q. What year was that? That was 2012.
14 Okay.
15 Where was Area North physically
16 located?
17 A. Belmont and Western.
18 Q. How long was -- so what did Grand and
19 Central become, then?
20 A. It was a patrol district. The 25th District
21 remained opened, and the detective division area was
22 closed.
23 Q. Okay, got it.
24 So that was in 2012. Area North became
25 a combination of Area Four and Area Five in 2012.

Page 194

1 When that happened, what happened to the Area Five
2 investigative files that were open?
3 A. They were moved to Area North.
4 Q. So they did move? They left Grand and
5 Central?
6 A. Correct.
7 Q. Area Four was not at Belmont and
8 Western prior to 2012, correct?
9 A. Area 4 was at Harrison and Kedzie.
10 Q. That's what I thought.
11 So does that mean that the Area Four
12 investigative files, open files, also moved to
13 Belmont and Western?
14 A. Some of them.
15 Q. Where did the -- well, some of them?
16 A. When they split up Area Four, some of the
17 districts came to Area North. Some of them went to
18 Area Central.
19 Q. Why? They split up based on what?
20 A. Geography, more than anything.
21 Q. Geography based on what? Like where
22 the crimes happened?
23 A. Based on where -- yeah, it's always based on
24 where the crime occurs, and then the districts were
25 redistributed when they closed 4 and 5.

Page 195

1 Q. So it was organized by way of district,
2 not --
3 MS. ROSEN: Well, they always organize
4 by district.
5 MS. BONJEAN: I understand.
6 A. Well, it's both.
7 Q. So Area Four is the violent crimes unit
8 that has the detective division that is
9 investigating homicides, right? Area Four and Area
10 Five combine, and they go to a different location.
11 But the files, then, like don't follow
12 the detectives? They go to like two different
13 places?
14 A. No, Area Four and Area Five don't combine.
15 Area Four and Five are closed, and those districts
16 are redistributed across the three areas.
17 So Area -- I'm sorry. The 1st District
18 was in Area Four. The 10th District was in Area
19 Four. In 2012, they went to Area Central. The 11th
20 District and the 12th District went to Area North.
21 Q. Okay. So I follow that.
22 But prior to 2012, all the Area Four
23 homicide files were maintained at Harrison and
24 Kedzie, that were open, right?
25 A. Yes.

Page 196

1 Q. Then when Area Four and Area Five were
2 dispensed with and they opened up Area North, the
3 homicide detective files that remained open were
4 organized by virtue of what district the crime
5 occurred in?
6 A. Exactly.
7 Q. And all open Area Five homicide
8 investigative files went to Belmont and Western Area
9 North, right?
10 A. Yes.
11 Q. How long did Area North exist?
12 A. March of 2012 to April of 2020.
13 Q. But in 2013, all of the closed files
14 should have gone to headquarters, correct?
15 A. Correct.
16 Q. Are you confident that that happened?
17 A. Yes. I mean, I can't say that they all made
18 it there, but the effort was put in to get them all
19 there.
20 Q. So these files, particularly the Area
21 Four and Area Five files, homicide files, made
22 apparently a completely unnecessary trip before
23 going to headquarters, right?
24 A. Can you repeat that one?
25 Q. The Area Four and Area Five homicide

Page 197

1 investigative files were stored at either Harrison
2 and Kedzie, for Area Four, and then Grand and
3 Central, for Area Five, as of January of 2012, and
4 then Area Five is created. Area Four and Five are
5 dismantled.
6 These files get -- Area Five files go
7 to Area North and the Area Four files get split up
8 between Area Central and Area North for less than a
9 year, and then they go to the homicide room of
10 headquarters, right?
11 A. I'm not following you.
12 Q. I guess -- well, strike that, because
13 the closed files should have already been at the
14 warehouse.
15 A. Right.
16 Q. Okay, fair enough.
17 The open files stayed with the areas,
18 right?
19 A. Right.
20 Q. So those didn't go. Got it. All
21 right, that was my mistake. Fair enough. Okay.
22 Those open files -- which we're talking
23 about cold cases at this point, right?
24 A. Not all of them. Even the recent files were
25 also moved.

Page 198

1 Q. Okay, yeah, and it does take a long
2 time to get your murder trial at 26th Street. So I
3 guess they could be there for a while.
4 So in 2020, then, the homicide files
5 that were open, where did they go in 2020?
6 A. They went to the areas that covered those
7 districts as those districts were again reorganized.
8 Q. And can you remind me how they were
9 reorganized in 2020?
10 A. Sure. So Area Three is the 1st District, the
11 18th District, the 12th district, the 19th district,
12 the 20th District and the 24th district.
13 Q. Okay.
14 A. Area Four is the 10th District, the 11th
15 District and the 15th District.
16 Q. Okay.
17 A. And then Area Five is the 14th District, the
18 16th District, the 17th District and the 25th
19 District.
20 Q. And the open files followed back to
21 Grand and Central, right?
22 A. For those appropriate districts, yes.
23 Q. Have there been homicide investigative
24 files ever stored at Gang Crimes North?
25 A. No.

Page 199

1 When you say "Gang Crimes North," do
2 you mean way back when?
3 Q. I mean, it's hard to know. I mean,
4 Gang Crimes North was located where, in the 1990s?
5 A. I don't know.
6 Q. Wasn't Belmont and Western Gang Crimes
7 North at one point? No?
8 A. It may have been. I don't know.
9 MS. ROSEN: I don't think so. I think
10 there might have been Gang Crimes Five.
11 MS. BONJEAN: I think Gang Crimes Five
12 was Belmont and Western at one time.
13 MS. ROSEN: I don't know.
14 A. That would make sense, but I'm not -- I don't
15 know.
16 Q. So, yeah, I guess that's why I was a
17 little confused, because if Area North was Belmont
18 and Western and Gang Crimes North was Belmont --
19 assuming I'm right about this, Gang Crimes North was
20 Belmont and Western --
21 MS. ROSEN: But Gang Crimes was gone,
22 right? Gang Crimes gets disbanded before all of
23 this.
24 MS. BONJEAN: Before Area North
25 becomes Area North, is that what you're saying?

Page 200

1 MS. ROSEN: Correct. Yeah.
2 Q. Were there files ever maintained at
3 Maxwell Street?
4 MS. ROSEN: What files?
5 MS. BONJEAN: I mean --
6 MS. ROSEN: Well, like --
7 MS. BONJEAN: -- homicide files, any
8 type of homicide files. I mean, that's a good
9 question.
10 A. Was Maxwell Street ever a detective division
11 area?
12 Q. I mean, you work in the department.
13 A. Yeah, but you're talking '60s.
14 Q. Okay. Well, I'm not talking about the
15 '60s.
16 A. Maxwell Street has been closed a long time.
17 MR. GREENBERG: I don't think Maxwell
18 Street was ever any detective --
19 THE WITNESS: Yeah, if it was never a
20 detective division area, then there should never
21 have been homicide files stored there.
22 Q. Where did they keep the street files?
23 MS. ROSEN: Objection; form.
24 A. Who keeps what street files?
25 Q. Let me ask it a little broader.

Page 201

1    Do you know whether there were any
2 Chicago Police Department files maintained at Area
3 Central, at 51st and Wentworth?
4 A.  If there were any files?
5 Q.  Yeah.
6 A.  The Area Central files.  The open Area
7 Central files would be maintained at 51st and
8 Wentworth.
9 Q.  So the open files, period, right?
10 A.  Right.
11 Q.  And closed files go to the warehouse,
12 right?
13 A.  Yes, eventually.
14 Q.  Okay.  Is there a scenario where the
15 system just doesn't work that great and closed files
16 sort of stay at the area longer than they should?
17 A.  Can you repeat that one.
18 Q.  Yeah.  I mean, are you willing to
19 concede that the system may not work as efficiently
20 as it should have and that closed files actually
21 stayed at the area longer than they should or never
22 made their way the warehouse at all?
23 A.  I don't know.
24 Q.  We talked about Homan Square being the
25 sort of repository for forensic material.

Page 202

1    If I ask you for the Wiley brothers'
2 investigative file, 1990 homicide investigative
3 file, where are all the places that pieces of that
4 file could be?
5    MS. ROSEN: Wait.  Can you either read
6 it back or rephrase it?  Because I lost it.
7    MS. BONJEAN: Yeah, I'll rephrase it.
8 I'll rephrase it.
9    MS. ROSEN: Okay.
10 Q.  The homicide investigative file for the
11 Wiley brothers, okay, it certainly contains forensic
12 information or forensic material, such as crime
13 scene photos.  I think there was ballistic stuff
14 done.
15    I'm assuming, according to your
16 testimony, that that actually is maintained at Homan
17 Square, right?
18 A.  No.
19 Q.  No?
20 A.  The investigative file would be maintained in
21 the area, and it wouldn't contain, necessarily,
22 crime scene photos or some of those forensic pieces.
23 Q.  Right.  I think we're saying the same
24 thing.
25    I'm saying once that file was closed,

Page 203

1 okay, Mr. Maysonet is convicted and he goes off to
2 prison, you know, and he gets his life sentence, and
3 he's now in prison in 1995.  Okay?  That case is now
4 closed.  I mean, it's more than closed.  It's
5 disposed of in the criminal justice process.
6    That file, as of 1995, allegedly goes
7 to the records division warehouse, correct?
8 A.  Correct.
9 Q.  But crime scene photos associated with
10 that case went to Homan Square, right?
11 A.  Where they were the whole time.
12 Q.  Okay.  So they were there -- even when
13 the case was open, you're saying it was in Homan
14 Square?  That material was in Homan Square?
15 A.  Yes.
16 Q.  So if the forensic unit went out and
17 took pictures of the crime scene and made copies to
18 go into some file at Area Five, but the originals
19 stayed in Homan Square, is that what you're saying?
20 A.  Yes.
21 Q.  Okay, got it.
22    This collection of 346 pages of this
23 PDF document which we marked as -- I think it was
24 Bruno-6, is that right?  Yeah, Bruno-6.
25    MS. ROSEN: Yes.

Page 204

1 Q.  How did that PDF -- well, let me ask,
2 where is that PDF maintained, all of the places it's
3 maintained right at this second?
4    MS. ROSEN: Objection; form.
5    If you understand the question, you can
6 answer.
7 A.  Where is the PDF once it was scanned?
8 Q.  Yeah.  So let me back up a second.
9    You've testified, and correct me if I'm
10 wrong, that after you got this interrogatory, okay,
11 in the Gonzalez matter, through Stephen Smith and
12 whatever means, you presumably asked for the
13 investigative file or asked -- I think you probably
14 would have asked for the investigative file, right?
15 Is that what you would have asked for?
16 A.  Yes.
17 Q.  From the warehouse?
18 A.  Uh-hum, yes.
19 Q.  And then somehow you get back, from the
20 warehouse personnel there, through somebody else in
21 your -- or maybe it's just e-mailed directly from
22 them.  You get back what you've identified as
23 Bruno-6, which appears to be a collection of both RD
24 reports and investigative file reports; maybe
25 because they're already put together, maybe not.

Page 205

1 But that's what you get back, and this would have
2 been in July of 2024, right?
3 A. Yes.
4 Q. Okay. Now, specifically that PDF --
5 and I'm not looking for privileged information. Did
6 you provide that PDF to your legal affairs
7 department, or how did that PDF make its way to me,
8 I guess? I'm curious if you know, if you can answer
9 it without violating privilege.
10     MS. ROSEN: Well, I can tell you that
11 I asked for it, and then I produced it. I became
12 aware of it, I asked for it, and I produced it.
13 Q. Then in response to the interrogatory,
14 this is what you have: You say, "Hey, there are
15 GPRs in here, and here it is," right?
16 A. Yes.
17 Q. Then at some point, there's some
18 confusion, and you go back to the warehouse and get
19 the physical files. There's actually this other,
20 you know, investigative file, this other file, and I
21 think you said Bruno-2 is not there, right?
22 A. Right.
23     MS. ROSEN: Bruno-2 to OLA, for the
24 original?
25     MS. BONJEAN: He said it wasn't there,

Page 206

1 but you said it was there, Eileen.
2     MS. ROSEN: No. He said he didn't
3 know where it was stored.
4     You asked what originals were brought
5 to be reviewed. I said he wouldn't know that. We
6 reviewed them.
7     MS. BONJEAN: Okay.
8     MS. ROSEN: So the three folders were
9 brought, from wherever they were brought, for our
10 review.
11     MS. BONJEAN: I mean, again, this is
12 in July of 2024?
13     MS. ROSEN: Yeah. The originals,
14 right, were brought, not the scanned version.
15     MS. BONJEAN: I understand.
16     MS. ROSEN: Okay.
17     MS. BONJEAN: You have this
18 amalgamation scanned version. I'm going to call it
19 that because that's what it is. It's an
20 amalgamation scanned version that has been marked as
21 Bruno-7, and then apparently there are these three
22 other files. One you've identified, I think
23 Bruno-4, as, I'll call it, the true investigative
24 file. Then there's Bruno-2, whatever that is, and
25 then this other kind of partially duplicative file,

Page 207

1 which is Bruno-7, right?
2     MS. ROSEN: Yes.
3 Q. Is it your understanding that all of
4 those documents are currently in the warehouse as we
5 speak, or all those files? Let me start over.
6     Is it your understanding that all of
7 those files, meaning Bruno-4, Bruno-5, Bruno-2, are
8 all in the warehouse as we speak? And you said
9 there was a paper copy of Bruno-7. So is that in
10 the warehouse?
11     MS. ROSEN: You're confusing it.
12 A. Yeah. Our numbers are off, yeah.
13 Q. Wait. Let me start over. Let me start
14 over. I'll make the record very clear.
15     MS. BONJEAN: You're right, I did
16 confuse it, because Bruno-7 is the Excel sheet.
17     MS. ROSEN: Yep.
18 A. Right.
19 Q. So let me start over.
20     MS. ROSEN: I mean, in all fairness,
21 I'm doing my best here.
22     MS. ROSEN: I just want it clear, as
23 clear as we can be.
24 Q. So after Bruno-6, which is a digitized
25 PDF, which I'm going call this amalgamation, --

Page 208

1 which I think you testified earlier exists both in a
2 digitized form and a paper form, right?
3 A. Yes.
4 Q. Okay. Bruno-6, is that currently in
5 the warehouse?
6 A. Yes.
7     MS. ROSEN: The paper form?
8     MS. ROSEN: Right, the paper form.
9 I know that the digitized version is everywhere at
10 this point, I mean, or at least in multiple spots.
11 Q. But Bruno-6, the paper form, is that in
12 the warehouse?
13 A. Yes.
14 Q. Do you know when it got to the
15 warehouse?
16 A. I don't know.
17 Q. Do you know who put the paper form in
18 the warehouse?
19 A. No.
20 Q. Was the paper file logged in any way,
21 when it went into the warehouse, as far as you know?
22 A. No.
23 Q. Okay. Now I'm going to ask about --
24 let's start with Bruno-2, which is that 66-page
25 document that has the 190 on the front.

Page 209

```
 1      Is that currently in the warehouse, to
 2   the best of your knowledge?
 3   A.  To the best of my knowledge, no.
 4   Q.  Bruno-4, which you've identified as the
 5   investigative file, is that currently in the
 6   warehouse, to the best of your knowledge?
 7   A.  Yes.
 8   Q.  Do you know when it was -- well, strike
 9   that.
10      Do you know when it was placed into its
11   proper spot in the warehouse?
12   A.  Give me one second.  I just want to make sure
13   that I'm clear on this.
14      So this amalgamation is --
15   Q.  Bruno-6.
16   A.  Bruno-6, but is it a copy of a combination of
17   5 and 4?
18   Q.  It appears to be a combination of a
19   bunch of things; 5, 4 and the permanent retention
20   file.
21   A.  Right.
22   Q.  It appears to be a combination of three
23   different files.
24   A.  Yes.
25   Q.  Bruno-6, though, you said there is an
```

Page 210

```
 1   actual paper file of it at this juncture, correct?
 2   A.  Well, that paper file is the combination of
 3   the other ones.
 4   Q.  Okay, but as currently constituted --
 5   as constituted, is what I'm asking, the PDF which is
 6   346 pages, okay, somebody put that together for you,
 7   right, or somebody scanned it at some point, right?
 8   A.  Yes.
 9   Q.  And what I'm hearing from you is that
10   you don't know how or why those three different
11   files got mixed up to go in a single PDF?
12   A.  (No response.)
13   Q.  Am I right?
14   A.  That I don't know how or why they got mixed
15   up?
16   Q.  Yeah, why they're in that particular
17   form.
18   A.  No, I don't know.
19   Q.  And you don't know when that occurred,
20   correct?
21   A.  No.  Correct.
22   Q.  And you don't know why it occurred?
23   A.  Correct.
24   Q.  But your belief is that right now, if
25   you and I got together and went to the warehouse
```

Page 211

```
 1   together, it would be there in that form, or are you
 2   saying the components of it are somewhere there?
 3   That's a different question.
 4   A.  Okay.  So I do not believe that what has been
 5   scanned has been also added to that file.  It's
 6   going to be 4 and 5 combined, with the permanent
 7   retention.
 8      MS. BONJEAN: Did we mark the
 9   permanent retention file?
10      MS. ROSEN: No.
11      MS. BONJEAN: Okay.  Well, we should,
12   just for the purpose --
13      MS. COOLBAUGH: We actually did mark
14   the permanent retention file.
15      (Off the record.)
16   Q.  So let me be clear, just as we go back,
17   to the extent I misspoke at various points.  I don't
18   think it was through the whole thing.
19      Bruno-5 is what you identified as the
20   investigative file, and Bruno-6 --
21      MS. ROSEN: No.
22      MS. BONJEAN: No?
23      MS. ROSEN: Wait.  Bruno-3 is the
24   investigative file.
25      MS. BONJEAN: Three?  No.
```

Page 212

```
 1      MS. COOLBAUGH: So you marked Bruno-1
 2   as the amended 30(b)(6) notice.
 3      Bruno-2 is the investigative file,
 4   RFC-Maysonet 1 to 66.
 5      You then marked, as Bruno-3, part 1,
 6   which was the RFC-Maysonet 50636.
 7      Bruno-4 is RFC-Maysonet 67 to 102, the
 8   permanent retention file.
 9      MS. BONJEAN: Okay.
10      MS. COOLBAUGH: Bruno-5 is part 2,
11   which was RFC-Maysonet 50862 to 51126.
12      Bruno-6 is the one that says "Second
13   Scanned Copy," which is RFC-Maysonet 051127.
14      MS. BONJEAN: Okay, I got it now.
15      So just for the purposes of the record,
16   going back -- you know, I'm sure I referred to the
17   exhibits incorrectly throughout this, at various
18   points, but I want to go back and clarify so we're
19   on the same page, because I think we were speaking
20   the same language but we were speaking equally the
21   wrong language.
22   Q.  Mr. Bruno, just to be clear, I think we
23   got Bruno-2 consistently right.  Bruno-2 is
24   RFC-Maysonet 1 through 66.  That's the collection of
25   police reports that can be found in the
```

Page 213

1  investigative file, right?
2     MS. ROSEN: You want an answer for
3  that?
4     MS. BONJEAN: I want him to answer,
5  actually.
6     MS. ROSEN: Yeah, okay. So ask it
7  again. He was just trying to get the files
8  straightened out.
9  Q. So Bruno-2 that we've been referencing
10  is what was produced to us originally as, I guess
11  we'll call it, the investigative file or incomplete
12  investigative file, whatever you want to call it,
13  which was marked RFC-Maysonet 1 through 66, and it's
14  the file and we marked that as Bruno-2. All right?
15  A. Okay.
16  Q. Is that a "Yes"?
17  A. "Yes."
18  Q. Okay. Then Bruno-3, which I think at
19  various points I called Bruno-5, -- which I
20  shouldn't. I think that was wrong. But Bruno-3 is
21  part 1 of this production, which you previously
22  identified as the investigative file, which is
23  marked RFC-Maysonet 50638 through 50860, correct?
24  A. Yes.
25  Q. Okay. So that is Bruno-3. To the

Page 214

1  extent I referred to it as Bruno-5, I was mistaken
2  throughout, but that is Bruno-3.
3     Then we have Bruno-4, which is the
4  permanent retention file, which is RFC-Maysonet 67
5  through RFC-Maysonet 102, right?
6  A. Yes.
7     MS. BONJEAN: And then Bruno-5, is
8  that part 2, Haley?
9     MS. COOLBAUGH: Yes.
10     MS. BONJEAN: Okay.
11  Q. So that is that collection of another
12  file that we've previously identified with Bates
13  stamp -- hold on.
14     MS. COOLBAUGH: RFC-Maysonet 50862 to
15  51126.
16     MS. BONJEAN: Yes. Right.
17  Q. That is Bruno-5, which had those
18  handwritten notes we discussed and that we've called
19  -- I think you called it a duplicate, but it's
20  partially duplicative, right?
21  A. Yes.
22  Q. Okay. Then Bruno-6 is a spreadsheet.
23     MS. BONJEAN: Well, what is this
24  Bruno-6?
25     MS. COOLBAUGH: RFC-Maysonet 051127 to

Page 215

1  051472, which is labeled as N234297, copy.
2  Q. So Bruno-6, then, is that digital
3  amalgamation file?
4  A. Yes.
5  Q. All right. We're on the same page.
6     So getting back to what is actually in
7  the warehouse, to the best of your understanding, I
8  think you said maybe we were just talking past each
9  other, but you said there's a paper copy of Bruno-6.
10     But what you're really saying is that
11  Bruno-6 is comprised of different files that include
12  paper copies that are in the warehouse, right?
13  A. Yes.
14  Q. It's not that the actual PDF was
15  printed out and then filed separately, right?
16  A. Correct.
17  Q. Just to clarify, you don't really know
18  how Bruno-6 came into being in the constitution that
19  it was provided to you by e-mail, right?
20  A. Correct.
21  Q. And you would agree that it seems to be
22  an amalgamation of the permanent retention file as
23  well as Bruno-3, which is the investigative file,
24  correct?
25  A. And Bruno-5.

Page 216

1  Q. Right. And Bruno-5, I guess, which is
2  this other file for which we don't have really a
3  formal name, right?
4  A. Correct.
5  Q. But your belief is that right now in
6  the warehouse -- well, let me ask it more
7  open-ended.
8     In the warehouse right now, if we went
9  and looked at the files, would Bruno-3, which is
10  part 1 that you've identified as the investigative
11  file and that has like -- I'm going to show it. It
12  has the RD number and has some handwritten stuff
13  right on the cover.
14     Does this exist physically in the
15  warehouse right now?
16     (Technical difficulties.)
17  Q. Bruno-3.
18  A. Yes.
19  Q. I don't know why you're popping out
20  there. Is that a "Yes"?
21  A. "Yes."
22  Q. Okay. It's your belief that Bruno-4,
23  which are the permanent retention files, are also in
24  the warehouse now, correct?
25  A. Yes.

Page 217

1  Q.  You're not entirely 100 percent certain
2  if it's filed with the investigate file or if it's
3  filed separate?  You would have to check that out?
4  A.  Correct.
5  Q.  Then Bruno-5, which is this other
6  unnamed duplicative file that has some handwritten
7  notes, you believe that is in the warehouse
8  presently as well, correct?
9  A.  Correct.
10  Q.  And it's all filed -- with the
11  exception of possibly the permanent retention file,
12  at least you believe that 3 and 5 are currently
13  together in the same spot, right?
14  A.  Yes.
15  Q.  And do you know whether Bruno-2 is in
16  the same spot with 3 and 5?
17  A.  I don't believe so.
18      MS. BONJEAN: And tomorrow, I'll be
19  able to get some clarity on that, is that what
20  you're saying, Eileen?
21      MS. ROSEN: Yeah, I hope.  We're still
22  working.  We're still investigating.
23      MS. BONJEAN: Okay.
24      MS. ROSEN: Let me know when it's a
25  good time to take a break.

Page 218

1      MS. BONJEAN: We can take a break.  I
2  need a break too, to regroup.
3      MS. ROSEN: Okay.
4      (Recess:  7:19 p.m. to 7:37 p.m.)
5  Q.  Mr. Bruno, putting aside at the moment
6  the locations of Bruno-2, Bruno-3 and Bruno-5, okay?
7  We are together on that?
8  A.  Yep.
9  Q.  Okay.  Do you have an explanation for
10  why the contents of those files vary?
11  A.  No.
12  Q.  If Bruno-3, which is Bates-stamped
13  RFC-Maysonet 50636 through RFC-Maysonet 50860, is
14  the investigative file, do you have an explanation
15  for why there are materials in Bruno-5 that do not
16  exist in Bruno-3, which is the investigative file
17  according to your testimony?
18  A.  I don't know.
19  Q.  All right.  I think you previously
20  testified to this, but I just want to clarify.  You
21  don't have, really, an understanding of when Bruno-2
22  or Bruno-5 were created, correct?
23  A.  Correct.
24  Q.  And you also don't know where they were
25  maintained prior to finding them in July of 2024,

Page 219

1  correct?
2  A.  Correct.
3  Q.  And you cannot speak to the integrity
4  of any of the individual files, I assume, about
5  whether there were documents removed, put in there,
6  anything of that nature, right?
7  A.  Correct.
8  Q.  Are you able to say when the
9  investigative file,-- which I think, again, we have
10  called it something different throughout, but we
11  know now that it is Bruno-3.  Do you know when it
12  first was sent to the records division warehouse?
13  A.  I don't know.
14  Q.  Is there some type of document or log
15  or chain of custody type of log that would tell us
16  when it went from Area Five to the records division
17  warehouse?
18  A.  No, not to my knowledge.
19  Q.  In any of these files that we've looked
20  at, have you ever seen a control card?
21  A.  I have not.
22  Q.  And the investigative file should have
23  a control card, shouldn't it?
24  A.  Yes.
25  Q.  Do you know why there is no control

Page 220

1  card associated with any of the materials or files
2  we've looked at for the Wiley brothers' homicide
3  investigation?
4  A.  I don't know.
5  Q.  We know that the investigative file
6  would have been at Area Five for some period of
7  time?  I think we agree on that, right?
8  A.  Yes.
9  Q.  And then it's your understanding that
10  it would have been sent after -- at least after
11  Mr. Maysonet, I guess, was convicted?  I think he
12  was the last one of the -- yeah, I'm certain he was
13  the last of the defendants to be convicted.
14      It allegedly went to the records
15  division warehouse, right?
16  A.  Correct.
17  Q.  There was a period of time that it
18  would have existed over at headquarters, in the
19  homicide room, correct?
20  A.  Possibly.
21  Q.  What do you mean, "possibly"?  Why do
22  you say "possibly"?
23  A.  Because I can't say for certain which of
24  those phases they got through.
25  Q.  So he kind of fell, as I recall, into

Page 221

1  like Phase IV, which would be the closed cases from
2  1990 to 2000?
3  A.  Right.
4  Q.  And you don't know if they actually
5  ever reached Phase IV?
6  A.  Correct.
7  Q.  So it's possible that that file from
8  1990 never actually went to headquarters, the
9  homicide room there, I think you called it or it was
10 called?
11 A.  Yes.
12 Q.  It could have just stayed, what, at the
13 warehouse?
14 A.  Yes.
15 Q.  Is there a way to figure that out?
16 A.  I don't know.  I mean, I can -- I can try and
17 track down who was responsible for that, see who
18 that was and where they are.
19 Q.  Well, when files went to the
20 headquarters homicide room, I mean, they were being
21 audited.  So wasn't there some logging of them?
22 A.  There should be.  I just have never seen one.
23 Q.  Okay.  I know we spoke largely about
24 the Maysonet file -- I shouldn't call it the
25 Maysonet file but the Wiley brothers' investigative

Page 222

1  file.
2      Would you say that the Wiley
3  investigative file is an aberration from other
4  homicide files from this time period, in the way
5  it's organized, in the way it has made its way
6  through the department or how it's been stored, or
7  is it pretty typical?
8  A.  It certainly has happened, but, you know,
9  it's still unusual.
10 Q.  Okay.  I had a question.  Hold on one
11 second.  I've got to get some help.
12     (Off the record.)
13 Q.  Do you know when the records division
14 warehouse started, I guess, electronically recording
15 in some way when files were requested, digitized and
16 sent outside the warehouse, whether it was the
17 state's attorney, whoever it may be?
18 A.  When they started recording what they
19 scanned?
20 Q.  Yeah.  Yeah, exactly, when they started
21 making some type of -- I mean, I'm sure there's
22 always some type of record when a file left the
23 warehouse.
24     I am assuming back in the '90s, there
25 would be like a paper document of that, or a log.

