IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Mary M. Rowland |
| | ) | |
| vs. | ) | JURY DEMAND |
| | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF MAYSONET'S MOTION TO EXCLUDE OPINION TESTIMONY OF RICHARD RUDOLPH**

Jennifer Bonjean
BONJEAN LAW GROUP.
303 Van Brunt Street, 1st Fl
Brooklyn, New York 11231
718-875-1850

Steve Greenberg
GREENBERG TRIAL LAWYERS
Attorneys and Counselors
53 W. Jackson Blvd., Suite 315
Chicago, IL 60604
(312) 399-2711

NOW COMES Plaintiff, Jose Juan Maysonet, Jr., by and through his undersigned attorneys, and moves this Honorable Court to bar the testimony of Bernard Murray pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).

## BACKGROUND

Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, and various state law causes of action, alleging that the Defendant Officers violated his Fourth, Fifth, and Fourteenth amendment rights when they framed him for a double homicide that resulted in his 27-year wrongful incarceration. At roughly 1:00 a.m. on May 25, 1990, Torrence and Kevin Wiley ("the Wiley brothers), were shot and killed in front of a vacant lot on North Avenue in Humboldt Park.

The initial scene investigation failed to reflect any leads, and the investigative file had no reports related to the investigation until *after* Plaintiff was arrested in charged. To put a finer point in it, the investigative file shows initial investigative activity on the day of the crime, May 25, 1990. The next report inventoried into the file was submitted on August 23, 1990, after Plaintiff was arrested and charged with the crime. Plaintiff's arrest and subsequent prosecution was based entirely on his alleged inculpatory statements that he has long claimed was fabricated and a produced of coercion.

Plaintiff's criminal convictions were later vacated and all charges dismissed when all of five investigating detectives in the case, through counsel, indicated that they would invoke their Fifth Amendment rights if called to testify at the retrial. Plaintiff's conviction for an attempt murder that occurred after the Wiley brothers' murders was also vacated and dismissed.

Tom Tiderington, Plaintiff's police practice expert prepared an expert report identifying deviations from generally accepted police practices in conducting criminal investigations. Richard Rudolph has offered an expert report defending the Defendant Officers' investigation.

2

# ARGUMENT

Mr. Rudolph's opinions must be barred in their entirety. Rudolph fails to explain the standard he used when reaching his opinions which are vague in any event. He cannot identify his process or methodology. Rather, Rudolph simply gives his subjective impressions of the investigation based entirely on his credibility assessments, and his conclusion that the Defendant Officers' account of the investigation is true and Plaintiff's version of his arrest and interrogation is a lie.

Rule 702 and *Daubert* requires district judges to act as gatekeepers to ensure that proposed expert testimony is both reliable and relevant. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.,* 932 F.3d at 986, 993 (7th Cir. 2021). Under this framework, a trial judge, as a gatekeeping matter, is responsible for ensure that proposed expert testimony "is not relevant, but reliable." *Id.* In assessing reliability, "the role of the court is to determine whether the expert is qualified in the relevant filed and to examine the methodology the expert has used in reaching his conclusions." *Id.* Once the district court determine that the "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be testified before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lapsley v. Xtek, Inc.,* 689 F. 3d 802, 805 (7th Cir. 2012). The expert's proponent has the burden of establishing the admissibility of his opinion by a preponderance of the evidence. *Varlen Corp. v. Liberty Mutual Ins. Co.,* 924 F. 3d 456, 459 (7th Cir. 2019).

A.     Rudolph's Opinions Are Unreliable Where He Failed to Identify his Methodology for Determining that the Wiley Brothers' Homicide Investigation was "Proper."

Rudolph's opinions concerning the Wiley brothers' homicide investigation are vague, imprecise, and wholly unreliable where he fails to explain what standard or methodology he

3

applied when examining the investigation. When evaluating the reliability of expert testimony, the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Kirk v. Clark Equip. Co.,* 991 F. 3d 865, 873 (7th Cir. 2021). A court may consider the following non-exhaustive list of factors:

> (1) [W]hether the particular scientific theory "can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Id.*

Although Rudolph's report opines that "[t]he investigation was in line with acceptable police standards," during his deposition he suggests he is opining on whether the investigation is "proper" [Ex. B at pg. 8] At other times, he claims he is only opining on whether it "followed the basic investigative steps." [*Id.* at pg. 279] Rudolph fails to consistently explain what he is opining on and what standard he applied. During his deposition, Rudolph was asked the following:

> Q. Going back to the last answer, you said you were retained essentially to render an opinion about whether the homicide investigation was done properly.
> A. Well, the basic investigative steps are followed properly.
> Q. So you were retained to render an opinion on whether basic investigative steps were done properly in the homicide investigation of the Wiley brothers.
> A. Yes. [*Id.* at 9]

When asked what his process was for determining whether "basic investigative steps were followed properly" Rudolph could not offer a logical and meaningful answer.

