# EXHIBIT A

The Sotos Law Firm

# Professional Opinion Report Submitted by Richard Rudolph

Case of Maysonet v. Guevara

Richard Rudolph
9-7-2023

Richard Rudolph                                        Case of Maysonet v. Guevara

# Contents

**PROFESSIONAL PROFILE** ....................................................................................................... 3

**INTRODUCTION** .................................................................................................................... 4

   Rate of Compensation ........................................................................................................5

**SYNOPSIS** ............................................................................................................................. 5

**THE HOMICIDE INVESTIGATION** ........................................................................................ 6

   Crime Scene ......................................................................................................................6
   Witnesses ...........................................................................................................................7
   Non-Fatal Shooting Arrest of Jose Maysonet ...................................................................8
   Jose Maysonet Debriefing July 15, 1990 .........................................................................8
   Jose Maysonet Follow-up Interview August 1, 1990 ........................................................9
   Jose Maysonet follow up interview ...................................................................................9

**SIGNIFICANT EVENTS OF THE HOMICIDE INVESTIGATION AND PARTICIPANTS IN
INVESTIGATION** .................................................................................................................. 11

   Jose Maysonet Interview July 15, 1990 .........................................................................11
   Jose Maysonet Interview August 1, 1990 ......................................................................12
   Jose Maysonet Interview August 22, 1990 ....................................................................12
      Rotating Investigators During Interrogations .............................................................14
   Assistant State's Attorney Frank DiFranco ....................................................................15
   Court Reporter Joseph Szybist ........................................................................................15
   Rosa Bello Interview August 22, 1990 ...........................................................................16
   Alfredo "Lluvia" Gonzalez Interview August 23, 1990 ..................................................17
   Justino "Tino" Cruz Interview August 24, 1990 .............................................................19
   Christopher "Fro" Gosens Hernandez November 24, 1990 ............................................20
      Co-Defendants Statements .........................................................................................20

**PENDING TRIALS** .............................................................................................................. 20

**MAYSONET GRANTED NEW TRIAL** ................................................................................. 21

   Fifth Amendment ............................................................................................................21

**EVALUATION** ..................................................................................................................... 22

   Latin Kings Element .......................................................................................................22
   Mr. Maysonet's English Proficiency ...............................................................................22
   Supervisors Conducting Interviews ................................................................................24
   Ballistics .........................................................................................................................25
   Tunnel Vision .................................................................................................................26
   Physical Evidence ...........................................................................................................27
   Assessment of Investigation ...........................................................................................29
   Allegations of Excessive Force .......................................................................................31
   Sergeant Mingey ............................................................................................................33
   Detective Paulnitsky .......................................................................................................33
   Sergeant Lee Epplen .......................................................................................................33
   Detective Ernest Halvorsen .............................................................................................34
   Detective Fernando Montilla ...........................................................................................34

**CONCLUSION** .................................................................................................................... 34

**ADDENDUM A - CV** ..........................................................................................................A1

Richard Rudolph                                                Case of Maysonet v. Guevara

**ADDENDUM B – MATERIALS RELIED UPON** .............................................................................B1

Richard Rudolph                                                    Case of Maysonet v. Guevara

### Professional Profile

I served the New York City Police Department for thirty years before my retirement in 2020. For the last eighteen years of my career, I was the Commanding Officer of various Precinct Detective Squads and my last six years were spent as the Commanding Officer of the Queens Homicide Squad.

Over my career, I supervised and managed detectives through more than 85,000 investigations. As a Detective Squad Commander, my teams continually captured an above-average clearance rate on the seven major index crimes and as the Commanding Officer of the Queens Homicide Squad, I led the squad to an exceptional clearance rate of homicide investigations which was at or above the citywide average. Over my career, I supervised and managed over 500 homicide investigations.

As the Homicide Commander, I oversaw and directed the investigations of the murders of New York City Police Officer Brian Moore in 2015 and Detective Brian Simonsen in 2019, as well as many other "high profile-media cases" such as Hip-Hop artist Lionel "Chinx" Pickens and the "Howard Beach Jogger" Karina Vetrano. I was commended by department executives and awarded a Unit Citation by the Police Commissioner of the New York City Police Department for steadfast leadership.

Prior to commanding detectives as a Detective Squad Commander, I served as Internal Affairs Supervisor Sergeant/Investigator responsible for conducting citywide investigations in all allegations of excessive force, death in custody cases, and firearm discharges by members of the service.

As a police officer/investigator, I was assigned to the NYPD's Northern Manhattan Initiative, the Special Operations Division's Street Crime Unit, and the Organized Crime Control Bureau as a Narcotics Investigator.

I hold a Master of Arts in Education Leadership, Management, and Policy from Seton Hall University, as well as a Bachelor of Science in Criminal Justice from Saint John's University, and am a graduate of the FBI National Academy's, 239th Session.

Currently, I serve as a continuing education instructor for the University of Louisville's, Southern Police Institute where I lecture on such topics as Development and Management of Major Criminal Investigations and Homicide Investigations. Attached as Addendum A is my curriculum vitae.

Richard Rudolph                                                 Case of Maysonet v. Guevara

## Introduction

  In March of 2023, I was retained by The Sotos Law Firm, which represents police officers from the City of Chicago regarding the case of Jose Juan Maysonet, Jr. v. City of Chicago, et al. Case No. 1:18-CV-2342. I was asked to review the homicide investigation conducted by the Chicago Police Department's Area Five Detective Division. In that case, Jose Juan Maysonet was arrested, prosecuted, and convicted for the killings of Kevin and Torrence Wiley on May 25, 1990.

  I was tasked to perform a review of the homicide investigation of the Wiley brothers and provide an expert opinion concerning the investigative tasks conducted by the investigators that led to the arrest of Mr. Maysonet and whether they conformed with generally accepted police practices at the time of the Wileys' homicide investigation. I was provided and reviewed depositions, case material, investigative reports, Chicago Police Department policies, training manuals and directives as well as photographs and a number of court-related documents. A full list of the documents I was provided and reviewed is attached to this report as **Addendum B**. All opinions expressed in this report are based on my education, training, and experience and the records I reviewed, and are held to a reasonable degree of professional certainty in the field of police practices, training, and administration.[1]

  The analysis and assessment I have conducted attempts to avoid any determination on the issue of credibility as that issue is reserved for the trier of fact. My role is to provide guidance and understanding of police practices and whether the investigators conformed with those police practices to assist the trier of fact in its evaluation of the evidence. In some instances, the investigators conduct may deviate from the best practices standard. However, the investigators conduct may still be reasonable, appropriate and conform with accepted practices particularly when viewed under the totality of the circumstances in the investigation. The best practices standard is the desirable objective for any investigation, although it usually fails to consider the reality and circumstances investigators encounter during an investigation. Therefore, the opinions in my report will evaluate whether the investigators conduct was reasonable and appropriate and conformed with accepted police practices at the relevant time.

  After an extensive and thorough review of the material provided to me and based on my professional training, knowledge and experience, the investigators in this case conducted a proper and thorough investigation. The investigation was in line with acceptable police standards in place during this investigation which led to the arrest, prosecution and conviction of Mr. Maysonet and his co-defendants Alfredo Gonzalez and Justino Cruz. The investigators followed evidentiary leads appropriately and corroborated the statements of suspects. While there could have been better documentation in the investigative file[2] that I was provided, there was sufficient documentation to provide the development of the detectives' investigation.

  The investigative file did not contain documentation throughout the investigative process such as General Progress Reports (GPRs), contemporaneous or other handwritten notes until the Supplemental Report was prepared by Detective Halvorsen. Generally, while a step-by-step documentation of the investigative steps taken by the detectives throughout the investigation is

---

[1] My expert opinions contained in this document are based on materials provided and are subject to change should additional materials and/or information become available.

[2] It is unknown whether all police records from the 30-year-old case were available.

Richard Rudolph                                            Case of Maysonet v. Guevara

the best practice, in 1990 as long as the course of the investigation is ultimately documented, that met the reasonable/acceptable practice standards. The Wiley homicide investigation as a whole complied with accepted police practices for the Chicago Police Department in 1990.

As this investigation proceeded through the legal process there were constant checks and balances between the Chicago Police Department and the Cook County State Attorney's Office that ensured that Mr. Maysonet and his co-defendants received a fair trial which established they were the perpetrators who shot and killed Kevin and Torrence Wiley. The checks and balances in place in 1990 provided Mr. Maysonet ample opportunity to report any police misconduct or abuse to authorities other than the Chicago Police Department.

## Rate of Compensation

I am being compensated at the rate of $275.00/hour for review of materials and preparation of my report. I charge $425/hour for testimony. In the last four years I have not testified as an expert.

## **Synopsis**

Mr. Maysonet first injected himself into the Wiley brothers investigation when being debriefed by Sergent Mingey after Mr. Maysonet had been arrested for shooting rival gang members. Interviewing known gang members was a good method to obtain information on other gang related crimes. Mr. Maysonet was a self-proclaimed member of the Latin Kings. The Latin Kings are historically one of the most violent street gangs in the United States.[3]

Mr. Maysonet had an extensive arrest history and he has admitted to unlawful gun possession, felony assault, and domestic violence.[4] Most enlightening, Mr. Maysonet stated during his deposition, "*a lot of times people ask questions, though, you know. You always have to have some kind of lie just to cover things up.*"[5] Mr. Maysonet's background helped to provide context to the investigation of him and steps taken.

After Mr. Maysonet injected himself into the Wiley brothers investigation, the Defendants appropriately followed up with him to obtain additional information. Pursuing leads such as Mr. Maysonet is good police practice. After Mr. Maysonet was out of custody, bringing him to the police station for a follow-up interview was good practice to follow a lead. According to the police reports, while at the police station, Mr. Maysonet provided additional information that he was present for the shooting and included the names of the others who were present. Mr. Maysonet's long-time girlfriend, and mother of his unborn son, was also interviewed and she corroborated Mr. Maysonet's story. Having corroboration of Mr. Maysonet's confession, it was appropriate to seek to charge Mr. Maysonet. The Felony Review Assistant State's Attorney ("ASA") was contacted so the detectives could present to him the evidence of Mr. Maysonet's confession and corroboration of his girlfriend. Mr. Maysonet then gave a court reported

---

[3] This criminal organization is believed to have originally organized in Chicago in the early 1960s before branching out to New York City and the rest of the country. As per the United States Department of Justice, "the Latin Kings street gang was formed in Chicago in the 1960s and consisted predominantly of Mexican and Puerto Rican males". The United States Department of Justice
https://www.justice.gov/entity-popup
[4] Maysonet Deposition 04/16/2021 page 172, lines 12-13
[5] Maysonet Deposition 04/16/2021 page 171, lines 18-21

confession to the ASA and subsequently drove with the ASA and Defendant Detectives to the scene to further corroborate his story, by showing them where he drove the car. After obtaining a confession, having the confessor again corroborate the confession by providing additional details is good practice. Detectives also followed up with the people Maysonet identified as involved and two out of the three identified by Maysonet corroborated Mr. Maysonet's story about driving to the shooting and how it occurred, albeit from their own perspective. This was appropriate and further attempts to corroborate what Mr. Maysonet said, which is appropriate. After several days, the detectives had three suspects all confirming they were present at the time of the shooting, one suspect who wholly denied any involvement, and a girlfriend who corroborated the story. This is good police work to follow up on the elements of the confession and speak to multiple people to corroborate what was said.

Around the time of charging Mr. Maysonet, Detective Halvorsen then completed a supplemental report. This report included the investigative steps that lead to seeking charges, which is required practice. The report was later turned over to Mr. Maysonet's defense attorney with other documents from the investigation. Mr. Maysonet alleges he did not speak English and so could not have made the court reported statement. He further alleges that he was physically abused by Defendant Guevara and forced to make the confession and that the confession he gave was not true. He further alleges coercion of witnesses to get them to fabricate inculpatory statements against him. Mr. Maysonet's expert, Mr. Tiderington, also criticized the investigation. As set forth more fully below, these allegations must be analyzed considering the materials and evidence and circumstances of this investigation. Additionally, Mr. Tiderington's criticisms must be assessed considering all the materials and evidence and the realities of investigations at that time. The materials and evidence reveal that the Defendants met acceptable police standards in 1990 in performing their investigation and properly presented the evidence to the ASA to allow the criminal justice system to take over to assess guilt or innocence.

### The Homicide Investigation

#### Crime Scene

On May 25, 1990, at approximately 0100 hours, Torrence and Kevin Wiley were shot and killed while standing on the sidewalk in front of a vacant lot next to 3428 W. North Avenue in Humboldt Park.

The crime scene was processed by the crime scene investigators who photographed the crime scene and the bodies of the victims. The investigators recovered ballistic evidence. Specifically, four (4) 9mm shell casings and later a 9mm bullet was found in Torrence Wiley's underwear at the medical examiner's office. A can of Milwaukee's Best beer was also recovered from the crime scene.[6]

The crime scene was a vacant lot on North Avenue with a walkway running from the sidewalk to an alley that ran parallel to North Avenue behind the buildings on North Avenue. The location of the 9mm shells that were recovered and where the bodies had come to rest indicated that the shooter was north of the victims, closer to the alley, and conceivably accessed the victims from the alley. A search of the crime scene failed to locate any other probative evidence.

---

[6] Crime Scene, RD #N-23497, PG #RFC-78, 05/25/1990

Richard Rudolph                                                    Case of Maysonet v. Guevara

There was no indication that the Wileys were robbed and the motive was unknown on the date of occurrence. Members of the Wiley family were interviewed and based on these interviews there was no indication that either brother was targeted nor that they were affiliated with a gang nor did they have a serious criminal history.

Witnesses

A witness canvass of the crime scene was conducted by Detectives Ware and Kondal. The detectives located three ear witnesses, Mr. David Milan, a staff member at the "Solder (*sic*) of God Church" and Alma Preceeo and her sister Carmina Macias who resided at 3419 W. North Avenue.

