# EXHIBIT B

**In The Matter Of:**

*Maysonet v.*
*Guevara*

---

*Richard Rudolph*
*December 6, 2023*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
              THE NORTH EASTERN DISTRICT OF ILLINOIS
 2            EASTERN DIVISION
              CASE NO.  18 CV 02342
 3
 4    ----------------------
      JOSE JUAN MAYSONET,
 5    JR.,                         CIVIL ACTION
 6         Plaintiff(s),        Deposition of:
 7         v.                      RICHARD RUDOLPH
 8    REYNALDO GUEVARA, et
      al.,
 9
           Defendant(s).
10    ----------------------
11
12
13            T R A N S C R I P T of the stenographic
14    notes of the proceedings in the above-entitled
15    matter as taken by and before DIANE M. HOLMES, a
16    Certified Court Reporter and Notary Public of the
17    State of New Jersey, held via videoconference on
18    Wednesday, December 6, 2023, commencing at
19    approximately 11:05 EST in the morning, pursuant to
20    notice.
21
22
23
24
25
```

## Page 2

```
 1    A P P E A R A N C E S:
 2
 3    BONJEAN LAW GROUP, PLLC
      Attorneys for Plaintiff Jose Juan Maysonet, Jr.
 4        750 Lexington Avenue, Suite
         New York, New York 10022
 5        718.875.1850
         Jennifer@bonjeanlaw.com
 6        Ashley@bonjeanlaw.com
         Haley@bonjeanlaw.com
      BY:  JENNIFER BONJEAN, ESQ.
 7        ASHLEY COHEN, ESQ.
         HALEY COOLBAUGH, PARALEGAL
 8
 9
10    LEINENWEBER BARONI & DAFFADA, LLC
      Attorneys for Defendant Reynaldo Guevara
11        1150 Wilmette Avenue, Suite D
         Wilmette, Illinois 60091
12        847.251.4091
         michael@ilesq.com
      BY:  MICHAEL SCHALKA, ESQ.
13
14    THE SOTOS LAW FIRM, P.C.
15    Attorneys for Defendants JoAnn Halvorsen, Edward
      Mingey, Lee Epplen, Fernando Montilla and Ronald
16    Paulnitsky
         141 W. Jackson Boulevard, Suite 1240A
17        Chicago, Illinois 60604
         630.735.3303
18        dbrueggen@jsotoslaw.com
      BY:  DAVID A. BRUEGGEN  ESQ.
19
20    ROCK, FUSCO & CONNELLY, LLC
21    Attorneys for Defendant City of Chicago
         321 N. Clark Street, Suite 2200
22        Chicago, Illinois 60654
         312.494.1000
23        tcarney@rfclaw.com
      BY:  THERESA CARNEY, ESQ.
24
25
```

## Page 3

```
 1    A P P E A R A N C E S: (Cont'd)
 2
 3    HINSHAW & CULBERTSON, LLP
      Attorneys for Frank Di Franco
 4        151 North Franklin Street
         Suite 2500
 5        Chicago, Illinois 60606
         312.704.3127
 6        smeher@hinshawlaw.com
      BY:  STEPHEN MEHR, ESQ.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                     I N D E X
 2    EXAMINATION                            PAGE
 3    RICHARD RUDOLPH
         DIRECT EXAMINATION BY MS. BONJEAN       5
 4
 5
 6
 7                    E X H I B I T S
 8    NUMBER          DESCRIPTION            PAGE
      Rudolph-1       PowerPoint presentation   47
 9
      Rudolph-2       Rudolph report            91
10
      Rudolph-3       Homicide file            141
11
      Rudolph-4       Report                   160
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Maysonet v.
Guevara

Page 5

1  R I C H A R D   R U D O L P H, c/o The Sotos Law
2  Firm, P.C., 141 W. Jackson Boulevard,
3  Suite 1240A, Chicago, Illinois 60604,
4  is duly sworn/affirmed by a Notary
5  Public of the State of New Jersey and
6  testifies under oath as follows:
7  **DIRECT EXAMINATION BY MS. BONJEAN:**
8  Q.  Good morning, Mr. Rudolph.
9  **A.  Good morning.**
10  Q.  My name is Jennifer Bonjean,
11  B-O-N-J-E-A-N.  My law firm is the Bonjean Law
12  Group, and I represent the plaintiff, Jose Juan
13  Maysonet in this action that's pending in the
14  Northern District of Illinois.
15  With me today is my paralegal, Haley
16  Coolbaugh, who will be helping with documents.
17  **MS. BONJEAN:** Before we get started,
18  I'll ask the other attorneys to place their
19  appearances on the record.
20  **MR. BRUEGGEN:** Dave Brueggen for the
21  defendant officers except for Guevara.
22  **MR. SCHALKA:** Michael Schalka for
23  Defendant Guevara.
24  **MS. CARNEY:** Theresa Carney on behalf
25  of the City of Chicago.

Page 6

1  **MR. MEHR:** Stephen Mehr for Frank Di
2  Franco.
3  Q.  Okay.  Mr. Rudolph, let me start by
4  asking whether you've had your deposition taken
5  before?
6  **A.  No, I have not.**
7  Q.  In your entire career as a New York
8  City police officer, no depositions?
9  **A.  No.**
10  Q.  Wow.  That's impressive.
11  Okay.  So let me go through some
12  guidelines for you.  We're going to be here most of
13  the day, and I'm going to be asking questions,
14  obviously, that relate to your opinion that you
15  rendered in connection with this case.
16  I will be looking for full and complete
17  answers to the best of your ability.  If you do not
18  understand one of my questions, will you please let
19  me know so I can reframe and we can get on the same
20  page?
21  Is that a yes?
22  **A.  I will, yes.**
23  Q.  I wasn't sure.  You broke up.  That
24  leads me to my next instruction.  You are going to
25  need to always speak audibly and yes or no.  Uh-huhs

Page 7

1  or uh-uhs are not able to be transcribed by the
2  court reporter, and so I would ask you to be
3  cognizant of that.
4  Everybody does it from time to time.
5  So if you do do it, I will just give you a gentle
6  reminder and ask you to either state yes or no.
7  Okay?
8  **A.  Okay.**
9  Q.  We're by Zoom, but this happens in
10  person too.  You may know where my question is going
11  and feel the impulse to answer it before I've
12  completed my question.  I'm going to ask that you
13  wait until I complete my question until you give
14  your answer so that we're not talking over each
15  other.  Is that understandable?
16  **A.  Understood.**
17  Q.  Okay.  And I will do the same and try
18  not to cut you off when I am waiting for you to
19  complete your answer.
20  If you need a break, let us know.
21  We're going to take breaks throughout the time here
22  today.  Just if there's a question pending, I'm
23  going to ask that you answer the question before we
24  take that break.  Okay?
25  **A.  Okay.**

Page 8

1  Q.  All right.  Sir, you were retained by
2  the Sotos Law Firm in connection with this case.
3  What were you retained to do?
4  **A.  I was retained to review the homicide**
5  **investigation of Maysonet and give my opinion if the**
6  **basic investigative steps were followed properly**
7  **back in 1990.**
8  Q.  Okay.  Are you looking at any documents
9  in front of you?  What do you have in front of you?
10  **A.  My report's over here.  That's it.**
11  Q.  Anything else?
12  **A.  No.**
13  Q.  Okay.  I'm going to ask --
14  **MR. BRUEGGEN:** Jennifer, just to let
15  you know, we do have police records and other
16  documents available if he needs them, but right now
17  it's just the report is off to the side.
18  **MS. BONJEAN:** Okay.  That's fine.
19  Q.  If throughout your testimony here today
20  you want to refer to a document, I'm going to ask
21  that you indicate as such, and I'll let you know --
22  that would probably be fine.  I just want to know
23  what you're looking at because I'm not in the room.
24  I can't see it.  Okay?
25  **A.  Okay.**

Page 9

1 Q. Going back to the last answer, you said
2 you were retained essentially to render an opinion
3 about whether the homicide investigation was done
4 properly.
5 A. Well, the basic investigative steps are
6 followed properly.
7 Q. So you were retained to render an
8 opinion whether basic investigative steps were done
9 properly in the homicide investigation of the Wiley
10 brothers?
11 A. Yes.
12 Q. Okay. And I want to first go through
13 your background if we can a little bit.
14 MS. BONJEAN: I didn't get a C V. Do
15 you have a C. V.?
16 MR. BRUEGGEN: Jennifer it's attached
17 to the report. I think it's addendum A.
18 MS. BONJEAN: There it is. I'm sorry.
19 I skimmed right past it.
20 Q. So you do have one. Thank you.
21 Now, maybe I'm incorrect, but it looks
22 like you've spent your entire career -- spent your
23 entire career as a New York City police officer. Is
24 that right?
25 A. I have.

Page 10

1 Q. And when did you join the New York City
2 police department?
3 A. October 1990.
4 Q. How old were you?
5 A. I was 23.
6 Q. And before you joined the department,
7 did you have any work experience?
8 A. I was a student.
9 Q. And where did you study?
10 A. I went to St. John's University.
11 That's where I ended up graduating from. I had to
12 go back to school after I joined the police
13 department, finish my degree.
14 Q. So you did some college and then didn't
15 complete your degree and went to the department and
16 then returned. Is that right?
17 A. Yes. That's correct.
18 Q. Okay. And apart from your time at the
19 New York City Police Department which we're going to
20 get into a little bit, have you held any other
21 employment positions?
22 A. No, I have not.
23 Q. And the training you received as a
24 police officer, was that in your capacity as a New
25 York City police officer predominantly or

Page 11

1 completely?
2 A. I don't -- my training as a police
3 officer?
4 Q. Yeah. It's fine. If you don't
5 understand the question, I will rephrase it.
6 A. I'm sorry.
7 Q. That's all right.
8 You received training as a New York
9 City police officer, right?
10 A. I did.
11 Q. Any other training outside of your time
12 with the New York City Police Department?
13 A. Once I made rank in the police
14 department, I was able to apply for different
15 scholarships. So I attended the FBI National
16 Academy. That was 2009.
17 Q. Okay. Anything else?
18 A. That was the only outside the agency
19 training that I had, but we had ongoing training
20 from the police academy until I retired.
21 Q. Obviously, you went -- you started
22 as -- went to the -- I'm blanking.
23 As a young member of the department,
24 when you first joined, your rank was I guess a
25 patrol officer. Is that right?

Page 12

1 A. Police officer, yes.
2 Q. Police officer. Okay.
3 Let me look at your -- and you want
4 through the academy I'm guessing initially, correct?
5 A. I did. I graduated in April '91.
6 Q. And when you became a detective, was
7 there any particularized training as a detective?
8 A. Well, I was never a detective. I was a
9 supervisor in the detective bureau.
10 Q. Oh, okay.
11 So when you were -- you were never a
12 detective in the New York City Police Department?
13 A. Officially, I was never a detective in
14 the New York City Police Department. That's
15 correct.
16 Q. Okay.
17 A. I was a narcotics investigator, you
18 know, after 18 months, if I -- I was in narcotics.
19 So 18 months, you get evaluated and recommended for
20 promotion, but I was promoted to sergeant two weeks
21 before my detective shield.
22 So I did the detective work but never
23 actually got the shield for being in narcotics.
24 Q. So let me just -- let me just -- before
25 we get there. I'm going to go through your time

Page 13

1 with the New York City Police Department, but I want
2 to ask a couple questions.
3    You have your bachelor's from St.
4 John's, and did you get a master's as well?
5 **A. I did, Seton Hall.**
6 Q. And in what area of study?
7 **A. So that was policy and management.**
8 **It's part of the New Jersey State Police graduate's**
9 **program at Seton Hall University.**
10 Q. And was it unique to law enforcement or
11 was it just policy and management as a -- you know,
12 at a higher level?
13 **A. Yeah. It was geared towards -- towards**
14 **law enforcement. So it focused more on human**
15 **resources, adult learning, public speaking, things**
16 **like that and managing.**
17    **So it was gauged to like law**
18 **enforcement for law enforcement executives.**
19 Q. Got it.
20    And were most of your colleagues in
21 your class in law enforcement or, I'm sorry, were
22 most students in your class in law enforcement?
23 **A. They all were.**
24 Q. So it really was geared towards people
25 in your industry. Is that right?

Page 14

1 **A. Yes.**
2 Q. Okay. How long did it take you to
3 complete that master's degree?
4 **A. I believe it was about -- because I had**
5 **to do it part-time, I want to say about a year and a**
6 **half.**
7 Q. Okay. All right. And then other
8 education, specialty training, you mentioned the FBI
9 National Academy. Is that something you did -- is
10 that something you did I think you said in 2009?
11 **A. Yeah, 2009 I believe it was.**
12 Q. All right. Any other education that
13 you can think of other than what you've identified
14 on your C.V.?
15 **A. That's formal education. That was it.**
16 Q. Okay. All right. So you have this
17 PowerPoint presentation that you produced in
18 response to the subpoena that is Bates stamped it
19 looks like Rudolph 108 through Rudolph 214.
20    Do you have a paper copy of it in front
21 of you?
22 **A. I don't, but I know it.**
23 Q. Okay. I figured.
24    You wrote it, right?
25 **A. Yeah, I did.**

Page 15

1 Q. Okay. If you need to look at it, we
2 can also pull it up on the screen. It's not a
3 problem.
4 **A. Okay. Thank you.**
5 Q. So the title of this PowerPoint
6 presentation is development and management of major
7 criminal investigations.
8    Tell me, first of all, why you prepared
9 or for what purpose you prepared this PowerPoint
10 presentation.
11 **A. Sure. So that's for the Southern**
12 **Police Institute. I started probably early last**
13 **year, and they needed somebody to -- to train police**
14 **executives on basically how to do management of**
15 **major criminal investigations, not just homicides,**
16 **shootings, assaults and the basic investigative**
17 **steps for that from the supervisor's angle, not from**
18 **the detective's angle, and so I was brought into**
19 **that.**
20 Q. Okay. And the first slide in this
21 presentation relates to your biography which is also
22 reflected on your C.V. So it indicates that you're
23 with the department for 30 years.
24    Tell me about your assignments that you
25 held before you -- before you became sergeant, and

Page 16

1 you can -- again, you know, you don't have to give
2 me detail-by-detail, but just if you could
3 summarize.
4 **A. Okay. So when I graduated the police**
5 **department -- I'm sorry, the police academy, I was**
6 **assigned out in Queens as a patrol officer often**
7 **working precinct anti-crime.**
8    **From there I was transferred to the**
9 **street crime unit which we were assigned citywide**
10 **initially. We got centralized back to Queens.**
11    **From the street crime, I was assigned**
12 **to OCCB narcotics up in Washington Heights, and then**
13 **we started the Manhattan northern initiative. So it**
14 **was focused on the 33rd Precinct as a narcotics**
15 **investigator.**
16    **Then I got promoted to sergeant from**
17 **there and shipped back out to Queens.**
18 Q. Okay. So your time as a patrol officer
19 and in the street crime unit was -- I'm sorry. Time
20 frame.
21 **A. Yeah, early '90s.**
22 Q. Okay. Those were not positions that
23 were investigating positions. Those were on the
24 street, right?
25 **A. Yes, just focused on violence and**

Page 17

1 street crime.
2 Q. Making arrests, responding to calls,
3 that type of thing?
4 A. Not really responding to calls. We
5 were more, you know, I don't know how you would say
6 it, proactively policing the neighborhoods.
7 Q. Lots of stop and frisks, right?
8 A. No.
9    MR. BRUEGGEN: Object to the form.
10 Q. A whole career of stop and frisks, your
11 whole decade, right?
12    MR. BRUEGGEN: Objection to form. Go
13 ahead, sir.
14 A. That's, you know -- I know everybody
15 says stop and frisk now, but we never called it
16 that. It was always stop, frisk, stop, you know,
17 question and maybe frisk.
18    That's what it always was, and, you
19 know, along the lines of the police department
20 started calling it stop and frisk. Ray Kelly called
21 it stop and frisk, and some everybody says stop and
22 frisk.
23    It's not a lot of fun frisking people.
24 I can tell you that.
25 Q. And then you were assigned to

Page 18

1 narcotics, and I think you said that was as an
2 investigator, correct?
3 A. Yes. Yes. I was a narcotics
4 investigator as a police officer.
5 Q. And for how long?
6 A. It was 17 months and two weeks.
7 Q. So --
8 A. That's when I was promoted to sergeant.
9 Q. So you weren't actually a detective in
10 narcotics, but you said you did investigations or
11 had an investigative responsibility as a police
12 officer.
13    Am I understanding that correctly?
14 A. I was on detective track.
15 Q. But you weren't a detective, right?
16 A. No.
17 Q. So your rank was still as a police
18 officer, right?
19 A. Yeah.
20 Q. And you did that for about 17 months?
21 A. About that, yes.
22 Q. Okay. And that was I think you said
23 you were up in Washington Heights and then somewhere
24 else in Manhattan after that, right?
25 A. Well, we first got assigned to OCCB,

Page 19

1 and then they started Manhattan -- Northern
2 Manhattan initiative and that was just focused on
3 the 33, the 34 and the 30. So I was assigned to the
4 33rd.
5 Q. Okay. OCCB is --
6 A. It used to be Organized Crime Control
7 Bureau I believe it was. It's defunct now.
8 So everybody's in the detective bureau now.
9 Q. What years were you in narcotics?
10 A. I think I was promoted to sergeant in
11 '99. So it had to be '97 and mostly in '98 I
12 believe.
13 Q. '97, '98. Okay.
14    And were you policing over by Columbia
15 University? Would that have been your area?
16 A. Sometimes if I was working a case we'd
17 be out by Columbia, but I was mostly down in --
18 below 164 Street to 155. So 155th, 164th Street in
19 that area, river to river.
20 Q. Okay. So Harlem then, right?
21 A. Well, it's Jackson Heights --
22 Washington Heights. Our office was down in Spanish
23 Harlem. Yes.
24 Q. Okay. What were your responsibilities
25 as a narcotics police officer during this period of

Page 20

1 1997, 1998 when you were doing investigations?
2 A. So my -- my job was as an investigator.
3 So you're either an investigator or you're an
4 undercover. So I was an investigator.
5    So I'd be part of the field team that
6 would apprehend subjects during buy and bust
7 operations. I would be on the field team while our
8 undercovers would do case buys, case interviews,
9 process arrests either by paperwork or transporting
10 prisoners to the precinct to be processed.
11 Q. Would you agree that most of your
12 investigations related to buy and busts, not
13 long-term, long-scale investigations?
14 A. We did have long-term case buys, case
15 investigations, and that was mostly our focus. They
16 were difficult.
17    I didn't have one myself. So I worked
18 on everybody else's case because they believed I was
19 going to get promoted to sergeant. So --
20 Q. Okay. So how many investigators in the
21 narcotics division that you were in? How many --
22 how many were there?
23 A. In our office was probably -- it was a
24 lot. It was probably close to 400.
25 Q. Okay.

Page 21

1 **A. My module had -- it's usually around**
2 **one and eight. So eight, 16, 20 something guys and**
3 **girls in my module.**
4 Q. So your responsibilities during this
5 period of time sounds like you were -- did you do
6 surveillance? Is that one of the things that you
7 did?
8 **A. We did surveillance. That was part of**
9 **buy and bust. That was part of case investigations.**
10 Q. Did you interview people?
11 **A. I did interview people.**
12 Q. Did you interview defendants or
13 accuseds or suspects I should say?
14 **A. I interviewed, you know, cooperators,**
15 **people who got arrested, witnesses.**
16 Q. So is that a, no, you weren't typically
17 interviewing suspects?
18 **A. No.**
19 **MR. BRUEGGEN:** Go ahead. Explain.
20 **A. No. We interviewed suspects. You**
21 **know, after we would arrest them, those were the**
22 **ones mostly that I interviewed.**
23 Q. For larger scale investigations, was --
24 the larger scale narcotics investigations, was the
25 detective bureau involved?

Page 22

1 **A. The detective bureau?**
2 Q. Yeah, or was this just -- I guess I'm
3 trying to understand.
4 For larger scale narcotics
5 investigations, was it just the narcotics unit that
6 handled those?
7 **A. No. Well, we would handle the drug**
8 **part of it. If we would arrest somebody and they**
9 **had information about homicides, shootings,**
10 **burglaries, robberies, we would pass that**
11 **information off to the detective bureau. Yes.**
12 Q. Okay. Did the detective bureau handle
13 narcotics investigations or was that solely the
14 responsibility of the unit that you were assigned
15 to?
16 **A. That was our responsibility.**
17 Q. Okay. And how many larger scale or --
18 yeah.
19 How many larger scale investigations
20 did you participate in if you can estimate for me?
21 **A. Oh, gosh.**
22 **MR. BRUEGGEN:** Object to the form. Go
23 ahead, sir.
24 **A. I would say maybe six or seven.**
25 Q. Did you ever testify in any prosecution

Page 23

1 of individuals who were arrested and charged in
2 connection with investigations that you participated
3 during your time in the narcotics unit?
4 **A. I did. Most of those -- most of my**
5 **testimony was for hearings, though. Usually didn't**
6 **make it to trial.**
7 Q. Okay. So am I to understand that you
8 testified in like Mapp/Dunaway hearings during --
9 **A. Yeah. Sorry.**
10 Q. That's all right. It was my fault.
11 You testified in pretrial hearings?
12 **A. Yes.**
13 Q. Okay. Can you estimate how many times?
14 **A. Oh, gosh. I couldn't even guess. Half**
15 **a dozen, maybe more.**
16 Q. All right. And then after your 17
17 months in narcotics, you were promoted to sergeant,
18 right?
19 **A. Yes.**
20 Q. As a sergeant, were you still on the
21 streets or were you taken off the streets?
22 **A. No. I was sent back to go back to**
23 **patrol. So I was a patrol sergeant in the 113th**
24 **down in South Jamaica.**
25 Q. That's Queens, right?

Page 24

1 **A. Yes.**
2 Q. How long were you a patrol sergeant at
3 the 113th?
4 **A. I did that for about a year and a half**
5 **I think it was.**
6 Q. And were you supervising patrol
7 officers in that --
8 **A. Yes, just patrol.**
9 Q. -- precinct?
10 Okay. And then where did you go?
11 **A. So I went -- I wanted to go back to**
12 **narcotics or detective bureau in New York City.**
13 **If you wanted to get back to**
14 **investigative assignment, you had to go to internal**
15 **affairs first. So I was transferred to internal**
16 **affairs before I could be assigned to the detective**
17 **bureau.**
18 Q. You say that with such shame.
19 **A. No. It was actually, you know -- it**
20 **wasn't happy work. It was -- I didn't enjoy it, but**
21 **it was enlightening. I think it made me a better**
22 **boss, a better supervisor, you know, understanding a**
23 **different side of the job, and that was in Group 54**
24 **if you knew what that was.**
25 Q. In the what?

Maysonet v.
Guevara

Page 25

1 A. Group 54. That was our -- my unit.
2 Q. No. I don't know what it is.
3 A. We handled citywide all allegations of
4 excessive force, death-in-custody cases and
5 instances where MOS involved shootings. Police
6 officers fired -- I'm sorry.
7 Q. And that was in -- I think at least on
8 your PowerPoint, it looks like it was from 2000 to
9 2002?
10 A. Yes.
11 Q. Okay. And after that, you then got
12 back to an investigative unit at least, detective
13 squad, the detective squad. Is that right?
14 A. Yes, in the 114 Astoria. That was the
15 XO.
16 Q. And what was your rank there, sergeant?
17 A. Sergeant.
18 Q. Now, in that time period and I think on
19 your PowerPoint you indicated you were there as an
20 executive officer of the detective squad at the rank
21 of sergeant from 2002 to 2006. Is that correct?
22 A. That's right.
23 Q. And what were your responsibilities and
24 duties as a sergeant in the detective squad at the
25 114?

Page 26

1 A. So as the executive officer, my job was
2 both administrative and, you know, being proactive
3 with the investigation. So I had to take care of
4 administrative issues within the squad such as, you
5 know, roll calls, equipment and things like that and
6 also review cases, and anything else that would come
7 up, I'd have to see -- if the lieutenant is not
8 around, then I'm the acting CO.
9 Q. When you say review cases, what do you
10 mean?
11 A. So when detectives, you know, conduct
12 an interview, type that interview, submit it for
13 approval, I would have to read the case and either
14 send it back to them for corrections or
15 clarification or sign it off for approval.
16 Q. So you would -- as part of your
17 responsibilities, you would review police reports or
18 reports that were prepared by detectives. Is that
19 fair?
20 A. Yes, ma'am.
21 Q. Okay. You weren't yourself doing
22 investigations as a sergeant in the detective squad
23 at the 114, right?
24 A. Well, if there's a scene of a major
25 crime, homicides, shootings, whatever, I'm out in

Page 27

1 the field with the detectives, and, sure, if there's
2 not enough people to go around, I have to go take a
3 detective with me, and him or her and I would
4 conduct that interview.
5 Maybe it's on the street. Maybe there
6 was nobody back at the squad. They'd have to come
7 back to the squad and conduct that interview. Just
8 because I wasn't -- you know, I wasn't just a
9 supervisor separated from the investigation.
10 Q. Would you consider yourself a hands-on
11 supervisor?
12 MR. BRUEGGEN: Object to the form. Go
13 ahead.
14 A. I was involved all the time.
15 Q. Did you write reports yourself?
16 A. I did, yeah.
17 Q. And you approved reports, correct?
18 A. I did.
19 Q. And you reviewed reports in connection
20 with investigations that were ongoing by the
21 detectives in your unit, right?
22 A. I did.
23 Q. Did those reports that you reviewed go
24 to another level for approval?
25 A. Usually, when I -- especially when I

Page 28

1 became the squad commander as a lieutenant. So the
2 sergeants, what we do typically is review -- you
3 know, sign-off on the cases, approve it or reject
4 it, and then when it comes to final sign-off, the
5 lieutenant would finally sign-off on that.
6 Q. So in the New York City Police
7 Department, there were actually multiple layers of
8 approval. Is that right?
9 MR. BRUEGGEN: Object to the form. Go
10 ahead.
11 A. That's correct.
12 Q. Who was the final sign-off person on a
13 police report? Was it the lieutenant?
14 A. The lieutenant, yes.
15 Q. Okay. So a detective would write a
16 report, there would be a review by the sergeant and
17 then you would kick it back if you saw any issues.
18 There might be a resubmission. When you approved
19 it, then it would go up to the lieutenant for a
20 final sign-off?
21 A. Typically, that's what we would do.
22 Yes. Sometimes the lieutenant is on vacation. I'd
23 have to sign-off myself.
24 Q. I understand.
25 You know, I know there's always

Maysonet v.
Guevara

Page 29

1  exceptions to a rule, but the way it was supposed to
2  work consistent with the practices, policies of the
3  department was that it go from directive to sergeant
4  and then to lieutenant. Is that right?
5  **A. That's correct.**
6  Q. Do you know when the New York City
7  Police Department went from a paper system to an
8  electronic system?
9    I'm guessing you were there for that.
10  **A. I was. Gosh. I was just going to the**
11  **FBI Academy. So we said that's 2009. So I want to**
12  **say 2008, in and around that date.**
13  Q. 2008. Do you remember what the name of
14  the system was just out of curiosity?
15  **A. Yeah. It was ECMS. It stands for**
16  **Enterprise Case Management System if I remember**
17  **correctly. ECMS, that's the slang for it.**
18  Q. That's been around -- that was around
19  for a long time, right?
20  **A. I want to say 2008. I don't think it**
21  **was 2 -- yeah. Yeah. It might have been 2006. I'd**
22  **have to go look it up.**
23  Q. My question was a little confusing, but
24  that's the system that NYPD continued to use for a
25  very long time after it was implemented, right?

Page 30

1  **A. I believe they're still using it. I'm**
2  **not sure.**
3  Q. I think they still use it, right?
4  **A. Yeah. It was good.**
5  Q. When you retired, they were still using
6  it, correct?
7  **A. Yes. Yes, ma'am.**
8  Q. Then in 2006 it looks like you went to
9  a detective squad as a commanding officer but still
10  sergeant. Tell me what that means.
11  **A. So it's a -- it's not as busy as the**
12  **precinct. So it's in the 104 which is like**
13  **Woodhaven, Ridgewood. So it's not terribly high**
14  **crime area.**
15    **So, typically, they might have a**
16  **sergeant assigned -- as its commanding officer**
17  **assigned to that. So the chief had assigned me**
18  **there.**
19  Q. What were your duties and
20  responsibilities as the commanding officer in, what
21  did you say, the 10 what?
22  **A. 104.**
23  Q. 104. Right.
24    What did you do there?
25    If you need to compare it to what you

Page 31

1  were doing before that, it could be helpful.
2  **A. Yeah. So I would do everything and**
3  **sign-off. So there were two sergeants there. So**
4  **the one sergeant would be in charge of robberies and**
5  **burglaries, and I was in charge of everything else.**
6    **So, basically, just, you know,**
7  **reviewing cases, directing the investigation,**
8  **setting up plans of action and plus all the**
9  **administrative stuff that goes with operating**
10  **basically an office.**
11    **So, you know, personnel issues, roll**
12  **calls, equipment, vehicles, you know, attend**
13  **meetings with the chief, attend meetings with the**
14  **precinct commander. Basically, just about**
15  **everything.**
16  Q. Let me go back to one thing. When you
17  were at the 114, and that was a detective squad, did
18  the detective -- did you do or supervise homicide
19  investigations there?
20  **A. Yes, I did.**
21  Q. Okay. Was that a part of your
22  responsibility -- was that a regular part of your
23  responsibility if you understand what I'm saying?
24  That was routine?
25  **A. Yes, that was extremely routine.**

Page 32

1    **So the dynamics of the New York City**
2  **Police Department, especially detective bureau,**
3  **detective squads have case responsibility for the**
4  **homicide investigation.**
5    **Homicide squad comes out and works**
6  **together with the local squad. Homicide squad**
7  **doesn't actually -- in New York City aren't really**
8  **assigned homicide cases. So it was up to us.**
9  Q. Okay. And then what about when you
10  were at the 104? Did you supervise homicide
11  investigations there?
12  **A. I did.**
13  Q. Okay. How many homicides occurred in a
14  year in the 114, if you can estimate, at least
15  during this time period?
16  **A. Yeah. Back then, it was kind of busy.**
17  **Probably hovered around 20 some odd cases. Maybe**
18  **more.**
19  Q. And what about at the 104?
20  **A. 104 is a little slower. So I think we**
21  **had about a little over 10, maybe 12. I'd have to**
22  **go look it up.**
23  Q. That's fine. I know it's an estimate.
24    And as commanding officer in the
25  detective squad at the 104, did you have these same

Maysonet v.
Guevara

---

Page 33

1 types of responsibilities as it relates to reviewing
2 the investigations or reviewing cases?
3 **A. I did. In fact, this time it was more**
4 **because I was -- I was the commanding officer. So I**
5 **was responsible and accountable to the investigation**
6 **itself and the case file.**
7 Q. And were you responsible for following
8 a homicide investigation that wasn't solved
9 immediately?
10 **A. Oh, yes, from beginning to end, you**
11 **know until we couldn't find any further leads. We**
12 **never stopped working on the case.**
13 Q. And what would that entail exactly?
14 **A. Well, the homicide investigation**
15 **typically would start at the crime scene, any**
16 **witnesses that would be there, canvass the**
17 **neighborhoods for witnesses. Back then we have**
18 **video, and then follow-up with crime scene after**
19 **that, whatever was recovered from the body, meet**
20 **with district attorney. Do we have any suspects**
21 **involved?**
22 **I mean like every homicide case is**
23 **totally different. So these are just basic**
24 **investigative steps that I'm coming with off the top**
25 **of my head, and then, you know, if we have -- if we**

---

Page 34

1 **did arrest somebody, supervised the interrogation,**
2 **meet with the district attorney again, write reports**
3 **to my supervisors separate from the case file, and**
4 **then follow it through trial.**
5 Q. You said that -- well, strike that.
6 You would agree that certainly some
7 cases have to be investigated for a longer period of
8 time, right?
9 Like you don't solve a case always
10 within 48 hours. Fair?
11 **A. No. That's fair to say.**
12 Q. And did the New York City Police
13 Department have a policy about what efforts would be
14 continued or how -- how you would continue your
15 efforts in a homicide investigation that went beyond
16 say 72 hours?
17 **MR. BRUEGGEN:** Object to the form. Go
18 ahead, sir.
19 **A. There was no policy for that.**
20 **Typically, we would just, you know, have a meeting**
21 **maybe with the department brass, maybe downtown and**
22 **just basically brainstorm, make sure we have enough**
23 **resources, what kind of ideas we could use moving**
24 **forward.**
25 **There's no specific policy for it,**

---

Page 35

1 **though.**
2 Q. My question wasn't a very good one.
3 I guess whether there's a written
4 policy or whether it was just a practice, if you
5 couldn't solve a homicide within 72 hours, was it
6 the practice of your squad or even the department to
7 just throw in the towel and say we couldn't close
8 this within 72 hours, let's move on to the next one?
9 **A. No.**
10 **MR. BRUEGGEN:** Object to the form. Go
11 ahead.
12 **A. Sorry. No. Personally, I would never**
13 **say that, but, you know, I never would want to give**
14 **up on a homicide investigation.**
15 Q. Was it your practice consistent with
16 NYPD's policies and practices to continue to work a
17 homicide investigation until it was solved and
18 closed for as long as possible?
19 **A. As long as possible, yes. I mean I had**
20 **homicide investigations go years before we even got**
21 **a break in the case before we were able to even move**
22 **forward.**
23 **So I mean, like I said, every case is**
24 **totally unique. Some can be solved in 72 hours.**
25 **Some can take two or three years. Sometimes longer.**

---

Page 36

1 **Sometimes they won't ever be solved.**
2 Q. Right.
3 I mean I understand there are cases
4 that are really unique cold cases or they go cold
5 and, of course, NYPD has a cold case unit, but my
6 question is more like, you know, did -- was it your
7 practice to continue to ensure that there was
8 personnel assigned to investigating a case for -- as
9 long as there were leads to follow, there were guys
10 on the case to try to close it?
11 **MR. BRUEGGEN:** Object to the form. Go
12 ahead.
13 **A. Yes. Typically, in the business squad,**
14 **we also had detectives just assigned -- the precinct**
15 **detective squad detectives assigned just to homicide**
16 **and shootings.**
17 **So if the case detective had a**
18 **homicide, he would have an internal partner that is**
19 **the homicide detective plus the homicide squad.**
20 **So, typically, when a case does get**
21 **cold or goes slow, that's when the homicide squad**
22 **picks up on it and works it until, you know,**
23 **exhaustion.**
24 Q. So there's -- you indicated from 2006
25 to 2007 you were in the detective squad. That's

---

Maysonet v.
Guevara

---

Page 37

1 different than the homicide squad?
2 **A. Well, yes. Detective -- when I said**
3 **detective squad, that's the precinct detective**
4 **squad. So, you know, in New York City every**
5 **precinct has its own squad.**
6 Q. Got it.
7 **A. Homicide covers the whole borough.**
8 Q. So you were the commanding officer of
9 the detective squad at the 104 between 2006, 2007.
10 It did involve investigating homicides, but there
11 was also a homicide squad that could get involved in
12 that -- in that investigation. Is that right?
13 **A. Typically involved, and they should be**
14 **involved. Yes.**
15 Q. Okay. So is it like the homicide squad
16 worked hand-in-hand with the precinct detective
17 squad?
18 **A. I'd like to say they were married to**
19 **them, that the thinking behind it is that the**
20 **homicide detectives are more senior and more**
21 **experienced detectives, and they work their way up**
22 **to homicide to bring it back and help teach younger**
23 **maybe nonexperienced, detectives.**
24 Q. Got it. Okay.
25     It looks like in 2007 you got promoted

---

Page 38

1 again to lieutenant?
2 **A. I did.**
3 Q. And you were -- remained in the
4 detective squad. Were you still at the 104 or did
5 you go somewhere else?
6 **A. No. I was transferred to the 115th**
7 **which is Jackson Heights.**
8 Q. Okay. Still in Queens?
9 **A. Yes, ma'am.**
10 Q. As a lieutenant, were you removed from
11 on-the-street fieldwork or did you remain as engaged
12 as you were as a sergeant?
13 **A. Well, that's a bigger squad and a**
14 **busier precinct. So I was still engaged but mostly**
15 **for more violent, bigger investigations,**
16 **kidnappings, shootings, homicides.**
17     **I would be out in the street with the**
18 **squad, but I had two sergeants that worked for me.**
19 **One does robbery and burglaries. The other one**
20 **would be XO like what I used to do in 114.**
21 Q. Okay. How large was the detective
22 squad at the 115?
23 **A. I think I had about 27 detectives and**
24 **two sergeants, but I have to look it up.**
25 Q. Estimates are fine.

---

Page 39

1     And there did you -- were you ultimate
2 approval -- approving officer for police reports?
3     **MR. BRUEGGEN:** Object to the form. Go
4 ahead.
5 **A. I was responsible for all -- all**
6 **reports generated, DD5s, that's what we called it,**
7 **that was done by my detectives and also responsible**
8 **for it by the department.**
9 Q. Were you also responsible for
10 maintaining and ensuring that those DD5s were
11 secured and preserved?
12 **A. Well, back then, I'm not sure if we**
13 **were on the computer then. We were on the computer.**
14 **So it was already in the cloud being preserved, but,**
15 **typically, notes and other department material that**
16 **couldn't be scanned into the computer, we would have**
17 **to save that in the case file box. Yes.**
18 Q. In fact, the policy of the NYPD is that
19 all handwritten memos in your memo books have to be
20 preserved, right?
21 **A. Oh, yes.**
22 Q. And, in fact, detectives' memo books
23 were uniform. Fair?
24     **MR. BRUEGGEN:** Object to the form. Go
25 ahead.

---

Page 40

1 **A. Not really. Well, I think just before**
2 **I left they started making a uniform -- kind of like**
3 **a police officer memo book for detectives, but,**
4 **typically, we just had the reporter spiral**
5 **notebooks, the smaller ones.**
6     **So we had that, and I would tell the**
7 **guys just for every case use that one book just for**
8 **that case. Another case, use another book so it**
9 **wouldn't get commingled. It wouldn't get lost,**
10 **things like that.**
11     **MS. BONJEAN:** Ashley, we can hear you.
12     **MS. COHEN:** Sorry. I thought I was on
13 mute.
14 Q. And, again, those -- what I've seen
15 typically in investigations are sort of a long,
16 skinny memo book that detectives use. Is that what
17 you're referencing?
18 **A. Yes.**
19 Q. And it has a spiral on the top?
20 **A. Yeah. We call them reporters.**
21 **Reporters, notebooks, spiral notebooks.**
22 Q. And it was against NYPD policy to toss
23 a reporter, right, throw it out?
24 **A. Oh, yes. You do not throw that out,**
25 **not purposely.**

---

Maysonet v.
Guevara

---

Page 41

1 Q. And when a reporter was filled up, was
2 it incumbent upon the detective to submit it for --
3 for inclusion in the case file?
4 A. Yes. So, typically, with the computers
5 now, we could scan that into the computer so it's in
6 there all the time, but we still want to save that
7 hard book and keep that in a separate case file.
8 Q. Okay. Were you responsible for
9 ensuring that the reports and any materials that you
10 developed in the course of an investigation or that
11 the detectives you were supervising developed in the
12 course of an investigation made its way to the
13 criminal justice system for use at a trial or was
14 that someone else's responsibility?
15     MR. BRUEGGEN: Object to the form. Go
16 ahead, sir.
17 A. Typically, detectives, the DA would
18 usually sometimes -- say if it's a homicide. The DA
19 would be in the office, and he or she needs all the
20 copies of all the paperwork.
21     As it proceeds to trial, they would
22 take -- now we just print out the whole case and put
23 it on a thumb drive for them, but we used to have to
24 photocopy it and bring everything down to the DA.
25 Typically, that's how it was done.

---

Page 42

1 Q. Okay. So, basically, it was through
2 the DA that documents would make its way to, for
3 lack of a better term, the criminal justice process?
4 A. Yes. I mean back in the day they were
5 snap-outs, the DD5s. So after the case was closed,
6 they would be sent down to Police Plaza, and I
7 forget what they call it, the microfilm, microfiche,
8 whatever it is, so all the old cases you could still
9 find down at Police Plaza that way. Now everything
10 is in the cloud.
11 Q. Was there a single filing system for
12 police reports in the cloud?
13     MR. BRUEGGEN: Object to the form. Go
14 ahead, sir.
15 A. In the cloud?
16 Q. Well, let me put it this way. Did NYPD
17 have parallel filing systems or just one filing
18 system for its reports?
19     MR. BRUEGGEN: Objection to form. Go
20 ahead.
21 A. Just one that I know.
22 Q. Okay. And was that always the case in
23 your experience as a New York City police officer?
24 A. So what happens is, yes, it was always,
25 because they get a complaint number, and everything

---

Page 43

1 attached to that complaint number starts from the
2 precinct downstairs, goes up to detective squad.
3 Everything is categorized or filed under that -- the
4 slang is 61 or complaint number 61, 61 number.
5     So everything is on -- under that case
6 number forever. I mean we have internal case
7 numbers for the squad, but a 61 is what we really go
8 by.
9 Q. All right. My question is was it
10 consistent with the policies of the department to
11 create a report, for instance, that -- and I guess
12 this would be more possible when there were -- this
13 was handwritten, but to create a report that was not
14 actually submitted but that a detective or an
15 investigator kept in a separate file for his own
16 use?
17     MR. BRUEGGEN: Object to the form. Go
18 ahead, sir.
19 A. Well, we only had one case file in
20 NYPD. Just one. There was no separate files.
21 Q. Okay. Then you were, again, promoted
22 from lieutenant to lieutenant commander. I'm
23 assuming that was a promotion, right?
24 A. Yes, discretionary promotion.
25 Q. What's after lieutenant commander?

---

Page 44

1 A. Captain.
2 Q. Okay.
3 A. Lieutenant commander is kind of a
4 lateral discretional promotion.
5 Q. And then after captain there's deputy?
6 A. Deputy inspector, correct. Then
7 inspector.
8 Q. And then?
9 A. Deputy chief and then assistant chief
10 and then chief of the bureau.
11 Q. Okay.
12 A. Chief of department and then police
13 commissioner.
14 Q. NYPD has an extremely I would say long
15 high hierarchy, right?
16 A. Oh, they do. So I think there's like
17 75, 78 chiefs.
18 Q. How many ranks are there in the New
19 York Police Department?
20 A. Well, that's pretty much always talked
21 about, but I guess, as a lieutenant, that was one of
22 1750. So that's a lot of lieutenants.
23 Q. So you were assigned as lieutenant
24 commander commanding officer of the homicide squad
25 from 2014 to 2020 in what precinct?

---

Maysonet v.
Guevara

1 **A. I was in charge of the whole borough.**
2 **I covered all the precincts.**
3 Q. Okay. And can you give us an idea
4 geographically what that looks like?
5 **A. Well, first, I had all of Queens which**
6 **went from Long Island City down to Rockaway and from**
7 **JFK to LaGuardia, and then when Commissioner Bratton**
8 **had come back in, they did a re-engineering because**
9 **we had two patrol bureaus and just one homicide**
10 **squad. So they wanted to have to two homicide**
11 **squads.**
12 **So they split the bureau and I was in**
13 **charge of what's called Queens south homicide. So**
14 **that was from basically the Long Island Expressway**
15 **south to JFK, from Brooklyn to the city line east of**
16 **Nassau.**
17 Q. Do you know what year they split Queens
18 into Queens north and south?
19 **A. Oh, man. It would have to be -- I'm**
20 **not sure. I'll say -- '17 I want to say. I'm not**
21 **sure, though.**
22 Q. So before they split it, there was only
23 one detective bureau in Queens borough, right? I'm
24 sorry. Strike that.
25 Before they split it, there was only

1 one homicide squad in the Queens borough, right?
2 **A. That is correct. You were correct with**
3 **the other one too. There used to be one Queens**
4 **borough and they split that already, but they never**
5 **split the homicide squad.**
6 Q. Got it.
7 And then they split -- they wanted two
8 homicide squads. So they split Queens into Queens
9 north and south in 2017, and you were the commanding
10 officer of Queens south, correct?
11 **A. I was, correct.**
12 Q. Until you retired in 2020?
13 **A. I did.**
14 Q. Okay. You have since gotten into
15 expert work it looks like.
16 Did you start a expert -- did you start
17 a firm or when did you start getting into expert
18 work?
19 **A. This is the first time. Just me.**
20 Q. Okay. Is this your first case?
21 **A. It is.**
22 Q. Wow. I feel privileged.
23 Have -- how many cases are you
24 presently retained on at the moment in total?
25 **A. Just this one right now.**

1 Q. Okay. And fair to say you've never
2 been qualified as an expert by a court of law in
3 police practice, right?
4 **A. I have not. I have not.**
5 Q. All right. Going back to what we
6 marked as Rudolph-1, or if we didn't mark it, I want
7 to mark it as Rudolph-1 which is this PowerPoint
8 presentation, this was prepared by you it looks like
9 when you were still with the department. Is that
10 correct?
11 **A. No. I did that -- well, some of it --**
12 **some of it was from presentations I did while I was**
13 **on the police department, but this one that I had to**
14 **rewrite specifically for the class that I was**
15 **teaching, yes.**
16 **(Exhibit Rudolph-1, PowerPoint**
17 **presentation, is marked for Identification.)**
18 **MR. BRUEGGEN:** And, Jennifer, we have a
19 copy. I have it printed out.
20 **MS. BONJEAN:** Okay. Perfect.
21 Q. And what was the purpose for preparing
22 this PowerPoint presentation?
23 I mean not just -- you said it was for
24 the University of the Southern Police Institute,
25 but apart from who you prepared it for, what was the

1 goal of it?
2 **A. Well, to explain the proper way to**
3 **supervise and manage a criminal investigation from a**
4 **supervisor's angle, not from a detective's angle.**
5 Q. But in order to supervise an
6 investigation, you have to be examining the actual
7 work of the individuals you are supervising, right?
8 **A. Correct.**
9 Q. And I want to go through some of these
10 slides. Page -- I guess it's page 8 of your
11 presentation. It's Bates stamped Rudolph 115, and
12 these two -- there's two pages of slides, 115 and
13 116, which identify department policies.
14 I assume you're talking about NYPD
15 policies. Is that right?
16 **A. Yeah. So I always speak about how we**
17 **do it in the NYPD, and I explain to everybody,**
18 **just because this is how the NYPD does it, it doesn't**
19 **mean that they're doing it wrong.**
20 **This is what we use, and it's worked**
21 **for us. So it's just really sharing of ideas.**
22 Q. Okay. And the first -- the first
23 principle or policy that you identify at page 8 is
24 that the basic principles of any homicide
25 investigation or major case development are, and

Maysonet v.
Guevara

Page 49

1 it's highlighted there, to preserve and document
2 throughout the course of the investigation. Is that
3 right?
4 **A. Correct. Yes.**
5 Q. And why is that important?
6 **A. That's important for us to know our**
7 **investigative steps so when we have to go to court**
8 **or trial everything has been documented and -- so if**
9 **anything should come up, it's already on the**
10 **paperwork instead of trying to do it off of memory**
11 **from months, years in the past.**
12 Q. So in preparing reports, one of the
13 purposes of reports is to serve to refresh a
14 detective's recollection when he has to go to court
15 and testify about it, right?
16 A. It could, yes.
17 Q. Are there any other benefits or reasons
18 why there was a policy to preserve and to document
19 the course throughout the course of the
20 investigation?
21 MR. BRUEGGEN: Object to the form. Go
22 ahead.
23 **A. Sorry. So, typically, exactly what**
24 **you're saying is that, you know, how about this case**
25 **that we're typing up today. Ten years from now**

Page 50

1 **somebody should be able to sit down and read the**
2 **case and understand what's happening, and,**
3 **typically, if we don't have it, step-by-step**
4 **documented investigation, it could be confusing.**
5 Q. I'm sorry. I didn't mean to cut you
6 off.
7 **A. Sometimes you can get lost in**
8 **understanding what's going on.**
9 Q. I think you wrote in your report that
10 also sometimes investigations change hands, right?
11 **A. Yes.**
12 Q. Would you agree that documenting an
13 investigation is helpful for a new detective coming
14 into an investigation?
15 **A. I would agree with that. Yes.**
16 Q. So they can see what happens before
17 their entrance into the investigation?
18 **A. Typically, I want every -- every**
19 **investigator to type specifically what he or she did**
20 **during that investigation, what investigative steps**
21 **did you do, and I want that on paper memorialized.**
22 Q. And would you agree that sometimes in
23 an investigation, particularly a prolonged
24 investigation or a complex investigation, as you're
25 developing leads or information, you don't

Page 51

1 necessarily know whether that information is going
2 to prove to be relevant by the time that you solve
3 the case?
4 **A. Well, sometimes an investigative step**
5 **we think might be relevant and might turn on it has**
6 **nothing do with the investigation whatsoever, but we**
7 **still want that memorialized in the case, and we'll**
8 **figure it out, you know, at the time we go to a**
9 **trial or getting ready to process somebody for**
10 **arrest.**
11 **I'd rather not make that decision early**
12 **in an investigation but -- and if it comes up during**
13 **trial, we just have to explain, hey, what about, you**
14 **know, you talked to this guy, and we explain why.**
15 **Well, he was at the scene of the crime and whatever**
16 **reason, you know, his alibi, he wasn't home or**
17 **whatever it was.**
18 Q. So fair to say it's better to err on
19 the side of documenting what you've done even if it
20 turns out to be irrelevant because it could be
21 relevant also, right?
22 MR. BRUEGGEN: Object to the form. Go
23 ahead.
24 **A. It could be. Maybe it's not at that**
25 **time, but it could be or maybe it won't.**

Page 52

1 Q. But the point is sometimes you don't
2 know that in a longer investigation until later down
3 the line, right?
4 **A. Correct.**
5 Q. And in documenting throughout the
6 course of the investigation, when you were
7 supervising detectives, did you expect them to
8 either -- strike that.
9 Either as a sergeant or as a lieutenant
10 or whatever rank you were, but I'm guessing as a
11 sergeant, in particular, when you were supervising
12 detectives, did you expect to get an update of what
13 these detectives were doing on a day-to-day basis?
14 **A. Well, typically, I would talk to them**
15 **on a daily basis, especially if it was a crime like**
16 **homicide or maybe a robbery pattern or something**
17 **real violent that it impacts community. I'm going**
18 **to be involved with that, but I do want -- I would**
19 **typically have them -- sometimes they can't type**
20 **that day.**
21 **So by the time -- we call it swing out.**
22 **By the time their week is over, they should have**
23 **something typed up that I can review while they're**
24 **not in the office.**
25 Q. So you want something memorialized

Maysonet v.
Guevara

1 about whatever investigation or investigative acts
2 they took maybe not that day but within a day or
3 two. Is that fair?
4    MR. BRUEGGEN: Object to form. Go
5 ahead.
6 **A.   Usually before -- we say swing out**
7 **because we don't have steady days off. These are**
8 **before they leave for their regular days off,**
9 **especially important or crucial interviews.**
10    **Sometimes, you know, something that**
11 **didn't seem that important wasn't typed up didn't**
12 **have a big impact on the case. That's fine. They**
13 **can type that when they come back.**
14 Q.   Okay. And then on page 9 of your
15 PowerPoint, Rudolph 116, again, you reiterate, if
16 I'm correct, on the second -- on the second section,
17 it says supervisors can be assured the initial
18 police response and preliminary investigation was
19 handled correctly and detailed documentation actions
20 taken as well as required notifications are
21 accurate, especially when a supervisor is not
22 initially present.
23    Tell me what that policy is that you
24 were advocating in your PowerPoint presentation?
25 **A.   So my point is to have a policy in**

1 **place. This is how the basic investigation should**
2 **be conducted, basic investigative steps should be**
3 **conducted.**
4    **There are times that supervisors aren't**
5 **there. So we need to train our people the right**
6 **way. That's the whole point of this PowerPoint.**
7    **So when the detectives aren't there and**
8 **there's not a supervisor with them, they're still**
9 **doing the basic documentation, basic investigative**
10 **steps, because, you know, it might happen when the**
11 **sergeant is off and I'm not -- and I'm not around.**
12 **So there might not be a supervisor working.**
13    **So you need to be able to, you know,**
14 **document and detail the investigative steps without**
15 **having a supervisor looking over their shoulder to**
16 **make sure that they're doing it.**
17 Q.   But, again, you write here that
18 documentation is an important part of the
19 investigation, right?
20 **A.   It is, yes.**
21 Q.   All right. And now going to page 11 of
22 your PowerPoint, again, that's Bates stamped Rudolph
23 118, you have a section called case management.
24 Tell me what that means.
25 **A.   Case management typically refers to the**

1 **administrative -- yeah.**
2    **So the case management, that's more the**
3 **administrative side. So we get the case file**
4 **submitted, what the investigative steps were**
5 **conducted by the detectives. I would review them**
6 **and, you know, not -- not only for accuracy, but**
7 **does it make sense. Were the logical investigative**
8 **steps taken that they're supposed to do, and then I**
9 **would come up with plans of action about what our**
10 **next investigative steps should be.**
11    **So I think you should go talk to this**
12 **person, talk to that person, do this, do this, and**
13 **make sure that's documented in that, and the**
14 **electronic system -- sorry. Go ahead.**
15 Q.   No. Please continue your answer. I
16 didn't mean to jump on you.
17 **A.   I was just going to say the electronic**
18 **system that we talked about, it makes it easier**
19 **because I could just type a note, and it will go**
20 **onto the case. I want you guys to do A, B and C,**
21 **and that gets memorialized in the case sometimes.**
22 Q.   So as a supervisor, you're reading
23 reports, you're following the course of the
24 investigation based largely on what their
25 memorializing in their reports and that way you can

1 also give them guidance about, hey, you should go do
2 this, go talk to this guy, go talk to this guy, go
3 back out and canvass here, whatever, right?
4    MR. BRUEGGEN: Object to form. Go
5 ahead.
6 **A.   It's more than guidance. I give them**
7 **the plan of action. I mean we sit down on breaks.**
8 **I do respect their opinions, but, yeah, it's more**
9 **direction than guidance.**
10 Q.   So it's not simply here's a suggestion.
11 There's actually a plan of action where you are
12 telling them, as their supervisor, this is what you
13 need to go do in this investigation, right?
14 **A.   Yes, because, typically, in NYPD, we**
15 **don't hold the detectives responsible. We hold the**
16 **supervisor responsible.**
17    **So you know about CompStat. So when I**
18 **go down to CompStat, I'm responsible for the**
19 **investigation. I'm responsible for the**
20 **investigative steps. I'm responsible for the**
21 **administrative part of that case.**
22 Q.   Got it.
23    And in this case management -- the
24 bullet points under case management, again, you've
25 bullet pointed that supervisors must ensure, and you

Maysonet v.
Guevara

---

Page 57

1 put it in bold I think here, proper and detailed
2 documentation has been and is being done throughout
3 the course of the investigation, right?
4 A. Correct.
5 Q. And you bolded that proper and detailed
6 documentation, right?
7 A. I did.
8 Q. I didn't bold that. You did.
9 A. I believe that. So I mean --
10 Q. No. I mean I commend you.
11     And you even kind of not repeat it, but
12 you say it a little differently down at the bottom.
13 It is paramount that the investigators take detailed
14 notes about each investigative step completed,
15 right?
16 A. Correct.
17 Q. You stand by that I assume, correct?
18 A. I do stand by that. I mean taking
19 notes is a personal thing. I'm sure we'll talk
20 about that later, but, you know, detailed
21 investigative notes and department forms, I mean
22 five years from now we need to know what happened in
23 this investigation. We're not going to know if we
24 are not taking care of our paperwork today.
25 Q. Right.

Page 58

1     So when, for instance, you know,
2 someone like Lieutenant Russo says, ah, I remember
3 doing a stop and frisk of Chanel Lewis.
4 A. You got to bring that guy up.
5 Q. Oh, we're going to talk about him.
6 A. All right.
7 Q. Don't worry.
8 A. Go ahead.
9 Q. But, again, I'm just saying like, you
10 know, if you're going to point to an investigative
11 step you took as to the chronology of a case, it's
12 going to be a much easier on the stand on
13 cross-examination if you can point back to a
14 document that says, see, here I actually did
15 interview this guy at this time. Would you agree?
16 A. Yes. So what happened, especially with
17 that, if you want to talk about that example, so
18 we're supervisor now. So Russo had to contact me,
19 and, typically, we don't type -- supervisors don't
20 type DD5s.
21     So although on that one I have a
22 separate form for department executive, so I put our
23 control on there, I talk to my detectives and that
24 goes on the DD5 that I spoke to Lieutenant Russo and
25 he said this and this and this when he met Chanel

---

Page 59

1 Lewis that day.
2 Q. All right. And on the next page of
3 your PowerPoint, Rudolph 119, which is at page 12, I
4 want to ask you about another bullet point that you
5 bolded which is basic investigative steps should
6 dictate the direction of the investigation.
7     Tell me what you -- what you mean by
8 that.
9 A. So, typically, whatever investigative
10 steps that we take, results for that will bring us
11 to the next one. So if we interview say Johnny
12 Jones and he gives us information about something,
13 we go to that investigative step, and from that
14 investigative step is going take us to the next one
15 which is going to take us to the next one.
16     It's hard to like -- you know, I know I
17 say cookie cutter in there, but it's true. They
18 can't just have this is a cookie cutter case. You
19 have to do A, B and C, because every homicide
20 investigation, every major criminal investigation is
21 unique and it's different.
22     We never know where it's going to take
23 us. So, you know, I don't like the guys to be like,
24 well, you need to do A, B and C. Well, let's do A
25 and see where A takes us. Maybe we'll have to do C

Page 60

1 and D, but that's what I try to engrain into them.
2 Q. That your next investigative step
3 should flow logically from the investigative steps
4 that preceded it, right?
5 A. Correct.
6 Q. It's not just, you know, shooting in
7 the dark. You want it to --
8 A. More than just like follow a checklist.
9 I'm sorry. I cut you off.
10 Q. It's all right. Go ahead.
11 A. More than just following a checklist.
12 That was like my point.
13 Q. Okay. Moving on to Rudolph 121 which
14 is -- looks like you have -- again, it appears, and
15 I think you said it at some point here, that this
16 is sort of an overview or an outline of basic
17 investigative steps that you have employed, again,
18 with the caveat that every case is different, right?
19 A. Correct.
20 Q. One thing that you pointed out that an
21 interview of the victim, if possible. In a
22 homicide, that wouldn't necessarily be possible, but
23 you also wrote that a detailed arrest history of the
24 victim is an important bit of information that you
25 would want to get in connection with an

---

Page 61

1 investigation. Can you explain to me why?
2 **A. So we might be able to develop leads or**
3 **motives from our victim's, you know, arrest history.**
4 **I mean is he somebody who's looked up for 10 times**
5 **for shoplifting or did he get locked up 10 times for**
6 **shooting people and he's in a gang or did he get**
7 **locked up 10 times for beating his wife or, you**
8 **know, is he a rapist?**
9 **So these are things we should know**
10 **about our victim.**
11 Q. And, again, that's certainly helpful
12 for understanding what the motive of a crime would
13 be, right?
14 **A. Yeah. Well, I don't know if it would**
15 **be a motive. It would help us in our investigation**
16 **I think.**
17 **Is he a drug dealer? Is he a gang**
18 **member? Like I said, domestic violence.**
19 Q. Well, again, taking that a step
20 further, it may be motive, but also to possibly see
21 what -- who the pool of possible offenders could be
22 as well, right?
23 **A. It could help us. Yes.**
24 Q. I mean if someone has a long arrest
25 history that would suggest he's a gang member, one

Page 62

1 possible lead is that the perpetrator of the crime
2 was a rival gang member, right?
3 **A. It could be a rival gang. It could be**
4 **internal disputes inside that gang.**
5 Q. Again, it's not the end of the
6 investigation, but that is -- looking at -- trying
7 to learn what you can about the victim is an
8 important part of it. Would you agree?
9 **A. I want to know as much as I can about**
10 **the victim.**
11 Q. Okay. The next -- on the next
12 PowerPoint you talk about getting detailed
13 background information about the crime scene itself,
14 right?
15 **A. Yes.**
16 Q. Why is that important?
17 **A. Because we want to know what -- like I**
18 **said, basic investigative steps. So is it an**
19 **apartment building? So what about that apartment**
20 **building? Is it a drug location?**
21 **We want to know past 911 jobs. I say**
22 **jobs. I'm sorry. 911 calls. What kind of building**
23 **is it? Is it apartment building? Is it a condo?**
24 **Is it a housing project?**
25 **Those are all important things to know.**

Page 63

1 **You can't just say it's an apartment building. That**
2 **doesn't help us if you type that on a piece of**
3 **paper, department form.**
4 **So, in order to try to develop leads,**
5 **so you need private house, street, in a bar. You**
6 **know, it's all pretty much explained there.**
7 Q. Right. Okay.
8 And then, you know, we're not going to
9 go through every page, but let's jump ahead to page
10 17 of your PowerPoint, Rudolph 124.
11 You talk about canvass as an important
12 part of the investigation or a part of the
13 investigation that -- one of the basic investigative
14 steps that you would take in an investigation. Is
15 that fair?
16 **MR. BRUEGGEN:** Object to form. Go
17 ahead, sir.
18 **A. Yes.**
19 Q. And that is dictated -- sorry.
20 And that is dictated -- it says the
21 crime scene will dictate the canvass. Fair?
22 **A. Right.**
23 Q. And you've also pointed out that, for
24 instance, an apartment building, it's not just --
25 you know, you need to go inside those apartment

Page 64

1 buildings and knock on doors, talk to all the
2 occupants, if you can, of an apartment building,
3 right?
4 **A. Not only that apartment. We want the**
5 **apartment next door, the apartment across the hall,**
6 **the apartment upstairs, downstairs, you know, if**
7 **there's a, you know -- if the buildings are**
8 **U-shaped, someone across the alleyway you might want**
9 **to talk to.**
10 **The crime scene is going to determine**
11 **our canvass.**
12 Q. Right.
13 And you talked about vehicle canvasses.
14 What are those and why are they important?
15 **A. So vehicle canvass is, typically, we**
16 **might have a perpetrator who fled the scene on foot.**
17 **Say there's a block party, a party at a house, and**
18 **there's a shooting, a stabbing, and the person runs**
19 **away, but they leave their car.**
20 **So we want the police officers --**
21 **usually, we use police officers for that to get all**
22 **the plates up and down the block, and then we go**
23 **back to the squad and the detectives can go through**
24 **all that, find out, you know, who owns that vehicle.**
25 **Are they, you know -- are they criminals or do they**

Maysonet v.
Guevara

---

Page 65

1 live on that block or do they live in another
2 neighborhood?
3 And now today we can just collect that
4 electronically.
5 Q. Right.
6 I guess in 1990 that wasn't as easy to
7 do?
8 A. Yeah. That's what plate reader means.
9 Yeah, plate reader. Those are typical on top of the
10 radio cars.
11 Q. Right.
12 Okay. Moving to Rudolph 128 or page
13 21, again, you're back to here talking about the
14 importance of canvasses and following up on no
15 answer locations.
16 So would you agree that, you know, if
17 you do a canvass in the middle of the night
18 immediately and you don't get a lot of responses,
19 it's important to go back and follow-up?
20 MR. BRUEGGEN: Object to the form,
21 incomplete hypothetical. Go ahead.
22 A. Extremely important to follow-up on all
23 canvasses.
24 Q. I think you said later on, again, at
25 Rudolph 130, page 23, I don't know if it's

---

Page 66

1 highlighted by you, it was bolded by you for sure --
2 A. It's me.
3 Q. It says follow-up on remaining no
4 answer canvasses. No such thing as negative
5 results.
6 What does that mean?
7 A. That would drive me crazy. So that's a
8 personal thing, but I think it's -- it's taken off
9 through the detective bureau. So we got away from
10 that.
11 So if I ask you to go -- if I ask a
12 detective to go down this block and look for
13 security video, and they come back as negative
14 results. I don't know what negative results are.
15 Does that mean is there cameras on the
16 block that don't record? Are there cameras there
17 that are live but don't work? I mean record. Are
18 there cameras that don't work at all or are the
19 cameras facing up in the sky, you know, or did you
20 go bang on the lady's door and she wasn't home?
21 I don't know. I don't know what that
22 means. So I like to get away from negative results
23 and tell me exactly what it is.
24 Banged on this lady's door. She has a
25 security video in the house that faces the street

---

Page 67

1 but doesn't record. That's a better canvass for
2 video.
3 Q. And if a detective came to you and said
4 I banged on this lady's door, she wasn't there, and
5 that was all they had done, I'm assuming, based on
6 what you have represented in this PowerPoint and
7 even here today, that you would expect detectives to
8 go back and follow-up to try to speak to the person.
9 Again, assuming the location is one that is near the
10 scene or --
11 A. Yeah. I got you.
12 MR. BRUEGGEN: Objection, incomplete
13 hypothetical. Go ahead, sir.
14 A. So, typically, this whole thing that
15 we're going through right now, this is what a
16 supervisor should be trying to review in the first
17 seven days of the investigation.
18 So we already know that follow-up
19 canvasses are no answers. We're going to have a
20 running list of what needs to be followed up, and
21 so, typically, I would just tell the guy we got to
22 follow-up on this address, follow-up on this woman,
23 follow-up on this victim. Let's make sure we get a
24 good interview with them.
25 We might not get it that day either,

---

Page 68

1 but we have to keep until -- as the case progresses
2 until we can get them all, if we can.
3 Q. Got it. Okay.
4 MR. BRUEGGEN: Jennifer, can you let me
5 know when you're at a breaking point?
6 MS. BONJEAN: Yeah. Let me -- I
7 might -- sure. We can take a break. You want to
8 take a five-minute or 10-minute break? What's your
9 feeling?
10 MR. BRUEGGEN: Five minutes is fine
11 with me.
12 MS. BONJEAN: We'll take five. Thank
13 you.
14 (Whereupon, a recess was taken.)
15 Q. Mr. Rudolph, I want to go back to your
16 PowerPoint at, specifically, I think it's 28, page
17 28 of your PowerPoint, Bates stamped Rudolph 135,
18 and this section deals with the responsibilities of
19 detective bureau supervisors, and then the
20 subcategory you have here is investigative
21 management.
22 Do you see that?
23 A. Yes.
24 Q. Okay. Number 6 indicates, and I'm
25 going to paraphrase, correct me if you feel like

---

Maysonet v.
Guevara

1 I've paraphrased incorrectly, that supervisors
2 should make sure that the detective squad units are
3 collecting all available investigative information
4 in a timely manner.  Is that fair?
5 **A.  That's fair.**
6 Q.  And what is -- why is it important to
7 be collecting information and intelligence and
8 investigative information in a timely manner?
9 **A.  Well, I think more like in today's --**
10 **in today's world, like we talked about before,**
11 **security video, that might only last for sometimes**
12 **48 hours, sometimes, you know, a week or 30 days.**
13 **So if there's locations with video,**
14 **something like that, if we don't get on that, we**
15 **could lose that information.**
16 Q.  So I mean, whether it's video or not,
17 obtaining information in a timely manner ensures
18 that it's preserved, right?
19 **A.  Preserved and collected, yes.**
20 Q.  Also, it could -- would you agree that
21 it -- since investigations should proceed in a
22 logical fashion, it could give you a lead that you
23 would follow that might take you to conclusion?
24 **A.  I mean it would have to depend on the**
25 **investigator himself and what happened.  These are**

1 **just basic investigative steps I put on here.**
2 **I mean it could.  Like I said, we**
3 **talked about security, cell phones, materials that**
4 **we might lose if we don't get it right away.**
5 Q.  I mean investigations should be
6 generally conducted in a timely manner, right?
7 **A.  Typically.  We have a formula.  It's**
8 **not -- you know, it's not in granite, but,**
9 **typically, three, seven, 30-day reviews.  So in 30**
10 **days, we should have a good idea where our case is**
11 **at.**
12 Q.  And this three, seven, 30 days, what
13 happens after 30 days?
14 **A.  Well, then we re-evaluate.  Look at all**
15 **our investigative steps, what we've done to date,**
16 **and what's our plan of action going forward.**
17 Q.  And is it like every 30 days for a
18 period of time once you get to 30 days?
19 **A.  After 30 days, usually, it's like**
20 **biweekly reviews.  So those are like unofficial,**
21 **official reviews, but if it's a high profile**
22 **investigation or something that the public might be**
23 **in danger of, we're going to review that almost**
24 **every day.**
25 Q.  For example, a double homicide you

1 would want to review regularly correct?
2 MR. BRUEGGEN: Object to form.
3 **A.  Yes.**
4 Q.  Okay.  Number 7 is supervisors must
5 continually verify investigative actions are
6 appropriately documented in a timely manner and
7 associated records and materials are properly
8 stored, maintained, secured, archived in accordance
9 with department procedures.
10 So there are kind of two ideas in here.
11 One that supervisors must continually verify
12 investigative actions are documented in a timely
13 manner and also that they're preserved, stored and
14 archived consistent with the policies of the
15 department, right?
16 **A.  Yes.  So this came out of the World**
17 **CompStat like when I spoke about how I'm accountable**
18 **for the investigation.**
19 **So if I'm constantly reviewing a case**
20 **and making plans of action, I need to make sure the**
21 **investigative steps were being properly followed and**
22 **in a timely manner.**
23 **So I don't want maybe a witness or**
24 **somebody we haven't spoken to or we haven't been**
25 **able to find and it sits there for days and weeks on**

1 **end.  That could be a problem, and then like we**
2 **talked about before, security video, cell phones,**
3 **basically like modern electronic materials that we**
4 **need to get right away and find a way how do we**
5 **secure that.**
6 **So now we do a lot of that in the**
7 **cloud.  We have to put it on thumb drives and make**
8 **copies of that.  Different steps.**
9 Q.  And why is it important that
10 investigative actions are documented in a timely
11 manner?
12 **A.  In a timely manner.  So we don't want**
13 **an interview that might have been done to not be**
14 **documented as soon as possible.**
15 **Typically, like I said, it should be**
16 **done within the first four days.  A detective**
17 **usually swings out.  If you say four days, three**
18 **days, that should be documented on paper.**
19 Q.  You don't want the Lieutenant Russo
20 problem, right, at trial?
21 MR. BRUEGGEN: Object to form.
22 Q.  Let me put it in different terms.  You
23 don't want to get to trial and be explaining on
24 cross-examination why there was no documentation for
25 something that you're now relying on as the basis

**Page 73**

1 for your arrest, right?
2 **A. I'd like to have all my paperwork**
3 **typically done as soon as possible and done by the**
4 **detectives that conducted that investigative step.**
5 Q. Okay. At page 30 of your PowerPoint,
6 Rudolph 137, number 10, I'm jumping around, but
7 number 10 says a supervisor must have a detailed
8 account of all leads and evidence.
9 What does that mean?
10 **A. So we need to know what evidence was**
11 **collected and basically what's being done with it**
12 **and where it is.**
13 **So if I have somebody's cell phone is**
14 **at our TARU or is at computer crimes or it was a**
15 **voucher and it's in the lab in the property clerk**
16 **and we need to get it out.**
17 Q. Going to page 38 of your PowerPoint in
18 Rudolph 145, you discuss a number of issues that
19 relate to the integrity of investigations.
20 What -- what do you or did you mean by
21 integrity of the investigations in this PowerPoint
22 presentation that you prepared?
23 **A. Well, I mean it says right there. The**
24 **first one is always Miranda, make sure that's**
25 **given -- there's always that fine line between**

**Page 74**

1 interview and interrogation.
2 So we always want to make sure that's
3 done. That's basically the job. It's supervising
4 to make sure Miranda is given as soon as possible.
5 Q. You mean -- I'm sorry.
6 You mean if you have a suspect?
7 **A. A suspect, and then if she might be --**
8 **like a witness might turn into a suspect. So we**
9 **don't want to have an interview and then all of a**
10 **sudden, when she turns into suspect, we never read**
11 **Miranda. So we want to get Miranda read to them as**
12 **soon as possible.**
13 Q. So would you say you err on the side of
14 giving Miranda particularly in serious
15 investigations because you often don't know whether
16 a witness turns into a suspect or may have some
17 culpability in the crime, right?
18 MR. BRUEGGEN: Object to form,
19 incomplete hypothetical. Go ahead.
20 **A. I would want Miranda read to a suspect**
21 **or a witness that could turn into a suspect as soon**
22 **as possible, and we might have to do it multiple**
23 **times, you know, as the day goes on, the night goes**
24 **on and --**
25 Q. In New York -- I mean, throughout your

**Page 75**

1 career, I think, you, as a police officer -- you can
2 speak to someone again with probable cause for about
3 24 hours before they have to be in front of a judge,
4 right?
5 MR. BRUEGGEN: Object to form,
6 foundation. Go ahead, sir.
7 **A. I'm not sure if it's 24 hours. After**
8 **he's arrested --**
9 Q. Yeah.
10 **A. I forget the time it would be before**
11 **his first hearing. Is it the one eighty eighty? Is**
12 **that what you're asking?**
13 Q. I'm asking, once someone's arrested,
14 they typically have to be at a Gerstein hearing in
15 front of a judge within 24 hours in New York, right?
16 Isn't that the rule of thumb?
17 MR. BRUEGGEN: Object to the form,
18 foundation. Go ahead, sir.
19 **A. I don't think so. You could be right.**
20 **I don't know. I never had to deal with that.**
21 Q. What do you mean? You never had to
22 deal with that in your work?
23 **A. Typically, once we -- once somebody's**
24 **arrested for murder, once we process him and he's**
25 **printed, our investigation is done.**

**Page 76**

1 **He could be out of the stationhouse in**
2 **an hour and be down to central booking, and now he's**
3 **on line to go before the judge.**
4 Q. Okay. Let me ask it this way. Someone
5 that you have in custody who's not free to leave,
6 which I call arrest, okay, I'm not calling charging,
7 I'm making a distinction between arrest and
8 charging, but someone who's been detained who is not
9 free to leave but who has not been charged, what
10 period of time can you hold someone from arrest to
11 charging?
12 MR. BRUEGGEN: Object to foundation.
13 Go ahead.
14 **A. I don't recall if there was a specific**
15 **time.**
16 Q. Okay.
17 **A. I don't know. I'm sorry.**
18 Q. Okay. I understand you identified some
19 things under the integrity of an investigation, but
20 I'm asking a more simple question of what do you
21 mean by an integrity of an investigation?
22 What does that mean?
23 **A. So the integrity as far as supervisors**
24 **has nothing do with, you know, misconduct or**
25 **corruption. It's just how the investigation is**

Maysonet v.
Guevara

---

Page 77

1 done.
2   So it's Miranda, evidence collection,
3 was that done correctly?  Do we have the right
4 personnel?  Make sure all our basic investigative
5 steps were completed and follow-up on our leads and
6 make sure all our department referrals.
7   So, typically, I would have to talk to
8 all the department executives and get them
9 information even though it's prelim so that they
10 might have to release information to the community,
11 and just keep in contact with the DA's office as I
12 wrote there.
13 Q.  Okay.  I don't want to put words in
14 your mouth, but when you say integrity of the
15 investigation, and I didn't -- I didn't assume you
16 meant anything about misconduct, but you're saying
17 integrity as in the quality of the investigation,
18 right?
19   You want a high quality of
20 investigation as much as possible, correct?
21 A.  I would agree with that.  Yes.
22 Q.  And these are some of the things that
23 you would expect to be honored, considered, done
24 competently for a high quality investigation, right?
25   MR. BRUEGGEN: Object to form.  Go

---

Page 78

1 ahead.
2 A.  I wouldn't expect that.  Like I said,
3 all investigations are unique, but this is what our
4 supervisors basically should be cognizant of, be
5 aware of and stay with that.
6 Q.  And on page -- well, page 39 of your
7 PowerPoint, but identified as Rudolph 146, you have
8 a section dealing with basic investigative
9 techniques, and -- and the first thing you discuss
10 in this section relates to the objective.  Oh, and
11 there you are.  You used the word quality
12 investigations too, right?
13 A.  Yeah.
14 Q.  Which includes making sure that basic
15 investigative techniques are used, right?
16 A.  Yes.
17 Q.  They're done so in a logical sequence
18 and priority, right?
19 A.  Yes.
20 Q.  And at an appropriate time, correct?
21 A.  Correct.
22 Q.  Doing a canvass, you know, at 3 in the
23 morning is not probably going to be as successful as
24 doing it either before work hours or in the -- or
25 after work hours, right?

---

Page 79

1 A.  Right.  So like something like that
2 would be if we had a shooting or robbery, something
3 that happened at, you know, 3 in the morning and
4 we're doing a canvass at 11, 12 o'clock at night --
5 in the afternoon, it's a residential neighborhood,
6 you're probably not going to get a lot of
7 information out of that or any leads.
8   So we want to do a canvass in or around
9 the same time frame as our crime.
10 Q.  And on the next page you discuss again
11 that it's important to canvass and then recanvass so
12 that you can speak to as many people and develop as
13 many leads as possible, right?
14 A.  Correct.
15 Q.  All right.  And how did you develop
16 this list of basic investigative techniques?
17 A.  Some of that I took from our NYPD
18 detective guide.  Some of it was from -- we have
19 basic investigative steps attached to each case that
20 detectives will file in the electronic ECMS system
21 now, some of that I took and merged it with
22 that, and some of it's my own.
23 Q.  Okay.  So these basic investigative
24 techniques that you've identified are sort of, would
25 you agree, like I guess standard that you would look

---

Page 80

1 to, again, understanding that every case is
2 different, but these are -- when you're training
3 people, these are the investigative techniques that
4 you would want supervisors to ensure are being
5 carried out by the individuals that they supervise,
6 correct?
7   MR. BRUEGGEN: Object to form.  Go
8 ahead.
9 A.  So, yes, that's basic investigative
10 techniques, but some of them you can't use for every
11 case, but they should have -- I hate to say
12 checklist.  Somebody should have a checklist
13 somewhere in their office.
14   We have that on our case files
15 automatically print out, but, yes, that's more of a
16 guide that they should always be cognizant of.
17 Q.  And I'm sorry.  You said that this --
18 that this -- these basic investigative techniques
19 come from I think you said NYPD's detective manual,
20 right?
21 A.  Detective guide and from ECMS system.
22 Q.  ECMS system.
23 A.  That's the electronic system we spoke
24 about.
25 Q.  And, again, for the purposes of the

---

Page 81

1 record, the ECMS system that you're referencing, can
2 you elaborate on how this information comes from the
3 ECMS system that you referenced?
4 **A.  So that is imprinted on every single**
5 **investigation, every one.  So as soon as the**
6 **detective opens up the case file, it's already there**
7 **for them to use as a reference on every case.  It**
8 **doesn't get deleted and you can't change it.**
9 **So that was developed by the department**
10 **some years ago, and it's a good -- it's a good guide**
11 **to use, especially if the supervisors aren't around**
12 **or running out of ideas what to do next.  So every**
13 **detective has that on a case, and then the**
14 **supervisor will have that when he goes to review the**
15 **case, and he can refer to that also.**
16 Q.  And, again, just so I understand and
17 the record is clear on this, are these likes steps
18 or -- I know we don't like the word checklist, but
19 are they just various steps that are basic
20 investigative techniques that are literally in the
21 ECMS system that a detective is filing into?
22 **MR. BRUEGGEN:** Object to the form.  Go
23 ahead, sir.
24 **A.  I think they referred that to as the**
25 **top dozen or something like that, but, obviously,**

Page 82

1 **they don't have to be followed in order, and you're**
2 **not going to use all of them in certain cases, but**
3 **that was just the top 12 point.  I think I have a**
4 **lot more than 12.**
5 Q.  Sure.
6 **A.  It's always good for a reference**
7 **material.**
8 Q.  And the top 12 which I know you've
9 elaborated on based on even your own experience, did
10 that exist at least in concept prior to the EMS
11 system being enacted?
12 **MR. BRUEGGEN:** Object to form.  Go
13 ahead.
14 **A.  I don't think -- I don't think it was**
15 **official, but it definitely wasn't printed out**
16 **anywhere.**
17 **I think one of the chiefs had a check**
18 **sheet that was flowing around, but I couldn't even**
19 **remember, but I think they broke it down and finally**
20 **put it out that anybody can use.**
21 Q.  Police officers have been doing
22 investigations for a long time, right?
23 **A.  Yes.**
24 Q.  And, obviously, technology changes.
25 The world changes.  So, you know, what constitutes

Page 83

1 potential evidence has changed over time.
2 Would you agree that basic
3 investigative techniques have remained consistent?
4 Again, putting aside, you know, that
5 there are technologies that may impact that, but
6 that basic investigative techniques have remained
7 the same over the last 50 years?
8 **MR. BRUEGGEN:** Object to form, vague.
9 **A.  I don't like -- my last 18 of my 30**
10 **years I was in the detective bureau.  So the**
11 **investigations that I started in the 114 until I**
12 **left homicide were totally different the way we**
13 **would approach investigations, but, you know, like I**
14 **said, basic investigative steps, we want to talk to**
15 **witnesses.  We want to track down other evidence,**
16 **yes, but I mean we didn't have all the resources**
17 **that we have today.**
18 Q.  No.  I understand that.
19 But there are certain things that have
20 remained consistent.  Canvassing has always been
21 something that is part of an investigation, right?
22 **A.  Correct.**
23 Q.  I mean going back, again, I don't know
24 how long, but certainly since 1990, right?
25 **A.  Uh-hmm.**

Page 84

1 Q.  Is that a yes?
2 **A.  Yes.**
3 Q.  And interviewing witnesses is an
4 investigative technique that probably goes back, you
5 know, since the beginning of the creation of law
6 enforcement, right?
7 **A.  Yes.**
8 Q.  Collecting whatever evidence may exist,
9 again, may come in different forms, but, certainly,
10 collecting evidence is a basic investigative
11 technique, correct?
12 **A.  Yes.**
13 Q.  Documenting your investigative steps
14 has been a -- I don't know if you want to call it a
15 technique, but it's been a requirement or at least
16 something that police officers have understood is
17 necessary for going back, you know, again, certainly
18 since 1990, right?
19 **MR. BRUEGGEN:** Object to form.  Go
20 ahead.
21 **A.  Not really.  So I kept on saying '90.**
22 **You know, in 1990, the NYPD, you know, even when I**
23 **was a cop, supervisors would get on me if I was**
24 **writing too much in my report.**
25 **So it's a little bit different, but**

Page 85

1 especially in the detective bureau, we really didn't
2 get into detailed documentation until CompStat.
3 That's when it started to really be held accountable
4 to have detailed information put on our detective
5 bureau reports.
6     I mean we didn't really have that when
7 I first got in the bureau until CompStat really
8 became -- you know, our alliance is CompStat and
9 being held accountable for our cases.
10 Q.  Are you saying there wasn't a policy in
11 the New York Police Department in 1990 to
12 memorialize your investigative work?
13     MR. BRUEGGEN: Objection, misstates
14 testimony.  Go ahead, sir.
15 A.  I don't know -- if you're talking about
16 detective bureau stuff in 1990, I was a rookie cop.
17 So I don't know what the detective guide was back in
18 1990, if one existed.
19 Q.  Okay.  But you're here as an expert
20 today, right?
21 A.  Right.
22 Q.  You're not here as just Rick Rudolph,
23 NYPD police officer.
24     So, again, I'm going to ask you, when
25 you started with the department -- when you went

Page 86

1 through the academy, one of the fundamental tenets
2 that you learned was to document your work, right?
3 A.  Typically, I would fill out complaint
4 reports, burglaries, robberies, stuff like that.
5 Q.  And you learned that you should include
6 the who, what, where, why in any report, right?
7 A.  Yes.
8 Q.  And that went back to when you started
9 with the department.  Fair?
10 A.  Yes.  Yes.
11 Q.  Certainly, Brady versus Maryland
12 existed before 1990, correct?
13 A.  I believe so.
14 Q.  1963.
15 A.  We always -- I only learned about Brady
16 here.  I was taught Rosario in New York.
17 Q.  Well, they're different, but they are
18 both similar.  One is constitutional.  Rosario is
19 actually more stringent than Brady, isn't it?
20     MR. BRUEGGEN: Object to foundation.
21 Go ahead.
22 A.  From what I read.  I couldn't be an
23 expert on case law.
24 Q.  Well, you were trained on your
25 obligations under People versus Rosario and Brady

Page 87

1 versus Maryland, right?
2 A.  Rosario, yes.
3 Q.  I mean Rosario predates.
4 A.  I might have been.  I don't remember
5 Brady.  I just know Rosario.  I've learned about
6 Brady since I've been involved in this case.
7 Q.  Are you saying through your 30 years in
8 the police department you didn't get trained on what
9 the U.S. Constitution requires under people -- or
10 under Brady versus Maryland?
11     MR. BRUEGGEN: Objection, misstates his
12 testimony.
13 A.  I'm not saying I didn't.  I just don't
14 remember.
15 Q.  You certainly understood your Rosario
16 obligations, right?
17 A.  I did.
18 Q.  And what were those?
19 A.  Preserve anything that's involved with
20 the case, any written notes, official forms, forms
21 in back of the notebooks that the police officers
22 might fill out in their own handwriting, regular
23 memo books from the police officers.
24 Q.  What is the consequence of failing to
25 oblige with your Rosario obligations?

Page 88

1     MR. BRUEGGEN: Object to form,
2 foundation.  Go ahead.
3 A.  Well, we could lose a case because of
4 it.
5 Q.  And did Rosario extend to disclosing
6 information that was not memorialized?
7     MR. BRUEGGEN: Object to form,
8 foundation.  Go ahead.
9 A.  I'm not sure I understand.
10 Q.  Meaning is it your understanding that,
11 if a witness says, you know what, I saw the
12 shooting, I know who did it, it's this guy, you
13 know, John Doe, he lives over here, okay, and a
14 police officer said that's not really consistent
15 with our working theory, I'm not going to write that
16 down, okay, I'm just going to -- I'm going to ignore
17 it, I know it's out there, but I'm not going to
18 write it down, is it your understanding that,
19 notwithstanding the fact that he didn't write it
20 down, he's still required to disclose that
21 information?
22     MR. BRUEGGEN: Object to form,
23 foundation.  Go ahead.
24 A.  I mean I would hope he would bring that
25 information to a detective if that's what we're

Maysonet v.
Guevara

1 talking about.
2 Q.  I mean would you agree, under Rosario,
3 that would be not only information, it's exculpatory
4 information that would have to be produced whether
5 someone writes it down or not?
6 A.  If he told somebody.  I mean I don't
7 know what's in a cop's mind that he would think
8 that's not important to tell anybody or just
9 disregard that information.
10 Q.  I mean you can't conceal exculpatory
11 information just because -- in your brain because
12 it's not helpful to your case.  Would you agree with
13 that?
14 A.  I'm just saying that I don't know
15 what's in the cop's mind.
16    You're saying he just like blew this
17 guy off which that would be terrible, and if he
18 reported it to a detective and then the detective
19 could write it down, of course, I'm going to sign
20 that over.
21 Q.  My point is, under Rosario and Brady
22 versus Maryland, you can't conceal exculpatory
23 information by refusing to put it on paper.  It's a
24 general proposition.  Would you agree with that?
25    MR. BRUEGGEN:  Object to form,

1 foundation.  Go ahead, sir.
2 A.  I don't know why we would not put that
3 on paper.
4 Q.  Okay.  That's not an answer to my
5 question.
6    I'm talking about your obligations
7 consistent with the Constitution and under state law
8 in New York that it is not appropriate, it's very
9 basic here, that you may not as a matter of
10 constitutional, statutory or common law in the State
11 of New York or elsewhere conceal exculpatory
12 information by simply refusing to document it.
13    MR. BRUEGGEN:  Object to form.
14 A.  You know, I would agree with we should
15 never hold back information.  I mean if that's what
16 you're asking me.
17 Q.  Are you saying there are some instances
18 where you can conceal exculpatory information --
19 A.  No.
20 Q.  -- by not reporting it?
21    MR. BRUEGGEN:  Objection, misstates his
22 testimony.
23 A.  No.
24 Q.  So you agree with me it sounds like?
25    MR. BRUEGGEN:  Object to form.

1 A.  I agree that we should not withhold any
2 information from the courts or any case purposely.
3 Q.  Right.
4    And you need to ensure that there are
5 systems in place to protect against inadvertent
6 suppression of information, correct?
7    MR. BRUEGGEN:  Object to form, vague.
8 Go ahead.
9 A.  That's why we have supervisory reviews.
10 Q.  All right.  You have in your expert
11 report -- mark that as 2.  You can keep the
12 PowerPoint handy, but we'll mark as Rudolph-2 your
13 report, and you have a professional profile at page
14 3 of that report, right?
15 A.  I do.
16    (Exhibit Rudolph-2, Rudolph report, is
17    marked for Identification.)
18 Q.  And in your professional profile, you
19 wrote at paragraph three that you were the homicide
20 commander in a number of high profile media cases,
21 right?
22 A.  Yes.
23 Q.  Including the murder of Karina Vetrano,
24 correct?
25 A.  Correct.

1 Q.  And that was a case that was
2 investigated over a period of time, right?
3 A.  Yeah.  It took a long time.
4 Q.  How long, if you know?
5 A.  Oh, gosh.  I think almost about -- I'm
6 going to say around eight months at least, give or
7 take.
8 Q.  And did you supervise Lieutenant Russo
9 and John Russo and Detective Michael Reeridge.  Is
10 that how you say his name?
11 A.  Greenidge.  Greenidge?
12 Q.  Yeah.  I'm sorry.  Greenidge, right?
13 A.  Yeah.  So, Russo, we were the same
14 rank, and he worked down at Police Plaza.  So I
15 didn't supervise him.  He didn't work for me.
16    Greenidge was -- he was in the local
17 106 Precinct detective squad.  So he worked on our
18 task force.  I also -- the task force, but he didn't
19 work for me.  He worked for the precinct detective
20 squad commander.
21 Q.  Right.
22    You wrote in your professional profile
23 that you directed the investigation.  Is that
24 correct?
25 A.  That is.  So Detective Barry Brown, he

Maysonet v.
Guevara

---

Page 93

1 works for me.
2 Q. I'm sorry. Say that again.
3 A. Detective Barry Brown, if that's what
4 you're looking at, he's the one that worked for me.
5 Q. Okay. And -- but there are other
6 investigators, I'm assuming, in the Karina Vetrano?
7 A. At one point I had -- first day I had
8 almost a hundred. As it went on, I had about 20 or
9 30, and then I had -- typically, every day I had
10 maybe 10 -- 10 or more assigned every day to the
11 task force.
12 Q. And it was a fairly cold case for quite
13 some time, right?
14 A. It slowed down. I don't know if I
15 would say it was cold. It just slowed down.
16 Q. You talk about it at length in your
17 PowerPoint presentation, right?
18 A. Yeah. I'm sorry.
19 Q. Go ahead. Sorry. Go ahead. Finish
20 your answer. We'll start again.
21    You discuss it at length in this
22 PowerPoint presentation that you produced, right?
23 A. Yes. That's a case presentation that I
24 did to show how it all -- when I teach the class how
25 it all ties together.

---

Page 94

1 Q. And you wrote the first big break was
2 when Lieutenant Russo called you about some
3 suspicions he had, correct?
4    MR. BRUEGGEN: Jennifer, can you tell
5 us what page you're at?
6    MS. BONJEAN: Yeah. It's at page 98 of
7 his PowerPoint presentation.
8 A. Yes. So he called me in February.
9 Yes, February.
10 Q. Was that correct? Yes?
11 A. Yeah, that's correct. Yeah.
12 Q. And -- he was -- he was telling some
13 suspicions, and as I understand it, was asking
14 for -- to pull a report from a stop and frisk he had
15 done of the suspect, right?
16 A. Well, he called 911, and he was looking
17 for that report that the police officers had done.
18 Q. Right.
19 A. He lives in that neighborhood. That's
20 why.
21 Q. Right. Right.
22    He had seen the suspect on a number of
23 occasions, right?
24 A. If I remember correctly, he saw him
25 twice.

---

Page 95

1 Q. As a supervisor, again, consistent with
2 these techniques that you were talking about, did
3 you question Lieutenant Russo about, you know, why
4 he had suspicions about a stop and frisk that didn't
5 result even in an arrest?
6 A. No. Like I said, we're the same rank,
7 and he works for the chief of detectives. So he
8 just gave me a lead, and I had detectives go and
9 find the 250.
10 Q. And are you saying you didn't supervise
11 Lieutenant Russo?
12 A. I don't -- we don't even work in the
13 same -- he works for the chief of detectives down at
14 Police Plaza, and I'm out in Queens homicide.
15 Q. Well, he's the guy that allegedly
16 cracked the case. So were you or were you not in
17 charge of the investigation?
18 A. Allegedly, yeah, I was in charge of the
19 investigation, but he gave us a lead. He gave us an
20 investigative lead.
21 Q. In your PowerPoint presentation here on
22 this case, you didn't mention anything about the
23 elimination testing that NYPD did, do you?
24 A. I don't believe so. Like I said, this
25 was just, you know, case presentation. I don't know

---

Page 96

1 if I had any stats in there.
2 Q. I'm sorry. I didn't catch that.
3 A. I'm not sure if I have any stats of
4 anything like that in here.
5 Q. You're, of course, aware that NYPD was
6 accused of doing basically a racial dragnet in that
7 case, right?
8 A. I would see reports, you know.
9 Q. Would you consider that a good
10 investigative technique?
11    MR. BRUEGGEN: Object to form, vague.
12 A. Which technique?
13 Q. Well, were you aware that NYPD did
14 phenotyping on DNA that was found on the victim's
15 phone?
16 A. I was not.
17 Q. That wasn't something that you were a
18 part of?
19 A. No.
20 Q. Were you aware that NYPD had used an
21 unlicensed lab to conduct so-called phenotyping to
22 get some type of DNA sketch of what the suspect
23 might look like from his DNA or from the DNA?
24 A. Yeah. I was never aware of any of
25 that. That's way -- way past me. I don't know how

---

Page 97

1 all that went down.
2     I mean I was never a part of any of
3 that. I never even seen any pictures what a person
4 might look like.
5 Q.  But you're aware that NYPD tried to use
6 that technology, that new technology from a lab that
7 was not even approved by the State of New York to
8 get a lead on who was responsible, right?
9 A.  I was never aware of that.  No.
10 Q.  And, in fact, went around and took DNA
11 from about 500 African American men in the Howard
12 Beach area, right?
13 A.  They collected a lot of DNA.  I don't
14 know if they were all black.
15 Q.  Well -- but you were doing it --
16 A.  We took -- we took DNA from all
17 different kinds of races of people.
18 Q.  Is that true?  Is that what's borne
19 out?
20 A.  I'm not lying.  You asked me a
21 question.  I gave you the answer.  I'm not going to
22 lie.
23 Q.  Well, I mean are you aware that the
24 actual -- well, strike that.
25     Are you saying that there was no part

Page 98

1 of the action plan was to obtain DNA of African
2 Americans disproportionate to anybody else?
3 A.  No.  There was no plan of that at all
4 whatsoever.
5 Q.  As the head of that investigation,
6 you're not aware that DNA was purposefully -- that
7 there was a plan to purposefully get DNA from
8 African Americans from this area.  Is that what
9 you're saying?
10 A.  That was never the plan.  Never the
11 plan.
12 Q.  And that there was no plan to
13 essentially surveil hundreds of men of color with
14 questionable relationships to Howard Beach and to
15 try to get their DNA to, I guess, either exclude
16 them or include them?
17 A.  So when you say the NYPD, you're
18 talking about me?
19 Q.  Yeah.
20 A.  I was running the investigation.  We
21 did not do that.  We didn't even know what color
22 this guy was.  We had no idea.  All I had was this
23 DNA that didn't fit anybody.
24 Q.  Okay.
25     MR. BRUEGGEN: Jennifer, let him

Page 99

1 finish.
2 Q.  I'm sorry.  Go ahead.
3 A.  It's all right.  No problem.
4     What happened is we got surrounding
5 precincts, 72 precincts.  Every prisoner that was in
6 there, did they take DNA swaps from them, either an
7 abandoned sample or they gave it to us that was
8 submitted.
9     Is a lot of those people black?
10 Probably.  It's a black neighborhood.
11     We also did that in the 106 precinct
12 which is all Italian and Spanish.  So we had DNA
13 from a lot of Italian and Spanish people we took
14 from there, and then we would get people locked up
15 from narcotics.  Try to get abandonment samples or
16 DNA samples from them, and that was all over the
17 borough, and we tracked down all her boyfriends, all
18 people that didn't like her family.  They were
19 white, Italian.
20     We talked to so many different people.
21 Q.  Right.
22     But are you -- are you denying that
23 there was DNA phenotyping done from the Parabon
24 NanoLabs that identified the suspect as black?
25     Are you denying that that happened?

Page 100

1     MR. BRUEGGEN: Objection, asked and
2 answered, foundation.
3 Q.  You can answer.
4 A.  I don't know anything about it.  We
5 didn't use it during the investigation.  You know, I
6 heard something in the paper about it since I left
7 the job, but I could tell you we never were involved
8 in any of that.  Nobody gave that to me.
9 Q.  Was it reported in any of the DD5s?
10 A.  It was definitely not on DD5 because I
11 signed off on the majority of those.  There were
12 several that I didn't see.
13 Q.  So if that was going on, was it going
14 on behind your back?
15     MR. BRUEGGEN: Objection, form,
16 foundation.
17 A.  I don't know anything of when it was
18 going on, who was doing it, but I was not privileged
19 to any of that or my team.
20 Q.  So just so I understand, you're saying,
21 as the person who directed this murder
22 investigation, the first time you heard anything
23 about NYPD using the Parabon lab to conduct
24 phenotyping on DNA recovered from the victim was
25 after the fact in a news article.  Is that what your

---

Page 101

1 testimony is?
2 **A. Yeah. I didn't find out until months**
3 **later.**
4 Q. Months. What do you mean months later?
5 Months from what, the conviction?
6 **A. Yeah, after trial.**
7 Q. Did you testify at that trial?
8 **A. I did not.**
9 Q. Would you agree that doing a racial
10 dragnet would be not an appropriate investigative
11 technique?
12     MR. BRUEGGEN: Object to the form,
13 argumentative and irrelevant.
14 **A. I think any time we're going to focus**
15 **on just a racial dragnet, like you said, that's**
16 **never appropriate and we would never do that.**
17 Q. Okay. Have you heard about that
18 whistleblower letter that was sent?
19     MR. BRUEGGEN: Object to form, vague.
20 **A. Whistleblower letter?**
21 Q. Yeah. The whistleblower of an NYPD
22 officer who reported that there was a racial dragnet
23 done and then that was litigated. I'm just
24 wondering if you're familiar with that.
25     MR. BRUEGGEN: Object to form and

---

Page 102

1 foundation. Go ahead.
2 **A. I do remember somebody sent a letter to**
3 **the chief, it was anonymous, during the first trial.**
4     **Is that what it was? I vaguely**
5 **remember that.**
6 Q. I think it -- I don't know if it was
7 after the mistrial or not, but you do remember
8 hearing something about that, correct?
9     MR. BRUEGGEN: Object to the form.
10 **A. Yes.**
11 Q. All right. What role did you have in
12 the interrogation of Chanel Lewis, if any?
13 **A. I did a supervised -- supervised the**
14 **interrogation from the squad lieutenant's room.**
15 Q. You were there?
16 **A. I was there for the second part,**
17 **because I was in Florida actually. I had to fly up**
18 **for the arrest.**
19 Q. Did you participate directly in the
20 interrogation?
21 **A. No.**
22 Q. Who conducted the interrogation?
23 **A. That was Detective Brown and**
24 **detective -- I can't remember his name. He was from**
25 **the 106. He was the case detective, but my**

---

Page 103

1 **detective has basically lead. He's the homicide**
2 **detective.**
3 Q. And that interrogation was challenged,
4 correct?
5     MR. BRUEGGEN: Object to the form. Go
6 ahead.
7 **A. Challenged during the trial?**
8 Q. Yeah.
9     It was challenged at trial and there
10 was a suppression motion, correct?
11 **A. There was, but it -- it was admitted.**
12 Q. Right. There was a -- yes. That we
13 are aware. He is in prison.
14     But I'm asking, though, that there was
15 a challenge made by Chanel Lewis's -- him and
16 obviously his counsel to move to suppress that
17 statement as involuntary, correct?
18 **A. He did.**
19 Q. And Chanel Lewis was -- what's the
20 correct term to use? He was I guess cognitively
21 disabled. Is that correct?
22     MR. BRUEGGEN: Object to the form,
23 foundation. Go ahead.
24 **A. I didn't think he was. I mean I would**
25 **say he's more reclusive.**

---

Page 104

1 Q. Was it ever determined that he had sort
2 of a below average IQ or anything of that nature?
3 **A. I couldn't tell you. I'm sorry.**
4 Q. Would you agree that would be an
5 important factor in determining how you interrogated
6 someone?
7     MR. BRUEGGEN: Object to form,
8 incomplete hypothetical.
9 **A. I don't think so. I mean the way we**
10 **might interact with somebody might be a little**
11 **different.**
12 Q. So you would approach an interrogation
13 of a intellectually disabled person the same as an
14 interrogation of someone who had normal, average or
15 high-functioning cognitive abilities or intellectual
16 abilities?
17     MR. BRUEGGEN: Objection, misstates his
18 testimony.
19 **A. That's not what I said. You can't**
20 **do -- every interrogation, just like an**
21 **investigation, is different. It's a feel.**
22     **So I have to interrogate somebody like**
23 **you or somebody like Chanel, it's a totally**
24 **different approach, you know.**
25 Q. So it sounds like you do think it would

---

Maysonet v.
Guevara

Page 105

1 be important to take into account someone's
2 intellectual functioning in determining how to
3 interrogate that person?
4 **MR. BRUEGGEN:** Object to form.
5 **A. What I think is his intellectual --**
6 **it's how you develop a rapport with somebody. I**
7 **mean you can't talk to him like he's a Harvard grad.**
8 **He might not want to answer questions for us.**
9 Q. I guess I'm more asking this. Would
10 you agree that -- let's start with a basic premise.
11 Would you agree that it is
12 inappropriate to use a physical coercion during an
13 interrogation?
14 **A. Physical coercion?**
15 Q. Physical coercion.
16 **A. Like beating somebody up?**
17 Q. Do you know what physical coercion is?
18 **A. You have to be more clear. I'm sorry.**
19 Q. Not a concept in your career at NYPD
20 that came up very often?
21 **A. I don't know what you mean by coercion,**
22 **physical.**
23 Q. Well --
24 **MR. BRUEGGEN:** Jennifer, you told him,
25 if he didn't understand a question, he can tell you.

Page 106

1 **MS. BONJEAN:** I'm trying --
2 **MR. BRUEGGEN:** Don't admonish him on
3 the record.
4 **MS. BONJEAN:** I'm not laughing at him.
5 I'm trying to figure out how to make it more clear.
6 Q. Would you agree that during the course
7 of an interrogation of a suspect that it would be
8 inappropriate to employ any type of physical
9 pressure on the person such as slapping, hitting,
10 squeezing, anything?
11 **A. That's not acceptable, no.**
12 Q. What about -- what about trickery? Is
13 trickery acceptable?
14 **MR. BRUEGGEN:** Object to form.
15 **A. In some forms it could be.**
16 Q. Okay. Would you agree that the tactics
17 that might be used with someone whose functioning is
18 average or above average could be safe in the sense
19 of not likely to produce a false confession whereas
20 those same tactics might have a different effect on
21 someone who is low functioning?
22 **MR. BRUEGGEN:** Object to the form,
23 incomplete hypothetical.
24 **A. Yeah. I don't know. I mean every**
25 **situation is different. I mean I don't -- I don't**

Page 107

1 **know how to answer a question like that.**
2 **You know, if I take somebody that's**
3 **mentally challenged, whatever, and he just stabbed**
4 **his girlfriend and he thinks he's dead or she's**
5 **dead, and I said, listen, she's alive and said you**
6 **did it and then he confesses, that's appropriate to**
7 **me.**
8 Q. Even with someone who is mentally
9 challenged?
10 **A. Yeah.**
11 Q. And what about juveniles? Do you treat
12 juveniles differently in a interrogation scenario?
13 **A. Yeah, of course. We're not allowed to**
14 **speak to juveniles without the parents or -- oh, I**
15 **mean they changed all the laws now in New York. So**
16 **I couldn't even tell you.**
17 **It used to be an adult at 16. So now I**
18 **don't even know what the laws are anymore.**
19 Q. Okay. But the laws changed for a
20 reason, right?
21 **MR. BRUEGGEN:** Object to foundation.
22 **A. I have no idea.**
23 Q. No idea why there might be policies put
24 in place for greater protections for juvenile
25 suspects. Is that what you're saying?

Page 108

1 **MR. BRUEGGEN:** Object to form,
2 argumentative.
3 **A. Yeah, that's a whole discussion.**
4 **MR. BRUEGGEN:** Scope.
5 **A. I mean, if he's a juvenile and he**
6 **shoots somebody dead the same as the same juvenile**
7 **that shoplifted? I don't know if they're the same**
8 **person.**
9 Q. But that assumes that they're already
10 guilty.
11 **A. I'm just saying --**
12 **MR. BRUEGGEN:** Object to form.
13 **A. I'm just saying about the investigation**
14 **part of it. That's all.**
15 Q. Right.
16 And I'm just saying how do you -- how
17 do you approach or how did you approach, you know,
18 again, back when you were supervising
19 investigations, an interrogation of a juvenile
20 versus an adult?
21 Are you saying you approach them
22 similarly, differently? Were there any policies
23 that dictated how you approached it?
24 **MR. BRUEGGEN:** Object to form,
25 relevance.

Page 109

1 A. It would depend on the age of the kid.
2 You know, we're talking about juveniles like 13, 14
3 years old, and what kind of crime did they do?
4     You can't just generalize everything.
5 Everything is unique.
6 Q. When you say what crime they did,
7 you're saying what crime they're suspected of doing?
8 That's what you mean, right?
9 A. Right.
10 Q. Or do you go into an interrogation just
11 assuming they did it already?
12     MR. BRUEGGEN: Objection, form,
13 argumentative.
14 A. I don't assume anything until I get all
15 our investigative steps in order.
16 Q. Okay. Let's look at your report. You
17 were retained to opine on a homicide investigation
18 that was conducted in connection with the murders of
19 the Wiley brothers, right?
20 A. Correct.
21 Q. And what standard did you use to
22 compare that investigation against to reach your
23 expert opinion?
24 A. So I relied on my -- my professional
25 education, my formal training and all my years of

Page 110

1 experience, and I used all the materials I was
2 supplied to go through the whole case and compare
3 that together and come up with an opinion.
4 Q. Okay. I didn't ask what you relied on.
5 I didn't ask what your expertise was.
6     I asked what standard you used in
7 reaching your conclusion.
8     MR. BRUEGGEN: Object to the form. Do
9 you understand?
10 A. No. I don't know what you mean by a
11 standard.
12 Q. Did you apply any standard when you
13 reviewed the materials in this case to reach your
14 expert opinion that you set forth in this report
15 dated September 7, 2023?
16 A. Well, my standard --
17     MR. BRUEGGEN: Object to form. Go
18 ahead.
19 A. Well, a standard that I used was
20 basically everything that we just talked about when
21 I teach at these classes that I got from a
22 combination from NYPD, the FBI and formal education
23 training.
24 Q. But what was your -- okay. Let me
25 ask -- okay.

Page 111

1     I don't know that I have an answer to
2 my question, but is that the best answer you can
3 provide me regarding what standard you applied when
4 you were examining this homicide investigation?
5     MR. BRUEGGEN: Object to form,
6 argumentative.
7 A. That's the best standard that I used.
8 Q. Okay. What was your methodology --
9 A. That was my methodology.
10 Q. Hold on. Let me finish my question.
11     What is the methodology you used in
12 reaching your ultimate opinion about this particular
13 homicide investigation?
14 A. So, like I said, I relied on my
15 education, my formal training and my experience, and
16 I used that with all the materials I was provided
17 from this case and came up with an opinion.
18 Q. And what was your process by which you
19 did that?
20 A. My process was I reviewed the case file
21 first and then depositions and any other material
22 that I had.
23 Q. And in reviewing, for example, the case
24 file, how did you go about examining the case file
25 to determine whether or not this investigation, I

Page 112

1 think you used the word previously, was proper?
2 A. So when I started with the
3 investigation, I read from the first supplemental
4 report all the way to the end, took some notes, and
5 then I got into any questions that come up after I
6 read all the depositions and tried to put it
7 altogether and review that case like I reviewed
8 thousands of other cases I did while I was squad
9 commander.
10 Q. And what did you review it for? What
11 were you looking for?
12 A. I wasn't looking for anything. I was
13 just tasked to find out the basic investigative
14 steps were followed and was it done properly.
15 Q. And you're talking about those basic
16 investigative steps that you delineated in part in
17 your PowerPoint presentation that we went over
18 earlier, right?
19 A. That's all for modern-day policing,
20 yes. I mean it's totally different than 1990 in
21 Chicago. Yes.
22 Q. I mean some of those things, though,
23 that we discussed were not different, right?
24 A. Some. Some are and some of them
25 aren't.

Maysonet v.
Guevara

---

Page 113

1 Q. Okay. I mean 1990 is, you know --
2 that's not like 1890. It's 1990, right?
3 **A. In the investigative world, it's a long**
4 **time ago. I got to the bureau what? I said it was**
5 **20 whatever. So when I left the job, it was night**
6 **and day.**
7 Q. Okay. Well, that's any profession, but
8 what -- tell me what standards did you look to from
9 investigations in 1990 to determine whether this was
10 a proper one in light of the fact that you didn't
11 even start with NYPD until 1991?
12 MR. BRUEGGEN: Object to the form.
13 **A. I started in '90, but yes. So basic**
14 **investigative steps that I write about, I was**
15 **looking for that in these case files regardless of**
16 **electronics and all other things, you know,**
17 **witnesses interviewed, defendants interviewed,**
18 **documentation.**
19 Q. So you would agree that those steps at
20 least would have been the same in 1990 as they are
21 today, correct?
22 **A. That's what I was looking at. Yes.**
23 Q. Okay. Wanting to know about the
24 background of the victim would be the same in 1990
25 as it is today, correct?

---

Page 114

1 **A. Yes.**
2 Q. But back to the question I actually
3 asked you. Did you have any standard that you
4 looked at, written or otherwise, from the relevant
5 time period to compare this investigation against?
6 MR. BRUEGGEN: Object to the form.
7 Do you understand the question?
8 **A. I don't understand. Sorry.**
9 Q. That's all right.
10 Did you consult or consider what the
11 standards were for a proper investigation in 1990
12 when you examined this case?
13 MR. BRUEGGEN: Object to the form.
14 Jennifer, you used the word other than
15 standards. I think that's the word that's tripping
16 him up. I don't know if there's another world.
17 MS. BONJEAN: I mean I'm not going to
18 respond to that.
19 MR. BRUEGGEN: Fair enough.
20 Q. You may answer if you can. If you want
21 me to or the court reporter to read it back --
22 **A. I don't understand the question.**
23 **So the standards from back in 1990 in**
24 **Chicago, I use my basic investigative steps which**
25 **some of them you can follow, like we said, from 1990**

---

Page 115

1 **to whenever. That's what I was looking at.**
2 **I have some Chicago Police Department**
3 **policies, yes, that I read. I used some of that.**
4 Q. You keep saying Chicago. I mean do you
5 think there's something -- was there something
6 unique about Chicago that would have been
7 different -- hold on, that would have been different
8 about -- that would provide different standards
9 regarding how a homicide investigation should be
10 conducted?
11 **A. No. I just -- I just used basic**
12 **investigative steps for homicide investigation which**
13 **can be done anywhere.**
14 Q. Okay. And so those basic investigative
15 steps as you have delineated them, from what source
16 did you get those basic investigative steps from,
17 again, the relevant time period which would have
18 been 1990?
19 **A. Well, my sources that I use are from --**
20 **mostly from NYPD and FBI.**
21 Q. Okay. And did you reference those
22 steps that would have been applicable in 1990?
23 MR. BRUEGGEN: Object to form.
24 **A. I think I put some NYPD references.**
25 **The detective guided the report. I'd have to look**

---

Page 116

1 **through it.**
2 Q. Okay. All right. Now, you have this
3 section that you call -- I mean you have an
4 introduction. We'll go back to that, but I want to
5 come to this.
6 What is this synopsis section that
7 you've --
8 **A. That was just, you know, a synopsis of**
9 **the case, the homicide investigation.**
10 Q. Like a summary?
11 **A. I guess you could say that.**
12 Q. What would you say? I'm asking you the
13 question.
14 **A. It's a brief synopsis of the homicide**
15 **investigation I would say.**
16 Q. Okay. So I'm going to jump to the
17 homicide investigation. We're going to go back to
18 those sections.
19 First of all, you talked about the
20 crime scene here. Well, actually, before we do
21 this, I just want -- you said something here that --
22 in your introduction I think -- let's see.
23 You said in the third paragraph at page
24 4 of 35 that you've -- the analysis and assessment I
25 have conducted, it tends to avoid any determination

---

Maysonet v.
Guevara

---

Page 117

1  on the issue of credibility as that issue is
2  reserved for the trier of fact, right?
3  **A. Right.**
4  Q. But in preparing this report, you
5  accept and, frankly, adopt the officer's versions of
6  what occurred, correct?
7     MR. BRUEGGEN: Objection, misstates the
8  report. Go ahead.
9  **A. Yeah. I don't do that at all. I just**
10 **evaluated what's on the report itself.**
11 Q. Right.
12    You evaluated what was on the reports,
13 correct? You accepted what was on the reports?
14    MR. BRUEGGEN: Objection, misstates the
15 testimony. Go ahead.
16 **A. Yeah, just the basic investigative**
17 **steps are on the report.**
18 Q. Okay. But Mr. Maysonet testified at
19 his deposition that certain -- certain events that
20 were reported in those reports never happened.
21 Okay. That would be -- that would be a conflict in
22 his version of the events and the police officer's
23 version of the events, right?
24    Can we agree on that?
25 **A. Correct.**

---

Page 118

1  Q. And when you were faced with that, you
2  always accepted the police officer's version of what
3  happened, correct?
4  **A. That's not correct. What I did was,**
5  **when he made an allegation or something like that, I**
6  **went through the case file to try to find some kind**
7  **of documentation about his abuse, about not having**
8  **Miranda, anything like that, and I couldn't find it.**
9  Q. Okay. So your process was that, if Mr.
10 Maysonet challenged what the events were that were
11 reported in the reports, you went and looked for
12 corroboration of his version of the events. Is that
13 right?
14 **A. I did.**
15 Q. And if you didn't find that
16 corroboration in the reports themselves, you adopted
17 the version that the police officers provided. Is
18 that right?
19    MR. BRUEGGEN: Objection, misstates the
20 report. Go ahead.
21 **A. No, I didn't say that.**
22    MS. BONJEAN: Okay. Stop coaching him,
23 Dave.
24 **A. He's not coaching me. I didn't say**
25 **that.**

---

Page 119

1     **I just said I evaluated the**
2  **investigative steps. If he killed these guys or**
3  **whatever he did, I didn't make that determination.**
4  Q. No. No. No. I'm not talking about
5  the ultimate conclusions of guilt or innocence, sir.
6  I mean that we're definitely not talking about, but
7  let me give you an example. Okay. Just so we can
8  be on the same page.
9     At page -- at page 9 of 35 of your
10 report, okay, you wrote during this initial
11 interview on July 15, 1990, Mr. Maysonet informed
12 Sergeant Mingey that he had specific information
13 about how he secured a 9-millimeter pistol in his
14 home for his fellow Latin King gang members, and
15 then on the night of the murder, the Latin King gang
16 members had retrieved the 9-millimeter pistol.
17 Additionally, when he learned of the double homicide
18 of the Wileys, he, and this is in italics, assumed
19 that the Latin Kings he gave the gun to must have
20 done the shooting.
21    Do you see that?
22 **A. I do.**
23 Q. Okay. What does Mr. Maysonet say about
24 what happened during that July 15, 1990, interview?
25 **A. I think he said that he's denying that**

---

Page 120

1  **any of that happened.**
2  Q. Right.
3     He said that did not happen, right?
4  **A. Yeah. Uh-hmm.**
5  Q. So where in your report do you mention
6  that right here?
7  **A. Later on I mention something about -- I**
8  **have to go through it all about his allegations and**
9  **everything. We addressed that. I'd have to look it**
10 **up.**
11 Q. That's what we're here to do. Okay.
12 That's what we're here to do today is for you to
13 look up in your report and answer my questions.
14    So where did you point out that Mr.
15 Maysonet actually says this did not occur?
16 **A. I'd have to go through it. I'll have**
17 **to find it.**
18    MR. BRUEGGEN: Is that what you're
19 asking him to do, Jennifer, go through it?
20    MS. BONJEAN: No. Yes, I am, but we'll
21 get to that.
22 Q. But, sir, in reviewing this homicide
23 investigation, do you think Sergeant Mingey lied
24 about this?
25 **A. Do I think he lied about it?**

---

Maysonet v.
Guevara

---

Page 121

1 Q. Yeah.
2 **A. I don't think anything. I'm just**
3 **reviewing the investigative steps taken.**
4 Q. But you're reviewing the investigative
5 steps taken by crediting what Sergeant Mingey said.
6 **A. I'm just going through the report and**
7 **what was reported.**
8 **The allegations he made was some 30**
9 **something years later, correct?**
10 Q. Oh, is that right?
11 You think Mr. Maysonet said that 30
12 years later?
13 **A. There was no other documentation that I**
14 **had that he made any reports like that.**
15 Q. Did you happen to look at any trial
16 testimony?
17 **A. I looked at some of it, yes.**
18 Q. Okay. And it's your testimony that Mr.
19 Maysonet never denied -- I mean never -- you
20 never -- well, strike that.
21 Let's just go with what you said here.
22 You're saying that, because he made it 30 years
23 later, you don't trust it, right?
24 **A. I didn't say that. I never said that.**
25 Q. Why did you say it was made 30 years

---

Page 122

1 later?
2 **A. I'm just saying I was looking through**
3 **the case files and I followed the basic**
4 **investigative steps and that's when I came up with**
5 **this report.**
6 Q. Okay. You're looking --
7 **A. He made those allegations.**
8 Q. Hold on. Let me ask my question.
9 You're looking through the case file
10 and you're looking at the basic investigative steps,
11 but you are assuming that this is an investigative
12 step that actually took place, right?
13 **MR. BRUEGGEN:** Objection to form.
14 **A. It was documented. Yes.**
15 Q. Okay. This -- what you say is a
16 documented step that took place, it necessarily
17 means that you are assuming it happened, correct?
18 **MR. BRUEGGEN:** Objection,
19 argumentative, form. Go ahead.
20 **A. I don't assume anything. I'm just**
21 **reviewing the case file.**
22 Q. But then I don't understand what your
23 job was here frankly. I don't really understand.
24 You're reviewing the case file, but by
25 reviewing the case file, you then documented all

---

Page 123

1 these investigative steps that you ultimately
2 concluded were appropriate, right?
3 **A. I did.**
4 Q. If they didn't happen, how could you
5 make an opinion about whether they were appropriate?
6 **A. How do you know it didn't happen?**
7 Q. I'm sorry. What did you just ask me?
8 **A. How do we know that didn't happen?**
9 Q. Because Mr. Maysonet says it didn't
10 happen.
11 **A. Okay.**
12 Q. And because, you know, he is walking
13 around. Some court decided that he should be -- his
14 conviction should be vacated, right?
15 **MR. BRUEGGEN:** Objection to form,
16 argumentative. Go ahead.
17 **A. I thought he was just granted a new**
18 **trial based on some attorney issues, not on the**
19 **homicide investigation itself.**
20 Q. So let's follow this through.
21 **A. That's legal issues. So that's all my**
22 **understanding was of that.**
23 Q. Oh, no. No. I think you can follow
24 this.
25 If he was granted a new trial, what

---

Page 124

1 happens after a new trial?
2 You can even refer to your Chanel Lewis
3 experience. What happens after someone's granted a
4 new trial?
5 **MR. BRUEGGEN:** Object to the form.
6 **A. What happens after somebody gets a new**
7 **trial?**
8 Q. Yeah.
9 **A. They get a new trial.**
10 Q. Right.
11 **A. Okay.**
12 Q. So you just said my understanding is
13 Mr. Maysonet just got a new trial. So what do you
14 think happened after that?
15 **A. He didn't get a new trial.**
16 Q. Well, what has to happen -- if he got a
17 new trial -- did you read the materials? What
18 happened?
19 **A. The DA refused to prosecute or go**
20 **forward.**
21 Q. Yeah.
22 They dismissed the charges, right?
23 **A. Okay.**
24 Q. Okay. So they dismissed the charges.
25 Do you know why they dismissed the charges?

---

Page 125

1 **A. It was lack of cooperation from the**
2 **police officers if I remember right.**
3 Q. Because all their police officers
4 invoked their Fifth Amendment rights and refused to
5 testify about the case. Did you read that part?
6 **A. I did.**
7 Q. Okay. Ever seen that happen in your
8 long experience with NYPD?
9 **A. What?**
10 Q. That when someone is -- gets a new
11 trial that every single investigating officer that
12 worked the case says, if you call me to the stand,
13 I'm going to invoke the Fifth?
14 **A. Did I ever see that scenario? No, I**
15 **did not.**
16 Q. That's odd, right?
17 MR. BRUEGGEN: Object to form.
18 **A. I'm not sure.**
19 Q. Well, in NYPD you get fired for saying
20 I'm not going to testify in a double homicide
21 conviction, correct?
22 MR. BRUEGGEN: Object to form,
23 incomplete hypothetical. Go ahead.
24 **A. You wouldn't -- I have to know the**
25 **circumstances. Typically, you're not going to be**

Page 126

1 **fired. You'd have to know what the -- I mean I**
2 **don't even know what we're talking about.**
3 Q. Well, if someone invokes the Fifth
4 who's not under indictment, it's because they fear
5 that they will be under indictment if they testify,
6 right?
7 MR. BRUEGGEN: Objection, misstates the
8 law.
9 MS. BONJEAN: It does not misstate the
10 law.
11 Q. By invoking the Fifth, these detectives
12 said I fear that my answers to your questions could
13 subject me to prosecution. So we are invoking the
14 Fifth. All five of them.
15 **A. I don't know if that's what they said,**
16 **but, you know, for whatever reason they took the**
17 **Fifth Amendment, that's their right to do it.**
18 Q. It's actually not their right to do
19 administratively unless they're under indictment,
20 and they weren't under indictment.
21 MR. BRUEGGEN: Object to form. Is that
22 a question or a statement?
23 Q. I mean what do you mean it's their
24 right to do?
25 Everyone has a Fifth Amendment right,

Page 127

1 but there are consequences for invoking the Fifth,
2 right?
3 **A. I would be guided whatever my attorney**
4 **told me to do.**
5 Q. Why would you need an attorney?
6 Have you ever retained an attorney when
7 you're just called as a witness in an investigation
8 that you investigated?
9 **A. I had an attorney for department**
10 **investigation. Yes.**
11 Q. Right. That's different.
12 When the DA says you worked this case,
13 Commanding Officer Rudolph, you need to show up and
14 testify about what happened, have you ever hired a
15 lawyer?
16 **A. Have I ever hired a lawyer? No, I**
17 **never got called to testify either.**
18 Q. I thought you said you testified many
19 times.
20 **A. You asked me as a lieutenant commander**
21 **did I ever testify, and I said no.**
22 Q. Let's broaden it.
23 Officer Rudolph, whatever rank you were
24 at, the DA says we're prosecuting this case. You
25 worked this case. We need your testimony.

Page 128

1 Can you remember a scenario in your 30
2 years that you ever went out and hired a lawyer?
3 **A. I've never done that. No.**
4 Q. No.
5 Because your job -- part of your job as
6 an officer is to go testify about your
7 investigation, correct?
8 **A. When I'm on the job.**
9 Q. Right. Right.
10 **A. Yes.**
11 Q. Yes. Yes. Yes, of course. When
12 you're on the job.
13 **A. Okay.**
14 Q. It is your job to testify about your
15 investigation, correct?
16 That is a fundamental piece of your
17 work is to go to court and testify about what you
18 did in an investigation, right?
19 **A. Yes.**
20 Q. Okay. And if you can't do that, you
21 can't do that part of your job, how long are you
22 going to be able to be a detective if you are unable
23 to go to court and testify about your work?
24 MR. BRUEGGEN: Object to form,
25 incomplete hypothetical, speculation. Go ahead.

Page 129

1 A. You know, it's a scenario. I don't
2 know. I never had to deal with that. So I couldn't
3 tell you.
4 Q. Okay.
5    MR. BRUEGGEN: Jennifer, I don't want
6 to disrupt you. We're probably going to want a
7 little longer of a break to grab some food. I don't
8 want you to get into an area and then have to stop
9 to get food. So let us know what works.
10    MS. BONJEAN: Okay. Well, give me a
11 couple minutes and then we'll get there.
12 Q. Okay. So just to be clear, starting at
13 the beginning of your homicide investigation, this
14 summary that you have provided, you are deriving
15 from -- starting at page 6 and going on, it's a
16 summary that you have derived from the Chicago
17 Police Department homicide file that was prepared,
18 right?
19 A. Correct.
20 Q. So when you said on May 25th of 1990 at
21 100 hours Torrence and Kevin Wiley were shot and
22 killed while standing on the sidewalk in front of a
23 vacant lot, you got that information from a report
24 that was contained in the homicide file, right?
25 A. Yes.

Page 130

1 Q. Okay. And you -- why did you include
2 it in your report here?
3 A. I just felt the walk through the
4 homicide investigation from the beginning would make
5 for a more better understanding of what happened.
6 Q. Okay. And a better understanding of what
7 happened as reflected in the homicide file, correct?
8 A. Yes.
9 Q. And then you go on and say the crime
10 scene was processed by the crime scene investigators
11 who photographed the crime scene and the bodies of
12 the victims, the investigators recovered ballistic
13 evidence and, specifically, these 9-millimeter shell
14 casings, a can of Milwaukee Best beer, et cetera.
15    Again, I think you even cite to it,
16 this is information you're obtaining from the
17 homicide -- homicide file, correct?
18 A. Yes.
19 Q. And you're accepting that at face value
20 which is why you included it in the homicide
21 investigation section, right?
22 A. At face value, yes. That's all I had
23 to go by.
24 Q. Okay. Now, you said a search of the
25 crime scene -- I'm sorry.

Page 131

1    The third paragraph. You said a search
2 of the crime scene failed to locate any other
3 probative evidence. How do you know that?
4 A. There's nothing else reported that was
5 recovered from the crime scene.
6 Q. Okay. So, again, you're relying on
7 what was documented and reported in the homicide
8 file, right?
9 A. Those are the materials provided to me.
10 Yes.
11 Q. Okay. Right.
12    But you are -- again, you're taking the
13 homicide file at face value, and that's why you
14 reached the conclusion that the crime scene failed
15 to locate any other probative evidence, right?
16 A. Correct.
17 Q. There was no indication that the Wileys
18 were robbed and the motive was unknown at the date
19 of occurrence, and members of the Wiley family were
20 interviewed, and based on the interview, there was
21 no indication that either brother was targeted nor
22 were they affiliated with a gang nor did they have a
23 serious criminal history, and, again, looking at
24 their rap sheets for arrest history, for example,
25 would be a way to look at their criminal history,

Page 132

1 correct?
2 A. Yes.
3 Q. And that's not just what a police
4 officer reports, but that's actually like a more
5 easily verifiable document, an arrest history, can
6 we agree on that, or a rap sheet?
7 A. Yes.
8 Q. And did you have a look at their rap
9 sheets, by the way?
10 A. I did. I believe, I just got to
11 remember off the top of my head, some marijuana, a
12 couple of jumping collar arrests. I think that was
13 it.
14 Q. They had no prior convictions, felony
15 convictions certainly, right?
16 A. I'm not sure.
17 Q. Well, isn't that something that you
18 would want to look at?
19 A. I'd rather look at just the arrest
20 history.
21 Q. Why?
22 A. That's where I'm going to get my
23 investigative leads, not if they were convicted or,
24 you know, innocent.
25 Q. Why?

Page 133

1 **A. Because a criminal history might**
2 **show -- like it could lead me to a co-defendant. It**
3 **could lead me to gang history. It could lead me to**
4 **anything.**
5 Q. Wouldn't you agree if somebody is
6 actually convicted of a crime that it would give you
7 a better indication that whatever was alleged was,
8 in fact, true and reliable?
9 **A. I wouldn't agree to that. I just --**
10 **like I said, just arrest history is what I'm focused**
11 **on.**
12 Q. Okay. So if someone's arrested, that
13 has -- carries the same -- strike that.
14 If someone's arrested, for instance,
15 for a robbery, that carries the same weight in your
16 mind as someone who's been convicted of a robbery?
17 MR. BRUEGGEN: Object to form,
18 misstates his testimony.
19 Q. Well, do you agree or not agree? Just
20 answer my question.
21 **A. I don't agree like -- I'm just focused**
22 **on the robbery arrests, if he got it thrown out, if**
23 **he got it -- you know, he did a robbery and pleaded**
24 **it down to disorderly conduct, but I'm just looking**
25 **at the robbery arrests.**

Page 134

1 Q. Also, someone could be acquitted
2 because they were wrongfully arrested for the crime
3 too, right? Not just thrown out, right?
4 **A. It's possible.**
5 Q. Just because someone -- do you think
6 it's more likely someone committed a crime if they
7 were arrested for it?
8 **A. I don't think anything. I just see**
9 **where my investigation is going to take me.**
10 **What I would tell you is that, if a guy**
11 **has five or six robbery arrests, two burglary**
12 **arrests and he got four of them thrown out, I'm**
13 **still looking at a guy that does robberies and**
14 **burglaries. He still was arrested for those crimes.**
15 **There's people that testified against them, whatever**
16 **it was, whatever scenario we're looking at.**
17 **I'm just talking the victimology of our**
18 **victim.**
19 Q. Okay. But in this case, these fellas
20 had really a minimal rap sheet of a couple
21 misdemeanor arrests, right?
22 **A. I believe so, yes.**
23 Q. No indication that they were involved
24 in gang activity or serious drug sales or anything
25 of that nature, right?

Page 135

1 **A. I believe there was some jumping**
2 **collars and I think marijuana if I remember**
3 **correctly.**
4 Q. A possession of marijuana. Not selling
5 marijuana, right?
6 **A. Possession.**
7 MS. BONJEAN: Okay. We can take a
8 break, Dave.
9 (Whereupon, luncheon recess was taken.)
10 A F T E R N O O N   S E S S I O N
11 R I C H A R D   R U D O L P H, resumes.
12 BY MS. BONJEAN:
13 Q. Okay. Mr. Rudolph, I'm going back to
14 your report.
15 MS. BONJEAN: Haley, are you there by
16 the way?
17 MR. COOLBAUGH: I am.
18 Q. Okay. And just before we get started,
19 do you have a copy of the investigative or homicide
20 file before you?
21 MR. BRUEGGEN: We have the
22 investigative file here.
23 Q. Okay. So, in your report, under the
24 subsection witnesses, you summarize -- I don't know.
25 Let's just say -- I guess let's just say this whole

Page 136

1 section really of witnesses is derived from the
2 report that -- first of all, it was derived from
3 reports that were contained within the homicide
4 file, right?
5 **A. Yes.**
6 Q. Okay. Which you take at their word,
7 correct?
8 MR. BRUEGGEN: Object to the form. You
9 can answer.
10 **A. I'm sorry?**
11 Q. You wrote it here without limitation.
12 You take it at its word, right?
13 MR. BRUEGGEN: Object to form. Go
14 ahead, sir.
15 **A. I take it as what was presented to me.**
16 **Yes.**
17 Q. Okay. So you are summarizing the
18 investigation based on what you -- what you read in
19 the homicide file and those initial reports, right?
20 **A. Well, what I had in the homicide file**
21 **and the supporting documents that I had with it.**
22 **Yes.**
23 Q. Well, what other supporting documents
24 are you talking about?
25 **A. Interviews, depositions, whatever else**

Maysonet v.
Guevara

Page 137

1 there was.
2 Q. Okay. That's -- I mean can we be a
3 little more specific?
4    Let's just stick with this section.
5 Hold on. Let's just stick with this section about
6 witnesses.
7    This summary that you provided in the
8 witnesses section of your report, what were the
9 sources of information that you relied on when you
10 wrote that summary section or that section of your
11 report?
12 **A. That was from the general progress**
13 **report from -- obviously, it's right here.**
14 Q. Okay. That's one thing. What else?
15 **A. About the witnesses? That would be it**
16 **for that part.**
17 Q. Okay. Sir, I'm talking about this --
18 this section that starts on page 7 and spills over
19 onto page 8. You wrote a bunch of information
20 there, single spaced a whole page, right?
21 **A. Correct.**
22 Q. Let's start with the basic question.
23 What was the purpose of writing that page of
24 information?
25    MR. BRUEGGEN: Objection. Don't answer

Page 138

1 that.
2    Are you trying to figure out his -- get
3 behind the writing of this? Again, I think that's
4 protected.
5 Q. Why did you write this section?
6 **A. Because the witnesses came up as part**
7 **of the case file. So I had to address that subject.**
8 Q. So you're summarizing what came up in
9 the case file. Is that what you're telling me?
10 **A. As far as these are your witnesses,**
11 **yes.**
12 Q. Okay. That's what I'm asking.
13    Anything else you looked at or relied
14 on in drafting this section of your report?
15 **A. If I keep reading through it, I guess**
16 **there was some statements made by Rosa Bello,**
17 **Justino Cruz, Alfredo Gonzalez and Maysonet. Yeah.**
18 Q. Sir, I am talking about just what's on
19 page 7.
20 **A. It's on page 7, yes.**
21 Q. Where -- where -- what are you
22 referencing in terms of --
23 **A. It starts with, although the three**
24 **earwitnesses did not observe the shooting of the**
25 **Wileys, and if you scroll down a little bit, you'll**

Page 139

1 **see this is consistent with the timeline events**
2 **corroborated by court-reported statements and**
3 **handwritten statements of Maysonet, Gonzalez, Cruz**
4 **and Bello.**
5 Q. Okay. So you're relying on the
6 handwritten statements of Mr. Maysonet, Alfredo
7 Cruz, Justino Cruz and Rosa Bello in your summary
8 here. Is that right?
9 **A. Not relying on it. Just putting it**
10 **with everything else.**
11 Q. What are you putting it with everything
12 else? What does that mean?
13 **A. General progress reports, plus**
14 **interviews, written statements.**
15 Q. Listen to my question. I don't you
16 need to just say stuff. I'm asking a specific
17 question.
18 **A. I'm trying to answer you.**
19 Q. Well, it's nonresponsive.
20    Sir, you said you didn't rely on it.
21 Okay. You didn't rely on it. So why is it included
22 in your expert report?
23 **A. It was evaluated. I didn't rely on it.**
24 **Everything that I evaluated.**
25 Q. So you evaluated the handwritten

Page 140

1 statements of Mr. Maysonet, Alfredo Gonzalez,
2 Justino Cruz and Rosa Bello, right?
3 **A. I did.**
4 Q. Okay. And what -- were you evaluating
5 it -- for what purpose? What was your goal in
6 evaluating those things?
7 **A. So if you go through the four**
8 **statements, their timelines match the timelines of**
9 **the two earwitnesses. So that's an important fact**
10 **that we need to know.**
11 Q. So that means that you are evaluating
12 it, and I assume then, because you think those two
13 pieces of the puzzle fit together, that leads you to
14 believe that the police are on the right track,
15 right?
16    MR. BRUEGGEN: Object to form.
17 **A. I believe this is a proper**
18 **investigative step to be conducted. Yes.**
19 Q. What's a proper investigative step?
20 **A. Interviewing the earwitnesses,**
21 **interviewing the three earwitnesses. The one that**
22 **called 911, that's one of the earwitnesses.**
23 Q. Well, of course, that's a proper step.
24 I'm not asking you about that.
25    I'm asking you what is the purpose of

Maysonet v.
Guevara

Page 141

1 this summary then?  I guess I'm confused about why
2 you are summarizing this here.
3      MR. BRUEGGEN: Objection, asked and
4 answered.  Go ahead, sir.
5 **A.  Summarizing the witnesses that were in**
6 **the case, I thought that was important.**
7 Q.  Why?
8 **A.  Because they're a witness in a homicide**
9 **investigation.**
10 Q.  Okay.  And what is your purpose in
11 summarizing it here?
12      For the purpose -- again, you're the
13 expert here.  What was your process?  Why were you
14 doing that?
15 **A.  It just goes to show the investigative**
16 **steps.  One step leads to another and another, and**
17 **this was part of it.  I couldn't just leave the**
18 **witnesses out.**
19 Q.  I'm not -- okay, sir.  Let's keep
20 going.
21      MS. BONJEAN: So we're going mark as 3
22 the homicide file.
23      (Exhibit Rudolph-3, Homicide file, is
24 marked for Identification.)
25      MR. BRUEGGEN: Is that RFC-1 through

Page 142

1 whatever?
2      MS. BONJEAN: Yeah.
3 Q.  Okay.  Let's -- I'm going to have you
4 look at -- okay.
5      Are you able to determine from this
6 homicide file what the first report was that was
7 prepared in the case?
8 **A.  The first report prepared?**
9 Q.  Yeah.
10 **A.  I don't know if this is laid out in**
11 **order.  So I couldn't really tell.**
12 Q.  I'm sorry.  What was the answer to the
13 question?  You can't tell?
14 **A.  You can't tell the way this is laid out**
15 **because this is 1993 on the top and the middle of**
16 **it's 1995.  The case file is 1992.  That's towards**
17 **the middle, and at the end, now we're into 1990.  So**
18 **I don't know which way this is going.**
19 Q.  Do you know how dates work?
20 **A.  I didn't say that.  You asked me how**
21 **the case was laid out.**
22 Q.  No, I didn't.
23      I said are you able to point me to the
24 first report that was prepared in this case?
25 **A.  I said, the way this is laid out, I**

Page 143

1 can't tell right now.
2 Q.  Are you able to count?  Like are you
3 able to understand that 1990 is before 1992?
4      MR. BRUEGGEN: Objection,
5 argumentative.
6      You're asking him to review the case
7 file and pull out the first document.
8      MS. BONJEAN: The guy is the police
9 practice expert.  I'm sorry.  It's not a hard ask.
10 Q.  Did you determine in reviewing this
11 homicide file which report was first prepared?
12      MR. BRUEGGEN: That's a different
13 question.  Okay.  There you go, sir.
14 **A.  The first -- I think the first reports**
15 **were prepared I want to say around the 25th, and**
16 **it's just from going to the top of the page of May.**
17 Q.  Okay.  So maybe --
18 **A.  They're done by the responding**
19 **detectives were the first ones.**
20 Q.  Okay.  Let's stop there.  Let's stop
21 there.
22      So your belief is that the first
23 reports in this case were prepared on May 25th of
24 1990?
25 **A.  On or about.**

Page 144

1 Q.  Right.
2      Well, where is the about part?
3 **A.  I don't know.  Maybe it was they typed**
4 **it -- started typing on the 24th, rolled into the**
5 **25th.  I don't know.**
6 Q.  So do you think they were preparing the
7 report before the murder happened?
8 **A.  I'm just saying I don't know exactly**
9 **what time they typed it up.**
10 Q.  Sir, can we -- can we assume that the
11 report would not have been prepared prior to the
12 crime?
13 **A.  Of course.**
14 Q.  Good.
15      So if the crime happened, as you
16 already pointed out in your report, at around 1
17 o'clock in the morning on May 25th of 1990, good
18 chance that any reports would have followed that
19 time on May 25th of 1990?
20 **A.  Yes.**
21 Q.  So you talked a lot about how an
22 investigation needs to follow a logical course,
23 right?
24 **A.  Correct.**
25 Q.  Okay.  So when you were looking at this

Page 145

1 investigation to offer your expert opinion on the --
2 how it was conducted, was part of your process to
3 figure out which report came first?
4 **A. I believe I did that. I tried to**
5 **figure out which went first.**
6 Q. And as you sit here today, are you able
7 to testify which one you believe came first?
8 **A. Well, I believe the first reports --**
9 **there's a few of them I believe done on the 25th.**
10 **Which one of them were done first, I don't know.**
11 Q. Why don't we -- starting at
12 RFC-Maysonet 59. Okay. Now, are you able to look
13 at this report and tell me when the report was at
14 least submitted?
15 **A. Submitted it looks like 0800 on the**
16 **25th.**
17 Q. Right.
18 **A. Yeah.**
19 Q. Okay. And can we agree that a report
20 would have to be written before it was submitted?
21 **A. I would hope so.**
22 Q. All right. So that's a yes?
23 **A. Yes.**
24 Q. And then if you look at RFC-Maysonet
25 Bates stamped 63 which is a few pages later --

Page 146

1 **A. Okay.**
2 Q. -- when was this report submitted?
3 **A. The 25th of May 1990 1630.**
4 Q. Is 1630 after 800?
5 **A. Yes.**
6 Q. A good chance that this report came
7 after the one that was submitted at 800?
8 **A. That's when the detective had submitted**
9 **it. Yes.**
10 Q. Right.
11 Fair to say both of these reports had
12 to have been prepared on May 25th of 1990 if we
13 assume that these dates and times are correct,
14 right?
15 **A. I would agree with that.**
16 Q. Okay. And then there's a report that
17 also was submitted on May 25 that starts with
18 RFC-Maysonet 55. Do you see that one?
19 **A. Not yet. Yes.**
20 Q. Okay. We don't have a time on that,
21 but it says it was submitted on May 25th of 1990,
22 right?
23 **A. Correct.**
24 Q. Okay. So let's start with the one that
25 is 800 hours. This is allegedly a field

Page 147

1 investigation, correct? Yes?
2 **A. I'm reading it. Yes, it looks like**
3 **that. It looks like -- okay.**
4 Q. I mean your report contains information
5 that is included in this particular report. Did you
6 review this report?
7 **A. I did.**
8 Q. Did you write your expert report or did
9 somebody else write it?
10 **A. I wrote it.**
11 Q. Okay. Did any of the attorneys working
12 on the case kind of do a skeleton draft for you or
13 outline?
14 **A. No.**
15 Q. Give you any bullet points about what
16 should be included?
17 **MR. BRUEGGEN:** Objection. Don't answer
18 that question. Privileged, work product.
19 Q. Well, I'm not looking for the work
20 product. I just want to make sure that you're the
21 one that actually wrote it.
22 Did you write your report?
23 **MR. BRUEGGEN:** Objection, asked and
24 answered. Go ahead, sir. Answer.
25 **A. You asked me and I told you.**

Page 148

1 Q. Okay. It just seemed like you have --
2 did you look -- what did you do to prepare for your
3 deposition today?
4 That's maybe a better question.
5 **A. I reviewed my report again. Some of**
6 **the case file I reviewed again.**
7 Q. Anything else?
8 **A. That's about it.**
9 Q. Okay. So this -- this initial field
10 investigation report that we're looking at that was
11 prepared by Detective Boyle and Tapkowski, right,
12 that you reference in your report, it documents the
13 scene, right?
14 **A. Okay.**
15 Q. Is that a yes?
16 **A. Yes.**
17 Q. Would you agree?
18 If you don't agree, say so.
19 **A. I agree.**
20 Q. Okay. Indicates that the motive of
21 this crime is unknown, correct?
22 **A. Yes.**
23 Q. Didn't say anything about this being a
24 gang territory, correct?
25 **A. No.**

Page 149

1 Q. No suspicions of at least at this
2 juncture that this was gang motivated, right?
3 A. Uh-hmm.
4 Q. Yes?
5 A. That's correct.
6 Q. And if you look at the last page of
7 this particular report which is page 4 of the report
8 but Bates stamped RFC-Maysonet, the detectives did a
9 canvass of the area to try to find witnesses,
10 correct?
11 A. Correct.
12 Q. Now, there were -- there's at least six
13 addresses where they indicated that there were no
14 answers, right?
15 A. Yes.
16 Q. Okay. And in a -- consistent with your
17 understanding of a -- what would constitute basic
18 investigative steps, you would want these officers
19 to go back out there and see if they could talk to
20 these people at a later date, right?
21 A. I would prefer that, yes.
22 Q. Okay. Did you see anything in this
23 case file that showed that they did, in fact, do
24 that?
25 A. I did not.

Page 150

1 Q. This would have violated your no
2 negative results mantra, right?
3 MR. BRUEGGEN: Object to the form.
4 A. Well, they didn't put no negative
5 results, you know. I would have preferred them to
6 go and follow-up on those no answers. Yes.
7 Q. In fact, part of your basic
8 investigative guideline is canvass and then
9 recanvass, right?
10 A. Yes.
11 Q. And there was no recanvass as far as
12 you can see in this case, correct?
13 A. As far as documentation said, no.
14 Q. And as far as any deposition testimony
15 goes either, right?
16 A. Any documentation. I didn't see any
17 follow-up canvass. No.
18 Q. Okay. Now, this next report that is
19 dated submitted May 25 at 1630, it reflects some
20 interviews with what appear to be the victims'
21 family, right?
22 MR. BRUEGGEN: Maysonet 63?
23 MS. BONJEAN: This is Maysonet 63.
24 A. Okay.
25 Q. Am I correct? Was that --

Page 151

1 A. Jolanda Wiley.
2 Q. Yeah.
3     These are family members, correct?
4 A. Yes.
5 Q. And speaking to family members is
6 important, obviously, to find out -- basically, you
7 want to know as much about the victims as you can.
8 You said that earlier, right?
9 A. Yes, try to develop some kind of leads.
10 Q. Who might want to have done this,
11 correct?
12 A. If they have any problems with anybody
13 in the neighborhood, you know, anybody not like them
14 for some reason, yeah, we want to know that.
15 Q. They were involved in any criminal
16 activity that might have, you know, made them more
17 susceptible to being in dangerous situations, right?
18 A. That's something we'd want to know.
19 Q. And this report suggests that -- looks
20 like the police officers on this date actually did
21 try to get information from the family members,
22 right?
23 A. Yes. They asked the -- somewhere in
24 here. The brother had nothing to add. Jolanda
25 couldn't understand why somebody would do this to

Page 152

1 them.
2 Q. Right.
3 A. Sandra, she couldn't add anything to
4 it?
5 Q. Right.
6     None of them said, oh, our brothers are
7 drug dealers or gang members or they had problems
8 with somebody. Nothing like that came out of these
9 interviews, right?
10 A. No.
11 Q. And you could also see in this
12 interview, I think you would agree, that Kazeel
13 Wiley indicated that she heard about it on the radio
14 in the morning. So it had some press coverage,
15 right?
16 A. Yes, I guess so.
17 Q. I mean --
18 A. She said so.
19 Q. Yeah.
20     Any reason to doubt that?
21 A. No.
22 Q. Okay. And then going -- I know it's
23 not -- these are not organized in chronological
24 order, but going off dates, if we go back to
25 RFC-Maysonet 55, another canvass report from the

Maysonet v.
Guevara

1 same day, right?

2 **A. Yes.**

3 Q. And I think you summarized what

4 occurred in this canvass report in this section of

5 the witnesses, right?

6 **A. I did.**

7 Q. And would you agree that, actually,

8 this report, you know, gives some information that

9 might be at least a starting point for this

10 investigation?

11 **A. I thought it was a good -- good**

12 **interview with the earwitnesses. Even though they**

13 **weren't eyewitnesses, it's a good interview.**

14 Q. Yeah, and there was -- you know, there

15 was some information provided that would kick off --

16 you know, I think you could call it a lead. No?

17 **A. I would take it as a lead.**

18 Q. It looks like the officers are doing a

19 good job at this point. It looks like they went

20 to -- they went to a tavern nearby to see if there

21 had been any black patrons, male black patrons

22 there, right?

23 **A. Well, they're looking for if they**

24 **bought a specific can of beer.**

25 Q. Right.

1    Because they -- from the scene, they

2 recovered a can of beer. So it would make sense to

3 go to the tavern and see if there were any black

4 patrons there who had bought a beer, right?

5 **A. Thinking maybe our victims had bought**

6 **that there, yes.**

7 Q. Of course. I understand.

8    That's what they're trying to find out,

9 right?

10 **A. Yes.**

11 Q. Where these guys came from?

12 **A. Yeah.**

13 Q. And Alma Preceeo, I don't know how it's

14 pronounced, but she lived right next to where or

15 right in the vicinity of that vacant lot was and she

16 described an argument she heard that she was

17 awakened by 2400 hours which would have been about

18 an hour before the shooting itself, correct?

19 **A. Yes. Her and her sister both heard the**

20 **argument, and I believe the argument lasted for an**

21 **hour to right around 1 o'clock.**

22 Q. Right.

23    And she's able to provide snippets of

24 the argument. She said they sounded intoxicated,

25 correct?

1 **A. I believe one of them said they sounded**

2 **like one of them might have been drunk.**

3 Q. Right.

4    Did you look at the tox reports of

5 these -- the victims?

6 **A. I believe I did. I don't remember what**

7 **it was.**

8 Q. And Carmen Macias says that it sounded

9 as it was two male blacks having the argument,

10 correct?

11 **A. I think she said they weren't speaking**

12 **in Spanish, if I remember correctly, and she thought**

13 **they were black.**

14 Q. All right. If you look at page 56 or

15 Bates stamped 56, that's what she says there too.

16 **A. Okay.**

17 Q. It sounded like two male blacks having

18 an argument, right?

19 **A. Yes.**

20 Q. One had a calm voice. The second had a

21 loud, abrasive type of voice and sounded like he may

22 have been drunk, right?

23 **A. Yes.**

24 Q. Okay. Did you look at the expert

25 report that we -- our -- from our expert that looked

1 at the tox reports in this case?

2 **A. Which report?**

3 Q. Were you aware that there were

4 toxicology reports done on the victims at the time

5 of the crime?

6 **A. The ME's report as part of the file, if**

7 **that's what you mean.**

8 Q. Yeah. I'm talking about the toxicology

9 report.

10 **A. Okay.**

11 Q. Did you see it? Did you look at it

12 when you reviewed this case file?

13 **A. I probably did. I just don't remember.**

14 Q. Would you agree that looking at the

15 toxicology report would be a good way of, you know,

16 corroborating what these women heard?

17 **A. Corroborating the tox report that**

18 **somebody heard? I don't think so.**

19 Q. Well, if one of them is saying one

20 sounded very drunk and the tox report shows that

21 that person was very drunk, is that corroboration?

22 **A. I mean it could be. I mean it's**

23 **very -- you know, just because somebody's drunk or**

24 **maybe he wasn't intoxicated, right? Maybe he only**

25 **had one beer.**

Page 157

1 Q. Well, sir, did you look at the
2 toxicology report?
3    MR. BRUEGGEN: Objection, asked and
4 answered. Go ahead.
5    MS. BONJEAN: Haley, can you pull up
6 our toxicology expert? I want to see if he looked
7 at it.
8 Q. And while Haley's doing that, I'm going
9 to have you look at RFC-Maysonet 25 and 29. Let me
10 know when you're done.
11 A. Okay.
12 Q. Which one are you looking at first, 25
13 or 29?
14 A. Twenty-five I got in front of me.
15 Q. So you got Torrence Wiley. He's
16 negative for benzos and opiates, right?
17 A. Uh-hmm.
18 Q. Positive for ethanol, correct?
19 A. Yes.
20 Q. You understand that to be alcohol,
21 right?
22 A. Yes.
23 Q. That's a pretty high amount there,
24 right, or do you not know?
25    MR. BRUEGGEN: Object to foundation.

Page 158

1 Go ahead.
2 A. I'm not exactly sure, but it looks
3 pretty high.
4 Q. Okay. We'll get to that in a second.
5 All right.
6    And then looking at RFC-Maysonet 29 for
7 Kevin Wiley, negative for benzos and opiates, very
8 high ethanol, right?
9 A. Yes.
10    MS. BONJEAN: Haley, I'm not talking
11 about that report.
12 Q. So would you agree that this
13 toxicology -- toxicology analysis is at least
14 consistent with what these sisters are saying about
15 how they characterized the voices of the people that
16 they thought were African American males, right?
17 A. Yes. She believed they were drunk, and
18 due to the tox, obviously, they had some alcohol in
19 their bodies. So that would be consistent.
20 Q. And they heard the gunshots, correct?
21 A. Both of them heard, yes.
22 Q. And did they report hearing any other
23 voices out there other than the two African American
24 males?
25 A. I don't recall that.

Page 159

1 Q. Well, take a look and see.
2    Anything in their reports that gave
3 indication of whether there was -- was anybody else
4 out there other than the two African American males
5 whose voices they heard?
6 A. I didn't see anything about another
7 person except for the two.
8 Q. Go ahead. I'm sorry. Finish.
9 A. I guess I'm missing it.
10 Q. No.
11    I mean they didn't -- they didn't
12 report hearing over the course of an hour anything
13 other than these -- at least they didn't report it,
14 hearing anything over the course of an hour other
15 than two African American males that appear to be
16 arguing, at least one seems extremely drunk, right?
17 A. She heard two people outside arguing,
18 yes, at 2400 hours.
19 Q. Right.
20    And they heard the gunshots, and so
21 they heard the arguing for the course of that hour
22 or -- and then they heard the gunshots, right?
23 A. Yes, that's what they said.
24 Q. And did you read the deposition of Ms.
25 Macias?

Page 160

1 A. I just don't remember it, but I'm
2 pretty sure I did.
3 Q. Okay. Nothing stands out as being sort
4 of inconsistent with what she initially reported in
5 your head at least, right?
6 A. Not that I can recall.
7 Q. Would you have noted that in your
8 expert report if she had said something at her
9 deposition that contradicted what was said in the
10 case file or in the report?
11    MR. BRUEGGEN: Objection, incomplete
12 hypothetical, speculation. Go ahead.
13 A. Yes, I would put that in there. Yeah.
14    MS. BONJEAN: Okay. I will mark this
15 as -- what are we on, 4?
16    MR. COOLBAUGH: Yes.
17    MS. BONJEAN: Haley, can you please
18 share with Mr. Rudolph?
19    (Exhibit Rudolph-4, Report, is marked
20 for Identification.)
21 Q. Mr. Rudolph, did you have a chance to
22 look at this report at any point prior to your
23 deposition here today?
24 A. I don't think so.
25 Q. I'm not going to have you read the

Maysonet v.
Guevara

1 whole thing.

2     **MS. BONJEAN:** But let's scroll through,
3 Haley, to the next page. Okay. Let's stop there
4 please.

5 Q. Do you see numeral 4? This expert
6 said, regarding the reported laboratory analysis for
7 Torrence Wiley, his BAC was at .186. Do you see
8 that?

9 **A. Yes.**

10 Q. Okay. Pretty high, right?

11 **A. It's pretty good.**

12 Q. Okay. And then Kevin Wiley at 5, and
13 scroll up a little bit, Haley, is .332. Do you see
14 that?

15 **A. Yes.**

16 Q. Like that's nearly dead, right?

17     I mean, you know, I might be being
18 hyperbolic, but it is -- would you agree that that's
19 an extremely high BAC to the point of near
20 unconsciousness?

21 **A. I wouldn't disagree with it I mean when**
22 **they say they were both intoxicated. Okay.**

23 Q. So, again, I just pointed this out that
24 the tox reports corroborated what these women -- at
25 least what Ms. Macias had reported to the first

1 responding detectives that were doing these
2 canvasses, right?

3 **A. Okay.**

4 Q. Is that a yes?

5 **A. Yes.**

6 Q. That's good police work, right?

7 **A. Well, I mean this report comes out**
8 **later on and it comes from the medical examiner's**
9 **office. So that's admitted later on. I don't know**
10 **if the police had a lot to do with that.**

11 Q. Well, I'm just saying -- that's not
12 really what I'm saying.

13 **A. I'm sorry.**

14 Q. What I'm saying is the tox analysis was
15 done, obviously, after the -- with the medical
16 examiner things, but good police work would involve
17 corroborating leads or seeing what -- you know,
18 whether a particular lead has legs, correct?

19 **A. You're talking about a medical**
20 **examiner's report. So that comes into the case**
21 **later on. That has nothing to do with police work.**

22 Q. Sir, you're telling me that a medical
23 examiner's report that gives information about maybe
24 the manner in which the crime was committed, the
25 information about the physical condition of the

1 victim, that type of information is not something
2 that, when you get that information, as a detective,
3 you want to compare it against what you know about
4 the case?

5 **A. I never said that. You asked me if**
6 **this was good police work to get the tox back on**
7 **these two victims.**

8     **I said I don't know if it has anything**
9 **to do with police work. It has to do with the ME's**
10 **report. The ME's report is included in the case**
11 **file. That's all I say. If these guys are drunk,**
12 **they're drunk.**

13 Q. And isn't that -- aren't you the Mr.,
14 you know, we want to know everything we can about
15 our victims?

16 **A. So we do know that.**

17 Q. Right.

18 **A. Okay.**

19 Q. The fact that one of them was in such
20 an inebriated state to the point of being near
21 unconscious, wasn't that a fact you want to know
22 about your victims?

23 **A. I don't know if it had any bearing on**
24 **being shot to death, but, yeah, I would want to know**
25 **that.**

1 Q. Well, it might have a bearing on a
2 number of other things that led up to that, but it
3 certainly is something you would want to consider,
4 correct?

5 **A. Anything from the medical examiner's**
6 **office is extremely important to a homicide**
7 **investigation. That's included in our case file.**

8 Q. Okay. Good. All right.

9     The general progress reports that you
10 looked at, those were all prepared on May 25th of
11 1990, right?

12 **A. All of them?**

13 Q. Yeah, all of them.

14     **MR. BRUEGGEN:** General progress
15 reports.

16 **A. Which ones?**

17 Q. All of them, sir. All of them.

18     Tell me -- tell me if you can find any
19 GPRs that were prepared on any date after May 25th
20 of 1990?

21     **MR. BRUEGGEN:** Jennifer, I don't think
22 you meant this to be a trick question, but I don't
23 think there's any GPRs in the document he's flipping
24 through, right?

25     **MS. BONJEAN:** Well, he references GPRs.

Page 165

1 Correct. I don't think there are any in the
2 investigative file, but he references them in his
3 report.
4   So I guess I'm asking whether he saw
5 any GPRs that were not prepared on the actual date
6 of the crime.
7   **MR. BRUEGGEN:** Go ahead. Can you
8 repeat that, Jennifer?
9   **MS. BONJEAN:** Yeah.
10 Q. Did you review any GPRs that were
11 prepared after May 25th of 1990?
12 **A. I don't recall.**
13 Q. Well, what would refresh your
14 recollection?
15 **A. If you show it to me, tell me what page**
16 **it's on.**
17 Q. Sir, I mean you have a footnote here in
18 which you refer to a general progress report of
19 CCSAO 874. I mean you're the expert allegedly.
20   **MR. BRUEGGEN:** Objection,
21 argumentative, form. Go ahead.
22 Q. It's very simple. Did you see any
23 handwritten notes in connection with this homicide
24 investigation that postdated May 25th of 1990?
25 **A. I don't know the exact dates, but I did**

Page 166

1 see some.
2 Q. That postdated May 25th of 1990?
3 **A. I said I don't remember the dates. You**
4 **asked me. I just answered you.**
5 Q. No, you didn't. Listen to the
6 question.
7 **A. I don't remember the dates. If you**
8 **give me the specific one I'm looking for instead of**
9 **going through all this paperwork, I can answer you.**
10 Q. Why don't you look at your report and
11 act like an expert and respond to my questions like
12 a normal expert would and tell me -- I mean it's not
13 for me to do your work for you. It's not for me to
14 do your work for you. I'm asking you questions that
15 you're obligated to answer as a so-called expert in
16 this case.
17   **MR. BRUEGGEN:** Objection,
18 argumentative, asked and answered.
19   **MS. BONJEAN:** Haley, do you have what I
20 asked you to pull up?
21   **MR. COOLBAUGH:** I will in about 15
22 seconds.
23   **MS. BONJEAN:** Okay.
24   **MR. COOLBAUGH:** Would you like me to
25 screen share, Jenny?

Page 167

1   **MS. BONJEAN:** Yeah.
2   **MR. COOLBAUGH:** Okay. Give me one
3 second.
4 Q. Okay. You see this GPR?
5 **A. I do.**
6 Q. You reference this GPR in your report,
7 by the way.
8 **A. Yes, I did.**
9 Q. Okay. And it has the name of --
10 **A. Lulu.**
11 Q. Well, it has a fair amount of
12 information on here -- some information on here. It
13 has the names of the -- one of the victims, right?
14 **A. Yes.**
15   **MR. BRUEGGEN:** Jennifer, can you give
16 us the Bates stamp for the record?
17   **MS. BONJEAN:** Yeah. Haley, can you
18 scroll down there please? 874.
19   Okay. Put it back down.
20 Q. So there's an interview with Jolanda
21 Wiley. Who is she?
22 **A. She's the sister of the two brothers.**
23 Q. All right. And does this appear to be
24 handwritten notes related to the interview of
25 Jolanda Wiley?

Page 168

1 **A. It looks like it. It looks like a**
2 **detective handwritten that. Yeah.**
3 Q. And we know from that report that was
4 prepared on May 25 that she was interviewed, right?
5 **A. I do. I believe it was the 25th. Yes.**
6 Q. And what's handwritten here also
7 appears in the report, correct?
8 **A. Yes.**
9 Q. And she says her brothers essentially
10 left the house. They were there from, I guess, 10
11 to 11, and then left the house around 11, right?
12 **A. They left the house around I think it**
13 **was 11 o'clock.**
14 Q. And then up at the top it says Lulu,
15 right?
16 **A. Yes.**
17 Q. And that -- that's something that was
18 mentioned by those ear-occurrence witnesses, right?
19 **A. Yes. So the two earwitnesses, they**
20 **heard somebody talking about Lulu or Lulu Dog.**
21 Q. And did you see anything in this report
22 or any other report that reflected an interview with
23 Lulu?
24 **A. Her interview with her, yes.**
25 Q. Okay. Where?

Maysonet v.
Guevara

---

Page 169

1  **A.  I got to go look it up.**
2  Q.  It's Jolanda, right?
3  **A.  Yeah, Jolanda.**
4  Q.  Jolanda.  I don't know.
5     At least the address is the same,
6  right?
7  **A.  Yes.**
8  Q.  Okay.  That's not reported anywhere,
9  though.  We just have to piece that together based
10 on the address, correct?
11 **A.  That's what we base it on.  Yes.**
12 Q.  Right.
13    It doesn't -- do you see anywhere on
14 these reports where a detective is like -- the two
15 African American males, one of them was saying Lulu
16 or Lulu Dog, and that appears to be him referencing
17 his sister because that's her nickname.
18    Do you see anything like that?
19 **A.  No.  They did not put that in there.**
20 Q.  I mean that would be good police work
21 to connect that dot in your reports, right?
22 **A.  Well, I would prefer for them to do**
23 **that just to clear it up, but, you know, obviously,**
24 **they thought they identified who Lulu Dog was and**
25 **moved on.**

---

Page 170

1  Q.  Well, how do you know that that's what
2  they thought?  Did you ask them?
3  **A.  I didn't ask anybody.**
4  Q.  Okay.  So you don't know what they
5  thought, right?
6  **A.  That's correct.  I would have rather**
7  **have it documented in there.  Yes.**
8  Q.  Do we even know whether they made the
9  connection?
10 **A.  Well, later on I got an affidavit that**
11 **somebody interviewed Jolanda, and she said that was**
12 **her.**
13 Q.  You mean when the defense attorneys
14 went out and got that information?
15 **A.  Could be.**
16    **MR. BRUEGGEN:** You're mixing that up
17 with Richard's declaration of Gonzalez.
18    **MS. BONJEAN:** Yeah.  Right.  When
19 defense counsel 25 years later did it, yeah.  I
20 mean, listen, I know we make better investigators
21 than most police officers, but I don't -- I think
22 you may not want to point to that.
23 Q.  Did you see any police officers make
24 that connection in any report now or later?  I mean
25 at the time of the incident or later?

---

Page 171

1  **A.  Like I said, I wish they would have**
2  **wrote that on there.  I prefer that.**
3  Q.  That would have been important that the
4  two individuals that these women heard arguing
5  likely were the victims, right?
6  **A.  I'm sorry.  I didn't catch that.**
7  Q.  Would you agree that if a detective was
8  able to determine at the time -- they should have
9  been able to determine at the time that the two
10 African American males who Ms. Macias and Ms.
11 Preceeo heard arguing on the street were the Wiley
12 brothers, one way that they might have been able to
13 confirm that or get close to confirming that is that
14 the fact that they were using the word Lulu and Lulu
15 is their sister.
16 **A.  Confirming that they're Wiley brothers?**
17 **I don't understand.**
18 Q.  Wow.  Okay.  Stick with me.
19 **A.  I'm trying.**
20 Q.  These sisters who listened to these two
21 seemingly African American men arguing on the street
22 from 12 o'clock to 1 o'clock before hearing the
23 shots, right?
24 **A.  Okay.**
25 Q.  Yes?  With me?

---

Page 172

1  **A.  Yes.**
2  Q.  Okay.  And one of them says -- one of
3  them seemed highly intoxicated and one -- they were
4  arguing, and one of them was saying get on the bus,
5  don't get on the bus and saying something about
6  Lulu, right?
7  **A.  That's what they said, yes.**
8  Q.  Right.
9     This is adding up, right, because we
10 know that they were actually intoxicated and that
11 Jolanda Wiley's nickname was Lulu, correct?
12 **A.  Okay.**
13 Q.  Would you agree with that?
14 **A.  I'd agree with that.**
15 Q.  All right.  Would it be important to
16 document somewhere, for instance, in a report or in
17 a note, these two African American males, one of
18 them was saying the word Lulu and they have a sister
19 named Lulu?
20 **A.  I mean I agreed with you before.  I**
21 **said, yes, I would rather have that on this**
22 **documentation.  Yes.**
23 Q.  Okay.  And we -- and that's not there,
24 is it?
25 **A.  No.**

---

Maysonet v.
Guevara

---

Page 173

1 Q. All right. Now, in the
2 investigative -- keep going.
3    MS. BONJEAN: Go to the next one,
4 Haley.
5 Q. Okay. Another GPR. Do you see when
6 the date of that GPR is?
7    MS. BONJEAN: Put it to the side,
8 Haley.
9 **A. May 25, '90.**
10 Q. Still on May 25, '90, right?
11 **A. Okay.**
12    MS. BONJEAN: Okay. You can center it,
13 Haley.
14 Q. Would you agree based on what we're
15 seeing here as compared to the reports that these
16 look like handwritten notes that were ultimately put
17 in these canvass reports?
18 **A. Yes, I would agree.**
19    MS. BONJEAN: Okay. Go to the next
20 one, Haley.
21 Q. It looks like some other handwritten
22 notes, right?
23 **A. Yes.**
24    MS. BONJEAN: Okay. Go ahead, Haley.
25 Q. Another GPR with -- what looks like

---

Page 174

1 times, right?
2 **A. Times.**
3 Q. It looks like -- it's seen stuff,
4 right?
5 **A. Yeah.**
6 Q. Number one, what he's wearing, how is
7 body is laid out.
8 **A. Yeah. I don't know if it's times**
9 **because the first one is 1472.**
10 Q. Yeah, you're right there. Fair enough.
11 Maybe those aren't times.
12    But it does appear to be listing
13 personnel on the scene, right?
14 **A. Yes, that probably makes more sense.**
15 Q. Okay. And it also seems to be giving
16 details about the victims, what they're wearing, et
17 cetera?
18 **A. Yes.**
19    MS. BONJEAN: Okay. Keep going, Haley.
20 Stop. Come back a little bit please.
21 Q. Does it appear to identify information
22 that was found at the scene?
23 **A. Can she go down a little more?**
24 Q. No.
25    I'm talking about look where it says

---

Page 175

1 three casings passageway, one Milwaukee Best. You
2 see that?
3 **A. I got you.**
4 Q. All of that information ended up in
5 that first field investigation report, right?
6 **A. Yes.**
7    MS. BONJEAN: Keep going, Haley.
8 Q. Okay. We see some additional GPRs.
9    MS. BONJEAN: Keep going. Stop. Come
10 back down, Haley.
11 Q. An interview with Isabella Negron,
12 Jenny Gonzalez, Aurelia Feliciano, and then these
13 are all those addresses where there were no answers.
14 Do you see that?
15 **A. Yes.**
16 Q. That corresponds to the initial field
17 investigation report, right?
18 **A. Yes.**
19    MS. BONJEAN: Okay. Keep going, Haley.
20 Q. Okay. And then this GPR is not until
21 it looks like that's November 23, 19, I think, 90,
22 right?
23    MR. BRUEGGEN: Object to foundation.
24 Q. Do you read it as anything else?
25 **A. I got the 23rd of November. I just**

---

Page 176

1 **can't make out the year.**
2 Q. Okay. Well, it's certainly not
3 November 23rd of '89. So it's either '90 or '91.
4 Sometime after '90, right?
5 **A. I would guess. I mean I can't tell.**
6 Q. Well, it's not '89. No crime had
7 happened at that point, right?
8 **A. I wouldn't say it's '89. I would not.**
9 Q. The earliest it could be would be
10 November 23rd of 1990, right?
11 **A. Okay. I'm just saying I can't read the**
12 **date. That's all.**
13 Q. Okay. I know, but you read the
14 November 23.
15    I mean isn't part of being a detective
16 like, you know, following logical inferences from
17 things?
18 **A. Yes, but not trying to read dates that**
19 **I can't understand.**
20 Q. Well, I just asked you. You said I see
21 the November.
22 **A. All right. All right. I got it. 23rd**
23 **of November. I'm not sure of the year. If you say**
24 **that's the year, that's the year.**
25    MS. BONJEAN: Okay. Keep going down,

---

Page 177

1  Haley. This is I think a repeat of the one we
2  already looked at beginning -- okay. That's it.
3  Those are the GPRs.
4  Q. Did you see any other GPRs other than
5  the ones we just looked at?
6  **A. No, not that I recall.**
7  Q. All right. If you did, I would sure
8  like to know where they are.
9     Now, you can put the investigative file
10  back in front of you right now.
11  **A. Okay.**
12  Q. In looking at this file, forget
13  everything else, just looking at the investigative
14  file, okay, if that's all you had in front of you,
15  are you able to tell us a single investigative act
16  that was carried out or taken between -- from May
17  26, 1990, until -- well. Strike that.
18     Let me ask it this way. Did you see
19  any report that was prepared after May 25th of 1990,
20  but before August 24th of 1990?
21  **A. No, I did not.**
22  Q. And it's your testimony that that is
23  consistent with accepted police practices that you
24  would not have a single report or handwritten note
25  about a double homicide investigation that occurred,

Page 178

1  again, on May 25th of 1990, not a single report
2  until almost three months later?
3  **A. I mean like I wrote about that also. I**
4  **said I'd rather have investigative steps documented**
5  **throughout the case investigation, but they got all**
6  **the investigative steps in their final report that**
7  **was done on the 23rd.**
8  Q. Yeah.
9     But you by your own standards have said
10  that a -- you said it multiple times, bolded,
11  highlight. In your own -- you know, listen, don't
12  sell your soul to be an expert, my friend, but your
13  own -- your own PowerPoint presentation you
14  emphasize to officers over and over again the
15  importance of documenting each and every step of an
16  investigation, right?
17  **A. I did, and we are also talking about**
18  **case management in 2023.**
19     **So that's the way they did it back**
20  **then. Would I like it better? Would I like better**
21  **documentation? Of course, I would, but that's the**
22  **way they did it back in 1990.**
23     **I write about modern police**
24  **investigating techniques and I'm talking about case**
25  **management stuff.**

Page 179

1  Q. Sir, is it your testimony that in 1990
2  it was consistent, it was normal the way they did it
3  back then to take a confession and not write a
4  report about it?
5  **A. I never said that.**
6  Q. Okay. Well, let's get into it. You
7  would agree that if you -- if somebody confessed to
8  a double murder or implicated themself in a double
9  murder, whether it was 1950 or 2023, there should be
10  a report that documents that confession or
11  incriminating statement.
12  **A. I would prefer that, yes.**
13  Q. I'm not asking you what you prefer.
14  Like that's just -- first of all, this isn't about
15  what you prefer. I mean that's kind of -- you know,
16  it's not really about your preferences. It's not
17  about you. It's about you're the expert.
18     It's about what is accepted in the law
19  enforcement community, and, yes, it's 1990, but are
20  you suggesting that, even in 1990, it was consistent
21  with accepted police practices not to document
22  confessions?
23     **MR. BRUEGGEN:** Objection, misstates his
24  testimony.
25  **A. All the statements were documented.**

Page 180

1  **They just weren't documented right away.**
2  Q. In what world would it be appropriate
3  to document a confession two months after it
4  happened?
5  **A. I don't know which confession you're**
6  **talking about. So --**
7  Q. Well, just -- I'm talking, if somebody
8  confessed to participating in a double homicide to a
9  police officer, whether it's 1990 or any time
10  thereafter, would you agree that accepted police
11  practices would require that officer to not only
12  document that -- those statements but to actually
13  go, you know, potentially get a warrant to arrest
14  that person?
15     **MR. BRUEGGEN:** Objection, incomplete
16  hypothetical, misstates the record. Go ahead, sir.
17  **A. I think that they should document that**
18  **as soon as possible, but it was documented back in**
19  **August.**
20  Q. What was documented?
21  **A. All the interviews that they did.**
22  Q. Okay. Let's keep going. On page 8 of
23  your report, you detailed Mr. Maysonet's arrest on
24  July 4th of 1990, right?
25  **A. Okay.**

Page 181

1 Q. You got that from police reports.
2 Fair?
3 **A. I did, yes.**
4 Q. Okay. And you wrote that Detective
5 Paulnitsky -- you didn't mention in here that
6 Detective Paulnitsky physically assaulted Mr.
7 Maysonet during this arrest, did you?
8 **A. During this arrest he was assaulted? I**
9 **did not.**
10 **MR. BRUEGGEN:** Wait. Objection to
11 form. Which arrest?
12 **MS. BONJEAN:** The July 4, 1990 arrest.
13 Q. Did you document that in your report or
14 consider it or why isn't -- is there any mention
15 about it?
16 **A. I didn't have that.**
17 **MR. BRUEGGEN:** Objection, misstates the
18 record. Go ahead.
19 Q. You didn't have it?
20 **A. I didn't have that. That he was**
21 **assaulted?**
22 Q. Did you read his deposition?
23 **A. I did.**
24 **MR. BRUEGGEN:** Objection, misstates the
25 record.

Page 182

1 **MS. BONJEAN:** Haley, let's pull up the
2 deposition. Well, hold on, Haley. I have to get
3 the page number. It's a long deposition.
4 All right. One second. I'm going to
5 try to keep asking questions as we go.
6 Q. You mentioned that Paulnitsky wrote in
7 his report that he knew Mr. Maysonet to be King Leo.
8 Do you see that?
9 **A. Yes.**
10 Q. Did you see Mr. Maysonet's --
11 **MS. BONJEAN:** Haley.
12 **MR. COOLBAUGH:** Yes.
13 **MS. BONJEAN:** Hold on a second. Are
14 there two volumes of this? Haley, I'm sorry. I'm
15 looking at the wrong thing. My apologies.
16 There we go. Okay. No. This is not
17 it either. Okay. Give me one second. Okay. There
18 we go.
19 Okay. Haley, do you have his -- Jose's
20 deposition up or available?
21 **MR. COOLBAUGH:** I do. What page would
22 you like me to display?
23 **MS. BONJEAN:** Okay. Page 214.
24 **MR. COOLBAUGH:** Would you like to mark
25 this, Jenny?

Page 183

1 **MS. BONJEAN:** No, we don't need to. Go
2 actually to like 212. Let's start back.
3 Okay. And then let's keep going.
4 Okay. Keep going. There's a lot of talk about this
5 between lawyers. Keep going. Okay.
6 Q. Do you see -- did you read Mr.
7 Maysonet's deposition?
8 **A. I did.**
9 Q. Okay. And do you see this questioning?
10 Do you remember was there any other
11 detective with Paulnitsky when you were arrested?
12 There was quite a few.
13 **MS. BONJEAN:** And then keep going.
14 Keep going, Haley. Okay. Stop.
15 Q. Basically, I was just coming out of the
16 store with a box of beer, and I know there was a
17 detective. They saw me going in. I guess they were
18 looking for someone with the name of King Leo.
19 That's what they were looking for, someone who
20 happened to call King Leo. I had a sweater with a
21 big ass lion and a big ass crown and bottom said
22 Leo, and that's basically how they created the name
23 King Leo when Paulnitsky came. He got out of the
24 car, starts walking over. He called me. He said
25 can you come over here? I said I don't understand

Page 184

1 English. So, you know, I kept walking like, you
2 know, none of my business. So I kept walking, and
3 all of a sudden, I felt kicking, kicking me in the
4 back, throwing me on the floor thinking that I had a
5 gun on me. So when I got turned around on the floor
6 after they caught me and stuff, and I had a few
7 weapons, you know, drawn in my face telling me
8 where's the gun, where's the gun. So what. You
9 know, there's some guy that was talking in Spanish,
10 though, you know, donde pistola, et cetera.
11 Do you see that?
12 **A. I do.**
13 Q. Okay. So did you ever mention Mr.
14 Maysonet's account of what happened during his
15 arrest in your expert report?
16 **A. That incident I did not mention it in**
17 **there because I thought just having the King Leo**
18 **connection and for that nonfatal shooting which is**
19 **what brought him into the squad for that case which**
20 **led to everything else.**
21 Q. Okay. But Mr. Maysonet says his
22 nickname was never King Leo. So Mr. Paulnitsky
23 would never have known him as King Leo.
24 **A. Okay. But I think other people told**
25 **detectives that King Leo did it, and he knew him as**

Page 185

1 King Leo, and he was picked out of a lineup I
2 believe.
3 Q.  Like I said, are you saying you believe
4 there was corroboration that Mr. Maysonet went by
5 the nickname King Leo?
6 A.  I'm not corroborating anything.  I'm
7 just saying that the detectives got a lead on a King
8 Leo.  One of the detectives knew who King Leo was.
9 They tracked down Maysonet.  They brought him into
10 the stationhouse.  They put him in a lineup and he
11 was picked out.  That's all I'm saying.
12 Q.  That would make sense if Mr. Maysonet
13 was actually known as King Leo, right?
14 A.  What name he goes by and what people
15 identify in the lineup are two different things.
16 Q.  Okay.  Do you have evidence that he was
17 identified in the lineup as King Leo?
18 A.  As King Leo.  I don't think they asked
19 him what his name was.  They just asked -- I'm
20 surmising that they asked them do you recognize
21 anybody.
22 Q.  Okay.  So just answer my question.
23    Is there -- is there anything -- any
24 material you looked at that corroborated
25 Paulnitsky's claim they knew Jose Maysonet as King

Page 186

1 Leo?
2 A.  It corroborates that he knew King Leo?
3 No.
4 Q.  Okay.  So you said Paulnitsky reported
5 that he knew King Leo to be Maysonet, right?
6 A.  That's what Paulnitsky said.  Yes.
7 Q.  And Mr. Maysonet says, no, he did not,
8 because I didn't go by the name King Leo.  He just
9 made that up because I had a lion on my shirt.
10 A.  Okay.
11 Q.  Or at least that's his theory of why he
12 made it up, but he said that's not my nickname,
13 right?
14    So they're contradicting each other on
15 that, right?
16 A.  I don't think they're contradicting.
17 It's different versions of what happened.
18 Q.  Right.  Different versions contradict.
19    Somebody says, you know -- somebody
20 says, you know, the person had -- was a black
21 person, and another witness says, no, it was a white
22 person, that would be a contradiction, right?
23 A.  Well, he's saying that he didn't go by
24 that name.  The detectives brought him in by
25 stationhouse.  He was picked out of a lineup.  So

Page 187

1 we're looking at his face, not his name.
2 Q.  Sir, you're just jumping ahead right
3 now.  What are you talking about right now?
4    I am saying is there anything that you
5 saw -- you put in your report that Paulnitsky
6 referred to him and said he knew him as King Leo,
7 right?
8 A.  Okay.
9 Q.  Right?  Is that a yes?
10 A.  Yes.
11 Q.  And Mr. Maysonet says I was never known
12 as King Leo.  Okay.  Right?
13 A.  Okay.
14 Q.  Okay.  You didn't mention that -- you
15 didn't put in here detective -- Mr. Maysonet denies
16 that anyone would have been calling him King Leo or
17 knew him as King Leo because his nickname was not
18 King Leo, right?
19 A.  That's how Paulnitsky knew him as King
20 Leo.  That's what was important to that case.
21 Q.  Nobody would know me as, you know,
22 Jennifer Lopez because I'm not Jennifer Lopez,
23 right?
24 A.  You don't go by that, but maybe
25 somebody else calls you that.

Page 188

1 Q.  Why?  That makes zero sense.  Why would
2 somebody --
3 A.  I'm not saying whether it makes sense.
4 It's just an investigative step that led to this.
5 Q.  It's a lie.  That's the other
6 possibility too, right?
7    It's a lie.  That's a possibility,
8 right?
9    Paulnitsky could have been lying about
10 that, right?
11 MR. BRUEGGEN: Object to the form.  Go
12 ahead, sir.
13 A.  Could Paulnitsky have been lying that
14 he knew King Leo as Maysonet?
15 Q.  He could have lied to say I -- I heard
16 it was King Leo.  That's why I went over there.  He
17 could have lied about that.  That's a possibility
18 too, right?
19 MR. BRUEGGEN: Object to the form.  Go
20 ahead.
21 A.  I mean it's possible that anybody could
22 lie about anything, but, you know, how did they
23 touch King Leo to that name and pick him out of a
24 lineup.
25 Q.  Sir, can we forget the lineup for a

Page 189

1 second?
2 **A. Well, I think that's important.**
3 Q. I'm not saying it's not important. I'm
4 saying it's a granular question. We're getting more
5 narrow here.
6    I'm saying that there are -- you would
7 agree that Mr. Maysonet's version of what transpired
8 based on his deposition testimony contradicts what
9 the police officer's version of what occurred in the
10 reports, right?
11    **MR. BRUEGGEN:** Objection, form, asked
12 and answered. Go ahead.
13 **A. Yes.**
14 Q. Okay. Okay. And you know Mr. Maysonet
15 was -- was not convicted ultimately of this crime or
16 his conviction was vacated and he was not convicted
17 of this, right?
18    **MR. BRUEGGEN:** Object to form.
19    Can rephrase that? You kind of bounced
20 around, Jennifer.
21    **MS. BONJEAN:** Yes.
22 Q. Mr. Maysonet's conviction for this
23 nonfatal shooting was vacated. He does not
24 currently stand convicted of this crime. Are you
25 aware of that?

Page 190

1 **A. Okay.**
2 Q. Are you aware of that?
3 **A. Yes, I'm aware of it.**
4 Q. Okay. Let's go on. Let's talk about
5 the July 3 -- I'm sorry. Strike that.
6    The July -- the arrest that we were
7 just talking about here, this July 15 arrest for
8 this unrelated shooting, okay, you write that Mr.
9 Maysonet was interviewed by Sergeant Mingey and
10 Detective Montilla who was Spanish speaking at the
11 violent crime area on July 15 after he was taken
12 into custody on this other matter, right?
13 **A. Yes.**
14    **MR. BRUEGGEN:** Jennifer, can you direct
15 us where you're at? You're going by his report?
16    **MS. BONJEAN:** Yeah. The bottom of page
17 8. I'm just trying to push ahead.
18 Q. You used the word debriefing. That's
19 your word, though, right?
20 **A. Yes.**
21 Q. That's not a word that the Chicago
22 Police Department officers in this case used, right?
23 **A. I'm not sure if they used that back in
24 1990 but --**
25 Q. Did they use it in their depositions in

Page 191

1 2020?
2 **A. I was just using my own verbiage there.**
3 Q. Okay. What does it mean?
4 **A. Debriefing of prisoners.**
5 Q. What does debriefing mean?
6 **A. Well, when somebody's arrested, we want
7 to -- especially if it's a violent criminal, if they
8 know anything about other crimes in the neighborhood
9 or have information about past crimes or crimes that
10 occurred, anything, guns, drugs.**
11 Q. Okay. You immediately jump in your --
12 in this bottom of page 8, you say the motive for the
13 shooting was gang related as the victims were YLODs.
14 Where did you get that?
15 **A. What are you talking about now?**
16 Q. Sir, at the bottom of page 8 in your
17 report, where did you get information that the
18 victims were YLODs?
19 **A. I believe that was in the -- one of the
20 police reports that I read.**
21 Q. You mean the cleared/closed report in
22 August?
23 **A. Could have been. I don't recall which
24 one it was.**
25    **MR. BRUEGGEN:** Jennifer, I think you're

Page 192

1 mixing up cases. This is talking about July 3
2 shooting.
3    **MS. BONJEAN:** Oh, okay. My apologies.
4 Even so, I was mixing up cases. You're right.
5 Q. The motive for the shooting from July
6 4, I guess, or the July 3 shooting -- okay. Okay.
7 Got it.
8    So you pointed out I think you must
9 have also considered Sergeant Mingey's testimony on
10 this that there was a potential connection because
11 the ballistics that were recovered in the July 3
12 shooting involved a 9-millimeter pistol, and there
13 was ballistics that was inventoried on May 25th of
14 1990 for the Wiley brothers' shooting, right?
15 **A. Yes. That's correct.**
16 Q. And Mingey knew they were both 9
17 millimeters, right?
18 **A. He knew that, yes.**
19 Q. And he was, according to him, and I
20 guess you have thought -- you -- you believe that
21 this was appropriate to question Mr. -- Mr. Maysonet
22 because he was a known Latin King. These guys were
23 found in Latin King territory and they both
24 allegedly involved the use of a 9-millimeter pistol,
25 right?

Maysonet v.
Guevara

Page 193

1 **A.  Well, I think it would have been**
2 **inappropriate if he didn't try to speak to Mr.**
3 **Maysonet.**
4 Q.  That's fair.  I don't -- I agree with
5 you.  We are not going to disagree on that.
6   Now -- and he even made sure that there
7 was Detective Montilla there who was a
8 Spanish-speaking property crimes detective to serve
9 as an interpreter, right?
10 **A.  Yes.**
11 Q.  Okay.  Now, you write that during --
12 and I'm going to page 9, that during this initial
13 interview, Maysonet told me that he had information
14 about how he secured a 9-millimeter pistol in his
15 home for his fellow Latin King members and that on
16 the night of the murder the Latin King members had
17 obtained the pistol and then he heard about the
18 double homicide, and he, and you put this in
19 quotations and italics, assumed that the Latin Kings
20 he gave the gun to must have done the shooting.
21   That's a oral statement of Mr. Maysonet
22 that at least makes him a very important witness in
23 this case, right?
24 **A.  I would agree with that.  Yes.**
25 Q.  Okay.  Did you see any reports about

Page 194

1 this so-called oral statement prepared in and around
2 the time of July 15, 1990?
3 **A.  No, I did not.**
4 Q.  Did you see any evidence whatsoever by
5 way of contemporaneous reports about what Sergeant
6 Mingey did with this information in your review of
7 this entire file?
8   MR. BRUEGGEN: Object to form.  Go
9 ahead.
10 **A.  No.  I didn't see any contemporaneous**
11 **notes from him.  The first time this gets documented**
12 **is on the 23rd.**
13 Q.  Not of July.  August 23.
14 **A.  August, yes.**
15 Q.  Okay.  So the first time this
16 incredibly important witness statement, possible
17 inculpatory statement gets documented, it's over a
18 month later, right?
19 **A.  Yes.**
20 Q.  That is not consistent with the
21 policies and practices of any department even in
22 1990, is it?
23 **A.  Policies and practices, I'm not sure**
24 **about that, but like I said, I prefer it when -- if**
25 **they would type it right away.  They didn't.  They**

Page 195

1 typed it later on in August.
2 Q.  There's no even handwritten notes about
3 it, is there?
4 **A.  Not that I saw, no.**
5 Q.  And, in fact, sir, Sergeant Mingey gets
6 this information on July 15th of 1990 that,
7 according to Mr. Maysonet, the same gun that is
8 used -- that he used in the shooting on July 3 is
9 the gun that was used in the double homicide, right?
10 **A.  No.  I never saw that.**
11 Q.  What do you mean?
12 **A.  You said the same gun?**
13 Q.  Well, according to this, you said Mr.
14 Maysonet informed Mingey that he had information
15 about how he, Mr. Maysonet, secured a 9-millimeter
16 pistol in his home for his fellow Latin King gang
17 members, right?
18 **A.  Right.**
19 Q.  Right.  Okay.
20   That he had this 9-millimeter gun --
21 you know, I'm assuming -- if you -- if you think he
22 had it and that it -- the whole reason Mingey is
23 there is because a 9 millimeter is used in this
24 shooting that Maysonet allegedly did, right, later
25 on?

Page 196

1 **A.  Yes.**
2 Q.  Okay.  So let's just go strictly by
3 what is reported.  Sergeant Mingey gets information
4 that Maysonet is in possession of a 9-millimeter
5 pistol or was in possession of a 9-millimeter
6 pistol, right?
7 **A.  Yes.**
8 Q.  That he purportedly or at least
9 believes that he gave two other Latin Kings to carry
10 out this shooting, right?
11   MR. BRUEGGEN: Object to the form.  Go
12 ahead.
13 **A.  He told them that Latin Kings came to**
14 **his house to retrieve the gun, and he believed the**
15 **shootings happened from them.**
16 Q.  Right.
17   And this all comes about because, as
18 you just pointed out, the reason Mingey's even
19 talking to Maysonet is because, you know, he's in
20 there for a shooting with a 9 millimeter, right?
21 **A.  It is the debriefing of a prisoner.**
22 **Yes.**
23 Q.  And, in part, because he's in there for
24 a shooting of a 9 millimeter.  Mingey himself has
25 said it stuck out in his head the shooting that

Maysonet v.
Guevara

---

Page 197

1 Maysonet was allegedly involved in involved a 9
2 millimeter and the double homicide involved a 9
3 millimeter, right?
4 **A. It's in close proximity and it's Latin**
5 **King gang territory, yes.**
6 Q. So, certainly, Sergeant Mingey at that
7 point should have -- should have at least by July 15
8 put in a request for comparative analysis to be done
9 between the two shootings, right?
10 **A. On July 15?**
11 Q. Yeah.
12 **A. I'm sorry. I don't follow.**
13 Q. Sergeant Mingey questions Mr. Maysonet
14 on July 15, right?
15 **A. Correct.**
16 Q. One of his reasons is because he
17 believes there's a connection between the shooting
18 that Mr. Maysonet is in custody for and the double
19 homicide, right?
20 **A. Correct.**
21 Q. Okay. He has ballistics evidence from
22 both of those events, correct?
23 **A. Okay. Yes.**
24 Q. A good detective -- I think you called
25 Mingey a -- you know, I don't know exactly what you

---

Page 198

1 said, but, you know, I'll use the word a seasoned
2 investigator would have requested that those -- that
3 ballistics evidence be compared, right?
4 You think there's a connection. Why
5 wouldn't you order them compared?
6 **A. First of all, to pair ballistics is**
7 **time-consuming, and by the time when they arrested**
8 **him and to get it done, it could be weeks, months,**
9 **and we're going to talk to them regardless whether**
10 **the gun matches or not.**
11 Q. May as well get it going, right?
12 **A. Absolutely. So we're not going to wait**
13 **months for ballistic comparison.**
14 Q. Who's talking about waiting? I'm
15 talking about putting the request in.
16 **A. I don't know how there was any policy**
17 **involved how do you expedite ballistic comparisons.**
18 Q. I'm not saying that. I'm asking, in
19 your mind, if a detective -- if a detective actually
20 believes -- if this really happened, if Mr. Maysonet
21 really said these things and Sergeant Mingey really
22 thinks that there is a connection between these two
23 events, a good detective who has ballistics evidence
24 from both of those shooting events would put a
25 request in to have them compared, right?

---

Page 199

1 **A. I don't know where the case file on**
2 **that homicide -- where it was with the ballistics,**
3 **where they were, who was comparing them.**
4 **Sometimes -- most of the time it gets done**
5 **automatically.**
6 **That being said, we're not going to**
7 **wait for ballistics to go talk to him.**
8 Q. Sir, whoever said anything about not --
9 I'm not saying that he had to wait to talk to him.
10 I'm saying after he talked to him,
11 after he talked to Mr. Maysonet, after Mr. Maysonet
12 made inculpatory statements, after Sergeant Mingey
13 believed that there was a connection. Okay?
14 **A. Okay.**
15 Q. Why wouldn't -- any good detective
16 would have said let's do a comparative analysis of
17 these ballistics because these crimes may be linked
18 and this guy seems to know something about both
19 these crimes, right?
20 **A. Well, that should have been documented**
21 **better, obviously, in the case, but I don't know how**
22 **the procedure was back then when they collected**
23 **shells.**
24 **Is it already being tested and they're**
25 **waiting results? I don't know.**

---

Page 200

1 Q. Well, if you looked at the case file,
2 you would know when Sergeant Mingey actually made
3 the request because he did eventually make the
4 request. Do you know when he made that request?
5 **A. I don't recall.**
6 Q. Okay. It wasn't when Mr. Maysonet told
7 him this important information in July 15.
8 **A. Okay.**
9 Q. Oh, distinguished. You said he was a
10 distinguished investigator.
11 Are you aware that Sergeant Mingey was
12 found liable in a wrongful conviction case that cost
13 the City of Chicago over $17 million and he invoked
14 the Fifth Amendment in that case?
15 **MR. BRUEGGEN:** Objection.
16 **A. No.**
17 Q. Are you aware that Sergeant Mingey is
18 currently facing lawsuits?
19 You know, kind of like how you treat
20 arrest histories, he's being sued in probably, I
21 don't know, at least a dozen wrongful conviction
22 cases presently.
23 **MR. BRUEGGEN:** Object to the form. Go
24 ahead, sir.
25 **A. No.**

---

Page 201

1 Q. Were you aware that, and I happen to
2 represent the guy, he was named in a lawsuit for
3 framing two individuals along with Guevara and
4 Halvorsen and all these guys. The case settled
5 for -- I don't know. City of Chicago paid out -- I
6 don't know. It was something like -- definitely
7 like $20.5 million on a wrongful conviction?
8 **MR. BRUEGGEN:** Object to form. Go
9 ahead.
10 A. No.
11 Q. Okay. Were you aware that even in this
12 case -- even in this case, Sergeant Mingey said he
13 would plead the Fifth if called to testify at a
14 retrial?
15 **MR. BRUEGGEN:** Object to form, vague.
16 This case meaning the civil case.
17 **MS. BONJEAN:** No. Well, we're going to
18 get there.
19 Q. But in the criminal case when Mr.
20 Maysonet got a new trial, Mr. -- Sergeant Mingey
21 lawyered up and said I'm going to plead the Fifth.
22 Were you aware of that?
23 A. I was.
24 Q. Okay. So he said I'm not going to come
25 in and testify about what I did. No way. I'm going

Page 202

1 to plead the Fifth, right?
2 A. Okay.
3 Q. Did you consider that at all?
4 **A. No. I just considered what was the**
5 **basic investigation, do the homicide investigation.**
6 **What these guys did before or after their career, I**
7 **couldn't tell you.**
8 Q. What do you mean before and after?
9 That's part of -- it was part of his
10 job in this case was to testify at the trial. Isn't
11 that part of your job as a police officer?
12 **A. My job was just to analyze this**
13 **homicide investigation.**
14 Q. No.
15 I'm saying, as a police officer in your
16 police work, isn't part of your job to show up in
17 court and testify if called to?
18 **A. If you're working. If I'm still on the**
19 **job. If I'm retired, it's a different world.**
20 Q. Okay. So if you're retired -- you're
21 telling me -- wait a second. Hold on.
22 You're telling me that if one of your
23 cases worked on -- let's just say -- I don't know.
24 Let's say Chanel Lewis's conviction
25 gets vacated at some point down the line again or

Page 203

1 one of these high profile cases that you mentioned,
2 right, the murders of Brian Moore or Brian Simonsen,
3 those -- the guys that were convicted of that, their
4 convictions are reversed, and the Queens' DA says
5 we're going to reprosecute that guy. We want Rich
6 Rudolph to come in and testify.
7 Are you saying you would come in and
8 plead the Fifth potentially?
9 **MR. BRUEGGEN:** Objection, misstates his
10 testimony.
11 A. I never said that.
12 Q. Would you ever do that, sir?
13 **MR. BRUEGGEN:** Objection, speculation.
14 Go ahead.
15 **A. When Brian was killed or both Brians**
16 **were killed, I would not. I would not.**
17 Q. Any case you played a role in, now that
18 you're retired, is there anything that would stop
19 you from still -- I mean I think -- you emphasize
20 over and over about how much you care for human life
21 in your -- in your -- in your PowerPoint.
22 Is there anything as an honorable
23 police officer that would stop you, even as a
24 retired officer, from coming in and testifying about
25 the solid investigative work that you did or your

Page 204

1 colleagues did on a murder case?
2 **MR. BRUEGGEN:** Objection, form,
3 relevance.
4 **A. I wouldn't know. I would have to see**
5 **what actually happened. I can't predict the future.**
6 **You're asking me about something that didn't happen.**
7 Q. All right. If you say so. I guess you
8 would know what you did on those cases better than
9 me. So I get it. You're concerned -- that's good
10 to know. Fair enough.
11 Are you aware that Sergeant Mingey, I
12 know it should be in the materials, actually invoked
13 his Fifth Amendment in response to questions about
14 his investigative work on this case?
15 A. I believe --
16 **MR. BRUEGGEN:** Object to foundation.
17 Go ahead.
18 **A. I believe in the beginning he did.**
19 **Yes.**
20 Q. Okay.
21 **MR. BRUEGGEN:** Jennifer, do you know
22 when it's a good time to take a break?
23 **MS. BONJEAN:** Can you tell me where we
24 are on time, Diane?
25 (Whereupon, a discussion was held off

Maysonet v.
Guevara

---

1 the record.)

2   **MS. BONJEAN:** All right. We'll take a

3 break.

4   (Whereupon, a recess was taken.)

5 Q. Mr. Rudolph, you summarized in your

6 report the interview of Mr. Maysonet on August 1,

7 1990, that took place at the Cook County Jail,

8 right?

9 **A. Yes.**

10 Q. It's on page 12 of your report.

11 **A. Okay.**

12 Q. Even though that interview took place

13 on August 1, 1990, you would agree that there's no

14 contemporaneous or even near contemporaneous notes

15 or reports memorializing that interview until, I

16 don't know, 23 days later, right?

17 **A. Correct.**

18 Q. And when it was finally memorialized 23

19 days later, it was clearly an inculpatory, if not,

20 confession, right?

21   **MR. BRUEGGEN:** Object to form. Go

22 ahead.

23 **A. It was he gave substantial information**

24 **about his participation in the homicide. Yes.**

25 Q. He incriminated himself in a direct

---

1 way, right?

2 **A. Yes.**

3 Q. Okay. And is your testimony that it's

4 consistent with industry standards even back in 1990

5 that when someone incriminates themself in a double

6 homicide in a direct way that it would not be

7 memorialized for, whatever, three and a half weeks

8 later?

9 **A. Well, as I said, I prefer it if they**

10 **would have typed that up that day and added it to**

11 **the case file, but, you know, when I talk about, you**

12 **know, documentation and all that stuff, I don't know**

13 **if we were held to standards of typing right away**

14 **back then as we do today.**

15 Q. Okay. Yeah, but this is not rocket

16 science. It's common sense. Someone confesses to a

17 crime, you write it down. You write it down fast,

18 right?

19   **MR. BRUEGGEN:** Object to form.

20 **A. I did say I agree they should type that**

21 **right away. Yes.**

22 Q. Right.

23   Because what's going to happen in

24 cross-examination which did happen?

25   What's going to happen to that officer

---

1 when he's confronted with the fact that he didn't

2 memorialize a confession until three weeks later?

3 **A. He would have to answer for it and why**

4 **he didn't.**

5 Q. That might be suspicious to the average

6 person, correct?

7   **MR. BRUEGGEN:** Object to form.

8 **A. I don't think it's suspicious. I'd**

9 **like to know the reason why.**

10 Q. Right.

11   Because it's suspicious because there's

12 not a really logical reason why you wouldn't

13 memorialize a confession to a double homicide,

14 right?

15   **MR. BRUEGGEN:** Object to form,

16 misstates the record. Go ahead.

17 **A. I think that -- you know, I don't know**

18 **what else was going on. Maybe they had a bunch of**

19 **cases at that time. For whatever reason that he**

20 **gave he didn't type it up right away.**

21 Q. Sergeant Mingey never, ever wrote a

22 report that memorialized that statement, correct?

23 **A. Correct.**

24 Q. Sergeant Mingey never made any

25 handwritten notes in a memo book or on a GPR or

---

1 anywhere that you saw memorializing that confession,

2 did he?

3 **A. I did not. That he did, no.**

4 Q. The other person who heard it Detective

5 Montilla didn't memorialize it at the time or at any

6 time, did he?

7   **MR. BRUEGGEN:** Objection, form.

8 **A. He did not.**

9 Q. And you're saying that that makes

10 perfect sense to you?

11 **A. I never said that. I never said that.**

12 Q. I mean, if it really happened, if there

13 really was a confession that it actually truly

14 happened, it would be important to document it at

15 the time, right?

16   **MR. BRUEGGEN:** Object to form. Go

17 ahead.

18 **A. I've already said yes.**

19 Q. Okay. All right. I'm going to jump

20 ahead to -- okay.

21   I'm going to jump ahead to page 21 of

22 your -- we talked a little bit about Mr. Maysonet

23 getting a new trial, but you have a paragraph in

24 here about two arrests that he had after his release

25 from prison. What relevance would that have to

---

Page 209

1 anything?
2 **A. Relevance would it have?**
3 Q. Yeah.
4 **A. I just had added that just to show**
5 **that, you know, his girlfriend was afraid of him and**
6 **showed his violent tendencies towards her.**
7 Q. What's your evidence of that?
8 **A. My evidence of it?**
9 Q. Yeah.
10 **A. He was arrested for it. He got a court**
11 **order of protection and he violated that.**
12 Q. Okay. That's actually -- I think you
13 have that mistaken.
14     Are you aware that the case was
15 completely thrown out and the order of protection
16 was vacated?
17 **A. I mean it doesn't mean it didn't happen**
18 **because they threw it out later on.**
19 Q. It also doesn't mean it happened.
20 **A. Okay.**
21 Q. Women lie sometimes, don't they?
22 **A. Well, I would hope not in domestic**
23 **violence like that. No.**
24 Q. No.
25     Women lie sometimes. People lie

Page 210

1 sometimes, right?
2 **A. Sometimes.**
3 Q. You have no idea whether that happened.
4 He wasn't convicted of it. There was no trier of
5 fact. There was no finding about it. The whole
6 case was actually tossed out.
7 **A. Okay.**
8 Q. So are you still putting some weight on
9 it simply because there was an arrest?
10 **A. I'm just saying he was arrested for**
11 **domestic violence.**
12 Q. Why?
13 **A. It's important.**
14 Q. Do you really put a lot of weight on an
15 arrest?
16 **A. It depends what kind of arrest it was**
17 **and what's the situation. Everything is different.**
18 **You can't just make a blanket statement.**
19 Q. I mean this is a very big file with a
20 lot of records, and in your 35-page report, you
21 thought it important to include arrests that he had,
22 and, by the way, even if it happened, what on earth
23 does it have to do with whether or not he committed
24 a double homicide of two African American men in
25 1990?

Page 211

1 **A. Does it have a connection with the**
2 **homicide?**
3 Q. What's its relevance to this case that
4 you thought it important to put in there?
5     Even if it was true, which he was never
6 convicted of it, but let's just say it's true for a
7 second, what is its relevance?
8 **A. His relevance is, when he threatened**
9 **his girlfriend, he was arrested for that. It shows**
10 **his violent behavior.**
11 Q. Oh. So you're saying it shows his
12 propensity for violence?
13 **A. Not propensity is of violence. Just what**
14 **was part of his case, of his arrest background.**
15 Q. Right.
16     What's its relevance?
17     Listen, there are tens of thousands of
18 pages of paper that could have been summarized in
19 your report, but you chose to summarize that one,
20 that he was arrested because his girlfriend claimed
21 that he abused her.
22     So why did you include that in here?
23 What is it relevant to your opinion about the police
24 investigation that was done in 1990?
25 **A. It's just background information from**

Page 212

1 **his past.**
2 Q. Well, it's not from his past. It's
3 from his present.
4 **A. Okay.**
5 Q. You didn't put -- you didn't mention
6 anything about the past of Detective Guevara in this
7 report I noticed.
8     **MR. BRUEGGEN:** Object to form,
9 argumentative. Go ahead.
10 **A. I didn't know about his past until this**
11 **was pretty much over.**
12 Q. Did you know that the Illinois
13 Appellate Court -- the Illinois Appellate Court
14 called Detective Guevara a malignant blight on the
15 Chicago Police Department and the criminal justice
16 system.
17 **A. I did not.**
18 Q. Did you know that he is responsible for
19 now some upwards of 40 cases that have been --
20 murder cases that were vacated as a result of his
21 misconduct?
22 **A. I was aware that he's being sued and**
23 **he's involved with some cases being overturned, but**
24 **I only found out that recently and nothing with this**
25 **case.**

Page 213

1  Q.  So it's not something that you knew
2  about when you were preparing your report in this
3  case?
4  **A.  I did not.**
5  Q.  You seem to put weight on people's
6  arrest histories and their backgrounds and their
7  tendencies that you draw inferences from by arrest
8  histories.  You did it with my client.  You
9  mentioned it before.  We talked about it earlier,
10 right?
11 **A.  Okay.**
12    **MR. BRUEGGEN:** Object to form.  Go
13 ahead.
14 Q.  So I'm wondering why it is that what's
15 not good for the goose is also good for the gander,
16 right?
17    Why not put any weight on the fact that
18 Detective Guevara -- his conduct has been
19 established in over 40 cases in the criminal court
20 system?
21    **MR. BRUEGGEN:** Object to form,
22 misstates.  Go ahead.
23    **MS. BONJEAN:** No.  It does not misstate
24 anything.
25 **A.  What's the question?  I'm sorry.**

Page 214

1  Q.  The fact that the Illinois Appellate
2  Court and numerous sitting circuit court judges have
3  found, have held that Detective Guevara engaged in a
4  pattern and practice of misconduct in his
5  investigative work during the relevant period, did
6  you take that into account when reviewing and
7  examining this homicide investigation?
8     **MR. BRUEGGEN:** Object to form, asked
9  answered.  Go ahead, sir.
10 **A.  I did not.  I just focused on what was**
11 **done during this case.  He did one -- two**
12 **interviews, and Maysonet was interviewed by other**
13 **detectives.**
14 Q.  The only evidence that was -- the only
15 evidence that was introduced against Mr. Maysonet at
16 his trial was his confession that he claims was
17 physically coerced by Detective Guevara.
18    Are you suggesting that Detective
19 Guevara was not the single greatest player in the
20 case against Mr. Maysonet at his trial?
21    **MR. BRUEGGEN:** Object to form.
22 **A.  I never said that.  I never said that.**
23 Q.  Do you know that Detective Guevara has
24 invoked his Fifth Amendment rights now for over a
25 decade, a decade?

Page 215

1     Well, I was the first one that set him
2  on the Fifth.  So I know when it happened.  A decade
3  he hasn't answered a single question about his
4  investigative work.
5  **A.  I know it now.**
6  Q.  Okay.  Did you consider that at all in
7  examining this case?
8  **A.  No.**
9  Q.  Were you aware that Circuit Court of
10 Cook County Judge Obbish expressly called Detective
11 Guevara after hearing immunized testimony a
12 bald-faced liar, his exact words?
13    **MR. BRUEGGEN:** Object to foundation.
14 **A.  I'm not aware of that.**
15 Q.  That would have been in 2000 I guess --
16 I think maybe '19.
17    **MR. BRUEGGEN:** Object, foundation.
18 **A.  I'm not aware of that.**
19 Q.  Would you agree that if a police
20 officer is universally considered a liar that that's
21 something an expert should take into account in
22 examining his investigative work on a case?
23    **MR. BRUEGGEN:** Objection, form,
24 argumentative, foundation, speculation.  Go ahead.
25 **A.  So I just took the case that was handed**

Page 216

1  **to me and evaluated the investigative steps**
2  **regardless of the detectives, what they -- they're**
3  **going through or what they've gone through or**
4  **anything like that.**
5  **Were the proper investigative steps**
6  **followed?  Yes.**
7  Q.  Yeah.
8     But how would you know if it's proper
9  if you can't trust what they've said happened?
10 **A.  I can't trust what they said?**
11 Q.  You trust liars?
12    **MR. BRUEGGEN:** Objection,
13 argumentative, form.  Go ahead.
14 **A.  Do I trust liars?  No, I don't trust**
15 **liars.**
16 Q.  Okay.  So if you have evidence that a
17 detective who is making these reports or whose work
18 is being examined is not someone who tends to tell
19 the truth about what they did or did not do, don't
20 you think that's an important thing to consider in
21 determining the quality of the investigation?
22    **MR. BRUEGGEN:** Object to form,
23 incomplete hypothetical.
24 **A.  So I get what you're trying to ask me,**
25 **but Maysonet was also interviewed by other people**

Page 217

1 and the district attorney, the ASA, and he gave the
2 same story.
3     So even if you take Guevara out, you
4 still have the same story.
5 Q.  Who -- you said he was interviewed --
6 okay.  I mean -- well, let me back up a second.
7     The coerced confession, the alleged
8 coerced confession, okay, preceded any following --
9 the following coerced -- strike that.
10     The interrogation of Detective Guevara
11 is what led to this so-called confession, right?
12     MR. BRUEGGEN: Object to form,
13 misstates the evidence.  Go ahead.
14 A.  I think Guevara got it at the last
15 minute because he was already interviewed like we
16 talked about with Mingey twice, and then he reported
17 the same story to the ASA.  Even if you take Guevara
18 out of it, his story was consistent.
19 Q.  Okay.  Well, let's -- let's start from
20 those oral statements.  Those were never reported,
21 though.
22 A.  They're reported.
23 Q.  No.  They were ed recorded after the
24 fact.
25 A.  They were recorded.

Page 218

1 Q.  They were recorded after he was
2 charged.
3 A.  You said they weren't recorded.
4 They're recorded a little bit late.
5 Q.  It doesn't count after you charge
6 somebody.
7 A.  Okay.
8 Q.  You know that.
9     Very easy to say someone said something
10 after you've charged them, right?
11     MR. BRUEGGEN: Object to form,
12 argumentative.  Go ahead.
13 Q.  Okay.  Let's keep going.
14     You had this whole section about the
15 Fifth Amendment, and I'm not sure if you understand
16 the Fifth Amendment or don't understand the Fifth
17 Amendment, but, of course, everyone has the right to
18 invoke the Fifth Amendment, and having given Miranda
19 rights many, many times, what is -- why do people
20 invoke the Fifth Amendment?
21     MR. BRUEGGEN: Objection,
22 argumentative, speculation, form.
23 A.  Well, I'd have to know a specific case.
24 If you want to talk about this case or just in
25 general Fifth Amendment, it's a protection that they

Page 219

1 have.
2 Q.  Let's just look at the United States
3 Supreme Court case.  What is the -- why did Miranda
4 rights come to be?  What are they designed to
5 protect?
6 A.  Miranda or the Fifth Amendment?
7 Q.  Same thing.
8 A.  What was that?
9 Q.  It's the same thing.
10 A.  Well, he's got a right to counsel and
11 he doesn't have to testify -- compelled to testify
12 if he doesn't -- if somebody doesn't feel
13 comfortable.
14 Q.  It's not if you don't feel comfortable.
15 A lot of people don't want to testify, but they have
16 to come when they get a subpoena.
17     What is the Fifth Amendment designed to
18 protect against?
19 A.  Your rights.  If you don't -- if you're
20 going to take the Fifth Amendment, it doesn't mean
21 that you're guilty.  It doesn't mean you're hiding
22 something.  It doesn't mean anything.  It's just
23 your right.
24 Q.  No.  I mean, you know, you're someone
25 who thinks that you're probably guilty if you get

Page 220

1 arrested.  So I'm not sure.  You know, you're pretty
2 inconsistent.
3     MR. BRUEGGEN: Objection.  Jennifer,
4 ask questions.
5 Q.  The Fifth Amendment is designed so that
6 you have the right not to what, incriminate
7 yourself, right?
8 A.  Okay.
9 Q.  That's what Miranda is all about,
10 correct, the right against self-incrimination,
11 correct?
12     MR. BRUEGGEN: Object to form.
13 Q.  You understand that?
14 A.  I understand.
15 Q.  It's not, Judge, I don't really feel
16 like testifying so I'm going invoke the Fifth.
17 That's not what you're allowed to do, right?
18 A.  What you're allowed to do or what your
19 attorney tells you to do are two different things to
20 me.
21 Q.  I'm not talking about attorneys.
22     I'm saying the Fifth Amendment is not
23 designed to protect people who don't want to
24 testify.  It's designed to protect people against
25 self-incrimination.  Can we agree on that?

Page 221

1    MR. BRUEGGEN: Object to form.  Go
2 ahead.
3 A.  Maybe they don't want to testify
4 because they feel like they might be incriminated.
5 Q.  Right.  That's what the Fifth Amendment
6 is designed to protect, right?
7 A.  It doesn't mean because they took the
8 Fifth that they're guilty or they're hiding
9 something.
10 Q.  I didn't say it did.  I said it is
11 designed -- its purpose is to protect people against
12 self-incrimination.
13    It's not to allow people to avoid the
14 discomfort of having to testify in a case they don't
15 want to, because if that was the case, you guys
16 would never probably get any convictions, right?
17    MR. BRUEGGEN: Object to form,
18 speculation.
19 A.  I wouldn't know.
20 Q.  Well, a lot of times witnesses don't
21 want to come in and testify, but they do because
22 they have to because they're under subpoena, right?
23 A.  Well, if they're subpoenaed to testify,
24 it doesn't mean they're going to, you know,
25 cooperate.  They might be called and put on the

Page 222

1 stand.  They might not cooperate fully.
2 Q.  Right.
3    They have to show up and they can't
4 just say I'm going to invoke the Fifth because I
5 don't want to testify.  No judge would let them do
6 that, right?
7 A.  No judge.  I don't know.
8    MR. BRUEGGEN: Objection, foundation,
9 speculation.
10 Q.  Unless there's some basis to believe
11 that their answers would be self-incriminating,
12 people cannot avoid testifying just because they
13 don't want to testify by invoking the Fifth.  Is
14 this not basic for you?
15 A.  Fine.  That doesn't mean they're guilty
16 of anything either.
17 Q.  You're the one saying that.  You're
18 really just showing your hand right now.  I'm not --
19 okay.
20    Now, do you understand that, when Mr.
21 Maysonet invoked the Fifth, he was under indictment?
22 A.  Okay.
23 Q.  He was facing charges?
24 A.  Right.
25 Q.  His Miranda rights were in place.  He

Page 223

1 had the right not to incriminate himself, right?
2 A.  Right.  He followed the advice of his
3 attorney.
4 Q.  He's not just following the advice of
5 his attorney.  Yes, of course, but, also, he -- he
6 was facing charges potentially.
7    His case was pending in court.  So it's
8 an obvious thing, right?
9 A.  Okay.  But his attorney told him to
10 take the Fifth which he did which he should have.
11 Q.  You don't know what his attorney told
12 him, but when all the officers that were
13 investigated this criminal case were called on for
14 retrial, they weren't under indictment for their
15 work in this case, right?
16    MR. BRUEGGEN: Object to foundation.
17 Go ahead.
18 A.  Not that I know of.
19 Q.  They weren't even under
20 investigation --
21    MR. BRUEGGEN: Object to foundation.
22 Q.  -- for their involvement in this case
23 or their investigative work in this case, correct?
24    MR. BRUEGGEN: Object to foundation.
25 Go ahead.

Page 224

1 A.  Not that I know of.
2 Q.  Okay.  Or -- you know.
3    So it's not really the same thing.  Mr.
4 Maysonet was under indictment.  These guys -- what's
5 your understanding of why they invoked the Fifth?
6 A.  There is no understanding.  I don't
7 know what his mind set is, and these aren't
8 detectives anymore.  They're civilians.
9 Q.  You think they're civilians?
10 A.  It makes a difference.
11 Q.  You think because they're civilians it
12 makes a difference?
13 A.  Well, I think they have some more to
14 protect than someone that's currently on the police
15 department.
16 Q.  I don't know about NYPD, but I'm fairly
17 certain that, if you're going to continue to collect
18 a pension from the Chicago Police Department, you
19 probably have an obligation to show up and testify
20 even after retirement.  Is that not the case for
21 NYPD?
22    MR. BRUEGGEN: Objection,
23 argumentative, form.  Go ahead.
24 A.  That's not an obligation.  No.
25    I mean what if these guys would be sued

Page 225

1 civilly?  At least I'll be indemnified by New York
2 City.
3     I don't know if these guys were
4 indemnified by the City of Chicago.  I don't know
5 what their reason was.
6     I know they took the Fifth.  That
7 doesn't mean their guilty.  It doesn't mean
8 anything.  It doesn't mean they're hiding anything.
9 They took the Fifth which is their right.
10 Q.  Why is it their right?
11 A.  As an American, that's their right.
12 Q.  I mean that's actually 100 percent
13 untrue.  You cannot just avoid testifying by taking
14 the Fifth.  You can't.  It's not a right as an
15 American.  It's just to avoid your obligations to
16 testify as a witness by taking the Fifth.  I don't
17 know where you learned your constitutional law, sir,
18 but that is incorrect.
19     But, more importantly, is it your
20 position that if they feared subsequent civil
21 litigation that they had every right to take the
22 Fifth?
23     MR. BRUEGGEN: Objection, misstates his
24 testimony.
25 A.  Yeah, I never said that.

Page 226

1 Q.  You said they might be sued.  You said
2 something like that.
3 A.  Something can happen.  I mean you don't
4 know what the future holds for them, right?
5     MR. BRUEGGEN: Jennifer, you're on
6 mute.
7     MS. BONJEAN: Sorry.
8 Q.  Right.  So I understand.
9     But are you suggesting that it was
10 appropriate for them to invoke the Fifth if they
11 feared being sued?
12     MR. BRUEGGEN: Objection, misstates his
13 testimony.
14     MS. BONJEAN: I'm asking him.
15 A.  I'm saying that, as civilians now, they
16 followed the advice of their attorneys and they
17 should have, and that's what they should have done.
18 That's what I'm saying, and I think, actually, the
19 other three guys wanted to cooperate, correct?  And
20 one died.
21 Q.  One of the guys wanted to cooperate?
22 A.  I thought -- I thought the other two
23 agreed to cooperate and Halvorsen too, but Halvorsen
24 died.
25 Q.  Well, you mean later on.

Page 227

1 A.  Yes.
2 Q.  I'm talking about when the time was to
3 reprosecute.
4 A.  I know.  We talked about that.  Like I
5 said, they followed the advice of the attorneys.  I
6 don't know what's in their mind.
7     If my attorney tells me I'm taking the
8 Fifth, that's what I'm doing.  If you gave me advice
9 on a case, I wouldn't go against you.
10 Q.  All right.  So you thought it was
11 appropriate for them to take the Fifth based on
12 their advice?
13 A.  It doesn't matter what I think.  I'm
14 just saying what's their right.
15 Q.  Okay.  And the reason I'm getting into
16 this is because you make it sound just like a
17 technicality that Mr. Maysonet was not reconvicted
18 because one of the cops wanted to take the Fifth as
19 if that happens every day.
20     MR. BRUEGGEN: Object to form.
21 A.  I don't remember saying that.
22 Q.  All right.  Let's talk about your
23 evaluation.  All right.  The first thing you say is
24 Latin Kings element.  I don't even know what that
25 means, but did you see anything in the case

Page 228

1 materials that showed that the victims were
2 associated with any gang?
3 A.  I did not.  No.
4 Q.  And the only connection I can see that
5 you identified is that the crime happened in Latin
6 King territory, right?
7 A.  Yes, but, you know, Maysonet's a Latin
8 King who -- admitted Latin King.  So that would be
9 considered gang related.
10 Q.  Yeah.
11     But he also says he didn't kill the
12 guys.  So --
13 A.  That's true.
14 Q.  So let's deal with -- putting aside the
15 disputed facts for a second, what else is there?
16     MR. BRUEGGEN: Object to form.
17     Can you just rephrase the question,
18 Jennifer?
19     MS. BONJEAN: Yeah.
20 Q.  Putting aside the facts that are
21 disputed between the parties, what did you see in
22 all of these materials that suggested this case had
23 anything to do with gang involvement?
24 A.  Just that he was admitted Latin King
25 and so was co-defendants.

Maysonet v.
Guevara

Page 229

1  Q.  Right.
2      But he denies having anything to do
3  with the case.  So if he had denied being -- what
4  does it matter if he was a Latin King if he says I
5  didn't even know it happened?
6  **A.  It's the co-defendants also said they**
7  **were Latin Kings that were with him, right?**
8  Q.  Do you understand all of these guys'
9  convictions have been vacated?  Do you understand
10 that, sir?
11 **A.  I understand.**
12     MR. BRUEGGEN: Objection, misstates the
13 testimony.
14 Q.  And Mr. Goossens -- well, Mr. Goossens
15 was never convicted in the first place, right?
16 **A.  Correct.**
17 Q.  So I'm asking -- follow me.  All of
18 those people, all of those co-defendants, they all
19 maintain to this day that they -- they did not carry
20 out this homicide.  Together, independently, they
21 had nothing to do with that.  Okay.  You may or may
22 not believe them.  It's beside the point at the
23 moment.
24     But they dispute that they were
25 involved, correct?

Page 230

1  **A.  Okay.**
2  Q.  Is that right?  Does your review of the
3  material --
4  **A.  Yes.**
5  Q.  You've read the depositions, have you?
6  **A.  I have.**
7  Q.  Okay.  You understand that all of these
8  gentlemen maintain that they are innocent and had
9  nothing to do with this shooting, correct?
10 **A.  Okay.**
11 Q.  It's a yes or no.  Do you agree?
12 **A.  Yes.**
13 Q.  Okay.  They also say we had nothing to
14 do with this shooting and it had nothing to do with
15 Latin Kings, because, yes, we were all Latin Kings,
16 but it had nothing to do with Latin Kings because we
17 never heard about it.  We wouldn't have known about
18 it.  It has nothing to do with us.  We were not
19 responsible collectively, individually for this
20 shooting.  They have testified to that.
21     That is what has been presented from
22 the defense side in this body of discovery, right?
23     MR. BRUEGGEN: Object to form,
24 compound, misstates the record.  Go ahead.
25 **A.  Yes.**

Page 231

1  Q.  Okay.  I'm not asking you to decide
2  whether you believe them.
3      I'm just asking you to acknowledge that
4  there is a whole part of this case where the
5  defendant -- criminal co-defendants, now plaintiffs,
6  two of them are plaintiffs, one of them was
7  acquitted, says this is all nonsense.  It never
8  happened this way.  It did not involve us, Latin
9  Kings.  We are innocent, right?
10     MR. BRUEGGEN: Object to the form,
11 asked and answered.
12 **A.  Yes.**
13 Q.  Okay.  So without relying -- without
14 relying on those disputed facts because those --
15 disputed, what other independent evidence out there
16 is there that this was a Latin King motivated crime
17 or a gang-motivated crime?
18 **A.  Well, I don't know if you're going to**
19 **dispute all of that, but how about Bello.  She says**
20 **Maysonet's a gang member.**
21 Q.  Sir, listen to my question.
22 **A.  You asked me many questions.**
23 Q.  I didn't ask that.  Sir, I'm asking you
24 to listen to my question.
25     I will concede right here that Mr.

Page 232

1  Maysonet was a gang member at the time.  That part
2  isn't in dispute.  It's not in dispute.
3      His involvement in this crime is a
4  dispute -- in dispute.  I'm asking you, as you sit
5  here today, what can you point to me in this record
6  that shows that this was gang motivated other than
7  the fact that Mr. Maysonet was in a gang?
8      Mr. Maysonet's not responsible for
9  every killing that ever happened in Humboldt Park.
10 I assume you'd agree with that, right?
11     MR. BRUEGGEN: Object to form.
12 **A.  I would hope not.**
13 Q.  Okay.  So, again, I'm asking for
14 independent evidence.  Let me give you an example.
15 **A.  I just told you.  What about Bello?**
16 Q.  What about Bello?
17 **A.  That's independent.**
18 Q.  What's independent?  What has she
19 corroborated?
20 **A.  Am I up?**
21 Q.  Yeah.
22     What is she corroborating?
23     MR. BRUEGGEN: Object to form.  Go
24 ahead.
25 **A.  She corroborated the gun being in the**

Maysonet v.
Guevara

Page 233

1  **house, giving the gun to Maysonet. Maysonet gives**
2  **the gun to Lluvia and the time he comes home and**
3  **that he spoke -- spoke English, and he's a Latin**
4  **King. You asked me.**
5  Q. Okay. But you're not following me.
6  **A. I'm just following the basic**
7  **investigative steps of this case.**
8  Q. Oh, my gosh.
9  **A. You want to take it all out, that's**
10 **different.**
11 Q. I'm asking you -- I'm asking you to
12 tell me something that you saw in this case that --
13 that everyone agrees on. Okay.
14    For instance, let me give you an
15 example. Was there any neutral -- is there any
16 evidence that you saw, for instance, I don't know,
17 that Mr. -- the Wiley brothers' siblings said, oh,
18 yeah, they're members of, you know, the Vice Lords
19 or something like that?
20 **A. No.**
21 Q. And, for instance, those two Hispanic
22 women that lived on North Avenue that heard the
23 fighting going on on the night can agree that these
24 ladies -- they have no dog in the fight, right?
25 **A. Yes.**

Page 234

1  Q. Okay. No reason to lie to the police
2  about a shooting about people they don't know,
3  correct?
4  **A. Correct.**
5  Q. They didn't, for instance, say we heard
6  people say King love or any gang slogans were
7  shouted, right?
8  **A. They didn't say that. No.**
9  Q. So is there anything other than the
10 statements of the witnesses and the co-defendants
11 that, again, are all in dispute that you can point
12 to, anything like neutral other than just this
13 material that we've -- the statements of Rosa Bello
14 and the co-defendants and Mr. Maysonet?
15    Anything else that you saw that leads
16 to the conclusion that this was a Latin King
17 enterprise?
18    MR. BRUEGGEN: Object to form.
19 **A. Latin King enterprise?**
20 Q. Latin King, you know, job, shooting?
21 **A. Well, like I said, Bello and his**
22 **co-defendants I can point to right away.**
23 Q. I know, but that's all disputed.
24    Apart from that.
25 **A. Well, if you have Paulnitsky saying**

Page 235

1  that he knew him as King Leo as being a part of the
2  **Latin Kings.**
3  Q. Nobody's disputing he was a Latin King.
4  **A. I don't know what else you're trying to**
5  **ask me.**
6  Q. It doesn't sound like you have anything
7  else to provide. I'm talking about the motivation.
8  I'm talking about the motivation.
9    MR. BRUEGGEN: Object to form.
10   Do you understand the question?
11 **A. The motivation of the homicide?**
12 Q. Yeah.
13 **A. Well, they said they had to go take**
14 **care of some guys up on North Avenue.**
15 Q. Right.
16   But they deny saying that and they
17 say --
18 **A. I understand that, but I'm just doing a**
19 **basic investigation from the police department**
20 **forms. Whatever they say later on, I can't control**
21 **that.**
22 Q. So you're just doing the investigation
23 based on what happened at the time of the
24 investigation?
25 **A. I'm not doing an investigation. I'm**

Page 236

1  **doing an evaluation on a homicide investigation.**
2  Q. You're just -- you're just evaluating
3  the investigation that preceded Mr. Maysonet's
4  arrest, right?
5    MR. BRUEGGEN: Objection.
6  Q. Correct?
7  **A. Yes.**
8  Q. And you're not considering evidence
9  that came after that for the purposes of evaluating
10 the investigation, correct?
11   MR. BRUEGGEN: Objection, misstates his
12 testimony.
13 **A. I never said that.**
14   MS. BONJEAN: Stop coaching him, Dave.
15 **A. He's not coaching me.**
16 Q. Yes, he is. Every time he says that,
17 you're like, no, I didn't say that. I mean it's
18 ridiculous. It's so obvious. You need some work if
19 you're going to be coached. You're going to have to
20 be a little more subtle about it.
21   MR. BRUEGGEN: Asked and answered. Is
22 that better? It was asked earlier.
23   MS. BONJEAN: As soon as you say it, he
24 just like repeats it without even thinking with his
25 own brain about it. It's very obvious. The record

Page 237

1 will reflect it.
2 Q. You're saying two things to me, sir,
3 that I'm not really getting.
4 When you evaluated this investigation,
5 you said I'm just looking at the investigation. At
6 what point are you -- the investigation ended when
7 the case was cleared and closed, right?
8 **A. The investigation ended?**
9 Q. Yes.
10 **A. Criminal investigation ended, yes.**
11 Q. At what point? What point are you
12 taking this through when you're evaluating, until
13 what point?
14 MR. BRUEGGEN: Object to the form.
15 **A. Taking what to what point?**
16 Q. You said you evaluated the
17 investigation. Okay. I'm hearing multiple things
18 from you.
19 On one hand, you're saying I'm just
20 looking to the investigation and not considering
21 anything that somebody said later, and then at
22 different points you said I considered all the
23 material that was provided to me. So which one is
24 it?
25 MR. BRUEGGEN: Object to form. Go

Page 238

1 ahead.
2 **A. I considered everything that I was**
3 **provided for including the allegations that were**
4 **made and tried to find documentation or**
5 **corroboration inside the case file to back that up.**
6 Q. Okay. So your process was, if Mr.
7 Maysonet or Mr. Gonzalez says, you know, that never
8 happened, I never made those statements to Sergeant
9 Mingey or Montilla which is what he has said, right?
10 **A. Okay.**
11 Q. You -- what -- what do you do with
12 those denials? You go to see if there is
13 corroboration of that? What did -- what did you do?
14 How did you reconcile that information
15 that you received through Mr. Maysonet's deposition?
16 MR. BRUEGGEN: Object to the form.
17 **A. There's no way I could have -- I'm not**
18 **doing an investigation. I mean I wouldn't have**
19 **resources to go track people down and start**
20 **interviewing people. I'm just evaluating what's in**
21 **front of me.**
22 Q. The fact that there was no
23 contemporaneous notes made of the statements
24 attributed to Mr. Maysonet on July 15 and then on
25 August 1, that actually corroborates what Mr.

Page 239

1 Maysonet is saying, doesn't it?
2 MR. BRUEGGEN: Object to form,
3 speculation.
4 **A. Yeah. I don't understand what you're**
5 **asking me.**
6 Q. Mr. Maysonet said I never confessed on
7 August 1st of 1990. I never confessed on August 1st
8 of 1990. I told them I had no information to
9 provide you. Here's my lawyer's card. Don't talk
10 to me again, and they left Cook County Jail. I
11 never confessed. That's what he's testified to,
12 right?
13 **A. Okay.**
14 Q. Correct?
15 **A. Correct.**
16 Q. Okay. And as it turns out, there is no
17 handwritten notes, no GPR and no report that shows
18 that he did, in fact, confess that was prepared
19 within any reasonable amount of time of August 1st
20 of 1990, right?
21 MR. BRUEGGEN: Objection, form,
22 speculation. Go ahead.
23 **A. But he also makes a court-reported**
24 **statement to the ASA and the court reporter, and**
25 **that's memorialized right there and then.**

Page 240

1 **So how did he not make that statement?**
2 Q. So what is your point?
3 **A. There is no point. You asked me none**
4 **of those statements are made, and I'm just walking**
5 **you through the investigation, and then the next**
6 **interview --**
7 Q. You didn't walk me through anything. I
8 promise you.
9 **A. So what I was saying, when it goes**
10 **through the entire investigation, they bring it to**
11 **an attorney, the attorney brings in the court**
12 **reporter, they make a statement, it's verbatim and**
13 **it's memorialized.**
14 Q. After he had his ass kicked.
15 **A. Well, he says he was beaten for like 12**
16 **hours.**
17 Q. Yeah. He was in custody for 12 hours.
18 Yes.
19 **A. Well, he said he was beaten for 12**
20 **hours.**
21 Q. No. He said off and on he was beaten.
22 He didn't say straight. Did you read his
23 deposition?
24 **A. I did read it.**
25 Q. He didn't say 12 hours straight.

Page 241

1  A.  He was beaten for the entire time which
2  is 12 hours.
3  Q.  He didn't say that.
4  A.  I got to look it up.
5  Q.  You're exaggerating.  That's not what
6  he said.  He has said that and he has consistently
7  said including at his own trial.
8      Did you read his testimony from the
9  suppression hearing?
10  A.  I did.
11  Q.  Sir, why are we battling about this
12  anyways?
13  A.  We are not.  You asked me a question.
14  I tried to answer as best I can.
15  Q.  You sound as if you are doubting Mr.
16  Maysonet's claim of physical abuse.
17  A.  I'm not doubting.
18  Q.  Are you making a judgment call about
19  his claim of physical abuse?
20      MR. BRUEGGEN: Objection, asked and
21  answered, form.
22  A.  I'm not doubting anything, and I'm not
23  assessing credibility, and I'm not judging anything.
24      I'm just searching that he said he was
25  beaten for 10 to 12 hours, and there's a Polaroid

Page 242

1  taken of him.  He doesn't have any physical --
2  obvious physical injuries and he signed the card,
3  and he was asked if you were mistreated, and he said
4  no, and he signed it.
5  Q.  Okay.  It's Chicago.  It's Chicago.
6  What can I tell you.  Do you know anything about
7  Chicago?
8      MS. CARNEY: Objection, argumentative,
9  form.
10  Q.  They know how to hit people without
11  leaving marks.
12      MS. CARNEY: Objection.  Jennifer, come
13  on.  That's unnecessary.
14  Q.  All right.  Have you heard of a guy
15  named Jon Burge?
16  A.  No.
17      MS. CARNEY: Objection to form,
18  foundation.
19  Q.  Would you agree, Mr. Rudolph, that if
20  it turns out to be true that Mr. Maysonet was
21  physically abused over the course of a 12-hour
22  interrogation that that would be improper?
23  A.  If somebody's beaten at any time by the
24  police, that is improper.
25  Q.  Okay.  So that's a yes.

Page 243

1      If it turns out to be true, if a jury
2  finds it is true that Mr. Maysonet was beaten for
3  over the course of 12 hours by Detective Guevara,
4  that would be improper and not appropriate police
5  practice?
6  A.  Well, first, they'd have to disregard
7  everything else, his photographs.  There's no
8  medical attention paperwork.  There's no nothing
9  which I'm not saying he didn't get beat for 12
10  hours.  There's just no paper trail on that.
11  Q.  Sir, you're not the trier of fact, are
12  you?
13  A.  I'm not anything.  I'm just saying --
14  Q.  Just listen to the question.
15  A.  It's a very serious allegation that he
16  made.
17  Q.  Yeah, it is.
18  A.  And there's no documentation.  Even if
19  he leaves the police department, there's nothing in
20  corrections.  There's no documents.  Nothing.
21      So I'm not saying I don't believe him.
22  I'm just saying what is in the report.
23  Q.  It sounds like you're saying you don't
24  believe him, but I'm glad you are.
25      MR. BRUEGGEN: Stop fighting with him

Page 244

1  please, Jennifer.  He's allowed to testify, and if
2  you disagree, that's okay.  Let him finish his
3  statement before you interrupt.
4  Q.  Okay.  Answer my question now, Mr.
5  Rudolph, without you trying to do my job for me,
6  because I don't need you to.  You're having a hard
7  enough job with our own job right this second.  So
8  please just answer my question.
9      MR. BRUEGGEN: Jennifer, this isn't an
10  appropriate way to deal with an expert.  I know
11  you're frustrated, but, still, stay professional
12  please.
13      MS. BONJEAN: Okay.  Thank you, Dave.
14  I appreciate your pep talk.
15  Q.  Mr. Rudolph, I am asking you to assume
16  that -- you understand that it is -- it is very much
17  in dispute whether Mr. Maysonet was physically
18  abused by Detective Guevara.  Do you understand
19  that?
20      MR. BRUEGGEN: Object to form.
21  A.  It's what?  You broke up.
22  Q.  It's in dispute between the parties.
23  That's why we're here.
24  A.  Okay.
25  Q.  You understand that, right?

Page 245

1 **A. I understand that.**
2 Q. It's ultimately for a jury to decide
3 whether Mr. Maysonet was beaten or not beaten,
4 correct?
5 **A. Yes, but I'm just saying we have to**
6 **disregard everything else in here.**
7 Q. Okay. My question for you is -- it
8 should be an easy one, I think.
9 If it turns out that a jury credits Mr.
10 Maysonet's testimony that he suffered physical abuse
11 at the hands of Detective Guevara as part of his
12 interrogation at Area 5, that that would not be
13 consistent with industry standards or appropriate
14 police practice?
15 MR. BRUEGGEN: Object to form, asked
16 and answered. Go ahead, sir.
17 **A. I wrote about that in there. Nobody's**
18 **ever, ever to be abused by police officers and**
19 **especially an interrogation room. It's never**
20 **acceptable and it's criminal conduct.**
21 Q. So that's a yes. You agree with me
22 that if that happened --
23 **A. If that happened, and that's**
24 **disregarding everything else that we talked about in**
25 **this case.**

Page 246

1 Q. You don't have to worry about that
2 part.
3 **A. You've asked me a question. I'm just**
4 **answering you.**
5 Q. If that happened, that would violate
6 every police practice norm that we know of long
7 before 1990, right?
8 MR. BRUEGGEN: Object to form.
9 Q. Correct?
10 **A. It's never acceptable to beat a**
11 **prisoner or beat anybody.**
12 MR. BRUEGGEN: Object to form.
13 **A. Absolutely.**
14 Q. Now, you had this whole section about
15 Mr. Maysonet's English proficiency. What -- I mean
16 the whole -- it looks to me like you're just -- your
17 your evaluation is your assessment that he actually spoke
18 English with some level of proficiency, right?
19 MR. BRUEGGEN: Objection, misstates the
20 document.
21 Q. What's the point of this section?
22 What's your opinion that you're rendering here?
23 **A. Well, I know he said that he didn't**
24 **understand English. So I'm not trying to disprove**
25 **that or whatever, but I'm just pointing out that the**

Page 247

1 **ASA said he spoke to him in English, the court**
2 **reporter did it in English and transcribed that, and**
3 **Bello said that he spoke English. That was it.**
4 Q. So you're pointing out the facts that
5 contradict Mr. Maysonet's claim of having
6 English-speaking deficiencies, right?
7 **A. I'm not disputing anything. I'm just**
8 **telling you what happened during the case file.**
9 Q. So you're telling me what the case
10 file -- what parts of the case file show that he had
11 English proficiency, right?
12 MR. BRUEGGEN: Object to the form. Go
13 ahead.
14 **A. Yeah. So if I just read through it, I**
15 **could point out more, but just off the top of my**
16 **head, you have those three people right there that I**
17 **think are credible.**
18 Q. Right.
19 You're pointing to evidence that shows
20 that he had English proficiency, right?
21 **A. Was able to at least communicate some**
22 **type of English.**
23 Q. That again -- that is the purpose of
24 this section is to point out in the case file and
25 elsewhere that evidence that demonstrated his

Page 248

1 English proficiency, correct?
2 MR. BRUEGGEN: Objection, asked and
3 answered.
4 **A. I already said yes.**
5 Q. Okay. You quarrel with Mr.
6 Tiderington's claim that it was unusual for Sergeant
7 Mingey as the unit supervisor to take the
8 investigative lead in interviewing Maysonet on
9 several occasions prior to his arrest, right?
10 MR. BRUEGGEN: Object to the form.
11 **A. I think he said it was highly unusual**
12 **for a supervisor to do interviews. So that's not --**
13 **that's not consistent with anything that I'm aware**
14 **of.**
15 Q. Okay. Is it highly unusual for the
16 only person taking the interview not to make a
17 contemporaneous report or take any notes?
18 MR. BRUEGGEN: Object to form.
19 **A. Well, notes is a personal thing. I**
20 **don't know if they're mandated to take notes. I**
21 **used to take notes a lot, but a lot of times I**
22 **didn't take notes.**
23 Q. Okay. Thanks.
24 But, again, I -- I really am having a
25 hard time reconciling how on one hand you can

Maysonet v.
Guevara

Page 249

1 emphasize the importance of documenting and
2 memorializing witness statements in a timely manner,
3 your words, not mine, and yet you are so quick to
4 say, yeah, it makes complete sense this Mingey took
5 an actual confession of a guy and didn't write a
6 single note about it.
7     MR. BRUEGGEN: Objection to form.
8 **A.  I never wrote that.  I never wrote**
9 **that, and I never said that.**
10 Q.  Well, maybe you should have because I
11 don't see -- I don't see where you find any fault
12 with it.
13     MR. BRUEGGEN: Objection, form,
14 argumentative.
15 Q.  In fact, you said his actions were
16 appropriate, excellent investigative work.
17     So you think Sergeant Mingey takes an
18 incriminating statement from Mr. Maysonet on July 15
19 and then, again, takes a full-on confession from him
20 on August 1, doesn't write a single note about it,
21 doesn't prepare a single report about it, and that's
22 excellent investigative work?
23     MR. BRUEGGEN: Objection, misstates the
24 document.  Go ahead, sir.
25 **A.  Like I said, I prefer it to be better**

Page 250

1 **documented.  Yes, we want that.  Was the**
2 **investigator's steps excellent?  Absolutely.**
3 Q.  How is that even consistent?
4     MR. BRUEGGEN: Objection,
5 argumentative.
6 Q.  Isn't part of the investigative steps
7 by your own -- actually, very nice PowerPoint.  Part
8 of those -- we can pull it out and look at it, but
9 I'm pretty sure you've identified multiple places
10 where the investigative steps include documenting
11 your investigations in a timely manner.
12 **A.  Yes.  This is we're talking also about**
13 **policing in today's world.  That's the way they did**
14 **it back then in 1990.  It doesn't mean the**
15 **investigative part of it was incorrect.**
16 **Like I said, notes are personal.**
17 **There's a lot of times I didn't take notes.**
18 Q.  It's not about taking notes, sir.  He
19 never documented it, not once ever.
20 **A.  All right.  Well, you asked me about**
21 **the notes.**
22 Q.  I didn't ask you about the notes.  I
23 said notes or reporting or documenting at any point.
24 Sergeant Mingey never prepared a report, documented
25 it or did anything so to memorialize these oral

Page 251

1 statements of Mr. Maysonet, and you call that
2 excellent investigative work?
3 **A.  It was.  Administratively, it could**
4 **have been better, you know, but the investigative**
5 **part was very good.**
6 Q.  Why?  What was so good about it?
7 **A.  Why?  Because he's got information from**
8 **a known gang member who's involved in a shooting.**
9 **That information led to the second interview which**
10 **led to the third interview and then basically his**
11 **arrest.**
12 Q.  Or Mr. Maysonet said absolutely nothing
13 of value in those two interviews, and after
14 Paulnitsky unlawfully arrests him, they have to
15 figure out probable cause to justify the arrest,
16 right?  That's a possibility too.
17     MR. BRUEGGEN: Objection to form.
18 Q.  And as a result, they made up the oral
19 statements after the fact.  That's a possibility
20 too, right?
21     MR. BRUEGGEN: Objection, form,
22 compound.
23 **A.  Anything's possible, but it's not -- I**
24 **wouldn't believe that would happen.**
25 Q.  Why?  Do you know these guys

Page 252

1 personally?
2 **A.  No.  I don't know anybody.**
3 Q.  So let's look at these two scenarios.
4 One possibility is that Sergeant Mingey interviewed
5 Mr. Maysonet with Detective Montilla and Mr.
6 Maysonet actually made these statements on July 15
7 and August 1 which we both agree have high
8 evidentiary value, right?
9     MR. BRUEGGEN: Object to form.
10 **A.  Yes.**
11 Q.  Okay.  One possibility is that this
12 seasoned, excellent investigator, Sergeant Mingey,
13 as his detective interpreter, just decided not to
14 prepare any documentation or reports or even any
15 handwritten notes about these statements of high
16 evidentiary value.  That's one possibility.
17     That's the one that you think is
18 plausible, right?
19     MR. BRUEGGEN: Objection, form.
20 **A.  Like I said, I wish they would have**
21 **typed that, you know, right away, but they didn't**
22 **till August.**
23 Q.  They didn't -- they didn't ever
24 actually.
25 **A.  They got the information documented in**

Page 253

1 the case in August. Sorry.
2 Q. Okay. The other possibility is that
3 Paulnitsky arrests Mr. Maysonet on August 23 or
4 whatever it was. They -- Detective Guevara comes in
5 and gets a confession from him, all right, and then
6 these guys sit around and realize, wait, what was
7 our basis to arrest him in the first place, right?
8 You got to have probable cause to
9 arrest, right?
10 MR. BRUEGGEN: Objection to form.
11 A. Okay.
12 Q. Yes? Right?
13 A. Yes.
14 Q. Was their collectively preparing this
15 cleared/closed report after he's on his way to Cook
16 County Jail -- they manufacture these oral
17 statements to justify the arrest. That's also a
18 possibility, right?
19 MR. BRUEGGEN: Objection, form,
20 speculation.
21 A. Yeah. That's totally -- I mean how do
22 you -- how do we explain the statement to the ASA
23 then?
24 Q. What do you mean?
25 A. He gave a recorded statement to the ASA

Page 254

1 without Lluvia in the room, and then you have Tino
2 Cruz, right? Cruz's statement is almost the same.
3 He's interviewed by different detectives.
4 Q. Sir, you're not following me.
5 A. I am following you.
6 Q. We're talking about those early oral
7 statements, not what happened once he's arrested.
8 Once he's arrested, I'm asking -- I'm
9 asking you to agree that one possibility is that
10 those oral statements, oral statements, the ones on
11 July 15 and August 1, forget what happened after,
12 were fabricated because they realized these
13 detectives -- Mingey realized that they didn't have
14 probable cause to bring them in. So they had to
15 come up with a basis for having arrested him in the
16 first place.
17 Otherwise, what would happen? What
18 would happen to that confession, that court-reported
19 confession if they never had probable cause to bring
20 him in?
21 MR. BRUEGGEN: Objection, form.
22 A. I don't understand this whole
23 hypothetical story. I'm not following it. I mean I
24 don't know what we're trying to make up here.
25 Q. Okay. Sir, if you don't have probable

Page 255

1 cause to arrest and a defendant makes a confession
2 where there was no probable cause to interrogate
3 him -- arrest him and interrogate him in the first
4 place, what are the possible ramifications legally
5 speaking for that?
6 MR. BRUEGGEN: Objection, form,
7 foundation.
8 A. The case could be thrown out.
9 Q. Right.
10 We call them different things. There
11 could be a pretrial hearing for lack of probable
12 cause and that statement would be thrown out, right?
13 A. The DA could refuse to prosecute.
14 Yeah. There's different ways it could happen.
15 Q. It's really important to have probable
16 cause before you arrest somebody, right?
17 A. Well, if you're going to arrest
18 somebody, you can only have probable cause to
19 arrest.
20 Q. Because if you don't have probable
21 cause, you know, the fruits of that arrest might get
22 suppressed at a later date, right?
23 A. Yes.
24 Q. Okay. So, now, these detectives have a
25 confession that they want to use, right, but maybe

Page 256

1 they didn't have probable cause. So Mingey
2 fabricates the oral statements because that would
3 have given them probable cause. Did you consider
4 that?
5 Did you consider that as a possibility?
6 MR. BRUEGGEN: Object to form.
7 A. I considered everything when Maysonet
8 said that everything was made up, but then it comes
9 back to the statement that was given to the ASA
10 which is recorded by the stenographer.
11 Q. I'm sorry.
12 A. Even if you disregard Mingey's two
13 interviews, you still have the interview with the
14 ASA.
15 Q. You keep saying that. Do you think
16 it's your job to determine what the truth is,
17 whether he's guilty or innocent? I'm confused.
18 MR. BRUEGGEN: Objection,
19 argumentative.
20 A. I told you that all day long I'm not
21 judging anybody. I'm just saying that the stories
22 were consistent all the way through.
23 Q. Yeah. They're consistent because it's
24 all being written by the same detectives. Did you
25 consider that?

Maysonet v.
Guevara

---

Page 257

1 **A. I don't think the court-reported**
2 **statement was written by a detective. I might be**
3 **wrong, but I don't think it was.**
4 Q. But Mr. Maysonet says the story was fed
5 to him by Guevara and he believed he was beaten but
6 he also believed he was going home after that
7 because he named someone else as the shooter, and,
8 Gonzalez, they -- they pointed a finger at each
9 other as the shooters, right?
10 **MR. BRUEGGEN:** Object to form. Go
11 ahead.
12 **A. They did, yes.**
13 Q. So that's inconsistent.
14 **A. Well, that's better. If their stories**
15 **were exactly the same, then that would be an issue I**
16 **would think.**
17 Q. They're just not not exactly the same,
18 they identify different shooters in their
19 statements.
20 **A. That's self-preservation. I mean they**
21 **have the same fact pattern that they all traveled in**
22 **the same vehicle together and so did Cruz had the**
23 **same fact pattern.**
24 Q. And they both thought they were going
25 home because they were implicating somebody else,

---

Page 258

1 and that's why they made the statement. Did you
2 consider that?
3 **MR. BRUEGGEN:** Objection to form, asked
4 and answered.
5 **A. I don't know how Tino Cruz is**
6 **interviewed by different detectives got the same**
7 **statement that he was forced to make.**
8 Q. All right. I want to go on.
9 **MR. BRUEGGEN:** Jennifer, is this a good
10 time for just a quick break, five minutes?
11 **MS. BONJEAN:** Yeah, I guess.
12 (Whereupon, a recess was taken.)
13 Q. Mr. Rudolph, you have a section at page
14 45 of your report called ballistics?
15 **A. Yes.**
16 Q. We kind of touched on this earlier, but
17 you seem to misunderstand Mr. Tiderington's opinion.
18 Mr. Tiderington's quarrel with the investigation is,
19 after Sergeant Mingey spoke to Mr. Maysonet, he did
20 not seek comparative analysis. Do you understand
21 that?
22 **MR. BRUEGGEN:** Object to form,
23 foundation. Go ahead.
24 **A. That's not how I understood it. I**
25 **thought he said they should get analysis first**

---

Page 259

1 **before they conducted an interview with them.**
2 Q. How could they do that until they
3 realize it was Mr. Maysonet's statements that
4 allegedly connected the two offenses, right?
5 **A. No. Well, the homicide, he had shell**
6 **casings from the homicide and the nonfatal, and he**
7 **got locked up for the nonfatal, and to wait for a**
8 **ballistics report before we talk to Maysonet about**
9 **homicide, that would have been -- could take months.**
10 Q. And that's not what Mr. Tiderington
11 said. He wasn't suggesting that he should wait to
12 talk to Mr. Maysonet. He never said that.
13 He said, after speaking to him, it
14 would make sense, if you believe there's a
15 connection, to do those ballistics testing then.
16 You would agree with that since --
17 **MR. BRUEGGEN:** Objection, form.
18 **A. The way I read it, he was saying it had**
19 **to be done before, before the interview, which I**
20 **don't agree with.**
21 **MR. BRUEGGEN:** You're on mute,
22 Jennifer.
23 Q. I don't believe that's what he was
24 saying, but you would agree with, if Mr. Maysonet
25 made the statements he did to Mr. Mingey or Sergeant

---

Page 260

1 Mingey on July 15 and Sergeant Mingey did, in fact,
2 believe there was a connection, as he claimed he
3 did, that would be the time to seek comparative
4 analysis, correct?
5 **A. Well, I would have had ballistics try**
6 **to match the shell casings before they even arrested**
7 **Maysonet regardless of who he was.**
8 **The shooting happened on the 3rd**
9 **or the 4th, and that should have been already**
10 **processed to match to any other crimes in the city**
11 **or the neighborhood or the homicide.**
12 Q. Right, but that didn't happen. That
13 was a failing on the part of --
14 **A. Well, I didn't know if it wasn't -- if**
15 **the results weren't back yet or I don't know exactly**
16 **how long it took them back in 1990 to compare shell**
17 **casings at crime scenes.**
18 Q. So you're saying that they should
19 have -- somebody should have made the request for
20 the comparative analysis as soon as there were --
21 there were ballistics to compare?
22 **A. Well, I would have somebody make a**
23 **request for analysis which in today's modern**
24 **policing it's automatically done from the day of the**
25 **homicide to see if that matched any crimes of the**

---

Page 261

1 past.
2 Q. Okay. But certainly -- certainly after
3 Sergeant Mingey spoke to Mr. Maysonet and his
4 opinion was developed that there was a connection
5 between Mr. Maysonet and this double homicide and
6 the shooting, the nonfatal shooting and the double
7 homicide, as soon as there was a connection in
8 Sergeant Mingey's mind, he should have made sure
9 that there was comparative analysis being conducted,
10 right?
11     MR. BRUEGGEN: Object to form. Go
12 ahead.
13 A. I would at least have him follow-up and
14 see if the ballistics were being analyzed. If not,
15 they should be getting done.
16 Q. Right. Okay.
17     Moving on to the section of -- yeah.
18     I think, just going back, you seem to
19 think that Mr. Tiderington was advocating waiting to
20 interview Mr. Maysonet to do comparable ballistics
21 testing when, in fact, his opinion was Sergeant
22 Mingey should have sought comparative ballistics
23 testing after interviewing Mr. Maysonet.
24 A. I don't remember it being written that
25 way. I remember he wanted to get the test done

Page 262

1 first before speaking to anybody.
2 Q. Okay. Okay. Moving on to this tunnel
3 vision section, again, you wrote here Mr. Maysonet
4 told Sergeant Mingey that he had specific
5 information about the homicide of the Wileys.
6     You repeated this about 20 times in
7 this report. Again, you're getting that from the
8 case files, right?
9 A. That's correct.
10 Q. Mr. Maysonet said he did not give him
11 that information. You acknowledge that Mr. Maysonet
12 actually denies ever having told Sergeant Mingey
13 anything of the sort, right?
14 A. I also said that I'm just basing this
15 report on the case file and all the documents.
16 Q. All right. I want to ask you some
17 questions about, after May 25, 1990, what actions
18 did you see these detectives take a week out from
19 that date?
20 A. I'm not sure.
21     Can you be more specific?
22 Q. Did you see them do any investigative
23 work after May 25, 1990, prior to Mr. Maysonet's
24 arrest on July 15?
25 A. I think they tried to interview from

Page 263

1 Chris some months later.
2     MR. BRUEGGEN: She's talking May 25.
3 A. Oh, May 25. I thought you said August
4 25.
5 Q. Let me lay the foundation again.
6 A. Go ahead. Sorry.
7 Q. Between May 25th of 1990, the date of
8 the murders, and the first time Mr. Maysonet is
9 allegedly interviewed on July 5 -- 15 of 1990, was
10 there any investigative work done in this case that
11 you could tell?
12 A. Not that was documented, no.
13 Q. Okay. Having considered everything
14 that you've looked at, not just the police reports
15 and the homicide investigative file, were you able
16 to discern whether there was any investigative work
17 done between May 25th of 1990, the date of the
18 murders, and Mr. Maysonet's arrest on July 15th of
19 1990?
20 A. Can I tell if there's any investigative
21 steps done during that period? No, you can't from
22 the case file.
23 Q. What about through any depositions you
24 read?
25 A. Well, you can't because it's not

Page 264

1 documented on this -- in the case file itself. So
2 it would be hard to guess what kind of investigative
3 steps were taken.
4 Q. Did you read anything from these --
5 from the detective?
6     I mean they may not have the memory of
7 Lieutenant Russo, but did you see anything in their
8 depositions that reflected that they took any
9 investigative acts in between the date of the
10 homicide and the date of Mr. Maysonet's arrest?
11 A. I don't recall.
12     MR. BRUEGGEN: Object to form.
13 A. I don't recall.
14 Q. Now, you said earlier that you would,
15 as a supervisor, be working around the clock
16 essentially with your colleagues, of course, to try
17 to solve a double homicide. Wouldn't you have?
18 A. I would.
19 Q. Okay. So don't you find it extremely
20 concerning that there is no single investigative
21 act -- investigative step taken between May 25 and
22 July 15 in this case?
23     MR. BRUEGGEN: Object to form.
24 A. So what I would say, the way we do it
25 in modern investigative policing today, that's how

Maysonet v.
Guevara

---

Page 265

1 our investigative steps have taken over. Right.
2    Back in 1990, in Area 5, I don't know
3 what their caseload was. I don't know what their
4 procedures were in-house, but for some reason, there
5 was a lapse in investigative steps, and it was not
6 documented.
7    In the birth of CompStat, that's how we
8 spoke about that earlier today, as a supervisor, I'm
9 held accountable for that. So I would be asked
10 constantly what happened since May until July.
11 There's no investigative steps going on here.
12 What's going on? So I'm accountable for that.
13    I don't know they had that dynamics
14 back in 1990 in Chicago PD.
15 Q.  Whether they had those dynamics or not,
16 I don't care what year it is, but 1990 is not that
17 long ago. Can we agree that it was -- a double
18 homicide was a pretty serious crime?
19 A.  Right. You're talking about
20 administrative stuff now that wasn't being
21 oversight.
22 Q.  No. I'm not talking about
23 administrative stuff.
24 A.  Yes. You're asking about investigative
25 steps done between this date and this date.

---

Page 266

1 Q.  That's not just administrative. That's
2 actually investigation -- investigative work. I'm
3 not talking about just documenting it.
4    What's the evidence that there was any
5 investigation conducted whatsoever in between those
6 two dates?
7 A.  What I would say is that it's
8 supervisor oversight would eliminate -- it's the
9 administrative part of it now, would eliminate the
10 gaps in our investigation, and I don't know if that
11 supervisor oversight existed back in Chicago in 1990
12 like it does in today's modern investigative police
13 work.
14 Q.  Okay. You also -- sir, did you read
15 anything even in the depositions of these detectives
16 who said, you know, we did -- I remember we did
17 this, we just didn't document it, or we would have
18 done this, we just didn't document it?
19    Did you see any of that?
20 A.  I remember some people saying things
21 about that, but I don't have specifics.
22 Q.  Are you just going to assume there was
23 investigative work done during those two time
24 periods and this was just a breakdown in reporting?
25    MR. BRUEGGEN: Object to form.

---

Page 267

1 A.  That's not what I'm saying at all.
2 What I'm saying is that there was a lack. In the
3 modern police world, that would be called a lack of
4 supervisory oversight.
5    There's no one watching the
6 investigative steps done in this case. I'm not
7 saying they did it and didn't record it, but there
8 should be better oversight.
9 Q.  There should be better oversight, yes.
10 Understood.
11    But putting oversight aside, there was
12 no investigation conducted during that period of
13 time. There were no leads followed. There were no
14 recanvassing. There was no -- nothing was done
15 between those two periods -- those two dates in a
16 double homicide.
17    You can't possibly suggest that even in
18 1990 that that was consistent with law enforcement
19 industry standards?
20 A.  I'm not saying that was consistent.
21 I'm just saying I don't know what the dynamics were
22 there.
23    Maybe they had a couple homicides going
24 on. Maybe they had leads in other cases they were
25 following up on. Maybe guys went on vacation.

---

Page 268

1 Maybe -- anything could happen. Maybe people got
2 transferred. I'm not sure.
3    What I'm saying is that, when the birth
4 of CompStat comes up, that's when we start having
5 supervisory oversight and we avoid these issues,
6 these administrative issues.
7 Q.  You have no basis whatsoever -- strike
8 that.
9    It is just entirely speculation on your
10 part. It had to do with there being other
11 homicides, people going on vacation. That's all
12 speculation on your part, correct?
13 A.  I said I don't know what's going on in
14 Area 5 in 1990.
15 Q.  Did you read the deposition of
16 Francisco Veras?
17 A.  Francisco Veras. It doesn't sound
18 familiar.
19 Q.  Did you render any opinion about --
20 A.  I just don't recall that one.
21 Q.  Did you address Francisco Veras'
22 allegations at all in your expert report?
23    MR. BRUEGGEN: Object to the form.
24 A.  I don't remember Francisco. I remember
25 reading it. I just don't remember the details.

---

Maysonet v.
Guevara

Page 269

1 Q. So as you may recall, the first field
2 investigation report was submitted at 8 a.m. in this
3 case on May 25th of 1990. The shooting happened at
4 1 a.m., right?
5 A. Correct.
6 Q. Okay. So this -- the canvass -- the
7 initial canvass that was done in the case was done
8 sometime after 1 a.m., probably -- definitely before
9 8 a.m. when it was submitted, and is it your
10 testimony that it was acceptable not to go out and
11 try to talk to the people that didn't answer their
12 doors that were identified in that initial field
13 investigation report at a later date?
14 A. I think that they did try to follow-up
15 on some, but I don't remember what the results were.
16 Q. Okay. What makes you think that?
17 You're just -- based on --
18 A. Just off the top of my head I think I
19 remember reading that.
20 Q. Where?
21 A. I'm not sure. I'd have to look it up.
22 Q. Yeah, look it up. Do it now please.
23 MR. BRUEGGEN: Look through the
24 reports.
25 Q. I mean, if you're going to say things,

Page 270

1 you got to back it up.
2 MR. BRUEGGEN: You talked about the
3 three reports that were the same date.
4 MS. BONJEAN: They were submitted on
5 the same date. I mean he's saying they went back
6 and recanvassed. So I'm asking when that happened.
7 Q. Find anything?
8 A. No. I didn't find it yet.
9 Q. Okay. I'm going to let you in on a
10 secret. There's no report that would suggest that
11 they went back to those addresses to try and
12 recanvass.
13 If anybody in this deposition can find
14 that for me, we can talk about it, but you're not
15 going to waste the time sitting here looking for
16 something that doesn't exist.
17 MR. BRUEGGEN: Objection, misstates the
18 record. Go ahead.
19 MS. BONJEAN: Well -- okay. You're
20 saying it misstates the record. Tell me where there
21 was a recanvass of those addresses that said no
22 answers. Help Mr. -- help him along if you care to.
23 MR. BRUEGGEN: RFC 56 at the very end
24 of the report.
25 MS. BONJEAN: Yeah. Okay.

Page 271

1 Q. So that same day -- that same day they
2 were able to talk to a couple people who were on
3 this list, but after that day they didn't go back to
4 try to find witnesses after that day, right?
5 A. They did follow-up on the no answers.
6 Q. Right, but not all the no answers, but
7 a couple of the no answers.
8 A. Right.
9 Q. And they did not recanvass the area
10 after May 25th of 1990, right?
11 A. Correct.
12 MS. BONJEAN: All right. Okay. So I
13 want to go back to -- Haley, actually, I'll do it
14 myself. That's fine.
15 MR. COOLBAUGH: Go ahead, Jenny. What
16 do you need?
17 MS. BONJEAN: I got it.
18 Q. I want you to look at Mr. Tiderington's
19 report. Okay.
20 On page 25 where you're going through
21 the ballistics section, you said -- you criticized
22 Mr. Tiderington's finding, and then you dropped a
23 footnote to where in his report you say that he said
24 that they should have done the ballistics before
25 interviewing him.

Page 272

1 Do you remember that or talking to him?
2 A. I'm looking at it. In the footnote?
3 Q. Yeah.
4 You said here, Mr. Tiderington can also
5 argue the detectives should have, quote, promptly
6 sought comparative analysis before they interviewed
7 Mr. Maysonet.
8 You chopped up what he actually said in
9 your first paragraph. Do you see that?
10 A. I'm reading it.
11 Q. Sir, just the first paragraph. It
12 shouldn't take you that long to read the first
13 paragraph of your own document at page 25, right?
14 A. I read it.
15 Q. Okay. So now I'm sharing with you page
16 14 of Mr. Tiderington's report. Do you see the last
17 paragraph?
18 It says, even though a crime lab report
19 prepared on May 30th of 1990 indicated that the
20 fired evidence collected from the Wiley murders
21 crime scene, quote/unquote, was suitable for
22 comparison. Neither Sergeant Mingey nor any other
23 investigating detectives promptly sought comparative
24 analysis between the firearm's evidence and the
25 firearm's evidence from the July 3, 1990, for which

Page 273

1  Maysonet was arrested.
2     If such analysis was conducted,
3  detectives would have known prior to arresting
4  plaintiff that no forensic connection could be made
5  between the two crimes as Mingey theorized.
6     Do you see that?
7  A.  I see it.
8  Q.  You understand there's a difference
9  between the arrest of Mr. Maysonet and the
10 interviewing of Mr. Maysonet on July 15, correct?
11 A.  Say it again.  I'm sorry.  I was
12 reading.
13 Q.  Do you understand what Tiderington is
14 saying here?
15    There was a crime lab report prepared
16 on May 30, 1990, five days after the shooting by the
17 crime lab, right?
18 A.  Correct.
19 Q.  Then they said we have fired evidence
20 from the scene that's suitable for comparing, right?
21 A.  Okay.
22 Q.  Do you remember seeing that report?
23 A.  I do.
24 Q.  It's a crime lab report.  It's suitable
25 for comparison.  Okay.

Page 274

1     And Tiderington says that neither
2  Mingey nor any detective sought comparative analysis
3  to take place between that firearm evidence and the
4  firearm evidence for which that was collected on
5  July 3 or collected in connection with the July 3
6  shooting, right?
7  A.  Okay.
8  Q.  And if that analysis had been conducted
9  when they got it, as you said you would have done,
10 you would have automatically compared these things,
11 they would have known prior to arresting Maysonet
12 that there was no forensic connection between these
13 two things.  That's -- do you understand that's kind
14 of different than what you have?
15 A.  The way I read it, he wanted us to do
16 the ballistic comparison before they interviewed
17 Maysonet.
18 Q.  Where do you get that?  Where in here
19 does it even suggest that?
20 A.  That's what you just read.
21 Q.  Where?
22    Read it to me.  What part of that did
23 you interpret that as him saying they should have
24 done this before they interviewed Maysonet on July
25 15?

Page 275

1  A.  You lost me.  I'm sorry.
2  Q.  Where?
3     You just said that's -- okay.  I think
4  the jury will be able to figure it out.
5     You did this section on tunnel vision,
6  and what is -- what was your opinion -- what is your
7  opinion about tunnel vision?
8  A.  As to what?
9  Q.  Sir, you rendered an opinion.  This is
10 based on -- what is your opinion as it relates to
11 tunnel vision?
12 A.  For this case, I don't think tunnel
13 vision existed.
14 Q.  Okay.  And did you lay out your
15 rationale for why you didn't think tunnel vision
16 existed, right?
17 A.  I did.
18 Q.  And all of the information that you've
19 identified here comes from the case file itself,
20 right?
21 A.  That's correct.
22 Q.  Okay.  Now, let's go to physical
23 evidence here.  What is your opinion that you're
24 rendering in this section of your report regarding
25 physical evidence?

Page 276

1  A.  This would be in regards to the
2  vehicle.
3  Q.  Physical evidence.  That's your label,
4  not mine.
5  A.  What kind of physical evidence do you
6  want to talk about?
7  Q.  Well, what is the purpose of this
8  section that you've labeled physical evidence, to
9  render an opinion about what?
10 A.  Well, I think the issue came up about
11 locating the vehicle, and I explained how trying to
12 find that vehicle some 90 days later, a recovered
13 firearm was enclosed borne inside the -- by the
14 perpetrators in that vehicle wouldn't be able to get
15 a search warrant for that and probably would have
16 got suppressed if we did.
17 Q.  Okay.  Well, did you see anywhere in
18 the case file where anyone asked Mr. Maysonet or any
19 of the co-defendants, hey, where can I find Jeffrey?
20 A.  I did not.
21 Q.  That would have been a good question to
22 ask, right?
23    MR. BRUEGGEN: Object to form.  Go
24 ahead.
25 A.  Yeah, I agree.  They should have

Maysonet v.
Guevara

---

Page 277

1 documented more attempts to try to find that
2 vehicle. Instead, it was also 90 days later. So I
3 don't know what kind of investigative value we would
4 have got from that.
5 Q. That's great. I'm glad you're
6 speculating about that. Just answer my questions.
7 Did you see in any of the
8 interrogations of any of these people or witnesses
9 where anyone said, hey, what's Jeffrey's last name?
10 A. I do not see any attempts to find that
11 vehicle was documented. No, I do not.
12 Q. Did you see any attempts on the part of
13 the investigators with any of the suspects, give us
14 a description of Jeffrey, what does he look like?
15 A. No, I did not.
16 Q. Does Jeffrey have a street name? Did
17 you see anything like that?
18 A. Yeah. I forget what it was, though.
19 I'm not sure.
20 Q. Where does Jeffrey hang out? Did you
21 see any questions like that?
22 A. No.
23 Q. How can we find Jeffrey? What sect
24 does he run with?
25 A. Like I said, there should have been

---

Page 278

1 better attempts to go find this, but they should
2 have documented it.
3 Q. Not just documented, sir. They should
4 have made an effort to go find the person who
5 allegedly owns the vehicle that was used in a double
6 homicide, right?
7 A. Well, there should be some documented
8 attempts at least.
9 Q. And there's nothing that suggests that
10 they went out to go find Jeffrey who purportedly
11 owned this older model, light blue, dark blue
12 Pontiac, correct?
13 A. Correct. This is a vehicle that just
14 came to light 90 days later in the investigation.
15 Q. So what. Investigations go on for
16 years. It doesn't mean you don't go try to talk to
17 the person that owns it.
18 A. That goes to physical evidence that
19 we're talking about. I don't know any kind of
20 physical evidence you could possibly get out of
21 that.
22 Q. Sir, it's not just getting the physical
23 evidence. It's talking to the people who own the
24 car that was used in a double homicide.
25 Are you telling me with a straight face

---

Page 279

1 that a good detective would not want to try to find
2 that person to interview him?
3 MR. BRUEGGEN: Object to form.
4 A. That's not what I said. What I said
5 was there should have been better attempts to
6 document -- attempts, investigator steps to find
7 this vehicle and anything else they did to locate
8 the owner.
9 Q. Right.
10 It doesn't even appear from this case
11 file that you think was excellently done that there
12 was even an attempt to ask any of these fellas who
13 are confessing for information about Jeffrey.
14 A. I never said it was excellently done.
15 What I said was this case followed the basic
16 investigative steps at that time and led to the
17 arrest of Maysonet. That's what I said.
18 Q. The wrongful arrest and wrongful
19 conviction. You left that part out.
20 MR. BRUEGGEN: Objection,
21 argumentative.
22 Q. Sir, there is no way for you to sit
23 here and tell anyone what additional evidence, if
24 any, would have been developed if investigators made
25 even a superficial effort at trying to find Jeffrey

---

Page 280

1 and this car that he allegedly drove that was
2 involved in this double homicide, right?
3 A. Like I said, I would have preferred
4 better documents, the attempts to find Jeffrey and
5 where that vehicle were.
6 Q. In fact, if the officers tried to find
7 Jeffrey, if they really wanted to, Jeffrey would
8 have told them I had my car. I never loaned it to
9 these guys. It was never involved in any crime.
10 MR. BRUEGGEN: Object to form, assumes
11 facts not in Evidence.
12 A. I wouldn't know what he's going to say.
13 Q. Right. We don't. He's dead now.
14 But the police didn't go to find out,
15 did they?
16 A. There was no documentation or
17 investigative steps that they went to find that
18 vehicle or Jeffrey.
19 Q. And none of these detectives testified
20 under oath in their depositions that they went to
21 try to find Jeffrey, did they?
22 A. Okay. Like I said, I would like to
23 have better documentation about that. I don't know
24 how much -- what else I can say about that.
25 Q. And if you read Mr. Goossens'

---

Maysonet v.
Guevara

1  deposition, he told you, yeah, we all know who Black
2  Jeffrey is.
3  **A. Okay.**
4  Q. Anybody could have told those
5  detectives where he was. What's your explanation
6  for why they did not go try to talk to him?
7  **A. My explanation is I don't know why they**
8  **didn't document that better.**
9  Q. No.
10    Why didn't they go do it?
11 **A. That goes back to my supervisory**
12 **oversight. There's a lack of administrative**
13 **oversight on that, these investigative steps when**
14 **that happened. That didn't happen in 1990. This**
15 **was past CompStat in our modern investigative world.**
16 Q. I don't know what CompStat is. It's
17 not something we talk about in Chicago. I am from
18 New York also. So I understand, but it's not a
19 concept that --
20 **A. Well --**
21    MR. BRUEGGEN: That's not a question.
22 Q. Okay. Are you familiar -- are you
23 aware that the Chicago Police Department at this
24 time had an entire gang crime intelligence unit?
25 **A. Am I aware of gang intelligence unit in**

1  **Chicago?**
2  Q. Yes. They had a gang intelligence
3  unit. Did you read the depositions where --
4  **A. Today or in 1990?**
5  Q. Huh?
6  **A. Today or in 1990?**
7  Q. In 1990.
8  **A. I know they had detective gang units.**
9  **I don't know they called it gang intelligence.**
10 Q. Gang intelligence. In fact, Detective
11 Guevara was what they call a gang crimes specialist
12 in -- prior to his -- prior to his becoming a
13 detective in 1990. Did you -- were you aware of
14 that?
15 **A. I did know that.**
16 Q. You did?
17 **A. Yes.**
18 Q. So did you see anything in the
19 materials you looked at that there was even an
20 effort to call up gang crimes -- they call it gang
21 crimes north, the gang crimes division to say, hey,
22 look in the nickname box or look in, you know, your
23 files for a guy named Jeffrey who drove this car?
24    MR. BRUEGGEN: Object to form. Go
25 ahead.

1  Q. Did you see anything like that?
2  **A. Like I said, there should have been**
3  **better documentation about that and that oversight**
4  **also with gang conferrals. There should be**
5  **executive conferrals on that.**
6  Q. Did you read the portion I think of
7  Mingey's testimony or one of these detectives that
8  discussed at length how they kept information about
9  gang members that included nicknames, where they
10 hung out, what cars they drove, their girlfriends,
11 who they hung out with, et cetera, probably more?
12 **A. I vaguely remember something like that,**
13 **but I couldn't testify to it.**
14 Q. These detectives could have made a
15 single call to say Latin King goes by the name Black
16 Jeffrey may drive this car. What do you know about
17 him, right?
18    That could have been done, but it
19 wasn't at least according to the case file, correct?
20 **A. It could have been, but it was not**
21 **documented. So that goes back to our same thing.**
22 **Supervisory oversight. You know, those basic**
23 **investigative steps could have been better**
24 **documented.**
25 Q. Why are you assuming it was done and

1  not documented rather than not done at all?
2  **A. I didn't say that. I didn't say that**
3  **at all. I did not say that. I prefer them to be**
4  **better documented in the case file. Right.**
5  Q. You also don't know whether it was
6  done.
7  **A. I'm sorry?**
8  Q. You also can't say that it was done let
9  alone not documented.
10 **A. Correct. That's the problem we run**
11 **into with lack of documentation.**
12 Q. What efforts did you see that the
13 police made to recover the gun?
14 **A. Efforts to recover the gun?**
15 Q. Yeah.
16 **A. There was no documentation on that**
17 **either.**
18 Q. Someone's confessing. Where's the gun,
19 right? Isn't that a good question?
20 **A. It's a good question to ask somebody.**
21 **Yes. The documentation about trying to find the**
22 **gun, I don't understand what you're trying to ask**
23 **me.**
24 Q. Would you agree that you have, as you
25 pointed out, three people who are alleging --

Maysonet v.
Guevara

Page 285

1 allegedly confessing to this double homicide, right,
2 and if you have people confessing to a double
3 homicide, a reasonable question to ask them as a
4 detective is where is the gun right now?
5 A. Well, I think that was addressed in
6 some of the interviews, correct?
7 Maysonet said that Gonzalez had taken
8 the gun and drove off with it. Gonzalez said
9 Maysonet had the gun the whole time.
10 Q. Okay. Again, contradictory statements
11 of these people. Exactly -- explain to me why there
12 was no effort -- well, strike that.
13 Why -- why do the investigating
14 officers not ask additional questions of either one
15 of them, including Justino Cruz, about where
16 these -- hold on a second. Give me one second.
17 You have two defendants who were
18 allegedly pointing the finger at each other and said
19 that they each had the gun. Don't you think,
20 whether it's 1890, 1990, 2090, that it would be
21 important to try to locate the murder weapon?
22 A. It's always preferable to find the
23 murder weapon, but the majority of homicide cases we
24 never locate the murder weapon.
25 Q. But you try, don't you?

Page 286

1 A. We try.
2 Q. What efforts did you see in this case
3 file of efforts to locate the murder weapon?
4 MR. BRUEGGEN: Objection, asked and
5 answered. Go ahead, sir.
6 A. As I said, there's no documented
7 attempts to find that weapon.
8 Q. Do you see any effort to get search
9 warrants of anyone's house?
10 A. Search warrants?
11 Q. Yeah.
12 A. I don't know what -- how would you get
13 a search warrant? For what?
14 Q. You don't think -- in your 30 years as
15 a police officer, you don't see the value in getting
16 a search warrant?
17 MR. BRUEGGEN: Objection, misstates his
18 testimony.
19 A. I don't understand what I need a search
20 warrant for. I don't know what you're asking me.
21 Q. Sir, Mr. Maysonet allegedly confesses
22 to this crime. His girlfriend allegedly says the
23 murder weapon was in her house at one time that she
24 shared with him. Alfredo Gonzalez said -- Mr.
25 Maysonet had the murder weapon, right? Correct?

Page 287

1 A. Maysonet leaves with the gun, correct.
2 I could never go to a judge with that information
3 and get a search warrant. Never.
4 Q. But you're telling me that you don't
5 think that --
6 A. Maybe it's different in Chicago. I
7 don't know.
8 Q. Hold on. I want to get this really
9 nice and clean on the record.
10 You're telling me that if Sergeant
11 Mingey or Detective Halverson or any of these
12 detectives went before a judge and said, Judge, I
13 would like a search warrant to search Mr. Maysonet's
14 home and this is why. A, he confessed to at least
15 driving the car that was involved in a double
16 homicide. His criminal co-defendant confessed also
17 to being present but said that Mr. Maysonet shot the
18 weapon. His girlfriend said that the weapon was
19 being kept in the house that was used or at least
20 that the detectives thought was used, and you're
21 telling me that that wouldn't be sufficient -- that
22 wouldn't make out probable cause to issue a search
23 warrant for Mr. Maysonet's home?
24 MR. BRUEGGEN: Objection, incomplete
25 hypothetical.

Page 288

1 A. Plus, you left out that Maysonet said
2 the vehicle left with the gun.
3 Q. So what.
4 A. I told the judge and judge --
5 Q. Okay. There's a contradictory
6 self-serving statement you pointed out earlier by
7 the defendant itself. Go ahead.
8 A. Am I up or no? I forgot what we're
9 talking about.
10 Q. I'm waiting for you to explain to me
11 how a judge wouldn't give a search warrant.
12 A. I could not go before a judge and say
13 90 days ago these guys had a gun in their house and
14 they went and did a homicide, and I need a fishing
15 expedition to go look through this guy's house based
16 on the statements you just said and even though he
17 said that somebody took the gun and left with it.
18 I couldn't do it. Maybe somewhere else
19 I could. In New York, I could not.
20 Q. I want all those judges in New York in
21 Chicago then.
22 Based on the reports you looked at as
23 well as the statements, were you ever able to figure
24 out what the -- how this murder went down?
25 A. I just --

Maysonet v.
Guevara

Page 289

1    MR. BRUEGGEN: Object to form. Go
2 ahead.
3    A. I just followed the basic investigative
4 steps the detectives took and looked up -- and
5 worked up the probable cause.
6    I mean I'm not judging if he did the
7 homicide. I'm just judging the investigation
8 itself.
9 Q. What was the probable cause for the
10 arrest?
11 A. His confession, corroboration from his
12 co-defendants, his girlfriend.
13 Q. Sir --
14 A. The ASA.
15 Q. I'm going to stop you right there.
16 His arrest preceded all of that. He
17 was arrested at the courthouse at about 9 a.m.
18 Okay. Do you remember all that testimony?
19 A. I do.
20 Q. Paulnitsky arrested him on --
21 Paulnitsky arrested him on August 22, 1990, in the
22 morning. Okay?
23 A. Okay.
24 Q. What was the probable cause to arrest
25 him on the morning of August 22, 1990?

Page 290

1    MR. BRUEGGEN: Objection, misstates the
2 record. Go ahead, sir.
3    A. It was probably based on the statements
4 that he already made, the prior statements.
5 Q. Those two oral statements that were
6 never recorded anywhere, right?
7 A. That's not true. They were all
8 recorded.
9 Q. No. They weren't recorded prior to his
10 arrest.
11 A. You said they weren't recorded. I said
12 they are recorded.
13 Q. They were recorded after he was
14 charged. They were not recorded prior to his
15 arrest.
16 A. Either way, they're recorded. I think
17 they should be recorded right away. Yes. They are
18 recorded.
19 Q. I'm not going to keep going around in
20 circles with you about that.
21 So what -- so can you point me to any
22 other probable cause to justify the arrest of my
23 client on the morning of August 22, 1990, other than
24 the statements that were not recorded anywhere at
25 the time of his arrest?

Page 291

1    MR. BRUEGGEN: Objection, misstates the
2 record.
3 A. That was the lead into the arrest. The
4 arrest with interviews with the co-defendants came
5 after that and his girlfriend.
6 Q. Right. I'm talking before all that.
7 Anything else? Anything else prior to
8 his arrest that made out probable cause?
9 A. Those two statements made the probable
10 cause.
11 Q. Okay. And those were in Sergeant
12 Mingey's head just like Lieutenant Russo's head,
13 right?
14    MR. BRUEGGEN: Objection, form,
15 argumentative.
16 A. I don't know what that means.
17 Q. It means there was no documentation.
18 It was just in Sergeant Mingey's brain that they had
19 taken place.
20 A. Like I said, there was documentation.
21 It was done later on. Would I have preferred it to
22 be done right away? Yes.
23 Q. Okay. You're just repeating yourself.
24 A. I'm not changing my answer. It's the
25 same answer.

Page 292

1 Q. I know. You're just repeating it.
2 A. You're asking the same question.
3 Q. You're not answering my question.
4 You're just repeating that same response to every
5 question. It's nonresponsive, but that's fine.
6 Those things turn out to be helpful in the end for
7 our position.
8    Okay. You have at page 29 of your
9 report assessment of investigation. What does that
10 mean?
11 A. That's the assessment of the
12 investigation that I reviewed.
13 Q. Okay. And you wrote -- you wrote I did
14 not uncover any objective documentation to support
15 any of the allegations made by Mr. Maysonet, right?
16 A. Correct.
17 Q. Why are you including that statement in
18 your report?
19 A. He made an allegation that he was beat
20 for 10 to 12 hours. So I would hope, that's such a
21 serious allegation like that, there would be some
22 type of documentation, photographs.
23    He might have reported to somebody
24 inside the Chicago PD. If he didn't feel
25 comfortable doing that, maybe he went to the

Page 293

1 district attorney or the federal government. I
2 didn't have any of that.
3 Q. Again, my question isn't -- is why was
4 that relevant to your assessment of the
5 investigation, that statement?
6 A. Because he made a serious allegation
7 about being abused, and there was no paper trail.
8 There was no photographs. There was no case
9 numbers. No anything from outside agencies,
10 internal agencies, district attorney or medical
11 treatment forms from corrections, anything.
12 Q. Okay. And therefore? And, therefore,
13 what?
14 A. Therefore, nothing. I'm not judging if
15 he was beat up or not. I'm just saying he made an
16 allegation, and I tried to look for things that were
17 in there to support that, and they were not in
18 there.
19 Q. What do you mean you tried to look for
20 things -- what do you mean you tried to look for
21 things to support that and they weren't in there?
22 A. I tried to look for his medical
23 treatment prisoner form, any complaints he might
24 have made with internal affairs, the FBI, the
25 district attorney.

Page 294

1    He was asked by the district attorney,
2 in fact, were you treated well? He says yes.
3 Q. Did you look at Detective Guevara's
4 long history of beating people up?
5 A. I did not.
6 Q. Did you look at Detective Guevara's
7 internal affairs history?
8 A. I did not.
9 Q. Did you consider the fact that, when
10 Detective Guevara was asked whether he physically
11 abused Maysonet, he said I invoke my Fifth Amendment
12 rights and I will not answer?
13 A. I know he took the Fifth Amendment.
14 Q. He took the Fifth Amendment
15 specifically to that question.
16 A. I don't know specific to that question.
17 I think just for the whole case, in general, he did.
18 Q. No. He took it specific to that
19 question as well.
20 A. No, but if he answered a whole bunch of
21 series of questions the same way, correct. I don't
22 know. I can't remember.
23 Q. What does that mean?
24 A. He just answered every question that he
25 was asked. He said I'm invoking my Fifth Amendment.

Page 295

1 Q. So that means it means something less
2 in your mind?
3 A. It doesn't mean anything. It just
4 means he took the Fifth Amendment.
5 Q. It doesn't mean anything. Okay.
6    You wrote from the onset Mr. Maysonet
7 offered information about the Wileys' homicides and
8 indicated his willingness to cooperate with the
9 investigation. That's not what Mr. Maysonet says,
10 right?
11 A. He says that during his interviews.
12 Yes.
13 Q. No. He said that in his deposition
14 that that is not, in fact, true. He never
15 cooperated.
16 A. Like I said, I was focused on the
17 investigation itself.
18 Q. Okay. In fact, this whole section
19 about your assessment of the investigation really
20 details the investigative homicide file, correct?
21    MR. BRUEGGEN: Objection, form,
22 misstates the record. Go ahead.
23 A. The basic investigative steps were
24 taken from the initial interview from Mr. Maysonet
25 till conclusion. Yes.

Page 296

1 Q. Again, this was part -- is there
2 anything that you can point me to in this assessment
3 of the investigation that does not derive from the
4 investigative file itself?
5    MR. BRUEGGEN: Object to the form.
6 A. I don't understand the question.
7 Q. Is there any information in this
8 section that you obtained from some other source
9 other than the investigative file that the defendant
10 officers prepared?
11 A. Just the materials that I was supplied
12 was the case file and --
13 Q. That's not what I'm asking. I'm not
14 asking that, and don't tell me it's materials you
15 were supplied. Please listen to the question so we
16 can get through this because we're all tired.
17    Is there anything in this assessment of
18 the investigation section -- when you wrote this
19 information here, is there any portion of it that
20 you obtained, okay, from some source other than the
21 homicide file?
22 A. The majority of this case, it came from
23 the information supplied to me, documents I read and
24 the case file.
25    I don't know exactly -- if you're

Page 297

1  **pointing to a specific spot, maybe I can read it and**
2  **I'll find out.**
3  Q.  Okay.  Well, you didn't -- you
4  didn't -- I mean you didn't mention Guevara's
5  deposition at all in here.
6  **A.  Okay.**
7  Q.  Sir, okay.  Let's start on page 30 and
8  let's go quickly please.
9      It says, from the onset, Mr. Maysonet
10  offered information about the Wiley brothers.  He
11  provided detail, et cetera, et cetera, et cetera.
12  You see that paragraph?
13  **A.  I do.**
14  Q.  His initial statements were made
15  without Detective Guevara being present and there
16  were no allegations of physical abuse, et cetera.
17  Do you see that?
18  **A.  I do.**
19  Q.  That all comes from the cleared/closed
20  report, right?
21  **A.  From the supplemental reports that were**
22  **filed, yeah.**
23  Q.  That's part of the homicide file,
24  correct?
25  **A.  Correct.**

Page 298

1  Q.  Next paragraph, that comes from the
2  cleared/closed report as well, correct?
3  **A.  Cleared/closed, you're talking about**
4  **the supplementary reports, yes.**
5  Q.  There's just one.  You keep saying as
6  if there's more than one.  There's the original
7  reports from May 25, and I'm talking about the next
8  report doesn't exist until August 23 or 25.  I don't
9  remember what it is.
10  **A.  Okay.**
11  Q.  Right?
12  **A.  Yes.**
13  Q.  Okay.  There's some mystery reports out
14  there that you have?
15  **A.  No.  Just verbiage sometimes, it's --**
16  Q.  That final report is the --
17  **A.  I gotcha.  I know what it is.**
18  Q.  That information came from the
19  cleared/closed, right?
20      MR. BRUEGGEN: Object to form.
21  **A.  Yes.**
22  Q.  Which is also a supplemental report,
23  but it's the final supplemental report?
24  **A.  Correct.**
25  Q.  During the interview of Mr. Maysonet,

Page 299

1  this comes from the cleared/closed as well as
2  ultimately the -- the court-reported statement,
3  correct?
4  **A.  Which line are we on?**
5  Q.  Where it says during the interview of
6  Mr. Maysonet.  Oh, I'm sorry.  This still comes from
7  the cleared/closed because this is the July 15
8  interview.
9  **A.  Yes.**
10  Q.  That's from the cleared/closed, right?
11  **A.  Yes.**
12  Q.  Okay.  And then moving on two
13  paragraphs, the second interview that occurred on
14  August 1, that's from the cleared/closed, right?
15  **A.  Yes.**
16  Q.  And then the third interview which is
17  on August 22 and also from the cleared/closed,
18  correct?
19  **A.  Correct.**
20  Q.  And then the interview with Detective
21  Guevara, all of that was, again, from the
22  cleared/closed or from the court-reported statement,
23  right?
24  **A.  Yes.**
25  Q.  Okay.  So this section that you call

Page 300

1  the assessment of the investigation is essentially
2  what was contained in the homicide file as well as
3  the statements, you know, the court-reported
4  statement, right?
5      MR. BRUEGGEN: Object to form.
6  **A.  Correct.**
7  Q.  Okay.  Now, you have this whole section
8  about allegations of excessive force, and then you
9  proceed to highlight all the evidence that seems to,
10  in your mind, I think, suggest that there was not
11  excessive force, right?
12  **A.  I didn't say that.**
13  Q.  What would be the purpose of
14  highlighting everything that -- you didn't highlight
15  anything where -- any of Mr. Maysonet's statements
16  about the excessive force, right?
17  **A.  I did address that, and I said that,**
18  **you know, looking through these allegations and**
19  **trying to find any documentation, photographs,**
20  **anything like that that could help support that, it**
21  **would have helped to put that in the case, and I**
22  **also said that is never acceptable to abuse --**
23  **physically abuse a prisoner or anything.**
24  Q.  Okay.  And then you have a couple
25  paragraphs of various defendant officers.  You did

Maysonet v.
Guevara

Page 301

1 not include Detective Guevara in here. Why not?

2 **A. I think we spoke about him throughout**

3 **the rest of the case.**

4 Q. Was this report -- well, strike that.

5 Let me ask it this way. Is there any

6 expert opinion that you intend to offer other than

7 what is contained in your report or what you have

8 testified to here today?

9 **A. Unless some material comes -- becomes**

10 **available, something that I didn't know about, I**

11 **will stand by this.**

12 Q. Is there anything else that you intend

13 to opine on that you haven't already addressed

14 either in your report or in your deposition

15 testimony here today?

16 **A. Not at this time.**

17 **MS. BONJEAN:** All right. Dave, give me

18 like two minutes, and I just -- to look over my

19 notes, and we could be done. Okay.

20 **MR. BRUEGGEN:** All right.

21 (Whereupon, a recess was taken.)

22 **MS. BONJEAN:** I have nothing further

23 for Mr. Rudolph.

24 **MR. BRUEGGEN:** Steven, Mike, Theresa,

25 anything?

Page 302

1 **MS. CARNEY:** Nothing from the city.

2 **MR. MEHR:** Nothing for Di Franco.

3 **MR. BRUEGGEN:** Can't hear you, Michael.

4 **MS. CARNEY:** I'm going to assume I can

5 read his lips and he has no questions.

6 **MR. SCHALKA:** Nothing for me.

7 **MR. BRUEGGEN:** I don't have anything

8 for follow-up. We will reserve for signature.

9 **MS. BONJEAN:** Thank you for your time.

10 Sorry to keep you late.

11 **MR. BRUEGGEN:** Jennifer, are you going

12 to order?

13 **MS. BONJEAN:** Yeah. I think we have

14 to.

15 **MR. BRUEGGEN:** I'll take a copy.

16 **THE COURT REPORTER:** Anybody else?

17 **MS. CARNEY:** No.

18 **MR. STEPHENSON:** No, not for me.

19 (Deposition concludes at 6:50 p.m.)

20

21

22

23

24

25

Page 303

1           CERTIFICATE OF OFFICER

2

3

4       I CERTIFY that the foregoing is a true

5 and accurate transcript of the testimony and

6 proceedings as reported stenographically by me at

7 the time, place and on the date as hereinbefore set

8 forth.

9         I DO FURTHER CERTIFY that I am neither

10 a relative nor employee nor attorney or counsel of

11 any of the parties to this action, and that I am

12 neither a relative nor employee of such attorney or

13 counsel, and that I am not financially interested in

14 the action.

15        *Diane M Holmes*

16

17      DIANE M. HOLMES, C.C.R.
     Certificate No. XI01660

18

19

20

21

22

23

24

25

283:19

## $

**$17 (1)**
200:13
**$20.5 (1)**
201:7

## A

**abandoned (1)**
99:7
**abandonment (1)**
99:15
**abilities (2)**
104:15,16
**ability (1)**
6:17
**able (25)**
7:1;11:14;35:21;
50:1;54:13;61:2;
71:25;128:22;142:5,
23;143:2,3;145:6,12;
154:23;171:8,9,12;
177:15;247:21;
263:15;271:2;275:4;
276:14;288:23
**above (1)**
106:18
**above-entitled (1)**
1:14
**abrasive (1)**
155:21
**Absolutely (4)**
198:12;246:13;
250:2;251:12
**abuse (7)**
118:7;241:16,19;
245:10;297:16;
300:22,23
**abused (6)**
211:21;242:21;
244:18;245:18;293:7;
294:11
**Academy (7)**
11:16,20;12:4;14:9;
16:5;29:11;86:1
**accept (1)**
117:5
**acceptable (6)**
106:11,13;245:20;
246:10;269:10;
300:22
**accepted (6)**
117:13;118:2;
177:23;179:18,21;
180:10
**accepting (1)**
130:19
**accordance (1)**
71:8
**according (4)**
192:19;195:7,13;

**account (5)**
73:8;105:1;184:14;
214:6;215:21
**accountable (6)**
33:5;71:17;85:3,9;
265:9,12
**accuracy (1)**
55:6
**accurate (2)**
53:21;303:5
**accused (1)**
96:6
**accuseds (1)**
21:13
**acknowledge (2)**
231:3;262:11
**acquitted (2)**
134:1;231:7
**across (2)**
64:5,8
**act (3)**
166:11;177:15;
264:21
**acting (1)**
26:8
**ACTION (11)**
1:5;5:13;31:8;55:9;
56:7,11;70:16;71:20;
98:1;303:11,14
**actions (6)**
53:19;71:5,12;
72:10;249:15;262:17
**activity (1)**
134:24;151:16
**acts (2)**
53:1;264:9
**actual (4)**
48:6;97:24;165:5;
249:5
**actually (42)**
12:23;18:9;24:19;
28:7;32:7;43:14;
56:11;58:14;86:19;
102:17;114:2;116:20;
120:15;122:12;
126:18;132:4;133:6;
147:21;151:20;153:7;
172:10;180:12;183:2;
185:13;198:19;200:2;
204:5,12;208:13;
209:12;210:6;225:12;
226:18;238:25;
246:17;250:7;252:6,
24;262:12;266:2;
271:13;272:8
**add (2)**
151:24;152:3
**added (2)**
206:10;209:4
**addendum (1)**
9:17
**adding (1)**

172:9
**additional (3)**
175:8;279:23;
285:14
**Additionally (1)**
119:17
**address (6)**
67:22;138:7;169:5,
10;268:21;300:17
**addressed (3)**
120:9;285:5;301:13
**addresses (4)**
149:13;175:13;
270:11,21
**administrative (12)**
26:2,4;31:9;55:1,3;
56:21;265:20,23;
266:1,9;268:6;281:12
**administratively (2)**
126:19;251:3
**admitted (3)**
103:11;162:9;
228:8,24
**admonish (1)**
106:2
**adopt (1)**
117:5
**adopted (2)**
18:16
**adult (3)**
13:15;107:17;
108:20
**advice (6)**
223:2,4;226:16;
227:5,8,12
**advocating (2)**
53:24;261:19
**affairs (4)**
24:15,16;293:24;
294:7
**affidavit (1)**
170:10
**affiliated (1)**
131:22
**afraid (1)**
209:5
**African (12)**
97:11;98:1,8;
158:16,23;159:4,15;
169:15;171:10,21;
172:17;210:24
**afternoon (1)**
79:5
**again (59)**
16:1;34:2;38:1;
40:14;43:21;53:15;
54:17,22;56:24;58:9;
60:14,17;61:11,19;
62:5;65:13,24;67:9;
75:2;79:10;80:1,25;
81:16;83:4,23;84:9,
17;85:24;93:2,20;
95:1;108:18;115:17;

130:15;131:6,12,23;
138:3;141:12;148:5,
6;161:23;178:1,14;
202:25;232:13;
234:11;239:10;
247:23;248:24;
249:19;262:3,7;
263:5;273:11;285:10;
293:3;296:1;299:21
**against (13)**
40:22;91:5;109:22;
114:5;134:15;163:3;
214:15,20;219:18;
220:10,24;221:11;
227:9
**age (1)**
109:1
**agencies (2)**
293:9,10
**agency (1)**
11:18
**ago (4)**
81:10;113:4;
265:17;288:13
**agree (69)**
20:11;34:6;50:12,
15,22;58:15;62:8;
65:16;69:20;77:21;
79:25;83:2;89:2,12,
24;90:14,24;91:1;
101:9;104:4;105:10,
11;106:6,16;113:19;
117:24;132:6;133:5,
9,19,19,21;145:19;
146:15;148:17,18,19;
152:12;153:7;156:14;
158:12;161:18;171:7;
172:13,14;173:14,18;
179:7;180:10;189:7;
193:4,24;205:13;
206:20;215:19;
220:25;230:11;
232:10;233:23;
242:19;245:21;252:7;
254:9;259:16,20,24;
265:17;276:25;
284:24
**agreed (2)**
172:20;226:23
**agrees (1)**
233:13
**ah (1)**
58:2
**ahead (115)**
17:13;21:19;22:23;
27:13;28:10;34:18;
35:11;36:12;39:4,25;
41:16;42:14,20;
43:18;49:22;51:23;
53:5;55:14;56:5;58:8;
60:10;63:9,17;65:21;
67:13;74:19;75:6,18;
76:13;78:1;80:8;

81:23;82:13;84:20;
85:14;86:21;88:2,8,
23;90:1;91:8;93:19,
19;99:2;102:1;103:6,
23;110:18;117:8,15;
118:20;122:19;
123:16;125:23;
128:25;136:14;141:4;
147:24;157:4;158:1;
159:8;160:12;165:7,
21;173:24;180:16;
181:18;187:2;188:12,
20;189:12;190:17;
194:9;196:12;200:24;
201:9;203:14;204:17;
205:22;207:16;
208:17,20,21;212:9;
213:13,22;214:9;
215:24;216:13;
217:13;218:12;221:2;
223:17,25;224:23;
230:24;232:24;238:1;
239:22;245:16;
247:13;249:24;
257:11;258:23;
261:12;263:6;270:18;
271:15;276:24;
282:25;286:5;288:7;
289:2;290:2;295:22
**al (1)**
1:
**alcohol (2)**
157:20;158:18
**Alfredo (4)**
138:17;139:6;
140:1;286:24
**alibi (1)**
51:16
**alive (1)**
107:5
**allegation (6)**
118:5;243:15;
292:19,21;293:6,16
**allegations (10)**
25:3;120:8;121:8;
122:7;238:3;268:22;
292:15;297:16;300:8,
18
**alleged (2)**
133:7;217:7
**allegedly (15)**
95:15,18;146:25;
165:19;192:24;
195:24;197:1;259:4;
263:9;278:5;280:1;
285:1,18;286:21,22
**alleging (1)**
284:25
**alleyway (1)**
64:8
**alliance (1)**
85:8
**allow (1)**

221:13
**allowed (4)**
107:13;220:17,18;
244:1
**Alma (1)**
154:13
**almost (5)**
70:23;92:5;93:8;
178:2;254:2
**alone (1)**
284:9
**along (3)**
17:19;201:3;270:22
**although (2)**
58:21;138:23
**altogether (1)**
112:7
**always (18)**
6:25;17:16,18;
28:25;34:9;42:22,24;
44:20;48:16;73:24,
25;74:2;80:16;82:6;
83:20;86:15;118:2;
285:22
**Amendment (23)**
125:4;126:17,25;
200:14;204:13;
214:24;218:15,16,17,
18,20,25;219:6,17,20;
220:5,22;221:5;
294:11,13,14,25;
295:4
**American (12)**
97:11;158:16,23;
159:4,15;169:15;
171:10,21;172:17;
210:24;225:11,15
**Americans (2)**
98:2,8
**amount (3)**
157:23;167:11;
239:19
**analysis (17)**
116:24;158:13;
161:6;162:14;197:8;
199:16;258:20,25;
260:4,20,23;261:9;
272:6,24;273:2;
274:2,8
**analyze (1)**
202:12
**analyzed (1)**
261:14
**angle (4)**
15:17,18;48:4,4
**anonymous (1)**
102:3
**answered (18)**
100:2;141:4;
147:24;157:4;166:4,
18;189:12;214:9;
215:3;231:11;236:21;
241:21;245:16;248:3;

258:4;286:5;294:20,
24
**anti-crime (1)**
16:7
**anymore (2)**
107:18;224:8
**Anything's (1)**
251:23
**anyways (1)**
241:12
**apart (3)**
10:18;47:25;234:24
**apartment (11)**
62:19,19,23;63:1,
24,25;64:2,4,5,5,6
**apologies (2)**
182:15;192:3
**appear (6)**
150:20;159:15;
167:23;174:12,21;
279:10
**appearances (1)**
5:19
**appears (3)**
60:14;168:7;169:16
**Appellate (3)**
212:13,13;214:1
**applicable (1)**
115:22
**applied (1)**
111:3
**apply (2)**
11:14;110:12
**appreciate (1)**
244:14
**apprehend (1)**
20:6
**approach (6)**
83:13;104:12,24;
108:17,17,21
**approached (1)**
108:23
**appropriate (15)**
78:20;90:8;101:10,
16;107:6;123:2,5;
180:2;192:21;226:10;
227:11;243:4;244:10;
245:13;249:16
**appropriately (1)**
71:6
**approval (5)**
26:13,15;27:24;
28:8;39:2
**approve (1)**
28:3
**approved (3)**
27:17;28:18;97:7
**approving (1)**
39:2
**approximately (1)**
1:19
**April (1)**
12:5

**archived (2)**
71:8,14
**area (13)**
13:6;19:15,19;
30:14;97:12;98:8;
129:8;149:9;190:11;
245:12;265:2;268:14;
271:9
**argue (1)**
272:5
**arguing (7)**
159:16,17,21;
171:4,11,21;172:4
**argument (6)**
154:16,20,20,24;
155:9,18
**argumentative (21)**
101:13;108:2;
109:13;111:6;122:19;
123:16;143:5;165:21;
166:18;212:9;215:24;
216:13;218:12,22;
224:23;242:8;249:14;
250:5;256:19;279:21;
291:15
**around (26)**
21:1;26:8;27:2;
29:12,18,18;32:17;
54:11;73:6;79:8;
81:11;82:18;92:6;
97:10;123:13;143:15;
144:16;154:21;
168:11,12;184:5;
189:20;194:1;253:6;
264:15;290:19
**arrest (62)**
21:21;22:8;34:1;
51:10;60:23;61:3,24;
73:1;76:6,7,10;95:5;
102:18;131:24;132:5,
19;133:10;180:13,23;
181:7,8,11,12;184:15;
190:6,7;200:20;
210:9,15,16;211:14;
213:6,7;236:4;248:9;
251:11,15;253:7,9,17;
255:1,3,16,17,19,21;
262:24;263:18;
264:10;273:9;279:17,
18;289:10,16,24;
290:10,15,22,25;
291:3,4,8
**arrested (26)**
21:15;23:1;75:8,13,
24;133:12,14;134:2,7,
14;183:11;191:6;
198:7;209:10;210:10;
211:9,20;220:1;
254:7,8,15;260:6;
273:1;289:17,20,21
**arresting (2)**
273:3;274:11
**arrests (12)**

17:2;20:9;132:12;
133:22,25;134:11,12,
21;208:24;210:21;
251:14;253:3
**article (1)**
100:25
**ASA (9)**
217:1,17;239:24;
247:1;253:22,25;
256:9,14;289:14
**ASHLEY (2)**
2:7;40:11
Ashley@bonjeanlawcom (1)
2:
**aside (4)**
83:4;228:14,20;
267:11
**ass (3)**
183:21,21;240:14
**assaulted (3)**
181:6,8,21
**assaults (1)**
15:16
**assessing (1)**
241:23
**assessment (9)**
116:24;246:17;
292:9,11;293:4;
295:19;296:2,17;
300:1
**assigned (17)**
16:6,9,11;17:25;
18:25;19:3;22:14;
24:16;30:16,17,17;
32:8;36:8,14,15;
44:23;93:10
**assignment (1)**
24:14
**assignments (1)**
15:24
**assistant (1)**
44:9
**associated (2)**
71:7;228:2
**assume (12)**
48:14;57:17;77:15;
109:14;122:20;
140:12;144:10;
146:13;232:10;
244:15;266:22;302:4
**assumed (2)**
119:18;193:19
**assumes (2)**
108:9;280:10
**assuming (9)**
43:23;67:5,9;93:6;
109:11;122:11,17;
195:21;283:25
**assured (1)**
53:17
**Astoria (1)**
25:14
**attached (3)**

9:16;43:1;79:19
**attempt (1)**
279:12
**attempts (9)**
277:1,10,12;278:1,
8;279:5,6;280:4;
286:7
**attend (2)**
31:12,13
**attended (1)**
11:15
**attention (1)**
243:8
**attorney (22)**
33:20;34:2;123:18;
127:3,5,6,9;217:1;
220:19;223:3,5,9,11;
227:7;240:11,11;
293:1,10,25;294:1;
303:10,12
**Attorneys (11)**
2:3,10,15,21,3:;
5:18;147:11;170:13;
220:21;226:16;227:5
**attributed (1)**
238:24
**audibly (1)**
6:25
**August (25)**
177:20;180:19;
191:22;194:13,14;
195:1;205:6,13;
238:25;239:7,7,19;
249:20;252:7,22;
253:1,3;254:11;
263:3;289:21,25;
290:23;298:8;299:14,
17
**Aurelia (1)**
175:12
**automatically (4)**
80:15;199:5;
260:24;274:10
**available (4)**
8:16;69:3;182:20;
301:10
**Avenue (4)**
2:,;233:22;235:14
**average (5)**
104:2,14;106:18,
18;207:5
**avoid (6)**
116:25;221:13;
222:12;225:13,15;
268:5
**awakened (1)**
154:17
**aware (29)**
78:5;96:5,13,20,24;
97:5,9,23;98:6;
103:13;156:3;189:25;
190:2,3;200:11,17;
201:1,11,22;204:11;

209:14;212:22;215:9,
14,18;248:13;281:23,
25;282:13
**away (14)**
64:19;66:9,22;70:4;
72:4;180:1;194:25;
206:13,21;207:20;
234:22;252:21;
290:17;291:22

## B

**BAC (2)**
161:7,19
**bachelor's (1)**
13:3
**back (80)**
8:7;9:1;10:12;
16:10,17;23:22,22;
24:11,13;25:12;
26:14;27:6,7;28:17;
31:16;32:16;33:17;
37:22;39:12;42:4;
45:8;47:5;53:13;56:3;
58:13;64:23;65:13,
19;66:13;67:8;68:15;
83:23;84:4,17;85:17;
86:8;87:21;90:15;
100:14;108:18;114:2,
21,23;116:4,17;
135:13;149:19;
152:24;163:6;167:19;
174:20;175:10;
177:10;178:19,22;
179:3;180:18;183:2;
184:4;190:23;199:22;
206:4,14;217:6;
238:5;250:14;256:9;
260:15,16;261:18;
265:2,14;266:11;
270:1,5,11;271:3,13;
281:11;283:21
**background (5)**
9:13;62:13;113:24;
211:14,25
**backgrounds (1)**
213:6
**bald-faced (1)**
215:12
**ballistic (4)**
130:12;198:13,17;
274:16
**ballistics (19)**
192:11,13;197:21;
198:3,6,23;199:2,7,
17;258:14;259:8,15;
260:5,21;261:14,20,
22;271:21,24
**bang (1)**
66:20
**Banged (2)**
66:24;67:4
**bar (1)**

63:5
**BARONI (1)**
2:
**Barry (2)**
92:25;93:3
**base (1)**
169:11
**based (16)**
55:24;67:5;82:9;
123:18;131:20;
136:18;169:9;173:14;
189:8;227:11;235:23;
269:17;275:10;
288:15;22;290:3
**basic (51)**
8:6;9:5,8;15:16;
33:23;48:24;54:1,2,9,
9;59:5;60:16;62:18;
63:13;70:1;77:4;78:8,
14;79:16,19,23;80:9,
18;81:19;83:2,6,14;
84:10;90:9;105:10;
112:13,15;113:13;
114:24;115:11,14,16;
117:16;122:3,10;
137:22;149:17;150:7;
202:5;222:14;233:6;
235:19;279:15;
283:22;289:3;295:23
**basically (18)**
15:14;31:6,10,14;
34:22;42:1;45:14;
72:3;73:11;74:3;78:4;
96:6;103:1;110:20;
151:6;183:15,22;
251:10
**basing (1)**
262:14
**basis (7)**
52:13,15;72:25;
222:10;253:7;254:15;
268:7
**Bates (8)**
14:18;48:11;54:22;
68:17;145:25;149:8;
155:15;167:16
**battling (1)**
241:11
**Beach (2)**
97:12;98:14
**bearing (2)**
163:23;164:1
**beat (5)**
243:9;246:10,11;
292:19;293:15
**beaten (10)**
240:15,19,21;
241:1,25;242:23;
243:2;245:3,3;257:5
**beating (3)**
61:7;105:16;294:4
**became (4)**
12:6;15:25;28:1;

85:8
**becomes (1)**
301:9
**becoming (1)**
282:12
**beer (6)**
130:14;153:24;
154:2,4;156:25;
183:16
**beginning (6)**
33:10;84:5;129:13;
130:4;177:2;204:18
**behalf (1)**
5:24
**behavior (1)**
211:10
**behind (3)**
37:19;100:14;138:3
**belief (1)**
143:22
**believes (3)**
196:9;197:17;
198:20
**Bello (10)**
138:16;139:4,7;
140:2;231:19;232:15,
16;234:13,21;247:3
**below (2)**
19:18;104:2
**benefits (1)**
49:17
**benzos (2)**
157:16;158:7
**beside (1)**
229:22
**best (6)**
6:17;111:2,7;
130:14;175:1;241:14
**better (28)**
24:21,22;42:3;
51:18;67:1;130:5,6;
133:7;148:4;170:20;
178:20,20;199:21;
204:8;236:22;249:25;
251:4;257:14;267:8,
9;278:1;279:5;280:4,
23;281:8;283:3,23;
284:4
**beyond (1)**
34:15
**big (5)**
53:12;94:1;183:21,
21;210:19
**bigger (2)**
38:13,15
**biography (1)**
15:21
**birth (2)**
265:7;268:3
**bit (9)**
9:13;10:20;60:24;
84:25;138:25;161:13;
174:20;208:22;218:4

**biweekly (1)**
70:20
**black (11)**
97:14;99:9,10,24;
153:21,21;154:3;
155:13;186:20;281:1;
283:15
**blacks (2)**
155:9,17
**blanket (1)**
210:18
**blanking (1)**
11:22
**blew (1)**
89:16
**blight (1)**
212:14
**block (5)**
64:17,22;65:1;
66:12,16
**blue (2)**
278:11,11
**bodies (2)**
130:11;158:19
**body (3)**
33:19;174:7;230:22
**bold (2)**
57:1,8
**bolded (4)**
57:5;59:5;66:1;
178:10
**BONJEAN (81)**
2:,;4:;5:7,10,11,17;
8:18;9:14,18;40:11;
47:20;68:6,12;94:6;
106:1,4;114:17;
118:22;120:20;126:9;
129:10;135:7,12,15;
141:21;142:2;143:8;
150:23;157:5;158:10;
160:14,17;161:2;
164:25;165:9;166:19,
23;167:1,17;170:18;
173:3,7,12,19,24;
174:19;175:7,9,19;
176:25;181:12;182:1,
11,13,23;183:1,13;
189:21;190:16;192:3;
201:17;204:23;205:2;
213:23;226:7,14;
228:19;236:14,23;
244:13;258:11;270:4,
19,25;271:12,17;
301:17,22;302:9,13
**B-O-N-J-E-A-N (1)**
5:11
**book (6)**
40:3,7,8,16;41:7;
207:25
**booking (1)**
76:2
**books (3)**
39:19,22;87:23

**borne (2)**
97:18;276:13
**borough (6)**
37:7;45:1,23;46:1,
4;99:17
**boss (1)**
24:22
**both (14)**
26:2;86:18;146:11;
154:19;158:21;
161:22;192:16,23;
197:22;198:24;
199:18;203:15;252:7;
257:24
**bottom (5)**
57:12;183:21;
190:16;191:12,16
**bought (2)**
153:24;154:4,5
**Boulevard (2)**
2:;5:2
**bounced (1)**
189:19
**box (3)**
39:17;183:16;
282:22
**boyfriends (1)**
99:17
**Boyle (1)**
148:11
**Brady (8)**
86:11,15,19,25;
87:5,6,10;89:21
**brain (3)**
89:11;236:25;
291:18
**brainstorm (1)**
34:22
**brass (1)**
34:21
**Bratton (1)**
45:7
**break (11)**
7:20,24;35:21;68:7,
8;94:1;129:7;135:8;
204:22;205:3;258:10
**breakdown (1)**
266:24
**breaking (1)**
68:5
**breaks (2)**
7:21;56:7
**Brian (3)**
203:2,2,15
**Brians (1)**
203:15
**brief (1)**
116:14
**bring (8)**
37:22;41:24;58:4;
59:10;88:24;240:10;
254:14,19
**brings (1)**

240:11
**broaden (1)**
  127:22
**broke (3)**
  6:23;82:19;244:21
**Brooklyn (1)**
  45:15
**brother (2)**
  131:21;151:24
**brothers (8)**
  9:10;109:19;152:6;
  167:22;168:9;171:12,
  16;297:10
**brothers' (2)**
  192:14;233:17
**brought (4)**
  15:18;184:19;
  185:9;186:24
**Brown (3)**
  92:25;93:3;102:23
**BRUEGGEN (259)**
  2:;5:20,20;8:14;
  9:16;17:9,12;21:19;
  22:22;27:12;28:9;
  34:17;35:10;36:11;
  39:3,24;41:15;42:13,
  19;43:17;47:18;
  49:21;51:22;53:4;
  56:4;63:16;65:20;
  67:12;68:4,10;71:2;
  72:21;74:18;75:5,17;
  76:12;77:25;80:7;
  81:22;82:12;83:8;
  84:19;85:13;86:20;
  87:11;88:1,7,22;
  89:25;90:13,21,25;
  91:7;94:4;96:11;
  98:25;100:1,15;
  101:12,19,25;102:9;
  103:5,22;104:7,17;
  105:4,24;106:2,14,22;
  107:21;108:1,4,12,24;
  109:12;110:8,17;
  111:5;113:12;114:6,
  13,19;115:23;117:7,
  14;118:19;120:18;
  122:13,18;123:15;
  124:5;125:17,22;
  126:7,21;128:24;
  129:5;133:17;135:21;
  136:8,13;137:25;
  140:16;141:3,25;
  143:4,12;147:17,23;
  150:3,22;157:3,25;
  160:11;164:14,21;
  165:7,20;166:17;
  167:15;170:16;
  175:23;179:23;
  180:15;181:10,17,24;
  188:11,19;189:11,18;
  190:14;191:25;194:8;
  196:11;200:15,23;
  201:8,15;203:9,13;

204:2,16,21;205:21;
206:19;207:7,15;
208:7,16,21;8:2;
213:12,21;214:8,21;
215:13,17,23;216:12,
22;217:12;218:11,21;
220:3,12;221:1,17;
222:8;223:16,21,24;
224:22;225:23;226:5,
12;227:20;228:16;
229:12;230:23;
231:10;232:11,23;
234:18;235:9;236:5,
11,21;237:14,25;
238:16;239:2,21;
241:20;243:25;244:9,
20;245:15;246:8,12,
19;247:12;248:2,10,
18;249:7,13,23;
250:4;251:17,21;
252:9,19;253:10,19;
254:21;255:6;256:6,
18;257:10;258:3,9,
22;259:17,21;261:11;
263:2;264:12,23;
266:25;268:23;
269:23;270:2,17,23;
276:23;279:3,20;
280:10;281:21;
282:24;286:4,17;
287:24;289:1;290:1;
291:1,14;295:21;
296:5;298:20;300:5;
301:20,24;302:3,7,11,
15
**building (7)**
  62:19,20,22,23;
  63:1,24;64:2
**buildings (2)**
  64:1,7
**bullet (4)**
  56:24,25;59:4;
  147:15
**bunch (3)**
  137:19;207:18;
  294:20
**bureau (21)**
  12:9;19:7,8;21:25;
  22:1,11,12;24:12,17;
  32:2;44:10;45:12,23;
  66:9;68:19;83:10;
  85:1,5,7,16;113:4
**bureaus (1)**
  45:9
**Burge (1)**
  242:15
**burglaries (5)**
  22:10;31:5;38:19;
  86:4;134:14
**burglary (1)**
  134:11
**bus (2)**
  172:4,5

**busier (1)**
  38:14
**business (2)**
  36:13;184:2
**bust (2)**
  20:6;21:9
**busts (1)**
  20:12
**busy (2)**
  30:11;32:16
**buy (3)**
  20:6,12;21:9
**buys (2)**
  20:8,14

---

# C

**c/o (1)**
  5:1
**call (17)**
  40:20;42:7;52:21;
  76:6;84:14;116:3;
  125:12;153:16;
  183:20;241:18;251:1;
  255:10;282:11,20,20;
  283:15;299:25
**called (22)**
  17:15,20;39:6;
  45:13;54:23;94:2,8,
  16;127:7,17;140:22;
  183:24;197:24;
  201:13;202:17;
  212:14;215:10;
  221:25;223:13;
  258:14;267:3;282:9
**calling (3)**
  17:20;76:6;187:16
**calls (6)**
  17:2,4;26:5;31:12;
  62:22;187:25
**calm (1)**
  155:20
**came (20)**
  67:3;71:16;105:20;
  111:17;122:4;138:6,
  8;145:3,7;146:6;
  152:8;154:11;183:23;
  196:13;236:9;276:10;
  278:14;291:4;296:22;
  298:18
**cameras (4)**
  66:15,16,18,19
**can (107)**
  6:19,19;9:13;14:13;
  15:2;16:1;17:24;
  22:20;23:13;32:14;
  35:24,25;40:11;45:3;
  50:7,16;52:23;53:13,
  17;55:25;58:13;61:1;
  62:7,9;64:2,23;65:3;
  68:2,2,4,7;75:1;
  76:10;79:12;81:1,15;
  82:20;90:18;91:11;

94:4;100:3;105:25;
111:2;114:20,25;
115:13;117:24;119:7;
123:23;124:2;128:1;
130:14;132:5;135:7;
136:9;137:2;144:10,
10;145:19;150:12;
151:7;153:24;154:2;
157:5;160:6,17;
163:14;164:18;165:7;
166:9;167:15,17;
173:12;174:23;177:9;
183:25;188:25;
189:19;190:14;
204:23;220:25;226:3;
228:4,17;232:5;
233:23;234:11,22;
241:14;242:6;248:25;
250:8;255:18;262:21;
263:20;265:17;
270:13,14;272:4;
276:19;277:23;
280:24;290:21;296:2,
16;297:1;302:4
**canvass (20)**
  33:16;56:3;63:11,
  21;64:11,15;65:17;
  67:1;78:22;79:4,8,11;
  149:9;150:8,17;
  152:25;153:4;173:17;
  269:6,7
**canvasses (6)**
  64:13;65:14,23;
  66:4;67:19;162:2
**Canvassing (1)**
  83:20
**capacity (1)**
  10:24
**Captain (2)**
  44:1,5
**car (8)**
  64:19;183:24;
  278:24;280:1,8;
  282:23;283:16;
  287:15
**card (2)**
  239:9;242:2
**care (6)**
  26:3;57:24;203:20;
  235:14;265:16;
  270:22
**career (7)**
  6:7;9:22,23;17:10;
  75:1;105:19;202:6
**Carmen (1)**
  155:8
**CARNEY (9)**
  2:;5:24,24;242:8,
  12,17;302:1,4,17
**carried (2)**
  80:5;177:16
**carries (2)**
  133:13,15

**carry (2)**
  196:9;229:19
**cars (2)**
  65:10;283:10
**CASE (209)**
  1:;6:15;8:2;19:16;
  20:8,8,14,14,18;21:9;
  26:13;29:16;32:3;
  33:6,12,22;34:3,9;
  35:21,23;36:5,8,10,
  17,20;39:17;40:7,8,8;
  41:3,7,22;42:5,22;
  43:5,6,19;46:20;
  48:25;49:24;50:2;
  51:3,7;53:12;54:23,
  25;55:2,3,20,21;
  56:21,23,24;58:11;
  59:18;60:18;68:1;
  70:10;71:19;79:19;
  80:1,11,14;81:6,7,13,
  15;86:23;87:6,20;
  88:3;89:12;91:2;92:1;
  93:12,23;95:16,22,25;
  96:7;102:25;110:2,
  13;111:17,20,23,24;
  112:7;113:15;114:12;
  116:9;118:6;122:3,9,
  21,24,25;125:5,12;
  127:12,24,25;134:19;
  138:7,9;141:6;142:7,
  16,21,24;143:6,23;
  147:12;148:6;149:23;
  150:12;156:1,12;
  160:10;162:20;163:4,
  10;164:7;166:16;
  178:5,18,24;184:19;
  187:20;190:22;
  193:23;199:1,21;
  200:1,12,14;201:4,12,
  12,16,16,19;202:10;
  203:17;204:1,14;
  206:11;209:14;210:6;
  211:3,14;212:25;
  213:3;214:11,20;
  215:7,22,25;218:23,
  24;219:3;221:14,15;
  223:7,13,15,22,23;
  224:20;227:9,25;
  228:22;229:3;231:4;
  233:7,12;237:7;
  238:5;245:25;247:8,
  9,10,24;253:1;255:8;
  262:8,15;263:10,22;
  264:1,22;267:6;
  269:3,7;275:12,19;
  276:18;279:10,15;
  283:19;284:4;286:2;
  293:8;294:17;296:12,
  22,24;300:21;301:3
**caseload (1)**
  265:3
**cases (30)**
  25:4;26:6,9;28:3;

31:7;32:8,17;33:2;
34:7;36:3,4;42:8;
46:23;82:2;85:9;
91:20;112:8;192:1,4;
200:22;202:23;203:1;
204:8;207:19;212:19,
20,23;213:19;267:24;
285:23

**casings (5)**
130:14;175:1;
259:6;260:6,17

**catch (2)**
96:2;171:6

**categorized (1)**
43:3

**caught (1)**
184:6

**cause (20)**
75:2;251:15;253:8;
254:14,19;255:1,2,12,
16,18,21;256:1,3;
287:22;289:5,9,24;
290:22;291:8,10

**caveat (1)**
60:18

**CCR (1)**
303:

**CCSAO (1)**
165:19

**cell (3)**
70:3;72:2;73:13

**center (1)**
173:12

**central (1)**
76:2

**centralized (1)**
16:10

**certain (5)**
82:2;83:19;117:19,
19;224:17

**certainly (13)**
34:6;61:11;83:24;
84:9,17;86:11;87:15;
132:15;164:3;176:2;
197:6;261:2,2

**CERTIFICATE (2)**
303:1,17

**Certified (1)**
1:16

**CERTIFY (2)**
303:4,9

**cetera (8)**
130:14;174:17;
184:10;283:11;
297:11,11,11,16

**challenge (1)**
103:15

**challenged (6)**
103:3,7,9;107:3,9;
118:10

**chance (3)**
144:18;146:6;
160:21

**Chanel (8)**
58:3,25;102:12;
103:15,19;104:23;
124:2;202:24

**change (2)**
50:10;81:8

**changed (3)**
83:1;107:15,19

**changes (2)**
82:24,25

**changing (1)**
291:24

**characterized (1)**
158:15

**charge (7)**
31:4,5;45:1,13;
95:17,18;218:5

**charged (5)**
23:1;76:9;218:2,10;
290:14

**charges (5)**
124:22,24,25;
222:23;223:6

**charging (3)**
76:6,8,11

**check (1)**
82:17

**checklist (5)**
60:8,11;80:12,12;
81:18

**Chicago (29)**
2:17,21,22;3:5;5:3,
25;112:21;114:24;
115:2,4,6;129:16;
190:21;200:13;201:5;
212:15;224:18;225:4;
242:5,5,7;265:14;
266:11;281:17,23;
282:1;287:6;288:21;
292:24

**chief (9)**
30:17;31:13;44:9,9,
10,12;95:7,13;102:3

**chiefs (2)**
44:17;82:17

**chopped (1)**
272:8

**chose (1)**
211:19

**Chris (1)**
263:1

**chronological (1)**
152:23

**chronology (1)**
58:11

**circles (1)**
290:20

**circuit (2)**
214:2;215:9

**circumstances (1)**
125:25

**cite (1)**
130:15

**City (28)**
2:21;5:25;6:8;9:23;
10:1,19,25;11:9,12;
12:12,14;13:1;24:12;
28:6;29:6;32:1,7;
34:12;37:4;42:23;
45:6,15;200:13;
201:5;225:2,4;
260:10;302:1

**citywide (2)**
16:9;25:3

**CIVIL (3)**
1:5;201:16;225:20

**civilians (4)**
224:8,9,11;226:15

**civilly (1)**
225:1

**claim (5)**
185:25;241:16,19;
247:5;248:6

**claimed (2)**
211:20;260:2

**claims (1)**
214:16

**clarification (1)**
26:15

**Clark (1)**
2:

**class (4)**
13:21,22;47:14;
93:24

**classes (1)**
110:21

**clean (1)**
287:9

**clear (5)**
81:17;105:18;
106:5;129:12;169:23

**cleared (1)**
237:7

**cleared/closed (12)**
191:21;253:15;
297:19;298:2,3,19;
299:1,7,10,14,17,22

**clearly (1)**
205:19

**clerk (1)**
73:15

**client (2)**
213:8;290:23

**clock (1)**
264:15

**close (5)**
20:24;35:7;36:10;
171:13;197:4

**closed (3)**
35:18;42:5;237:7

**cloud (5)**
39:14;42:10,12,15;
72:7

**CO (1)**
26:8

**coached (1)**

236:19

**coaching (4)**
118:22,24;236:14,
15

**co-defendant (2)**
133:2;287:16

**co-defendants (10)**
228:25;229:6,18;
231:5;234:10,14,22;
276:19;289:12;291:4

**coerced (4)**
214:17;217:7,8,9

**coercion (5)**
105:12,14,15,17,21

**cognitive (1)**
104:15

**cognitively (1)**
103:20

**cognizant (3)**
7:3;78:4;80:16

**COHEN (2)**
2:7;40:12

**cold (6)**
36:4,4,5,21;93:12,
15

**collar (1)**
132:12

**collars (1)**
135:2

**colleagues (3)**
13:20;204:1;264:16

**collect (2)**
65:3;224:17

**collected (7)**
69:19;73:11;97:13;
199:22;272:20;274:4,
5

**collecting (4)**
69:3,7;84:8,10

**collection (1)**
77:2

**collectively (2)**
230:19;253:14

**college (1)**
10:14

**color (2)**
98:13,21

**Columbia (2)**
19:14,17

**combination (1)**
110:22

**comfortable (3)**
219:13,14;292:25

**coming (4)**
33:24;50:13;
183:15;203:24

**commander (10)**
28:1;31:14;43:22,
25;44:3,24;91:20;
92:20;112:9;127:20

**commanding (9)**
30:9,16,20;32:24;
33:4;37:8;44:24;46:9;

127:13

**commencing (1)**
1:18

**commend (1)**
57:10

**commingled (1)**
40:9

**commissioner (2)**
44:13;45:7

**committed (3)**
134:6;162:24;
210:23

**common (2)**
90:10;206:16

**communicate (1)**
247:21

**community (3)**
52:17;77:10;179:19

**comparable (1)**
261:20

**comparative (10)**
197:8;199:16;
258:20;260:3,20;
261:9,22;272:6,23;
274:2

**compare (7)**
30:25;109:22;
110:2;114:5;163:3;
260:16,21

**compared (5)**
173:15;198:3,5,25;
274:10

**comparing (2)**
199:3;273:20

**comparison (4)**
198:13;272:22;
273:25;274:16

**comparisons (1)**
198:17

**compelled (1)**
219:11

**competently (1)**
77:24

**complaint (4)**
42:25;43:1,4;86:3

**complaints (1)**
293:23

**complete (6)**
6:16;7:13,19;10:15;
14:3;249:4

**completed (3)**
7:12;57:14;77:5

**completely (2)**
11:1;209:15

**complex (1)**
50:24

**compound (2)**
230:24;251:22

**CompStat (10)**
56:17,18;71:17;
85:2,7,8;265:7;268:4;
281:15,16

**computer (5)**

39:13,13,16;41:5;
73:14
**computers (1)**
41:4
**conceal (4)**
89:10,22;90:11,18
**concede (1)**
231:25
**concept (3)**
82:10;105:19;
281:19
**concerned (1)**
204:9
**concerning (1)**
264:20
**concluded (1)**
123:2
**concludes (1)**
302:19
**conclusion (5)**
69:23;110:7;
131:14;234:16;
295:25
**conclusions (1)**
119:5
**condition (1)**
162:25
**condo (1)**
62:23
**conduct (8)**
26:11;27:4,7;96:21;
100:23;133:24;
213:18;245:20
**conducted (17)**
54:2,3;55:5;70:6;
73:4;102:22;109:18;
115:10;116:25;
140:18;145:2;259:1;
261:9;266:5;267:12;
273:2;274:8
**conferrals (2)**
283:4,5
**confess (1)**
239:18
**confessed (7)**
179:7;180:8;239:6,
7,11;287:14,16
**confesses (3)**
107:6;206:16;
286:21
**confessing (4)**
279:13;284:18;
285:1,2
**confession (22)**
106:19;179:3,10;
180:3,5;205:20;
207:2,13;208:1,13;
214:16;217:7,8,11;
249:5,19;253:5;
254:18,19;255:1,25;
289:11
**confessions (1)**
179:22

**confirm (1)**
171:13
**confirming (2)**
171:13,16
**conflict (1)**
117:21
**confronted (1)**
207:1
**confused (1)**
141:1;256:17
**confusing (2)**
29:23;50:4
**connect (1)**
169:21
**connected (1)**
259:4
**connection (24)**
6:15;8:2;23:2;
27:19;60:25;109:18;
165:23;170:9,24;
184:18;192:10;
197:17;198:4,22;
199:13;211:1;228:4;
259:15;260:2;261:4,
7;273:4;274:5,12
**CONNELLY (1)**
2:
**consequence (1)**
87:24
**consequences (1)**
127:1
**consider (13)**
27:10;96:9;114:10;
164:3;181:14;202:3;
215:6;216:20;256:3,
5,25;258:2;294:9
**considered (9)**
77:23;192:9;202:4;
215:20;228:9;237:22;
238:2;256:7;263:13
**considering (2)**
236:8;237:20
**consistent (26)**
29:2;35:15;43:10;
71:14;83:3,20;88:14;
90:7;95:1;139:1;
149:16;158:14,19;
177:23;179:2,20;
194:20;206:4;217:18;
245:13;248:13;250:3;
256:22,23;267:18,20
**consistently (1)**
241:6
**constantly (2)**
71:19;265:10
**constitute (1)**
149:17
**constitutes (1)**
82:25
**Constitution (2)**
87:9;90:7
**constitutional (3)**
86:18;90:10;225:17

**consult (1)**
114:10
**contact (2)**
58:18;77:11
**contained (4)**
129:24;136:3;
300:2;301:7
**contains (1)**
147:4
**Cont'd (1)**
3:1
**contemporaneous (6)**
194:5,10;205:14,
14;238:23;248:17
**continually (2)**
71:5,11
**continue (5)**
34:14;35:16;36:7;
55:15;224:17
**continued (2)**
29:24;34:14
**contradict (2)**
186:18;247:5
**contradicted (1)**
160:9
**contradicting (2)**
186:14,16
**contradiction (1)**
186:22
**contradictory (2)**
285:10;288:5
**contradicts (1)**
189:8
**Control (3)**
19:6;58:23;235:20
**convicted (10)**
132:23;133:6,16;
189:15,16,24;203:3;
210:4;211:6;229:15
**conviction (10)**
101:5;123:14;
125:21;189:16,22;
200:12,21;201:7;
202:24;279:19
**convictions (5)**
132:14,15;203:4;
221:16;229:9
**Cook (4)**
205:7;215:10;
239:10;253:15
**cookie (2)**
59:17,18
**COOLBAUGH (11)**
2:;5:16;135:17;
160:16;166:21,24;
167:2;182:12,21,24;
271:15
**cooperate (6)**
221:25;222:1;
226:19,21,23;295:8
**cooperated (1)**
295:15
**cooperation (1)**

125:1
**cooperators (1)**
21:14
**cop (2)**
84:23;85:16
**copies (2)**
41:20;72:8
**cops (1)**
227:18
**cop's (2)**
89:7,15
**copy (4)**
14:20;47:19;
135:19;302:15
**corrections (3)**
26:14;243:20;
293:11
**correctly (7)**
18:13;29:17;53:19;
77:3;94:24;135:3;
155:12
**corresponds (1)**
175:16
**corroborated (5)**
139:2;161:24;
185:24;232:19,25
**corroborates (2)**
186:2;238:25
**corroborating (5)**
156:16,17;162:17;
185:6;232:22
**corroboration (7)**
118:12,16;156:21;
185:4;238:5,13;
289:11
**corruption (1)**
76:25
**cost (1)**
200:12
**counsel (5)**
103:16;170:19;
219:10;303:10,13
**count (2)**
143:2;218:5
**County (4)**
205:7;215:10;
239:10;253:16
**couple (8)**
13:2;129:11;
132:12;134:20;
267:23;271:2,7;
300:24
**course (27)**
36:5;41:10,12;49:2,
19,19;52:6;55:23;
57:3;89:19;96:5;
106:6;107:13;128:11;
140:23;144:13,22;
154:7;159:12,14,21;
178:21;218:17;223:5;
242:21;243:3;264:16
**COURT (24)**
1:1,16;7:2;47:2;

49:7,14;114:21;
123:13;128:17,23;
202:17;209:10;
212:13,13;213:19;
214:2,2;215:9;219:3;
223:7;239:24;240:11;
247:1;302:16
**courthouse (1)**
289:17
**court-reported (7)**
139:2;239:23;
254:18;257:1;299:2,
22;300:3
**courts (1)**
91:2
**coverage (1)**
152:14
**covered (1)**
45:2
**covers (1)**
37:7
**cracked (1)**
95:16
**crazy (1)**
66:7
**create (2)**
43:11,13
**created (1)**
183:22
**creation (1)**
84:5
**credibility (2)**
117:1;241:23
**credible (1)**
247:17
**crediting (1)**
121:5
**credits (1)**
245:9
**crime (57)**
16:9,11,19;17:1;
19:6;26:25;30:14;
33:15,18;51:15;
52:15;61:12;62:1,13;
63:21;64:10;74:17;
79:9;109:3,6,7;
116:20;130:9,10,11,
25;131:2,5,14;133:6;
134:2,6;144:12,15;
148:21;156:5;162:24;
165:6;176:6;189:15,
24;190:11;206:17;
228:5;231:16,17;
232:3;260:17;265:18;
272:18,21;273:15,17,
24;280:9;281:24;
286:22
**crimes (15)**
73:14;134:14;
191:8,9,9;193:8;
199:17,19;260:10,25;
273:5;282:11,20,21,
21

**criminal (19)**
15:7,15;41:13;42:3;
48:3;59:20;131:23,
25;133:1;151:15;
191:7;201:19;212:15;
213:19;223:13;231:5;
237:10;245:20;
287:16
**criminals (1)**
64:25
**criticized (1)**
271:21
**cross-examination (3)**
58:13;72:24;206:24
**crown (1)**
183:21
**crucial (1)**
53:9
**Cruz (9)**
138:17;139:3,7,7;
140:2;254:2;257:22;
258:5;285:15
**Cruz's (1)**
254:2
**CULBERTSON (1)**
3:3
**culpability (1)**
74:17
**curiosity (1)**
29:14
**currently (3)**
189:24;200:18;
224:14
**custody (4)**
76:5;190:12;
197:18;240:17
**cut (3)**
7:18;50:5;60:9
**cutter (2)**
59:17,18
**CV (3)**
1:;14:14;15:22

**D**

**DA (9)**
41:17,18,24;42:2;
124:19;127:12,24;
203:4;255:13
**DAFFADA (1)**
2:
**daily (1)**
52:15
**danger (1)**
70:23
**dangerous (1)**
151:17
**dark (2)**
60:7;278:11
**DA's (1)**
77:11
**date (21)**
29:12;70:15;

131:18;149:20;
151:20;164:19;165:5;
173:6;176:12;255:22;
262:19;263:7,17;
264:9,10;265:25,25;
269:13;270:3,5;303:7
**dated (2)**
110:15;150:19
**dates (9)**
142:19;146:13;
152:24;165:25;166:3,
7;176:18;266:6;
267:15
**Dave (6)**
5:20;118:23;135:8;
236:14;244:13;
301:17
**DAVID (1)**
2:
**day (23)**
6:13;42:4;52:20;
53:2,2;59:1;67:25;
70:24;74:23;93:7,9,
10;113:6;153:1;
206:10;227:19;
229:19;256:20;
260:24;271:1,1,3,4
**days (21)**
53:7,8;67:17;69:12;
70:10,12,13,17,18,19;
71:25;72:16,17,18;
205:16,19;273:16;
276:12;277:2;278:14;
288:13
**day-to-day (1)**
52:13
**dbrueggen@jsotoslawcom (1)**
2:18
**DD5 (2)**
58:24;100:10
**DD5s (5)**
39:6,10;42:5;58:20;
100:9
**dead (5)**
107:4,5;108:6;
161:16;280:13
**deal (5)**
75:20,22;129:2;
228:14;244:10
**dealer (1)**
61:17
**dealers (1)**
152:7
**dealing (1)**
78:8
**deals (1)**
68:18
**death (1)**
163:24
**death-in-custody (1)**
25:4
**debriefing (4)**
190:18;191:4,5;

196:21
**decade (4)**
17:11;214:25,25;
215:2
**December (1)**
1:18
**decide (2)**
231:1;245:2
**decided (2)**
123:13;252:13
**decision (1)**
51:11
**declaration (1)**
170:17
**Defendant (9)**
2:10,21;5:21,23;
231:5;255:1;288:7;
296:9;300:25
**Defendants (5)**
1:;2:15;21:12;
113:17;285:17
**defense (3)**
170:13,19;230:22
**deficiencies (1)**
247:6
**definitely (5)**
82:15;100:10;
119:6;201:6;269:8
**defunct (1)**
19:7
**degree (3)**
10:13,15;14:3
**deleted (1)**
81:8
**delineated (2)**
112:16;115:15
**demonstrated (1)**
247:25
**denials (1)**
238:12
**denied (2)**
121:19;229:3
**denies (1)**
187:15;229:2;
262:12
**deny (1)**
235:16
**denying (3)**
99:22,25;119:25
**department (52)**
10:2,6,13,15,19;
11:12,14,23;12:12,14;
13:1;15:23;16:5;
17:19;28:7;29:3,7;
32:2;34:13,21;35:6;
39:8,15;43:10;44:12,
19;47:9,13;48:13;
57:21;58:22;63:3;
71:9,15;77:6,8;81:9;
85:11,25;86:9;87:8;
115:2;127:9;129:17;
190:22;194:21;
212:15;224:15,18;

235:19;243:19;
281:23
**depend (2)**
69:24;109:1
**depends (1)**
210:16
**Deposition (23)**
1:6;6:4;117:19;
148:3;150:14;159:24;
160:9,23;181:22;
182:2,3,20;183:7;
189:8;238:15;240:23;
268:15;270:13;281:1;
295:13;297:5;301:14;
302:19
**depositions (11)**
6:8;111:21;112:6;
136:25;190:25;230:5;
263:23;264:8;266:15;
280:20;282:3
**deputy (3)**
44:5,6,9
**derive (1)**
296:3
**derived (3)**
129:16;136:1,2
**deriving (1)**
129:14
**described (1)**
154:16
**DESCRIPTION (2)**
4:;277:14
**designed (7)**
219:4,17;220:5,23,
24;221:6,11
**detail (2)**
54:14;297:11
**detail-by-detail (1)**
16:2
**detailed (11)**
53:19;57:1,5,13,20;
60:23;62:12;73:7;
85:2,4;180:23
**details (3)**
174:16;268:25;
295:20
**detained (1)**
76:8
**detective (132)**
12:6,7,8,9,12,13,21,
22;18:9,14,15;19:8;
21:25;22:1,11,12;
24:12,16;25:12,13,20,
24;26:22;27:3;28:15;
29:3;30:9;31:17,18;
32:2,3,25;36:15,17,
19,25;37:2,3,3,9,16;
38:4,21;41:2;43:2,14;
45:23;50:13;66:9,12;
67:3;68:19;69:2;
72:16;79:18;80:9,19,
21;81:6,13,21;83:10;
85:1,4,16,17;88:25;

89:18,18;92:9,17,19,
25;93:3;102:23,24,
25;103:1,2;115:25;
128:22;146:8;148:11;
163:2;168:2;169:14;
171:7;176:15;181:4,
6;183:11,17;187:15;
190:10;193:7,8;
197:24;198:19,19,23;
199:15;208:4;212:6,
14;213:18;214:3,17,
18,23;215:10;216:17;
217:10;243:3;244:18;
245:11;252:5,13;
253:4;257:2;264:5;
274:2;279:1;282:8,
10,13;285:4;287:11;
294:3,6,10;297:15;
299:20;301:1
**detectives (57)**
26:11,18;27:1,21;
36:14,15;37:20,21,23;
38:23;39:7;40:3,16;
41:11,17;52:7,12,13;
54:7;55:5;56:15;
58:23;64:23;67:7;
73:4;79:20;95:7,8,13;
126:11;143:19;149:8;
162:1;184:25;185:7,
8;186:24;214:13;
216:2;224:8;254:3,
13;255:24;256:24;
258:6;262:18;266:15;
272:5,23;273:3;
280:19;281:5;283:7,
14;287:12,20;289:4
**detectives' (1)**
39:22
**detective's (3)**
15:18;48:4;49:14
**determination (2)**
116:25;119:3
**determine (8)**
64:10;111:25;
113:9;142:5;143:10;
171:8,9;256:16
**determined (1)**
104:1
**determining (3)**
104:5;105:2;216:21
**develop (6)**
61:2;63:4;79:12,15;
105:6;151:9
**developed (5)**
41:10,11;81:9;
261:4;279:24
**developing (1)**
50:25
**development (2)**
15:6;48:25
**Di (3)**
3:;6:1;302:2
**DIANE (3)**

1:15;204:24;303:

**dictate (2)**
59:6;63:21

**dictated (3)**
63:19,20;108:23

**died (2)**
226:20,24

**difference (3)**
224:10,12;273:8

**different (42)**
11:14;24:23;33:23;
37:1;59:21;60:18;
72:8,22;80:2;83:12;
84:9,25;86:17;97:17;
99:20;104:11,21,24;
106:20,25;112:20,23;
115:7,7,8;127:11;
143:12;185:15;
186:17,18;202:19;
210:17;220:19;
233:10;237:22;254:3;
255:10,14;257:18;
258:6;274:14;287:6

**differently (3)**
57:12;107:12;
108:22

**difficult (1)**
20:16

**DIRECT (5)**
4:,5:7;190:14;
205:25;206:6

**directed (2)**
92:23;100:21

**directing (1)**
31:7

**direction (2)**
56:9;59:6

**directly (1)**
102:19

**disabled (2)**
103:21;104:13

**disagree (3)**
161:21;193:5;244:2

**discern (1)**
263:16

**disclose (1)**
88:20

**disclosing (1)**
88:5

**discomfort (1)**
221:14

**discovery (1)**
230:22

**discretional (1)**
44:4

**discretionary (1)**
43:24

**discuss (4)**
73:18;78:9;79:10;
93:21

**discussed (2)**
112:23;283:8

**discussion (2)**

108:3;204:25

**dismissed (3)**
124:22,24,25

**disorderly (1)**
133:24

**display (1)**
182:22

**disproportionate (1)**
98:2

**disprove (1)**
246:24

**dispute (9)**
229:24;231:19;
232:2,2,4,4;234:11;
244:17,22

**disputed (5)**
228:15,21;231:14,
15;234:23

**disputes (1)**
62:4

**disputing (2)**
235:3;247:7

**disregard (4)**
89:9;243:6;245:6;
256:12

**disregarding (1)**
245:24

**disrupt (1)**
129:6

**distinction (1)**
76:7

**distinguished (2)**
200:9,10

**DISTRICT (10)**
1:,1;5:14;33:20;
34:2;217:1;293:1,10,
25;294:1

**DIVISION (3)**
1:2;20:21;282:21

**DNA (17)**
96:14,22,23,23;
97:10,13,16;98:1,6,7,
15,23;99:6,12,16,23;
100:24

**document (24)**
8:20;49:1,18;54:14;
58:14;86:2;90:12;
132:5;143:7;164:23;
172:16;179:21;180:3,
12,17;181:13;208:14;
246:20;249:24;
266:17,18;272:13;
279:6;281:8

**documentation (29)**
53:19;54:9,18;57:2,
6;72:24;85:2;113:18;
118:7;121:13;150:13,
16;172:22;178:21;
206:12;238:4;243:18;
252:14;280:16,23;
283:3;284:11,16,21;
291:17,20;292:14,22;
300:19

**documented (39)**
49:8;50:4;55:13;
71:6,12;72:10,14,18;
122:14,16,25;131:7;
170:7;178:4;179:25;
180:1,18,20;194:11,
17;199:20;250:1,19,
24;252:25;263:12;
264:1;265:6;277:1,
11;278:2,3,7;283:21,
24;284:1,4,9;286:6

**documenting (9)**
50:12;51:19;52:5;
84:13;178:15;249:1;
250:10,23;266:3

**documents (12)**
5:16;8:8,16;42:2;
136:21,23;148:12;
179:10;243:20;
262:15;280:4;296:23

**Doe (1)**
88:13

**Dog (5)**
168:20;169:16,24;
233:24

**domestic (3)**
61:18;209:22;
210:11

**donde (1)**
184:10

**done (69)**
9:3,8;39:7;41:25;
51:19;57:2;67:5;
70:15;72:13,16;73:3,
3,11;74:3;75:25;77:1,
3,23;78:17;94:15,17;
99:23;101:23;112:14;
115:13;119:20;128:3;
143:18;145:9,10;
151:10;156:4;157:10;
162:15;178:7;193:20;
197:8;198:8;199:4;
211:24;214:11;
226:17;259:19;
260:24;261:15,25;
263:10,17,21;265:25;
266:18,23;267:6,14;
269:7,7;271:24;
274:9,24;279:11,14;
283:18,25;284:1,6,8;
291:21,22;301:19

**door (4)**
64:5;66:20,24;67:4

**doors (2)**
64:1;269:12

**dot (1)**
169:21

**double (25)**
70:25;119:17;
125:20;177:25;179:8,
8;180:8;193:18;
195:9;197:2,18;
206:5;207:13;210:24;

261:5,6;264:17;
265:17;267:16;278:5,
24;280:2;285:1,2;
287:15

**doubt (1)**
152:20

**doubting (3)**
241:15,17,22

**down (41)**
19:17,22;23:24;
41:24;42:6,9;45:6;
50:1;52:2;56:7,18;
57:12;64:22;66:12;
76:2;82:19;83:15;
88:16,18,20;89:5,19;
92:14;93:14,15;
95:13;97:1;99:17;
133:24;138:25;
167:18,19;174:23;
175:10;176:25;185:9;
202:25;206:17,17;
238:19;288:24

**downstairs (2)**
43:2;64:6

**downtown (1)**
34:21

**dozen (3)**
23:15;81:25;200:21

**draft (1)**
147:12

**drafting (1)**
138:14

**dragnet (4)**
96:6;101:10,15,22

**draw (1)**
213:7

**drawn (1)**
184:7

**drive (3)**
41:23;66:7;283:16

**drives (1)**
72:7

**driving (1)**
287:15

**dropped (1)**
271:22

**drove (4)**
280:1;282:23;
283:10;285:8

**drug (5)**
22:7;61:17;62:20;
134:24;152:7

**drugs (1)**
191:10

**drunk (9)**
155:2,22;156:20,
21,23;158:17;159:16;
163:11,12

**due (1)**
158:18

**duly (1)**
5:4

**during (29)**

19:25;20:6;21:4;
23:3,8;32:15;50:20;
51:12;100:5;102:3;
103:7;105:12;106:6;
119:10,24;181:7,8;
184:14;193:11,12;
214:5,11;247:8;
263:21;266:23;
267:12;295:11;
298:25;299:5

**duties (2)**
25:24;30:19

**dynamics (4)**
32:1;265:13,15;
267:21

**E**

**earlier (8)**
112:18;151:8;
213:9;236:22;258:16;
264:14;265:8;288:6

**earliest (1)**
176:9

**early (4)**
15:12;16:21;51:11;
254:6

**ear-occurrence (1)**
168:18

**earth (1)**
210:22

**earwitnesses (7)**
138:24;140:9,20,
21,22;153:12;168:19

**easier (2)**
55:18;58:12

**easily (1)**
132:5

**east (1)**
45:15

**EASTERN (2)**
1:,2

**easy (3)**
65:6;218:9;245:8

**ECMS (8)**
29:15,17;79:20;
80:21,22;81:1,3,21

**ed (1)**
217:23

**education (6)**
14:8,12,15;109:25;
110:22;111:15

**Edward (1)**
2:15

**effect (1)**
106:20

**effort (5)**
278:4;279:25;
282:20;285:12;286:8

**efforts (6)**
34:13,15;284:12,
14;286:2,3

**eight (3)**

21:2,2;92:6

**eighty (2)**
75:11,11

**either (20)**
7:6;20:3,9;26:13;
52:8,9;67:25;78:24;
98:15;99:6;127:17;
131:21;150:15;176:3;
182:17;222:16;
284:17;285:14;
290:16;301:14

**elaborate (1)**
81:2

**elaborated (1)**
82:9

**electronic (6)**
29:8;55:14,17;72:3;
79:20;80:23

**electronically (1)**
65:4

**electronics (1)**
113:16

**element (1)**
227:24

**eliminate (2)**
266:8,9

**elimination (1)**
95:23

**else (37)**
8:11;11:17;18:24;
26:6;31:5;38:5;98:2;
131:4;136:25;137:14;
138:13;139:10,12;
147:9;148:7;159:3;
175:24;177:13;
184:20;187:25;
207:18;228:15;
234:15;235:4,7;
243:7;245:6,24;
257:7,25;279:7;
280:24;288:18;291:7,
7;301:12;302:16

**else's (2)**
20:18;41:14

**elsewhere (2)**
90:11;247:25

**emphasize (3)**
178:14;203:19;
249:1

**employ (1)**
106:8

**employed (1)**
60:17

**employee (2)**
303:10,12

**employment (1)**
10:21

**EMS (1)**
82:10

**enacted (1)**
82:11

**enclosed (1)**
276:13

**end (7)**
33:10;62:5;72:1;
112:4;142:17;270:23;
292:6

**ended (5)**
10:11;175:4;237:6,
8,10

**enforcement (9)**
13:10,14,18,18,21,
22;84:6;179:19;
267:18

**engaged (3)**
38:11,14;214:3

**English (12)**
184:1;233:3;
246:15,18,24;247:1,2,
3,11,20,22;248:1

**English-speaking (1)**
247:6

**engrain (1)**
60:1

**enjoy (1)**
24:20

**enlightening (1)**
24:21

**enough (6)**
27:2;34:22;114:19;
174:10;204:10;244:7

**ensure (4)**
36:7;56:25;80:4;
91:4

**ensures (1)**
69:17

**ensuring (2)**
39:10;41:9

**entail (1)**
33:13

**Enterprise (3)**
29:16;234:17,19

**entire (7)**
6:7;9:22,23;194:7;
240:10;241:1;281:24

**entirely (1)**
268:9

**entrance (1)**
50:17

**Epplen (1)**
2:

**equipment (2)**
26:5;31:12

**err (2)**
51:18;74:13

**especially (10)**
27:25;32:2;52:15;
53:9,21;58:16;81:11;
85:1;191:7;245:19

**ESQ (6)**
2:,,,7:3:

**essentially (5)**
9:2;98:13;168:9;
264:16;300:1

**EST (1)**
1:19

**established (1)**
213:19

**estimate (4)**
22:20;23:13;32:14,
23

**Estimates (1)**
38:25

**et (9)**
1:8;130:14;174:16;
184:10;283:11;
297:11,11,11,16

**ethanol (1)**
157:18;158:8

**evaluated (10)**
12:19;117:10,12;
119:1;139:23,24,25;
216:1;237:4,16

**evaluating (7)**
140:4,6,11;236:2,9;
237:12;238:20

**evaluation (3)**
227:23;236:1;
246:17

**even (60)**
23:14;35:6,20,21;
51:19;57:11;67:7;
77:9;82:9,18;84:22;
95:5,12;97:3,7;98:21;
107:8,16,18;113:11;
124:2;126:2;130:15;
153:12;170:8;179:20;
192:4;193:6;194:21;
195:2;196:18;201:11,
12;203:23;205:12,14;
206:4;210:22;211:5;
217:3,17;223:19;
224:20;227:24;229:5;
236:24;243:18;250:3;
252:14;256:12;260:6;
266:15;267:17;
272:18;274:19;
279:10,12,25;282:19;
288:16

**events (9)**
117:19,22,23;
118:10,12;139:1;
197:22;198:23,24

**eventually (1)**
200:3

**Everybody (5)**
7:4;17:14,21;20:18;
48:17

**everybody's (1)**
19:8

**Everyone (3)**
126:25;218:17;
233:13

**evidence (45)**
73:8,10;77:2;83:1,
15;84:8,10;130:13;
131:3,15;185:16;
194:4;197:21;198:3,
23;209:7,8;214:14,

15;216:16;217:13;
231:15;232:14;
233:16;236:8;247:19,
25;266:4;272:20,24,
25;273:19;274:3,4;
275:23,25;276:3,5,8;
278:18,20,23;279:23;
280:11;300:9

**evidentiary (2)**
252:8,16

**exact (2)**
165:25;215:12

**exactly (11)**
33:13;49:23;66:23;
144:8;158:2;197:25;
257:15,17;260:15;
285:11;296:25

**exaggerating (1)**
241:5

**EXAMINATION (3)**
4:,2;5:7

**examined (2)**
114:12;216:18

**examiner (1)**
162:16

**examiner's (4)**
162:8,20,23;164:5

**examining (6)**
48:6;111:4,24;
214:7;215:7,22

**example (7)**
58:17;70:25;
111:23;119:7;131:24;
232:14;233:15

**excellent (5)**
249:16,22;250:2;
251:2;252:12

**excellently (2)**
279:11,14

**except (2)**
5:21;159:7

**exceptions (1)**
29:1

**excessive (4)**
25:4;300:8,11,16

**exclude (1)**
98:15

**exculpatory (5)**
89:3,10,22;90:11,
18

**executive (4)**
25:20;26:1;58:22;
283:5

**executives (3)**
13:18;15:14;77:8

**exhaustion (1)**
36:23

**Exhibit (4)**
47:16;91:16;
141:23;160:19

**exist (3)**
82:10;84:8;270:16;
298:8

**existed (5)**
85:18;86:12;
266:11;275:13,16

**expect (5)**
52:7,12;67:7;77:23;
78:2

**expedite (1)**
198:17

**expedition (1)**
288:15

**experience (7)**
10:7;42:23;82:9;
110:1;111:15;124:3;
125:8

**experienced (1)**
37:21

**expert (30)**
46:15,16,17;47:2;
85:19;86:23;91:10;
109:23;110:14;
139:22;141:13;143:9;
145:1;147:8;155:24,
25;157:6;160:8;
161:5;165:19;166:11,
12,15;178:12;179:17;
184:15;215:21;
244:10;268:22;301:6

**expertise (1)**
110:5

**Explain (9)**
21:19;48:2,17;
51:13,14;61:1;
253:22;285:11;
288:10

**explained (2)**
63:6;276:11

**explaining (1)**
72:23

**explanation (2)**
281:5,7

**expressly (1)**
215:10

**Expressway (1)**
45:14

**extend (1)**
88:5

**extremely (7)**
31:25;44:14;65:22;
159:16;161:19;164:6;
264:19

**eyewitnesses (1)**
153:13

---

**F**

**fabricated (1)**
254:12

**fabricates (1)**
256:2

**face (6)**
130:19,22;131:13;
184:7;187:1;278:25

**faced (1)**

118:1

faces (1)
66:25

facing (4)
66:19;200:18;
222:23;223:6

fact (37)
33:3;39:18,22;
88:19;97:10;100:25;
113:10;117:2;133:8;
140:9;149:23;150:7;
163:19,21;171:14;
195:5;207:1;210:5;
213:17;214:1;217:24;
232:7;238:22;239:18;
243:11;249:15;
251:19;257:21,23;
260:1;261:21;280:6;
282:10;294:2,9;
295:14,18

factor (1)
104:5

facts (5)
228:15,20;231:14;
247:4;280:11

failed (1)
131:2,14

failing (2)
87:24;260:13

fair (19)
26:19;34:10,11;
39:23;47:1;51:18;
53:3;63:15,21;69:4,5;
86:9;114:19;146:11;
167:11;174:10;181:2;
193:4;204:10

fairly (2)
93:12;224:16

false (1)
106:19

familiar (3)
101:24;268:18;
281:22

family (6)
99:18;131:19;
150:21;151:3,5,21

far (5)
76:23;138:10;
150:11,13,14

fashion (1)
69:22

fast (1)
206:17

fault (2)
23:10;249:11

FBI (6)
11:15;14:8;29:11;
110:22;115:20;
293:24

fear (2)
126:4,12

feared (2)
225:20;226:11

February (2)
94:8,9

fed (1)
257:4

federal (1)
293:1

feel (9)
7:11;46:22;68:25;
104:21;219:12,14;
220:15;221:4;292:24

feeling (1)
68:9

Feliciano (1)
175:12

fellas (2)
134:19;279:12

fellow (3)
119:14;193:15;
195:16

felony (1)
132:14

felt (2)
130:3;184:3

Fernando (1)
2:

few (4)
145:9,25;183:12;
184:6

field (9)
20:5,7;27:1;146:25;
148:9;175:5,16;
269:1,12

fieldwork (1)
38:11

Fifth (49)
125:4,13;126:3,11,
14,17,25;127:1;
200:14;201:13,21;
202:1;203:8;204:13;
214:24;215:2;218:15,
16,16,18,20,25;219:6,
17,20;220:5,16,22;
221:5,8;222:4,13,21;
223:10;224:5;225:6,
9,14,16,22;226:10;
227:8,11,18;294:11,
13,14,25;295:4

fight (1)
233:24

fighting (2)
233:23;243:25

figure (8)
51:8;106:5;138:2;
145:3,5;251:15;
275:4;288:23

figured (1)
14:23

file (77)
4:;33:6;34:3;39:17;
41:3,7;43:15,19;55:3;
79:20;81:6;111:20,
24,24;118:6;122:9,21,
24,25;129:17,24;

130:7,17;131:8,13;
135:20,22;136:4,19,
20;138:7,9;141:22,
23;142:6,16;143:7,
11;148:6;149:23;
156:6,12;160:10;
163:11;164:7;165:2;
177:9,12,14;194:7;
199:1;200:1;206:11;
210:19;238:5;247:8,
10,10,24;262:15;
263:15,22;264:1;
275:19;276:18;
279:11;283:19;284:4;
286:3;295:20;296:4,
9,12,21,24;297:23;
300:2

filed (2)
43:3;297:22

files (6)
43:20;80:14;
113:15;122:3;262:8;
282:23

filing (4)
42:11,17,17;81:21

fill (2)
86:3;87:22

filled (1)
41:1

final (6)
28:4,12,20;178:6;
298:16,23

finally (3)
28:5;82:19;205:18

financially (1)
303:13

find (44)
33:11;42:9;64:24;
71:25;72:4;95:9;
101:2;112:13;118:6,
8,15;120:17;149:9;
151:6;154:8;164:18;
238:4;249:11;264:19;
270:7,8,13;271:4;
276:12,19;277:1,10,
23;278:1,4,10;279:1,
6,25;280:4,6,14,17,
21;284:21;285:22;
286:7;297:2;300:19

finding (2)
210:5;271:22

finds (1)
243:2

fine (11)
8:18,22;11:4;32:23;
38:25;53:12;68:10;
73:25;222:15;271:14;
292:5

finger (2)
257:8;285:18

finish (6)
10:13;93:19;99:1;
111:10;159:8;244:2

firearm (3)
274:3,4;276:13

firearm's (2)
272:24,25

fired (5)
25:6;125:19;126:1;
272:20;273:19

FIRM (5)
2:;5:2,11;8:2;46:17

first (61)
9:12;11:24;15:8,20;
18:25;24:15;45:5;
46:19,20;48:22,22;
67:16;72:16;73:24;
75:11;78:9;85:7;93:7;
94:1;100:22;102:3;
111:21;112:3;116:19;
136:2;142:6,8,24;
143:7,11,14,14,19,22;
145:3,5,7,8,10;
157:12;161:25;174:9;
175:5;179:14;194:11,
15;198:6;215:1;
227:23;229:15;243:6;
253:7;254:16;255:3;
258:25;262:1;263:8;
269:1;272:9,11,12

fishing (1)
288:14

fit (2)
98:23;140:13

five (7)
57:22;68:10,12;
126:14;134:11;
258:10;273:16

five-minute (1)
68:8

fled (1)
64:16

flipping (1)
164:23

floor (2)
184:4,5

Florida (1)
102:17

flow (1)
60:3

flowing (1)
82:18

fly (1)
102:17

focus (2)
20:15;101:14

focused (8)
13:14;16:14,25;
19:2;133:10,21;
214:10;295:16

follow (10)
34:4;36:9;60:8;
69:23;114:25;123:20,
23;144:22;197:12;
229:17

followed (15)

8:6;9:6;67:20;
71:21;82:1;112:14;
122:3;144:18;216:6;
223:2;226:16;227:5;
267:13;279:15;289:3

following (14)
33:7;55:23;60:11;
65:14;176:16;217:8,
9;223:4;233:5,6;
254:4,5,23;267:25

follows (1)
5:6

follow-up (16)
33:18;65:19,22;
66:3;67:8,18,22,22,
23;77:5;150:6,17;
261:13;269:14;271:5;
302:8

food (2)
129:7,9

foot (1)
64:16

footnote (3)
165:17;271:23;
272:2

force (7)
25:4;92:18,18;
93:11;300:8,11,16

forced (1)
258:7

foregoing (1)
303:4

forensic (2)
273:4;274:12

forever (1)
43:6

forget (6)
42:7;75:10;177:12;
188:25;254:11;
277:18

forgot (1)
288:8

form (163)
17:9,12;22:22;
27:12;28:9;34:17;
35:10;36:11;39:3,24;
41:15;42:13,19;
43:17;49:21;51:22;
53:4;56:4;58:22;63:3,
16;65:20;71:2;72:21;
74:18;75:5,17;77:25;
80:7;81:22;82:12;
83:8;84:19;88:1,7,22;
89:25;90:13,25;91:7;
96:11;100:15;101:12,
19,25;102:9;103:5,
22;104:7;105:4;
106:14,22;108:1,12,
24;109:12;110:8,17;
111:5;113:12;114:6,
13;115:23;122:13,19;
123:15;124:5;125:17,
22;126:21;128:24;

133:17;136:8,13;
140:16;150:3;165:21;
181:11;188:11,19;
189:11,18;194:8;
196:11;200:23;201:8,
15;204:2;205:21;
206:19;207:7,15;
208:7,16;212:8;
213:12,21;214:8,21;
215:23;216:13,22;
217:12;218:11,22;
220:12;221:1,17;
224:23;227:20;
228:16;230:23;
231:10;232:11,23;
234:18;235:9;237:14,
25;238:16;239:2,21;
241:21;242:9,17;
244:20;245:15;246:8,
12;247:12;248:10,18;
249:7,13;251:17,21;
252:9,19;253:10,19;
254:21;255:6;256:6;
257:10;258:3,22;
259:17;261:11;
264:12,23;266:25;
268:23;276:23;279:3;
280:10;282:24;289:1;
291:14;293:23;
295:21;296:5;298:20;
300:5
**formal (4)**
14:15;109:25;
110:22;111:15
**forms (7)**
57:21;84:9;87:20,
20;106:15;235:20;
293:11
**formula (1)**
70:7
**forth (2)**
110:14;303:8
**forward (4)**
34:24;35:22;70:16;
124:20
**found (6)**
96:14;174:22;
192:23;200:12;
212:24;214:3
**foundation (27)**
75:6,18;76:12;
86:20;88:2,8,23;90:1;
100:2,16;102:1;
103:23;107:21;
157:25;175:23;
204:16;215:13,17,24;
222:8;223:16,21,24;
242:18;255:7;258:23;
263:5
**four (4)**
72:16,17;134:12;
140:7
**frame (2)**

16:20;79:9
**framing (1)**
201:3
**Francisco (4)**
268:16,17,21,24
**Franco (3)**
3:;6:2;302:2
**Frank (2)**
3:;6:1
**Franklin (1)**
3:4
**frankly (2)**
117:5;122:23
**free (2)**
76:5,9
**friend (1)**
178:12
**frisk (9)**
17:15,16,17,20,21,
22;58:3;94:14;95:4
**frisking (1)**
17:23
**frisks (2)**
17:7,10
**front (10)**
8:9,9;14:20;75:3,
15;129:22;157:14;
177:10,14;238:21
**fruits (1)**
255:21
**frustrated (1)**
244:11
**full (1)**
6:16
**full-on (1)**
249:19
**fully (1)**
222:1
**fun (1)**
17:23
**functioning (3)**
105:2;106:17,21
**fundamental (2)**
86:1;128:16
**further (4)**
33:11;61:20;
301:22;303:9
**FUSCO (1)**
2:
**future (2)**
204:5;226:4

## G

**gander (1)**
213:15
**gang (38)**
61:6,17,25;62:2,3,
4;119:14,15;131:22;
133:3;134:24;148:24;
149:2;152:7;191:13;
195:16;197:5;228:2,
9,23;231:20;232:1,6,

7;234:6;251:8;
281:24,25;282:2,8,9,
10,11,20,20,21;283:4,
9
**gang-motivated (1)**
231:17
**gaps (1)**
266:10
**gauged (1)**
13:17
**gave (15)**
95:8,19,19;97:21;
99:7;100:8;119:19;
159:2;193:20;196:9;
205:23;207:20;217:1;
227:8;253:25
**geared (2)**
13:13,24
**general (8)**
89:24;137:12;
139:13;164:9,14;
165:18;218:25;
294:17
**generalize (1)**
109:4
**generally (1)**
70:6
**generated (1)**
39:6
**gentle (1)**
7:5
**gentlemen (1)**
230:8
**geographically (1)**
45:4
**Gerstein (1)**
75:14
**gets (10)**
55:21;124:6;
125:10;194:11,17;
195:5;196:3;199:4;
202:25;253:5
**girlfriend (8)**
107:4;209:5;211:9,
20;286:22;287:18;
289:12;291:5
**girlfriends (1)**
283:10
**girls (1)**
21:3
**given (5)**
73:25;74:4;218:18;
256:3,9
**gives (4)**
59:12;153:8;
162:23;233:1
**giving (3)**
74:14;174:15;233:1
**glad (2)**
243:24;277:5
**goal (2)**
48:1;140:5
**goes (16)**

7;234:6;251:8;
31:9;36:21;43:2;
58:24;74:23,23;
81:14;84:4;141:15;
150:15;185:14;240:9;
278:18;281:11;
283:15,21
**Gonzalez (10)**
138:17;139:3;
140:1;170:17;175:12;
238:7;257:8;285:7,8;
286:24
**Good (38)**
5:8,9;30:4;35:2;
67:24;70:10;81:10,
10;82:6;96:9;144:14,
17;146:6;153:11,11,
13,19;156:15;161:11;
162:6,16;163:6;
164:8;169:20;197:24;
198:23;199:15;204:9,
22;213:15,15;251:5,
6;258:9;276:21;
279:1;284:19,20
**goose (1)**
213:15
**Goossens (2)**
229:14,14
**Goossens' (1)**
280:25
**gosh (5)**
22:21;23:14;29:10;
92:5;233:8
**gotcha (1)**
298:17
**government (1)**
293:1
**GPR (8)**
167:4,6;173:5,6,25;
175:20;207:25;
239:17
**GPRs (8)**
164:19,23,25;
165:5,10;175:8;
177:3,4
**grab (1)**
129:7
**grad (1)**
105:7
**graduated (2)**
12:5;16:4
**graduate's (1)**
13:8
**graduating (1)**
10:11
**granite (1)**
70:8
**granted (3)**
123:17,25;124:3
**granular (1)**
189:4
**great (1)**
277:5
**greater (1)**

107:24
**greatest (1)**
214:19
**Greenidge (4)**
92:11,11,12,16
**GROUP (4)**
2:;5:12;24:23;25:1
**guess (28)**
11:24;22:2;23:14;
35:3;43:11;44:21;
48:10;65:6;79:25;
98:15;103:20;105:9;
116:11;135:25;
138:15;141:1;152:16;
159:9;165:4;168:10;
176:5;183:17;192:6,
20;204:7;215:15;
258:11;264:2
**guessing (3)**
12:4;29:9;52:10
**GUEVARA (27)**
1:8;2:10;5:21,23;
201:3;212:6,14;
213:18;214:3,17,19,
23;215:11;217:3,10,
14,17;243:3;244:18;
245:11;253:4;257:5;
282:11;294:10;
297:15;299:21;301:1
**Guevara's (3)**
294:3,6;297:4
**guidance (3)**
56:1,6,9
**guide (5)**
79:18;80:16,21;
81:10;85:17
**guided (2)**
115:25;127:3
**guideline (1)**
150:8
**guidelines (1)**
6:12
**guilt (1)**
119:5
**guilty (7)**
108:10;219:21,25;
221:8;222:15;225:7;
256:17
**gun (26)**
119:19;184:5,8,8;
193:20;195:7,9,12,20;
196:14;198:10;
232:25;233:1,2;
284:13,14,18,22;
285:4,8,9,19;287:1;
288:2,13,17
**guns (1)**
191:10
**gunshots (3)**
158:20;159:20,22
**guy (20)**
51:14;56:2,2;58:4,
15;67:21;88:12;

89:17;95:15;98:22;
134:10,13;143:8;
184:9;199:18;201:2;
203:5;242:14;249:5;
282:23

**guys (25)**
21:2;36:9;40:7;
55:20;59:23;119:2;
154:11;163:11;
192:22;201:4;202:6;
203:3;221:15;224:4,
25;225:3;226:19,21;
228:12;235:14;
251:25;253:6;267:25;
280:9;288:13

**guys' (1)**
229:8

**guy's (1)**
288:15

## H

**HALEY (27)**
2:;5:15;135:15;
157:5;158:10;160:17;
161:3,13;166:19;
167:17;173:4,8,13,20,
24;174:19;175:7,10,
19;177:1;182:1,2,11,
14,19;183:14;271:13

**Haley@bonjeanlawcom (1)**
2:6

**Haley's (1)**
157:8

**half (4)**
14:6;23:14;24:4;
206:7

**Hall (3)**
13:5,9;64:5

**Halverson (1)**
287:11

**Halvorsen (4)**
2:15;201:4;226:23,
23

**hand (3)**
222:18;237:19;
248:25

**handed (1)**
215:25

**hand-in-hand (1)**
37:16

**handle (2)**
22:7,12

**handled (3)**
22:6;25:3;53:19

**hands (2)**
50:10;245:11

**hands-on (1)**
27:10

**handwriting (1)**
87:22

**handwritten (16)**
39:19;43:13;139:3,

6,25;165:23;167:24;
168:2,6;173:16,21;
177:24;195:2;207:25;
239:17;252:15

**handy (1)**
91:12

**hang (1)**
277:20

**happen (23)**
54:10;120:3;
121:15;123:4,6,8,10;
124:16;125:7;201:1;
204:6;206:23,24,25;
209:17;226:3;251:24;
254:17,18;255:14;
260:12;268:1;281:14

**happened (50)**
57:22;58:16;69:25;
79:3;99:4,25;117:20;
118:3;119:24;120:1;
122:17;124:14,18;
127:14;130:5,7;
144:7,15;176:7;
180:4;183:20;184:14;
186:17;196:15;
198:20;204:5;208:12,
14;209:19;210:3,22;
215:2;216:9;228:5;
229:5;231:8;232:9;
235:23;238:8;245:22,
23;246:5;247:8;
254:7,11;260:8;
265:10;269:3;270:6;
281:14

**happening (1)**
50:2

**happens (8)**
7:9;42:24;50:16;
70:13;124:1,3,6;
227:19

**happy (1)**
24:20

**hard (6)**
41:7;59:16;143:9;
244:6;248:25;264:2

**Harlem (1)**
19:20,23

**Harvard (1)**
105:7

**hate (1)**
80:11

**head (9)**
33:25;98:5;132:11;
160:5;196:25;247:16;
269:18;291:12,12

**hear (2)**
40:11;302:3

**heard (25)**
100:6,22;101:17;
152:13;154:16,19;
156:16,18;158:20,21;
159:5,17,20,21,22;
168:20;171:4,11;

188:15;193:17;208:4;
230:17;233:22;234:5;
242:14

**hearing (11)**
75:11,14;102:8;
158:22;159:12,14;
171:22;215:11;
237:17;241:9;255:11

**hearings (3)**
23:5,8,11

**Heights (5)**
16:12;18:23;19:21,
22;38:7

**held (9)**
1:17;10:20;15:25;
85:3,9;204:25;
206:13;214:3;265:9

**help (7)**
37:22;61:15,23;
63:2;270:22,22;
300:20

**helped (1)**
300:21

**helpful (5)**
31:1;50:13;61:11;
89:12;292:6

**helping (1)**
5:16

**hereinbefore (1)**
303:7

**here's (2)**
56:10;239:9

**hey (5)**
51:13;56:1;276:19;
277:9;282:21

**hiding (3)**
219:21;221:8;225:8

**hierarchy (1)**
44:15

**high (14)**
30:13;44:15;70:21;
77:19,24;91:20;
157:23;158:3,8;
161:10,19;203:1;
252:7,15

**higher (1)**
13:12

**high-functioning (1)**
104:15

**highlight (3)**
178:11;300:9,14

**highlighted (2)**
49:1;66:1

**highlighting (1)**
300:14

**highly (3)**
172:3;248:11,15

**himself (4)**
69:25;196:24;
205:25;223:1

**HINSHAW (1)**
3:3

**hired (3)**

127:14,16;128:2

**Hispanic (1)**
233:21

**histories (3)**
200:20;213:6,8

**history (13)**
60:23;61:3,25;
131:23,24,25;132:5,
20;133:1,3,10;294:4,7

**hit (1)**
242:10

**hitting (1)**
106:9

**hold (13)**
56:15,15;76:10;
90:15;111:10;115:7;
122:8;137:5;182:2,
13;202:21;285:16;
287:8

**holds (1)**
226:4

**HOLMES (2)**
1:15;303:

**home (10)**
51:16;66:20;
119:14;193:15;
195:16;233:2;257:6,
25;287:14,23

**Homicide (123)**
4:;8:4;9:3,9;31:18;
32:4,5,6,8,10;33:8,14,
22;34:15;35:5,14,17,
20;36:15,18,19,19,21;
37:1,7,11,15,20,22;
41:18;44:24;45:9,10,
13;46:1,5,8;48:24;
52:16;59:19;60:22;
70:25;83:12;91:19;
95:14;103:1;109:17;
111:4,13;115:9,12;
116:9,14,17;119:17;
120:22;123:19;
125:20;129:13,17,24;
130:4,7,17,17,20;
131:7,13;135:19;
136:3,19,20;141:8,22,
23;142:6;143:11;
164:6;165:23;177:25;
180:8;193:18;195:9;
197:2,19;199:2;
202:5,13;205:24;
206:6;207:13;210:24;
211:2;214:7;229:20;
235:11;236:1;259:5,
6,9;260:11,25;261:5,
7;262:5;263:15;
264:10,17;265:18;
267:16;278:6,24;
280:2;285:1,3,23;
287:16;288:14;289:7;
295:20;296:21;
297:23;300:2

**homicides (9)**

15:15;22:9;26:25;
32:13;37:10;38:16;
267:23;268:11;295:7

**honorable (1)**
203:22

**honored (1)**
77:23

**hope (5)**
88:24;145:21;
209:22;232:12;
292:20

**hour (6)**
76:2;154:18,21;
159:12,14,21

**hours (24)**
34:10,16;35:5,8,24;
69:12;75:3,7,15;
78:24,25;129:21;
146:25;154:17;
159:18;240:16,17,20,
25;241:2,25;243:3,
10;292:20

**house (13)**
63:5;64:17;66:25;
168:10,11,12;196:14;
233:1;286:9,23;
287:19;288:13,15

**housing (1)**
62:24

**hovered (1)**
32:17

**Howard (2)**
97:11;98:14

**Huh (1)**
282:5

**human (2)**
13:14;203:20

**Humboldt (1)**
232:9

**hundred (1)**
93:8

**hundreds (1)**
98:13

**hung (2)**
283:10,11

**hyperbolic (1)**
161:18

**hypothetical (12)**
65:21;67:13;74:19;
104:8;106:23;125:23;
128:25;160:12;
180:16;216:23;
254:23;287:25

## I

**idea (6)**
45:3;70:10;98:22;
107:22,23;210:3

**ideas (4)**
34:23;48:21;71:10;
81:12

**Identification (4)**

47:17;91:17;
141:24;160:20
**identified (11)**
14:13;76:18;78:7;
79:24;99:24;169:24;
185:17;228:5;250:9;
269:12;275:19
**identify (5)**
48:13,23;174:21;
185:15;257:18
**ignore (1)**
88:16
**ILLINOIS (10)**
1:;2:11,17,22;3:5;
5:3,14;212:12,13;
214:1
**immediately (3)**
33:9;65:18;191:11
**immunized (1)**
215:11
**impact (2)**
53:12;83:5
**impacts (1)**
52:17
**implemented (1)**
29:25
**implicated (1)**
179:8
**implicating (1)**
257:25
**importance (3)**
65:14;178:15;249:1
**important (38)**
49:5,6;53:9,11;
54:18;60:24;62:8,16,
25;63:11;64:14;
65:19,22;69:6;72:9;
79:11;89:8;104:5;
105:1;140:9;141:6;
151:6;164:6;171:3;
172:15;187:20;189:2,
3;193:22;194:16;
200:7;208:14;210:13,
21;211:4;216:20;
255:15;285:21
**importantly (1)**
225:19
**impressive (1)**
6:10
**imprinted (1)**
81:4
**improper (3)**
242:22,24;243:4
**impulse (1)**
7:11
**inadvertent (1)**
91:5
**inappropriate (3)**
105:12;106:8;193:2
**incident (2)**
170:25;184:16
**include (7)**
86:5;98:16;130:1;

210:21;211:22;
250:10;301:1
**included (7)**
130:20;139:21;
147:5,16;163:10;
164:7;283:9
**includes (1)**
78:14
**Including (5)**
91:23;238:3;241:7;
285:15;292:17
**inclusion (1)**
41:3
**incomplete (11)**
65:21;67:12;74:19;
104:8;106:23;125:23;
128:25;160:11;
180:15;216:23;
287:24
**inconsistent (3)**
160:4;220:2;257:13
**incorrect (3)**
9:21;225:18;250:15
**incorrectly (1)**
69:1
**incredibly (1)**
194:16
**incriminate (2)**
220:6;223:1
**incriminated (2)**
205:25;221:4
**incriminates (1)**
206:5
**incriminating (2)**
179:11;249:18
**inculpatory (3)**
194:17;199:12;
205:19
**incumbent (1)**
41:2
**indemnified (2)**
225:1,4
**independent (4)**
231:15;232:14,17,
18
**independently (1)**
229:20
**indicate (1)**
8:21
**indicated (6)**
25:19;36:24;
149:13;152:13;
272:19;295:8
**indicates (3)**
15:22;68:24;148:20
**indication (5)**
131:17,21;133:7;
134:23;159:3
**indictment (7)**
126:4,5,19,20;
222:21;223:14;224:4
**individually (1)**
230:19

**individuals (5)**
23:1;48:7;80:5;
171:4;201:3
**industry (4)**
13:25;206:4;
245:13;267:19
**inebriated (1)**
163:20
**inferences (2)**
176:16;213:7
**information (76)**
22:9,11;50:25;51:1;
59:12;60:24;62:13;
69:3,7,8,15,17;77:9,
10;79:7;81:2;85:4;
88:6,21,25;89:3,4,9,
11,23;90:12,15,18;
91:2,6;119:12;
129:23;130:16;137:9,
19,24;147:4;151:21;
153:8,15;162:23,25;
163:1,2;167:12,12;
170:14;174:21;175:4;
191:9,17;193:13;
194:6;195:6,14;
196:3;200:7;205:23;
211:25;238:14;239:8;
251:7,9;252:25;
262:5,11;275:18;
279:13;283:8;287:2;
295:7;296:7,19,23;
297:10;298:18
**informed (2)**
119:11;195:14
**in-house (1)**
265:4
**initial (10)**
53:17;119:10;
136:19;148:9;175:16;
193:12;269:7,12;
295:24;297:14
**initially (4)**
12:4;16:10;53:22;
160:4
**initiative (2)**
16:13;19:2
**injuries (1)**
242:2
**innocence (1)**
119:5
**innocent (4)**
132:24;230:8;
231:9;256:17
**inside (5)**
62:4;63:25;238:5;
276:13;292:24
**inspector (2)**
44:6,7
**instance (9)**
43:11;58:1;63:24;
133:14;172:16;
233:14,16,21;234:5
**instances (2)**

25:5;90:17
**instead (3)**
49:10;166:8;277:2
**Institute (2)**
15:12;47:24
**instruction (1)**
6:24
**integrity (7)**
73:19,21;76:19,21,
23;77:14,17
**intellectual (3)**
104:15;105:2,5
**intellectually (1)**
104:13
**intelligence (6)**
69:7;281:24,25;
282:2,9,10
**intend (2)**
301:6,12
**interact (1)**
104:10
**interested (1)**
303:13
**internal (8)**
24:14,15;36:18;
43:6;62:4;293:10,24;
294:7
**interpret (1)**
274:23
**interpreter (2)**
193:9;252:13
**interrogate (4)**
104:22;105:3;
255:2,3
**interrogated (1)**
104:5
**interrogation (19)**
34:1;74:1;102:12,
14,20,22;103:3;
104:12,14,20;105:13;
106:7;107:12;108:19;
109:10;217:10;
242:22;245:12,19
**interrogations (1)**
277:8
**interrupt (1)**
244:3
**interview (46)**
21:10,11,12;26:12,
12;27:4,7;58:15;
59:11;60:21;67:24;
72:13;74:1,9;119:11,
24;131:20;152:12;
153:12,13;167:20,24;
168:22,24;175:11;
193:13;205:6,12,15;
240:6;248:16;251:9,
10;256:13;259:1,19;
261:20;262:25;279:2;
295:24;298:25;299:5,
8,13,16,20
**interviewed (20)**
21:14,20,22;

113:17,17;131:20;
168:4;170:11;190:9;
214:12;216:25;217:5,
15;252:4;254:3;
258:6;263:9;272:6;
274:16,24
**interviewing (9)**
21:17;84:3;140:20,
21;238:20;248:8;
261:23;271:25;
273:10
**interviews (14)**
20:8;53:9;136:25;
139:14;150:20;152:9;
180:21;214:12;
248:12;251:13;
256:13;285:6;291:4;
295:11
**into (33)**
10:20;15:18;39:16;
41:5;45:18;46:8,14,
17;50:14,17;60:1;
74:8,10,16,21;81:21;
85:2;105:1;109:10;
112:5;129:8;142:17;
144:4;162:20;179:6;
184:19;185:9;190:12;
214:6;215:21;227:15;
284:11;291:3
**intoxicated (5)**
154:24;156:24;
161:22;172:3,10
**introduced (1)**
214:15
**introduction (2)**
116:4,22
**inventoried (1)**
192:13
**investigated (4)**
34:7;92:2;127:8;
223:13
**investigating (7)**
16:23;36:8;37:10;
125:11;178:24;
272:23;285:13
**investigation (153)**
8:5;9:3,9;26:3;
27:9;31:7;32:4;33:5,
8,14;34:15;35:14,17;
37:12;41:10,12;48:3,
6,25;49:2,20;50:4,13,
14,17,20,23,24,24;
51:6,12;52:2,6;53:1,
18;54:1,19;55:24;
56:13,19;57:3,23;
59:6,20,20;61:1,15;
62:6;63:12,13,14;
67:17;70:22;71:18;
75:25;76:19,21,25;
77:15,17,20,24;81:5;
83:21;92:23;95:17,
19;98:5,20;100:5,22;
104:21;108:13;

109:17,22;111:4,13,
25;112:3;114:5,11;
115:9,12;116:9,15,17;
120:23;123:19;127:7,
10;128:7,15,18;
129:13;130:4,21;
134:9;136:18;141:9;
144:22;145:1;147:1;
148:10;153:10;164:7;
165:24;175:5,17;
177:25;178:5,16;
202:5,5,13;211:24;
214:7;216:21;223:20;
235:19,22,24,25;
236:1,3,10;237:4,5,6,
8,10,17,20;238:18;
240:5,10;258:18;
266:2,5,10;267:12;
269:2,13;278:14;
289:7;292:9,12;
293:5;295:9,17,19;
296:3,18;300:1

**investigations (37)**
15:7,15;18:10;20:1,
12,13,15;21:9,23,24;
22:5,13,19;23:2;
26:22;27:20;31:19;
32:11;33:2;35:20;
38:15;40:15;50:10;
69:21;70:5;73:19,21;
74:15;78:3,12;82:22;
83:11,13;108:19;
113:9;250:11;278:15

**investigative (140)**
8:6;9:5,8;15:16;
18:11;24:14;25:12;
33:24;49:7;50:20;
51:4;53:1;54:2,9,14;
55:4,7,10;56:20;
57:14,21;58:10;59:5,
9,13,14;60:2,3,17;
62:18;63:13;68:20;
69:3,8;70:1,15;71:5,
12,21;72:10;73:4;
77:4;78:8,15;79:16,
19,23;80:3,9,18;
81:20;83:3,6,14;84:4,
10,13;85:12;95:20;
96:10;101:10;109:15;
112:13,16;113:3,14;
114:24;115:12,14,16;
117:16;119:2;121:3,
4;122:4,10,11;123:1;
132:23;135:19,22;
140:18,19;141:15;
149:18;150:8;165:2;
173:2;177:9,13,15;
178:4,6;188:4;
203:25;204:14;214:5;
215:4,22;216:1,5;
223:23;233:7;248:8;
249:16,22;250:6,10,
15;251:2,4;262:22;

263:10,15,16,20;
264:2,9,20,21,25;
265:1,5,11,24;266:2,
12,23;267:6;277:3;
279:16;280:17;
281:13,15;283:23;
289:3;295:20,23;
296:4,9

**investigator (14)**
12:17;16:15;18:2,4;
20:2,3,4;43:15;50:19;
69:25;198:2;200:10;
252:12;279:6

**investigators (8)**
20:20;57:13;93:6;
130:10,12;170:20;
277:13;279:24

**investigator's (1)**
250:2

**invoke (7)**
125:13;218:18,20;
220:16;222:4;226:10;
294:11

**invoked (6)**
125:4;200:13;
204:12;214:24;
222:21;224:5

**invokes (1)**
126:3

**invoking (5)**
126:11,13;127:1;
222:13;294:25

**involuntary (1)**
103:17

**involve (3)**
37:10;162:16;231:8

**involved (25)**
21:25;25:5;27:14;
33:21;37:11,13,14;
52:18;87:6,19;100:7;
134:23;151:15;
192:12,24;197:1,1,2;
198:17;212:23;
229:25;251:8;280:2,
9;287:15

**involvement (3)**
223:22;228:23;
232:3

**IQ (1)**
104:2

**irrelevant (2)**
51:20;101:13

**Isabella (1)**
175:11

**Island (2)**
45:6,14

**issue (5)**
117:1,1;257:15;
276:10;287:22

**issues (8)**
26:4;28:17;31:11;
73:18;123:18,21;
268:5,6

Italian (3)
99:12,13,19
italics (2)
119:18;193:19

## J

**Jackson (4)**
2:;5:2;19:21;38:7
**Jail (3)**
205:7;239:10;
253:16
**Jamaica (1)**
23:24
**Jeffrey (16)**
276:19;277:14,16,
20,23;278:10;279:13,
25;280:4,7,7,18,21;
281:2;282:23;283:16
**Jeffrey's (1)**
277:9
**JENNIFER (30)**
2:;5:10;8:14;9:16;
47:18;68:4;94:4;
98:25;105:24;114:14;
120:19;129:5;164:21;
165:8;167:15;187:22,
22;189:20;190:14;
191:25;204:21;220:3;
226:5;228:18;242:12;
244:1,9;258:9;
259:22;302:11
Jennifer@bonjeanlawcom (1)
2:5
**Jenny (4)**
166:25;175:12;
182:25;271:15
**Jersey (3)**
1:17;5:5;13:8
**JFK (2)**
45:7,15
**JoAnn (1)**
2:15
**job (24)**
20:2;24:23;26:1;
74:3;100:7;113:5;
122:23;128:5,5,8,12,
14,21;153:19;202:10,
11,12,16,19;234:20;
244:5,7,7;256:16
**jobs (2)**
62:21,22
**John (2)**
88:13;92:9
**Johnny (1)**
59:11
**John's (2)**
10:10;13:4
**join (1)**
10:1
**joined (3)**
10:6,12;11:24
**Jolanda (9)**

151:1,24;167:20,
25;169:2,3,4;170:11;
172:11
**Jon (1)**
242:15
**Jones (1)**
59:12
**JOSE (1)**
1:;2:3;5:12;185:25
**Jose's (1)**
182:19
**JR (2)**
1:5;2:3
**JUAN (3)**
1:;2:3;5:12
**judge (14)**
75:3,15;76:3;
215:10;220:15;222:5,
7;287:2,12,12;288:4,
4,11,12
**judges (2)**
214:2;288:20
**judging (5)**
241:23;256:21;
289:6,7;293:14
**judgment (1)**
241:18
**July (36)**
119:11,24;180:24;
181:12;190:5,6,7,11;
192:1,5,6,11;194:2,
13;195:6,8;197:7,10,
14;200:7;238:24;
249:18;252:6;254:11;
260:1;262:24;263:9,
18;264:22;265:10;
272:25;273:10;274:5,
5,24;299:7
**jump (6)**
55:16;63:9;116:16;
191:11;208:19,21
**jumping (4)**
73:6;132:12;135:1;
187:2
**juncture (1)**
149:2
**jury (4)**
243:1;245:2,9;
275:4
**justice (3)**
41:13;42:3;212:15
**justify (3)**
251:15;253:17;
290:22
**Justino (4)**
138:17;139:7;
140:2;285:15
**juvenile (4)**
107:24;108:5,6,19
**juveniles (4)**
107:11,12,14;109:2

## K

**Karina (2)**
91:23;93:6
**Kazeel (1)**
152:12
**keep (25)**
41:7;68:1;77:11;
91:11;115:4;138:15;
141:19;173:2;174:19;
175:7,9,19;176:25;
180:22;182:5;183:3,
4,5,13,14;218:13;
256:15;290:19;298:5;
302:10
**Kelly (1)**
17:20
**kept (6)**
43:15;84:21;184:1,
2;283:8;287:19
**Kevin (3)**
129:21;158:7;
161:12
**kick (2)**
28:17;153:15
**kicked (1)**
240:14
**kicking (2)**
184:3,3
**kid (1)**
109:1
**kidnappings (1)**
38:16
**kill (1)**
228:11
**killed (4)**
119:2;129:22;
203:15,16
**killing (1)**
232:9
**kind (21)**
32:16;34:23;40:2;
44:3;57:11;62:22;
71:10;109:3;118:6;
147:12;151:9;179:15;
189:19;200:19;
210:16;258:16;264:2;
274:13;276:5;277:3;
278:19
**kinds (1)**
97:17
**King (50)**
119:14,15;182:7;
183:18,20,23;184:17,
22,23,25;185:1,5,7,8,
13,17,18,25;186:2,5,
8;187:6,12,16,17,18,
19;188:14,16,23;
192:22,23;193:15,16;
195:16;197:5;228:6,
8,8,24;229:4;231:16;
233:4;234:6,16,19,20;

235:1,3;283:15

**Kings (11)**
119:19;193:19;
196:9,13;227:24;
229:7;230:15,15,16;
231:9;235:2

**knew (15)**
24:24;182:7;
184:25;185:8,25;
186:2,5;187:6,17,19;
188:14;192:16,18;
213:1;235:1

**knock (1)**
64:1

**known (8)**
184:23;185:13;
187:11;192:22;
230:17;251:8;273:3;
274:11

## L

**lab (8)**
73:15;96:21;97:6;
100:23;272:18;
273:15,17,24

**label (1)**
276:3

**labeled (1)**
276:8

**laboratory (1)**
161:6

**lack (7)**
42:3;125:1;255:11;
267:2,3;281:12;
284:11

**ladies (1)**
233:24

**lady's (3)**
66:20,24;67:4

**LaGuardia (1)**
45:7

**laid (5)**
142:10,14,21,25;
174:7

**lapse (1)**
265:5

**large (1)**
38:21

**largely (1)**
55:24

**larger (5)**
21:23,24;22:4,17,
19

**last (9)**
9:1;15:12;69:11;
83:7,9;149:6;217:14;
272:16;277:9

**lasted (1)**
154:20

**late (2)**
218:4;302:10

**later (38)**

52:2;57:20;65:24;
101:3,4;120:7;121:9,
12,23;122:1;145:25;
149:20;162:8,9,21;
170:10,19,24,25;
178:2;194:18;195:1,
24;205:16,19;206:8;
207:2;209:18;226:25;
235:20;237:21;
255:22;263:1;269:13;
276:12;277:2;278:14;
291:21

**lateral (1)**
44:4

**Latin (31)**
119:14,15,19;
192:22,23;193:15,16,
19;195:16;196:9,13;
197:4;227:24;228:5,
7,8,24;229:4,7;
230:15,15,16;231:8,
16;233:3;234:16,19,
20;235:2,3;283:15

**laughing (1)**
106:4

**LAW (22)**
2:,;5:1,11,11;8:2;
13:10,14,17,18,21,22;
47:2;84:5;86:23;90:7,
10;126:8,10;179:18;
225:17;267:18

**laws (3)**
107:15,18,19

**lawsuit (1)**
201:2

**lawsuits (1)**
200:18

**lawyer (3)**
127:15,16;128:2

**lawyered (1)**
201:21

**lawyers (1)**
183:5

**lawyer's (1)**
239:9

**lay (2)**
263:5;275:14

**layers (1)**
28:7

**lead (16)**
62:1;69:22;95:8,19,
20;97:8;103:1;133:2,
3,3;153:16,17;
162:18;185:7;248:8;
291:3

**leads (18)**
6:24;33:11;36:9;
50:25;61:2;63:4;73:8;
77:5;79:7,13;132:23;
140:13;141:16;151:9;
162:17;234:15;
267:13,24

**learn (1)**

62:7

**learned (6)**
86:2,5,15;87:5;
119:17;225:17

**learning (1)**
13:15

**least (29)**
25:7,12;32:14;
82:10;84:15;92:6;
113:20;145:14;149:1,
12;153:9;158:13;
159:13,16;160:5;
161:25;169:5;186:11;
193:22;196:8;197:7;
200:21;225:1;247:21;
261:13;278:8;283:19;
287:14,19

**leave (5)**
53:8;64:19;76:5,9;
141:17

**leaves (2)**
243:19;287:1

**leaving (1)**
242:11

**led (7)**
164:2;184:20;
188:4;217:11;251:9,
10;279:16

**Lee (1)**
2:

**left (12)**
40:2;83:12;100:6;
113:5;168:10,11,12;
239:10;279:19;288:1,
2,17

**legal (1)**
123:21

**legally (1)**
255:4

**legs (1)**
162:18

**LEINENWEBER (1)**
2:

**length (3)**
93:16,21;283:8

**Leo (30)**
182:7;183:18,20,
22,23;184:17,22,23,
25;185:1,5,8,8,13,17,
18;186:1,2,5,8;187:6,
12,16,17,18,20;
188:14,16,23;235:1

**less (1)**
295:1

**letter (3)**
101:18,20;102:2

**level (3)**
13:12;27:24;246:18

**Lewis (5)**
58:3;59:1;102:12;
103:19;124:2

**Lewis's (2)**
103:15;202:24

**Lexington (1)**
2:

**liable (1)**
200:12

**liar (2)**
215:12,20

**liars (3)**
216:11,14,15

**lie (8)**
97:22;188:5,7,22;
209:21,25,25;234:1

**lied (4)**
120:23,25;188:15,
17

**lieutenant (27)**
26:7;28:1,5,13,14,
19,22;29:4;38:1,10;
43:22,22,25;44:3,21,
23;52:9;58:2,24;
72:19;92:8;94:2;95:3,
11;127:20;264:7;
291:12

**lieutenants (1)**
44:22

**lieutenant's (1)**
102:14

**life (1)**
203:20

**light (3)**
113:10;278:11,14

**likely (2)**
106:19;134:6;171:5

**likes (1)**
81:17

**limitation (1)**
136:11

**line (6)**
45:15;52:3;73:25;
76:3;202:25;299:4

**lines (1)**
17:19

**lineup (7)**
185:1,10,15,17;
186:25;188:24,25

**linked (1)**
199:17

**lion (2)**
183:21;186:9

**lips (1)**
302:5

**list (3)**
67:20;79:16;271:3

**listen (10)**
107:5;139:15;
166:5;170:20;178:11;
211:17;231:21,24;
243:14;296:15

**listened (1)**
171:20

**listing (1)**
174:12

**literally (1)**
81:20

**litigated (1)**
101:23

**litigation (1)**
225:21

**little (17)**
9:13;10:20;29:23;
32:20,21;57:12;
84:25;104:10;129:7;
137:3;138:25;161:13;
174:20,23;208:22;
218:4;236:20

**live (3)**
65:1,1;66:17

**lived (2)**
154:14;233:22

**lives (2)**
88:13;94:19

**LLC (2)**
2:,

**LLP (1)**
3:3

**Lluvia (2)**
233:2;254:1

**loaned (1)**
280:8

**local (2)**
32:6;92:16

**locate (6)**
131:2,15;279:7;
285:21,24;286:3

**locating (1)**
276:11

**location (2)**
62:20;67:9

**locations (2)**
65:15;69:13

**locked (4)**
61:5,7;99:14;259:7

**logical (6)**
55:7;69:22;78:17;
144:22;176:16;
207:12

**logically (1)**
60:3

**long (27)**
14:2;18:5;24:2;
29:19,25;35:18,19;
36:9;40:15;44:14;
45:6,14;61:24;82:22;
83:24;92:3,4;113:3;
125:8;128:21;182:3;
246:6;256:20;260:16;
265:17;272:12;294:4

**longer (4)**
34:7;35:25;52:2;
129:7

**long-scale (1)**
20:13

**long-term (2)**
20:13,14

**look (56)**
12:3;15:1;29:22;
32:22;38:24;66:12;

70:14;79:25;96:23;
97:4;109:16;113:8;
115:25;120:9,13;
121:15;131:25;132:8,
18,19;142:4;145:12,
24;148:2;149:6;
155:4,14,24;156:11;
157:1,9;159:1;
160:22;166:10;169:1;
173:16;174:25;219:2;
241:4;250:8;252:3;
269:21,22,23;271:18;
277:14;282:22,22;
288:15;293:16,19,20,
22;294:3,6;301:18
**looked (16)**
61:4;114:4;118:11;
121:17;138:13;
155:25;157:6;164:10;
177:2,5;185:24;
200:1;263:14;282:19;
288:22;289:4
**looking (39)**
6:16;8:8,23;54:15;
62:6;93:4;94:16;
112:11,12;113:15,22;
115:1;122:2,6,9,10;
131:23;133:24;
134:13,16;144:25;
147:19;148:10;
153:23;156:14;
157:12;158:6;166:8;
177:12,13;182:15;
183:18,19;187:1;
237:5,20;270:15;
272:2;300:18
**looks (23)**
9:21;14:19;25:8;
30:8;37:25;45:4;
46:15;47:8;60:14;
145:15;147:2,3;
151:19;153:18,19;
158:2;168:1,1;
173:21,25;174:3;
175:21;246:16
**Lopez (2)**
187:22,22
**Lords (1)**
233:18
**lose (3)**
69:15;70:4;88:3
**lost (3)**
40:9;50:7;275:1
**lot (22)**
17:23;20:24;44:22;
65:18;72:6;79:6;82:4;
97:13;99:9,13;
129:23;144:21;
154:15;162:10;183:4;
210:14,20;219:15;
221:20;248:21,21;
250:17
**Lots (1)**

17:7
**loud (1)**
155:21
**love (1)**
234:6
**low (1)**
106:21
**Lulu (14)**
167:10;168:14,20,
20,23;169:15,16,24;
171:14,14;172:6,11,
18,19
**luncheon (1)**
135:9
**lying (3)**
97:20;188:9,13

## M

**ma'am (3)**
26:20;30:7;38:9
**Macias (4)**
155:8;159:25;
161:25;171:10
**maintain (2)**
229:19;230:8
**maintained (1)**
71:8
**maintaining (1)**
39:10
**major (5)**
15:6,15;26:24;
48:25;59:20
**majority (3)**
100:11;285:23;
296:22
**makes (12)**
55:18;174:14;
188:1,3;193:22;
208:9;224:10,12;
239:23;249:4;255:1;
269:16
**Making (7)**
17:2;40:2;71:20;
76:7;78:14;216:17;
241:18
**male (3)**
153:21;155:9,17
**males (7)**
158:16,24;159:4,
15;169:15;171:10;
172:17
**malignant (1)**
212:14
**man (1)**
45:19
**manage (1)**
48:3
**management (13)**
13:7,11;15:6,14;
29:16;54:23,25;55:2;
56:23,24;68:21;
178:18,25

**managing (1)**
13:16
**mandated (1)**
248:20
**Manhattan (4)**
16:13;18:24;19:1,2
**manner (12)**
69:4,8,17;70:6;
71:6,13,22;72:11,12;
162:24;249:2;250:11
**mantra (1)**
150:2
**manual (1)**
80:19
**manufacture (1)**
253:16
**many (16)**
20:20,21,22;22:17,
19;23:13;32:13;
44:18;46:23;79:12,
13;99:20;127:18;
218:19;19;231:22
**Mapp/Dunaway (1)**
23:8
**marijuana (4)**
132:11;135:2,4,5
**mark (7)**
47:6,7;91:11,12;
141:21;160:14;
182:24
**marked (5)**
47:6,17;91:17;
141:24;160:19
**marks (1)**
242:11
**married (1)**
37:18
**Maryland (4)**
86:11;87:1,10;
89:22
**master's (2)**
13:4;14:3
**match (3)**
140:8;260:6,10
**matched (1)**
260:25
**matches (1)**
198:10
**material (8)**
39:15;82:7;111:21;
185:24;230:3;234:13;
237:23;301:9
**materials (15)**
41:9;70:3;71:7;
72:3;110:1,13;
111:16;124:17;131:9;
204:12;228:1,22;
282:19;296:11,14
**matter (5)**
1:15;90:9;190:12;
227:13;229:4
**may (52)**
7:10;61:20;74:16;

83:5;84:8,9;90:9;
114:20;129:20;
143:16,23;144:17,19;
146:3,12,17,21;
150:19;155:21;
164:10,19;165:11,24;
166:2;168:4;170:22;
173:9,10;177:16,19;
178:1;192:13;198:11;
199:17;229:21,21;
262:17,23;263:2,3,7,
17;264:6,21;265:10;
269:1,3;271:10;
272:19;273:16;
283:16;298:7
**maybe (41)**
9:21;17:17;22:24;
23:15;27:5,5;32:17,
21;34:21,21;37:23;
51:24,25;52:16;53:2;
59:25;71:23;93:10;
143:17;144:3;148:4;
154:5;156:24,24;
162:23;174:11;
187:24;207:18;
215:16;221:3;249:10;
255:25;267:23,24,25;
268:1,1;287:6;
288:18;292:25;297:1
**MAYSONET (119)**
1:2;3:5;13:8;5;
117:18;118:10;
119:11,23;120:15;
121:11,19;123:9;
124:13;138:17;139:3,
6;140:1;150:22,23;
181:7;182:7;184:21;
185:4,9,12,25;186:5,
7;187:11,15;188:14;
189:14;190:9;192:21;
193:3,13,21;195:7,14,
15,24;196:4,19;197:1,
13,18;198:20;199:11,
11;200:6;201:20;
205:6;208:22;214:12,
15,20;216:25;222:21;
224:4;227:17;232:1,
7;233:1,1;234:14;
238:7,24;239:1,6;
242:20;243:2;244:17;
245:3;248:8;249:18;
251:1,12;252:5,6;
253:3;256:7;257:4;
258:19;259:8,12,24;
260:7;261:3,5,20,23;
262:3,10,11;263:8;
272:7;273:1,9,10;
274:11,17,24;276:18;
279:17;285:7,9;
286:21,25;287:1,17;
288:1;292:15;294:11;
295:6,9,24;297:9;
298:25;299:6

**Maysonet's (22)**
180:23;182:10;
183:7;184:14;189:7,
22;228:7;231:20;
232:8;236:3;238:15;
241:16;245:10;
246:15;247:5;259:3;
262:23;263:18;
264:10;287:13,23;
300:15
**mean (138)**
26:10;33:22;35:19,
23;36:3;42:4;43:6;
47:23;48:19;50:5;
55:16;56:7;57:9,10,
18,21;59:7;61:4,24;
66:6,15,17;69:16,24;
70:2,5;73:9,20,23;
74:5,6,25;75:21;
76:21,22;83:16,23;
85:6;87:3;88:24;89:2,
6,10;90:15;97:2,23;
101:4;103:24;104:9;
105:7,21;106:24,25;
107:15;108:5;109:8;
110:10;112:20,22;
113:1;114:17;115:4;
116:3;119:6;121:19;
126:1,23,23;137:2;
139:12;147:4;152:17;
156:7,22,22;159:11;
161:17,21;162:7;
165:17,19;166:12;
169:20;170:13,20,24;
172:20;176:5,15;
178:3;179:15;188:21;
191:3,5,21;195:11;
202:8;203:19;208:12;
209:17,17;210:19;
217:6;219:20,21,22,
24;221:7,24;222:15;
224:25;225:7,7,8,12;
226:3,25;236:17;
238:18;246:15;
250:14;253:21,24;
254:23;257:20;264:6;
269:25;270:5;278:16;
289:6;292:10;293:19,
20;294:23;295:3,5;
297:4
**Meaning (2)**
88:10;201:16
**means (12)**
30:10;54:24;65:8;
66:22;122:17;140:11;
227:25;291:16,17;
295:1,1,4
**meant (2)**
77:16;164:22
**media (1)**
91:20
**medical (8)**
162:8,15,19,22;

164:5;243:8;293:10,
22
**meet (2)**
33:19;34:2
**meeting (1)**
34:20
**meetings (2)**
31:13,13
**MEHR (4)**
3:;6:1,1;302:2
**member (7)**
11:23;61:18,25;
62:2;231:20;232:1;
251:8
**members (12)**
119:14,16;131:19;
151:3,5,21;152:7;
193:15,16;195:17;
233:18;283:9
**memo (6)**
39:19,22;40:3,16;
87:23;207:25
**memorialize (5)**
85:12;207:2,13;
208:5;250:25
**memorialized (10)**
50:21;51:7;52:25;
55:21;88:6;205:18;
206:7;207:22;239:25;
240:13
**memorializing (4)**
55:25;205:15;
208:1;249:2
**memory (2)**
49:10;264:6
**memos (1)**
39:19
**men (4)**
97:11;98:13;
171:21;210:24
**mentally (2)**
107:3,8
**mention (10)**
95:22;120:5,7;
181:5,14;184:13,16;
187:14;212:5;297:4
**mentioned (5)**
14:8;168:18;182:6;
203:1;213:9
**merged (1)**
79:21
**ME's (3)**
156:6;163:9,10
**met (1)**
58:25
**methodology (3)**
111:8,9,11
**MICHAEL (4)**
2:;5:22;92:9;302:3
**michael@ilesqcom (1)**
2:12
**microfiche (1)**
42:7

**microfilm (1)**
42:7
**middle (3)**
65:17;142:15,17
**might (48)**
28:18;29:21;30:15;
51:5,5;54:10,12;61:2;
64:8,16;67:25;68:7;
69:11,23;70:4,22;
72:13;74:7,8,22;
77:10;87:4,22;96:23;
97:4;104:10,10;
105:8;106:17,20;
107:23;133:1;151:10,
16;153:9;155:2;
161:17;164:1;171:12;
207:5;221:4,25;
222:1;226:1;255:21;
257:2;292:23;293:23
**Mike (1)**
301:24
**millimeter (5)**
195:23;196:20,24;
197:2,3
**millimeters (1)**
192:17
**million (2)**
200:13;201:7
**Milwaukee (2)**
130:14;175:1
**mind (9)**
89:7,15;133:16;
198:19;224:7;227:6;
261:8;295:2;300:10
**mine (2)**
249:3;276:4
**Mingey (47)**
2:;119:12;120:23;
121:5;190:9;192:16;
194:6;195:5,14,22;
196:3,24;197:6,13,25;
198:21;199:12;200:2,
11,17;201:12,20;
204:11;207:21,24;
217:16;238:9;248:7;
249:4,17;250:24;
252:4,12;254:13;
256:1;258:19;259:25;
260:1,1;261:3,22;
262:4,12;272:22;
273:5;274:2;287:11
**Mingey's (7)**
192:9;196:18;
256:12;261:8;283:7;
291:12,18
**minimal (1)**
134:20
**minute (1)**
217:15
**minutes (4)**
68:10;129:11;
258:10;301:18
**Miranda (13)**

73:24;74:4,11,11,
14,20;77:2;118:8;
218:18;219:3,6;
220:9;222:25
**misconduct (4)**
76:24;77:16;
212:21;214:4
**misdemeanor (1)**
134:21
**missing (1)**
159:9
**misstate (2)**
126:9;213:23
**misstates (30)**
85:13;87:11;90:21;
104:17;117:7,14;
118:19;126:7;133:18;
179:23;180:16;
181:17,24;203:9;
207:16;213:22;
217:13;225:23;
226:12;229:12;
230:24;236:11;
246:19;249:23;
270:17,20;286:17;
290:1;291:1;295:22
**mistaken (1)**
209:13
**mistreated (1)**
242:3
**mistrial (1)**
102:7
**misunderstand (1)**
258:17
**mixing (3)**
170:16;192:1,4
**model (1)**
278:11
**modern (7)**
72:3;178:23;
260:23;264:25;
266:12;267:3;281:15
**modern-day (1)**
112:19
**module (2)**
21:1,3
**moment (2)**
46:24;229:23
**month (1)**
194:18
**months (17)**
12:18,19;18:6,20;
23:17;49:11;92:6;
101:2,4,4,5;178:2;
180:3;198:8,13;
259:9;263:1
**Montilla (6)**
2:;190:10;193:7;
208:5;238:9;252:5
**Moore (1)**
203:2
**more (41)**
13:14;17:5;23:15;

32:18;33:3;36:6;
37:20,20;38:15;
43:12;55:2;56:6,8;
60:8,11;69:9;76:20;
80:15;82:4;86:19;
93:10;103:25;105:9,
18;106:5;130:5;
132:4;134:6;137:3;
151:16;174:14,23;
189:4;224:13;225:19;
236:20;247:15;
262:21;277:1;283:11;
298:6
**morning (10)**
1:19;5:8,9;78:23;
79:3;144:17;152:14;
289:22,25;290:23
**MOS (1)**
25:5
**most (8)**
6:12;13:20,22;
20:11;23:4,4;170:21;
199:4
**mostly (6)**
19:11,17;20:15;
21:22;38:14;115:20
**motion (1)**
103:10
**motivated (3)**
149:2;231:16;232:6
**motivation (3)**
235:7,8,11
**motive (7)**
61:12,15,20;
131:18;148:20;
191:12;192:5
**motives (1)**
61:3
**mouth (1)**
77:14
**move (3)**
35:8,21;103:16
**moved (1)**
169:25
**moving (6)**
34:23;60:13;65:12;
261:17;262:2;299:12
**much (11)**
44:20;58:12;62:9;
63:6;77:20;84:24;
151:7;203:20;212:11;
244:16;280:24
**multiple (5)**
28:7;74:22;178:10;
237:17;250:9
**murder (17)**
75:24;91:23;
100:21;119:15;144:7;
179:8,9;193:16;
204:1;212:20;285:21,
23,24;286:3,23,25;
288:24
**murders (5)**

109:18;203:2;
263:8,18;272:20
**must (7)**
56:25;71:4,11;73:7;
119:19;192:8;193:20
**mute (3)**
40:13;226:6;259:21
**myself (3)**
20:17;28:23;271:14
**mystery (1)**
298:13

---

**N**

**name (16)**
5:10;29:13;92:10;
102:24;167:9;183:18,
22;185:14,19;186:8,
24;187:1;188:23;
277:9,16;283:15
**named (5)**
172:19;201:2;
242:15;257:7;282:23
**names (1)**
167:13
**NanoLabs (1)**
99:24
**narcotics (19)**
12:17,18,23;16:12,
14;18:1,3,10;19:9,25;
20:21;21:24;22:4,5,
13;23:3,17;24:12;
99:15
**narrow (1)**
189:5
**Nassau (1)**
45:16
**National (2)**
11:15;14:9
**nature (2)**
104:2;134:25
**near (4)**
67:9;161:19;
163:20;205:14
**nearby (1)**
153:20
**nearly (1)**
161:16
**necessarily (3)**
51:1;60:22;122:16
**necessary (1)**
84:17
**need (27)**
6:25;7:20;15:1;
30:25;54:5,13;56:13;
57:22;59:24;63:5,25;
71:20;72:4;73:10,16;
91:4;127:5,13,25;
139:16;140:10;183:1;
236:18;244:6;271:16;
286:19;288:14
**needed (1)**
15:13

**needs (4)**
  8:16;41:19;67:20;
  144:22
**negative (8)**
  66:4,13,14,22;
  150:2,4;157:16;158:7
**Negron (1)**
  175:11
**neighborhood (7)**
  65:2;79:5;94:19;
  99:10;151:13;191:8;
  260:11
**neighborhoods (2)**
  17:6;33:17
**Neither (4)**
  272:22;274:1;
  303:9,12
**neutral (2)**
  233:15;234:12
**New (50)**
  1:17;2:4,4;5:5;6:7;
  9:23;10:1,19,24;11:8,
  12;12:12,14;13:1,8;
  24:12;28:6;29:6;32:1,
  7;34:12;37:4;42:23;
  44:18;50:13;74:25;
  75:15;85:11;86:16;
  90:8,11;97:6,7;
  107:15;123:17,25;
  124:1,4,6,9,13,15,17;
  125:10;201:20;
  208:23;225:1;281:18;
  288:19,20
**news (1)**
  100:25
**next (21)**
  6:24;35:8;55:10;
  59:2,11,14,15;60:2;
  62:11,11;64:5;79:10;
  81:12;150:18;154:14;
  161:3;173:3,19;
  240:5;298:1,7
**nice (2)**
  250:7;287:9
**nickname (7)**
  169:17;172:11;
  184:22;185:5;186:12;
  187:17;282:22
**nicknames (1)**
  283:9
**night (7)**
  65:17;74:23;79:4;
  113:5;119:15;193:16;
  233:23
**nobody (3)**
  27:6;100:8;187:21
**Nobody's (2)**
  235:3;245:17
**None (4)**
  152:6;184:2;240:3;
  280:19
**nonexperienced (1)**
  37:23

**nonfatal (5)**
  184:18;189:23;
  259:6,7;261:6
**nonresponsive (2)**
  139:19;292:5
**nonsense (1)**
  231:7
**nor (7)**
  131:21,22;272:22;
  274:2;303:10,10,12
**norm (1)**
  246:6
**normal (3)**
  104:14;166:12;
  179:2
**NORTH (7)**
  1:;3:4;45:18;46:9;
  233:22;235:14;
  282:21
**Northern (3)**
  5:14;16:13;19:1
**Notary (2)**
  1:16;5:4
**note (5)**
  55:19;172:17;
  177:24;249:6,20
**notebooks (4)**
  40:5,21,21;87:21
**noted (1)**
  160:7
**notes (30)**
  1:14;39:15;57:14,
  19,21;87:20;112:4;
  165:23;167:24;
  173:16,22;194:11;
  195:2;205:14;207:25;
  238:23;239:17;
  248:17,19,20,21,22;
  250:16,17,18,21,22,
  23;252:15;301:19
**notice (1)**
  1:20
**noticed (1)**
  212:7
**notifications (1)**
  53:20
**notwithstanding (1)**
  88:19
**November (7)**
  175:21,25;176:3,
  10,14,21,23
**NUMBER (16)**
  4:;42:25;43:1,4,4,6;
  68:24;71:4;73:6,7,18;
  91:20;94:22;164:2;
  174:6;182:3
**numbers (2)**
  43:7;293:9
**numeral (1)**
  161:5
**numerous (1)**
  214:2
**NYPD (31)**

29:24;36:5;39:18;
40:22;42:16;43:20;
44:14;48:14,17,18;
56:14;79:17;84:22;
85:23;95:23;96:5,13,
20;97:5;98:17;
100:23;101:21;
105:19;110:22;
113:11;115:20,24;
125:8,19;224:16,21
**NYPD's (2)**
  35:16;80:19

## O

**oath (2)**
  5:6;280:20
**Obbish (1)**
  215:10
**Object (138)**
  17:9;22:22;27:12;
  28:9;34:17;35:10;
  36:11;39:3,24;41:15;
  42:13;43:17;49:21;
  51:22;53:4;56:4;
  63:16;65:20;71:2;
  72:21;74:18;75:5,17;
  76:12;77:25;80:7;
  81:22;82:12;83:8;
  84:19;86:20;88:1,7,
  22;89:25;90:13,25;
  91:7;96:11;101:12,
  19,25;102:9;103:5,
  22;104:7;105:4;
  106:14,22;107:21;
  108:1,12,24;110:8,17;
  111:5;113:12;114:6,
  13;115:23;124:5;
  125:17,22;126:21;
  128:24;133:17;136:8,
  13;140:16;150:3;
  157:25;175:23;
  188:11,19;189:18;
  194:8;196:11;200:23;
  201:8,15;204:16;
  205:21;206:19;207:7,
  15;208:16;212:8;
  213:12,21;214:8,21;
  215:13,17;216:22;
  217:12;218:11;
  220:12;221:1,17;
  223:16,21,24;227:20;
  228:16;230:23;
  231:10;232:11,23;
  234:18;235:9;237:14,
  25;238:16;239:2;
  244:20;245:15;246:8,
  12;247:12;248:10,18;
  252:9;256:6;257:10;
  258:22;261:11;
  264:12,23;266:25;
  268:23;276:23;279:3;
  280:10;282:24;289:1;

296:5;298:20;300:5
**Objection (78)**
  17:12;42:19;67:12;
  85:13;87:11;90:21;
  100:1,15;104:17;
  109:12;117:7,14;
  118:19;122:13,18;
  123:15;126:7;137:25;
  141:3;143:4;147:17,
  23;157:3;160:11;
  165:20;166:17;
  179:23;180:15;
  181:10,17,24;189:11;
  200:15;203:9,13;
  204:2;208:7;215:23;
  216:12;218:21;220:3;
  222:8;224:22;225:23;
  226:12;229:12;236:5,
  11;239:21;241:20;
  242:8,12,17;246:19;
  248:2;249:7,13,23;
  250:4;251:17,21;
  252:19;253:10,19;
  254:21;255:6;256:18;
  258:3;259:17;270:17;
  279:20;286:4,17;
  287:24;290:1;291:1,
  14;295:21
**objective (2)**
  78:10;292:14
**obligated (1)**
  166:15
**obligation (2)**
  224:19,24
**obligations (5)**
  86:25;87:16,25;
  90:6;225:15
**oblige (1)**
  87:25
**observe (1)**
  138:24
**obtain (1)**
  98:1
**obtained (3)**
  193:17;296:8,20
**obtaining (2)**
  69:17;130:16
**obvious (4)**
  223:8;236:18,25;
  242:2
**obviously (11)**
  6:14;11:21;81:25;
  82:24;103:16;137:13;
  151:6;158:18;162:15;
  169:23;199:21
**occasions (2)**
  94:23;248:9
**OCCB (3)**
  16:12;18:25;19:5
**occupants (1)**
  64:2
**occur (1)**
  120:15

**occurred (7)**
  32:13;117:6;153:4;
  177:25;189:9;191:10;
  299:13
**occurrence (1)**
  131:19
**o'clock (6)**
  79:4;144:17;
  154:21;168:13;
  171:22,22
**October (1)**
  10:3
**odd (2)**
  32:17;125:16
**off (23)**
  7:18;8:17;22:11;
  23:21;26:15;33:24;
  49:10;50:6;53:7,8;
  54:11;60:9;66:8;
  89:17;100:11;132:11;
  152:24;153:15;
  204:25;240:21;
  247:15;269:18;285:8
**offenders (1)**
  61:21
**offenses (1)**
  259:4
**offer (2)**
  145:1;301:6
**offered (2)**
  295:7;297:10
**office (9)**
  19:22;20:23;31:10;
  41:19;52:24;77:11;
  80:13;162:9;164:6
**officer (47)**
  6:8;9:23;10:24,25;
  11:3,9,25;12:1,2;16:6,
  18;18:4,12,18;19:25;
  25:20;26:1;30:9,16,
  20;32:24;33:4;37:8;
  39:2;40:3;42:23;
  44:24;46:10;75:1;
  85:23;88:14;101:22;
  125:11;127:13,23;
  128:6;132:4;180:9,
  11;202:11,15;203:23,
  24;206:25;215:20;
  286:15;303:1
**officers (26)**
  5:21;24:7;25:6;
  64:20,21;82:21;
  84:16;87:21,23;
  94:17;118:17;125:2,
  3;149:18;151:20;
  153:18;170:21,23;
  178:14;190:22;
  223:12;245:18;280:6;
  285:14;296:10;
  300:25
**officer's (4)**
  117:5,22;118:2;
  189:9

**official (3)**
70:21;82:15;87:20
**Officially (1)**
12:13
**often (3)**
16:6;74:15;105:20
**old (3)**
10:4;42:8;109:3
**older (1)**
278:11
**Once (9)**
11:13;70:18;75:13,
23,23,24;250:19;
254:7,8
**one (112)**
6:18;9:20;20:17;
21:2,6;31:4,16;35:2,
8;38:19,19;40:7;
42:17,21;43:19,20;
44:21;45:9,23;46:1,3,
3,25;47:13;49:12;
58:21;59:11,14,15;
60:20;61:25;63:13;
67:9;71:11;73:24;
75:11;81:5;82:17;
85:18;86:1,18;93:4,7;
113:10;137:14;
140:21,22;141:16;
145:7,10;146:7,18,24;
147:21;155:1,2,20;
156:19,19,25;157:12;
159:16;163:19;166:8;
167:2,13;169:15;
171:12;172:2,2,3,4,
17;173:3,20;174:6,9;
175:1;177:1;182:4,
17;185:8;191:19,24;
197:16;202:22;203:1;
211:19;214:11;215:1;
222:17;226:20,21;
227:18;231:6;237:19,
23;245:8;248:25;
252:4,11,16,17;254:9;
267:5;268:20;283:7;
285:14,16;286:23;
298:5,6
**ones (6)**
21:22;40:5;143:19;
164:16;177:5;254:10
**ongoing (2)**
11:19;27:20
**only (17)**
11:18;43:19;45:22,
25;55:6;64:4;69:11;
86:15;89:3;156:24;
180:11;212:24;
214:14,14;228:4;
248:16;255:18
**onset (2)**
295:6;297:9
**on-the-street (1)**
38:11
**onto (2)**

**55:20;137:19**
**opens (1)**
81:6
**operating (1)**
31:9
**operations (1)**
20:7
**opiates (2)**
157:16;158:7
**opine (2)**
109:17;301:13
**opinion (24)**
6:14;8:5;9:2,8;
109:23;110:3,14;
111:12,17;123:5;
145:1;211:23;246:22;
258:17;261:4,21;
268:19;275:6,7,9,10,
23;276:9;301:6
**opinions (1)**
56:8
**oral (11)**
193:21;194:1;
217:20;250:25;
251:18;253:16;254:6,
10,10;256:2;290:5
**order (10)**
48:5;63:4;82:1;
109:15;142:11;
152:24;198:5;209:11,
15;302:12
**Organized (2)**
19:6;152:23
**original (1)**
298:6
**otherwise (1)**
114:4;254:17
**out (117)**
16:6,17;19:17;
26:25;29:14;32:5;
38:17;40:23,24;
41:22;47:19;51:8,20;
52:21;53:6;56:3;
60:20;63:23;64:24;
71:16;72:17;73:16;
76:1;79:7;80:5,15;
81:12;82:15,20;86:3;
87:22;88:17;95:14;
97:19;101:2;106:5;
112:13;120:14;128:2;
133:22;134:3,12;
138:2;141:18;142:10,
14,21,25;143:7;
144:16;145:3,5;
149:19;151:6;152:8;
154:8;158:23;159:4;
160:3;161:23;162:7;
170:14;174:7;176:1;
177:16;183:15,23;
185:1,11;186:25;
188:23;192:8;196:10,
18,25;201:5;209:15,
18;210:6;212:24;

**217:3,18;229:20;**
231:15;233:9;239:16;
242:20;243:1;245:9;
246:25;247:4,15,24;
250:8;251:15;255:8,
12;262:18;269:10;
275:4,14;277:20;
278:10,20;279:19;
280:14;283:10,11;
284:25;287:22;288:1,
6,24;291:8;292:6;
297:2;298:13
**outline (1)**
60:16;147:13
**outside (4)**
11:11,18;159:17;
293:9
**over (32)**
7:14;8:10;19:14;
32:21;52:22;54:15;
83:1,7;88:13;89:20;
92:2;99:16;112:17;
137:18;159:12,14;
178:14,14;183:24,25;
188:16;194:17;
200:13;203:20,20;
212:11;213:19;
214:24;242:21;243:3;
265:1;301:18
**oversight (12)**
265:21;266:8,11;
267:4,8,9,11;268:5;
281:12,13;283:3,22
**overturned (1)**
212:23
**overview (1)**
60:16
**own (16)**
37:5;43:15;79:22;
82:9;87:22;178:9,11,
13,13;191:2;236:25;
241:7;244:7;250:7;
272:13;278:23
**owned (1)**
278:11
**owner (1)**
279:8
**owns (3)**
64:24;278:5,17

**P**

**PAGE (56)**
4:,2;6:20;48:10,10,
23;53:14;54:21;59:2,
3;63:9;9;65:12,25;
68:16;73:5,17;78:6,6;
79:10;91:13;94:5,6;
116:23;119:8,9,9;
129:15;137:18,19,20,
23;138:19,20;143:16;
149:6,7;155:14;
161:3;165:15;180:22;

**182:3,21,23;190:16;**
191:12,16;193:12;
205:10;208:21;
258:13;271:20;
272:13,15;292:8;
297:7
**pages (3)**
48:12;145:25;
211:18
**paid (1)**
201:5
**pair (1)**
198:6
**paper (11)**
14:20;29:7;50:21;
63:3;72:18;89:23;
90:3;100:6;211:18;
243:10;293:7
**paperwork (7)**
20:9;41:20;49:10;
57:24;73:2;166:9;
243:8
**Parabon (2)**
99:23;100:23
**paragraph (10)**
91:19;116:23;
131:1;208:23;272:9,
11,13,17;297:12;
298:1
**paragraphs (2)**
299:13;300:25
**PARALEGAL (2)**
2:;5:15
**parallel (1)**
42:17
**paramount (1)**
57:13
**paraphrase (1)**
68:25
**paraphrased (1)**
69:1
**parents (1)**
107:14
**Park (1)**
232:9
**part (55)**
13:8;20:5;21:8,9;
22:8;26:16;31:21,22;
54:18;56:21;62:8;
63:12,12;83:21;
96:18;97:2,25;
102:16;108:14;
112:16;125:5;128:5,
21;137:16;138:6;
141:17;144:2;145:2;
150:7;156:6;176:15;
196:23;202:9,9,11,16;
211:14;231:4;232:1;
235:1;245:11;246:2;
250:6,7,15;251:5;
260:13;266:9;268:10,
12;274:22;277:12;
279:19;296:1;297:23

**participate (2)**
22:20;102:19
**participated (1)**
23:2
**participating (1)**
180:8
**participation (1)**
205:24
**particular (5)**
52:11;111:12;
147:5;149:7;162:18
**particularized (1)**
12:7
**particularly (2)**
50:23;74:14
**parties (3)**
228:21;244:22;
303:11
**partner (1)**
36:18
**parts (1)**
247:10
**part-time (1)**
14:5
**party (2)**
64:17,17
**pass (1)**
22:10
**passageway (1)**
175:1
**past (11)**
9:19;49:11;62:21;
96:25;191:9;212:1,2,
6,10;261:1;281:15
**patrol (9)**
11:25;16:6,18;
23:23,23;24:2,6,8;
45:9
**patrons (3)**
153:21,21;154:4
**pattern (4)**
52:16;214:4;
257:21,23
**Paulnitsky (18)**
2:16;181:5,6;182:6;
183:11,23;184:22;
186:4,6;187:5,19;
188:9,13;234:25;
251:14;253:3;289:20,
21
**Paulnitsky's (1)**
185:25
**PC (2)**
2:;5:2
**PD (2)**
265:14;292:24
**pending (3)**
5:13;7:22;223:7
**pension (1)**
224:18
**people (5)**
13:24;17:23;21:10,
11,15;27:2;54:5;61:6;

79:12;80:3;86:25;
87:9;97:17;99:9,13,
14,18,20;134:15;
149:20;158:15;
159:17;184:24;
185:14;209:25;
216:25;218:19;
219:15;220:23,24;
221:11,13;222:12;
229:18;234:2,6;
238:19,20;242:10;
247:16;266:20;268:1,
11;269:11;271:2;
277:8;278:23;284:25;
285:2,11;294:4
**people's (1)**
213:5
**pep (1)**
244:14
**percent (1)**
225:12
**Perfect (2)**
47:20;208:10
**period (13)**
19:25;21:5;25:18;
32:15;34:7;70:18;
76:10;92:2;114:5;
115:17;214:5;263:21;
267:12
**periods (2)**
266:24;267:15
**perpetrator (2)**
62:1;64:16
**perpetrators (1)**
276:14
**person (24)**
7:10;28:12;55:12,
12;64:18;67:8;97:3;
100:21;104:13;105:3;
106:9;108:8;156:21;
159:7;180:14;186:20,
21,22;207:6;208:4;
248:16;278:4,17;
279:2
**personal (4)**
57:19;66:8;248:19;
250:16
**Personally (2)**
35:12;252:1
**personnel (4)**
31:11;36:8;77:4;
174:13
**phenotyping (4)**
96:14,21;99:23;
100:24
**phone (2)**
73:13;96:15
**phones (2)**
70:3;72:2
**photocopy (1)**
41:24
**photographed (1)**
130:11

**photographs (4)**
243:7;292:22;
293:8;300:19
**physical (21)**
105:12,14,15,17,22;
106:8;162:25;241:16,
19;242:1,2;245:10;
275:22,25;276:3,5,8;
278:18,20,22;297:16
**physically (6)**
181:6;214:17;
242:21;244:17;
294:10;300:23
**pick (1)**
188:23
**picked (3)**
185:1,11;186:25
**picks (1)**
36:22
**pictures (1)**
97:3
**piece (3)**
63:2;128:16;169:9
**pieces (1)**
140:13
**pistol (9)**
119:13,16;192:12,
24;193:14,17;195:16;
196:5,6
**pistola (1)**
184:10
**place (16)**
5:18;54:1;91:5;
107:24;122:12,16;
205:7,12;222:25;
229:15;253:7;254:16;
255:4;274:3;291:19;
303:7
**places (1)**
250:9
**Plaintiff (3)**
2:3;5:12;273:4
**Plaintiffs (3)**
1:6;231:5,6
**plan (9)**
56:7,11;70:16;98:1,
3,7,10,11,12
**plans (3)**
31:8;55:9;71:20
**plate (2)**
65:8,9
**plates (1)**
64:22
**plausible (1)**
252:18
**played (1)**
203:17
**player (1)**
214:19
**Plaza (4)**
42:6,9;92:14;95:14
**plead (4)**
201:13,21;202:1;

203:8
**pleaded (1)**
133:23
**please (12)**
6:18;55:15;160:17;
161:4;167:18;174:20;
244:1,8,12;269:22;
296:15;297:8
**PLLC (1)**
2:
**plus (4)**
31:8;36:19;139:13;
288:1
**pm (1)**
302:19
**point (40)**
52:1;53:25;54:6;
58:10,13;59:4;60:12,
15;68:5;82:3;89:21;
93:7;120:14;142:23;
153:9,19;160:22;
161:19;163:20;
170:22;176:7;197:7;
202:25;229:22;232:5;
234:11,22;237:6,11,
11,13,15;240:2,3;
246:21;247:15,24;
250:23;290:21;296:2
**pointed (10)**
56:25;60:20;63:23;
144:16;161:23;192:8;
196:18;257:8;284:25;
288:6
**pointing (5)**
246:25;247:4,19;
285:18;297:1
**points (3)**
56:24;147:15;
237:22
**Polaroid (1)**
241:25
**police (114)**
6:8;8:15;9:23;10:2,
12,19,24,25;11:2,9,
12,13,20;12:1,2,12,
14;13:1,8;15:12,13;
16:4,5;17:19;18:4,11,
17;19:25;25:5;26:17;
28:6,13;29:7;32:2;
34:12;39:2;40:3;42:6,
9,12,23;44:12,19;
47:3,13,24;53:18;
64:20,21;75:1;82:21;
84:16;85:11,23;87:8,
21,23;88:14;92:14;
94:17;95:14;115:2;
117:22;118:2,17;
125:2,3;129:17;
132:3;140:14;143:8;
151:20;162:6,10,16,
21;163:6,9;169:20;
170:21,23;177:23;
178:23;179:21;180:9,

10;181:1;189:9;
190:22;191:20;
202:11,15,16;203:23;
211:23;212:15;
215:19;224:14,18;
234:1;235:19;242:24;
243:4,19;245:14,18;
246:6;263:14;266:12;
267:3;280:14;281:23;
284:13;286:15
**policies (11)**
29:2;35:16;43:10;
48:13,15;71:14;
107:23;108:22;115:3;
194:21,23
**policing (6)**
17:6;19:14;112:19;
250:13;260:24;
264:25
**policy (14)**
13:7,11;34:13,19,
25;35:4;39:18;40:22;
48:23;49:18;53:23,
25;85:10;198:16
**Pontiac (1)**
278:12
**pool (1)**
61:21
**portion (2)**
283:6;296:19
**position (2)**
225:20;292:7
**positions (3)**
10:21;16:22,23
**Positive (1)**
157:18
**possession (4)**
135:4,6;196:4,5
**possibility (12)**
188:6,7,17;251:16,
19;252:4,11,16;253:2,
18;254:9;256:5
**possible (20)**
35:18,19;43:12;
60:21,22;61:21;62:1;
72:14;73:3;74:4,12,
22;77:20;79:13;
134:4;180:18;188:21;
194:16;251:23;255:4
**possibly (3)**
61:20;267:17;
278:20
**postdated (2)**
165:24;166:2
**potential (2)**
83:1;192:10
**potentially (3)**
180:13;203:8;223:6
**PowerPoint (32)**
4:;14:17;15:5,9;
25:8,19;47:7,16,22;
53:15,24;54:6,22;
59:3;62:12;63:10;

67:6;68:16,17;73:5,
17,21;78:7;91:12;
93:17,22;94:7;95:21;
112:17;178:13;
203:21;250:7
**practice (10)**
35:4,6,15;36:7;
47:3;143:9;214:4;
243:5;245:14;246:6
**practices (7)**
29:2;35:16;177:23;
179:21;180:11;
194:21,23
**preceded (4)**
60:4;217:8;236:3;
289:16
**Preceeo (2)**
154:13;171:11
**precinct (16)**
16:7,14;20:10;24:9;
30:12;31:14;36:14;
37:3,5,16;38:14;43:2;
44:25;92:17,19;99:11
**precincts (3)**
45:2;99:5,5
**predates (1)**
87:3
**predict (1)**
204:5
**predominantly (1)**
10:25
**prefer (10)**
149:21;169:22;
171:2;179:12,13,15;
194:24;206:9;249:25;
284:3
**preferable (1)**
285:22
**preferences (1)**
179:16
**preferred (3)**
150:5;280:3;291:21
**prelim (1)**
77:9
**preliminary (1)**
53:18
**premise (1)**
105:10
**prepare (3)**
148:2;249:21;
252:14
**prepared (28)**
15:8,9;26:18;47:8,
25;73:22;129:17;
142:7,8,24;143:11,15,
23;144:11;146:12;
148:11;164:10,19;
165:5,11;168:4;
177:19;194:1;239:18;
250:24;272:19;
273:15;296:10
**preparing (6)**
47:21;49:12;117:4;

144:6;213:2;253:14

**present (4)**
53:22;212:3;
287:17;297:15
**presentation (19)**
4:;14:17;15:6,10,
21;47:8,17,22;48:11;
53:24;73:22;93:17,
22,23;94:7;95:21,25;
112:17;178:13
**presentations (1)**
47:12
**presented (2)**
136:15;230:21
**presently (2)**
46:24;200:22
**preserve (3)**
49:1,18;87:19
**preserved (6)**
39:11,14,20;69:18,
19;71:13
**press (1)**
152:14
**pressure (1)**
106:9
**pretrial (2)**
23:11;255:11
**pretty (11)**
44:20;63:6;157:23;
158:3;160:2;161:10,
11;212:11;220:1;
250:9;265:18
**previously (1)**
112:1
**principle (1)**
48:23
**principles (1)**
48:24
**print (2)**
41:22;80:15
**printed (3)**
47:19;75:25;82:15
**prior (14)**
82:10;132:14;
144:11;160:22;248:9;
262:23;273:3;274:11;
282:12,12;290:4,9,14;
291:7
**priority (1)**
78:18
**prison (2)**
103:13;208:25
**prisoner (5)**
99:5;196:21;
246:11;293:23;
300:23
**prisoners (2)**
20:10;191:4
**private (1)**
63:5
**privileged (3)**
46:22;100:18;
147:18

**proactive (1)**
26:2
**proactively (1)**
17:6
**probable (20)**
75:2;251:15;253:8;
254:14,19,25;255:2,
11,15,18,20;256:1,3;
287:22;289:5,9,24;
290:22;291:8,9
**probably (20)**
8:22;15:12;20:23,
24;32:17;78:23;79:6;
84:4;99:10;129:6;
156:13;174:14;
200:20;219:25;
221:16;224:19;269:8;
276:15;283:11;290:3
**probative (2)**
131:3,15
**problem (5)**
15:3;72:1,20;99:3;
284:10
**problems (2)**
151:12;152:7
**procedure (1)**
199:22
**procedures (2)**
71:9;265:4
**proceed (2)**
69:21;300:9
**proceedings (2)**
1:14;303:6
**proceeds (1)**
41:21
**process (10)**
20:9;42:3;51:9;
75:24;111:18,20;
118:9;141:13;145:2;
238:6
**processed (3)**
20:10;130:10;
260:10
**produce (1)**
106:19
**produced (3)**
14:17;89:4;93:22
**product (2)**
147:18,20
**profession (1)**
113:7
**professional (5)**
91:13,18;92:22;
109:24;244:11
**proficiency (5)**
246:15,18;247:11,
20;248:1
**profile (6)**
70:21;91:13,18,20;
92:22;203:1
**program (1)**
13:9
**progress (5)**

137:12;139:13;
164:9,14;165:18
**progresses (1)**
68:1
**project (1)**
62:24
**prolonged (1)**
50:23
**promise (1)**
240:8
**promoted (8)**
12:20;16:16;18:8;
19:10;20:19;23:17;
37:25;43:21
**promotion (4)**
12:20;43:23,24;
44:4
**promptly (2)**
272:5,23
**pronounced (1)**
154:14
**propensity (2)**
211:12,13
**proper (11)**
48:2;57:1,5;112:1;
113:10;114:11;
140:17,19,23;216:5,8
**properly (7)**
8:6;9:4,6,9;71:7,21;
112:14
**property (2)**
73:15;193:8
**proposition (1)**
89:24
**prosecute (2)**
124:19;255:13
**prosecuting (1)**
127:24
**prosecution (2)**
22:25;126:13
**protect (8)**
91:5;219:5,18;
220:23,24;221:6,11;
224:14
**protected (1)**
138:4
**protection (3)**
209:11,15;218:25
**protections (1)**
107:24
**prove (1)**
51:2
**provide (5)**
111:3;115:8;
154:23;235:7;239:9
**provided (9)**
111:16;118:17;
129:14;131:9;137:7;
153:15;237:23;238:3;
297:11
**proximity (1)**
197:4
**Public (4)**

1:16;5:5;13:15;
70:22
**pull (7)**
15:2;94:14;143:7;
157:5;166:20;182:1;
250:8
**purportedly (2)**
196:8;278:10
**purpose (11)**
15:9;47:21;137:23;
140:5,25;141:10,12;
221:11;247:23;276:7;
300:13
**purposefully (2)**
98:6,7
**purposely (2)**
40:25;91:2
**purposes (3)**
49:13;80:25;236:9
**pursuant (1)**
1:19
**push (1)**
190:17
**put (35)**
41:22;42:16;57:1;
58:22;70:1;72:7,22;
77:13;82:20;85:4;
89:23;90:2;107:23;
112:6;115:24;150:4;
160:13;167:19;
169:19;173:7,16;
177:9;185:10;187:5,
15;193:18;197:8;
198:24;210:14;211:4;
212:5;213:5,17;
221:25;300:21
**putting (8)**
83:4;139:9,11;
198:15;210:8;228:14,
20;267:11
**puzzle (1)**
140:13

## Q

**qualified (1)**
47:2
**quality (5)**
77:17,19,24;78:11;
216:21
**quarrel (2)**
248:5;258:18
**Queens (16)**
16:6,10,17;23:25;
38:8;45:5,13,17,18,
23;46:1,3,8,8,10;
95:14
**Queens' (1)**
203:4
**questionable (1)**
98:14
**quick (2)**
249:3;258:10

**quickly (1)**
297:8
**quite (2)**
93:12;183:12
**quotations (1)**
193:19
**quote (2)**
272:5
**quote/unquote (1)**
272:21

## R

**races (1)**
97:17
**racial (4)**
96:6;101:9,15,22
**radio (2)**
65:10;152:13
**ramifications (1)**
255:4
**rank (9)**
11:13,24;18:17;
25:16,20;52:10;
92:14;95:6;127:23
**ranks (1)**
44:18
**rap (4)**
131:24;132:6,8;
134:20
**rapist (1)**
61:8
**rapport (1)**
105:6
**rather (6)**
51:11;132:19;
170:6;172:21;178:4;
284:1
**rationale (1)**
275:15
**Ray (1)**
17:20
**reach (2)**
109:22;110:13
**reached (1)**
131:14
**reaching (2)**
110:7;111:12
**read (43)**
26:13;50:1;74:10,
11,20;86:22;112:3,6;
114:21;115:3;124:17;
125:5;136:18;159:24;
160:25;175:24;
176:11,13,18;181:22;
183:6;191:20;230:5;
240:22,24;241:8;
247:14;259:18;
263:24;264:4;266:14;
268:15;272:12,14;
274:15,20,22;280:25;
282:3;283:6;296:23;
297:1;302:5

Maysonet v.
Guevara

Richard Rudolph

**reader (2)**
65:8,9

**reading (7)**
55:22;138:15;
147:2;268:25;269:19;
272:10;273:12

**ready (1)**
51:9

**real (1)**
52:17

**realize (2)**
253:6;259:3

**realized (2)**
254:12,13

**really (35)**
13:24;17:4;32:7;
36:4;40:1;43:7;48:21;
84:21;85:1,3,6,7;
88:14;122:23;134:20;
136:1;142:11;162:12;
179:16;198:20,21,21;
207:12;208:12,13;
210:14;220:15;
222:18;224:3;237:3;
248:24;255:15;280:7;
287:8;295:19

**reason (14)**
51:16;107:20;
126:16;151:14;
152:20;195:22;
196:18;207:9,12,19;
225:5;227:15;234:1;
265:4

**reasonable (2)**
239:19;285:3

**reasons (2)**
49:17;197:16

**recall (11)**
76:14;158:25;
160:6;165:12;177:6;
191:23;200:5;264:11,
13;268:20;269:1

**recanvass (6)**
79:11;150:9,11;
270:12,21;271:9

**recanvassed (1)**
270:6

**recanvassing (1)**
267:14

**received (3)**
10:23;11:8;238:15

**recently (1)**
212:24

**recess (5)**
68:14;135:9;205:4;
258:12;301:21

**reclusive (1)**
103:25

**recognize (1)**
185:20

**recollection (2)**
49:14;165:14

**recommended (1)**

12:19

**reconcile (1)**
238:14

**reconciling (1)**
248:25

**reconvicted (1)**
227:17

**record (23)**
5:19;66:16,17;67:1;
81:1,17;106:3;
167:16;180:16;
181:18,25;205:1;
207:16;230:24;232:5;
236:25;267:7;270:18,
20;287:9;290:2;
291:2;295:22

**recorded (18)**
217:23,25;218:1,3,
4;253:25;256:10;
290:6,8,9,11,12,13,14,
16,17,18,24

**records (3)**
8:15;71:7;210:20

**recover (2)**
284:13,14

**recovered (7)**
33:19;100:24;
130:12;131:5;154:2;
192:11;276:12

**re-engineering (1)**
45:8

**Reeridge (1)**
92:9

**re-evaluate (1)**
70:14

**refer (4)**
8:20;81:15;124:2;
165:18

**reference (5)**
81:7;82:6;115:21;
148:12;167:6

**referenced (1)**
81:3

**references (3)**
115:24;164:25;
165:2

**referencing (4)**
40:17;81:1;138:22;
169:16

**referrals (1)**
77:6

**referred (2)**
81:24;187:6

**refers (1)**
54:25

**reflect (1)**
237:1

**reflected (2)**
15:22;130:7;
168:22;264:8

**reflects (1)**
150:19

**reframe (1)**

6:19

**refresh (2)**
49:13;165:13

**refuse (1)**
255:13

**refused (2)**
124:19;125:4

**refusing (2)**
89:23;90:12

**regarding (4)**
111:3;115:9;161:6;
275:24

**regardless (4)**
113:15;198:9;
216:2;260:7

**regards (1)**
276:1

**regular (3)**
31:22;53:8;87:22

**regularly (1)**
71:1

**reiterate (1)**
53:15

**reject (1)**
28:3

**relate (2)**
6:14;73:19

**related (4)**
20:12;167:24;
191:13;228:9

**relates (4)**
15:21;33:1;78:10;
275:10

**relationships (1)**
98:14

**relative (2)**
303:10,12

**release (2)**
77:10;208:24

**relevance (8)**
108:25;204:3;
208:25;209:2;211:3,
7,8,16

**relevant (8)**
51:2,5,21;114:4;
115:17;211:23;214:5;
293:4

**reliable (1)**
133:8

**relied (5)**
109:24;110:4;
111:14;137:9;138:13

**rely (3)**
139:20,21,23

**relying (6)**
72:25;131:6;139:5,
9;231:13,14

**remain (1)**
38:11

**remained (4)**
38:3;83:3,6,20

**remaining (1)**
66:3

**remember (38)**
29:13,16;58:2;
82:19;87:4,14;94:24;
102:2,5,7,24;125:2;
128:1;132:11;135:2;
155:6,12;156:13;
160:1;166:3,7;
183:10;227:21;
261:24,25;266:16,20;
268:24,24,25;269:15,
19;272:1;273:22;
283:12;289:18;
294:22;298:9

**reminder (1)**
7:6

**removed (1)**
38:10

**render (4)**
9:2,7;268:19;276:9

**rendered (2)**
6:15;275:9

**rendering (2)**
246:22;275:24

**repeat (3)**
57:11;165:8;177:1

**repeated (1)**
262:6

**repeating (3)**
291:23;292:1,4

**repeats (1)**
236:24

**rephrase (3)**
11:5;189:19;228:17

**Report (158)**
4:,;8:17;9:17;28:13,
16;43:11,13;50:9;
84:24;86:6;91:11,13,
14,16;94:14,17;
109:16;110:14;112:4;
115:25;117:4,8,10,17;
118:20;119:10;120:5,
13;121:6;122:5;
129:23;130:2;135:14,
23;136:2;137:8,11,
13;138:14;139:22;
142:6,8,24;143:11;
144:7,11,16;145:3,13,
13,19;146:2,6,16;
147:4,5,6,8,22;148:5,
10,12;149:7,7;
150:18;151:19;
152:25;153:4,8;
155:25;156:2,6,9,15,
17,20;157:2;158:11,
22;159:12,13;160:8,
10,19,22;162:7,20,23;
163:10,10;165:3,18;
166:10;167:6;168:3,
7,21,22;170:24;
172:16;175:5,17;
177:19,24;178:1,6;
179:4,10;180:23;
181:13;182:7;184:15;

187:5;190:15;191:17,
21;205:6,10;207:22;
210:20;211:19;212:7;
213:2;239:17;243:22;
248:17;249:21;
250:24;253:15;
258:14;259:8;262:7,
15;268:22;269:2,13;
270:10,24;271:19,23;
272:16,18;273:15,22,
24;275:24;292:9,18;
297:20;298:2,8,16,22,
23;301:4,7,14

**reported (19)**
89:18;100:9;
101:22;117:20;
118:11;121:7;131:4,
7;160:4;161:6,25;
169:8;186:4;196:3;
217:16,20,22;292:23;
303:6

**Reporter (10)**
1:16;7:2;40:4,23;
41:1;114:21;239:24;
240:12;247:2;302:16

**reporters (2)**
40:20,21

**reporting (3)**
90:20;250:23;
266:24

**reports (61)**
26:17,18;27:15,17,
19,23;34:2;39:2,6;
41:9;42:12,18;49:12,
13;55:23,25;85:5;
86:4;96:8;117:12,13,
20;118:11,16;121:14;
132:4;136:3,19;
139:13;143:14,23;
144:18;145:8;146:11;
155:4;156:1,4;159:2;
161:24;164:9,15;
169:14,21;173:15,17;
181:1;189:10;191:20;
193:25;194:5;205:15;
216:17;252:14;
263:14;269:24;270:3;
288:22;297:21;298:4,
7,13

**report's (1)**
8:10

**represent (2)**
5:12;201:2

**represented (1)**
67:6

**reprosecute (2)**
203:5;227:3

**request (8)**
197:8;198:15,25;
200:3,4,4;260:19,23

**requested (1)**
198:2

**require (1)**

180:11
**required (2)**
53:20;88:20
**requirement (1)**
84:15
**requires (1)**
87:9
**reserve (1)**
302:8
**reserved (1)**
117:2
**residential (1)**
79:5
**resources (4)**
13:15;34:23;83:16;
238:19
**respect (1)**
56:8
**respond (2)**
114:18;166:11
**responding (4)**
17:2,4;143:18;
162:1
**response (4)**
14:18;53:18;
204:13;292:4
**responses (1)**
65:18
**responsibilities (7)**
19:24;21:4;25:23;
26:17;30:20;33:1;
68:18
**responsibility (7)**
18:11;22:14,16;
31:22,23;32:3;41:14
**responsible (15)**
33:5,7;39:5,7,9;
41:8;56:15,16,18,19,
20;97:8;212:18;
230:19;232:8
**rest (1)**
301:3
**resubmission (1)**
28:18
**result (3)**
95:5;212:20;251:18
**results (10)**
59:10;66:5,14,14,
22;150:2,5;199:25;
260:15;269:15
**resumes (1)**
135:11
**retained (8)**
8:1,3,4;9:2,7;46:24;
109:17;127:6
**retired (7)**
11:20;30:5;46:12;
202:19,20;203:18,24
**retirement (1)**
224:20
**retrial (2)**
201:14;223:14
**retrieve (1)**

196:14
**retrieved (1)**
119:16
**returned (1)**
10:16
**reversed (1)**
203:4
**review (19)**
8:4;26:6,9,17;28:2,
16;52:23;55:5;67:16;
70:23;71:1;81:14;
112:7,10;143:6;
147:6;165:10;194:6;
230:2
**reviewed (9)**
27:19,23;110:13;
111:20;112:7;148:5,
6;156:12;292:12
**reviewing (13)**
31:7;33:1,2;71:19;
111:23;120:22;121:3,
4;122:21,24,25;
143:10;214:6
**reviews (4)**
70:9,20,21;91:9
**rewrite (1)**
47:14
**REYNALDO (2)**
1:8;2:10
**RFC (1)**
270:23
**RFC-1 (1)**
141:25
**RFC-Maysonet (7)**
145:12,24;146:18;
149:8;152:25;157:9;
158:6
**Rich (1)**
203:5
**RICHARD (2)**
1:7;4:3
**Richard's (1)**
170:17
**Rick (1)**
85:22
**Ridgewood (1)**
30:13
**ridiculous (1)**
236:18
**right (490)**
8:1,16;9:19,24;
10:16;11:7,9,25;
13:25;14:7,12,16,24;
16:24;17:7,11;18:15,
18,24;19:20;23:10,16,
18,25;25:13,22;
26:23;27:21;28:8;
29:4,19,25;30:3,23;
34:8;36:2;37:12;
39:20;40:23;43:9,23;
44:15;45:23;46:1,15;
47:3,5;48:7,15;49:3,
15;50:10;51:21;52:3;

54:5,19,21;56:3,13;
57:3,6,15,25;58:6;
59:2;60:4,10,18;
61:13,22;62:2,14;
63:7,22;64:3,12;65:5,
11;67:15;69:18;70:4,
6;71:15;72:4,20;73:1,
23;74:17;75:4,15,19;
77:3,18,24;78:12,15,
18,25;79:1,13,15;
80:20;82:22;83:21,
24;84:6,18;85:20,21;
86:2,6;87:1,16;91:3,
10,14,21;92:2,12,21;
93:13,17,22;94:15,18,
21,21,23;96:7;97:8,
12;99:3,21;102:11;
103:12;107:20;
108:15;109:8,9,19;
112:18,23;113:2;
114:9;116:2;117:2,3,
11,23;118:13,18;
120:2,3,6;121:10,23;
122:12;123:2,14;
124:10,22;125:2,16;
126:6,17,18,24,25;
127:2,11;128:9,9,18;
129:18,24;130:21;
131:8,11,15;132:15;
134:3,3,21,25;135:5;
136:4,12,19;137:13,
20;139:8;140:2,14,
15;143:1;144:1,23;
145:17,22;146:10,14,
22;148:11,13;149:2,
14,20;150:2,9,15,21;
151:8,17,22;152:2,5,
9,15;153:1,5,22,25;
154:4,9,14,15,21,22;
155:3,14,18,22;
156:24;157:16,21,24;
158:5,8,16;159:16,19,
22;160:5;161:10,16;
162:2,6;163:17;
164:8,11,24;167:13,
23;168:4,11,15,18;
169:2,6,12,21;170:5,
18;171:5,23;172:6,8,
9,15;173:1,10,22;
174:1,4,10,13;175:5,
17,22;176:4,7,10,22,
22;177:7,10;178:16;
180:1,24;182:4;
185:13;186:5,13,15,
18,22;187:2,3,7,9,12,
18,23;188:6,8,10,18;
189:10,17;190:12,19,
22;192:4,14,17,25;
193:9,23;194:18,25;
195:9,17,18,19,24;
196:6,10,16,20;197:3,
9,14,19;198:3,11,25;
199:19;202:1;203:2;

204:7;205:2,8,16,20;
206:1,13,18,21,22;
207:10,14,20;208:15,
19;210:1;211:15;
213:10,16;217:11;
218:10,17;219:10,23;
220:6,7,10,17;221:5,
16,22;222:2,6,18,24;
223:1,1,2,8,15;225:9,
10,11,14,21;226:4,8;
227:10,14,22,23;
228:6;229:1,7,15;
230:2,22;231:9,25;
232:10;233:24;234:7,
22;235:15;236:4;
237:7;238:9;239:12,
20,25;242:14;244:7,
25;246:7,18;247:6,11,
16,18,20;248:9;
250:20;251:16,20;
252:8,18,21;253:5,7,
9,12,18;254:2;255:9,
12,16,22,25;257:9;
258:8;259:4;260:12;
261:10,16;262:8,13,
16;265:1,19;269:4;
271:4,6,8,10,12;
272:13;273:17,20;
274:6;275:16,20;
276:22;278:6;279:9;
280:2,13;283:17;
284:4,19;285:1,4;
286:25;289:15;290:6,
17;291:6,13,22;
292:15;295:10;
297:20;298:11,19;
299:10,14,23;300:4,
11,16;301:17,20
**rights (7)**
125:4;214:24;
218:19;219:4,19;
222:25;294:12
**rival (2)**
62:2,3
**river (2)**
19:19,19
**robbed (1)**
131:18
**robberies (4)**
22:10;31:4;86:4;
134:13
**robbery (9)**
38:19;52:16;79:2;
133:15,16,22,23,25;
134:11
**ROCK (1)**
2:
**Rockaway (1)**
45:6
**rocket (1)**
206:15
**role (2)**
102:11;203:17

**roll (2)**
26:5;31:11
**rolled (1)**
144:4
**Ronald (1)**
2:
**rookie (1)**
85:16
**room (4)**
8:23;102:14;
245:19;254:1
**Rosa (4)**
138:16;139:7;
140:2;234:13
**Rosario (11)**
86:16,18,25;87:2,3,
5,15,25;88:5;89:2,21
**routine (2)**
31:24,25
**RUDOLPH (34)**
1:7:4:,3;5:8;6:3;
14:19,19;48:11;
53:15;54:22;59:3;
60:13;63:10;65:12,
25;68:15,17;73:6,18;
78:7;85:22;91:16;
127:13,23;135:13;
160:18,21;203:6;
205:5;242:19;244:5,
15;258:13;301:23
**Rudolph-1 (4)**
4::47:6,7,16
**Rudolph-2 (3)**
4::91:12,16
**Rudolph-3 (2)**
4::141:23
**Rudolph-4 (2)**
4::160:19
**rule (2)**
29:1;75:16
**run (2)**
277:24;284:10
**running (3)**
67:20;81:12;98:20
**runs (1)**
64:18
**Russo (11)**
58:2,18,24;72:19;
92:8,9,13;94:2;95:3,
11;264:7
**Russo's (1)**
291:12

**S**

**safe (1)**
106:18
**sales (1)**
134:24
**same (45)**
6:19;7:17;32:25;
79:9;83:7;92:13;95:6,
13;104:13;106:20;

108:6,6,7;113:20,24;
119:8;133:13,15;
153:1;169:5;195:7,
12;217:2,4,17;219:7,
9;224:3;254:2;
256:24;257:15,17,21,
22,23;258:6;270:3,5;
271:1,1;283:21;
291:25;292:2,4;
294:21
**sample (1)**
99:7
**samples (2)**
99:15,16
**Sandra (1)**
152:3
**save (2)**
39:17;41:6
**saw (12)**
28:17;88:11;94:24;
165:4;183:17;187:5;
195:4,10;208:1;
233:12,16;234:15
**saying (89)**
31:23;49:24;58:9;
77:16;84:21;85:10;
87:7,13;89:14,16;
90:17;95:10;97:25;
98:9;100:20;107:25;
108:11,13,16,21;
109:7;115:4;121:22;
122:2;125:19;144:8;
156:19;158:14;
162:11,12,14;169:15;
172:4,5,18;176:11;
185:3,7,11;186:23;
187:4;188:3;189:3,4,
6;198:18;199:9,10;
202:15;203:7;208:9;
210:10;211:11;
220:22;222:17;
226:15,18;227:14,21;
234:25;235:16;237:2,
19;239:1;240:9;
243:9,13,21,22,23;
245:5;256:15,21;
259:18,24;260:18;
266:20;267:1,2,7,20,
21;268:3;270:5,20;
273:14;274:23;
293:15;298:5
**scale (5)**
21:23,24;22:4,17,
19
**scan (1)**
41:5
**scanned (1)**
39:16
**scenario (5)**
107:12;125:14;
128:1;129:1;134:16
**scenarios (1)**
252:3

**scene (23)**
26:24;33:15,18;
51:15;62:13;63:21;
64:10,16;67:10;
116:20;130:10,10,11,
25;131:2,5,14;
148:13;154:1;174:13,
22;272:21;273:20
**scenes (1)**
260:17
**SCHALKA (4)**
2:;5:22,22;302:6
**scholarships (1)**
11:15
**school (1)**
10:12
**science (1)**
206:16
**Scope (1)**
108:4
**screen (2)**
15:2;166:25
**scroll (4)**
138:25;161:2,13;
167:18
**search (13)**
130:24;131:1;
276:15;286:8,10,13,
16,19;287:3,13,13,22;
288:11
**searching (1)**
241:24
**seasoned (2)**
198:1;252:12
**second (19)**
53:16,16;102:16;
155:20;158:4;167:3;
182:4,13,17;189:1;
202:21;211:7;217:6;
228:15;244:7;251:9;
285:16,16;299:13
**seconds (1)**
166:22
**secret (1)**
270:10
**sect (1)**
277:23
**section (34)**
53:16;54:23;68:18;
78:8,10;116:3,6;
130:21;136:17;134:4,
5,8,10,10,18;138:5,
14;153:4;218:14;
246:14,21;247:24;
258:13;261:17;262:3;
271:21;275:5,24;
276:8;295:18;296:8,
18;299:25;300:7
**sections (1)**
116:18
**secure (1)**
72:5
**secured (5)**

39:11;71:8;119:13;
193:14;195:15
**security (5)**
66:13,25;69:11;
70:3;72:2
**seeing (3)**
162:17;173:15;
273:22
**seek (2)**
258:20;260:3
**seem (4)**
53:11;213:5;
258:17;261:18
**seemed (2)**
148:1;172:3
**seemingly (1)**
171:21
**seems (4)**
159:16;174:15;
199:18;300:9
**self-incriminating (1)**
222:11
**self-incrimination (3)**
220:10,25;221:12
**self-preservation (1)**
257:20
**self-serving (1)**
288:6
**sell (1)**
178:12
**selling (1)**
135:4
**send (1)**
26:14
**senior (1)**
37:20
**sense (11)**
55:7;106:18;154:2;
174:14;185:12;188:1,
3;206:16;208:10;
249:4;259:14
**sent (4)**
23:22;42:6;101:18;
102:2
**separate (5)**
34:3;41:7;43:15,20;
58:22
**separated (1)**
27:9
**September (1)**
110:15
**sequence (1)**
78:17
**sergeant (62)**
12:20;15:25;16:16;
18:8;19:10;20:19;
23:17,20,23;24:2;
25:16,17,21,24;26:22;
28:16;29:3;30:10,16;
31:4;38:12;52:9,11;
54:11;119:12;120:23;
121:5;190:9;192:9;
194:5;195:5;196:3;

197:6,13;198:21;
199:12;200:2,11,17;
201:12,20;204:11;
207:21,24;238:8;
248:6;249:17;250:24;
252:4,12;258:19;
259:25;260:1;261:3,
8,21;262:4,12;
272:22;287:10;
291:11,18
**sergeants (4)**
28:2;31:3;38:18,24
**series (1)**
294:21
**serious (7)**
74:14;131:23;
134:24;243:15;
265:18;292:21;293:6
**serve (2)**
49:13;193:8
**set (4)**
110:14;215:1;
224:7;303:7
**Seton (2)**
13:5,9
**setting (1)**
31:8
**settled (1)**
201:4
**seven (4)**
22:24;67:17;70:9,
12
**several (2)**
100:12;248:9
**shame (1)**
24:18
**share (2)**
160:18;166:25
**shared (1)**
286:24
**sharing (2)**
48:21;272:15
**sheet (3)**
82:18;132:6;134:20
**sheets (2)**
131:24;132:9
**shell (4)**
130:13;259:5;
260:6,16
**shells (1)**
199:23
**shield (2)**
12:21,23
**shipped (1)**
16:17
**shirt (1)**
186:9
**shooter (1)**
257:7
**shooters (2)**
257:9,18
**shooting (38)**
60:6;61:6;64:18;

79:2;88:12;119:20;
138:24;154:18;
184:18;189:23;190:8;
191:13;192:2,5,6,12,
14;193:20;195:8,24;
196:10,20,24,25;
197:17;198:24;230:9,
14,20;234:2,20;
251:8;260:8;261:6,6;
269:3;273:16;274:6
**shootings (8)**
15:16;22:9;25:5;
26:25;36:16;38:16;
196:15;197:9
**shoots (1)**
108:6
**shoplifted (1)**
108:7
**shoplifting (1)**
61:5
**shot (3)**
129:21;163:24;
287:17
**shots (1)**
171:23
**shoulder (1)**
54:15
**shouted (1)**
234:7
**show (10)**
93:24;127:13;
133:2;141:15;165:15;
202:16;209:4;222:3;
224:19;247:10
**showed (3)**
149:23;209:6;228:1
**showing (1)**
222:18
**shows (6)**
156:20;211:9,11;
232:6;239:17;247:19
**siblings (1)**
233:17
**side (7)**
8:17;24:23;51:19;
55:3;74:13;173:7;
230:22
**sidewalk (1)**
129:22
**sign (2)**
26:15;89:19
**signature (1)**
302:8
**signed (3)**
100:11;242:2,4
**sign-off (7)**
28:3,4,5,12,20,23;
31:3
**similar (1)**
86:18
**similarly (1)**
108:22
**Simonsen (1)**

203:2
**simple (2)**
76:20;165:22
**simply (3)**
56:10;90:12;210:9
**single (14)**
42:11;81:4;125:11;
137:20;177:15,24;
178:1;214:19;215:3;
249:6,20,21;264:20;
283:15
**sister (5)**
154:19;167:22;
169:17;171:15;
172:18
**sisters (2)**
158:14;171:20
**sit (6)**
50:1;56:7;145:6;
232:4;253:6;279:22
**sits (1)**
71:25
**sitting (2)**
214:2;270:15
**situation (2)**
106:25;210:17
**situations (1)**
151:17
**six (3)**
22:24;134:11;
149:12
**skeleton (1)**
147:12
**sketch (1)**
96:22
**skimmed (1)**
9:19
**skinny (1)**
40:16
**sky (1)**
66:19
**slang (2)**
29:17;43:4
**slapping (1)**
106:9
**slide (1)**
15:20
**slides (2)**
48:10,12
**slogans (1)**
234:6
**slow (1)**
36:21
**slowed (2)**
93:14,15
**slower (1)**
32:20
**smaller (1)**
40:5
**smeher@hinshawlawcom (1)**
3:6
**snap-outs (1)**
42:5

**snippets (1)**
154:23
**so-called (4)**
96:21;166:15;
194:1;217:11
**solely (1)**
22:13
**solid (1)**
203:25
**solve (4)**
34:9;35:5;51:2;
264:17
**solved (4)**
33:8;35:17,24;36:1
**somebody (42)**
15:13;22:8;34:1;
50:1;51:9;61:4;71:24;
80:12;89:6;102:2;
104:10,22,23;105:6,
16;107:2;108:6;
124:6;133:5;147:9;
151:25;152:8;156:18;
168:20;170:11;179:7;
180:7;186:19,19;
187:25;188:2;218:6;
219:12;237:21;
255:16,18;257:25;
260:19,22;284:20;
288:17;292:23
**somebody's (5)**
73:13;75:23;
156:23;191:6;242:23
**someone (29)**
41:14;58:2;61:24;
64:8;75:2;76:4,8,10;
89:5;104:6,14;
106:17,21;107:8;
125:10;126:3;133:16;
134:1,5,6;183:18,19;
206:5,16;216:18;
218:9;219:24;224:14;
257:7
**someone's (6)**
75:13;105:1;124:3;
133:12,14;284:18
**Sometime (2)**
176:4;269:8
**Sometimes (21)**
19:16;28:22;35:25;
36:1;41:18;50:7,10,
22;51:4;52:1,19;
53:10;55:21;69:11,
12;199:4;209:21,25;
210:1,2;298:15
**somewhere (6)**
18:23;38:5;80:13;
151:23;172:16;
288:18
**soon (10)**
72:14;73:3;74:4,12,
21;81:5;180:18;
236:23;260:20;261:7
**sorry (49)**

9:18;11:6;13:21;
16:5,19;23:9;25:6;
35:12;40:12;45:24;
49:23;50:5;55:14;
60:9;62:22;63:19;
74:5;76:17;80:17;
92:12;93:2,18,19;
96:2;99:2;104:3;
105:18;114:8;123:7;
130:25;136:10;
142:12;143:9;159:8;
162:13;171:6;182:14;
190:5;197:12;213:25;
226:7;253:1;256:11;
263:6;273:11;275:1;
284:7;299:6;302:10
**sort (6)**
40:15;60:16;79:24;
104:1;160:3;262:13
**SOTOS (3)**
2:;5:1;8:2
**sought (4)**
261:22;272:6,23;
274:2
**soul (1)**
178:12
**sound (4)**
227:16;235:6;
241:15;268:17
**sounded (6)**
154:24;155:1,8,17,
21;156:20
**sounds (4)**
21:5;90:24;104:25;
243:23
**source (3)**
115:15;296:8,20
**sources (2)**
115:19;137:9
**South (6)**
23:24;45:13,15,18;
46:9,10
**Southern (2)**
15:11;47:24
**spaced (1)**
137:20
**Spanish (6)**
19:22;99:12,13;
155:12;184:9;190:10
**Spanish-speaking (1)**
193:8
**speak (7)**
6:25;48:16;67:8;
75:2;79:12;107:14;
193:2
**speaking (7)**
13:15;151:5;
155:11;190:10;255:5;
259:13;262:1
**specialist (1)**
282:11
**specialty (1)**
14:8

**specific (13)**
34:25;76:14;
119:12;137:3;139:16;
153:24;166:8;218:23;
262:4,21;294:16,18;
297:1
**specifically (5)**
47:14;50:19;68:16;
130:13;294:15
**specifics (1)**
266:21
**speculating (1)**
277:6
**speculation (12)**
128:25;160:12;
203:13;215:24;
218:22;221:18;222:9;
239:3,22;253:20;
268:9,12
**spent (2)**
9:22,22
**spills (1)**
137:18
**spiral (3)**
40:4,19,21
**split (8)**
45:12,17,22,25;
46:4,5,7,8
**spoke (12)**
58:24;71:17;80:23;
233:3,3;246:17;
247:1,3;258:19;
261:3;265:8;301:2
**spoken (1)**
71:24
**spot (1)**
297:1
**squad (46)**
25:13,13,20,24;
26:4,22;27:6,7;28:1;
30:9;31:17;32:5,6,6,
25;35:6;36:13,15,19,
21,25;37:1,3,4,5,9,11,
15,17;38:4,13,18,22;
43:2,7;44:24;45:10;
46:1,5;64:23;69:2;
92:17,20;102:14;
112:8;184:19
**squads (3)**
32:3;45:11;46:8
**squeezing (1)**
106:10
**St (2)**
10:10;13:3
**stabbed (1)**
107:3
**stabbing (1)**
64:18
**stamp (1)**
167:16
**stamped (7)**
14:18;48:11;54:22;
68:17;145:25;149:8;

155:15
**stand (7)**
57:17;18;58:12;
125:12;189:24;222:1;
301:11
**standard (10)**
79:25;109:21;
110:6,11,12,16,19;
111:3,7;114:3
**standards (10)**
113:8;114:11,15,
23;115:8;178:9;
206:4,13;245:13;
267:19
**standing (1)**
129:22
**stands (2)**
29:15;160:3
**start (15)**
6:3;33:15;46:16,16,
17;93:20;105:10;
113:11;137:22;
146:24;183:2;217:19;
238:19;268:4;297:7
**started (15)**
5:17;11:21;15:12;
16:13;17:20;19:1;
40:2;83:11;85:3,25;
86:8;112:2;113:13;
135:18;144:4
**starting (4)**
129:12,15;145:11;
153:9
**starts (5)**
43:1;137:18;
138:23;146:17;
183:24
**State (8)**
1:17;5:5;7:6;13:8;
90:7,10;97:7;163:20
**statement (28)**
103:17;126:22;
179:11;193:21;194:1,
16,17;207:22;210:18;
239:24;240:1,12;
244:3;249:18;253:22,
25;254:2;255:12;
256:9;257:2;258:1,7;
288:6;292:17;293:5;
299:2,22;300:4
**statements (40)**
138:16;139:2,3,6,
14;140:1,8;179:25;
180:12;199:12;
217:20;234:10,13;
238:8,23;240:4;
249:2;251:1,19;
252:6,15;253:17;
254:7,10,10;256:2;
257:19;259:3,25;
285:10;288:16,23;
290:3,4,5,24;291:9;
297:14;300:3,15

**STATES (2)**
1:1;219:2
**stationhouse (3)**
76:1;185:10;186:25
**stats (2)**
96:1,3
**statutory (1)**
90:10
**stay (2)**
78:5;244:11
**steady (1)**
53:7
**stenographer (1)**
256:10
**stenographic (1)**
1:13
**stenographically (1)**
303:6
**step (17)**
51:4;57:14;58:11;
59:13,14;60:2;61:19;
73:4;122:12,16;
140:18,19,23;141:16;
178:15;188:4;264:21
**step-by-step (1)**
50:3
**STEPHEN (2)**
3:;6:1
**STEPHENSON (1)**
302:18
**steps (71)**
8:6;9:5,8;15:17;
33:24;49:7;50:20;
54:2,10,14;55:4,8,10;
56:20;59:5,10;60:3,
17;62:18;63:14;70:1,
15;71:21;72:8;77:5;
79:19;81:17,19;
83:14;84:13;109:15;
112:14,16;113:14,19;
114:24;115:12,15,16,
22;117:17;119:2;
121:3,5;122:4,10;
123:1;141:16;149:18;
178:4,6;216:1,5;
233:7;250:2,6,10;
263:21;264:3;265:1,
5,11,25;267:6;279:6,
16;280:17;281:13;
283:23;289:4;295:23
**Steven (1)**
301:24
**stick (3)**
137:4,5;171:18
**still (25)**
18:17;23:20;30:1,3,
5,9;38:4,8,14;41:6;
42:8;47:9;51:7;54:8;
88:20;134:13,14;
173:10;202:18;
203:19;210:8;217:4;
244:11;256:13;299:6
**stop (24)**

17:7,10,15,16,16,
20,21,21;58:3;94:14;
95:4;118:22;129:8;
143:20,20;161:3;
174:20;175:9;183:14;
203:18,23;236:14;
243:25;289:15
**stopped (1)**
33:12
**store (1)**
183:16
**stored (2)**
71:8,13
**stories (2)**
256:21;257:14
**story (6)**
217:2,4,17,18;
254:23;257:4
**straight (3)**
240:22,25;278:25
**Street (16)**
2:;3:4;16:9,11,19,
24;17:1;19:18,18;
27:5;38:17;63:5;
66:25;171:11,21;
277:16
**streets (2)**
23:21,21
**strictly (1)**
196:2
**strike (12)**
34:5;45:24;52:8;
97:24;121:20;133:13;
177:17;190:5;217:9;
268:7;285:12;301:4
**stringent (1)**
86:19
**stuck (1)**
196:25
**student (1)**
10:8
**students (1)**
13:22
**study (2)**
10:9;13:6
**stuff (10)**
31:9;85:16;86:4;
139:16;174:3;178:25;
184:6;206:12;265:20,
23
**subcategory (1)**
68:20
**subject (2)**
126:13;138:7
**subjects (1)**
20:6
**submit (2)**
26:12;41:2
**submitted (15)**
43:14;55:4;99:8;
145:14,15,20;146:2,7,
8,17,21;150:19;269:2,
9;270:4

**subpoena (3)**
14:18;219:16;
221:22
**subpoenaed (1)**
221:23
**subsection (1)**
135:24
**subsequent (1)**
225:20
**substantial (1)**
205:23
**subtle (1)**
236:20
**successful (1)**
78:23
**sudden (2)**
74:10;184:3
**sued (5)**
200:20;212:22;
224:25;226:1,11
**suffered (1)**
245:10
**sufficient (1)**
287:21
**suggest (5)**
61:25;267:17;
270:10;274:19;
300:10
**suggested (1)**
228:22
**suggesting (4)**
179:20;214:18;
226:9;259:11
**suggestion (1)**
56:10
**suggests (2)**
151:19;278:9
**suitable (3)**
272:21;273:20,24
**Suite (6)**
2:,,,3:;5:3
**summarize (1)**
16:3;135:24;211:19
**summarized (3)**
153:3;205:5;211:18
**summarizing (5)**
136:17;138:8;
141:2,5,11
**summary (7)**
116:10;129:14,16;
137:7,10;139:7;141:1
**superficial (1)**
279:25
**supervise (8)**
31:18;32:10;48:3,5;
80:5;92:8,15;95:10
**supervised (3)**
34:1;102:13,13
**supervising (7)**
24:6;41:11;48:7;
52:7,11;74:3;108:18
**supervisor (22)**
12:9;24:22;27:9,11;

53:21;54:8,12,15;
55:22;56:12,16;
58:18;67:16;73:7;
81:14;95:1;248:7,12;
264:15;265:8;266:8,
11
**supervisors (14)**
34:3;53:17;54:4;
56:25;58:19;68:19;
69:1;71:4,11;76:23;
78:4;80:4;81:11;
84:23
**supervisor's (2)**
15:17;48:4
**supervisory (5)**
91:9;267:4;268:5;
281:11;283:22
**supplemental (4)**
112:3;297:21;
298:22,23
**supplementary (1)**
298:4
**supplied (4)**
110:2;296:11,15,23
**support (4)**
292:14;293:17,21;
300:20
**supporting (2)**
136:21,23
**supposed (2)**
29:1;55:8
**suppress (1)**
103:16
**suppressed (2)**
255:22;276:16
**suppression (3)**
91:6;103:10;241:9
**Supreme (1)**
219:3
**sure (44)**
6:23;15:11;27:1;
30:2;34:22;39:12;
45:20,21;54:16;
55:13;57:19;66:1;
67:23;68:7;69:2;
71:20;73:24;74:2,4;
75:7;77:4,6;78:14;
82:5;88:9;96:3;
125:18;132:16;
147:20;158:2;160:2;
176:23;177:7;190:23;
193:6;194:23;218:15;
220:1;250:9;261:8;
262:20;268:2;269:21;
277:19
**surmising (1)**
185:20
**surrounding (1)**
99:4
**surveil (1)**
98:13
**surveillance (2)**
21:6,8

53:21;54:8,12,15;
55:22;56:12,16;
58:18;67:16;73:7;
81:14;95:1;248:7,12;
264:15;265:8;266:8,
11
**susceptible (1)**
151:17
**suspect (12)**
74:6,7,8,10,16,20,
21;94:15,22;96:22;
99:24;106:7
**suspected (1)**
109:7
**suspects (6)**
21:13,17,20;33:20;
107:25;277:13
**suspicions (4)**
94:3,13;95:4;149:1
**suspicious (3)**
207:5,8,11
**swaps (1)**
99:6
**sweater (1)**
183:20
**swing (2)**
52:21;53:6
**swings (1)**
72:17
**sworn/affirmed (1)**
5:4
**synopsis (3)**
116:6,8,14
**system (20)**
29:7,8,14,16,24;
41:13;42:11,18;
55:14,18;79:20;
80:21,22,23;81:1,3,
21;82:11;212:16;
213:20
**systems (2)**
42:17;91:5

**T**

**tactics (2)**
106:16,20
**talk (37)**
52:14;55:11,12;
56:2,2;57:19;58:5,17,
23;62:12;63:11;64:1,
9;77:7;83:14;93:16;
105:7;149:19;183:4;
190:4;198:9;199:7,9;
206:11;218:24;
227:22;239:9;244:14;
259:8,12;269:11;
270:14;271:2;276:6;
278:16;281:6,17
**talked (19)**
44:20;51:14;55:18;
64:13;69:10;70:3;
72:2;99:20;110:20;
116:19;144:21;
199:10,11;208:22;
213:9;217:16;227:4;
245:24;270:2
**talking (51)**
7:14;48:14;65:13;

85:15;89:1;90:6;95:2;
  98:18;109:2;112:15;
  119:4,6;126:2;
  134:17;136:24;
  137:17;138:18;156:8;
  158:10;162:19;
  168:20;174:25;
  178:17,24;180:6,7;
  184:9;187:3;190:7;
  191:15;192:1;196:19;
  198:14,15;220:21;
  227:2;235:7,8;
  250:12;254:6;263:2;
  265:19,22;266:3;
  272:1;278:19,23;
  288:9;291:6;298:3,7
**Tapkowski (1)**
  148:11
**targeted (1)**
  131:21
**TARU (1)**
  73:14
**task (3)**
  92:18,18;93:11
**tasked (1)**
  112:13
**taught (1)**
  86:16
**tavern (2)**
  153:20;154:3
**tcarney@rfclawcom (1)**
  2:23
**teach (3)**
  37:22;93:24;110:21
**teaching (1)**
  47:15
**team (3)**
  20:5,7;100:19
**technicality (1)**
  227:17
**technique (6)**
  84:4,11,15;96:10,
  12;101:11
**techniques (12)**
  78:9,15;79:16,24;
  80:3,10,18;81:20;
  83:3,6;95:2;178:24
**technologies (1)**
  83:5
**technology (3)**
  82:24;97:6,6
**telling (13)**
  56:12;94:12;138:9;
  162:22;184:7;202:21,
  22;247:8,9;278:25;
  287:4,10,21
**tells (2)**
  220:19;227:7
**Ten (1)**
  49:25
**tendencies (2)**
  209:6;213:7
**tends (2)**

116:25;216:18
**tenets (1)**
  86:1
**tens (1)**
  211:17
**term (2)**
  42:3;103:20
**terms (2)**
  72:22;138:22
**terrible (1)**
  89:17
**terribly (1)**
  30:13
**territory (4)**
  148:24;192:23;
  197:5;228:6
**test (1)**
  261:25
**tested (1)**
  199:24
**testified (9)**
  23:8,11;117:18;
  127:18;134:15;
  230:20;239:11;
  280:19;301:8
**testifies (1)**
  5:6
**testify (33)**
  22:25;49:15;101:7;
  125:5,20;126:5;
  127:14,17,21;128:6,
  14,17,23;145:7;
  201:13,25;202:10,17;
  203:6;219:11,11,15;
  220:24;221:3,14,21,
  23;222:5,13;224:19;
  225:16;244:1;283:13
**testifying (4)**
  203:24;220:16;
  222:12;225:13
**testimony (33)**
  8:19;23:5;85:14;
  87:12;90:22;101:1;
  104:18;117:15;
  121:16,18;127:25;
  133:18;150:14;
  177:22;179:1,24;
  189:8;192:9;203:10;
  206:3;215:11;225:24;
  226:13;229:13;
  236:12;241:8;245:10;
  269:10;283:7;286:18;
  289:18;301:15;303:5
**testing (4)**
  95:23;259:15;
  261:21,23
**Thanks (1)**
  248:23
**theorized (1)**
  273:5
**theory (2)**
  88:15;186:11
**thereafter (1)**

180:10
**therefore (3)**
  293:12,12,14
**THERESA (3)**
  2:;5:24;301:24
**thinking (4)**
  37:19;154:5;184:4;
  236:24
**third (4)**
  116:23;131:1;
  251:10;299:16
**though (15)**
  23:5;35:1;45:21;
  77:9;103:14;112:22;
  153:12;169:9;184:10;
  190:19;205:12;
  217:21;272:18;
  277:18;288:16
**thought (21)**
  40:12;123:17;
  127:18;141:6;153:11;
  155:12;158:16;
  169:24;170:2,5;
  184:17;192:20;
  210:21;211:4;226:22,
  22;227:10;257:24;
  258:25;263:3;287:20
**thousands (2)**
  112:8;211:17
**threatened (1)**
  211:8
**three (15)**
  35:25;70:9,12;
  72:17;91:19;138:23;
  140:21;175:1;178:2;
  206:7;207:2;226:19;
  247:16;270:3;284:25
**threw (1)**
  209:18
**throughout (9)**
  7:21;8:19;49:2,19;
  52:5;57:2;74:25;
  178:5;301:2
**throw (3)**
  35:7;40:23,24
**throwing (1)**
  184:4
**thrown (6)**
  133:22;134:3,12;
  209:15;255:8,12
**thumb (2)**
  41:23;72:7;75:16
**Tiderington (5)**
  259:10;261:19;
  272:4;273:13;274:1
**Tiderington's (5)**
  248:6;258:17,18;
  271:18,22;272:16
**ties (1)**
  93:25
**till (2)**
  252:22;295:25
**time-consuming (1)**

198:7
**timeline (1)**
  139:1
**timelines (2)**
  140:8,8
**timely (11)**
  69:4,8,17;70:6;
  71:6,12,22;72:10,12;
  249:2;250:11
**times (18)**
  23:13;54:4;61:4,5,
  7;74:23;127:19;
  146:13;174:1,2,8,11;
  178:10;218:19;
  221:20;248:21;
  257:17;262:6
**Tino (2)**
  254:1;258:5
**tired (1)**
  296:16
**title (1)**
  15:5
**today (23)**
  5:15;7:22;8:19;
  49:25;57:24;65:3;
  67:7;83:17;85:20;
  113:21,25;120:12;
  145:6;148:3;160:23;
  206:14;232:5;264:25;
  265:8;282:4,6;301:8,
  15
**today's (5)**
  69:9,10;250:13;
  260:23;266:12
**together (7)**
  32:6;93:25;110:3;
  140:13;169:9;229:20;
  257:22
**told (19)**
  89:6;105:24;127:4;
  147:25;184:24;
  193:13;196:13;200:6;
  223:9,11;232:15;
  239:8;256:20;262:4,
  12;280:8;281:1,4;
  288:4
**took (28)**
  53:2;58:11;79:17,
  21;92:3;97:10,16,16;
  99:13;112:4;122:12,
  16;126:16;205:7,12;
  215:25;221:7;225:6,
  9;249:4;260:16;
  264:8;288:17;289:4;
  294:13,14,18;295:4
**top (10)**
  33:24;40:19;65:9;
  81:25;82:3,8;132:11;
  142:15;143:16;
  168:14;247:15;
  269:18
**Torrence (3)**
  129:21;157:15;

161:7
**toss (1)**
  40:22
**tossed (1)**
  210:6
**total (1)**
  46:24
**totally (6)**
  33:23;35:24;83:12;
  104:23;112:20;
  253:21
**touch (1)**
  188:23
**touched (1)**
  258:16
**towards (5)**
  13:13,13,24;
  142:16;209:6
**towel (1)**
  35:7
**tox (8)**
  155:4;156:1,17,20;
  158:18;161:24;
  162:14;163:6
**toxicology (7)**
  156:4,8,15;157:2,6;
  158:13,13
**track (4)**
  18:14;83:15;
  140:14;238:19
**tracked (2)**
  99:17;185:9
**trail (2)**
  243:10;293:7
**train (2)**
  15:13;54:5
**trained (2)**
  86:24;87:8
**training (12)**
  10:23;11:2,8,11,19,
  19;12:7;14:8;80:2;
  109:25;110:23;
  111:15
**transcribed (2)**
  7:1;247:2
**transcript (1)**
  303:5
**transferred (4)**
  16:8;24:15;38:6;
  268:2
**transpired (1)**
  189:7
**transporting (1)**
  20:9
**traveled (1)**
  257:21
**treat (2)**
  107:11;200:19
**treated (1)**
  294:2
**treatment (2)**
  293:11,23
**trial (31)**

23:6;34:4;41:13,21;
49:8;51:9,13;72:20,
23;101:6,7;102:3;
103:7,9;121:15;
123:18,25;124:1,4,7,
9,13,15,17;125:11;
201:20;202:10;
208:23;214:16,20;
241:7

**trick (1)**
164:22

**trickery (2)**
106:12,13

**tried (11)**
97:5;112:6;145:4;
238:4;241:14;262:25;
280:6;293:16,19,20,
22

**trier (3)**
117:2;210:4;243:11

**tripping (1)**
114:15

**true (12)**
59:17;97:18;133:8;
211:5,6;228:13;
242:20;243:1,2;
290:7;295:14;303:4

**truly (1)**
208:13

**trust (6)**
121:23;216:9,10,
11,14,14

**truth (2)**
216:19;256:16

**try (27)**
7:17;36:10;60:1;
63:4;67:8;98:15;
99:15;118:6;149:9;
151:9,21;182:5;
193:2;260:5;264:16;
269:11,14;270:11;
271:4;277:1;278:16;
279:1;280:21;281:6;
285:21,25;286:1

**trying (22)**
22:3;49:10;62:6;
67:16;106:1,5;138:2;
139:18;154:8;171:19;
176:18;190:17;
216:24;235:4;244:5;
246:24;254:24;
276:11;279:25;
284:21,22;300:19

**tunnel (6)**
262:2;275:5,7,11,
12,15

**turn (4)**
51:5;74:8,21;292:6

**turned (1)**
184:5

**turns (7)**
51:20;74:10,16;
239:16;242:20;243:1;

245:9

**Twenty-five (1)**
157:14

**twice (2)**
94:25;217:16

**two (61)**
12:20;18:6;31:3;
35:25;38:18,24;45:9,
10;46:7;48:12,12;
53:3;71:10;134:11;
140:9,12;155:9,17;
158:23;159:4,7,15,17;
163:7;167:22;168:19;
169:14;171:4,9,20;
172:17;180:3;182:14;
185:15;196:9;197:9;
198:22;201:3;208:24;
210:24;214:11;
220:19;226:22;231:6;
233:21;237:2;251:13;
252:3;256:12;259:4;
266:6,23;267:15,15;
273:5;274:13;285:17;
290:5;291:9;299:12;
301:18

**type (18)**
17:3;26:12;50:19;
52:19;53:13;55:19;
58:19,20;63:2;96:22;
106:8;155:21;163:1;
194:25;206:20;
207:20;247:22;
292:22

**typed (7)**
52:23;53:11;144:3,
9;195:1;206:10;
252:21

**types (1)**
33:1

**typical (1)**
65:9

**typically (37)**
21:16;28:2,21;
30:15;33:15;34:20;
36:13,20;37:13;
39:15;40:4,15;41:4,
17,25;49:23;50:3,18;
52:14,19;54:25;
56:14;58:19;59:9;
64:15;67:14,21;70:7,
9;72:15;73:3;75:14,
23;77:7;86:3;93:9;
125:25

**typing (7)**
49:25;144:4;206:13

---

**U**

**Uh-hmm (4)**
83:25;120:4;149:3;
157:17

**Uh-huhs (1)**
6:25

**uh-uhs (1)**
7:1

**ultimate (3)**
39:1;111:12;119:5

**ultimately (5)**
123:1;173:16;
189:15;245:2;299:2

**unable (1)**
128:22

**unconscious (1)**
163:21

**unconsciousness (1)**
161:20

**uncover (1)**
292:14

**under (22)**
5:6;43:3,5;56:24;
76:19;86:25;87:9,10;
89:2,21;90:7;126:4,5,
19,20;135:23;221:22;
222:21;223:14,19;
224:4;280:20

**undercover (1)**
20:4

**undercovers (1)**
20:8

**understandable (1)**
7:15

**Understood (5)**
7:16;84:16;87:15;
258:24;267:10

**uniform (2)**
39:23;40:2

**unique (5)**
13:10;35:24;36:4;
59:21;78:3;109:5;
115:6

**unit (13)**
16:9;19;22:5,14;
23:3;25:1,12;27:21;
36:5;248:7;281:24,
25;282:3

**UNITED (2)**
1:1;219:2

**units (2)**
69:2;282:8

**universally (1)**
215:20

**University (4)**
10:10;13:9;19:15;
47:24

**unknown (2)**
131:18;148:21

**unlawfully (1)**
251:14

**unless (3)**
126:19;222:10;
301:9

**unlicensed (1)**
96:21

**unnecessary (1)**
242:13

**unofficial (1)**

70:20

**unrelated (1)**
190:8

**untrue (1)**
225:13

**unusual (3)**
248:6,11,15

**up (93)**
6:23;10:11;15:2;
16:12;18:23;26:7;
28:19;29:22;31:8;
32:8,22;35:14;36:22;
37:21;38:24;41:1;
43:2;49:9,25;51:12;
52:23;53:11;55:9;
58:4;61:4,5,7;64:22;
65:14;66:19;67:20;
81:6;99:14;102:17;
105:16,20;110:3;
111:17;112:5;114:16;
120:10,13;122:4;
127:13;138:6,8;
144:9;157:5;161:13;
164:2;166:20;168:14;
169:1,23;170:16;
172:9;175:4;182:1,
20;186:9,12;192:1,4;
201:21;202:16;
206:10;207:20;217:6;
222:3;224:19;232:20;
235:14;238:5;241:4;
244:21;251:18;
254:15,24;256:8;
259:7;267:25;268:4;
269:21,22;270:1;
272:8;276:10;282:20;
288:8;289:4,5;
293:15;294:4

**update (1)**
52:12

**upon (1)**
41:2

**upstairs (1)**
64:6

**upwards (1)**
212:19

**use (26)**
29:24;30:3;34:23;
40:7,8,16;41:13;
43:16;48:20;64:21;
80:10;81:7,11;82:2,
20;97:5;100:5;
103:20;105:12;
109:21;114:24;
115:19;190:25;
192:24;198:1;255:25

**used (31)**
19:6;38:20;41:23;
46:3;78:11,15;96:20;
106:17;107:17;110:1,
6,19;111:7,11,16;
112:1;114:14;115:3,
11;190:18,22,23;

195:8;8,9,23;248:21;
278:5,24;287:19,20

**U-shaped (1)**
64:8

**using (5)**
30:1,5;100:23;
171:14;191:2

**usually (8)**
21:1;23:5;27:25;
41:18;53:6;64:21;
70:19;72:17

---

**V**

**vacant (2)**
129:23;154:15

**vacated (7)**
123:14;189:16,23;
202:25;209:16;
212:20;229:9

**vacation (3)**
28:22;267:25;
268:11

**vague (5)**
83:8;91:7;96:11;
101:19;201:15

**vaguely (2)**
102:4;283:12

**value (8)**
130:19,22;131:13;
251:13;252:8,16;
277:3;286:15

**various (2)**
81:19;300:25

**vehicle (16)**
64:13,15,24;
257:22;276:2,11,12,
14;277:2,11;278:5,
13;279:7;280:5,18;
288:2

**vehicles (1)**
31:12

**Veras (2)**
268:16,17

**Veras' (1)**
268:21

**verbatim (1)**
240:12

**verbiage (2)**
191:2;298:15

**verifiable (1)**
132:5

**verify (2)**
71:5,11

**version (7)**
117:22,23;118:2,
12,17;189:7,9

**versions (3)**
117:5;186:17,18

**versus (6)**
86:11,25;87:1,10;
89:22;108:20

**Vetrano (2)**

91:23;93:6
via (1)
    1:17
Vice (1)
    233:18
vicinity (1)
    154:15
victim (10)
    60:21,24;61:10;
    62:7,10;67:23;
    100:24;113:24;
    134:18;163:1
victimology (1)
    134:17
victims (14)
    130:12;151:7;
    154:5;155:5;156:4;
    163:7,15,22;167:13;
    171:5;174:16;191:13,
    18;228:1
victims' (1)
    150:20
victim's (2)
    61:3;96:14
video (8)
    33:18;66:13,25;
    67:2;69:11,13,16;
    72:2
videoconference (1)
    1:17
violate (1)
    246:5
violated (2)
    150:1;209:11
violence (6)
    16:25;61:18;
    209:23;210:11;
    211:12,13
violent (6)
    38:15;52:17;
    190:11;191:7;209:6;
    211:10
vision (6)
    262:3;275:5,7,11,
    13,15
voice (2)
    155:20,21
voices (3)
    158:15,23;159:5
volumes (1)
    182:14
voucher (1)
    73:15

                W

wait (9)
    7:13;181:10;
    198:12;199:7,9;
    202:21;253:6;259:7,
    11
waiting (5)
    7:18;198:14;

199:25;261:19;
    288:10
walk (2)
    130:3;240:7
walking (5)
    123:12;183:24;
    184:1,2;240:4
warrant (9)
    180:13;276:15;
    286:13,16,20;287:3,
    13,23;288:11
warrants (2)
    286:9,10
Washington (3)
    16:12;18:23;19:22
waste (1)
    270:15
watching (1)
    267:5
way (48)
    29:1;37:21;41:12;
    42:2,9,16;48:2;54:6;
    55:25;72:4;76:4;
    83:12;96:25,25;
    104:9;112:4;131:25;
    132:9;135:16;142:14,
    18,25;156:15;167:7;
    171:12;177:18;
    178:19,22;179:2;
    194:5;201:25;206:1,
    6;210:22;231:8;
    238:17;244:10;
    250:13;253:15;
    256:22;259:18;
    261:25;264:24;
    274:15;279:22;
    290:16;294:21;301:5
ways (1)
    255:14
weapon (9)
    285:21,23,24;
    286:3,7,23,25;287:18,
    18
weapons (1)
    184:7
wearing (2)
    174:6,16
Wednesday (1)
    1:18
week (3)
    52:22;69:12;262:18
weeks (6)
    12:20;18:6;71:25;
    198:8;206:7;207:2
weight (5)
    133:15;210:8,14;
    213:5,17
weren't (15)
    18:9,15;21:16;
    26:21;126:20;153:13;
    155:11;180:1;218:3;
    223:14,19;260:15;
    290:9,11;293:21

What's (35)
    43:25;45:13;50:2,8;
    68:8;70:16;73:11;
    89:7,15;97:18;
    103:19;117:10;
    138:18;140:19;168:6;
    206:23,25;209:7;
    210:17;211:3,16;
    213:14,25;224:4;
    227:6,14;232:18;
    238:20;246:21,22;
    265:12;266:4;268:13;
    277:9;281:5
whatsoever (5)
    51:6;98:4;194:4;
    266:5;268:7
whenever (1)
    115:1
whereas (1)
    106:19
where's (3)
    184:8,8;284:18
Whereupon (6)
    68:14;135:9;
    204:25;205:4;258:12;
    301:21
whistleblower (3)
    101:18,20,21
white (2)
    99:19;186:21
whole (24)
    17:10,11;37:7;
    41:22;45:1;54:6;
    67:14;108:3;110:2;
    135:25;137:20;161:1;
    195:22;210:5;218:14;
    231:4;246:14,16;
    254:22;285:9;294:17,
    20;295:18;300:7
who's (7)
    61:4;76:5,8;126:4;
    133:16;198:14;251:8
whose (3)
    106:17;159:5;
    216:17
wife (1)
    61:7
Wiley (18)
    9:9;109:19;129:21;
    131:19;151:1;152:13;
    157:15;158:7;161:7,
    12;167:21,25;171:11,
    16;192:14;233:17;
    272:20;297:10
Wileys (4)
    119:18;131:17;
    138:25;262:5
Wileys' (1)
    295:7
Wiley's (1)
    172:11
willingness (1)
    295:8

Wilmette (2)
    2:,11
wish (2)
    171:1;252:20
withhold (1)
    91:1
within (9)
    26:4;34:10;35:5,8;
    53:2;72:16;75:15;
    136:3;239:19
without (10)
    54:14;107:14;
    136:11;231:13,13;
    236:24;242:10;244:5;
    254:1;297:15
witness (12)
    71:23;74:8,16,21;
    88:11;127:7;141:8;
    186:21;193:22;
    194:16;225:16;249:2
witnesses (22)
    21:15;33:16,17;
    83:15;84:3;113:17;
    135:24;136:1;137:6,
    8,15;138:6,10;141:5,
    18;149:9;153:5;
    168:18;221:20;
    234:10;271:4;277:8
woman (1)
    67:22
women (6)
    156:16;161:24;
    171:4;209:21,25;
    233:22
wondering (2)
    101:24;213:14
Woodhaven (1)
    30:13
word (13)
    78:11;81:18;112:1;
    114:14,15;136:6,12;
    171:14;172:18;
    190:18,19,21;198:1
words (3)
    77:13;215:12;249:3
work (51)
    10:7;12:22;24:20;
    29:2;35:16;37:21;
    46:15,18;48:7;66:17,
    18;75:22;78:24,25;
    85:12;86:2;92:15,19;
    95:12;128:17,23;
    142:19;147:18,19;
    162:6,16,21;163:6,9;
    166:13,14;169:20;
    202:16;203:25;
    204:14;214:5;215:4,
    22;216:17;223:15,23;
    236:18;249:16,22;
    251:2;262:23;263:10,
    16;266:2,13,23
worked (13)
    20:17;37:16;38:18;

48:20;92:14,17,19;
    93:4;125:12;127:12,
    25;202:23;289:5
working (8)
    16:7;19:16;33:12;
    54:12;88:15;147:11;
    202:18;264:15
works (6)
    32:5;36:22;93:1;
    95:7,13;129:9
world (10)
    69:10;71:16;82:25;
    113:3;114:16;180:2;
    202:19;250:13;267:3;
    281:15
worry (2)
    58:7;246:1
Wow (3)
    6:10;46:22;171:18
write (21)
    27:15;28:15;34:2;
    54:17;88:15,18,19;
    89:19;113:14;138:5;
    147:8,9,22;178:23;
    179:3;190:8;193:11;
    206:17,17;249:5,20
writes (1)
    89:5
writing (3)
    84:24;137:23;138:3
written (8)
    35:3;87:20;114:4;
    139:14;145:20;
    256:24;257:2;261:24
wrong (3)
    48:19;182:15;257:3
wrongful (5)
    200:12,21;201:7;
    279:18,18
wrongfully (1)
    134:2
wrote (26)
    14:24;50:9;60:23;
    77:12;91:19;92:22;
    94:1;119:10;136:11;
    137:10,19;147:10,21;
    171:2;178:3;181:4;
    182:6;207:21;245:17;
    249:8,8;262:3;
    292:13,13;295:6;
    296:18

                X

XI01660 (1)
    303:17
XO (2)
    25:15;38:20

                Y

year (10)
    14:5;15:13;24:4;

Maysonet v.
Guevara

Richard Rudolph

32:14;45:17;176:1,
23,24,24;265:16
**years (21)**
15:23;19:9;35:20,
25;49:11,25;57:22;
81:10;83:7,10;87:7;
109:3,25;121:9,12,22,
25;128:2;170:19;
278:16;286:14
**YLODs (2)**
191:13,18
**York (33)**
2:4,4;6:7;9:23;10:1,
19,25;11:8,12;12:12,
14;13:1;24:12;28:6;
29:6;32:1,7;34:12;
37:4;42:23;44:19;
74:25;75:15;85:11;
86:16;90:8,11;97:7;
107:15;225:1;281:18;
288:19,20
**young (1)**
11:23
**younger (1)**
37:22

### Z

**zero (1)**
188:1
**Zoom (1)**
7:9

### 0

**02342 (1)**
1:
**0800 (1)**
145:15

### 1

**1 (12)**
144:16;154:21;
171:22;205:6,13;
238:25;249:20;252:7;
254:11;269:4,8;
299:14
**10 (12)**
30:21;32:21;61:4,5,
7;73:6,7;93:10,10;
168:10;241:25;
292:20
**100 (2)**
129:21;225:12
**10022 (1)**
2:4
**104 (9)**
30:12,22,23;32:10,
19,20,25;37:9;38:4
**106 (3)**
92:17;99:11;102:25
**108 (1)**

14:19
**10-minute (1)**
68:8
**11 (5)**
54:21;79:4;168:11,
11,13
**11:05 (1)**
1:19
**113th (2)**
23:23;24:3
**114 (7)**
25:14,25;26:23;
31:17;32:14;38:20;
83:11
**115 (3)**
38:22;48:11,12
**1150 (1)**
2:
**115th (1)**
38:6
**116 (2)**
48:13;53:15
**118 (1)**
54:23
**119 (1)**
59:3
**12 (17)**
32:21;59:3;79:4;
82:3,4,8;171:22;
205:10;240:15,17,19,
25;241:2,25;243:3,9;
292:20
**121 (1)**
60:13
**124 (1)**
63:10
**1240A (2)**
2:;5:3
**128 (1)**
65:12
**12-hour (1)**
242:21
**13 (1)**
109:2
**130 (1)**
65:25
**135 (1)**
68:17
**137 (1)**
73:6
**14 (2)**
109:2;272:16
**141 (3)**
2:;4:;5:2
**145 (1)**
73:18
**146 (1)**
78:7
**1472 (1)**
174:9
**15 (1)**
119:11,24;166:21;
190:7,11;194:2;

197:7,10,14;200:7;
238:24;249:18;252:6;
254:11;260:1;262:24;
263:9;264:22;273:10;
274:25;299:7
**151 (1)**
3:4
**155 (1)**
19:18
**155th (1)**
19:18
**15th (2)**
195:6;263:18
**16 (2)**
21:2;107:17
**160 (1)**
4:
**1630 (3)**
146:3,4;150:19
**164 (1)**
19:18
**164th (1)**
19:18
**17 (5)**
18:6,20;23:16;
45:20;63:10
**1750 (1)**
44:22
**18 (4)**
1:;12:18,19;83:9
**186 (1)**
161:7
**1890 (2)**
113:2;285:20
**19 (2)**
175:21;215:16
**1950 (1)**
179:9
**1963 (1)**
86:14
**1990 (91)**
8:7;10:3;65:6;
83:24;84:18,22;
85:11,16,18;86:12;
112:20;113:1,2,9,20,
24;114:11,23,25;
115:18,22;119:11,24;
129:20;142:17;143:3,
24;144:17,19;146:3,
12,21;164:11,20;
165:11,24;166:2;
176:10;177:17,19,20;
178:1,22;179:1,19,20;
180:9,24;181:12;
190:24;192:14;194:2,
22;195:6;205:7,13;
206:4;210:25;211:24;
239:7,8,20;246:7;
250:14;260:16;
262:17,23;263:7,9,17,
19;265:2,14,16;
266:11;267:18;
268:14;269:3;271:10;

272:19,25;273:16;
281:14;282:4,6,7,13;
285:20;289:21,25;
290:23
**1991 (1)**
113:11
**1992 (2)**
142:16;143:3
**1993 (1)**
142:15
**1995 (1)**
142:16
**1997 (1)**
20:1
**1998 (1)**
20:1
**1st (3)**
239:7,7,19

### 2

**2 (2)**
29:21;91:11
**20 (5)**
21:2;32:17;93:8;
113:5;262:6
**2000 (2)**
25:8;215:15
**2002 (2)**
25:9,21
**2006 (5)**
25:21;29:21;30:8;
36:24;37:9
**2007 (3)**
36:25;37:9,25
**2008 (3)**
29:12,13,20
**2009 (4)**
11:16;14:10,11;
29:11
**2014 (1)**
44:25
**2017 (1)**
46:9
**2020 (3)**
44:25;46:12;191:1
**2023 (4)**
1:18;110:15;
178:18;179:9
**2090 (1)**
285:20
**21 (2)**
65:13;208:21
**212 (1)**
183:2
**214 (2)**
14:19;182:23
**22 (4)**
289:21,25;290:23;
299:17
**2200 (1)**
2:
**23 (9)**

10:5;65:25;175:21;
176:14;194:13;
205:16,18;253:3;
298:8
**23rd (6)**
175:25;176:3,10,
22;178:7;194:12
**24 (3)**
75:3,7,15
**2400 (2)**
154:17;159:18
**24th (2)**
144:4;177:20
**25 (18)**
146:17;150:19;
157:9,12;168:4;
170:19;173:9,10;
262:17,23;263:2,3,4;
264:21;271:20;
272:13;298:7,8
**250 (1)**
95:9
**2500 (1)**
3:
**25th (24)**
129:20;143:15,23;
144:5,17,19;145:9,16;
146:3,12,21;164:10,
19;165:11,24;166:2;
168:5;177:19;178:1;
192:13;263:7,17;
269:3;271:10
**26 (1)**
177:17
**27 (1)**
38:23
**28 (2)**
68:16,17
**29 (4)**
157:9,13;158:6;
292:8

### 3

**3 (12)**
78:22;79:3;91:14;
141:21;190:5;192:1,
6,11;195:8;272:25;
274:5,5
**30 (21)**
15:23;19:3;69:12;
70:9,12,13,17,18,19;
73:5;83:9;87:7;93:9;
121:8,11,22,25;128:1;
273:16;286:14;297:7
**30-day (1)**
70:9
**30th (1)**
272:19
**312.494.1000 (1)**
2:
**312.704.3127 (1)**
3:

**321 (1)**
   2:
**33 (1)**
   19:3
**332 (1)**
   161:13
**33rd (2)**
   16:14;19:4
**34 (1)**
   19:3
**35 (2)**
   116:24;119:9
**35-page (1)**
   210:20
**38 (1)**
   73:17
**39 (1)**
   78:6
**3rd (1)**
   260:8

---

**4**

**4 (6)**
   116:24;149:7;
   160:15;161:5;181:12;
   192:6
**40 (2)**
   212:19;213:19
**400 (1)**
   20:24
**45 (1)**
   258:14
**47 (1)**
   4:
**48 (2)**
   34:10;69:12
**4th (2)**
   180:24;260:9

---

**5**

**5 (6)**
   4:;161:12;245:12;
   263:9;265:2;268:14
**50 (1)**
   83:7
**500 (1)**
   97:11
**54 (2)**
   24:23;25:1
**55 (2)**
   146:18;152:25
**56 (3)**
   155:14,15;270:23
**59 (1)**
   145:12

---

**6**

**6 (3)**
   1:18;68:24;129:15
**6:50 (1)**

302:19
**60091 (1)**
   2:11
**60604 (2)**
   2:17;5:3
**60606 (1)**
   3:5
**60654 (1)**
   2:22
**61 (4)**
   43:4,4,4,7
**63 (3)**
   145:25;150:22,23
**630.735.3303 (1)**
   2:

---

**7**

**7 (5)**
   71:4;110:15;
   137:18;138:19,20
**718.875.1850 (1)**
   2:
**72 (5)**
   34:16;35:5,8,24;
   99:5
**75 (1)**
   44:17
**750 (1)**
   2:
**78 (1)**
   44:17

---

**8**

**8 (9)**
   48:10,23;137:19;
   180:22;190:17;
   191:12,16;269:2,9
**800 (3)**
   146:4,7,25
**847.251.4091 (1)**
   2:
**874 (2)**
   165:19;167:18
**89 (3)**
   176:3,6,8

---

**9**

**9 (10)**
   53:14;119:9;
   192:16;193:12;
   195:23;196:20,24;
   197:1,2;289:17
**90 (11)**
   84:21;113:13;
   173:9,10;175:21;
   176:3,4;276:12;
   277:2;278:14;288:13
**90s (1)**
   16:21
**91 (3)**

4:;12:5;176:3
**911 (4)**
   62:21,22;94:16;
   140:22
**97 (2)**
   19:11,13
**98 (3)**
   19:11,13;94:6
**99 (1)**
   19:11
**9-millimeter (10)**
   119:13,16;130:13;
   192:12,24;193:14;
   195:15,20;196:4,5