Page 223

1  Is that correct, or do you know?
2  A.  I don't know.
3  Q.  Okay.  At some point, they have this
4  network.  Would that monitor when a request was made
5  and when it left the warehouse or something was sent
6  by an electronic or digitized version?
7      MS. ROSEN: Are you asking if the
8  warehouse has a record?
9      MS. BONJEAN: Yeah.  I mean, I know --
10 he said there's a network there.
11     MS. ROSEN: A server.  Right, a
12 network server.
13     You're talking about like the scanned
14 files or also sending back and forth requests?
15 Q.  Let me ask it this way, and let's talk
16 about right now.  In 2024, the Cook County State's
17 Attorney has a retrial of an old case and they want
18 to get the investigative file.
19     Do you know how that request is
20 processed or how it comes in to the police
21 department?
22 A.  That would be through subpoena, which would
23 go through the records division and, from there,
24 over to the warehouse.
25 Q.  If it's an old file that has never been

Page 224

1  digitized, they would actually have to go to the old
2  paper file and then I assume they would scan it and
3  send it, right?
4  A.  Yes.
5  Q.  But if it had been requested for some
6  other reason previously, there might already be a
7  digitized version of it, is that fair?
8  A.  Yes.
9      MS. BONJEAN: Off the record.
10     (Off the record.)
11 Q.  Do you know whether gang crimes
12 maintained their own files that -- I mean, I know
13 gang crimes maintained their own files but that were
14 maybe in part duplicative to homicide investigative
15 files?
16     MS. BONJEAN: I can't hear you,
17 Eileen.  I'm sorry.
18     MS. ROSEN: I'm sorry.  Object to the
19 form.
20 A.  Gang crimes shouldn't have their own homicide
21 investigative files, no.
22 Q.  Do you know whether they -- well,
23 certainly detectives and gang crimes officers
24 worked, you know, in tandem at times, in
25 gang-related offenses.

Maysonet v.
Guevara

Page 225

1   Do you know whether or not gang crimes
2  officers kept any files, any reports, for instance,
3  in connection with a homicide, that would not appear
4  in the investigative file or would not be in the
5  investigative file?
6  A.  No, that should not be.  If they did a report
7  connected to a homicide investigation, that should
8  go in the investigative file.
9      MS. COOLBAUGH: I found it, Jenny,
10  just a side note.
11      MS. BONJEAN: Okay, go ahead.
12      MS. COOLBAUGH: It's RFC-Maysonet
13  51292, within what we previously marked as Bruno-6.
14      MS. BONJEAN: Bruno-6?
15      MS. COOLBAUGH: Yes.
16      MS. BONJEAN: That's 51292, you said?
17  Oh, okay.  This is that digitized version.  Okay,
18  let's look at this.
19  Q.  This is that 346-page document that was
20  requested in September of 2018, that's in here.  So
21  you see what's marked as RFC-Maysonet 51292?
22  A.  Yes.
23  Q.  So you got a request from Kara Hutson
24  in September of '18, which I guess corresponds to
25  that spreadsheet, right?

Page 226

1  A.  Yes.
2  Q.  It's contained in this amalgamation of
3  materials which we've marked as Bruno-6, but this
4  wasn't what was produced to us.  Do you have any
5  idea why?
6      MS. ROSEN: What's the "this" that
7  you're saying "wasn't what was produced to us"?
8      MS. BONJEAN: Well, this 346-page PDF
9  was not produced to us.
10      MS. ROSEN: Okay.  I just wanted to be
11  clear on the record.
12      MS. BONJEAN: Yes.
13  Q.  I mean, I'm a little confused.  It's a
14  request from September of 2018 that appears in a
15  single PDF, that's 346 pages long.  It's a request
16  from counsel for the city, but this isn't what was
17  produced to us in 2018.
18      So any explanation as to why?
19  A.  No.  I don't know.
20  Q.  Do you know where this request went to?
21  I mean, it says, you know, "Office of the
22  Superintendent/Office of Legal Affairs."  So looking
23  at this, does this suggest that it went to OLA?
24  A.  Yes.
25  Q.  The request itself is Xeroxed or

Page 227

1  photocopied and put into this 346 pages of
2  materials, correct?
3  A.  Yes.
4  Q.  And this 346 pages of material that's
5  marked as Bruno-6, according to you, you didn't get
6  until July of 2024, correct?
7  A.  Correct.
8  Q.  So at the time this request was made,
9  there was this collection of materials from the
10  actual investigation and this other file, right?
11      MS. ROSEN: Objection; form.
12  A.  Can you repeat that?
13  Q.  Yeah.  I mean, at the time this request
14  was made, it is part of the same document that
15  contains materials from the investigative file and
16  this other file that we've marked as, I guess,
17  Bruno-5, right?  Yeah.
18      MS. ROSEN: I'm sorry.  What's the
19  question now?
20  Q.  I said, at the time this request was
21  made in September of 2018, it is part of a PDF that
22  contains documents that are found in the actual
23  investigative file and also found in what we've
24  marked as Bruno-5, which is this, again, other
25  materials?

Page 228

1      MS. ROSEN: Right, but it's right in
2  front of -- if you look at the next page, 51293, I
3  haven't done the comparison, but that looks, to me,
4  like the documents from Exhibit 2.
5      MS. BONJEAN: I mean, it's -- okay.
6  You are not the deponent, but --
7      MS. ROSEN: But you're asking a
8  question.  Well, you're misconstruing the prior
9  testimony where he --
10      MS. BONJEAN: I mean, I'm not, and let
11  me get clarity.
12      MS. ROSEN: Get clear.  Fine.
13  Q.  Mr. Bruno, you've testified that you
14  received, via e-mail, a 346-page PDF in July of 2024
15  and that's what prompted you to say, "Listen, there
16  are GPRs in this file," right?
17  A.  Yes.
18  Q.  Contained within this PDF is a request
19  from 2018, seeking the complete investigative file,
20  correct?
21  A.  Correct.
22  Q.  And not only this request is in there
23  but, actually, documents exist within this 346-page
24  PDF that are not included in Bruno-2?
25  A.  Correct.

Maysonet v.
Guevara

Page 229

1 Q. Okay. So my question is, and maybe you
2 don't know the answer to it, but when Rock-Fusco and
3 Kara Hutson -- who was, I guess, is this
4 paralegal -- requested the investigative file in
5 September of 2018, it was copied and placed
6 somewhere -- I mean, well, let me just ask, where
7 did this go? I mean, where did this request go?
8 Where was it put, do you know?
9 A. I don't know. It looks like it got mixed in
10 with the file.
11 Q. Well, it's all mixed together, it would
12 appear.
13 And I guess my explanation -- or my
14 question is, why didn't this PDF, with the 346
15 pages, get produced to plaintiff's counsel back in
16 2018? Do you know why?
17 MS. ROSEN: Well, but you're
18 presupposing now that the PDF existed in 2018, and
19 that's contrary to what he's testified to.
20 MS. BONJEAN: I mean, he doesn't know
21 when it was created.
22 MS. ROSEN: Right, but he talked about
23 it being components.
24 Regardless, you can answer the
25 question. You can answer the question.

Page 230

1 Objection; form.
2 Q. Just to get clarity, we know it's
3 components of a number of different files. You just
4 don't know when it was created in this PDF, correct?
5 A. Correct.
6 Q. But if there's a document from
7 September of 2018, I think we can assume it was
8 created after September of 2018?
9 A. Yes.
10 Q. And according to you, it wasn't created
11 for your benefit? It was already created, and they
12 just produced it to you in July of 2024?
13 A. Correct.
14 Q. Okay. We now have figured out that
15 this 346-page PDF, which is an amalgamation of a
16 number of different documents, was created sometime
17 after September of 2018 but before July of 2024,
18 right?
19 A. Yes.
20 Q. But you don't know how it was created,
21 why it was created or why it is a combination of a
22 number of different documents from a bunch of
23 different files either, right?
24 A. I don't know.
25 Q. And you don't know why it wasn't ever

Page 231

1 even produced, correct?
2 A. Correct.
3 MS. BONJEAN: All right. Let's take a
4 five-minute break. I may be almost finished here,
5 but I've got to look at something. Okay?
6 MS. ROSEN: Yep.
7 (Recess: 8:02 p.m. to 8:08 a.m.)
8 Q. We're close to the end here, but I just
9 want to clarification.
10 In 2017, Mr. Bruno, who was handling
11 requests for this investigative file?
12 MS. ROSEN: Objection; form.
13 Q. If you know.
14 A. I don't know.
15 Q. Well, in 2017, the -- I think you did
16 not fully commit to this, but in 2017, the Wiley
17 brothers' investigative file was either located at
18 the homicide room in headquarters or at the
19 warehouse, is that right?
20 A. Right.
21 Q. Could it be anywhere else?
22 A. No, it shouldn't be.
23 Q. And it really shouldn't even have been
24 at the warehouse, but you just don't know because
25 you never got to Phase IV?

Page 232

1 A. Correct.
2 Q. So in 2017, to the best of your belief,
3 it could have been in one of two places, the
4 investigative file; in the headquarters homicide
5 room, if you got to Phase IV, or it would have still
6 been at the warehouse, right?
7 A. Correct.
8 Q. And if either a defense attorney, in
9 2017, issued a subpoena for that investigative file
10 or the Cook County State's Attorney requested that
11 investigative file by way of a subpoena or a more
12 informal request, do you know where that request
13 would have gone?
14 A. It would have gone to records.
15 Q. And then records would have -- how
16 would records have determined, in 2017, where that
17 investigative file was?
18 A. Well, records has always maintained somebody
19 at the warehouse.
20 Q. Do you know whether, in 2017, the
21 warehouse had an electronic database or was
22 maintaining or logging records or logs about where
23 files were and who requested them?
24 A. No. I believe that started shortly after.
25 Q. I mean, you have the spreadsheet from

Page 233

1 the bureau of detectives, right?
2 A. Correct.
3 Q. That does not include requests by way
4 of a subpoena, right?
5 A. Correct.
6 Q. Just to put a finer point on it, in
7 2017, Mr. Maysonet received a new trial, okay, and
8 at that time, the Cook County State's Attorney's
9 Office was allegedly going to retry him, okay, and
10 that was -- you know, that was for about a year that
11 they allegedly were going to retry him, and during
12 that time period, there was a request made for the
13 investigative file. Do you know -- by probably a
14 number of people but at least by the Cook County
15 State's Attorney.
16    Do you know, in 2017 or early 2018, if
17 we wanted to figure out who made the request and how
18 the Chicago Police Department received it and how
19 they responded to it, where we would get that
20 information?
21 A. Records or legal affairs.
22 Q. Does legal affairs handle retrials and
23 criminal prosecutions usually?
24 A. No.
25 Q. No, right?

Page 234

1 A. No.
2 Q. This would have just been a retrial.
3 There was no civil case, nothing like that.
4    Does legal affairs get involved in
5 cases at the criminal juncture that they think might
6 result in a civil case? Do you know whether that
7 happens?
8 A. Can you repeat that?
9 Q. Yeah. It was not well-phrased.
10    Do you know whether the legal affairs
11 department of the Chicago Police Department gets
12 engaged in a case where there's been a new trial
13 ordered, that maybe they think could result in a
14 dismissal or an acquittal and a potential civil
15 case?
16 A. Yeah, I don't know.
17 Q. Okay. But either a subpoena from the
18 state or a subpoena from defense counsel, back in
19 2017, still would just go to the records division,
20 right?
21 A. It would go to records, yes.
22 Q. If I wanted to learn what was produced
23 in response to a subpoena or a request in 2017 by
24 the Chicago Police Department, is there a place that
25 I could find that information out from?

Page 235

1 A. I don't know of such a place.
2 Q. So as you sit here today, taking me at
3 my word that there was a request for the file in
4 2017, the investigative file, you don't know what
5 was produced in 2017?
6 A. No.
7 Q. And you don't know whether what we've
8 marked as Bruno-2 or Bruno-3 or Bruno-5 was produced
9 in connection with the retrial of Mr. Maysonet,
10 correct?
11 A. Correct.
12 Q. Okay. You may have answered. I'm
13 sorry if you did. Do you know when you started
14 maintaining this bureau of detectives spreadsheet?
15 A. I don't know.
16 Q. It's not co-extensive with requests
17 made through the records division, right?
18 A. No.
19 Q. If an investigative file that was
20 sought either through the legal affairs department
21 or FOIA was somewhere other than the warehouse,
22 would it have been indicated on that BOD
23 spreadsheet?
24 A. It should.
25 Q. What are the other options? It says

Page 236

1 "warehouse" on all those, but what are the other
2 options?
3 A. It could be in an area.
4 Q. And would the BOD spreadsheet indicate
5 what area a file would be at?
6 A. Yes.
7 Q. Do you know when that data was inputted
8 into this system that the bureau of detectives
9 maintains?
10 A. Which data?
11 Q. The data where files exist.
12 A. I think -- no, I don't know.
13 Q. In order to know where a file is, there
14 has to have been data inputted at some point, right?
15    MS. ROSEN: Objection; form.
16 A. Yeah, can you repeat that?
17 Q. Yeah. I guess I just want to go back
18 to like, I don't understand how this spreadsheet
19 gets created.
20    Like do you have your own database at
21 the bureau of detectives, or is someone just making
22 a log of requests and just inputting it into the
23 spreadsheet?
24 A. Yeah, I believe they're maintaining a log of
25 requests and then putting the information in as they

Page 237

1  learn it.
2  Q.  So these individuals who work in the
3  bureau of detectives who are doing this work, and I
4  think you said there are about two of them, when a
5  request comes in, either a FOIA request or a legal
6  affairs request, they sort of track down stuff and
7  then they're creating a spreadsheet as they go?
8  A.  Yes.
9  Q.  The bureau of detectives doesn't -- are
10  you saying that the bureau of detectives doesn't
11  have its own database of where files are?  They're
12  just keeping a spreadsheet once requests are made?
13  A.  The warehouse has a spreadsheet that
14  indicates where files are.
15  Q.  Anyplace else?  I mean, apart from the
16  warehouse that maintains a spreadsheet, do you know
17  of any other division or unit in the Chicago Police
18  Department that maintains that information?
19  A.  No.
20  Q.  So when the bureau of detectives is
21  putting together this spreadsheet, they're getting
22  information from the warehouse, I assume, right?
23  A.  Or the appropriate area.
24  Q.  So are they just making phone calls to
25  figure out where it's at?

Page 238

1  A.  Yes.
2  Q.  So is it fair to say there isn't some
3  sort of reliable central database at this point that
4  anybody could call to find out where an
5  investigative file is, and all of its components?
6  A.  I mean, the best list is going to be with the
7  warehouse.
8  Q.  Well, would the warehouse be
9  maintaining information about files that are still
10  at the areas?
11  A.  No, but they -- I don't know when they put
12  them in there.  You know, they may maintain that
13  list as they come in, and then they know that it's
14  not at the warehouse, it's in the area.
15  Q.  Okay.  But it's just by powers of
16  deductive reasoning, like, "If we don't have it, the
17  area must have it"?  Is that what you're saying?
18  A.  They can look into it and see the status of
19  it.
20  Q.  If I wanted to know right now all of
21  the files that were being maintained at Area Five
22  still to this day, at Grand and Central, how would I
23  find that information out?  Is there a database
24  somewhere?
25  A.  No.

Page 239

1  Q.  What about files being maintained in
2  any of the other areas in the city --
3  A.  No.
4  Q.  Yeah, I was going to say, is there a
5  database that would tell us what's been maintained
6  there?
7  A.  No.  Each area will maintain their own files.
8  Q.  Right.  I understand they're
9  maintaining them.
10  But how are they documenting that
11  they're maintaining them, or are they?
12  A.  Yeah, I don't believe they are.
13  Q.  But the warehouse, as far as you know,
14  does have some database that says, "Okay, we have
15  these files.  This is where they're at.  This is the
16  RD number, etcetera," right?
17  A.  Yes.
18  Q.  So if a request comes in to the records
19  department for a specific RD number, okay, and the
20  warehouse does not have that in their database, what
21  are the best guesses about where it would be?  In
22  the area, is that --
23  A.  In the area.
24  Q.  And so then there's no database to go
25  to, to find it, but you would just, what, call up

Page 240

1  the area and say, "Do you have this?"
2  A.  Yes.
3  Q.  Is that true now, or is that just true
4  for old files?
5  A.  I don't believe records connects us to a
6  database that's going to tell you the location of a
7  file.
8  MS. BONJEAN: All right.  We've been
9  at it a long time, but I think that concludes my
10  questioning.
11  MS. ROSEN: I just have one or two, to
12  follow up.
13  MS. BONJEAN: Sure.
14
15  EXAMINATION BY MS. ROSEN:
16  Q.  Looking at Exhibit Number 6, so the
17  file that you obtained in July when you were
18  answering the interrogatory, --
19  MS. BONJEAN: Wait.
20  Q.  -- if you take a --
21  MS. BONJEAN: That's 5, I think, isn't
22  that?
23  THE WITNESS: No, that's 6.
24  MS. ROSEN: That's 6.
25  Q.  Taking a look at RFC-51292, which was

Page 241

1 that request that Ms. Bonjean directed you to
2 earlier from Kara, if you take a look at the pages
3 after that, 51293 through 51356, are you looking at
4 those pages?
5 A. Yes.
6 Q. Are those copies of the same documents
7 that are in Exhibit Number 2, which was RFC-1
8 through 66, the file that had the 190 on it?
9 A. Yes, the same as Bruno-2.
10 Q. Okay. Now that you have looked at that
11 and confirmed that those documents are the same as
12 Bruno-2, can you tell us, with respect to Bruno-6,
13 what it's made up of, based on the other exhibits
14 we've looked at today?
15 A. Yes. So Bruno-6 is a combination of Bruno-2,
16 Bruno-3, Bruno 4 and Bruno-5.
17 Q. And based on that, do you have a belief
18 about where Bruno number 2, the original of Bruno
19 number 2, is being maintained today?
20 A. Yes, at the warehouse.
21 Q. And why do you believe that now, based
22 on your review of Bruno-6?
23 A. Because it is part of the scanned copy that
24 was sent to me.
25    MS. ROSEN: I don't have any more

Page 242

1 questions.
2    MS. BONJEAN: I do have a follow-up.
3    MS. ROSEN: Sure.
4
5    EXAMINATION BY MS. BONJEAN:
6 Q. Bruno-6 is not a complete duplicate of
7 Bruno-2, Bruno-3, Bruno-4 and Bruno-5, is it?
8 A. I don't know.
9 Q. Well, we can just do basic math to
10 figure that part out. Bruno-6 is 346 pages, right?
11 A. Okay.
12 Q. Yes? Let me get it right, but I'm
13 pretty sure that's it. Okay. So Bruno-6, which is
14 RFC-Maysonet 51127 to 51472, is 346 pages, right?
15 A. Okay. Yes.
16 Q. Bruno-5 alone is 444 pages.
17 A. Okay. Yes.
18 Q. So Bruno-6 is not a complete copy of
19 Bruno-2, Bruno-3, --
20 A. Yes.
21 Q. -- Bruno-4 or Bruno-5, right?
22 A. Yes.
23 Q. It is an amalgamation of a bunch of
24 different files that includes, perhaps, Bruno-2 and
25 then portions of Bruno-3, Bruno-4, Bruno-5, right?

Page 243

1 A. Yes.
2 Q. Or at least portions of one of those
3 files, correct?
4 A. Correct.
5 Q. Do you know whether Bruno-2 -- strike
6 that.
7    Just to reiterate, you have no idea, as
8 you sit here today, how that 346-page PDF that we've
9 marked as Bruno-6 came into being, correct?
10 A. Correct.
11 Q. You don't know when it came into being,
12 but we can assume it was after 2018, correct, since
13 there's a 2018 document in there? Correct?
14 A. Correct.
15 Q. And you don't know who did it, right?
16 A. Correct.
17 Q. And you don't know why it was put
18 together this way, correct?
19 A. Correct.
20 Q. You don't know when it was put together
21 this way, but you think you might be able to find
22 that information out, right?
23 A. Yes.
24 Q. Okay. We talked about potentially
25 through metadata or if the warehouse had some

Page 244

1 insights into when that was scanned and why it was
2 scanned or how it was scanned, correct?
3 A. Correct.
4    MS. BONJEAN: All right. I have
5 nothing further.
6    MS. ROSEN: I have nothing further.
7 Anybody else?
8    MR. ENGQUIST: Obviously, no.
9    MS. ROSEN: We reserve signature.
10    MS. BONJEAN: All right.
11    (Exhibit(s) attached to transcript.)
12    (Time noted: 8:28 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 245

```
 1            C E R T I F I C A T E

 2

 3        I, JOYCE TKACH, a Certified Court Reporter

 4    and Notary Public of the State of New Jersey,

 5    certify that the foregoing is a true and accurate

 6    transcript of the stenographic notes of the

 7    deposition of said witness, who was first duly sworn

 8    by me on the date hereinbefore set forth, and with

 9    this proceeding having been conducted via Zoom.

10        I FURTHER CERTIFY that I am neither attorney,

11    nor counsel for, nor related to or employed by, any

12    of the parties to the action in which this

13    deposition was taken, and further that I am not a

14    relative or employee of any attorney or counsel in

15    this case, nor am I financially interested in this

16    case.

17

18

19

20            Joyce Tkach

21

22            JOYCE TKACH, C.C.R.
              LICENSE NO. 30XI00198900
23

24

25
```

Page 246

```
 1
 2        I have read the foregoing, and the same is

 3    true and correct to the best of my knowledge and

 4    belief.

 5

 6

 7                        KEVIN D. BRUNO

 8

 9

10        I certify that this deposition was signed in

11    my presence by KEVIN D. BRUNO on this      day of

12              , 2024.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15    hand and affixed my seal of office on this      day

16    of              , 2024.

17

18                        Notary Public in and for

19                        the State of _____

20     My commission expires               ,

21

22

23

24

25
```

**[**

**[sic] (2)**
7:25;153:9

**A**

**aberration (1)**
222:3
**ability (2)**
16:6;84:23
**able (19)**
7:17,22;23:12;
30:12;73:12;102:18;
116:14;127:19;
135:22;136:6,17;
161:12;171:2;179:20;
189:9,23;217:19;
219:8;243:21
**absolutely (1)**
39:25
**academy (1)**
7:24
**acceptable (1)**
112:2
**access (7)**
76:23;77:9;103:18;
135:6;153:17,19;
170:17
**according (14)**
57:14;58:22;63:5;
82:3;83:10;97:1;
122:8;155:4,15;
188:15;202:15;
218:17;227:5;230:10
**accusation (1)**
39:19
**acknowledge (1)**
168:4
**acquittal (1)**
234:14
**across (4)**
36:1;37:17;171:8;
195:16
**active (1)**
72:21
**actual (14)**
92:15;95:15;96:25;
97:2;102:9;109:2;
124:13;141:6;164:2;
175:14;210:1;215:14;
227:10,22
**actually (25)**
18:14;50:8;51:2,4;
52:7;65:16;70:17;
91:1;124:12;136:7;
157:8;163:20;165:2;
175:14;189:21;
201:20;202:16;
205:19;211:13;213:5;
215:6;221:4,8;224:1;
228:23

**added (3)**
45:4,6;211:5
**additional (7)**
47:3;63:21;64:2;
89:21;99:10;108:14;
171:8
**Address (1)**
160:25
**addressing (1)**
191:14
**Administration (1)**
153:9
**administrative (2)**
177:6,15
**admit (1)**
169:8
**admitted (1)**
25:13
**advance (1)**
39:7
**affairs (26)**
125:6;173:19;
174:1,10;175:23;
176:20;177:1;178:5,
21;184:22;185:6,16;
186:1,2,4;187:13;
188:7,10;205:6;
226:22;233:21,22;
234:4,10;235:20;
237:6
**aforementioned (1)**
153:6
**afternoon (2)**
5:6;8:16
**afternoons (1)**
8:17
**Again (36)**
7:19;11:8,16;15:18;
16:23;23:16;35:16;
45:17;48:16;54:24;
58:25;84:19;87:5;
107:16;110:12;111:5,
17;124:24;132:21;
145:16,21;148:7;
153:23;157:7,25;
164:12;172:24;
177:19;183:5;188:5;
191:9;198:7;206:11;
213:7;219:9;227:24
**against (1)**
145:4
**ago (1)**
185:11
**agree (18)**
20:21;54:12;72:3;
93:6;96:19,22;99:3,8;
109:1;110:20;114:17;
116:7;123:10;124:15;
167:17;173:11;
215:21;220:7
**ahead (4)**
22:6;51:14;76:9;
225:11