> Q. What is the methodology you used in reaching your ultimate opinion about this particular homicide investigation?
> A. So, like I said, I relied on my education, my formal training and my experience, and I used that with all the materials I was provided from this case and came up with an opinion.
> Q. And what was your process by which you did that?
> A. My process was I reviewed the case file first and then depositions and any other material that I had.

4

> Q. And what did you review it for? What were you looking for?
> A. I wasn't looking for anything. I was just tasked to find out the basic investigative steps were followed and was it done properly. [Ex. A at pgs. 111-112]

Rudolph could not identify was constituted "basic investigative steps" nor could he explain how he measured whether the investigative steps were "proper." He did not identify any standard that he compared this investigation against; he relied on his own subjective impressions about the investigation. Notably, he repeatedly agreed with Mr. Tiderington, noting that he would have liked to see the detectives take certain investigative actions or document certain investigative activities, but inexplicably and without a consistent explanation, always landed back at his opinion that the case followed "basic investigative steps" whatever that means.

B.     Rudolph's Opinions Are Also Inadmissible Because He Repeatedly Credits the Defendants' Narrative of the Investigation as Set Forth in their Police Reports Intruding on the Role of Jury.

As an initial matter, Rudolph provides a "Synopsis" of the case at pages 5-6 of his report which is little more than an introduction about why he personally believes Plaintiff is guilty. He references Maysonet's "extensive arrest history" without mentioning that Maysonet has no misdemeanor or felony convictions of any kind. Rudolph finds it highly relevant that Plaintiff was charged with a domestic violence case 30 years after the Wiley brothers' murder that was ultimately dismissed, but gives no weight to the fact that two federal juries returned verdicts that found Defendants Guevara and Mingey liable for framing innocent people in the 1990s or the fact that both men pled the Fifth Amendment in connection with their work *on this case.* Prior accusations only have meaning as it relates to the Plaintiff's credibility – not the Defendants. Rudolph's assessment of Plaintiff's guilt or innocence based on his subjective and biased impressions of the discovery record is irrelevant, unreliable and inadmissible.

5

Rudolph repeatedly claims that he did not make credibility assessments, but his testimony and report shows otherwise. First, in his summary of the homicide investigation, he relies *solely* on the Defendant Officers' account of the investigation while disregarding all evidence that rebuts it. For example, Rudolph opines that the oral statements attributed to Plaintiff and his court-reported statement are likely true since "when a person is telling the truth, their statement tends to remain consistent throughout the interview . . . and the core of Mr. Maysonet's statement remained the same going back to his initial interview with Sergeant Mingey" [Ex. A at pg. 13] However, in reaching this conclusion, Rudolph expressly discredits Maysonet's pretrial suppression hearing testimony and his deposition testimony (along with a mountain of other contradictory evidence) about the coercive interrogation concluding, "I have not seen any documentation to corroborated these allegations." [*Id.* at 14]

These opinions are wildly improper and invade the province of the jury. It is well settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as the believability or truthfulness of that testimony. *United States v. Hall,* 165 F. 3d 1095, 1107 (7th Cir. 1999). While an expert is permitted to render an opinion based upon factual assumptions, an expert is prohibited from testifying that a disputed fact actually occurred. *Richman v. Sheahan,* 415 F. Supp. 2d 929, 943-44 (N.D. Ill. 2006). *See also Jordan v. City of Chicago,* 2012 U.S. Dist. LEXIS 3472, *14 (N.D. Ill. Jan. 11, 2012).

Rudolph did not indicate in his report or during his deposition that he was basing his opinion on factual assumptions. Rather, his opinions are premised in his credibility determinations and belief that the Defendant Officers' account is the truthful one.