In substance, Mr. Milan told the detectives he heard four gunshots. Ms. Preceeo and Ms. Macias were able to provide further details but did not witness the shooting.

Ms. Preceeo informed the detectives she was awakened at approximately 2400 hours by two men arguing. The argument lasted about one hour before she heard four gunshots. She then called 911 and reported the shooting. Ms. Preceeo did not observe the shooting, nor could she identify the men who were arguing.

Ms. Macias was interviewed via telephone. In substance, Ms. Macias stated she was also awakened at approximately 2400 hours by the sound of men arguing. She believed one of the men was very calm and the other was loud and may have been drunk. She heard them mention the name "Lulu Dog" numerous times before hearing the gunshots. She did not call 911 because she did not have a telephone. She did not witness the shooting, but when she did look out of her window, she observed the victims laying on the ground.

Although the three ear witnesses did not observe the shootings of the Wileys, their statements had investigative value for the homicide investigation. Hearing the argument provided police with an idea of how long the Wiley brothers had been located at the place where they were shot. The three witnesses reported hearing four gunshots at approximately 0100 hours. This was consistent with the timeline of events and corroborated the court-reported statements and handwritten statements made by Mr. Maysonet, Alfredo Gonzalez, Justino Cruz and Rosa Bello.

The General Progress Report (GPR) appeared to have identified "LuLu" as being the sister of the victims because the address contained in the GPR matched that of Jolanda Wiley who lived at 1925 N. Drake, 3rd floor. Accordingly, the GPR recorded Jolanda Wiley's information with handwritten notes recorded in a General Progress Report[7].

On May 25, 1990, at approximately 1630 hours, Detective Boyle submitted a Chicago Police Department Supplementary Report to further document his interview with Jolanda Wiley. In substance she stated, on May 24, at approximately 2200 hours, her brother Torrence arrived at her home. He left the home with their brother Kevin at approximately 2300 hours. Neither Torrence nor Kevin told Jolanda where they were going. She could not provide any further information about the homicides of her brothers.[8]

Detective Boyle conducted a proper, logical and basic investigative step. The initial interviews conducted at the crime scene brought to light the name of "LuLu." Detective Boyle followed up on the lead and appeared he identified "LuLu" as the sister of the victim. He

---

[7] Detective John Boyle, General Progress Report # CCSAO000874
[8] Detective John Boyle, RD #N-234297, PG #RFC-64, 05/25/1990

Richard Rudolph                                              Case of Maysonet v. Guevara

documented his interview on a General Progress Report and attached his contemporaneous notes to the case. This was done in accordance with widely accepted police investigate practices.

## Non-Fatal Shooting Arrest of Jose Maysonet

According to a July 4, 1990, Supplemental Report by Detective Holec, on July 3, 1990, at approximately 2200 hours near 4028 W. Wabansia, a drive-by-shooting occurred with three victims being shot. Three spent 9mm shell casings were recovered at the crime scene but not the weapon.

Detective Holec also reported that two of the victims had identified the shooter from photographs shown to them. As a result, they identified "King Leo" as the person who was the shooter.

Detective Paulnitsky prepared a Supplement Report on July 16, 1990, and stated on July 15, 1990, that Sergeant Mingey assigned him to follow-up on the non-fatal shooting investigation. After he reviewed the investigative steps taken, Detective Paulnitsky learned the shooter was identified as "King Leo". Detective Paulnitsky reported in the Supplement Report that he knew "King Leo" to be Jose Maysonet.

With that information, he and Detective Bongiorno went to Mr. Maysonet's home. The detectives documented they spoke to Mr. Maysonet in English and Mr. Maysonet agreed to assist with the investigation. He was informed of his Miranda rights and stated that he understood those rights and was transported to Area 5.

A line-up procedure was conducted and Mr. Maysonet was identified as the shooter. Mr. Maysonet then told Detective Paulnitsky and Detective Bongiorno in English that he did not understand English and needed a Spanish translator. A police officer from the 25th District was brought in to serve as the interpreter. The facts of the case were presented to felony review ASA Muchin who conducted an interview with Mr. Maysonet with the assistance of the same police officer from the 25th District as an interpreter. As a result, Mr. Maysonet was charged with three counts of Aggravated Battery.

## Jose Maysonet Debriefing July 15, 1990

The non-fatal July 3, 1990 shooting involved a 9mm pistol and occurred in relatively close proximity to the Wileys' homicides and about forty days afterward. The motive for the shooting was gang related as the victims were YLODs (Young Latino Organization Disciples) and Mr. Maysonet was a known member of the Latin Kings. The Wiley brothers had been murdered in Latin Kings territory and the same caliber weapon was used. Sergeant Mingey was mindful of the facts of the Wiley brothers homicides and believed there may be a connection with the non-fatal shooting. Sergeant Mingey determined Mr. Maysonet should be debriefed in order to cultivate any probative information he may have and try to develop leads in the Wileys homicide investigation. Detective Montilla *(who speaks Spanish)* accompanied Sergeant Mingey to provide interpreter services if necessary and did act as an interpreter for Sergeant Mingey to conduct his debriefing.[9] Mr. Maysonet's statements tied him to the double homicide investigation of the Wileys during the debriefing and offered information about the perpetrators.

---

[9] Debriefing suspects and witnesses as explained by Sgt. Mingey is good police work. It provides an opportunity to learn about any information on the street about other crimes.

Richard Rudolph                                                    Case of Maysonet v. Guevara

During this initial interview on July 15, 1990, Mr. Maysonet informed Sergeant Mingey that he had specific information about how he secured a 9mm pistol in his home for his fellow Latin King gang members and that on the night of the murder, the Latin Kings gang members had retrieved the 9mm pistol. Additionally, when he learned of the double homicide of the Wileys, he *"assumed that the Latin Kings he gave the gun to must have done this shooting."*[10]

Mr. Maysonet had inserted himself into the homicide investigation and was, at minimum, a witness who could provide important information for the homicide investigation.

As the case with any distinguished investigator, Sergeant Mingey debriefed a perpetrator who was a known gang member and obtained information about an active homicide investigation. This was a logical and effective investigative technique performed by Sergeant Mingey in line with accepted investigative police practices, which resulted in a lead in the Wiley brothers homicides.

## Jose Maysonet Follow-up Interview August 1, 1990

Having developed a lead and rapport with Mr. Maysonet, Sergeant Mingey followed-up on the intelligence in order to try to obtain additional probative information.

On August 1, 1990, Sergeant Mingey and Detective Montilla conducted a follow-up interview with Mr. Maysonet at the Cook County Jail. Mr. Maysonet was given an attorney wavier form by the Cook County guard which he signed and agreed to speak to the investigators without the presence of an attorney. This follow-up interview conducted by Sergeant Mingey and Detective Montilla was not only proper but a basic investigative step that professional investigators would be expected to conduct. That is, to follow-up on leads until sufficient evidence was discovered to support charging a suspect with the crime. Although it is not commonplace for sergeants to follow up leads, Sergeant Mingey and Detective Montilla had developed a connection with Mr. Maysonet which might allow them to get more information rather than substituting a new detective to conduct the follow-up interview. In addition, back in 1990 in Chicago, it was a busy time for the detectives and while Mr. Maysonet's information was a lead it was uncertain how credible the lead was and it would take a substantial time commitment to interview him while he was held in jail. As part of the "team concept," Sergeant Mingy allowed the detectives to concentrate on their active investigations while he followed up with Mr. Maysonet.

The follow-up interview conducted by Sergeant Mingey resulted in new information. In substance, Mr. Maysonet stated he knew the names of the perpetrators that killed the Wiley brothers but refused to provide the names until a deal was in place to have him released from jail. He also told the investigators that he was present during the homicide, but he was not the shooter. Mr. Maysonet had possibly made himself more than just a witness and now he was a potential perpetrator involved in the killing of the Wileys.

## Jose Maysonet Follow-up Interview

As per the Supplement Report, on August 22, 1990, Detective Paulnitsky was in the courthouse and observed Mr. Maysonet who was now released on bond regarding his non-fatal shooting arrest. Detective Paulnitsky was aware of Mr. Maysonet's prior statements to Sergeant

---

[10] Sergeant Mingey's Interview at Area 5, RD# N-234297, PG #RFC-83, 08/23/1990

Richard Rudolph                                                    Case of Maysonet v. Guevara

Mingey indicating his knowledge of and possible involvement in the Wiley homicides. He had Mr. Maysonet brought back to Area 5 for a follow-up interview. Once at Area Five, at approximately 1100 hours, Mr. Maysonet was read his Miranda rights by Detective Montilla and agreed to speak with the investigators (there is no indication that Sgt. Mingey was involved in this interviewing). In substance, Mr. Maysonet essentially repeated his same version of events that he had given during his two previous interviews. However, during this interview, he added his life and the lives of his family were threatened by Latin King gang members if he were to cooperate with the police.

Based on the Supplemental Report, Detective Paulnitsky acted appropriately when he brought Mr. Maysonet to Area 5 for a follow-up interview. Mr. Maysonet established himself as a potential witness or suspect in the homicide investigation based on two previous interviews, particularly when he put himself at the crime scene when the Wileys were shot and killed but denied being the shooter. Additionally, Mr. Maysonet had previously indicated that he was willing to cooperate with the homicide investigation if he were to get a deal to have his pending charges dismissed.[11] It would be beneficial if the Supplemental Report contained a more detailed accounting of events. Specifically, after Mr. Maysonet was read his Miranda rights and agreed to speak with the detectives.[12] Nevertheless, that does not diminish the fact that Detective Paulnitsky acted properly when he realized Mr. Maysonet was released on bond and there was a need to conduct a follow-up interview with Mr. Maysonet.

In the same Supplemental Report, on August 22, 1990, at approximately 2000 hours, Mr. Maysonet was interviewed by Detective Guevara *(who speaks Spanish)*. Mr. Maysonet was again given his Miranda rights and agreed to speak with Detective Guevara. This was the first interview of Mr. Maysonet conducted by Detective Guevara and according to the Supplement Report, this interview lasted approximately one hour. Mr. Maysonet provided additional details related to his previous statements he gave. Mr. Maysonet provided more detail about the May 20, 1990, incident when a member of the Latin Kings came to his home. He explained Lluvia gave him a dark finished 9mm, fifteen (15) shot pistol, to store in his home for safekeeping. He also gave a detailed account of the night of May 24, 1990, when the Wiley brothers were shot and killed. Mr. Maysonet stated that on May 24, 1990, somewhere between 2300 hours and 2400 hours three Latin King gang members came to his house to retrieve the 9mm pistol he had secured in his home. He said their names were "Lluvia," "Fro," and "Tino". They told Mr. Maysonet they needed the gun because "*they had something to do with two guys at Drake and North Ave that involved dope*"[13]. He further stated that "Lluvia" was wearing a black hooded sweatshirt which according to Mr. Maysonet indicated they were going out to do a "roll". They asked Mr. Maysonet to drive and he agreed. Mr. Maysonet continued to tell Detective Guevara, that all four of them got into a car, which Mr. Maysonet described as an *"older model, light blue over dark blue, Pontiac Bon*[adventure] *that belonged to another Latin King named Jeffery."*[14] and he drove that vehicle from North Avenue to Drake Avenue and parked in a nearby alleyway.

The three men got out of the car while Mr. Maysonet remained in the vehicle behind the steering wheel. Approximately five minutes later, Mr. Maysonet heard five to six gunshots. He looked out of the car window and saw "Lluvia" with the 9mm pistol in his hand and pointing the gun at the two victims. When the victims did not move, the three men then got back into car and

---

[11] Maysonet statement, RD# N-234297, PG #RFC-83, 08/23/1990
[12] Maysonet statement, RD# N-234297, PG #RFC-84, 08/23/1990
[13] Maysonet statement, RFC# 000084, 08/23/1990
[14] Maysonet statement, RFC# 000084, 08/23/1990

Richard Rudolph                                                    Case of Maysonet v. Guevara

drove back to Mr. Maysonet's home. Mr. Maysonet went into his home and the others drove off, with "Lluvia" as the driver.

Mr. Maysonet stated that the next day, May 25, 1990, at approximately, 1100 hours he met, by chance, "Lluvia" on a street corner. There he says "Lluvia" made a direct statement to him about the homicides. According to Mr. Maysonet, "Lluvia" said to him, "*I killed two black motherfuckers*"[15]. Mr. Maysonet further stated that the day he was released on bond on the non-fatal shooting, the same three Latin Kings came to his house along with two other Latin Kings named "Cisco" and Efrain "King" Cruz. Mr. Maysonet divulged that "King" pointed the same 9mm pistol used in the Wiley homicides to Mr. Maysonet's head and threatened to kill him if he cooperated with the police concerning the killing of the Wiley brothers.

According to the Supplement Report, Mr. Maysonet further stated he knew where "Lluvia" and "Fro" lived and offered to point out those locations. The detectives took Mr. Maysonet to canvass for those locations. During the canvass, Mr. Maysonet identified an apartment building on Kedzie Avenue as "Lluvia's" residence and a house on Spaulding Avenue where "Fro" lived. As the detectives drove past the corner of Spaulding Avenue and Le Moyne Avenue Mr. Maysonet pointed out "Lluvia" to the detectives who was standing at that corner.

Mr. Maysonet was taken back to Area Five and shown photographs of known Latin King gang members. As a result, Mr. Maysonet identified Chris Fernandez who he knew as "Fro".

At Area Five, Mr. Maysonet was interviewed by ASA Jennifer Borowitz who was present for another case but was familiar with the Wileys homicide investigation. That interview was conducted in the presence of Detectives Guevara and Montilla. In the course of that interview, Mr. Maysonet reiterated his statement he made to the detectives to ASA Borowitz and agreed to give his statement to a court reporter. Mr. Maysonet was then interviewed by ASA DiFranco in the presence of the detectives and outside their presence. His statement was later taken and recorded by ASA DiFranco and the court reporter without Detective Guevara being present. That statement was consistent with the prior statements Mr. Maysonet had made.