**Ah-ha (1)**
163:7
**Aid (1)**
101:21
**al (1)**
5:10
**Alfredo (2)**
119:2;124:4
**alleged (1)**
189:17
**allegedly (5)**
131:23;203:6;
220:14;233:9,11
**allowed (1)**
111:13
**almost (2)**
177:3;231:4
**alone (1)**
242:16
**along (3)**
6:8;7:22;92:25
**although (2)**
107:8;170:12
**always (10)**
35:13,15;40:16;
103:8,24;124:16;
194:23;195:3;222:22;
232:18
**amalgamation (11)**
122:22;164:17;
206:18,20;207:25;
209:14;215:3,22;
226:2;230:15;242:23
**amended (1)**
212:2
**amongst (1)**
106:23
**amount (2)**
80:2;170:13
**and/or (1)**
63:10
**anniversary (1)**
7:15
**annoying (1)**
25:6
**answered (3)**
43:16;149:6;235:12
**anticipate (1)**
10:7
**Anyplace (2)**
70:2;237:15
**apart (5)**
49:9,25;81:24;
149:17;237:15
**apparently (4)**
132:15;190:1;
196:22;206:21
**appear (15)**
62:12,18;91:20;
100:25;107:5;109:5,
17,18;114:10;126:19;
130:5;180:4,11;
225:3;229:12

**appearances (2)**
5:12,17
**appeared (2)**
128:16;188:24
**appears (24)**
18:18;20:21;21:3;
56:11,14;88:4,7,14,
15,19;90:6;98:6;
99:25;107:18;116:19;
136:12;149:8;158:19;
160:7;164:16;204:23;
209:18,22;226:14
**appreciate (1)**
40:17
**appropriate (6)**
42:16,24;44:10;
134:7;198:22;237:23
**appropriately (1)**
171:9
**approval (4)**
69:11;71:18;80:18;
81:7
**approvals (1)**
47:20
**approved (6)**
67:1,2;69:14,15,15;
70:22
**approximately (1)**
7:11
**April (6)**
11:7;60:20;143:3;
149:9;185:10;196:12
**Area (179)**
8:6,7,13,14,18,21;
9:9,10,18,22;10:5,13,
14,15,24;11:6,8,11,
14;15:16;16:1;20:1,1,
12;35:25;36:4;37:13,
15;38:23;42:7,19,25;
43:3;45:8;46:15;
48:21;49:5;65:18,22;
66:11;67:21;73:2,10,
15,18;74:6;75:1,3;
76:15;77:11;85:19;
103:23;104:10,20,23,
25;105:16,17,24,24;
106:14,22,23;117:8,
19;120:6;125:21;
150:21,24;152:18;
153:3;154:4;155:9;
156:10;190:8,12,13,
15,16,19,21;191:1,3,
5,7,16,21,22,25;
192:4,5,8,9,9,12,13,
18;193:1,1,4,5,5,6,8,
10,11,12,12,15,21,24,
25,25;194:1,3,7,9,11,
16,17,18;195:7,9,9,
14,14,15,17,18,18,19,
20,22;196:1,1,2,7,8,
11,20,21,25,25;197:2,
3,4,4,6,7,7,8,8;198:10,
14,17;199:17,24,25;

200:11,20;201:2,6,6,
16,21;202:21;203:18;
219:16;220:6;236:3,
5;237:23;238:14,17,
21;239:7,22,23;240:1
**Areas (23)**
11:3,15;16:10;42:5;
65:5;150:4,8,11;
151:3,10,13,24;152:3,
14;153:18,19;154:11,
15;195:16;197:17;
198:6;238:10;239:2
**arose (1)**
104:25
**around (6)**
27:7;116:9;139:24;
147:24;187:2;191:11
**arrest (3)**
119:6,13,17,21
**Ashley (1)**
5:12
**aside (4)**
65:21;75:11;82:3;
218:5
**assembled (2)**
108:9;135:12
**assessment (2)**
43:4;63:24
**assigned (13)**
8:1,6,10,24;10:15;
20:7,14;42:23;43:3;
45:19;134:25;176:4,5
**assignment (1)**
176:24
**assignments (1)**
123:6
**assist (3)**
5:15;6:20;49:21
**assistants (1)**
123:6
**Assisted (1)**
20:8
**assisting (1)**
20:15
**associated (2)**
203:9;220:1
**assume (13)**
36:22;43:4;53:8;
68:18;77:18;107:9;
124:10;189:20;219:4;
224:2;230:7;237:22;
243:12
**assuming (10)**
69:15;75:24;76:7,
10,17;91:2;103:19;
199:19;202:15;
222:24
**assumption (1)**
112:9
**assumptions (1)**
107:17
**attached (1)**
244:11

**attendance (1)**
  20:23
**attention (1)**
  93:4
**Attorney (8)**
  171:16;172:3;
  185:24;222:17;
  223:17;232:8,10;
  233:15
**attorneys (2)**
  96:12;115:14
**Attorney's (4)**
  115:13;171:11;
  185:2;233:8
**audit (12)**
  140:4,11,17;
  141:10,14,17;149:14,
  17;157:9,15;158:23;
  159:11
**audited (1)**
  221:21
**auditing (2)**
  139:21;140:2
**audits (1)**
  158:23
**August (10)**
  11:25;57:17;58:25;
  59:5,19;61:5,14;63:7;
  81:18;82:6
**Austin (1)**
  165:22
**authored (6)**
  51:5,22;52:20;
  53:12;54:3;59:9
**authoring (1)**
  81:5
**automated (1)**
  33:22
**available (1)**
  171:24
**Avenue (4)**
  5:2;10:18;26:1,2
**aware (9)**
  55:17;81:4;116:3;
  144:3;145:3;152:16;
  171:15;185:12;
  205:12

**B**

**back (67)**
  7:21;8:12;9:1;
  14:17;30:6;37:5,22;
  41:25;42:7,14;43:2,
  20;44:15;52:17;61:4;
  63:18;65:16;68:4;
  70:12;72:20;73:5,9;
  76:11;96:5,15;97:21;
  98:8,11,12,15,22;
  109:13;119:25;
  127:16,17;129:12;
  144:10;146:9;149:25;
  159:2;162:21;167:1;

168:9,22,25;169:5;
171:6;183:19;184:20;
187:24;198:20;199:2;
202:6;204:8,19,22;
205:1,18;211:16;
212:16,18;215:6;
222:24;223:14;
229:15;234:18;
236:17
**backdated (1)**
  56:20
**background (1)**
  7:2
**ballistic (2)**
  181:20;202:13
**bankers (2)**
  155:17;156:23
**based (15)**
  39:21;40:14;80:22;
  91:7,15;175:2,9;
  176:9;194:19,21,23,
  23;241:13,17,21
**basement (3)**
  75:10,19;106:9
**basic (2)**
  144:12;242:9
**basis (2)**
  72:24;166:20
**Bates (25)**
  18:6;27:19;62:5;
  83:19;84:13;85:8;
  87:5,9,24;88:16;
  97:24;102:25;121:9,
  12;128:5;129:3;
  133:22;142:10,11,24;
  143:4;146:25;158:2,
  16;214:12
**Bates-stamped (6)**
  26:13;28:13;63:19;
  88:3;109:14;218:12
**bathroom (1)**
  167:23
**bear (1)**
  89:8
**bears (2)**
  28:16;30:15
**became (6)**
  8:18;11:6;156:1;
  193:10,24;205:11
**become (1)**
  193:19
**becomes (2)**
  182:22;199:25
**beginning (2)**
  128:9;166:15
**begins (1)**
  86:8
**behalf (7)**
  5:18,19,23;6:1;
  15:21;21:22;124:3
**belabor (1)**
  7:4
**belief (12)**

89:19;91:19;
166:21;168:5;170:20;
188:8,19;210:24;
216:5,22;232:2;
241:17
**Belmont (10)**
  190:23;193:17;
  194:7,13;196:8;
  199:6,12,17,18,20
**beneficial (1)**
  148:11
**benefit (1)**
  230:11
**best (21)**
  16:6;19:19;40:13,
  13,14;63:24;70:20;
  77:14;104:13;105:16;
  119:12;164:14;
  168:14;207:21;209:2,
  3,6;215:7;232:2;
  238:6;239:21
**better (4)**
  75:3;139:22;148:8,
  11
**beyond (2)**
  49:15;74:11
**big (3)**
  19:1;102:14;109:15
**bin (1)**
  47:20
**binds (1)**
  84:3
**bit (2)**
  7:2;28:22
**blanking (1)**
  102:23
**block (1)**
  26:1
**blue (5)**
  161:22,23;162:2,
  12;164:10
**BOD (17)**
  133:16,21,24;
  134:1,22,25;148:21;
  174:12,13;175:24;
  176:1,12,14;178:9,10;
  235:22;236:4
**BOD# (1)**
  178:7
**BONJEAN (191)**
  5:5,7,8,16;6:2;
  11:21;12:5,11;18:2,9;
  19:8;21:12,19;23:11,
  18,21;24:23;25:1,8;
  27:13,15,25;28:4,9,
  25;29:5,8,14,18,22,
  25;30:6,19;31:17;
  39:9,13,23;40:7,22;
  41:2,10,16;43:23;
  44:3;50:12,16;51:14;
  52:9,13,15,23;53:22;
  55:5;57:22;60:9;62:1,
  8,20;69:21;71:1;74:9,

12,20;78:12,16,20;
81:22;83:4;84:10,17,
25;86:23;87:1,6,12,
15,19,21;91:9,14,25;
92:24;93:21;94:1,12,
16,20;95:25;96:3,5;
100:15,18,21;101:11;
104:3;120:22;121:1,
4,16;127:22;129:5,7,
10,13;133:8,15,18;142:4,
6,10,12,19;143:23;
144:3,5,9;157:19;
158:4,7,12;161:19,23;
162:7;165:6;166:5,8;
167:24;168:2;172:7,
11,13,19;176:13,15;
180:15,21;183:22;
187:7,18;188:2;
190:3,6;191:4;195:5;
199:11,24;200:5,7;
202:7;205:25;206:7,
11,15,17;207:15,20;
208:8;211:8,11,22,25;
212:9,14;213:4;
214:7,10,16,23;
217:18,23;218:1;
223:9;224:9,16;
225:11,14,16;226:8,
12;228:5,10;229:20;
231:3;240:8,13,19,21;
241:1;242:2,5;244:4,
10
**B-o-n-j-e-a-n (1)**
  5:7
**both (8)**
  116:18;130:15;
  132:19;138:6;141:8;
  195:6;204:23;208:1
**bottom (4)**
  30:20;51:16;59:15;
  189:9
**box (3)**
  160:11;161:13;
  164:12
**boxes (9)**
  155:18;156:10,23;
  159:13,14;160:7;
  167:5;169:1;171:8
**Boyle (2)**
  20:7;56:12
**Brady (1)**
  120:14
**brain (1)**
  30:2
**breadth (1)**
  23:8
**break (16)**
  40:8,10;52:10;
  53:18;54:13,21;89:5,
  7;92:23;93:22;96:1;
  167:23;217:25;218:1,
  2;231:4
**Brian (2)**

97:17;99:12
**bring (2)**
  151:3;164:2
**broader (3)**
  180:13,17;200:25
**broke (2)**
  132:21;157:12
**broken (1)**
  157:25
**brothers (7)**
  16:18;85:10;88:11;
  110:22;128:11;
  179:18;202:11
**brothers' (31)**
  15:2,8;17:8;20:25;
  22:13,17;24:13,15,20;
  25:18;26:4;44:18;
  50:4;81:12;82:12;
  83:9;85:1;97:18;99:6,
  17;115:2;120:12;
  154:21;161:3;162:17;
  164:8;171:19;202:1;
  220:2;221:25;231:17
**brought (15)**
  164:25;165:3,5,9,
  13,15,18,21,23;166:7;
  188:9;206:4,9,9,14
**Bruno (32)**
  5:6,21;6:3,7,11;
  12:12;18:14;25:12;
  28:19;41:6;44:6;62:9,
  11;88:2;94:4;96:7,16;
  100:22;101:17;
  111:18;121:19;
  158:11,19;166:9;
  168:4;212:22;218:5;
  228:13;231:10;
  241:16,18,18
**Bruno-1 (5)**
  11:22,23;14:18;
  93:24;212:1
**Bruno-10 (2)**
  158:13,15
**Bruno-2 (47)**
  18:3,5,13;94:2,9,
  13;95:2,10;102:14;
  109:13;110:9;114:7;
  115:7;118:24;123:11;
  128:23;165:15,17,23;
  170:14;180:11;
  183:23;188:10,16;
  189:17;205:21,23;
  206:24;207:7;208:24;
  212:3,23,23;213:9,14;
  217:15;218:6,21;
  228:24;235:8;241:9,
  12,15;242:7,19,24;
  243:5
**Bruno-3 (23)**
  27:17,18;44:15;
  63:20;91:4;211:23;
  212:5;213:18,20,25;
  214:2;215:23;216:9,

17;218:6,12,16;
219:11;235:8;241:16;
242:7,19,25
**Bruno-4 (34)**
61:25;62:4,13;
64:19;91:4,9,15;93:3,
5;94:8;95:7,11,20;
96:20;97:3,12;107:4;
109:3;115:7;123:11;
128:15;165:7;166:13;
188:15;189:12;
206:23;207:7;209:4;
212:7;214:3;216:22;
242:7,21,25
**Bruno-5 (49)**
87:22,23;88:3;
91:12,13,19;93:6,10;
96:9,16,20;97:9;
101:24;102:3,24;
108:12,14;109:7;
110:11;116:1;118:18;
123:11;129:2;136:14;
165:12;166:13;
188:15;189:12;207:7;
211:19;212:10;
213:19;214:1,7,17;
215:25;216:1;217:5;
218:6,15,22;227:17,
24;235:8;241:16;
242:7,16,21,25
**Bruno-6 (41)**
121:5,8;122:2;
123:9;127:24;129:4,
5;130:22;135:11;
146:3;162:22;169:9;
203:24,24;204:23;
207:24;208:4,11;
209:15,16,25;211:20;
212:12;214:22,24;
215:2,9,11,18;225:13,
14;226:3;227:5;
241:12,15,22;242:6,
10,13,18;243:9
**Bruno-7 (11)**
133:19,20;172:11,
14,24;183:21;184:20;
206:21;207:1,9,16
**Bruno-8 (6)**
142:20,23;143:6;
146:11,18,18
**Bruno-9 (4)**
142:22;143:2;
149:8;158:25
**Bulk (3)**
159:17,18,22
**bunch (5)**
17:16;59:4;209:19;
230:22;242:23
**bureau (34)**
6:15,19,21,22;9:14;
13:12,22;14:1;65:15;
133:25;134:3,5,10,23;
143:3;148:14;153:8;

173:3,7;174:5;176:2,
6,18;178:11;184:5;
186:20;233:1;235:14;
236:8,21;237:3,9,10,
20
**bureaus (1)**
134:8
**Byrne (5)**
140:3,15,17;
141:14;149:10

## C

**cabinets (3)**
75:12,19;77:17
**calendar (1)**
61:8
**call (23)**
6:4,6,7;22:11,14,
16;27:17;31:6,7,8;
82:13;89:23;101:3;
122:2;133:1;206:18,
23;207:25;213:11,12;
221:24;238:4;239:25
**called (16)**
11:11;33:6;42:6,8,
11;45:22;71:25;
86:11;101:14;157:3;
213:19;214:18,19;
219:10;221:9,10
**calling (1)**
114:7
**calls (2)**
63:10;237:24
**came (17)**
7:24;33:23;40:25;
93:13;107:9;130:8;
141:13;169:23;
179:23;185:25;186:3,
12,21;194:17;215:18;
243:9,11
**Can (141)**
6:12;10:8;11:2,22;
12:7,14,20;13:6;
14:24;17:12,25;22:5;
23:8,21,22;24:6,10;
27:22;28:9,23;29:19,
23;30:10,14;32:22,
23;35:21;40:6,11,19,
19;41:4;44:1;46:19;
48:4;49:16;51:11,12;
52:6,15;54:16,17;
56:23,24;58:1;62:15;
63:13;65:16;66:10;
69:3;71:4;72:3;73:5;
74:14,18,18,24;79:2,
25;80:5,6,9,21;81:2;
82:4,15;83:25;84:11;
87:4;89:5;92:14,22;
93:6,22;94:25;95:8;
98:3;99:20;100:10;
101:10;103:1;107:15;
111:3;112:22,24;

115:24;117:5;122:4;
123:10;124:25;125:3;
131:16;132:5,25;
133:5;134:19;143:20;
145:2;148:7;149:21;
162:13;167:22;
168:11,13;169:3;
172:14,24;173:12,15,
18;175:7,11;178:15;
181:8,14;183:21;
187:15,24;189:25;
196:24;198:8;201:17;
202:5;204:5;205:8,
10;207:23;212:25;
218:1;221:16,16;
227:12;229:24,25;
230:7;234:8;236:16;
238:18;241:12;242:9;
243:12
**candid (2)**
101:12,13
**Candida (2)**
101:7,15
**Candido (3)**
101:3,7,15
**card (6)**
78:1,2,3;219:20,23;
220:1
**cards (5)**
77:24;78:5,9;
101:21;107:18
**care (2)**
23:19;25:3
**Carlos (1)**
117:11
**Carney (1)**
106:12
**case (73)**
8:20;11:19;15:3;
32:2,11,13,25;34:9;
36:18,21;37:3;39:18;
40:20;43:7,11;45:2,3,
5,7,14;46:4,14,20;
47:18,24;48:6;49:4;
56:6;59:16,24;61:22;
64:21,22,22;65:1,23;
66:14;67:16,22;68:1;
70:6;72:22;73:1;
76:16;90:24;99:11;
104:25;105:1,14;
108:17;115:14;
116:17;120:15;
123:24;126:16;
143:10;150:14,20;
171:11;181:24;
184:24,25;185:16,19;
189:17;203:3,10,13;
223:17;234:3,6,12,15
**cases (7)**
144:24;145:4;
154:13;156:13;
197:23;221:1;234:5
**cataloguing (2)**

149:19;151:19
**category (1)**
154:22
**Central (25)**
10:19,22;11:15;
76:1;190:12,13,15,19,
22;191:1,16;192:5,
10;193:19;194:5,18;
195:19;197:3,8;
198:21;201:3,6,7;
238:3,22
**certain (5)**
132:9;177:23;
217:1;220:12,23
**Certainly (7)**
30:9,10;50:2;70:4;
202:11;222:8;224:23
**chain (3)**
23:24;103:15;
219:15
**challenges (1)**
141:5
**chance (9)**
16:25;17:6;18:14;
28:7,19;73:20;79:11;
171:10;179:25
**change (3)**
33:18,20;34:10
**changed (5)**
10:24;33:21;54:4,8;
150:19
**Chapter (2)**
13:17,18
**chart (2)**
86:7;172:10
**check (8)**
38:6;107:18;
124:14;125:3;136:3;
139:9;175:3;217:3
**Chicago (38)**
5:2,20;6:13,23;7:5,
9;11:25;12:14;15:7;
16:7;34:19;73:23,24;
99:4;111:1,6,9,11,17,
19,21;131:21;134:24;
138:1;139:19;140:10,
18;145:5,14;161:11;
181:1,2;188:16;
201:2;233:18;234:11,
24;237:17
**Chief (18)**
5:20;6:3,6,12,15,19,
20,9:14;23:25;41:6;
111:18;131:21,22;
140:3,14,17;141:14;
149:10
**choice (1)**
41:8
**chooses (1)**
111:8
**CHRIS (12)**
33:22;34:3,5,22,23;
37:7;105:10;143:10,

11,12;144:1,5
**chronologically (1)**
68:13
**city (33)**
5:18,20;11:3,24;
12:13;15:7,15,21;
16:7;21:22;34:22;
36:2;37:17;48:9;
63:10,16;73:22,23;
82:19;84:3,3;118:5,9;
121:7;138:1;145:5;
161:11;168:14;
185:24;186:9;188:15;
226:16;239:2
**citywide (1)**
37:11
**civil (6)**
144:23;145:4;
173:19;234:3,6,14
**civilian (1)**
125:18
**clarification (3)**
126:3;190:21;231:9
**clarify (3)**
168:11;212:18;
215:17;218:20
**clarifying (1)**
54:18
**clarity (4)**
143:20;217:19;
228:11;230:2
**clean (1)**
171:7
**cleaned (2)**
166:25;168:24
**clear (16)**
10:9;18:17;23:23;
58:20;65:19;85:7;
106:1;172:25;207:14,
22,23;209:13;211:16;
212:22;226:11;
228:12
**Cleared/Open (1)**
154:10
**click (1)**
162:13
**client (1)**
124:4
**clipboard (1)**
47:22
**clipboards (4)**
48:20;49:7,7;70:7
**close (1)**
231:8
**closed (42)**
11:3;45:2,8,14;
46:4;72:22;104:8;
105:18;106:13,23;
148:2;150:6,14;
151:23;152:2,17,25;
153:12,18,22;154:3,
17,23;155:12;156:15;
190:17;192:4;193:5,

10;22;194:25;195:15;
196:13;197:13;
200:16;201:11,15,20;
202:25;203:4,4;221:1
**coaching (2)**
53:23;92:1
**co-defendant (1)**
119:2
**co-extensive (1)**
235:16
**Cohen (1)**
5:13
**cold (4)**
8:20;150:12;
154:13;197:23
**collection (34)**
18:1,6,15;22:12,16;
24:1,4,12,14,19;
26:10,12;27:19;
28:20;31:5;46:22;
47:12;56:5;62:5;
87:24;94:5,21;95:1,5;
97:8;121:9;128:22;
137:12;142:24;
203:22;204:23;
212:24;214:11;227:9
**color (1)**
62:17
**column (3)**
50:12;159:16;
177:24
**columns (1)**
53:5
**combination (14)**
122:13;126:21,23;
127:3;130:1,4,5;
193:25;209:16,18,22;
210:2;230:21;241:15
**combine (3)**
11:11;195:10,14
**combined (4)**
138:15,23;167:11;
211:6
**coming (2)**
7:14;37:7
**command (1)**
23:24
**commander (2)**
9:6,10
**commit (1)**
231:16
**common (1)**
166:22
**communication (1)**
53:21
**communications (2)**
125:1;187:14
**compared (2)**
91:24;128:13
**comparison (3)**
91:18;105:7;228:3
**complete (7)**
82:23;83:24;84:15;

168:16;228:19;242:6,
18
**completely (2)**
142:8;196:22
**completion (1)**
69:11
**comply (1)**
41:9
**components (4)**
211:2;229:23;
230:3;238:5
**comprehensive (1)**
131:24
**comprised (1)**
215:11
**computer (1)**
182:23
**computerized (1)**
144:16
**concealed (1)**
120:19
**concede (1)**
201:19
**conceded (1)**
96:18
**conceivable (1)**
172:2
**concludes (1)**
240:9
**conclusion (2)**
44:21;92:6
**conducted (1)**
149:15
**confident (3)**
56:17,25;196:16
**confirmed (1)**
241:11
**confuse (1)**
207:16
**confused (7)**
55:12;131:20;
135:9;176:9;186:7;
199:17;226:13
**confusing (1)**
207:11
**confusion (1)**
205:18
**connected (3)**
142:15,17;225:7
**connection (12)**
16:19;17:8;19:14;
26:4;65:25;78:6;
81:11;120:11;159:10;
163:6;225:3;235:9
**connects (1)**
240:5
**consistent (4)**
48:25;49:11;99:3;
111:21
**consistently (2)**
27:2;212:23
**consisting (1)**
136:11

**consists (1)**
83:15
**constituted (5)**
128:1,6,9;210:4,5
**constitutes (2)**
83:8;85:1
**constitution (1)**
215:18
**contain (5)**
72:12;88:14;113:1;
170:13;202:21
**contained (15)**
21:3;34:20;38:11;
77:10;82:16;95:22;
99:16;101:23;107:21;
118:18;137:12;167:6;
180:9;226:2;228:18
**containing (1)**
169:2
**contains (7)**
20:22;25:17;31:12;
94:16;202:11;227:15,
22
**contents (10)**
21:12,15,22;31:18;
100:8,12,17;120:4;
156:16;218:10
**continued (1)**
8:21
**contrary (1)**
229:19
**control (9)**
31:20;77:24;78:1,3,
5,9;219:20,23,25
**conversation (2)**
74:17,20
**conversations (2)**
22:2;124:25
**convicted (6)**
116:4;155:2,3;
203:1;220:11,13
**Cook (8)**
115:13;171:11,15;
172:3;223:16;232:10;
233:8,14
**Coolbaugh (13)**
5:14;27:14;91:13;
121:3;211:13;212:1,
10;214:9,14,25;225:9,
12,15
**C-o-o-l-b-a-u-g-h (1)**
5:14
**coordinator (7)**
42:7,9,11,23;45:22;
73:19;74:5
**coordinators (1)**
42:5
**copied (5)**
47:13,16;100:8;
186:21;229:5
**copies (27)**
13:24;32:18;46:13;
47:4,22;48:20;49:6,

24;66:6,10,11,11,22;
67:19,23;69:23,25;
70:6,17,21;72:16;
107:13;130:9;184:3;
203:17;215:12;241:6
**co-plaintiff (1)**
123:24
**copy (58)**
11:23;12:8;18:5,18,
18;25:15,16;27:18;
29:20;32:12,14,16;
49:20;53:2;59:15,24;
60:1,5;62:4;63:7;
64:2,22;67:21;70:4;
83:24;87:23;89:17,
20,25;90:2,8;92:4;
98:15,17;121:8,14,15,
20;122:6,11;128:17;
129:22;130:11,19;
133:20;142:23;143:2;
158:15;162:23;
185:21;186:5;207:9;
209:16;212:13;215:1,
9;241:23;242:18
**copying (2)**
26:23;148:16
**corner (1)**
19:22
**correctly (1)**
192:13
**correlate (1)**
59:8
**correlated (2)**
99:11;147:15
**correspond (2)**
143:9;184:22
**corresponds (2)**
184:23;225:24
**counsel (9)**
185:22;186:6,6,7,8;
187:6;226:16;229:15;
234:18
**count (2)**
82:17;84:11
**counting (1)**
84:9
**County (8)**
115:13;171:11,16;
172:3;223:16;232:10;
233:8,14
**couple (6)**
8:15;9:15;30:8;
92:25;122:9;164:17
**course (8)**
27:8;29:17;46:24;
47:15;70:22;72:19;
185:9;192:15
**court (12)**
20:22;37:3;39:12;
71:3;89:21;104:21;
105:1;152:6,19;
153:1;155:8;158:14
**courtesy (1)**