    1.    Rudolph's Opinion About "Latin Kings Element."

Rudolph notes that the Latin Kings street gang was a violent street gang that operated in the area where the shootings occurred. He further opines that "as a detective knowing which gangs controlled which areas was relevant and important investigative knowledge." This is hardly controversial. The detectives were free to explore potential gang motive in this case, but Rudolph was not free to credit the Defendant Mingey' testimony that Plaintiff made inculpatory oral statements to him. Plaintiff has always maintained that those unrecorded oral statements were fabricated after Plaintiff was charged with the crime to create probable cause for his arrest. It is unclear what Rudolph is opining about in connection with the "Latin Kings Element" but to the extent it relates to the disputed question of whether Mingey's testimony is truthful about Plaintiff's alleged oral statement, the opinion is inadmissible.

2. Rudolph's Opinion About Maysonet's English Proficiency

Rudolph opines that Plaintiff spoke with sufficient English proficiency to understand his *Miranda* warnings and that his confession was taken in English as opposed to Spanish as Plaintiff claims (translated by Defendant Montilla). The question of Plaintiff's ability to speak and comprehend English is a hotly contested issue. Rudolph relies on Plaintiff's court-reported statement and certain police reports to reach his conclusion. But he disregards Plaintiff's own testimony, Mr. Goossens's testimony that Plaintiff spoke minimal English, Plaintiff's mother and sister's testimony that he spoke limited English, and even Defendant Montilla's testimony that he served as an interpreter for Plaintiff's questioning. To the extent Rudolph's testimony is offered to persuade the jury about Plaintiff's English-speaking abilities, this opinion intrudes into the jury function. Notably, Mr. Tiderington does not opine on Plaintiff's English-speaking abilities. There is evidence on both sides of the equation concerning this topic, and Rudolph's opinions on the matter are inadmissible.

7

3. Rudolph's Opinion as to the Comparative Ballistics Evidence.

Rudolph sets up several straw man arguments in connection to his opinions related to comparative ballistics evidence, none of which rebut Tiderington's opinions. For example, Mr. Tiderington did *not* opine that Mingey should have waited to interview Plaintiff until obtaining comparative ballistics evidence. [Ex. A at pgs. 25-26] Tiderington also never claimed that there was anything improper about interviewing Plaintiff about his knowledge of the Wiley brothers' murders to determine any gang connection.

Tiderington pointed out that a sound investigation would have involved obtaining prompt comparative ballistics analysis between the firearms evidence from the July 3, 1990, shooting for which Plaintiff was arrested, and the firearms evidence collected in connection with the Wiley brothers' murders on May 25, 1990, particularly if Mingey's claim that Plaintiff admitted to having knowledge and involvement in the crime is true. Rudolph mischaracterizes Tiderington's opinion to offer his own irrelevant one. Rudolph writes that he is aware of no policy in 1990 to expedite ballistics comparison. Even if this dubious proposition was true, it is beside the point. Tiderington did not fault Mingey for failing to seek expedited ballistics analysis, Tiderington faulted Mingey for failing to *request* ballistics analysis until a month after he allegedly made a connection between these two shootings. Contrary to Rudolph's report, Mr. Tiderington did not opine that there was something improper about seeking ballistics analysis. Quite the opposite, Tiderington merely pointed out that it should have been done once Mingey allegedly made a possible connection between the crimes.

Additionally, Rudolph's opinions trying to explain away the fact that ballistics evidence did not show a connection between the crimes, namely that gang members will use different firearms to commit shootings or homicides is grossly inappropriate and inadmissible. Rudolph's

8

opinion only makes sense if he assumes that Plaintiff is, in fact, guilty of committing this crime. That the ballistics evidence did not match is also entirely consistent with Plaintiff's innocence.

    4.        Rudolph's Opinions About "Tunnel Vision."

Rudoph defends the investigation of the Wiley brothers' murder but relies entirely on Mingey's testimony that Plaintiff made two oral statements prior to his arrest that were not documented until *after* Plaintiff was already charged. As Plaintiff has long claimed, including in his Complaint and his testimony, he never made any inculpatory oral statements to Defendant Mingey. Plaintiff's claims are corroborated by Mingey's failure to contemporaneously document these so-called oral statements. Incredibly, Mingey claims that Plaintiff essentially confessed to the crime on August 1, 1990, but that he did not charge Plaintiff or even bother to make a contemporaneous report or note of the confession until a month later. Mingey's partner did not recall any confession. If Rudoph seeks to defend the investigation, he must acknowledge that his opinion is based on crediting Mingey's testimony. He cannot render such an opinion by making a credibility assessment of Mingey's testimony.