At the request of ASA DiFranco, Detectives Paulnitsky and Montilla escorted ASA DiFranco and Mr. Maysonet to the crime scene located at 3438 W. North Avenue. There Mr. Maysonet explained the route he drove on the night of the homicides, the alleyway where he parked the vehicle and pointed out the location where the Wileys were killed.

### **Significant Events of the Homicide investigation and Participants in Investigation**

#### Jose Maysonet Interview July 15, 1990

As described above, on July 15, 1990, Sergeant Mingey believed there may be a connection between the July 3, 1990 shootings and the Wiley brothers homicide and debriefed Mr. Maysonet at Area 5. Mr. Maysonet was read his Miranda rights by Detective Montilla and he agreed to speak with the investigators and provided some relevant information about possible suspects, but he refused to provide the legal or street names of the Latin Kings who had obtained a 9mm pistol from Mr. Maysonet on the night of the Wiley brothers homicide.

Based on my training, education and experience, especially with gathering intelligence from persons who have been arrested, this interview was not only proper but a basic investigative step to gather information about violent crimes that have occurred or may perhaps occur in the

---

[15] Maysonet statement, RFC# 000085, 08/23/1990

future. The debriefing of all prisoners, especially violent gang members, has proven to be an important investigative tool for law enforcement to gather intelligence to assist in solving violent crimes. In addition, Sergeant Mingey's connection of the use of a 9mm pistol in both crimes that happened in close proximity showed excellent investigative skills by attempting to determine any connection between the crimes.

    As was the case with this interview with Mr. Maysonet, he provided information to the investigators about the night of the double homicide. Specifically, how he secured a 9mm firearm in his home for three other members of the Latin Kings and gave that firearm to them when they came to his home that night. This basic investigative step taken by the investigators developed a lead in the Wiley brothers' homicide and made Mr. Maysonet at minimum a witness and possibly a suspect in that case. It should be noted that Detective Guevara was not present during this interview.

## Jose Maysonet Interview August 1, 1990

    The investigators acted properly by following up on a lead that was developed from their initial debriefing of Mr. Maysonet. In fact, they were able to cultivate further information from Mr. Maysonet who placed himself at the crime scene when the Wiley brothers were killed but denied being the person who pulled the trigger. Mr. Maysonet further indicated he was willing to cooperate with the homicide investigation. This basic investigative step was essential and key to the homicide investigation, in that, Mr. Maysonet was more than someone who had information about the homicide, but he made himself a witness or suspect. The investigators correctly conducted a follow-up interview and developed probative information as well as identifying a suspect in the homicide investigation. It should be noted that Detective Guevara was not present during this interview.

## Jose Maysonet Interview August 22, 1990

    As noted above, each time Mr. Maysonet was questioned he provided the same statement and added additional details. In my experience, this is common for suspects to try to hold back information that may hurt them, but with additional questioning may provide more details.

    Mr. Maysonet's statement provided details that only would be known by someone who was a participant in the homicide. A statement that he repeated to the prosecutor and was recorded by a court reporter, without any deviation from this fact pattern. The information in the Supplemental Report confirms this follow-up interview conducted by Detective Guevara was proper and consistent and a widely accepted investigative step. The interrogation led to the arrests of not only Mr. Maysonet but the other perpetrators who were convicted for committing the Wiley homicides.

    According to ASA DiFranco's deposition testimony, when he arrived at Area 5, he read Mr. Maysonet his Miranda rights before he spoke to Mr. Maysonet. Mr. Maysonet agreed to speak with the prosecutor, provided an initial statement to ASA DiFranco, and had an opportunity to speak to ASA DiFranco outside the presence of the police. Mr. Maysonet then gave a court-reported statement in which he denied being mistreated or abused. Mr. Maysonet was specifically asked if he was treated fairly by the police and the prosecutor and he answered in the affirmative. A photocopy of a polaroid of Mr. Maysonet was taken after he gave his court-reported statement to the prosecutor and there does not appear to be any obvious physical

Richard Rudolph                                                    Case of Maysonet v. Guevara

injuries to Mr. Maysonet. All who were present for the court reported statement; the court reporter, Mr. Maysonet, ASA DiFranco and Detective Montilla signed the back of the polaroid and it is dated and timed.

The information documented in the Supplemental Report, the court-reported statement as well as the depositions of the prosecutors, Detective Montilla, and the court-reporter confirmed that obtaining a court-reported statement was proper and consistent and a widely accepted basic investigative step.

Over my career, especially as a narcotics investigator and Internal Affairs investigator, I have conducted hundreds of interviews of witnesses and suspects. Moreover, as the commanding officer of both precinct detective squads and the homicide squad, I have observed and/or reviewed thousands of interviews of suspects and witnesses. Based on my real-life experiences, I can decisively state that when a defendant tells a lie or tries to give a false or misleading statement, they will often leave out details or change the narrative as they try to recall what they said in previous statements.

When I lecture about investigative tasks and techniques to police executives and investigators throughout the country, I discuss statement analysis. I have an enormous amount of experience reviewing and observing statements made by witnesses and perpetrators that provides unique insight into assessing statements. One point to be aware of is inconsistencies in several statements made by the one person on the same subject. For example, when a person is being deceptive, they may leave out or minimize information from their statement or add extraneous information to protect themselves. Over the course of an investigation, investigators may need the witness or perpetrator to provide their statement a second or third time or possibly even more based on the circumstances. Once the statements are compared, investigators may see discrepancies between the statements.

However, when a person is telling the truth, their statement tends to remain consistent throughout the interview. According to the Supplemental Report, the court-reported statement, the depositions of the prosecutors, Detective Montilla and Sergeant Mingey, the core of Mr. Maysonet's statements remained the same going back to his initial interview with Sergeant Mingey.

During his deposition on April 16, 2021, Mr. Maysonet alleged that on August 22, 1990, Detective Paulnitsky verbally threatened him. He stated, Detective Paulnitsky *"grabbed me by the shirt and told me if I say anything bad about him or call him a white guy, that he was going to bust my face."*[16] Mr. Maysonet also alleged Detective Paulnitsky physically abused him. He stated, Detective Paulnitsky *"slapped the right side of his face and knocked him down."*[17] Detective Paulnitsky has denied these allegations. There is no indication that this specific instance of alleged abuse impacted the course of Maysonet's statement as there are no additional details provided following the alleged physical abuse or during the course of his prosecution. While Mr. Maysonet, through his attorney, alleged in a motion to suppress that he was physically abused, when given the opportunity to testify about it, he did not mention any physical interaction with Detective Paulnitsky.

The unjustified use of physical force is a deviation from standard police practices. Nonetheless, even accepting the abuse allegations as described by Mr. Maysonet, that does not tie this interaction to the investigation of the Wileys Homicide. Instead, Mr. Maysonet's described it as an isolated incident of a perceived insult, physical interaction and threat if further

---

[16] Maysonet Deposition 04/16/2021 page 271, lines 20-23
[17] Maysonet Deposition 04/16/2021 page 271, line 24

Richard Rudolph                                    Case of Maysonet v. Guevara

insults were made. Detective Paulnitsky did not interact with Mr. Maysonet again until after he gave his court reported statement.

Mr. Maysonet also alleged during his deposition on April 16, 2021, that he was physically abused, forced to confess and refused legal counsel by Detective Guevara. I have not seen any documentation to corroborate these allegations, such as photographs that documented any signs of physical abuse or any type of medical treatment of inmate reports that document any injuries. Likewise, there is no corroborating evidence from the court reporter, ASA DiFranco or any testimony from a person who was a party to this interaction with Mr. Maysonet.

Mr. Maysonet's motion to suppress provides a single sentence that alleges physical abuse. Similar to his claim against Detective Paulnitsky, when Mr. Maysonet was given the opportunity to testify, he did not mention the alleged physical abuse he suffered at the hands of the detectives. Instead, the focus of his motion to suppress and related testimony was that he was under the influence of cocaine or a benzodiazepine that he took for his panic condition while in the police station.

While these allegations of physical abuse are concerning, Mr. Maysonet had the opportunity to bring them to the Court's attention and provide evidentiary support for them and let the justice system address his allegations. Mr. Maysonet failed to elaborate on any alleged physical abuse.

To be clear and avoid any ambiguity, there is zero tolerance for anyone to be physically abused by police officers, detectives, sergeants or anyone in law enforcement. Yes, we are held to a higher standard than the rest of the country and we should be. The trust of the public and the courts must have in law enforcement is paramount. As investigators, especially in a large city like Chicago, our job is to investigate violent crimes, such as homicide, rape, child abuse, elder abuse as well as other felony assaults. We have to face the evils of society just about every day and there is no other profession that has to confront these horrors of society so regularly, yet even so, it is critical to remain focused and professional.

## Rotating Investigators During Interrogations

It should be noted that for various reasons it is not uncommon during interviews to switch investigators. For example:

- A detective conducting the interview may not be able to develop a rapport with the subject and the interview has failed to produce any constructive results. The injection of a different detective may yield productive results.

- There may be a need to have a gender specific investigator conducting the interview, such as in the cases of rape and other sexual assaults. If the victim were a female, she may be more comfortable speaking with a female detective.

- There may be a need to have a detective with more knowledge about the crime or those involved in the crime to conduct the interview, such as with gang related crimes.

Richard Rudolph                                                    Case of Maysonet v. Guevara

- Another reason for rotating detectives may be administrative, such as staffing or overtime issues, it was not unusual for detectives to rotate during interviews based on the shift changes.

Rotation of investigators is not a deviation from generally accepted police practices in 1990, nor it is detrimental to an investigation and could be advantageous in some interrogations to change the interviewer. In this case, from review of the records, it appears the interviewer of Maysonet was changed because of a shift change – the day shift was ending and the afternoon/evening shift was available. Additionally, given the gang-related nature of this crime, bringing in a former gang specialist like Detective Guevara would provide a benefit over a property crime detective like Detective Montilla. Detective Guevara would have more knowledge and understanding of how gangs work and may be able to use that knowledge to get Mr. Maysonet to provide more details.

## Assistant State's Attorney Frank DiFranco

Mr. Maysonet also alleged he asked for his attorney on numerous occasions but was denied his right to counsel by Detective Guevara despite being given his Miranda rights twice before he confessed. Mr. Maysonet was given his Miranda rights for the third time that day, fifth time in the investigation, by the ASA DiFranco on August 23, 1990, at approximately 0928 hours. Mr. Maysonet waived his Miranda rights and agreed to answer the state's attorney's questions. At the conclusion of that interview Mr. Maysonet was specifically asked, in essence, by ASA DiFranco if anyone forced or threatened him to make his statement and was it given freely and voluntary? To which Mr. Maysonet replied, *"no"* and *"yes"* respectively. He was also asked about how he was treated by the police, to which he replied, *"good"*[18].

ASA DiFranco provided Mr. Maysonet another opportunity to report the alleged abuse and misconducted as well as exercise his right to have his attorney present during any questioning by himself. Mr. Maysonet did not take advantage of such opportunity.

During his deposition on September 12, 2019, ASA DiFranco testified that Mr. Maysonet was interviewed by him and his statement was recorded by a stenographer. ASA DiFranco made known the entire interview was conducted in English which is the only language he understands and the only way he is able to communicate with other people. He further stated he conversed with Mr. Maysonet in English and there were no issues as to Mr. Maysonet not understanding English. After the interview was concluded with Mr. Maysonet, ASA DiFranco provided Mr. Maysonet a transcript of his statement to read and review, to which he did as well as made corrections. In fact, ASA DiFranco stated he had Mr. Maysonet read aloud the first part of his statement to ensure Mr. Maysonet could also read and understand English. There was no translator used during his interview with Mr. Maysonet.

## Court Reporter Joseph Szybist

On June 9, 2021, Joseph Szybist was deposed for this case. Mr. Szybist was the court reporter who recorded Mr. Maysonet's statement to ASA DiFranco on August 23, 1990.

---

[18] Maysonet Statement to State Attorney 08/23/1990, JGS Maysonet 01702, PG #6

In substance, Mr. Szybist testified that Mr. Maysonet's interview was conducted in English and he recorded it verbatim without the use of an interpreter. Mr. Szybist stated he did not understand any language other than English nor was his equipment able to record any languages other than English. Therefore, he could not record any statement that was not conducted in English.

Mr. Szybist added that if Mr. Maysonet would have said he was abused by the police, he would have recorded that statement as well, *"Our job is to make a verbatim transcript of what was said"*[19].

## Rosa Bello Interview August 22, 1990

On August 22, 1990, at approximately, 2100 hours Ms. Rosa Bello was present at Area 5 and was allowed to see and speak with Mr. Maysonet in the presence of detectives. Mr. Maysonet told her to *"tell the truth about the night the blacks were killed."*[20] She agreed and was interviewed by the investigators. The detectives appropriately sought to corroborate Mr. Maysonet's statement and questioned his girlfriend Rosa Bello about the interactions with the 9mm pistol at her apartment.

In substance, Ms. Bello stated that on May 24, 1990, she was home with Mr. Maysonet when three of his friends, "Lluvia," "Fro," and "Tino" came to her home. She further stated, "Lluvia" asked Mr. Maysonet for the gun. She describes it as a *"9mm 15 shot pistol"* and *"she knows guns."*[21] Ms. Bello continued to state that the gun was wrapped in a towel, and she put it in a plastic bag and gave the gun to Mr. Maysonet who in turn gave it to "Lluvia." Mr. Maysonet left their apartment with the other three men returned home at approximately 0100 hours. According to Ms. Bello, Mr. Maysonet made a direct statement to her and said he had *"been out with the guys and he had been driving*.*"*[22] Later that evening, Mr. Maysonet told her that two guys had been shot.