79:4
**cover (4)**
28:23;40:1;88:7;
216:13
**covered (3)**
11:14;151:4;198:6
**covering (1)**
181:11
**covers (1)**
153:12
**CPD (1)**
153:8
**crazy (1)**
58:18
**create (1)**
67:17
**created (43)**
45:6;46:2,3,10;
50:25;51:20,22;
52:20;59:8;66:12;
105:10;109:21;133:2;
135:22,23;136:2,7,11,
23;137:5,9,11;
149:24;157:12,25;
159:10;167:13,20;
170:5;178:9;182:23;
193:5;197:4;218:22;
229:21;230:4,8,10,11,
16,20,21;236:19
**creates (1)**
65:17
**creating (1)**
237:7
**crime (14)**
37:19;38:25;
180:20;182:12,22;
183:1,10;184:2;
194:24;196:4;202:12,
22;203:9,17
**crimes (25)**
8:7;9:24;10:16;
37:20;38:24;104:25;
153:3;193:2;194:22;
195:7;198:24;199:1,
4,6,10,11,18,19,21,22;
224:11,13,20,23;
225:1
**criminal (11)**
105:15;106:6,24;
115:14;173:16;192:2,
15,16;203:5;233:23;
234:5
**crossed (1)**
117:14
**Cuevas (2)**
99:15,15
**curious (2)**
124:10;205:8
**curiously (1)**
121:19
**current (1)**
160:3
**currently (11)**

6:14;22:22;122:17;
128:6,9;207:4;208:4;
209:1,5;210:4;217:12

**cursory (2)**
17:1;91:7

**custody (2)**
103:15;219:15

**cut (1)**
152:24

**cutting (2)**
70:25;71:1

## D

**daily (1)**
67:5

**data (6)**
175:15,18;236:7,
10,11,14

**database (10)**
232:21;236:20;
237:11;238:3,23;
239:5,14,20,24;240:6

**Date (25)**
51:8;53:14;54:1,2,
9,10,10,18;56:19,20,
21;59:9,10;79:16;
160:21,22,23;169:3;
172:6,18;177:24,25,
25;178:2;179:7

**dated (3)**
11:25;59:19;149:9

**dates (5)**
30:25;31:2;55:6;
186:17,18

**day (5)**
25:2;39:10;67:7;
159:20;238:22

**deadline (1)**
40:18

**dealing (1)**
141:5

**decades (1)**
168:22

**December (3)**
8:3;9:19,20

**decent-sized (1)**
148:14

**decided (2)**
40:1,3

**decision (2)**
34:1;39:25

**deductive (1)**
238:16

**deeper (1)**
169:1

**Defendant (2)**
5:20;6:1

**defendants (3)**
5:17,23;220:13

**defense (1)**
32:10,13;115:14;
232:8;234:18

**definitely (1)**
74:22

**definitive (1)**
172:17

**delegated (1)**
125:11

**dep (2)**
22:3;39:7

**Department (43)**
6:13,24;7:6,9;
34:19;49:2,12;99:4;
101:21;104:10,12;
111:2,6,11,18,19,21;
131:22;132:10;
134:24;139:19;
140:10;141:5,6;
145:14;174:1;176:21;
181:1,2;185:7;
186:22;200:12;201:2;
205:7;222:6;223:21;
233:18;234:11,11,24;
235:20;237:18;
239:19

**department-generated (1)**
182:7

**Department-issued (1)**
111:10

**department's (2)**
70:12;140:18

**deponent (2)**
5:18;228:6

**Deposition (8)**
11:24;12:18;13:7;
21:20;22:8;38:8;
48:10;84:6

**deps (1)**
40:16

**Deputy (9)**
5:20;6:3,6,12,14,
19;9:14;117:16;
131:22

**described (2)**
55:14;94:14

**description (4)**
50:7;19;53:7;55:15

**designated (5)**
12:13;21:10;52:17;
86:20;153:7

**designee (10)**
15:6,7,15;16:6;
44:5;48:9;73:23;84:2,
5;111:18

**desk (1)**
154:6

**destroyed (1)**
183:14

**detail (2)**
7:20;149:22

**detailed (1)**
15:18

**detective (60)**
6:19,23;8:4,6,13,
18;9:2,10,11,21,22;

10:5,16;13:8,14;14:4,
13;20:15;33:22;
41:24;47:18;48:24;
49:4,20;50:21;51:22;
52:21;56:12;59:3;
65:5;66:19;68:3,9;
70:3,5;73:19;75:21,
25;76:2,4,11,14;79:7;
80:11,16;99:10;
125:20;150:3,8,11;
151:3,9,24;152:14;
193:21;195:8;196:3;
200:10,18,20

**detectives (41)**
6:15,21,22;9:14;
13:12,22;14:1;45:9,
10;46:16,21;47:24;
48:5;49:23;133:25;
134:3,6,11,23;143:3;
148:15;153:8;173:4,
7;174:5;176:2,6,18;
178:11;184:5;186:20;
195:12;224:23;233:1;
235:14;236:8,21;
237:3,9,10,20

**determine (4)**
90:12;132:25;
135:23;171:22

**determined (2)**
132:8;232:16

**developed (1)**
72:19

**development (1)**
147:13

**Dickinson (1)**
20:8

**dictated (3)**
37:23;43:3,19

**dictates (1)**
81:4

**difference (1)**
187:19

**different (47)**
14:21;23:15;36:24;
46:10,15,21;47:9,13;
53:4;54:12,20;56:21;
65:5;95:23;98:13;
108:13;122:9;130:6;
131:25;138:12,24;
139:2,6;141:2;151:3;
156:3,10,11;164:17;
167:11;169:2;170:10;
173:12;177:4;184:12;
195:10,12;209:23;
210:10;211:3;215:11;
219:10;230:3,16,22,
23;242:24

**differentiate (1)**
127:19

**differently (2)**
106:18;138:12

**difficulties (9)**
15:10;19:9;44:12;

69:17;70:24;90:9;
152:20;156:25;
216:16

**difficulty (1)**
141:1

**digital (4)**
145:1;182:15,22;
215:2

**digitally (1)**
183:8

**digitize (3)**
144:19,24;182:21

**digitized (3)**
144:17;145:18;
169:11;183:1,2;
207:24;208:2,9;
222:15;223:6;224:1,
7;225:17

**digitizing (1)**
182:20

**directed (1)**
241:1

**direction (1)**
140:14

**directive (12)**
44:8;78:15,18,23;
79:2,3,6;80:1,10;
81:3;147:2,2

**directives (5)**
39:16;49:13;78:17;
111:22;147:5

**directives- (1)**
39:15

**directly (2)**
185:25;204:21

**disagreeing (1)**
47:25

**disbanded (1)**
199:22

**Discharge (1)**
14:5

**discontinued (2)**
35:1,18

**discovery (1)**
144:22

**discuss (2)**
21:10;41:4

**discussed (3)**
40:16;63:19;214:18

**dismantled (1)**
197:5

**dismissal (1)**
234:14

**dispensed (1)**
196:2

**disposed (4)**
105:1,14;106:24;
203:5

**disposition (4)**
104:21;152:6,19;
192:16

**distinction (1)**
17:15

**distributing (1)**
67:19

**District (35)**
8:1,2,10,24,25;
9:18;10:14;66:12,18,
20;67:1,24;160:24;
193:20,20;195:1,4,17,
18,20,20;196:4;
198:10,11,11,11,12,
12,14,15,15,17,18,18,
19

**districts (8)**
11:13,16;194:17,
24;195:15;198:7,7,22

**Division (107)**
8:6,11,13;9:2,10,
11;10:16;13:8,14;
14:4,13;19:21;25:23,
24;26:19,22;27:3,4;
32:16,18;33:7,10,12,
14,23;34:2,20;35:4,7,
15,16,22;36:4;38:7;
46:13;59:25;61:14,
17,18;63:9;64:25;
65:3,4,5,15,17,18;
66:13,19;67:4,11,15,
15,18;68:3,4,7;71:22;
75:22,25;76:4,11,14;
79:7;85:15,22;103:4,
6,9,25;104:1,4,18;
105:2,9,11;106:15;
110:3;119:7,14,24;
122:6;123:15;125:9,
13,25;130:17;131:12;
135:13;136:10;
137:16;138:8;139:20;
150:15;156:5;193:21;
195:8;200:10,20;
203:7;219:12,16;
220:15;222:13;
223:23;234:19;
235:17;237:17

**document (61)**
25:13;28:13;44:22;
50:8,20,21,25;51:20,
22;52:8,20;53:7;
57:15;65:24;67:11,
12;84:8;86:11,19;
92:14,18;93:2;99:23;
110:16;112:21;
117:21;118:17;133:1,
13,19,21;135:11;
136:7,23,24;138:18;
139:3;146:3;147:16;
158:10,16;159:3;
162:19,22;164:5,16;
169:10;170:11,17;
173:1;174:19;176:25;
189:5;203:23;208:25;
219:14;222:25;
225:19;227:14;230:6;
243:13

**documentation (1)**

22:17
**documented (4)**
112:15,15,18,19
**documenting (1)**
239:10
**documents (90)**
5:15;18:1,6;20:20,
22;21:5;22:12;24:1,5,
12,14,20;26:10,12;
27:19;31:5;32:9,17;
37:24;38:10,19;
41:21;42:2,24;45:6;
46:23;54:25;55:7;
56:6,18;57:13;58:11,
21,24;59:4,8;62:5;
65:25;72:22,23;79:4,
5;82:15;83:16;84:21,
24;87:24;88:20;
89:22;91:3,6;94:21;
95:1,6;97:8;102:10;
107:4;109:11;115:11;
120:24;121:6,9;
122:5;123:16;126:13;
127:24;128:21,22;
129:1,24;139:2;
142:24;145:16;148:8;
157:16;162:14;164:8;
168:15;173:11;
176:19;180:9;207:4;
219:5;227:22;228:4,
23;230:16,22;241:6,
11
**done (7)**
25:7,8;35:25;70:11;
158:23;202:14;228:3
**double (2)**
68:2;108:1
**double-check (2)**
138:14,21
**double-hole (2)**
108:2,7
**double-sided (4)**
98:17,19,19,21
**doubt (1)**
71:11
**down (13)**
12:8;30:19,20;
31:15;39:12;51:12;
141:13;157:13,25;
163:21;177:18;
221:17;237:6
**drastic (1)**
139:24
**draw (1)**
93:4
**drive (7)**
131:9,10,11,13;
135:17;136:6,20
**dug (1)**
169:1
**duly (1)**
5:3
**duplicate (16)**

90:17,21,23;92:2,7;
93:7;96:17;123:10;
167:8,8,13,16,17,19;
214:19;242:6
**duplicates (4)**
88:25;89:2,3;102:9
**duplicative (6)**
91:2,21;206:25;
214:20;217:6;224:14
**during (7)**
37:6;46:1,23;47:14;
72:19;187:22;233:11

**E**

**earlier (12)**
14:9;45:22;65:19;
71:21;102:13;105:21;
122:25;145:22;
152:17;185:13;208:1;
241:2
**early (6)**
37:23;38:12;42:2,
14;144:15;233:16
**easier (2)**
139:23;148:9
**easy (2)**
115:10;190:12
**effective (1)**
79:16
**efficiently (1)**
201:19
**effort (2)**
144:19;196:18
**eight-page (1)**
158:9
**Eileen (19)**
5:19;18:10;23:12;
40:8;43:18;44:5;
78:12;84:4;125:3;
133:8;157:18,19;
162:7;163:19;183:22;
186:14;206:1;217:20;
224:17
**either (17)**
16:10;34:12;56:20;
102:16;109:25;
132:23;136:13;178:4;
192:1;197:1;202:5;
230:23;231:17;232:8;
234:17;235:20;237:5
**elapse (5)**
78:24;80:3,11,24;
81:5
**electronic (10)**
36:22;130:13;
132:14,24;134:12,14;
144:16;169:14;223:6;
232:21
**electronically (1)**
222:14
**Eleven (1)**
57:16

**else (14)**
42:12;70:2;137:25;
157:18;164:1;170:21;
174:22;177:2;180:18,
23;204:20;231:21;
237:15;244:7
**e-mail (5)**
126:10,12;187:11;
215:19;228:14
**e-mailed (3)**
163:2;169:10;
204:21
**employment (1)**
7:8
**end (2)**
129:3;231:8
**ended (1)**
130:9
**ending (1)**
83:2
**engage (1)**
53:24
**engaged (1)**
234:12
**ENGQUIST (4)**
5:22,22;12:10;
244:8
**enlarge (1)**
28:9
**enough (2)**
197:16,21
**ensure (1)**
33:25
**ensured (1)**
77:6
**entailed (1)**
149:17
**enter (1)**
68:22
**entered (5)**
56:11;68:14,17;
69:1,6
**Entering (3)**
50:20;51:3;53:10
**enters (2)**
55:23;106:12
**entire (3)**
6:20;104:10,12
**entirely (2)**
35:1;217:1
**entries (2)**
55:7;60:24
**Entry (12)**
51:8;54:1,9,10;
56:20;59:9;60:11,19;
68:11;83:11;162:17;
174:17
**envelope (6)**
99:21,24;100:8,11;
107:10,21
**Epplen (1)**
5:23
**equally (1)**

212:20
**equipped (1)**
75:3
**era (1)**
145:6
**eradicate (2)**
144:1,5
**eras (1)**
181:11
**erroneously (1)**
120:17
**essentially (5)**
108:10;124:5;
145:14;150:18;
179:17
**estimate (2)**
34:17;183:5
**estimating (1)**
172:18
**et (1)**
5:10
**etcetera (2)**
80:1;239:16
**Eugene (1)**
149:10
**even (15)**
17:1;46:16;48:11;
60:19;111:20;113:7;
150:11;161:23;
168:22;172:4;189:11;
197:24;203:12;231:1,
23
**event (3)**
86:13;98:25;132:13
**eventually (2)**
163:19;201:13
**everywhere (1)**
208:9
**evidence (6)**
56:8;107:13,22;
181:20,21;182:12
**exact (2)**
11:16;93:7
**exactly (9)**
67:20;73:15;74:16;
131:6;157:14;173:1;
189:19;196:6;222:20
**exactness (1)**
169:25
**EXAMINATION (3)**
5:5;240:15;242:5
**examiner (1)**
20:24
**example (2)**
77:21;102:1
**examples (2)**
102:5,6
**Excel (5)**
175:10,16,16;
177:21;207:16
**except (2)**
37:6;104:6
**exception (1)**

217:11
**Excerpt (5)**
133:15,21;174:18,
24;175:2
**exclusively (1)**
34:15
**Executive (7)**
143:6,17;146:9,12,
22;147:15,23
**Exhibit (27)**
11:23;14:17;18:5;
27:18;50:8,9,15;53:5;
57:9,13;60:12;62:4;
71:7;82:2;87:23;
89:15;110:5,9;121:8;
133:20;142:23;143:2;
158:15;172:10;228:4;
240:16;241:7
**exhibits (3)**
212:17;241:13;
244:11
**exist (11)**
33:14,16;34:3;
130:12,14;190:22;
196:11;216:14;
218:16;228:23;
236:11
**existed (1)**
61:9;78:9;135:19;
166:24;220:18;
229:18
**existence (3)**
93:14;132:18;
143:11
**existing (1)**
146:13
**exists (1)**
208:1
**expect (1)**
107:10
**expects (1)**
113:2
**explain (5)**
102:18;120:3;
167:7;168:13;178:15
**explanation (8)**
63:3,13;64:15;
102:8;218:9,14;
226:18;229:13
**extent (6)**
21:10;39:4,14;
62:22;211:17;214:1
**eyes (1)**
161:24

**F**

**faces (1)**
24:24
**facilitate (1)**
22:3
**facility (1)**
154:5

**fact (4)**
93:5;124:13;
138:22;186:14
**faint (1)**
107:25
**fair (12)**
65:6;75:2;102:15;
103:14;150:24;
170:13;174:1;189:9;
197:16,21;224:7;
238:2
**fairness (1)**
207:20
**fall (1)**
154:22
**falls (1)**
154:24
**familiar (2)**
101:8,17
**fantastic (1)**
142:2
**far (12)**
62:2;67:18;80:15;
106:10,11;111:11;
132:24;137:23;
163:25;177:18;
208:21;239:13
**fashion (2)**
126:11;138:19
**fax (1)**
119:25
**faxed (1)**
119:7
**FBI (1)**
140:7
**February (10)**
7:24;8:5;9:5,12,13,
22;10:17;179:16;
180:8;183:24
**feel (1)**
147:10
**fell (1)**
220:25
**Felony (1)**
116:17
**felt (1)**
139:22
**few (2)**
34:11;52:12
**figure (9)**
82:18;86:3,14;
116:15;186:11;
221:15;233:17;
237:25;242:10
**figured (1)**
230:14
**file (470)**
21:4,8;22:7,11,14,
22;23:5,25;24:6,8,11,
17;25:4;26:3,8,9,14,
17;27:1;28:24;30:15;
31:6,6,7,9,10,14,21,
23,25;32:1,8,9,16,18,

19;33:1,1,4,7,9,10,13,
14;34:20,25;36:12;
37:3,17;38:20;40:21,
25;41:4,21;42:3,4,6,8,
11,23;43:5,6,10,14,
20;44:18,22,25;45:1,
4,6,12,13,17,22;46:2,
7,13,13;47:2,8,10,14,
17,21;49:10,18,18;
50:1,6,22;51:2,5;53:1,
14,15;54:11,19,25;
55:2,8,9,11,15,16,19,
19;56:18;57:2,9,10,
14;58:12,21,25;59:5,
11;60:2,3,6;61:19,20,
22;62:12,25;63:1,8,
10,11,14,15,23;64:3,
5,5,12,13,16,17,17;
65:14,18;67:9,18;
68:12,15,18;69:7;
70:1,14,16;71:7,8,23,
25;72:4,4,6,8,11,12,
18,20,21,23;73:2,3,6,
19;74:5,5;75:12,15,
19;76:3,10,17;77:1,5,
9,17,20;78:2,4,6;79:1,
22;80:4,13,19;81:10,
12,16,18,25;82:4,6,
10,12,19,23,24;83:1,
2,8,10,15,16,18;
84:16;85:2,9,13;86:2,
20;88:5,5,8,16,21,24;
89:18,20,24,25;90:3,
16,18,20,21,24;91:2,
17,22;92:3,7,15,19,
19;93:4,9;94:6,22,23,
25;95:4,6,8,9,15,18,
23,23;96:8,17;97:1,2,
6,7,11,18;98:9;99:17,
24;100:14;101:24;
102:2,3,10,11,14,16,
19,20,24;103:1;
104:24;105:7,8;
106:22,23;107:3;
108:17,20,25;109:3,6,
20;111:4;112:2,4,5,7;
114:6,6;115:6,7,25;
117:3,3;118:18,21;
120:9;121:14;122:10,
12,13,14,23;123:5,7;
124:5,7,13,17,18,18;
126:5,7,16,20,23,24,
25;127:1,3,4,9,10,25;
128:1,6,10,14;129:21,
22;130:11,20;131:8,
23,24;132:1,6,14,15,
19,19;133:1;136:12,
13,14;137:13;139:24;
154:22;156:18;157:4;
161:11,14;163:12,16,
20;164:2,24;165:8,11,
24,25;168:16;169:16;
170:18,21;171:8,11,

17;174:7;179:5,17;
180:4,9;184:7;185:1;
187:23;188:5,8;
189:16,18,18;192:22;
202:2,3,4,10,20,25;
203:6,18;204:13,14,
24;205:20,20;206:24,
25;208:20;209:5,20;
210:1,2;211:5,9,14,
20,24;212:3,8;213:1,
11,12,14,22;214:4,12;
215:3,22,23;216:2,11;
217:2,6,11;218:14,16;
219:22;220:5;221:7,
24,25;222:1,3,22;
223:18,25;224:2;
225:4,5,8;227:10,15,
16,23;228:16,19;
229:4,10;231:11,17;
232:4,9,11,17;233:13;
235:3,4,19;236:5,13;
238:5;240:7,17;241:8
**file- (1)**
219:9
**filed (12)**
22:25;106:23;
130:9;167:10;170:21;
184:24;185:10,12;
215:15;217:2,3,10
**files (295)**
12:22;13:9,15,23;
14:2;15:1,7,16;16:19;
17:7,17,18;21:11,11,
13,15,23;27:6,9;
29:15;32:4,7;33:14;
34:2;35:5,10,11,15,
22;36:4,9,10,15;37:6,
14,16,20,21,25;38:7,
11,14,16,17,23,24,24,
24,25,25;42:10,17,25;
44:11;45:8,20;46:10,
17;47:3,16;73:7;75:7;
76:14;77:6,10,13,23;
78:10;79:7;81:17,21;
85:22;90:14;92:5;
102:9;103:12,16,19,
23;104:9,17,17;
105:20,23;106:5,13,
13,23;108:6,25;
109:2;122:9;126:18;
127:13,14;130:6;
137:13,13,24;138:1,7,
7;139:13,13,14,15,16,
18,21;140:2,11,18,21,
23;141:1,1,10,17;
143:7,14,18,19,21,22,
23;144:2,6,14,20,24;
145:6,7,11,19;148:2,
3,16,23,24;149:3,4,5,
15,17,20;150:3,6,7,
11,24;151:2,9,23;
152:3,9,14,18,25;
153:6,13,18,22;154:9,

10,17,23;155:25;
156:3,6,6,11,12,15,17,
19;157:9;160:5;
164:8,17,21;166:11,
11,12,12,12;167:1,3,
4,4,6,8,8,13,19;168:6,
8,15,19;169:2,4,25;
171:6;182:10,20;
184:4,10;185:21;
186:5,21;190:1,7,10,
17;191:19,22,25;
192:4,9,14,18;193:8;
194:2,12,12;195:11,
23;196:3,8,13,20,21,
21;197:1,6,6,7,13,17,
22,24;198:4,20,24;
200:2,4,7,8,21,22,24;
201:2,4,6,7,9,11,15,
20,20;519:206:22;
207:5,7;209:23;
210:11;213:7;215:11;
216:9,23;218:10;
219:4,19;220:1;
221:19;222:4,15;
223:14;224:12,13,15,
21;225:2;230:3,23;
232:23;236:11;
237:11,14;238:9,21;
239:1,7,15;240:4;
242:24;243:3
**filing (1)**
37:11
**fill (1)**
113:2
**filled (4)**
51:23;52:21;59:14;
117:24
**final (3)**
104:20;152:5;
192:16
**find (26)**
24:3,6;28:6;38:4;
73:12,17;74:3,4,19;
79:21;86:1;92:14;
95:1,9;103:1;116:14;
125:13;136:2;163:13;
170:2;171:2;234:25;
238:4,23;239:25;
243:21
**finding (3)**
74:8;140:21;218:25
**fine (8)**
6:5;28:5,10;41:11;
52:11;139:8;180:15;
228:12
**finer (1)**
233:6
**finish (2)**
10:9;25:10
**finished (1)**
231:4
**firearms (1)**
181:20

10,17,23;155:25;
156:3,6,6,11,12,15,17,
19;157:9;160:5;
164:8,17,21;166:11,
11,12,12,12;167:1,3,
4,4,6,6,7,13,17,
22,24;198:4,20,24;
200:2,4,7,8,21,22,24;
201:2,4,6,7,9,11,15,
20,20;519:206:22;
207:5,7;209:23;
210:11;213:7;215:11;
216:9,23;218:10;
219:4,19;220:1;
221:19;222:4,15;
223:14;224:12,13,15,
21;225:2;230:3,23;
232:23;236:11;
237:11,14;238:9,21;
239:1,7,15;240:4;
242:24;243:3
**firm (3)**
5:8,13;124:3
**first (41)**
10:14;28:12;30:6;
50:12;55:21;61:4;
65:24;66:4;68:10,13;
75:10;86:3,15;87:4,
14;88:2;92:8,10;
108:13;109:21;
110:16;117:15;118:2;
129:19,20;132:23;
133:2;134:20;139:12;
144:12;146:22;
147:22;167:14,20;
170:10;173:10;
174:17,18;177:24;
181:12;219:12
**Five (71)**
8:6;7:9;19,22;10:5,
15,24;11:4,8,12,14,
16;15:17;16:1;20:1,
13;42:7,25;43:3;
46:15;48:22;49:5;
65:22;73:2,10,15,18;
74:6;75:1,3;77:11;
103:23;104:11;
105:17,24;106:14;
117:8,19;154:4;
190:8,13,15,16;
191:21;192:8,9,12,13,
18;193:6,12,25;
194:1;195:10,14,15;
196:1,7,21,25;197:3,
4,4,6;198:17;199:10,
11;203:18;219:16;
220:6;238:21
**five-minute (1)**
231:4
**flip (1)**
108:10
**floor (11)**
75:10,10,22;76:1,2,
4,11,13;105:25;
134:11;148:17
**focus (2)**
38:17;40:24
**FOIA (26)**
132:8;134:22,24;
148:17;173:13;174:9;
175:20,22;176:11,20,
25;178:5,17;179:1,2,
16;180:13;181:7;
183:19;184:6,9,11,12,
13;235:21;237:5
**FOIA# (1)**
178:23
**folder (16)**
18:19;21:4;25:14,
14,15,16,17,21,22;
44:23;88:5;122:19,
21;166:3,4,6
**folders (4)**
108:15;165:4;

166:2;206:8

**follow (5)**
100:19;170:3;
195:11,21;240:12

**followed (1)**
198:20

**following (1)**
197:11

**follows (2)**
5:3;52:18

**follow-up (1)**
242:2

**follow-ups (1)**
9:16

**force (1)**
48:11

**forensic (7)**
182:8,20;201:25;
202:11,12,22;203:16

**forensics (6)**
180:25;181:2,18;
182:13,21;183:13

**forgot (2)**
149:6;175:6

**form (58)**
11:1;12:19;17:10;
22:8,15,20;23:7;24:9;
26:6,15;32:20;35:20;
41:22;45:11,15;
46:18,25;47:6;48:3;
50:15;54:6,15;56:22;
69:8;75:5,17,20;76:9;
77:2,8;90:15;91:23;
94:11;95:3;110:24;
111:10;112:12;
120:16;132:4;134:13,
13,14;187:25;200:23;
204:4;208:2,2,7,8,11,
17;210:17;211:1;
224:19;227:11;230:1;
231:12;236:15