    5.        Rudolph's Opinions about "Physical Evidence."

Rudolph seems to agree with Tiderington's opinions about the utter failure of the Defendant Officers to attempt to corroborate Plaintiff's alleged confession, including by interviewing a Latin King named "Black Jeffrey" whose car, an "older model, light blue over dark blue, Pontiac Bov." was allegedly involved in the shooting. Rudolph repeatedly points out that "it would have been better" if the defendant officers better documented their investigation, attempted to locate alleged witnesses mentioned by Plaintiff in his court-reported statement, attempted to locate the owner of the car that was allegedly involved in the crime, and attempted to find the murder weapon. But Rudolph simply goes on to speculate why the detectives did not

take the investigative actions that Tiderington contends are inconsistent with investigative norms. In fact, Rudolph fails to point to a single statement from the Defendant Officers' own testimony to support these opinions. Rather, he engages in rampant speculation about why the Defendant Officers did not take certain actions and why it probably would not have led to useable evidence in any event.

For example, in response to Tiderington's opinion that the Defendant Officers should have made efforts to location the "older model, light blue over dark blue, Pontiac Bov." driven by a Latin King they called "Black Jeffrey," Rudolph opines that "it would be problematic for Jeffrey" to drive around in this vehicle for 90 days that had a pistol in it." Rudolph did not explain his methodology or point to any facts or data to support his opinion. In fact, he does not really render an opinion, he simply steps into the shoes of the Defendant Officers and throws out hypothetical reasons why the Defendant Officers did not take certain investigative actions. These opinions are inadmissible.

      6.      Rudolph's "Assessment of the Investigation" Opinions.

Starting at page 29 through 31, Rudolph opines about the investigation without citing any methodology, any standards, or even any facts or data. He simply regurgitates the Defendant Officers' version of events as set out in their closing supplementary report that Plaintiff contends is fabricated. Rudolph's opinions are entirely dependent on crediting the officers' reports and testimony and disregarding Plaintiff's testimony and the testimony of Alfredo Gonzalez, Justino Cruz, Christopher Goosens, Rosa Bello, former ASA Jennifer Borowitz, Defendant Montilla, and a mountain of other contradictory evidence. Again, Rudolph intrudes on the fact-finding function of the jury when assessing this investigation.

      7.      Opinions Regarding Allegations of Excessive Force.

Rudolph's opinions regarding Plaintiff's allegations of excessive force are inadmissible as they invade the province of the jury. Rudolph details cherry-picked portions of the discovery record, highlighting those facts that he believes weigh against a finding that Mr. Maysonet was physically abused during his interrogation. Rudolph ultimately concludes "[t]here are no court records, prison records, or any independent corroborating documentation for the injuries allegedly suffered by Mr. Maysonet and Mr. Gonzalez because their allegedly being abused while in custody at Area Five [sic]." [Ex. A at pg. 33] This opinion, to the extent it constitutes an opinion, is inadmissible. Rudolph concedes that the use of physical force in an interrogation is prohibited by national police standards. That's where his opinion should end. It is for the jury to decide the factual question of whether Defendant Guevara did employ physical violence against Plaintiff. Rudolph is not permitted to give his "opinions" about why the jury should side with Guevara (who invoked his Fifth Amendment to questions about his use of physical abuse) over Plaintiff on this issue.

8. Rudolph's Opinions Regarding the Defendant Officers.

Rudolph offers conclusory opinions that each Defendant Officers with the exception of Defendant Guevara "acted properly" and did "good police work." For the reasons already discussed at length above, these opinions are unreliable. They are not based on anything other than Rudolph's subjective impressions and his credibility determination that the Defendant Officers are telling the truth about their investigation and Plaintiff is lying about it.

## CONCLUSION

For the foregoing reasons, Rudolph's testimony must be barred in its entirety.

Respectfully Submitted,
PLAINTIFF JOSE MAYSONET

By: /s/*JENNIFER BONJEAN*

11

*One of Plaintiff's attorney*

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
303 Van Brunt Street, 1ˢᵗ Fl
Brooklyn, New York 11231
718-875-1850

Steve Greenberg
GREENBERG TRIAL LAWYERS
Attorneys and Counselors
53 W. Jackson Blvd., Suite 315
Chicago, IL  60604
(312) 399-2711