A confirmatory identification was conducted by the detectives. Ms. Bello was shown two single photographs to confirm the people she knew as "Lluvia" and "Fro." Ms. Bello made a positive identification and signed each photograph which was witnessed and signed by ASA DiFranco and Detective Montilla.[23] This would be a correct, lawful and an accepted basic investigative step. The fact that "Lluvia" and "Fro" were known to her would eliminate the need for a photo array. A photo array would normally be used in cases when the witness never saw the perpetrators before or until that time in question.

Ms. Bello provided a handwritten statement to ASA DiFranco in which she confirmed the events of the night and that she provided a gun to Maysonet to give to Lluvia. Ms. Bello's account of events was confirmed in her deposition and her statement corroborated Mr. Maysonet's story.

Ms. Bello's statement supported the statement given by Mr. Maysonet, which gave more weight to the accuracy of his statement. She verified Mr. Maysonet's story about what happened at the apartment when Lluvia, Tino and Fro came to pick up a gun. She further confirmed the

---

[19] Joseph Szybist Deposition 06/09/2021, PG #61, lines 11,12
[20] Rosa Bello statement, RD# N-234297, PG #RFC-85, 08/23/1990
[21] Rosa Bello statement, RD# N-234297, PG #RFC-85, 08/23/1990
[22] Rosa Bello statement, RD# N-234297, PG #RFC-85, 08/23/1990
[23] Rosa Bello Confirmatory Identification, CCSAO308 & CCSAO309

Richard Rudolph                                                          Case of Maysonet v. Guevara

time Mr. Maysonet left the apartment and when he returned. As well as the statement he made to her about people being shot, as described above.

Corroborating Mr. Maysonet's statement was an appropriate and significant investigative step to proceed in the homicide investigation. It should be noted that Rosa Bello has never denied nor retracted her written statement or denied she told the truth. In fact, during her deposition she was specifically asked, *"When you testified back in March 26, 1992 in the case of the People versus Alfredo Gonzalez, did you tell the truth?"*[24] to which she replied *"yes, told the truth."*[25] Additionally, Ms. Bello was asked, *"Did Jose Maysonet speak English?"* to which she replied, *"yes he did."*[26]

While reviewing her deposition, it was apparent Ms. Bello had moved on with her life and relocated halfway across the country where she now lives with her husband and children. Her testimony seemed to indicate she is afraid of Mr. Maysonet and tried to avoid providing any information instead answering *"it's been too many years, I don't recall"*[27] and similar responses to simple questions. During her deposition Ms. Bello was asked why she ended her relationship with Jose Maysonet. Although hesitant to answer the question she stated, *"He was abusive. There you go."*[28] In fact, the physical abuse was so bad that she explained how she almost stabbed Mr. Maysonet, *"because he kicked me in the face while I was sleeping."*[29] The records also reveal that there were attempts made on Ms. Bello's life as a result of her involvement in this case including an attempt to run her over which led to the State's Attorney helping to relocate her.

During her deposition Ms. Bello alleged that at least one detective threatened to take her children away if she didn't cooperate with the investigation. It does not appear that she ever reported this alleged misconduct to any authorities back in 1990, despite her being in contact with the State's attorneys after the police investigation was concluded. Such a threat, if it happened, is unprofessional and inappropriate, but does not by itself indicate that the information she provided was not true. Ms. Bello later testified to the same information under oath, which she confirmed under oath at her deposition.

### Alfredo "Lluvia" Gonzalez Interview August 23, 1990

On August 23, 1990, Sergeant Mingey and Detective Gawrys canvassed the neighborhood around Kedzie Avenue to search for Alfredo Gonzalez, who had been pointed out by Mr. Maysonet during a canvass of the neighborhood. As a result, Sergeant Mingy and Detective Gawrys located Mr. Gonzalez on the street and transported him back to Area Five.

On August 23, 1990, at approximately 2300 hours an interview was conducted with Alfredo "Lluvia" Gonzalez at Area 5. The interview was conducted by Detective Guevara who gave Mr. Gonzalez a copy of Mr. Maysonet's signed statement to read. Upon reading that statement, Mr. Gonzalez informed the detectives that Mr. Maysonet was a liar and he wanted to

---

[24] Rosa Bello deposition, 10/15/2021, PG #13, Lines 15-17
[25] Rosa Bello deposition, 10/15/2021, PG #15, Line 7
[26] Rosa Bello deposition, 10/15/2021, PG #48, Lines 5-7
[27] Rosa Bello deposition, 10/15/2021, PG #11, Line 11
[28] Rosa Bello deposition, 10/15/2021, PG #28, Line 13
[29] Rosa Bello deposition, 10/15/2021, PG #29, Lines 12-13

Richard Rudolph                                                    Case of Maysonet v. Guevara

"*tell the true story.*"[30] Mr. Gonzalez was read his Miranda rights by Detective Guevara which he understood and agreed to speak with the detectives.

During his interrogation, Mr. Gonzalez made an incriminating statement, although self-serving, about the night of May 24, 1990. Mr. Gonzalez provided specific details as to his actions and actions of the other three perpetrators when they shot and killed the Wileys.

In substance, Mr. Gonzalez stated that he was also a member of the Latin Kings and on the night of May 24, 1990, at approximately 2300 hours, he was alone walking to his home when he recognized a midsized, 2DSD, blue in color, with a man named "Fro" inside of the vehicle. He motioned for the vehicle to stop in an attempt to get a ride to his home. The vehicle stopped and Mr. Gonzalez got in the car and asked for a ride home. Inside the vehicle were three men, Mr. Gonzalez gave a detailed description of those men who were also members of the Latin Kings. He said, Mr. Maysonet was driving and wearing a dark blue hoodie, "Fro" (the front passenger) had on a black hoodie, and his nephew "Tino" (seated in the backseat) was wearing a white hoodie. Mr. Maysonet drove the four men to a nearby alley parallel to North Avenue and parked. Mr. Gonzalez said it was at this point the other three men got out of the vehicle and put their hoods up. These actions lead him to believe they were going to do a *"roll"* and kill someone. He further stated that Mr. Maysonet was in possession of a 9mm pistol. The three men walked away and were soon out of the sight of Mr. Gonzalez. Next, he heard five to six gunshots and all three men got back into the vehicle and drove off, with Mr. Maysonet as the driver. Mr. Gonzalez, for the second time, observed Mr. Maysonet with the pistol. Mr. Gonzalez looked up as they drove away and he saw two men on the ground. Mr. Maysonet at that point drove Mr. Gonzalez home.

Mr. Gonzalez gave a court reported statement to ASA Borowitz providing the same story and would later testify to the same statement at his trial.

Mr. Gonzalez's statement corroborated the fact pattern of Mr. Maysonet's statement, specifically to the fact that all four perpetrators were in the blue car together and Mr. Maysonet was the driver who drove them to the crime scene. Mr. Gonzalez distanced himself by saying he remained in the vehicle while Mr. Maysonet and the other two perpetrators exited the vehicle and walked to the street where they shot and killed the Wileys. Despite the difference of who the shooter was, Mr. Gonzalez's statement corroborated Mr. Maysonet's statement about who was in the car and how the murders took place.

The interview of Mr. Gonzalez was proper and an accepted basic investigative step; to question co-perpetrators and listen to their version of events. More often than not, this basic investigative step will reveal similarities and differences in each perpetrator's statements. This will help in developing probative leads and may clarify what actually occurred. The results of the interview of Gonzalez contributed to the arrests of Mr. Maysonet and the other perpetrators who committed the Wiley homicides.

Over the course of my career, I have observed and read hundreds of statements given by perpetrators and witnesses. It is common for perpetrators, especially ones who have committed violent crimes, to distance themselves from their co-defendants with a self-serving statement. The belief is if they minimize their involvement in the crime committed, they would be less guilty or not guilty at all as what appears to be the case with Mr. Gonzalez, who put himself with the other three perpetrators at the crime scene but denied being the person who pulled the trigger.

Mr. Gonzalez stated during his deposition that he was also physically abused, and his confession was coerced by Detective Guevara. He did not provide any evidence or

---

[30] Gonzalez Statement, RD#- 234297, PG #RFC-91, 08/24/1990

Richard Rudolph                                                    Case of Maysonet v. Guevara

documentation to corroborate such allegations. At the conclusion of his interview with the ASA Mr. Gonzalez was specifically asked, *"have the police treated you fairly"* and has *"the state's attorney, treated you okay?"* which he replied *"yeah."*[31]

I am not aware of Mr. Gonzalez making any claims of abuse prior to trial or during his trial. Instead, he maintained his story throughout the trial that he was with his co-defendants during the killing of the Wileys but was never privy to any planning of the homicide.

## Justino "Tino" Cruz Interview August 24, 1990

As described above, Mr. Maysonet and Mr. Gonzalez both identified Justino "Tino" Cruz as a participant in the killing of the Wileys. Subsequently, On August 24, 1990, Investigators set out on the day shift or "Second Watch" to locate Mr. Cruz. At approximately 0500 hours, Detectives Smitka and Schak located Mr. Cruz and transported him back to Area Five.

On August 24, 1990, Justino "Tino" Cruz was interviewed at Area Five by Detectives Smitka and Schak regarding the homicide of the Wiley brothers. Mr. Cruz was read his Miranda rights and agreed to speak with the detectives.

Mr. Cruz gave a detailed statement to the detectives as to his actions on the night when he and his co-defendants set out and killed the Wileys on May 24, 1990. His statement also corroborated the fact pattern that Mr. Maysonet had laid out in his statement.

ASA John Perkaus responded to Area Five and conducted his own interview with Mr. Cruz. Mr. Cruz reiterated the statement he made to Detectives Smitka and Schak to ASA Perkaus. ASA Perkaus in turn prepared a handwritten statement as to what Mr. Cruz stated. Mr. Cruz reviewed that statement and signed it at approximately 1445 hours that day.

In substance, Mr. Cruz stated that on May 24, 1990, at approximately 2330 hours, he, Alfredo Gonzalez and Chris "Fro" Hernandez went to the home of Mr. Maysonet and picked up a *"9mm automatic machine pistol,"*[32] which Lluvia put into his belt. The four men then got into a car and drove away. Mr. Maysonet was the driver, Lluvia the front passenger, Fro sat behind him in the back seat next to Mr. Cruz, who was seated behind Mr. Maysonet. After a "short while" they parked in an alleyway and Mr. Cruz, Lluvia and Fro got out of the vehicle while Mr. Maysonet remained in the car. Mr. Cruz stated he acted as a "look out" for the police while Lluvia and Fro kept walking and approached the two victims (Kevin and Torrence Wiley). After a few minutes, Mr. Cruz heard 5 to 6 gunshots and Lluvia and Fro ran back to the vehicle. Lluvia still had the 9mm pistol in his hand when all three men got into the vehicle and drove away.

Mr. Cruz's statement was corroborated by the statements of Mr. Maysonet and Mr. Gonzalez. Although all three men have slightly different versions of events, the fact pattern remained the same. Mr. Cruz provided specific details, such as where they were seated in the car that would only be known to someone who was in the vehicle.

The interview of Mr. Cruz was conducted by Detectives Smitka and Schak and was not in the presence or the participation of Detective Guevara. Mr. Cruz's statement was taken by a different ASA yet had the same fact pattern as the statements given by Mr. Maysonet and Mr. Gonzalez.

In my professional opinion, this separation of the statement from other detectives working the case made Mr. Cruz's statement more corroborative. The interview was not only a

---

[31] Gonzalez Statement, 08/24/1990, page #CCSAO000736
[32] Cruz, RD# N-234297, PG #RFC-89, 08/24/1990

proper investigative step but a crucial one which corroborated the statements of both Mr. Maysonet and Mr. Gonzalez.

## Christopher "Fro" Gosens Hernandez November 24, 1990

Christopher "Fro" Gosens, aka Hernandez never made incriminating statements as to his actions in the killings of the Wiley brothers. Detectives Schalk and Bogucki conducted a follow-up interview with Christopher "Fro" Gosens on November 24, 1990, at Area 5. Mr. Gosens lied about knowing Mr. Maysonet, Lluvia and Tino and denied being with them that night. As a result of the interview and with no corroboration by a non-suspect of his presence at the murder scene, the assistant state's attorney did not approve charges so Christopher "Fro" Gosens was released.

## Co-Defendants Statements

Three of the four suspected perpetrators, Mr. Maysonet, Mr. Gonzalez, and Mr. Cruz all made statements as to their actions when they set out to shoot and kill the Wiley brothers. As stated, based on my professional experience, education, and formal training, these statements are consistent with statements made in self-interest believing if they did not pull the trigger, they could not be found guilty of murder. However, all three men had the same fact pattern in their statements. None of them disputed the fact the four of them drove to the crime scene in a blue car with Maysonet as the driver, parked in an alley north of North Avenue, the Wileys were shot and killed, and all four got back into the same car and drove away again with Mr. Maysonet as the driver.

During the course of a homicide investigation, it is very common for co-defendants to provide different versions of events. They may be self-serving statements (as appears in this homicide investigation) but more commonly people tend to observe, recall, and interpret events in a different way from each other. Often this is the case with multiple witnesses who observe a violent crime committed in their presence. Therefore, to suggest the contradictions in the statements made by Mr. Maysonet, Mr. Gonzalez, and Mr. Cruz would be detrimental to the homicide investigation would be misleading. In fact, it would be a cause for concern if all defendants had stated exactly the same details of the event.

### **Pending Trials**

While Mr. Maysonet, Lluvia and Tino were in jail awaiting trial, Mr. Maysonet's mother's apartment was fire bombed. On a separate occasion, Ms. Bello and Mr. Maysonet's son were almost run over by a car which she described as not an accident but an attempted assault. These events do not appear coincidental, but rather retaliation against Mr. Maysonet and Rosa Bello for speaking to the police. These post arrest events corroborate Mr. Maysonet's pre-arrest statement that he and his family were threatened by other Latin Kings.

As pre-trial proceedings continued, Tino ultimately agreed to a plea in exchange for his testimony against Lluvia and Gosens. Tino testified under oath at Lluvia's trial providing the same story he had told police.