**formal (1)**
216:3

**format (1)**
130:12

**forms (2)**
166:20;173:12

**forth (1)**
223:14

**forward (2)**
143:25;154:2

**forwarded (1)**
135:12

**found (7)**
64:17;115:6;169:1;
212:25;225:9;227:22,
23

**Four (25)**
11:3,12,14,15;
193:6,11,12,25;194:7,
11,16;195:7,9,14,15,
18,19,22;196:1,21,25;
197:2,4,7;198:14

**fourth (1)**
134:11

**frame (3)**
79:15;104:6;187:23

**frankly (3)**
23:13,14;39:15

**frivolous (1)**
41:13

**front (13)**
12:2,8;13:4,24;
18:19;38:2;44:16;
95:16,18;149:11;
186:19;208:25;228:2

**fully (2)**
34:25;231:16

**function (1)**
177:5

**funneled (1)**
134:7

**further (2)**
244:5,6

## G

**gang (17)**
38:24;193:2;
198:24;199:1,4,6,10,
11,18,19,21,22;
224:11,13,20,23;
225:1

**gang-related (1)**
224:25

**gave (2)**
33:24;146:5

**general (11)**
20:24;32:10,12,24;
44:7;56:6;65:23;
66:14;67:16,22;68:1

**generally (2)**
15:19;103:22

**generate (1)**
175:8

**generated (2)**
86:5,15;152:12;
178:24

**Geography (2)**
194:20,21

**Gesturing (1)**
177:11

**gets (5)**
45:4;199:22;203:2;
234:11;236:19

**given (1)**
190:2

**giving (2)**
84:8,23

**glance (1)**
92:8

**goal (1)**
148:1

**goes (7)**
27:17;28:15;87:7;
132:9;177:25;203:1,6

**Gonzalez (6)**
116:19;119:3;
123:25;124:4;189:16;
204:11

**Good (4)**
5:6;89:1;200:8;
217:25

**governs (1)**
80:23

**GPR (17)**
55:14,14,15;56:6;
99:7;110:23,25;
111:7,9,14,24,25;
112:1,11;113:2,5;
114:18

**GPRs (30)**
43:9,10;57:8;71:6,
14,17;72:6,13;81:15,
21,24;82:2,3,5;123:4;
124:5,11,14,16,17;
125:14;126:4;144:7,
8;163:11,12,16;
164:23;205:15;
228:16

**grab (1)**
76:25

**Grand (9)**
10:18,19,22;76:1;
193:18;194:4;197:2;
198:21;238:22

**great (6)**
17:19;25:10;40:18;
88:19;129:11;201:15

**Greenberg (2)**
55:23;200:17

**Group (2)**
5:8;183:13

**guess (48)**
5:16,18;7:14;10:16;
17:19;52:1,3;54:3;
82:18;86:23;94:1;
102:7;104:14;107:22;
115:9;119:12;120:20;
129:15;130:17;
131:20;132:11;135:8;
146:14;147:12;
158:11;168:5,14;
173:24;176:17;182:8,
19;184:23;186:7;
191:17;193:9;197:12;
198:3;199:16;205:8;
213:10;216:1;220:11;
222:14;225:24;
227:16;229:3,13;
236:17

**guesses (1)**
239:21

**guessing (4)**
144:23;171:12;
185:2;186:14

**Guevara (5)**
5:10;6:1;99:11

**guided (1)**

44:8

**guideline (1)**
80:2

**guys (2)**
12:6;87:2

## H

**Haley (10)**
5:14;27:13;28:9;
30:7;31:17;62:1,20;
121:1,16;214:8

**half (2)**
6:17;10:3

**Halvorsen (4)**
5:23;59:3,20;63:6

**hand (3)**
84:21,24;145:16

**hand-carried (1)**
188:6

**handed (1)**
89:14

**handing (2)**
145:10,10

**handle (6)**
175:19,22,24;
176:19,25;233:22

**handled (2)**
9:3;42:4

**handling (2)**
179:13;231:10

**handwriting (3)**
30:20;98:11;102:25

**handwritten (12)**
18:20;43:7;92:12;
110:18;111:9,22;
112:10;114:10;
115:12;214:18;
216:12;217:6

**handy (1)**
12:6

**happen (4)**
40:17;62:24;
182:18,19

**happened (12)**
11:12;48:1,13;
63:25;127:12;164:21;
189:24;194:1,1,22;
196:16;222:8

**happens (4)**
132:15;144:25;
145:13;234:7

**happy (2)**
41:7;84:5

**hard (3)**
29:20;52:8;199:3

**Harrison (3)**
194:9;195:23;197:1

**head (2)**
80:22;174:3

**Headquarters (47)**
8:18;65:12;104:8;
125:22;134:11;

139:23;148:2,9,18,20;
149:18;151:4,13;
153:8;154:5,18;
155:14;156:2,4,16,24;
157:4;159:24;164:3,
25;165:3,9,13,16,18,
21,23;166:7;167:3,5;
168:24;169:5;174:12,
13;196:14,23;197:10;
220:18;221:8,20;
231:18;232:4

**hear (6)**
15:13;44:13;69:18;
152:23;190:14;
224:16

**hearing (1)**
210:9

**held (3)**
6:16;32:9;138:19

**help (5)**
7:22;73:19;172:25;
181:7;222:11

**helped (1)**
163:8

**helpful (1)**
85:6

**Henderson (2)**
97:17;99:12

**Henry (1)**
99:15

**Hey (1)**
205:14

**high (1)**
7:1

**highlighting (1)**
162:9

**highlights (3)**
161:25;162:2,12

**himself (1)**
70:4

**hold (16)**
7:8;18:11;41:13,18;
55:22;60:5;80:17;
86:21;110:14;127:20;
128:4;142:9;158:7;
180:12;214:13;
222:10

**holding (1)**
83:18

**hole (1)**
177:18

**holes (2)**
100:1;108:1

**HOM# (1)**
160:13

**Homan (15)**
181:5,10,13,17,22;
182:21;183:15,25;
184:17;201:24;
202:16;203:10,13,14,
19

**homes (1)**
101:14

**homicide (146)**
  8:17,19;14:5;15:1,
  2,9,16,21;16:1,18,20;
  17:3,7,9;19:14;20:17,
  25;22:13,18;24:15,
  20;25:18;26:4;37:20,
  21;38:23;44:18;50:4;
  65:20,21;68:2;70:23;
  72:19;73:3,6,7;77:10;
  78:9;81:12,12;82:13;
  85:2,9,21;86:2,4;
  90:20;97:19;99:6,17;
  103:23;104:8;105:19;
  115:3;120:12;124:18;
  128:10;131:24;
  137:25;139:13,14,17;
  140:11,18,20;141:10,
  17;143:7,14,18,19;
  144:14;145:19;148:1,
  3,23,24;149:15,19;
  150:3,6,7,10;151:2,9,
  23;152:2,14,18,25;
  153:6,12,18,22;154:6,
  8,10,17,19,23;155:14,
  21;156:12;157:4;
  159:23;160:13,16,22;
  161:3,11;164:8;
  169:4,5;171:19;
  174:7;181:16;190:7,
  10;191:18;192:9,13;
  193:8;195:23;196:3,
  7,21,25;197:9;198:4,
  23;200:7,8,21;202:2,
  10;220:2,19;221:9,
  20;222:4;224:14,20;
  225:3,7;231:18;232:4
**homicides (7)**
  32:7;150:1;157:13;
  158:16,20;160:19;
  195:9
**Honestly (1)**
  161:25
**hope (1)**
  217:21
**Huh (1)**
  124:10
**hunch (1)**
  168:6
**hundred (1)**
  149:25
**Hutson (2)**
  225:23;229:3
**hyperlink (1)**
  164:13
**hyperlinks (1)**
  162:13

**I**

**ID (1)**
  107:18
**idea (11)**
  75:14;98:25;99:16;

  109:19;115:10;120:8;
  151:15;166:9,16;
  226:5;243:7
**identical (1)**
  90:8,12;128:15,16;
  167:18
**identification (13)**
  12:1;18:8;27:21;
  62:7;88:1;101:21;
  117:22;118:3;121:11;
  133:23;143:1,5;
  158:18
**identified (23)**
  12:15;15:19;23:1;
  44:17;54:25;55:9;
  71:6;85:8;90:3;91:17;
  93:3;95:8;107:3;
  146:12;165:8;188:14;
  204:22;206:22;209:4;
  211:19;213:22;
  214:12;216:10
**identifies (1)**
  146:13
**identify (5)**
  84:23;113:5;150:2;
  151:8,22
**identifying (1)**
  152:13
**identity (1)**
  151:15
**II (2)**
  151:22;152:13
**III (3)**
  153:5,14,21
**Illinois (4)**
  5:2;99:14;101:20,
  20
**immediately (2)**
  66:25;67:6
**implementation (1)**
  33:21
**implemented (1)**
  34:25
**implementing (1)**
  148:11
**important (4)**
  112:14,17;138:16;
  189:3
**improper (1)**
  53:23
**improve (1)**
  155:25
**improved (1)**
  156:1
**inadvertently (1)**
  167:10
**incident (1)**
  160:23
**incidents (2)**
  9:4;14:6
**include (8)**
  32:7,10,12;111:4;
  112:1,3;215:11;233:3

**included (6)**
  112:5;114:5;
  118:20,23;153:21;
  228:24
**includes (2)**
  119:17;242:24
**including (5)**
  38:23;70:14;83:6;
  122:9;168:16
**incomplete (1)**
  213:11
**inconsistent (3)**
  49:17,22;70:10
**incorrectly (1)**
  212:17
**increase (1)**
  139:24
**indefinitely (1)**
  153:2
**indicate (1)**
  236:4
**indicated (3)**
  57:8;78:24;235:22
**indicates (4)**
  14:24;27:9;149:14;
  237:14
**Indicating (3)**
  25:14;27:10;78:3
**indication (1)**
  164:13
**individual (6)**
  42:15,23;44:9;51:4;
  99:5;219:4
**individuals (3)**
  42:20;46:15;237:2
**informal (1)**
  232:12
**information (35)**
  14:25;15:19,25;
  21:14;36:25;38:22;
  39:1;40:12,19,25;
  41:4;75:14;113:2,18;
  124:24;126:2;136:5,
  19;137:2;157:10;
  164:22;171:24;173:7;
  175:9;187:16;202:12;
  205:5;233:20;234:25;
  236:25;237:18,22;
  238:9,23;243:22
**initial (1)**
  108:25
**initially (4)**
  8:10,23;163:5,11
**initiated (1)**
  26:18
**initiating (1)**
  65:24
**Inmate (1)**
  115:20
**innuendo (1)**
  22:4
**inputted (2)**
  236:7,14

**inputting (1)**
  236:22
**inquired (1)**
  116:14
**inquiries (1)**
  16:17
**inside (1)**
  99:25
**insights (1)**
  244:1
**instance (7)**
  65:14;80:17;
  107:17;108:16;133:2;
  159:23;225:2
**instruct (1)**
  53:20
**instructed (1)**
  39:21
**instructing (1)**
  74:12
**integrity (1)**
  219:3
**interacted (1)**
  117:17
**interchangeably (1)**
  33:5
**Interest (2)**
  97:17;99:12
**interfaces (1)**
  173:1
**internal (7)**
  140:4,11;147:12;
  160:17,18;178:10;
  182:6
**Internet (1)**
  115:20
**interrogatories (2)**
  123:4;125:7
**interrogatory (10)**
  123:21,23;124:2,
  23;163:6,8;169:16;
  204:10;205:13;
  240:18
**into (69)**
  7:20;32:25;37:7,24;
  38:15;41:21;42:3,16,
  24;43:5,20;44:9,11;
  47:20,21;50:21;51:2,
  5;53:14,15;54:11,19;
  55:1,8,10,15;56:18;
  57:1,14;58:12,25;
  59:4,10;63:22;65:4;
  68:15,18;69:6;71:8;
  72:23;77:20;78:25;
  80:4,12,18;81:16,18,
  25;93:13;112:6;
  117:2;131:4,7;
  132:18;143:10;
  154:22;175:13;
  203:18;208:21;
  209:10;215:18;
  220:25;227:1;236:8,
  22;238:18;243:9,11;

  244:1
**intuitive (1)**
  142:8
**inventory (38)**
  31:20,21,23;32:8;
  44:22,25;45:2;50:7;
  53:1;55:1,16,19,20;
  56:7;57:24;58:5,7,9;
  60:2,3,6;62:25;63:8,
  14;64:3,9,12,16;
  68:12;70:16;71:7;
  81:10;82:4;83:11,16;
  97:6,7;182:11
**investigate (1)**
  217:2
**investigated (4)**
  45:7;46:15,20;86:4
**investigating (3)**
  68:3;195:9;217:22
**investigation (47)**
  15:2,8;16:18,20;
  17:4,9;21:1;22:13,18;
  24:13,16,17,21;25:19;
  26:5,11;44:19;46:24;
  47:15;49:19,21;50:4;
  65:20,22;66:1;70:23;
  72:20;82:13;83:9;
  85:10;97:19;99:6,18;
  106:21;110:21;112:8;
  114:3;115:2,3;
  120:12;131:24;153:2;
  171:20;181:16;220:3;
  225:7;227:10
**investigations (7)**
  15:17,22;16:2;
  34:21;77:11;139:18;
  154:3
**investigative (287)**
  9:3,7;12:22;13:9,
  15,23;14:2;15:1,16;
  17:3;25:4;26:3,8,9;
  31:7,9,10,14,21,23;
  32:1,4,7,8,19;35:10,
  11;36:9;37:14;38:13,
  17,20,23;39:1;40:24;
  44:18,22,25;45:1,12;
  46:2,6,13,22;47:2,8,
  10,14,17,21;49:10,18;
  50:1,6,22;52:25;
  54:11,25;55:2,8,9,11,
  16,19;57:2,9,10;
  58:12;59:4,11;60:2,6;
  62:24;63:8,14,21,22;
  64:3,11,16;68:12,15,
  18;69:7;70:1,14,16;
  71:7,8;72:10,12,18;
  73:2;77:10,20,23;
  78:6,10;79:1,7,22;
  80:4,12,19;81:10,16,
  17,18,20,25;82:4,6,
  10,12,23,24;83:1,2,8,
  10,15,16,18;85:2,9,
  13,21;86:2,20;89:20;

90:3,13,16,18,20,21,
24;91:17,22;92:5,7,
15,19;93:4;94:6,22,
23,25;95:4,6,8,23;
96:25;97:2,5,7,11,18;
98:9;99:17,24;102:2,
10,20;103:23;104:16,
17,24;105:23;107:3;
108:6;109:2;112:18;
114:6;115:6;117:3;
118:21;122:14,23;
124:6,16,18;126:16,
20,24,25;127:1,4,9,
14;128:10,14;129:22;
131:23;136:13;
137:13;138:7;139:13,
14,16;143:14,21,23;
144:2,6,14;145:5;
149:4,5;150:24;
154:4,21;155:6;
156:6;161:14;165:8,
24;166:11;167:4;
168:16;169:4,16;
170:18,21;171:16;
179:17;180:14;184:4;
189:16,18;190:7,10,
17;191:19;192:14;
193:8;194:2,12;
196:8;197:1;198:23;
202:2,2,10,20;204:13,
14,24;205:20;206:23;
209:5;211:20,24;
212:3;213:1,11,12,22;
215:23;216:10;
218:14,16;219:9,22;
220:5;221:25;222:3;
223:18;224:14,21;
225:4,5,8;227:15,23;
228:19;229:4;231:11,
17;232:4,9,11,17;
233:13;235:4,19;
238:5

**involved (2)**
149:21;234:4

**IR (1)**
56:7

**issue (7)**
15:3;39:17;40:20;
156:2;166:22,23,25

**issued (4)**
11:18;98:10;
147:24;232:9

**issues (10)**
74:21;140:20,21,
21,24,25;141:3,4,7;
156:14

**IV (5)**
154:2;221:1,5;
231:25;232:5

---

## J

**January (1)**

197:3

**Jennifer (9)**
5:7;12:2;24:22;
39:2;92:22;100:10;
161:17;167:22;176:8

**Jenny (1)**
225:9

**Jesus (1)**
99:15

**job (3)**
6:18;42:15;124:23

**jobm (1)**
124:22

**jobs (2)**
7:10;177:4

**Joe (1)**
101:6

**joined (2)**
7:5,23

**joining (1)**
7:9

**Jose (2)**
5:9;118:15

**Josh (1)**
5:22

**Joyce (2)**
52:15;71:1

**Juan (1)**
5:9

**July (21)**
115:21;116:9,20;
117:24;119:7;123:1;
128:2;135:20;136:15;
168:7,17;188:25;
189:5;205:2;206:12;
218:25;227:6;228:14;
230:12,17;240:17

**juncture (2)**
210:1;234:5

**justice (8)**
105:15;106:6,25;
173:16;192:2,15,16;
203:5

---

## K

**Kara (3)**
225:23;229:3;241:2

**Kedzie (3)**
194:9;195:24;197:2

**keep (10)**
12:7;16:15,23;
29:25;31:17;62:20;
70:25;178:8;191:10;
200:22

**keeping (1)**
237:12

**keeps (1)**
200:24

**kept (12)**
32:5;37:14;73:7;
85:16;105:20;122:17,
20;147:3;154:3;

180:22;190:19;225:2

**Kevin (2)**
6:5,6

**key (1)**
76:23

**kind (12)**
7:18;46:10;91:2;
109:10;139:4;144:16;
146:2;154:12;163:21;
184:17;206:25;
220:25

**KLZ (1)**
97:25

**knew (1)**
19:12

**knowledge (9)**
48:23;105:17,22;
141:12;152:11;209:2,
3,6;219:18

**known (2)**
33:8;193:2

**knows (5)**
21:16;28:6;44:2;
74:15;165:21

---

## L

**lab (1)**
38:25

**labeled (3)**
82:21;87:2;215:1

**lack (1)**
123:4

**language (3)**
136:9;212:20,21

**largely (1)**
221:23

**last (10)**
10:25;23:10;34:11;
52:16;83:11;88:15;
141:25;155:2;220:12,
13

**late (4)**
33:23;34:23;
105:10;143:12

**later (1)**
116:10

**law (3)**
5:7,8;124:3

**lawsuit (5)**
25:5;26:18;173:22;
184:23;185:10

**lawyer (1)**
84:1

**leads (2)**
31:13,24

**learn (2)**
234:22;237:1

**least (23)**
10:25;28:12;46:9;
79:4;80:15;82:11;
92:18;103:24;105:3;
109:16;116:4,8;

128:1;130:6;136:22;
162:19;163:20;189:4;
208:10;217:12;
220:10;233:14;243:2

**leaving (1)**
161:17

**led (1)**
124:14

**left (7)**
9:20;26:22;96:7;
137:24;194:4;222:22;
223:5

**left-hand (1)**
19:2

**legal (27)**
125:6;164:23;
173:19;174:1,10;
175:23;176:20;177:1;
178:5,20;184:22;
185:6,16;186:1,2,3;
187:13;188:7,10;
205:6;226:22;233:21,
22;234:4,10;235:20;
237:5

**lengthy (1)**
6:7

**less (1)**
197:8

**letter (6)**
18:23,24;19:18;
34:9;86:9;170:3

**level (4)**
7:1;17:1;53:25;
149:22

**license (1)**
98:6

**lieutenant (4)**
8:22,23;9:1,2

**lieutenants (1)**
46:22

**lieutenant's (3)**
48:21;49:8;70:7

**life (1)**
203:2

**lifetime (1)**
185:11

**light (1)**
115:24

**likely (1)**
18:21

**line (2)**
60:19;92:25

**lips (1)**
71:3

**list (3)**
32:8;238:6,13

**listed (1)**
44:24

**Listen (2)**
84:10;228:15

**literally (1)**
39:10

**litigation (5)**

141:4,7;145:4;
148:16;173:19

**little (13)**
6:7;7:2;26:14;
28:22;100:1;108:13;
135:9;148:7;181:14;
191:14;199:17;
200:25;226:13

**locate (6)**
150:3;151:2,9,16,

**located (14)**
10:17;22:19,22;
24:16;85:14;93:10;
151:23;153:7,22;
179:5,6;193:16;
199:4;231:17

**locating (3)**
141:1;149:19;
152:13

**location (12)**
65:10;73:8,9,
105:20;106:6,14;
179:3;188:16;195:10;
240:6

**locations (8)**
10:24;15:25;21:11;
47:14;141:2;156:11,
12;218:6

**locked (1)**
153:15

**Loevy (2)**
124:3,3

**log (17)**
27:8;53:1;55:1,10,
19,20;68:12;71:7;
83:16;132:23;133:3,
4;219:14,15;222:25;
236:22,24

**logged (1)**
208:20

**logging (4)**
70:17;173:6;
221:21;232:22

**logs (1)**
232:22

**long (13)**
6:16;25:2;28:1,15;
62:9;80:23;181:24;
193:18;196:11;198:1;
200:16;226:15;240:9

**longer (3)**
34:5;201:16,21

**look (66)**
16:25;17:6;18:14;
20:20;21:6;22:7;28:7,
11,20;29:15,20;36:11,
17,21;38:5,9,15;
39:20;40:2;55:22;
57:16;58:16;60:11,
17;61:24;68:11;78:3;
79:2,4,9,11;81:13;
89:1,5;90:11;92:10;

97:13;107:2;108:12;
110:11,14;113:10;
114:15;115:12,17;
117:5,22;119:5,16;
120:13,24;141:25;
163:24;171:10;
172:14,22,24;179:25;
181:8;184:2;225:18;
228:2;231:5;238:18;
240:25;241:2

**looked (29)**
12:21;13:1;14:18;
17:16;21:16,19;
30:12;64:18;78:20;
93:23;94:8,13,22;
95:15;102:13;103:12;
106:2;110:16;124:9,
12;141:23;158:24;
165:7;172:9;216:9;
219:19;220:2;241:10,
14

**looking (41)**
28:12;30:11;52:25;
53:13;55:18;56:25;
57:4;58:13;62:12;
78:14;79:5,6,12,17,
20;81:10;82:11,20;
85:3;87:20;96:25;
97:15;108:16;112:21;
119:8;120:2;124:24;
129:8;131:22;135:23;
157:23;158:9;163:11;
172:10;174:17;
177:22;184:20;205:5;
226:22;240:16;241:3

**looks (38)**
20:23;25:13,15;
30:25;31:18;57:12,
17;58:13;59:3,14;
60:13,14,16,20;63:21;
89:17,21;91:3,5;92:4;
99:23;100:1;101:20;
107:13,25;114:13,14;
115:20;120:17;130:1;
146:10,11;162:17;
175:12;184:21;188:4;
228:3;229:9

**Lord (1)**
191:10

**lost (2)**
19:8;202:6

**lot (6)**
88:25;91:5;92:8;
123:5;181:11;187:22

## M

**Magic (2)**
18:21;19:17

**maintain (7)**
42:10;45:19;49:25;
148:10;187:13;
238:12;239:7

**maintained (73)**
23:2,5;27:2;34:19;
35:5,13,16;37:25;
47:13,16,22,23;48:20;
49:7;67:10;73:2,3;
77:4;93:16,19;
103:24;104:18,24;
105:8,11,16,24;106:5;
122:15;134:9,12,13;
138:7,12;139:18;
141:20;145:1;150:8,
11,23;151:13;154:6;
156:4;159:4;173:3;
180:18;181:4,9,13,16;
182:7;183:15;184:5;
190:12,19;192:24;
193:8;195:23;200:2;
201:2,7;202:16,20;
204:2,3;218:25;
224:12,13;232:18;
238:21;239:1,5;
241:19

**maintaining (7)**
46:23;232:22;
235:14;236:24;238:9;
239:9,11

**maintains (7)**
75:25;134:20;
145:18;175:15;236:9;
237:16,18

**maintenance (1)**
155:25

**makes (4)**
35:23;58:8;157:11;
187:10

**making (11)**
17:14;42:24;47:4;
67:19;70:21;107:16;
152:10;187:22;
222:21;236:21;
237:24

**mandated (1)**
43:19

**Mango (2)**
114:14,15

**manila (1)**
18:19

**manner (3)**
108:7;157:11;174:7

**many (4)**
45:8;82:15;131:14;
156:11

**March (6)**
8:16;13:12;188:5,
17;193:6;196:12

**Mario (1)**
98:1

**mark (14)**
11:21;18:2;61:25;
87:21;121:5,5,20;
128:9;133:19;142:20,
21;158:11;211:8,13

**marked (74)**

11:25;18:3,7,13;
27:20;62:6,13,16;
64:19;84:8,11,14;
87:25;88:3;91:10,19;
93:2,10,23;95:2;96:9,
15;97:1,2,9,12;
101:24;102:3,24;
107:4;109:3,7,20;
110:17;115:6,7;
116:1;118:18;121:10;
123:9;128:14,15,23;
129:2;130:22;133:22;
135:11;136:14;
142:25;143:5;146:3,
10;149:8;158:17,25;
162:22;165:12;
166:13;169:9;203:23;
206:20;212:1,5;
213:13,14,23;225:13,
21;226:3;227:5,16,
24;235:8;243:9

**Marker (3)**
18:21,24;19:18

**markings (1)**
116:8

**marks (2)**
108:1;162:23

**Master (1)**
116:17

**match (1)**
169:24

**material (7)**
120:14;128:20;
170:14;201:25;
202:12;203:14;227:4

**materials (30)**
17:1;18:15;80:23;
96:18,20,21;102:1,19;
109:25;121:24;
122:23,23,24;123:19;
126:15;130:5;136:13;
179:21,23;180:1,3;
181:15;187:1;218:15;
220:1;226:3;227:2,9,
15,25

**math (2)**
88:19;242:9

**matter (7)**
5:9;16:7;55:9;
127:8;139:9;174:7;
204:11

**matters (2)**
12:14;16:12

**Maxwell (4)**
200:3,10,16,17

**may (56)**
6:7;9:1;10:7;15:25;
16:22;17:16,19;25:6;
45:22;56:15,19;57:2,
15,16;58:12,13,15,16,
22;61:2;64:3;65:20;
68:15,17,19;69:1,7;
71:8,15;72:20;73:6,

10;76:12;79:18;80:3,
11,24;81:5,16,25;
82:2;83:11;95:13;
152:4,5;186:17;
189:11,20,22,23;
199:8;201:19;222:17;
231:4;235:12;238:12

**maybe (27)**
7:4;14:8,8,9;25:10;
30:1;43:17;45:23;
98:6;101:6;148:6;
157:23;165:1;172:14,
25;173:2;174:3;
177:18;182:17;
187:15;204:21,24,25;
215:8;224:14;229:1;
234:13