As a result of Tino's agreement to cooperate and testify, Fro was arrested and charged with murder even though he was already incarcerated for a different homicide. Lluvia was

Richard Rudolph                                                    Case of Maysonet v. Guevara

convicted for the Wiley homicides with testimony from Rosa Bello and Tino. Mr. Maysonet and Gosens subsequently went to trial via jury and bench trial respectively. Mr. Maysonet was convicted and Mr. Gosens was acquitted.

### Maysonet Granted New Trial

In 2016, Mr. Maysonet was granted a new trial by the court. In essence, the court determined a conflict existed with Mr. Maysonet's defense attorney and not with the homicide investigation. The prosecutor subsequently declined to prosecute Mr. Maysonet a second time. This was due to the fact the detectives involved in the homicide investigation indicated that they would assert their Fifth Amendment rights at any retrial. Mr. Maysonet was released from prison and he petitioned for a certificate of innocence that was denied.

Subsequent to his release, Mr. Maysonet was arrested on two occasions, including being returned to the IDOC on a parole violation. The first arrest resulted when Mr. Maysonet physically abused his girlfriend and would not let her leave her apartment and forced her to have sex with him. She subsequently was granted an order of protection against Mr. Maysonet which he violated resulting in the second arrest. These actions by Mr. Maysonet support Ms. Bello's statements about her interactions with Mr. Maysonet in a romantic relationship.

## Fifth Amendment

An assertion of a person's Fifth Amendment rights is in no way an admission of guilt nor should it be viewed as such. The long, since retired, detectives in question informed prosecutors, through counsel, that they would exercise their Fifth Amendment rights if Mr. Maysonet was to be retried. That decision appears to have been made after consulting with their attorneys. If that were to be the circumstance, they followed the advice of their attorneys.

Mr. Tiderington implies that the Defendants committed misconduct that is supported by their assertion of their Fifth Amendment right. As a law enforcement professional, I find it deeply troubling that another law enforcement professional would take such a false and misleading position. Members of law enforcement are under no moral obligation to give up their rights and testify against the advice of their lawyers or union representatives and assertion of the right does not mean that the alleged conduct happened and to suggest otherwise is disingenuous.

Mr. Tiderington did not consider that his comments would equally apply to Mr. Maysonet who during his deposition would be *"invoking his Fifth Amendment rights"*[33] when questioned about his non-fatal shooting arrest. This was Mr. Maysonet's right and he was correct to follow the advice of his attorney.

It should be noted, with the exception of Detective Guevara and Detective Halvorsen, who is deceased, the remaining subjects submitted to questioning and did not assert their Fifth Amendment rights during this litigation. Indeed, Detective Halvorsen came off his assertion of his Fifth Amendment rights and also submitted to questioning, but died prior to being deposed in this case.

Over my thirty-year law enforcement career, I have had numerous occasions to conduct official department interviews with members of the service formally known as, "Interrogations of Members of the Service."[34] I conducted those interviews as a sergeant while assigned to

---

[33] Maysonet Deposition 04/16/2021 page 212, line 17
[34] NYPD Patrol Guide, "Interrogation of Members of the Service", Procedure #206-13, 08/01/2013

Richard Rudolph                                      Case of Maysonet v. Guevara

Internal Affairs and as the commanding officer of various detective squads. Protections in this
procedure are set forth to protect the members of the service as well as the department and
ensure a quality and fair interrogation is conducted. I can state as fact, that it is very common for
members of the service to invoke their Fifth Amendment rights when advised to by their
attorneys, outside official department investigations. For example, members of the service
involved in a firearm discharge incident will not make any statements to a district attorney until
certain protections are in place and/or the district attorney has refused to prosecute.

In summary, the retired detectives did not act improperly when they followed the advice
of their attorneys and exercised their rights as American citizens. To suggest otherwise would be
improper.

## Evaluation

The Detective Bureau is responsible for the prevention, detection, and investigation of
crime and to complement patrol services. Detectives are dedicated problem solvers who are
trained to follow leads in an investigation, find evidence to support identification of a suspect,
and present that evidence to the prosecutor for consideration of criminal charges.

Quality investigations require: "the performance of logical investigative techniques, in a
priority sequence or simultaneously, be conducted at an appropriate time and in a manner that
efficiently utilizes resources and optimizes the likelihood of obtaining probative information and
producing a positive result".[35]

### Latin Kings Element

As discussed in more detail in Mr. Bjes' expert report, the Latin King Street gang was a
violent gang in the Humboldt Park area of Chicago in 1990. As further explained by Mr. Bjes,
the Latin Kings gang was organized into sets or groups that would congregate or "hang out" at a
corner and would control territory from that corner out in multiple directions. As a detective
knowing which gangs controlled which areas was relevant and important investigative
knowledge. This could provide a direction for the investigation to proceed in a crime such as the
Wiley brothers homicides. In this case, the murder happened in the territory of the Latin Kings
from Wabonsia and Kimball, of which Mr. Maysonet was a member. This would allow
investigators to reasonably rely on Mr. Maysonet's initial statements indicating he had
knowledge of the murder.

### Mr. Maysonet's English Proficiency

On August 22, 1990 and August 23, 1990, while at Area 5, Mr. Maysonet was read his
Miranda rights several times in Spanish and English according to the Supplemental Reports, the
court-reported statement by Joseph Szybist, the ASA, and Mr. Maysonet's defense attorney
during his closing argument for the criminal trial for the homicide case.[36] These materials
indicate he understood his Miranda rights and he waived such rights. He then gave a detailed,
court-reported statement, to ASA Frank DiFranco as to his actions and the actions of his co-
defendants when they shot and killed the Wiley brothers. In his court-reported statement, Mr.

---

[35] NYPD Detective Guide, "Investigative Techniques", Procedure #502-01, 01/13/2021
[36] Mr. Richard Beuke Closing Argument 08/11/1995 page 46 lines 9-10

Richard Rudolph                                                    Case of Maysonet v. Guevara

Maysonet never mentioned that he did not understand his rights, nor did he state that he did not understand English. Although some of the earlier interviews were conducted in Spanish by Detective Montilla, it is common to interview people in their primary language because they will feel more comfortable speaking. The records also indicate that Mr. Maysonet spoke English that was confirmed by his long-time girlfriend as well as past interactions with the police.

Although not required, the use of Spanish speaking officers to conduct interviews of suspects and witnesses of persons who speak English but prefer to converse in Spanish is a common and proper police practice at least until the investigators can determine that the suspect can communicate adequately in English. With contemporary police investigations it is best practice to document a witness or suspect's ability to understand and speak English and if a translator was used while conducting an interview. This is predominantly to protect the investigators from a situation such as in this case, where Mr. Maysonet has denied an ability to speak English. Additionally, back in 1990, this best practice was not clear and investigators were only guided to document all relevant information.

Detective Paulnitsky's July 16, 1990, Supplemental Report regarding the July 3, 1990, non-fatal shootings of Oscar Molina, William Vale and Martin Valetin notes that he and Detective Bongiorno went to Mr. Maysonet's residence and informed him of the allegations of his involvement in the non-fatal shooting. The report properly noted, in line with recent best practices, that Mr. Maysonet *"spoke and was able to communicate in English without any problems."*[37]

However, the Supplemental Report also stated that during an interview following a lineup procedure, where witnesses identified Mr. Maysonet as the shooter, Mr. Maysonet told detectives in English that he could not communicate in English and needed a Spanish interpreter, so at that time detectives brought in a police officer to interpret English to Spanish for Mr. Maysonet Nevertheless, throughout the interview Mr. Maysonet spoke English.

This is not an uncommon situation, where a suspect will converse in English and as the investigation proceeds profess an inability to speak English to delay the investigation even where the suspect's use of English makes clear that he is able to communicate in that language.

Additionally, there is also a prior arrest of Mr. Maysonet in which the arresting officer attributes comments in English to Mr. Maysonet.

As an element of his case, Mr. Maysonet now claims that he did not understand English despite having spent over ten years in Chicago, graduating from junior high school and attending high school. Furthermore, Mr. Maysonet's sister, Rose, divulged and Mr. Maysonet confirmed that his girlfriend, Rosa Bello back in 1990, whom he lived with, spoke very little Spanish and communicated in broken Spanish.

In Rosa Bello's deposition, she stated that she lived with Mr. Maysonet for approximately six years before the Wiley homicides and was able to communicate with Mr. Maysonet in English. When ASA DiFranco took Mr. Maysonet's statement, Joseph Syzbist, a court reporter, was present to document the interview for the record and there was no mention that the interview was not conducted in English, which Syzbist testified to in his deposition would have been the case.

To the point, Mr. Maysonet had ample opportunities to inform the prosecutor that he did not understand English, his rights or report any mistreatment. But when asked on the record if he was treated fairly by the police and prosecutor, he answered in the affirmative.

---

[37] Maysonet 9606, PG #3, 07/16/1990

Richard Rudolph                                        Case of Maysonet v. Guevara

## Supervisors Conducting Interviews

Mr. Tiderington claims that it is "*highly unusual and inconsistent with acceptable investigative practices for Sergeant Mingey, the unit supervisor, to take the investigative lead by interviewing Maysonet on multiple occasions instead of assigning the task to one of the homicide detectives.*"[38] It is unclear where Mr. Tiderington draws this conclusion from as he does not cite any accepted practices such as any Chicago Police Department practices or practices developed by other police departments or police organizations that would support this contention.

Over my years as a detective squad commander and one who has supervised and managed tens of thousands of criminal investigations, I can state, without hesitation, that the debriefing of all detained suspects, especially violent gang members, has proven to be an important investigative tool to assist detectives in solving violent crimes.

For example, a few years ago as the Commanding Officer of the Queens Homicide Squad, my team and I were investigating a homicide similar to the Wileys case. In our case, the victim was approached by a masked gunman and shot multiple times causing his demise. The incident took place on a city street in the early hours of a February morning. There were no eyewitnesses but several ear witnesses. Approximately six months later, a man and three others were arrested when the vehicle they were riding in was stopped by a patrol unit. The police officers recovered a 9mm pistol and narcotics. After he was processed by patrol, the precinct Field Intelligence Officer (a sergeant) conducted a detained suspect debriefing in order to gather any information about any other crimes he may know about. This perpetrator told the sergeant that he had information regarding a homicide that happened a few months ago and knew who was involved but would not provide any details unless a "deal could be made" and he was released on his current gun and drug possession charges.

The Homicide Squad was notified, my team responded, and interviewed this perpetrator. He reiterated the story he told to the Field Intelligence Officer. The Homicide Detectives informed him they didn't have the authority to "make deals" with defendants and that could only be done with the district attorney and his attorney. As it turned out, not only did this perpetrator have crucial information about the homicide but he was the shooter and mastermind of this killing. If it were not for the Field Intelligence Officer conducting the initial debriefing of the perpetrator, the homicide investigation may have lasted for months or even years.

Mr. Tiderington may not have experienced working in busy metropolitan detective divisions where it is typical for detectives to be assigned anywhere from 150 to 250 cases per year depending on the neighborhood of assignment. As in the above example, it is not uncommon for a sergeant to debrief perpetrators about past crimes or crimes yet to be committed in order to allow detectives to focus on active investigations. Moreover, 1990 was a very busy time for the Chicago Police Department and even more so for the detectives given the large number of violent crimes and murders that were committed during that time, especially in the Humboldt Park community[39].

Working in a demanding detective division like Area 5 did not provide the luxury for sergeants to sit back while detectives did all the work. As a team concept, sergeants would routinely assist where they could. This would include the debriefing of detained suspects which

---

[38] Thomas J. Tiderington, Expert Report PG #15
[39] Yale University Institution for Social Policy Studies, *48 Years of Crime in Chicago: A Descriptive Analysis of Serious Crime Trends from 1965 to 2013,* PG #14 Figure 3. Average Homicide Rates in Chicago by Community Area (see 1990-1999)

would assist in gathering information and leads. Violent gang related crimes like the homicides of Torrence and Kevin Wiley are extremely difficult to solve because of the lack of witnesses and physical evidence that could link perpetrators to the crime. That made it all the more important to uncover corroborating gang members and/or co-defendants that could provide probative information.

Furthermore, to suggest that it would be "*highly unusual and inconsistent with acceptable investigative practices*"[40] for a supervisor (in this case Sergeant Mingey) to take a lead and personally conducted interviews with suspects is at minimum a misleading statement. For example, the New York City Police Department has Field Intelligence Officers (FIOs) assigned to all police precincts, transit districts, and police service areas which would amount to approximately one hundred (100) ranking uniformed members of the service.

All Field Intelligence Officers are of the rank of sergeant, their main objective is to collect and disseminate criminal intelligence information in order to support narcotics, firearms and other criminal investigations, ranging from simple short-term cases to complex long-term investigations.[41] A major part of the Field Intelligence Officers investigative responsibilities are the debriefing of detained suspects, especially violent street gang members arrested for gun possession. The purpose of detained suspect debriefings is to develop leads about other violent crimes.

In my professional opinion, this is exactly what Sergeant Mingey did when he conducted both his initial and follow-up interviews with Mr. Maysonet. His actions were not only highly appropriate but excellent investigative work which assisted the detective division to develop leads and were entirely consistent with modern investigative techniques.

## Ballistics

Mr. Tiderington also argues that the detectives should have "*promptly sought comparative analysis between that firearms evidence and the firearms evidence from the July 3, 1990 for which Maysonet was arrested*"[42] before they interviewed Mr. Maysonet because "*no forensic connection could be made between the two crimes as Mingey theorized.*"[43]

While Mr. Tiderington may believe that waiting for a busy crime lab to do ballistics comparisons is the better way to proceed, it would be troublesome if Sergeant Mingey did not debrief Mr. Maysonet, a known gang member, who was arrested for a non-fatal shooting, especially given the same caliber weapon used and proximity of the crimes.