**Maysonet (14)**
5:9,10;116:4,19;
118:12,15;155:1;
166:10;203:1;220:11;
221:24,25;233:7;
235:9

**Marker (3)**
18:21,24;19:18

**Maysonet's (2)**
65:21;78:6

**mean (95)**
21:5;23:21;24:23;
25:1;28:5;29:1,9,25;
32:6;36:10;41:12;
44:4;48:12,17;51:9;
54:9;55:14,19;67:6;
70:3;81:21;84:4;89:2;
93:5;94:11;95:10;
96:11;104:2,24;
108:3;111:1,13;
112:14;131:19;134:5;
135:8;142:7;143:24;
147:9;150:18;152:17;
156:6,7;159:17;
162:10;163:5;167:16;
172:13;175:12;
176:15;177:3;178:16,
24;179:4;180:15,16;
181:2,10;182:8;
183:22;185:17;187:7;
189:23;191:3,13;
194:11;196:17;199:2,
3,3;200:5,8,12;
201:18;203:4;206:11;
207:20;208:10;
220:21;221:16,20;
222:21;223:9;224:12;
226:13,21;227:13;
228:5,10;229:6,7,20;
232:25;237:15;238:6

**meaning (7)**
49:9;72:21;76:23;
85:16;118:7;162:13;
207:7

**means (10)**
50:21;59:10;98:3;
100:5;138:25;161:21;
162:4;170:16;185:22;

204:12

**meant (2)**
57:19;96:11

**mechanism (1)**
187:15

**Media (2)**
160:10,11

**medical (1)**
20:23

**meet (1)**
39:8

**meeting (2)**
55:23;106:12

**Member (4)**
50:20,24;51:3;
53:10

**memo (10)**
12:21,23;120:2,5;
141:15,16,23;143:3;
149:9;158:24

**memorialized (1)**
141:18

**memorialize (1)**
29:12

**memory (1)**
184:9

**memos (1)**
141:20

**mentioned (2)**
14:7,9

**mere (1)**
93:5

**mess (1)**
148:13

**metadata (3)**
136:22;170:4;
243:25

**Michael (1)**
99:13

**Michigan (5)**
5:2;26:1,2;104:8;
174:14

**Mid-2000s (2)**
182:17,19

**middle (1)**
20:6

**midnight (2)**
8:14,25

**Miedzianowski (1)**
101:6

**might (14)**
7:21;9:15;47:23;
51:1;66:10;70:6;
176:9;180:6,17;
184:3;199:10;224:6;
234:5;243:21

**mind (1)**
27:23

**Mingey (1)**
5:23

**Minor (1)**
97:17

**minute (4)**

62:10;92:24;181:8;
183:20
**minutes (2)**
52:12;168:1
**miraculously (1)**
188:24
**miscellaneous (2)**
99:23;167:6
**misconstruing (1)**
228:8
**misfiled (4)**
166:18;168:9,19;
188:20
**misheard (1)**
151:6
**missed (1)**
119:18
**misspoke (1)**
211:17
**misstates (1)**
32:20
**mistake (1)**
197:21
**mistaken (4)**
16:9;63:6;155:3;
214:1
**mixed (6)**
156:11,12;210:11,
14;229:9,11
**model (1)**
146:14
**moment (2)**
161:19;218:5
**monitor (1)**
223:4
**months (1)**
8:12
**Montilla (1)**
5:24
**more (21)**
28:22;40:11;41:6;
87:9;102:6,7;129:15;
140:22;142:14;
144:12;148:19;
157:18;165:2;168:5,
12;181:14;194:20;
203:4;216:6;232:11;
241:25
**morning (1)**
133:14
**most (1)**
131:23
**move (7)**
7:22;148:1,10;
153:5;168:23;169:4;
194:4
**moved (29)**
8:12,15,20;9:9;
27:6,9;34:22;40:18;
104:7;105:2;127:15;
139:15,19;148:23,24;
149:3;151:12;154:1,
5;155:9,13;156:15;

159:2;167:1;168:25;
192:17;194:3,12;
197:25
**moves (1)**
27:10
**moving (7)**
71:4;139:22;
143:25;148:8;149:17;
154:2;171:6
**much (6)**
67:25;78:24;80:10,
23;81:5;167:24
**multiple (3)**
14:12;22:1;208:10
**murder (5)**
20:1;48:13;83:9;
154:3;198:2
**murders (1)**
19:25
**must (6)**
27:8;80:25;111:7,9;
119:18;238:17
**muted (1)**
158:3
**Muzupappa (3)**
174:23;177:9,15
**myself (4)**
12:9;124:14;
127:18;172:22

## N

**N234297 (3)**
28:16;30:16;215:1
**name (12)**
5:6;45:23;86:12;
98:6;109:6;114:14;
121:14;125:16;131:3,
10;166:12;216:3
**names (1)**
20:12
**narrative (2)**
51:23;52:22
**nature (2)**
43:8;219:6
**NBC (4)**
132:1;9;179:16;
180:10
**nearly (1)**
116:9
**necessarily (4)**
59:7;98:21;132:2;
202:21
**need (16)**
12:10;30:9;41:5;
72:7;84:10;89:1;
90:11;129:12;138:14;
142:10;149:12;158:2;
167:25;184:13,18;
218:2
**needed (2)**
87:13;177:4
**needs (1)**

41:6
**network (15)**
131:8,10,11,13;
135:17;136:6,20;
145:21,25;146:6;
159:7;171:25;223:4,
10,12
**new (6)**
40:23,25;96:12;
143:14;233:7;234:12
**news (1)**
163:19
**next (10)**
51:15;119:5;120:5;
126:2;129:21;146:16,
25;164:21;178:20;
228:2
**nine (3)**
8:11;57:16;58:9
**non-homicide (1)**
156:13
**North (33)**
8:18,21;11:6,11,14;
191:3,5;193:1,1,2,4,5,
9,10,15,24;194:3,17;
195:20;196:2,9,11;
197:7,8;198:24;
199:1,4,7,17,18,19,24,
25
**note (3)**
112:1;113:7;225:10
**noted (1)**
244:12
**notes (21)**
78:13,15;92:12;
110:18,21;111:3,7,9,
14,22;112:10,14,17,
18,22;114:10;115:5,
12;147:4;214:18;
217:7
**notice (20)**
11:18,24;12:15,24;
14:19,23;15:14;22:2;
38:22;39:22,24,25;
41:9;49:15;74:11;
93:25;161:4,24;
174:6;212:2
**notified (2)**
74:23;174:12
**November (10)**
7:7,12,18,24;9:8,
11;60:14,16,17,18
**number (83)**
13:9;14:24;19:2,5,
14,21,25;20:24;24:7;
28:16;30:16;35:24;
36:5,11,12,18,21;
37:12;50:8,9;53:5;
56:8;68:11,14;77:14,
15,16;85:23;86:2,4,
14,15;87:10;88:11;
89:12;96:8;97:25;
98:7;106:19,20,22;

114:13;130:17;
145:25;146:1;155:22;
156:14,21;157:13;
158:1,3;159:14;
160:14,16,17,18,19;
161:13;169:2;173:12;
175:2,4,7,9,11;178:8,
11,24;179:2;183:17;
185:17;19;216:12;
230:3,16,22;233:14;
239:16,19;240:16;
241:7,18,19
**numbers (15)**
18:23;19:24;36:13,
14,18;56:7;57:13;
84:13;85:18;121:13;
151:20;161:22;162:3;
184:25;207:12
**numerical (1)**
86:16

## O

**oath (1)**
47:19
**object (26)**
12:19;21:9,24;
22:15;23:22;48:3,15;
49:14;53:19;54:5,14;
56:22;62:21;74:10;
75:5,17;76:8;77:2,8;
90:15;91:23;110:24;
112:12;120:16;132:4;
224:18
**objected (1)**
39:3
**objecting (3)**
16:10;21:18;22:5
**Objection (26)**
11:1;17:10;22:20;
23:7;24:9;26:6,15;
32:20;35:20;39:5;
41:22;45:11,15;
46:18,25;47:6;69:8;
75:20;94:10;95:3;
200:23;204:4;227:11;
230:1;231:12;236:15
**objections (3)**
12:4;23:19;41:12
**obligated (1)**
112:6
**observing (1)**
96:12
**obtain (1)**
126:22
**obtained (4)**
101:13;188:6,9;
240:17
**obvious (2)**
48:18;115:10
**obviously (4)**
39:20;144:22;
145:9;244:8

**occurred (9)**
49:5;50:3;66:21;
157:9;160:24;180:16;
196:5;210:19,22
**Occurrence (1)**
160:25
**occurs (1)**
194:24
**October (1)**
8:22
**odd (2)**
7:10;177:4
**off (32)**
16:22;19:10;30:1;
41:19;45:9;47:1,4,7;
59:20;61:1,5;63:6;
67:3,3;71:5;80:21;
96:7,14;106:15;
116:5;120:25;125:5;
127:21;136:6;174:3;
184:8;203:1;207:12;
211:15;222:12;224:9,
10
**offense (7)**
32:25;56:6;65:23;
66:14;67:16,22;68:1
**offenses (1)**
224:25
**office (23)**
6:4;47:23;48:21,21;
49:8,8;70:7;100:13;
115:13;125:12;
134:10;173:18;
175:23;178:5,20;
179:1;185:25;187:5,
10,12;188:7;226:21;
233:9
**officer (7)**
8:2;51:5;53:11;
56:12;80:24;111:8;
113:5;125:19;179:13;
184:12
**officer-involved (1)**
9:4
**officers (8)**
80:2;175:19;
176:11,18,22,23;
224:23;225:2
**offices (1)**
5:1
**OLA (1)**
186:18,18;189:22;
190:1;205:23;226:23
**old (12)**
7:11;111:23;
143:18,24;144:24;
145:11,19;161:11;
223:17,25;224:1;
240:4
**once (9)**
23:16;48:16;66:21;
144:25;145:13;
167:11;202:25;204:7;

237:12

**one (72)**
12:3;13:24;14:7;
18:23,23;21:21,25;
22:5,10,24;27:24;
41:18;42:19;45:12;
60:7;61:12;65:24;
67:11;68:13;73:7;
84:3;86:21;87:8,9,14;
90:16;92:18;93:21;
96:11;97:5;102:9;
103:15,19;104:7;
105:20;111:14;120:5;
123:6;127:20;129:7;
133:9,11;142:14,16,
21;145:2,22;155:2;
158:3,7;166:3;
168:10;173:13;177:9;
178:20;191:7,22,25;
192:4;196:24;199:7,
12;201:17;206:22;
209:12;212:12;
220:12;221:22;
222:10;232:3;240:11;
243:2

**one-page (1)**
133:20

**ones (3)**
13:6;143:24;210:3

**ongoing (2)**
46:3;72:21

**only (6)**
21:11;28:23;83:15;
145:7;153:12;228:22

**onto (1)**
80:17

**open (26)**
73:1;100:11;
106:13,21;150:3,7,10,
20;151:2,7,9;154:9;
192:1,18;194:2,12;
195:24;196:3,7;
197:17,22;198:5,20;
201:6,9;203:13

**opened (6)**
11:15;100:8,16;
126:17;193:21;196:2

**open-ended (3)**
129:16;168:12;
216:7

**operations (4)**
76:2,13,18;105:24

**opportunity (4)**
11:17;17:17,20;
20:20

**opposed (2)**
56:19;139:3

**options (2)**
235:25;236:2

**order (29)**
13:9,9,13,13,14,18,
22,25;14:1,4,13;41:9;
44:7,7,8;57:5;78:23;

79:8,22,23;80:1,7,10;
81:4;86:16;140:17;
141:13,17;236:13

**ordered (1)**
234:13

**orders (5)**
12:22;13:2;38:6;
49:13;111:22

**organic (1)**
16:23

**organization (1)**
31:13

**organize (4)**
108:25;139:22;
148:10;195:3

**organized (31)**
16:16,24;31:11;
32:5;35:9,23;36:4,7,
9;37:18;77:13;85:17,
18,22;106:18,19;
145:24;155:20;156:4,
7,9,20;157:5,10,10;
167:12;182:14;
183:17;195:1;196:4;
222:5

**original (31)**
20:16;21:6,20;22:8;
25:21;32:15,17,24;
43:6,7,11,15;66:3,15,
23,24;67:3;68:25;
69:5,16;70:21;72:13;
100:14;110:8;132:6;
145:10;183:7,9;
185:1;205:24;241:18

**originally (4)**
20:14;137:4,8;
213:10

**originals (14)**
21:16;46:12;62:18;
67:18;70:18;72:7,9,
10;183:3,14;184:4;
203:18;206:4,13

**others (1)**
14:3

**otherwise (2)**
12:7;29:23

**out (62)**
7:24;28:6;34:4;
38:4;39:9;51:23;
52:21;60:13;65:22;
70:25;71:1;73:13,17;
74:3,4,8;78:2,4,16;
82:18;86:3,14;107:9;
113:3;115:25;116:9,
15,15,20,23,25;
117:24,24;125:8,13,
25;136:2;139:15,19;
148:17,24;149:3;
152:24;163:9;170:2;
171:2;181:5;186:11;
203:16;213:8;215:15;
216:19;217:3;221:15;
230:14;233:17;

234:25;237:25;238:4,
23;242:10;243:22

**outer (1)**
88:7

**outside (9)**
185:21,23,24;
186:6,6,7,8;187:6;
222:16

**over (28)**
10:3;19:1;27:7;
39:11;52:24;63:8;
68:2;80:8;81:22;
97:23;117:14;123:8;
129:16;136:8;145:10,
10,16;167:5;169:1;
187:13;190:9;192:24;
207:5,13,14,19;
220:18;223:24

**overbroad (3)**
23:17;39:4;40:4

**overlooked (1)**
144:13

**overseeing (1)**
6:20

**own (13)**
26:14;46:17;98:22;
131:13;134:24;
135:16;140:11;
224:12,13,20;236:20;
237:11;239:7

**P**

**page (31)**
14:20,23;28:12;
30:7;31:19;51:15,16;
55:21,24;56:2;59:15;
81:9;83:1,2;87:5;
88:2,15;92:10;95:16,
18;97:13,21;101:19;
113:11;119:5;146:16,
25;147:23;212:19;
215:5;228:2

**pages (34)**
27:25;30:8,11;
82:20;84:9,11;88:20;
93:6,6;100:24;122:1;
126:14,15;128:21;
129:1,20,21;130:4,18,
20;136:11;137:17;
164:16;203:22;210:6;
226:15;227:1,4;
229:15;241:2,4;
242:10,14,16

**Paige (1)**
99:13

**paper (32)**
29:12;37:6;53:1;
98:8,14,16,23;111:3,
23;132:15,19,24;
143:14;144:6,8;
145:7,19;187:7,25;
207:9;208:2,7,8,11,

17,20;210:1,2;215:9,
12;222:25;224:2

**papers (1)**
145:10

**paperwork (1)**
152:12

**paralegal (2)**
5:15;229:4

**parameters (3)**
36:24;39:22,24

**parentheses (1)**
121:15

**part (28)**
26:7;27:16;29:1;
38:21;52:10;63:20;
64:25;65:2;82:11,21,
22;86:22;94:5,21;
151:1;165:12;166:5,
7;212:5,10;213:21;
214:8;216:10;224:14;
227:14,21;241:23;
242:10

**partially (5)**
167:8,17,19;
206:25;214:20

**particular (16)**
22:10,24;23:5;27:1;
31:25;85:23;86:1;
109:24;122:24;127:8;
132:25;159:3;175:1;
176:3,7;210:16

**particularly (1)**
196:20

**parties (1)**
12:6

**parts (1)**
82:19

**party (2)**
173:22,24

**passed (1)**
164:22

**passing (2)**
78:12,15

**past (1)**
215:8

**paths (1)**
117:14

**patrol (4)**
8:2,11;66:12;
193:20

**Paulnitsky (1)**
5:24

**pause (1)**
126:19

**PDF (42)**
28:14,15;82:20;
86:24;87:3;121:15,
17;129:17;130:18;
132:14,19;136:11,24;
137:6,17;163:4,7;
164:5;170:5,11;
203:23;204:1,2,7;
205:4,6,7;207:25;

17,20;210:1,2;215:9,
12;222:25;224:2

**pen (1)**
88:10

**people (13)**
6:3;20:12;65:8;
99:13,14;130:18;
132:8;136:3;148:15;
175:22,24;176:3;
233:14

**per (2)**
21:11;73:20

**percent (1)**
217:1

**perhaps (2)**
107:21;242:24

**period (9)**
11:10;16:2;37:7;
152:8;201:9;220:6,
17;222:4;233:12

**permanent (33)**
32:25;33:5,7,8,13;
38:24;62:16,25;
63:11;64:4,12,17;
67:17;71:22;72:3,8;
105:7;126:18,23;
127:3,10,13,25;
136:12;209:19;211:6,
9,14;212:8;214:4;
215:22;216:23;
217:11

**permitted (2)**
49:23;78:24

**permitting (1)**
154:11

**person (10)**
42:9;43:2;45:19,21;
51:1;53:14;74:5;
125:16;134:24;190:3

**personal (1)**
100:25

**personnel (11)**
131:1,3;134:22;
135:5,13;136:11;
137:16;139:1;145:20;
161:12;204:20

**persons (1)**
42:9

**perspective (1)**
70:12

**pertaining (1)**
85:10

**pertinent (1)**
112:8

**Phase (13)**
150:2,9;151:8,22;
152:13;153:5,14,21;
154:2;221:1,5;
231:25;232:5

**phases (1)**
220:24

**phone (2)**
  114:13;237:24
**photocopied (3)**
  100:12,17;227:1
**photocopy (1)**
  18:18
**photographs (5)**
  101:23;102:16,19;
  107:9;180:5
**photos (27)**
  100:18,24,25;
  101:3,7,12,13;107:22;
  180:10,18,20,21,22;
  181:4;182:25;183:1,
  1,7,9,24;184:2,2,8,11;
  202:13,22;203:9
**phrases (1)**
  39:4
**physical (6)**
  12:8;130:13,19;
  164:21,24;205:19
**physically (5)**
  10:17;100:13;
  163:24;193:15;
  216:14
**pictures (2)**
  181:19;203:17
**piece (7)**
  98:8,13,15,22;
  111:23;120:17;
  187:24
**pieces (2)**
  202:3,22
**pile (1)**
  75:13
**pinpoint (1)**
  169:3
**pinpointed (1)**
  165:2
**place (9)**
  5:12;19:15;80:12;
  103:5;138:11;167:14,
  20;234:24;235:1
**placed (29)**
  37:24;44:11;49:6;
  55:1,10;56:18;57:1,
  14;58:11,21,24;
  59:10;63:10,22;64:4;
  71:8,22;72:7,9;77:20;
  78:25;80:4;81:15,17,
  24;82:5;117:2;
  209:10;229:5
**places (11)**
  44:10;59:4;66:9;
  138:13;139:2;167:11;
  184:12;195:13;202:3;
  204:2;232:3
**plaintiff (6)**
  5:9,14;11:19;17:2,
  8,23
**plaintiffs (1)**
  63:16
**plaintiff's (1)**

**plan (1)**
  155:15
**plate (1)**
  98:7
**Please (16)**
  6:8;24:10;27:15;
  32:23;46:19;49:3;
  51:17;54:7;64:10;
  81:2;91:25;95:7;96:2;
  97:12;129:13;168:13
**Plus (4)**
  44:24;119:21;
  136:13;183:24
**pm (10)**
  52:14,14;96:4,4;
  168:3,3;218:4,4;
  231:7;244:12
**point (29)**
  10:20;28:13;35:1;
  46:1;54:24;83:3;
  102:7;104:7;105:7;
  106:10;110:22;
  115:15;136:15;
  137:23;143:13;170:9,
  22;188:19;190:22;
  191:18;197:23;199:7;
  205:17;208:10;210:7;
  223:3;233:6;236:14;
  238:3
**pointing (1)**
  78:16;84:12
**points (3)**
  211:17;212:18;
  213:19
**Polaroid (1)**
  100:24
**Police (37)**
  6:13,23;7:5,9,23;
  20:22;34:19;49:2,6,
  12;70:11;99:4;111:1,
  6,8,10,11,17,19,21;
  117:18;131:21;
  134:24;139:19;
  140:10,18;145:14;
  181:1,2;182:6;201:2;
  212:25;223:20;
  233:18;234:11,24;
  237:17
**police-generated (1)**
  101:13
**police-shooting (1)**
  117:17
**policies (6)**
  13:2;38:9;49:1,13;
  80:15;99:4
**policy (12)**
  37:22;43:19;78:22;
  79:16;80:1,6,21;81:4;
  111:2,6,10;127:8
**poorly (2)**
  156:7,9
**popping (1)**

216:19
**portions (2)**
  242:25;243:2
**position (4)**
  6:12,16;42:6;177:7
**positive (2)**
  157:15;182:5
**possible (10)**
  16:16,24;19:7,16;
  37:10;70:8;75:18;
  136:18;172:2;221:7
**possibly (4)**
  217:11;220:20,21,
  22
**Post-it (1)**
  113:16
**potential (1)**
  234:14
**potentially (1)**
  243:24
**PowerDMS (2)**
  147:2,3
**powers (1)**
  238:15
**practice (1)**
  80:7
**practices (1)**
  49:1
**precise (1)**
  136:9
**pre-existed (2)**
  132:16;148:3
**Preferably (1)**
  111:25
**preparation (7)**
  13:7;21:20;22:8;
  29:9,11,14;38:8
**prepare (3)**
  12:17;40:11;80:16
**prepared (20)**
  16:5,19;23:4;45:2,
  13,16,17;47:19;
  53:11;65:25;66:4;
  68:2,9,19;71:15;
  81:11;108:6;117:23;
  123:14;136:18
**prepares (1)**
  80:24
**present (4)**
  109:2;150:4;151:5,
  10
**presented (1)**
  17:18
**Presently (10)**
  83:4;85:14;93:11;
  110:6;122:15;125:21;
  128:1;159:5;181:17;
  217:8
**presumably (5)**
  68:23;136:6;
  154:22;155:4;204:12
**presume (1)**
  137:11

**presupposing (1)**
  229:18
**pretty (5)**
  107:25;161:12;
  177:23;222:7;242:13
**preview (1)**
  189:25
**previous (1)**
  135:20
**previously (26)**
  44:16;54:2;64:18;
  65:13;91:17;93:23;
  95:2;96:16;128:14,
  23;131:4,15,19;
  135:10;138:17;162:4,
  18;164:4,9,14,15;
  213:21;214:12;
  218:19;224:6;225:13
**primarily (1)**
  144:23
**primary (1)**
  177:5
**print (3)**
  29:3;52:7,10
**printed (8)**
  12:3;115:25;116:8,
  20,23,25;117:24;
  215:15
**printing (1)**
  162:19
**printout (1)**
  116:18;118:7,9
**prior (15)**
  7:8;34:18;68:19;
  71:15;76:9;81:18;
  82:6;89:14;93:17;
  136:15;187:19;194:8;
  195:22;218:25;228:8
**prison (3)**
  116:5;203:2,3
**privilege (4)**
  187:13,17;188:1;
  205:9
**privileged (4)**
  53:20;124:24;
  125:1;205:5
**Probably (9)**
  27:6;67:5;93:7;
  99:7;136:19;185:2;
  187:24;204:13;
  233:13
**problem (2)**
  52:2;152:9
**problems (3)**
  146:11,13;191:14
**procedures (1)**
  148:12
**process (18)**
  37:11;45:4;46:2,3;
  67:20;74:4;77:19;
  105:3,15;106:7,25;
  151:1;173:16;174:11;
  192:2,15,16;203:5

**processed (1)**
  223:20
**Processing (4)**
  59:16,25;61:2;
  182:22
**produce (2)**
  145:5;157:21
**produced (19)**
  17:2,7,20;28:14,25;
  39:17;82:19;93:17;
  100:12;121:6,14;
  124:6;133:14;138:19;
  142:5,7;147:16;
  157:20;165:12;166:2,
  3,14;168:7,14,17;
  171:23;177:20,21;
  179:21;180:5,10;
  183:23;187:11;
  189:16,19,21;205:11,
  12;213:10;226:4,7,9,
  17;229:15;230:12;
  231:1;234:22;235:5,8
**Producing (1)**
  25:4
**production (2)**
  179:21;213:21
**program (1)**
  9:21
**programs (1)**
  57:24
**Progress (4)**
  58:3,5,9,10
**promoted (6)**
  8:3,9,22;9:6,13;
  10:12
**prompted (2)**
  141:3;228:15
**promptly (1)**
  67:7
**prop (1)**
  57:23
**proper (1)**
  209:11
**Property (3)**
  58:7,8,9
**propounded (1)**
  123:24
**prosecutions (1)**
  233:23
**provenance (2)**
  103:11;109:24
**provide (3)**
  41:5;102:6;205:6
**provided (7)**
  63:15;80:1;102:5;
  115:12;127:2;157:17;
  215:19
**Public (1)**
  101:21
**pull (4)**
  27:15;36:25;39:15;
  121:16
**pulled (1)**

183:24
**punch (4)**
107:11;108:2,3,7
**punches (4)**
107:5,20;109:9,16
**purport (1)**
17:2
**purportedly (1)**
104:18
**purports (1)**
160:2
**purpose (5)**
48:10;123:20;
136:8;149:1;211:12
**purposes (2)**
26:23;212:15
**pursuant (4)**
49:12;111:1,5;
158:23
**put (41)**
18:10;36:25;47:20;
50:21;51:23;52:21;
53:15;54:11,19;
55:15;70:6;112:6;
115:25;122:23;123:2,
18,20;130:23,24;
135:12;137:17;139:2;
146:4,17;155:17;
170:16;174:18,19,25;
175:13;196:18;
204:25;208:17;210:6;
219:5;227:1;229:8;
233:6;238:11;243:17,
20
**puts (2)**
53:14;175:18
**putting (8)**
44:9;51:2,4;65:21;
82:3;218:5;236:25;
237:21