The Firearms Analysis Unit of the Chicago Police Department later determined the 9mm shell casings did not match the non-fatal shooting for which Mr. Maysonet was arrested. But this, in no way, diminished the basic investigative step taken by Sergeant Mingey.

First of all, Sergeant Mingey's investigative step was proper because he performed a logical investigative technique and efficiently optimized the prospect of obtaining probative information from Mr. Maysonet which did produce a positive result. The debriefing of Mr. Maysonet provided the first leads for the homicide investigation of the Wileys. Sergeant Mingey had drawn a reasonable connection from a separate crime and, in his experience, a debriefing could be probative. The homicide investigation that had no eyewitnesses, very little physical

---

[40] Expert Report of Thomas J. Tiderington, PG #15
[41] Intelligence - NYPD (nyc.gov)
[42] Expert Report of Thomas J. Tiderington, PG #14
[43] Expert Report of Thomas J. Tiderington, PG #14

Richard Rudolph                                                    Case of Maysonet v. Guevara

evidence and could have possibly gone on for months, years or possibly never solved if not for the basic and proper investigative step taken by Sergeant Mingey.

In my experience, it is vital for investigators to take purposeful investigative steps to develop leads to solve violent crimes as was the case with Sergeant Mingey. Mr. Tiderington's suggestion that Sergeant Mingey should have waited until comparable ballistics testing was completed before interviewing Mr. Maysonet is a classic example of a hindsight bias and is not supported by any accepted police practices.

Second, it would have been sensible for Sergeant Mingey to conduct an interview with Mr. Maysonet regardless of the 9mm connection because Mr. Maysonet was an admitted Latin King gang member whose "territory" included the homicide crime scene of the Wiley brothers. During Mr. Maysonet's deposition he explained how he and his fellow Latin Kings controlled the territory of the Wiley homicides scene, which was also near 4028 W. Wabansia, where the non-fatal shooting occurred and for which Mr. Maysonet was arrested. These two locations are in close proximity to each other and about which Mr. Maysonet would likely be very familiar.

In my professional experience, gang members are cognizant of what would occur in and around their territory, specifically violent crimes. Mr. Maysonet admitted this during his deposition. Therefore, this would be another reason to debrief Mr. Maysonet to determine if had any probative information regarding violent crimes committed within his territory.

Finally, although a proper and prudent investigative step by Sergeant Mingey to determine if Mr. Maysonet had any beneficial information, it is not surprising that the ballistic evidence did not match. It has been my experience that gang members will use different firearms to commit shootings and/or homicides. Those weapons are often considered "hot" or "have a body attached to it" and a gang member would not want to be arrested while in possession of said weapon. Those guns are commonly discarded in such places as sewers, garbage dumpsters, or waterways. Sometimes, the guns are passed off or sold to other affiliated gang members which can become what is often referred to by law enforcement as a "community gun." Meaning those guns will have "brass catcher hits" throughout different parts of the city with no obvious connections to any of the crimes.

I could not locate a Chicago Police Department 1990 procedure to expedite ballistic comparison or if a policy even existed. Back in 1990, most examinations conducted by the laboratory technicians were labor intensive and time consuming. Evidence such as latent prints and ballistic evidence was done under a magnifying glass or a microscope by the technicians without the benefit of today's computers or databases. These examinations were often extremely time consuming. Coupled with the case load, any results of the examinations could take some time.

Therefore, to suggest that Sergeant Mingey failed to *"promptly arrange for comparative analysis of the firearms evidence was inconsistent with accepted investigative practices"*[44] is pure speculation and a misleading statement.

Tunnel Vision

The homicide investigation of the Wileys began on the night of May 24, 1990. Almost two months later, on July 15, 1990, Mr. Maysonet was arrested for a non-fatal shooting. During his debriefing, Mr. Maysonet told Sergeant Mingy that he had specific information about the

---

[44] Thomas J. Tiderington, Expert Report, PG #24, 01/12/2023

Richard Rudolph                                            Case of Maysonet v. Guevara

homicides of the Wileys. Mr. Maysonet had now injected himself into the Wileys homicide investigation, which at a minimum, he made himself a witness. On August 1, 1990, a follow-up interview was conducted by Sergeant Mingey at the Cook County Jail. In that interview, Mr. Maysonet provided further details about the Wileys homicides which he now made himself a suspect in the investigation. The detectives followed up on this lead and uncovered evidence against Mr. Maysonet and the other three perpetrators. Probable cause was developed by the detectives and the case was presented to the ASA. ASA DiFranco, in turn, presented the facts of the case and the investigative steps taken by the detectives to his supervisor. As a result, the State's Attorney agreed to proceed with prosecution and Mr. Maysonet was arrested and charged with the Wileys' homicides on August 23, 1990.

Mr. Maysonet had become a suspect in the homicide investigation based on the performance of logical investigative techniques conducted by the detectives that developed probative information which led to the arrests of Mr. Maysonet and his co-defendants.

As I noted it would be beneficial if the case file contained better-quality documentation in the Supplemental Reports and the GPRs particular to the investigative steps taken throughout the course of the homicide investigation. However, this investigation was conducted over thirty years ago prior to a push for more thorough documentation. To suggest *"Tunnel vision is apparent"*[45] in this investigation and to be stated as fact, would be considered a misleading statement. Based on the reports I reviewed, I was unable to find any evidence of "tunnel vision".

During the course of any homicide investigation, it is typical for the detectives to consider various suspects. One mission of the homicide detective is to follow-up on leads until sufficient evidence is found to support seeking charges. The facts of the investigation will tend to change over time as new information is developed. This would include suspects in the investigation. As was the case in the homicide investigation of the Wileys.

## Physical Evidence

Over the course of my career, as a Commanding Officer of Precinct Detective Squads and the Homicide Squad, I have supervised and managed over five hundred homicide investigations. In every homicide investigation it would be favorable to recover every piece of evidence, including the weapons used. Unfortunately, that is not reality. In fact, it has been my experience that the majority of homicide investigations fail to recover the murder weapon or other evidence such as a vehicle used by the perpetrators.

In his court-reported statement on August 23, 1990, at approximately 0928 hours, Mr. Maysonet stated that on the night of May 24, 1990, he drove an *"older model, light blue over dark blue, Pontiac Bov."*[46] with his co-defendants, "Lluvia", "Fro" and Tino." He further stated the vehicle belonged to another Latin King named "Jeffery." Mr. Maysonet provided specific details as to the route he drove to get to the crime scene when he *"saw Alfredo Gonzalez"-"shoot and kill the victims."*[47] After the homicides, Mr. Maysonet drove himself and his co-defendants back to his home. Mr. Maysonet exited the vehicle and Alfredo "Lluvia" got into the driver seat and drove off with the other two perpetrators.

It would be a logical investigative step to identify the legal name of "Jeffery" and determine if he had any vehicles registered to him or his address and attempt to locate the vehicle

---

[45] Thomas J. Tiderington, Expert Report, PG #21, 01/12/2023
[46] Maysonet Statement, RD #N-234297, PG #RFC-84, 08/23/1990
[47] Maysonet Statement, RD #N-234297, PG #RFC-85, 08/23/1990

Richard Rudolph                                              Case of Maysonet v. Guevara

itself, if possible. Again, it would be beneficial if there was better documentation on the GPRs and a more detailed account on the Supplemental Report about the investigative efforts to locate "Jeffery" as well as the vehicle. However, the facts concerning this vehicle are as follows based on the materials provided to me:

- Mr. Maysonet stated he drove an *"older model, light blue over dark blue, Pontiac Bov."*[48] on the night of May 24, 1990. Mr. Maysonet stated that as fact on August 23, 1990, in his statement to the detectives. This was the first time the investigators were made aware of said vehicle being used in connection with the homicides of the Wileys approximately ninety (90) days after the Wileys were killed.

- Mr. Maysonet did not provide any discerning details such as a partial plate number, dents, rust, missing hubcaps, or anything else to distinguish that Pontiac from possibly hundreds or thousands of similar vehicles located in the City of Chicago in 1990.

- The description of the vehicle Mr. Maysonet provided was ambiguous, *"older model, light blue over dark blue, Pontiac Bov."*

Therefore, should a vehicle, based solely on that description of the Pontiac, be located, it would be improper and illegal for the police to have *"immediately stopped and a warrant should be obtained to search and impound the vehicle."*[49]

Established on this fact pattern, this would not be a generally accepted police practice nor a logical investigative approach to obtain evidence especially in a homicide investigation. It would be extremely difficult to show probable cause, present the facts to a judge and obtain a search warrant based on such a vague description of the vehicle. In fact, if police officers did locate a blue Pontiac based on this vague description, conducted a car stop and recovered any evidence either in the driver's possession or in plain view, such evidence could be suppressed by the court.

Using the same fact pattern, if police officers would have located a blue Pontiac that was parked and unoccupied there would be no legal authority to impound that vehicle. It would be extremely difficult to obtain a search warrant. Also, if the officers entered that vehicle and conducted an inventory search and did recover probative evidence in connection with the homicide investigation, such evidence could be suppressed.

As I stated above, it is not uncommon for vehicles used in connection with homicide investigations to never be recovered or identified. Therefore, it would not be *"highly unusual and inconsistent with investigative protocols and practices"*[50] for said vehicles not to be processed by crime scene technicians. To suggest so would be disingenuous.

However, for the concept of evidence recovery, if the Pontiac that Mr. Maysonet vaguely described was recovered and unoccupied and the investigators were able to develop probable cause and obtain a search warrant, the probability of any probative evidence would be minimal.

First, the Pontiac would presumably have been driven around the city for at least ninety (90) days and more likely by a Latin King known as "Jeffery." It would also be likely "Jeffery" traveled in the Pontiac with his fellow Latin King gang members or other persons. Therefore, it

---

[48] Maysonet Statement, RD #N-234297, PG #RFC-84, 08/23/1990
[49] Thomas J. Tiderington, Expert Report, PG #5, 01/12/2023
[50] Thomas J. Tiderington, Expert Report, PG #23, 01/12/2023

Richard Rudolph                                                    Case of Maysonet v. Guevara

would be my professional opinion that it would be problematic for "Jeffery" and the other gang members to drive around in a vehicle for at least ninety (90) days that had a pistol inside of it which was used in a double homicide. As stated earlier, it has been my experience those firearms are usually discarded or circulated among other perpetrators.

Second, the recovery of fingerprints could be probable and not unexpected due to the fact that three of the four perpetrators admitted to being in the vehicle on the night of the homicides. What would be unexpected is useable fingerprints from Mr. Maysonet and his co-defendants to be recovered from at least ninety (90) days in the past unless Mr. Maysonet and his co-defendants were in the vehicle weeks after the Wileys were killed.

Third, the recovery of *"clothing and other powerful tangible evidence of guilt"*[51] is again, in my opinion, a problematic statement. This would suggest that the investigators could have recovered clothing worn by the perpetrators when they killed the Wileys. First, whether clothing of the shooters was left in the car is pure speculation. But even if some clothes were discovered in the car ninety days after the murders, the clothing would have still need to be identified during court proceedings as the items worn by the perpetrators specifically the night the Wileys were killed. One could suggest the investigators could have recovered forensic evidence from the clothing that may have linked the perpetrator who shot the Wileys. This would assume there would be "blow back" from one of the bodies and trace DNA evidence such as blood and hair fibers could have been recovered from the clothing of the shooter. The problem with this, is that back in 1990, DNA evidence was at best in its infancy stages and not widely used in court proceedings and forensic recovery of evidence back some thirty years ago did not have the ability to discern microscopic evidence like we do today. If blood was found, the investigators may have been able to compare blood types from the clothing to the Wileys, which again could be difficult being that the clothes would have been in a car for at least ninety (90) days.

Someone may suggest if the perpetrators clothing was recovered, it could be sent to the crime lab to be tested for gunshot residue. Having supervised and managed thousands of criminal investigations, I can say without hesitation that gunshot residue is difficult to recover and it has an extremely short "shelf life." Typically, the person or items need to be tested within a few hours and, as in this case, the vehicle only became known to the investigators some ninety (90) days after the homicides.

It would have been optimum for the investigators to recover the Pontiac as with any evidence connected to a homicide investigation. As stated, under the best practices, better documentation on the Supplemental Reports about the investigative steps taken to identify the vehicle and its owner would be preferred. Nevertheless, the investigators acted properly and within generally accepted police practices.

## Assessment of Investigation

During his deposition, Mr. Maysonet made several allegations about serious police misconduct and corruption predominantly concerning Detective Guevara. These allegations included, but are not limited to, physical and mental abuse, bribery, extortion, protection racket, and a coerced confession.

As part of my review of this homicide investigation, I did not uncover any objective documentation to support any of the allegations made by Mr. Maysonet such as: photographs of

---

[51] Thomas J. Tiderington, Expert Report, PG #23, 01/12/2023

Richard Rudolph                                                      Case of Maysonet v. Guevara

injuries, "medical treatment of prisoner forms", Internal Affairs case numbers, Federal Bureau of Investigation case numbers nor Federal or State Attorneys case numbers. I further was not provided any medical records to corroborate the allegations of physical abuse.

Nevertheless, based on the information supplied to me and the seriousness of the allegations made by Mr. Maysonet, I have reviewed the facts of the homicide investigation and addressed the accusations.

From the onset, Mr. Maysonet offered information about the Wileys homicides and indicated his willingness to cooperate with the investigation. In fact, he provided detailed information about the homicides that only someone who was involved would know. His initial statements were made without Detective Guevara being present and there were no allegations of physical abuse during the questioning by Sergeant Mingey nor Detective Montilla. Although Mr. Maysonet's statements to the investigators were self-serving at times, his initial descriptions of events would end up being consistent with his final confession.

For instance, the interview with Mr. Maysonet that took place on July 15, 1990, by Sergeant Mingey and Detective Montilla, after Mr. Maysonet was arrested for triple non-fatal shooting and was being processed at Area Five. This was a detained suspect debriefing interview and not an interrogation regarding his non-fatal shooting arrest. However, Mr. Maysonet was read his Miranda rights by Detective Montilla and he agreed to speak with the investigators.