## Q

**quick (1)**
81:13
**quickly (4)**
7:18;40:18;125:3;
161:13
**quit (1)**
91:25
**quite (1)**
39:15

## R

**rabbit (1)**
177:18
**Ramirez (1)**
98:1
**random (1)**
98:8
**range (4)**
83:19;85:8;87:5;

154:24
**rank (2)**
6:11;49:9
**rap (6)**
118:4,5,12,15;
119:2,21
**rather (2)**
51:5;52:3
**R-Case (6)**
34:7,8,13,15;36:11,
21
**RD (94)**
24:7,8,11;30:15;
33:1,4;34:25;35:24;
36:4,10,11,12,13,14,
15,18,18,21;37:1,12,
16,25;38:11,16;
40:21;41:4,21;42:3;
43:5,6,10,14,20;
44:11;45:13,17;46:2;
61:20,22;62:12;63:1,
10,15;64:5,13,17;
65:14;71:25;72:4;
77:14,16;85:18,23;
86:2,4,14,15;88:11;
105:7;106:19,20,22;
122:10,11,13,22;
127:25;128:6;129:21;
137:13;138:6;139:14;
143:21;145:25;146:1;
149:3;151:19;155:22;
156:21;157:13,25;
159:14;161:13;
166:12;175:2,4,7,9,
11;183:17;204:23;
216:12;239:16,19
**reach (1)**
92:6
**reached (5)**
39:9;44:21;125:8,
25;221:5
**read (4)**
52:17;58:1;184:6;
202:5
**reading (1)**
78:18
**ready (1)**
96:22
**real (2)**
81:13;191:14
**realized (2)**
126:21;167:11
**really (20)**
23:4,18;52:1;83:25;
105:22;106:1;130:4;
164:17;166:25;
168:25;169:23,24;
191:13;192:23,23;
215:10,17;216:2;
218:21;231:23
**reason (6)**
26:21;38:15;71:11;
146:4;152:23;224:6

**reasoning (1)**
238:16
**recall (3)**
94:4;105:6;220:25
**receipt (1)**
107:19
**receive (4)**
128:22,25;131:14;
168:17
**received (13)**
27:3;67:23;123:3;
126:3,5,14;128:21;
163:4;170:12;178:2;
228:14;233:7,18
**receives (2)**
65:1,3
**recent (1)**
197:24
**recently (1)**
153:7
**Recess (5)**
52:14;96:4;168:3;
218:4;231:7
**reckon (1)**
120:15
**recollection (1)**
30:3
**record (24)**
5:12;10:9;19:10;
41:19;71:5;85:7;
89:10;96:6,14;
117:23;118:3;120:25;
125:5;127:21;130:19;
207:14;211:15;
212:15;222:12,22;
223:8;224:9,10;
226:11
**recording (2)**
222:14,18
**records (106)**
19:21;24:18;25:23,
24;26:19,22;27:2,4,
10,32:16,18;33:6,10,
12,14;34:2,20;35:4,7,
14,15,16,22;36:3;
38:7;44:9;46:12;
59:16,25;61:2,14,16,
18;63:9;64:25;65:3,4,
14,17,18;66:13,24,25;
67:4,10,14,15,17,24;
68:2,4;69:20,22;
71:21;85:15,22;
103:3,6,9,25;104:1,4,
18;105:2,8,11;106:15,
22;110:3;119:7,13,
24;122:6;123:14;
125:9,12,25;130:16;
131:12;135:13;
136:10;137:16;138:8;
139:20;150:15;
153:23;156:5;164:24;
179:9;203:7;219:12,
16;220:14;222:13;

223:23;232:14,15,16,
18,22;233:21;234:19,
21;235:17;239:18;
240:5
**re-create (1)**
145:15
**red (2)**
88:10;102:25
**redistributed (2)**
194:25;195:16
**refer (1)**
14:17
**reference (1)**
121:12
**referenced (1)**
38:22
**referencing (1)**
213:9
**referred (2)**
212:16;214:1
**referring (3)**
17:11;25:12;94:19
**reflect (9)**
19:20,24;20:12;
31:2;51:3;59:22;
160:7;164:4;177:25
**reflected (4)**
53:6;63:15;161:4;
164:9
**reflection (1)**
160:3
**reflects (4)**
20:11;53:8;80:10;
159:19
**refresh (1)**
30:3
**regarding (3)**
123:4;143:7,18
**regardless (2)**
74:18;229:24
**regroup (1)**
218:2
**regular (1)**
72:23
**reiterate (1)**
243:7
**related (26)**
12:22;15:7,21;16:1,
11,17;17:3;20:25;
22:12,17;24:12,15,17,
20;25:18;34:21;
37:19;38:7,22;98:7;
126:16;141:7,14;
143:18;175:3;179:18
**relates (2)**
15:15,25
**relating (4)**
15:1,1;26:10;62:22
**relevance (4)**
99:5;110:21;114:2;
115:1
**relevant (1)**
181:15

**reliable (1)**
238:3
**rely (1)**
54:23
**remain (2)**
32:18;153:15
**remained (7)**
152:18;153:1;
155:4,5;192:18;
193:21;196:3
**remember (7)**
10:8;49:9;71:20;
93:24;105:21;117:9
**remind (1)**
39:3;127:18;198:8
**removed (1)**
219:5
**reopened (1)**
11:7
**reorganized (3)**
156:17;198:7,9
**repeat (18)**
24:10;32:23;46:19;
49:3;52:15;55:4;
56:24;69:3;80:5;81:2;
107:15;145:2;168:11;
196:24;201:17;
227:12;234:8;236:16
**rephrase (1)**
54:6;202:6,7,8
**report (43)**
20:24;32:11,13,25;
49:21;50:13;51:6;
53:11,12;54:3;56:6,8,
9;59:16;64:21,22,23;
65:23;66:3,7,13,14;
67:16,22;68:1,9,10,
14;69:1,6,10,16,23;
78:25;80:3,12,16,25;
81:6;119:17,21;
182:23;225:6
**reporter (3)**
39:12;71:3;158:14
**reports (57)**
16:19;17:3,16;
20:22,23,25;25:17;
28:20;32:24;33:23;
34:20;42:16;43:5,6,7,
17,18;112,12,13,15,15,
20;44:10;46:5;47:12,
19,21;48:20;49:6,24;
51:4;57:1;63:22;65:1,
3;70:17,22;72:15;
77:19;91:20;92:9;
94:5;95:10,13,14;
119:6,13;182:6,7,9,
11,13;204:24,24;
212:25;225:2
**repository (2)**
39:1;201:25
**represent (4)**
5:8;100:10;186:9;
189:15

**represents (2)**
5:13;19:3
**request (76)**
15:24;40:4;117:22;
118:2,4;119:1,13,17;
126:3;131:25;132:16;
135:20;139:11;
161:10;166:10;170:7;
172:8;173:13;174:6,
11;176:20;178:1,3,4,
18,21;179:7,16,22;
180:13;181:7;183:20;
184:7,7,8,9,10,11,14,
22;185:3,6,16;186:2,
3,12;187:5,20;188:3,
4;189:23,25;223:4,
19;225:23;226:14,15,
20,25;227:8,13,20;
228:18,22;229:7;
232:12,12;233:12,17;
234:23;235:3;237:5,
5,6;239:18;241:1
**requested (22)**
22:1;118:12,15;
126:24;131:15,18,19;
164:24;168:8,15;
171:16;172:4;174:8;
179:10;185:1;190:1;
222:15;224:5;225:20;
229:4;232:10,23
**Requester (1)**
179:12
**requesting (1)**
132:1
**requests (34)**
119:16;131:14;
134:2,4,5;139:24;
140:22;144:22;
148:16,17;173:11;
174:4,9,9;175:3,19,
20,23,25;176:19,25,
25;178:9;187:10,12,
19,22;223:14;231:11;
233:3;235:16;236:22,
25;237:12
**require (2)**
29:12,15
**required (6)**
37:24;44:11;49:12;
51:24;52:22;80:11
**re-scanning (1)**
131:16
**rescinds (1)**
13:18
**research (2)**
41:6;147:12
**reserve (1)**
244:9
**residual (1)**
108:1
**resolution (1)**
106:6
**resolve (1)**

155:7
**resolved (2)**
74:21;153:1
**respect (2)**
140:25;241:12
**responded (2)**
119:24;233:19
**responding (1)**
123:20
**response (12)**
9:3,7;20:16;30:22;
51:25;68:5;137:20;
169:16;186:13;
205:13;210:12;
234:23
**responsibilities (1)**
6:18
**responsible (4)**
44:9;70:20;77:21;
221:17
**responsive (2)**
179:22;184:13
**restricted (2)**
153:16,19
**result (3)**
152:13;234:6,13
**resulted (2)**
141:10;158:22
**retention (32)**
33:1,5,8,9,13;
38:24;62:16,25;
63:11;64:4,12,17;
71:22;72:4,8;105:8;
126:18,23;127:3,10,
13,25;136:12;209:19;
211:7,9,14;212:8;
214:4;215:22;216:23;
217:11
**retrial (3)**
223:17;234:2;235:9
**retrials (1)**
233:22
**retrieved (1)**
139:1
**retry (3)**
172:20;233:9,11
**returned (3)**
168:9;170:22;171:3
**revealing (1)**
125:1
**review (10)**
11:18;17:1;71:19;
80:22;91:7,15;108:8;
185:2;206:10;241:22
**reviewed (5)**
12:21;13:6;108:9;
206:5,6
**reviews (21)**
38:1;50:23;51:10,
18;52:4;55:25;59:23;
64:24;79:10,13;
81:14;82:8;89:4,11,
16;92:16;97:14;

99:22;113:19;119:15;
133:7
**RFC-1 (3)**
109:14;124:9;241:7
**RFC-51292 (1)**
240:25
**RFC-Maysonet (58)**
18:3,6,17;23:1;
26:13;27:1,16,19;
28:14;30:15;61:13;
62:2,3,5;63:20;86:18;
87:24;88:4;90:2,4;
91:16;94:2;97:13,22,
24;100:22;103:1;
108:17;109:20;
112:11;114:9;115:17;
117:6;119:8;121:9,
13;133:22;142:24;
143:4;158:10,17;
212:4,6,7,11,13,24;
213:13,23;214:4,5,14,
25;218:13,13;225:12,
21;242:14
**right (385)**
7:15;9:19,25;10:13,
22,25;16:12,14;
17:25;18:25;19:11;
20:4,14;21:13;23:6;
25:14,19;27:5,9;
31:22,22;34:22;35:4;
36:18,19,22;37:6,8,
10,13;38:13;41:17;
44:23;46:11,17;
47:15,25;49:2,13;
50:22;51:6;53:8,12;
54:13,21;56:9,12,15;
57:6,10,15;58:12,19,
22;59:1,5,11;60:14,
21,24;61:6,10;63:18;
65:15;66:1,4,7;67:4,9,
12;68:15,20,23,25;
69:2,7,23;70:5,8,11,
13,16,18,23;75:15,19;
76:20;79:23;80:19;
81:9;82:21;85:6,11,
12;86:5,22;87:17;
88:21,23;91:11,22;
92:11,20;94:6,7,14,
18;95:16,18,19,23,24;
96:3;98:17,23;99:11;
100:13,15,21;101:9,
17;102:3,16;103:9,12,
16;104:19,23;105:4,6,
12;106:2,16,25;
107:11,14,22;109:3,
25;110:3,9;113:3,6,7;
116:10;118:9;119:3,
21,23,25;120:20,23;
121:23;123:11,16,21;
124:2,7,11,12,18;
125:23,25;126:9;
128:23;129:2,8,17,22,

23;130:24;131:14,25;
132:3,16;133:18;
134:18,25;135:3,14,
15,20;136:15,16,20,
21;137:21,22;138:8,
11,20,24;139:4;
140:8;141:18,21;
142:6,19,22;143:7,11,
12,13,15;145:7,8;
146:6,14,23;147:3,14,
20,21,24;148:4;150:4,
16,17,21;151:11,12,
21;152:19;153:3,5,13,
20;154:6,8,13,14,23;
155:11;157:22;
158:13;159:11,12,20,
24,25;160:5,22;161:1,
14,16;162:19,21,23;
163:17,23;164:11,18,
20;165:4;169:11;
170:6,8,23;172:6,21;
173:4,12,13,14,20;
176:12;177:14,17;
179:13,18;180:11,14;
181:13;185:13;186:3,
22,23;189:6,13,20;
190:23;191:8,23,24;
192:6;195:9,24;
196:9,23;197:10,15,
18,19,21,23;198:21;
199:19,22;201:9,10,
12;202:17,23;203:10,
24;204:3,14;205:2,15,
21,22;206:14;207:1,
15,18;208:2,8;
209:21;210:7,7,13,24;
212:23;213:1,14;
214:5,16,20;215:5,12,
15,19;216:1,3,5,8,13,
15;217:13;218:19;
219:6;220:7,15;
221:3;223:11,16;
224:3;225:25;227:10,
17;228:1,1,16;
229:22;230:18,23;
231:3,19,20;232:6;
233:1,4,25;234:20;
235:17;236:14;
237:22;238:20;239:8,
16;240:8;242:10,12,
14,21,25;243:15,22;
244:4,10
**right-hand (1)**
19:22
**rights (2)**
144:23;145:4
**Rock-Fusco (2)**
186:8;229:2
**Rodriguez (1)**
99:15
**role (1)**
8:21
**room (30)**

73:4,6,14,16;75:7,
15;76:3,10,17;77:5,6,
9;84:22;148:14;
153:7,9,15;154:19;
155:14,21;157:4;
159:23;169:5;192:22;
197:9;220:19;221:9,
20;231:18;232:5
**Rosario (1)**
99:15
**ROSEN (230)**
5:19,19;11:1;12:2,
19;17:10;18:11;21:9,
14,24;22:15,20;23:7,
14,20;24:9,22,24;
25:7,10;26:6,15;
27:22;28:2,21;29:2,7,
11,17,19,23;32:20;
35:20;39:2,11,14;
40:3,9,23;41:3,15,22;
43:22;44:1;45:11,15;
46:18,25;47:6;48:3,
15;49:14;50:10,14;
51:11;52:6,11;53:17,
19,24;54:5,14,17;
55:3,12;56:22;57:21;
60:8;69:3,8,20;74:7,
10,14;75:5,17,20;
76:8;77:2,8;78:14,18;
81:20;82:17;83:3,5,
19,22;84:7,12,20;
86:21,24;87:4,8,13,
17;89:14;90:15;
91:12,23;92:22;93:1,
25;94:3,10,15,18,24;
95:3;96:2,10;100:10,
16,20;101:4,10;
104:1;110:24;112:12;
120:16,21;129:3,6,9,
11,14;132:4;133:9,11,
13,17;142:3,5,9,11,
13,16;143:20;144:1,4,
7,11;157:21;158:2,6;
161:17,20;162:8,24;
165:4,17,20;166:1,6;
167:22;168:1;172:5,
9,12,16,22;176:8,14;
180:12,20;184:1;
186:16;187:4,10,21;
189:21;190:5,24;
191:3,6,21;195:3;
199:9,13,21;200:1,4,
6,23;202:5,9;203:25;
204:4;205:10,23;
206:2,8,13,16;207:2,
11,17,22;208:7;
211:10,21,23;213:2,6;
217:21,24;218:3;
223:7,11,24;218:3;
226:6,10;227:11,18;
228:1,7,12;229:17,22;
231:6,12;236:15;
240:11,15,24;241:25;

242:3;244:6,9

**Rosen's (1)**
185:3

**roughly (2)**
129:1,20

**Rule (1)**
11:24

**run (3)**
56:7;67:5;146:21

## S

**same (36)**
9:6;10:10;11:16;
14:20;16:2;46:6,11;
79:20;91:4,5,20;92:9;
95:10,13,14;103:5;
106:5,14,23;132:2,7;
138:11;175:22,24;
188:16;189:18;
202:23;212:19,20;
215:5;217:13,16;
227:14;241:6,9,11

**sarcasm (2)**
25:11;48:16

**saved (2)**
131:8;145:13

**saves (1)**
131:15

**saw (3)**
126:17;161:24;
164:7

**saying (31)**
22:4;23:16;33:2;
36:5,17;37:10;41:20;
50:14;60:5;83:14,17;
86:25;95:12;122:11;
123:13;132:13;140:5,
12;167:2;190:16;
199:25;202:23,25;
203:13,19;211:2;
215:10;217:20;226:7;
237:10;238:17

**Scahill (2)**
5:25,25

**scan (4)**
132:6;185:21;
186:5;224:2

**Scanned (38)**
121:15;131:4,5,6,7,
8,16;145:11;162:5,14,
18;164:5,9,14,15;
169:19,21,22;170:12;
185:23;186:24;187:2;
189:4,5,6;204:7;
206:14,18,20;210:7;
211:5;212:13;222:19;
223:13;241:23;244:1,
2,2

**scenario (1)**
201:14

**scene (11)**
68:10;180:20;

182:12,22;183:1,10;
184:2;202:13,22;
203:9,17

**scenes (1)**
117:18

**scope (2)**
49:15;74:22

**screen (1)**
27:23;96:13;116:18

**screwed (1)**
81:23

**scroll (13)**
28:4,22;29:3,5,6,8,
23;30:9,19;31:15;
51:11,12;62:8

**scrolled (1)**
30:8

**scrolling (1)**
30:1

**se (2)**
21:11;153:11

**search (3)**
36:24;175:7,11

**second (42)**
14:23;41:18;55:21,
24;56:2;60:11,12;
61:9;63:19;64:7,11,
16;75:10,22;76:1,2,4,
11,13;82:22;86:21,22,
24;87:3,9;105:25;
121:15;127:18,20,20;
129:20;133:5;144:10;
158:8;163:15;172:14;
191:5;204:3,8;
209:12;212:12;
222:11

**Section (1)**
153:9

**secure (2)**
75:11;76:22

**secured (2)**
153:16,19

**security (1)**
77:6

**seeking (3)**
14:25;15:15;228:19

**seem (2)**
84:18;119:7

**seems (8)**
6:7;23:12;117:23;
143:9;184:22;189:3;
191:13;215:21

**selection (1)**
123:15

**send (3)**
131:5,16;224:3

**sending (1)**
223:14

**sense (10)**
35:23;58:8;67:25;
77:5;119:11;123:5;
156:9;157:11;172:20;
199:14

**Sent (29)**
59:15,24,24;60:7;
61:1,5,13;63:7;64:3,
22;68:2;116:4;
119:25;123:8,15;
126:8,9,9,10;130:4;
154:18;169:12,15;
185:23;219:12;
220:10;222:16;223:5;
241:24

**sentence (2)**
140:1;203:2

**separate (8)**
26:14;35:10,12;
49:9,25;138:15;
165:25;217:3

**separated (1)**
138:10

**separately (5)**
47:24;87:22;
138:22,25;215:15

**September (14)**
184:21;185:4,5,15;
187:2,5;225:20,24;
226:14;227:21;229:5;
230:7,8,17

**sequential (1)**
36:1

**sequentially (2)**
36:1;57:5

**sergeant (20)**
8:10,11,13,15,19;
10:12;46:16;81:1,7;
117:11,15;118:11,14;
119:20;174:21,22,23;
177:9,15,16

**sergeants (1)**
46:21

**sergeant's (3)**
47:23;48:21;49:8

**serve (1)**
6:14

**server (2)**
223:11,12

**set (12)**
20:20,21;75:11,12;
76:22;109:24;121:6,
23;122:4,24;126:13;
128:25

**seven-page (1)**
142:23

**share (1)**
149:12

**shed (1)**
115:24

**sheet (31)**
31:20,24;50:7;58:5,
7,9;60:3,7,11,12;61:1,
5,9,13;62:25;63:8,14,
19;64:3,9,12,16;97:6;
118:4,5,12,15;119:2,
21,25;207:16

**sheets (5)**

29:12;45:2;60:8;
97:6,8

**shift (3)**
8:16,25;113:6

**shipped (3)**
104:21;152:4;
154:25

**shooting (1)**
9:4

**shootings (1)**
117:18

**short (1)**
84:9

**shortly (1)**
232:24

**show (1)**
216:11

**showing (2)**
84:7,14

**shows (1)**
162:18

**side (3)**
19:2;88:16;225:10

**sign (1)**
78:3

**signature (1)**
244:9

**signed (2)**
59:20;63:6

**significance (1)**
163:10

**significant (1)**
7:20

**significantly (1)**
140:22

**silent (1)**
186:15

**simply (1)**
84:7

**single (4)**
139:3;174:6;
210:11;226:15

**single-sided (1)**
98:18

**sit (8)**
25:22;42:22;78:8;
85:2;137:1,15;235:2;
243:8

**six (1)**
25:4

**six-week (1)**
9:21

**slight (1)**
6:9

**Smith (8)**
125:17,23,24;
126:6,22;130:23;
174:22;204:11

**snarky (1)**
24:24

**soapbox (1)**
191:15

**software (2)**

175:13,15

**somebody (11)**
23:12;74:25;76:23;
119:12;163:23;164:1;
174:22;204:20;210:6,
7;232:18

**somehow (1)**
204:19

**someone (11)**
12:14;23:23;75:2;
77:4,5;123:14;125:9,
10,11;186:8;236:21

**sometime (1)**
137:12;230:16

**sometimes (1)**
184:3

**Somewhere (16)**
34:14;86:7;136:23;
137:25;141:20;145:1;
170:21;180:18,22;
183:5;187:8;188:20;
211:2;229:6;235:21;
238:24

**soon (1)**
67:2

**SOP (2)**
13:17,18

**sorry (28)**
13:17;15:13;18:25;
28:10;44:13;55:3;
87:8;90:10;94:10;
96:10;97:22;104:4;
122:7;127:22;129:14;
132:21;146:19;153:2;
155:6;158:4;169:20;
190:14;195:17;
224:17,18;227:18;
235:13

**sort (20)**
17:17;20:6;34:24;
37:11;48:10;62:21;
67:11;88:15;95:9;
102:23;103:15;108:8;
163:1;175:8,12;
184:11;201:16,25;
237:6;238:3

**sorts (1)**
149:2

**sought (2)**
179:10;235:20

**sound (1)**
47:25

**sounds (4)**
125:24;150:19;
189:8,20

**South (4)**
5:2;11:14;26:1,2

**space (2)**
154:11;156:2

**speak (13)**
12:14;21:22;23:4,8;
39:6,16;40:4;48:2,5;
189:23;207:5,8;219:3

**speaking (6)**
　73:18;97:11;
　103:23;111:17;
　212:19,20
**Special (14)**
　13:8,12,14,18,22,
　25;14:1,4,8,13;44:7;
　79:7,22,23
**specific (7)**
　16:20;24:19;41:3;
　141:9;181:14;192:8;
　239:19
**specifically (11)**
　15:16;16:17;37:20;
　38:16;43:20;119:8;
　122:1;137:5;159:10;
　165:1;205:4
**specifics (2)**
　15:4;38:10
**spell (1)**
　101:10
**split (4)**
　11:13;194:16,19;
　197:7
**spoke (1)**
　221:23
**spot (3)**
　209:11;217:13,16
**spots (1)**
　208:10
**Spreadsheet (33)**
　133:16,21;134:1,9,
　16,21;135:6,24;
　158:20,22;159:4;
　160:2;164:7;175:8,
　11,13,17;177:20,21;
　187:9;214:22;225:25;
　232:25;235:14,23;
　236:4,18,23;237:7,12,
　13,16,21
**spreadsheets (7)**
　149:24;151:18;
　157:12,17,20,22,24
**Square (15)**
　181:5,10,13,17,23;
　182:21;183:15,25;
　184:17;201:24;
　202:17;203:10,14,
　19
**stack (1)**
　21:5
**stacked (1)**
　120:18
**staff (2)**
　148:19,21
**stamp (19)**
　18:6;27:19;59:14;
　62:5;85:8;87:24;
　88:16;97:24;102:25;
　121:9,12;128:5;
　133:22;142:10,24;
　143:4;147:1;158:16;
　214:13

**stamped (4)**
　33:7,13;127:25;
　130:11
**stamps (1)**
　128:18
**stand (1)**
　133:24
**start (20)**
　5:16;7:4;16:17;
　18:1;52:24;80:7;
　81:22;97:23;104:16;
　123:18;129:16;
　134:15;136:8;142:13;
　190:9;207:5,13,13,19;
　208:24
**started (14)**
　5:11;7:23;34:23,24;
　127:13;159:1;169:7;
　173:6;182:20;222:14,
　18,20;232:24;235:13
**starting (6)**
　5:17;35:17;83:1;
　86:18;107:24;128:8
**starts (4)**
　83:20;102:25;
　116:18;142:21
**State (5)**
　99:13,14;101:20;
　118:7;234:18
**statement (1)**
　176:21
**State's (9)**
　115:13;171:11,16;
　172:3;222:17;223:16;
　232:10;233:8,15
**stating (1)**
　48:17
**Status (2)**
　115:21;238:18
**stay (1)**
　201:16
**stayed (9)**
　150:20;154:15;
　155:8;192:14,18;
　197:17;201:21;
　203:19;221:12
**staying (1)**
　89:9
**Stephen (6)**
　125:17,23,24;
　126:6;130:23;204:11
**stick (1)**
　147:22
**still (27)**
　10:19,22,23;34:4;
　36:18;73:1;79:12;
　111:3,13;112:2;
　130:12;138:15,22;
　144:7,8;167:3;
　172:19,25;183:15;
　188:20;217:21,22;
　222:9;232:5;234:19;
　238:9,22

**stop (2)**
　24:22;34:2
**storage (7)**
　104:22;146:13;
　148:11;149:2;153:7,
　23;154:5
**storages (1)**
　140:21
**store (1)**
　148:2
**stored (22)**
　16:1;75:7;105:19;
　127:5,7,9;138:22,25;
　143:7,18;154:10;
　159:17;181:16;183:8;
　191:19,23;192:9;
　197:1;198:24;200:21;
　206:3;222:6
**storing (1)**
　127:13
**straightened (1)**
　213:8
**streamlined (1)**
　16:16
**street (10)**
　38:25;117:16;
　166:12;198:2;200:3,
　10,16,18,22,24
**strictly (2)**
　34:13;143:24
**strike (23)**
　22:21;30:12;33:11;
　35:14;47:11;51:2;
　52:23;55:6;57:19;
　70:15;80:7;93:20;
　104:15;124:21;
　129:16;136:8;155:6;
　170:9;190:8;193:9;
　197:12;209:8;243:5
**stuck (2)**
　120:15;163:9
**stuff (4)**
　180:14;202:13;
　216:12;237:6
**subfile (2)**
　26:14;95:9
**subject (3)**
　16:7,12;139:10
**submission (1)**
　81:6
**submit (1)**
　80:25
**submits (1)**
　80:18
**submitted (4)**
　66:15;69:11;71:17;
　113:8
**subpoena (16)**
　97:15,16;98:8,10,
　13,22;173:15,25;
　174:11;223:22;232:9,
　11;233:4;234:17,18,
　23