During the interview Mr. Maysonet said he knew about the homicide of the Wiley brothers and did provide information to the investigators. Mr. Maysonet provided initial facts about providing a firearm to three Latin Kings that night, but refused to provide the names of these Latin Kings. Mr. Maysonet seemed to be doing what many detained suspects do that are caught on a case, try to trade information for consideration on their coming charges. Mr. Maysonet choose to inject himself into the homicide investigation as a witness and possibly a perpetrator.

Detective Guevara was not present during this initial interview. Furthermore, Mr. Maysonet did not make any allegations that Sergeant Mingey or Detective Montilla abused him or coerced this information from him.

The second interview with Mr. Maysonet occurred on August 1, 1990. Sergeant Mingey and Detective Montilla went to the Cook County Jail and conducted a follow-up interview with Mr. Maysonet where he was being held for his non-fatal shooting arrest. Mr. Maysonet was given an attorney wavier and agreed to speak to the investigators.

In substance, Mr. Maysonet stated he knew the names of the perpetrators that killed the Wiley brothers but refused to provide any names of the perpetrators until a deal was in place and he was released from jail. In spite of that, Mr. Maysonet provided new information regarding the homicide. He put himself at the crime scene when the Wileys were killed. Mr. Maysonet informed Sergeant Mingey and Detective Montilla that he was present during the homicide but he was not the shooter. He refused to provide any further information. Mr. Maysonet had now implanted himself into the homicide investigation. He now potentially made himself more than just a witness, he made himself a potential accomplice or suspect in the homicide investigation. This additional information would also be consistent with his final statement to the ASA.

Again, Detective Guevara was not present during this interview and Mr. Maysonet did not make any allegations that Sergeant Mingey or Detective Montilla abused him or coerced information from him during this interview.

The third interview with Mr. Maysonet was conducted on August 22, 1990 after Detective Paulnitsky had Maysonet brought to Area Five for additional questioning. Mr.

Richard Rudolph                                                          Case of Maysonet v. Guevara

Maysonet was read his Miranda rights by Detective Montilla and agreed to speak with the investigators. However, Mr. Maysonet stated his life and the lives of his family were threatened by Latin King gang members if he were to cooperate with the police. While at the time the threat was uncorroborated, the subsequent events of a firebombing of Maysonet's mother's house and attempt to runover Ms. Bello provides corroboration for Mr. Maysonet's fear.

At approximately 2000 hours, Mr. Maysonet was interviewed by Detective Guevara for the first time regarding the homicide investigation. Mr. Maysonet is again given his Miranda rights and agreed to speak with the investigators.

In substance, Mr. Maysonet added to his original statements during his first two interviews. Mr. Maysonet told Detective Guevara that in addition to securing the weapon in his home and giving the pistol to his co-defendants, he was the operator of the vehicle and drove himself and the other three perpetrators to the crime scene. There, his three co-defendants got out of the vehicle, killed the Wileys and returned to the vehicle. Mr. Maysonet then drove himself and his co-defendants back to his home and he went inside. The other three perpetrators drove off in the same vehicle.

## Allegations of Excessive Force

Mr. Maysonet and Mr. Gonzalez allege their confessions were coerced and they were continually beaten by Detective Guevara. Other than Mr. Cruz's testimony, there is no evidence that Cruz was interviewed by Detective Guevara and the Supplement Reports indicate it was two other detectives who had not been involved in the Wiley brothers homicide investigation.

Mr. Maysonet alleged Detective Guevara coerced his confession through physical and mental abuse. Mr. Maysonet testified during his deposition that he told Detective Guevara he did not know anything about the homicides. This caused both him and Detective Guevara to be, *"mad and stuff"*[52] to the point he offered Detective Guevara a bribe, *"I tried to offer him money and stuff"*[53]. Detective Guevara did not accept the bribe from Mr. Maysonet. Instead, according to Maysonet he left the room and returned with a flashlight and a yellow book which he used to physically abuse Mr. Maysonet.

Mr. Maysonet stated he was beaten by Detective Guevara from the onset of his interrogation. Mr. Maysonet stated he was beaten *"all day and all night"*[54] and was refused the right to use the bathroom. This caused him to urinate and defecate on himself. According to his allegation and timeline, Mr. Maysonet was beaten on and off by Detective Guevara from approximately 2000 hours on August 22, 1990, until 0928 hours on August 23, 1990, a total of thirteen (13) hours. In reviewing the documents, there is no concurrent documentation to corroborate the extent of the alleged continual abuse over hours. At the conclusion of his court-reported statement, a polaroid photograph of Mr. Maysonet was taken, dated August 23, 1990, at 1045 hours and signed by Mr. Maysonet, Court Reporter Joseph Szybist, ASA Frank DiFranco and Detective Montilla. The photo does not corroborate Mr. Maysonet's claim of severe abuse over multiple hours that caused him to urinate and defecate on himself.

---

[52] Maysonet Deposition 04/16/2021, PG #279, line 1
[53] Maysonet Deposition 04/16/2021, PG #279, lines 2,3
[54] Maysonet Deposition 04/16/2021, PG #308, line 1

Richard Rudolph              Case of Maysonet v. Guevara

Similarly, it was alleged by Mr. Gonzalez that he was also beaten by Detective Guevara the next day and forced to confess. During his deposition, Mr. Gonzalez alleged Detective Guevara physically abused him before and during his interrogation. Mr. Gonzalez claimed that Detective Guevara would beat him every time he entered the room. This would mean Detective Guevara beat Mr. Gonzalez from approximately 2300 hours on August 23, 1990, until approximately 0200 hours on August 24, 1990, for a total of four (4) hours. Yet the photograph that was taken of Mr. Gonzalez and signed by him on August 24, 1990, at approximately 0305 hours, did not show any obvious signs of physical injuries.




All three men had ample opportunities to report any misconduct or abuse to authorities other than the Chicago Police Department.

First, Mr. Maysonet, Mr. Gonzalez, and Mr. Cruz were interviewed by ASAs without the detectives being present. They could have reported any misconduct or abuse or could have referenced it during their statements which would have been memorialized by the court reporter.

Second, at some point after the three men met with their respective attorneys, they did not report any abuse. The attorneys unquestionably would have reported such allegations of abuse to the State's Attorney, the court and possibly the Chicago Police Department or the Federal Bureau of Investigation.

Third, the attorneys would have demanded medical attention for their clients, for at a minimum, to document any internal or external injuries. This documentation would have created a permanent record and given veracity to the allegations made by Mr. Maysonet and Mr. Gonzalez.

Finally, if the allegations of physical abuse were fact and caused such fear in Mr. Maysonet and Mr. Gonzalez to a point they were terrified to report to anyone the abuse they suffered; certainly, someone along the custody lines would have documented "injuries to a

Richard Rudolph                                      Case of Maysonet v. Guevara

prisoner" even if the prisoners denied any injuries. Such as the transporting officers, intake officers at Cook County Jail or anyone who would have taken custody and responsibility for Mr. Maysonet and Mr. Gonzalez would have documented any injuries to the prisoners at a minimum to protect themselves from any allegations of misconduct and abuse.

There are no court records, prison records, or any independent corroborating documentation for the injuries allegedly suffered by Mr. Maysonet and Mr. Gonzalez because of their allegedly being abused while in custody at Area Five.

## Sergeant Mingey

The investigative steps taken by Sergeant Mingey led to the successful closure of the Wiley homicide investigation. His initial interview with Mr. Maysonet developed probative information that was the foundation of the investigative steps taken and resulted in the arrests of Mr. Maysonet and his co-defendants. A review of the case documents revealed that Sergeant Mingey not only acted properly when he conducted basic investigative steps but it was also good police work.

## Detective Paulnitsky

Detective Paulnitsky played an important role in this homicide investigation. A review of the records indicates he had understood the community he served. He was familiar with the gangs that operated within Area 5 and knew some gang members by their legal name. As evident when he documented that he knew "King Leo" to be Jose Maysonet. This led to the arrest of Mr. Maysonet for the non-fatal shootings which, in turn, led to the first interview with Sergeant Mingey. Having Maysonet brought in for additional interrogation was also appropriate based on the information Maysonet had previously provided of having knowledge of the Wiley homicides. The allegations of abuse and misconduct made against Detective Paulnitsky have been discussed previously in this document.

## Sergeant Lee Epplen

Sergeant Lee Epplen has been named as one of the defendants in this case. In 1990, he was assigned to Area 5 and supervised criminal investigations as well as the detectives who conducted the investigation. During the course of the homicide investigation of the Wiley brothers, Sergeant Epplen had little, if any, personal contact with Mr. Maysonet. In fact, it appears his only connection with the homicide investigation was to review and approve documents submitted by the detectives. As per this case, Sergeant Epplen was not named as a subject of any allegations of serious misconduct or corruption. From a review of the materials, the only involvement of Sergeant Epplen seemed to be his signature on the Supplement Report. However, as he explained in his deposition, his duties as a sergeant were to ensure that the police reports provided the course of the investigation, which as noted above, the report did. He is not responsible to independently confirm every fact in a police report and can rely on his detectives to provide fact-based reports.

As a detective bureau supervisor, especially as a detective squad sergeant, I had similar duties and responsibilities as Sergeant Epplen. For example, upon reporting for my tour of duty I would review the cases assigned to the detective squad by the patrol services bureau. I would

Richard Rudolph                                           Case of Maysonet v. Guevara

then assign those cases to the detectives. In some instances, I would assign certain major cases to detectives that had the experience and skill set that would be optimal for that specific case. For instance, a robbery investigation that was narcotics related. I may assign the case to a detective who was previously assigned to the Narcotics Division.

Other duties and responsibilities I had as a detective squad sergeant was to review cases. This included approving or disapproving official department forms submitted by the detectives the same as Sergeant Epplen. Like Sergeant Epplen, I was not responsible to independently corroborate the actions and findings of detectives, but instead to ensure that the investigative steps had been documented in the reports.

Sergeant Epplen played no role in the Wiley brothers homicide investigation other than as a supervisor of the defendant detectives.

## Detective Ernest Halvorsen

Detective Ernest Halverson has also been named as a defendant in this case. In 1990, he was assigned to Area 5, a command he was assigned to for twenty-eight years. As to his part in the homicide investigation of the Wiley brothers, the only evidence I have reviewed is that Detective Halvorsen was the writer of the majority of the case file. It appears he therefore had minimum, if any, contact with Mr. Maysonet, and there is no evidence I reviewed that showed he was involved in any improper interrogation with Mr. Maysonet, or that he was involved in any questioning of Mr. Maysonet at all. From my review of the record, it does not appear that Detective Halvorsen's role was any more than the author for the investigation report. In that role and because he was not doing the investigation, he would have to rely on other detectives to provide him the information and details learned. Similar to Sergeant Epplen, it appears that Detective Halvorsen at worst is responsible for relying on detectives to do their jobs appropriately.

## Detective Fernando Montilla

Detective Montilla's contributions to the homicide investigation are detailed above. Upon review of the case files and related documents, it is apparent that Detective Montilla served mostly as an interpreter. A review of the case documents, Detective Montilla was asked by his supervisor to act as a translator during some of the interviews conducted with Mr. Maysonet and he complied. This would be expected from a professional investigator. Even though Detective Montilla was present during some of the interviews, he did not conduct those interviews. There are no allegations of excessive force or coercive interrogation made against Detective Montilla.

### Conclusion

The homicide investigation of the Wileys was conducted with acceptable police standards in place during 1990. The investigation developed an initial lead and the investigators followed up on that lead. They pursued evidentiary leads appropriately and were able to validate the statements made by suspects. Their investigative steps succeeded in developing probative information which led to the arrest, prosecution and conviction of Mr. Maysonet and his co-defendants Alfredo Gonzalez and Justino Cruz.

Richard Rudolph                                        Case of Maysonet v. Guevara

    Throughout the investigation there were checks and balances between the Chicago Police Department the State Attorney's Office and the court system which ensured the correct persons were arrested and prosecuted for killing the Wiley brothers.

    As previously discussed, there could have been better documentation in the case files that I was provided. However, the case files contained sufficient documentation to follow the progress and the process of the detectives' investigation.

    After an extensive and thorough review of the material provided to me and based on my years professional training, knowledge and experience, I can conclude that investigators conducted a proper and thorough homicide investigation and followed the evidence where it led.

Richard Rudolph

Richard Rudolph                                                              Case of Maysonet v. Guevara

## ADDENDUM A - CV

# RICHARD RUDOLPH

## Executive-level Commanding Officer
*Characterized as a problem solver with deep expertise in*
*law enforcement strategy, investigations, and leadership.*

| **Police Solutions & Action Plans** | **Crisis Management** | **Analysis & Response** |
|---|---|---|
| Enter situations with focus on answering the open questions and seeing things from the criminal's perspective. Known for getting in front of issues proactively, especially with internal topics, leveraging ability to strategize turnaround initiatives. | Adjust and adapt to crisis situations easily and strategize long-range resolutions successfully. History of tackling severe circumstances calmly and with precision that leads to good arrests and safety for community and officers. | Stay in constant touch with the crime statistics affecting community. Identify patterns swiftly and develop crime fighting tactics to end crime sprees – and coordinate ideas with patrol officers and outside commands. |

**Advanced Education & Training:** FBI National Academy ▪ Leadership, Training, Development, & Homeland Security **Key Skills:** Leadership ▪ Crisis Management ▪ Conflict Resolution ▪ Union Relationships ▪ Investigation Management ▪ Internal Investigations ▪ COMPSTAT & Trend / Pattern Analysis ▪ Agency Relations (FBI, DEA, Federal Enforcement) ▪ Community Relations ▪ Budget Management

## CAREER HISTORY

**NEW YORK CITY POLICE DEPARTMENT,** 30+ years
**COMMANDING OFFICER, HOMICIDE/DETECTIVE SQUAD** (2006–2020)

Promoted to Lieutenant Commander by the Police Commissioner in 2015. Retained in bureau upon promotion to Lieutenant in 2007. Expert in leading teams to investigate and apprehend criminals involved in the 7 major crimes: Murder, Rape, Robbery, Felony Assault, Burglary, Grand Larceny, and Grand Larceny Auto. Specialist in homicide investigations, teaching / instructing new officers, and directing teams. Commanded several detective squads within communities of 220,000 residents from vast array of races and religions. Commended for building and maintaining strong presence in precincts with community, officers and executive leadership.