**subpoenas (1)**
　99:10
**suggest (5)**
　116:8;120:1;
　161:21;179:15;
　226:23
**suggesting (3)**
　21:8;172:16;183:23
**Summary (7)**
　143:6,17;146:10,
　12,22;147:15,23
**summer (3)**
　8:8;10:2;122:25
**Sunday (1)**
　121:7
**superintendent (1)**
　23:25
**Superintendent/Office (1)**
　226:22
**supervised (1)**
　8:17
**supervising (3)**
　46:21;81:1,7
**supervisor (2)**
　66:16;69:11
**supervisors (2)**
　71:18,19
**supp (6)**
　43:7,12,15;58:3,10,
　10
**supplemental (1)**
　68:8
**supplementary (12)**
　56:8;68:14;69:1,6,
　16;72:15;78:25;80:3,
　12,16,25;81:6
**suppose (1)**
　191:22
**supposed (6)**
　63:9;84:2;170:22,
　25;188:25;189:12
**supposedly (1)**
　129:22
**Supp's (1)**
　108:18
**Sure (42)**
　6:14;7:3,23;9:17;
　10:11;13:8;14:19;
　21:14;35:25;36:2;
　37:16;42:16,24;
　51:13;54:23;67:20;
　68:7;78:20;79:6,19;
　91:10;93:12;102:5;
　110:15;123:1;132:22;
　133:6;136:9;145:3,3;
　156:1;167:24;172:5;
　174:12;185:18;
　198:10;209:12;
　212:16;222:21;
　240:13;242:3,13
**surprise (1)**
　176:16
**suspects' (1)**

**101:14**
**switching (1)**
　191:10
**sworn (3)**
　5:3;14:5;125:19
**synonymous (1)**
　72:4
**system (20)**
　33:22,23,25;34:3,
　22,25;35:23;36:22;
　37:7;105:1,10;131:4,
　7;143:10;144:16;
　155:8,24;201:15,19;
　236:8
**systems (1)**
　182:24

**T**

**table (1)**
　31:18
**taek (1)**
　40:7
**talk (12)**
　14:20;15:6;40:8,10;
　53:17;60:10;68:8;
　73:5;125:12;181:12;
　187:15;223:15
**talked (7)**
　105:21;145:22;
　192:12,21;201:24;
　229:22;243:24
**talking (25)**
　12:24;37:19;39:11;
　45:18,21;50:10;
　51:21;52:19;53:4;
　62:22;73:14;105:17;
　108:4;137:5,25;
　143:21;152:7;157:20;
　181:19;191:17;
　197:22;200:13,14;
　215:8;223:13
**tandem (1)**
　224:24
**tangents (1)**
　16:22
**Tapkowski (1)**
　20:8
**tasked (1)**
　124:22
**team (5)**
　8:21;9:3,7;117:17;
　176:22
**teams (1)**
　8:17
**Technical (9)**
　15:10;19:9;44:12;
　69:17;70:24;90:9;
　152:20;156:25;
　216:16
**technically (1)**
　33:6
**telling (4)**

7:5;79:5;120:6;
165:22
**tells (1)**
86:8
**ten (5)**
8:11;48:11;58:10;
116:9;168:1
**term (1)**
101:16
**terms (1)**
75:7
**terrible (1)**
161:24
**testified (18)**
5:3;25:19;47:19;
48:24;49:4;53:10;
54:2,13,21;65:13;
70:6;135:10;138:17;
204:9;208:1;218:20;
228:13;229:19
**testify (2)**
15:20;29:16
**testifying (1)**
157:23
**testimony (22)**
14:25;15:6,15;16:5,
11;26:25;32:21;
61:12;62:23;71:20;
76:5;84:4;90:1,7;
106:4;111:16,20;
135:19;155:5;202:16;
218:17;228:9
**Thanks (1)**
52:12
**theories (1)**
168:10
**theory (2)**
171:4,5
**therein (1)**
82:16
**third (2)**
15:24;173:24
**Thomas (1)**
149:10
**though (8)**
89:10;123:10;
142:8;165:16;169:8;
170:6;189:11;209:25
**thought (11)**
14:7;40:14;57:20;
58:18;75:23;105:23,
25;135:10;169:13;
184:6;194:10
**Three (19)**
8:13,14;9:9,11;
10:3,13,14;58:11;
130:6;165:4;166:1,6;
195:16;198:10;206:8,
21;209:22;210:10;
211:25
**three-page (1)**
11:23
**throughout (5)**

108:14;192:14;
212:17;214:2;219:10
**thrown (1)**
75:13
**tight (1)**
40:18
**times (3)**
22:1;153:16;224:24
**Timothy (1)**
5:25
**title (1)**
42:13
**titled (4)**
14:5;133:21;143:3;
158:16
**TN628443 (1)**
185:17
**to/from (2)**
149:9;158:24
**today (33)**
5:11;12:13,17;13:7;
14:20;22:9,23;24:2,
16;25:22;29:10;
33:16;34:3;36:7,13,
20;38:9;42:22;78:8;
83:8;85:2;103:2,4;
110:3;111:20;130:14;
137:2,15;191:18;
235:2;241:14,19;
243:8
**together (37)**
28:5;117:19;
122:17,20,24;123:2,
19,20;127:6,7,9;
130:10,23,24;135:12;
137:17;138:11,20;
139:4;146:4,20;
167:12;170:17;
174:19,19,25;187:24;
204:25;210:6,25;
211:1;217:13;218:7;
229:11;237:21;
243:18,20
**told (3)**
29:19;157:8;187:4
**Tom (3)**
140:3,15,17
**tomorrow (2)**
190:4;217:18
**took (1)**
203:17
**top (11)**
27:23;28:16;80:22;
107:5;108:2,3,9;
109:10,15,16;174:3
**topic (1)**
161:18
**total (1)**
160:19
**touch (1)**
74:25
**touched (1)**
150:12

track (4)
178:8;186:17;
221:17;237:6
**tracking (3)**
134:15;160:19;
178:8;179:2
**tracks (1)**
134:2
**trail (2)**
187:8,25
**training (1)**
9:21
**transcript (1)**
244:11
**transition (1)**
37:6
**trial (3)**
198:2;233:7;234:12
**trip (1)**
196:22
**true (9)**
23:15;95:13;144:9;
181:25;182:2,4;
206:23;240:3,3
**try (6)**
16:15,23;74:25;
116:15;125:13;
221:16
**trying (6)**
74:4;82:22;139:21;
171:7;187:18;213:7
**Tuesday (1)**
115:21
**turned (1)**
168:6
**twenty-fifth-year (1)**
7:15
**Twenty-three (1)**
7:13
**two (17)**
13:24;23:15;46:9;
57:12;60:8;82:19;
90:13;102:8;139:2,6;
166:4;176:22,23;
195:12;232:3;237:4;
240:11
**two-hole (6)**
107:5,11,20;108:3;
109:9,16
**two-page (1)**
143:2
**type (24)**
6:8;18:19;21:4;
37:19;44:7,8;56:7;
59:14;78:23;88:5;
91:21;96:17;107:19;
108:20;125:12;
132:24;147:1;151:20;
160:11;200:8;219:14,
15;222:21,22
**types (2)**
43:13;107:22
**typewritten (2)**

18:20;20:7
**typical (1)**
222:7
**typically (3)**
65:23;66:16;187:13

---

U

**Uh-hum (3)**
83:22;95:17;204:18
**ultimately (1)**
80:18
**umbrella (1)**
181:19
**unable (1)**
16:11
**under (3)**
24:7;40:17;47:19
**underneath (3)**
19:17;100:2;119:21
**understood (1)**
169:13
**unearthed (1)**
188:22
**unit (17)**
9:6,7,24;59:16,25;
64:21,22,23;65:2;
176:3,5,5,18;181:20;
195:7;203:16;237:17
**Universal (1)**
179:17
**unless (1)**
151:6
**unnamed (1)**
217:6
**unnecessary (1)**
196:22
**unprofessional (4)**
24:25;25:4,5,6
**unusual (2)**
124:15;222:9
**up (44)**
7:14;11:13,15;12:7,
10;18:10;19:22;
27:15;36:17,21,25;
41:13;75:12;76:22;
79:14;81:23;89:13;
100:8,11,16;121:17;
126:17;130:9;132:21;
144:10;156:11;
166:25;168:6,24;
170:3;171:7;175:1;
177:19;184:11;
194:16,19;196:2;
197:7;204:8;210:11,
15;239:25;240:12;
241:13
**updated (1)**
14:11
**updating (1)**
147:4
**upon (1)**
69:10

use (8)
33:4;34:5,6,12,22;
35:17;39:3;120:19
**used (5)**
42:12;56:21;
108:23,25;148:25
**usually (2)**
124:17;233:23

---

V

**various (3)**
211:17;212:17;
213:19
**vary (1)**
218:10
**Velez (4)**
117:11;118:11,14;
119:20
**versa (1)**
102:11
**version (12)**
12:3;130:19,20;
131:5;169:14;206:14,
18,20;208:9;223:6;
224:7;225:17
**versions (4)**
14:12;145:1,11,19
**versus (1)**
156:5
**via (5)**
126:10;134:15;
173:19;187:11;
228:14
**vice (1)**
102:11
**Victim (1)**
160:25
**video (1)**
160:11
**viewed (1)**
100:13
**violate (1)**
188:1
**violating (1)**
205:9
**violent (7)**
8:7;9:24;10:16;
37:20;104:25;153:3;
195:7
**virtue (1)**
196:4

---

W

**Wait (7)**
64:9;143:20;
163:15;202:5;207:13;
211:23;240:19
**waiving (1)**
187:16
**wants (2)**
49:20;84:4

**warehouse (141)**
24:18;25:23,25;
26:20,22;27:3,4;35:6,
7,16;65:9;85:15,23;
104:2,5,19,22;105:3;
106:15;110:3;122:7,
9,18;123:7,15;125:9,
13;127:16;130:10,17;
131:2,9,12;135:2,5,
13;136:4,10;137:17,
24;138:8;139:1,15,
20;141:2;145:20;
148:13,22,25,25;
149:4,18;150:15;
152:5,10;153:23;
154:25;155:10,13;
156:5,8,16;159:2,6,
18;160:1;163:24;
166:19;167:1,6;
168:10,20,25;169:1,6;
171:7,7,25;173:2;
179:3;180:9;184:16,
25;186:21;188:6,9;
192:5,17;197:14;
201:11,22;203:7;
204:17,20;205:18;
207:4,8,10;208:5,12,
15,18,21;209:1,6,11;
210:25;215:7,12;
216:6,8,15,24;217:7;
219:12,17;220:15;
221:13;222:14,16,23;
223:5,8,24;231:19,24;
232:6,19,21;235:21;
236:1;237:13,16,22;
238:7,8,14;239:13,20;
241:20;243:25
**watch (2)**
120:5,6
**watching (1)**
96:13
**way (44)**
6:8;31:11;37:18;
42:3;74:18;83:7,14;
84:9;86:13;90:6;
100:23;115:9;132:24;
141:18;146:17;
147:15;150:10;
152:10;156:17;165:2;
166:3;173:13,23;
175:7;176:20;185:4;
186:11,17;192:1;
195:1;199:2;201:22;
205:7;208:20;221:15;
222:4,5,5,15;223:15;
232:11;233:3;243:18,
21
**ways (1)**
174:4
**Weapon (1)**
14:5
**week (2)**
80:17;142:1

**welcome (1)**
162:8
**well-founded (1)**
39:20
**well-phrased (1)**
234:9
**Wentworth (5)**
191:2,7,17;201:3,8
**weren't (4)**
48:11,13;138:11;
183:14
**West (1)**
10:18
**Western (9)**
190:23;193:17;
194:8,13;196:8;
199:6,12,18,20
**what's (24)**
25:3;44:24;45:4;
64:22;74:23;79:16;
82:25;86:11;91:4;
108:23;109:14;
119:12;120:6;125:16;
126:2;129:3;160:10,
16;179:9;193:4;
225:21;226:6;227:18;
239:5
**wheel (1)**
145:15
**Whereas (1)**
72:15
**Where's (1)**
191:1
**wherever (1)**
206:9
**whole (4)**
48:10;82:24;
203:11;211:18
**who's (3)**
51:2;140:1;179:13
**whose (1)**
42:15
**Wiley (40)**
15:8;16:18;17:8;
20:25;22:13,17;
24:13,15,20;25:18;
26:4;44:18;50:4;
81:12;82:12;83:9;
85:1,10;88:10;97:18;
99:6,17;110:22;
115:2;120:12;128:10;
154:21;161:3,8,8;
162:17;164:8;171:19;
179:18;202:1,11;
220:2;221:25;222:2;
231:16
**Williams (1)**
149:10
**willing (1)**
201:18
**withdraw (1)**
120:22
**within (39)**

21:3;32:9;34:11;
45:9;67:7;73:15;
74:22;75:21;76:15;
85:23;88:20;95:4,6,
22;134:10,22;141:4;
148:14;150:3;151:9,
23;152:14;153:7;
156:21;163:12;
165:24;166:19;
168:20;175:24;
176:17;178:9;180:4,
25;181:18;182:13;
183:13;225:13;
228:18,23
**without (5)**
25:11;124:25;
131:16;187:16;205:9
**Witness (34)**
38:1;41:5;50:23;
51:10,18;52:4;53:23;
55:25;59:23;64:24;
79:10,13;81:14;82:8;
83:21,23;87:11;89:4,
11,12,16;92:16;
97:14;99:22;113:19;
119:15;133:7,10,12;
142:14,18;158:5;
200:19;240:23
**word (7)**
42:12;78:21;101:4,
5,7;120:19;235:3
**words (4)**
18:20,21;20:7;33:4
**work (19)**
45:3;46:4;63:21;
65:8,9,9;66:16;73:22;
117:15,19;125:21;
135:2;155:24;174:15;
200:12;201:15,19;
237:2,3
**worked (15)**
8:2,7,11,14,19,24;
20:12;67:20;68:6;
75:1,3;77:5;117:16;
148:17;224:24
**working (12)**
33:25;41:25;45:9,
10;46:17;47:1,4,7,24;
117:8;168:10;217:22
**works (7)**
6:23;61:9;65:2;
123:14;125:10,22;
174:21
**write (1)**
170:3
**writing (2)**
58:2;81:6
**written (24)**
13:1;37:22;43:19;
44:8;78:23;79:25;
80:9,15;81:3;88:10,
12;97:21;99:1,7;
110:23,25;112:24;

113:23,25;114:17,20,
24;147:19,20
**wrong (6)**
14:10;70:10;
156:12;204:10;
212:21;213:20
**wrote (6)**
19:5;112:10,22;
113:6,21;114:22
**Wylie (1)**
15:2

**X**

**Xerox (1)**
18:18
**Xeroxed (1)**
226:25

**Y**

**year (25)**
6:17;19:14;20:2,3;
27:4;85:18,23;86:3,
14,16;98:6;146:1;
149:24;155:22;
156:20,21;157:13,25;
160:20;178:16,18,21;
193:13;197:9;233:10
**years (18)**
8:15;10:3,25;23:10;
25:5;27:7;34:11;
48:12;116:10;117:14;
149:25;150:4;151:4,
10,24;152:15;154:4;
168:22
**yellow (2)**
161:25;162:9
**Yep (7)**
61:21;94:3;142:9;
162:24;207:17;218:8;
231:6

**Z**

**Zoom (2)**
55:23;106:12

**0**

**000001 (1)**
18:7
**000066 (1)**
18:7
**000067 (1)**
62:6
**000102 (1)**
62:6
**04 (6)**
116:20;117:24;
118:12,15;119:3,8
**05 (1)**
85:4

**050 (1)**
97:22
**050636 (2)**
27:20;85:3,4,8
**050638 (2)**
90:4;91:16
**050647 (1)**
97:24
**050648 (1)**
97:13
**050649 (1)**
99:9
**050650 (1)**
99:9
**050652 (1)**
99:14
**050654 (1)**
99:20
**050656 (1)**
100:22
**050662 (1)**
101:19
**050663 (1)**
100:23
**050672 (1)**
107:24
**050674 (1)**
107:24
**050860 (5)**
85:3,5,8;90:4;91:16
**050861 (1)**
27:20
**050862 (9)**
86:18;87:6,11,12,
17,25;88:4;90:2;
103:1
**050864 (4)**
92:11;110:17;
112:11,22
**050868 (1)**
108:17
**051005 (2)**
113:10,13
**051009 (1)**
114:9
**051038 (1)**
120:2
**051057 (1)**
115:18
**051061 (1)**
116:18
**051075 (1)**
117:6
**051077 (1)**
119:1
**051079 (1)**
119:9
**051081 (1)**
119:9
**051126 (2)**
87:7;90:2
**051127 (5)**
121:10,13;128:5;

212:13;214:25
**051161 (1)**
  128:5
**051162 (1)**
  128:8
**051226 (1)**
  87:25
**051472 (4)**
  121:10,13;129:10;
  215:1
**051473 (3)**
  158:4,10,17
**051487 (1)**
  158:10
**051489 (1)**
  158:17
**051494 (3)**
  142:18,25;146:19
**051495 (2)**
  146:17,25
**051499 (1)**
  146:19
**051500 (2)**
  142:25;146:19
**051859 (1)**
  143:4
**051860 (1)**
  143:4
**051862 (1)**
  133:22
**06 (1)**
  183:5

### 1

**1 (31)**
  14:17,24;18:3,12,
  17;23:1;24:1;26:13;
  27:1,16;29:1;55:18;
  56:1,5;57:9;60:12,20;
  71:7;82:2,21;83:11;
  94:2;109:20;166:3,5;
  212:4,5,24;213:13,21;
  216:10
**10 (6)**
  57:13,16,19,21;
  58:21;164:9
**100 (1)**
  217:1
**102 (3)**
  62:3;212:7;214:5
**10th (2)**
  195:18;198:14
**11 (2)**
  57:13,18
**11-01 (5)**
  13:19,20;14:4,9,13
**11th (4)**
  8:24,25;195:19;
  198:14
**12th (2)**
  195:20;198:11
**12-year-old (1)**

48:12
**13 (3)**
  104:6;115:21;138:5
**13-year (1)**
  152:8
**14 (1)**
  104:7
**14th (1)**
  198:17
**15 (1)**
  7:7
**15-26 (3)**
  13:13,16,23
**15th (1)**
  198:15
**164 (1)**
  59:16
**16th (1)**
  198:18
**17-page (1)**
  158:15
**17th (1)**
  198:18
**18 (3)**
  9:20;13:18;225:24
**180 (1)**
  176:5
**18th (4)**
  8:1,2;9:18;198:11
**19 (2)**
  143:3;149:9
**190 (7)**
  19:1,12;94:16;
  102:15;109:15;
  208:25;241:8
**1985 (2)**
  15:17,22
**1986 (1)**
  13:8
**1990 (71)**
  20:4;23:2;33:14;
  35:5,17;37:5,23;42:7,
  14,25;43:2,21;45:18;
  48:6,22;49:2,5;56:15,
  19;57:2,15;58:12,22,
  25;59:5,19;61:6,14;
  63:7;65:9,21,22;
  68:15,17,19;69:2,7;
  70:12;71:9,15;72:20;
  73:6,9,10;75:3;76:12;
  77:11,25;78:9;81:16,
  19,25;82:7;86:9;
  103:24;104:14,17;
  138:6;154:9,18,23;
  158:16,20;182:4;
  183:9,11;190:18;
  191:18;202:2;221:2,8
**1990s (2)**
  190:11;199:4
**1992 (3)**
  60:21,24;64:4
**1995 (7)**
  98:10;116:4,5;

155:3,8;203:3,6
**1999 (4)**
  7:7,12,19,24
**19th (2)**
  189:11;198:11
**1st (2)**
  195:17;198:10

### 2

**2 (15)**
  15:14;52:10;59:15;
  81:9;89:12;110:5,9;
  165:13;166:7;212:10;
  214:8;228:4;241:7,
  18,19
**2:18 (1)**
  52:14
**2:23 (1)**
  52:14
**2000 (15)**
  15:17,22;150:4;
  151:4,10,24;152:15;
  153:13,23;154:9,18,
  23;182:2;190:18;
  221:2
**2000s (1)**
  182:17
**2002 (7)**
  33:19;34:1,19,21,
  25;35:17;37:5
**2004 (4)**
  115:21;116:1,9;
  117:8
**2005 (4)**
  8:3;9:19,20;182:17
**2006 (4)**
  8:5;9:23;10:17;
  182:19
**2009 (2)**
  8:8;10:2
**2010 (2)**
  8:12;10:13
**2011 (1)**
  14:14
**2012 (16)**
  8:16;11:3;104:6,17;
  105:4;138:3;148:4;
  193:6,13,24,25;194:8;
  195:19,22;196:12;
  197:3
**2013 (25)**
  104:7;138:6;
  139:12,20;140:12,19;
  141:11,23;143:3;
  146:14;147:24;148:3;
  149:4,9;150:19;
  151:1,11,24;152:15;
  153:13,23;155:13;
  157:14;159:10;
  196:13
**2015 (1)**
  13:12

**2016 (1)**
  8:19
**2017 (20)**
  171:15,23;172:3;
  178:17;179:16;180:8;
  183:24;231:10,15,16;
  232:2,9,16,20;233:7,
  16;234:19,23;235:4,5
**2018 (38)**
  8:22;26:18,19;27:5;
  166:10,24;167:2;
  168:7,14;170:6,17,20;
  172:4,15;178:21;
  180:5;181:25;184:21;
  185:5,10,12,13,15;
  187:2;225:20;226:14,
  17;227:21;228:19;
  229:5,16,18;230:7,8,
  17;233:16;243:12,13
**2019 (3)**
  9:1;188:5,17
**2020 (14)**
  7:25;9:5;11:7,15;
  34:14;127:15;137:12,
  18;167:1;169:7;
  196:12;198:4,5,9
**2022 (2)**
  9:8,12
**2023 (6)**
  9:12,13;189:11,20,
  22,24
**2024 (18)**
  7:19;11:25;34:14;
  93:17;128:2;168:7,
  18;175:6;189:1,5;
  205:2;206:12;218:25;
  223:16;227:6;228:14;
  230:12,17
**20th (3)**
  184:21;185:5;
  198:12
**22 (1)**
  11:25
**226 (2)**
  27:25;30:9
**226-page (2)**
  27:18;28:15
**22-ish (1)**
  34:16
**234297 (1)**
  19:18
**236 (2)**
  82:20;93:5
**24 (1)**
  60:13
**24th (1)**
  198:12
**25 (8)**
  57:16;58:12,13,16,
  22;68:15;81:16;82:2
**25th (13)**
  56:15,19;57:2,15;
  68:17,19;69:1,7;71:8,

15;81:25;193:20;
  198:18
**265-page (1)**
  87:23
**26th (3)**
  185:15;188:17;
  198:2
**27 (2)**
  57:17;63:7
**27th (7)**
  58:25;59:5,19;61:6,
  14;81:18;82:6
**29 (1)**
  79:18

### 3

**3 (2)**
  217:12,16
**3:44 (1)**
  96:4
**3:55 (1)**
  96:4
**30b6 (16)**
  11:18,24;12:15,24;
  14:18;15:14;22:2;
  38:22;39:22,24,25;
  49:15;74:11;93:25;
  189:22;212:2
**310 (1)**
  129:21
**346 (19)**
  122:1,16;126:14,
  15;128:21;130:4,18,
  20;136:11;137:17;
  164:16;203:22;210:6;
  226:15;227:1,4;
  229:14;242:10,14
**346-page (19)**
  121:8,17;129:17;
  132:14;133:1;137:6;
  138:18;146:3;162:21;
  164:5;169:10;170:4,
  11;225:19;226:8;
  228:14,23;230:15;
  243:8
**35 (2)**
  10:25;23:10
**3510 (1)**
  5:2
**355th (1)**
  178:21
**35th (2)**
  104:8;174:14
**36 (1)**
  129:20
**36-page (1)**
  62:4
**3900 (1)**
  26:1
**3922 (1)**
  26:2

161:6
**51494 (1)**
  142:20
**51859 (2)**
  142:13,21
**51862 (1)**
  133:14
**51st (5)**
  191:2,7,17;201:3,7
**5555 (1)**
  10:18

### 4

**4 (11)**
  16:9;91:20;96:19,
  20,21;194:9,25;
  209:17,19;211:6;
  241:16
**404 (1)**
  153:9
**4044 (1)**
  153:11
**42.1.3LE1 (1)**
  147:6
**444 (4)**
  88:20;93:6;129:1;
  242:16
**494 (1)**
  146:23

### 5

**5 (14)**
  16:9;60:19,23;
  91:20;94:9;96:18,21;
  194:25;209:17,19;
  211:6;217:12,16;
  240:21
**5:53 (1)**
  168:3
**50 (1)**
  20:1
**50636 (6)**
  27:16;28:14,15;
  30:15;212:6;218:13
**50638 (1)**
  213:23
**50640 (1)**
  63:20
**50642 (1)**
  61:13
**50860 (2)**
  213:23;218:13
**50861 (1)**
  28:15
**50862 (2)**
  212:11;214:14
**51 (1)**
  20:1
**51126 (4)**
  87:17;88:17;
  212:11;214:15
**51127 (1)**
  242:14
**51292 (3)**
  225:13,16,21
**51293 (2)**
  228:2;241:3
**51356 (1)**
  241:3
**51472 (1)**
  242:14
**51478 (1)**

### 6

**6 (5)**
  129:24;182:17;
  240:16,23,24
**6:06 (1)**
  168:3
**60 (1)**
  142:13
**60653 (1)**
  5:2
**60s (2)**
  200:13,15
**66 (15)**
  18:4,12;23:1;24:1;
  26:13;27:1;94:2;
  109:14,20;124:9;
  166:3;212:4,24;
  213:13;241:8
**66-page (1)**
  208:24
**67 (3)**
  62:3;212:7;214:4

### 7

**7 (7)**
  55:18;56:1,5;68:11,
  14;172:10;183:5
**7:19 (1)**
  218:4
**7:37 (1)**
  218:4
**70s (1)**
  150:20
**7th (2)**
  8:10;10:14

### 8

**8 (7)**
  57:19,21;58:4,8,20;
  60:23;183:5
**8:02 (1)**
  231:7
**8:08 (1)**
  231:7
**8:28 (1)**
  244:12
**80th (1)**
  178:18

**81 (1)**
  97:25
**823 (1)**
  97:25
**86 (1)**
  79:18
**860 (1)**
  85:6
**86-3 (3)**
  13:10;79:8,23

### 9

**9 (3)**
  57:19,21;58:20
**90 (1)**
  82:2
**90-50 (1)**
  19:23
**90-51 (1)**
  19:23
**90s (13)**
  33:24;34:23,24;
  37:23;38:12;42:1,2,
  14;105:10;143:12;
  144:15;150:15;
  222:24
**92 (2)**
  61:2;83:11
**95 (2)**
  155:9,10
**98 (1)**
  33:24
**987-page (1)**
  18:5