### KEY AREAS OF IMPACT

- **Quantifiable Results:** Led and worked with more than 85K investigations since 2002. As squad commander, continually captured an above average clearance rate on 7 major crimes and contributed to an overall decrease in crime within precincts; as the homicide commander, lead the squad to an exceptional clearance rate of homicides- at or above the citywide average; since 2002, supervised and managed over 500 homicide investigations.

- **Turnarounds & Team Building:** Known for capturing true performance turnarounds from historically problem officers by creating an environment that clearly – and strictly – communicates performance requirements while providing leadership and coaching to help make the transition happen.

- **Community & Media Relations:** Handle high-profile situations professionally – giving the media what they need to report fairly on events and crimes without compromising integrity of investigations. Provide community leaders and residents concrete, non-confidential information to foster involvement and transparency. Work effectively with residents from widely-varying backgrounds – easily forming relationships with people from all ethnic, financial, religious, and specialty-group backgrounds.

A1

Richard Rudolph                                                    Case of Maysonet v. Guevara

- **Site Assessments:** Worked with business owners and facility managers to identify safety and security issues in commercial buildings, supermarkets, banks, and apartment buildings. Helped site managers devise better ways to secure doorways, add lighting, and work with electronic access systems.
- **Budget Management & Funding Requests:** Manage operational overtime budget as directed, managing schedules and making adjustment when necessary. Prepare and submit grant-like requests for equipment and staffing resources.
- **Resources & Networking:** Connect easily with subject matter experts from inside and outside law enforcement around the world; able to leverage relationships through FBI National Academy, ties with other agencies due to special projects within the NYPD, and through extensive networking in professional associations.
- **Training:** Approach daily work as ongoing training ground – involve officers in strategic decisions while sharing best practices to employ training techniques that make crime scenes double as learning situations.
- **Internal Affairs:** Balance hard-core investigation techniques with respect for members of force under probe. Often brought in as "clean team" to inject fresh perspective and energy in cases involving numerous high-ranking officers.  Investigated high-profile cases, civilian shootings, and racially-sensitive cases.
- **COMPSTAT:** Breakdown analysis, trends, and direction of investigations and crimes within precincts; work in conjunction with captain to present information to executive leadership and community leaders.
- **Consulting & Presentations:** Speak 4 times annually at the FBI National Academy orientation day to new enrollees in program; served on Georgia's Dekalb County Police Department promotional assessment board. Lectured at Association of Prosecuting Attorneys National Convention on the subject of child homicide. Lectured at the FBI National Academy West Virginia's Chapter annual convention.

### HANDS-ON CRIME SCENE & INVESTIGATIONS EXPERIENCE

- **Investigations:** Supervised, coordinated, and managed 4,000+ criminal and non-criminal investigations annually. Worked on all types of cases from larceny to missing persons in the midst of September 11th terrorist attacks, to easily achieved collaboration with several agencies, to "controlled urgency" action plans during high-profile shooting and homicide cases, led investigation of child abandonment case involving fraud.
- **Crime Scenes & Prevention:** Lead the Homicide Squad through the investigation of the murders of a New York City Police Officer and a Detective (separate incidents), as well as many other "high profile-media cases"- such as  Hip Hop artist Lionel "Chinx" Pickens and the "Howard Beach Jogger" Karina Vetrano and was commended by department executives and the Police Commissioner for steadfast leadership; Lead teams conducting full range of interviews, investigations, and apprehensions as New York's first line of defense in terrorism.

### PROFESSIONAL TRAJECTORY

**Continuing Education Instructor, Southern Police Institute, University of Louisville** (2022- present)

**Homicide Squad, Commanding Officer, Lieutenant Commander** (2014 – 2020)

**Detective Squad, Commanding Officer, Lieutenant (retained within Detective Bureau)** (2007 – 2014)

**Detective Squad, Commanding Officer, Sergeant** (2006 – 2007)

**Executive Officer Detective Squad, Sergeant** (2002 – 2006)

**Internal Affairs Bureau, Sergeant** (2000 – 2002) ▪ **113th Precinct, Patrol Supervisor, Sergeant** (1999 – 2002)

**Northern Manhattan Initiative, Organized Crime Control Bureau, Narcotics Investigator** (1997 – 1999)

A2

Richard Rudolph                                                Case of Maysonet v. Guevara

**Special Operations Div., Street Crime Unit, Officer** (1996 – 1997) ▪ **Patrol / Anti-crime, Officer** (1991 – 1996)

## EDUCATION, SPECIALTY TRAINING, PROFESSIONAL AFFILIATIONS

**Graduate,** FBI NATIONAL ACADEMY, 239TH SESSION

**Master of Arts, Education,** SETON HALL UNIVERSITY, COLLEGE OF EDUCATION LEADERSHIP, MANAGEMENT & POLICY

**Bachelor of Science, Criminal Justice,** SAINT JOHN'S UNIVERSITY

**Certificates: Leadership Management and Policy** AND **Human Resources Training and Development,** SETON HALL UNIVERSITY; **Law Enforcement Intelligence – Toolbox and Sustaining the Intelligence Capacity,** FEMA AND DEPARTMENT OF HOMELAND SECURITY, MICHIGAN STATE UNIVERSITY

COURSES & TRAINING: **Public Relations in Administration** ▪ **Community Relations** ▪ **HR** ▪ **Training & Development** ▪ **Personnel Administration** ▪ **Performance Improvement Strategies** ▪ **Adult Learning** ▪ **Leadership Dynamics & Analysis of Supervisory Behavior** ▪ **Leadership & Management Assessment**

**2016 Awarded Unit Citation by the Police Commissioner, City of New York**
**2013 John Fahy Award for Community Service- FBI Nation Academy Associates**
**2 Commendations, 7 Meritorious Police Duty, 10 Excellent Police Duty, and 3 Unit Citations**

**FBI National Academy Associates** ▪ **FBI National Academy Associates Florida Chapter** ▪ **American Academy for Professional Law Enforcement** ▪ **Kappa Delta Pi, International Honor Society in Education – Seton Hall University Educators** ▪ **NYPD Football Team (Alumni)**

A3

Richard Rudolph                                                    Case of Maysonet v. Guevara

# ADDENDUM B – Materials Relied Upon

1. Deposition + Exhibits of Justino Cruz
2. Deposition + Exhibits of Alfredo Gonzalez
3. Deposition + Exhibits of Christopher Goosens
4. Deposition + Exhibits of Jose Juan Maysonet
5. Deposition + Exhibits of Frank DiFranco
6. Deposition + Exhibits of Joseph Szybist
7. Deposition of Richard Beuke
8. Deposition + Exhibits of Jennifer Borowitz
9. Deposition + Exhibits of Stephen Gawrys
10. Deposition + Exhibits of James Doody
11. Deposition + Exhibits of Rosa Bello
12. Deposition + Exhibits of Carmen Macias
13. Deposition + Exhibits of Edward Mingey
14. Deposition of Edward Mingey (Serrano case)
15. Deposition of Richard Schak
16. Deposition + Exhibits of Roland Paulnitsky
17. Deposition + Exhibits of Fernando Montilla
18. Deposition of Lee Epplen
19. Deposition + Exhibits of Reynaldo Guevara
20. Deposition of Robert Flores
21. Deposition of Ernest Halvorsen
22. Deposition + Exhibits of John Foster
23. Deposition of Lee Epplen
24. Deposition + Exhibits of Francisco Veras
25. Deposition + Exhibits of Thomas Tiderington
26. Deposition of Sara Cazares
27. Answer to Amended Complaint
28. Investigative File RFC 1-66
29. PR File RFC 67-102
30. Cruz Criminal History RFC 000106, 001685-1703
31. Gonzalez Criminal History RFC 000107
32. Maysonet Criminal History RFC 000108-000115, 001704-1715
33. Goosens Arrest History RFC 001680-1684
34. CCSAO File      CCSAO 1-2847
35. GPR      JGS_MAYSONET 2547
36. 1990-08-23 Maysonet Statement JGS_MAYSONET 1697-1703
37. 1990-08-24 Justino Cruz Statement CCSAO 750-752
38. 1990-08-24 Alfredo Gonzalez Statement CCSAO 727-736
39. Precero & Macias Statements    JGS_MAYSONET 2548-2459
40. Jose Maysonet Affidavit          JGS_MAYSONET 2533-2536
41. Ben Carbery Affidavit   JGS_MAYSONET 2544-2545
42. Kevin Wiley Rap Sheet JGS_MAYSONET 2546
43. Torrance Wiley Rap Sheet          JGS_MAYSONET 2550
44. Jennifer Bonjean Affidavit          JGS_MAYSONET 2551-2552

B1

Richard Rudolph                                                    Case of Maysonet v. Guevara

45. Edward Andersen Funeral Documents    JGS_MAYSONET 2553
46. Photos at funeral          JGS_MAYSONET 2554-2560
47. Santiago Obituary Card JGS_MAYSONET 2561
48. Transcript of Record Appeal Cover        MAYSONET 95-96
49. Motion for a new trial    MAYSONET 97-99
50. Defendant Jury Instructions        MAYSONET 100-102
51. Certificate of Service re Doc's re Notice of Appeal        MAYSONET 103-104
52. Transcript of Record Appeal Cover        MAYSONET 105
53. 1992-06-09 ROP - Def Arraigned        MAYSONET 106-125
54. 1992-11-05 ROP - Motion to Withdraw MAYSONET 126-135
55. 1994 Letters MAYSONET 11158-11160
56. 1995-01-10 ROP – Motion to Quash        MAYSONET 136-216
57. Certificate of Service re Doc's file re Notice of Appeal    MAYSONET 217
58. 1995-01-24 ROP - Continuance MAYSONET 219-225
59. 1995-01-25 ROP            MAYSONET 226-228
60. 1995-01-31 ROP - MTSMAYSONET 229-380
61. 1995-02-06 ROP - Motion to Withdraw Appearance        MAYSONET 382-389
62. 1995-06-26 ROP - Continuance by Agreement    MAYSONET 390-392
63. 1995-08-08 ROP - Jury Impaneled and sworn    MAYSONET 393-535
64. 1995-08-09 ROP - Opening Statement AM Session        MAYSONET 536-623
65. 1995-08-09 ROP - Jury Trial PM Session        MAYSONET 624-736
66. 1995-08-09 ROP - Jury Trial PM Session        MAYSONET 624-737
67. Certficate of Service Doc file re Notice of Appeal        MAYSONET 737-738
68. 1995-08-10 ROP - Jury Trial      MAYSONET 739-846
69. Certificate of Service re Doc's file re Notice of Appeal    MAYSONET 847
70. 1995-08-10 ROP - Jury Trial      MAYSONET 848-1027
71. 1995-08-11 ROP - Trial - Closing, Verdict        MAYSONET 1028-1131
72. 1995-09-08 ROP - Motion for a new trial        MAYSONET 1132-1135
73. 1995-09-28 ROP - Sentencing Continued        MAYSONET 1136-1138
74. 1995-10-06 ROP - Continuance MAYSONET 1139-1142
75. 1995-10-16 ROP - Motion for New Trial and Sentencing MAYSONET 1143-1174
76. 1996-03-15 - Report of Compliance        MAYSONET 1175
77. Certificate of Service re Docs re NOA    MAYSONET 1176-1177
78. Cover and Certificate of Service re Record of Appeal      MAYSONET 1178-1179
79. 1993-12-17 ROP - Mtn for IQ Eval and Continuance        MAYSONET 1180-1187
80. 1994-01-07 ROP - Mtn for re-indictment        MAYSONET 1188-1190
81. 1994-02-18 ROP            MAYSONET 1191-1194
82. 1995-03-14 ROP - Status of Medical Records    MAYSONET 1195-1198
83. 1996-08-01 - Report of Compliance        MAYSONET 1199
84. Certificate of Service Docs re NOA        MAYSONET 1200
85. MTQ arrest and MTS Statements        MAYSONET 1201-1202
86. COI Hearing            DIFRANCO 30-153
87. CCDOC Consent to be Interviewed Form        MAYSONET 10864
88. Criminal Court Transcripts        RFC 378-987
89. Alfredo Gonzalez Presentence Investigative Report
90. Justino Cruz Disposition JGS_MAYSOENT 01295-01305
91. Maysonet Attempted Murder Disposition JGS_MAYSONET 01603-01616

B2

Richard Rudolph                                                    Case of Maysonet v. Guevara

92. Attempt Murder File MAYSONET 9596-9617
93. SO 89-01 Detective Division Standard Operating Procedure Manual        RFC 49099-19104
94. CR Files RFC 001718-6515
95. Training Histories        RFC 001017-1063
96. CPD Directives RFC 14148-14536, RFC 000276-284, RFC 000285-494
97. Training Material Indices from 1970-1995        RFC 14537-16896
98. Training Policies RFC 048266-50166
99. Foster 000001-000279
100.        Mingey Personnel File   RFC 001064-1132
101.        Epplen Personnel File   RFC 001133-1234
102.        Guevara Personnel File  RFC 001235-1373
103.        Halvorsen Personnel File        RFC 001374-1515
104.        Montilla Personnel File RFC 001516-1593
105.        Paulnitsky Personnel File       RFC 001594-1677
106.        2017-11-15 ROP State Nolle Pros
107.        Tiderington Expert Report
108.        Expert Report of Stefan Bjes